*original*

AP·76458

NO. AP-76,458

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

---

## GARY GREEN
### Appellant

VS.

## THE STATE OF TEXAS
### Appellee

FILED IN
COURT OF CRIMINAL APPEAL

AUG 22 2011

Louise Pearson, Clerk

---

APPEALING THE TRIAL COURT'S CAPITAL JUDGMENT
ASSESSING THE DEATH SENTENCE BASED ON JURY VERDICT
OF GUILTY AND ANSWERS TO SPECIAL ISSUES
IN CAUSE NUMBER F09-59380-S FROM THE 282ND JUDICIAL
DISTRICT COURT OF DALLAS COUNTY, TEXAS
THE HONORABLE ANDY CHATHAM, JUDGE PRESIDING

**ORIGINAL**

---

### BRIEF FOR APPELLANT

---

JOHN TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
ATTORNEY FOR APPELLANT ON APPEAL ONLY

ORAL ARGUMENT IS REQUESTED

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 22 2011

Louise Pearson, Clerk

NO. AP-76,458

IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS

---

# GARY GREEN
**Appellant**

VS.

# THE STATE OF TEXAS
**Appellee**

---

APPEALING THE TRIAL COURT'S CAPITAL JUDGMENT
ASSESSING THE DEATH SENTENCE BASED ON JURY VERDICT
OF GUILTY AND ANSWERS TO SPECIAL ISSUES
IN CAUSE NUMBER F09-59380-S  FROM THE 282ND JUDICIAL
DISTRICT COURT  OF DALLAS COUNTY, TEXAS
THE HONORABLE ANDY CHATHAM, JUDGE PRESIDING

---

BRIEF FOR APPELLANT

---

JOHN TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
ATTORNEY FOR APPELLANT ON APPEAL ONLY

ORAL ARGUMENT IS REQUESTED

## **IDENTITIES OF PARTIES AND COUNSEL**

HONORABLE ANDY CHATHAM          JUDGE PRESIDING
    133 N. Industrial Blvd          282ND JUDICIAL DISTRICT COURT
    Frank Crowely Courts Bldg.      OF DALLAS COUNTY, TEXAS
    Dallas, Texas 75207

GARY GREEN                      APPELLANT
    TDC#999561
    Polunsky Unit
    3872 FM 350 South
    Livingston, Texas 77351

HONORABLE PAUL JOHNSON          ATTORNEY FOR APPELLANT
    311 n. Market Street
    Suite 300
    Dallas, Texas 75202
    SBOT# 10778230

HONORABLE KOBBY T. WARREN       ATTORNEY FOR APPELLANT
    3811Turtle Creek Blvd.
    Suite 600
    Dallas, Texas 75219
    SBOT# 24028113

HONORABLE BRADY R.WYATT         ATTORNEY FOR APPELLANT
    3300 Oak Lawn Ave.,
    Suite 300
    Dallas, Texas 75219
    SBOT# 24008318

HONORABLE JOHN TATUM            ATTORNEY FOR APPELLANT
    990 S. Sherman St.
    Richardson, Texas 75081
    SBOT#19672500

HONORABLE CRAIG WATKINS         DISTRICT ATTORNEY
    133 N. Industrial Blvd          DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

HONORABLE ANDREW BEACH
    133 N. Industrial Blvd
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 01944900

ASSISTANT DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

HONORABLE JOSH HEALY
    133 N. Industrial
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24026288

ASSISTANT DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

HONORABLE JENNIFER BENNETT
    133 N. Industrial
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24000091

ASSISTANT DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

# TABLE OF CONTENTS

PAGE

IDENTITIES OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-vi

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi-xii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxiv

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv-xxii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-22

    A.    Trial on the Merits
          The State on Guilt/Innocence

            1) Testimony of Margarita Brooks . . . . . . . . . . . . . . . . . . . . . . . . . 1
            2) Testimony of Latasha Bradfield . . . . . . . . . . . . . . . . . . . . . . . . . 1
            3) Testimony of James Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2
            4) Testimony of Dr. Joseph Martinez . . . . . . . . . . . . . . . . . . . . . . . 2
            5) Testimony of Jerome Armstead . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4
            6) Testimony of Jerrett Armstead . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            7) Testimony of Jason Gindratt . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5
            8) Testimony of Troy Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            9) Testimony of Shirley Coleman . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
            10) Testimony of Kevin Kirchdorfer . . . . . . . . . . . . . . . . . . . . . . . 6
            11) Testimony of Robert Quirk . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            12) Testimony of Bruce Chamberlain . . . . . . . . . . . . . . . . . . . . . . 7
            13) Testimony of Angela Fitzwater . . . . . . . . . . . . . . . . . . . . . . . . 7-8
            14) Testimony of Jill Urban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            15) Testimony of Meredith Lann . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            16) Testimony of Ray Montgomery, Jr. . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Trial on the Merits
          The Defense did not present any evidence on Guilt/Innocence

    C.    The State on Punishment
            17) Testimony of Ray Cunningham . . . . . . . . . . . . . . . . . . . . . . . . . 9
            18) Testimony of Jennifer Wheeler . . . . . . . . . . . . . . . . . . . . . . . . . 9
            19) Testimony of Tony Hayes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10
            20) Testimony of D.A. Watts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            21) Testimony of Charles Moss . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            22) Testimony of Joseph Johnson, Jr. . . . . . . . . . . . . . . . . . . . . . . . 10
            23) Testimony of Belinda Lacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

24) Testimony of Shulonda Ransom . . . . . . . . . . . . . . . . . . . . . . . . .    11
25) Testimony of Kevin Ashford . . . . . . . . . . . . . . . . . . . . . . . . . .    11-12
26) Testimony of Melodye Nelson  . . . . . . . . . . . . . . . . . . . . . . . .    12-13
27) Testimony of Ruth Lyons  . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13
28) Testimony of Ray Montgomery  . . . . . . . . . . . . . . . . . . . . . . . .    13
29) Testimony of Jerrett Armstead . . . . . . . . . . . . . . . . . . . . . . . . .    13
30) Testimony of Jerome Armstead . . . . . . . . . . . . . . . . . . . . . . . .    13
31) Testimony of Margarita Brooks  . . . . . . . . . . . . . . . . . . . . . . . .    13

D.    The Defense on Punishment
32) Testimony of Shirley Coleman  . . . . . . . . . . . . . . . . . . . . . . . .    13-14
33) Testimony of Lanelle Williams . . . . . . . . . . . . . . . . . . . . . . . . .    14-15
34) Testimony of Mary Sampson  . . . . . . . . . . . . . . . . . . . . . . . . . .    15-17
35) Testimony of Bertha Curry  . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
36) Testimony of Dr. Kellie Gray-Smith . . . . . . . . . . . . . . . . . . . . . .    17-18
37) Testimony of Dr. Gilbert Martinez . . . . . . . . . . . . . . . . . . . . . .    18-21
38) Testimony of Nysasno Carter  . . . . . . . . . . . . . . . . . . . . . . . . . .    22


SUMMARY OF ISSUES     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22-23


ISSUES ON VOIR DIRE

ISSUE NO. 1     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24-32
ISSUE NO. 2     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32-37
ISSUE NO. 3     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37-41
ISSUE NO. 4     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41-42
ISSUE NO. 5     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43-45
ISSUE NO. 6     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45-48
ISSUE NO. 7     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48-50
ISSUE NO. 8     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51-53
ISSUE NO. 9     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    53-57
ISSUE NO. 10    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58-60
ISSUE NO. 11    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60-62
ISSUE NO. 12    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    62-64
ISSUE NO. 13    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    64-66
ISSUE NO. 14    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    67-68
ISSUE NO. 15    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    68-71
ARGUMENT ON ISSUES NOS. 1-15 . . . . . . . . . . . . . . . . . . . . . . . . . .    71-72
ISSUE NO. 16    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    73-74
ISSUE NO. 17    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    74-75


TRIAL GUILT/INNOCENCE ISSUES
ISSUE NO. 18    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    75-83
ISSUE NO. 19    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    83-92
ISSUE NO. 20    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    83-92
ISSUE NO. 21    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    83-92

ISSUE NO. 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83-92
ISSUE NO. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83-92
ISSUE NO. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83-92
ISSUE NO. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82-83

**TRIAL PUNISHMENT ISSUES**
ISSUE NO. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92-94
ISSUE NO. 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-98
ISSUE NO. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-102
ISSUE NO. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102-109
ISSUE NO. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109-110

**FEDERAL ISSUES**
ISSUE NO. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110-111
ISSUE NO. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111-112
ISSUE NO. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112-113
ISSUE NO. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113-114
ISSUE NO. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-115
ISSUE NO. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115-116
ISSUE NO. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
ISSUE NO. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118-119
ISSUE NO. 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118-119
ISSUE NO. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
ISSUE NO. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119-120
ISSUE NO. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
ISSUE NO. 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
ISSUE NO. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122-123
ISSUE NO. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123-124
ISSUE NO. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

## INDEX OF AUTHORITIES

FEDERAL CASES

***Apprendi v. New Jersey***
530 U.S. 466 (2000), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112,114,115

***Blystone v. Pennsylvania***
494 U.S. 299 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

***Boyde v. California***
494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) . . . . . . . . . . . . . . . . . 116, 119

***Bush v. Gore***
531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

***Butler***
441 U.S. at 375-76, 99 S.Ct.1755. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

***Callins v. Collins***
510 U.S. 114 S.Ct. at 1129-30, 127 L.Ed.2d at 437-39 . . . . . . . . . . . . . . . . . . . . . . . . . . 111,118

***Eddings v. Oklahoma***
455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 31,118

***Fare v. Michael C.***
442 U.S.. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 83

***F. Johnson v. Texas***
113 S.Ct. 2568 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

***Furman v. Georgia***
408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120,123

***Gilmore v. Taylor***
508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 123

***Godfrey v. Georgia***
466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

***Gregg v. Georgia***
428 U.S. 153, 189 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111,120,121

***In Re Windship***
397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

***Jackson v. Virginia***
443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . . . . . . . . . . 94,95

***Johnson v.Texas***
509 U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

***Jones v. United States***
526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

***Jurek v. Texas***
428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

***Lewis v. Jeffers***
497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

***Lisenba v. California***
314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166(1941) . . . . . . . . . . . . . . . . . . . . . . . . . . 124

***Lockett v. Ohio***
438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 32,118

***Lowenfield v. Phelps***
484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

***Mills v. Maryland***
486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) . . . . . . . . . . . . . . . . . 115, 116

***Miranda v. Arizona***
384 U.S. 439 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82,83

***Morgan v. Illinois***
504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

***Payne v. Tennessee***
501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

***Penry v. Johnson***
121 S.Ct. 1910 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

***Penry v. Lynaugh***
492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97,119

vii

*Ring v. Arizona*
536 U.S.,122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Ross v. Oklahoma*
4897 U.S. 81 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sawyer v. Whitley*
112 S. Ct. 2514, 2522-23 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Spaziano v. Florida*
468 U.S. 447-64 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120,121

*Tenard v. Dretke*
542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wainwright v. Witt*
469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Walton v. Arizona*
497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 117,119

*Woodson v. North Carolina*
428 U.S. 280, 305 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31,123

STATE CASES

*Anderson v. State*
633 S.W.2d 851, 854 (Tex. Crim.App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Apolinar*
106 S.W. 3d at 414-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Ardovina v. State*
143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Beltran v. State*
728 S.W.2d 382,388(Tex.Cr.App.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99,100,102

*Benz v. State*
233 S.W.3d 847 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Borgen v. State*
682 S.W.2d 620, 623 (Tex. App. - Houston [1st. Dist.] 1984, no pet.). . . . . . . . . . . . . . . . . . . . . 91

**_Brasfield v. State_**
600 S.W.2d 288 (Tex. Cr. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99,100

**_Brooks v. State_**
599 S.W.2d 312 (Tex. Cr. App. 1979), cert. den. 453 U.S. 913, 101 S.Ct. 3146,
69 L.Ed.2d 996 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

**_Butler v. State_**
769 S.W.2d 234, 239 (Tex. Crim.App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**_Carter v. State_**
717 S.W.2d 60 (Tex. Cri. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

**_Cheny v. State_**
507 S.W.2d 549 (Tex. Crim. App. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**_Clark v. State_**
717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . 30

**_Coble v. State_**
330 S.W. 3d 353 (Tex.Crim.App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

**_Coe v. State_**
683 S.W.2d 431, 438 (Tex.Crim.App.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**_Corbarrubio v. State_**
675 S.W.2d 749 (Tex. Cr. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**_Cordova v. State_**
733 S.W.2d 175, 182 (Tex. Cr. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**_Covarrubias v. Tex. Dep't of Criminal Justice-Inst. Div._**
52 S.W.3d 318, 324 (Tex.App.-Corpus Christi 2001, no pet.) . . . . . . . . . . . . . . . . . . 109

**_Cruz v. State_**
6291 (Tex. Ct. App. Corpus Christi, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

**_Cuevas v. State_**
575 S.W.2d 543 (Tex. Cr. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-32

**_Cumbo v. State_**
760 S.W.2d 251 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Demouchette v. State*
731 S.W.2d 75, 83 (Tex. Crim. App. 1986), cert denied, 482 U.S. 920 (1987) . . . . . . . . . . . . . 72

*Elliot v. State*
858 S.W.2d 478, 487-488 (Tex. Cr. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Faulder v. State*
745 S.W.2d 327 (Tex. Cr. App.. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fierro*
706 S.W.2d 310,319 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99,102

*Garcia v. State*
626 S.W.2d 46 (Tex. Cr. App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Harris v. State*
790 S.W.2d 568, 581 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Hernandez v. State*
757 S.W.2d 744 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Holberg v. State*
 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Hooper v. State*
100 Tex. Cr. R. 147, 272 S.W.493, 495 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Houston v. State*
663 S.W.2d 455, 456 (Tex. Crim.App.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Hovila v. State*
562 S.W.2d 243 (Tex. Cr. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*James v. State*
47 S.W. 3d 710, 714 (Tex. App.- Texarkana 2001, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . 107

*Janecka v. State*
739 S.W.2d 813, 832 (Tex. Cr. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Johnson v. State*
673 S.W.2d 190, 197 (Tex. Crim. App.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Jones v. State*
982 S.W.2d 386 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73,74

x

***Joseph v. State***
309 S.W.3d 20 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

***Jurek v. State***
522 S.W.2d 934 (Tex. Cr. App. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

***Landry v. State***
706 S.W.2d 105, 111 (Tex. Crim. App. 1985), *cert denied*, - U.S. - ,
107 S.Ct. 242, 93 L.ed.2d 167 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

***Lawrence v. State***
700 S.W.2d 208 (Tex. Cr. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

***Logan v. State***
698 S. W. 2d 680, 682 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

***Mays v. State***
726 S.W.2d 937, 950 (Tex. Cr. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

***Mays v. State***
318 S.W.3d 368 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

***McClure v. State***
544 S.W.2d 390 (Tex. Crim. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

***McFarlane v. State***
254 S.W.2d 136 (Tex. Cr. App. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

***McFarland v. State***
989 S.W.2d 749, 751 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

***McGinn v. State***
961 S.W.2d 161,168 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

***Mitchell v. State***
650 S.W.2d 801 (Tex. Cr. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***Nance v. State***
946 S.W.2d. 490, 493 (Tex. App. -Fort Worth 1997, pet. ref'd). . . . . . . . . . . . . . . . . . 108

***O'Bryan v. State***
591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Perkins v. State*
32 Tex. 109, 112(1869) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Reese v. State*
877 S.W.2d 328, 333 (Tex. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*Reeves v. State*
806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, –U.S.–, 111 S.Ct. 641,
113 L.Ed.2d 736 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Robinson v. State*
548 S.W.2d 63, 64 (Tex. Cr. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Roethel*
80 S.W.3d at 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Roney v. State*
632 S.W.2d 598,603 (Tex. Cr. App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-100

*Santana v. State*
714S.W.2d 1, 8 (Tex. Cr. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99,102

*Santellan v. State*
939 S.W.2d 155 (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Shaver v. State*
280 S.W.2d 740, 742 (Tex. Crim.App. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Smith v. State*
573 S.W.2d 763 (Tex. Cr. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-32

*State v. Williams*
392 So.2d 619, 631 (La.1980) (on rehearing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Stone v. State*
751 S.W.2d 579 (Tex. Ct. App.- Houston [1ˢᵗ Dist.] 1988) . . . . . . . . . . . . . . . . . . . . . . . . 92

*Wallace v. State*
618 S.W.2d 67 (Tex. Cr. App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Warren v. State*
562 S.W.2d 474 (Tex. Cr. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

***Washington v. State***
16 S.W.3d 70, 73 (Tex. App.-Houston [1st Dist] 2000, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . 91

***Williams v. State***
565 S.W.2d 63, 65 (Tex. Cr. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

***Williams v. State***
692 S.W.2d 671, 676 (Tex.Crim.App.1984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

***Wilson v. State***
938 S.W.2d 57, 59 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

STATE STATUTES

Tex. Code Crim. Proc. 38.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Tex. Code Crim. P. Ann. Art. 35.16(c)(2)
(Vernon Supp. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 29,37,42,45,48,50,53,57,60,62,64,66,68,74

Tex. Code Crim. P. Ann. Art. 35.16(a)(9)
(Vernon Supp. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 29,37,42,45,48,50,53,57,60,62,64,66,68,74

Tex. Code Crim. Proc. Ann. Art. 37.07, § 3(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107,108

Tex. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107,108

TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999). 99,117

TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(b)(2) (Vernon Supp. 1999) . . . . . . . . . . . 102

TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(1) (Vernon Supp. 1999) . . . . . . . . 111,112

TEX.CODE.CRIM. PROC. art. 37.071 Sec. E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

TEX.CODE CRIM. PROC. ANN. Art 38.03 (Vernon Supp. 1991) . . . . . . . . . . . . . . . . . . . . 95

Tex. Code Crim. Proc. Ann. art. 42.12 §§ 2(f)(2), 2(g) (Vernon Supp. 2001) . . . . . . . . . . . 113

## STATEMENT OF THE CASE

By an indictment filed on the  day of October 30, 2009, Appellant was charged in trial court cause number F09-59380-S with one count of capital murder. (C.R. Vol. 1 p. 7) The indictment alleged that Appellant intentionally or knowingly caused the death of Lovetta Armstead  by stabbing the deceased with a knife and intentionally and knowingly caused the death of Jazzmen Montgomery by asphyxia by drowning.  On November 5, 2010 Appellant was convicted of the offense of capital murder. (CR: Vol.1 p.153 ) The jury answered special issues such that a death sentence was imposed on November 9, 2010. (Clerk's Record Vol.1  p. 160)

The testimony in the trial on the merits began on October 27, 2010.  The jury answered "Yes" to Special Issue No. 1 and 2 and "No" to Special Issue No. 3. (RR: Vol. 53 p. 79-80)  In accordance with the previous verdict of guilty and answers to the special issues, the trial court entered a judgment and assessed Appellant's punishment at death. (RR: Vol. 53 p. 81)

On December 3, 2010, Appellant timely filed a Motion for New Trial that was subsequently denied by the court.  Notice of appeal was filed even though appeal to this Court is automatic. *See* Tex. Code Crim.Proc.Ann. art. 37.071,§ 2(g)(Vernon Supp. 2001)

## ISSUES PRESENTED

## VOIR DIRE ISSUES

### APPELLANT'S ISSUES NO. 1

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON BILLY CHANCELLOR

### APPELLANT'S ISSUES NO. 2

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON SHEILA YRIGOLLEN

### APPELLANT'S ISSUE NO. 3

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON NORMA WILEY

### APPELLANT'S ISSUES NO. 4

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON ELIZABETH LOPEZ

### APPELLANT'S ISSUES NO. 5

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON CATHEY YOUNG

### APPELLANT'S ISSUES NO. 6

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON ANETA JOHNSON

### APPELLANT'S ISSUES NO. 7

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON TERRY CRAWFORD

### APPELLANT'S ISSUE NO. 8

THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON BARBARA GARRETT

**APPELLANT'S ISSUE NO. 9**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON THOMAS FRAZIER**

**APPELLANT'S ISSUE NO. 10**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON SREENIVASAREDDY THALLAPAREDDY**

**APPELLANT'S ISSUE NO. 11**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON WILLIAM OGLE**

**APPELLANT'S ISSUE NO. 12**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CHARLA MOE**

**APPELLANT'S ISSUE NO. 13**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JACKIE BREWER**

**APPELLANT'S ISSUE NO. 14**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON LISA HENSLEY**

**APPELLANT'S ISSUE NO. 15**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DEBRA STORY**

**APPELLANT'S ISSUE NO. 16**

**THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICE WHICH DEPRIVED APPELLANT OF A FAIR TRIAL**

**APPELLANT'S ISSUE NO. 17**

       **THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICE
WHICH DEPRIVED APPELLANT OF A FAIR TRIAL**

**TRIAL ISSUES**

**APPELLANT'S ISSUE NO. 18**

       **THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S
OBJECTION TO THE INTRODUCTION INTO EVIDENCE OF A
WRITTEN STATEMENT OF THE DEFENDANT**

**APPELLANT'S ISSUE NO. 19**

       **THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION
TO THE STATE ARGUING OUTSIDE THE RECORD IN THE
GUILT/INNOCENCE STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 20**

       **THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION
FOR MISTRIAL WHEN THE PROSECUTOR ARGUED IMPROPERLY IN THE
GUILT/INNOCENCE STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 21**

       **THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S
OBJECTION TO THE STATE'S CLOSING ARGUMENT IN THE
GUILT/INNOCENCE STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 22**

       **THE TRIAL COURT ERRED IN
DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE
PROSECUTOR IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE
OF THE TRIAL**

<u>APPELLANT'S ISSUE NO. 23</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE OF THE TRIAL**

<u>APPELLANT'S ISSUE NO. 24</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE OF THE TRIAL**

<u>APPELLANT'S ISSUE NO. 25</u>

**THE EXECUTION OF A SEVERELY MENTALLY ILL PERSON, SUCH AS APPELLANT IS PROHIBITED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S BAN ON CRUEL AND UNUSUAL PUNISHMENT AND VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

<u>APPELLANT'S ISSUE NO. 26</u>

**THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE CONVICTION FOR CAPITAL MURDER**

<u>APPELLANT'S ISSUE NO. 27</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE STATE QUESTIONED THE WITNESS ABOUT EXTRANEOUS BAD ACTS THAT WERE COMMITTED BY OTHERS AND WHICH WERE PREJUDICIAL TO THE DEFENDANT**

<u>APPELLANT'S ISSUE NO. 28</u>

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 2 IN THE PUNISHMENT STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 29**

> THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE EVIDENCE OF EXTRANEOUS OFFENSE PRESENTED BY THE STATE DUE TO THE STATE'S UNTIMELY AND UNREASONABLE NOTICE OF IT'S INTENT TO USE EVIDENCE OF AN EXTRANEOUS OFFENSE IN PUNISHMENT

**APPELLANT'S ISSUE NO. 30**

> THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE EVIDENCE OF THE CONTENTS OF LETTERS, STATE'S EXHIBITS NOS. 148A AND 148B

## FEDERAL ISSUES

**APPELLANT'S ISSUE  NO. 31**

> THE STATUE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY

**APPELLANT'S ISSUE NO. 32**

> THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AMENDMENT AS INTERPRETED IN *PENRY V. JOHNSON* BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE INTOLERABLE AND  UNRELIABLE

## APPELLANT'S ISSUE NO. 33

THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE BEYOND A REASONABLE DOUBT STANDARD

## APPELLANT'S ISSUE NO. 34

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE 37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A VIOLATION OF ARTICLE ONE Sec. 10 AND Sec. 13 OF THE TEXAS CONSTITUTION

## APPELLANT'S ISSUE NO. 35

THE TEXAS  DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY

## APPELLANT'S ISSUE NO. 36

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES

**APPELLANT'S ISSUE NO. 37**

> THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S
> RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL
> JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND
> FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION
> BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS
> AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY
> DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE
> IMPOSITION OF THE DEATH PENALTY

**APPELLANT'S ISSUE NO. 38**

> THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE
> PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT
> IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH
> AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF
> THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S
> DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO
> ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL
> EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH
> PENALTY.

**APPELLANT'S ISSUE NO. 39**

> THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE
> COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN
> VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION
> BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING
> THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE
> ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER
> ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH
> PENALTY

**APPELLANT'S ISSUE NO. 40**

> THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO
> HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID
> STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE
> CONSIDERED BY THE JURY

**APPELLANT'S ISSUE NO. 41**

THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE

**APPELLANT'S ISSUE NO. 42**

THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA

**APPELLANT'S ISSUE NO. 43**

TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW

**APPELLANT'S ISSUE NO. 44**

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT AS BEING UNCONSTITUTIONAL BASED ON THE ENUMERATED CONSTITUTIONAL DEFECTS OF THE TEXAS CAPITAL MURDER DEATH PENALTY LAW

**APPELLANT'S ISSUE NO. 45**

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

**APPELLANT'S ISSUE NO. 46**

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE I, § 19, OF THE TEXAS CONSTITUTION.

## STATEMENT OF FACTS

*This case involves the stabbing death of Appellant's wife Lovetta Armstead and the strangulation, drowning death of her 5 year old daughter, Jazzmen Montgomery.*

### TRIAL ON THE MERITS

#### State's Evidence on guilt/innocence

*1)Testimony of Margarita Brooks :* Margarita Brooks, the mother of Lovetta Armstead, testified her daughter was born in 1977 and graduated from DeSoto High School and received a college degree from Texas College in Tyler, Texas. (RR: Vol. 46 p. 37-39) She said Lovetta had taught at the Gateway Charter School and Friendship West Baptist Church, where she worked part time in day care. (RR: Vol. 46 p. 39) She said her daughter had three children, J.T., Jerrett and Jazzmen. (RR: Vol. 46 p. 40)

The witness testified that her daughter met Gary Green in 2007 and he moved in with her daughter and grandchildren. (RR: Vol. 46 p. 40) She said their relationship was very tumultuous because Gary didn't work, which was the source of contention. (RR: Vol. 46 p. 41) She said they were married in June, 2009, about three months before the murders. (RR: Vol. 46 p. 41) She said when they were married, Gary was employed but quit his job three weeks later. (RR: Vol. 46 p. 41-42) In the days before the murder, Lovetta told her that she was going to have her marriage annulled. (RR: Vol. 46 p. 43) She last saw her daughter when she took Lovetta to see a house to lease. (RR: Vol. 46 p. 44)

She identified State's Exhibits Nos 5 and 6 as handwritten notes from Lovetta and State's Exhibit No. 7, a handwritten letter from Gary Green. (RR: Vol. 46 p. 48) The notes were read to the jury. (RR: Vol. 46 p. 50-58)

*2) Testimony of Latasha Bradfield:* Latasha Bradfield, a neighbor of Lovetta Armstead and Gary Green, testified that on September 21, 2009 when she returned home, she saw Gary Green outside next to their car which had the trunk open. (RR: Vol. 46 p.64) She went inside her house and about 40 minutes later she heard knocking on her door. (RR: Vol. 46 p. 64) She said J.T. and Jerrett were screaming that Gary killed their mother and sister. (RR: Vol. 46 p. 64) Jerrett was holding his stomach and told her that Gary had stabbed him. (RR: Vol. 46 p. 65) She said Jarrett was holding a phone so she took it from him and spoke with the 911 operator. (RR: Vol. 46 p.66) She told the operator that she was going to go see what they boys were talking about. (RR: Vol. 46 p. 67) She went into the house, saw Lovetta in the bedroom and told the 911 operator. (RR: Vol. 46 p. 70-71) The 911 tapes were played for the jury. (RR: Vol. 46 p. 71)

*3)Testimony of James Jones:* James Jones, a Dallas Police Officer, testified that he answered a call on September 21, 2009 at 3844 Morning Springs in south Dallas. (RR: Vol. 46 p. 80) The fire

1

department was present when he arrived and told him there were two deceased victims inside.  (RR: Vol. 46 p. 81)  He said he and Officer Alder entered the house and he went to the master bedroom and found the complainant lying in front of the bathroom door and a young child in the bathroom.  (RR: Vol. 46 p. 82)  He said the bathroom was covered in blood.  (RR: Vol. 46 p. 84)  He said they checked the doors and windows but didn't see any signs of forced entry.  (RR: Vol. 46 p. 84)  Using photographs, the witness described the scene.  (RR: Vol. 46 p. 84-88)  He notified crime scene personnel and he and Officer Adler secured the crime scene.  (RR: Vol. 46 p. 87-88)

*4)Testimony of Dr. Joseph Martinez:* Dr. Martinez testified he was on the faculty at UT Southwestern Medical School and taught emergency medicine at Parkland Hospital.  (RR: Vol. 46 p. 90) He identified the medical records of Gary Green who was admitted at 2:56 a.m. and released at 7:04 a.m. on September 22, 2009.  (RR: Vol. 46 p. 91) Photographs of Mr. Green were shown to the jury and the doctor stated that Mr. Green had stab wounds on the upper left back.  (RR: Vol. 46 p. 92) He said Mr. Green also had a number of cuts on his right hand.  (RR: Vol. 46 p. 92-93) He recalled that they were concerned about an overdose of Tylenol and Benadryl. (RR: Vol. 46 p.93-94) He said they waited until Mr. Green's lab results were within a normal range before releasing him. (RR: Vol. 46 p. 94) He said Mr. Green was very calm, cooperative and didn't talk very much.  (RR: Vol. 46 p. 95-96)

On cross examination the doctor did not recall if Mr.Green had undergone a psychiatric evaluation at the hospital. (RR: Vol. 46 p. 97) He thought that Mr. Green might have been evaluated in the jail. (RR: Vol. 46 p. 97)

*5) Testimony of Jerome Armstead:* Jerome Armstead, known to his family as J.T., testified that he was thirteen years old and was 12 years old when the offense occurred. (RR: Vol. 46 p. 99) He said he was in the 7th grade and his mother was a substitute teacher at his school.  (RR: Vol. 46 p. 101) He identified Gary Green as his stepfather.  (RR: Vol. 46 p. 102) He said on September 21, 2009 his brother, Jarrett was home from school with Gary that day because he had misbehaved at school.  (RR: Vol. 46 p. 103) He rode the bus home from school and later that evening his mother dropped him and his brother off at Friendship West, their church, for a program.  (RR: Vol. 46 p. 108)  He said his mother usually picked them up at 8:30 p.m., but on this Monday, Gary picked them up.  (RR: Vol. 46 p. 108)

J.T. testified that Gary was dressed all in black and they were surprised to see him because he never picked them up before.  (RR: Vol. 46 p. 110) He said Gary told them that their mother was out clubbing with her friend Shante and their sister was at his granny's house.  (RR: Vol. 46 p. 110) He said Gary was smiling and asking them about their program at church.  (RR: Vol. 46 p. 111) He said Gary told him to take a shower because his mother told him he was smelly. (RR: Vol. 46 p. 112) He said he went

2

to take a bath, while Jerrett was in their bedroom. (RR: Vol. 46 p. 112) He said he heard his brother screaming, calling him for help because Gary was trying to kill him. (RR: Vol. 46 p. 114) He said he took his clothes and ran out of the bathroom. (RR: Vol. 46 p. 114) He said he stopped at the door and saw Gary holding Jerrett by his collar and was bringing J.T. into the bathroom. (RR: Vol. 46 p. 114) He said Gary threw Jerrett against the toilet so he jumped back into the bathtub. (RR: Vol. 46 p. 114) He said Gary then sat on the counter and locked the bathroom door. (RR: Vol. 46 p. 114) He said Gary was asking them why he shouldn't kill them. (RR: Vol. 46 p. 115) He said his brother started talking and Gary stabbed him in the stomach. (RR: Vol. 46 p. 116) He said Gary had three knives that he set on the counter. (RR: Vol. 46 p. 116)

The witness testified that after his brother was stabbed, he pushed Gary off of his brother and Gary tried to stab him but missed. (RR: Vol. 46 p. 117) He said his brother was telling Gary that they were too young to die. (RR: Vol. 46 p. 117) He said Jarrett began blurting out reasons Gary shouldn't kill them. (RR: Vol. 46 p. 118) He said Gary then told them that he wasn't going to kill them. (RR: Vol. 46 p. 118) He said Gary told them that he had something to show them and told him to put on his clothes. (RR: Vol. 46 p. 118) He said after he was dressed, Gary took a knife, put it up to Jerrett's neck and started to try to "screw it in." (RR: Vol. 46 p. 119) He said his brother ducked down and Gary sat down on the toilet. (RR: Vol. 46 p. 119) He said Gary then told them to come with him and they walked out of the bathroom and into his mother's room. (RR: Vol. 46 p. 119)

He said when they got into the bedroom, they saw their mother's body and fell on their knees and started crying. (RR: Vol. 46 p. 120) He said Gary told his brother to grab him some clothes and began taking off his clothing. (RR: Vol. 46 p. 121) He said his brother got him some clothes. (RR: Vol. 46 p. 121) He said they looked into the bathroom and saw their sister who appeared to be dead. (RR: Vol. 46 p. 122) Gary asked him to hand him the pills that were on the dresser in the bathroom. (RR: Vol. 46 p. 123) After giving Gary the pills, he threw his mother's cell phone on the bed and told them that after he leaves, call the police. (RR: Vol. 46 p.124) He said they followed him to the door and Gary told them "You know how I told y'all to say, see you later, never bye? (RR: Vol. 46 p. 126) He said Gary then paused and said "Well this is good-bye." (RR: Vol. 46 p. 127) He said Gary told them that he loved his mother to death. (RR: Vol. 46 p. 127) He said Gary made them give him a hug. (RR: Vol. 46 p. 127) He then called 911 and ran over to their neighbor's house. (RR: Vol. 46 p. 128) He said their neighbor, Ms.Tasha, thought they were playing until she began talking to the police. (RR: Vol. 46 p. 128) He said the paramedics arrived and took them away in an ambulance. (RR: Vol. 46 p. 128)

3

On cross examination the witness testified that Gary told them that he was going to kill himself. (RR: Vol.46 p. 130)

*6) Testimony of Jerrett Armstead:*   Jerrett Armstead, the ten year old son of Lovetta Armstead, testified that his mother and Gary were married in their house. (RR: Vol. 46 p. 134) On the day of the offense, he had to stay home from school and Gary was in the house that day.  (RR: Vol. 46 p. 134) He said Gary liked to play video games. (RR: Vol. 46 p. 135) He said it was a normal day at home and his mother took him and his brother that evening to church. (RR: Vol. 46 p.137) He said Gary picked them up, which was unusual, and took them home.  (RR: Vol. 46 p. 138) When they got home, Gary told J.T. to take a bath. (RR: Vol. 46 p. 139) He went to his bedroom and put on his sleeping clothes and then followed Gary to the kitchen. (RR: Vol. 46 p.139-140) He said he and Gary talked about school and he explained to him how he had gotten into trouble at school. (RR: Vol. 46 p. 140) He said Gary grabbed him and he couldn't breathe and then stabbed at him close to his side. (RR: Vol. 46 p. 140) He said when they went to the bathroom, Gary tried to slice his neck with the knife. (RR: Vol. 46 p. 141) He said dull side of the knife was next to his skin. (RR: Vol. 46 p. 141) He said he yelled for J.T. and yelled that Gary was trying to kill him. (RR: Vol.46 p. 141) He said Gary pushed him into the bathroom and he almost hit the toilet. (RR: Vol. 46 p.142) He said Gary tried to slice his neck again and asked them why he shouldn't kill them. (RR: Vol. 46 p. 142) He said he began to talk to Gary while his brother stood in the shower and couldn't talk. (RR: Vol. 46 p.142-143) He told Gary that they were too little to die and they wouldn't tell anyone what happened. (RR: Vol. 46 p. 143) He said Gary tried to cut him again but it "didn't work." (RR: Vol. 46 p. 143) He said they went to their mother's bedroom where they saw the bodies of their mother and sister. (RR: Vol. 46 p. 144) He said Gary changed clothes.  (RR: Vol. 46 p. 145) He said Gary told them that he killed their mother because she wanted to divorce him and he loved her to death.  (RR: Vol. 46 p. 145) Gary told them that it was good-bye and he said something about killing himself before he drove away in his mother's car. (RR: Vol. 46 p. 146) He said his stomach hurt and it was bleeding harder. (RR: Vol. 46 p.146) They ran next door and told their neighbor what had happened. (RR: Vol. 46 p. 146) The witness showed the jury the scar from the stab wound. (RR: Vol. 46 p. 147)

*7) Testimony of Jason Gindratt:* Jason Gindratt, a detective with the Dallas Police Department in the Crime Scene Section, testified that he and Detective Will Vick were called to the house at 9:40 p.m.. (RR: Vol. 46 p. 149) They waited for a search warrant and after 1:00 a.m. they went inside the house, did a walk through and began collecting evidence. (RR: Vol. 46 p. 150-151) Using the photographs he took at the scene, the witness described the house. (RR: Vol. 46 p. 151-) He said there

were four knives missing from a knife block on the kitchen counter. (RR: Vol. 46 p. 153) He said they found a knife under the microwave, on the kitchen counter and under a cushion on the couch. (RR: Vol. 46 p. 154-155) He said that in the middle of the bed in the master bedroom, they found handwritten letters. (RR: Vol. 46 p. 157) He said that a person sitting on the bed could see into the bathroom. (RR: Vol. 46 p. 158)

The witness testified that the bathroom was very bloody and determined that the main offense occurred there. (RR: Vol. 46 p. 158) He said the young girl was laying on the floor and had wet clothing. (RR: Vol. 46 p. 159) He said the commode lid was broken off and there was a pool of dried blood. (RR: Vol. 46 p. 159) He said there was an orange man's t-shirt with holes in it on the sink counter in the bathroom. (RR: Vol. 46 p. 160) He said there was a knife blade under the bath mat. (RR: Vol. 46 p. 160) He said Ms. Armstead's body had been moved from her original position and was laying parallel to the bed and exercise machine. (RR: Vol. 46 p. 161) He said the girl had a foamy substance coming out of her nose and mouth. (RR: Vol. 46 p. 162) He found a broken off knife in the boys' bathroom. (RR: Vol. 46 p. 162)

*8)Testimony of Troy Smith:* Troy Smith, an Officer with the Dallas Police Department, testified that on September 22, 2009 he was working with Officer Tom Mott when at 2:15 a.m. an older woman and two men came into the Southeast Substation. (RR: Vol. 46 p. 165) He said he eventually took the Defendant to Parkland Hospital. (RR: Vol. 46 p. 165) He said he was unaware of the double homicide that occurred earlier. (RR: Vol. 46 p. 167) He said after they confirmed there had been a double homicide, they placed Gary Green under arrest. (RR: Vol. 46 p. 167) He said the Defendant did not try to run and didn't give them any problems. (RR: Vol. 46 p. 168) He said once the doctor at Parkland signed off on Mr. Green's release, they took him to the Homicide Unit on South Lamar. (RR: Vol. 46 p.169)

On cross examination the witness stated that Mr. Green was taken to Parkland because of a cut on his back. (RR: Vol. 46 p. 171) He said Mr. Green appeared to be depressed. (RR: Vol. 46 p. 172) He said he wrote in his report that Mr. Green had ingested a number of pills that night. (RR: Vol. 46 p.173)

*9) Testimony of Shirley Coleman:* Shirley Coleman, the aunt of Gary Green, testified that on September 22, 2009, her sister, Mary Sampson, the mother of Gary Green, called her in the early morning hours, very upset, so she went to her sister's house. (RR: Vol. 47 p. 6) When she arrived, she found her sister hysterical, and learned that the police had come to their house looking for Gary in connection with two murders. (RR: Vol. 47 p. 8) Her sister told her that she had spoken to Gary on the telephone but he wouldn't answer his phone anymore. (RR: Vol. 47 p. 9) She called Gary at his friend's house, spoke with

5

Gary, telling him that his mother was hysterical and that he needed to turn himself into the police.  (RR: Vol. 47 p.9) She and family members went to the friend's house and when she saw Gary getting into the family's car, she went home.  (RR: Vol. 47 p. 12) On the way home, she saw a police car, flagged it down and told them about Gary Green and the murders.  (RR: Vol. 47 p.14) She said the police didn't understand so they went to her house and stayed until they learned of the murders.  (RR: Vol. 47 p. 14)

On cross examination the witness testified that when she spoke to Gary on the phone, his speech was slurred and he sounded out of it.  (RR: Vol. 47 p. 16)

*10) Testimony of Kevin Kirchdorfer:* Kevin Kirchdorfer, a Dallas Police Officer, testified that on September 22, 2009, he was flagged down by Shirley Coleman who told him she was worried that Gary Green might come to her house. (RR Vol. 47 p. 20) He called the Southeast Station and learned that Gary Green was in custody.  (RR: Vol. 47 p. 21) He returned to the station where he was assigned to ride with Mr. Green in the ambulance to Parkland.  (RR: Vol. 47 p. 21) He said Mr. Green made the statement "Can't get the images out of my mind."  (RR: Vol. 47 p. 23)

*11) Testimony of Robert Quirk:* Robert Quirk, a homicide detective with the Dallas Police Department, testified that he and Detective Ahearn were called to the scene of a double murder and upon arriving, learned that there were witnesses and a suspect identified.  (RR: Vol. 47 p. 6-7) They interviewed Latasha Bradfield, the neighbor. (RR: Vol. 47 p. 28) He said the main crime scene was in the master bathroom. (RR: Vol. 47 p. 28) He learned that Mr. Green had surrendered and had been taken to Parkland Hospital for treatment.  (RR: Vol. 47 p. 29-30) At 7:15 the interview of Mr. Green began and was videotaped.  (RR: Vol. 47 p. 30-31) The video was played for the jury. (RR: Vol. 47 p. 33) He said Mr. Green told him about the handwritten notes and where to find them in the house.  (RR: Vol. 47 p. 36) He contacted Detective Chamberlain and told him to collect the notes. (RR: Vol. 47 p. 37)

The witness testified that Lovetta Armstead's P.T.Cruiser was located where the Defendant told them he had left it the night of the murders.  (RR: Vol. 47 p. 40) The car was searched and a Fanta can containing the Defendant's fingerprints, and an empty blister pack of Benadryl was found on the floorboard.  (RR: Vol. 47 p. 42) He said there were about 26 to 28 empty holes in the blister packs.  (RR: Vol.47 p. 42) There was no damage to the car.  (RR: Vol. 47 p. 43) A buccal swab was obtained from the Defendant. (RR: Vol. 47 p. 43)

On cross examination the detective testified that Mr. Green answered every question asked of him and was cooperative.  (RR: Vol. 47 p. 47) He said he asked Mr. Green if there were any mental issues because Mr.Green had taken some medication and had been treated at Parkland.  (RR: Vol. 47 p. 48) He said Mr. Green told him he had a history of mental issues and described his diagnosis.  (RR: Vol. 47 p.

6

49) He said Mr. Green did not try to fake insanity or tried to use his mental condition to justify his actions. (RR: Vol. 47 p. 50) He said Mr. Green told him that he had been diagnosed with manic depression and borderline schizophrenia. (RR: Vol. 47 p. 51) He said Mr. Green did not use this as an excuse for his behavior. (RR: Vol. 47 p. 52)

The witness testified that although Mr. Green told him he thought that the kids and the family and Lovetta's mother were plotting against him, he didn't believe him and didn't think they were symptoms of paranoia. (RR: Vol. 47 p. 54) He said Mr. Green told him that he heard voices in his head telling him to commit the murders. (RR: Vol. 47 p. 55) He said Mr. Green thought he had been betrayed by Lovetta and the family. (RR: Vol. 47 p. 55) He said he didn't believe Mr. Green when he said he wanted to die. (RR: Vol. 47 p.59)

The detective testified that Mr.Green was dejected and somewhat remorseful. (RR: Vol. 47 p. 62) He said Mr. Green told him that he thought that if he did this, that the family would be back together in heaven. (RR: Vol.47 p. 64) He said Mr. Green told him that he thought the pills would kill him and their investigation showed that he did take the pills. (RR: Vol. 47 p. 65) He said he thought Mr.Green took those pills thinking that they would kill him. (RR: Vol. 47 p. 67) He said that he didn't know that Mr.Green had been in Timberlawn, a mental hospital, a month before the offense. (RR: Vol. 47 p.69) He said this knowledge would not have had any bearing on his testimony that Mr.Green was faking the claims of mental illness. (RR: Vol.47 p. 73) He didn't know why he didn't follow up and investigate the defendant's mental issues. (RR: Vol. 47 p. 74)

*12) Testimony of Bruce Chamberlain:* Bruce Chamberlain, a Dallas Police Officer, testified that in September, 2009 he was a homicide detective and assisted in the investigation of this case. (RR: Vol. 47 p. 78) On September 22, 2009, Detective Quirk told him to go back out to the house, meet with a crime scene detective and photograph and retrieve some written notes. (RR: Vol. 47 p. 79) They found the two notes under the mattress in the bedroom. (RR: Vol. 47 p. 80) They also found an empty Tylenol box at the residence. (RR: Vol. 47 p. 80).

*13) Testimony of Angela Fitzwater:* Angela Fitzwater, a forensic biologist at the Southwestern Institute of Forensic Sciences, testified that she analyzed the fingernail clippings taken from Lovetta Armstead, obtaining a DNA profile from the clippings. (RR: Vol. 47 p. 85) She compared this profile with the known DNA profile taken from a buccal swab from Gary Green. (RR: Vol. 47 p. 85) She said the clippings from the right hand showed two contributors, but she could not determine a major and minor contributor. (RR: Vol. 47 p. 85) She said the genetic markers observed in the DNA profile of Lovetta Armstead were detected in the mixture. (RR: Vol. 47 p. 85) She said all the genetic markers

7

observed in the DNA profile of Gary Green was observed in the mixture.  (RR: Vol. 47 p. 85) There was one genetic marker that was not contributed by either person. (RR: Vol. 47 p. 86) She said the clippings from the left hand showed the DNA profile of Gary Green which matched on nine areas.  (RR: Vol. 47 p. 86) She said a sperm cell fraction was obtained from the vaginal swab taken from the victim at autopsy and showed the DNA profile of the major contributor matched the profile of Gary Green.  (RR: Vol. 47 p. 90) She could not quantify the amount of time had elapse between intercourse and death, but thought that it was recent. (RR: Vol. 47 p. 92)

   *14) Testimony of Jill Urban:* Jill Urban, a medical examiner, testified that she performed the autopsy on Lovetta Armstead on the morning of September 22, 2009.  (RR: Vol. 47 p. 99) She said there was a cluster of stab wounds in the right upper quadrant of the abdomen and a cluster of stab wounds on the back of her neck and the right side of her upper back.  (RR: Vol. 47 p. 100) A stab wound to the right back punctured the right lung, a stab wound on the back of the left thigh that was eight inches deep, and a stab wound to the elbow and right hand.  (RR: Vol. 47 p. 101-102) She said there was evidence of strangulation.  (RR: Vol. 47 p. 101-102) She testified that there was evidence of more than 25 stab wounds which was consistent with the Defendant's confession. (RR: Vol. 47 p. 106) She wrote in the autopsy report that asphyxial injuries were a possible cause of death while she bled out from her stab wounds.  (RR: Vol. 47 p. 107)

   *15) Testimony of Meredith Lann:* Meredith Lann, a medical examiner, testified that at the time of Jazzmen Armstead's autopsy, she was a fellow SWIFS and performed the autopsy under the supervision of Dr. Joni McClain.  (RR: Vol. 47 p. 111) She said that there was hemorrhage on the very top of the head and the eyes contained small burst blood vessels or petechia.  (RR: Vol. 47 p. 115) The lungs showed pulmonary edema.(RR: Vol. 47 p. 116) She said there was frothy pinkish yellow fluid coming from the nose and the upper and lower airways were filled with the foamy fluid.  (RR: Vol. 47 p. 116) She said this was pulmonary edema, the reaction of the body to hypoxia or low state of oxygen. (RR: Vol. 47 p. 116) She said that the Defendant's confession of drowning the victim was consistent with her findings.  (RR: Vol. 47 p. 120)

   *16) Testimony of Ray Montgomery, Jr.:* Ray Montgomery, Jr., the father of Jazzmen Montgomery, testified that after he ended his relationship with Lovetta, he maintained a presence in Jazzmen's life. (RR: Vol. 47 p. 131) She spent the weekend before her death with him. (RR: Vol. 47 p. 132)

*The Defense on Guilt/Innocence: The Defense did not present any evidence in the guilt/innocence stage of the trial.  The jury found the Defendant guilt of capital murder as charged in the indictment. (RR: Vol.48  p. 33-34 )*

**The State on Punishment**

*17) Testimony of Ray Cunningham:* Ray Cunningham, a Dallas Police Officer, testified that on July 28th, 1989 he was working in South Dallas when he and Officer Terry stopped at an apartment complex, and the Defendant started running when they approached.  (RR: Vol. 49 p. 27-28) He said they chased him through a field and found 14 or 15 bags of crack cocaine on his person.  (RR: Vol. 49 p. 28) Mr. Green was arrested and told them that the drugs belonged to him.  (RR: Vol. 49 p. 29)

*18) Testimony of Jennifer Wheeler:* Jennifer Wheeler testified that in 1989 she knew the Defendant while she was attending high school.  (RR: Vol. 49 p. 33) She said her parents didn't approve of her spending so much time with Gary because he didn't have a job.  (RR: Vol. 49 p. 36) She broke up with Gary in May, 1989.  (RR: Vol. 49 p. 37) On August 6th, 1989 she saw him at the bus stop while she was driving to work that morning and stopped and gave him a ride to his house.  (RR: Vol. 49 p. 39) She testified that when he got into the car, he told her he would drive and drove to Crawford Park.  (RR: Vol. 49 p. 39) She said he told her that he was going to kill her and she told him she loved him and begged him not to kill her.  (RR: Vol. 49 p. 39) The next thing she remembered was waking up in a hospital with a stab wound in her chest, ligature marks, black eyes, swollen jaw and a missing tooth.  (RR: Vol. 49 p. 40) She said he pled guilty to aggravated assault.  (RR: Vol. 49 p. 41) She kept in contact with him while he was in prison and after he was released, she let him borrow her car for a day.  (RR: Vol. 49 p. 44) When he didn't return the car, she and her brother went to look for him and when they found him driving the car, her brother handed her a gun and told her to shoot out the tires.  (RR: Vol. 49 p. 45) She said she shot but didn't hit the car and they all drove to a 7-11 where they saw a police officer.  (RR: Vol. 49 p. 45) She said this was the last time she saw Gary Green.  (RR: Vol. 49 p. 45)

On cross examination the witness testified that Gary was completely enamored with her and she was became his whole life.  (RR: Vol. 49 p. 47) She didn't remember Gary having any friends.  (RR: Vol. 49 p. 48) She said the assault did not make any sense.  (RR: Vol. 49 p. 48) She said he stopped hurting her because she told him she loved him and then drove her to the hospital.  (RR: Vol. 49 p. 48) She said that he told her his life was falling apart before him.  (RR: Vol. 49 p. 49)

*19) Testimony of Tony Hayes:* Dallas Police Officer Tony Hayes testified that on August 6th, 1989 he answered a call at the Southeast Methodist Hospital where he spoke to both the victim and

suspect. (RR: Vol. 49 p. 56) The victim had injuries to her eyes, face, neck and abdomen. (RR: Vol.49 p. 56)

*20)Testimony of D.A.Watts:* D.A. Watts, a retired detective for the Dallas Police Department, testified that in May,1990 he worked as a robbery detective and took the statement of Gary Green concerning the robbery at the County Fair Food Mart which occurred on April 9th, 1990. (RR: Vol. 49 p. 72)

*21) Testimony of Charles Moss:* Charles Moss, a retired institutional parole officer, testified that on June 5th, 1992 he interviewed Gary Green, making notes as they spoke. (RR: Vol. 49 p. 78) He said Mr. Green told him that his rationale for committing the aggravated assault was that he was young and wanted to see if he could do it. (RR: Vol. 49 p. 78) Mr. Green admitted to him that he sold crack cocaine for about a month to also see if he could get away with it. (RR: Vol. 49 p. 79) He said Mr. Green's file showed that he had treatments for stress management but there were no indications of past mental illness or suicide attempts. (RR: Vol. 49 p. 81) He said Mr. Green told him that he committed the robbery for the thrill and to see if he could do it. (RR: Vol. 49 p. 81)

On cross examination the witness stated that he did not recall if Mr. Green's TDCJ contained reports that he had been treated on numerous occasions by the psychiatric staff for what they termed stress-related problems. (RR: Vol. 49 p. 83)

*22) Testimony of Joseph Johnson, Jr.:*   Joseph Johnson, Jr. testified that in April, 1990 he was the store manager for County Fair Foods and had hired Gary Green to be a stocker. (RR: Vol. 49 p. 85-86) Mr. Green worked for him two days and on the third day, he called in, saying he was sick. (RR: Vol. 49 p. 89) He said later that day, Mr. Green came to the store, the owner of the store saw him and had him fire Mr. Green. (RR: Vol. 49 p. 90)

The witness testified that the week after firing Mr. Green, the store was robbed by men wearing masks and carrying guns. (RR: Vol. 49 p. 92-93) He said he was laying on the floor of the office with his hands over his eyes while one of the robbers shot the doorknob off and came into the office. (RR: Vol. 49 p. 95) The suspect stepped over him, and opened the cash drawer and took the money. (RR: Vol. 49 p. 95) He later learned that Gary Green had been one of the robbers. (RR: Vol. 49 p. 98)

*23)Testimony of  Belinda Lacy:* Belinda Lacy testified that in the 1990's she was a correction officer, worked in the kitchen area and there met Gary Green. (RR: Vol. 49 p. 104) They became romantically involved and as their relationship progressed, she quit because correctional officers cannot date inmates. (RR: Vol. 49 p. 106) She said she began visiting Gary and considered them to be husband and wife. (RR: Vol. 49 p. 107) She wrote letters to the parole board on behalf of Gary and he was

eventually paroled. (RR: Vol. 49 p. 109) She met him in Dallas and she and Gary married in his mother's house. (RR: Vol. 49 p. 110) They had lived with his mother for approximately six weeks before Gary left her. (RR: Vol. 49 p. 111) She said she moved back to east Texas to be with her family. (RR: Vol. 49 p. 111)

*24) Testimony of Shulonda Ransom:* Shulonda Green testified that she met Gary Green in 2001 but had seen him for over five years. (RR: Vol. 49 p.123) She said she and Gary both worked at Walmart and became romantically involved. (RR: Vol. 49 p. 124) Their son, Gary, Jr. was born in October, 2001. (RR: Vol. 49 p. 124) She said Gary began to physically abuse her when she was five months pregnant and they began to live together. (RR: Vol. 49 p. 125) She said she moved back with her mother until Gary apologized and they moved back together when she was eight months pregnant. (RR: Vol. 49 p. 127) She said Gary continued to choke or hit her and then apologize and tell her he wouldn't do it again. (RR: Vol. 49 p. 127) She became pregnant again in February, 2002 and gave birth to their daughter, Meionni. (RR: Vol. 49 p. 127) She said that Gary continued to abuse her until he choked her until she passed out. (RR: Vol. 49 p. 128-129)

On cross examination the witness testified that Gary's fits of rage did not make sense to her and she didn't know why he would get mad at her. (RR: Vol. 49 p. 133) She stated that it didn't have anything to do with drugs or alcohol and seemed bizarre to her. (RR: Vol. 49 p. 133) She said Gary didn't have any friends. (RR: Vol. 49 p. 134)

*25) Testimony of Kevin Ashford:* Kevin Ashford testified that in the 1990's he worked for the Texas Department of Criminal Justice Institutional Division as a correctional officer. (RR: Vol. 50 p.7) He said he worked in administrative segregation and on January 9, 1994 he was called to help in the cafeteria. (RR: Vol. 50 p. 9) He said he encountered Gary Green, one of approximately 100 inmates in the cafeteria at the time. (RR: Vol. 50 p. 11) He said Mr. Green was going off by himself and he wanted him to sit with the main group so he could watch all of them. (RR: Vol. 50 p. 12) When he ordered Mr. Green to get with the main group, Mr. Green threw his food tray at him, striking him in his midsection. (RR: Vol. 50 p. 13) He said he then struggled with Mr. Green until another officer helped him take him to the floor where he was handcuffed. (RR; Vol. 50 p. 13-14) He stated that he never dealt with Mr. Green again. (RR: Vol. 50 p. 14)

On cross examination the witness testified that he did not recall a fellow employee named James Williams and was not aware that other guards were interviewed in response to the allegations he made against Mr. Green. (RR: Vol. 50 p. 16) The witness was shown Defense Exhibit No. 2, a report by another guard concerning the incident and stated he had never seen it before. (RR: Vol. 50 p. 19) He

stated that he did not know that if there is an assault upon a guard, it is referred to the Inspector General's Office for criminal prosecution.  (RR: Vol. 50 p. 19) He did not know why the case was never prosecuted.  (RR: Vol. 50 p. 20) The report stated that Officer Williams saw the incident and reported that the food tray hit the table and not the witness. (RR: Vol. 50 p. 20)

*26) Testimony of Melodye Nelson:*   Melodye Nelson, a warden with the Texas Department of Criminal Justice, testified that she has been with the system for almost twenty-one years. (RR: Vol. 50 p. 25-26) The witness described the prison system in Texas and stated there were currently approximately 150,000 persons incarcerated in Texas. (RR: Vol. 50 p. 29) The witness described the classification system for the jury.  (RR: Vol. 50 p. 30-34) She stated that a person receiving life with parole went into the general population as a level G3. (RR: Vol. 50 p. 35) She said that prior to the implementation of life without parole, G3 offenders could, after ten years, be classified as a G2.  (RR: Vol. 50 p. 36) She said that she testified in a capital murder trial and erroneously told that jury that a capital murderer on a life without parole sentence, could potentially after ten years move down to a G2.  (RR: Vol. 50 p. 36) She said she was unaware of an addendum that said life without parole must remain a G3.  (RR: Vol. 50 p. 36)

The witness described that movement available within the prison system for a G3 offender. (RR: Vol. 50 p. 37) She described the types of offenses that were eligible for a G3 offender. (RR: Vol. 50 p. 37-38) The witness described the opportunities for violence and stated that death row was the most secure unit in the system. (RR: Vol. 50 p. 40-41) The witness described the confiscated weapons that had been found in common areas and exhibited in court.  (RR: Vol. 50 p. 41-42) The witness described the type of contraband brought into the prison. (RR: Vol. 50 p. 43-46)

On cross examination the witness stated that the prison system is a well run organization and the personnel are well trained.  (RR: Vol. 50 p. 47) She said that the propensity for violence is not related to the crime for which they are serving.  (RR: Vol. 50 p. 53) She agreed that the for the number of inmates in the system, there was actually a small number of criminal acts of violence committed.  (RR: Vol. 50 p. 55)

On further redirect examination the witness testified that parole gives prisoners incentives to be good.  (RR: Vol. 50 p. 58)

On recross examination the witness testified there was nothing to show that a person sentenced to life without parole has a greater propensity towards any violent act. (RR: Vol. 50 p. 88) She said that it was an individual choice. (RR: Vol. 50 p. 88)   She said that a lot of people in the system are being treated for mental illness, including people who are in prison as a result of their mental illness. (RR: Vol.

12

50 p. 91) She said that it was their goal to treat these people and in doing so greatly lessen their propensity and ability to commit further violent criminal acts. (RR: Vol. 50 p. 91)

*27) Testimony of Ruth Lyons:* Ruth Lyons, a friend of Lovetta Armstead's mother, Margarita, testified that she had a long term relationship with Margarita and met Lovetta when she was three years old. (RR: Vol. 50 p. 95) She said in early 2008 she was living with Lovetta, Gary Green and the children. (RR: Vol. 50 p. 96) She said after speaking to J.T., she spoke with Gary and asked him if he "put his hands on" Lovetta. (RR: Vol. 50 p. 111) She said Gary told her, yes, he had put his hands on her and said he was sorry. (RR: Vol. 50 p. 112) She said Gary began crying and said he was very sorry. (RR: Vol. 50 p. 113)

*28) Testimony of Ray Montgomery:* Ray Montgomery was recalled and testified that his daughter's death has had a great impact on his life and it was hard to know that she was not part of his life anymore. (RR: Vol. 50 p. 115-116)

*29) Testimony of Jerrett Armstead:* Jerrett Armstead was recalled and testified that he goes to counseling and has a lot of anger since the incident. (RR: Vol. 50 p. 117) He said he misses his sister and has nightmares. (RR: Vol. 50 p. 118)

*30) Testimony of Jerome Armstead:* Jerome Armstead was recalled and testified that he was very depressed since his mother and sister left. (RR: Vol. 50 p. 120) He said was in counseling and cries a lot. (RR: Vol. 50 p. 120) He said he was trying to be strong for his little brother. (RR: Vol. 50 p. 120)

*31) Testimony of Margarita Brooks:* Margarita Brooks, the mother of Lovetta Armstead, testified that it was difficult to see her grandsons suffer. (RR: Vol. 50 p. 123) She said their lives were difficult because they had to go to appointments with therapists and psychiatrists. (RR: Vol. 50: 124)

*The Defense on punishment*

*32) Testimony of Shirley Coleman:* Shirley Coleman, the aunt of Gary Green, was recalled and testified that her mother and Gary's grandmother, Bertha Curry, had mental issues throughout her life. (RR: Vol. 51 p. 10) She said at one time her mother pretended to be pregnant after having a hysterectomy and told everyone that she had a misarrange. (RR: Vol. 51 p. 11) She said her mother even put raw meat into the toilet and told everyone that she had a miscarriage. (RR: Vol. 51 p. 11) She said her mother would pretend to be pregnant when someone else in the family was pregnant and would pretend to be injured if other people were injured. (RR: Vol. 51 p. 11) She stated that her mother was on medication for her mental condition. (RR: Vol. 51 p. 12)

The witness testified that Gary's mother, Mary, was her older sister and was not an attentive mother to her children. (RR: Vol. 51 p. 12-13) She said Mary had a nervous breakdown where she had to

13

be hospitalized. (RR: Vol. 51 p. 14) Gary's father, Thomas Carter also had confirmed mental issues and while in the Army, was sent to Leavenworth. (RR: Vol. 51 p. 14-15) She said Thomas was abusive toward Mary and would beat her in front of Gary. (RR: Vol. 51 p. 15) Aaron Green, a step brother, had mental issues and her Aunt Levinia had four children who had mental illness. (RR: Vol. 51 p. 17) She said her Aunt Fay, Bertha's sister, had her children removed by CPS. (RR: Vol. 51 p. 18) Ms. Coleman testified that her younger sister, Deborah, had confirmed mental illnesses and had been to Vernon State Hospital. (RR: Vol. 51 p. 19) Another aunt, sister of Bertha, suffered from mental illness and received treatment at the MHMR facility on Samuel Boulevard. (RR: Vol. 51 p. 19)

The witness testified that there had been some violence in her family. (RR: Vol. 51 p. 20) She said her sister, Diane was murdered and a stepbrother Robert Burrow, murdered his wife and then killed himself . (RR: Vol. 51 p. 20) Her Aunt Thelma had children and grandchildren with mental illness. (RR: Vol. 51 p. 21) She said that mental illness ran throughout the family on both sides. (RR: Vol. 51 p. 21)

The witness stated that while Gary was in high school, he stayed by himself. (RR: Vol. 51 p. 22) After he was released from prison he lived with her for a month or two and brought wife, Belinda, with him. (RR: Vol. 51 p. 22-23) She said his behavior was very different when he came home.(RR: Vol. 51 p. 23) She said he didn't have any friends, just girls. (RR: Vol. 51 p. 23) She recalled Gary sitting in her living and bursting out laughing for no apparent reason. (RR: Vol. 51 p. 23)

*33) Testimony of Lanelle Williams:* Lanelle Williams, testified that she and Gary met in 2003 and began a relationship. (RR: Vol. 51 p. 55) After some time had passed, they moved in together at the Mariah Vista Apartments in Dallas. (RR: Vol. 51 p. 56) They lived together for two years while Gary worked and she looked after her grandchildren. (RR: Vol. 51 p. 57) She said that Gary did not go out a lot and did not have any people over to the apartment. (RR: Vol. 51 p. 58) She said she liked the fact that Gary didn't drink or smoke. (RR: Vol. 51 p. 59) She said Gary liked to spend his time alone. (RR; Vol. 51 p. 60) She said Gary would be in a room by himself and she would hear him talking but couldn't understand what he was saying. (RR: Vol. 51 p. 61-62) She stated that he would talk nonsensically at times. (RR: Vol. 51 p. 62) She testified that Gary once told her that vampire followed him home from the store and because of this, he left his bicycle in the alley. (RR: Vol. 51 p. 62) He told her that vampires lived among them. (RR: Vol. 51 p. 62) She said she heard rats in the wall but she never heard them. (RR: Vol. 51 p.65) She said Gary had a car and job and was good to her. (RR: Vol. 51 p. 66) She said he helped her take care of her grandkids and was never violent with her. (RR: Vol. 51 p. 67) She said relationship ended when she had to move back to Arlington to help her son with his family. (RR: Vol. 51 p. 68) She said Gary then moved in with his mother and was planning to move to Arlington, but

14

they grew apart. (RR: Vol. 51 p. 68) She said they remained friends and talked on the phone. (RR: Vol. 51 p. 69)

The witness testified that the weekend before the incident, Gary called her numerous times, telling her that he was stressed. (RR: Vol. 51 p. 81) When she heard about the incident, she was shocked because it was not like the Gary she knew. (RR: Vol. 51 p. 81-82) She stated she was still a friend to Gary and didn't think he deserved the death penalty. (RR: Vol. 51 p. 82-83)

*34) Testimony of Mary Sampson:* Mary Sampson, the mother of the Defendant, testified that there were five girls and two boys in her family and she had two children, Gary Green and Nysasno Carter. (RR: Vol. 51 p. 94-95) She said she told the Grand Jury that Gary had graduated from high school but in fact he quit in the 10th or 11th grade. (RR: Vol. 51 p. 97) She said she reviewed her testimony before the Grand Jury and her testimony was different today. (RR: Vol. 51 p. 98)

The witness testified that there was a lot of mental illness in her family. (RR: Vol. 51 p. 99) She said her sister Deborah had been committed to a mental hospital because she saw things and thought people were inside her stomach cutting her up. (RR: Vol. 51 p. 99) Her brother killed his wife and then committed suicide. (RR: Vol. 51 p. 99) She said her mother was not normal and was taking medications. (RR: Vol. 51 p. 100) She said she did not have a good relationship with the father of her sons, Thomas Carter. (RR: Vol. 51 p. 100) When she was pregnant with Nysasno, he would jump up in the middle of the night and tell her that they were both crazy and needed to see a psychiatrist. (RR: Vol. 51 p. 100-101) She said Thomas was abusive and kicked her in the stomach and blackened her eyes when she was pregnant with Nysasno. (RR: Vol. 51 p. 101) She left him in either 1978 or 1979 because he beat her. (RR: Vol. 51 p. 101) She said she had a nervous breakdown and it was hard for her to get through the day. (RR: Vol. 51 p. 102) She said she went to the doctor for these issues. (RR: Vol. 51 p. 102) It lasted six months during her pregnancy and a year and a half after her brother committed suicide. (RR: Vol. 51 p. 102) She went to their family doctor who gave her Valium. (RR: Vol. 51 p. 102)

The witness testified that Thomas Carter was abusive toward his son Gary and Gary witnessed his abuse toward her. (RR: Vol. 51 p. 103) She said Gary didn't have any friends and played by himself. (RR: Vol. 51 p. 103) She said he didn't make very good grades in school. (RR: Vol. 51 p. 104) Gary was seven years old when she and Leon were married. (RR: Vol. 51 p. 104) She said Thomas served time in Leavenworth because of an incident with his commanding officer. (RR: Vol. 51 p. 105) She said Thomas drank a lot and thought he was an expert in karate. (RR: Vol. 51 p. 106) She said he was violent with other people. (RR: Vol. 51 p. 106) She said Leon tried to show Gary how to work in construction but Gary had a problem doing it. (RR: Vol. 51 p. 106) When Gary was in junior high school, he went to

15

the roof of the elementary school by their house and had to be talked down by her sister. (RR: Vol. 51 p. 108) She said Gary told everyone that he was constantly stressed and that no one understood him. (RR: Vol. 51 p. 109)

The witness testified that in his teen years, Gary became paranoid and wouldn't sit with his back to the door and kept a bat in his room. (RR: Vol. 51 p. 109) Gary always felt like someone was out to get him and hurt him. (RR: Vol. 51 p. 109) She said Gary's daughter, La Jay, was seven years old, didn't have any friends, stayed by herself and constantly got into trouble at school. (RR: Vol. 51 p. 113) She said La Jay reminds her of how Gary acted. (RR: Vol. 51 p. 114) She said La Jay is currently seeing mental health doctors and taking medication. (RR: Vol. 51 p. 114)

The Defendant's mother testified that she was shocked when Gary was arrested for drugs and for the incident with Jennifer. (RR: Vol. 51 p. 114) She said it was totally out of character for him and he had never beat anyone before. (RR: Vol. 51 p. 114) She said when he got out of the penitentiary, he was withdrawn and stayed to himself. (RR: Vol. 51 p. 115) After he was imprisoned for robbery, she saw him in prison and thought he was withdrawn. (RR: Vol. 51 p. 116) She said she met Belinda Lacy and after she and Gary were married, they lived with her. (RR: Vol. 51 p. 117) She said Belinda was very nice and easygoing. (RR: Vol. 51 p. 118) She didn't know why Gary moved out. (RR: Vol. 51 p. 118) She said she didn't see him very much after he moved out. (RR: Vol. 51 p. 119) When she did talk to him, he would tell her that he was under a lot of pressure and didn't know how to deal with the stress. (RR: Vol. 51 p. 120) She knew he had a girlfriend named Shulonda, the mother of his children and knew he lived with Lanelle for six to seven years. (RR: Vol. 51 p. 120) She thought Gary met Lovetta at the end of 2008 and married. (RR: Vol. 51 p. 121) She said in the months before the incident, she would see Gary every three months. (RR: Vol. 51 p. 122) She said Gary would be acting like he was always in a hurry and always told her that he needed to get away and he couldn't. (RR: Vol. 51 p. 122)

The mother witness testified that Gary called her from Timberlawn and told her that he had come to the end of his rope and had committed himself. (RR: Vol. 51 p. 124) She stated that he did not tell her he was there to get a check. (RR: Vol. 51 p.124) He told her that he wanted to go to sleep and never wake up. (RR: Vol. 51 p. 124) She said she called Nysasno and told him what Gary was telling her. (RR: Vol. 51 p. 125) She said she next saw him when they picked him up after the incident. (RR: Vol. 51 p. 126)

She said when she saw Gary that night, he appeared to under anesthesia and she asked him what was wrong. (RR: Vol. 51 p. 129) He told her that he wanted to go to sleep and never wake up. (RR: Vol. 51 p. 130) Gary told her that if the police had talked to her, she knew what had happened and repeated

16

that he wanted to die. (RR: Vol. 51 p. 130) She said Gary didn't want her to pick him up because he just wanted to lay down and die. (RR: Vol. 51 p.131) When she did see Gary, she could hardly understand him because he had taken so many pills. (RR: Vol. 51 p. 132) She said when they arrived at the police station, Gary was still out of it and she noticed he had been stabbed in the back. (RR: Vol. 51 p. 133) She stated that Gary was remorseful and told her that Lovetta would come to him and talk to him. (RR: Vol. 51 p. 134)

    *35) Testimony of Bertha Curry:* Bertha Curry, the grandmother of the Defendant, testified that she had seven children, one who died of natural causes and two who were killed. (RR: Vol. 51 p. 162) She stated that she didn't think Gary's father, Thomas Carter, was a good person. (RR: Vol. 51 p. 164) She said Thomas would beat Gary, throw him around, sling him and catch him by the neck. (RR: Vol. 51 p. 165) She said Thomas was a violent person and kicked her daughter in the stomach when she was pregnant. (RR: Vol. 51 p. 165) She said he would say he was "doing Kung Fu" on her when he kicked her. (RR: Vol. 51 p. 165) She told him to stop beating Gary and after the divorce, Thomas didn't see Gary anymore. (RR: Vol. 51 p. 166)

    The witness testified that from an early age, Gary wasn't normal. (RR: Vol. 51 p. 167) She said on one occasion Gary picked up a snake and bit his head off. (RR: Vol. 51 p. 167) She said her daughter denied anything was wrong with Gary. (RR: Vol. 51 p. 168) She said that she didn't want to come to court and say anything that would make their family look bad. (RR: Vol. 51 p. 169) She said that a lot of people in their family had mental problems but no one wanted to admit it. (RR: Vol. 51 p. 169)   She took medication for anxiety, depression and other issues. (RR: Vol. 51 p. 171) She saw the same issues in her family when she was growing up. (RR: Vol. 51 p. 172) Her daughter Deborah was admitted to Vernon State Hospital. (RR: Vol. 51 p. 172) She said Gary lived with her on and off through his childhood. (RR: Vol. 51 p. 177) She said Gary played by himself and would withdraw from people. (RR: Vol. 51 p. 177) She said Gary wasn't happy with his life and didn't understand what was wrong with him. (RR: Vol. 51 p. 179) She said Gary talked a lot about suicide. (RR: Vol. 51 p. 180) She said he was always talking to himself. (RR: Vol. 51 p. 180) She started seeing Gary withdraw from people and not play with other kids when he was seven or eight years old. (RR: Vol. 51 p. 180) She didn't recall keeping a job over a year. (RR: Vol. 51 p. 183) In 2007 Gary started to withdraw from her and she didn't see him very much. (RR: Vol. 51 p. 184) She said he became very nervous and didn't' focus on normal things. (RR: Vol. 51 p. 184)

    *36) Testimony of Dr. Kellie Gray-Smith:* Dr. Gray-Smith testified that she was employed by the Plano School District as a licensed specialist in school psychology and special education coordinator.

(RR: Vol. 51 p. 204-205) She said she has training in the multicultural aspects of psychology.  (RR: Vol. 51 p. 207) She said that there were differences between the way different races handle learning disabilities and emotional disturbance.  (RR: Vol. 51 p. 208) She said that African-American community seeks less treatment and mental health support than other cultures. (RR: Vol. 51 p. 208) She said that there is a lack of understanding and a misperception that it is bad behavior that needs to be addressed at home. (RR: Vol. 51 p. 209) She said that there is a misperception of treatment being more harmful than helpful and a distrust of mental health professionals.  (RR: Vol. 51 p. 209) She said that there was the fear of stigma attached to someone that receives mental health treatment.  (RR: Vol. 51 p. 210)   She said she has found that the church in the black community has perpetuated these beliefs.  (RR: Vol. 51 p. 211)

The witness testified that there is a strong, proven genetic and hereditary link between individuals passing on traits and symptomologies of mental illness and emotional behaviors.  (RR: Vol. 51 p. 211) She stated that early intervention was very important to prevent secondary conditions from developing and to teach social skills, problem solving and coping skills. (RR: Vol. 51 p.211) She said special education would address not only learning problems but emotional, behavioral and social problems. (RR: Vol. 51 p.214) Problems with relating to peers, difficulty relating to adults, poor problem solving skills, using aggression to solve problems, difficulty with everyday stressors, low self esteem and isolation could be expected in people who do not have help.  (RR: Vol. 51 p. 216-217) She said the prognosis was very poor for the person who does not have effective intervention. (RR: Vol. 51 p. 218)

The witness testified that she had examined the school records of the Defendant and found that he was not successful and there was evidence of chronic school failure starting early in elementary school.  (RR: Vol. 51 p. 222) She did not know the Defendant and did not know the charges when she reviewed the records. (RR: Vol. 51 p. 219) She said that the records sowed that the Defendant was in the lowest ten percent for students his age.  (RR: Vol. 51 p.224)

*37)Testimony of Dr. Gilbert Martinez:*   Dr. Martinez, a director and owner of South Texas Neuropsychological Associates in San Antonio, Texas, testified that he is a clinical neuropsychologist usually asked to evaluate a person's mental functioning.  (RR: Vol. 52 p. 6-7) He said he also consults with both the prosecution and defense in performing analysis and diagnoses on people. (RR: Vol. 52 p. 8) He said he tries to get as much social and medical history as possible and also spends time with them. (RR: Vol. 52 p. 10) He stated that he was asked to evaluate Mr. Green's cognitive functioning, intellectual functioning and emotional functioning.  (RR: Vol. 52 p. 13) He reviewed Mr. Green's medical records, previous evaluations, interviewed him and administered a battery of psychological and

18

neuropsychological tests. He did not interview Mr. Green about the particular details of the offense so he could make an independent evaluation. (RR: Vol. 52 p. 16) He stated that Mr. Green's full scale I.Q. test showed him to be in the upper borderline range at 78 or 79. (RR: Vol. 52 p. 22) He said Mr. Green didn't have any severe memory problems but did have attentional problems. (RR: Vol. 52 p. 22) He did not find any evidence for a severe cognitive disturbance like brain damage or a head injury. (RR: Vol. 52 p. 22) Mr. Green had difficultly with higher level thinking, with learning and mental shifting which was consistent with his low I.Q. (RR: Vol. 52 p. 23) He said Mr. Green's I.W. level was a percentile rank of seven which meant that 93 people would theoretically do better than him. (RR: Vol. 52 p. 24) He said people with this level I. Q. can usually function independently, but would have difficulty understanding complicated information. (RR: Vol. 52 p. 24) He said Mr. Green did not have a formal learning disability. (RR: Vol. 52 p. 26) He said Mr. Green's low average I.Q. and poor academic functioning together set the stage for a pattern of chronic academic and personal underachievement. (RR: Vol. 52 p. 27)

Dr. Martinez testified that in reviewing Mr. Green's history and his test results he determined that Mr. Green suffered from severe chronic problems with mood that included both depression and episodes of agitation and irritability and elevated moods where were associated with manic episodes or bipolarity. (RR: Vol. 52 p. 31) He concluded that Mr. Green has difficulty with though and had believed that other people were trying to hurt him or do him wrong. (RR: Vol. 52 p. 31) He said Mr. Green was mistrustful of other people and was hypervigilant and suspicious. (RR: Vol. 52 p. 31) He said these problems met the criteria for schizoaffective disorder of the bipolar type. (RR: Vol. 52 p. 31) He said Mr. Green would have episodes of severe depression where they withdrew, episodes of sadness, very anxious and at times have an elevated mood. (RR: Vol. 52 p. 32) He said a person with schizoaffective disorder can have a disturbance in thought where they have paranoid delusions. (RR: Vol. 52 p. 32) He said during these episodes of paranoid delusions, they are going to believe things that are not true, think that something is happening that is not actually happening or think that people are trying to hurt them or conspire against them.(RR: Vol. 52 p.32)

The doctor testified that his diagnosis was different than that of Timberlawn's where Mr. Green was diagnosed with a major depressive disorder with psychotic features. (RR: Vol. 52 p. 34) He said the report from Timberlawn showed that they thought Mr. Green may be bipolar but they didn't have enough evidence. (RR: Vol. 52 p. 34) He said the records showed Mr. Green to be suffering from depression, increased isolation, decreased energy and increased hopelessness. (RR: Vol. 52 p.35) The clinician described Mr. Green as being passive and stating the he just wanted to go to sleep and not wake up. (RR:

19

Vol. 52 p. 35) The report stated that there had not been any suicide attempt and no homicidal ideation. (RR: Vol. 52 p. 35) He said the report showed that Mr. Green also had racing thoughts. (RR: Vol. 52 p. 36) He said most people who have racing thoughts do not have severe depression. (RR: Vol. 52 p. 38) He said this was inconsistent with a major depressive disorder. (RR: Vol. 52 p. 38)

The witness testified that the Timberlawn report showed that Mr. Green came in for treatment because "he wanted to know the truth." (RR: Vol. 52 p. 40) He said Mr. Green was put on Risperdal and Remeron. (RR: Vol. 52 p. 41) Risperdal is a medication used to treat schizophrenia and Remeron is typically used for depression. (RR: Vol. 52 p. 41)

The witness testified that a major depressive disorder is a severe mental illness. (RR: Vol. 52 p. 42) He said Timberlawn's diagnosis of major depressive disorder recurrent with psychotic features and his diagnosis of schizoaffective disorder were not mutually exclusive and had a lot of the same common symptoms. (RR: Vol. 52 p. 43) He said that schizoaffective bipolar disorder was also a severe mental illness. (RR: Vol. 52 p. 43) He said that a person with schizoaffective bipolar disorder can be severely depressed, withdrawn, unmotivated, and intensely sad and can also have agitation or irritability or an elevated mood. (RR: Vol. 52 p. 44) He said people with this diagnosis are going to believe that people are trying to harm them. (RR: Vol. 52 p. 44) He said they will be paranoid or delusional and can have delusions where they believe something is happening that is not really happening. (RR: Vol. 52 p. 44) He said Mr. Green told the psychiatrists at Timberlawn that he has been depressed all his life. (RR: Vol. 52 p. 45) He said that the records at Timberlawn showed that Mr. Green thought he was more depressed being at the hospital. (RR: Vol. 52 p. 46) He said the notes show that Mr. Green was withdrawn, had a blunted affect and a depressed mood. (RR: Vol. 52 p. 47) He said it showed that Mr. Green reported worthlessness and had no place in the world and knew there was life after death for him. (RR: Vol. 52 p. 48)

The witness testified that there was nothing in the records to show that Mr. Green went to Timberlawn so he could get a government check. (RR: Vol. 52 p. 48) He said there were notes that showed Mr. Green's levels of anxiety, depression and isolated behaviors were increasing while at Timberlawn. (RR: Vol. 52 p. 49) He said Mr. Green was discharged and given a referral for a follow-up at a clinic in Dallas. (RR: Vol. 52 p. 50)   He said Mr. Green was discharged because he requested to be discharged. (RR: Vol. 52 p. 51) He said that it appeared that the clinician at Timberlawn did not feel that Mr.Green needed to be committed at that time. (RR: Vol. 52 p. 52) He said Mr. Green did not appear to tell anyone that he was going to kill himself or cause anyone any harm immediately. (RR: Vol. 52 p. 52) He said there was a clinical note that Mr. Green went to North Star Clinic where they did the same type

20

of evaluations with him and reported the same symptomatologies. (RR: Vol.52 p. 53) He said the information in this report was consistent with what Mr. Green had reported at Timberlawn and the diagnosis that he had formulated. (RR: Vol. 52 p. 53)

The witness testified that he thought Mr. Green had features of paranoid personality disorder which was very common in people with schizoaffective disorder where their paranoid thinking is a part of their personality. (RR: Vol. 52 p. 55) He said the believe people are trying to hurt them, are very mistrustful of others and other's intentions. (RR: Vol. 52 p. 55) He said this occurs every day of their lives and affects the way that they interact with other people. (RR: Vol. 52 p. 55)

The witness stated that he also thought Mr. Green had a borderline personality disorder. (RR: Vol. 52 p. 56) He said people with this disorder can go into a rage and lose control of their behavior when they feel threatened or fell that something bad is going to happen to them. (RR: Vol. 52 p. 55) He said that people with this disorder have suicidal gesturing, they tell people over and over again that they'd rather die or that they want to kill themselves. (RR: Vol. 52 p. 56) He said Mr. Green also had avoidant personality disorder in which people stay to themselves and don't socialize. (RR: Vol. 52 p.56) He said Mr. Green also has a depressive personality where he was always thinking negatively about things. (RR: Vol. 52 p. 56) He said these people feel hopeless, helpless and think bad things are going to happen to them all the time. (RR: Vol. 52 p. 56)

Dr. Martinez testified that he thought Mr. Green had characteristics that were consistent with antisocial personality disorder. (RR: Vol. 52 p. 58-59) He explained that a personality disorder describes a person's behavior, whereas a mental disorder describes a person's functioning, their mood and thinking. (RR: Vol. 52 p. 61) He said schizoaffective disorder, a chronic condition, was treatable with medication(RR: Vol. 52 p. 61) He said people with this disorder often self-medicate to get some sort of relief from the tension, pain and emotional turmoil they're experiencing. (RR: Vol. 52 p. 62-63) He said the drugs can make the condition worse and cause more problems in their lives. (RR: Vol. 52 p. 63)

On redirect examination the witness stated that there was no doubt in his mind that Mr. Green was very mentally ill. (RR: Vol. 52 p. 108) He identified State's Exhibit No. 103 as psychiatric notes from the Defendant while he was in the penitentiary which state he was angry and depressed. (RR: Vol. 52 p. 115) He said the note, dated September 20, 1994 that he was having a nervous breakdown, no one cared and he had been thinking about hurting someone. (RR: Vol. 52 p. 115) On August 19, 1994, the Defendant had thoughts of killing himself, and in 1995 the Defendant closed himself off from people and said he was going to join the French Foreign Legion. (RR: Vol. 52 p. 116) He stated that Mr.Green has a severe mental disorder but he could not say why he would kill someone. (RR: Vol. 52 p. 119)

21

*38) Testimony of Nysasno Carter*: Nysasno Carter testified that his brother, Gary Green, did not get along with their stepfather, Leon. (RR: Vol. 52 p. 129) He said Gary had trouble accepting Leon as his father. (RR: Vol. 52 p.129) He said he thought Gary was mentally ill. (RR: Vol. 52 p. 131) Gary always talked about death, that he didn't have anything to live for and didn't understand why God made him that way. (RR: Vol. 52 p. 131) He said Gary was always by himself at school and never had any friends. (RR: Vol. 52 p. 131) He said he tried to look after his older brother. (RR: Vol. 52 p.132) He said Gary didn't make good grades in school. (RR: Vol. 52 p.133) He told his mother that something was wrong with Gary but she didn't want to hear it and brushed him off. (RR: Vol. 52 p.133) He said a number of people in his family have mental problems, but no one wanted to admit it. (RR: Vol. 52 p. 33) He knew Jennifer Alcorn and knew why Gary went to the penitentiary. (RR: Vol. 52 p. 134) He said when Gary got out of prison for the second time, they got a job together working at Walmart. (RR: Vol. 52 p. 136) He said Gary was still acting strange. (RR: Vol. 52 p.136) He said Gary told him that he was hearing things and that he didn't have anything to live for. (RR: Vol. 52 p.137) He told Gary that he just needed to pray. (RR: Vol. 52 p. 137) He said he talked to Gary about going to the hospital because Gary was constantly talking about being tired and wanting to give up. (RR: Vol. 52 p. 138) He said Gary told him that he was hearing demons. (RR: Vol. 52 p. 138) He said that he was driving a truck and would be gone for weeks at a time. (RR: Vol. 52 p. 140) He spoke to Gary about having him committed, but when he returned home, he could not find Gary. (RR: Vol. 52 p. 139) He learned that Gary had checked himself into Timberlawn and he thought it was the best idea. (RR: Vol. 52 p. 141)

The witness testified that he spoke with Gary on the day of the incident and Gary sounded very slow, like he was very tired. (RR: Vol. 52 p.142) He said when he saw Gary that night, Gary seemed very different. (RR: Vol. 52 p. 144) He learned that Gary had taken a lot of pills that night. (RR: Vol. 52 p. 144) He said Gary was still in a depressed state and told him that he was hearing Lovetta telling him that she had forgiven him. (RR: Vol. 52 p. 145) He stated his brother has a very severe mental problem. (RR: Vol. 52 p. 146)

*The jury answered Special Issue Number 1 as "yes" and Special Issue Number 2 as "no", resulting in the punishment of death. (RR: Vol. 53 p. 79-80)  The Trial Court ordered that a sentence of death be carried out. (RR: Vol. 53 p. 82)*

## SUMMARY OF ISSUES

Appellant raises issues in this brief that are categorized into the following groups: I. Voir Dire Issues: Issues on error in the trial court denying challenges for cause against 15 prospective jurors;

Appellant did not receive a fair trial because the jury was biased and or prejudiced;  II. Trial Issues: trial court erred in overruling Appellant's objection to the introduction of Appellant's written statement because he did not expressly waive his Miranda rights; Appellant argues in six issues that the trial court erred in overruling, and then after sustaining Appellant's objection, failing to instruct the jury on Appellant's objection to the State's egregious closing argument which was totally improper jury argument and highly prejudicial.  The State repeatedly ignored the trial court's admonishments until the trial court 'sua sponte' ended the State's jury argument.; III. Punishment Issues: Appellant argues that the evidence showed he is a severely mentally ill person and his execution is prohibited by the Eighth Amendment to the United States Constitution and violates the equal protection clause of the 14th Amendment to the United States Constitution; Appellant argues that the evidence is insufficient to support the conviction for capital murder; Appellant further argues that the trial court erred in denying his motion for mistrial when the State improperly questioned, outside the record, a witness about extraneous bad act which was highly prejudicial; Appellant submits that the evidence was legally insufficient to support the jury's answer to Special Issue No. 2; the trial court erred in overruling Appellant's objection to the evidence of extraneous offense introduced by the State because Appellant was not given timely notice of its intent; the trial court erred in overruling Appellant's objection to the evidence of the contents of letters introduced by the State because they were extremely remote in time; IV. Federal Issues: Issues involving previously raised constitutional challenges that have been previously raised and denied by this Court in order to preserve these issues for possible future review in federal court.

## VOIR DIRE ISSUES

## APPELLANT'S ISSUE NO. 1

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BILLY CHANCELLOR

## SUMMARY OF VOIR DIRE OF VENIRE PERSON

Appellant directs this Honorable Court's attention to Reporter's Record Volume 7 page 192 at which defense counsel made the following objection:

MR. JOHNSON: Judge, we're going to challenge the juror for cause. I believe the juror unequivocally stated the information presented in Special issue Number 2, which the juror is - - or the juror is instructed that he must be able to listen to and consider for purposes of determining whether or not sufficient mitigation exists, he's already testified - - and case law states that age is something that the juror would have to be able to at least consider, that the person's background and character are - - are the most important considerations that would be before a potential juror in a death penalty case in considering existence of mitigating circumstances. And unequivocally this juror has stated that he would not give any ear to any information regarding background, character, age, that he - - and everything - - all his answers go back to the fact that he - - or he associates a finding of guilt with the death sentence. And I believe that his answer sufficiently shows that in his mind, he does not have a distinction, other than the fact that if he finds somebody guilty, that that person is going to be - - that it's going to be possible that they're going to - - that they could commit something - - an act of violence or assault in the future.

And I did go back several times, Judge, and - - and I kept trying to get him to delineate a distinction between possibility and probability and all he could ever say is whether it would be possible that he was going to do it again. So we've got a juror that's - - to start off with, I think his answers in this courtroom show, Number 1, that he's death prone for an individual that's been found guilty beyond a reasonable doubt. He doesn't have a clear understanding of what Question Number 1 is asking. He keeps - - he keeps equating a yes answer to that question, with the fact that someone has been proven guilty.

And then when going into Question Number 2, he specifically says, as the question asks, he - - we have no - - we have no problem with the fact that he would consider the circumstance of the offense because that's the only thing he can consider. But he's also - - that question points you to these particular areas, and he said, I will consider the offense, but I won't consider the character, which the question requires. I won't consider the background, which the question requires.

And he equates personal moral culpability with another concept which he said he would also not consider. And so under this juror's mind I've asked him if there are any areas that he can think of, of anything that might be considered mitigating - - no sufficiently because I can't

24

push him into that corner, wasn't trying to. But he has no - - there's nothing that he could articulate that he would be willing to listen to other than whatever has been proven to him. And we have no burden of proof, which is - - is obvious, and so it goes back to - - whatever is being proven is going to go back to the fact that the person is found guilty, the person - - he's going to believe is a continuing threat.

So we believe that this juror is certainly not qualified under Special issue Number 2. And also, Judge, the - - and we are very uncomfortable with the fact that in regards to the Fifth Amendment rights of the Defendant that he - - he talked in his questionnaire and his answers from the witness stand were such that he is looking for an outward expression of remorse by the Defendant. And the only was that that could come would obviously be through the Defendant's testimony. And then he says in the next breath that he wouldn't require it, but the only thing that he's ever indicated that might prevent him from giving a death sentence would be remorse. And he's indicated that based on his impairment with regards to those issues - - the questions and issues under Special Issue number 2, we certainly don't believe this juror is qualified to sit on this panel.

THE COURT: Denied.


Appellant argues that Mr. Chancellor would automatically access the death penalty if he

found the defendant guilty of capital murder. Mr. Chancellor, when questioned by the State,

testified that just "murder in general" was deserving of a death sentence. (RR: Vol. 7 p. 134)

The following occurred at RR: Vol. 7 p.171-172):

Q. So now you have just found somebody guilty of that crime. It seems to me what you told us earlier if the State can prove that crime to you beyond a reasonable doubt, then you are in favor of the death penalty for that person?
A. Yes.
Q. Is that accurate?
A. Yes.
Q. And like I say, there's nothing wrong with feeling that way. I'm just trying to make sure I understand how you feel. And so as you sit here today, you say that, when you - - when you knowingly and intentionally commit capital murder and there's no legal excuse or justification, Billy Chancellor is going to be of the mind-set that that person should receive the ultimate punishment?
A. Yes.

Appellant submits that Mr. Chancellor was not qualified as a death penalty juror because

he stated he would not give meaningful consideration to a defendant's age or background in

answering Special Issue No. 2 and would only consider the crime itself.  The following occurred

at RR: Vol. 7 pp. :

Q. Okay.  You talked - - in your questionnaire they asked you - - in one of the questions was that some people feel genetics or certain things as birth and upbringing and environment should be considered in determining the proper punishment of someone convicted of a crime. And it asks you what do you think, and you said, we all have choices in life to do the right or wrong things.

A. And that's - - I don't look at it where it's always someone where they're raised, the gender.  I look at the choices.  That's my question.  I always say it's the choices that we make in life and that's the choice at the time - - you had a choice to walk away from crime or you had the choice to do the crime.  I don't think it has so much to do with how you was raised, you know, your background or your gender.

Q. And see, that's fine to feel that way.  That's kind of what I'm getting at if I ask you that - - I mean, you answer in the questionnaire was pretty - - was pretty clear that background is not going to really - - that's not something you're going to consider in trying to determine whether or not there's mitigation there, correct?

A. Correct.

Q. And so when you're considering mitigation, you're not going to consider the person's age,  you're not going to consider anything in regards to background because it's just your honest belief that everybody's had an opportunity to - - to make the decision in regards to right or wrong on their own; is that right?

A. That's correct.

....

Q. That's what I'm asking.  So you're saying the person's character and their background is not something that you would even consider for purposes of switching a death sentence to a life sentence because it goes back to they had a choice to make?

A. That's correct.

Q. Okay.  And so that's what I'm asking you.  So can you give me any examples of something that you would listen to or that you would be interested in hearing in regards to - - on the issue of mitigation?

A. I can't think of anything, you know, off the top, you know, without hearing the - - hearing the case itself.  You know, I just - - can't just answer that - - answer that without having any idea of what's going on with the case.

Q. So you can't - - you can't right off the top of your head think of things that you would include or that you might consider, but - - but without a doubt you're not going to worry about the issues of character and the background and age of the Defendant?  Those are things that's not going to be - - that you're not going to consider; is that correct?

A. No.

Q. I mean, whenever you say no, you're saying I am correct?

A. Yeah.  I mean, I'm not - - no, I won't consider the age or the background, anything but the crime itself.

26

Mr. Chancellor never wavered from his belief that only the crime itself, not anything

about the defendant should be considered in answering Special Issue No. 2.  Appellant has shown

that Mr. Chancellor would absolutely not give meaningful consideration to any evidence he

presented in punishment on Special Issue No. 2.

Appellant further argues that Mr. Chancellor would automatically find the defendant to be

a future danger if convicted of capital murder. The following occurred during the State's

examination of Mr. Chancellor at RR: Vol. 7 p 149:

Q. When you think of that special issue, whether there's a probability the Defendant
would commit criminal acts of violence that would constitute a continuing threat to society, what
comes to mind when you first read that?
A. If he had the chance, would he do it again.
Q. So kind of making a prediction?
A. Yes.
Q. All right. Good. Now, let me tell you this. Just like the guilt stage of the trial, we have
the burden on this special issue, meaning we have to prove that to you beyond a reasonable
doubt.  I always like to say the Defense attorneys during the guilt stage and through this special
issue can do crossword puzzles all day long. They've met their burden because we have to be the
ones to do the proving.  Does that make sense?
A. Yes.
Q. All right. Now, some terms we talk - - or some terms that are in there that I want to
break down because you brought up a great point, if he had the chance, would he do it again.  So
I want to start with that. Do you see the word "probability" there?  When you think of
probability, what comes to mind when you hearing the word "probability"?
A. Can do it again.  It can actually happen again.
Q. Is there a chance it could happen again?
A. Chance it could happen again.
Q. Now, let me tell you, there's no definition of probability. We can't give it to you. The
courts have told us it has to mean more than a mere possibility.  Obviously, I think you would
agree with me that anything is possible?
A. Yes.
Q. So it would have to be more than a mere possibility.  We've had some jurors tell us
more likely than not or greater than 50 percent. It's up to you, though, what you, Mr. Chancellor,
thinks it means.
A. There is a possibility.
Q. It has to be more than a mere possibility.
A. Yes, more than a mere possibility.

27

Appellant submits that Mr. Chancellor did not have a full understanding of the State's question and simply parroted "Yes, more than a mere possibility." The following occurred when Mr. Chancellor was questioned by the defense (RR: Vol. 7 p. 179-180):

Q. Okay. Well, you'd agree - - I mean, if that's - - if that's your definition of it could it happen again, could an assault happen or could this happen, that - - I mean, that seems to fall under the realm of any kind of a possibility, does it not?
A. Yes.
Q. And that' why I'm asking the question, because it sound - - I mean, it's possible that anything can happen, is it not?
A. That's true.
Q. So I mean, than how would you ever be able to answer Question Number 1 that it's not possible that something could happen again?
A. Well, I look at - - that's just something - - would have to show me some type of fact that it could happen again.
Q. That's what I'm asking you right now. Just a person here in the courtroom with common sense, I mean, you agree that anything could possibly happen?
A. Yes, anything could possibly happen.
Q. Right. So you're telling us that would be enough for you to answer that Special issue Number 1 yes?
A. No, I have to look at evidence that shows that that trait could happen again.

Appellant further submits that Mr. Chancellor would require the defendant to show remorse toward his victim's families. Mr. Chancellor states (RR: Vol. 7 p.174):

A. I'm looking at - - for the person that committed the crime, telling the victim, it's the victim's family, someone, that they have remorse from committing that crime, because they was - - knowingly had committed that crime at the time. That was one fo the factors that was stating knowingly what you was doing at the time.

When Mr. Chancellor was reminded about the defendant's fifth amendment right not to testify, he stated that he understood this right by reading the information given to him that day. He further states that he always thought someone had to get up on the stand to testify in a capital murder trial. (RR: Vol. 7 p.176)

28

Appellant has shown that the responses Mr. Chancellor gave on his questionnaire and during voir dire show him to be unqualified to serve on a death penalty jury. Mr. Chancellor showed himself to be a person who would automatically assess the death penalty if he found the defendant guilty of capital murder. Mr. Chancellor exhibited a lack of understanding of what was required of him in deciding Special Issue Number 1. Mr. Chancellor required the defendant to show remorse for his actions. Furthermore, Mr. Chancellor would never give meaningful consideration to any evidence Appellant presented in punishment on Special Issue No. 2. For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Billy Chancellor, stating that Mr. Chancellor was an objectionable juror. (RR: 7 p. 192) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 7 p. 195)

It is fundamental that in all criminal prosecutions, an accused is entitled to an impartial jury composed of people who are unprejudiced, disinterested, equitable, and just who have not prejudged the merits of the case. *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim.App. 1955); Tex. Const. Art. I, § 10. The voir dire process is designed to insure to the fullest extent possible, that such an impartial jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978).

Article 35.16(c)(2) of the Texas Code of Criminal Procedure, allows the defense to challenge for cause any prospective juror who has a bias or prejudice against any law applicable to the case upon which the defense is entitled to rely, either as a defense to the offense being

29

prosecuted or as mitigation of the punishment therefor. *Clark v. State*, 717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986); Tex. Code Crim. P. Ann. Art. 35.16(c)(2) (Vernon Supp. 1992). When a prospective juror is biased against the law, or shown to be biased as a matter of law, he must be excused when challenged, even if he states that he can set his bias aside and be a fair and impartial juror. *Clark*, 717 S.W.2d at 917; *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim.App. 1982).

In *Cumbo v. State*, 760 S.W.2d 251 (Tex. Crim. App. 1988) it was held:

"In *Cuevas v. State*, 575 S.W.2d 543 (Tex. Cr. App. 1979), and *Smith v. State*, 573 S.W.2d 763 (Tex. Cr. App. 1978), the challenged veniremen were thoroughly questioned as to whether they could consider life imprisonment for a defendant found guilty of capital murder. The veniremen repeatedly indicated they would not consider life imprisonment in such a situation and evidence a strong conviction that death is the only appropriate punishment for one found guilty of capital murder. Under those circumstances, we held that the veniremen could not be rehabilitated by ritually reciting that they would "follow the evidence" in considering the special punishment issues. *CF. Janecka v. State,* 739 S.W.2d 813, 832 (Tex. Cr. App. 1987).

In the instant case, as can be observed, the prospective juror Enderli evidence a strong conviction that death ought to be the appropriate penalty for one convicted of capital murder and that he could not consider life imprisonment for capital murder. He further evidenced that he would have difficulty in ever answering special issues numbers one and three. Enderli clearly was not rehabilitated by the court's "lecture" and his answers that he could put "that aside," do his duty as a jury and follow his oath.

Where a prospective juror states his belief that he can set aside any influences and personal bias he may have, and the court overrules the challenge for cause, the court's decision will be reviewed in light of *all* the answers given. *Faulder v. State*, 745 S.W.2d 327 (Tex. Cr. App.. 1987); *Cordova v. State*, 733 S.W.2d 175, 182 (Tex. Cr. App. 1987); *Mays v. State*, 726 S.W.2d 937, 950 (Tex. Cr. App. 1986); *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Cr. App. 1982). When, however, a prospective juror is shown to be biased as a matter of law, he *must* be excused when challenged, even if he states that he can set his bias aside and provide a fair trial. *Cordova*, supra, at 182; *Clark v. State,* 717 S.W.2d 910, 916, 917 (Tex. Cr. App. 1986); *Anderson,* supra, at 854; *Williams v. State*, 565 S.W.2d 63, 65 (Tex. Cr. App. 1978); *Hooper v. State,* 100 Tex. Cr. R. 147, 272 S.W.493, 495 (1925).

The trial court erred in overruling the challenge for cause. *Cuevas,* supra; *Smith*, supra. The appellant was forced to unnecessarily use a peremptory challenge, and having exhausted his allotment of such challenges was required to accept an "objectionable" juror on the jury. Appellant preserved his error.

Appellant submits that he is entitled to rely on the following federal law as it applies to jury selection in capital cases and that the complained of juror was biased against the law as a matter of law based on the prospective jurors voir dire examination.

Appellant argues that the Court's ruling in regard to this juror violates the holdings of *Morgan v. Illinois*, 504 U.S. 719 (1992) because general questions do not comply with the duty to ensure that the juror is unbiased. The Supreme Court has explicitly held that these questions are insufficient to ferret out bias:

"Can you follow the law?" "You can be fair, can't you?" " You can follow the Court's instructions, can't you?" A capital juror must be willing and able to accept and apply the statutory presumption of life. A death sentence cannot be automatic. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Additionally, the law requires that a capital juror be able to consider and give effect to mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104 (1982). That juror must be able to consider an individual defendant's mitigation. *Tennard v. Dreke*, 124 S.Ct. 2562 (2004) Thereby, a capital juror must be able to consider any relevant mitigating evidence from the defense. *Payne v. Tennessee*, 501 U.S. 808 (1991). Any potential juror who would automatically vote for the death penalty is challengeable for cause. *Morgan v. Illinois, supra.* See also *Wainwright v. Witt*, 469 U.S. 412 (1985). See also *Ross v. Oklahoma*, 4897 U.S. 81 (1988)

31

Since mitigation can be anything under *Lockett v. Ohio*, 438 U.S. 586 (1978) a prospective capital juror must be able to consider any mitigation evidence the defense seeks to rely upon. The trial court erred in overruling the challenge for cause. *Cuevas,* supra; *Smith*, supra. The appellant was forced to unnecessarily use a peremptory challenge, and having exhausted his allotment of such challenges was required to accept an "objectionable" juror on the jury. Appellant preserved his error."

**APPELLANT'S ISSUE NO. 2**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON SHEILA YRIGOLLEN**

**<u>SUMMARY OF VOIR DIRE OF VENIRE PERSON SHEILA YRIGOLLEN</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 8 page 79 at which defense counsel made the following objection:

MR. WYATT: Your Honor, we would - - are we back on the record?
We'd like to challenge for cause in this case. Ms. Yrigollen state that - - basically she couldn't follow the law in this situation, Judge, that if somebody was - - she would not hold the State to prove every one of the elements beyond a reasonable doubt. She hesitated when the State was asking that question. Maybe the State rehabilitated. I don't think the State did.
And then I asked her an appointed question about the stabbing murder and asphyxiation on one person and the second person and I flip-flopped the two and that person was going to - - and the Defendant was going to ride down on the elevator, she said, you know what, unequivocally from there, no, I'm going to convict that person. There's no other - - she didn't ask - - you know, at that point in time, Judge, she answered that question truthfully, honestly, and that was her answer, and I believe that's the way she feels about this. I don't believe that in a situation like that, that she can really rehabilitate herself. You know, she answered that truthfully, that she was not going to follow the law, that she was going to convict that person of murder at that point in time, even if the State made a mistake.
Also, on Special issue Number 2, she stated that she would not consider the Defendant's character and background in whether or not she would change a death sentence back to a life sentence. She said she couldn't even think of a way that she could do that. She could be open-minded when I questioned her a little further, but the Defendant's character and background

32

would not be taken into consideration.  We believe she should be challenged for cause for that, also, your Honor.

In this case with this juror, Ms Yrigollen, she also stated on numerous occasions that before she even got to Special Issue Number 1, if she believed that the Defendant was guilt of capital murder, that 11 other people believed beyond a reasonable doubt that at that point in time the correct sentence was death at that point in time - - she said that on multiple occasions, Judge. Despite knowing that the law was life in prison, she said at that point in time she made up her mind - - I believe she said three times that the correct sentence in her mind was death.  And we believe for those three reasons, Your Honor, that she is challenged for cause.

The trial court overruled Appellant's challenge for cause.  (RR: Vol. 8 p. 81)

Appellant submits that Ms. Yrigollen could not follow the law and would not require the

State to prove every allegation.  The following occurred at RR: Vol. 8 p. 78:

Q. The person committed two murders, you believe that beyond a reasonable doubt, but the State didn't prove it up the right way; that the person sitting at this table is a murderer, double murderer, you believe that beyond a reasonable doubt, that this person should either - - you know, go to prison for life or get the death sentence, at that point in time knowing that person is going to get up out of this courtroom, ride down in the elevator with you, walk out, catch a bus, catch a ride, take a taxi, have one of his family members pick him up, get out of this courtroom. At this point in time, knowing that, that you're going to sit there and say the law says, you know what, that person is not guilty because the State didn't prove up their allegations, at that point in time, could you at that point in time find that person not guilty?
A. No.

Ms. Yrigollen was extremely pro death.  When asked by the State why she thought the death

penalty was a good thing to have, she replied " It's just - - if you take a life, I feel like, you know,

then - - the end result should be a life." (RR: Vol. 8 p. 14) In explaining to defense counsel why

she rated herself a "10" in favor of the death penalty, Ms. Yrigollen stated " I believe that the

death penalty is a sentence that should be extended to a person that does a crime, that on a - - as I

state, it's - - if the crime was premeditated murder or whatever, or on a child, rape or anything

like that, I feel like it should be a death sentence." (RR: Vol. 8 p.53)

Appellant submits that this juror would automatically find the defendant a future danger if she found him guilty of capital murder.  The following occurred during voir dire by the State at RR: Vol. 8 p. 26:

Q. And I can guarantee you that they're really good lawyers and that they're not going to do that, but they don't have any burden is my point, okay?  So we have to prove Special issue Number 1 beyond a reasonable doubt. Now, when you see that, what does that mean to you, whether there's a probability that he can't - - would commit criminal acts of violence that would constitute a continuing threat to society?  In a nutshell, does that mean probably going to be dangerous again?
A. I would take it that, yes, he would be a danger to society due to the crime, the severity of the crime that he's being judged on.

Ms. Yrigollen demonstrated a lack of understanding of the term "probable" as seen in the following exchange (RR: Vol. 8 p. 48):

Q. Okay. So right there it says where there's a probability that the Defendant would commit criminal acts of violence.  We're talking about the future, right?
A. Yes.
Q. Okay. And whether there's a probability - - at that point in time what does "probability", that word mean to you?
A. As I told her, it's - - I mean, possibility.  I mean, I don't know - - possibility - -
Q. Possibility - -
A. - - possibility of - - but as she said, there's not a definition.
Q. Well, you would agree that a possibility is something that can happen, correct?
A. It's probable.
Q. Okay.  Well, that's the difference that I want to get to. I want to get to what you believe the difference between possible and probable is.  What do you believe the difference is?
A. The difference between possible and probable?
Q. Yes, ma'am.
A. Probable is maybe.  I don't know - - the possible is it could.  I don't know.
Q. Well, probability means probably that it's more likely than not, right, that something would happen?
A. Could- yes.

The following exchange illustrates Ms. Yrigollen's bias toward assessing a sentence of death for the offense of capital murder (RR: Vol. 8 p.49-50):

34

Q. So if you're saying that, hey, this person is sent down to - - you know, you found the person guilty beyond a reasonable doubt of capital murder - -

A. Yes.

Q. - - at that point in time, and at that point in time it's not a death penalty. It's not a - - it's not a death penalty case. At that point in time he's getting life in prison. You understand that, right?

A. Yes.

Q. That once you convict him of capital murder, at that point in time you cannot give him the death sentence. He's getting life in prison at that point in time?

A. No. You're saying once he's convicted - -

Q. Once he's convicted, you and 11 other people - - say you're sitting on a jury - -

A. Uh-huh.

Q. - - and you've heard all the evidence in this case, and you convict this man beyond a reasonable doubt of capital murder. What do you think is the appropriate punishment at that point in time?

A. Whatever is - - I mean, you're presenting - - the - - the sentence is death sentence. That's what it's going for, right?

Further evidence of Ms. Yrigollen's inability to consider evidence on future dangerousness or mitigation is seen in the following (RR: Vol. 8 p. 54-55):

Q.(By Mr. Wyatt): Okay. You go the worst capital murder you can think of.

A. Yes.

Q. Okay. You got - - like you said, you know, kids, lot of people dying, the whole nine yards. I mean, think about that for a second. And at that point in time you and 11 other jurors say beyond a reasonable doubt that the Defendant in that case is guilty, guilty of capital murder, guilty of doing all those atrocious things that have been presented here in court, okay? And at that point in time knowing that you got to go on to Special Issue Number 1, answer that yes or no, and then maybe continue on to Special Issue Number 2. At that point int time, you're sitting there, you've convicted him beyond a reasonable doubt, what is your thought of the appropriate punishment at that point in time?

A. If it was proven to me without - - within a reasonable doubt, the death sentence.

Ms. Yrigollen repeatedly states throughout voir dire that if the evidence shows the defendant to be guilty of capital murder beyond a reasonable doubt, she would assess the death penalty.

Ms. Yrigollen was also unqualified as a juror because she would not give meaningful consideration to mitigation evidence presented by Appellant. She stated unequivocally that she

would not follow the law with regards to Special Issue Number 2. The following exchange

occurred at RR: Vol. 8 p. 70-71:

Q. In a case like this when you've got - - you're switching a death sentence back to life
imprisonment without parole, it says the Defendant's character - - you've got to include - -
you've go to look at these things. It says right there in Special issue Number 2 what you've go to
look at - -
A. Uh-huh.
Q. - - including the circumstances of the offense, the Defendant's character and background
and personal moral culpability of the Defendant. What comes to your mind when you think
about those - - that phrase that I just read to you right there?
A. The part where - -where the Defendant's character and background, okay, I - - I don't hold
too much on that in making my decisions, you know, based on, okay, good father, you know,
took his kids to school, things like that. I wouldn't take that into consideration. I mean, I - -
that's not the case. That's not what has been proven to me on that.
Q. Okay. So Special issue Number 2 says right there that you go to - - taking into
consideration all the evidence, including the circumstances of the Defendant's character and
background, that's not something you're really going to take into consideration when you're
looking at Special Issue Number 2?
A. No, I'm not.
Q. Okay. And knowing that the law is that you're supposed to look at those things, you're
supposed to look at the Defendant's character, you're supposed to look at the background from
the evidence presented, you're saying, you know what, I found this guy guilty of capital murder,
I've answered yes that I think he's going to be a continuing threat to society. At that point in time
Special issue Number 2 says, hey, I look at the Defendant's character, look at his background and
see if there's any reason that you can come up with why you want to basically change over a
death sentence to a life sentence. That's the law. At that point in time you're supposed to be
looking at those things. But really that's not going to factor into it for you?
A. That's - - that's the law, but that would not factor into it to me.

Ms. Yrigollen had a bias toward law enforcement. She wrote in her questionnaire that

she thought police would be more truthful. (RR: Vol. 8 p. 39)

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

This juror demonstrated in her answers in both the questionnaire and voir dire that she was not

qualified to serve as a juror in a death penalty trial. She proved that she was pro-death, would

automatically sentence a defendant to death if found guilty, would automatically find the

defendant to be a future danger, would not consider mitigation evidence and had a law

enforcement bias.  Appellant has shown that this juror would not follow the law as required in

order to provide Appellant with due process.

Appellant objected to seating of venire person, Sheila Yrigollen, stating that Ms. Yrigollen

was an objectionable juror. (RR: 8 p. 79) Because the Trial Court erred in denying Appellant's

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied  upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 8 p. 81) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 3

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON NORMA WILEY

### SUMMARY OF VOIR DIRE OF VENIRE PERSON NORMA WILEY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 12 page 128

at which defense counsel made the following objection:

MR. JOHNSON: Judge, we're certainly going to challenge this juror for cause. She - -
she stated unequivocally on several occasions that if she found someone guilty beyond a
reasonable doubt and if the State proved beyond a reasonable doubt that the person was going to
be a future danger, she stated several times that honestly she would not ever go back switch that
sentence to a sentence of life or find mitigation sufficient to switch that back to a sentence of life
if she knew beyond a reasonable doubt that that person was going to be a continuing threat to
society. I mean, I don't think she could make it any clearer.  She said it two or three separate
times.  And once the State started objecting in such a way that it told her that she was saying the
wrong thing or the thing that would prevent her from being able to be on the jury, she backed up
a little.
But this is an opportunity for the Court to say - -you've had an opportunity to observe not
only her answer - - her spoken word, but also her demeanor in - - in the context in which her
answer was given.  And we're talking about a situation here where our client is on trial for his

37

life. He's entitled under the Constitution of the United States and the State of Texas due process, and he's entitled to a jury that is - - that is actually qualified - - not just qualified y spoken word, but actually qualified to hear this case and decide the issues before them. And we're going to ask the Court to take into consideration the context and the manner in which the answers were given. And were going to ask the Court to excuse her for cause based upon her answers to the - - to the fact that she would not be able to change or consider mitigation to a point where she would find somebody or allow someone to have a life sentence that she knew was going to be a future threat to society.

The trial court overruled Appellant's challenge for cause. (RR: Vol. 12 p. 130)

The voir dire of Ms. Wiley shows that she was much in support of the death penalty. She stated on the questionnaire that if you convict someone of taking someone's life, then that person should have his life taken by the State. (RR: Vol. 12 p. 94) She believed that the word of God sets forth the need for the death penalty in a murder case. (RR: Vol. 12 p. 95) She stated that "The Bible says an eye for an eye and a tooth for a tooth." (RR: Vol. 12 p. 95) When asked how she reconciled and eye for an eye with the commandment thou shalt not kill, she stated "Because the Bible also goes on to say that government sets up a time when a life should be taken for taking a life or kidnaping or rape, so therefore God appoints the government to do that." (RR: Vol. 12 p. 96)

The following occurred during voir dire by the defense at RR: Vol. 12 p. 99-100):

Q. And a lot of people with strong beliefs and especially people with strong religious beliefs like you, even though you're told, well, you can't do this and you can't do that, a lot of times the truth of the matter is when you look inside of yourself and you look inside of your mind and your heart, Ms. Wiley may be saying to herself, now that I look at it that way, I might always be leaning a little too far towards the word of God as I understand it, because that is my preconceived and that's the - - that's the beliefs that I brought into this courtroom today when you came in the door. And I want to make - - I want to give you an opportunity to think about it, and just be honest - - mainly be honest with yourself.

A. I understand what you're saying because I'm 65 years old and at the age of 65, you don't go anywhere without some preconceived ideas.

. . .

38

Q. ...How could you ever justify in your mind letting that person have a life sentence when you know that he's going to make victims of other innocent victims?

A. I have to be honest with you and tell you I could not, because it might be your wife that is the next victim or my husband that is the next victim or my child.

Q. And that's - - and that's the point that I said earlier, Ms. Wiley, and that's why I appreciate - - that why I wanted to come back and talk to you about these issues.

A. If they had done their job and proved in my mind beyond a reasonable doubt that he is guilty of all that he's been accused of, then I would not have a problem.

Q. Well, they way you phrased that, ma'am, is not - - I know you wouldn't have a problem. I think - - I think - -

A. If they don't do their job, I would have a problem finding him guilty or - - or sentencing him to anything.

Q. Right. And see, ma'am, I have no doubt that Norman Wiley would have no problem. I think Norma Wiley, based upon her beliefs, would never have anything but one solution for that person after you've answered Special Issue Number 1 yes. Would you agree with that?

A. Issue Number 1?

Q. Once you answered that question yes, and in all honesty, Norma Wiley is never going to turn around and let that persons have a life sentence where he's going to be - -

A. No, if that's been proven to me, yes, you're right.

Appellant submits that Ms. Wiley has demonstrated by her answers that she would automatically find the defendant a future danger and assess death if she found him guilty of capital murder. Appellant further argues that Ms. Wiley would not consider the mitigation evidence presented by the defense in answering Special Issue No. 2. The following occurred at RR: Vol. 12 p. 107:

Q. ...If you look right down about the middle of the page there, ma'am, it says some people feel that genetics and circumstances of birth and upbringing and environment should all be considered in determining punishment for someone convicted. What do you think? You see - - did you want to take a second there and just read your - -

A. I said: I disagree. These are all excuses. I was abused as a child, but decided early on to cherish my children as gifts from God. I gave birth to four and have adopted three and they are all gifts from God.

Ms. Wiley also exhibited a bias toward law enforcement. She believed that a police officer was more likely to tell the truth than a lay person. (RR: Vol. 12 p. 117-118) Two of her sons were police officers. The following occurred at RR: Vol. 12 p. 118-119):

39

Q. Okay. That's why I was asking you because that feeling in regards to all your thoughts and regards to actions and accountability and consequences and people who are out there being paid to put their life on the line to protect society - - I mean, some people place police officers and their testimony on a little bit of a - - a platform, I guess.

A. No, unfortunately, there are those that will get on the stand and lie. We all know that.

Q. You wouldn't - - you wouldn't give a police - - police officer any more credibility whatsoever than you would just anybody else?

A. I would have to look at their face and hear what they're saying before I can give them - - give them credibility at all.

At this point, Ms. Wiley said that she could usually tell when someone was trying to "pull the wool over her eyes." The following exchange occurred (RR: Vol. 12 p. 120):

Q. Hey, Ms. Wiley, I'm going to ask you a question. I'm going to ask a question. It's going to seem kind of weird, but I've noticed that while we've been sitting here, you've actually looked over at the face fo the Defendant.

A. Yes.

Q. Can you tell me what you've gathered or what you've - - -

A. Nothing. He hasn't said anything to me.

Q. So you'd actually have to hear him speak?

A. Yes. I have to hear the - - the - - either hear the truth or hear the lies and hear how it's misconstrued or whatever, along with looking in his eyes.

Appellant submits that even though Ms. Wiley stated that she did not have to hear from the Defendant, Appellant believes she would want and expect the Defendant to testify, at which time she could hear him speak while she looked him in the eye. (RR: Vol. 12 p.121)

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Ms. Wiley showed that she was a strong supporter of the death penalty, believing that it was sanctioned by the Bible. Ms. Wiley demonstrated that she would automatically find the defendant to be a future danger if convicted of capital murder. The only scenario that she used in why she would consider a life sentence was the scenario given to her by the State which was an extreme case of child abuse. Furthermore, Ms. Wiley stated that mitigation issues were "excuses" and she would not consider them. Defendant is guaranteed a jury who will give him

40

meaningful consideration on his mitigation evidence.  Ms. Wiley exhibited a bias toward police, having two sons who were police officers.  Finally, Ms. Wiley testified that she would need to hear from the defendant so she could look him in the eye and determine whether or not he was lying.

Appellant objected to seating of venire person, Norma Wiley, stating that Ms. Wiley was an objectionable juror. (RR: 12 p. 128) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied  upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 12 p. 130) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

### APPELLANT'S ISSUE NO. 4

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON ELIZABETH LOPEZ

### <u>SUMMARY OF VOIR DIRE OF VENIRE PERSON ELIZABETH LOPEZ</u>

Appellant directs this Honorable Court's attention to Reporter's Record Volume 16 page 83 at which defense counsel made the following objection:

MR. WARREN: Your Honor, we would - - the Defense would make a - - based on her - - her answers to - - on the questionnaire in regards to being able to follow the law provided by the Judge, as well as some of her answers here in the courtroom today, Your Honor, we would respectfully submit Ms. Lopez for cause.
THE COURT: All right. Overrule - - overrule your submission.

Appellant submits that Ms. Lopez was a victim of a shooting which was so severe that she had to learn how to walk again.  She stated that this event changed her entire life.  (RR: Vol.

16 p. 52) Appellant argues that this event could have created in Ms. Lopez, a bias against the

Defendant or anyone who was accused of a violent crime.

Ms. Lopez was a very strong supported of the death penalty.  She wrote several times in

her questionnaire that she believes in an eye for an eye.   The following occurred at RR: Vol. 16

p. 77:

Q. You also put in there about - - in your questionnaire you talked about an eye for an eye.
You listed it a couple of times. Can you kind of tell me what your interpretation is of an eye for
an eye?
A. I guess me mind-set at that time when I was filling this out - - I mean, it's - - if someone
committed serial crimes, and one day - - and there's no remorse, everything was done to - - it was
intentional to harm somebody.  Somebody that wants to blow up a building and harm other
people, why - - the way I look at it, I should not sit back there and say, you know, the State
should continue on paying for this person to be incarcerated.  Their first intention was not to live
to begin with, so I mean giving them the death penalty, if that was one of the consequences, then
so be it.  That's the eye.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

Appellant objected to seating of venire person, Elizabeth Lopez, stating that Ms. Lopez was an

objectionable juror. (RR: 16 p.83) Because the Trial Court erred in denying Appellant's

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied  upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 16 p. 83) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

42

## APPELLANT'S ISSUE NO. 5

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CATHEY YOUNG

### SUMMARY OF VOIR DIRE OF VENIRE PERSON CATHEY YOUNG

Appellant directs this Honorable Court's attention to Reporter's Record Volume 18 page 58

at which defense counsel made the following objection:

MR. WARREN:     Defense would move for - - to challenge Mr. Young for cause based on her answer - - or her statement made about she does not believe in life without parole. And we believe based on that statement that she has preconceived notions and consideration - - and would not be able to consider any evidence that the law would have her to consider in regards to Special Issue Number 2. We believe they would be automatically answered in the negative without considering the evidence that the law requires.

The trial court overruled Appellant's challenge for cause. (RR: Vol. 18 p. 58)

Appellant submits that Ms. Young would not give meaningful consideration to the mitigation evidence presented by Appellant. During voir dire by the defense, the following occurred at RR: Vol. 18 p. 43:

Q. ...You know, I look at some of your - - you know, your answers in the questionnaire about - - like there was a question about genetics and upbringing, background, things of that nature. You say - - basically your answer - - I'm going to paraphrase, if you'll allow me. We all deal with certain situations, but we can't blame anyone but ourselves. It that - - is that a fair assumption?
A. Yes.
Q. And also about - - I think that was the main - - but basically it's a personal decision and - - and they should be held responsible for their own actions; is that right?
A. I strongly believe that. I - -

In addition to not giving consideration to mitigation issues, Ms. Young, while voicing the

opinion she would consider life without parole, was in fact opposed to life without parole as

evidenced in the following exchange (RR: Vol. 18 p. 48-49):

Q. And there are a lot of - - as Ms. Bennett stated, there's a lot of things that they take into consideration whether or not they're going to seek death in a capital murder case because, for instance, if there were two - - if there was a 7-Eleven on one side and at Stop and Go on the other

43

and they were robbed at the exact same time on the exact same day and the clerks were killed during the course of robberies, so those would both be capital murders. They could decide to seek death in one and not the other. What are your feelings on that?

A. Well, I'm curious why they didn't - -

Q. Are you of the opinion that all capital murders should be eligible - - I mean, should seek the death penalty?

A. I don't really believe in life in prison.

Q. Okay.

A. I think it's a - - it's a burden on the State - -

Q. Yes, ma'am.

A. - - financially.

Q. Yes, ma'am.

A. And I just don't believe in life without prison.

Appellant argues that his challenge on this juror should have been granted because he would

have to overcome her bias against life without parole. Other evidence which demonstrates Ms.

Young was unqualified to serve as a juror because she was so prone to finding guilt is found at

RR: Vol. 18 p. 45-46:

Q. ...And it talks about whether in order to protect society, you convict all ten or you acquit all ten to protect the innocent, which would be that one. And you wrote, convict all ten. Can you kind of explain to me how you would be okay with letting someone that you clearly know has done this murder - - or capital - -heinous, terrible murder, and be okay - - acquitting them and how you would feel because of their innocence, but you would convict if innocent in that scenario?

A. If the facts are there and the State has proven - - and even though this guy looks innocent, he may not - -

Q. In this scenario, you know, let's just assume with that scenario that the person is innocent. Would you still - - assuming that, would you still convict all ten or would you acquit all then?

A. I would still convict all ten.

Q. Okay.

A. And the reason I would do that is because that's nine. You can't let all nine go, and just have one innocent person. And I know I'd probably be that innocent person going to jail, but - -

Appellant submits that by her testimony, Ms. Young has shown herself to be of the mind set

that she should convict, "even though the guy looks innocent, he may not" because she would not

want anyone who she thought might by any chance, be guilty go free.

44

The trial court should have granted Appellant's challenge to Ms. Young because she clearly demonstrated she would not give meaningful consideration to the mitigation evidence presented by Appellant, she stated a bias against life in prison without parole and she exhibited a desire to convict so that there would not be any chance a guilty person would go free.

Appellant objected to seating of venire person, Cathey Young, stating that Ms. Young was an objectionable juror. (RR: 18 p. 58) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied  upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 18 p. 58) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

### APPELLANT'S ISSUE NO. 6

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON ANETA JOHNSON

### SUMMARY OF VOIR DIRE OF VENIRE PERSON ANETA JOHNSON

Appellant directs this Honorable Court's attention to Reporter's Record Volume 19 page 132 at which defense counsel made the following objection:

MR. JOHNSON: Yes, Judge. This juror has certainly shown she is death prone. The - - her answers to the questions show that the - - that her belief was that a finding of guilty to any type of premeditated, intentional act of murder would be sufficient in her mind for a sentence of death. Once - - and she had stated that prior to being told or given any legal definition of capital murder. However, en after being so admonished, it was all the way through half of my voir dire before she understood that you couldn't - - that life without parole wasn't appropriate for someone that killed somebody in self-defense or by way of an accident. This juror clearly does not have a clear understanding and definition in her mind of a type of individual that should be subject to death. She equates guilt with death.  We believe that she just shows that she is death prone.  And we believe as she sat here in the courtroom when I took her to the precipice of Question Number 2, she said repeatedly that she didn't know if she would ever be able to do that.  And only upon

45

further prodding did she say she would keep an open mind, but certainly this is the type of situation, Judge, where this juror indicated - - has indicated that she has reservations about whether or not she would - - and be able to follow the law in regards to giving fair consideration to Special Issue Number 2. And we submit that she's subject to cause for those reasons.

The trial court overruled Appellant's challenge for cause. (RR: Vol. 19 p. 133)

Appellant argues that for Ms. Johnson, a finding of guilty to any type of premeditated, intentional act of murder would be sufficient in her mind for a sentence of death. She repeatedly testified that premeditation was the best argument for the death penalty. RR: Vol. 19 p. 65: "Premeditated. You know, to take someone's life, or planning to take someone's life."; p.66: "...that person goes back to planning, you know, someone's death..." p. 68: "So you feel - - it sounds like in - - in the premeditated murder case, you feel rather strongly. You're fairly strong in favor of the death penalty - -" A. "Yes."; p. 100: "...be appropriate that the person would receive a sentence of death?" "If it was premeditated, yes."

Ms. Johnson also voiced the opinion that the death penalty should not be available to anyone who was acting in self-defense. (RR: Vol. 19 p. 67) This clearly shows that Ms. Johnson did not have a full understanding of what constituted capital murder.

Ms. Johnson was also a juror who would not give meaningful consideration to mitigation evidence in determining Special Issue No. 2. The following occurred during the State's examination at RR: Vol. 19 p. 75:

Q. . . .We're going to talk about this a little bit more later, but what is your - - kind of what are your feelings on somebody's, you know, upbringing, background, and whether or not that should be taken into consideration?
A. You mean what do I think? Do I think their background plays into everything that they do?
Q. Yeah, how do you feel about that?
A. It goes back to circumstances. I don't really think that all the time that it  does, but I think sometime.

46

Q. So if somebody committed a brutal murder, let's say, would - - would how they were raised be important to you?

A. No.

Q. Should that lessen their punishment, do you think?

A. Should it lessen their punishment?

Q. Yes.

A. No, I don't think so.

Appellant submits that Ms. Johnson was also unqualified because she did not understand the

meaning of "probable." The following occurred at RR: Vol. 19 p. 115:

Q. You - - when the prosecutor asked you what you thought about probability, you remember what you said?

A. I said they would probably do it again, something to that - -

Q. Does probably meant pretty much the same as possibly?

A. Yes.

While defense counsel explained the difference to her, Appellant submits that it would only

take the possibility of future criminal acts of violence to convince Ms. Johnson to answer "yes"

to Special Issue No. 1.

Appellant argues that while the defense was questioning Ms. Johnson about the possibility of

changing her mind from death to a life sentence when considering Special Issue No. 2, she stated

that she didn't know if she could do this.  (RR: Vol. 19 p. 119, 121) The State then voiced an

objection, stating that she just needed to "keep and open mind" and "would follow the law."

(RR: Vol. 19 p. 120) The State again objected while Ms. Johnson was being questioned on the

same topic.  (RR: Vol. 19 p. 123) After these objections, Ms. Johnson began answering defense

counsel with the statements about keeping an open mind.  (RR: Vol. 19 p. 123,124) Appellant

submits that just as defense counsel was getting Ms. Johnson to express her true feelings, that she

would not change her mind on death versus life on the basis of mitigation evidence,  the State

interjected itself and reminded Ms. Johnson of the "appropriate" answers in order to be qualified

47

as a juror. Ms. Johnson demonstrated that she would not give meaningful consideration to mitigation evidence presented by Appellant.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Aneta Johnson, stating that Ms. Johnson was an objectionable juror. (RR: 19 p. 132) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 19 p. 132) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

### APPELLANT'S ISSUE NO. 7

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON TERRY CRAWFORD

### SUMMARY OF VOIR DIRE OF VENIRE PERSON TERRY CRAWFORD

Appellant directs this Honorable Court's attention to Reporter's Record Volume 25 page 73 at which defense counsel made the following objection:

MR. WARREN: Your Honor, we would respectfully move for - - move for cause on ms. Crawford based on her answers to her work schedule and not being able to devote her full attention to this offense - - or to this trial, Your Honor. We believe that it would affect her in her deliberations, as well as her verdict in the case, Your Honor.

Appellant argues that Ms. Crawford, a mother of six, wife of a firefighter, and sleep study technician would not be able to devote her full attention to the trial. The following occurred at RR: Vol. 25 p. 21 while being examined by the State:

Q....So understanding that, but then not knowing what your schedule is like and what you may or may not be able to make arrangements to do, tell me what - - I guess would you be able to

make arrangements and plan for and be on this jury if - - if we selected you today, or is it going to cause you some type of extreme hardship?

A. The hardship would be like I say, my husband works a 24-hour shift, so when he's gone, he's unavailable from 7:00 a.m. to 7:00 a.m.

Q. Okay.

A. SO that would be my only part with the three kids at home.

Q. Right. And do you have - - I don't know, do you have family?

A. We do have family, so I could probably make arrangements. It's just we've never been in this situation before, so.

While Ms. Crawford thought she could manage her absence from her family, when asked if whether or not she would be able to give her full attention and not be distracted by things at home, she replied "Yes, ma'am." and further stated "I would hope so, yes, ma'am." She went on to say that with kids, it was sometimes hard. (RR: Vol. 25 p. 22)

Ms. Crawford also voiced concern over the financial aspects of her absence from work. When by the State if she had any further questions, the following occurred (RR: Vol. 25 p. 45):

Q. As far as like you talking about the job, being away from my job for two weeks, can be an issue as far as financially, as well.

A. Sure.

Q. And my boss has given me a little bit of a hard time about this. What are my rights as far as being on a jury for two weeks and not working?

A. Well, we can't make him pay you.

It was explained to Ms. Crawford that her boss could not fire her for serving on a jury.(RR: Vol. 25 p. 50) She stated that she understood that the trial would last approximately two weeks. (RR: Vol. 25 p. 50) Miss Crawford stated that it was a possibility that her family life would "creep into her mind", affecting a possible verdict. However, she stated that while she worked, she was able to set her personal feelings aside and deal with her patients. (RR: Vol. 25 p. 51)

Ms. Crawford was asked about her job (RR: Vol. 25 p. 51):

Q. ...And - - but kind of like you in dealing with that equipment, that you're the only one that's qualified to handle that equipment - -

49

A. Right. Yes, I was the only one trained on it.

Q. Okay. Are there other people that can possibly handle it that have watched you?

A. It's not that I'm the only one in this world that could ever do it. I'm just at this moment the only one that has been trained on it.

Appellant argues that this was another reason Ms. Crawford should have been disqualified by the trial court. She was a medical professional with specialized training who was the only person qualified to use specialized equipment. Certainly there were enough jurors to question and qualify without jeopardizing the health of citizens by removing for at least two weeks the only person qualified to operate such equipment. Ms. Crawford admitted that her boss would be upset if she was absent for two weeks. There could be no certainty that all the concerns Ms. Crawford had in her life, children at home, a firefighter husband and a specialized job would not affect her deliberations. Placing a juror who could not diligently listen to evidence and deliberate on this jury would deny Appellant his right to a fair trial.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Terry Crawford, stating that Ms. Crawford was an objectionable juror. (RR: 25 p. 73) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 25 p. 73) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 8

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON BARBARA GARRETT

## SUMMARY OF VOIR DIRE OF VENIRE PERSON BARBARA GARRETT

Appellant directs this Honorable Court's attention to Reporter's Record Volume 27 page 120 at which defense counsel made the following objection:

MR. WYATT: Judge, we make a challenge for cause on Juror Number 1038, Ms. Barbara Garrett, in that her answers when asked if she equated a guilty verdict beyond a reasonable doubt, holding the State to all their elements and if those elements were proven and she found the Defendant guilty, that that would equate to an automatic death sentence in a capital murder case. For that reason, we would move for a strike for cause.

Appellant argues that the answers of Ms. Garrett in the questionnaire and on voir dire show that she would automatically assess a death sentence if she found a defendant guilty of capital murder. She believed that a death penalty type of crime was when "somebody intentionally taking somebody's life." (RR: Vol. 27 p. 65) She further stated that self defense would be the only reason against the death penalty. (RR: Vol. 27 p. 65) After the State explained to the juror how the Special Issues worked and instructed her on how she had to keep and open mind until she heard all the evidence, the following exchanged occurred at RR: Vol. 27 p. 88:

Q. If you find somebody guilty of a horrible, heinous capital murder?
A. Uh-huh.
Q. Not an accident, not in self-defense, but we haven't talked about the special issues yet.
A. Okay.
Q. Are there any definite punishment options yet?
A. I would think it would be death.

51

Ms. Garrett's testimony showed that she would always sentence a defendant to death

regardless of the Special Issues if the murder of a child was involved.  The following occurred at

RR: Vol. 27 p. 108:

Q.. . .And like I said, we lose a lot of people right there because they say, you know what, this
person is dangerous, they're a murderer, I've convicted them of capital murder.  And, you know
what, I don't need to go on to Special Issue Number 1 and Number 2, I think they deserve the
death penalty.
And the reason I ask you that specifically is because of your answer - -
A. Uh-huh.
Q,. - -that you gave to the State.  What are your feelings on that?
A. My - -my feelings in that - - based upon how Mr. Healy explained it to me, is that I would
have an obligation to listen to the - - you know, to the character and everything of the person.  In
my mind, yeah, I probably would think, well, like I said - - I mean, since you killed a child, I'm
thinking you guilty and you need to die.  That's just the way I feel.

Obviously Ms. Garrett understood that she had to <u>listen</u> to the evidence on Special Issue

Number 1 and 2, but she would not give any of the evidence any meaningful consideration.  She

would not keep an open mind to consider the evidence and therefore would not follow the law.

Further evidence of Ms. Garrett's views on assessing the death penalty was found at RR: Vol.

27 p. 112:

A. I - - mainly because I believe in the - -I have to have proof, and I base that upon what I
would want, you know, if I was say - - I'm not, in - - in, you know, in his shoes.  I just think even
though - - I - -I think everybody - - anybody that senselessly take a life, you know, for no real - -
you know, no reason - -I mean, just intentionally take a life, I believe they - - their life should be
taken, also.

Throughout the voir dire of Ms. Garrett, she repeatedly stated that and intentional murder was

sufficient to warrant the death penalty.  She showed that she would automatically assess the death

penalty, without regard to Special Issues Numbers 1 and 2.  For these reasons  Appellant submits

that the Trial Court erred in denying Appellant's challenge for cause.  Appellant objected to

seating of venire person, Barbara Garrett, stating that Ms. Garrett was an objectionable juror.

(RR: 27 p.120) Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 27 p. 121) See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

**APPELLANT'S ISSUE NO. 9**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON THOMAS FRAZIER**

**<u>SUMMARY OF VOIR DIRE OF VENIRE PERSON THOMAS FRAZIER</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 27 pages 193-195 at which defense counsel made the following objection:

MR. JOHNSON: Judge, the Defense will challenge this juror. I submit to the Court that - - you know, he - - every time I got him to another explanation of the law, he said I didn't know that until just now. Its already been explained to him by the Court and by the prosecution and by myself and it seems like - - besides the three times of explaining these concepts to him, he still just does not have a grasp of the exact issues. And then he turns back around and will just say that based on the fact situation, in his head he thinks it calls for an automatic sentence of death. And I mean, I'll tell the Court, and I hope the Court can tell from my demeanor and manner in which I questioned this juror that I wasn't trying to lay a trap or trick him in any way. I was trying to make sure that he had a firm grasp of the issues that were before us. And he's shown - - he's shown that he is - - that he is death prone.

And my main objection to him, Judge, in addition to the fact that he's death prone, after 30 minutes of - - or 40 minutes of me talking to him, when I went back and explained to him that just an intentional murder or deliberate murder is not subject to the death penalty, he said he doesn't agree with that. And I just don't believe that this man has a grasp of the issues here that's before us. And even though he may say yes in some of the appropriate areas, his - - his explanations as to his thought process, I would submit to the Court would show that he's not the kind of juror that's qualified to sit and hear a case and make a determination as to the life or death of an individual. And I would also further go from that point to say that based upon the - - something that he's heard, whether it be hearsay or otherwise, that in his mind at this point in time he has formed a conclusion as to the guilt or innocence that would impede his ability to be a fair juror, and that's in violation of 35.156 of the code of Criminal Procedure.

53

THE COURT: 35.16?

MR. JOHNSON: 35.16, section - - subsection 10. And I would submit that it's clear from what I've told him, we're not conceding any issue, that they covered the guilt or innocence, and he says that based on what he heard the first time and based on what he's heard here, in his mind he already believes the Defendant to be guilty. We're going to submit him for cause, based upon each of those reasons.

The Trial Court denied Appellant's challenge. (RR: Vol. 27 p. 195)

Appellant submits that the record shows Mr. Frazier had the preconceived idea that the

Defendant was guilty. The following occurred at RR: Vol. 27 p. 189-191):

A. Everything that I've heard tody and even when I was here a month ago tells me that you've already convicted the Defendant, that he's guilty.

Q. What is - - what is that?

A. Well, I mean, you're - - everything that you've said is - - we're not so concerned about whether or not the Defendant is guilty or innocent, but whether or not he would be a threat in the future.

Q. Okay. I think I said earlier that we weren't conceding any of those issues, but that the prosecutor had already - -

A. I know you said it.

Q. Okay.

A. But in between the lines.

Q. Okay.

A. You as a defense attorney already has told me that you think your Defendant is going to be found guilty.

Q. And that - -

A. You're basically concerned about what's going to happen to him as far as punishment.

Q. Okay. How does that make you - - I don't know that I would agree with you, but how does that make you feel - -

A. You're not - - you're not in a position to agree with it, but it doesn't make any difference to me as a juror. I have my duty to do as a juror based solely on the evidence and on - - maybe on learning a little bit about the Defendant.

Q. What was I that you heard at the - - at the first time that we were here that caused you to feel that he was guilty?

A. Oh, most of what's been said has - - by you - -

Q. Yes, sir.

A. - -has been based on punishment.

Q. Correct.

A. To me, that implies that you already think the Defendant is gong to go down, that he's going to be found guilty.

Q. Okay. In fact, I asked you - -

A. I'm being totally honest.  And I think the big part in your mind as the Defense - -
Q. Okay.
A. - - is that you're concerned more about what's going to happen after the Defendant has been found guilty.  As a juror, I can't even - - I can't say that he's guilty at this point.  I've got to wait.  I'm not sure that he is guilty.  I don't have no way of knowing.

The juror states that he has to assume the Defendant is not guilty in order to serve on the jury, but Appellant submits that he could put aside his strongly held stated belief that the defendant is in fact guilty as shown by the questioning of both the State the Defense.  Appellant's right to a fair trial would be denied by a juror who had a preconceived idea that he was guilty before he heard any testimony.  Appellant had no alternative but to strike this juror who should have been disqualified by the trial court.

Appellant further submits that Mr. Frazier would automatically assess the death penalty if the defendant was convicted of capital murder.  The following illustrating this point is found at RR: Vol. 27 p. 187:

Q. Okay.  And in your mind could you equate fairness as - - as - - as a penance to the victims of the crime?  Could you equate that with life without parole, or do you think that in some cases just the nature of the case itself is going to call for death as a - - as a way of extracting revenge?
A. Well, our law is not set up that way.
Q. Well, it's not and that's why I was - - this is why you get to tell me how you feel.
A. But if our law were different, if I had a way of changing the law, I damn sure would.
Q. Okay.
A. I think if you take a - - deliberately take a person's life, especially two people, just cold-blooded deliberately do it and you're not mentally incapacitated, then you should get death.  I'm sorry, but I think that's fair.

Mr. Frazier would automatically assess death for a defendant who killed a child.  (RR: Vol. 27 p. 180)  He believed that everyone should be responsible for their own actions.  (RR: Vol. 27 p. 159)  He also believed the death penalty was appropriate for "regular murder."  He had

difficulty understanding why the death penalty was not an option for murder.  The following

occurred at RR: Vol. 27 p. 176-177:

> Q. I pull a gun right now and point it at her and kill her, she's dead.  I meant to do it, and I
> did it.  But I didn't rob her.  I didn't rape her.  I wasn't in the process of stealing from her.  I just
> took her life.  That's murder.  I'm not even subject to getting the death penalty to that.
> A. Well, I have to be honest, I would tend to say that warrants a death penalty because you've
> taken another life deliberately.  You had time to think about it before you did it.  It was
> deliberate.
> Q. It is.  And that's one thing I want to tell you right now.  You used the word "deliberate."
> I'm going to use the word "intentional."
> A. The same.
> Q. Knowing and intentional.
> A. Intentional.
> . . .
> Q. And the law says that a juror can't just equate intentional murder with an automatic
> sentence of death.
> A. Okay.  I'm a little confused.  Up until this point I've always felt that if you intentionally
> take the life of another person without some kind of just cause, you know, either defense or self-
> defense or defending someone else, that you - - that person is guilty of murder, taking a life, and
> should be punished.
> Q. Should be punished.
> A. Not necessarily always by death, but maybe, depending, you know.  Depending - -
> Q. I think it was explained to you - - I think the Judge explained it.  I think the prosecution
> explained to you that's not the way the law works.
> A. I understand that as of today. I didn't know it before.
> Q. Okay.  Well - -
> A. I didn't - - I didn't make the distinction between that.
> Q. Well, how does it make you feel now?  I mean, do you think that's - - can you operate - -
> could you operate as a juror under that framework and under that understanding of what the law
> actually is?
> A. Yes, I can.
> Q. Even though you feel strongly in regards to just the taking of a - - of a life?
> A. I think I can, but what - - I'm a little bit confused.  To me, it's a little bit different.

Appellant argues that Mr. Frazier was also biased toward law enforcement.  He wrote on his

questionnaire that he hoped the police would be more likely to tell the truth.  (RR: Vol. 27 p.

160) He stated "I'm a little bit prejudiced towards policemen - - ."  (RR: Vol. 27 p. 161) He

further stated "- - in general because - - I mean, their job is to, you know, protect the public.  And

I would tend to give great consideration to what an officer said, but I would to anyone, any

witness, so I don't know if there's any difference or not really."

Appellant submits that by his statement, Mr. Frazier admits to being bias but then realizes

that perhaps this would keep him off the jury so he amends his answer.  Mr. Frazier was seventy

years old, could have been excused but stated that he did not want to be excused.  He had served

on several juries, including a murder trial.  (RR: Vol. 27 p. 133)

Mr. Frazier was a wholly unqualified juror who should have been struck by the trial court or

excused by agreement of the parties.  His answers show a bias for the death penalty and a lack of

understanding of the law.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

Appellant objected to seating of venire person, Thomas Frazier, stating that Mr. Frazier was an

objectionable juror. (RR: 27 p.193-195) Because the Trial Court erred in denying Appellant's

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied  upon by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 27 p. 195) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 10

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON SREENIVASAREDDY THALLAPAREDDY

### SUMMARY OF VOIR DIRE OF VENIRE PERSON SREENIVASAREDDY THALLAPAREDDY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 29  page 70 at which defense counsel made the following objection:

MR. WARREN: Yes, sir.  We would move Mr. Thallapareddy, Juror Number 1297, for cause based on several of his answers.  We do not believe that he would actually be able to follow the law.  He stated in the affirmative - - we listened to his answers throughout the voir dire from the State, as well as the Defense, Your Honor.  We do not believe that he has answered the questions in such a manner that it would qualify him to be a juror in this case, Your Honor.

The trial court overruled Appellant's challenge for cause.  (RR: Vol. 29 p. 70)

Appellant submits that Mr. Thallapareddy should not have been questioned and should have been excused from the start of voir dire.  He told the court that he had travel plans to see his elderly grandparents in India.  He planned to travel in September or in October at the time of the trial.  He voiced a concern that he may need to go to India to look after his grandparents who were in their 90's and felt that they were at the end of their lives.  (RR: Vol. 29 p. 34-35) The State opined that since they hadn't bought their plane tickets, it didn't sound like he had any conflicts. (RR: Vol. 29 p. 35) Appellant submits that Mr. Thallapareddy stated he wanted to be disqualified from this jury.  (RR: Vol. 29 p. 55)

Mr. Thallapareddy testified that he understood what the mitigation issue was asking him to look at, but he stated that "I might conflict my judgment.  I may not be able to do that."  (RR: Vol. 29 p. 53) Mr. Thallapareddy further showed himself to be unqualified because he thought

58

the death penalty the appropriate punishment rather than life imprisonment.  The following

occurred at RR: Vol. 29 p. 63-64:

A. Yeah, I already told you that I may not agree with the law, but I may follow the law.

Q. But you do agree with the law?

A. Yeah, some - - I mean, as I told you earlier, if a person - -I mean, if everybody - - if the State proves - - not like the State maybe, but the judicial system proves that a person committed willingly with a plan or something like that, committed a crime - -

Q. Yes, sir.

A. - - then why should we waste the tax dollars to put him into prison and - - what is the reason why he need to suffer in the prison to begin with for - - for life imprisonment? What he - - the society achieving by doing that?

Q. So do you not - - let me ask you this, Mr Thallapareddy.  Do you not believe that - -

A. No, no, I mean, you are not - -you are saying, he will recover and we will allow him into society and he will be useful to the society and he will help the society, right? That's not going to happen.  When you say life imprisonment, right?

Q. No, sir. In this particular instance, this is absolutely life without parole.

A. That's what I'm saying.  When you send - - when you send a person, life without - - life without parole to prison then he's not able to - -what you say, help the society.  Then why would we do that? What is the purpose we are achieving by sending him to jail, if he's not coming out?

Q. So do you think - - you think for any particular crime where an individual is sentenced to life, that basically he should be sentenced to death as opposed to life?

A. Yeah.  I mean, why not? Why - - why not? That is my belief. I mean, if he commits a heinous crime.

Q. Yes, sir.

A. I'm not saying, okay, if he accident or something (sic).

Q.  Yes, sir.

A. Then why shouldn't we sentence him to death and forget about him? So that he - -I mean, by accident he might do the same thing.  I mean, when we are talking about the jail system itself as a society - -

Q. Yes, sir.

A. - -he may do it to them and also we are wasting a lot of tax dollars.

Mr. Thallapareddy clearly shows that he is prone to assessing the death penalty and would

not consider a life sentence to be just.  Appellant submits that his obviously strongly held beliefs

made him unqualified as a juror in this capital/death case.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.

Appellant objected to seating of venire person, Sreenivasareddy Thallapareddy, stating that Mr.

Thallapareddy was an objectionable juror. (RR: 29 p. 70) Because the Trial Court erred in

denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the

prospective juror's bias against the Defendant, or as a matter of law against the law as relied

upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 29 p. 70)

See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 11

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON WILLIAM OGLE

### SUMMARY OF VOIR DIRE OF VENIRE PERSON WILLIAM OGLE

Appellant directs this Honorable Court's attention to Reporter's Record Volume 30  pages

76-77 at which defense counsel made the following objection:

MR. WYATT: Yes, Your Honor, we'll give it a challenge for cause on - -with regards to
Special Issue Number 2, that his - - the answer in his questionnaire is the exact opposite of what
he just said on the stand, Judge.  He said that when it comes to genetics, circumstances of birth,
upbringing, and environment - - and actually he even said it on the stand, that he would not
consider those things.  And when asked that question - - it said taking into consideration all the
circumstances of the background, the defendant's character, the two answers don't match up,
Judge.  And for that reason, we would move for a strike for cause on Juror Number 778, Mr.
Ogle.

The Trial Court denied Appellant's challenge.  (RR: Vol. 30 p. 77)

Appellant submits that Mr. Ogle would automatically assess death if the defendant was found

guilty of capital murder.  The following shows Mr. Ogle's strong feelings about the death penalty

(RR: Vol. 30 p. 54):

Q. . . And in your questionnaire it says, you know, you believe an eye for an eye.  Not only
did you check that you believed eye for an eye, but on page 2 you wrote the best argument for the
death penalty is an eye for an eye.  Tell me what you feel about that, where that belief comes
from.

A. That's from the Bible.

Q. Absolutely. Old Testament, right? So tell me a little bit about how you formed your opinions.

A. Well, I mean, an eye for an eye - - I mean, if it's a crime where there's no - - you know, if you - - like if you kill an officer or if you kill somebody, if you premeditate to go in and kill two or three people, there's certain crimes that I feel like the death penalty should be for. And I mean, maybe somebody's background, if they continue to have this pattern, then there's no - - there's not going to be any rehabilitation. So in those cases I feel like it is what it is. I mean, the death penalty should be there for those type of cases.

Appellant submits that Mr. Ogle was entirely unqualified because he believed the death penalty should be used for crimes involving more than one person, such as the case at bar.

Appellant argues that Mr. Ogle would not give meaningful consideration to the defendant's mitigation evidence as required by law. The following exchange shows Mr. Ogle's true feelings on mitigating circumstances (RR: Vol. 30 p. 72):

Q. . . .And I wanted to loop back around to your questionnaire here on page 8 - - if you don't mind going to page 8. And the question about half - - a little more than halfway down the page, says some people feel - - it's a question about genetics, circumstances of birth, upbringing, things like that, and you said, no, I don't really want to consider those things. The punishment should fit the crime. Explain - - if you go into a little more detail about that, about how you feel about it, how you came to believe those things.

A. I don't know. It all  - - I mean, it just - - in my opinion it just depends on - - it doesn't matter to me, the genetics, the circumstances of upbringing, the birth, whatever, but basically the history of what that person has done and then the crime itself.

While Mr. Ogle stated that he would consider mitigation evidence, Appellant submits that this statement in directly opposite of the statement he made in the questionnaire and on voir dire that he would not consider, genetics, circumstances of upbringing and other mitigating factors. Appellant argues that Mr. Ogle was not qualified because he would not give meaningful consideration to mitigation evidence which ultimately meant nothing to him.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, William Ogle, stating that Mr. Ogle was an

61

objectionable juror. (RR: 30 p.76-77) Because the Trial Court erred in denying Appellant's

challenge for cause Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's

bias against the Defendant, or as a matter of law against the law as relied  upon the by the

Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 30 p. 77) See authorities

cited and argument in  Issue No. 1 which are incorporated herein by reference.

### APPELLANT'S ISSUE NO. 12

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON CHARLA MOE

### SUMMARY OF VOIR DIRE OF VENIRE PERSON CHARLA MOE

Appellant directs this Honorable Court's attention to Reporter's Record Volume 31  page 161

at which defense counsel made the following objection:

>MR. WYATT: Yes, we have a challenge for cause on Ms. Moe, based on her questionnaire, her answers - - that basically through my questioning, relate to Special issue Number 2.  Then on the questionnaire she states that none of those factors that are listed in Special issue number 2 should be taken into consideration in determining the proper punishment of a Defendant convicted of capital murder.  And after Special Issue Number 1 is answered yes, through the hypothetical that I took her through, she changed her answer to now that she would consider it.  And we believe that based on the conflicting answers that she is someone who couldn't follow the law and we challenge her for cause.

The trial court overruled Appellant's challenge for cause.  (RR: Vol. 31 p.161)

Appellant submits that Ms. Moe was a death prone juror who would automatically assess the

death penalty if she found the defendant guilty of capital murder.  The following exchange shows

the mind set of Ms. Moe, particularly before the State "instructed" her on what answers qualifies

a juror. RR: Vol. 31 p. 113:

Q. Okay. Great. Well, then, let's talk about the death penalty. You said that you're okay with the death penalty if - - if it's a premeditated crime. Tell us how you feel about that or why you feel that way.

A. Kind of based on an eye for an eye. You know, if - - if they go into it knowing, okay, I'm going to go kill somebody for whatever reason, it's just - - it's not acceptable to me. It's - - if somebody was happened to be killed in - - like if they were trying to rob somebody and the person was killed accidentally and they didn't go into it thinking, okay, I'm going to rob this person and kill them, that makes a difference tome because it wasn't - -it wasn't thought of ahead of time.

Q. So for you like a premeditation or planning, if there's evidence of that, that would be important for you?

A. Uh-huh.

Q. What about children? You mentioned children on page 2 of your questionnaire, that you feel pretty strongly about crimes against children.

A. Yeah, maybe because I have two children.

...

A. For example, if - - if, for example - - like say somebody hurt my child and then I went or my husband went and said, I'm going to go kill this person because they hurt my child, I don't' agree with that. You know, I wouldn't want them - - that wouldn't be okay for them to do, and then not get the death penalty. But if somebody hurt a child, rape or murder or, you know, something like that, I can't think of another example - -to me, that - -you know, the child has no defense. They - -they couldn't, you have fought back necessarily. That would be - -

Q. Right.

A. - -that would be more of an instance where I would be okay with the death penalty in the case of child being hurt.

Appellant submits that Ms. Moe was a juror who would not give the defendant's mitigation

evidence meaningful consideration. The following occurred at RR: Vol. 31 p. 140-141:

Q. Also, if we could go to page number 8. This is something that I wanted to ask you about. When - - it was a question about genetics and circumstances and upbringing and environment. Should those things be considered in determining the proper punishment? And you said no, people can and have risen above these things to be normal, upstanding citizens. And the word - - when I'm asking you questions about your questionnaire, the word that jumped out there was "normal." What did you mean by normal, when you're putting that in there? Some people might have just put to be upstanding citizens, but when you put normal in there, it kind of piqued my interest why you put that in there.

A. Honestly, I couldn't tell you why. I guess maybe I - - maybe I was thinking law-abiding and just wrote normal instead.

Q. Okay.

A. But I do, also - - I mean, I don't know if I can add to that now. I do also know that there are circumstances that - - kind of like what she was saying, you know, child is raised and, you

63

know, locked in an attic for13years and then goes out and kills somebody.  You know, there are circumstances that would change the thoughts - - change my thoughts, I guess.

The following occurred at RR: Vol. 31 p. 157:

Q.. . . Your question - - your answer on page 8 versus what you know your duty as a juror on this case if you're chosen, how do you feel about that now?

A. I know the Judge said I had to try and give yes and no answers, but what I - - I guess the first thing that pops in my head is I think I could take it into consideration, but I don't know - - I couldn't sit her and say, well, if X happened, then I would say no to the death penalty.  I could take it into consideration, but I don't know that I could put that aside.

Appellant has shown that Ms. Moe would prone to assessing the death penalty and would not give meaningful consideration to mitigation evidence needed to determine the answer to Special Issue No. 2.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Charla Moe, stating that Ms. Moe was an objectionable juror. (RR: 31 p.161) Because the Trial Court erred in denying Appellant's challenge for cause Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied  upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 31 p. 162) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 13

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON JACKIE BREWER

### SUMMARY OF VOIR DIRE OF VENIRE PERSON JACKIE BREWER

Appellant directs this Honorable Court's attention to Reporter's Record Volume 32  page 103-105 at which defense counsel made the following objection:

64

MR. WYATT: Specifically, as Mr. Brewer's answers to Special Issue Number 2, about the Defendant's character, background, about taking those into consideration, he gave differing answers on his questionnaire versus what he said on the stand. And also, at one point in time on the stand he said that, you know what, he couldn't take those things into consideration, after he answered Special issue Number 1 yes. And also, under Wainwright, taking into totality of the circumstances in this case that the juror - - the potential juror, Mr. Brewer, Number 1363, is death prone.

The Trial Court denied Appellant's challenge. (RR: Vol. 32 p. 104) The following occurred

at RR: Vol. 32 p. 104:

THE COURT: And does the Defense - - the Defense if out of - -
MR. JOHNSON: Yes, sir, Judge.
THE COURT: - - is out of strikes.
MR. JOHNSON: Yeah, we do, we find ourselves out of strikes, and as we just made a challenge for cause for this particular juror, which we respectfully understand the Court's ruling - - although we respectfully understand it, we certainly don't agree with it. And I think it's clear from the totality of this individual that if the Court even would feel that under the totality of his answers to the questions and the answers that he provided on his juror questionnaire, this juror would certainly be unacceptable to the Defense under any conceivable circumstance. This has been a little bit of an unusual circumstance in regards to the selection of this jury panel because this particular Judge - - you, yourself, have shared the duties with a couple of other Judges. We've had several challenges for cause on probably half the - - at least half we've been forced to use peremptory challenges against. We've - - we've made what we believe to be good faith and legally based and legally sound challenges for cause which were ultimately denied by the various Judges that have heard this situation. And we believe that the result of this is that the Defendant - - the state of the case is at this point, the Defendant is going to be deprived of his right to due process and equal protection of the laws and he's going to be required to seat jurors that are unqualified, as we certainly believe this juror is.
So at this time, Judge, we are - - we have absolutely no choice at this point in time, we're faced with the dilemma of either having to be forced by the Court to accept a juror that's unacceptable or we are at this time going to ask the Court to grant us at least - - at least and additional three challenges - - we would ask for three at this time, but we are still two jurors away from seating a full panel and we think in order to - - based on the pace that we've kept and the good faith efforts by both sides to seat the jury, we would request at this time three additional peremptory challenges so that we are allowed to at least use one of those three challenges against this particular juror.
THE COURT: I'll give you one challenge at this time.

Appellant submits that Mr. Brewer would not give meaningful consideration to mitigation

evidence presented in punishment and would have difficulty in ever finding anything mitigating

65

enough to change his mind from death to life.  Mr. Brewer stated on the questionnaire that genetics, circumstances of birth, upbringing and environment were not relevant as far as punishment.  (RR: Vol. 32 p. 70) The State gave Mr. Brewer the proper answers ( for example "open to listening to the evidence")  in order to be qualified as a juror in this death case.

Mr. Brewer had difficulty even imagining under what circumstances he could change his mind from a death sentence to life sentence.  The following occurred during the State's examination after the State gave Mr. Brewer the dramatic example of a child being raised in an attic as a mitigating circumstance at RR: Vol. 32 p. 67:

> Q. . . But is that  - - Special Issue Number 2 something that you would be open to considering, and it might be a high bar for you.  It might not be a high bar for you.  But you would be open to it and if you heard it, you would be able to do that and answer that question in such a way to spare his life?
> A. You are right, that's a hard question to answer. That would hit me emotionally in the heart when I heard that.  You gave a hypothetical situation there, and I haven't heard enough, even with that hypothetical situation, to tell whether I would be able to convert that from death to life.

Appellant submits that Mr. Brewer, despite his protestations, would not be open to changing his mind from assessing a death sentence to a life sentence.  The answers he gave on the questionnaire and those in the courtroom are at odds.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Jackie Brewer, stating that Mr. Brewer was an objectionable juror. (RR: 32 p.103) Because the Trial Court erred in denying Appellant's challenge for cause Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied  upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 32 p. 106) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 14

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON LISA HENSLEY

### SUMMARY OF VOIR DIRE OF VENIRE PERSON LISA HENSLEY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 39  page52-53  at which defense counsel made the following objection:

MR. JOHNSON: Yes, sir.  Judge, after speaking further with Mr. Warren about this, we are going to issue a challenge for cause for this juror in fact that the - - both on the - - in her paper or in the questionnaire her answers in the questionnaire exhibits a tendency to be death prone.  Her demeanor - - or her answers from the witness stand, although she says that she would be able to follow the law as it's written, we still feel that based on an observation of this particular individual, that she is death prone, that she is someone who does lean too far towards the views of the State in regards to the issues that are involving capital punishment and the assessment of a death sentence and in answering questions that would result in the court being forced to issue a sentence of death.

In fact, her response to the first question on the questionnaire is that she feels the taking of another human beings's life for a crime is a biblical punishment.  And these things all certainly factor into the decision.  And at this point in time, it's a juror that we cannot accept and in no way in good faith would we accept this juror.  And we are going to be forced at this time, - - we're out of strikes, and we're in a position where we must at this time request additional strikes because this juror here, we definitely cannot accept.

We would ask the Court for at a minimum one additional peremptory challenge at this time so that we can eliminate Ms. Hensley from consideration of being placed on this jury.  And we would ask for a minimum of one.

We ask the Court to grant us at this time an three additional peremptory challenges as we continue this process.  We are in search of the final juror, and we would ask for three additional strikes at this time.

THE Court: Okay.  The challenge for cause is denied.  I will grant you one more peremptory strike...

Appellant argues that Ms Hensley would automatically assess a death sentence if she found

the defendant guilty of capital murder.  The following questioning by the State illustrates her

strong beliefs in the death penalty (RR: Vol. 39 p. 34):

Q. Okay. And now on page 1 of your questionnaire, you put - - when asked about being in favor of the death penalty, you put it is biblical.

A. Uh-huh.

Q. Can you kind of explain that to me?  I think I know where you - -

67

A. Well, eye-for-an-eye, tooth-for -a-tooth, you know.

Q. Yes, ma'am.  How - - how steadfast do you hold that?

A. Well, I believe that we have a gracious God.

Q. Yes, ma'am.

A. And that, you know, he looks at everything.  And he makes  the judgement, but I do believe the Bible and I follow it, yes.

Ms. Hensley was very adamant in belief in an eye-for-an-eye and following the Bible.

Appellant submits that she would automatically assess a death sentence if she found Appellant guilty of capital murder and therefore was an unqualified juror.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Lisa Hensley, stating that Ms. Hensley was an objectionable juror. (RR: 39 p.52-53) Because the Trial Court erred in denying Appellant's challenge for cause Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied  upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 39 p. 54) See authorities cited and argument in  Issue No. 1 which are incorporated herein by reference.

## APPELLANT'S ISSUE NO. 15

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S  CHALLENGE FOR CAUSE AGAINST VENIREPERSON DEBRA STORY

### SUMMARY OF VOIR DIRE OF VENIRE PERSON DEBRA STORY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 41  page 141-142 at which defense counsel made the following objection:

MR. JOHNSON: Yes, sir, Judge.  We're going to have to challenge Ms. Story for cause. It's - - obviously, there's a copy of her questionnaire in the record and the questionnaire is replete with numerous instances of answers in regards to the special issues that would cause her to be completely - - a juror that we could not live with.  Shows a - - being death prone to the point that it would offend the mandates of Wainwright versus Witt, and she spoke to us here in the

68

courtroom and says she understands it and could do differently, but I'm not sure that she's convinced us of that. She feels that everybody that should get - - if you kill someone, you should get a quick and swift sentence of death. And we would ask the Court to base a - - grant us a challenge for cause, based on Court's observation of that juror, not only through the Court's review of her questionnaire, but also through her oral answers here in the courtroom. And we would challenge her for cause based on that we feel she would automatically be prone to answer the special issue in such a way as to result in a verdict of death if she was to find the Defendant guilty of this offense.

THE COURT: All right. Thank you, Mr. Johnson. Defendant's challenge for cause is denied.

MR. HEALY: The State would accept her a Juror 12

MR. JOHNSON: Your Honor, at this time with the State accepting the juror and the Defense - - we previously asked for additional strikes. The Court has - - hasn't granted to give us a blanket group of strikes. The Court had granted us strikes on a one-by-one basis, and we have exercised our seventeenth peremptory strike. At this time we're forced to request at a minimum the eighteenth strike because this juror is one that we cannot accept in good faith. And we would ask for additional strikes so we could exercise it against her. We don't feel she is qualified under the law, and we don't feel she's qualified under consideration of due process and fairness to the Defendant. We would ask the Court for an additional strike at this time.

THE COURT: Okay. Request for additional strike is denied.

MR. JOHNSON: Your Honor, in lieu- - in light of the Court's ruling, then we find ourselves without an additional strike. We find ourselves without the ability to remove her from consideration for the jury, and I wouldn't use the term "we will accept this juror", but we will be at this time forced to accept this juror against our objections and against what we believe to be an erroneous ruling by the Court with respect to our challenge for cause, as well as what we believe to be an erroneous ruling from the Court in regards to denying our request for an additional peremptory challenge. So at this time we will accept Mr. Story as - - we will not accept her, but we will be forced to have her upon our jury.

Appellant was extremely pro-death as seen by the answers on her questionnaire. She believed in an eye-for-an-eye and stated "because I don't believe that someone should have the right to live if they take someone else's life." (RR: Vol. 41 p. 70)

She answered the question in the questionnaire concerning innocence and guilt of a group of ten that she thought all should be convicted, even the innocent person so that the other guilty persons would not go free. While she stated that she would answer that question differently now, Appellant submits that this is indicative of a death prone juror who would automatically assess the death penalty. She wrote on her questionnaire that as a taxpayer, she didn't that it was right

to let the person live in prison, enjoying food, clothing, and shelter.  (RR: Vol. 41 p. 101-102)

The following illustrates her strong feelings in favor of the death penalty as it applied to the cost

of housing a convicted capital murderer:

> Q. Tell me how you feel now.
> A. Well, you know, I understand that there is a process of appeals and everything after someone has been convicted. And - - and, you know, what's their right to appeal.
> Q. Right.
> A. And during that time, we ask taxpayers pay for the prison, the food, and all that.  And I understand that.  I guess I get upset when it takes 10, 15 years and these people are still living and we're paying for all of that.  And where that money could maybe go to help someone who is really needy or whatever.  These - - these were just my opinions.  And when I hear things explained, you know, which I - - I'm open to listening to explanations and stuff.  I'm not so cruel that I am against, you know, everything that - - what you're saying.
> Q. Right.
> A. But I just think that if someone has been convicted of a horrible, horrible crime and they were sentenced to death, I think there should be some sort of limitation times or whatever for appeals. And then we should go on with what the verdict was.

Ms. Story also thought the death penalty was used too seldom and thought that if a person

was convicted, they ought to be executed within six months.  (RR: Vol. 41 p. 101)

Ms. Story also had a bias toward law enforcement.  She had a uncle who had been the police

chief of Mesquite, Texas in Dallas County and a former husband who was a police officer. (RR:

Vol. 41 p. 74)  Appellant submits that Ms. Story had a very strong connection to law enforcement

and would give their testimony more credibility than others.

Appellant argues that the feelings toward the death penalty expressed by Ms. Story show that

she is unqualified to serve as a juror because she would have a bias toward assessing the ultimate

punishment, death.  She stated that she believed in an eye-for-an-eye, that the death penalty was

used too seldom, and she thought the execution of the verdict took too long and ultimately cost

the taxpayer too much money to keep a convicted capital murderer alive.  These statements, in

spite of her protestations that she would "keep an open mind" and follow the law, show that she

would not give a life sentence due consideration. She would go into the trial with a mindset that favored the death penalty.

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Debra Story, stating that Ms. Story was an objectionable juror. (RR: 41 p.140-141) Appellant submits that he has asserted a clear and specific challenges for cause clearly articulating grounds therefore; that he used a peremptory challenge on those jurors; that all his peremptory challenges were exhausted; that his request for additional strikes was denied; and, that an objectionable juror sat on the case. See authorities cited and argument in Issue No. 1 which are incorporated herein by reference.

Appellant suffered a detriment from the loss of the additional strike, in that an objectionable juror was seated on the jury. Appellant has demonstrated harm, and thereby reversible error, in that Appellant has shown that the Trial Court erroneously denied challenges for cause on all fourteen venire members. Therefore, this Court should reverse and remand this cause for a new trial based on Appellant's Issue Nos. 1 through 15 on improper jury selection; which as a whole denied Appellant his right to due process in the selection of a capital murder – death penalty jury.

## SUMMARY OF OBJECTIONS IN SELECTION PROCEDURE

Appellant made challenges for cause against venire members. The Trial Court denied each challenge for cause. The Trial Court had granted Appellant two additional peremptory strikes. In each challenge of a juror, Appellant requested additional strikes but was denied. Therefore, objectionable and biased jurors to the defense were seated on the Jury. Appellant suffered a detriment from the loss of the additional peremptory strikes. The Trial Court abused its discretion in denying Appellant's challenge for cause against venire members Billy Chancellor,

71

Sheila Yrigollen, Norma Wiley, Elizabeth Lopez, Cathey Young, Aneta Johnson, Terry

Crawford, Barbara Garrett, Thomas Frazier, Sreenivasareddy Thallapareddy, William Ogle,

Charla Moe, Jackie Brewer, Lisa Hensley and Debra Story for the specific reason stated in each

issue.

## ARGUMENTS AND AUTHORITIES

### (Issues Nos. 1-15 are combined for additional argument in that they contain similar issues of law.)

Appellant submits that when the trial court errs in overruling a challenge for cause against a

venire member, the defendant is harmed only if he uses a peremptory strike to remove the venire

member and thereafter suffers a detriment from the loss of the strike. *Demouchette v. State*, 731

S.W.2d 75, 83 (Tex. Crim. App. 1986), cert denied, 482 U.S. 920 (1987).

A review of the record to determine if Appellant preserved error to complain of the propriety

of the Trial Court's ruling on his challenge for cause reflects the following:

(1) The voir dire of the complained of venire members was recorded and transcribed.
(2) Appellant timely asserted a clear and specific challenge for cause against each venire member.
(3) Appellant clearly articulated the grounds of the challenge for cause against the venire member.
(4) The Trial Court denied Appellant's challenge for Cause against each venire member.
(5) Appellant exhausted all of his peremptory strikes. (RR: 38 p. 80)

Based on the record, Appellant preserved error to complain of the propriety of the Trial

Court's ruling on his challenges for cause. *Harris*, 790 S.W. 2d 581 (Tex. Crim. App. 1989).

See *Hernandez v. State*, 757 S.W.2d 744 (Tex. Crim. App. 1988). These errors in the voir dire

process denied Appellant his right to due process and a fair trial.

## APPELLANT'S ISSUE NO. 16

## THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICED
## WHICH DEPRIVED APPELLANT OF A FAIR TRIAL
## (FEDERAL CONSTITUTIONAL ISSUE)

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been qualified according to the law by the standards of the U.S. Constitution and or interpreting Federal Court opinions. Appellant submits that one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of the United States Constitution.

Appellant has suffered injury by denying him due process guaranteed by the 'constitution' in applying law of jury selection to the case at bar. It is a violation of due process to provide for a wrong with no remedy (i.e. *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998) and its holding concerning reversible error is constitutionally illusory erroneous and barbaric in its application. It's misuse on appeal by application to other than trivial trial error is itself a violation of constitutional due process.

To grant Appellant rights of voir dire, but hold that a violation of the same is not a denial of due process of the highest order is a deceit upon the citizens of this State that potentially stand accused of an offense, as it usurps each citizen's right to fair and impartial jury as in the case at bar, where the State and trial court take advantage of the defendant having to use its peremptory challenges in a matter in an attempt to have a fair trial by correcting the trial court's errors. See

all dissents in *Jones* that fights for basic ideals of fairness for all citizens and non citizens of this State as to criminal litigation jurisprudence in jury trial.

**APPELLANT'S ISSUE NO. 17**

**THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICED
WHICH DEPRIVED APPELLANT OF A FAIR TRIAL
(STATE CONSTITUTION ISSUE)**

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been qualified according to the law.  Art. 35.16 C.C. P. Appellant submits that one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of Constitution of the State of Texas Article One, Section 10.

Appellant has suffered injury by denying him due process guaranteed by Art. 35.16 C.C. P. in applying law of jury selection to the case at bar.  It is a violation of due process to provide for a wrong with no remedy (i.e. *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998) and its holding concerning reversible error is constitutionally illusory erroneous and barbaric in its application.  It's misuse on appeal by application to other than trivial trial error is itself a violation of constitutional due process.

To grant Appellant rights of voir dire, but hold that a violation of the same is not a denial of due process of the highest order is a deceit upon the citizens of this State that potentially stand accused of an offense, as it usurps each citizen's right to fair and impartial jury as in the case at bar, where the State and trial court take advantage of the defendant having to use its peremptory challenges in a matter in an attempt to have a fair trial by correcting the trial court's errors.  See

74

all dissents in *Jones* that fights for basic ideals of fairness for all citizens and non citizens of this

State as to criminal litigation jurisprudence in jury trial.

## TRIAL ISSUES

### APPELLANT'S ISSUE NO. 18

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE INTRODUCTION INTO EVIDENCE OF A WRITTEN STATEMENT OF THE DEFENDANT

Appellant respectfully directs this Honorable Court's attention to Reporter's Record

Volume 48 pp 47-64 at which as sub rosa hearing was conducted on the voluntariness of the

written statement of the Defendant in regard to the failure to comply with the requirements of

"Miranda" and article 38.22 C.C.P.:

THE COURT: ...All right. Confession. Are we ready to proceed on that right now?

MR. JOHNSON: Yes, sir, Judge, and I believe it's a pretty straightforward and simple matter.

THE COURT: It's just a question of whether or not it was voluntary; is that - - is that what the issue has been?

MR. JOHNSON: That's correct, Your Honor.

THE COURT: Boiled down to?

MR. JOHNSON: Pursuant to several of the Defendant's pretrial motions we requested and the Court indicated the Court would - - we had objected to the admissibility of the confession based on the fact that it was obtained not - - not in compliance with the requirements of 38.22 and the Court's agreed to consider it. And the Court has reviewed the confession - -

THE COURT: The Court has.

MR. JOHNSON: - - and the relevant portions of that confession are at the - - are pretty close to the very beginning and would contain - - be pretty much self-explanatory in regards to our argument that it was not voluntarily made.

THE COURT: Okay.

MR. JOHNSON: Does the Court want me to argue specifics in regards to that, or is the Court - -

THE COURT: I may in a second.

Does each side have a copy - - I think the easiest way to proceed with this is to look at the transcript. Do you have that in front of you?

MR. JOHNSON: Yes, sir.

MR. BEACH: Yes, sir.

THE COURT: Okay. Is the Defense objection - - let's just look at this. I can kind of take

75

this somewhat piecemeal. Is the Defense objection to everything that happens on page 1, 2, and 3?

MR. JOHNSON: Yes, sir - - well, no my objection is to - - my objection is to - -

THE COURT: I want to take care of pages 1,2, and 3 just first.

MR. JOHNSON: Okay. We don't object to 1 and 2, Judge.

THE COURT: Well, that's what I asked you, if you object to 1 and 2. Pages 1, 2, and 3 are everything that - - -all the questioning that happened prior to the Miranda warnings being given.

MR. JOHNSON: We are going to object to all of those, too, Your Honor. We're objecting to any statement that was made prior to the introduction and the waiver of Miranda.

THE COURT: Okay. That's why I'm saying - - let's look at 1, 2, and 3 first. Because that's - - that's - - those issues are a little clear.

What says the State?

MR. BEACH: In terms of the admissibility of just the lead-in questions before the Miranda rights are given?

THE COURT: Yes.

MR. BEACH: Other than - - Judge, it's - - it just offers the background leading into the right that this is - - it goes to the voluntariness that the Defendant was not denied anything, was asked if he wanted water or cigarettes. It really is not a custodial interrogation per se because it's not - - he's not asking about the crime itself. It's just basic physical needs, introduction, and sets the context of him going into reading the Miranda rights.

THE COURT: What says the Defense to that?

MR. JOHNSON: Judge, we - - we disagree with that assessment. We object to it.

THE COURT: All right. I'll reserve my ruling on that. I'll think about that.

Next, 38.23 objection; is that right?

MR. JOHNSON: Yes, sir.

THE COURT: What specifically are you saying is infirm about the involuntariness of the statement?

MR. JOHNSON: Judge, we - - we submit that on pages 3, going in - - carrying over into page 4 of the transcript that the Defendant has his rights read to him, but there's - - he is never asked if he would voluntarily waive those rights.

THE COURT: It's not in there. What says the State?

MS. LAMBERT: Your Honor, an expressed waiver from the Defendant is not necessary. He was advised of his rights, and he said that he understood those rights and he continued with the interview. It's clear from the totality of the circumstances that his - - his speaking to the Defendants (sic) was voluntary and that - - that's an indication that he did waive those rights.

I do - - I have a 2010 Court of Criminal Appeals case. It's a similar circumstance. It's a capital murder case out of Bexar County. And at the beginning of the recording, they read him his Miranda rights. He affirms that he understands them. And then he proceeds to be interviewed for six hours. At no time does he make an expressed waiver, but from the totality of the circumstances of the interview, the CCA says that it's clear that he waived those rights by his voluntariness to talk to the detectives. There's no coercion. There's no - - there's nothing indicating that he was not voluntarily making those statements to the police. And they reiterate that an expressed waiver is not necessary to show that the Defendant voluntarily waived those rights.

76

THE COURT: What does the Supreme Court say?

MS. LAMBERT: I would think - -

THE COURT: Because that's where eventually this will end up.

MS. LAMBERT: I have not found anything contrary to this. I could not say definitively if there's anything in the works, but to my knowledge, this is the law in Texas, and there's nothing - - the Supreme Court - - I haven't found anything that is contrary.

THE COURT: Well, it used to be in Texas the defense lawyer could fall asleep at the table and that wasn't ineffective, but the Federal courts changed that.

What says the Defense?

MR. JOHNSON: Your Honor, I haven't seen that particular case. I know there's - - I have not - - in all candor with the Court, I know there's some cases in regards to the totality and the waiver. In regards to a situation such as this, I believe that he went from an - -his explanation of his rights into his discussion of talking with the Defendant in regards to the facts of this case shows that the way he did it was expressly done in a way that would not have inquired as to the Defendant as to whether or not he voluntarily wished to waive those rights. The officer couched it in terms of he just had some issues - - some kind of issues and things he wanted to talk about and clear up, but he didn't specifically say that he wanted to specifically ask him and question him in regards to the - - to an offense that could potentially - - led to a sentence of life without parole or even death. And you're questioning a person in these circumstances and the officer was fully aware and knew what the potential consequences of these charges because they are later discussed in - - in the tape and in the transcript. The Court can see that. The officer tells him later that now that you've told me this, you're looking at life or death. Didn't explain that to him up front and couched his conversation with the Defendant after his explanation of his Miranda rights in such a way as I don't believe led the defendant to fully understand or appreciate that what he was going into was a full explanation as to the circumstances of what was involved.

That's also shown by kind of banal chitter chat that they had between the - - in the first couple of pages. It sounds like just kind of a discussion in regards to the Defendant's health and well-being after being in the hospital. So I just say that it is a totality situation, and that's the issue. And I understand that, but like I said, I think it's a case-by-case basis and analysis has to be done by the Court on a case-by-case basis. And we believe that under the situation as it exists in this case, that the - - it doesn't rise to the level.

THE COURT: Well, what your - - are you saying that there needs to be an additional Miranda admonition because this is a potentially a death case?

MR. JOHNSON: No, sir, I'm not saying there's a requirement or there's a requirement for any additional Miranda, but there's certainly a requirement - - with the officer knowing what was at stake, I believe that the Court should look for a clear and unequivocal waiver, and the circumstances from which the State is going to argue that under totality analysis, that the - - it should be deemed a waiver. I think that it should be termed - - or couched in terms that would have clearly shown that he was asking the Defendant to go in and explain the - - his - - his involvement in the deaths of these individuals that would have subjected him to the penalty, that the officer was aware of existed instead of just saying, hey, are you good with this, are you good with that.

THE COURT: Well, I don't think it matters whether it's a Class B driving while license suspended - -

77

MR. JOHNSON: Well, I agree.

THE COURT: - - or capital murder.

MR. JOHNSON : I agree.

THE COURT: But you're asking - - saying that he should have inquired - - shouldn't - - you're saying two things. You're saying, well, Judge, I'm not asking for something extra, but we're asking that he be further admonished that this is a case that potentially involves a death sentence.

MR. JOHNSON: No, that's not what I'm saying, Judge. Maybe - - maybe I haven't been clear. I'm not asking for an additional - - any additional requirements of the Miranda, but I'm asking that is a case involving a person's life or death, I'm asking that the Court, before it rules in the favor of the State in the totality argument that they're making, that this Court - - that the Court itself can find that clear and unequivocal even under the totality, that the Court finds that clearly and unequivocally the Defendant was in full understanding of - - of what it was that he was being asked to do, And I don't believe that this record or this transcript here in this confessions shows that.

THE COURT: The Court disagrees with you on that. And I'll point to - - I think your client fully understood the ramifications of this case early on in the interview - - very early on in the interview.

THE COURT: All right. Maybe it wasn't as early on as I thought, but at some point during the interview - - and there's one reference on page 28, I think - - maybe I just missed it, but I know there's at some point a discussion at which Mr. Green says that he just wants to go to the Judge, plead guilty, and have the Judge give him the death penalty.

MR. BEACH: Because he deserves it. Those are his words, "I deserve it", and he's talking after that which clearly shows - -

THE COURT: I know. Yeah, that's - -

MR. JOHNSON: That's on page - - page 27,Judge, is the first - - first paragraph - - or is the first part in there that has any discussion about the ramifications of the Defendant's actions.

THE COURT: Okay.

MR. JOHNSON: Twenty-seven and 28.

THE COURT: Twenty-seven and 28. So - - in looking at that, whether it happens on page 2, 27, or 57,he still - - he know– it wasn't - - it wasn't like this - - I mean, and I'm making this finding based on - - I've watched a revelation that he had halfway through the interview. He knew this all along that the ramifications of this - - for this was the death penalty. He knew that could happen. It's wasn't something that the officer told him later on, oh, by the way, you know, this is a capital case.

MR. JOHNSON: Well, actually - -

THE COURT: I know the officer did that. The officer did that at the end, at the back end. But what I'm saying is your client knew that all along. That was not a revelation to him that he was unaware of. He knew that was a possibility before he started even talking to the officer.

MR. JOHNSON: Judge, I'm going to have to disagree with the - - I'm going to have to disagree with the Court's characterization of it. Twenty-seven and 28 says the Defendant just says he wants to die.

THE COURT: No, he says he wants to go to the Judge and just say I - - just give me the death penalty.

MR. JOHNSON: And ask for the death penalty. And at this point in time there's no - - there is nothing in the transcript or the record to show that the Defendant was actually - - had any knowledge that he might be subjected to that until page 33 when it's talking and then it's explained to him by the officer that this is, in fact, a capital murder in which he may get - - me may, in fact, get a death penalty.

THE COURT: I - -I understand that, but I'm making a finding that the statements were voluntary. I'm more troubled by a waiver that - -

MR. BEACH: Could I add something in that regard, Judge?

THE COURT: You may.

MR. BEACH: We're talking about a Defendant who has been to the penitentiary twice already. He's not someone unfamiliar with how the criminal justice system works. He gave a written confession back in 1990.

MR. JOHNSON: Judge, I'm going to object to going outside the record. This is all - -

MR. BEACH: Well, no, it goes to the voluntariness. It goes to his mind-set that night.

MR. JOHNSON: But I just - -

THE COURT: Hold on. Hold it. Hold it. Guys, don't talk over each other. It's hard enough for Darlene to write down what we say, because some of us talk fairly quickly. Let's just do this one - - one at a time.

MR. BEACH: May I continue?

THE COURT: Now, an objection has been made as to things outside of the record. What I would like for you to do is make an offer of proof as to what you would introduce if we had all of the records to respond to his objection.

MR. BEACH: Judge, we would make - - the State would make the following offer of proof, that we would introduce, first of all, the Defendant's written confession that he gave to DPD back in 1990 on the aggravated robbery case involving the Court Fair Grocery Store that the Defendant and others robbed at gunpoint where the Defendant eventually pled and received 20 years, the Texas Department of Corrections.

Prior to that he was arrested and convicted of a delivery of a controlled substance, as well as aggravated assault of his high school girlfriend, received four years in the penitentiary on those charges. So we would offer the written confession of that aggravated robbery case, as well as we'd offer the pen packs confirming the Defendant had, in fact, been through the system and had gone to the penitentiary twice before September 22, 2009.

MR. JOHNSON: Well, Judge, according to the State's Argument, there's no need to Mirandize him on this case since he been Mirandized 20 years ago. And we certainly don't believe that's the percept of the law and that's not the understanding of 38.22.

THE COURT: That's not the argument they're making. The argument they're making is this is not somebody who is a novice to the system. This is not somebody who is so familiar with police tactics. And instead, they're saying that he was aware of this and that he was - - when he was told that he had the right to an attorney and he was told that he had the right to terminate the interview at any time and that he understands these rights, and he says yes.

MR. BEACH: Further, Judge, the record will demonstrate in this case that the Defendant voluntarily turned himself in that night to the Dallas Police Department, that he voluntarily told the doctors at Parkland Hospital that he had killed his wife and his kid. Again, he's telling

79

anybody who asks that, yeah, this is what I did, just like he had promised to do in this five and half page letter that you've already admitted.

I mean, the evidence is going to show that if he didn't kill himself that night, which that was his original plan, apparently, that this is what he was going to be looking at. It's not a situation where he was arrested 45 days later down in Tahiti, you know, sipping a margarita on the beach. He turned himself in that night because his suicide plan didn't work.

THE COURT: Well, if he had going to Tahiti, we wouldn't be here not for this.

Just give me a second, I'm trying to find - - -I'm trying to sign onto Westlaw, and I can't get signed on.

What's your cite on your case?

MS. LAMBERT: It's 309 S.W.3d 20.

THE COURT: Hold on, hold on. 309- - -

MS. LAMBERT: S.W.3d 20.

THE COURT: Twenty?

MS. LAMBERT: Twenty. 20 it's Joseph v. State. And in that case, the CCA specifically declined to say that an expressed waiver was necessary. It was a similar situation, the Defendant was eager to talk to the police.

MR. JOHNSON: Judge, can I be excused for about five minutes while you're looking at that?

THE COURT: Sure. We're off the record.

(Recess)

MR. HEALY : Judge, at this time I'm handing you a copy of State's Exhibit 118 and 118A which are the written stipulations on the head shots. If you can sign those so I can offer those. 118 is already admitted, so 118A is the one.

(State's Exhibit 118A offered.)

MR. HEALY: Any objections, Brady?

MR. WYATT: No objection to 118A. 118 has already been admitted, Judge.

THE COURT: Admitted.

(State's Exhibit 118A admitted.)

(Recess.)

THE COURT: Okay. Where - - where did Paul go?

MR. WYATT: Right here.

(Recess.)

THE COURT: All right. All right. The Court's reviewed the case submitted by the State regarding the - - the waiver, and I think the - - the issue - - just so the appellate courts are clear what the issue, what this Court is responding to is whether a Defendant must affirmatively waive his right to be silent and whether he makes that waiver knowingly, intelligent - - intelligently, and voluntarily.

In this case, the Defendant was asked whether he understood his rights; is that - - is that correct?

MR. JOHNSON: That's correct.

THE COURT: And the State, your position is that by indicating that he understands those rights and continues on answering questions, you're asking this Court to make a decision based on the totality of the circumstances that he effectively waived his rights in answering questions because he understood what those rights are; is that correct?

80

MS. LAMBERT: Yes, Your Honor.

THE COURT: Okay. The guidance that the Court gets for that comes - - oh, and one other thing. I think everyone will agree, I think, that there was no written card given to the Defendant for him to sign?

MR. JOHNSON: That's correct.

MR. BEACH: Yes, sir.

THE COURT: Is that contrary to police policy normally, don't they normally - -

MR. BEACH: Not since they've - - not since they've gon to videotaping. They don't do that routinely because it's right there on videotape.

THE COURT: I understand, it's not required under the law, right?

MR. BEACH: Right.

THE COURT: I just didn't know if that was - - if that was - -

MR. BEACH: That's my understanding - -

THE COURT: Well, anyway, the - - the Court is allowed to look at the totality of the circumstances. The Court looks at the fact that there are certain things that - - that are very clear to the Court in watching the interview, listening to the interview, and reading the interview. And that is - - is that there was nothing coercive about the officers' questions. There was not threats of violence. There was not any sensory deprivation. He was offered water, offered cigarettes, offered - - and made - - and made comfortable.

The Court finds that the interview made by the Defendant was made voluntarily and he waived his right to remain silent and he understood what those rights are. I can look to this prior arrests. I can look at his past involvement with the police. I can look to a number of different factors. When added up in this case, this is not a 17-year-old plucked off the street, stuck in a room for 24 hours without sleep and then when the officer comes in and says, you know you have a right to a lawyer, you can terminate this interview at any time, right? You understand that? Yes. Okay. Did you do it? Well, yeah.

That wasn't this situation. I'm allowed to look at the totality of the circumstances. I'm allowed to look at your client, look at the entire interview as a whole. I would have liked to have had an affirmative waiver in which the officer says point blank, do you waive your rights. Would like to have it. We don't have it in this case. But I don't think it's required. Instead, the State is required to prove whether or not the waiver was voluntary by a preponderance of the evidence. And in this case, the Court rules that it has.

Now, pages 1,2,and 3, since the Court has ruled that the waiver was - - and that the State has complied with Miranda, what do you say about pages 1, 2, and 3? You're not waiving your right. It's just a question of - - of - - if you want pages 1, 2, and 3 in, but I'm prepared to address the Defense's concern with 1, 2,and 3, but it may be on a strategic part that you say, I don't object to 1, 2 - - pages 1, 2 and 3 being in.

MR. JOHNSON: Judge, if I could go Ahead and make a record at this time, just that - - the Court had - - earlier in our discussion about the voluntariness of the confession, the Court had alluded to several portions of the transcript in regards to whether or not the Defendant was aware of the severity of the nature of the actions that he was being accused of. Last six lines page 27 - - one, two, three, four, five, six - - the first eight pages - - the first eight lines of page 28 - -

THE COURT: I'm looking at that.

81

MR. JOHNSON: Page 323, both from line 6 to - - almost to the bottom of the page; page 34 from line 7 even to line 15, there appears to be material in there which may be somewhat of an arguably objectionable nature on basis or on behalf of the Defendant. And I have previously bracketed those, formulated possible objections to that testimony. Just want the record to reflect that we are not raising any objections to that at this time for strategic reasons and based on advice of various personnel we've consulted with during the preparation of the defendant in this case.

THE COURT: Okay. So you're not making a special objection to - - -

MR. JOHNSON: Those portions that I just stated, Your Honor. I just want the record to reflect that down the road if someone is grading my paper and they say I should have made some type of objection to that material, I want the record to reflect that based on the consultation with people that - - who are participating in the preparation of this case for possible issues in regards to Special issues 1 and 2, we are not raising any objections due to strategic reasons.

THE COURT: Okay.

MR. BEACH: And, Judge, at this time we would offer States' Exhibit 91, the redacted confession disk, and State's Exhibits 92, the transcript of the redacted confession disk in evidence.

(State's Exhibits 91 and 92 offered.)

MR. HEALY: Ninety-two is the translation.

MR. BEACH: Translation, it's 92.

MR. JOHNSON: And we'd have no objection based upon the redaction,

THE COURT: Subject to your Miranda objection.

MR. JOHNSON: Subject to those already been ruled on by the Court.

THE COURT: All right. They're admitted.

During this sub rosa hearing the State referenced the trial court to the case of *Joseph v. State*, 309 S.W.3d 20 (Tex. Crim. App. 2010) in which the trial court relied upon in its denial of Appellant's motion to suppress the oral recorded statement of Appellant while he was in custody and being interviewed by police. The *Joseph* case does set out the applicable law found in Article 38. 22 C.C.P. and *Miranda v. Arizona*, 384 U.S. 439 (1966)

Like the facts in the *Joseph* case, Appellant does not assert that he was not warned of his rights. Appellant argues that absent on 'express' waiver, he did not knowingly, intelligently and voluntarily waive his "Miranda" rights. Appellant argues that the State failed to show by a preponderance of the evidence that waiver exists in this case.

82

"A valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S.. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). The "totality-of-the-circumstances approach" requires the consideration of "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. *Fare*, 442 U.S. at 725, 99 S.Ct. 2560; *see also Butler*, 441 U.S. at 375-76, 99 S.Ct.1755. The totality of the circumstances indicates that Appellant did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

## APPELLANT'S ISSUES NOS. 19-24

## JURY ARGUMENT IN GUILT/INNOCENCE STAGE OF THE TRIAL

The following issues are stated individually as each complained of incident during the State's Jury argument in the guilt/innocence stage of the trial in the case at bar was denoted by an objection by trial counsel. Although it is arguable that in the beginning of the State's argument the first issues may not amount to error that would cause this case to be reversed, the combination of and cumulative effect of each issue presented as a group of issues involving the same or similar facts and same legal issue would amount to reversible error.

Defendant's trial counsel started objecting to the State's prosecutors essentially arguing in such a manner that was inappropriate to the issue of guilt/innocence, instead they argued the issue of punishment and the necessity for the death penalty to be imposed in this case. This type of argument was built on the State over stepping the normal boundaries associated with factual presentations as 'reasonable deductions from the evidence' to rank speculation on the possible specific facts involved with the two homicides in this case.

In reviewing these next issues, this Honorable Court will see how the State's prosecutors were out of control in their disregard to the trial judge's attempt to keep their jury arguments within the issue of guilt/innocence and not go into issues of punishment. Despite defense counsel's many objections, the trial court could not control the State's abuse in argument so the trial judge unilaterally stopped the State's argument pursuant to a granted running objection from defense counsel and sent the jury to deliberate guilt/innocence.

The issues and incidents are presented as a group:

## APPELLANT'S ISSUE NO. 19

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE STATE ARGUING OUTSIDE THE RECORD IN THE GUILT/INNOCENCE STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page 13-14 at which the following occurred:

(By MS. BENNETT): ..Can you even imagine what she went through, all the while knowing that her little baby girl was laying there on the bed watching this? Can you even imagine what the last moments of her life must have been like? And all the while, while she's being stabbed and bleeding and choked, wondering what is to become of her family at that point.

And it didn't end there, did it? Because the monster wasn't' done yet. Can you imagine the last hours of this little girl's life? When she got home with her mom and went into her room, did she get up on her bed and play with her dolls, or was she on the floor working on her school work

84

when the monster walked into her room?  What was she saying and what was she thinking when he put that duct tape over her mouth?  And when he told her everything is going to be okay, as he was putting her arms behind her back and binding her feet, and what was she thinking about when she laid on that bed?  Did he tie her to that bed with that phone cord to make her stay, or did she just stay because she didn't know what else to do while she laid there and watched her mother bed and plead for her life and get stabbed and choked and God knows what else happened in that bedroom that night while that little girl watched.

Can you imagine what she must have been thinking when this man picked her up and took her over her dead mother's body into that bathroom, that bathroom covered in blood, her mother's blood?  The moan that had blood all over his face took her, and while he filled up that bathtub with water, was he talking to her?  Was she crying.

MR. JOHNSON: Excuse me, Judge.  Your Honor, I'm going to object - - I'm going to object to the entire tone of the argument.  This - - the issue is guilt and guilt alone.  And the argument prosecution is presenting to the jury has no relation to the issue of guilt of the Defendant.  We're going to object to this opinion.  It's outside the scope of this - - this portion of the proceeding.  We're going to object to it.

THE COURT: And it's overruled.  It's - - it's what the attorney say is not evidence.  It's simply a closing argument.

MS. BENNETT: Can you imagine what she was thinking while that bathtub was filling up with water?  Was he telling her it was going to be all right, right before he - -

THE COURT: Now, that's objectionable.  You can't interject speculation.  You only stick to what was adduced at trial.

**APPELLANT'S ISSUE NO. 20**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR ARGUED IMPROPERLY IN THE GUILT/INNOCENCE STAGE OF THE TRIAL**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page

20-21 at which the following occurred:

MR. HARRIS: Blind you? Ladies and gentlemen, we told you from the beginning that this was a horrific case, and that we start off with the guilt and innocence phase and then we move to the punishment phase.  And in that punishment phase you would do what?  You'd be asked to reconsider some of the evidence from the guilt and innocence phase.  Remember, you got those two special issues you got to address?  You got those two special issues you got to address.  We told you that there would come a time when you would have to reconsider the evidence from the guilt and innocence phase.  That's what we're talking about right now.

MR. JOHNSON: Judge, I want to object, that is absolutely improper - -

THE COURT: Sustained.

MR. JOHNSON: - - and I'm going to ask the jury to be instructed.

THE COURT: Jury, do not even consider the second half of this.  Don't' consider it.  Don't

85

think about it. I - -I cannot be clearer, that there is time and place. This is guilt and innocence only.

MR. JOHNSON: And I'm asking - -

THE COURT: Guilt and innocence only.

MR. JOHNSON: And I'm asking - - I'm asking - - at this time, Your Honor, I'm going to move for a mistrial based on that argument.

THE COURT: It's denied.

Jury, I've instructed the jury to disregard. I know they will. Sometimes the - - sometimes you hear things and there's just an instruction to say - - it's like the Jedi mind trick, these are going like that. And you don't - -just - -you put it out of your head and you don't think about it, because why? Now is not the time and place, so in the - - I trust that you will not think about it in considering you verdict of guilty or not guilty. And that you will wait until the appropriate time to think about the two special issues that are down the road. So we'll wait until - -

## APPELLANT'S ISSUE NO. 21

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE STATE'S CLOSING ARGUMENT IN THE GUILT/INNOCENCE STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 pages

24-25 at which the following occurred:

(BY MR. HARRIS): . . I want to talk to you about and ask you to recall, you know, when - - when he's back there with Lovetta and she's trying to find, you know, some decency, she's trying to tell him, you're a good man, you're not a monster, but she was wrong. Almost 30 stab wounds. Remember, he said we tussled for an hour and a half? About an hour and a half, they tussled in that bloody bathroom. She's trying to not only save her like, but at least don't kill Jazzmen, stab the baby, as her baby lays on the bed basically hogtied with duct tape. You know, can you imagine what it must have been like for Lovetta, a mother? You know, even after you take those first few stab wounds, what it must have been like for a mother.

MR. JOHNSON: Your Honor, again,,I'm going to object. I want the record to formally reflect that I believe this - - the entire scope of this argument is outside the issue as to the guilt or innocence of the Defendant and it is improper. And I think the Court certainly has within its discretion the ability to limit argument to the issue before the trier of fact at the particular time. This is the guilty phase, not the punishment phase - -

MR. HARRIS: Judge, I'll move on.

THE COURT: I understand. Record's made. Okay.

MR. HARRIS: I want you to- - when you think about the horror that Gary Green inflicted and who we're dealing with, who we're talking about, and what type of person can look into the eyes of this little girl- - what type of person can look into the eyes of this little girl - -

86

MR. JOHNSON: Judge, again, I'm going to renew my objection at this point in time. This argument is completely outside the scope of guilt argument.

THE COURT: Objection's overruled.

MR. JOHNSON: And I'd ask that - - I'd ask that - - I'm sorry, Mr. Harris. So I'd ask that so I don't be required - - and I apologize for interrupting - -

THE COURT: You want a running objection?

MR. JOHNSON: I want a running objection to the entire argument.

THE COURT: All right. You have a running objection. I think if - - I think it's going to cross - - crosses the line, I will at that time sustain an objection.

## APPELLANT'S ISSUE NO. 22

### THE TRIAL COURT ERRED IN
### DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR
### IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page 27-29:

(By Mr. Harris):. .But, again, he doesn't stop there. Now he showers. He puts on all black. All black. That's the evidence in this case. Why all black? Grim reaper? He knows exactly what he's doing. He's carrying out his manuscript. He's carrying out his plan.

And the reality of it, ladies and gentlemen is, see, once he does that, once he brings Jazzmen in that room - - remember, all that week, oh, Lovetta, she wouldn't listen. Oh, she wouldn't listen. Oh, she listened when he walked Jazzmen in that room. She listened then. Oh, she told him, I love you, I love you. Oh, it's a reasonable deduction from the evidence that she told him, I love you. We can work this out. I just need time. See, she would have said anything. She would have done anything for him to stop. But that's domestic violence.

But it doesn't stop there. He puts his black on and he goes up to the church. He goes and gets Jerrett and he goes and gets J.T. He's sitting in church and not - - not just talking about some little old church. You're talking about a huge cathedral of worship. He's sitting in the church waiting on the boys. That's the predator we're talking about.

When the boys come, what did y'all - - what did y'all talk about in church today? That's the cold-hearted monster we're talking about.

THE COURT: We're outside the scope of this case.

MR. HARRIS: That's what the boys told you, ladies and gentlemen. That's what the boys told you. He said, what did y'all learn in church today as he drove them back to their home where their mother and their sister lie dead in the bathroom. He drove them back to the home to - -

THE COURT: And these are not issues of guilt and innocence. It's not going to show intentional or knowing, or that this was part of the same criminal episode.

MR. HARRIS: He intentionally wrote out - -he intentionally sat down, put pen to paper, he intentionally wrote out exactly what he was going to do. He knowingly went to that church. He intentionally took those boys back to that house to finish off his plan.

87

THE COURT: Well, okay. Stop. We have a running objection that he's not on trial for assaulting the boys. If he was on trial for assaulting the boys, I - - I - - remember, it's not - -these are not - -

MR. HARRIS: I'll move on.

THE COURT : - -not issues for guilt or innocence. The jury will disregard.

### APPELLANT'S ISSUE NO. 23

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page 29-30:

MR. HARRIS: Ladies and gentlemen, there is no doubt that Gary Green is a capital murderer. You knew that from the time you heard the 911 tape and you hear those boys on there yelling, he killed my momma, he killed my mamma and my little sister. You know that then. From the time those boys walked in, you knew exactly what happened.

Now, we're just simply asking - - you make it official. You put the world on notice that Gary Green is a capital murderer. And just as he told you in his confession, he's a capital murderer that deserves the death penalty - -

THE COURT: Okay - -

MR. JOHNSON: Judge - -

MR. HARRIS: That's what - -

THE COURT: All right. That's it. We're done with closing argument.

All right. Ladies and gentlemen, sometimes we're going to have - - we got ahead of ourself. It's okay. Sometimes we get ahead of ourselves. Emotions are running high, but it's not time - - it's just not time for that, okay? This is guilt or innocence. That's all we can talk about at this time. I'm going to ask that you retire back to the jury room, and if you need any evidence whatsoever, ask for it, and we will - - we'll make sure that it is provided to you in this matter. Read the charge, elect a foreman. The time is now yours. You will have all the time you need to deliberate. If you need to take break, take a break. I you - - but the only thing that I do ask is that you all deliberate all together, okay? You can't - - three can't go downstairs, three can't hang out up here. Anyway, deliberate all together, if you would.

### APPELLANT'S ISSUE NO. 24

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHEN THE PROSECUTOR IMPROPERLY ARGUED IN THE GUILT/INNOCENCE STAGE OF THE TRIAL

Appellant directs this Honorable Court's attention to Reporter's Record Volume 48 page 30-33:

MR. JOHNSON: Your Honor- - Your Honor, if I may - -

THE COURT: Not right now. I will give you all kinds of opportunity to make a record, but I'm going to excuse the jury.

MS. LAMBERT: Judge. What about the alternates?

THE COURT: I will take care of that, too.

MS. LAMBERT: They can't leave the building.

THE COURT: I know. Please go - - go with the bailiff.

THE BAILIFF: All rise.

(Jury excused from the courtroom.)

THE COURT: Okay. We're pulling the alternates. We have that already - - already planned.

MR. JOHNSON: Your Honor, I'm required in the presence of the jury to secure a ruling, not only to the objection of that comment, but also to secure the Court's admonishment to the jury that they be instructed to disregard it.

THE COURT: I did - -one, I sustained it. Two, I shut down the argument. And, three, I did admonish them and told them only to consider that. I did all three of those things.

MR. JOHNSON: But then I'm also required to request a mistrial in the presence of the jury.

THE COURT: You're not required to request a mistrial in front of the jury. You're required to request - - you are required to request a mistrial. I understand that, but I'm denying that request. The request is timely made. It's made. The jury is not now present. There's - - you want to make - - make the record and make the point, I think there are certain things that should - - that are not to be made in front of the jury.

MR. JOHNSON: The only point I want to be on the  record, Judge, is that I request an instruction to the jury in the presence of the jury that they be instructed to disregard in its entirety the last comment in regards to what the Defendant deserves as a result of anything he may or may not have done. And I - -if the Court's ruling is that you believe that was done following objection and that it complies with the requirements, that's all I - - that's all that's necessary from me.

THE COURT: Yes, I believe that it was done. I think the Defendant made a timely objection, and that the Defense didn't need to request an admonishment because I made an admonishment that I think addressed the issue in telling the jury to disregard and not to consider issues that - - that are not - -not before them. They understand, I think, that the State was getting ahead of themselves in their argument.

State wish to respond?

MR. BEACH: I understand the Court's ruling, Judge. Other than the fact that it is in evidence that the Defendant say, I deserve the death penalty, that was a direct quote from the Defendant, so that is in evidence, and that goes to show his guilty state of mind in terms of guilt or innocence.

THE COURT: Well - -

MR. BEACH: Which I'm just saying - -

THE COURT: That is not at all what the - -what the argument - -the State's argument was.

MR. HARRIS: That is exactly what I said, Judge. I said, even in his own words he said he deserved the death penalty.

THE COURT: No- -

MR. HARRIS: Which is - - -

THE COURT: - - no, no. That was not what - - that wasn't what happened.

89

MR. HARRIS: That's exactly what I said, Judge, sir.

THE COURT: I understand that, but it is - - it is - - the Defense had previously made an objection regarding getting ahead, and it was - -

MR. BEACH: I - - we understand why you did what you did, so I mean, we're - -we're going on from there.

THE COURT: Okay.

MR. BEACH: We're going on from there.

THE COURT: Okay.  All right. We're off the record.

## (COMBINED ARGUMENT FOR THE ABOVE ISSUES)

Any of the complained of arguments singularly or in combination were uninvited by defense counsel and were a totally improper line of argument to pursue at the guilt/innocence stage of the trial.  The error was compounded by the trial judge's initial overruling of defense counsel's objections.  The improper remark injecting the death penalty as a punishment in the guilt/innocence stage of the proceedings effectively told the jury to find Appellant guilty of capital murder so the jury could assess the death sentence without any reference to the special issue submission on future dangerousness and or mitigation that is the basis of our statutory scheme for potential death penalty cases.  This is the last thing the jury heard when the court stopped the egregious argument and sent the jury to deliberate without a proper curative instruction.   See *Cheny v. State*, 507 S.W.2d 549 (Tex. Crim. App. 1974)

The complained of error was repeated and compounded by the prosecutor's actions in disregarding the trial court's constant admonishments to cease his improper argument; only to have the trial judge 'sua sponte' terminate the prosecutor's argument, sustained the defense counsel's running objection, but the trial court did not provide any further curative relief as requested by the defense after the jury was summarily retired to the jury room.  Such misconduct can not be held harmless. See *McClure v. State*, 544 S.W.2d 390 (Tex. Crim. App. 1977).

90

Proper jury argument generally falls into the following four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence ; (3) responsive arguments; and (4) pleas for law enforcement. *McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999); *Washington v. State*, 16 S.W.3d 70, 73 (Tex. App.-Houston [1st Dist] 2000, pet. ref'd). The State may not depart from these categories to engage in conduct calculated to deny an accused a fair and impartial trial. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim. App. 1996)

The argument of which appellant complains was improper,  because it was not within the four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement.  *Landry v. State*, 706 S.W.2d 105, 111 (Tex. Crim. App. 1985), *cert denied*, - U.S. - , 107 S.Ct. 242, 93 L.ed.2d 167 (1986); *Borgen v. State*, 682 S.W.2d 620, 623 (Tex. App. - Houston [1st. Dist.] 1984, no pet.).

Generally, an instruction by the trial court ordering the jury to disregard improper argument will cure error; it is only when a statement to the jury is so inflammatory that its prejudicial effect cannot reasonable be cured by an instruction to disregard that reversible error will result.  *Logan v. State,* 698 S. W. 2d 680, 682 (Tex. Crim. App. 1985).  In order to satisfy this requirement, the argument must be extreme, manifestly improper, inject new and harmful facts into the case, or violate a mandatory statutory provision.  *Id.* Whether an argument is harmful enough to warrant reversal is ultimately determined on the basis of it probable effect on the minds of the juror. *Id.*

The error made by the prosecutor was manifestly improper, and was calculated to give and probably did give, the impression to the jury that it should get on with the guilt verdict so the

91

jury can impose the death penalty without any reference to the Texas special issue submission in punishment. See *Stone v. State*, 751 S.W.2d 579 (Tex. Ct. App.- Houston [1st Dist.] 1988)

Furthermore, the trial court erred in not finally instructing the jury to disregard the prosecutor's argument and or abused its discretion in denying a mistrial due to the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), and the measures adopted to cure the misconduct (the efficacy of any cautionary instruction. A mistrial was the appropriate remedy then, because the objectionable conduct of the State was so emotionally inflammatory that curative instructions were not likely to prevent the jury from being prejudiced against the Defendant.

The law provides for, and presumes a fair trial, free from improper argument by the prosecuting attorney. Appellant submits that the actions of the State in argument has denied Appellant his constitutional right to a fair trial which in turn is a denial of due process of law by the prosecutor intentionally disregarding the trial court' admonishments. Therefore, this intentional disregard of the trial court's authority subverted due process of law in the case at bar. The proper remedy now is reversal.

## PUNISHMENT ISSUES

### APPELLANT'S ISSUE NO. 25

**THE EXECUTION OF A SEVERELY MENTALLY ILL PERSON, SUCH AS APPELLANT IS PROHIBITED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S BAN ON CRUEL AND UNUSUAL PUNISHMENT AND VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

A review of the evidence shows without a doubt that Appellant was mentally ill before and at the time of the commission of the offense. Appellant respectfully is aware of this Court's

92

holding in *Mays v. State*, 318 S.W.3d (Tex.Crim. App. 2010). Appellant submits this issue in the constitutional context that it is a violation of the Eighth Amendment and due process through the fourteenth Amendment to the United States Constitution to have the death penalty assessed as punishment in this case due to Appellant's mental illness.

Appellant's conduct at the time in issue was described by the witness, Jerome Armstead, (RR: Vol. 46 pp. 99-130) who was 12 years old at the time and Jerret Armstead, (RR: Vol,. 46 p. 134-147) who was 10 years old, before the jury in the guilt/innocence stage of the trial.

See summary of Jerome Armstead's testimony in Summary of Reporter's Record section of this brief beginning on page 2. See summary of Jerrett Armstead's testimony in Summary of Reporter's Record section of this brief beginning on page 4.

The evidence further showed that Appellant had a significant history of mental illness. (RR: Vol. 47 p. 47-51) Appellant also attempted suicide by overdose of pills in an attempt to be reunited with the family in heaven.

Appellant submits this issue in conjunction with the next issue to preserve his complaint for further federal review in his belief that in the future the Supreme Court of the United States may extend the application of the cases of *Atkins v. Virginia* and or *Roper v. Simmons* to the ban of execution as a punishment to the mentally ill. See *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010).

Appellant submits this issue in order to preserve the same for a future possible reversal of current applicable law in the Federal Court system. Therefore, Appellant argues that his constitutional rights as stated herein have been violated by the assessment of the death penalty in this case where the evidence shows that he is severely mentally ill.

93

The next issue is also submitted in part to preserve Appellant' s complaint for possible

Federal Review with knowledge from the record review of how defense counsel's strategically

tried this case in both stages of the bifurcated trial.

## APPELLANT'S ISSUE NO. 26

## THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE CONVICTION FOR CAPITAL MURDER

Appellant submits that the evidence presented at trial was not sufficient to support the

conviction for capital murder.

Standard of Review

When an Appellant questions the sufficiency of evidence, the Appellate Court reviews the

evidence in the light most favorable to the verdict. The Court must determine whether any

rational trier of fact could have found each element of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v.*

*State*, 769 S.W.2d 234, 239 (Tex. Crim.App. 1989). This standard of review applies to

circumstantial evidence cases as well as to direct evidence cases. *Houston v. State*, 663 S.W.2d

455, 456 (Tex. Crim.App.1984).

Texas law requires that the State establish:(1) the offense was actually committed; and (2)

the accused was the person who either committed or participated in the crime. See *Johnson v.*

*State*, 673 S.W.2d 190, 197 (Tex. Crim. App.1984). The State must prove more than just a

plausible explanation of the crime. *Reeves v. State*, 806 S.W.2d 540, 543 (Tex. Crim.App.1990),

cert. denied, –U.S.–, 111 S.Ct. 641, 113 L.Ed.2d 736 (1991). While the trier of fact is the sole

judge of the weight and credibility of the witnesses, *Coe v. State*, 683 S.W.2d 431, 438

(Tex.Crim.App.1984); *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984), a guilty verdict should not be allowed to stand merely because the defendant was found to be the most likely perpetrator. A defendant, even the most likely defendant, is presumed to be innocent unless his guilty is established beyond reasonable doubt. See TEX.CODE CRIM. PROC. ANN. Art 38.03 (Vernon Supp. 1991); see also *Ardovina v. State*, 143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941); *Perkins v. State*, 32 Tex. 109, 112(1869).

The State must exclude every reasonable hypothesis raised by the evidence that tends to exculpate the accused. A review of the testimony shows that the record is insufficient to show Appellant participated in the offense of Capital Murder. The sufficiency of the evidence in this case is based on many circumstances where the State's evidence fails to meet the burden of proof. Appellant argues that the State failed to present sufficient evidence to support the conviction for capital murder.

Appellant submits that the evidence shows that when the killings were committed, Appellant was suffering from mental illness and was not cognizant of what he doing at the time of the killings. He was acting delusional and paranoid, thinking his family was conspiring against him, when he killed Lovetta and her daughter Jazzman.

In summary, viewing all of the evidence in the light most favorable to the State and giving full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, no rational trier of fact could have found beyond a reasonable doubt that Appellant was guilty of capital murder because of his mental illness. See *Jackson*, 443 U.S. at 318-19, 99 S.Ct. At 2788-90; *Santellan v. State*, 939 S.W.2d 155, 160 (Tex. Crim. App.1997). The record establishes, at

95

best, only a "mere modicum" of evidence of Appellant's guilt, which will not support a

conviction beyond a reasonable doubt. See *McGinn v. State*, 961 S.W.2d 161,168 (Tex. Crim.

App. 1998)(citing *Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789). Appellant submits that there is no

evidence in the record to support his conviction for <u>capital</u> murder. (See discussion of

requirement that there be evidence beyond a reasonable doubt of every fact necessary to

constitute the crime with which a defendant is charged in *Cruz v. State*, 6291 (Tex. Ct. App.

Corpus Christi, 1982)citing *In Re Windship*, 397 U.S. 358 (1970).)

## APPELLANT'S ISSUE NO. 27

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL
WHEN THE STATE QUESTIONED THE WITNESS ABOUT EXTRANEOUS BAD
ACTS THAT WERE COMMITTED BY OTHERS AND WHICH WERE
PREJUDICIAL TO THE DEFENDANT**


       Appellant directs this Honorable Court's attention to Reporter's Record Volume 50 at

which the following occurred:

BY MR. BEACH:
   Q. I mean, having a food tray thrown at you, Mr. Ashford, compare to getting stabbed in the
back like you were; is that correct?
   A. Yep.
   Q. That's a big deal, right?
   A. A little bit.
   Q. Okay. And you also told us that during this time frame in a single shift, one day, you had
to have 17 major uses of force?
   A.Yes, sir.
   Q. So this - - this was not an - -
   MR. JOHNSON: Judge, this is outside the record and I'm going to object to it.
   THE COURT: I'm a little confused. Against Mr. Green?
   MR. BEACH: No, no, no, in general, in one day where he had to hit 17 - -
   THE COURT: Alright. That's - - objection is sustained.
   MR. JOHNSON: I'm gong to ask that the jury be instructed to disregard. It is irrelevant, it's
improper.
   MR. BEACH: May I respond?
   THE COURT: Yeah.

MR. BEACH: He's trying to get him to say this is a major deal.  His question's opened up the door that this was a - - some kind of major unique deal, and it's not, Judge. It happens every day.

MR. JOHNSON: That's not - - that's not what - - that's not what I was saying at all, Judge.

THE COURT: I just - - it's just a question of what does he do. What does Mr. Green do, not other people.

MR. BEACH: He's trying - - he's trying to make it a big deal. That's all right, I'll move on.

THE COURT: Let's just focus on Mr. Green and - - and the actions of him.

MR. JOHNSON: And - - Well, Judge, my objection to the question, and the whole line of questioning, is that it's <u>irrelevant</u>, and it's <u>improper</u>. The Court sustained it. I'm going to ask the jury be instructed at this time to disregard it.

THE COURT: Well, it's just a question. It's not evidence that - -

MR. JOHNSON: Well, the way he - - the way he phrased it to the witness, he stated it as a fact and it's before this jury now be considered as fact. We're going to object and ask the jury to be instructed to disregard it.

THE COURT: Okay. In an abundance of caution, the jury will disregard. But the jury is reminded that the questions the attorneys ask are not evidence. The answers to the questions - - that are evidence.

MR. JOHNSON: And further, we move for a mistrial at this - - at this point, because I believe this is going to be a cumulative error that continues through this portion of the punishment phase.

THE COURT: Okay. That's denied.

MR. BEACH: I'll pass the witness.

MR. JOHNSON: Nothing further.

Appellant argues that the trial court erred in not granting his request for a mistrial due to the State's attempt to question the witness about injurious acts the witness experienced in a day at the witness's job that were not alleged to have been committed by Appellant. This was a blatant attempt to put before the jury irrelevant bad acts of others. The obvious intent was to prejudice Appellant with the ill will effect that any jury would feel toward incarcerated inmates that act against guards. This 'piling on' effect was prejudicial to the issue at hand and violative of the proposition expounded in *Penry*, 492 U.S. 302, where the Supreme Court wrote:

"Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty,"evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged

background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

Appellant argues that this error could not be cured by instruction to the jury as the suggestion that the witness encountered 17 other incidents would naturally be taken by the question from the prosecutor that this was a stated a fact. The error substantially affected Appellant's rights to receive a fair trial and impinged on his constitutional right to individualized assessment of punishment in a death penalty eligible case.

**APPELLANT'S ISSUE NO. 28**

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE
JURY'S ANSWER TO SPECIAL ISSUE NO. 2 IN
THE PUNISHMENT STAGE OF THE TRIAL**

Appellant argues that there was insufficient evidence of future dangerousness because with treatment for his mental illness, Appellant is not a future danger.

"In *Roney v. State,* 632 S.W.2d 598,603 (Tex. Cr. App. 1982), this court wrote:

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State,* 591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979), where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State,* 522 S.W.2d 934 (Tex. Cr. App. 1975); *Jurek v. Texas,* 428 U.S. 262, 96 S.ct. 2950, 49 L.Ed.2d 929 (1976)."

*Benz v. State,* 233 S.W.3d 847 (Tex. Crim. App. 2007). This Court should reform the judgement to life imprisonment. *Holberg v. State* 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) and Art. 44.251 (a).

98

## ARGUMENT AND AUTHORITIES

When deciding whether there was sufficient evidence to support a jury's finding that there is a probability the defendant will commit criminal acts of violence that will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.071(b)(2), V.A.C.C.P., beyond a reasonable doubt.  See *Beltran v. State,* 728 S.W.2d 382,388(Tex.Cr.App.1987); *Santana v. State,* 714 S.W.2d 1, 8 (Tex. Cr. App. 1986); *Fierro,* 706 S.W.2d 310,319 (Tex. Crim. App. 1986).

"Prior criminal conduct, the age of the defendant and psychiatric evidence are among the various factors relevant in deciding the record punishment issue." *Roney v. State,* supra, at 661. Psychiatric testimony, however, is not essential to support an affirmative finding to the issue of future dangerousness. *Beltran v. State,* supra, at 390; *Carter v. State,* 717 S.W.2d 60 (Tex. Cri. App. 1986); *Williams v. State,* 68 S.W.2d 692 (Tex. CR. App. 1983); *Mitchell v. State,* 650 S.W.2d 801 (Tex. Cr. App. 1983).  See also *Brooks v. State,* 599 S.W.2d 312 (Tex. Cr. App. 1979), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981).

Other factors relevant to the issue have been discussed in *Brasfield v. State,* 600 S.W.2d 288 (Tex. Cr. App. 1980); *Hovila v. State,* 562 S.W.2d 243 (Tex. Cr. App. 1978).  In *Robinson v. State,* 548 S.W.2d 63, 64 (Tex. Cr. App. 1977), this Court wrote:

> "This Court has stated that in determining the likelihood of whether or not a defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record.  It could consider the range and the severity of his prior criminal conduct.  It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another.  It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity but more than the emotions of the average man, however inflamed, could withstand." (Citations omitted.)

In order to determine whether the facts present in the instant case were sufficient we may look to other cases where the State failed to present sufficient evidence. We have, inter alia, examined the cases of *Roney v. State,* supra; *Garcia v. State,* 626 S.W.2d 46 (Tex. Cr. App.

1982); *Wallace v. State,*618 S.W.2d 67 (Tex. Cr. App. 1981); *Brasfield v. State, supra; Warren v. State*, 562 S.W.2d 474 (Tex. Cr. App. 1978), as well as *Beltran v. State*, supra.

The State presented evidence of the offense of possession of a controlled substance with intent to sell in 1989. (RR: Vol. 49 p. 29) State's witness Jennifer Wheeler testified that Gary Green assaulted her, stabbing her in the chest, for which he pled guilty to aggravated assault. (RR: Vol. 49 p. 41) She testified that Gary was enamored with her and had no friends. (RR: Vol. 49 p. 48) She testified that the assault didn't make any sense and he stopped and drove her to the hospital when she told him that she still loved him. (RR: Vol. 49 p. 49) The State further presented evidence of an aggravated robbery in which Mr. Green robbed the store from which he had recently been fired. (RR: Vol. 49 p. 98)

Shulonda Ransom testified that she and Gary Green lived together in 2001 and had a son, Gary Green, Jr. and a daughter, Melionni. (RR: Vol. 49 p. 123) She said Gary physically abused her while she was pregnant. (RR: Vol. 49 p. 125-129) She said Gary's behavior was bazaar and didn't make any sense to her. (RR: Vol. 49 p. 133) She said his behavior was not related to drugs or alcohol. (RR: Vol. 49 p. 133) She also stated that Gary didn't have any friends. (RR: Vol. A49 p. 134)

The State presented testimony from correctional officers that had contact with Mr. Green during his incarceration in the 1990's. Kevin Ashford testified that Mr. Green failed to obey his order to join the other inmates in the cafeteria and threw his food tray at him, striking him in the midsection. (RR: Vol. 50 p. 13)  Mr. Ashford testified on cross examination that he was not aware other guards were interviewed about the incident and did not know that the report about the incident reported that the tray hit the table, not him. (RR: Vol. 50 p. 21) This incident, which was the most egregious case the State presented to show Mr. Green was violent in prison, was not referred to the Inspector General's Office for criminal prosecution. (RR: Vol. 50 p. 20)

Appellant submits that all the instances of violence occurred with women he was involved with at the time and when he was not taking medication for his documented mental

100

illness.  The infractions that occurred during his previous incarcerations occurred prior to 1994.

From 1994 until his release in 2009, there were no issues concerning Mr. Green.

Dr. Martinez testified that Mr. Green was bipolar and suffered from schizoaffective disorder and severe depression.  (RR: Vol. 52 p. 31-32) He said that Mr. Green had paranoid delusions that people were trying to hurt or conspire against him.  (RR: Vol. 52 p. 32) He stated that Mr. Green was severely mentally ill.  (RR: Vol. 52 p. 108)

The State presented no evidence refuting Mr. Green's diagnosis.

The State of Texas has determined that dangerous people must be executed when they pose such a threat that there is no safe place that the State can put them.  The law that allows for a jury to impose the death penalty also requires the evidence for future dangerousness to be substantial and convincing.  The State executes people because they are dangerous, not because of the impact the murder has had on the victim's family.  Appellant submits that the jury was influenced more by the courtroom packed with friends and family members of the victims rather than any evidence of future dangerousness presented at trial.   The State did not present any evidence of future dangerousness that would overcome Appellant's peaceful, nonviolent twenty year history in the Texas Department of Criminal Justice.  The finding on Special Issue No. 2 by the jury is grossly unjust.  It is apparent that the jury voted "yes" to the issue of future dangerousness without any compelling evidence to support their verdict in order to assure the death penalty for the defendant.  Appellant is aware of and does not ignore this Honorable Court's holding in *Coble v. State*, 330 S.W. 3d 353 (Tex.Crim.App. 2010).  However, unlike *Coble*, Appellant is not arguing that the evidence is insufficient due to a character conversion which was rejected by this Court.  The prison evidence was very important to show that the Defendant could be adequately controlled in prison such that he would not be a future danger some 20 years after the alleged offense.  Even though this is not the exclusive test, it is a very important consideration in determining sufficiency of the evidence.  Otherwise, there can not ever be an adequate sufficiency review to meet due process considerations as all capital murder

offenses are heinous by nature.  See *Berry v. State*, 233 S.W. 3d (Tex. Crim. App. 2007) for case where the crime itself was heinous, but other extrinsic factors were held to be controlling in determining lack of sufficiency of evidence of future danger.

This Court should find in viewing the evidence and under the test described in *Beltran v. State, supra*; *Santana v. State, supra*; and *Fierro v. State, supra,* there is insufficient evidence to support the affirmative finding by the jury to the second special issue under Article 37.071(b)(2), *supra.* See also *Ellason v. State*, 815 S.W.2d 656 (Tex. Crim. App. 1991) for discussion of evidence evaluation on this issue.

**APPELLANT'S ISSUE NO. 29**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE EVIDENCE OF EXTRANEOUS OFFENSE PRESENTED BY THE STATE DUE TO THE STATE'S UNTIMELY AND UNREASONABLE NOTICE OF IT'S INTENT TO USE EVIDENCE OF AN EXTRANEOUS OFFENSE IN PUNISHMENT**

Appellant respectfully directs this Honorable Court's attention to Reporter's Record Volume 51 pp. 33-44 at which the following occurred:

Q. Did you also - - also talk to him about the fact that he had robbed at gunpoint the place that employed him, that grocery store?
A. Yes, sir.
MR. BEACH: Are we going to have a hearing? Can we approach?
(Sidebar conference.)
THE COURT; You don't need to - - do we need to have a hearing?
MR. JOHNSON: Yes, sir.
THE COURT: Okay.  Folks, we're going to have a short break.
THE BAILIFF: All rise.
(Jury excused from courtroom.)
THE COURT: May this witness be excused?
MR. BEACH: No, we need to get a quick offer on the record.
THE COURT: Okay.  Have a seat.
Jury is not now present.
(Outside the presence of the jury, defendant present.)
VOIR DIRE EXAMINATION
BY MR. BEACH:
Q. Shirley, you talked to Gary about him robbing that County Fair Food Store; is that correct?

102

A. Yes, sir.

Q. And that was on Loop 12?

A. Yes, sir.

Q. And when you talked to Gary about robbing that store, did you ask him if he had been involved in any other robberies, or did he tell you if he had been involved in any other robberies?

A. He just - - he just said he robbed that store, the Hunt store.

Q. Gary - - when you're talking about robbing the County Food Store, he admitted to you that he had robbed the Hunt store?

A. Yes, sir.

Q. Now is that pretty close to the County Fair Food Store?

A. Yes, sir.

Q. Like right next door almost or right down the block?

A. A block, yeah.

Q. Okay. Did you ask him why he - - why he was doing it?

A. I don't know. I think I did, but probably not really.

Q. Cant' remember what he - - what he told you about that?

A. It was just an easy thing to do.

MR. BEACH: That's all, Judge. And we've given notice that Gary could - - talked to his aunt about robbing another store. So I would like to ask her those questions in front of the jury.

MR. JOHNSON: Well, Judge, we're going to object to that. That's just a statement without any factual basis. There's no background factual basis for the statement.

THE COURT: I don't think there has to be, does there? I mean, it's - - and then the jury is instructed that they need to either believe it beyond a reasonable doubt or not. There's a limiting instruction that goes along with it.

MR. JOHNSON: But I mean, it's strictly - - it's strictly an assertion that she says that was made by the Defendant. There's no way to test the reliability of the statement. Well, if he had robbed - - I mean, the State has an ability and the State - - they gave us notice that he had - - and actually, they did give us - - they gave us notice that he said he had robbed another store. If they had the particulars of it, they should have done due diligence and sought out to determine whether or not that store had ever, in fact, been robbed.

They had the ability to do that to give us notice so that we could have examined it. And they did not give us notice as to the exact particulars of what they're now claiming here in court. And we haven't - - and so I haven't had an opportunity to see if, in fact, that store had ever been robbed. If so, what was the description of the person that robbed it. And those issues are things that would have been necessary and relevant for us to do. And quite frankly, if the Court is going to allow it, we need to ask for a continuance so that we can, in fact, go back and see if that store was ever robbed and do an investigation on it.

THE COURT: When was the notice given?

MR. BEACH: I mean, three months ago.

THE COURT: Okay.

MR. BEACH: And we've had conversations with him. He knows it was - - Shirley Coleman is the aunt that - - that Gary told this to and he - - Shirley is his witness. I mean - -

MR. JOHNSON: This is the first time we've ever heard that - - what - - that there was ever an

allegation - - I knew that - - I knew that - - what he said, after I've inquired about that, but it was never told to anybody that it was a particular store that had ever been robbed.

MR. BEACH: I said another store.

MR. JOHNSON: And my argument, Judge, goes to the fact that if the State had that information, they're required to turn it over in their notice. They're required to give us particulars as to the date, the time, and if they have an opportunity to say that we have extraneous material to prove that this is more likely than not true. I submit they should have had to turn that over under 404(b).

THE COURT: Okay. Well, here  - - it's - - if they tell you, Defense, we have evidence, or we believe that a witness is going to testify that the Defendant told her he robbed a store, but the State doesn't have any- they don't know what store, all they know is - - that's all she can say is just that.

MR. JOHNSON: No, they say that now they have the exact location of the store, the name of the store, the location of the store. And they said that was the information, and the notice that they've given us was that the - - this was not the only robbery he had ever committed. I didn't know - - the notice doesn't go to the fact that he ever robbed another grocery store, that he had ever robbed an individual.

MR. BEACH: I'll just raise the question. I'll track the notice, Judge. I don't care if it's the store, I don't care if it's, you know, a lingerie shop- -

MR. JOHNSON": Judge, the notice - -

MR. BEACH: - - he was involved in another robbery.

MR. JOHNSON: If the notice is insufficient, it doesn't matter. They had - - they had the opportunity and they should have exercised due diligence. - -

MR. BEACH: It's not insufficient. He was involved in another robbery.

THE COURT: Okay. All right. Let's - - the notice of extraneous offense says: Defendant admitted to one of his aunts that the robbery of Joe Johnson at County Fair Foods was not the only robbery he had committed.

MR. JOHNSON: What was the name the Court said, which aunt?

THE COURT: To one of his aunts.

MR. JOHNSON: And he's got - - he's got a dozen.

THE COURT: Well, then - -

MR. JOHNSON: And I wasn't made aware that it was this one until two days ago.

MR. BEACH: I don't think that's right.

MR. JOHNSON: It is correct.

MR. BEACH: It's not.

MR. JOHNSON: Mr. Healy can attest to that.

MR. BEACH: You didn't even think it was on the notice.

THE COURT: Stop. I think that it was probably incumbent on the Defense at that point to say which aunt - - that this notice is insufficient, which aunt.

MR. JOHNSON: Judge, if the notice is insufficient, it's insufficient. We're not - - we're not required to play guessing games as to which aunt. We're not required to ask for more particulars. We don't file a Motion to Quash under 404(b) notice. The State - - it's incumbent upon the State, if they intent to offer to the evidence, they - - they're required by the statute to give notice.

THE COURT: I understand. What I'm going to allow the State to do is they elicit testimony that the Defendant admitted to one of his aunts that the robbery of County Fair Foods was not the only robbery he had committed. That's what the notice allows them to do. It can't go into any further particulars other than that. The jury can either believe it or not believe it.

MR. BEACH: Yes, sir.

MR. JOHNSON: Then that allows them to speculate that the Defendant committed ten other robberies.

MR. HEALY: Then ask him about the specific robbery.

MR. JOHNSON: That's the reason the notice is insufficient, Judge. If the notice is insufficient, it just can't become sufficient. I mean, we can call it up however we want to, but if it's not sufficient and saying that they told one of his aunts, that's absolutely insufficient. And I'll put Mr. Healy on the witness stand to testify that we were only made aware at the beginning of this week that it was even going to be tried - - that it was even Shirley who - - I asked him about it. I had to go back and see exactly which - - I didn't even know where they had given it to us, and I was told it was given in a supplemental notice of extraneous.

MR. HEALY: Back up. You didn't even know you had the notice of the aggravated robbery.

MR. JOHNSON: That's what I said. I'll agree.

MR. BEACH: Judge, you made the ruling. I mean, he can object to it. Let's move - -

THE COURT: All right. I'm - - you've - - you disagree with me, and that's fine. Maybe I'm wrong. It just seems that this is sufficient, but to go into - - and then - - I'm not going to allow the State to go pull out the store that got robbed and have them come in here and identify the guy and say this is what happened and that there was a gun involved and that, I mean - - -no, I'm just saying I'm only going to allow them to testify as to exactly what was in the notice. And that is that was not the only robbery.

MR. JOHNSON: Well, Judge, The Defendant making a statement that he did something is not an extraneous act.

MR. BEACH: It's an admission.

MR. JOHNSON: The admission alone is not an extraneous act that's sufficient. In order to prove an extraneous act, they have to - - -they have to be able to convince the jury that the act, in fact, did occur beyond a reasonable doubt.

THE COURT: I understand that.

MR. JOHNSON: If defendant - - if they said we're going to put up one of his uncles to say that he killed Jimmy Hoffa, then - - then I guess the Court is going to allow him to say, yeah, he was actually involved in the Jimmy Hoffa murder. I mean, that's basically what the Court is allowing him to do and allowing them to sit up there and say he was involved in more than this one robbery. It allows the jury to speculate. It's highly prejudicial. And again, if the State had the details, if they had the name of the individual or the witness that he told and had the particulars of the place he robbed, they're required to give that notice to us, Judge. And this is inviting the jury to speculate.

MR. BEACH: We don't know the date. We' don't' know, you know, the year. We have no idea. You know, a Hunt's Grocery Store back in that time frame. That's all we know. There's no way that we could have given him any more notice.

MR. JOHNSON: I think they just said that it's a block from the other store. They certainly had enough information to inquire, Judge.

105

THE COURT: Was it - - I don't know what happened. I wasn't there. I'm just saying. It seems to me that that's sufficient notice, and it's not just extraneous offenses, it's bad acts.

MR. JOHNSON: Well, a bad act - - Judge, it's not a bad act to say you did something. It's a bad act if they can prove that it was done beyond a reasonable doubt. You can't - - -you can't use the fact that - - you cannot use an extraneous act or an extraneous bade act unless the jury believes beyond a reasonable doubt that it, in fact, it occurred. And that's the problem that we have here. There's no basis to believe that the underlying conduct actually occurred.

MR. BEACH: A nephew telling his aunt this isn't the only robbery I was involved in, boy that's a - - that's a Jimmy Hoffa analogy if I've ever heard one. I mean, that's a real stretch, Judge. That' s why they get the instruction that you're going to give them on it. If they don't believe it, they disregard it.

THE COURT: If they don't believe it, they can disregard it. And she's here, and she's subject to cross-examination. So I don't want you to go into the particulars. I want to limit it solely to what is on the notice.

MR. BEACH: I don't know the particulars, but I will abide by the Court's ruling.

THE COURT: All right,. Bring the jury in. Exception is noted.

Oh, while the jury is not here, we had an off-the-record-conversation.

MR. JOHNSON: Judge, it's - - that's not been applicable, so it doesn't matter.

(Discussion off the record.)

MR. JOHNSON: Judge, we are going to ask - - we're going to ask out of - - certainly not waiving any objection we made, we're going to ask that - - without going into the particulars, that the prosecution because now the notice is that there was only one other - -

THE COURT: Hold on.

MR. JOHNSON: Hold on, Tony.

THE COURT: Hold on.

MR. JOHNSON: we are going to request at this time - - ad, again, without waiving any objection to what we believe is completely inadmissible, we are going to ask that the Court instruct the prosecution to make an allusion to the fact that he said he had been involved in a single other robbery. What the Court's allowing them to do with that ruling - -

THE COURT: I - - I agree. He never admitted to - - he talked to her and indicated, it's my understanding, that there was one. You can insert the word - -

MR. BEACH: One.

THE COURT: - - one.

MR. HEALY: Uno.

(Jury returned to the courtroom.)

THE COURT: Thank you all. Please be seated. Please continue.


" On timely request of the defendant, notice of intent to introduce evidence under this

article shall be given in the same manner required by Rule 404(b), Texas Rules of Criminal

Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad

act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, *notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred* and the name of the alleged victim of the crime or bad act."

The Legislature's enactment of article 37.07 section (g), limits the trial court's discretion to admit evidence of extraneous offenses at the punishment phase.  Unlike Rule 404(b), article 37.07, section 3(g) specifies that notice is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred.  Compare Tex. Code Crim. Proc. Ann. Art. 37.07, § 3(g) with Tex. R. Evid. 404(b).

Appellant contends that the court erred by admitting the evidence because the State's notice was unreasonable.  The notice statute does not require that defendants complain about the adequacy of notice before trial.  *See* Tex. Code Crim. Proc. Ann. Art. 37.07, § 3.   *See James v. State,* 47 S.W. 3d 710, 714 (Tex. App.- Texarkana 2001, no pet.) (Noting that defendant "is not required to complain about the adequacy of the notice, but that the State is required by statute to provide specific information").

Article 37.07 provides, in part, that upon finding of guilt, evidence may be offered by either party "as to any matter" the trial court "deems relevant to sentencing." Tex. Code Crim. Proc. Ann. Art. 37.07 § 3(a).  This evidence includes "the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried," and "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible." *Id.* Article 37.07 section 3(g) provides for

107

admission of extraneous offense evidence if the State gives timely notice of its intent to use that evidence in the punishment phase of trial. *Id.* Art 37.07 §3(g) (Vernon 2009).

Appellant contends that the State did not provide sufficient notice of its intent to introduce evidence that the Defendant having robbed the Hunt Store. The purpose of article 37.07 section 3(g) is to avoid unfair surprise and to enable a defendant to prepare to answer the extraneous offense evidence. *Apolinar*, 106 S.W. 3d at 414-15; *Roethel*, 80 S.W.3d at 282; *Nance v. State*, 946 S.W.2d. 490, 493 (Tex. App. -Fort Worth 1997, pet. ref'd). This analysis requires examining the record to determine whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial. *Roethel*, 80 S.W.3d at 282. In determining the latter, appellate courts look at whether the defendant was surprised by the substance of the testimony and whether that affected his ability to prepare cross-examination or mitigating evidence. *Id.*

The rule requiring advance notice of the State's intent to use evidence of other crimes, wrongs or acts at trial was designed to eliminate the unfair prejudice that can result from the surprise introduction of these matters at trial. Thus, the lack of surprise is a valid and important consideration in assessing the reasonableness of notice. However, notice is not deemed reasonable merely because the defense is not surprised. If lack of surprise were the only consideration, the State could routinely lay behind the log, making last minute disclosures of its intent to use extraneous offenses in those cases where the defendant arguably would not be surprised by the State's intent to use such evidence at trial. Tactics of this sort would undermine the letter as well as the spirit of the rule. A sister court of appeals has taken a similar approach in determining the reasonableness of notice under this rule. In, the court did not limit its inquiry to

whether the accused was surprised but also focused on whether the State informed the accused of its intent to introduce the extraneous offenses. 13 S.W. 3d at 77

The State provided virtually no notice of the county and date of the offenses. The notice states only that appellant "committed another robbery." This Court should conclude that the notice was unreasonable as a matter of law and that the evidence accordingly was inadmissible. The district court abused its discretion by concluding otherwise.

APPELLANT'S ISSUE NO. 30

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S
OBJECTION TO THE EVIDENCE OF THE CONTENTS OF LETTERS,
STATE'S EXHIBITS NOS. 148A AND 148B

Appellant directs this Honorable court's attention to Reporter's Record Volume 52 pp 167-180 at which a sub rosa hearing was conducted. (The transcription of the hearing is attached hereto as Appendix A).

Appellant complains that the State's notice of intent to introduce evidence of extraneous offense in the punishment stage was not timely nor reasonable in its detail. Additionally, the defense objected that the letters are more than 20 years old and are too remote to be relevant to the issue of mitigation; thereby rendering them more prejudicial than probative on this issue.

Appellant adopts and incorporates the argument and authorities cited in the previous issue to be presented here as if they were set out verbatim.

Appellant argues that the 20 years old letters are so remote that the proffered evidence had no probative value as evidence that could be considered by the jury on the issue of future dangerousness or mitigation pursuant to Art. 37.07, C.C.P. Appellant submits that the trial court

109

abused its discretion in overruling Appellant's objection to threatening aspect of the letters to Defendant's girlfriend at the time as being more prejudicial than probative.  (RR: Vol. 52 p. 163)

Part of defense counsel's objection also went to the surprise aspect of not being able to use this information in conjunction with preparation for trial with the defense's expert witness preparation for presenting mitigation or opposing future dangerousness evidence.  The turn over of the contents of the threatening letters occurred at the commencement of the punishment evidence (4 days prior to proffer).  Appellant submits this prejudiced his ability to prepare an adequate defense strategy for the punishment hearing in not allowing enough time to investigate and evaluate this proffered evidence with the defense's mitigation expert. This in turn violated the Defendant's right to due process (RR: Vol. 52 p. 165)

### FEDERAL CONSTITUTIONAL ISSUES

*(The following Constitutional Issues have been previously submitted to this Honorable Court; which previously has turned them down. See Saldano v. State, 232 S.W.3d 77 (Tex. Crim.App. 2007) Appellant submits these issues in this case not to cause unnecessary litigation but to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system; which has final constitutional power of review.)*

### APPELLANT'S ISSUE NO. 31

**THE STATUE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY**

The Texas Legislature reacted to *Penry* [1] by amending article 37.071 to include a mitigation instruction. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(1)(Vernon Supp. 2001).  This instruction in effect allows the jury to impose a life sentence if, in their sole discretion, they choose to do so. *See id.*

---

[1] *See Penry v. Lynaugh, 492 U.S. 302, 322-28 (1989).*

As Justice Blackmun noted in his dissent to denial of certiorari in *Callins v. Collins,* to comply with the mandates of the Eighth Amendment, the death penalty must be fairly administered with reasonable consistency. *See Callins v. Collins,* 114 S. Ct. 1127, 1129 (1994) (mem.)(Blackmun, J., dissenting).  In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty.  Therefore, the statute should be found unconstitutional.

The very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die.  The mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose.  Thus, the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race,[2] unsightliness, mental illness, or a difference relating to a host of other improper considerations.  The arbitrariness and capriciousness that results from this unfettered discretion renders the present scheme unconstitutional.  *See Gregg,* 428 U.S. at 189.

Under these circumstances, this Court should declare the statutory scheme under which Appellant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence.

### APPELLANT'S ISSUE NO. 32

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AMENDMENT AS INTERPRETED IN *PENRY V. JOHNSON* BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE INTOLERABLE AND  UNRELIABLE**

This Court should hold that the Texas death penalty scheme violates the Eight Amendment under the Supreme Court's decision in *Penry v. Johnson,* 121 S.Ct. 1910 (2001) (hereinafter *"Penry II"*).  While the opinion in that case only repudiated a judicially-crafted mitigation instruction, the statutory mitigation special issue given in Appellant's case is similarly vulnerable to the criticism that is sends "mixed signals" to the jury. Because the mitigation special issue submitted to the jury pursuant to the dictates of article 37.07 sent "mixed signals" to the jury, that statute is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry* .  Consequently, Appellant's conviction was secured in violation of his right to Eighth Amendment rights as applicable via the Due Process clause of the

---

[2]*Cf.* James Kimberly et al., *More Racial Testimony Found in Capital Cases,* Hous. Chron., June 9, 2000, at A1 (Discussing testimony of expert asserting race as a factor that contributes to future dangerousness that caused the U.S. Supreme Court to overturn a Texas death penalty sentence); *Saldano v. Texas,* 530 U.S. 1212 (2000)(mem.).

Fourteenth Amendment. Therefore, this Court should reverse Appellant's conviction and sentence, and remand this cause to the trial court.

## APPELLANT'S ISSUE NO. 33

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE BEYOND A REASONABLE DOUBT STANDARD**

Under the Texas statutory scheme, Appellant's jury was not instructed on a burden of proof on the mitigation special issue. *See Lawton*, 913 S.W.2d at 557 ("the Texas legislature has not assigned a burden of proof regarding mitigating evidence"). Moreover, because of the juxtaposition of the reasonable doubt instruction with the Special Issue Number 2, the jury could have read the charge to mean that Appellant had the burden of proving beyond a reasonable doubt mitigation sufficient to warrant life rather than death. *See id.* ("the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case").

The Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), NECESSITATES A FINDING THAT THE Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death.

*Apprendi* should be applied to article 37.071, section 2(e)(1). Under that statute, a jury is asked to decide:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See* Tex. Code. Crim. Proc. Ann. art. 37.071, § 2(e)(1) (Vernon Supp. 2001). As stated above, that issue was submitted to the jury in this instant case.

The jury was also instructed that if ten or more jurors answer the special issue in the affirmative, a sentence of life imprisonment would be imposed. *See* Tex. Code Crim. Proc. Ann. art 37.071,§ 2(f)(2)(Vernon Supp. 2001). Although they could not be instructed as such, if the jurors had reached a stalemate and been unable to agree, a sentence of life imprisonment would have been imposed. *See* Tex. Code Crim. Proc. Ann. art. 42.12 §2(g)(Vernon Sup. 2001). Thus, in Appellant's trial, *the absence of a jury decision on the mitigation issue would have automatically capped Appellant's punishment at life*

*imprisonment.* <u>Only</u> if all twelve jurors answer in the negative, as was the case here, could the death penalty have been imposed. *See* Tex. Code Crim. Proc. Ann. art. 42.12 §§ 2(f)(2), 2(g) (Vernon Supp. 2001).

Thus, section 2(e)(1) plainly fits the mold of an issue on which *a factual determination raises the maximum punishment which is available.* The factual issue involves a comparison, but that does not later its factual character. This Court has held that there is no burden of proof with respect to the mitigation issue, at least on the face of the statute. *See Lawton*, 913 S.W. 2d at 557. In practice, however, "the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case." *See id.* If so, the construction of the statute in *Lawton* is 180 degrees opposite to the principles of *Apprendi*, but even the lack of any specific assignment of the burden is at odds with *Apprendi.* Even the most compelling evidence of diminished personal culpability can come up short when the genuine *Penry* question is converted into a comparison against repulsive facts. In fact, the net effect can be even worse than that. As demonstrated by other cases where attorneys have sought to waive[3] the mitigation issue because this weighing brings in additional damaging evidence, this weighing process sometimes turns a purported "mitigation" question into an additional vehicle for the State to throw even more evidence into the kettle of jury deliberations.

Because the statute under which Appellant was sentenced to die does not require the jury to enter a negative finding on the mitigation special issue only if the State had proven beyond a reasonable doubt that there was not mitigating evidence sufficient to warrant imposition of a life sentence rather than death, that statute is unconstitutional. Consequently, Appellant's conviction was secured in violation of his right to Due Process as secured by the Fourteenth Amendment as interpreted in *Apprendi*. Therefore, this Court should reverse Appellant's conviction and sentence, and remand this cause to the trial court.

<u>APPELLANT'S ISSUE N3. 44</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE 37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A VIOLATION OF ARTICLE ONE SEC. 10 AND SEC. 13 OF THE TEXAS CONSTITUTION**

The trial court denied Appellant's Motion to Hold articles 37.071 Sec. 2(E) and (F). The infirmities in the statute discussed in the previous issue are also violative of State Constitutional Law. Under the "due course of law" provision of the Texas Constitution, Article I Sec. 10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane v. State*,

---

[3]*See, e.g. Mosley v. State,* 983 S.W.2d 249, 263-64 (Tex. Crim. App. 1998)(op. on reh'g). *cert denied*, 526 U.S. 1070 (1999).

113

254 S.W.2d 136, 136 (Tex. Cr. App. 1953).  When the burden of proof is shifted to the Defendant, the State's burden has essentially been reduced.  See e.g., *Corbarrubio* v. *State*, 675 S.W.2d 749 (Tex. Cr. App. 1983) overruled in part, *Lawrence v. State*, 700 S.W.2d 208 (Tex. Cr. App. 1985), and *Elliot v. State*, 858 S.W.2d 478, 487-488 (Tex. Cr. App. 1993).  Such a punishment, based on a reduced burden, is not in accordance with Texas law and is unconstitutional.

## APPELLANT'S ISSUE NO. 35

**THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY**

The current "mitigation" special issue in Texas, and the one applied in this case was as follows: Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Consistent with current Texas law, the jury charge did not impose any burden of proof as to mitigation on either the State or Appellant. Appellant's Motion on the unconstitutionality of the burden of proof on this special issue was denied by the trial court.

Recently, the United States Supreme Court declared that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty. *See Ring v. Arizona*, 536 U.S.,122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002). Applying the holdings from its previous decisions in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court stated: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n. 6, 119 S.Ct. 1215. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact--no matter how the State labels it--must be found by a jury beyond a reasonable doubt." *Apprendi*, 530 U.S. at 482-83, 120 S.Ct. 2348. Therefore, that which has the effect of increasing punishment beyond a maximum statutory sentence must be considered the functional equivalent of an element of an offense greater than the one covered by the jury's guilty verdict. *Id.*, 530 U.S. at 495, 120 S.Ct. 2348.

114

The trial court imposition of the death sentence should be reversed.

## APPELLANT'S ISSUE 36

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES.**

All twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively. *See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999). Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. *See id.* § 2(f)(2). The trial court here instructed the jury accordingly.  The failure of a capital jury to garner the requisite number of votes either way results in a life sentence. *See id.* § 2(g).  Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to unanimously agree on an answer to either special issue results in a life sentence. *See id.* § 2(a). This feature of article 37.071 creates the potential for considerable confusion among reasonable jurors.

A. The "Majority Rules" Harm Analysis

Texas' 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality.  Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other jurors are firmly voting "yes", holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) ("common sense ... suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

Put another way, Texas' 12/10 Rule is a built-in impermissible "dynamite charge", which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps*, 484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d. In this way, Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations - a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams*, 392 So.2d 619, 631 (La.1980) (on rehearing). In *Williams*, the court stated:

"In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality ... *Instead, the members of the sentencing body were left to speculate as to what the outcome would be in the event there was no unanimity.* Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required. [emphasis added.] *Id.*"

B. The *Mills* Principle

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland*, that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors as to whether the mitigating evidence offered by the capital defendant warrants either a negative answer to the first special or second special issue, or an affirmative response to the third, thus resulting in the imposition of a life sentence. *Mills v. Maryland*, 486 U.S. at 373-75, 108 S.Ct. at 1864-65, 100 L.Ed.2d. Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give into a "majority rules" mentality is too great under the Eighth Amendment.

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), Appellant was sentenced to death in an unconstitutional manner. For these reasons, the judgment of the trial court should be reversed and the cause remanded for a new trial.

## APPELLANT'S ISSUE NO. 37

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.**
## ARGUMENT AND AUTHORITIES

At the conclusion of the punishment phase, the trial court submitted to the jury the two statutory special issues (see TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999).

116

The trial court did not define certain critical terms appearing in these questions, namely, "probability", "continuing threat to society", and "criminal acts of violence", which terms are so vague and indefinite as to be violative of Appellant's fundamental constitutional rights. Consequently, the jury was deprived of any instructions concerning the meaning of these crucial terms in the special issues.

The failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. This is raised as a fundamental error since no objection appears in the record. *See Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death penalty upon this Appellant in comparison to other cases in which other defendants received a life sentence. This failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Appellant. His death sentence must therefore be vacated. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers*, 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

### APPELLANT'S ISSUE NO. 38

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

### APPELLANT'S ISSUE NO. 39

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

**(These two issues are combined in that they contain similar facts and issues of law.)**

117

**ARGUMENT AND AUTHORITIES**

Justice Blackmun of the United States Supreme Court concluded that the death penalty, as currently administered in this country, is unconstitutional. *See Callins v. Collins*, 510 U.S. 1141,114 S.Ct. 1127, 1129, 127 L.Ed.2d 435, 449 (1994) (Blackmun, J., dissenting). Justice Blackmun summarized his position in the following excerpt:

> It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck. In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982).
> To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due to the uniqueness of the individual." *Lockett v. Ohio*, 455 U.S. 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and probing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice. Finally, because human error is inevitable, and because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.
> On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable. Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well.

The Texas capital sentencing scheme fails to adhere to principled guidelines in weighing punishment evidence. The focus upon aggravating circumstances, to the exclusion of mitigating evidence, clearly violates the constitutional mandate of individualized sentencing. *See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256, 278-79 (1989). The federal and state constitutions prohibit the imposition of the death penalty until a scheme is employed which eliminates the sentencer's total discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

118

## APPELLANT'S ISSUE NO. 40

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE CONSIDERED BY THE JURY**

Article 37.071 Sec. 2 (c)and (f), submitted to a jury upon conviction of capital murder.

This statute is unconstitutional because it fails to require that mitigation be considered. A juror is required to consider all mitigation. After the juror has considered the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to mandate consideration of mitigating evidence makes this statute unconstitutional in violation of the Eighth Amendment.

Capital murder statutes that have survived constitutional scrutiny all require that the jury be told that it must consider all mitigating evidence. E.G. *Johnson v. Texas,* 113 S.Ct. 2658 (1993); *Boyde v. Califronia,* 494 U.S. 370 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299 (1990).

## APPELLANT'S ISSUE NO. 41

**THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE**

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, *e.g., Walton v. Arizona,* 100 S.Ct. 3047, 3055 (1990) (state's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory "Penry" special issue, the Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "*sufficient.*. Mitigating circumstances," TEX. CODE CRIM. PRO. Art. 37.071, Sec. (e), the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statue does not explicitly use the term "aggravating circumstance," clearly that is how the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *F. Johnson v. Texas,* 113 S.Ct. 2568 (1993)(describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether the State or the defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

119

### APPELLANT'S ISSUE NO. 42

**THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA**

In *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was being administered, the chief constitutional infirmity that controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. *See also, Gregg v. Georgia*, 428 U.S. 153 (1976); *Spaziano v. Florida*, 468 U.S. 447-64 (1984).

Rather than submit such an open-ended, unstructured sentencing issue, the Eighth Amendment requires a trial court in the sentencing phase of a capital case to instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors. *Cf Gregg v. Georgia*, 428 U.S. 153 (1976) (discussing Georgia's post *Furman* capital sentencing statute). Unless such an instruction is submitted in this case, a death sentence returned by Defendant's jury would violate the Eighth and Fourteenth Amendments.

### APPELLANT'S ISSUE NO. 43

**TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW**

As discussed above, the pivotal sentencing issue in Texas capital cases - the statutory "*Penry*" special issue– does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there are "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence. See TEX. CODE CRIM. PRO. Arts. 37.071 and 37.0711 (Vernon 1994). In a larger sense, however, the "*Penry*" special issue requires Texas juries to perform the same functions that other states' post-Furman capital sentencing juries perform: (i) the threshold finding of particular aggravating and mitigating circumstances; and (ii) the balancing process, whereby jurors determine whether the mitigating factors outweigh aggravating factors. *Cf. Gregg v. Georgia* 428 U.S. 153 (1976) (discussing Georgia's post- Furman's statute).

Appellant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute but also is a prerequisite to a constitutionally implemented capital sentencing scheme. Because the second statutory

special issue is open-ended and unstructured– i.e., not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific "findings" in this regard – the Court of Criminal appeals has no way to know which aggravating and mitigating factors that jurors considered. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. In this way, meaningful appellate review is impossible. The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered. See *Sawyer v. Whitley*, 112 S. Ct. 2514, 2522-23 (1992) (noting "how difficult [a] task" a reviewing court faces in "assess[ing] how jurors" reacted to mitigating and aggravating evidence "particularly considering the breadth of those factors that a jury .. must be allowed to consider" without knowing how jurors actually considered the totality of the evidence.)

Because the Court of Criminal Appeals is required by statute and by the Constitution to review the sufficiency of the evidence supporting a jury's negative answer to the statutory *"Penry"* special issue, the open-ended and unstructured nature of Arts. 37.071 and 37.0711, which prevents meaningful appellate review, renders the Texas capital sentencing stature unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

<u>APPELLANT'S ISSUE NO. 44</u>

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO QUASH THE INDICTMENT AS BEING UNCONSTITUTIONAL BASED ON THE ENUMERATED CONSTITUTIONAL DEFECTS OF THE TEXAS CAPITAL MURDER DEATH PENALTY LAW**

Appellant filed a Motion to Quash the indictment for raising numerous constitutional issues concerning the death penalty. The Trial Court denied the Motion.

**ARGUMENTS AND AUTHORITIES**

Appellant presented these issues in this motion, partly in an effort to avoid any claim of waiver for further review even though this Court has previously resolved the issues adversely to Appellant's position.

The Texas capital punishment scheme does not permit the jury to consider and give effect to all the mitigating circumstances which exist concerning the defendant in violation of the Eighth and Fourteenth Amendment of the United States Constitution and/or Article 1 Sec. 10, 13 and 14 of the Texas Constitution.

121

The Texas scheme unconstitutionally chills the defendant's ability to present relevant mitigation evidence which results in ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendment to the United States Constitution and Art. 1 Sec. 10 of the Texas Constitution.

The Texas death penalty scheme gives prosecutor's unfettered discretion to elect to proceed with the death penalty in violation of the Eighth and Fourteenth Amendment to the United States Constitution.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because jurors are not informed that a failure to agree on a special issue will result in life imprisonment.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because it does not provide for an option of a life sentence without parole.

The Texas Death Penalty Statute, art 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the procedure by which the death penalty is imposed in Texas denies the defendant protection from cruel and unusual punishment.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the jurors are not adequately guided by the three issues to present the jury from acting in an arbitrary and capricious manner.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because punishment issues no. 1 and 3 have been answered by the finding of guilt of capital murder and the second issue does not provide an adequate test of probability for juror guidance in determining the issue.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because there is no proportionality review on appeal.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the requirement to execute peremptory challenges prior to examination of the entire jury panel denies Appellant effective assistance of counsel.

The trial court erred in overruling the Motion to Quash the indictment which denied Appellant his constitutional right to a fair trial.

## APPELLANT'S ISSUE NO. 45

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Tex.C. Crim. P. 37.071 fails to provide a method by which the state determines the death-worthiness of the Defendant. This failure eliminates rationality and consistency in the decision to seek death and violates the Defendant's right to equal protection and due process as set out in the 5th and 14th Amendment to the United States Constitution, Article 1, Sections 13 and 19 of the Texas Constitution and Tex. C. Crim Proc. Art.1.04.

The decision as to which defendant is to be subjected to the death penalty varies from county to county. There are likely 254 different methods in determining which cases shall be prosecuted as capital cases and in which of those the penalty of death will be sought. Often the decision can turn on the county's willingness to fund the defense, the race of the defendant, the age, sex, race or status of the victim in the community. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied. *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

As the right to life is guaranteed by the Constitution certainly the life of a citizen demands as much consideration and protection as does a voter. The right to life is a fundamental one. *Furman v. Georgia*, 408 U.S. 238, 359 (1972). The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought, violates the principles set forth in the United States Constitution.

The Texas Death Penalty scheme magnifies the arbitrary and freakish manner in which the death penalty is imposed in the state, all in violation of the Due Process clause of the 5th Amendment to the United State Constitution and the prohibition against the imposition of Cruel and Unusual Punishment of the 8th Amendment. Specifically, the potentially arbitrary and capricious discretion of the county prosecutors is made worse by the fact that (a) Tex.C. Crim. P. Art. 37.071 does not require a proportionality review to be performed on sentences of death; (b )Texas juries are not told that their failure to agree on any of the sentencing phase special issues will result in a life sentence. Jurors are in fact told that ten (10) of them must agree in order to return a verdict in favor of the Defendant; © the

123

Governor of Texas does not have independent authority to grant Clemency and can only do so upon recommendation of the Texas Board of Pardons and Parole; (d) the Texas Board of Pardons and Parole does not meet when considering Clemency petitions and "faxes" or "calls in" their votes; (e) counsel for Clemency petitioners are denied compensation for their assistance provided to a condemned inmate, essentially denying him counsel in the final hour of life.

## APPELLANT'S ISSUE NO. 46

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE I, § 19, OF THE TEXAS CONSTITUTION.**

Due process in both the federal and state constitutions requires that Appellant receive the fundamental fairness necessary to the due administration of justice. *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166(1941); *Reese v. State*, 877 S.W.2d 328, 333 (Tex. Crim. App. 1994). Appellant cites many constitutional and statutory violations in the issues contained in Appellant's Brief. If this Court deems that none of these reasons taken alone justify reversing the trial court's judgment, then Appellant prays the Court consider the cumulative effect of the errors in the trial court. Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive her of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments, as well as Article I, Section 19. Consequently, the trial court's judgment should be reversed, and the cause remanded for a new trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the trial of the case, Appellant prays this Honorable Court reverse the judgment of the trial court and remand for a new trial.

Respectfully submitted,

John Tatum
Counsel for Appellant

U.S. POSTAGE
PAID
RICHARDSON, TX
75080
AUG 18 11
AMOUNT
$22.25
00086108-12

## CERTIFICATE OF SERVICE

I, JOHN TATUM, do hereby certify that a true and correct copy of the foregoing Brief for Appellant was delivered to Craig Watkins, Criminal District Attorney, Appellate Section, 11th floor, Frank Crowley Criminal Courts Building, Dallas, Texas 75207, on this 23 day of August, 2011.

John Tatum

## CERTIFICATE OF SERVICE

The undersigned attorney for Appellant certifies that a true and correct copy of the foregoing brief was mailed , postage prepaid, to Gary Green  TDC# 999561 at the Polunsky Unit 3872 FM 350 South, Livingston, Texas 77351, by U.S. Mail this the 23 day of August, 2011.

John Tatum

# APPENDIX A

1  the punishment phase of a -- of a capital crime, Judge, I think
2  is -- and certainly a case that the Court has discretion to
3  decide whether or not the admission of them at this time would
4  be violative of the Defendant's due process rights and
5  violation of the State, as well as the 8th and 14th Amendments
6  to the United States Constitution. And we're going to object
7  to them on that basis.
8          THE COURT: I -- I --
9          MR. JOHNSON: I have another objection, also.
10         THE COURT: Well, let's just -- one objection at
11 a time. I'm looking at Article 37.07(g). Where is your
12 appellate lawyer?
13         MR. HEALY: She went to get cases on argument.
14         THE COURT: Okay. That's nonsensical.
15         MR. HEALY: I'm just telling you where they
16 went.
17         (Counsel returns to courtroom.)
18         THE COURT: Okay. 37.07(g), untimely request of
19 the Defendant --
20         MS. LAMBERT: 37.07 or 37.071?
21         THE COURT: 37.07(g).
22         MS. LAMBERT: Which section?
23         THE COURT: G.
24         MS. LAMBERT: It's numbered. 37.07?
25         THE COURT: Section 3(g).

1  were given notice during the punishment phase.
2          MS. LAMBERT: You were given notice as soon as
3  we received the letters.
4          MR. JOHNSON: I'm sorry?
5          THE COURT: I understand that.
6          MR. BEACH: Last Friday -- last -- didn't you
7  tell them last Friday? Jennifer called Paul last Friday when
8  she found out about the letters.
9          MR. JOHNSON: We were told last Friday that
10 there were some letters, but we weren't told -- we obviously
11 didn't see the contents of the letters until --
12         MR. BEACH: Monday.
13         MR. JOHNSON: -- until during the punishment
14 phase.
15         THE COURT: So Monday is when you actually saw
16 them?
17         MR. BEACH: Saw them.
18         MR. JOHNSON: Yes.
19         MS. BENNETT: The same day the State saw them,
20 we -- yes.
21         THE COURT: I understand that, but --
22         MS. LAMBERT: Okay, Judge, the case law says
23 that they're not required to receive notice of rebuttal
24 evidence.
25         THE COURT: It's not rebuttal evidence. It's

1          MS. LAMBERT: Okay. That's due to extraneous
2  offenses.
3          THE COURT: Yes.
4          MS. LAMBERT: Did I miss something?
5          THE COURT: And bad acts.
6          MS. LAMBERT: Okay.
7          MR. BEACH: He objects that we were going to --
8  did not exercise due diligence in giving them to them, so we
9  never gave them notice until --
10         MS. BENNETT: We're in rebuttal.
11         MR. BEACH: -- when he first found out about it.
12         MS. LAMBERT: We already talked about this.
13         THE COURT: No, listen.
14         MS. LAMBERT: I'm listening. I'm sorry, I
15 missed the -- I missed the beginning.
16         THE COURT: It has to do with punishment. This
17 is punishment, okay?
18         MS. LAMBERT: Okay. So the letters were given
19 to him last Monday?
20         THE COURT: Monday.
21         MS. LAMBERT: And we've been talking about them
22 for four days? That would be considered reasonable notice.
23         THE COURT: When was notice given?
24         MR. JOHNSON: There was never notice given,
25 Judge, or they -- we were never given notice before trial. We

1  punishment evidence.
2          MS. LAMBERT: We're rebutting the --
3          MR. JOHNSON: What are you rebutting? We
4  haven't offered any future danger testimony.
5          THE COURT: It's punishment evidence. Just --
6  I'm reading the section -- the code section that this is under
7  is under punishment.
8          MS. LAMBERT: So the objection is that you
9  didn't receive adequate notice, or what's your objection?
10         MR. JOHNSON: Number one, we didn't receive
11 adequate notice, and, number two, we haven't offered any future
12 dangerous testimony. How can you say you're offering rebuttal
13 testimony, when we haven't offered any?
14         (Discussion off the record between counsel.)
15         THE COURT: Okay. And just -- just for the
16 record, too, just so we know exactly where we are, I want to
17 point out Section 37.071, Section 2, the introduction of
18 evidence of extraneous conduct is governed by the notice
19 requirements of Section 3(g), Article 37.07. Just so we know
20 that -- where -- where we are. And this is -- this is
21 specifically talking about being found -- after being found
22 guilty, so the punishment stage. Doesn't say anything about
23 rebuttal. It just says the punishment stage.
24         So here's my question. If notice of something
25 has not been given until after the punishment stage is begun --

169

1   MS. LAMBERT: Well, we got -- you had -- Friday
2   is when we gave it to them?
3   MR. JOHNSON: We were given it Monday.
4   MR. BEACH: Before the punishment started.
5   MS. LAMBERT: Right. And you were notified on
6   Friday --
7   MR. JOHNSON: We were notified of the existence
8   of the letters --
9   MS. LAMBERT: -- of the existence of the
10  letters, and then you were given the letters on Monday when we
11  actually received them, correct?
12  MR. JOHNSON: Correct.
13  THE COURT: Follow me.
14  MS. LAMBERT: I'm with you, Judge.
15  THE COURT: Okay. Trial starts. Verdict of
16  guilt is returned. After the verdict of guilt is returned, but
17  before evidence is presented in the punishment phase, notice is
18  given to the Defense of evidence that they wish to bring up
19  during the punishment phase.
20  We're all in agreement that 404(b) talks about
21  case in chief, but the question is the punishment phase. It
22  doesn't talk about rebuttal in the State's case or even the
23  State's portion. It just says evidence of bad acts shall be --
24  the Defense shall be given notice prior to its introduction.
25  That's 37.07(g) as referenced by 37.071, Section 2.

170

1   MS. SMITH: Okay. So what's your argument about
2   why it's unreasonable?
3   MR. JOHNSON: It's not timely.
4   MS. SMITH: Well, it's timely in the sense that
5   we gave it over as soon as we had it, so how does it --
6   MR. LAMBERT: And you have to show surprise,
7   which obviously you're not surprised because we've been talking
8   about it for four days.
9   MR. JOHNSON: I was -- I was surprised.
10  MS. SMITH: Well, how are you prejudiced?
11  You've had time to find a way to respond to them. You've had
12  plenty of time to come up with this argument, try to exclude
13  it. Show me how you're prejudiced. Just so it might come in
14  doesn't mean you're prejudiced, too, by the way.
15  MR. JOHNSON: Well, Judge, there's such a
16  remoteness to the language. It has no probative value as to
17  the special issues.
18  MS. LAMBERT: Oh, so now it's 403?
19  MR. JOHNSON: Well, it's 403, it's 404.
20  THE COURT: No, we're not going to argue 403
21  right now. I'm more concerned about this.
22  MS. LAMBERT: The notice?
23  THE COURT: Yes.
24  MS. SMITH: Okay. Well, it doesn't give a
25  number, doesn't tell us -- it just says timely, right, or

171

1   reasonable?
2   MS. LAMBERT: Reasonable. And case law doesn't
3   put a number on what reasonable is. And considering the fact
4   that he was told as soon as we knew and the fact that we've
5   been talking about it for four days and he's still -- has never
6   raised this argument until right now, I don't see how he can
7   complain that he wasn't reasonably notified.
8   MR. JOHNSON: Well, Judge, as I just -- as I
9   stated a moment ago in regards to my due process argument, the
10  fact --
11  MS. LAMBERT: So now it's due process?
12  MR. JOHNSON: That's what I objected to a moment
13  ago.
14  MS. LAMBERT: Okay.
15  MR. JOHNSON: And the -- we're claiming that --
16  that it's -- it's unfair at this time to allow the admission of
17  this evidence because as I said a moment ago, we were not
18  allowed to have this information prior to trial and prior to
19  the formulation of our defensive strategy and prior to the
20  formulation in the consultations with our expert witnesses and
21  had we, in fact, had this information, then we may have changed
22  our whole strategy in how to try the case.
23  MS. LAMBERT: Your expert witnesses reviewed the
24  letters today.
25  MR. JOHNSON: Our expert witnesses had

172

1   formulated their opinions prior to coming to the courtroom.
2   MS. LAMBERT: And changed them when they were
3   here, so they could have taken this information and used it to
4   form the basis of their expert opinion.
5   MR. JOHNSON: But we don't have an
6   opportunity to change the formulation of our strategy to
7   proceed with the whole trial.
8   MS. LAMBERT: You could have done so on Friday
9   or on Monday.
10  MR. JOHNSON: That's a little bit --
11  THE COURT: Don't -- don't say Friday. It was
12  Monday. For the record, it's Monday.
13  MS. SMITH: But punishment still hadn't started.
14  MR. JOHNSON: Well, I'm talking about --
15  THE COURT: I understand that, but I don't want
16  the record to be confused as to what my opinion of when they
17  received notice.
18  MS. LAMBERT: I got it.
19  THE COURT: So I don't want to -- don't -- I
20  just want it to be clear that the Court believes it was -- it
21  was Monday morning prior to punishment beginning, but it was
22  still Monday, not Friday.
23  MR. JOHNSON: So that's the nature of our --
24  that's the nature of our objections, Judge. We feel -- and
25  it's strictly within the discretion of the Court. And this is

173

1    a capital crime. And certainly -- the Court can certainly
2    err -- err on the side of caution in order to protect the
3    constitutional rights of the Defendant.
4              THE COURT: All right. The Court makes the
5    following finding -- the Court finds -- the Court finds that
6    the State did not discover the -- the letters until the Friday
7    prior to the beginning of -- of punishment. The Court finds
8    that the State at that time gave notice to the Defense of their
9    intent to introduce these records as bad acts and included
10   within that the name of -- of all of the parties and all
11   identifying information and turned over these letters to the
12   Defense on Monday prior to the beginning of -- of punishment.
13             The Court finds that introduction of them now at
14   this time satisfies the timely notice requirement to which the
15   Defense has excepted. The exception is noted.
16             Now, next argument. Content. Content
17   objections?
18             MR. JOHNSON: Judge, we're just going to object
19   to the content of the letters is -- the -- of the information
20   contained in the letters is at least 20 years ago. It's --
21   it's too remote, has no bearing on the issue as to the future
22   dangerousness issue of the Defendant or in regards to
23   mitigation as he sits in this courtroom today.
24             THE COURT: What says the State?
25             MS. SMITH: I'm sorry, I did not hear what you

175

1              MR. JOHNSON: No, I understand. And, Judge, the
2    only problem -- the only problem with reading it again is I
3    don't have an objection to Mr. Beach reading it if there's
4    absolutely no inflection and if he reads it in the same manner
5    in which it's written, because there were -- several words were
6    misspelled. They need to be read phonetically and not what his
7    assumption of the wording -- or the letters are supposed to be.
8              MR. BEACH: I can do that.
9              MR. JOHNSON: And with absolutely no inflection,
10   and so I don't have a problem with him doing it in that regard.
11   And we -- absolutely, it's imperative that since this is going
12   to be read to the jury, it would be considered an exhibit that
13   -- that they bring a -- in some fashion they have these things
14   bracketed on a separate exhibit so that the jury is not allowed
15   to even inadvertently see the remaining portions of those
16   letters.
17             THE COURT: Is that -- does the State agree to
18   that stipulation?
19             MR. BEACH: Yes, sir.
20             THE COURT: All right. Then that's -- that's
21   how we will proceed.
22             MR. JOHNSON: And just out of an abundance of
23   caution, Judge, at this time all of these letters -- and I know
24   Ms. LaBar is very good at what she does. There's -- there's
25   been several exhibits in the trial so far that have been

174

1    just said, Paul. We were busy.
2              MR. BEACH: Let me try to handle this.
3              MS. SMITH: Okay.
4              MR. BEACH: I don't know how many times we've
5    heard in the last day and half that the Defendant has been
6    mentally ill his entire life. Well, his entire life includes
7    when he was in the penitentiary writing letters to his ex-high
8    school girlfriend about, you know, how he made choices and he
9    was sane and it wasn't for the money, it was for the thrill of
10   getting away from it. So that -- that's -- that goes to his
11   antisocial personality versus his mental illness, and they've
12   opened all that up for our ability to rebut it with these
13   letters.
14             THE COURT: And which -- what -- what do you
15   want to introduce?
16             MR. BEACH: Those two excerpts that I read,
17   Judge, into the record.
18             THE COURT: And how do you -- how do you
19   propose -- how do you all -- okay, I'm going to rule that those
20   are admissible over Defense's objection which is timely made.
21             Now, how are we going to get it in?
22             MR. BEACH: I would suggest to read it.
23             THE COURT: You're not waiving anything by --
24   you're not waiving anything by coming to an agreement on how
25   it's delivered.

176

1    admitted for record purposes only, and we just want to reurge
2    the Court and the reporter to exercise extreme caution and make
3    sure that the jury is not given any access to any of the
4    exhibits that have been introduced for record purposes only.
5              THE COURT: All the hand -- the handwritten
6    letters to the girlfriend of which the State gave notice of on
7    -- on Monday, those are admitted for record purposes. Now, the
8    other letters, it's my understanding, were admitted for all
9    purposes.
10             MR. BEACH: That's correct.
11             MR. JOHNSON: That's correct.
12             THE COURT: And we've had a conversation.
13             MR. JOHNSON: They were -- they were included in
14   the business record affidavits.
15             THE COURT: Okay. Right. Then we're --
16   we're -- in agreement.
17             MS. LAMBERT: Judge, did -- did you get --
18   regarding closing argument?
19             THE COURT: Did I get what? Yeah, I looked. I
20   know that. I know that section. That's not 37.071. Go get
21   the jury.
22             MS. BENNETT: Yeah, we'll do it after. You
23   found a case on point.
24             Lisa did.
25             (Discussion off the record.)

177

1    THE BAILIFF:  All rise.

2    (Jury returned to courtroom.)

3    THE COURT:  Thank you all.  Please be seated.

4    Defense.

5    MR. JOHNSON:  Your Honor, ladies and gentlemen,

6    Defense is going to rest.

7    THE COURT:  State?

8    MR. BEACH:  The State at this time would offer

9    into evidence two excerpts from a letter written by the

10   Defendant to Jennifer Alcorn while he was in the penitentiary,

11   those being State's Exhibits 148A, that's already been

12   published to the jury about the college, and now State's 148B.

13   (State's Exhibits 148A and 148B offered.)

14   THE COURT:  Please proceed.

15   MR. JOHNSON:  Your Honor, if the Court would

16   note our previous objection.

17   THE COURT:  Previous objection is noted.

18   MR. BEACH:  And are they admitted?

19   THE COURT:  They're admitted.

20   (State's Exhibits 148A and 148B admitted.)

21   MR. BEACH:  That I know that's all behind us

22   now.  Jennifer, when we first came as one, I said if you ever

23   blank, blank, blank, blank over, and think you can play with my

24   feeling, I'll kill you.  Isn't that what I said, question mark,

25   question mark, question mark.  You see, you and nobody else can

---

178

1    just turn on my feelings and turn them off when you get ready.

2    I'm not make out of that can of material.

3    I have associated with people on both sides of

4    the laws.  I just choose to go the wrong way.  Me doing the

5    wrong thing that placed me here, it wasn't the money mostly, it

6    was the high of done wrong and getting away with it.  I wasn't

7    on drugs or alcohol.  Like to think I was completely sane at

8    that time.  You see I know what it takes to make and be a

9    success, but this place at this time is the best place for me.

10   Understand what I'm talking about first before you make a judge

11   of my sanity.  When I was out, my people will tell you if I

12   wasn't incarcerated at the time of the summer of 1990, I would

13   have killed up a lot of people or been killed.  Really because

14   I was gone, I really was living for day-to-day, not caring

15   about life and people.

16   The State rests.

17   (State Rests.)

18   THE COURT:  Defense rest?

19   MR. JOHNSON:  Close.

20   (Defense Closes.)

21   THE COURT:  Close?

22   MR. BEACH:  Close.

23   (State Closes.)

24   THE COURT:  Ladies and gentlemen, you've heard

25   all the evidence you're going to hear in this case.  We are

---

179

1    going to reconvene tomorrow morning at 10:00 a.m., at which

2    time you will hear arguments from counsel.  The -- I don't know

3    what that's going to be yet, but you will find out then.  Do

4    not start making up your mind until you've been given what's

5    called the charge of the Court.  Just like in the first stage

6    of this case, you will get jury instructions on how to proceed

7    and what you are to look at and how to proceed.  You cannot

8    make your decision as to what you think should happen until

9    then.  You can't discuss it amongst yourselves until you have

10   been so told to do so by the Courts.  So until tomorrow

11   morning, we will read the charge at 10:00 a.m., each side will

12   have a chance to -- to make an argument, and then we will let

13   you make up your mind then.

14   Lunch will be provided to you tomorrow.  It will

15   be delivered here.  You'll get a chance to order it and things

16   like that.  So until tomorrow morning, 10 o'clock.  Jury --

17   MR. JOHNSON:  Judge, we need to approach about a

18   matter.  Could we have the jury remain in the jury room until

19   the bailiff excuses them?

20   THE COURT:  In the jury room, yes, you may.

21   (Jury excused from courtroom.)

22   (Discussion off the record.)

23   THE COURT:  Bring them in.  Bring them in.

24   (Jury returned to courtroom.)

25   THE COURT:  Thank you all.  Please be seated.

---

180

1    Ladies and gentlemen, one other -- one other

2    thing, and this is -- this is important.  Again, this is book

3    stuff.  That -- I'm going to ask that you all pack a bag

4    tonight, okay?  Going to have to be couple days worth -- worth

5    of clothes, just -- just to make sure.  Because once we start

6    the deliberation process, you all are going to be stuck.  And

7    that's a good thing.  It really is.  I know you're not -- you

8    don't like it, but it's -- it's part of the process.  It's part

9    of how things work, just to make sure that the decision is not

10   tainted, make sure the decision is not rushed, that you simply

11   race at the end of the day and go, oh, boy, it's 4:15, we

12   better make a decision.  You can't do that in this case.

13   You all know how important this is, so pack a

14   bag tomorrow.  Don't know if it's going to be needed or not,

15   but make sure to pack a bag.  I know one person has -- has

16   airport duty.  Try to make other arrangements, if that can be

17   done ahead of time rather than at the last minute.  Like I

18   said, just in an abundance of caution, I don't want you to rush

19   through your decisions.  I want them to be made according to

20   the rules so that we don't have to do this again.  But one of

21   the things is that you will be required to stay together.

22   Yes, sir?

23   JUROR:  Should we bring our things in the

24   morning or leave them --

25   THE COURT:  You can always bring them in.  We've

# CCA Scanning Cover Sheet



2503576

CaseNumber: AP-76,458
EventDate: 10/31/2012
Style 1: GREEN, GARY
Style 2:
Event code: MANDATE ISSD

EventID: 2503576
Applicant first name:
Applicant last name:
Offense: 19.03
Offense code: Capital Murder
Trial court case number: F09-59380-S
Trial court name: 282nd District Court
Trial court number: 320570282
County: Dallas
Trial court ID: 328
Event map code: MANDATE
Event description:
Event description code:
Remarks:

☐ Document Scanned                    ☐ Created or
                                      ☐ Appended

Scanned by          date          Image ID

DEC 1 7 2012

Comment

3



# TEXAS COURT OF CRIMINAL APPEALS
## Austin, Texas

### M A N D A T E

THE STATE OF TEXAS,

TO THE  **282ND DISTRICT COURT OF DALLAS COUNTY**  — GREETINGS:

Before our **COURT OF CRIMINAL APPEALS**, on the **OCTOBER 3, 2012**, the cause upon appeal to revise or reverse your Judgment between:

### GARY GREEN

### VS.

### THE STATE OF TEXAS

CCRA NO. AP-76,458

TRIAL COURT NO. F09-59380-S

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is **ORDERED, ADJUDGED AND DECREED** by the Court that the judgment be **AFFIRMED**, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

**WHEREFORE**, We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER**,

Presiding Judge of our said **COURT OF CRIMINAL APPEALS**,

with the Seal thereof annexed, at the City of Austin,

on this day October 31, 2012.

LOUISE PEARSON, Clerk

Abel Acosta
Chief Deputy Clerk

COPY



RECEIVED IN
COURT OF CRIMINAL APPEALS

NOV 15 2012

Louise Pearson, Clerk

# COURT OF CRIMINAL APPEALS

## MANDATE RECEIPT ACKNOWLEDGEMENT

October 31, 2012

Case Number AP-76,458

GREEN, GARY

COA No.    Tr. Ct. No. F09-59380-S

Dallas County, 282nd District Court

Pursuant to Rule 51.2(a)(1) T.R.A.P., I, *Katriona Eggleston*
hereby acknowledge receipt of the mandate of the Court of Criminal
Appeals on ___11/2/12___ in the above numbered and styled case.

**PLEASE RETURN UPON RECEIPT**

**ATTN: ABEL ACOSTA**



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,458

### GARY GREEN, Appellant

### v.

### THE STATE OF TEXAS

## ON DIRECT APPEAL
## FROM CAUSE NO. F09-59380-S IN THE 282nd DISTRICT COURT
## DALLAS COUNTY

**KELLER, P.J.,** delivered the opinion of the Court in which PRICE, WOMACK, KEASLER, HERVEY, COCHRAN and ALCALÁ, JJ., joined.  JOHNSON, J., concurred. MEYERS, J., did not participate.

In November 2010, appellant was convicted of capital murder and sentenced to death.[1]

---

[1] TEX. PENAL CODE § 19.03(a); TEX. CODE CRIM. PROC. art. 37.071.  Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

GREEN–2

Direct appeal to this Court is automatic.[2] Appellant raises 46 points of error. Finding no reversible error, we affirm the judgment of conviction and sentence of death.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant was convicted of killing his wife, Lovetta Armstead, and Lovetta's six-year-old daughter, Jazzmen Armstead, in the same criminal transaction. In point of error twenty-six, appellant contends that the evidence is insufficient to support his conviction for capital murder. When reviewing a challenge to the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[3] To obtain a conviction for capital murder, as charged in this case, the State was required to prove that appellant intentionally or knowingly committed murder as defined under Section 19.02 (b)(1) and murdered more than one person during the same criminal transaction.[4]

Appellant's conviction for capital murder is supported by his own confession. In it, he explained that the week before the offense, he had discovered that Lovetta was going behind his back to get their marriage annulled. On the day of the offense, September 21, 2009, Lovetta wrote two letters to appellant, telling him that it was time for them to part ways and that he needed to move out. Appellant felt betrayed by his wife's actions and wrote his own letter in response, detailing his plan

---

[2] Art. 37.071, § 2(h).

[3] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

[4] *See* TEX. PENAL CODE § 19.03 (a)(7)(A).

to "take five lives" that night, including his own. While Lovetta was reading the letter in the master bedroom, appellant took knives from the kitchen and went into Jazzmen's bedroom, where he tied her up and put duct tape over her mouth. He then brought Jazzmen into the master bedroom and laid her on the end of the bed. Appellant proceeded to struggle with Lovetta for about an hour and a half, stabbing her more than twenty-five times. Once Lovetta was dead, appellant took Jazzmen into the bathroom, filled the bathtub, and held Jazzmen under the water until she died. He stated that Jazzmen struggled so much that he had to turn his head away. He pulled her from the tub and laid her face down onto the floor. Then he took a shower, changed into dress clothes, and went to pick up Lovetta's two sons, Jerome ("J.T.") and Jerrett, from their regular church program.

Appellant's confession was corroborated by physical evidence and by witness testimony, including that of J.T. and Jerrett, who were twelve and ten years old at the time of the offense. According to their testimony, J.T. and Jerrett attended their regular church program that evening, and appellant picked them up when the program was over. They testified that they were surprised to see him because usually their mother picked them up. J.T. also noticed that appellant was wearing all black. When they arrived home, appellant told J.T. to take a shower and instructed Jerrett to put on his pajamas for bed. Appellant then called Jerrett into the kitchen to discuss issues Jerrett was having in school. As Jerrett was explaining the problems, appellant grabbed a knife, held it to Jerrett's throat, and dragged him toward the bathroom. J.T. was still in the bathroom, and he heard his brother calling for help and yelling that appellant was "going to kill him." J.T. stood at the bathroom door and saw appellant holding Jerrett by his collar. Appellant threw Jerrett into the bathroom with J.T., came in himself, and locked the door. Appellant then sat on the bathroom

counter with three knives beside him and asked the two boys why he should not kill them.

As Jerrett began to plead for their lives, saying they were too little to die and that they would not tell anyone about what had happened, appellant stabbed him in the stomach. J.T. tried to push appellant off of Jerrett, but missed. Appellant then told the boys that he was not going to kill them and told J.T. to get dressed because appellant had something to show them. As they were about to leave the bathroom, appellant suddenly put the knife up to Jerrett's throat and tried to "screw it in," but Jerrett ducked away and backed up towards the toilet. Appellant paused and then said: "All right. Come on." Appellant led the boys into their mother's room and, when they saw their mother's body, they fell to their knees crying. Appellant explained to J.T. and Jerrett that he had to kill their mother because she wanted to divorce him and he "loved her to death" and did not want her to leave him. The boys also saw their sister's body in the bathroom. Appellant changed clothes and told J.T. to hand him some pills that were on the dresser in the bathroom. Appellant then threw a cell phone on the bed and instructed the boys to call 911 after he had left. J.T. recalled that appellant said he was going to kill himself. Appellant made the boys give him a hug before he left.

After appellant fled the apartment, the boys called 911 and ran to the home of their neighbor, Latasha Bradfield. According to Bradfield's testimony, Jerrett was holding his stomach, and both boys were screaming that appellant had killed their mother and sister. Bradfield took the phone from Jerrett's hand and spoke with the 911 operator. She then went next door and verified that Lovetta was lying on the floor of the bedroom and that she was not breathing.

Officer James Jones and his partner, Officer Alder, responded to the 911 call. Officer Jones went into the master bedroom and found Lovetta lying in front of the bathroom door and Jazzmen

in the bathroom. The bathroom was covered in blood. Detective Jason Gindratt and Detective Will Vick were also called to the house on the evening of the offense. During their inspection of the crime scene, they noticed that four knives appeared to be missing from the knife block in the kitchen. The knives were later found under the microwave, on the kitchen counter, and under a cushion on the couch. The detectives also found handwritten letters in the middle of the bed in the master bedroom. Lovetta's mother, Margarita Brooks, identified the handwriting as Lovetta's and appellant's. In Lovetta's letter, she wrote that it was time for her and appellant to part and that appellant needed to move out. In appellant's letter, he expressed his anger toward Lovetta for kicking him out and laid out his plan to murder the entire family. Appellant's letter stated, "You asked to see the monster, so here he is, the monster you made me. Bitch. There will be five lives taken today, me being the 5th."

Around 2:15 a.m., hours after the murders took place, appellant, his mother, and his brother all went to a police substation. Officer Troy Smith testified that appellant's mother told him that her son might have been involved in a murder. After Officer Smith confirmed that there had been a double homicide, he placed appellant under arrest.

Homicide Detective Robert Quirk and his partner, Detective Ahearn, were called to the scene of the murders. Upon arriving, they learned that there were witnesses and that a suspect had been identified. After hearing that appellant had surrendered, they headed to the police station to meet him and conduct an interview. Detective Quirk read appellant his *Miranda* rights, which appellant

agreed to waive, and then appellant confessed.[5] Appellant also told the detectives where to find the letters, as well as Lovetta's car, in which he had fled on the night of the murders.  When Lovetta's car was searched, a soda can and a nearly empty blister pack of Benadryl, both containing appellant's fingerprints, were found on the floorboard.  Quirk testified that about 26 of the 28 pills were gone from the Benadryl blister pack.

During the interview with Detective Quirk, appellant was cooperative and answered every question asked of him.  Appellant told Quirk that he had a history of mental illness and that he had been in a mental hospital, Timberlawn, one month before the offense.  Appellant told Quirk that he thought Lovetta and her children were plotting against him and that he heard voices telling him to commit the murders.   Appellant said he took the pills to kill himself so that the family would be back together in heaven.  Quirk testified that appellant seemed dejected and somewhat remorseful.

Forensic evidence was provided by Angela Fitzwater, a forensic biologist, who analyzed fingernail clippings taken from Lovetta.  Fitzwater compared the DNA profile taken from the clippings with the known DNA profile taken from a buccal swab from appellant.  She testified that the clippings from the right hand showed two contributors, Lovetta and appellant, and that the clippings from the left hand showed the DNA profile of appellant, which matched in nine areas.  She also testified that a sperm-cell fraction obtained from a vaginal swab taken from Lovetta during the autopsy showed appellant to be the major contributor.  Fitzwater was unable to quantify the amount of time that had elapsed between the intercourse and death, but she thought that it was recent.

Jill Urban, the medical examiner who performed Lovetta's autopsy, classified the manner

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of death as a homicide. Urban testified that Lovetta had suffered more than twenty-five stab wounds, including one in the right back that had punctured the right lung and one on the back of the left thigh that was eight inches deep. There were stab wounds on Lovetta's elbow and right hand, as well as clusters of stab wounds in the right upper quadrant of her abdomen, on the back of her neck, and on her upper back. The wounds were all consistent with appellant's confession.

Meredith Lann performed the autopsy on Jazzmen and also ruled the manner of death to be a homicide. Lann testified that there was a hemorrhage on the very top of Jazzmen's head and that her eyes contained small burst blood vessels, also known as petechia. Jazzmen's lungs showed pulmonary edema, which Lann explained is the body's reaction to hypoxia, or a low state of oxygen. When examining Jazzmen's face more closely, Lann noticed a small amount of adhesive residue in an L-shape on the left cheek, which was consistent with appellant's statement that he had placed duct tape over Jazzmen's mouth. There was evidence that Jazzmen's hands and ankles had been bound with duct tape as well. Lann testified that appellant's confession to drowning Jazzmen was consistent with those findings. The defense presented no evidence during the guilt phase of trial.

Appellant submits that no rational trier of fact could have found beyond a reasonable doubt that he was guilty of capital murder because the evidence shows that when he killed Lovetta and Jazzmen, he was suffering from a mental illness and was not cognizant of what he was doing. He argues that he was delusional and paranoid and thought his family was conspiring against him.

There is no diminished capacity defense in Texas, only the insanity defense, which appellant

is not claiming.[6]  The Texas legislature has not enacted any affirmative defense, other than insanity, based on mental disease, defect, or abnormality.[7]  Diminished capacity, at best, negates the required mental state.  In order for diminished capacity to negate the required mens rea, the jury would have to believe that appellant suffered from a mental illness, that he was suffering from that very mental illness at the time of the murders, and that, because of the mental illness, he was not acting intentionally or knowingly when he committed the murders.

The record shows that evidence of appellant's mental illness was not presented until the punishment phase of trial.  Moreover, even if appellant had presented such evidence during the guilt stage, given the motive, the letter, and the confession, a rational trier of fact could still have found beyond a reasonable doubt that appellant was guilty of capital murder.  Point of error twenty-six is overruled.

## II. VOIR DIRE ISSUES

### A. Challenges for Cause

In points of error one through fifteen, appellant claims that the trial court violated statutory and constitutional law by erroneously forcing him to use peremptory strikes on potential jurors who should have been removed for cause.  He contends that, as a result, he was forced to accept an objectionable juror, Debra Story, after he had exhausted his peremptory challenges and was denied additional peremptory challenges by the trial court.

---

[6] *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008).

[7] *Id.*

### 1. *Applicable Law*

A prospective juror may be challenged for cause if he has a bias or prejudice against any law upon which the defense is entitled to rely.[8] Bias against the law is the refusal to consider or apply the relevant law.[9] The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law.[10] Before a prospective juror can be excused for cause on this basis, however, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views.[11] The proponent of a challenge for cause has the burden of establishing that his challenge is proper.[12] The proponent does not meet this burden until he has shown that the prospective juror understood the requirements of the law and could not overcome his prejudice well enough to follow it.[13]

We review a trial court's ruling on a challenge for cause with considerable deference,[14] particularly when the prospective juror's responses are vacillating, unclear, or contradictory.[15] When

---

[8] Art. 35.16(c)(2).

[9] *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

[10] *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003) (citing *Feldman v. State*, 71 S.W.3d 738 (2002)).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007) (citing *Colburn v. State*, 966 S.W.2d 511 (Tex. Crim. App. 1998)).

[15] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

reviewing a trial court's decision on a challenge for cause, we look at the entire record of voir dire to determine whether there is sufficient evidence to support the trial court's ruling.[16]

When a trial judge errs in denying a challenge for cause against a prospective juror, the defendant is harmed if he uses a peremptory strike to remove the prospective juror and thereafter suffers a detriment from the loss of the strike.[17] To show such harm, the appellant must demonstrate that he: 1) asserted a clear and specific challenge for cause; 2) used a peremptory challenge on the complained-of prospective juror; 3) exhausted all of his peremptory challenges; 4) requested additional strikes and was denied; and 5) identified an objectionable juror who served on the jury.[18]

In the present case, the record shows that appellant used a peremptory challenge to remove each potential juror identified in issues one through fourteen after his challenges for cause to them were denied. By the time appellant challenged the juror identified in issue fifteen, Debra Story, he had exhausted all of his peremptory challenges, as well as two extra ones that had been granted by the court. Appellant's challenge for cause to Debra Story was denied, as was his request for an additional peremptory challenge, and Debra Story was seated on the jury despite appellant's objection. Because appellant received two extra peremptory challenges, to show harm he must demonstrate that the trial court erroneously denied his challenge to at least three of the complained-of

---

[16] *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[17] *Sells*, 121 S.W.3d at 758.

[18] *Id.*

prospective jurors identified in issues one through fourteen.[19]

## 2. Prospective Jurors Challenged

### 1. *Billy Chancellor*

In point of error one, appellant claims that the trial court erred in denying appellant's challenge for cause against potential juror Billy Chancellor. Appellant challenged Chancellor on the basis that "he would automatically assess the death penalty if he found the defendant guilty of capital murder," and that "he exhibited a lack of understanding of what was required of him" in answering the first special issue.

The record reflects that Chancellor understood that if he were to serve as a member of the jury, he could not determine punishment without first considering the special issues.

> Q. [STATE]: All right. Now, what I want you to do, Mr. Chancellor, I want you to assume with me then – that's when I talk about these hypotheticals, I want you to assume with me right now that we have proved this to you, that the Defendant on a certain date in Dallas County, State of Texas, caused the death of two individuals. All right?
>
> A. [CHANCELLOR]: Yes.
>
> Q. [STATE]: During the same criminal transaction. We proved it to you beyond all – any and all reasonable doubt. All right? You have found that person guilty of capital murder. Follow me so far?
>
> A. [CHANCELLOR]: Yes.
>
> Q. [STATE]: At that point what happens?

---

[19] *Saldano*, 232 S.W.3d at 93 (noting that, in order to show harm, the defendant would have to show that the trial court erroneously denied his challenges for cause to three of the complained-of venire members because he had received two extra peremptory strikes). Due to our disposition below, we need not decide whether this requirement applies to point of error fifteen, in which appellant claims that a juror who was challengeable for cause actually served on the jury.

A. [CHANCELLOR]: We look at the Issue 1, to see whether or not he will be a menace to society.  At the next step would be the Issue 2, to determine that point, yes, we would give him the death penalty or it would be the life sentence.

With regard to the first special issue, Chancellor affirmed that he would consider all of the evidence before making a decision.

Q. [DEFENSE]: Now, in all honesty, Mr. Chancellor, a lot of folks tell us, they say . . . I can tell you that if I've just found guilty – somebody guilty of that crime beyond a reasonable doubt, I'm going to always vote Question Number 1 to be yes.  How do you feel about that?

A. [CHANCELLOR]: I'm not going – I can't say I would always – I wouldn't be the one that always vote for that to be yes.  Still, going back to the evidence itself, to me, I would evaluate all the evidence, you know, being a juror, to even make that decision regarding that situation, Number 1.

Chancellor agreed that he was "the type of person" who would not make any "automatic decisions," but would "keep an open mind" and "listen to all the evidence before deciding yes or no on [the] special issues," even if it led to a life sentence instead of the death penalty.

Q. [STATE]: Do you think you're the type of person – and I think you are – who can listen to all the facts in the case, make the determination with regards to the guilt evidence and then if the Defendant is found guilty, keep an open mind, wait to hear all the evidence again, and then answer those special issues based on the evidence. And if it leads you to any other combination to where it would be life in prison, so be it.  Are you that type of person, sir?

A. [CHANCELLOR]: Yes.

Moreover, Chancellor's testimony demonstrates his understanding that the law requires probability to be more than a mere possibility.[20]  Chancellor agreed with the general statement that

---

[20] *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) (jurors must acknowledge and give effect to the fact that probability is more than a mere possibility).

"anything could possibly happen," but stated that that would not be enough for him to answer "yes"

to the first special issue.

> Q. [DEFENSE]: [I]t's possible that anything can happen, is it not?
>
> A. [CHANCELLOR]: That's true.
>
> Q. [DEFENSE]: So I mean, then how would you ever be able to answer Question Number 1 that it's not possible that something could happen again?
>
> A. [CHANCELLOR]: Well, I look at – that's just something – would have to show me some type of fact that it could happen again.
>
> Q. [DEFENSE]: That's what I'm asking you right now. Just a person here in the courtroom with common sense, I mean, you agree that anything could possibly happen?
>
> A. [CHANCELLOR]: Yes, anything could possibly happen.
>
> Q. [DEFENSE]: Right. So you're telling us that would be enough for you to answer that Special Issue Number 1 yes?
>
> A. [CHANCELLOR]: No, I have to look at evidence that shows that that trait could happen again.
>
> Q. [DEFENSE]: I'm not sure I'm understanding where you're drawing that distinction at though.
>
> A. [CHANCELLOR]: I'm looking at it from where – if the prosecutor said – or someone in the case itself say [sic], you know what, we've seen this pattern going on with this person, and I think this probably could happen again, looking at a pattern.

Appellant also challenged Chancellor on the basis that he "required the defendant to show

remorse for his actions," which, appellant argues, would require a defendant to testify.  But the

record shows that Chancellor understood the Fifth Amendment and that a defendant has the right not

to testify.  When asked whether he would hold it against a defendant if a defendant chose not to

GREEN–14

testify, Chancellor replied: "No, I wouldn't hold it against him."

Finally, appellant challenged Chancellor on the basis that he would "never give meaningful consideration" to any evidence presented in punishment on the second special issue and would not consider certain evidence to be mitigating, specifically, the defendant's age or background. A venireperson is not challengeable for cause on the ground that he does not consider a particular type of evidence to be mitigating.[21] Furthermore, Chancellor indicated on multiple occasions that he would listen to all of the evidence presented and would follow the law. Based on the record before us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Billy Chancellor.

### 2. *Sheila Yrigollen*

In point of error two, appellant claims that the trial court erred in denying the challenge for cause against potential juror Sheila Yrigollen. Appellant claims that Yrigollen was challengeable for cause because she "could not follow the law" and "would not hold the State to [its burden to] prove every one of the elements beyond a reasonable doubt." While the record reflects that Yrigollen may have been unsure of the law at the outset, it also reflects that once the law was explained to her, she understood that the State has the burden of proof.

> Q. [STATE]: You've got to follow the law, and what the law says is the State – we set it out and we – we do the accusing, we have to do the proving, okay?
>
> A. [YRIGOLLEN]: Okay.
>
> Q. [STATE]: And – and I tell you this not to think that we're not going to be able to

---

[21] *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

prove it beyond a reasonable doubt, okay, but just to show that to be a qualified juror, you have to be able to follow the law. And what the law says, you have to hold us to our burden. So if we fail to prove any element, your job as a juror in following the law would be to find someone not guilty.

A. [YRIGOLLEN]: All right.

Q. [STATE]: All right? Is that something you feel like you could do?

A. [YRIGOLLEN]: Yes.

Yrigollen understood and confirmed that she could follow the law and hold the State to proving the elements.

Q. [STATE]: But the point is to be a qualified juror, you have to follow the law. What the law says, it's our job to prove –

A. [YRIGOLLEN]: To prove –

Q. [STATE]: – the elements to you. And if we fail to do that, if we fail to do our job, then you would have to find the Defendant not guilty. Does that make sense?

A. [YRIGOLLEN]: Yes.

Q. [STATE]: And could you do that?

A. [YRIGOLLEN]: Yes.

Although Yrigollen's response to a long hypothetical posed to her by the defense does suggest that she would not hold the State to proving every one of the elements beyond a reasonable doubt, she was immediately rehabilitated by the trial court before being excused.

[THE COURT]: All right. One last thing from me. Are you going to make the State prove each and every element of the indictment that they've alleged?

[YRIGOLLEN]: Yes.

[THE COURT]: All right. Step outside, please.

GREEN–16

Appellant also claims that Yrigollen was pro-death, that she would automatically sentence a defendant to death if found guilty, that she would automatically find the defendant to be a future danger, and that she would not consider mitigation evidence.

The record shows that Yrigollen agreed with the statement that "you can't find that somebody is automatically going to be a future danger just because of what they did, until you wait and listen to all the evidence that you hear at punishment." She confirmed that she could "keep an open mind" about the issue and would "not make any automatic answers."

> Q. [STATE]: [If] you found someone guilty of a horrible, brutal, disgusting capital murder, are you automatically going to say, you know what, I'm going to have to find that they're a future danger because what they did is so bad?
>
> A. [YRIGOLLEN]: No.
>
> Q. [STATE]: You're going to wait and listen?
>
> A. [YRIGOLLEN]: Wait and listen.
>
> Q. [STATE]: And that's what the law requires, and you can follow the law, can you not?
>
> A. [YRIGOLLEN]: Yes.

With respect to appellant's claim that Yrigollen would not consider certain evidence to be mitigating, specifically, the defendant's age or background, jurors are not required to regard any particular type of evidence as mitigating.[22] Furthermore, Yrigollen testified that she would keep an open mind and review and consider all the evidence presented before determining the mitigation issue. She confirmed that she would "keep an open mind and wait until [she heard] all the evidence

---

[22] *Id.*

to make . . . any decisions, especially as far as [the] last two special issues." When Yrigollen was

asked by the defense whether her decision for the second special issue would be "pretty much made"

if she answered yes to the first special issue, she responded: "No, it's not. I mean, there's a lot of

factors, evidence – I mean, I – I would keep an open mind. I mean, I don't go in there with a mind-

set death sentence, that's it. Okay."

Finally, appellant claims that Yrigollen was challengeable because she had a bias toward law

enforcement. As the State points out, this argument was not raised in the trial court and was

therefore not preserved for review.[23] Regardless, we have held that as long as a potential juror does

not have an extreme or absolute position regarding the credibility of any witness, he or she is not

challengeable for cause simply for being more skeptical toward one category of witnesses over

another.[24] Yrigollen testified that she understood that the "law says that we have to start off every

witness equally that gets up on the witness stand." She further testified that she would not "believe

everything a police officer says just because they're a police officer." Based on the record before

us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Sheila

Yrigollen.

### 3. *Norma Wiley*

In point of error three, appellant claims that the trial court erred in denying the challenge for

cause against potential juror Norma Wiley. Appellant claims that Wiley was challengeable for cause

---

[23] TEX. R. APP. PROC. 33.1(a); *Sells*, 121 S.W.3d at 758.

[24] *Jones v. State*, 982 S.W.2d 386, 389-90 (Tex. Crim. App. 1998) (citing *Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978)).

because she "would not consider the mitigation evidence presented by the defense." When this challenge was raised before the trial court, the State responded that Wiley had merely been confused by some of the questions and that, once the special issues were explained to her, she stated unequivocally that she could be fair, that she would follow the law, and that she would be open to considering mitigating circumstances. The record supports the State's position.

During voir dire, Wiley was asked whether it would be appropriate for her to make up her mind as to whether a defendant should receive a death sentence before the jury has gone back to deliberate on the two special issues. She responded: "No, because if I did, then I'm breaking the law. If the law says that I have to wait and hear the second set of circumstances first before I reach that decision, then I have to wait." She agreed that it seemed fair that she would answer the special issues only after hearing all of the evidence presented.

When the State described a hypothetical case with hypothetical mitigating circumstances to Wiley, the following exchange occurred:

Q. [STATE]: So I'm not saying that [this hypothetical] is sufficient mitigation or isn't sufficient, I'm just trying to give you some ideas in your mind to kind of think about. Is that something you would be open to?

A. [WILEY]: The mitigating circumstances?

Q. [STATE]: Yes.

A. [WILEY]: And thinking about it, absolutely, yeah.

Q. [STATE]: And not just mitigating, because you might hear a lot of mitigating, but sufficiently mitigating to – to go from that – what's about to be a death sentence to kind of take it back to a life sentence?

A. [WILEY]: Yes.

GREEN–19

Appellant also claims that Wiley was challengeable for cause because she was a strong supporter of the death penalty and believed that it was sanctioned by the Bible, that she would automatically find the defendant to be a future danger if she found him guilty of capital murder, that she exhibited a bias toward police because she has two sons who are police officers, and that she would need the defendant to testify so that she could look him in the eye and determine whether or not he was lying. The record reflects that none of these issues were raised in the trial court and were therefore not preserved for review.[25] Even if these issues had been raised, Wiley stated on numerous occasions that she would follow the law. She also stated that she would not give police officers any more credibility than anyone else.[26] Finally, Wiley understood and agreed that a defendant has an absolute right not to testify and that, as a juror, she could not hold that against him. Based on the record before us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Norma Wiley.

### 4. *Elizabeth Lopez*

In point of error four, appellant claims that the trial court erred in denying the challenge for cause against potential juror Elizabeth Lopez. Appellant challenged Lopez on the basis of "her answers [on] the questionnaire in regards to being able to follow the law . . . as well as some of her answers . . . in the courtroom." Appellant's objection before the trial court was not specific enough

---

[25] *See* footnote 23.

[26] As we have already mentioned, as long as a potential juror does not have an extreme or absolute position regarding the credibility of any witness, he or she is not challengeable for cause simply for being more skeptical toward one category of witnesses over another. *Jones*, 982 S.W.2d at 389-90.

to preserve error for appellate review.[27]  In any event, Lopez stated on the record that she would be able to follow the law.  She agreed that, if the State failed to meet its burden of proof, in order to be a qualified juror she would have to follow the law and find the defendant not guilty.  She further agreed that she would be able to "keep an open mind and wait and listen to all of the evidence presented at the guilt phase and also at the punishment phase" before making any decisions with regard to the two special issues.  Based on the record before us, the trial court properly denied appellant's challenge for cause to Elizabeth Lopez.

### 5. *Cathey Young*

In point of error five, appellant claims that the trial court erred in denying the challenge for cause against potential juror Cathey Young.  Appellant challenged Young based on her statement that she did not believe in life without parole, which, appellant argues, suggests that she would not give meaningful consideration to any mitigating evidence presented to her.

The statement to which appellant is referring occurred during the  following exchange:

Q. [STATE]: Are you of the opinion that all capital murders should be eligible – I mean, should seek the death penalty?

A. [YOUNG]: I don't really believe in life in prison.

Q. [STATE]: Okay.

A. [YOUNG]: I think it's a – it's a burden on the State –

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: – financially.

---

[27] *See* footnote 23.

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: And I just don't believe in life in prison.

Q. [STATE]: Okay. Well, and – well, then let me ask you this, Ms. Young. With you not believing in life in prison, is there any scenario whatsoever that you would see where life in prison would be proper in regards to when you have those options?

A. [YOUNG]: I'd just have to look at the individual circumstance and say, well, I was wrong. This one time it's right.

The record shows that although Young stated that she did not believe in life in prison, she was commenting on the financial burden that it places on the State. She then immediately conceded that she *could* find life in prison to be appropriate, depending on the individual circumstances of a case. Young agreed that she would "have no choice" but to follow the law, regardless of her personal views, because "it's the right thing to do."

A. [YOUNG]: Let me put it this way. When you're on a jury, it's a job.

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: Your job is to listen to what's presented to you, whether you like it or not, whether you agree with it or not, and do what the law tells you to do. And that's the way I look at it, right, wrong, indifferent, that would be my job for however long it took.

Young stated that, even after finding a defendant guilty, she could keep an open mind and wait to hear the evidence presented at punishment before making a decision on the special issues. She further stated that she would give fair consideration to all of the evidence, including any mitigation evidence. Based on the record before us, the trial court properly denied appellant's challenge for cause to Cathey Young.

6. *Aneta Johnson*

In point of error six, appellant claims that the trial court erred in denying the challenge for cause against potential juror Aneta Johnson.  Appellant challenged Johnson because "her answers to the questions show [that she believed] a finding of guilty to any type of premeditated, intentional act of murder would be sufficient in her mind for a sentence of death."  Appellant described Johnson as "death prone," and argued that "she equates guilt with death."  He further argued that, based on her statement that the death penalty should not be applied to anyone who was acting in self-defense, Johnson did not understand capital murder.  Appellant claimed that, based on her responses and statements, Johnson would be unable to follow the law and give fair consideration to the mitigation special issue.

The record shows that at one time Johnson "kind of thought that maybe it wasn't right to take other people's lives."  But her views changed and she became more in favor of the death penalty in her thirties after an experience involving a felony committed against a young child.  Still, Johnson stated that her belief in the death penalty depended "on the situation [and] the circumstances" and that her view of the death penalty was not extreme.

> Q. [DEFENSE]: Well, now that that happened and your views changed, do you think you've kind of gone the other way to the other end of the extreme or –
>
> A. [JOHNSON]: No, I do not.  I think that I would still be able to make, you know, a decision on – like I say, depending on the circumstances.

The record shows that Johnson personally considered premeditation to be an important factor in deciding whether the death penalty is warranted.  However the record also shows that she understood and agreed that, regardless of her personal views, under the law premeditation alone would not be enough to automatically decide in favor of the death penalty.  The defense asked

whether a death sentence would be appropriate for a hypothetical premeditated murder "if one of the other factors weren't involved, such as the death of a policeman and a fireman [or] child under the age of six," and Johnson responded: "No, I would have to go by what the law says . . . ." Defense counsel then asked Johnson about a hypothetical premeditated offense that did involve one of the other factors:

> Q. [DEFENSE]: Okay. Now, you understand that just being guilty of [a premeditated capital offense] automatically does not mean that you're going to get a sentence of death?
>
> A. [JOHNSON]: Right.
>
> Q. [DEFENSE]: Okay. But it sounds to me like you're saying if it was shown to you that it was a premeditated commission of one of those offenses, that [you think the defendant] should always receive death; is that correct?
>
> A. [JOHNSON]: No, because – I mean, I would have to go as far as the special issues, you know, as far as giving them, you know, the death penalty.

Appellant argued that Johnson did not understand capital murder, as evidenced by her statement that the death penalty should not be applied to anyone who was acting in self-defense. The record shows that Johnson affirmed her understanding of capital murder after it was explained to her.

> Q. [DEFENSE]: Now, capital murder is a knowing, intentional taking of a life under the circumstances that we talked about. And the type of indictment that we have in this case, it's the knowing and intentional murder of two or more people at the same time or in the same criminal transaction. And, ma'am, I think I've made it clear, but I want to make sure. We're not talking about any kind of accident. We're not talking about any kind of self-defense. We're not talking about defending your property. We're not talking about defending a loved one. It's not insane. You intended and knowingly and intentionally took the lives of more than one person at the same time, okay? And these people – you know it's pretty obvious, they're going to be innocents. They're going to be people who didn't deserve it, didn't have it coming. So you see the kind of cases we're talking about?

GREEN–24

A. [JOHNSON]: Yes.

Johnson stated that she could follow the law and consider all of the evidence presented, including mitigation evidence, before considering the two special issues. When she was asked by the defense whether she could "honestly come in here in this courtroom and perform [juror] duties in the way the law envisions," she replied: "I believe I can honestly do that to the best of my abilities." Johnson stated that she could "assure" defense counsel that she could "separate [the] crime itself from an automatic answer as to whether the person should receive a sentence of death."

Q. [STATE]: So what the law says is, look, Ms. Johnson, we can't jump to any conclusions just because we hear facts of a case. We have to wait and hear all evidence at punishment, then we can decide. Does that make sense?

A. [JOHNSON]: Yes.

Q. [STATE]: Okay. And that's something that you could do?

A. [JOHNSON]: Yes.

Q. [STATE]: And, again, you could hold the State to our burden and understand we're the ones that have to prove this to you beyond a reasonable doubt. And, again, the Defense doesn't have to show you anything in regards to Special Issue Number 1. You with me?

A. [JOHNSON]: Yes.

Q. [STATE]: Okay, good. All right. So – now, let's – let's make sure we're on the same page. You're on my capital murder jury. You've found someone guilty of capital murder, a horrible, brutal, cold-blooded, terrible crime, okay? Now, you've just now come in and found him guilty. You haven't heard punishment yet. Have you made any automatic decisions about how you're going to answer either one of those special issues at this point?

A. [JOHNSON]: No.

Q. [STATE]: You're going to wait until you hear the punishment evidence before

you make any decisions, right?

A. [JOHNSON]: Yes.

Johnson also stated that, with respect to mitigation evidence, she could be open-minded about

imposing a life sentence if appropriate.

Q. [DEFENSE]: The law says that you have to go back and do this examination yourself.

A. [JOHNSON]: Oh, I can do that. I can go back and re-examine and have an open mind.

Q. [DEFENSE]: Okay. So you say you could go back and have an open mind as to whether or not there's something there that was sufficient in your mind to switch that from – from – to switch or to make the sentence of life without parole – to impose that sentence rather than a sentence of death?

A. [JOHNSON]: I could be open-minded about it.

Appellant has also claimed that Johnson was challengeable because she did not understand

the meaning of "probable." However the record shows that this argument was not raised in the trial

court and is therefore not preserved for review.[28]  Moreover, the record shows that she agreed that

"probable" had to be "more than a mere possibility."  Based on the record before us, the trial court

properly denied appellant's challenge for cause to Aneta Johnson.

### 7. Terry Crawford

In point of error seven, appellant claims that the trial court erred in denying the challenge for

cause against potential juror Terry Crawford.  Appellant objected to Crawford because, based on her

answers regarding her family and work schedule, she "would not be able to devote her full attention

---

[28] *See* footnote 23.

to the trial." Crawford explained that she is a mother of six, that her husband is a firefighter who works twenty-four-hour shifts, and that she watches the children when he is working. She also stated that she works as a sleep-study technician. When asked whether serving on a jury would cause her some type of "extreme hardship," Crawford expressed some concern about not being available to watch her children while her husband is at work. However she then stated that she could "probably make arrangements" with family members. She also expressed some concern about missing work, but was relieved when it was explained to her that her employer could not fire her for serving on the jury. Crawford affirmed that if she were selected as a juror, she could give the case her full attention and would not be distracted by things going on at home. Appellant also argues that Crawford should have been disqualified by the trial court because she was the only one qualified to use specialized equipment at her job. He states in his brief: "Certainly there were enough jurors to question and qualify without jeopardizing the health of citizens by removing for at least two weeks the only person qualified to operate such equipment." This specific claim was not raised in the trial court and is therefore not preserved for review.[29] Even if this claim had been raised in the trial court, there is nothing in the record to suggest that Crawford's absence would jeopardize anyone's health. Moreover, the record shows that Crawford testified that she was not "the only one in this world that could ever [operate the equipment]." Finally, the possible effect on Crawford's patients is not relevant to whether the challenge for cause was properly denied. We find that the evidence was sufficient for the trial court to believe that Crawford would not be distracted, but could properly carry out her duties as a juror. Based on the record before us, the trial court properly denied appellant's

---

[29] *Id.*

challenge for cause to Terry Crawford.

### 8. *Barbara Garrett*

In point of error eight, appellant claims that the trial court erred in denying the challenge for cause against potential juror Barbara Garrett. Appellant objected to Ms. Garrett because her answers to the questionnaire and on voir dire "show that she would automatically assess a death sentence if she found a defendant guilty of capital murder."

Once the law was explained to her, Garrett said that she would not make an automatic decision in determining appellant's sentence, but would listen and consider all the evidence before answering the special issues.

> Q. [STATE]: Do you think you're the type of person who could wait and not make any automatic decisions knowing that, you know what, I just found somebody guilty of probably the worst thing I've heard of and I know he's looking at life or death, but I have to wait and listen to all the evidence before deciding. Do you think you can do that?

> A. [GARRETT]: Yes.

Ms. Garrett stated that she could hold the State to its burden. She also affirmed that she would wait to hear all of the evidence presented at punishment, including mitigation evidence, before making a decision about the special issues.

> Q. [STATE]: And that's why it's important to wait and keep an open mind before deciding. Does that make sense?

> A. [GARRETT]: Yes.

> Q. [STATE]: And – and neither side could ask you what you, Ms. Garrett, thinks is sufficiently mitigating to warrant sparing this person's life. It's more of a are you the type of person who will follow the law, who will wait, come back in the punishment stage, listen to all the evidence. Then go back when you're deliberating on these two

special issues and deliberate all the evidence in good faith and then answer those special issues.

A. [GARRETT]: Okay.

Q. [STATE]: Do you think you can do that?

A. [GARRETT]: Yes.

Based on the record before us, the trial court properly denied appellant's challenge for cause to Barbara Garrett.

### 9. *Thomas Frazier*

In point of error nine, appellant claims that the trial court erred in denying the challenge for cause against potential juror Thomas Frazier. Appellant claims that Frazier was challengeable for cause because he did not seem to understand the issues and law and that he is "death prone"and would automatically assess the death penalty.

The record reflects that the prosecutor gave Frazier a thorough explanation of what constitutes capital murder in Texas. The prosecutor also explained the two phases of a criminal trial, the State's burden of proof, the two special issues, the Fifth Amendment, the weight to be given witness testimony, and the presumption of innocence. Throughout the explanations, Frazier affirmed his understanding. He conceded that, prior to these explanations, he had not completely understood the law. But after the law was explained to him, when defense counsel asked whether Frazier could "operate as a juror under that framework and under that understanding of what the law actually is," he responded: "Yes, I can."

The record reflects that Frazier understood that a guilty verdict does not automatically equate

to a death sentence and he affirmed that he could follow the law.  He said that he "would never

disregard anything that was presented to [him] as evidence . . . and [he] would never come to a

decision based on emotion or anything that's unfair."  He described himself as "a conscientious

citizen . . . dedicated to upholding the law."

> Q. [DEFENSE]: Okay.  Law in our state says the person found guilty of capital
> murder is going to receive life without the possibility of parole.
>
> A. [FRAZIER]: I can go along with that.  I can go along with the law.  I mean, I don't
> have any big problems with our law.  I believe in our laws.

In addition to stating that he could follow the law, Frazier also stated that he would not make

any automatic decisions with regard to punishment.

> Q. [STATE]: So if you found someone guilty of capital murder, at that point before
> you've heard the punishment evidence, would there be any automatic answers for you
> as far as those two special issues at that point?
>
> A. [FRAZIER]: No.  I wouldn't have enough information.  I'm hoping to learn more
> about the Defendant as the process goes along.

Frazier affirmed that he would give fair consideration to all evidence presented.  His

testimony demonstrates that he was not, as appellant claims, "death prone," and would not

automatically assess a sentence of death.

> Q. [DEFENSE]: A lot of people just say if I've just found him guilty of a terrible,
> horrible crime, I'm automatically going to answer that question yes.
>
> A. [FRAZIER]: No, no.  There's too many circumstances where they wouldn't – that
> couldn't happen.  I mean, what was the emotion – emotional makeup of the person
> at the time the crime was committed?
>
> Q. [DEFENSE]: Okay.
>
> A. [FRAZIER]: Were there – was there something going on that made that period

GREEN–30

exceptional?

Q. [DEFENSE]: Right.

Appellant also argues that Frazier was challengeable because in his mind he had already formed a conclusion as to the guilt of the defendant, which would impede his ability to be a fair juror in violation of Article 35.16 of the Code of Criminal Procedure.[30] The record reflects that Frazier read "in between the lines" of defense counsel's questioning and believed that there was not going to be an issue of guilt in this case, only punishment. During questioning by the defense, Frazier stated: "Everything that I've heard today and even when I was here a month ago tells me that you've [defense counsel] already convicted the Defendant, that he's guilty." Frazier further stated: "You as a Defense attorney already [have] told me that you think your Defendant is going to be found guilty . . . [y]ou're basically concerned about what's going to happen to him as far as punishment." The record reflects that Frazier was merely commenting on defense counsel's position, not his own, and that he had not yet formed an opinion as to the defendant's guilt. In fact, Frazier stated that defense counsel's position "doesn't make any difference to [him] as a juror." He further stated: "I have my duty to do as a juror based solely on the evidence and on – maybe on learning a little bit about the Defendant." Frazier again clarified that he was commenting only on the defense position, not his own, when he stated: "[Y]ou're concerned more about what's going to happen after the Defendant has been found guilty. As a juror, I can't even – I can't say that he's guilty at this point. I've got to wait. I'm not sure that he is guilty. I don't have no way of knowing." Frazier's

---

[30] Art. 35.16(a)(10) (providing that a challenge for cause may be made against a juror if there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict).

GREEN–31

statements demonstrate that he had not yet formed an opinion as to the defendant's guilt and that he would follow the law and consider all evidence presented before coming to any conclusions.

Appellant also claims Frazier was biased toward law enforcement. This argument was not raised in the trial court and is therefore not preserved for review.[31] Furthermore, the record reflects that Frazier's position regarding the credibility of police officers was neither extreme nor absolute.[32] Based on the record before us, the trial court properly overruled appellant's challenge to Thomas Frazier.

### 10. *Sreenivasareddy Thallapareddy*

In point of error ten, appellant claims that the trial court erred in denying the challenge for cause against potential juror Sreenivasareddy Thallapareddy. Appellant challenged Thallapareddy because, "based on several of his answers," appellant did not believe that he would be able to follow the law. This objection before the trial court was not specific enough to preserve error for appellate review.[33] In any event, the record reflects that Thallapareddy understood and could follow the law. He stated on the record: "I will follow the law as my civic duty." He also stated that he would hold the State to its burden: "I mean, if [the State] cannot prove it, I have to say he's not guilty." He affirmed that, if the State failed to meet its burden, he would "be okay with acquitting" a defendant, stating, "Yes, because I mean, that's what the law says." Thallapareddy stated that he would listen to all the evidence before answering the special issues, and that he could keep an open mind and

---

[31] *See* footnote 23.

[32] *See* footnote 24.

[33] *See* footnote 23.

GREEN–32

spare someone's life if he heard sufficiently mitigating evidence. The trial court properly denied appellant's challenge for cause against Sreenivasareddy Thallapareddy.

### 11. *William Ogle*

In point of error eleven, appellant claims that the trial court erred in denying the challenge for cause against potential juror William Ogle. Appellant challenged Ogle because he would not consider certain mitigating evidence, namely "genetics, circumstances of birth, upbringing, and environment." We have held that jurors are not required to regard any particular type of evidence as mitigating.[34] Moreover, the record shows that Ogle specifically stated his belief that "not in every case do I think that you should get the death penalty for capital murder." He also stated that he could follow the law and give fair consideration to all evidence presented, including mitigation evidence, before coming to a conclusion about the two special issues. When the defense asked: "Can you envision a circumstance where you can consider [mitigating circumstances] if you are a juror on this case?" Ogle responded: "Yes."

> Q. [DEFENSE]: And a lot of people say, I'm not going to take those things into consideration, I've already made up my mind, he's a murderer, okay? All those things, the reasons that he could be a capital murderer, he's a murderer. I think he's going to make people victims in the future. You know what, at that point in time, I've made up my mind and I don't need to go on to Special Issue Number 2. I don't see how there could be any sufficiently mitigating or mitigating circumstances that I can consider. They even give me that answer all the time. Do you feel the same way?
>
> A. [OGLE]: No.

On appeal, appellant argues that Ogle was also challengeable because he would automatically

---

[34] *Joubert*, 235 S.W.3d at 734.

assess death if the defendant were found guilty of capital-murder and that he thinks the death penalty should be reserved for "multi-murder" capital offenses. These claims were not presented to the trial court and are therefore not preserved for review.[35]

Even if these claims were preserved for our review, Ogle did not say that he would automatically assess the death penalty in all capital murder cases, nor did he say that the death penalty should be reserved for multi-murder capital offenses. When requested to tell the court how he formed his opinions concerning when the death penalty should be given, Ogle stated:

> A. [OGLE]: Well, I mean, an eye for an eye – I mean, if it's a crime where there's no – you know, if you – like if you kill an officer or if you kill somebody, if you premeditate to go in and kill two or three people, there's certain crimes that I feel like the death penalty should be for. And I mean, maybe somebody's background, if they continue to have this pattern, then there's no – there's not going to be any rehabilitation. So in those cases I feel like it is what it is. I mean, the death penalty should be there for those type of cases.

That statement indicates that Ogle merely believed that the death penalty should be an option in certain cases (e.g., where an officer or multiple people are killed). This is especially true, in Ogle's opinion, where it does not appear that the offender will, based on his or her background, ever be rehabilitated. Thus, it does not follow that Ogle believed that the death penalty was automatically warranted in every case where the defendant was convicted of capital murder or where there were multiple victims. Based on the record before us the trial court properly denied appellant's challenge to William Ogle.

### 12. *Charla Moe*

In point of error twelve, appellant claims that the trial court erred in denying the challenge

---

[35] *See* footnote 23.