GREEN–34

for cause against potential juror Charla Moe.  Appellant challenged Moe because, although she initially stated on the questionnaire that she would not consider mitigation evidence, she changed her answer during questioning and stated that she would.  Appellant argued that, based on her conflicting answers, Moe would not be able to follow the law.  Appellant describes Moe as a "death prone juror who would automatically assess the death penalty if she found the defendant guilty of capital murder."

The record reflects that Moe did not fully comprehend the relevant law until it was explained to her during the voir dire proceedings.  She conceded that she had not understood the process of a capital murder trial until it was explained to her, stating, "I didn't fully understand what – what goes into the decisions," and that "it makes more sense now."  She also stated: "I don't necessarily think everybody deserves the death penalty . . . ."

> Q. [DEFENSE]: Could you envision a scenario where you would say, you know what, I believe that person deserves death.  I don't even need to go on to Special Issue Number 1 or Special Issue Number 2.
>
> A. [MOE]: Well, before today, I probably would have said yes, but since I didn't understand what those fully meant, I think I would still be able – I think I now would be able to take into – well, both of them.  I think I would be able to look at both of them and see, you know – take those into account and – and then decide whether it was death penalty or life in prison.

After the law was explained to her, Moe stated on more than one occasion that she could follow the law, keep an open mind, and give fair consideration to all of the evidence presented, including mitigation evidence, before determining her answers to the special issues.

> Q. [STATE]: [Y]ou've just got to be open to looking at everything . . . including, you know, everything that it lists in there.  You know, the circumstances of the offense, obviously.  The Defendant's character and background, you know, his personal

responsibility and decide is there anything there that rises to such a level, to not just mitigating, but sufficiently mitigating to warrant switching that sentence back from death to life. And you sound like that's something that you would be open to listening to and hearing about?

A. [MOE]: Yes.

Q. [STATE]: Okay. So in the process, first you find someone guilty of capital murder. If – if you do that, at that point, even if it's horrible and terrible, at that point have you made up your mind as to those two special issues before you hear the punishment evidence?

A. [MOE]: No.

Based on the record before us, the trial court did not abuse its discretion in overruling appellant's challenge to Charla Moe.

### 13. *Jackie Brewer*

In point of error thirteen, appellant claims that the trial court erred in denying the challenge for cause against potential juror Jackie Brewer. Appellant challenged Brewer because his answers in the questionnaire conflicted with his answers during questioning. Appellant argues that, not only would Brewer not give meaningful consideration to mitigation evidence, but that he "would have difficulty in ever finding anything mitigating enough to change his mind from death to life."

The record reflects that Brewer stated that he would follow the law and that he was open to considering mitigation evidence. When questioned by the State, Brewer affirmed that he "wouldn't find someone guilty unless the State proved its case beyond a reasonable doubt." He also affirmed that "once [he] found someone guilty . . . [he] wouldn't automatically be able to make any answers to those [special] issues until after [he] heard the punishment evidence." With respect to the mitigation issue, Brewer stated more than once on the record that he was open to considering

mitigation evidence.

> Q. [STATE]: And then you would be open to considering – and I know you've said that three times just now, but I'm just – open to considering Special Issue Number 2, as well?

> A. [BREWER]: Yes.

Brewer did say that he could not know what specific evidence would be enough for him to go from death penalty to a life sentence until he actually heard it. However, a juror is not required to give examples of factors that he might view as mitigating.[36]

> A. [BREWER]: I wouldn't know until that moment that I got that . . . evidence.

> Q. [STATE]: And that's okay, and you would still be a qualified juror because what the law says is it doesn't even have to be a situation you could envision right now. Nobody is going to say, Mr. Brewer, what would it take for you, but what you have to be able to mean is that you would be open to it and that if you heard it, you would know it and you could do that.

> A. [BREWER]: And here, again, I would be open to it if it hit me . . . in the right way that I could swing from the death penalty to life in prison.

The State pointed out during its questioning that Brewer's answers from the questionnaire conflicted with those on the stand and sought to clarify Brewer's position.

> Q. [STATE]: [Y]ou initially said you don't think those issues are relevant to punishment, but we realize that you fill out this questionnaire before you know what the law is, as it pertains to these special issues. But I guess I might as well go ahead and ask you . . . talking about what we just talked about – and you see on the special issue there that – that it has you take into consideration the circumstances of the offense, but also the Defendant's character and background and their culpability, so a lot of things. Not just genetics, circumstances of birth, upbringing, and environment, but certainly probably their background and background encompasses that. Just to make sure that you are open to listening to everything and that you would consider what you heard.

---

[36] *Threadgill*, 146 S.W.3d at 668.

GREEN–37

A. [BREWER]: Yes, I would.

Brewer's testimony demonstrates that, notwithstanding his responses to the questionnaire, he could follow the law and would wait to consider all of the evidence presented, including mitigation evidence, before determining his answers to the two special issues. Based on the record before us, the trial court properly denied appellant's challenge for cause to Jackie Brewer.

### 14. *Lisa Hensley*

In point of error fourteen, appellant claims that the trial court erred in denying the challenge for cause against potential juror Lisa Hensley. Appellant challenged Hensley because she was "death prone" and would automatically assess a death sentence if she found the defendant guilty of capital murder. Appellant points out that Hensley was "very adamant in her belief in an eye-for-an-eye and following the Bible."

Hensley stated on the record that she believes in and follows the Bible and that she attends church regularly. But when the defense asked about her church's doctrine regarding the death penalty, she responded: "I make my own opinion" and "It doesn't matter what they think." In Hensley's view, a death sentence "depends on the circumstances."

The record reflects that Hensley agreed with and could follow the law. She stated her belief that "we live under the law that we've written, so that's what we go by." She affirmed that she would "be able to wait and not make any automatic decisions until [she had] heard all the evidence presented at punishment," and stated that she agreed with this process because "[t]here could be extenuating circumstances . . . that should be considered." Hensley affirmed that she would "be open to listening and hearing about what the circumstances might be . . . in making a decision." Based

GREEN–38

on the record before us, it was not an abuse of discretion for the trial court to deny appellant's

challenge for cause against Lisa Hensley.

### 15. *Debra Story*

In point of error fifteen, appellant claims that the trial court erred in denying the challenge

for cause against Debra Story. Appellant challenged Story on the basis that she is "death prone" and

would automatically assess a death sentence if she found the defendant guilty of the offense.

Appellant also claims on appeal that Story was challengeable because she had a bias toward law

enforcement; however the record does not demonstrate that her position regarding the credibility of

law enforcement was extreme or absolute.[37]  Regardless, this claim was not presented to the trial

court and is therefore not preserved for review.[38]

The record shows that, while Ms. Story did state on her questionnaire that she believed in "an

eye for an eye," her answers during questioning made it clear that she would not automatically assess

the death penalty in every case.

> Q. [STATE]: [A]re you the type that could give fair consideration to the punishment
> evidence if you have found somebody guilty of capital murder?
>
> A. [STORY]: Oh, sure.
>
> Q. [STATE]: What I mean by that is you can't automatically say because I believe
> in an eye-for-an-eye or because I believe if you take a life, you deserve your life to
> be taken.
>
> A. [STORY]: Right. I – I think you need to look at the case.  You need to look at all
> the – all the evidence, and I'm not eye-for-an-eye like you were saying.  I guess I

---

[37] *See* footnote 24.

[38] *See* footnote 23.

GREEN–39

believe in capital murder – I mean, capital punishment.

Q. [STATE]: I thought you did check eye-for-an-eye in your – you were – no, I'm sorry.

A. [STORY]: I mean, I guess I am. I – just because you find them guilty of murder, I would listen through the punishment phase or whatever and be open.

Story indicated that she would not make an automatic decision, but would be open and listen

to all of the evidence before answering the special issues.

Q. [STATE]: Do you think, Ms. Story, honestly, you're the type of person that could go all the way through this process and depending on the evidence, if it left – if it led you to a death sentence, so be it, and if it led you to life without parole, so be it?

A. [STORY]: Yes, sir.

When the defense questioned Story about her responses on the questionnaire, she conceded

that she had not completely understood the process and stages of a capital trial until after it was

explained to her.

Q. [DEFENSE]: [H]ow do you feel about that distinction now that it's been explained to you?

A. [STORY]: Well, I mean, now that it's explained and I'm – I've been educated on it, I understand – I mean, I understand that the case is separate from the punishment . . . . You look at them separately, and it's not an automatic, you know, killing type thing. Like in my questionnaire, you know, I'm uneducated really, I'm just having my opinions and my first instinct is, you know, yes, he should have the death penalty. But I would listen to the case and be objective to it and be objective to the punishment, also.

After the law was explained to her, Story stated: "When the punishment phase started, I

would start fresh." She also stated: "I know it's a very big responsibility, and I – you need to look

at it openly when you come in here and listen."

Q. [DEFENSE]: Now that you understand the system, if you had the chance to fill out this questionnaire again, do you think you would have filled it out a little different?

A. [STORY]: I would probably. I think educating people – you know, when you learn the system and learn what, then you can make a good decision. I mean, we're just given these questionnaires, fill these out, and y'all can go home type thing . . . you're filling them out on what you hear, what you have been brought up to think, or whatever. And when you hear how the system works, you know, what's required of you, then you would look at this a little different, I think.

The record reflects that Story would not automatically assess a death sentence as appellant claims, but would follow the law and do what was required of her. The trial court properly overruled appellant's challenge to Debra Story.

### 3. *Conclusion*

After thoroughly reviewing the record of the voir dire proceedings, we find that there is sufficient evidence to support the trial court's denial of appellant's challenges for cause to the prospective jurors identified in points of error one through fourteen. Moreover, we find that there is sufficient evidence to support the trial court's denial of appellant's challenge for cause to Debra Story, who appellant identifies in point of error fifteen as the objectionable juror that he was forced to accept. Points of error one through fifteen are overruled.

### B. Constitutional Right to a Fair and Impartial Jury

In points of error sixteen and seventeen, appellant contends that the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury and that he suffered a violation of his rights under the state and federal constitutions and under Article 35.16 of the Texas Code of Criminal Procedure. We have already held that the record supports the trial court's denials of

appellant's challenges for cause. Appellant has not shown that the trial court's rulings on his challenges were in error, nor that they resulted in the seating of a juror who was biased or prejudiced. Points of error sixteen and seventeen are overruled.

### III. GUILT PHASE ISSUES

#### A. Admissibility of Appellant's Confession

In point of error eighteen, appellant argues that the trial court erred in overruling his objection to the introduction into evidence of his videotaped statement to the police. Appellant contends that the admission of his statement was in violation of the requirements of *Miranda* and Article 38.22 of the Code of Criminal Procedure.[39] Appellant does not assert that he was not warned of his rights. Rather, he claims that, because he did not make an express waiver, he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

We have held that a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.[40] However, we have also held that a waiver need not assume a particular form, that neither a written nor an oral express waiver is required, and that in some cases, a waiver can be clearly inferred from the actions and words of the person interrogated.[41]

The question is not whether appellant explicitly waived his *Miranda* rights, but whether he

---

[39] Art. 38.22; *Miranda v. Arizona*, 384 U.S. 436 (1966).

[40] *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010) (citing *Miranda*, 384 U.S. at 475).

[41] *Id.* at 24-25 (citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) and *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988)).

waived them knowingly, intelligently, and voluntarily under the standard outlined in *Moran v. Burbine*.[42] The waiver inquiry under this standard has two distinct dimensions: (1) the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[43] Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may we properly conclude that appellant's *Miranda* rights were properly waived.[44] This "totality-of-the-circumstances" approach requires consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct.[45]

Prior to trial, appellant objected to the admission of his statement to Detective Quirk, and the trial court held a *Jackson v. Denno* hearing to determine whether appellant's statement was voluntary and admissible.[46] The trial court found that appellant understood his rights, voluntarily waived those rights, and made his statement to the police voluntarily. We agree. The totality of the circumstances indicates that appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

---

[42] *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011); *Joseph*, 309 S.W.3d at 25.

[43] *Joseph*, 309 S.W.3d at 25.

[44] *Id.*

[45] *Id.*; *see also Lucio v. State*, 351 S.W.3d 878, 893-94 (Tex. Crim. App. 2011) (stating that a "subsequent course of conduct" can show a waiver of rights).

[46] *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964).

GREEN–43

The record reflects that before the interrogation began, Detective Quirk introduced himself and asked appellant if he needed anything, such as water or a cigarette or a bathroom break. Detective Quirk then stated: "[B]efore we start I need to read you your rights though, ok?" Appellant was shown a card containing the written warnings and was asked to read along as Detective Quirk read the warnings aloud. After Detective Quirk read the warnings, the following exchange occurred:

[QUIRK]: Do you understand your rights?

[APPELLANT]: Yes, sir.

[QUIRK]: Yes?

[APPELLANT]: Yes.

[QUIRK]: Ok. Umm. Like I said I got a whole lot of unanswered questions. And I'd like to talk to you about this. Are you good with that?

[APPELLANT]: Yes, sir.

Appellant then participated in the interview, which lasted over an hour. He was cooperative and answered every question asked of him. Detective Quirk later testified that appellant seemed dejected and somewhat remorseful. Appellant did not ask for an attorney, nor did he ask to terminate the interview at any time. At no point during the interrogation was appellant promised anything or threatened. Additionally, appellant is not a novice to the criminal justice system.[47] He has two prior criminal convictions and has experience with giving a confession to the police.[48]

---

[47] *See Nichols v. State*, 754 S.W.2d 185, 190 (Tex. Crim. App. 1988), *overruled on other grounds by Harris v. State*, 784 S.W.2d 5 (Tex. Crim. App. 1989), *and Green v. State*, 764 S.W.2d 242 (Tex. Crim. App. 1989).

[48] In 1990, appellant gave a written confession to an aggravated robbery at a grocery store.

GREEN–44

Based on the totality of the circumstances in this case, the record supports the trial court's

finding that appellant knowingly, intelligently, and voluntarily waived his rights in accordance with

*Miranda* and Article 38.22.[49]  Point of error eighteen is overruled.

## B. Jury Argument

In points of error nineteen through twenty-four, appellant contends that the State made

improper jury arguments during the guilt stage of trial and that the trial court erred in overruling

appellant's subsequent objections and motions for mistrial.  Appellant sets out each complained-of

incident in a separate point of error, but argues that "the combination of and cumulative effect of

each issue presented as a group of issues involving the same or similar facts and same legal issue

would amount to reversible error."  He contends that the State's improper remarks "effectively told

the jury to find [appellant] guilty of capital murder so the jury could assess the death sentence

without any reference to the special issue submission on future dangerousness and or mitigation that

is the basis of our statutory scheme for potential death penalty cases."

### 1. *Overruled Objections*

In point of error nineteen, appellant argues that the trial court erred in overruling his objection

to the State arguing outside the record during the guilt stage of trial.  The complained-of argument

went as follows:

> [STATE]: Can you imagine what she went through, all while knowing that her baby
> girl was laying there on the bed watching this? Can you even imagine what the last
> moments of her life must have been like? And all the while, while she's being
> stabbed and bleeding and choked, wondering what is to become of her family at that
> point.

---

[49] Art. 38.22; *Miranda*, 384 U.S. 436.

And it didn't end there, did it? Because the monster wasn't done yet. Can you imagine the last hours of this little girl's life? When she got home with her mom and went into her room, did she get up on her bed and play with her dolls, or was she on the floor working on her school work when the monster walked into her room? What was she saying and what was she thinking when he put that duct tape over her mouth? And when he told her everything is going to be okay, as he was putting her arms behind her back and binding her feet, and what was she thinking about when she laid on that bed? Did he tie her to that bed with that phone cord to make her stay, or did she just stay because she didn't know what else to do while she laid there and watched her mother beg and plead for her life and get stabbed and choked and God knows what else happened in that bedroom that night while that little girl watched.

Can you imagine what she must have been thinking when this man picked her up and took her over her dead mother's body into that bathroom, that bathroom covered in blood, her mother's blood? The man that had blood all over his face took her, and while he filled up that bathtub with water, was he talking to her? Was she crying?

[DEFENSE]: Excuse me, Judge. Your Honor, I'm going to object – I'm going to object to the entire tone of the argument. This – the issue is guilt and guilt alone. And the argument prosecution is presenting to the jury has no relation to the issue of guilt of the Defendant. We're going to object to this opinion. It's outside the scope of this – this portion of the proceeding. We're going to object to it.

[THE COURT]: And it's overruled. [W]hat the attorney say[s] is not evidence. It's simply a closing argument.

Under Texas Rules of Appellate Procedure Rule 33.1(a)(1), a complaint must be made to the trial court by a timely request, objection, or motion.[50]   The requirement of a timely trial-level complaint is satisfied "if the party makes the complaint as soon as the grounds for it become apparent."[51]   Typically this means "as soon as the [objecting party] knows or should have known that

---

[50] TEX. R. APP. P. 33.1(a)(1); *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012).

[51] *Lackey*, 364 S.W.3d at 843.

an error occurred."[52] Here, appellant objected only after the State had made several similar remarks to the jury regarding what may have been going through the minds of the victims during the murders. As such, this point of error was not preserved for appellate review.

In point of error twenty-one, appellant contends that the trial court erred in overruling his objection to the State's closing argument as being outside the scope of guilt. Appellant contends that the State was trying to prejudice the jury in its determination of guilt by making an argument concerning punishment.

> [STATE]: I want to talk to you about and ask you to recall, you know, when – when he's back there with Lovetta and she's trying to find, you know, some decency, she's trying to tell him, you're a good man, you're not a monster, but she was wrong. Almost 30 stab wounds. Remember, he said we tussled for an hour and a half? About an hour and a half, they tussled in that bloody bathroom. She's trying to not only save her life, but at least don't kill Jazzmen, stab the baby, as her baby lays on the bed basically hogtied with duct tape. You know, can you imagine what it must have been like for Lovetta, a mother? You know, even after you take those first few stab wounds, what it must have been like for a mother?

> [DEFENSE]: Your Honor, again, I'm going to object. I want the record to formally reflect that I believe this – the entire scope of this argument is outside the issue as to the guilt or innocence of the Defendant and it is improper. And I think the Court certainly has within its discretion the ability to limit argument to the issues before the trier of fact at the particular time. This is the guilt phase, not the punishment phase.

> [STATE]: Judge, I'll move on.

> [THE COURT]: I understand. Record's made. Okay.

> [STATE]: I want you to – when you think about the horror that Gary Green inflicted and who we're dealing with, who we're talking about, and what type of person can look into the eyes of this little girl – what type of person can look into the eyes of this little girl –

---

[52] *Id.*

[DEFENSE]: Judge, again, I'm going to renew my objection at this point in time. This argument is completely outside the scope of guilt argument.

[THE COURT]: Objection's overruled.

[DEFENSE]: And I'd ask that – I'd ask that – I'm sorry, Mr. Harris. So I'd ask that so I don't be required – and I apologize for interrupting –

[THE COURT]: You want a running objection?

[DEFENSE]: I want a running objection to the entire argument.

[THE COURT]: All right. You have a running objection. I think if – I think that it's going to cross – crosses the line, I will at that time sustain an objection.

Appellant's first objection was not preserved because no formal ruling by the trial court was made.[53] Appellant's second objection was overruled by the trial judge, after which appellant requested a running objection. However, this request for a running objection was not made on a timely basis.[54] Appellant failed to obtain rulings on prior objections as well as failed to object each time the State made similar impermissible jury arguments.[55] The jury had already heard previous similar remarks by the State with no objection. We need not decide whether the trial court erred in allowing the State's later remarks concerning the same subject matter because any error is harmless.[56]

Even if we were to find that the trial court erred in overruling appellant's objections to the

---

[53] TEX. R. APP. P. 33.1(a)(2)(A).

[54] *See Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008).

[55] TEX. R. EVID. 103; *see id.*

[56] *See Saldano*, 232 S.W.3d at 102-03.

GREEN–48

State's remarks in points of error nineteen and twenty-one, we determine that any error was harmless. Improper argument is non-constitutional error.[57]  Texas Rules of Appellate Procedure Rule 44.2(b), which governs the harm analysis for non-constitutional error, provides that any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."[58]  In *Mosley v. State*, we held that determining harm under that standard in improper argument cases requires balancing the following three factors: (1) severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction absent the misconduct.[59]

Applying the three *Mosley* factors, we find that any error here was harmless.  To begin, the level of misconduct, if any, was mild.  The State's remarks did not inject any new facts into the record.  The State simply asked the jury members to apply their general knowledge and experience to evidence that was properly before them and to imagine what was going through the minds of the victims during the murders.[60]  The details in the State's remarks were a summation of or reasonable deduction from the evidence, most of which came from appellant's own confession describing the offense.

For the remarks in point of error nineteen, the trial judge overruled appellant's objection, but then immediately cleared up any possible misunderstanding by the jury by stating: "[W]hat the attorneys say is not evidence.  It's simply a closing argument."  For the remarks in point of error

---

[57] *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008).

[58] TEX. R. APP. P. 44.2(b).

[59] *Mosley*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998);

[60] *Id.*

twenty-one, the trial judge did not perform any curative measures, but that is because he had overruled the objection, believing the statements to be permissible.

Finally, with regard to the certainty of conviction absent the misconduct, the evidence of appellant's guilt was overwhelming. Appellant wrote a letter prior to the offense about his plan to kill Lovetta, her children, and then himself, he confessed to the murders, he did not present any evidence at the guilt phase of trial to refute the State's charges, witness testimony corroborated appellant's confession, forensic evidence from the autopsies confirmed the causes of death and were in line with appellant's confession, and appellant's guilt was conceded during defense counsel's closing argument.   The State's remarks likely had little or no prejudicial effect on the minds of the jurors in their determination of guilt.  Points of error nineteen and twenty-one are overruled.

## 2. *Denial of Motion for Mistrial*

In points of error twenty, twenty-two, twenty-three, and twenty-four, appellant contends that the trial court erred in denying his motions for mistrial after the State made improper remarks during the guilt phase of trial.  In point of error twenty, appellant complains about the following remarks made at the very beginning of the State's closing argument:

> [STATE]: Blind you? Ladies and gentlemen, we told you from the beginning that this was a horrific case, and that we start off with the guilt and innocence phase and then we move to the punishment phase. And in that punishment phase you would do what?  You'd be asked to reconsider some of the evidence from the guilt and innocence phase.  Remember, you got those two special issues to address?  You got those two special issues to address.  We told you that there would come a time when you would have to reconsider the evidence from the guilt and innocence phase. That's what we're talking about right now.

Appellant complains about the next portion of the State's closing argument in point of error

twenty-two:

> [STATE]: But again, he doesn't stop there. Now he showers. He puts on all black. All black. That's the evidence in this case. Why all black? Grim reaper? He knows exactly what he's doing. He's carrying out his manuscript. He's carrying out his plan. . . .
>
> He puts his black on and he goes up to the church. He goes to the church. That's the evidence in this case. And he goes and gets Jerrett and he goes and gets JT. He's sitting in church and not – not just talking about some little old small church. You're talking about a huge cathedral of worship. He's sitting in the church waiting on the boys. That's the predator we're talking about.
>
> When the boys come, what did y'all – what did y'all talk about in church today? That's the cold-hearted monster we're talking about.
>
> [THE COURT]: We're outside the scope of this case.
>
> [STATE]: That's what the boys told you, ladies and gentlemen. That's what the boys told you. He said, what did y'all learn in church today as he drove them back to their home where their mother and their sister lie dead in the bathroom. He drove them back to the home to –
>
> [THE COURT]: And these are not issues of guilt and innocence. It's not going to show intentional or knowing, or that this was part of the same criminal episode.
>
> [STATE]: He intentionally wrote out – he intentionally sat down, put pen to paper, he intentionally wrote out exactly what he was going to do. He knowingly went to that church. He intentionally took those boys back to that house to finish off his plan.
>
> [THE COURT]: Well okay. Stop. We have a running objection that he's not on trial for assaulting the boys. If he was on trial for assaulting the boys, I – I – remember, it's not – these are not –
>
> [STATE]: I'll move on.
>
> [THE COURT]: – not issues for guilt or innocence. The jury will disregard.

In point of error twenty-three, appellant complains about the last remarks made at the end of

the State's closing argument:

[STATE]: Ladies and gentlemen, there is no doubt that Gary Green is a capital murderer. You knew that from the time you heard the 911 tape and you hear those boys on there yelling, he killed my mamma, he killed my mamma and my little sister. You knew that then. From the time those boys walked in, you knew exactly what happened. Now, we're just simply asking – you make it official. You put the world on notice that Gary Green is a capital murderer. And just as he told you in his confession, he's a capital murderer that deserves the death penalty.

In each of these instances, the trial judge sustained appellant's objections to the State's remarks as being outside the scope of the guilt phase, and the jury was given prompt instructions to disregard. However, the trial court denied appellant's motions for mistrial.  Appellant's last motion for mistrial, described in point of error twenty-four, took place after the jury had already been dismissed to deliberate.  Appellant asked that the jury be admonished and instructed to disregard the State's last remark about the death penalty. The trial judge assured appellant that he had already given the jury an adequate instruction to disregard and then denied appellant's motion for mistrial.

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile."[61]  Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.[62]  When the trial court sustains an objection and grants an instruction to disregard, but denies the motion for mistrial, the proper issue to address is whether the refusal to grant the mistrial was an abuse of discretion on the part of the trial court.[63]  The question of whether a mistrial for improper argument should have been

---

[61] *Hawkins v. State*, 135 S.W.3d 72, 76 (Tex. Crim. App. 2004).

[62] *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003).

[63] *Hawkins*, 135 S.W.3d at 76-77.

granted involves most, if not all, of the same considerations that attend a harm analysis.[64]   To determine whether the trial court abused its discretion in denying appellant's motion, we balance the following three factors: (1) the severity of the misconduct; (2) any curative measures; and (3) the certainty of conviction absent the misconduct.[65]

The State's remarks were a small part of the State's entire closing argument at the guilt phase. The State's remarks did not tell the jury anything it did not already know.   Moreover, the trial judge sustained appellant's objections, gave prompt curative instructions telling the jury to disregard the State's remarks and, on several occasions, reminded the jury to consider the issue at hand and to wait until the appropriate time to think about issues of punishment.   Finally, with respect to certainty of conviction absent the misconduct, we have already noted the overwhelming evidence of appellant's guilt.

Given the brevity of the State's remarks, the lack of prejudice, the curative measures, and the strength of the evidence supporting appellant's conviction, we find that the trial court did not abuse its discretion in denying appellant's motions for mistrial.   Points of error twenty, twenty-two, twenty-three, and twenty-four are overruled.

### 3. *Conclusion*

Appellant has not demonstrated error or harm in individual points of error nineteen through twenty-four, nor has he shown that the combination of and cumulative effect of each issue presented amounts to reversible error.

---

[64] *Id.* at 77.

[65] *Id.*

## IV. PUNISHMENT PHASE ISSUES

### A. Legal Sufficiency of the Evidence of Future Dangerousness

In point of error twenty-eight, appellant contends that there was insufficient evidence of future dangerousness because, with treatment for his mental illness, appellant is not a future danger. In our review of the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found, beyond a reasonable doubt, that there was a probability that appellant will commit further criminal acts of violence that would constitute a continuing threat to society, whether in or out of prison.[66]

In determining the special issues, the jury is entitled to consider all of the evidence at both the guilt and punishment stages of the trial.[67] Some factors the jury may consider when determining whether appellant will pose a continuing threat to society include: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence.[68]

Through testimony from family members and experts, during punishment appellant provided

---

[66] *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905, 178 L. Ed. 2d 760 (2011).

[67] *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

[68] *See Waldrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

GREEN–54

evidence of his state of mind during the offense as well as his mental illness. Appellant's aunt, Shirley Coleman, stated that the family has a history of mental illness. Appellant's grandmother, father, daughter, step-brother, aunts, and cousins have all suffered from mental illness throughout their lives. Many of them had been treated, hospitalized, and medicated because of their mental illnesses. She also testified that appellant's mother, Mary Sampson, was not an attentive mother to her children and at one point had a nervous breakdown and had to be hospitalized.

Mary testified that, during his teen years, appellant was paranoid. He would not sit with his back to the door and always had to have a [baseball] bat with him because he thought someone was trying to hurt him. She said that appellant's daughter, La Jay, acts similarly to how appellant acted when he was a child and is now seeing mental-health doctors and taking medication.

On the night of the present incident, Sampson picked up appellant. She said that appellant appeared to be drugged or under anesthesia. When she asked him what was wrong, he told her that he wanted to go to sleep and never wake up. She stated that appellant was remorseful and told her that Lovetta would come visit him and talk to him.

Appellant's ex-girlfriend, Lanelle Williams testified to appellant's quiet and withdrawn behavior and stated that she was surprised when she heard about the incident because appellant was never violent towards her. During the time that appellant and Williams lived together, Williams said that appellant would be in a room by himself and that she would hear him talking but could not understand what he was saying. On one occasion, appellant told her that vampires were following him home from work and that vampires live among them.

Expert testimony was used by appellant to show possible explanations for his lack of

GREEN–55

treatment for his mental illness thus far in his life as well as the severity of his mental illness. Dr. Kellie Gray-Smith, a licensed specialist in school psychology and a special-education coordinator, testified that mental illness can be passed genetically and that members of the African-American community often shy away from mental-health treatment. She testified that there is a strong proven genetic and hereditary link between individuals passing on traits and symptomologies of mental illness and emotional behaviors. Problems with relating to peers, difficulty relating to adults, poor problem-solving skills, using aggression to solve problems, difficulty with everyday stressors, low self-esteem, and isolation could be expected in people who do not receive help for their mental illness.

Dr. Gray-Smith also testified that, in the African-American community, there is a general lack of understanding about mental health, a misrepresentation of treatment being more harmful than helpful, and a distrust of mental-health professionals. She said that the African-American community has a fear of the stigma attached to someone that receives mental-health treatment and a belief that bad behavior is to be addressed at home.

Dr. Gilbert Martinez, a clinical neuropsychologist, testified to appellant's mental illness as well as to its severity. Dr. Martinez reviewed appellant's medical records and previous evaluations, interviewed him, and administered a battery of psychological and neuropsychological tests. He stated that appellant's full scale I.Q. test showed him to be in the upper borderline range of 78 or 79. He testified that appellant did not have any severe memory problems or mental retardation but did have attentional problems. Consistent with his low I.Q., appellant had difficult with higher-level thinking, learning, and mental shifting.

Dr. Martinez testified that, in reviewing appellant's history and his test results, he determined that appellant suffered from severe chronic problems with mood that included both depression and episodes of agitation, irritability, and elevated moods that were associated with manic episodes or bipolarity. He said appellant was mistrustful of other people and was hypervigilant and suspicious. He testified that these problems meet the criteria for schizoaffective disorder of the bipolar type. In describing this disorder, Dr. Martinez explained that persons with schizoaffective disorder can have disturbances in thought where they have paranoid delusions. During these episodes of paranoid delusions, a person is likely to believe things that are not true, think that something is happening that is not, or think that people are trying to hurt him or conspire against him.

Appellant's medical records indicated that at Timberlawn, the mental hospital to which appellant was admitted a month before the incident, his doctors had diagnosed a major depressive disorder. Dr. Martinez testified that a major depressive disorder is a severe mental illness. Dr. Martinez explained that Timberlawn's diagnosis and his diagnosis of schizoaffective disorder are not mutually exclusive and share a lot of the same symptoms. Dr. Martinez testified that schizoaffective bipolar disorder is also a severe mental illness. A person with this disorder can be severely depressed, withdrawn, unmotivated, intensely sad, and can also have agitation, irritability, or an elevated mood.

Dr. Martinez stated that he also thought appellant had a borderline personality disorder. He said that people with this disorder can go into a rage and lose control of their behavior when they feel threatened or feel that something bad is going to happen to them. People with this disorder also have suicidal gesturing. They will tell people over and over again that they would rather die or that they

want to kill themselves. He said that appellant also had avoidant personality disorder and a depressive personality. Dr. Martinez testified that there was no doubt in his mind that appellant suffered from a severe mental illness, but the doctor could not say why appellant would kill someone because it was outside his expertise.

To demonstrate the calculated nature of the offense as well as the forethought and deliberation exhibited by the crime's execution, the State introduced into evidence the letter that appellant wrote before the murders and which spelled out his intentions and then introduced evidence that he followed through with those intentions by killing Lovetta and Jazzmen as well as attempting his own suicide. Appellant stabbed Lovetta more than twenty-five times, covering the bathroom in blood, and then drowned Jazzmen in the bathtub while her hands and feet were tied. Appellant then re-dressed, in all black, and went to pick up Lovetta's sons from their church program. After stabbing the younger son, Jerrett, appellant attempted to stab J.T., but missed. Appellant stopped short of murdering the entire family, as he had intended, only because the young boys pleaded for their lives, promising they would not tell anyone what had happened.

Through appellant's criminal history, the State provided evidence of appellant's multiple criminal charges, including drug possession, for which he received a four-year sentence, aggravated robbery (twenty years), aggravated assault (four years), and thirteen disciplinary violations while he was incarcerated, one of which was for assaulting a prison guard.

The aggravated-assault charge originated from an attack appellant committed on Jennifer Wheeler, one of appellant's high school classmates. Wheeler testified that she was attacked and stabbed by appellant and that, when she later awoke in the hospital, she had black eyes, a swollen

jaw, a missing tooth, and multiple stab wounds.  When questioned about the attack, appellant showed little remorse and replied that he was young and wanted to see if he could get away with it.

Appellant's aggravated-robbery charge arose from his entering a grocery store and committing a robbery at gunpoint.  Appellant had previously been employed at the grocery store. Shortly after he was released from prison, he was hired by local grocer Joseph Johnson.  But after appellant was fired for giving a false reason for not showing up to work, he committed the armed robbery.  Appellant later told his parole officer that he had committed the robbery, that this was not the only robbery in which he had been involved, and that he did it for a thrill and to see if he could get away with it.

The State presented evidence of appellant's dangerous behavior while in prison.  When in prison for the aggravated robbery, he committed thirteen disciplinary violations.  In one instance, he assaulted a prison guard.  The guard, Kevin Ashford, testified that he had ordered appellant to sit with a group of prisoners so that Ashford could better monitor them.  Appellant refused.  When Ashford ordered appellant to step into the hall to speak to another officer, appellant threw a food tray at Ashford's mid-section.

Through testimony from his ex-girlfriends and Lovetta's children, the State also presented evidence of appellant's history of violence and abuse that was not documented in his criminal history. Shulonda Ransom, one of appellant's ex-girlfriends, testified that appellant abused her when she was pregnant with their first child and then again when she was pregnant with their second. Appellant would hit or choke her, apologize, tell her he would never do it again, and then repeat this abusive cycle.  The last time appellant abused Ransom, he choked her until she passed out and then

stole everything from her apartment. Lovetta's children also testified at trial that appellant was physically abusive towards their mother in front of them.

Neither the State nor appellant presented appellant's age or personal circumstances as mitigating evidence, and appellant was not acting under duress or domination of another at the time of the offense. When we take all the *Keeton* factors into account and view the evidence in the light most favorable to the verdict, there is ample evidence upon which a rational fact finder could have found beyond a reasonable doubt that appellant was a future danger to society.[69]

Although the *Keeton* factors are all relevant, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone can be sufficient to support an affirmative answer to that special issue."[70]  A rational jury could find in this case that the circumstances of the crime alone indicate that appellant would commit future violent criminal acts. The murders were gruesome and calculated. Over the space of an hour and a half, appellant stabbed his wife more than twenty-five times. He drowned his step-daughter, changed clothes, and went to pick up his two step-sons from church. He then stabbed one of the boys as he pleaded for his and his brother's lives. Appellant then made the two boys view the bodies of their mother and sister. Given the heinous nature of the murders themselves, a rational trier of fact could have determined, beyond a reasonable doubt, that appellant would be an ongoing threat to society.

Appellant argues that his history of violence occurred while he was not being treated for his

---

[69] *Keeton*, 724 S.W.2d at 61.

[70] *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (citing *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)).

mental illness and that with treatment he would no longer be a future danger. However, appellant's

argument about treatment and its effect on his mental illness is unsubstantiated. When defense

counsel questioned Dr. Martinez about the treatment possibilities for appellant's mental illness, the

doctor testified that there was no doubt in his mind that appellant was very mentally ill but that

schizoaffective disorder can be a treatable condition. However, Dr. Martinez was unwilling to testify

conclusively that treatment would cease appellant's violent behavior.

> Q. [DEFENSE]: Schizoaffective disorder is an actual treatable medical slash mental condition, is it not?
>
> A. [MARTINEZ]: It's treatable, yes. I mean, there's medications that are given to treat it. It's a chronic condition, so it's something that happens throughout a person's life and it will recur. . . . So it's just like any other mental disorder where there are treatment options, but there's a lot of different factors that come into play as to whether a person does well or not.

Nowhere in Dr. Martinez's testimony does he indicate that appellant would not be a future

danger if he were given the proper medication for his mental illness. In fact, Dr. Martinez's

testimony indicates just the opposite. Depending on appellant's life, including his level of stress or

stability, his mental illness could either worsen or improve. This does not prove that, given the

proper medication, appellant would not be a future danger.[71]

Because the jury could have determined, either by considering the *Keeton* factors or by

looking at the offense itself, that there was a probability that appellant would commit further criminal

acts of violence that would constitute a continuing threat to society, point of error twenty-eight is

---

[71] Lastly, appellant contends that the jury's determination of future dangerousness was influenced more by the courtroom packed with friends and family of the victims rather than the evidence adduced at trial. There is no evidence of this.

GREEN–61

overruled.

## B. Constitutionality of Executing the Mentally Ill

In point of error twenty-five, appellant contends that he had suffered from a severe mental

illness before and during the commission of the offense and, therefore, it is in violation of the Eighth

and Fourteenth Amendments of the United States Constitution to have the death penalty assessed

as punishment.[72]  Evidence presented by appellant during the punishment phase was used to show

that appellant had a history of mental illness and that he was hospitalized one month before the

incident and diagnosed with a severe mental illness.  Appellant also provided testimony that multiple

family members, including parents, children, and siblings, also suffered from mental illness.  To

provide evidence that he was suffering from a mental illness at the time of the incident, appellant

introduced evidence of his delusional thinking including that he thought Lovetta and her family were

trying to conspire against him and that he tried to commit suicide the night of the incident, in an

attempt to be reunited with the family in heaven.

Appellant acknowledges this Court's holding in *Mays v. State* but asks to preserve this issue

for future possible reversal in the federal court system.[73]  Appellant believes that, in the future, the

United States Supreme Court may extend the application of *Atkins v. Virginia* and *Roper v. Simmons*

to ban execution as a punishment of the mentally ill.  However, we have rejected appellant's

---

[72] U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

[73] *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 1606, 179 L. Ed. 2d 506 (2011).

GREEN–62

argument and are not persuaded to revisit it here.[74]  We, therefore, overrule point of error twenty-five.

### C. Denial of Motion for Mistrial

In point of error twenty-seven, appellant contends that the trial court erred in denying his motion for mistrial when the State questioned the witness, Mr. Ashford, about extraneous bad acts committed by others, which appellant claims had a prejudicial effect on the juror's minds.

Q. [STATE]: I mean, having a food tray thrown at you, Mr. Ashford, compare to getting stabbed in the back like you were; is that correct?

A. [ASHFORD]: Yep.

Q. [STATE]: That's a big deal, right?

A. [ASHFORD]: A little bit.

Q. [STATE]: Okay. And you also told us that during this time frame in a single shift, one day, you had to have 17 major uses of force?

A. [ASHFORD]: Yes, Sir.

[DEFENSE]: Judge, this is outside the record and I'm going to object to it.

[THE COURT]: I'm a little confused. Against Mr. Green?

[STATE]: No, no, no, in general, in one day where he had to hit 17 -

[THE COURT]: Alright. That's - - objection is sustained.

[DEFENSE]: I'm going to ask that the jury be instructed to disregard. It is irrelevant, it's improper.

[THE COURT]: Let's just focus on Mr. Green and - - and the actions of him.

---

[74] *See id.* at 379-80.

GREEN–63

[DEFENSE]: Well, Judge, my objection to the question, and the whole line of questioning, is that it's irrelevant, and it's improper. The Court sustained it. I'm going to ask the jury be instructed at this time to disregard it.

[THE COURT]: Well, it's just a question. It's not evidence that -

[DEFENSE]: Well, the way he phrased it to the witness, he stated it as a fact and it's before this jury now [to] be considered a fact. We're going to object and ask the jury to be instructed to disregard it.

[THE COURT]: Okay. In an abundance of caution, the jury will disregard. But the jury is reminded that the questions the attorneys ask are not evidence. The answers to the questions - - that are evidence.

[DEFENSE]: And further, we move for a mistrial at this point, because I believe this is going to be a cumulative error that continues through this portion of the punishment phase.

[THE COURT]: Okay. That's denied.

Appellant argues that the obvious intent of the State was to prejudice appellant with the ill-will that any jury would feel toward incarcerated inmates who act out against guards and to put before the jury bad, irrelevant acts committed by others. Appellant contends that this "piling on" effect was prejudicial to the issue at hand and amounted to a denial of due process. Lastly, appellant claims that this error substantially affected his right to a fair trial free from prejudice and therefore could not be cured simply by an instruction to the jury to disregard.

Assuming the line of questioning was improper, we find that the State's line of questioning likely had little or no prejudicial effect. The record reflects that there was only a brief exchange between the State and the witness before appellant objected and the State explained that the incidents they were questioning the witness about were occurrences that happened, in general, one day. Moreover, the evidence was not specifically about appellant, so the prejudicial effect was minimal.

GREEN–64

The record also reflects that the measure adopted to cure the misconduct was timely and efficient. The trial court sustained appellant's objection to the line of questioning and instructed the jury to disregard. Generally, an instruction to disregard cures any prejudicial effect.[75] We, as the appellate court, are to presume the jury followed the instruction to disregard.[76] The trial judge even went a step further and explained to the jury that questions asked by the attorneys are not evidence, but rather it is the answers to those questions that are evidence.

Given the strength of the evidence supporting the jury's answers to the special issues, the trial court's instruction to disregard, and the lack of prejudicial effect of the complained of testimony, we hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. Point of error twenty-seven is overruled.

### D. Admissibility of Extraneous Offense Evidence at Punishment

#### 1. *Admission of Testimony Regarding an Extraneous Robbery*

In point of error twenty-nine, appellant contends that the trial court erred in overruling his objection to the admission of testimony regarding an extraneous bad act. The State wanted to cross-examine appellant's aunt, Shirley Coleman, about a robbery that appellant had allegedly admitted to her. Appellant argues that the State's notice of intent to introduce the evidence of the extraneous crime was unreasonable because it failed to follow the guidelines set forth in Texas Code of Criminal Procedure Article 37.07, § 3(g). Under Article 37.07, § 3(g), additional notice is required if an attorney intends to use evidence of an extraneous offense that has not resulted in a final conviction,

---

[75] *Hawkins*, 135 S.W.3d at 77.

[76] *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

GREEN–65

as was the circumstance here.[77]  To be reasonable, the notice must include the date on which and the county in which the alleged crime or bad act occurred.[78]  The State provided notice to appellant of its intent, but did not provide the date or the county in which the offense occurred, and, therefore, the appellant contends that the notice was inadequate.

However, the notice provision applies only to evidence introduced in the State's case-in-chief, not when the State presents the evidence in rebuttal or during cross-examination, as occurred in the present case.[79]  As such, the trial court did not err in overruling appellant's objection because the State was not required to give appellant any notice of its intent to introduce the evidence.

Even so, any error in the admission of the testimony did not affect appellant's substantial rights.  Error in admitting evidence with insufficient notice under Article 37.07, § 3(g), is non-constitutional error.[80]  Accordingly, we must disregard any error that does not affect appellant's substantial rights.[81]  An error is considered to affect a person's substantial rights when the error had a substantial and injurious effect or influence on the jury's verdict.[82]

Here, the State gave appellant notice of its intent to introduce the evidence.  Appellant even admitted that he had notice and that he knew to which aunt the notice was referring.  Also, the

---

[77] *Id.*

[78] *Id.*

[79] *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002).

[80] *See Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005).

[81] TEX. R. APP. P. 44.2(b).

[82] *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

prosecutors did not provide the information about the date and county of the offense only because they did not have knowledge of those facts themselves. Thus, there is no indication from the record that the omission was intended to mislead appellant or prevent him from preparing a defense. There is also no indication that appellant was surprised; he admitted to having been given notice. Lastly, appellant failed to make any specific claims of how he was prejudiced or harmed by the lack of notice and how his defense would have been any different had he been given proper notice.

Because the record shows that appellant's ability to prepare for the evidence or otherwise present a defense was not impaired, we conclude that even if the notice were deficient, it did not affect appellant's substantial rights. Point of error twenty-nine is overruled.

### 2. *Admission of Excerpts of Letter Written by Appellant*

In point of error thirty, appellant complains about the trial court's admission of excerpts from letters that appellant wrote to his high-school classmate, Jennifer Wheeler, while appellant was incarcerated in the 1990s. As in point of error twenty-nine, appellant contends that the State failed to provide adequate notice of its intent to introduce this evidence under Article 37.07 of the Texas Code of Criminal Procedure. He also claims that, because the letters were twenty years old, they were too remote to be relevant to the issue of mitigation, thereby rendering them more prejudicial than probative.

Wheeler, who was one of the State's punishment witnesses, did not bring the letters to the attention of the State until the Friday before the punishment phase of trial began. As soon as the State became aware of the existence of the letters, it notified appellant of its intent to present the

evidence at punishment. When Wheeler brought the letters to the courthouse the following Monday,

the State immediately made copies of the letters and gave them to defense counsel.

The State planned to use two excerpts from the letters as rebuttal evidence. The first excerpt

stated:

> I'm currently attending college to get my associates and to hopefully start on my
> second degree before my time of release comes.

The second excerpt read:

> But I know that's all behind us now. Jennifer, when we first came as one, I said if
> you ever _____ me over and think you can play with my feeling I'll kill you. Isn't
> that what I said????
>
> You see you and nobody else can just turn on my feelings and turn them off when
> you get ready. I'm not make out of that can of material.
>
> I have associated with people on both sides of the laws. I just choose to go the wrong
> way. With me doing the wrong that placed me here. It's wasn't the money mostly, it
> was the high of dong wrong and getting away with it. I wasn't on drugs or alcohol
> like to think I was completely sane at that time. You see I know what it takes to make
> and be success. But this place at this time is the best place for me.
>
> Understand what I'm talking about first before you make a judge of my sanity. When
> I was out my people will tell you that if I wasn't incarcerated at the time of the
> summer of 1990 I would have killed up a lot of people or been killed!! Really,
> because I was I really was livin for day to day . . . . Not caring about life and people.
>
> (State's Exhibits 148A and 148B) (grammatical and spelling errors in original).

Appellant objected to the admission of the letter excerpts on the basis that he did not receive

adequate notice. Appellant contends that he was surprised by the evidence and was not able to use

the information in conjunction with his preparation for trial. Because the letters were given to

appellant only at the commencement of the punishment evidence, he claims he was not able to

GREEN–68

prepare an adequate defense strategy for the punishment hearing.

The State was not required to give appellant notice of its intent to introduce the letter excerpts because the letters were not evidence of an extraneous offense. Even if the letters were considered extraneous-offense evidence, as we stated in point of error twenty-nine, if evidence is being offered in rebuttal or cross-examination, the State is not required to give notice.[83] Here, the letters were used by the State to rebut appellant's claims of mental illness and low I.Q.  Appellant had already introduced testimony from his family members about the family history of mental illness, and appellant argued that, with treatment, he would no longer be a future threat to society. Appellant had also presented evidence that he had a low I.Q., struggled with problem solving, and was unsuccessful in school. In the letters, appellant stated that he was "completely sane" and that he "choose[s] to go the wrong way" for the "high of do[i]ng wrong and getting away with it." He also reported that he was getting his associate's degree and would hopefully start on his second degree soon. Because the two excerpts were offered to rebut appellant's previous arguments, the State was not required to give appellant notice, and, for that reason, appellant's contention regarding lack of notice is without merit.

Moreover, even if the State had been required to give appellant notice, the record reflects that the State's notice and production of the letters, in light of their late discovery, were timely. As soon as the State became aware of the existence of the letters, it notified appellant of its intent to present the evidence at punishment.  The State also provided copies of the letters as promptly as possible after receiving the letters at the court the following Monday.  The record reflects that the State was

---

[83] *See Jaubert*, 74 S.W.3d at 4; *Washington v. State*, 943 S.W.2d 501 (Tex. App.—Fort Worth 1997, pet. ref'd).

GREEN–69

not acting in bad faith. Notice could not have been provided any sooner because the State itself was unaware of the existence of this evidence. Additionally, appellant was provided copies of the letters before the punishment phase began and had four days to prepare a defense or cross-examination. He has failed to show that his defense strategy would have been different had he been notified of the letters any sooner or that his defense was "injuriously" affected by the State's lack of notice.[84]

Appellant also objected to the content of the letters on the basis that the letters were too remote to be relevant and had no probative value as to the special issues. We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard.[85] The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement.[86]

Under Rule 403, evidence that is relevant and admissible may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[87] Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial.[88] Unfair prejudice does not arise from the mere fact that evidence injures a party's case.[89] Virtually all testimony and evidence will be

---

[84] *See Hernandez v. State*, 176 S.W.3d 821, 825-26 (Tex. Crim. App. 2005).

[85] *Davis*, 329 S.W.3d at 802 (citing *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007)).

[86] *Id.*

[87] Tex. R. Evid. 403.

[88] *See Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009).

[89] *See Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

prejudicial to the opposing party, as that is the central point of offering evidence.[90] It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 applies.[91]

The letters tended to rebut appellant's claims that his behavior was the result of mental illness rather than an antisocial personality. This is relevant and very probative as to appellant's future dangerousness, given the violent nature of the previous crime and the similarity of the threats in the letter to the present offense. Also, the letters did not contain any subject matter that would confuse or mislead the jury, and the matters were neither complicated nor technical. We hold that the trial court could have reasonably concluded that the testimony did not tend to confuse or distract the jury from the primary issues and that it did not cause unfair prejudice.

Based on the above-mentioned reasons, the trial court could have reasonably concluded that the evidence was more probative than prejudicial. The trial judge's decision was within the zone of reasonable disagreement, and, therefore, does not amount to an abuse of discretion. Point of error thirty is overruled.

## V. CONSTITUTIONAL ISSUES REGARDING THE DEATH PENALTY

In points of error thirty-one through forty-six, appellant raises constitutional challenges to the Texas death-penalty statute. In point of error thirty-one, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the cruel and unusual

---

[90] *Id.*

[91] *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).

punishment prohibition of the Eighth Amendment because it allows the jury too much discretion to determine who should live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty." In point of error thirty-two, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry v. Johnson* because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to that special issue intolerable and unreliable."[92]

In point of error thirty-three, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on appellant rather than requiring a jury finding against appellant on that issue under the beyond a reasonable doubt standard." In point of error thirty-four, appellant claims that "the trial court erred in denying [his] motion to hold Article 37.071 Sec. 2(e) and (f) concerning burden of proof unconstitutional as a violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution."

In point of error thirty-five, appellant claims that "the Texas Death Penalty scheme violates due process protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny."[93] In point of error

---

[92] *Penry v. Johnson*, 532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001).

[93] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

thirty-six, appellant claims that "the Texas Death Penalty scheme violated [his] rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten 'no' votes for the jury to return a negative answer to the punishment special issues."

In point of error thirty-seven, appellant claims that "the Texas Death Penalty scheme violated [his] rights against cruel and unusual punishment, an impartial jury and to due process of the law under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty." In point of error thirty-eight, appellant claims that "the Texas Death Penalty scheme denied [him] due process of law, and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty."

In point of error thirty-nine, appellant claims that "the Texas Death Penalty scheme denied [him] due course of law, and imposed cruel and unusual punishment, in violation of Article I, §§ 13 and 19, of the Texas Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty." In point of error forty, appellant claims that "the trial court erred in overruling [his] motion to hold Art. 37.071 Sec. 2(e) and (f) unconstitutional because said statute fails to require the issue of mitigation be considered by the

GREEN–73

jury."

In point of error forty-one, appellant claims that "the statutory '*Penry*' special issue in Tex. Code Crim. Pro. Arts. 37.071 & 37.0711 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence." In point of error forty-two, appellant claims that "the statutory '*Penry*' special issue is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia.*"[94]

In point of error forty-three, appellant claims that "Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellant review." In point of error forty-four, appellant claims that "the trial court erred in overruling [his] motion to quash the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law."

In point of error forty-five, appellant claims that "the cumulative effect of the above-numerated constitutional violations denied [him] due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution." In point of error forty-six, appellant claims that "the cumulative effect of the above-enumerated constitutional violations denied [him] due course of law under Article I, § 19, of the Texas Constitution."

In his brief, appellant acknowledges that the challenges he raises in points of error thirty-one

---

[94] *Furman v. Georgia*, 408 U.S. 238 (1972).

GREEN–74

through forty-six have been previously submitted and overruled by this Court.[95]  He asserts these

issues in order "to invite this Court to review any prior stand on any issue and more importantly to

preserve each issue for further review in the Federal Court system."   We decline appellant's

invitation to review our prior decisions on these issues.[96]  Points of error thirty-one through forty-six

are overruled.

      The judgment of the trial court is affirmed.

DELIVERED: October 3, 2012
DO NOT PUBLISH

---

[95] *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007).

[96] *Id.* at 108-09.

*76458*

# * * * * *   D E A T H   P E N A L T Y   * * * * *

## C L E R K ' S   R E C O R D

Volume of __ONE__ Of __TWO__

Trial Court Cause Number __F09-59380-S__

In the __Judicial__ District Court __282nd__

of Dallas County, Texas,

Honorable __ANDY  CHATHAM__ , Judge Presiding.

======================================================

__THE STATE OF TEXAS__ , Plaintiff

vs.

__GARY GREEN__ , Defendant

======================================================

Appealed to the Court of
Criminal Appeals of Texas at Austin, Texas

FILED IN
COURT OF CRIMINAL APPEALS

MAR 1 4 2011

======================================================

Louise Pearson, Clerk

Name __John Tatum__

Address __990 S. Sherman, Richardson, TX   75081__

Telephone No. __972.705.9200__

Fax No. __972.690.9901__

SBOT No. __19672500__

Attorney for: __Gary Green__

======================================================

Delivered to the Court of Criminal Appeals of Texas at Austin, Texas
_____ day of _____ , _____ .

Signature of Clerk _____

Name of Clerk _____

Title _____

======================================================

Appellate Court Cause No. _____

Filed in the Court of Criminal Appeals of Texas at Austin, Texas

this __4th__ day of __March__ , __2011__ .

GARY FITZSIMMONS, DALLAS COUNTY DISTRICT CLERK

By __Ana McDaniel__ , Deputy

1

| | | |
|---|---|---|
| 1 | GARY GREEN | CAUSE NO.   F09-59380-S |
| 2 | VS | IN THE 282nd JUDICIAL DISTRICT |
| 3 | THE STATE OF TEXAS | COURT OF DALLAS COUNTY, TEXAS |

# * INDEX *

| | | |
|---|---|---|
| 7 | Clerk's Record Cover | Vol. 1-01 |
| 8 | Index | Vol. 1-02 |
| 9 | Caption | Vol. 1-06 |
| 10 | True Bill of Indictment   (30 Oct 09)<br>Affidavit for Arrest Warrant | Vol. 1-07 |
| 11 | Trial Docket | Vol. 1-09 |
| 12 | Writ/Officer's Return   (04 Nov 09) | Vol. 1-18 |
| 13 | Notice of Filing Discovery   (23 Feb 10)<br>envelope | Vol. 1-19 |
| 15 | Pretrial Scheduling Order   (15 Apr 10) | Vol. 1-22 |
| 16 | Writs for Special Venire   (21 Apr 10) | Vol. 1-23 |
| 17 | Defendant's Ex Parte Motion for Expert Assistance<br>in Indigent Case, Sealed/Granted   (07 May 10) | Vol. 1-25 |
| 18 | First Administrative Judicial Region   (26 Jul 10)<br>Order of Assignment by the Presiding Judge | Vol. 1-30 |
| 20 | Motion to Amend Indictment/Granted<br>(03 Aug 10) | Vol. 1-34 |
| 21 | Green's Discovery Supplement   (03 Aug 10)<br>envelope | Vol. 1-38 |
| 23 | Discovery Supplement   (03 Aug 10)<br>envelope | Vol. 1-40 |

GARY GREEN                                          PAGE   2

F09-59380-S

=================================================================

Order for Diffusion Tensor Imaging Tensor (DTI) or          Vol. 1-42
Magnetic Resonance Imaging (MRI) to be Conducted
on Defendant      (12 Aug 10)

Motion to Preserve Right to File Other Motions/Granted      Vol. 1-43
(01 Sep 10)

Motion to Amend the Indictment    (27 Sep 10)              Vol. 1-46

State's Motion for Psychiatric Examination of Defendant     Vol. 1-50
for Rebuttal Testimony    (27 Sep 10)

Notice of Extraneous Offenses    (27 Sep 10)              Vol. 1-53

State's Motion for Discovery of Expert Witnesses           Vol. 1-56
(27 Sep 10)

State's Designation of Expert Witnesses    (01 Oct 10)     Vol. 1-58

Motion to Set Aside the Indictment    (05 Oct 10)         Vol. 1-60
(Unconstitutionality of Statute)

Motion to Dismiss the Death Penalty in the State of Texas   Vol. 1-66
on the Ground that its Capital Sentencing Procedure is
Unconstitutional Due to its Failure to Meet Minimum
Requirements Set Forth in Furman V. Georgia and its
Progeny, as Evinced by the Findings of the Capital Jury
Project and Other Research   (05 Oct 10)

Order for Medical/Therapeutic/Psychiatric Record Release    Vol. 1-131
(05 Oct 10)

State's Notice of Intent to use Business Records Accompanied  Vol. 1-134
by Affidavit    (07 Oct 10)

Deputy Reporter Statement    (14 Oct 10)                 Vol. 1-137
Deborah Hamon

State's Supplemental Witness List    (19 Oct 10)          Vol. 1-138

3

1   GARY GREEN                                                    PAGE   3

2   F09-59380-S

3   ================================================================

4

   Supplemental Notice of Extraneous Offenses          Vol. 1-139

5   (22 Oct 10)

6   State's Second Supplemental Witness List                Vol. 1-140
   (22 Oct 10)

7

   Appointment of Deputy Official Court Reporter       Vol. 1-141

8   Deborah Hamon     (22 Oct 10)

9   Supplemental State's Response to Motion to List         Vol. 1-142
   Witnesses    (26 Oct 10)

10

   Note to the Court:    Requesting Letters, Timberlawn     Vol. 1-143

11  Records, Person Records, Dr. Martinez Records,
   Confession Transcript from interrogation, Video

12  Confession     (05 Nov 10)

13  Note to the Court:   13 documented incidents from       Vol. 1-144
   prison    (05 Nov 10)

14

   Charge of the Court - Guilt/Innocence               Vol. 1-145

15  (09 Nov 10)

16  Jury Verdict on Guilt                                   Vol. 1-153

17  Charge of the Court - Punishment                        Vol. 1-154
   (09 Nov 10)

18

   Special Issues No. 1 & 2                            Vol. 1-160

19

   Judgment/Sentence    (05 Nov 10)                   Vol. 1-162

20  Judgment of Conviction by Jury

21  Notice of Disposition    (09 Nov 10)                    Vol. 1-165

22  Trial Court's Certification of Defendant's Right of Appeal   Vol. 1-166
   (10 Nov 10)

23

24

1   GARY GREEN                                                PAGE · 4

2   F09-59380-S

3   ================================================================

4
    Defendant's Notice of Appeal and Pauper Oath              Vol. 1-167 ·
5   Appointment of Attorney on Appeal    (10 Nov 10)

6   Appointment of Counsel for Indigent Defendant             Vol. 1-168
    John Tatum    (15 Nov 10)
7
    Order Appointing Writ Counsel    (10 Nov 10)              Vol. 1-169
8   Brad Levenson

9   Motion for New Trial    (03 Dec 10)                       Vol. 1-170

10  Applications for Subpoenas                                Vol. 1-177

11  Subpoenas                                                 Vol. 1-221

12  Pass Slips                                                Vol. 1-289

13  Front Cover of Trial Jacket                               Vol. 1-292

14  Clerk's Certification that Appellate Record is True and   Vol. 1-293
    Correct
15

16

17

18

19

20

21

22

23

24

                                                                5

CAPTION

The State of Texas          §

County of Dallas            §


In the   282nd Judicial District Court   of Dallas County, Texas, the Honorable  Andy Chatham , Judge Presiding, the following proceedings were held and the following instruments and other papers were filed in this cause, to wit:


Trial Court Cause No.   F09-59380-S


The State of Texas          §          In the   282nd

Vs.                         §          Judicial District Court

 Gary Green                 §          of Dallas County, Texas

6

LM

DEFENDANT  Green, Gary _____ B_M_03141971  CHARGE CAP MUR MULT/3RD _____

AKA:

ADDRESS    3844 Morning Springs Trail, Dallas, Tx ____  LOCATION DSO _____

FILING AGENCY  TXIDPD0000  DATE FILED October 30, 2009 _____ COURT ____ JDC282 ____

COMPLAINANT  Armstead, Lovetta _____  F-0959380 _____ VTR: _____

C/C        _____ ... _____ _____

_____

TRUE BILL INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of

Dallas County, State of Texas, duly organized at the _____ October _____ Term, A.D., ___ 2009 ___ of the

_____ Criminal District Court 7 _____ , Dallas County, in said Court at said

Term, do present that one                    **GREEN, GARY**                    , Defendant,

On or about the ___ 22 nd ___ day of September A.D., 2009 ___ in the County of Dallas and said State, did

unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA
ARMSTEAD, by BY STABBING LOVETTA ARMSTEAD WITH A KNIFE, A DEADLY WEAPON,
and during the same criminal transaction said defendant did then and there intentionally and knowingly
cause the death of another individual, to-wit: JAZZMEN MONTGOMERY, by ASPHYXIA BY
DROWNING.

     And it is further presented to said Court that prior to the commission of the offense or offenses set out
above, the defendant was finally convicted of the felony offense of AGGRAVATED ROBBERY WITH A
DEADLY WEAPON, in the 292ND JUDICIAL DISTRICT COURT of DALLAS County, Texas, in
Cause Number F-9031096, on the 4TH day of JUNE, 1990,

     And that prior to the commission of the offense or offenses for which the defendant was convicted as
set out above, the defendant was finally convicted of the felony offense of AGGRAVATED ASSAULT
WITH A DEADLY WEAPON, in the 194TH JUDICIAL DISTRICT COURT of DALLAS County,
Texas, in Cause Number F-8989526, on the 7TH day of SEPTEMBER, 1989,

against the peace and dignity of the State.                    _Gyle C. Cowart_

     CRAIG WATKINS                                   Foreman of the Grand Jury.
Criminal District Attorney of Dallas County, Texas

COURT

7

STATE OF TEXAS   AFFIDAVIT FOR ARREST WARRANT   COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant who, after

being duly sworn by me, on oath stated: My name is __Detective Robert Quirk #5809__

and I am a peace officer of the City of Dallas, Dallas County, Texas. I, the affiant, have good reason and

do believe that on or about the __21__ day of __September__, 20 __09__, one (name of suspect)

__Gary Green, B/M/03-14-1971__ did then and there in the City of Dallas, Dallas County, Texas

commit the offense of __Capital Murder__,

a violation of Section __19.03__ of the __Texas Penal Code__,

a __Capital Felony__.

Affiant's belief is based upon the following facts and information which Affiant received from:

☒ Affiant's personal investigation of this alleged offense.

☐ _____, a fellow peace officer of the City of Dallas, Dallas
County, Texas, who personally participated in the investigation of this alleged offense,
providing this information to Affiant, and whose information Affiant believes to be credible.

On September 21, 2009, between the hours of 5:30 p.m. and 8:00 p.m. suspect Gary Green, B/M/03-14-1971, committed the offense of Capital Murder, 19.03, a Capital Felony, against complainant's Lovetta Armstead, B/F/32, and Jazzmen Montgomery, B/F/6, by inflicting homicidal violence upon them causing their deaths. The offense occurred at 3844 Morning Springs Trail, Dallas, Dallas County, Texas.

At about 5:30 p.m. complainant Armstead dropped her two son's ages 12 and 9 off at church for the evening. At about 8:00 p.m. suspect Green returned to the church to pick the children up alone and returned home. Shortly afterwards suspect Green grabbed the 9 year old and in front of the 12 year old stabbed the child once in the torso. Suspect Green then forced the two children to a rear bedroom where she showed them the deceased bodies of their mother and 6 year old sister, and admitted to causing their deaths. Suspect Green told the children he would allow them to live and then fled the offense location in complainant Armstead's vehicle. The two boys called 9-1-1 and ran to a neighbor's house for help. When Dallas Police Officers arrived they discovered complainant's Armstead and Montgomery deceased. The two young boys were transported to Children's Hospital for treatment.

On September 22, 2009, at 2:15 a.m. suspect Green arrived at the Southeast Patrol Division and turned himself in. A short time later officers recovered complainant Armstead's vehicle near the intersection of Buckner Boulevard and Prairie Creek Road. Detective Quirk interrogated suspect Green in the homicide unit, and Detective Quirk obtained a videotaped voluntary statement in which Green admits to this Capital Murder.

__#5809__
_____
AFFIANT

WHEREFORE, Affiant requests that an arrest warrant be issued for the above accused individual in accordance with the law.

SUBSCRIBED AND SWORN TO BEFORE ME on the _____

__22__ day of __Sep__, 20 __09__   MAGISTRATE, IN AND FOR DALLAS COUNTY, TEXAS

**MAGISTRATE'S DETERMINATION OF PROBABLE CAUSE**

On this the __22__ day of __Sep__, 20 __09__
I hereby acknowledge that I have examined the foregoing
affidavit and have determined that probable cause exists
for the issuance of an arrest warrant for the individual
accused therein.

_____
MAGISTRATE, IN AND FOR DALLAS COUNTY, TEXAS

S/N 2761-01-207
POL-015298

Case 3:15-cv-02197-M-BH Document 24-2 Filed 08/01/16 Page 50 of 238 PageID 3515

TRIAL DOCKET - CRIMINAL DISTRICT COURT - DALLAS COUNTY, TEXAS

NO. F09-59380-YS

BAIL STATUS: JAIL

| STATE OF TEXAS | | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN | ATTORNEYS | CAP MUR MULTI/HAB | Oct 30, 2009 |

9

| DATE OF ORDER | ORDER OF COURT |
|---|---|
| 11/8/09 | Arrest |
| 11/20/09 | |
| 11/12/09 | 12/11/09 |
| 1/28/10 | 1/08/10 |
| 1/28/10 | 3/11/10 |
| 2/11/10 | Adm. ye: M decision to seek death penalty |
| 2/11/10 | Juma 3/11/10 |
| 4/15/10 | Ironing 7/16/10 Pretrial |
| 4/15/10 | Special 11/8/10 7-13-10 |
| 1/15/10 | Motion/docket 8-23-10 |
| 1/15/10 | 10-19-10 |
| 1/23/10 | Voir dire & Attorney Smith (J#1) is Patricia Kilaabu agreed, 88 Chandler A#1 |
| | 88 Norman agreed, 112 Granville agreed |
| 8/24/10 | 137 Whitelow A#2, #4 Chandler agreed, 145 Peterman agreed, |
| | 208 Yucub #3 killed, 807 Henneberger (J#4) 163 Mills agreed, 188 Pitman agreed, |
| 8/25/10 | 13' Hazell Chester killed, 737 Peterson Chandler A, 355 Roma recused -320 Hab. 165 |
| | 396 Diaz A |
| 8/30/10 | 398 Diaz agreed, 384 Cardenas excused, 391 Martinez (J#5) 457 Chisholm S#1 |
| | 188 Hernandez excused |

TRIAL DOCKET -- CRIMINAL DISTRICT COURT -- DALLAS COUNTY, TEXAS

No. F07-59320-45

10

BAIL STATUS:

STATE OF TEXAS
v
GARY GREEN

| DATE OF ORDER | STATE OF TEXAS | ATTORNEYS | ORDERS OF COURT | OFFENSE | DATE OF FILING |
|---|---|---|---|---|---|
| 8/30/10 | | | Voir dire 438 WITH 5 WINNER agreed, 575 Deneil Huth; Keeberg Fave, 542 Jeffrey | | |
| 8/31/10 | | | Duncan agreed, 607 Benjamin Butch Carlone, 595 Antony Johnson agreed | | |
| | | | 666 Kevin Kolb agreed, 717 Judith Foly Peterson agreed, 830 Norma Kelley agreed | | |
| 9/1/10 | | | 920 Shawn Mitchell agreed, 704 Marcella Upshaw Owens not set | | |
| | | | 943 Elizabeth Horn agreed, 836 Mavis Jean Fullton agreed, 948 John Louis | | |
| | | | D'Elluzo S #2, 942 John Mouw agreed, 958 Adolphus Alexander | | |
| | | | agreed | | |
| 9/3/10 | | | 1055 Faby Ruiz Cancel, 1021 Elizabeth Lopez Δ#5, 1035 Lucille | | |
| | | | Reddic agreed, 1074 Jonathan Freeman claimed exception, 1018 Bobby Ray | | |
| | | | civilians agreed | | |
| | | | (955) Kari Kiddings - Excused by Agmt, 1045 Edie Marie Alvarado - Excused by Agmt | | |
| 9/7/10 | | | (655) Tom Andra Wilcox - Excused by Agmt, (1035) Paul Alvarez - Excused by Agmt | | |
| | | | (100) Cathy Cheung - Dible, (548) Jeffrey R. Viskozski - S#3, (127) Martha Naugle - Excused | | |
| 9/3/10 | | | (1088) Stephanie Scott - Excused, (1045) Quenelino Kinnons - Excused | | |

TRIAL DOCKET -- CRIMINAL DISTRICT COURT -- DALLAS COUNTY, TEXAS

No. F04-59380-YS

| BAIL STATUS: | DATE OF ORDER | STATE OF TEXAS | ATTORNEYS | OFFENSE | ORDERS OF COURT | DATE OF FILING |
|---|---|---|---|---|---|---|
| | | GARY GREEN | | CAP. MURDER - MULT/HAB | | |
| | 9/9/10 | | | | (330) Ruth Stuhlfeld - Challenged, (231) ANETA Johnson - △ #3 *(332) Stephen Read | |
| | 9/9/10 | | | | (417) Samuel Stephanie Lopez - EXCUSED | |
| | 9/10/10 | | | | (303) James Berg - Richard Bost, district attorney - EXcused, (450) Robert Bruce - J#6 | |
| | 9/13/10 | | | | (303) HARRY MAY - S#4 | |
| | | | | | 421 CURTIS GOODEN - CHWE 9, 496 Stephanie CARROTH - S#5, 16 Linda Johnson agreed | |
| | | | | | 70 Jerry Lee DeLeZen CHWE - 92 William Ray Gustavson agreed | |
| | 9/14/10 | | | | 169 TIMOTHY LYNNE REITER CHWE - 244 Steven Mitch FREITZEL agreed | |
| | | | | | 233 Mary Ellen GREAVES CHWE - 495 DARIA BREZE agreed, 1201 STEVEN | |
| | | | | | CHWE TIEANOR agreed | |
| | 9/15/10 | | | | Verginia Swann, Auttenuated questionnaire AlexCourt - 277 Megan Johnson Crews | |
| | | | | | 204 James Keith BAKER DX 8 | |
| | 9/16/10 | | | | 379 John Edward GHWEN CHWE 9, 652 - MARTHA Grigaut CHWE | |
| | | | | | 811 Rolly John Jakial agreed, 653 - Joselyn Diane Skreel S#5, 404 | |
| | | | | | John POZADZIDES J#6 | |

**TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS**

No. _____

| DATE OF ORDER | BAIL STATUS: STATE OF TEXAS | ATTORNEYS | OFFENSE | ORDERS OF COURT | DATE OF FILING |
|---|---|---|---|---|---|
| | | | | | |

12

TRIAL DOCKET -- CRIMINAL DISTRICT COURT -- DALLAS COUNTY, TEXAS

| STATE OF TEXAS | ATTORNEYS | OFFENSE | No. |
|---|---|---|---|
| VS. | Paul Johnson | CAPITAL MURDER | F0903553(M) |
| GARY GREEN | Coby WARREN | | Andy BEACH |
| | Brady Wyatt | | Josh Healey |
| | | | Jennifer Bennett |
| | | | Heath Harris |

**DATE OF ORDER / ORDERS OF COURT**

**9/30/10** — #224 — Maud Taylor — Excused #1055, #KAREN Thompson — EXCUSED, #1363 — Jackie Brewer — (S#10), #150 Henry Kirby — EXCUSED; #1197 Cynthia Miller — (S#11) #1186 — LINDA Brotkin — EXCUSED

**10/1/10** — #1341 — Jennette Sevens — Excused, #1377 — Rhonda Drake — EXcused, #1369 Henry Zhao — EXCUSED #1393 Henry King (S#12)

**10/4/10** — #391 — Ruby Jenula — EXCUSED; #347 — Christopher — EXCUSED, #1163 Hermer Hanes — EXCUSED #20A — Margaret Hale — (S#13), #39A — Ann Branch — EXCUSED, #39A — Jason McCann — EXCUSED, Porter Mason #683 — EXcused, #650 Donney Kennedy — EXcused (No Show)

**10/5/10** — #1B — Clint Spencer — EXcused, Orena Horn Dew — EXCUSED, Janie's Peebles — #170 — Danielle Smith — EXcused, David Follett #7A — EXcused #11B — ODELL Snyder — EXCUSED, Charlotte GARRETT — 9A — EXCUSED, Thomas Fowler — #1313 — EXcused #1432 — Sharri Price — EXCUSED; #1959 Dennis Thompson — EXcused

13

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

BAIL STATUS: JAIL

GARY GREEN

STATE OF TEXAS

| DATE OF ORDER | ATTORNEY | ORDER OF COURT | OFFENSE | DATE OF FILING |
|---|---|---|---|---|
| | | | CAP MUR MULT | 10/02/09 |

14

9/6/10  #1451 Kevin Conahan – Excused; #7B – Edward Morrow – Excus
#52A – Woodrow McClurg – #511; #518 – Micky Carr – Excused
#53A – Mike Emery – #11

9/7/10  #17A – Debra Hensley – Excused; #13A – Marina Trevino – #14
#14A – Debra Jones – Excused; Renee Spino #480 – Excused
#25A – Charles Williamson – Excused; #43B Robert Johns – Excused

9/11/10  #2C – Sonya Cole MM – Excused; #10C Ronald Hildenbarger Gr
#1A – Lisa Hogan – Excused; #1A Andrew Heard – Excused; 15C John
Cassandra (Excused; #3 IA James No #4A – Excused; 67B Shane
Jed Son – Excused; #31A – Lisa Khone – Excused; #31 – Lance
Burgess – Excused; #57B – David Grant – Excused; #24 –
Irma Ramirez – Bilingual Uder ( their bar)

10/12/10  #35C – Shanna Garcia – Excused; #26C – Andrew Welser – Excused
#50A – Elias Quintero – Excused; #12C – Billy Lair – Excused
#61A – Debra Story – #123 Marjorie Jerden #9D – Excused
#12D – David Camper – Excused; #13B – Dian Smith –
Excused; #17D Linda Banks – Excused; #17B – Russell Oesch –
AED Steve Sparks – #8D Excused; #9A – Nikki Janis – Excused

10/13/10  #54D – Nicole Phillips – Excused; #54C – Ruben Romero – Excused; #57D –
Randall Bell – Excused; #62B – Keith Holton – Excused; #1B –
Kathryn Fairleigh – Excused; #32D – Kara Bradburn – Excused
#41B – [illegible] Mary Rodriguez – Excused; #25B – Nikesha [illegible]
Excused; #37D – Melinda Hitchner – Excused; #3D – David Belknap
Excused; #60B – Wendell Vardine – Excused; [illegible]; #35B-Excused;
#5B – Mark L Travis – Excused; Edith R – Robert [illegible]; #5EB Don Holt [illegible]

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

BAIL STATUS: JAIL

GARY GREEN

| DATE OF ORDER | STATE OF TEXAS | ATTORNEY | ORDER OF COURT | OFFENSE | DATE OF FILING |
|---|---|---|---|---|---|
| | | | | | 10/02/09 |
| | | | CAP MUR MULT | | |

15

10/14/10  # 62.5 - Thomas Whitman - EXCUSED. # 44c - Deborah Hilen -
EXCUSED; # 38C - Karen Halsell - EXCUSED; #7D Vickie Fei T.F.-
EXCUSED; # 16C - Susan Trumbo - EXCUSED; # 14th Nita Morris -
EXCUSED, # 8C - Shola Shropshire (Alt #1). # 48C Lynn Willeas -
EXCUSED. # 1D- Patricia Diehl (ALT #2)

10/19/10  Sworn in as witnesses:
LaTonya Bradfield, Shirley Coleman, Roberta Lacy, Kay Montgomery,
Shulonda Ransom, Gabrielle Scott, Lateya Smith, My Sasidis Chater,

10/25/10  Sworn in as witnesses -
Allison # 9345, Castro # 8867, Chambers # 6632, Collins # 6293, Cindeat # 7197,
Ingram # 7002, Jones # 8486, Kirchdoerk # 9287, Lewis-Kack # 7126, Montle # 5804,
Reynolds # 8245, Osunin # T024, Roering # 9355, Samels # 7152, Smith # 6005, Trenley # 9525,
Quintanilla # 8321, Vick # 7702, Williams # 9110, Demazieus Armstead, Ebony Hendris,
Andrea # 8721, Natikai Bailey, Lisita Hendris

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

BAIL STATUS: JAIL

| DATE OF ORDER | STATE OF TEXAS | ATTORNEY | ORDER OF COURT | OFFENSE | DATE OF FILING |
|---|---|---|---|---|---|
| | GARY GREEN | | | CAPITAL MURDER | 10/02/09 |
| 2/5/10 | Pre-Trial Mo Set aside Denied after hrg | | | | |

16

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

**BAIL STATUS:** JAIL

STATE OF TEXAS

GARY GREEN

| DATE OF ORDER | ATTORNEY | ORDER OF COURT | OFFENSE | DATE OF FILING |
|---|---|---|---|---|
| | | | CAP MUR MULT | 10/02/09 |

17

Handwritten entries:

10/28/10 — Tr'd Δ Test & Close 𝒯 - 9:55 - 10:06
Δ - 10:06 - 10:09
𝒯 - 10:09 - 10:20

Jury Verdict ⇒ Guilty as Charged ⇒ 10:37

11/5/10 — Punished Tr & Δ Test & Close. 𝒯 - 10:30 - 11:02
Δ - 11:03 - 11:26
𝒯 - 11:38 - 3:14
12:15 - 12:44

All Jurors don Oy'd to discuss case amongst themselves Ktdn

Verdict ⇒ Death Penalty
Yes on Sp Iss One
No on Sp Iss. Two

*BND: 040752066*
*W.T. 87903*

WRIT

CAUSE NO. F-0959380-YS

THE STATE OF TEXAS
    VS.
GARY GREEN

282ND JUDICIAL DISTRICT COURT
OF DALLAS COUNTY, TEXAS

OFFENSE: CAP MUR MULT

TO THE SHERIFF OF DALLAS COUNTY, TEXAS-GREETINGS:

YOU ARE HEREBY COMMANDED TO IMMEDIATELY SERVE  GARY GREEN

THE DEFENDANT IN THE ABOVE TITLED CAUSE,

WITH ACCOMPANYING CERTIFIED COPY OF THE ORIGINAL INDICTMENT IN SAID CAUSE.

    WITNESS MY OFFICIAL SEAL AND SIGNATURE AT MY OFFICE IN THE CITY OF DALLAS,

THIS THE  30TH DAY OF    OCTOBER  A.D. 2009.

GARY FITZSIMMONS
CLERK OF THE DISTRICT COURTS
DALLAS COUNTY, TEXAS

BY _____  DEPUTY
M BROADWAY

---

OFFICER'S RETURN

CAME TO HAND ON THIS THE  4th  DAY OF  November  A.D. 20 09

AND EXECUTED ON THIS THE  4th  DAY OF  November  A.D. 20 09

BY DELIVERING TO THE DEFENDANT IN PERSON

THE CERTIFIED COPY OF THE INDICTMENT ATTACHED HERETO.

    RETURNED ON THIS THE  4th DAY OF  November  A.D. 20 09  .

BY _____  DEPUTY          SHERIFF,  DALLAS COUNTY,TEXAS

18

CAUSE NUMBER: F09-59380

| | | |
|---|---|---|
| THE STATE OF TEX | § | IN THE 282ⁿᵈ JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## NOTICE OF FILING DISCOVERY

Now comes the State of Texas and files this Notice of Discovery documenting that the State has produced the following items to the attorney for Defendant:

1. All discovery available to the State as of February 15, 2010 labeled as Exhibit A;

2. Jail calls DVD labeled Exhibit B;

3. Defendant's confession labeled Exhibit C;

4. Forensic Interview of Jerome Armstead labeled as Exhibit D;

5. Forensic Interview of Jerrett Armstead labeled as Exhibit E;

6. 911 call labeled as Exhibit F;

7. Nysano Carter Statement labeled as Exhibit G;

8. NBC Footage labeled as Exhibit H; and

9. WFAA Footage labeled as Exhibit I.

10. TDCJ Pen PACK = Exhibit J.

Respectfully submitted,

Andy Beach
Assistant District Attorney
Dallas County, Texas
Bar Card Number: 01944900

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A TRUE AND CORRECT COPY OF THE
FOREGOING Motion has been [ ] hand delivered, [ ] mailed, [ ] faxed, to the Attorney for the
Defendant on this the 3rd day of _____Feb_____, 2010.

_____
Andy Beach
Assistant District Attorney

20



To Remain Sealed for Future Appellate purposes. So ORDERED.

JUDGE 282ND DISTRICT COURT

Gary Green
Sealed Discovery
tendered to defense
on 2-23-10.

21

FILED

CAUSE NUMBER: F09-59380

| | | |
|---|---|---|
| THE STATE OF TEX | § | IN THE 282nd 2011 APR 15 PM 4: 14 JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | DISTRICT CLERK |
| | § | DALLAS CO. TEXAS |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |
| | | DEPUTY |

## PRETRIAL SCHEDULING ORDER

1.   This case is set for pretrial hearing on July 16, 2010;

2.   The special venire panel will be summoned to appear on July 23, 2010;

3.   Individual jury selection shall begin on August 23, 2010; and

4.   This case is set for jury trial on October 19, 2010.

Judge Presiding

22

Cause No. F-0959380-S

THE STATE OF TEXAS

VS.

Gary Green

IN THE 282ND JUDICIAL
DISTRICT COURT OF
DALLAS COUNTY, TEXAS

## WRIT FOR SPECIAL VENIRE

It appearing to the Court that a motion for Special Venire was filed in the above-numbered and styled cause, and;

It further appearing to the Court that this cause is a capital case;

**IT IS THEREFORE THE ORDER** of this Court that a writ for special venire be and hereby is granted;

**IT IS FURTHER ORDERED AND COMMANDED** that that Sheriff of Dallas County, Texas, summon by mail 1500 persons to appear in the Central Jury Room, Dallas County, Texas, at the Frank Crowley Courts Building, 133 North Industrial Blvd., Dallas, Texas, at 8:30a.m. on July 23, 2010, for jury duty in the above-numbered and styled cause.

SIGNED this the 21 day of April, 2010.

ANDY CHATHAM , JUDGE
282nd JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

23

Cause No. F-0959380-S

| | |
|---|---|
| THE STATE OF TEXAS | IN THE 282ND JUDICIAL DISTRICT COURT OF |
| VS. | DALLAS COUNTY, TEXAS |
| Gary Green | |

## WRIT FOR SPECIAL VENIRE

It appearing to the Court that a motion for Special Venire was filed in the above-numbered and styled cause, and;

It further appearing to the Court that this cause is a capital case;

**IT IS THEREFORE THE ORDER** of this Court that a writ for special venire be and hereby is granted;

**IT IS FURTHER ORDERED AND COMMANDED** that that Sheriff of Dallas County, Texas, summon by mail 1500 persons to appear in the Central Jury Room, Dallas County, Texas, at the Frank Crowley Courts Building, 133 North Industrial Blvd., Dallas, Texas, at 1:00 pm. on July 23, 2010, for jury duty in the above-numbered and styled cause.

SIGNED this the 21 day of April, 2010.

ANDY CHATHAM , JUDGE
282nd JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

24

FILED

*CAUSE NO., F0959380*

2010 MAY -7  AM 10: 34

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

*THE STATE OF TEXAS*                    *IN THE 282nd JUDICIAL*

*VS*                                    *DISTRICT COURT OF*

*GARY GREEN*                            *DALLAS, COUNTY, TX*

## DEFENDANT'S EX PARTE MOTION FOR EXPERT ASSISTANCE IN INDIGENT CASE, SEALED

*NOTICE TO CLERK OF COURT:* This application is to be considered EX PARTE and is filed for purposes of the record. This application is required to be SEALED, by law, and disclosure can be made ONLY to the TRIAL COURT and COUNSEL FOR THE DEFENDANT.

## DISCLOSURE TO THE PUBLIC OR THE STATE IS PROHIBITED

## MOTION FOR APPOINTMENT OF PSYCHOLOGIST

*TO THE HONORABLE JUDGE OF SAID COURT;*

*NOW COMES, Gary Green, by and through his attorney of record, in the above styled and numbered cause and respectfully moves the court to appoint a Neuropsychologist to assist i the preparation of his defense, and in support thereof would show the court as follows:*

I.

*The Defendant herein is charged with the offense of capital Murder. The State of Texas has declared an intent to seek the penalty of Death in the event of a conviction.*

25

## II.

The defendant is indigent a d without funds to arrange for the retaining of a mental health expert.

## III.

Defendant has the right to the effective assistance of counsel. This includes and extends to counsel's obligation to make an adequate investigation and preparation of all matters that might be or might become relevant to all pertinent issues in defendant's case. A Neuropsychologist is essential to the examination and evaluation of all data relevant to the mental status of the defendant, the defendant's character and background, and any issues which might be relevant to possible mitigation of the defendant's punishment, if any.

## IV.

Counsel for defendant is unable to provide effective assistance without the assistance of said expert.

## V.

Counsel for the Defendant would request that this Motion and Order be considered EX PARTE and remained SEALED until after this case has been concluded. Defendant has a right to protect work product, attorney-client communications and the names of expert witnesses not expected to be called for trial. Defendant expects that the Neuropsychologist so retained may be obliged by

26

contract to respect the attorney-client privilege as an agent of the attorney and may not be compelled to testify.

## VI.

If the Defendant is not provided with expert assistance, he will be deprived of due process, due course, and equal protection of the laws, the effective assistance of counsel, his right to confront witnesses against him, his right to a fair and impartial trial, his right to present evidence favorable to his case, and his right to explain or deny evidence presented against him in the punishment phase, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution `and Article I, Section 10,13, and 19 of the Texas Constitution.

## VII.

Anticipated expenses of such an expert will cover costs associated with trips to the County Jail for purposes of interviewing and conducting testing of the defendant, scoring of such tests, written analysis and conclusions. Record review, collateral interviews and attorney consultation will also be necessary and approximately $3,500.00 in expert fees and expenses is anticipated for this endeavor.

## **_PRAYER_**

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays that this honorable Court appoint Dr. Gilbert Martinez, PhD. to assist in the preparation of his defense and to conduct the necessary examinations of evidence

27

*in this case, and that the Court will authorize and order the County Auditor to pay*

*said costs of such services.*

*Respectfully submitted,*

*Paul J. Johnson*
*Attorney for Defendant*
*SBN 10778230*
*1825 Market Center Blvd., #320*
*Dallas, TX 75207*
*(214) 761-0707*

28

FILED

CAUSE NO.: F09-59380-S

2010 MAY -7 AM 10: 34

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS

_____ DEPUTY

THE STATE OF TEXAS                    IN THE 282nd JUDICIAL

VS                                     DISTRICT COURT OF

GARY GREEN                             DALLAS COUNTY, TEXAS

## ORDER ON EX PARTE MOTION FOR EXPERT ASSISTANCE IN INDIGENT CASE, SEALED

On this the **7** day of **May**, 2010, came to be heard the above and foregoing Motion. After consideration of the same, it is the order of the Court that said motion is ~~hereby~~:

**GRANTED**                              **DENIED**

~~IF GRANTED~~, it is ORDERED that the defense be authorized to hire Dr. Gilbert Martinez, as an expert, and that the County Auditor is ORDERED to pay up to $3,500.00 in fees and expenses.

IT IS FURTHER ORDERED that this motion shall be sealed and not subject to inspection by the public or the State of Texas until the conclusion of the trial in this matter.

_____
JUDGE

29

**THE STATE OF TEXAS**
**FIRST ADMINISTRATIVE JUDICIAL REGION**
**ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE**

Pursuant to Article 74.056, Texas Government Code, I hearby assign the:

Honorable James R. Fry ,

Senior Judge of The 15th District Court

To The 282nd District Court of Dallas County, Texas.

This assignment is for the period of 1 days beginning 8/23/2010, providing that the assignment shall continue after the specified period of time as may be necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period, or the undersigned presiding judge has terminated this assignment in writing, whichever occurs first.

CONDITION(S) OF ASSIGNMENT [IF ANY]:

To hear Cause Nos. F-0959380-S and F-0960870-S:  The State of Texas vs. Gary Green.

The Clerk is directed to post a copy of this assignment on the notice board so that attorneys and parties may be advised of this assignment, in accordance with the law.

ORDERED this __26__ day of _____July_____, 20_10_

John Ovard, Presiding Judge
First Administrative Judicial Region

ATTEST:

Administrative Assistant

Assign#        21388

30

**THE STATE OF TEXAS**
**FIRST ADMINISTRATIVE JUDICIAL REGION**
**ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE**

Pursuant to Article 74.056, Texas Government Code, I hearby assign the:

Honorable James R. Fry ,

Senior Judge of The 15th District Court
To The 282nd District Court of Dallas County, Texas.

This assignment is for the period of 5 days beginning 8/2/2010, providing that the assignment shall continue after the specified period of time as may be necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period, or the undersigned presiding judge has terminated this assignment in writing, whichever occurs first.

CONDITION(S) OF ASSIGNMENT [IF ANY]:

The Clerk is directed to post a copy of this assignment on the notice board so that attorneys and parties may be advised of this assignment, in accordance with the law.

ORDERED this __26__ day of _____July_____, 20_10_

_____
John Ovard, Presiding Judge
First Administrative Judicial Region

ATTEST:

_____
Administrative Assistant

Assign#          21390

31

**THE STATE OF TEXAS**
**FIRST ADMINISTRATIVE JUDICIAL REGION**
**ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE**

Pursuant to Article 74.056, Texas Government Code, I hearby assign the:

Honorable Webb Biard ,

Senior Judge of The 6th District Court
To The 282nd District Court of Dallas County, Texas.

This assignment is for the period of 1 days beginning 8/23/2010, providing that the assignment shall continue after the specified period of time as may be necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period, or the undersigned presiding judge has terminated this assignment in writing, whichever occurs first.

CONDITION(S) OF ASSIGNMENT [IF ANY]:

To hear Cause Nos. F-0959380-S and F-0960870S:  The State of Texas vs. Gary Green.

The Clerk is directed to post a copy of this assignment on the notice board so that attorneys and parties may be advised of this assignment, in accordance with the law.

ORDERED this _26_ day of _____*July*_____, 20_10_

John Ovard, Presiding Judge
First Administrative Judicial Region

ATTEST:

Administrative Assistant

Assign#        21387

32

**THE STATE OF TEXAS**
**FIRST ADMINISTRATIVE JUDICIAL REGION**
**ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE**

Pursuant to Article 74.056, Texas Government Code, I hearby assign the:

Honorable Quay Parker ,

Senior Judge of The 259th District Court
To The 282nd District Court of Dallas County, Texas.

This assignment is for the period of 1 days beginning 8/23/2010, providing that the assignment shall continue after the specified period of time as may be necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period, or the undersigned presiding judge has terminated this assignment in writing, whichever occurs first.

CONDITION(S) OF ASSIGNMENT [IF ANY]:

To hear Cause Nos. F-0959380-S and F-0960870-S:  The State of Texas vs. Gary Green.

The Clerk is directed to post a copy of this assignment on the notice board so that attorneys and parties may be advised of this assignment, in accordance with the law.

ORDERED this __26__ day of _____*July*_____, 20_10_

_____
John Ovard, Presiding Judge
First Administrative Judicial Region

ATTEST:

_____
Administrative Assistant

Assign#        21389

33

FILED

CAUSE NUMBER: F09-59380

2010 AUG -3 AM 11: 06

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

_____DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF DALLAS CO., TEXAS |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION TO AMEND INDICTMENT

To The Honorable Judge Of Said Court:

COMES NOW the State of Texas before the Court, by and through her Assistant District Attorney, and moves the Court to amend the Indictment in this cause, pursuant to Tex. Code Crim. Proc. Ann. Art. 28.10. The State asks the Court to allow the amending of the Indictment in the above-styled and numbered cause to read as follows:

In paragraph one of the indictment, the word(s) asphyxia by drowning should be deleted; and the word(s) asphyxiating Jazzmen Montgomery should be substituted, so as to make the indictment, in pertinent part, read as follows:

Unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA ARMSTEAD, BY STABBING LOVETTA ARMSTEAD WITH A KNIFE, A DEADLY WEAPON, and during the same criminal transaction said Defendant did then and there intentionally and knowingly cause the death of another individual, to-wit: Jazzmen Montgomery, by ASPHYXIATING Jazzmen Montgomery.

The State would show that said amendment does not charge the Defendant with an additional or different offense, nor does it prejudice the substantial rights of the Defendant.

WHEREFORE, the State Prays that the Court grant this motion and amend the indictment as requested herein.

Respectfully submitted,

Andy Beach
Assistant District Attorney
Dallas County, Texas
Bar Card Number: 01944900

34

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this Motion to Amend the Indictment was [✓] hand delivered, [ ] mailed, and/or [ ] faxed to the Attorney for the Defendant on this the _____ day of _____August_____, 2010.

Andy Beach
Assistant District Attorney

35

## ORDER TO AMEND INDICTMENT

On this the ____3____ day of August, 2010, came on to be heard the above Motion, and the Motion is hereby GRANTED.

The Court further finds that the said Amendment does not charge the Defendant with an additional or different offense, nor does it prejudice the rights of the Defendant.

_____
Judge Presiding

36

LM

DEFENDANT  Green, Gary                    B  M  03141971  CHARGE CAP MUR MULT/3RD

AKA:

ADDRESS    3844 Morning Springs Trail, Dallas, Tx          LOCATION DSO

FILING AGENCY TXDPD0000  DATE FILED October 30, 2009          COURT       JDC282

COMPLAINANT Armstead, Lovetta                    F-0959380      VT#:

C/C

---

### TRUE BILL INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of

Dallas County, State of Texas, duly organized at the ___October___ Term, A.D., ___2009___ of the

_____ Criminal District Court 7 _____ , Dallas County, in said Court at said

Term, do present that one                    **GREEN, GARY**                    , Defendant,

On or about the ___22nd___ day of September A.D., 2009  in the County of Dallas and said State, did

unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA ARMSTEAD, by BY STABBING LOVETTA ARMSTEAD WITH A KNIFE, A DEADLY WEAPON, and during the same criminal transaction said defendant did then and there intentionally and knowingly cause the death of another individual, to-wit: JAZZMEN MONTGOMERY, by ~~ASPHYXIA BY DROWNING~~ Asphyxiating Jazzmen Montgomery, 8/3/10 Ag₂₄

        And it is further presented to said Court that prior to the commission of the offense or offenses set out above, the defendant was finally convicted of the felony offense of AGGRAVATED ROBBERY WITH A DEADLY WEAPON, in the 292ND JUDICIAL DISTRICT COURT of DALLAS County, Texas, in Cause Number F-9031096, on the 4TH day of JUNE, 1990,

        And that prior to the commission of the offense or offenses for which the defendant was convicted as set out above, the defendant was finally convicted of the felony offense of AGGRAVATED ASSAULT WITH A DEADLY WEAPON, in the 194TH JUDICIAL DISTRICT COURT of DALLAS County, Texas, in Cause Number F-8989526, on the 7TH day of SEPTEMBER, 1989,

against the peace and dignity of the State.

CRAIG WATKINS                                    _Gayle C. Cowart_

Criminal District Attorney of Dallas County, Texas          Foreman of the Grand Jury.

TDC/COURT

37

F09-59380

FILED

2010 AUG -3  AM 11: 0

DISTRICT CLERK
DALLAS CO., TEXAS
——DEPUTY

Green's  Discovery  Supplement
6-8-10

C T COPY

38



39

GARY Green

FO9-59380

Discovery Supplement
(Complete Autopsy File)

CT COPY

FILED

2010 AUG -3 AM 11:07

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS

_____ DEPUTY

40



6-17-10

41

### CAUSE NO. F09-59380

| | |
|---|---|
| *THE STATE OF TEXAS* | *IN THE 282ND JUDICIAL* |
| *VS.* | *DISTRICT COURT OF* |
| *GARY GREEN* | *DALLAS COUNTY, TEXAS* |

### ORDER FOR DIFFUSION TENSOR IMAGING (DTI) OR MAGNETIC RESONANCE IMAGING (MRI) TO BE CONDUCTED ON DEFENDANT

*On this the __12__ day of __August__, 2010, the Court hereby orders that*

*the Dallas County Sheriffs Department transfer inmate Gary Green, BNO 09073266, to*

*Parkland Hospital for the purpose of conducting DTI or MRI imaging on said inmate.*

*This procedure is necessary to evaluate possible neurological issues that may impact*

*said inmates cognitive, affective, and behavioral dysfunction.*

*IT IS HEREBY ORDERED that all results, reports or data obtained as a result*

*of said testing be provided to attorney Paul J. Johnson, 1825 Market Center Blvd, Suite*

*320, Dallas, Tx, 75207.*

*JUDGE*

42

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

FILED
2010 SEP -1 PM 1:26

## MOTION TO PRESERVE RIGHT TO FILE OTHER MOTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Gary Green,  Defendant in the above-cause, by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and  files this Motion to Preserve Right to File Other Motions, and for good and sufficient cause would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty.

3. Defense counsel is not always able to present every pertinent motion at the initial pre- trial motion hearing in that, even with due diligence, they may not learn of the relevance of a particular motion until after said hearing, e.g., Motion to Quash because of defective indictment based on recent Court of Criminal Appeals of federal court ruling, or a Motion to Suppress based on evidence that is produced as a result of a Pre-Trial Motion hearing.

43

WHEREFORE, PREMISES CONSIDERED, Defendant prays that relief be granted as prayed for herein.

Paul Johnson
1825 Market Center Blvd 320
Dallas , Texas
(214) 741 0707
State Bar No. 10728170
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the ____ day of September, 2010.

Paul Johnson

44

CAUSE NO. F09-59380

| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

ORDER

On this ____ day of _____, 20___ came on to be heard the Defendant's Motion to file additional motions, and after due consideration, the Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____✗_____ GRANTED

_____ DENIED, to which ruling
Defendant timely excepts.


_____
JUDGE PRESIDING

7

45

CAUSE NUMBER: F09-59380

*FILED*

2010 SEP 27 PM 3: 27

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION TO AMEND INDICTMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas before the Court, by and through her Assistant District Attorney, and moves the Court to amend the Indictment in this cause, pursuant to Tex. Code Crim. Proc. Ann. Art. 28.10. The State asks the Court to allow the amending of the Indictment in the above-styled and numbered cause beginning with "on or about" and ending with "JAZZMEN MONTGOMERY" to read as follows:

on or about the 21st day of September A.D., 2009 in the County of Dallas and said State, did unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA ARMSTEAD, by stabbing LOVETTA ARMSTEAD with a knife, a deadly weapon and by asphyxiating LOVETTA ARMSTEAD and during the same criminal transaction said Defendant did then and there intentionally and knowingly cause the death of another individual, to-wit: JAZZMEN MONTGOMERY, by drowning and by asphyxiating JAZZMEN MONTGOMERY.

The State would show that said amendment does not charge the Defendant with an additional or different offense, nor does it prejudice the substantial rights of the Defendant.

WHEREFORE, the State Prays that the Court grant this motion and amend the indictment as requested herein.

Respectfully submitted,

Andy Beach
Assistant District Attorney
Dallas County, Texas
Bar Card Number: 01944900

46

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of this Motion to Amend the Indictment was [ ✓ ] hand delivered, [ ] mailed, and/or [ ] faxed to the Attorney for the Defendant on this the 27th day of _September_, 2010.

Andy Beach
Assistant District Attorney

47

## ORDER TO AMEND INDICTMENT

On this the _____ day of _____, 2010, came on to be heard the above Motion, and the Motion is hereby GRANTED.

The Court further finds that the said Amendment does not charge the Defendant with an additional or different offense, nor does it prejudice the rights of the Defendant.

_____

Judge Presiding

48

LM

DEFENDANT Green, Gary_____  B  M  03141971  CHARGE CAP MUR MULT/3RD

AKA:

ADDRESS   3844 Morning Springs Trail, Dallas, Tx____   LOCATION DSO

FILING AGENCY TXDPD0000   DATE FILED October 30, 2009_____   COURT ____JDC282____

COMPLAINANT Armstead, Lovetta_____   F-0959380____   VT#:

C/C   _____

TRUE BILL INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of

Dallas County, State of Texas, duly organized at the ____October____ Term, A.D., ___2009___ of the

_____Criminal District Court 7_____, Dallas County, in said Court at said

Term, do present that the                         GREEN, GARY                         , Defendant,

On or about the _____27th_ day of September A.D., 2009_ in the County of Dallas and said State, did

unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA
ARMSTEAD, by BY STABBING LOVETTA ARMSTEAD WITH A KNIFE, A DEADLY WEAPON,
and during the same criminal transaction said defendant did then and there intentionally and knowingly
cause the death of another individual, to-wit: JAZZMEN MONTGOMERY, by ASPHYXIA BY
DROWNING,   And it is further presented to said Court that prior to the commission of the offense or offenses set out
above, the defendant was finally convicted of the felony offense of AGGRAVATED ROBBERY WITH A
DEADLY WEAPON, in the 292ND JUDICIAL DISTRICT COURT of DALLAS County, Texas, in
Cause Number F-9031096, on the 4TH day of JUNE, 1990,

And that prior to the commission of the offense or offenses for which the defendant was convicted as
set out above, the defendant was finally convicted of the felony offense of AGGRAVATED ASSAULT
WITH A DEADLY WEAPON, in the 194TH JUDICIAL DISTRICT COURT of DALLAS County,
Texas, in Cause Number F-8989526, on the 7TH day of SEPTEMBER, 1989,

against the peace and dignity of the State.

CRAIG WATKINS
Criminal District Attorney of Dallas County, Texas

Foreman of the Grand Jury.

COURT

49

FILED
09 OCT 30 PM12: 33
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
_____DEPUTY

CAUSE NUMBER:  F09-59380

*FILED*
*2010 SEP 27  PM 3: 27*

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ⁿᵈ JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## STATE'S MOTION FOR PSYCHIATRIC EXAMINATION
## OF DEFENDANT FOR REBUTTAL TESTIMONY

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW The State of Texas, by and through the undersigned Assistant District Attorney, and requests an order requiring the defendant, Gary Green, to submit to a mental examination for use by the State in rebutting psychiatric or psychological testimony to be presented by Defendant, and would show the Court:

I.

The State is entitled to a psychiatric examination of the Defendant by its own expert for purposes of preparing rebuttal testimony.  Chamberlain v. State, 998 S.W.2d 230, 234 (Tex. Crim. App. 1999); Lagrone v. State, 942 S.W.2d 602, 611-12 (Tex. Crim. App. 1997).

II.

The State hereby requests this Court to require Defendant to submit to a mental examination by a State expert under the following conditions:

a)  The State shall notify the Defendant's counsel, in advance of the time and place of the examination.  Defendant's counsel may not be present during the examination.  The Defendant may recess the interview and consult with counsel.

b)  The mental health expert shall not relate by any manner or means his conversations, findings, conclusions, and opinions with any State prosecutors or agents.  The expert shall reduce his findings, conclusions, and opinions to writing and deliver the same to the Court for in-camera inspection.

c)  The Court, after examination of the expert's report, will decide whether to release the ultimate conclusions only.  If the Court determines the report to contain Brady material, it shall release the material to the attorneys.

d)  The State may have the expert present in court if the defense presents a mental health expert to testify.

50

e)      If the defense calls a mental health expert to testify, at that time, the State's expert's report shall be turned over to the State by the Court.

**WHEREFORE, PREMISES CONSIDERED,** the State requests that the Court order the Defendant to submit to an examination with a State expert at least **20 days before trial**, trial is currently set on October 25, 2010, and order the State's expert to submit his report to the Court **within seven days of the examination.**

Respectfully submitted,

Andy Beach
Assistant District Attorney
Dallas County, Texas
State Bar Number:  01944900

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of this motion was [  ] hand-delivered [  ] faxed to Paul Johnson, Kobby Warren or Brad Wyatt, Attorney for Defendant, on the 27th day of September, 2010.

Andy Beach
Assistant District Attorney
Dallas, Texas

51

CAUSE NUMBER: F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## ORDER

BE IT REMEMBERED that on this day, after proper and timely notice to the Defendant, by and through his attorney of record, came on to be heard and considered the STATE'S MOTION FOR PSYCHIATRIC EXAMINATION OF DEFENDANT FOR REBUTTAL TESTIMONY,

The Court having considered said Motion, it is hereby –

ORDERED that said STATE'S MOTION FOR PSYCHIATRIC EXAMINATION OF DEFENDANT FOR REBUTTAL TESTIMONY IS [ ] GRANTED [ ] DENIED.

[ ] With the following provisions:

SIGNED AND ENTERED on this the _____ day of _____, 2010.


JUDGE PRESIDING


52

**CAUSE NUMBER: F09-59380**

*FILED 2010 SEP 27 PM 3: 27*
*DISTRICT CLERK*
*DALLAS CO. TEXAS*
*DEPUTY*

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

<u>**NOTICE OF EXTRANEOUS OFFENSES**</u>

Pursuant to **TEX. CODE CRIM. PRO. ARTICLES. 37.07, AND 37.071 AND TEX. R. CRIM. EVID. 404(B),** I am hereby giving you notice that during presentation of State's case in chief, or during punishment, in the above-captioned and numbered criminal action, the following crimes, wrongs or acts, other than the act alleged in the indictment, may be introduced:

- In the spring of 1989, in Dallas County, Defendant forced Jennifer Alcorn Wheeler to have sexual intercourse without her consent.

- On or about July 28, 1989, Defendant was in possession of thirteen baggies of crack cocaine. Defendant pled guilty in cause number F89-91529 in Dallas County, Texas, and was sentenced to four years in prison.

- On or about August 6, 1989, in Dallas County, Texas, Defendant beat, choked, and stabbed Jennifer Alcorn Wheeler. Defendant pled guilty to this aggravated assault in cause number F89-89526 and was sentenced to four years in prison.

- On or about April 9, 1990, in Dallas County, Texas, Defendant robbed Joe Johnson at gunpoint at County Fair Foods. Defendant pled guilty to this Aggravated Robbery in cause number F90-31096 and was sentenced to twenty years in prison.

- Defendant admitted to one of his aunts that the robbery of Joe Johnson at County Fair Foods was not the only robbery he had committed.

- On or about February 24, 1991, Defendant exposed his penis to Officer Calhoun with the intent to gratify Defendant's sexual desire while he was incarcerated in prison.

- On or about March 6, 1991, Defendant failed to obey an order of Officer Parish while he was incarcerated in prison.

- On or about June 29, 1991, Defendant failed to obey an order of Sgt. Huston while incarcerated in prison.

53

- On or about July 17, 1991, Defendant failed to complete his work assignment while he was incarcerated in prison.

- On or about September 16, 1991, Defendant failed to obey an order of the medical staff while he was incarcerated in prison.

- On or about September 20, 1991, Defendant failed to obey an order of the medical staff while he was incarcerated in prison.

- On or about December 9, 1991, Defendant and inmate Roland Reed engaged in a fight without weapons while incarcerated in prison.

- On or about May 6, 1992, Defendant assaulted inmate James Bowen while he was incarcerated in prison.

- On or about June 3, 1992, Defendant refused to turn out for his work assignment while he was incarcerated in prison.

- As related to his parole caseworker in 1992, Defendant smoked marijuana on a regular basis from the age of 14. Defendant also sold crack cocaine. Defendant paid for his marijuana by being a lookout and bodyguard for drug dealers.

- On or about October 2, 1993, Defendant engaged in a fight with inmate Reginald Davis while he was incarcerated in prison.

- On or about January 10, 1994, at Tennessee Colony, Texas, Defendant assaulted prison guard Officer Ashford by throwing his food tray at the officer and kicking the officer while he was incarcerated in prison.

- On or about April 22, 1994, Defendant stored personal items in the ventilation hoods while incarcerated in prison.

- On or about August 3, 1994, Defendant assaulted prison guard Officer C. Baker by throwing a light bulb which struck the officer on his right leg while incarcerated in prison.

- From summer of 2001 through February 2002, in Dallas County, Defendant assaulted, beat and choked Suhlonda Ransom on multiple occasions.

- Between 2008 and September of 2009, Defendant physically assaulted Jerome and Jerrett Armstead by beating them with a belt on numerous occasions.

54

• On or about September 21, 2009, Defendant stabbed Jerrett Armstead in the stomach in Dallas County, Texas.

Respectfully submitted,

_____

Andy Beach
Assistant District Attorney
Dallas County, Texas
Bar Card Number: 01944900

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been [ ] hand-delivered, [ ] mailed, [ ] faxed, to the Attorney for the defendant of this the 21th day of September, 2010.

_____

Andy Beach
Assistant District Attorney

55

CAUSE NUMBER:  F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

**FILED**
2010 SEP 27 PM 3: 27
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
____DEPUTY

## STATE'S MOTION FOR DISCOVERY OF EXPERT WITNESSES

### TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes the District Attorney of Dallas County, Texas, in the above cause, and moves the Court to instruct the Defense to disclose to the State the name, address, and telephone numbers of each person the defense may use at the trial to present evidence under Rules 702, 703, and 705 of the Texas Rules of Evidence.

This procedure is authorized by Art. 39.14(b) Code of Criminal Procedure.

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Motion was delivered to opposing counsel on the 27th day of _____September_____, 2010.

ANDY BEACH

56

## ORDER

On the _____ day of _____, 2010, the said Motion came on to be heard, and same is hereby GRANTED / DENIED.

_____
Judge Presiding

57

CAUSE NUMBER: F0929380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## STATE'S DESIGNATION OF EXPERT WITNESSES

**Comes Now the State of Texas,** by undersigned counsel, and gives notice pursuant to 39.14(b) T.C.C.P. and in accordance with the Court's pretrial rulings and gives notice of intent to use expert testimony from the below-listed expert witnesses:

Dr. Randy Price
11882 Greenville Avenue, Suite 107
Dallas, TX 75243

Melodye Nelson
Lane Murray Unit
21916 N. Highway 36 Bypass
Gatesville, TX 76596

Further, the State will call SWIFS employees, the Defendant's treating physicians, and DCAC psychologists concerning their treatment of Jerome and Jerrett Armstead.

Respectfully submitted,

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

58

## CERTIFICATE OF SERVICE

I, Andy Beach, Assistant District Attorney, hereby certify that a true and correct copy of the foregoing Motion was [  ] faxed, [ ° ] hand delivered, [  ] mailed, to Paul Johnson, the attorney of record on this the 7th day of October, 2010.

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

59

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | 0 | IN THE DISTRICT COURT OF |
| | 0 | |
| vs. | 0 | DALLAS COUNTY, TEXAS |
| | 0 | |
| GARY GREEN | 0 | 282ND JUDICIAL DISTRICT |

## MOTION TO SET ASIDE THE
## INDICTMENT (UNCONSTITUTIONALITY OF STATUTE)

NOW COMES, the Defendant, Gary Green., by and through his attorney of record, and moves to set aside the indictment, and for good cause shows the following:

### I.

The Texas capital punishment scheme, which limits the jury to consideration of the special issues, does not permit the jury to consider and give effect to all the mitigating circumstances which exist concerning Defendant, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, §~10, 13 and 19 of the Texas Constitution. See, Penry v. Lynaugh, 109 S.Ct.2934(1989);Eddings v. Oklahoma, 455 U.S. 104 (1982); and Lockett v. Ohio, 438 U.S. 586 (1978)

### II.

The Texas capital punishment scheme unconstitutionally chills Defendant's ability to present relevant mitigating evidence to the jury, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I §~10, 13 and 19 of the Texas Constitution.

### III.

The unconstitutional chilling effect described in Paragraph II above denies Defendant the effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I §10 of the Texas Constitution.

### IV.

The Texas death penalty scheme gives prosecutors unfettered discretion in deciding whether to seek the death penalty in any particular case in violation of the Eighth and Fourteenth

1

60

Amendments to the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution.

## V.

Article 37.071 of the Texas Code of Criminal Procedure mandates that "jury should return a special verdict of 'yes' or 'no' on each issue submitted." It further requires the Court to instruct the jury that it may not answer "yes" unless it agrees unanimously, and that it may not answer "no" unless 10 or more jurors agree. The article mandates a life sentence if the jury is unable to agree on a special verdict. And the article provides that nobody inform jurors that a failure to agree on a special issue will result in a life sentence. These provisions considered together violate the Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution for the following reasons:

1.  Informing a juror that he *shall* answer the questions "yes" or "no" might reasonably cause this juror to shift his position to satisfy the requirements of the 12-0 rule.

2.  The statutory prohibition against informing jurors of the impact of his individual vote relieves him of psychological responsibility for the jury's collective decision to impose death as punishment.

3.  The statutory prohibition fails to provide the jury with accurate information concerning the sentencing process in Texas.

4.  The statutory 10 vote prerequisite to a "no" response establishes an artificial numerical threshold which bears no relationship to conditions required by Texas law for assessment of a life sentence. See r. Clary, Voting for Death:   Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure, 19 St.M.L.J. 353,374—75 (1987).

## VI.

Under the Texas law, a capital jury may not be informed that Defendant would have to serve at least 40 years in prison before becoming eligible for parole on a life sentence. Without such information, a jury will not have an accurate and proper understanding of the parole system in Texas. That is the jury will be required to predict the Defendant's future danger to society without knowing how long he will have to be incarcerated. Such an uninformed prediction promotes arbitrary, capricious and standardless sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution, and fails to promote the concept of individualized sentencing required by those constitutional provisions.

61

## VII.

The Texas capital punishment scheme is unconstitutional in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, §~10, 14 and 19 of the Texas Constitution, because it does not provide for the possibility of a life sentence without parole, which virtually insures that the jury will impose a death sentence.

## VIII.

The Texas death penalty scheme is a mandatory one, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, §~10, 14 an 19 of the Texas Constitution.

## IX.

The Texas death penalty scheme is unconstitutional in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10, 14 and 19 of the Texas Constitution, because it does not define the various terms and phrases used in the three special issues in ways that would permit the jury to give full mitigating significance to those terms.

## X.

The procedure by which the death penalty is imposed in Texas denies the Defendant protection from cruel and unusual punishment. A close analysis of the statute reveals that the system for imposition of the death penalty permits arbitrary and unchecked discrimination amounting to a denial of equal protection under the law. Pursuant to the provisions of the Texas *statutes,* two persons could commit capital offenses under similar circumstances, yet one could receive the death penalty and the other life imprisonment. The special issue submission pursuant to Article 37.071 provides no real standard for the guidance of juries in death penalty cases. Turning to the issues themselves, one can readily see that they are couched in nebulous terms that defy a realistic answer.

There is no properly defined policy for assisting jurors with the life and death question. The only guidance with the Court gives the jury under Article 37.071, concerning capital punishment, is simply to submit these three rather meaningless issues, affirmative answers to which result in a mandatory death sentence. Consequently, the Defendant is not adequately protected from jurors acting arbitrarily and with caprice in arriving at the awesome decision between life and death.

3

62

## XI.

The Defendant has a right to be free from punishment imposed arbitrarily and capriciously in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I §~13 and 19 of the Texas Constitution. The special issues procedure set out in Article 37.071 allows total discretion to a jury to make unfavorable findings against a defendant, and such findings may be based on any prejudices the jury may have, individually or as a whole.

## XII.

Article 37.071 is so vague and indefinite as to be incapable of interpretation by reasonable men and is therefore facially void as violating the Defendant's rights to due process and due course of law and fundamental fairness guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I §~10, 13 and 14 of the Texas Constitution.

## XIII.

The statutes upon which said prosecution is based are violative of the Eighth Amendment to the United States Constitution and Article I §~13 and 19 of the Texas Constitution in that the death penalty is not a deterrent to future homicides.

## XIV.

Article 37.071 is violative of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution in that questions number one and three have already been answered by the jury in convicting the Defendant, and that whether there is a "probability" the Defendant would commit violent criminal acts in the future is a "vague" and indefinite inquiry because there is always some mathematical probability that any person might commit a violent act in the future and the statute provides no guidelines or other statutory limitations upon the factors to be considered by the jury in making that determination.

## XV.

Death by lethal injection is cruel and unusual punishment in violation of the Eights and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution.

## XVI.

Capital punishment per se is violative of the Eighth Amendment protection against cruel and unusual punishment and the Fourteenth Amendment right to due process of law. The death penalty cannot be justified as furthering any of the accepted purposes of punishment.

4

63

## XVII.

The Texas death penalty scheme does not provide for meaningful appellate review because it does not require a proportionality review in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution.

## XVIII.

Interpreting Article 35.13 of the Texas Code of Criminal Procedure to require peremptory challenges to be made prior to examination of the entire jury panel in capital cases only denies the right to effective assistance of counsel, a fair and impartial jury, due process, due course, and equal protection under the laws as guaranteed by the United States and Texas Constitutions.

## XIX.

The death penalty in Texas is, and for many years has been, administered in a manner that purposefully discriminates against members of the minority race in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10,13 and 19 of the Texas Constitution.

## XX.

The Texas death penalty scheme does not properly narrow the *class* of persons eligible for the ultimate punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully prays that this Honorable Court set aside the indictment herein and dismiss said cause, and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Paul Johnson,
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the _5_ day of __, 2000.

Paul Johnson

5

64

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | 0 | IN THE DISTRICT COURT OF |
| | 0 | |
| vs | 0 | DALLAS  COUNTY, TEXAS |
| | 0 | |
| GARY GREEN | 0 | 282ND  JUDICIAL DISTRICT |

## ORDER ON DEFENDANT'S SECOND MOTION TO SET ASIDE THE
## INDICTMENT (UNCONSTITUTIONALITY OF STATUTE)

On this ____ day of _____,2010, came on to be heard the Defendant's

Motion to Set Aside the Indictment (Unconstitutionality of Statute), and after due consideration, the

Court is of the opinion, and it is hereby ORDERED, that said Motion is:

_____ GRANTED

_____ DENIED, to which ruling
Defendant timely excepts.

_____
JUDGE PRESIDING

6

65

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | 0 | IN THE DISTRICT COURT OF |
| | 0 | |
| vs. | 0 | DALLAS COUNTY, TEXAS |
| | 0 | |
| GARY GREEN | 0 | 282ND JUDICIAL DISTRICT |

### MOTION TO DISMISS THE DEATH PENALTY IN THE STATE OF TEXAS ON THE GROUND THAT ITS CAPITAL SENTENCING PROCEDURE IS UNCONSTITUTIONAL DUE TO ITS FAILURE TO MEET MINIMUM REQUIREMENTS SET FORTH IN *FURMAN V. GEORGIA* AND ITS PROGENY, AS EVINCED BY THE FINDINGS OF THE CAPITAL JURY PROJECT AND OTHER RESEARCH

TO THE HONORABLE JUDGE OF SAID COURT:

GARY GREEN, Defendant pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article One, Sections Three, Ten, Thirteen, and Nineteen of the Texas Constitution; and other applicable law, moves this Court to declare the death penalty process in Texas unconstitutional on the ground that the sentencing statute, Tex. Code Crim. Proc. art 37.071, creates confusion in the jurors, because jurors are given both faulty instructions and misleading information by the courts, because they abdicate the responsibility of making a life or death decision, they often believe that they are required to return a verdict of death, because they do not consider or are confused by mitigating evidence, and because they still use race as a determining factor in sentencing.

### I.

### INTRODUCTION

A substantial body of uncontroverted research conducted on actual capital jurors shows that there are several critical failings in the procedure that the Texas courts use to determine the sentence in a case in which the state seeks the death penalty. As a result of these many flaws,

66

the death penalty in Texas is incapable of being applied in a manner that comports with federal and state constitutional protections.

The United States Supreme Court has devoted an extraordinary amount of its time granting *certiorari* in state death penalty cases so as to articulate precisely what the Constitution requires for a lawful jury death sentence verdict. The Court has ruled on a plethora of procedural and substantive constitutional questions addressed to various provisions of the Fifth, Sixth, Eighth, and Fourteenth Amendments. The Court has articulated firmly established constitutional imperatives which must be met for a lawfully determined sentence of death.

Unfortunately, what the Court has deemed constitutional is often not enough to ensure a defendant of his right to a fair capital trial. The Court must review this standard within the context of a substantial body of peer-reviewed, validated, and uncontroverted scientific literature, focusing mostly on research conducted and analyzed by social scientists working with the Capital Jury Project (CJP)—a nationwide research group funded by the National Science Foundation that has interviewed over 1200 jurors who actually made the life or death sentencing decision in 354 capital trials in fourteen death penalty states. CJP spent more than ten years thoroughly analyzing how real capital juries actually go about making real capital sentencing decisions – and comparing their findings to the Supreme Court's pronouncements.

*Furman v. Georgia*, 408 U.S. 238 (1972), created a body of law regarding capital murder cases that set forth constitutional mandates determining the fairness and impartiality with which capital defendants must be treated. Despite these established provisions, jurors in Texas still do not allow for a fair trial. As the CJP data evinces, these jurors are unable to make their decision on a constitutional basis because of the confusing nature of Texas's sentencing statute, because jurors are given both faulty instructions and misleading information by the courts, because they

2

67

abdicate the responsibility of making a life or death decision, because they often believe that they are required to return a verdict of death, because they do not consider mitigating evidence, because the way Texas defines mitigating evidence as anything that reduces "moral blameworthiness" is misleading and confusing, and because jurors still use race as a determining factor in sentencing. Because jurors are unable to meet these constitutional standards, the death penalty process in Texas is unconstitutional under *Furman* and its successive cases.

## II.

## SOCIAL SCIENCE AND THE LAW IN THE ERA BEFORE THE CAPITAL JURY PROJECT

For forty years, social scientists have been conducting scientific-method-based, verifiable research into the twin questions of how juries go about making their decisions and what impact the capital *voir dire* screening process has on the non-excluded group's decisionmaking dynamic.[1] The Supreme Court has periodically been presented with studies by litigants who hoped to shed some objective, experiential, outside-the-courtroom, fact-based light on whatever particular legal issue was before the court. In the past, the Court has rejected these studies. Initially this evidence was rejected because the field of study was too new and there was insufficient data to support the relief being requested. *See Witherspoon v. Illinois*, 391 U.S. 510, 517 (1968) (rejecting three studies offered to support a claim that death-qualified juries were guilt-prone juries as "too tentative and fragmentary" to support a *per se* constitutional ruling). As the field gained acceptance, it was still rejected by the Court because it did not address the question of how "actual jurors sworn under oath apply the law to facts of an actual case

---

[1]    *See, e.g.,* HARRY KALVEN & HANS ZEISEL, THE AMERICAN JURY (University of Chicago Press, 1966).

3

68

involving the fate of an actual capital defendant." *Lockhart v. McCree*, 476 U.S. 162, 171 (1986). In essence, the Court said data from artificial jurors in an artificial setting was unpersuasive even when drawn from scientifically sound and statistically valid mathematical equations. *See McCleskey v. Kemp*, 481 U.S. 279 (1987) (finding studies showing that race influences capital decisionmaking do not answer question of how jurors eligible for service in McCleskey's case are likely to approach issues when sworn).

The clear message from *Lockhart* and *McCleskey* was that the Court would reject studies unless the research removed itself from the experimental and addressed the actual. To have persuasive force, social science research on capital juries needed to interview actual jurors from actual capital trials.

In response to this alleged shortcoming as perceived by the Court, studies based on in-depth interviews of actual capital jurors were conducted in Florida, California, and Oregon. These studies showed that capital jurors were not following the constitutional guidelines established by the Supreme Court's post-*Furman* jurisprudence:

> Shortly after the *McCleskey* decision, researchers undertook studies based on in-depth interviews with persons who had served on capital juries in Florida, California, and Oregon. These interviews focused on how jurors actually made their decisions and whether, or to what extent they were guided by the capital statutes in their respective states. The questioning was largely an open ended inquiry into what factors influenced the sentencing decision, and whether jurors' decision-making was being guided by statutory provisions and the Court's conception of the sentencing decision as a reasoned moral choice.
>
> * * * *
>
> These studies raised serious questions about the operation of post-*Furman* capital statutes. Jurors appear to understand sentencing instructions poorly, especially their obligation to give effect to mitigation. Many appear to presume that death is the appropriate punishment for capital offenses without regard for

4

69

mitigation. They seem to focus narrowly on a single issue to simplify decision-making and to reach consensus on punishment. In explaining the decision to impose the death penalty, they invoke guilt related considerations as if the sentencing process was merely a replay of the guilt decision. These soundings were *sufficiently ominous to justify a more extensive investigation of the capital sentencing process*, one that would take a more systematic look into the black box of jury decision-making. [2]

The constitutional failures of the post-*Furman* capital sentencing schemes are further substantiated by studies of the Capital Jury Project. Created in 1990, with funding from the Law and Social Sciences Program of the National Science Foundation (grant NSF SES-9013252), the CJP researched the decisionmaking of actual capital jurors. The CJP's interviews chronicle the jurors' experiences and decisionmaking over the course of the trial, identify points at which various influences come into play, and reveal the ways in which jurors reach their final sentencing decisions.

The CJP began in eight states and has grown to a total of fourteen states. States were chosen for the CJP research to reflect the principal variations in guided discretion capital statutes. Within each state, 20 to 30 capital trials were picked to represent both life and death sentencing outcomes. From each trial, a target sample of four jurors was systematically selected for in-depth, three-to-four-hour personal interviews. Interviewing began in the summer of 1991. The present CJP working sample includes 1,201 jurors from 354 capital trials in 14 states. These 14 states are responsible for 76.1% of the 3,718 persons on death row as of June 1, 2002, and for 79.0% of the 795 persons who were executed between 1977 and September 1, 2002.

---

[2]   JAMES R. ACKER ET AL., AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT, AND FUTURE OF THE ULTIMATE PENAL SANCTION 8-11 (2d ed., Carolina Academic Press 2003) (emphasis added.).

5

**70**

Data collected and analyzed by CJP researchers played a substantial role in *Simmons v. South Carolina*, 512 U.S. 154 (1994). Since 1993, some 30 articles presenting and discussing the findings of the CJP have been published in scholarly journals.[3]

## III.

## CONSTITUTIONAL PRINCIPLES ESTABLISHED SINCE *FURMAN V. GEORGIA* AND JURORS' INABILITY TO FULFILL THESE REQUIREMENTS

## A.

## PROCEDURES MUST BE CLEAR AND OBJECTIVE; YET, BECAUSE MOST JURORS ARE STILL CONFUSED OVER SENTENCING PROCEDURES, THERE RESULTS AN UNCONSTITUTIONAL AND UNJUST CAPITAL SENTENCING SYSTEM

1. <u>The Supreme Court Requires That There Be No Risk of Arbitrary Decisions Made by Jurors</u>

The modern death penalty era began when *Furman v. Georgia* struck down capital sentencing as it had been historically applied by the states. The *Furman* Court concluded that capital punishment was being applied in an unconstitutional manner. *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972). The system of unfettered discretion to sentence capital defendants to die had resulted in a jury decisionmaking system that was so freakishly wanton, so arbitrary and capricious, and so unreviewable on appeal that it violated the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Id.*

In the three decades since *Furman*, the Court has made it clear that the "vesting of standardless sentencing power in the jury violates the Eighth and Fourteenth Amendments." *Woodson v. North Carolina*, 428 U.S. 280, 302 (1976). A capital jury's sentencing discretion

---

3  *See* the Capital Jury Project Website at http://albany.edu/scj/CJPhome.htm for an updated listing of CJP related articles, commentaries, and doctoral dissertations.

6

71

must be channeled by clear and objective standards which provide specific and detailed guidance for the jury and render the capital sentencing process one that can be rationally reviewed. *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420 (1980).

Three statutory capital sentencing schemes that, on their faces, appeared to address the concerns expressed in *Furman* were upheld by the Court in 1976. *See Jurek v. Texas*, 428 U.S. 262 (1976); *Profitt v. Georgia*, 428 U.S. 242 (1976); *Gregg v. Georgia*, 428 U.S. 153 (1976). These statutory schemes used three different approaches—Florida's weighing approach, Georgia's threshold approach, and Texas's directed approach. All three approaches had four essential features in common that met the constitutional concerns expressed *Furman*:

1)1   A rational mechanism for narrowing the class of death-eligible offenders;

1)2   Bifurcated sentencing proceedings separate from the guilt determination;

1)3   An instructional scheme that channels the sentencing jury discretion with clear and objective standards which purportedly provide guidance for the jurors that is understandable and that makes rationally reviewable the process by which the jury imposes a death sentence; and

1)4   Appellate review that is adequate to ensure the sentencing decision was arrived at by means that comport with what the Constitution requires.

The requirement of clear and objective standards to guide capital jurors has led the Court to strike down vague statutory criteria which cannot be reviewed objectively on appeal. In *Godfrey*, Georgia's "outrageously or wantonly vile, horrible, and inhuman" aggravator was invalidated. *Godfrey*, 488 U.S. at 422–23. The Court concluded it was so vague that it failed to provide any meaningful guidance to the jury. *Id.* at 428–29. A capital jury making a sentencing decision on such a factor was as unconstrained in its sentencing choice as juries were under the schemes invalidated by *Furman*.

Oklahoma's "especially heinous, atrocious, or cruel" standard was struck down on this same basis. *Maynard*, 486 U.S. at 364. The *Maynard* Court reaffirmed that its Eighth Amendment jurisprudence since *Furman* had "insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Id.* at 362. Thus, the Court's jurisprudence has made it clear that capital sentencing decisions must be made

7

72

according to criteria that are sufficiently clear to permit ordinary citizens to understand and apply them.

The requirement that a death sentence not be imposed arbitrarily is derived from "the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson*, 428 U.S. at 305). It was chiefly the concern that decisions of life and death were being arbitrarily determined that led the Supreme Court in 1972 to declare the death penalty in violation of the Eighth and Fourteenth Amendments to the Constitution. *See generally Furman v. Georgia*, 408 U.S. 238 (1972). In capital cases, therefore, the Court is committed to ensuring that there is sufficient process to guarantee, as much as is humanly possible, that "the sentence was not imposed out of whim . . . or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring).

2.     2.     **The American Law Institute's Withdrawal of the Model Penal Code Section on Capital Punishment**

On October 23, 2009, the Council of the American Law Institute (ALI) voted overwhelmingly to withdraw Section 210.6 of the Model Penal Code, which deals with capital punishment, based on doubts that any foreseeable regime for its implementation could meet basic concerns of fairness in process and outcome. Specifically, the resolution adopted by the Council stated that Section 210.6 should be withdrawn "in light of the current intractable institutional and structural obstacles to ensuring a minimally adequate system for administering capital punishment."[4]  Furthermore, although the Council voted against taking an official position on capital punishment, it also voted against undertaking a project to revise or replace the section.[5]

Section 210.6, the main provision of the Model Penal Code concerning capital punishment, was first adopted by the ALI in 1962. The section sought to guide significant concerns regarding capital punishment, defining those cases appropriate for capital punishment,

---

[4]     AM. LAW INST., MESSAGE FROM ALI DIRECTOR LANCE LIEBMAN, http://www.ali.org/_news/10232009.htm (last visited Nov. 6, 2009).

[5]     AM. LAW INST., REPORT OF THE COUNCIL TO THE MEMBERSHIP OF THE AMERICAN LAW INSTITUTE ON THE MATTER OF THE DEATH PENALTY 3–4 (2009), *available at* http://www.ali.org/doc/ Capital%20Punishment_web.pdf.

8

73

aggravating and mitigating circumstances, and special sentencing procedures.   Recently, however, ALI members called into question the continued viability of the guidelines, and the group commissioned an extensive report concerning the fair administration of the death penalty.[6] This report examined the major rationales giving rise to skepticism over whether current or potential future capital punishment systems are capable of being fairly applied or reaching just results:

> (a) the tension between clear statutory identification of which murders should command the death penalty and the constitutional requirement of individualized determination; (b) the difficulty of limiting the list of aggravating factors so that they do not cover (as they do in a number of state statutes now) a large percentage of murderers; (c) the near impossibility of addressing by legal rule the conscious or unconscious racial bias within the criminal-justice system that has resulted in statistical disparity in death sentences based on the race of the victim; (d) the enormous economic costs of administering a death-penalty regime, combined with studies showing that the legal representation provided to some criminal defendants is inadequate; (e) the likelihood, especially given the availability and reliability of DNA testing, that some persons sentenced to death will later, and perhaps too late, be shown to not have committed the crime for which they were sentenced; and (f) the politicization of judicial elections, where—even though nearly  all  state  judges  perform  their  tasks conscientiously—candidate statements of personal views on the death penalty and incumbent judges' actions in death-penalty cases become campaign issues.[7]

After reviewing these general issues with the death penalty itself, the ALI Council decided to withdraw Section 210.6.

The Council further outlined four primary factors as the basis for its decision.  First, it noted that Section 210.6 was an untested innovation when it was first enacted.  According to the Council, the subsequent decades of practice with capital punishment systems modeled on it and

---

6        *Id.* at 1–3.
7        *Id.* at 5.

9

74

the myriad U.S. Supreme Court decisions reshaping the constitutional landscape in these intervening years proved that, "on the whole[,] the section has not withstood the tests of time and experience."[8]

Second, the Council asserted that many ALI members still had important concerns about the administration of capital punishment law as a whole, and felt unable to recommend procedures that would adequately alleviate them. Thus, they determined that the ALI "should not play a further role in legitimating capital punishment, no matter how unintentionally, by retaining the section in the Model Penal Code."[9]

Third, it discussed the fact that the basic question underlying the death penalty was deeply moral, political, social, and personal in nature. As such, substantial consensus—even among ALI members themselves—would be unlikely, and continued study would fail to contribute meaningfully to the policy debate. For these reasons, the ALI decided against further examining the question and proposing to speak on it later.

Finally, it observed that, while some Council members thought the ALI could play a useful role in recommending constitutionally sound procedures, others believed that "real-world constraints make it impossible for the death penalty to be administered in ways that satisfy norms of fairness and process."[10] Based on this division, the Council concluded that any effort to offer a set of contemporary procedures for administering the death penalty would fail intellectually, institutionally, and politically; therefore, it determined not to undertake such an effort.

Importantly, Section 210.6, which purportedly outlined proposals for how to make the death penalty less arbitrary, was cited approvingly by the Supreme Court in its 1976 decision

---

8    *Id.* at 4.
9    *Id.*
10   *Id.* at 5.

10

75

upholding the constitutionality of reformed state death penalty laws. *See Gregg v. Georgia*, 428 U.S. 153, 193–95 (1976).  Indeed, the *Gregg* Court acknowledged that "some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate," but cited the Model Penal Code as evidence that such standards had in fact been developed. *Id.* at 193.  Thus, the section's withdrawal signifies a compelling recognition by the legal community that the standards have proven unworkable in the American judicial system.  Furthermore, the ALI's action undermines the very reasoning set forth by the Court in justifying the constitutionality of capital punishment.  As such, the Court's analysis now lacks the logical potency it once held, and a fresh review of the issue is therefore warranted in order to avoid arbitrary decision making by capital juries.

### 3.      3.      Texas's "10-12 Rule"

4.            The Texas Code of Criminal Procedure requires the court to charge the jury that it may not answer any issue submitted under Subsection (b) of Article 31.071 (asking "whether the defendant would commit criminal acts of violence that would constitute a continuing threat to society"), section 2(d)(2) "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree.  TEX. CODE CRIM. PROC. art. 37.071 § 2(d)(2) (Vernon Supp. 2006).  The court is also required by Article 37.071 § 2(f)(2) to charge the jury that it may not answer the issue submitted under Subsection (e) (whether there is a "sufficient mitigating circumstance or circumstances that warrant a sentence of life imprisonment without parole," rather than death, should be imposed) "no" unless it agrees unanimously and it may not answer "yes" unless ten or more jurors agree. *Id.* § 2(f)(2).

5.            Under articles 37.071(2)(c) and 37.071(2(f)(1), the jurors shall answer each interrogatory either "yes" or "no." *Id.* § 2(c), 2(f)(1).  In the event that the jury is unable to

11

76

answer any issue, either because it was unable to secure unanimity for a "yes" answer or ten votes for a "no" answer pursuant to the issues submitted under Subsection (b), or because it was unable to secure unanimity for a "no" answer or ten votes for a "yes" answer pursuant to the issue submitted under Subsection (e), 37.071(2)(g) requires the Court to sentence the defendant to life in prison. *Id.* § 2(g). This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e). Article 37.071(2)(a) prohibits the Court, either attorney, and the defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. *Id.* § 2(a). Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

4.   **The 10-12 Rule Creates an Impermissible Risk of Arbitrariness Through the Presentation of False and Misleading Evidence**

Death is different not only in severity but also in kind from all other punishments. The Eighth and Fourteenth Amendments to the United States Constitution demand additional procedural safeguards in capital trials. *See generally Gregg v. Georgia*, 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972); *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (holding that death is qualitatively different). The effect of these safeguards is that legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty and the right of each defendant to

12

77

individualized sentencing.[11]   The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness and denies defendants their right to individualized sentencing.

### a.   The Bar Against False, Misleading, or Inaccurate Information

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Court held that the Due Process Clause of the Fifth and Fourteenth Amendments is violated where the capital sentencing decision is made on the basis of false, inaccurate, or misleading information.   The jury that sentenced Simmons to death reasonably may have believed he could be released on parole if he were not sentenced to death.   The Court concluded that such a misunderstanding "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." *Id.* at 162.   In *Shafer v. South Carolina*, 532 U.S. 36 (2001), the Court reaffirmed the principles established in *Simmons*.   A capital jury's choice to sentence someone to death should never be premised upon false, misleading, or inaccurate beliefs because such erroneous beliefs have the effect of forcing the jury to choose death to make sure that the defendant is never released.

Not only are jurors confused about the effects of their decision, but also about the way in which they are to make the decision.   The Texas death penalty statute affirmatively creates confusion in the minds of the jurors.   Jurors are first told that the jury as a whole shall answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be

---

11

    It is precisely this difficulty that caused Justice Blackmun to conclude that the entire enterprise of seeking to make the death penalty constitutionally acceptable was flawed.   In his dissent from the Court's denial of a petition to grant a writ of certiorari, Blackmun declared: "From this day forward, I no longer shall tinker with the machinery of death . . . . It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies." *Collins v. Collins*, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting).

13

78

in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that, in the event of a non-answer, the defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion, but it *actively prohibits* any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

Death penalty statutes are not effectively guiding discretion when jurors misunderstand the instructions, mistakenly believe death is required by law, and do not appreciate their responsibility for the sentence imposed. The CJP findings indicate that a large majority of jurors believe the law is responsible for the sentence, yet this is problematic due to their lack of understanding of the law. Exemplifying the confusion that jurors have over the directed approach to sentencing that Texas has embodied, one juror asked by the CJP said that, on the range of issues to consider,

> We just had to stick to those four [sic] basic criteria. We couldn't deviate with this mitigating circumstance or testimony of people that had spoken on his behalf or against him. We just had to go by those guidelines that they give you when you make that decision.[12]

---

[12]   Craig Haney, Lorelei Sontag & Sally Costanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 J. SOC. ISSUES 149, 165–66 (1994).

14

79

Jurors do not understand what is expected of them, particularly when the sentencing instructions are as vague and confusing as the 10-12 Rule is on its face, even without additional misleading information from the courts. According to a study by William Bowers and Benjamin Stoglia,

> Jurors' mistaken beliefs about the death penalty alternative are a substantial influence on their sentencing decisions, prominent at the first vote on punishment and even stronger by the final punishment verdict. When jurors engage in the give and take of deliberations, the effect of their misperceptions becomes most pronounced. This is when the rhetoric of early release can become the currency of persuasion. Early in deliberations, the most substantial movement occurs among the previously undecided, whose life or death votes on the first jury ballot are strongly in accord with their mistaken release estimates. Later in deliberations there are cross-overs between life and death as well as confirmations from undecided to life or death, again consistent with jurors' typically mistaken release estimates. The end result of this allocation process is a substantial difference between death votes by jurors who believe the alternative yields only 0–9 years served (68.5%) and death votes by those who believe it is 20 years or longer (43.1%).[13]

6.      **b.      *The False Dilemma of Leniency***

7.          The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them, and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers, and a life sentence follows from another, a reasonable juror might conclude that the *only* way to get either of these punishments is to answer the questions posed to them. *See California v. Brown*, 479 U.S. 538, 541 (1987) (quoting *Francis v. Franklin*, 471 U.S. 307 (1985)) (holding that the constitutional sufficiency of capital sentencing instructions is

---

13          William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 671 (1999).

15

determined by what a reasonable juror could have understood the charge as meaning). This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant. Given that each of the jurors has already found the defendant guilty of a capital offense, none of these options would look desirable to a juror who honestly believes that a life sentence in warranted. Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether unacceptable third option will result.

8.        In *Simmons*, the Court prohibited just this sort of unfairness, holding that the State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole. *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994). The Texas statute instructs jurors that at least ten of them must agree in order for a life sentence to be imposed and yet prohibits jurors from learning that only one vote against death is actually required for a life sentence. It is precisely because jurors are left to speculate when capital juries are not informed of the consequences of a deadlock that several states have declared the practice to be in violation of Eight Amendment protections as found in *Gregg v. Georgia*, 428 U.S. 153 (1976). *See, e.g., New Jersey v. Ramseur*, 106 N.J. 123, 314 (1987) (stating that the jury must be told, in effect, that the law recognizes deadlock as a permissible result, an outcome allowed by the statute, and a legal trial verdict that by law results in imprisonment rather than death); *Louisiana v. Williams*, 392 So.2d 619, 634–35 (1980) (holding

16

81

that, by allowing jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action).

### c.    The False Dilemma of Impermissibility

While this confusion might pressure jurors to change their position in order to avoid the unknown third option, it might lead to an even more basic misunderstanding.  Because jurors are told that each question must be answered, and voting ballots do not include an option for non-answer, a reasonable juror following the instructions might believe that a non-answer is not only undesirable, but is in fact impermissible.  Such a juror might believe that because he or she is unable to secure the ten votes required to give the answer that juror wishes the jury to give, and because some answer either way must be given, that juror is in fact obliged to vote with the others and sentence the defendant to death.  Although the law is clear that a death sentence may never be mandatory, and individual jurors must always be free to vote for life, such a belief would reasonably follow from the instructions mandated by the Texas sentencing scheme.  *See Roberts v. Louisiana*, 428 U.S. 325 (1976) (striking down mandatory death sentences for persons convicted of the first-degree murder of police officers); *Woodson v. North Carolina*, 428 U.S. 280 (1976) (holding state legislation that mandated the death penalty for all convicted first-degree murderers unconstitutional).

In fact, jurors often mistakenly believe that they are required by law to impose death.[14]  One study found that when jurors asked for clarification and were simply

---

[14]    *See generally*, Stephen P. Garvey, Sheri Lynn Johnson & Paul Marcus, *Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases*, 85 CORNELL L. REV. 627 (2000).  In addition to this mistaken belief, one study also found that "[a]bout half the jurors incorrectly believe that a mitigating factor must be proved beyond a reasonable doubt.  Less than a third of jurors understand that mitigating factors need only be proved to the juror's personal satisfaction.  The great majority of jurors – in excess of sixty percent in both life and death cases – erroneously believe that jurors must agree unanimously for a mitigating circumstance to support a vote against death." Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions*

17

82

referred back to the original instructions, rather than being disavowed of their false belief they became *more likely* to mistakenly believe that the evidence required them to vote for death.[15] This is precisely what the Texas statute would have judges do when jurors ask questions regarding the implications of a non-answer.   The Texas statutory scheme creates a set of instructions that lead jurors to have false beliefs regarding their sentencing options, prohibits them from learning their true options, and then operates in a fashion that solidifies their pro-death leanings.

9.          *d.      Due Process Boundaries on State Discretion*

10.          It is true that state legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some information from jury instructions.   *See California v. Ramos*, 463 U.S. 992, 1001 (1983) (asserting that the Court generally defers to the state's choice of substantive factors relevant to the penalty determination).   However, that discretion is bounded by the requirements of due process.   *See, e.g., Kelly v. South Carolina*, 534 U.S.246, 246–47 (2002); *Shafer v. South Carolina*, 532 U.S 36, 39 (2001); *Ramdass v. Virginia*, 530 U.S. 156, 195 (2000) (Stevens, J. dissenting); *Simmons v. South Carolina*, 512 U.S. 154, 175 (1994) (O'Connor, J., concurring in judgment).

11.          In *Ramos*, the Court permitted a jury instruction regarding the state governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest. *Ramos*, 463 U.S. at 1001–06.  Despite being prompted to apply *Ramos* in the case of *Caldwell v. Mississippi*, the Court refused, holding that when the State argues that automatic appellate review is meant to determine whether the death penalty is

_____

[15]          *in Capital Cases*, 79 CORNELL L. REV. 1, 11 (1993).
          Garvey et al., *supra* note 14, at 639.

18

83

appropriate in a given case, this information not only inaccurately depicts the role of the appellate court but, more importantly, it serves an illegitimate state purpose by diminishing the ability of jurors to feel the gravity of their task. *Caldwell v. Mississippi*, 472 U.S. 320, 336–41 (1985).

12.    The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the three issues, this provides an incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed.

13.    This situation is unique to capital sentencing juries. During the guilt/innocence phase of a criminal trial, it is strictly correct to inform the jury that unanimity is required for either a verdict of guilt or acquittal. Although anything short of unanimity will lead to a mistrial, and thus might lead the defendant to be released as though he were acquitted, he may still be retried and is thus unable to claim numerous basic constitutional protections such as that of double jeopardy. Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the defendant is identical in both. *See Padgett v. State*, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) (holding that a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer). Thus, instructing the jury that ten or more of them must agree upon a life answer in order to sentence the defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law.

19

84

14.        So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence. The false distinction between a life answer of ten or more jurors and a non-answer of less than ten jurors must be removed.

15.        *e.      A Historical Perspective*

16.        This sentencing structure was not used prior to 1981. Under Texas's former capital sentencing statute, if a jury failed to respond to any of the three special issues the result was a complete mistrial, requiring a new trial, not just on sentencing, but on guilt as well. *See Eads v. State*, 598 S.W.2d 304, 308 (Tex. Crim. App. 1980). Under such a scheme, setting aside the other arguments proffered here, an instruction that ten or more jurors are required for a life sentence would be just as unobjectionable as an instruction that unanimity is required for death, a finding of guilty, or an acquittal. Presumably in response to *Eads* and the additional costs and difficulties that such a situation would pose, the Texas legislature in 1981 amended the death penalty statute, inserting the default sentence of life in the event of a non-answer. It was at that time that the legislature also added the infirm language that is now in article 37.071(2)(a), prohibiting jurors from being informed of this default result. It is clear that the legislature wished to change the sentencing reality of defendants without informing jurors of this change. In doing so, however, the legislative change made the old instructions inaccurate depictions of the law. Not only are the instructions inaccurate, but they were intended to be inaccurate and confusing in order to serve an illegitimate state interest.

17.        Texas' deliberate attempt to confuse the jurors only exacerbates the problem already in progress: that these jurors are confused by the sentencing instructions given in the 10-12 Rule in article 37.071. This confusion leads to decisions made by jurors on an arbitrary,

20

85

rather than a structured and well-considered, basis. Furthermore, the juries are making these life or death decisions through unconstitutionally misguided and false information provided by the Texas courts. As such, Texas' sentencing protocol is unconstitutional.

### 5.    The Reality Behind Juror Unanimity

The problems inherent in the structure of Texas's 10-12 Rule are further compounded by recent research providing insight into how juries reach their decisions. Of particular note are the findings of a study conducted as a part of the National Center for State Courts (NCSC) project on hung juries. Employing data taken from nearly 3,500 jurors in non-capital felony cases, the study sought to shed empirical light on the processes underlying juror decisionmaking, particularly the formation of juror opinions, the impact of deliberation, and the role of the dissenting juror.[16]  The researchers determined that 38–54% of juries included at least one dissenter, that is, a juror who would have reached a different verdict than the one entered by the jury if that juror had been deciding the case alone.[17]  However, these dissenters often ultimately conformed to the views of the majority of the jury panel, as "a sizable proportion of jurors eventually voted in line with the group but at odds with their personal preferences."[18]  These findings raise important questions about the significance and reliability of ostensible unanimity.

Of critical importance is the issue of what gives rise to the existence of dissent among a jury that is statutorily required to reach a unanimous verdict. The NCSC researchers identified

---

[16]  Nicole L. Waters & Valerie P. Hans, *A Jury of One: Opinion Formation, Conformity, and Dissent on Juries* 2–3, 7 (Cornell Legal Studies, Research Paper No. 08-030, 2008), *available at* http://ssrn.com/ abstract=1297272.  While the jurors surveyed in this study were all involved in non-capital cases, the findings are nevertheless relevant here because they dealt with guilt-phase determinations in serious felony criminal settings.

[17]  *Id.* at 12–13. This seemingly wide range was based on the manner in which the dissenting juror's vote was compared to the majority's. Under each method, however, a significant number of juries contained at least one juror whose one-person verdict differed from that of "the general verdict reached by the jury as a whole" (38%), "the jury's decision on the first count" (46%), or "the final vote of the jury" (54%). *Id.*

[18]  *Id.* at 24.

21

86

several elements that result in a purportedly unanimous jury nevertheless containing dissenting individuals. First, they noted the psychological effects of social pressure to conform to the views of a group, particularly if the dissenter is alone and without supporters. The impact of social pressure to conform is well documented. For example, Professor Scott E. Sundby of Washington & Lee University has asserted that jurors who hold out against the majority begin to feel isolated, and "[a]s they feel more and more isolated . . . they start to doubt themselves, doubt their judgments."[19] Indeed, jurors often change their minds quickly after realizing that they are in the minority. According to Sundby, "Studies show that isolation triggers a . . . reflex in the pain center of the brain. . . . We've evolved as human beings [to] where it is difficult for us to stand by ourselves."[20] Furthermore, William Bowers, director of the National Capital Jury Project, notes that minority jurors are particularly susceptible to feeling like outsiders during deliberations, and states that they "often feel that they're being railroaded into a death sentence, and they often give in."[21] Thus, it is evident that psychological factors often lead individual jurors to silence their own personal beliefs for the sake of group conformity.

Second, the NCSC study suggested that jurors' role expectations played an important part in the persistence of dissent within a supposedly unanimous jury. Specifically, they discussed the knowledge from the outset that group consensus was required, adherence to the letter of the law despite one's opposing common sense of fairness or justice, and various structural aspects of the deliberation process. The combination of these role expectations and typical conformity pressures, then, worked to "encourage jurors to accede to the majority view even if they [were]

---

[19]    Daarel Burnette & Stacy St. Clair, *Death-Penalty Holdouts: Experts Intrigued by Rare Ability to Withstand Pressure*, CHI. TRIB., Oct. 25, 2009, *available at* http://www.chicagotribune.com/news/chi-death-penalty-holdouts-25-bdoct25,0,806297.story (detailing the "rare ability to withstand intense pressure during deliberations" exhibited by three jurors in the Brown's Chicken massacre trials).
[20]    *Id.*
[21]    *Id.*

22

87

not privately convinced. The desire to fulfill one's job as a juror may outweigh one's individual verdict preference."[22] The study concluded, "What seems clear is that unanimous jury decisions include not only those cases in which there is genuine agreement but also a significant number of cases in which jurors 'agree to disagree' and acquiesce."[23] This evidence that so-called "unanimous" jury verdicts are in fact often merely a result of psychological factors affecting jurors' decisionmaking abilities flies directly in the face of the capital statutory sentencing requirements. *See* TEX. CODE CRIM. PROC. art. 37.071.

Significantly, those jurors who personally opposed the majority's decision were more often in favor of acquittal than conviction.[24] This means that many defendants are being convicted despite the fact that at least one juror on their panel favored acquittal. This notion of pro-defendant dissenters is particularly disturbing in the capital sentencing context due to the sentencing statute's prohibition against judges, attorneys, or parties informing juries of the ability for just one juror favoring life to prevent the defendant from being executed. *See* TEX. CODE CRIM. PROC. art. 37.071(2)(a). Under this scheme, a dissenting juror who is unaware that he or she is single-handedly able to prevent a defendant from receiving a death sentence may be more likely to conform his or her vote to the wishes of the majority despite personally believing that life imprisonment is the more appropriate punishment.

---

22   Waters & Hans, *supra* note 16, at 26.
23   *Id.* at 27.
24   *Id.* at 19.

88

## B.

## DESPITE THE COURT'S CONSTITUTIONAL REQUIREMENTS, JURORS STILL RELY ON THEIR PREDETERMINED FEELINGS ABOUT CAPITAL PUNISHMENT AND THE SENTENCING PROCESSES

### 1. Jurors Evade Responsibility for Their Capital Sentencing Decisions

18.     Just as jurors who are informed that their decision will be reviewed for appropriateness by an appellate court are impermissibly led to deflect their awesome responsibility onto the appellate courts, Texas jurors are impermissibly led to relieve themselves of a sense of responsibility by placing it either upon the other jurors who are unwilling to join the vote in favor of life (it is their fault that the defendant will be killed because, by not joining the other jurors, they prevent the jury from reaching the required minimum of ten votes), or upon the statutory scheme that purports to require ten votes, rather than merely one, in order to give life (it is the fault of the Texas statute because, unless a juror can get at least ten votes for life, that juror may not vote for life).  Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors or upon a restrictive sentencing statute.

        As the Court explained in *Caldwell*, "Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985).  However, CJP data demonstrates that this assumption is false.  Almost no capital jurors view themselves as ultimately responsible for the decision they make.  Rather, they place primary responsibility elsewhere:

> The vast majority of jurors did not see themselves as most responsible for the sentence.  Over 80% assigned primary responsibility to the defendant or the law, with 49.3% indicating the defendant and 32.85% indicating the law was most responsible.  In contrast, only 5.5% thought the individual juror was most responsible and only 8.9% believed the jury as a whole was most responsible . . . .[25]

One study relying on CJP statistics explained further the jurors' relinquishment of responsibility for the life or death of a capital defendant:

> [T]here was a tendency among jurors from [samples from studies in both California and Oregon] to shift or abdicate responsibility for the ultimate decision—to the law, to the judge, or to the legal instructions—rather than to grapple personally with the life and

---

[25]   William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51,174–75 (2003).

24

89

> death consequences of the verdicts they were called upon to render. [In addition, the researchers concluded:] Capital penalty instructions fail to acknowledge (let alone clearly frame or carefully guide) the inherently moral nature of the task that they direct jurors to undertake. They seem to imply that death sentencing involves nothing more than simple accounting, an adding up of the pluses and minuses on the balance sheet of someone's life.[26]

Moreover, the jurors themselves who were evaluated in this CJP study explained the way in which the jurors framed their sentencing decision:

> We are not sentencing him to death—we are just answering these questions. We talked about it. We are just answering these questions—to get a clear mind so as not to feel guilty that I sentenced him to die. That's how the law has it—just answer these questions.[27]

*Caldwell* states that capital jurors must not be misled so as to diminish their sense of responsibility for any death sentence imposed. *Caldwell*, 472 U.S. at 332 (O'Connor, J., concurring). Each juror must understand that he or she alone is responsible for his or her sentencing decision. Uncorrected beliefs that "responsibility for any ultimate determination of death will rest with others" create a possible bias toward a death sentence. *Id.* at 333.

A jury unconvinced that death is the appropriate punishment, "might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts" and vote for death on the assumption that the ultimate sentencer will correct any error. *Id.* at 332. A jury led to believe a life sentence cannot be increased to death may vote death because it understands any decision to "'delegate' responsibility" for a sentence of death "can only be effectuated by returning" a death sentence. *Id.*

---

[26]     ACKER ET AL., *supra* note 2, at 8–11 (quoting Haney et al., *supra* note 12, at 160, 172) (internal citations omitted).

[27]     *Id.* (quoting Haney et al., *supra* note 12, at 161–167) (internal citations omitted).

25

90

19.     Assuming *arguendo* that the Texas statute does not provide the jury with the type of inaccurate and illegitimate information prohibited by a traditional reading of *Caldwell*, new empirical data suggests that such a reading of *Caldwell* is entirely inadequate to ensure that capital jurors feel the truly awesome responsibility placed upon them. *McGautha v. California*, 402 U.S. 183, 208 (1971). Many death penalty jurors seek, and manage to find, ways to deny their personal moral responsibility for the sentencing decision.[28]  Given that jurors hardly need to have inaccurate information provided to them in order for them to deflect responsibility, the *Caldwell* rule itself should be read in light of the empirically supported premise that death penalty jurors will take advantage of any available opportunity to *mislead themselves* about the extent of their responsibility for the sentencing decision. *Id.* If we are to give any meaning to Justice Harlan's concern in *McGautha* that death penalty jurors be required to individually feel this terrific weight upon their shoulders, courts must inform jurors that just as each of them is required to vote for death in order for that punishment to take place, each has the power to give the defendant life unilaterally.

2.     **Jurors Believe They Are Required to Return a Verdict of Death When Confronted With the Issue of Future Dangerousness**

The Supreme Court ruled in *Woodson v. North Carolina* that no state can require the death penalty solely on the grounds that specific aggravating circumstances have been established. *Woodson v. North Carolina*, 428 U.S. 280 (1976). This means that, despite a state's requirement that jurors in a capital case must consider any aggravating circumstances, jurors cannot be obligated to make a decision of death solely because these factors exist. Unfortunately, this

---

[28]
See Joseph L. Hoffman, *Where's the Buck? Juror Misperception of Sentencing Responsibility in Death Penalty Cases*, 70 IND. L.J. 1137, 1157 (1995) (explaining that jurors, even when not outwardly misled, find ways of avoiding their responsibility in death sentencing decisions).

26

91

constitutional mandate is profoundly misunderstood by capital jurors in Texas, resulting in both confusion and an unjust process that culminates in improper executions.

The future dangerousness, or "continuing threat," special issue in Texas is so illogically framed in its statement of the state's burden of proof as to impose no actual burden on the prosecution at all to prove the single aggravating factor upon which a defendant can obtain any review.  As it currently stands, Texas courts' instructions allow jurors to rest their decisions upon the mere *possibility* that the defendant *might* be a threat to *free society* at some time in the future, instead of holding the State to its burden of proving a *probability*, *beyond a reasonable doubt*, of such a threat to *prison society*.  The risk of a possibility does not rise to the required standard of proof, and the cause of the jurors' inability to hold the State to its burden is the framing of the burden in the instruction itself.  Without clearly defining and explaining the State's burden of proof on the issue of future danger, the courts force jurors to labor under confusion during their deliberations.  Indeed, numerous studies show that jurors in capital cases are frequently confused about the proper burden of proof.[29]  This confusion is compounded by the preconceived notions regarding the death penalty held by most jurors as well as the faulty procedures underlying the gathering and admission of evidence concerning future dangerousness.

### a. The Ill-Defined Capital Jury Instruction

Article 37.071, § 2(b)(1) of the Texas Code of Criminal Procedure states that in a capital case, "[T]he court shall submit . . . to the jury . . . whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) (Vernon Supp. 2006).  The state bears

---

[29]   *See* John Blume, et.al., *Lessons from the Capital Jury Project*, in BEYOND REPAIR: AMERICA'S DEATH PENALTY (Stephen Garvey, ed., 2003); *see also* Shari Seidman Diamond & Judith N. Levi, *Improving Decisions in Death by Revising and Testing Jury Instructions*, 79 JUDICATURE 224 (1996); Eisenberg & Wells, *supra* note 14.

27

92

the burden of proving this probability beyond a reasonable doubt. *Id.* § 2(c). This jury instruction is a misleading denial of due process and due course of law—both of which are constitutionally guaranteed—as well as a violation of the guarantees against cruel and unusual punishment.

The court's failure to define the statutory terms is objectionable because it impermissibly leads the jurors to believe they are required to give death for undefined qualifications. The term "probability," without proper explanation, may mean to a juror no more than a bare chance; "criminal acts of violence" may mean no more than traffic violations; "threat" no more than minor property damage or loss; and "continuing" may similarly mean only for a very short time. Perhaps the most unsettling and potentially misleading of these terms, however, is the word "society." This is because, despite the alternative of life without parole, Texas courts refuse to explicitly limit the "society" to which capital defendants presumably pose a threat as prison society, rather than society as a whole.[30] Apparently, Texas courts simply assume jurors will naturally construe the statutory term in such a limited manner on their own. *See Rougeau v. State*, 738 S.W.2d 651, 660 (Tex. Crim. App. 1987), *overruled on other grounds by Harris v. State*, 784 S.W.2d 5, 18–19 (Tex. Crim. App. 1989) (finding that the term "society" is "usually dependent upon the context in which the word is used," and asserting that in the capital sentencing context the "jury would clearly focus its attention on the 'society' that would exist for the defendant and *that* 'society' would be the 'society' that is within the Department of Corrections"). However, as we have seen, there is no reason to believe that lay jurors will be

---

[30] Meghan Shapiro, Article, *An Overdose of Dangerousness: How "Future Dangerousness" Catches the Least Culpable Capital Defendants and Undermines the Rationale for the Executions It Supports*, 35 AM. J. CRIM. L. 145, 150–51 (2008).

28

93

able to decipher such a specific and confusing point of law without further instruction from a judge.

This problem is particularly salient given the extremely low actual prison violence rates of incarcerated capital murderers, who were found by a recent study to be "among the most docile and trustworthy inmates in the institution."[31] Indeed, risk assessment experts have determined, based on large-scale data collection of prison behavior, that the estimated likelihood a newly imprisoned capital murderer will commit any violence whatsoever during his first forty years of incarceration is only 16.4%.[32] The probability that an incarcerated capital defendant will commit another murder during that time period is a mere 0.2%.[33]   Unfortunately, most jurors are completely unaware of these statistics and instead rely on their own misconceptions and the dubious testimony of so-called "experts."[34]

Furthermore, many jurors refuse to even accept the underlying notion that convicted capital murderers who are sentenced to life without parole in lieu of death will actually remain in prison for the rest of their natural lives.[35]   In practice, therefore, failure by Texas courts to limit the term "society" specifically to the prison population may violate the Supreme Court's ruling in *Simmons*, which forbade the states from "creat[ing] a false dilemma by advancing generalized

---

[31]   Shapiro, *supra* note 30, at 162 (quoting Jonathan R. Sorensen, *Criminology: An Actuarial Risk Assessment of Violence Posed By Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251, 1256 (2000) (analyzing data obtained through capital juror exit polls)).

[32]   Sorensen, *supra* note 31, at 1264.

[33]   *Id.*

[34]   For example, one study showed that capital jurors believed there was an 85% likelihood of violent crime and a 50% likelihood of another homicide being committed by offenders serving a life sentence. *Id.* at 1269. For more on jurors' reliance on the dubious predictions of future dangerousness by psychiatric "experts," see *infra* Part III.B.2.c.

[35]   Bowers & Steiner, *supra* note 13, at 650 (explaining the persistent phenomenon that most jurors do not believe that a sentence of life without parole actually eliminates the availability of parole).

29

94

arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994); *see also Ramdass v. Angelone*, 530 U.S. 156 (2000) (limiting the applicability of *Simmons* to cases where the defendant is definitively ineligible for parole). Thus, although the only "society" convicted capital defendants could pose a "continuing threat" to is prison society, and although that threat is exceedingly small, there nevertheless remains a great, unconstitutional danger that jurors will base a death sentence on misunderstood, unrealistic, and outright incorrect interpretations of future threat, rather than on the proper law and statutory guidelines.

The failure to define these important statutory terms may also be regarded by jurors as strategic in that it implies that death is the preferred sentence and amounts to a subtle comment on the weight of the evidence to be considered under both special issues. Consideration of mitigating circumstances may then become conditional upon, and perhaps related to, a future dangerousness finding far too easily made. Again, without meaningful guidance from a judge, jurors are left to speculate as to how such evidence should be interpreted.

In any event, this potential for misinterpretation leads to violations of a capital defendant's statutory right to a unanimous verdict. In order for a capital defendant in Texas to be considered a continuing threat, the jurors must be unanimous in their decision to answer "yes" to the future dangerousness issue. TEX. CODE CRIM. PROC. art. 37.071 § 2(d)(2) (Vernon Supp. 2006); *see also supra* Parts III.A.2–3 (discussing Texas's 10-12 Rule). However, even if all twelve jurors answer in the affirmative, there is no assurance that they will all have based their answer on the same definitions of the various statutory terms. Thus, when jurors are unclear as to what the terms mean, they may each conclude that the defendant poses a future danger for a different

30

95

reason. The mathematical possibilities created by twelve jurors individually interpreting five statutory terms—"probability," "criminal acts of violence," "continuing," "threat," and "society"—are astounding. Indeed, there are potentially thousands of verdicts in this situation. This variance is clearly far from the unanimity required under Texas law, and hence violates the very statute by which the sentencing process is led. Without further instructions as to what future dangerousness means, jurors are unable to make a decision that comports with Texas's capital sentencing requirements.

The issue of future dangerousness can be clarified with proper jury instructions given by the court. Thus, Texas courts must define more clearly for the jury what the terms in Article 37.071 mean so as not to permit a misunderstanding on the part of the jurors as to what verdict is required. Failure to do so amounts to nothing less than a violation of the constitutional and statutory rights of capital defendants. And yet, despite any efforts that Texas may make to improve the clarity of its statutory requirements, and regardless of whether or not Texas takes the steps proffered above, jurors may still be unable to demonstrate an understanding of the future dangerousness issue enough to ensure a constitutional trial.

**b.     *Jurors' Fear of Personal Responsibility for Possible Future Violent Acts***

The lack of an accurate definition of relevant statutory terms coupled with the influence of misleading evidence regarding future dangerousness distort the constitutional function of capital sentencing by replacing the jurors' duty to consider the defendant's culpability with a fear of responsibility for later acts of violence if the defendant is not executed. That is, these factors create an unwarranted fear in the minds of jurors that their failure to impose a death sentence while they have the opportunity could lead to escalated prison violence or the eventual release or escape of violent prisoners. Ultimately, as a result of the future dangerousness special issue,

31

96

death sentences may be handed down through a perverse balancing test based on "jurors' fear of the imagined consequences attendant to an incorrect prediction of *non-dangerousness*, since the consequences of an incorrect prediction of *dangerousness* are comparably less."[36]  However, the facts demonstrate that these imagined consequences are, statistically speaking, extraordinarily unlikely.

Still, the risk that aggravation evidence based on the defendant's culpability will be overshadowed by the jurors' fear of responsibility for future violence stemming from evidence of future dangerousness may manifest itself in several ways.  First, it may give jurors a means to rationalize ignoring weaknesses in the prosecution's case for properly seeking a culpability-based execution.  Second, it may divert jurors' attention away from thoroughly considering the culpability-based aggravation evidence altogether.  Finally, the fear of responsibility for future violence may cause jurors to twist otherwise compelling mitigation evidence—such as evidence of juvenile status or low intellectual functioning[37]—into justification for believing the defendant poses a future threat of violence.[38]

Generally, the transformation of mitigating circumstances into aggravating factors in the minds of jurors is permissible unless the jury is stripped of the ability to consider it as mitigation altogether.  *See Penry v. Lynaugh*, 492 U.S. 302, 320 (1989).  However, these inherent problems with the future dangerousness inquiry have the potential to make the entire culpability inquiry

---

36      Shapiro, *supra* note 30, at 178 (emphasis added).

37      It is well-documented that certain types of mitigation evidence such as these may serve as a "two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (citing *Penry v. Lynaugh*, 492 U.S. 302, 323–25 (1989)) (discussing the impact of mental retardation as a mitigating factor); *see also Roper v. Simmons*, 543 U.S. 551, 567–71 (2005) (generally analyzing the juvenile death penalty in terms of mitigating and aggravating circumstances).

38      Shapiro, *supra* note 30, at 168–69.

32

97

moot, thereby rendering it unconstitutional.[39]   The admission of evidence of questionable validity serves to further this dangerous potential.

### c.   The Impact of Untrustworthy "Expert" Testimony

One of the most common methods of proving the future dangerousness special issue is through the testimony of so-called "expert" witnesses in the form of clinical "dangerous diagnosticians," or psychiatrists who claim to be able to diagnose a defendant's risk of future dangerousness to a high degree of certainty.[40]   However, the predictions made by such witnesses are notoriously unreliable.   For example, the American Psychiatric Association asserted as far back as 1983 that predictions of long-term future dangerousness are, at best, "wrong in at least two out of every three cases," with some measures placing the error rate as high as 85%.[41]   One researcher found the rate of incorrect prediction even higher, reporting that mental health professionals were wrong in 95% of 155 Texas cases, taking into account even slightly violent behavior causing only minor injuries.[42]   Other studies have bolstered these conclusions, finding

---

39

  *Id.* at 169.

40

  *Id.* at 159.  A second, more legitimate class of experts, known as a "risk assessors," limits themselves to pointing out traits associated with an increased risk of future violence, rather than making individualized conclusions about particular defendants.  However, this field is relatively newer and, although more scientifically reliable, has faced greater difficulty being admitted as evidence in the courts. *Id.* at 159–60.

41

  Amicus Brief of the American Psychiatric Ass'n for Petitioner at 14, *Barefoot v. Estelle*, 463 U.S. 880 (1983) (No. 82-6080).

42

  John F. Edens, et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is It Time to "Disinvent the Wheel"?*, 29 LAW & HUM. BEHAV. 55 (2005).

33

98

that mental health professionals are highly skeptical of their own predictions and that academics have almost universally rejected their reliability.[43]

Perhaps the most recent study of convicted capital defendants found the degree of error in assertions of future dangerousness among federal prosecutions to be "sobering, both in its inability to discriminate who will and will not engage in violent misconduct in prison and in the minority who fulfill the prediction."[44] Although the federal prosecutors had asserted that all of the inmates in the study posed a future threat, less than one percent of them went on to commit an assault causing moderate injuries, and zero caused a life threatening injury, assaulted a member of the prison staff, or committed another homicide.[45] Thus, it is apparent that prosecutors exercise poor judgment in putting forth dangerousness assertions, and that such predictions are generally unreliable. Still, these experts continue to testify in Texas, claiming to be able to predict future dangerousness with scientific certainty.[46]

Unfortunately, Texas courts also continue to give an inflated level of credence to such suspect expert testimony. This practice dates back to before 1983, when the United States Supreme Court refused to overturn a Texas death sentence based on questionable psychiatrist testimony regarding the defendant's future dangerousness in the landmark case of *Barefoot v.*

---

[43]    Mark David Albertson, *Can Violence Be Predicted? Future Dangerousness: The Testimony of Experts in Capital Cases*, 3 CRIM. JUST. 18, 21 (1989) (finding clinicians' average self-reported future dangerousness accuracy rate to be between 40–46%); JOHN MONAHAN, PREDICTING VIOLENT BEHAVIOR: AN ASSESSMENT OF CLINICAL TECHNIQUES 21 (1981) ("Rarely have research data been as quickly or nearly universally accepted by the academic and professional communities as those supporting the proposition that mental health professionals are highly inaccurate at predicting violent behavior.").

[44]    Mark D. Cunningham, Thomas J. Reidy, & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 LAW & HUM. BEHAV. 46, 61 (2008).

[45]    *Id.*

[46]    *See* Brent E. Newton, *A Case Study in Systemic Unfairness: The Texas Death Penalty, 1973-1994*, 1 TEX. J. C.L. & C.R. 1, 23 (1994) (noting that one "expert" was cited as predicting dangerousness to "100% certainty," or similar language, in 141 capital cases in Texas alone).

34

99

*Estelle*, 463 U.S. 880 (1983). Courts have also been reluctant to consider experimental research in this area. *See, e.g.*, *Lockhart v. McCree*, 476 U.S. 162, 168–73 (1986) (rejecting multiple social science studies regarding jurors' predispositions as inadequate to support a constitutional challenge against the imposition of the death penalty). Instead, they have preferred to rely on jurors' ability to separate the "wheat from the chaff," *Barefoot*, 463 U.S. at 901, by appropriately discounting unreliable expert testimony through existing adversarial procedures such as cross-examination and competing defense witnesses. The empirical evidence, however, indicates that jurors are frequently unable to do so.[47]

The most troubling aspect of expert testimony predicting future dangerousness, then, is not merely its extremely high unreliability or continued evidentiary admissibility, but instead the great probative weight that jurors ascribe to it. Several studies based on interviews with jurors in the capital punishment context indicate that jurors place substantial weight on expert testimony of future dangerousness during sentencing.[48]  Recently, Krauss, McCabe, and Lieberman performed a study on jurors' reactions to expert testimony regarding future dangerousness, using valid samples (i.e., subjects taken from an actual jury pool) and realistic simulations (i.e., trial transcripts taken from actual cases).[49]  Specifically, they compared two types of psychiatric

---

[47]  *See* Daniel A. Krauss, John G. McCabe & Sarah McFadden, *Limited Expertise and Experts: Problems with the Continued Use of Future Dangerousness in Capital Sentencing*, in MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY, PUNISHMENT, AND COMPETENCY 135 (Robert F. Schopp, Richard L. Wiener, Brian H. Bornstein & Steven L. Willborn eds., 2009) (finding that jurors lack the ability to accurately differentiate between scientifically valid versus invalid expert testimony and properly weigh each in their decisionmaking).

[48]  Daniel A. Krauss, John G. McCabe & Joel D. Lieberman, *Dangerously Confused? Jurors' Reactions to Expert Testimony on Dangerousness in a Sexually Violent Predator Trial* 11 (Working Paper Series, July 13, 2009), *available at* http://papers.ssrn.com/abstract_id=1433522 (citing John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 CORNELL L. REV. 397 (2001); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decisions Under the Special Issues Sentencing Framework*, 18 LAW & HUM. BEHAV. 151 (1994)).

[49]  *Id.* This study dealt with predictions of future dangerousness in the context of sexually violent predators, rather than capital murderers. However, the findings are relevant in the capital sentencing context as well because it is left to the jury in both situations to determine how much weight to grant to the expert predictions of mental

35

100

evaluations: the all-too-common yet less reliable or scientifically based clinical hunches such as those put forth in *Barefoot*; and the scientific, empirically based assessments derived from actuarial instruments or guided professional judgment measures.[50]  They found that jurors clearly favored the less scientifically valid clinical testimony over more accurate actuarial assessments. Essentially, they determined that "a fundamental disconnect in juror decisionmaking appears to exist in this context—jurors are more persuaded by less accurate expert testimony."[51]

Researchers have also found that the adversarial methods historically believed to enable jurors to differentiate between reliable and unreliable witness testimony are in fact ineffective at doing so.  For example, the study discussed above found that cross-examination does little to dissuade jurors from believing prosecution experts, as "[t]he jurors viewed the experts . . . as substantially similar even after cross-examination."[52]  Furthermore, another study determined that competing witnesses testifying on a capital defendant's behalf have little effect on jurors. This is because jurors' misguided faith in inaccurate expert testimony applies with particular force to prosecution experts, who jurors perceive as more credible, as opposed to defense experts, who jurors see more as "hired guns."[53]  This inequity may stem in part from the fact that prosecution experts generally testify to an affirmative—albeit scientifically unreliable, as discussed above—assessment that the defendant will pose a future danger, whereas defense experts typically testify only that the prosecution expert's diagnosis was unfounded in science

---

50  health clinicians regarding future dangerousness, with the defendant's liberty similarly at stake. *Id.* at 7.

The former correspond to the common but illegitimate "dangerous diagnosticians," while the latter correspond to the less widespread but more reliable "risk assessors," discussed at *supra* note 40 and accompanying text.

51  Krauss et al., *supra* note 48, at 28.

52  *Id.* at 26.

53  Shapiro, *supra* note 30, at 164 (quoting Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1129–30 (1997)).

36

**101**

(rather than testifying affirmatively that the defendant will not pose a future danger).  Whatever the reason, such testimony is not helpful to the jury in deciding on the defendant's appropriate level of culpability, but only serves to fuel the jurors' misinformed, speculative fear, which has little or no basis in science or law.

Thus, the effects of admitting testimony purporting to predict future dangerousness is potentially highly prejudicial.  Indeed, unless and until courts reevaluate their deference to misguided expert testimony, they run the risk of exposing jurors to less accurate clinical testimony while shielding them from more accurate actuarial testimony.  Furthermore, even if both types of testimony are admitted, there is still a substantial likelihood of injustice occurring because of jurors' documented preference for unreliable clinical testimony.[54]  In addition to such problematic interpretation of scientific evidence, capital defendants must also overcome the myriad of misconceptions about the capital sentencing process already commonly perceived by capital jurors.

### d.    *Common Juror Misconceptions*

In no state are jurors free of the misconception that the law requires the death penalty if the evidence establishes that the murder was "heinous, vile or depraved" or the defendant would be "dangerous in the future."  The numbers of overall jurors who believed that they were *required* to return a verdict of death is still staggeringly high.  Jurors who gave a death sentence that were interviewed by the CJP explained what were called "operative factors" that shaped their sentencing decisions.  As the study explained:

> While most of the jurors who voted for death (64%) cited the "manner of the killing" as an operative factor, more than half (54%) gave the impermissible "presumption of death" as a factor,

---

[54]        Krauss et al., *supra* note 48, at 28.

37

102

the constitutionally forbidden belief that the death penalty was the correct or appropriate punishment, unless they could be persuaded otherwise. As one juror bluntly put it, "Of course he got death. That's what we were there for." [55]

These accounts typically concerned the demeanor of the defendant and the juror's perception of his future dangerousness if not sentenced to death:

CA:   Once I was convinced that he did it, I was convinced that he was kind of cold-blooded and didn't have any feelings, basically.

KY:   I can't explain to you how he looked but I guess that's when I knew . . . the way he sat there.

TX:   I think this feeling came about over days of watching him and knowing he could do something like that again.[56]

The defendant's likely future dangerousness is an especially prominent theme—the likelihood that "he could do something like that again," in the words of the juror just quoted:

SC:   When we heard all of the evidence I thought he would be dangerous if he got out and in thirty years he might still be dangerous.

CA:   I feel he's like a dangerous snake. I feel that he might be a threat.

TX:   Well while he was in jail waiting to go to trial for this he got in a fight. And I could see that to me, or it looked like somebody, he wasn't going to change. And if he was let back into society he would continue with his path of crimes.

CA:   [W]e didn't want him to get back out on the street again.[57]

---

[55]    ACKER ET AL., *supra* note 2, at 41, 45–46.

[56]    William J. Bowers, Marla Sandys, & Benjamin D. Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making*, 83 CORNELL L. REV. 1476, 1499 (1998).

[57]    *Id.* at 1500.

38

103

As indicated, some jurors found the fact of guilt and the nature of the crime compelling. They believe death is called for when the crime is heinous, the evidence is explicit, the defendant appears unrepentant, or seems apt to repeat his crime.

In Texas, where future dangerousness is a factor to be considered pursuant to Article 37.071, over 44% of capital jurors interviewed believed that the death penalty was required if they found the murder "heinous, vile, or depraved." Furthermore, an egregiously high proportion (68.4%) believed that they had to return a verdict of death if they believed that the defendant would be dangerous in the future. In terms of the future dangerousness issue, this percentage is startlingly higher than capital jurors in any other state:

| Table 4 | Percentages of Jurors Thinking Law Required Death if Defendant's Conduct was "Heinous, Vile or Depraved," or Defendant "Would be Dangerous" in Future by State [58] | | |
|---|---|---|---|
| | DEATH REQUIRED IF DEFENDANT'S CONDUCT IS HEINOUS, VILE OR DEPRAVED | DEATH REQUIRED IF DEFENDANT WOULD BE *DANGEROUS IN FUTURE* | <u>N</u>* |
| Alabama | 56.3% | 52.1% | 48 |
| California | 29.5% | 20.4% | 146 |
| Florida | 36.3% | 25.2% | 111 |
| Georgia | 51.4% | 30.1% | 72 |
| Indiana | 34.4% | 36.6% | 93 |
| Kentucky | 42.7% | 42.2% | 109 |
| Missouri | 48.3% | 29.3% | 58 |
| N. Carolina | 67.1% | 47.4% | 76 |
| Pennsyl. | 56.9% | 37.0% | 73 |
| S. Carolina | 31.8% | 28.2% | 110 |
| Tenn. | 58.3% | 39.6% | 48 |
| Texas | 44.9% | 68.4% | 117 |
| Virginia | 53.5% | 40.9% | 43 |
| **All States** | **43.9%** | **36.9%** | **1136** |

---

[58]
    Bowers & Foglia, *supra* note 25, at 72–73.

39

* The number of subjects answering each question varied slightly, and the number (N) for each state is the lowest number of subjects answering any of the questions.

These mistaken beliefs result in a jury that is much more likely to return a verdict of death. Therefore, in order to preserve any semblance of constitutionality, it is imperative that Texas courts instruct with more clarity the meanings of the future danger issue in 37.071, both in the phrases used by the statute and in the manner in which to determine this qualification.

### 3. Jurors Have a Predetermined Stance On the Death Sentence and Do Not Consider Mitigating Circumstances

The Eighth and Fourteenth Amendments dictate that there be an individualized determination of the appropriate sentence for each defendant. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). Just as the statutory scheme cannot preclude consideration of mitigating evidence, so too "the sentencer [may not] refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). Simply allowing the mitigating evidence be admitted is not enough. "The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *see also Mills v. Maryland*, 486 U.S. 367 (1988) (holding that requirement of unanimous jury finding on mitigating factors created unconstitutional barrier to consideration of relevant mitigating evidence); *Skipper v. South Carolina*, 476 U.S. 1 (1986) (finding that excluding relevant mitigating evidence of defendant's adjustment to prison setting violates *Eddings*). Only when the capital juror is free to consider and give effect to all mitigating evidence is there an assurance that there has been an individualized sentencing determination. *Lockett*, 438 U.S. at 605.

40

105

### a.   Preconceptions and Jurors' Ability to Consider Mitigation Evidence

*Witherspoon*'s prohibition against a capital jury biased toward death was extended in *Morgan v. Illinois*, 504 U.S. 719 (1992), to require the disqualification of death-biased jurors. The *Morgan* Court held that potential jurors who would automatically impose a sentence of death without regard to mitigating circumstances are disqualified from serving as capital jurors. Leaving such jurors on a capital jury violates the capital defendant's constitutional right to an impartial jury. The opinion in *Morgan* states:

> A juror who will automatically vote for the death penalty will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. *If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence.*

> \* \* \* \*

> Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.

*Id.* at 729 (emphasis added).

*Morgan* is significant because the Court made it clear that attorneys must not be precluded from examining potential jurors about their ability to consider the mitigating evidence likely to be presented. Adequate *voir dire* on these subjects "plays a critical function" of insuring that the jury is not skewed toward a verdict of death. *Id.* at 730. The capital defendant has a constitutional right to an individualized determination of the appropriate sentence, no matter how bad the crime.

41

**106**

In addition, the *Morgan* Court defined what the term "impartial" means in a capital case:

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, *a juror must be as "indifferent as he stands unsworne."* Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. This is true, *regardless of the heinousness of the crime* charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in *1 Burr's Trial 416* (1807). *"The theory of the law is that a juror who has formed an opinion cannot be impartial."* *Reynolds v. United States*, 98 U.S. 145, 155 (1879).
>
> \* \* \* \*
>
> Thus it is that our decisions dealing with capital sentencing juries and presenting issues most analogous to that which we decide here today, [citations omitted], have relied on the strictures dictated by the Sixth and Fourteenth Amendments to ensure the impartiality of any jury that will undertake capital sentencing.

*Id.* at 727–28 (emphasis added).

**b.    The Presentation of Mitigation Evidence**

Furthermore, if the State's prosecuting team withholds from defendant and trial defense counsel information that, considered as a whole, contained material exculpatory, impeaching or mitigating *Brady* material, and if said material had been presented to the trial jury as direct, circumstantial or impeaching evidence, there is a "reasonable probability" that a different result would have been obtained. In other words, "the suppression of the evidence 'undermined confidence in the outcome of the trial,'" regardless of the good or bad faith of the prosecutor and even if the police had failed to disclose that evidence to that prosecutor or any one in the prosecutor's office. *See Kyles v. Whitley*, 514 U.S. 419 (1995) (holding that reversal is required

42

**107**

if, after considering the suppressed evidence collectively, the court finds there is a reasonable probability that a different result would have been obtained but for that suppression of the evidence that undermined confidence in the outcome of the trial); *United States v. Bagley*, 473 U.S. 667 (1985) (impeaching evidence is favorable to the accused under *Brady v. Maryland*, 373 U.S. 83 (1963); however, the failure to disclose impeaching evidence on request constitutes constitutional error only if it deprives defendant of a fair trial, i.e., the suppression undermines confidence in the outcome); *Brady v. Maryland*, 373 U.S. 83 (exculpatory evidence).

The real question for potential jurors regarding their views about capital punishment is whether those views would prevent or impair the juror's ability to return a verdict of a term of years, life without parole, or death in the case before the juror. If a fact or circumstance specific to the case would cause the potential juror to invariably vote for death regardless of the strength of the mitigating evidence the defense might present, then the juror's partiality is impaired and he should be excused for cause. For these reasons, the parties in a capital case must be permitted to probe into juror attitudes about the significant facts in the specific case.

### c.   *Sentencing Determinations Made During the Guilt Phase of Trial*

Approximately 30% of all capital jurors nationwide made the decision that the defendant should receive the death penalty *while evidence was still being introduced at the guilt phase of the trial*. In Texas, this number climbs to over 37%. Thus, an admonition like that contained in Article 37.071 § 2(e)(1) (stating that the court shall instruct the jury to consider whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed") is of highly questionable effectiveness. Tex. Code Crim Proc. art 37.071 § 2(e)(1) (Vernon Supp. 2006).

43

108

| Table 1: | Percentage of Capital Jurors Taking Each Stand on Punishment Before Sentencing Stage of the Trial in 13 States |
|---|---|

59

| States | Death | Life | Undecided | No. of jurors |
|---|---|---|---|---|
| Alabama | 21.2 | 32.7 | 46.2 | 52 |
| California | 26.1 | 16.2 | 57.7 | 142 |
| Florida | 24.8 | 23.1 | 52.1 | 117 |
| Georgia | 31.8 | 28.8 | 39.4 | 66 |
| Indiana | 31.3 | 17.7 | 51.0 | 96 |
| Kentucky | 34.3 | 23.1 | 42.6 | 108 |
| Missouri | 28.8 | 16.9 | 54.2 | 59 |
| North Carolina | 29.2 | 13.9 | 56.9 | 72 |
| Pennsylvania | 33.8 | 18.9 | 47.3 | 74 |
| South Carolina | 33.3 | 14.4 | 52.3 | 111 |
| Tennessee | 34.8 | 13.0 | 52.2 | 46 |
| Texas | 37.5 | 10.8 | 51.7 | 120 |
| Virginia | 17.8 | 31.1 | 51.1 | 45 |
| All States | 30.3% | 18.9% | 50.8% | 1135 |

The evidence establishes that most early pro-death jurors do not even wait for guilt-phase deliberations to begin before deciding the penalty. Pro-death jurors prejudge the penalty decision during the guilt phase, long before they have even had the opportunity to discuss it with any of their fellow jurors or heard any of the capital defendant's mitigating evidence.[60] Many of these early pro-death jurors cite convincing proof of guilt as the reason for their early pro-death stands:

> FL: When I was convinced he was guilty—when we were going through the hard evidence.

> NC: After the pathologist report, after I was convinced he was the one who did it.

> FL: When I knew in my heart that he was guilty . . . . This was after hearing the forensic evidence from prosecution.

---

59
    *Id.* at 57.

60
    Bowers et al., *supra* note 56, at 1497.

TX:   Uh, before we actually voted, before we went in there. I was pretty sure, I mean, I was absolutely sure, because I truly believe in what the Bible says and I think I told them this when they chose me.

For some jurors, it was the grotesque or gruesome nature of the crime that convinced them that death should be the punishment:

KY:   Once guilt was established that (the defendant) had committed this gruesome crime. I had no problem at all determining what punishment was applicable.

MO:   Um, I'd say probably right when the prosecutor made the statement. She was stabbed twenty-two times.

SC:   When they started to talk about the brutality of the crime.[61]

Many jurors stressed the role of physical evidence, especially photographs or video tapes, as critical in their punishment decisions:

AL:   When the D.A. handed us the pictures.

CA:   Video tape portion of the trial. (When the jury viewed a video tape of the killing that a store monitoring system had recorded.)

KY:   After I saw pictures and hair and semen analysis.

MO:   (After) looking at the pictures and seeing you know, the crime, the autopsy photos.

FL:   During the evidence - when (I) saw the pictures of the victim.

MO:   After I knew, when they showed us the photographs of (the victim) and how he had been murdered. I knew (the defendant) had done it by the video tape but I didn't know how severe and how gruesome it was.[62]

---

[61]   *Id.* at 1498.

[62]   *Id.*

45

110

In a few instances they gave vivid accounts of how photo or video evidence had affected them:

> NC:   During the trial. I can tell you . . . when we saw pictures of this woman's body, burned . . . .   Where her feet were burned off . . . .   Horrible, horrible pictures of this.   That convinced me.

> CA:   Just sitting there watching (a video tape of the killing from a store monitoring system). I've seen a lot (of) stuff, but I never. . . .   Even Arnold Schwarzenegger movies didn't affect me like that, you know? This wasn't make-believe, watching that video tape. The video tape was very powerful. [63]

Thus, many jurors attribute their early stands for death to unquestionable proof of guilt, heinous aspects of the crime, and physical evidence, especially in photographs and audio or video tape.  In addition to the nature of the crime and the evidence of guilt, some early pro-death jurors focused on the defendant to explain what caused them to take a stand for death during the guilt stage of the trial. appreciate

In terms of how strongly early pro-death jurors felt about the decision they made to impose the death penalty, and in terms of how consistently they stuck to their early decision, the CJP data establishes that 97.4% of all early pro-death jurors "felt strongly about their early pro-death stance," with 70.4% indicting they were "absolutely convinced" and 27% indicating they were "pretty sure" about their decision.[64] Given these findings, the mandate of *Eddings*, that the sentencer must be able to both hear and give effect to mitigation, is not met.

> Most of these early pro-death jurors (59.5%) never wavered from their initial stance for death when questioned at the three subsequent points in the process. Presenting mitigating evidence during the penalty phase cannot be very effective when so many

---

[63]   *Id.* at 1499.

[64]   Bowers & Foglia, *supra* note 25, at 57.

46

111

jurors declare that they were already "absolutely convinced" that the defendant deserved death before they heard any mitigation evidence. Given the human proclivity to interpret information in a way that is consistent with what one already believes, it is not surprising that most jurors never waver from their premature stance. [65]

### 4. Moral Blameworthiness Instruction Creates a Needless Risk That the Client's Background Will Be Disregarded As a Mitigating Factor

The introduction of mitigating evidence is crucial to ensuring the defendant a fair trial under *Lockett* because, without this consideration, there is not an individualized determination of the proper sentencing for each defendant. *Lockett v. Ohio*, 438 U.S. 586, 606 (1978). When jurors are unable to understand the confusing sentencing instructions, or when courts impede the ability of the jurors to consider this evidence effectively, the constitutional safeguard of mitigating evidence is taken away, and the defendant's right to due process is impeded. It is therefore important to acknowledge the problems facing the use of mitigating evidence today and the objections necessary to any denial of this right by the courts.

In *Boyde v. California*, the Court held that the standard by which an instruction claim was to be judged is whether there is a "reasonable likelihood" that the instruction prevented consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U.S. 370, 380 (1990). In reaching this conclusion, the Court discussed other cases involving jury instructions concerning mitigating evidence that came prior to its decision. *Id.* at 378–79. In *Penry v. Lynaugh*, the standard set forth for determining the way in which constitutionality of jury instructions regarding mitigating evidence was to be determined was whether "a reasonable juror *could well have believed* that there was no vehicle for expressing the view that [the defendant] did not deserve to be sentenced to death based upon his mitigating evidence." *Penry v. Lynaugh*, 492 U.S. 302, 326 (1989) (emphasis

---

65    *Id.*

47

112

added). In *Franklyn v. Lynaugh*, the standard was "neither of the Special Issues as they *would have been understood by reasonable jurors* gave the jury the opportunity to consider petitioner's mitigating evidence." *Franklin v. Lynaugh*, 487 U.S. 164, 192 (1988) (Stevens, J., dissenting) (emphasis added).

As the Court struggled to define the proper mitigating evidence instructions, states tried to qualify the definition of mitigating evidence themselves. The struggle to define mitigating evidence is encapsulated in Article 37.071, which states that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (Vernon Supp. 2006). The problem herein lies in the fact that the moral blameworthiness instruction in 37.071 creates a risk that the client's background will be disregarded as a mitigating factor, and may instead be used as a question of moral culpability in committing the crime. It is difficult for courts to dissect whether or not they add this requirement when they do not understand mitigating circumstances in the sentencing process.

Through the pattern of the Court's decisions, the sentencing phase becomes a means of retribution instead of incapacitation. As Bowers and Steiner explain,

> When speaking of the sentencing decision, the Court has characterized the jury's function as making a retributive assessment of the defendant's moral blameworthiness and guilt; it has declined to analyze deterrence; and has characterized incapacitation as a secondary consideration. Thus, Justice O'Connor declared in *Enmund v. Florida* that the Eighth Amendment concept of proportionality requires a nexus between the punishment imposed and the defendant's blameworthiness. In *Tison v. Arizona*, it explained that, "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." Concerning the primacy of retributive over incapacitative purposes in jury sentencing, in *California v. Ramos*, Justice Marshall challenged incapacitation as a justification for imposing a death sentence, saying "[c]apital punishment simply cannot be justified as necessary to keep criminals off the streets." A year later in *Spaziano v. Florida*, the Court explicitly gave secondary standing to the goal of incapacitation, saying "incapacitation has never been embraced as a sufficient justification for the death penalty" and that "retribution clearly plays a more prominent role in a capital case." The Court concluded, "[i]n the context of capital felony

48

113

cases, therefore, the question whether the death sentence is an appropriate, non-excessive response to the particular facts of the case will depend on the retribution justification."[66]

Despite the fact that the death penalty has risen from the notions of incapacitation, the question remains whether jurors are able to give appropriate, non-excessive responses when they themselves are unaware of what it is that they are answering.

> This kind of retributive judgment, according to the Court, requires a "reasoned moral response" to the evidence and arguments, one unencumbered by ignorance or emotion and one supported with information sufficient and relevant for reliable rational decision-making. As Justice O'Connor wrote in her *California v. Brown* concurrence, "the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." In *Franklin v. Lynaugh*, Justice O'Connor stressed that full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a "reasoned moral response to the defendant's background, character, and crime."[67]

The *Penry* Court discussed the way in which a reasoned moral response can explain the individualized treatment, sentencing reliability, and retributive element of moral culpability.

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant . . . ." Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human being" and has made a reliable determination that death is the appropriate sentence. "Thus, the sentence imposed

---

66    Bowers & Steiner, *supra* note 13, at 624.

67    *Id.*

49

at the penalty stage should reflect a reasoned moral response to the
defendant's background, character, and crime."[68]

Yet with the differing standards set forth in *Penry*, *Lynaugh*, and *Boyde*, how can jurors reliably be considered to give a "reasoned moral response" that allows them to "consider and give effect" to mitigating evidence in their sentencing decision when they are unaware of what it is that they are considering?

The CJP research demonstrates that capital jurors fail to either understand or follow the instructions given in capital trials, or both. This is consistent with pre-CJP and non-CJP data and conclusions that significant numbers of capital jurors fail to understand the concept and role of mitigation in capital cases. Capital jurors fail to understand that they are not only allowed to consider mitigation, but they are required to do so even if it does not excuse or lessen the capital defendant's culpability for the murder. Thus, the commands of *Lockett* are being ignored. Jurors generally do not understand jury instructions. For more than twenty years, social scientists, linguists, psychologists, lawyers, and academics—not only those involved in the CJP— have been conducting experiments to determine whether jurors understand the instructions they are given during both civil and criminal trials.[69] The published findings, including several empirical studies, reveal that jurors experience a plethora of comprehensibility problems.[70] As one law

---

68    *Id.* at 625 (internal citations omitted).

69    *E.g.*, R.P. Charrow & V. Charrow, *Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions*, 79 COLUM. L. REV. 1306 (1979); *see also* Eisenberg & Wells, *supra* note 14; Joel D. Lieberman & Bruce D. Sales, *What Social Science Teaches Us About the Jury Instruction Process*, 3 PSYCHOL. PUB. POL'Y & L. 589 (1997); James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?* 70 IND. L.J. 1161 (1995); Judith L. Ritter, *Your Lips are Moving . . . But the Words Aren't Clear: Dissecting the Presumption that Jurors Understand Instructions*, 69 MO. L. REV. 163 (2004).

70    John Blume et al., *Lessons from the Capital Jury Project*, in THE MODERN MACHINERY OF DEATH: THE FUTURE OF CAPITAL PUNISHMENT (Duke University Press 2002); William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 IND. L. J. 1043 (1995); Bowers & Steiner, *supra* note 13; Charrow & Charrow, *supra* note 69; Mark Costanzo & Sally Costanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 LAW & HUM. BEHAV. 185 (1992); Diamond & Levi, *supra* note 29; Theodore Eisenberg et al., *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339 (1996); Eisenberg &

50

professor noted, "the empirical studies find that . . . it is neither rational nor logical to conclude that instructed jurors understand what they have been told."[71] Furthermore, this phenomenon pervades judicial proceedings in every state court throughout the nation, including the courts of the State of Texas.[72]

In particular, capital jurors have exhibited an inability to comprehend sentencing phase instructions.[73] Moreover, this low level of comprehension pervades every aspect of the sentencing procedure. From procedural knowledge about the decisionmaking process to a comprehensive understanding about the concepts of mitigation and aggravation, capital jurors exhibit a conspicuous lack of comprehension. Over half of the capital jurors (56.4%) studied in California failed to understand that the jury did not have to be unanimous about individual mitigating factors before they were allowed to consider them. Moreover, a third (37.6%) believed mitigating factors had to have been proven to them beyond a reasonable doubt before they could be considered.[74]

---

Wells, *supra* note 14; Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 COLUM. L. REV. 1538 (1998); C. Haney & M. Lynch, *Comprehending Life and Death Matters*, 18 LAW & HUM. BEHAV. 411–36 (1994); Geoffrey P. Kramer & Dorean M. Koenig, *Do Jurors Understand Criminal Jury Instructions? Analyzing the Results of the Michigan Juror Comprehension Project*, 23 U. MICH. J. L. REFORM 401 (1990); Lieberman & Sales, *supra* note 69; Luginbuhl & Howe, *supra* note 69; Ritter, *supra* note 69; Marla Sandys, *Cross-Overs—Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 IND. L.J. 1183 (1995); Laurence Severance & Elizabeth Loftus, *Improving the Ability of Jurors to Comprehend and Apply Criminal Jury Instructions.* 17 LAW & SOC'Y REV. 153 (1982); Walter W. Steele & Elizabeth G. Thornbury, *Jury Instructions: A Persistent Failure to Communicate*, 67 N.C. L. REV. 77 (1988); Richard L. Wiener et al., *The Role of Declarative Knowledge in Capital Murder Sentencing*, 28 J. APPLIED PSYCHOL. 124 (1998); Richard L. Wiener, *Comprehensibility of Approved Jury Instruction in Capital Murder Cases*, 80 Journal of Applied Psychology 455 (1995).

71  Ritter, *supra* note 69, at 197.

72  *E.g.,* Steele & Thornbury, *supra* note 70 (finding that the majority of potential jurors in both civil and criminal cases in Dallas County, Texas could not understand the jury instructions).

73  *E.g.* Luginbuhl & Howe, *supra* note 69; *see also* Haney & Lynch, *supra* note 70; Ritter, *supra* note 69, at 200–01.

74  Bowers & Foglia, *supra* note 25, at 66–71.

116

The reasons for this massive misunderstanding of the rules which are supposed to guide and channel capital jury decisionmaking is the lack of familiarity with the capital sentencing process—i.e., the total absence of any culturally normative experience with the unique kind of decision capital jurors are called upon to make.

Americans are very familiar with a jury's role as factfinder.  This role is a longstanding part of our culture.  However, Americans are *not* familiar with the role a capital jury has in making the decision as to whether the capitally accused should live or die. American jurors are accustomed to finding facts such as whether a weapon was used, whether a taking of property was a theft, or whether a driver was legally intoxicated. They are unaccustomed to deciding what weight to give a capital defendant's dysfunctional childhood, serious psychiatric disorder, or brain damage in a capital sentencing.  Capital jurors have to resort to their own rules because terms like mitigation and aggravation have no meaning to them:

> [CA juror:]  The first thing we asked for after the instruction was, could the judge define mitigating and aggravating circumstances. Because the different verdicts that we could come up with depended on if mitigating outweighed aggravating, or if aggravating outweighed mitigating, or all of that.  So we wanted to make sure.  I said: "I don't know that I exactly understand what it means."  And then everybody else said, "No, neither do I," or "I can't give you a definition."  So we decided we should ask the judge.  Well, the judge wrote back and said, "You have to glean it from the instructions."

> [CA juror:]  I don't think anybody liked using those terms because when we did use them, we got confused . . . .  They were just confusing and I had never really used them before in anything. So, yeah, they sit there and throw these stupid words at you and I'm like, "Well, what do they mean?"  I get so confused "cause they sound the same."  I'm thinking, "Now which one was that again?" You know.  And it totally confused me.[75]

---

[75]  Haney et. al, *supra* note 12, at 168–69.

The net effect of these misunderstandings is that capital jurors are skewed toward a sentence of death.

> The misunderstandings reflected in these incorrect responses on the questions regarding how to handle mitigating and aggravating evidence all make a death sentence more likely. It is more difficult to find mitigating evidence than the law contemplates when jurors think they are limited to enumerated factors, must be unanimous, and need to be satisfied beyond a reasonable doubt. The CJP data show that nearly half (44.6%) of the jurors failed to understand the constitutional mandate that they be allowed to consider any mitigating evidence. Two-thirds (66.5%) failed to realize they did not have to be unanimous on findings of mitigation. Nearly half (49.2%) of the jurors incorrectly thought they had to be convinced beyond a reasonable doubt on findings of mitigation . . . . The constitutional mandate of *Gregg* and companion cases to guide jurors' exercise of sentencing discretion is not being satisfied when jurors do not understand the guidance.[76]

The CJP presents empirical data that shows the large percentage of Texas jurors who failed to understand crucial aspects of mitigating evidence in the sentencing process:

| Table 3 | Percentages of Jurors Failing to Understand Guidelines for Considering Aggravating and Mitigating Evidence | | | | | |
|---|---|---|---|---|---|---|

[77]JURORS WHO <u>FAILED TO UNDERSTAND</u> THAT THEY . . .

| State | Could consider any mitigating evidence | Need not be unanimous on mitigating evidence | Need not find mitigation beyond reas. doubt | Must find aggravation beyond reas. doubt | N* | |
|---|---|---|---|---|---|---|
| Alabama | 54.7% | 55.8% | 53.8% | 40.0% | 52 | |
| California | 24.2% | 56.4% | 37.6% | 41.7% | 149 | |
| Florida | 49.6% | 36.8% | 48.7% | 27.4% | 117 | |
| Georgia | 40.5% | 89.0% | 62.2% | 21.6% | 73 | |
| Indiana | 52.6% | 71.4% | 58.2% | 26.8% | 97 | |
| Kentucky | 45.9% | 83.5% | 61.8% | 15.6% | 109 | |
| Missouri | 36.8% | 65.5% | 34.5% | 48.3% | 57 | |
| N. Carolina | 38.7% | 51.2% | 43.0% | 30.0% | 79 | |

---

[76]    Bowers & Foglia, *supra* note 25, at 71.

[77]    *Id.* at 68.

53

118

| | | | | | | |
|---|---|---|---|---|---|---|
| Pennsy. | 58.7% | 68.0% | 32.0% | 41.9% | 74 | |
| S. Carolina | 51.8% | 78.9% | 48.7% | 21.9% | 113 | |
| Tenn | 41.3% | 71.7% | 46.7% | 20.5% | 44 | ** |
| Texas | 39.6% | 72.9% | 66.0% | 18.7% | 47 | |
| Virginia | 53.3% | 77.3% | 51.2% | 40.0% | 43 | |
| All States | 44.6% | 66.5% | 49.2% | 29.9% | 1185 | |

* The number of subjects answering each question varied slightly, and the number (N) for each state is the lowest number of subjects answering any of the questions.
** The number of Texas jurors is reduced in this table because these two questions were replaced by others while the interviewing in Texas was underway.

The above data clearly illustrate that jurors have an extremely skewed understanding of the way in which mitigating evidence factors into the sentencing of life or death. Because the nature of the process of considering mitigating evidence is often unusual for the jurors, it is imperative that the courts do everything in their power to alleviate confusion, as death is "so profoundly different from all other penalties." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

The unconstitutionally limiting definition of "mitigating evidence" as being anything that reduces moral blameworthiness presents a major problem.  This is because there is much in the way of mitigating evidence as allowed by *Tennard* and other cases that have nothing to do with moral blameworthiness, such as IQ levels (for example, those present in *Penry*) and the ability to transition well to prison life. *See Tennard v. Dretke 542 U.S. 274 (2004)*; *Skipper v. South Carolina*, 476 U.S. 1 (1986). To make matters worse, the phrase "mitigating evidence" is not used in the actual jury instruction.  The language in Article 37.071 is that jurors are to consider "mitigating circumstance or circumstances."  This creates a problem in the minds of the jurors not only because they are confused over mitigating evidence and mitigating circumstances, but the fact that "circumstances" is plural may lead jurors to wonder whether just one mitigating circumstance is enough for a sentence of life. Jurors may wonder why, if one circumstance is sufficient for a decrease in culpability, there is a second, plural qualification.

54

119

With such confusion by the jurors over mitigating evidence, the fact that moral culpability factors in at any stage may be even more confusing. It becomes risky that the jurors will consider the moral culpability not at the sentencing stage, but for the crime itself. If the jurors have already ruled that the defendant is guilty, they will obviously find the defendant morally culpable. And when the jurors believe that the moral culpability of the defendant determines whether that person is sentenced to life or death, the end result of death becomes all the more probable. When courts neglect to do their duty to instruct the jury effectively, and instead propagate confusion on the part of the juries, the sentencing phase of the judicial process becomes compromised. As such, the sentencing process becomes unconstitutional.

5.   **The Introduction of Victim Impact Evidence Without Procedural Safeguards is Unduly Prejudicial and Prevents the Jury from Handing Down a Sentence Based Upon A Reasoned Moral Response to Penalty Phase Evidence.**

In 1991 the Court, in deciding *Payne v. Tennessee*, held that the families of murder victims may be permitted to describe the emotional impact of the crime to the court and the jury at the penalty phase of a capital trial. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The rationale behind this was the incorporation of the harm done by the defendant into the jury's assessment of moral blameworthiness for the purpose of punishment. The Court stated:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. [T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

*Id.* at 825. As a preliminary point, it is worth noting that the Court's analysis suggests that the secondary, often unforeseeable and unintended, harm to the victim's family is a necessary consideration in determining the defendant's moral blameworthiness. Not only is it counterintuitive that unforeseeable and unintended consequences

55

120

of one's actions be factored into consideration of their moral blameworthiness, but the Court also disregards the degree to which the primary harm, i.e., the death of the victim has already, and appropriately, been considered by the jury. Unless it can be shown that the defendant intended the secondary harm to the victim's family, no inference of additional moral blameworthiness with regard to this harm can be made. Also, the jury will most likely have spent a large part of the guilt phase of the trial being informed as to the details of the crime and the harm done to the victim. This harm is the "specific harm caused by the defendant," and the harm for which he can reasonably be held morally accountable. *Id.*

Far from simply "counteracting" the defendant's mitigating evidence, victim impact evidence may, without statutory control, so overwhelm the emotions of the jury as to render their constitutionally required consideration of the relevant mitigating evidence impossible. *Id. The Court* asserted that victim impact evidence was to be considered for its informational (as opposed to emotional) value, pointing out that "[v]ictim impact evidence is simply another form or method of *informing* the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* (emphasis added). This characterization of victim impact evidence as purely informative, however, ignores the degree to which such evidence can overwhelm the emotions of the jurors. In separate opinions dissenting from a denial of certiorari in *Kelly v. California*, 129 S.Ct. 564 (2008) Justices Breyer and Stevens both quoted the following language from a district court opinion:

> I cannot help but wonder if *Payne* would have been decided in the same way if the Supreme Court Justices in the majority had ever sat as trial judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony . . . and the juror's sobbing during the victim impact testimony still rings in my ears.

*Id.* at 567 (quoting *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa, 2005)). The judge in *Johnson* elaborated on the degree to which such evidence is simply too prejudicial and emotionally overwhelming to be presented to the jury in a capital sentencing hearing. He argued that victim impact evidence is so overwhelming that, even with procedural safeguards,

56

121

"[S]uch potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias . . . ." *Johnson*, 362 F. Supp. 2d at 1107.

This prejudicial effect of Victim Impact Statements (VIS) during sentencing has been the subject of various empirical studies. One such study by Luginbuhl and Burkhead tested the influence of VIS on two groups of mock jurors: one group presented with Victim Impact Statements, and the other without. Half of the jurors in the group that considered victim impact testimony voted for the imposition of the death penalty, as opposed to only 20% for the group that did not consider such testimony.[78] A subsequent, similar study by Myers and Arbuthnot found that two-thirds of mock jurors exposed to VIS that voted for guilt during the first phase of trial also voted to impose a death sentence, compared with only one-third for those not considering such evidence.[79] These studies indicate a consistent, measurable effect of Victim Impact Statements that increase the likelihood of death sentences imposed by jurors due to powerful emotions undermining rational and reasoned decision-making.

In addition to this research, the emotional impact of this evidence is troubling for two reasons. First, there is evidence to suggest that jurors enter the penalty phase having already decided that the defendant should be put to death.[80] Under *Lockett v. Ohio*, 438 U.S. 586 (1978), jurors have a constitutional duty to consider all relevant mitigating evidence; however, victim impact evidence will serve to intensify their anger and overwhelm their ability to remain open to the mitigating evidence, thereby preventing them from performing their constitutionally required

---

[78] Jeremy A. Blumenthal, *Affective Forecasting and Capital Sentencing: Reducing the Effect of Victim Impact Statements*, 46 AM. CRIM. L. REV. 107, 111 (2009).

[79] *Id.*

[80] Bowers et al., *supra* note 56, at 1486–94.

duty.[81] Second, allowing victim impact evidence to overwhelm the emotions of the jurors in this fashion flies directly in the face of Supreme Court opinion on this issue. The court has indicated that the "sentence imposed at the penalty phase should reflect a reasoned moral response to the defendant's background, character, and crime *rather than mere sympathy or emotion.*" *California v. Brown*, 479 U.S. 538 at 545 (1987) (emphasis added); *see also Penry v. Lynaugh*, 492 U.S. 302, 327–28 (1989); *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988). A response to the defendant's crime as referenced above would include any response to the impact of the victim's death. The Court specifically requires that a sentence imposed in response to such consideration reflect a reasoned and moral decision rather than an emotional one. Victim impact evidence, as presented in the State of Texas today, forecloses that possibility. Such is the emotional impact of this evidence that a decision made after hearing it would likely be based upon impermissible emotional considerations. At the very least, the state should impose statutory controls on the use of victim impact statements during the penalty phase so as to protect the ability of the jurors to impose a sentence based upon a reasoned moral response to the evidence presented.

To allow the jury to hear victim impact statements without specific statutory authorization and safeguards determined by the legislature is to prevent them from meeting their duty to properly consider all mitigating evidence as required by the U.S. Constitution under the rule announced in *Lockett*, and to foreclose the possibility of a sentence that results from a reasoned moral response as required by *Brown*.

---

[81]      Susan A. Bandes, *Repellent Crimes and Rational Deliberation: Emotion and the Death Penalty*, 33 VT. L. REV. 17 (2009).

58

123

6.   **Race Can Play No Part in Capital Sentencing, Yet Race Is Continually a Factor in Juror's Decisions**

Race is another improper consideration for a capital sentencing jury.  Cases decided

subsequent to *Furman* determine that race cannot play any role in the capital jury's

decisionmaking.

> In a capital sentencing proceeding before a jury, the jury is called upon to make a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.'"
>
> ****
>
> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected.
>
> ****
>
> The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence. "The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."

*Turner v. Murray*, 476 U.S. 28, 33–35 (1986).

Safeguards must be followed to minimize the risk of race infecting the capital sentencing

determination.  For this reason, a capital defendant accused of an interracial crime is entitled to

have prospective jurors informed of the race of the victim and questioned on the issue of racial

bias. *Id.*

Furthermore, juries must be selected in a manner that is representative of the community

so that there runs less risk of discriminatory behavior on behalf of the jurors. While the Supreme

Court has repeatedly acknowledged that any attempt to separate the sentencer's decision from

his experiences would impose a false and inappropriate mechanical rigidity to the sentencing

59

124

proceedings, it has emphasized that the collective " moral, factual and legal judgment[s] of [juries] play a meaningful role in the sentencing." *Barclay v. Florida*, 463 U.S. 939, 950 (1983). The fair cross section requirement does not entitle a defendant to a jury that mirrors the community and reflects the numerous distinctive groups present in the population. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). However, the Sixth Amendment guarantees a defendant the *opportunity* for a representative jury by requiring that jury wheels, pools of names, panels, or venires from which the trial court draws juries must not systematically exclude distinctive groups in the community. If such systematic exclusion occurs, then the resulting jury fails to constitute a fair cross section of the community. *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979). In *Duren*, the Supreme Court set forth a three-part test to establish a prima facie case of the violation of the fair cross section requirement: (1) that the group alleged to be excluded is a "distinctive group in the community"; (2) that the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.* at 363.

CJP data demonstrates that in all 14 states, the process of capital jury decisionmaking is influenced not only by the race of the defendant and the race of the victim, but by both the racial composition of the jury and the races of the individual jurors.[82] CJP data further demonstrates

---

[82] William J. Bowers et. al, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 IND. L. J. 1043 (1995) (summarizing some of the early findings of the CJP). The data collection occurred in many states, including Texas (the south-central quadrant, consisting of Austin, Houston, San Antonio, and rural counties). In general, the study finds that jurors misunderstand the judge's sentencing instructions in ways that favor the impositions of the death penalty. Moreover, this study (like many of the other studies on this list) reveals that future danger continues to be of primary importance to jurors. Research found that the majority of jurors, ranging upward as much as 60%, were extremely concerned about the defendant's future dangerousness. *Id.*

60

125

that the outcome of a capital jury's verdict is greatly dependent on how many white males make it onto the jury and whether any African American males serve as jurors.[83]

The data demonstrates, for instance, that white male capital jurors (generally speaking) do not experience lingering doubt about the defendant's guilt. The dominance of white male jurors was strongly associated with the imposition of a death sentence of black defendants:

> The presence of five or more white males on the jury dramatically increased the likelihood of a death sentence [in cases in which there was a black defendant and a white victim]. There was a forty-point difference in the likelihood of a death sentence between cases with four and those with five white male jurors (23.1% vs. 63.2%). The difference rose only slightly, to forty-one points when the comparison was between four or fewer, and five or more, white male jurors (30% vs. 70.7%).[84]

On the other hand, African American male capital jurors (generally speaking) frequently are less likely to sentence a black defendant to death.

> The presence of black male jurors in [cases in which there are black defendants and white victims], by contrast, substantially reduced the likelihood of a death sentence. The critical twenty-nine-point difference came between the absence and the presence of one black male juror. In the absence of black male jurors, death sentences were imposed in 71.9% of the cases, as compared to 42.9% when one black male was on the jury. The difference rose to thirty-four points when the comparison was between none and one or more black male jurors (71.9% vs. 37.5%).[85]

Black and white jurors differ dramatically in their predetermined stances on whether or not to impose the death penalty. This begins early and becomes exacerbated as the judicial process moves from trial to punishment:

---

[83]  William J. Bowers, Benjamin D. Steiner & Marla Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 170, 178–79 (2001).

[84]  *Id.* at 193.

[85]  *Id.*

61

126

Race also distinguishes the decision-making patterns of individual jurors. In [cases in which there are black defendants and white victims], black and white jurors differ early in the trial about what the punishment should be and become further polarized as the trial proceeds. The white jurors are quicker to take a stand on punishment than their black counterparts. At the time of sentencing instructions, well over half of white jurors think the punishment should be death. By the time of the jury's first vote on punishment, most black jurors think the punishment should be life imprisonment. This progressive divergence in jurors' stands on punishment in essentially the same cases demonstrates that black and white jurors make different, apparently race-linked interpretations of the same evidence.

This polarization of jurors along racial lines is present in many different factors of the guilt and sentencing phases that are constitutionally mandated.

Specifically, these differences of interpretation include the future dangerousness of the defendant, the defendant's remorsefulness over the crime, and even the possibility that the defendant is not guilty of capital murder. Black and white jurors are sharply divided on these matters in [black defendant/white victim] cases. White jurors are particularly likely to see the defendant as a danger to society, and black jurors are especially likely to see the black defendant as remorseful or to have lingering doubts about his guilt. In effect, black and white jurors in [black defendant/white victim] cases have different concerns and focus on different considerations, with opposing implications for the defendant's punishment.[86]

Black jurors are able to put themselves in the defendant's situation and understand what it must be like for the defendant's family.[87]  They feel that the defendant's remorse was the strongest rationale for mercy.[88] Furthermore, they do not see the defendant as someone who will hurt other people in the future.[89]

---

86
    *Id.* at 241–42

87
    *Id.* at 216.

88
    *Id.* at 217–18.

89
    *Id.* at 220–26.

62

127

Much of the separation between black and white jurors in these cases is enhanced with any lingering doubts of the defendant's guilt.[90]

> The black jurors' lingering doubts in [black defendant/white victim] cases encompass questions of the defendant's motivation and responsibility for the crime, as well as his actual involvement in the killing. Their doubts are not simply afterthoughts but concerns that they manifest in their stands on guilt prior to the jury's guilt deliberations, at the jury's first vote on guilt, and in reaching the final guilt determination. Nor are black jurors' misgivings about guilt confined to the [black defendant/white victim] cases... Black jurors' lingering doubts appear to reflect a more general mistrust of the criminal justice process.[91]

Black and white jurors' sentencing discrepancies are also illuminated when considering the defendant's remorsefulness:

> Black jurors' greater sense than their white counterparts of the defendant's remorsefulness in [black defendant/white victim] cases appears to be rooted foremost in their ability to identify with the defendant or to imagine themselves to be like him and to see themselves in his situation. White jurors, in contrast, are especially unlikely to be reminded of someone by the defendant or to place themselves in the situation of the defendant's family in such cases. In turn, blacks are most, and whites least, likely to believe that the defendant deserved mercy on the grounds of his remorsefulness... In black defendant cases..., white jurors are especially likely to see the defendant as lacking remorse and to deny that the defendant even pretended to be sorry.[92]

Lastly, the issue of future dangerousness splits the black and white jurors even further in the sentencing process:

> The tables turn when it comes to dangerousness. White jurors in [black defendant, white victim] cases are the ones most likely to see the defendant as dangerous. Compounding their concern about dangerousness, they are also the ones most likely to believe that he

---

90    *Id.* at 211–12.

91    *Id.* at 242.

92    *Id.*

63

128

will serve a relatively short term in prison if not given a death sentence. Both black and white jurors in these cases agree that the defendant's dangerousness and his possible return to society were discussed a great deal in jury deliberations; however, only white jurors are much more likely to vote for death as a result of their perception of the defendant's dangerousness. Jurors' responses from all... defendant/victim racial combinations suggest that white jurors believe black defendants are more dangerous than white defendants, and that black jurors believe defendants who killed blacks are more dangerous than those who killed whites.[93]

It would be difficult to imagine a more arbitrary circumstance than having to depend on the racial composition of the jury for a life sentence. Nevertheless, the data demonstrate that the outcome of a capital case is greatly dependent on the race of the individual jurors and on the overall racial composition of the jury as a whole. While *Furman* and *Turner* demand that race not be taken into account, these constitutional provisions are not possible to protect when jurors come into the sentencing phases with racial bias already present in their minds. Therefore, despite the fact that these constitutional safeguards exist, there is no way in which they ensure the defendant a fair sentence.

## IV.

## CONCLUSION

*Furman v. Georgia* set a precedent that the death penalty is not to be arbitrarily applied. *See Furman v. Georgia*, 408 U.S. 238 (1972). The death penalty cases that followed established principles in order to allow states' sentencing processes to comport with the Sixth, Eighth, and Fourteenth Amendments. These include requiring clear and objective standards for sentencing, forbidding jurors from evading responsibility for their decisions, the need for jurors not to base a death decision for a defendant based solely upon the existence of aggravating factors, the need

---

[93] *Id.*

for consideration of mitigating evidence, and the need to remove race from sentencing considerations. Yet the data from the Capital Jury Project, in several studies in different fields, concludes that jurors are incapable of fulfilling these requirements in such a way that will allow the Texas sentencing process to be constitutional. As such, the Texas sentencing process under Article 37.071 is unconstitutional.

As applied in the real world of capital trials, actual capital jurors are not making sentencing decisions consistent with state and federal constitutional mandates.  For these reasons, [Defendant] requests that this Court dismiss the State's Notice of Intent to Seek Death.

Respectfully submitted,

Paul Johnson
Attorney for Gary Green, Defendant

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was mailed to the District Attorney on this 5 day of Oct, 2010.

Paul Johnson, Attorney for Gary Green,  Defendant

65

130

CAUSE NO. F0959380

STATE OF TEXAS                                     IN THE 282ND JUDICIAL

VS.                                                        DISTRICT COURT OF

GARY GREEN                                        DALLAS COUNTY, TEXAS

## ORDER FOR MEDICAL / THERAPEUTIC / PSYCHIATRIC RECORD RELEASE

On this the **5TH** day of **OCTOBER,** 2010 the Court has reviewed the attached

subpoena application for ANY AND ALL medical / therapy records of any kind from,

**PARKLAND HEALTH & HOSPITAL SYSTEMS, DALLAS COUNTY JAILS**

pertaining to **GARY GREEN** and good cause has been shown for the issuance of the

attached subpoena to further the prosecution of a criminal matter pending before this

court.


**IT IS HEREBY ORDERED** that the health care provider named in the subpoena

release all records designated therein.


SIGNED <u>OCTOBER 5,</u> 2010


<u>_____</u>
The Honorable Judge Presiding


JUDICIAL District Court #<u>282ND</u>


☒ **INVESTIGATOR WILL SERVE**      ☐ **CONSTABLE WILL SERVE**


131

**SERVED**

NO. F0959380

282ND JUDICIAL DISTRICT COURT

DALLAS COUNTY, TEXAS

STATE of TEXAS

VS.

GARY GREEN

**SUBPOENA**

ISSUED

This 5TH day of OCTOBER, 2010

By _____, Deputy

GARY FITZSIMMONS
Clerk, District Courts
Dallas County, Texas

ATTORNEY:

ANDY BEACH
Assistant District Attorney
Dallas Criminal District Attorney
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207
(214)653-3897

132

---

THE STATE OF TEXAS

TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS - GREETINGS:

YOU ARE HEREBY COMMANDED to summon

CUSTODIAN OF RECORDS OR DESIGNATE PARKLAND HEALTH & HOSPITAL SYSTEMS, DALLAS COUNTY JAILS

to be and appear before the **282ND JUDICIAL DISTRICT COURT** of Dallas County, Texas, at the Courthouse of said County in the City of Dallas, on the 1ST day of NOVEMBER, 2010, at 9:00 then and there to testify as a witness in behalf of the State in a Criminal action pending in said Court, wherein THE STATE of TEXAS is plaintiff and GARY GREEN , Defendant, No. F0959380

**DUCES TECUM**  ☐NOT APPLICABLE

and that she/him bring with her/him and produce in said Court, at said time and place:  CERTIFIED COPIES OF ANY & ALL RECORDS PERTAINING TO MEDICAL / PSYCHOLOGICAL TREATMENT OF DALLAS COUNTY JAIL INMATE GARY GREEN B/M 03/14/71 AIS #2643937 & BOOKIN #09073266 FROM 05/10/10 TO PRESENT.

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

☑In the alternative, such information may be provided to D.A. INV JIM SPURGER 214.653.3897

and there remain from day to day and from term to term until discharged by the Court.

HEREIN FAIL NOT. But of this Writ make due return, showing how you have executed the same.

**OUT OF COUNTY**  ☐NOT APPLICABLE

A DISOBEDIENCE OF this Subpoena is punishable by a fine not exceeding $500, to be collected as fines and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE, THIS 5TH day of OCTOBER, 2010.

GARY FITZSIMMONS
CLERK, DISTRICT COURTS
DALLAS COUNTY, TEXAS

By _____, Deputy

## OFFICER'S RETURN

CAME TO HAND on the ..... *6TH* .....day of ..... *OCTOBER* ..................................... 20.*10*., and executed by delivering a copy of the within Subpoena to the following within named witnesses, all of whom were summoned in .......... *DALLAS* .................................. County, on the dates and at the places hereinafter set forth, as follows:

| NAME | DATE | WHERE | COURSE | DISTANCE |
|------|------|-------|--------|----------|
| *ANGELA SHARP* | *10-11-10* | .........................miles...................from...........................miles |
| | | .........................miles...................from...........................miles |
| | | .........................miles...................from...........................miles |

I actually and necessarily traveled............................miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.

AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS:

............................................................................................ . . . . . . . . . . . . . . . . . . . .  $
............................................................................................ . . . . . . . . . . . . . . . . . . . .  $
............................................................................................ . . . . . . . . . . . . . . . . . . . .  $
                                                                    TOTAL  . . . . . . . . . . . . . . . . .  $

The following named witnesses not summoned for the reasons set opposite their names:

..........................................................................................................................
..........................................................................................................................
..........................................................................................................................

..................................................................To total amount of money furnished  ...................
witnesses  . . . . . . . . . . . . . . . . . .  $ ...................
.................................................................................
For summoning ...................... witnesses  at ...................... each . . . . . . . . .   ...................
Mileage, ................ miles at.............  ...................
TOTAL, . . . . . . . . . . . . . . . . . . . . .  $ ...................

Sheriff.........................................................................
Dallas County, Texas
By............................................................................
Deputy *INV.*

**JUAN L. BEDOLLA**
**CRIMINAL INVESTIGATOR**
**# 466**

Subscribed  and  sworn  to  before  me,  this  the  ........................................... day  of
..................................................................20........

..................................................................................
..................................................................................

133

CAUSE NUMBER: F09-59380

| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
|---|---|---|
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

### STATE'S NOTICE OF INTENT TO USE BUSINESS RECORDS ACCOMPANIED BY AFFIDAVIT

**Comes Now the State of Texas** and hereby gives notice of her intent to file business records accompanied by affidavit pursuant to Rule 902(10) of *the Texas Rules of Criminal Evidence* from the following entities:

TDCJ, Parole Division

Texas Department of Family and Protective Services

Children's Medical Center / Jerrett Armstead

Power Guardian

Parkland Hospital

Metrocare Services

TDCJ Medical

Timberlawn

TDCJ, Parole Division, Monthly Reports

TDCJ, Inspector General's Office

Parkland / Dallas County Jail Heath

Dallas Children Advocacy Center

These records and affidavits have been on file with the Court for more than thirty days as included in the Discovery Production discs provided to the Defendant. The State is filing a confirmatory disc with today's date labeled "Exhibit 1."

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

134

## CERTIFICATE OF SERVICE

I, Andy Beach, Assistant District Attorney, hereby certify that a true and correct copy of the foregoing Notice was [  ] faxed, [ ✓ ] hand delivered, [  ]  mailed, to Paul Johnson, the attorney of record on this the 7th day of October, 2010.

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

135

10/7/10



Ex #1

136

CAUSE NUMBER(S) _F09-59380-S_

_State of Texas_     §    IN THE _282nd Judicial_

§

VS.     §    _District Court_

§

_Gary Green_     §    _Dallas_ COUNTY, TEXAS

## DEPUTY REPORTER STATEMENT

Pursuant to Rule 13.5 of the *Texas Rules of Appellate Procedure*, Appointing Deputy Reporter, I hereby certify the following:

A.    The judge of the above-named trial court designated the undersigned as a Deputy Official Court Reporter in the above cause(s).

B.    I, the undersigned Deputy Official Court Reporter, worked the following date(s) in the above court and on the above case(s).

_10/14/2010   Capital Murder_
_Individual Voir Dire_

SIGNED ON THIS THE _14th_ day of _October_, _2010_.

_Deborah K. Hamon_

DEBORAH K. HAMON
PO Box 850557
Mesquite, Texas 75185-0557
Phone/Fax: (214) 550-5020
Texas CSR Number: 4473
CSR expires: 12/31/_2011_

137

CAUSE NUMBER: F09-59380

FILED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | 2010 OCT 19  AM 9:27 |
| VS. | § | DISTRICT COURT OF |
| | § | DISTRICT CLERK |
| GARY GREEN | § | DALLAS CO., TEXAS |
| | | DALLAS COUNTY, TEXAS  DEPUTY |

### STATE'S SUPPLEMENTAL WITNESS LIST

Comes Now the State of Texas by and through her Assistant District Attorney, Any Beach, and files this Supplemental Witness List:

Jackie Womack – DSO
Shontel Hemphill – 911 Operator
Nikki Butler – Friend of Complaining Witness
Ruthie Lyons – Family friend
Angela Fitzwater – SWIFS

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Motion was delivered to opposing counsel on the ____ day of _____, 2010.

ANDY BEACH

138

CAUSE NUMBER:  F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

**FILED** 2010 OCT 22 AM 10: 23

## SUPPLEMENTAL NOTICE OF EXTRANEOUS OFFENSES

Pursuant to **TEX. CODE CRIM. PRO. ARTICLES. 37.07, AND 37.071 AND TEX. R. CRIM. EVID. 404(B),** I am hereby giving you notice that during presentation of State's case in chief, or during punishment, in the above-captioned and numbered criminal action, the following crimes, wrongs or acts, other than the act alleged in the indictment, may be introduced:

In late 2007 and/or early 2008, Gary Green choked Lovetta Armstead at their house at 3844 Morning Springs Trail in Dallas County, Texas.

Respectfully submitted,

Andy Beach
Assistant District Attorney
Dallas County, Texas
Bar Card Number:  01944900

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been [ ] hand-delivered, [ ] mailed, [ ] faxed, to the Attorney for the defendant of this the ___22___ day of _____Oct_____, 2010.

Andy Beach
Assistant District Attorney

139

FILED

CAUSE NUMBER: F09-59380

2010 OCT 22 AM 10: 23

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## STATE'S SECOND SUPPLEMENTAL WITNESS LIST

Comes Now the State of Texas by and through her Assistant District Attorney, Any Beach, and files this Second Supplemental Witness List:

Detective Hamb – DSO Identification Expert
Dr. Randy Price – Retained Expert
Melodye Nelson – Prison Expert

ANDY BEACH
Assistant District Attorney
Dallas County, Texas

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Motion was delivered to opposing counsel on the 22 day of OCT , 2010.

ANDY BEACH

140

THE STATE OF TEXAS

COUNTY OF DALLAS

673/408

FILED

2010 OCT 22 PM 2:46

## APPOINTMENT OF DEPUTY OFFICIAL COURT REPORTER
[Pursuant to Texas Government Code §52.042(a) and Texas Rule of Appellate Procedure 13.5]

The Court hereby appoints Deborah K. Hamon to serve as Deputy Official Court Reporter of the Judicial District Court of Dallas County, State of Texas. This appointment commences on October 14, 2010, and shall terminate upon the conclusion of the Court's docket on October 15, 2010.

Ordered this 13th day of October, 2010.

_____
ANDY CHATHAM, JUDGE

## STATEMENT OF DEPUTY OFFICIAL COURT REPORTER
[Pursuant to Texas Government Code §52.045 and Texas Constitution, Article 16, Section 1, Subsection (b)]

I, Deborah K. Hamon, do solemnly swear that I have not directly or indirectly paid, offered, promised to pay, contributed, or promised to contribute any money or thing of value, or promised any public office or employment for the giving or withholding of a vote at the election at which I was elected or as a reward to secure my appointment or confirmation, whichever the case may be, so help me God.

_____
DEBORAH K. HAMON

## OATH OF DEPUTY OFFICIAL COURT REPORTER
[Pursuant to Texas Government Code §52.045 and Texas Constitution, Article 16, Section 1, Subsection (a)]

I, Deborah K. Hamon, do solemnly swear that I will faithfully execute the duties of the office of Deputy Official Court Reporter for the 282nd Judicial District Court of Dallas County, State of Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God.

_____
DEBORAH K. HAMON

Sworn to before me this 13th day of October, 2010.

_____
ANDY CHATHAM, JUDGE

141

CAUSE NUMBER: F0959380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL |
| VS. | § | DISTRICT COURT # 4 OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## SUPPLEMENTAL STATE'S RESPONSE TO MOTION TO LIST WITNESSES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW THE STATE OF TEXAS, by and through its Assistant District Attorney, **Jennifer Bennett**, and in response to Defendant's Motion to List Witnesses, announces to the Court prior to the commencement of testimony that in addition to the other witnesses listed previously the State may call one or more of the following witnesses to give testimony in the punishment phase of this cause:

Dallas Police Officers

Tony Hayes

Stacy Ward

Respectfully submitted,

Jennifer Bennett
Assistant District Attorney
Dallas County, Texas
Bar Card No. 24000091

142

Letters (all)
Timber Lawn Records
Prison Records (all)
Dr. Martinez Records
Confession Transcript from interrogation
Video Confession

FILED

2010 NOV -5  PM 1: 46

US DISTRICT CLERK
DALLAS CO. TEXAS

DEPUTY

143



13 documented incidents
from prison

FILED

2010 NOV -5  PM 2: 33

KAREN FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS

_____ DEPUTY

144

## CAUSE NUMBER: F09-59380-S

| | | |
|---|---|---|
| **STATE OF TEXAS** | )( | **IN THE 282ND DISTRICT** |
| **VS.** | )( | **COURT OF DALLAS** |
| | )( | **COUNTY, TEXAS** |
| **GARY GREEN** | )( | **JULY TERM, A.D., 2010** |

### CHARGE OF THE COURT

**MEMBERS OF THE JURY:**

The Defendant, Gary Green, stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 21st day of September, 2009, in Dallas County, Texas.

To this charge, the defendant has pleaded not guilty.

You are instructed that the law applicable to this case is as follows:

Our law provides that a person commits murder when he intentionally or knowingly causes the death of an individual.

"Individual" means a human being who is alive.

"Person" means an individual.

A person commits capital murder when the person murders more than one person during the same criminal transaction.

A "deadly weapon" means: (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death, serious bodily

145

injury, or, (B) anything in the manner of its use or intended use is capable of causing death or serious bodily injury.

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

146

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if were committed, and even then you may only consider the same in determining the motive or intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

147

Now, considering all the law contained in the Court's charge, if you believe from the evidence beyond a reasonable doubt that on or about the 21st day of September, A.D., 2009, in the County of Dallas and State of Texas, the Defendant, Gary Green, did unlawfully then and there intentionally or knowingly cause the death of an individual, to-wit: Lovetta Armstead, by stabbing Lovetta Armstead with a knife, a deadly weapon, or by asphyxiating Lovetta Armstead; and during the same criminal transaction said defendant did then and there intentionally or knowingly cause the death of another individual, to-wit: Jazzmen Montgomery, by drowning or asphyxiating Jazzmen Montgomery, then you will find the Defendant, Gary Green, guilty of the offense of capital murder and say by your verdict, guilty.

If you do not so believe, or if you have a reasonable doubt as to the defendant's guilt, then you will acquit the defendant of capital murder and say by your verdict, not guilty.

148

Our law provides that a defendant may testify in his own behalf if he elects to do so, but if he elects not to testify his election shall not be taken as a circumstance against him. In this case, the defendant has elected not to testify. You are instructed that you shall not refer or allude to this fact throughout your deliberations, or take it into consideration for any purpose whatsoever as a circumstance against him.

149

At times throughout the trial the Court has been called upon to pass on the question of whether or not certain evidence is admitted. You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them. Whether evidence is admissible is purely a question of law. In admitting evidence to which an objection is made, the Court neither determines what weight should be given such evidence nor does it pass on the credibility of the witness. As to any offer of evidence that has been rejected by the Court, you must not consider the same. As to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection.

An indictment is not evidence of guilt. Therefore, you are instructed that the indictment in this case shall not be considered by the jury as any evidence of guilt.

In all criminal cases, the burden of proof is on the State. All persons are presumed to be innocent, and no person may be convicted of an offense unless each element of the offense is proven beyond a reasonable doubt. You are charged that it is only from the witness stand that the jury is permitted to receive evidence regarding the case, and no juror is permitted

150

to communicate to any other juror anything he may have heard regarding the case from any source other than the witness stand.

In deliberating on this case you are not to refer to or discuss any matter or issue not in evidence before you. Further, you shall not talk about this case to anyone not of your jury.

You are not to be swayed by mere sentiment, conjecture, sympathy, passions, prejudices, public opinion, or public feeling in considering all the evidence before you.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony, but you are bound to receive and to follow the law from the Court.

In arriving at your verdict, it will not be proper for you to fix the same by lot, chance, or any other method other than by a full, fair, and free exchange of the opinion of each individual juror.

After you have retired to consider your verdict, no one has any authority to communicate with you except the officer who has you in charge. You may communicate with this Court in writing, signed by your presiding juror, through the officer who has you in charge. Do not attempt to talk to the officer, the attorneys, or the Court concerning any question you may have.

After argument of Counsel, you will retire and select one of your members

151

as your presiding juror.  It is the duty of your presiding juror to preside at

your deliberations and to vote with you in arriving at a verdict.  Your verdict

must be unanimous, and after you have arrived at your verdict, you may use

one of the forms attached by having your presiding juror sign the particular

form that conforms to your verdict.

ANDY CHATHAM, JUDGE
282nd JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

152

## VERDICT FORM

We, the jury, find beyond a reasonable doubt the Defendant, Gary Green, guilty of capital murder, as charged in the indictment.

_____
**PRESIDING JUROR (SIGNATURE)**

JOHN POZADZIDES
_____
**PRESIDING JUROR (PRINTED)**

**OR**

We, the jury, find the Defendant, Gary Green, not guilty.

_____
**PRESIDING JUROR (SIGNATURE)**

_____
**PRESIDING JUROR (PRINTED)**

153

CAUSE NO. F09-59380-S

STATE OF TEXAS )( IN THE 282ND JUDICIAL DISTRICT

VS. )( COURT OF DALLAS COUNTY, TEXAS

GARY GREEN )( JULY TERM, A.D., 2010

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

By your verdict returned in this case you have found the Defendant,

Gary Green, guilty of the offense of capital murder, which was alleged to have

been committed on or about the 21st day of September, 2009, in Dallas County,

Texas. It is now your duty to determine from all the evidence in the case,

answers to certain questions called special issues.

The mandatory punishment for the offense of capital murder, of which you

have found the defendant guilty, is death or confinement in the Institutional

Division of the Texas Department of Criminal Justice, for life without parole.

Two special issues, numbered one and two, are included in this charge.

You are instructed to answer these two special issues either "Yes" or "No" in

accordance with the instructions given in this charge. The special issues are as

follows:

**Special Issue No. 1**: Do you find from the evidence beyond a reasonable

doubt that there is a probability that the Defendant, Gary Green, would commit

154

criminal acts of violence that would constitute a continuing threat to society?

**Special Issue No. 2**: Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, Gary Green, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

## INSTRUCTIONS REGARDING SPECIAL ISSUE NO. 1

In deliberating on your answer to Special Issue No. 1, you are instructed that the State has the burden of proving beyond a reasonable doubt that Special Issue No. 1 should be answered "Yes."

If you do not find and believe from the evidence beyond a reasonable doubt that the answer to Special Issue No. 1 should be "Yes," or if you have a reasonable doubt thereof, then you shall answer the special issue "No."

You shall consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 1 "Yes" unless the jury agrees unanimously, and you may not answer Special Issue No. 1 "No" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1.

155

If you have answered "No" to Special Issue No. 1, then you shall cease your deliberations. If you have answered "Yes" to Special Issue No. 1, then you shall next consider Special Issue No. 2.

## INSTRUCTIONS REGARDING SPECIAL ISSUE NO. 2

If you answer that a sufficient mitigating circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the Court will sentence the Defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

A defendant sentenced to confinement for life without parole is ineligible for release from the department on parole.

In deliberating on your answer to Special Issue No. 2, you are instructed that you may not answer Special Issue No. 2 "No" unless the jury agrees unanimously, and you may not answer Special Issue No. 2 "Yes" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 2. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness.

156

## INSTRUCTIONS REGARDING ALL SPECIAL ISSUES

You are instructed that if the jury answers "Yes" to Special Issue No. 1 and answers "No" to Special Issue No. 2, the Court shall sentence the defendant to death.

If the jury answers "No" to Special Issue No. 1 or answers "Yes" to Special Issue No. 2, then the Court shall sentence the Defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

If the jury's answers to Special Issues No. 1 and No. 2 are unanimous, then the presiding juror may sign each special issue for the entire jury. If any answer or answers are not unanimous, but agreed to by at least 10 members of the jury, as set out above, then the 10 or more jurors who agree shall individually sign the special issue.

During your deliberations upon the special issues you must not consider, discuss, nor relate any matters not in evidence before you. You shall not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

In arriving at the answers to the special issues, it will not be proper for you to fix the same by lot, chance, or any other method other than by a full, fair, and free exchange of the opinion of each individual juror.

157

You are not to be swayed by conjecture, passions, prejudices, public opinion, or public feeling in considering all the evidence before you and in answering the special issues.

In determining your answers to the special issues, you shall consider all the evidence submitted to you in this whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the Defendant, and this punishment phase of the trial wherein, you are now called upon to determine the answers to the special issues submitted to you by the Court.

## GENERAL INSTRUCTIONS

You are further instructed that if there is any evidence before you in this case regarding the Defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the special issues.

You are further instructed the law allows the defendant to testify in his own behalf at this phase of the trial, but a choice on his part not to do so is not to be considered as a circumstance against him and no presumption can be indulged in by the jury for a choice on his part not to do so. You are instructed

158

in this case not to consider, discuss, or even refer to the choice on the part of the defendant not to testify during your consideration of this case.

After the reading of this Charge, you shall not talk with anyone not of your jury. After the argument of counsel, you will retire to consider your answers to the special issues submitted to you. It is the duty of your presiding juror to preside in the jury room and vote with you on the answers to the special issues submitted.

You are the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

ANDY CHATHAM, JUDGE
282ND JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

159

## SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Gary Green, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer: _YES_

_____
**PRESIDING JUROR**

_John Pozadzides_
**PRESIDING JUROR (PRINTED)**

If your answer to this special issue is "No," and is not unanimous, then the 10 or more jurors who agree should sign individually below:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

If your answer to Special Issue No. 1 is "Yes," you shall proceed to answer Special Issue No. 2.

If your answer to Special Issue No. 1 is "No," you shall cease your deliberations.

160

## SPECIAL ISSUE NO. 2

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant, Gary Green, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Answer: _NO_

_____
PRESIDING JUROR

_John Pozadzides_
PRESIDING JUROR (PRINTED)

If your answer to this special issue is "Yes" and is not unanimous, then the 10 or more jurors who agree should sign individually below:

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

161

VOL 673 PAGE 543

CASE NO. F-0959380-S
INCIDENT NO./TRN: 9175068125

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL DISTRICT |
| | § | |
| v. | § | COURT |
| | § | |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX04205494 | § | |

## JUDGMENT OF CONVICTION BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. Andy Chatham | Date Judgment Entered: | 11/5/2010 |
| Attorney for State: | Josh Healy | Attorney for Defendant: | Paul Johnson |

Offense for which Defendant Convicted:
**CAPITAL MURDER MULTIPLE**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **19.03 Penal Code** |

Date of Offense:
**9/22/2009**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **CAPITAL FELONY** | **NOT GUILTY** |
| Verdict of Jury: | Findings on Deadly Weapon: |
| **GUILTY** | **YES, NOT A FIREARM** |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punishment Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| **JURY** | **11/5/2010** | |

| Punishment and Place of Confinement: | **DEATH CONFINEMENT IN THE INSTITUTIONAL DIVISION, TDCJ UNTIL SENTENCE OF DEATH IS CARRIED OUT** |
|---|---|

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ -0- | $ 240 | $ N/A | ☐ VICTIM (see below) ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| | From **9/22/2009** to **11/5/2010** | From | to | From | to |
|---|---|---|---|---|---|
| Time Credited: | From | to | From | to | From | to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

**N/A DAYS**  NOTES: N/A

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

162

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

### Punishment Assessed by Jury / Court / No election  (select one)

☒ **Jury**. Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court**. Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election**. Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

### Punishment Options  (select one)

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ**. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

### Execution / Suspension of Sentence  (select one)

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

### Furthermore, the following special findings or orders apply:

The Court FINDS Defendant used or exhibited a deadly weapon, namely, A KNIFE, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. TEX. CODE CRIM. PROC. art. 42.12 §3g

**Signed and entered on November 5, 2010**

X _____
Andy Chatham
JUDGE PRESIDING

DEFENDANT EXCEPTS AND GIVES NOTICE
OF APPEAL TO THE COURT OF APPEALS,
FIFTH DISTRICT OF TEXAS AT DALLAS

Clerk: K. MATTHEWS-FREEMAN

*Thumbprint Certification attached.

GREEN GARY F-0959380 S

Page 2 of 4          Right Thumbprint*

163

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

THE STATE OF TEXAS                    CAUSE NO. F 09-59380.

VS.                                   JUDICIAL 282nd   DISTRICT COURT ____

*Gary Green*                          DALLAS COUNTY, TEXAS

RIGHT THUMB                           DEFENDANT'S *right* HAND

THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-
NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION
OF THE ABOVE STYLED AND NUMBERED CAUSE.

DONE IN COURT THIS 28 DAY OF October , 20 10 .

_____
BAILIFF/DEPUTY SHERIFF

*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:

_____ LEFT THUMBPRINT          _____ LEFT/RIGHT INDEX FINGER

_____ OTHER, _____

SIGNED AND ENTERED ON THIS _____ DAY OF _____ , 20 ___ .

_____
PRESIDING JUDGE

164

NOTICE OF DISPOSITION
IN 282ND JUDICIAL DISTRICT
DALLAS COUNTY, TEXAS

SEQ    0003

DATE 110910
TIME 142510

CASE NUMBER F-0959380
OFFENSE CAP MUR MULT
REDUCED CHARGE

THE STATE OF TEXAS VS.
DEF GREEN GARY
BNO 09073266
DISPOSED BY JCJP

RACE B SEX M DOB 031471

SENTENCE
DEATH SENTENCE

APPEAL  11/5/10

SPECIAL CONDITION

MNT

$     0.00 FINE  $     240.00 COST

SENTENCE TO BEGIN   110510

ADDITIONAL CREDIT FOR TIME SERVED
9/2/09-11/5/10
REMARKS 110910 DEFT IN JAIL. COSTS DUE. RETURN ANY AND ALL WARRANTS ON
THIS CASE ONLY.

RELEASE INFORMATION

REMARKS

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS COUNTY, TEXAS

BY
MATTHEWS K
DEPUTY CLERK

165

THE STATE OF TEXAS     ☐     IN THE _Judicial_
VS.     ☐     DISTRICT COURT _282nd_
    ☐     DALLAS COUNTY, TEXAS

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL*

I, judge of the trial court, certify this criminal case:

☑ is not a plea-bargain case, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial, and not withdrawn or waived, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, and the defendant has NO right of appeal, [or]

☐ the defendant has waived the right of appeal, [or]

☐ other (please specify): _____

Judge            Date Signed    11/10/10

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, as set forth below, including any right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeals judgment and opinion to my last known address and that **I have only 30 days** in which to file a *pro se* petition for discretionary review in the court of appeals. Tex. R. App. P. 68.2. I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit. I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a *pro se* petition for discretionary review.

Defendant          Defendant's Counsel PAUL JOHNSON
Mailing Address:       State Bar No.: 10778230 12402811
                     Mailing Address: 311 N. MARKET ST. STE. 300
Telephone #:                DALLAS, TX 75202
Fax # (if any):          Telephone #: 214-761-0707
                     Fax # (if any): 214-202-8461 CELL

*A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case ---- that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant ---- a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2). In order to perfect an appeal a written notice of appeal must be filed with the trial court clerk within **30 days (90 days if a timely motion for new trial is filed)** after the day sentence is imposed or suspended in open court or after the day the trial court enters an appealable order.

166

JUDGEMENT / SENTENCE DATE   11-5-10
MOTION FOR NEW TRIAL FILED   YES   NO

*Deputy District Clerk*

DRAWER #40

THE STATE OF TEXAS

VS.

CAUSE NO. F-0959380 S

Judicial DISTRICT COURT  282nd

DALLAS COUNTY, TEXAS

FILED
2010 NOV 10  PM 3:

**DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH**

**APPOINTMENT OF ATTORNEY ON APPEAL**

TO THE HONORABLE JUDGE OF SAID COURT:

    Comes now Defendant in the above cause and states: I am the defendant in the above cause, I was convicted in this cause and now give Notice of Appeal to the Texas Court of Appeals for the Fifth Supreme Judicial District of Texas of Dallas, Texas, and that I am penniless, destitute and indigent person, too poor to employ counsel to represent me on the appeal, and too poor to pay for or give security for the Statement of Facts and a true copy thereof herein.
WHEREFORE, I pray that the Court will appoint an attorney to represent me in this appeal and that the Court will order the Court Reporter of this Court to prepare and deliver me or my appointed Counsel the original and a true copy of the Statement of Facts in this case, together with all exhibits attached thereto if practical.

*Deft in gail*

                               Defendant

    BEFORE ME, the undersigned authority, personally appeared the above Defendant, known to me to be the person whose signature appears above, and after being duly sworn on oath states that he is the defendant in the above cause, and that the matters and things set forth in the foregoing are true and correct in all things.

GARY FITZsimmons
JIM HAMLIN
DISTRICT CLERK
Dallas County, Texas

By

Deputy District Clerk

**ORDER**

    The Defendant having requested the Court to appoint Counsel,

    it is Ordered the Honorable _____ 990 South

Address: Sherman St., Richardson, Texas 75081
a regular licensed and practicing attorney of Texas, be, and he/she is hereby appointed to represent Defendant in prosecuting his/her appeal herein, and it is further Ordered that the Court Reporter is hereby directed to transcribe all of the notes as same may appertain to this cause and as taken during the trial of this cause which began on _____, _____, and make Statement of Facts in duplicate and furnish same to defendant or his appointed Counsel.

                               Judge

167

FORM 40



Loc. ___West Tower 3P 3rd Floor Control Center 03P 08___   Bookin Number: 09073266    Audit Number: 201023191

## APPOINTMENT OF COUNSEL FOR INDIGENT DEFENDANT

The State of Texas

Vs.

**GREEN GARY**

282nd Judicial District Court (FS)

District Court

Dallas County, Texas

Cause No.:        Offense                    LD

F0959380      CAP MUR MULT              FX

It appearing that the defendant has executed a sworn statement certifying that he/she is without means to employ counsel and requesting appointment of counsel; the Court finds that the defendant is indigent and hereby appoints:  The Attorney: JOHN TATUM

Phone: 972-705-9200     Alt. Phone: 214-507-3455

Email: JTATUMLAW@GMAIL.COM

Address: 990 S  SHERMAN ST,   RICHARDSON, TX 75081

A practicing attorney of the State to represent the defendant in said case(s).

Signed this 15th day of November, 2010

JUDGE

Andy Chatham          168

IndigentAppointmentPD

CAUSE NO.  F09-59380-S

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## ORDER APPOINTING WRIT COUNSEL

The defendant, Gary Green , having been convicted of the offense of capital murder and sentenced to death;

The Court finds that the defendant is indigent and entitled to appointment of counsel for the purpose of a writ of habeas corpus;

The Court therefore appoints that Brad D. Levenson, Director of Office of Capital Writs, 1033 La Posada Drive, Suite 374, Austin, Texas 78752, as counsel for the defendant to prepare an application for writ of habeas corpus pursuant to Article 11.071 of the Code of Criminal Procedure and to represent the defendant on said writ.

The clerk is hereby ordered to send a copy of this order to Brad D. Levenson, the attorney for the State, and the Court of Criminal Appeals.

SIGNED this _____ 10 _____ day of November, 2010.

ANDY CHATHAM, JUDGE
282ND JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

169

CAUSE NO. F08-59380-S

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

## MOTION FOR NEW TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Defendant, Gary Green, in the above styled and numbered cause and through his undersigned Attorneys and pursuant to Rule 21, et seq. Texas Rules of Appellate Procedure, files his Motion for New Trial and moves the Court to grant him a new trial herein for the good and sufficient reasons as follows:

I.

Defendant was charged by indictment with the offense of Capital Murder. The jury returned answers to special issues that resulted in a judgment of death. Thirty days has not elapsed since the imposition of said sentence by the jury.

II.

The evidence is legally and or factually insufficient to support the jury's verdict that Defendant is guilty of the offense of capital murder.

170

III.

The evidence is legally and or factually insufficient to support the jury's verdict as to Special Issue No. 2 regarding the issue of future danger.

IV.

Defendant states that the State presented in jury argument a misleading emphasis on sympathy and emotion rather than arguing that the jury should consider only the narrowing defined special issues. This method of jury arguments contrary to the constitutional requirements that were put into place when the death penalty was reinstated in Texas using narrowly defined special issues.

It was stated by Judge John Paul Stevens:

"It is of vital importance . . . that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice and emotion."

The following is a quote from the Dallas Morning News Thursday December 2, 2010:

"At the time, states were pushing back against a court decision that essentially imposed a moratorium on executions. What followed was a movement toward narrowly crafted laws intended to root out emotion, build in safeguards and apply capital punishment fairly.

Stevens now writes candidly about a more recent and "regrettable judicial activism" that has loosened restrictions on capital punishment and opened the door once again to abrogation of justice. Prosecutors have a clarified freedom, for example, to root out potential jurors who have qualms about the death penalty and to seek it for non-triggermen.

Stevens now believes the death penalty represents "the pointless and needless extinction of life with only marginal contribution to any discernible social public purposes."

171

Stevens and Garland point out one benefit that is glaringly evident in Texas: support for the death penalty "wins votes," the justice say.  An NYU law and sociology professor, Garland wrote recently in the *Houston Chronicle* that "politicians give voters what they want by enacting capital punishment statues even when they will never be enforced."

A deterrent to crime is one supposed benefit for the death penalty but its imposition is not associated with lower murder rates in the 35 states that allow it.  Further consider this from Garland: Our of 14,000 homicides in the U.S. last year, juries imposed death sentence in only 106 cases.  Death is far from a sure punishment for taking a life, nor is it swift.  Some death row inmates have been there for decades.

Just in Texas, the sentence is far from evenly imposed.  Of the 316 people on Texas death row, more than a third are from Harris County.

In what should be particularly disturbing in Texas - for obvious reasons - Stevens mentions the "execution of innocents" as if a given.  Perhaps that, more than anything, has caused prominent Texans, from a former governor to former prosecutors, to adjust their thinking, as has Steven, and advocate a saner justice system that guards against a flawed but irrevocable sentence."

This misleading argument before the jury effectively denied the Defendant his right to due process and a fair trial.

In closing argument by the prosecutor, the State made erroneous and misleading statements to the jury members which influenced the jury verdict and substantially impaired the jury's ability to give meaningful consideration to the evidence put forth by the defense on the 2nd and 3rd special issues.  This action by the prosecutor was knowingly misleadingf based only on emotion and sympathy and its impression and denied the Defendant the constitutional guarantees

172

afforded him by the 4th, 5th, 6th, 8th and 14th amendments to the United States Constitution as well as the Texas Constitution Article 1 Sec. 10.

V.

Wherefore Premises Considered, Defendant prays this Honorable Court set this Motion for New Trial for an evidentiary hearing to fully develop the facts supporting the issues raised in this motion for new trial and after said hearing, that this motion be granted as to the hearing on punishment; to which Defendant has shown that he is entitled to same.

Respectfully submitted,

John Tatum
990 S. Sherman
Richardson, Texas 75081
(972) 705-9200
State Bar No. 19672500
Attorney for Defendant
on Motion for New Trial and Appeal

**CERTIFICATE OF SERVICE**

I, Attorney for Defendant, certify that I have hand delivered a copy of this motion to the Assistant District Attorney of Dallas County, Texas on _____, 2010.

John Tatum

173

**CAUSE NO. F08-59380-S**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 282ND JUDICIAL** |
| **VS.** | § | **DISTRICT COURT** |
| **GARY GREEN** | § | **DALLAS COUNTY , TEXAS** |

## ORDER SETTING HEARING

On this _____ day of _____, 2010, the Defendant's Motion for a New Trial was timely presented to the Court by Defendant's counsel and it appearing that said Motion is supported by affidavit, the Defendant is entitled to an evidentiary hearing on the Defendant's Motion for New Trial.

It is therefore ordered that said Motion be set for hearing before this Court on the _ _____ day of _____, 2010 at ___ o'clock _ M.

_____
Judge Presiding

174

CAUSE NO. F08-59380-S

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

### ORDER

This day came on to be heard the motion of Defendant Donald Bess to set aside the verdict and judgment herein rendered, and grant him a new trial of this cause; and the state being present in court by his assistant district attorney and the Defendant Donald Bess, being represented by John Tatum and Robbie McClung, appointed counsel on appeal, and the court having heard the said motion, and the evidence thereon submitted, is of the opinion the same should be granted in whole or in part as to punishment hearing only. It is therefore considered, ordered and adjudged by the court that the said motion be and the same is granted; and the verdict, judgment of conviction and sentence entered against the said defendant Donald Bess at a former day of this term are set aside and vacated, and the said defendant is granted a new trial of this cause.

Signed this the _____ day of _____, 2010.

_____
Judge Presiding

175

OR

## ORDER DENYING MOTION FOR NEW TRIAL

It is therefore considered, ordered, and adjudged by the court that the said motion for new trial herein be and the same is refused, and in all things overruled.

Signed this the ____ day of _____, 2010.

_____
Judge Presiding

176

## APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas:

In the case of the STATE OF TEXAS Vs. <u>GARY GREEN</u>

CAUSE NUMBER: <u>F0959380</u>, CHARGE WITH: <u>CAPITAL MURDER</u> SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: <u>CUSTODIAN OF RECORDS OR DESIGNATE FOR CHILDREN'S MEDICAL CENTER</u> whose vocation is that of <u>***RECORDS***</u> and whose location is <u>CMC DALLAS</u> and that he/she bring with him/her and produce in said Court, at <u>9:00 A.M.</u> on <u>01/29/</u> 2010:

**CERTIFIED COPIES OF ANY AND ALL RECORDS PERTAINING TO ANY MEDICAL TREATMENT OF JARRET ARMSTEAD B/M 06/02/00.**

In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: **JIM SPURGER.** Criminal Investigator, **Frank Crowley Courts Building, 133 N. Industrial Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.**

The testimony of said witness is believed to be material to the State.

**ANDY BEACH**

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers: **214-653-3897**

APPLIED FOR by the aforesaid Assistant District Attorney this <u>29TH</u> day of <u>DECEMBER</u>, 2009.

Issued by: _____

Date Issued: DEC 2 9 2009 _____

GARY FITZSIMMONS, District Clerk

Dallas County, Texas

By: _____

Deputy District Clerk

[REV. DECEMBER 31, 2001]

DUCESDIST/CRIMINAL COURT
177

CAUSE NO. F0959380

| | |
|---|---|
| STATE OF TEXAS | IN THE 282ND JUDICIAL |
| VS. | DISTRICT COURT OF |
| GARY GREEN | DALLAS COUNTY, TEXAS |

## ORDER FOR MEDICAL / THERAPEUTIC / PSYCHIATRIC RECORD RELEASE

On this the **29TH** day of **DECEMBER,** 2009 the Court has reviewed the attached subpoena application for ANY AND ALL medical / therapy records of any kind from, **CHILDREN'S MEDICAL CENTER** pertaining to **JARRET ARMSTEAD** and good cause has been shown for the issuance of the attached subpoena to further the prosecution of a criminal matter pending before this court.

**IT IS HEREBY ORDERED** that the health care provider named in the subpoena release all records designated therein.

SIGNED <u>DECEMBER 29,</u> 2009

_____
The Honorable Judge Presiding

JUDICIAL District Court #<u>282ND</u>

☒ **INVESTIGATOR WILL SERVE**   ☐ **CONSTABLE WILL SERVE**

178

### APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas:

*FILED*
*09 DEC 29 PM 3: 04*
*GARY FITZSIMMONS*
*DISTRICT CLERK*
*DALLAS CO. TEXAS*
*_____ DEPUTY*

In the case of the STATE OF TEXAS VS. GARY GREEN

CAUSE NUMBER: F0959380, CHARGE WITH: CAPITAL MURDER SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: CUSTODIAN OF RECORDS OR DESIGNATE FOR CHILDREN'S MEDICAL CENTER whose vocation is that of *RECORDS* and whose location is CMC DALLAS and that he/she bring with him/her and produce in said Court, at 9:00 A.M. on 01/29/ 2010:

**CERTIFIED COPIES OF ANY AND ALL RECORDS PERTAINING TO ANY MEDICAL TREATMENT OF JEROME ARMSTEAD B/M 08/12/97.**

    **In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: JIM SPURGER. Criminal Investigator, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.**

    The testimony of said witness is believed to be material to the State.

**ANDY BEACH**

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers: **214-653-3897**

APPLIED FOR by the aforesaid Assistant District Attorney this 29TH day of DECEMBER, 2009.

Issued by: _____

GARY FITZSIMMONS, District Clerk

Dallas County, Texas

Date Issued: **DEC 2 9 2009** _____

By: _____

Deputy District Clerk

[REV. DECEMBER 31, 2001]

CAUSE NO. F0959380

| | |
|---|---|
| STATE OF TEXAS | IN THE 282ND JUDICIAL |
| VS. | DISTRICT COURT OF |
| GARY GREEN | DALLAS COUNTY, TEXAS |

## ORDER FOR MEDICAL / THERAPEUTIC / PSYCHIATRIC RECORD RELEASE

On this the **29TH** day of **DECEMBER,** 2009 the Court has reviewed the attached subpoena application for ANY AND ALL medical / therapy records of any kind from, **CHILDREN'S MEDICAL CENTER** pertaining to **JEROME ARMSTEAD** and good cause has been shown for the issuance of the attached subpoena to further the prosecution of a criminal matter pending before this court.

**IT IS HEREBY ORDERED** that the health care provider named in the subpoena release all records designated therein.

SIGNED <u>DECEMBER 29, 2009</u>

_____
The Honorable Judge Presiding

JUDICIAL District Court #<u>282ND</u>

☒ **INVESTIGATOR WILL SERVE**    ☐ **CONSTABLE WILL SERVE**

180

## APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

FILED

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas: DEC 29 PM 3: 04

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

In the case of the STATE OF TEXAS VS. <u>GARY GREEN</u>

DEPUTY

CAUSE NUMBER:  <u>F0959380</u>, CHARGE WITH:  <u>CAPITAL MURDER</u> SET FOR TRIAL:  please issue a subpoena in accordance with the law, for the following witness:  <u>CUSTODIAN OF RECORDS OR DESIGNATE FOR DALLAS COUNTY ADULT PROBATION</u> whose vocation is that of <u>***RECORDS***</u> and whose location is <u>FRANK CROWLEY</u> and that he/she bring with him/her and produce in said Court, at <u>9:00 A.M.</u> on <u>01/29/</u> 2010:

**CERTIFIED COPIES OF ANY AND ALL RECORDS PERTAINING TO FORMER PROBATIONER GARY R. GREEN  B/M  03/14/1971.**

**In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address:  JIM SPURGER.  Criminal Investigator, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.**

The testimony of said witness is believed to be material to the State.

**ANDY BEACH**

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers:  **214-653-3897**

APPLIED FOR by the aforesaid Assistant District Attorney this <u>29TH</u> day of <u>DECEMBER</u>, 2009.

Issued by:

GARY FITZSIMMONS, District Clerk

Dallas County, Texas

Date Issued:  **DEC 2 9 2009**

By:

Deputy District Clerk

[REV. DECEMBER 31, 2001]

DUCESDIST/CRIMINAL COURT

181

## APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

FILED

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas:

09 DEC 29 PM 3: 04

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

In the case of the STATE OF TEXAS VS. <u>GARY GREEN</u>

_____ DEPUTY

CAUSE NUMBER: <u>F0959380</u>, CHARGE WITH: <u>CAPITAL MURDER</u> SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: <u>CUSTODIAN OF RECORDS OR DESIGNATE FOR DISD</u> whose vocation is that of <u>***RECORDS***</u> and whose location is <u>DISD</u> and that he/she bring with him/her and produce in said Court, at <u>9:00 A.M.</u> on <u>01/29/</u> 2010:

**CERTIFIED COPIES OF ANY AND ALL RECORDS PERTAINING TO FORMER STUDENT GARY R. GREEN  B/M  03/14/1971. TO INCLUDE: ATTENDANCE, DISIPLINE, GRADES, PLACEMENT TESTING, ETC...**

In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: **JIM SPURGER.** Criminal Investigator, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.

The testimony of said witness is believed to be material to the State.

**ANDY BEACH**

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers: **214-653-3897**

APPLIED FOR by the aforesaid Assistant District Attorney this <u>29TH</u> day of <u>DECEMBER</u>, 2009.

Issued by:

GARY FITZSIMMONS, District Clerk

Dallas County, Texas

Date Issued: DEC 2 9 2009

By: _____

Deputy District Clerk

[REV. DECEMBER 31, 2001]

APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

To The Clerk Of the 282nd Judicial District Court Of Dallas County, Texas:

In the case of the STATE OF TEXAS VS. GARY GREEN

CAUSE NUMBER: F0959380, CHARGE WITH: CAPITAL MURDER SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: STORMIE GARDNER whose vocation is that of *CUSTODIAN OF RECORDS* and whose location is DALLAS TEXAS and that he/she bring with him/her and produce in said Court, at 9:00 A.M. on 03/10/10 2010:

CERTIFIED COPIES UNDER AFFIDAVIT AUTHENTICATING SAME: MONTLY REPORTS ON PAROLEE GARY R. GREEN B/M 03/14/1971 FROM 01/01/2008 TO PRESENT.

In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: JIM SPURGER. Criminal Investigator, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.

The testimony of said witness is believed to be material to the State.

ANDY BEACH

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers: 214-653-3897

APPLIED FOR by the aforesaid Assistant District Attorney this 3RD day of MARCH, 2010.

Issued by

Date Issued

Jim Hamlin, District Clerk

Dallas County, Texas

By

Deputy District Clerk

[REV. DECEMBER 31, 2001]

DUCESDIST/CRIMINAL COURT

183

APPLICATION FOR SUBPOENA IN THE DISTRICT COURT, TEXAS

To The Clerk Of The 282ND Judicial District Court, Dallas County, Texas

In the case of the STATE OF TEXAS VS. **GARY GREEN**

CAUSE NUMBER: <u>F0959380</u> CHARGED WITH: <u>CAPITAL MURDER</u>

DATE SET FOR TRIAL: <u>10/19/</u>, **2010**, at **9:00 A.M.**, you will please issue… subpoena…in accordance with the law, for the following named witness…residing in the County, as set out:

1. LATASHA BRADFIELD                                        Phone #214.375.8188

residing in DALLAS                County, Texas, and whose vocation is WITNESS

Location: 3848 MORNING SPRINGS TRAIL DALLAS, TEXAS

2. MARGARITA BROOKS                                        Phone #214.849.6115

residing in DALLAS                County, Texas, and whose vocation is WITNESS

Location: 1106 STANWYCK AVE. DUNCANVILLE, TEXAS 75137

3. NYSASNO CARTER                                        Phone #972.682.2921

residing in DALLAS                County, Texas, and whose vocation is WITNESS

Location: 3420 PARK RUN MESQUITE, TEXAS 75150

4. KAREN CHEN M.D.                                        Phone #UNK

residing in DALLAS                County, Texas, and whose vocation is M.D.

Location: CMC 1935  MEDICAL DISTRICT DR. DALLAS, TEXAS 75235

5. SHIRLEY COLEMAN                                        Phone #UNK

residing in DALLAS                County, Texas, and whose vocation is WITNESS

Location: 9703 HOMEPLACE DR. DALLAS, TEXAS 75217

6. JOSEPH D. JOHNSON JR.                                        Phone #214.284.1225

residing in ROCKWALL                County, Texas, and whose vocation is WITNESS

Location: 336 BLACKHAWK DR. ROCKWALL, TEXAS 75087

The testimony of said witness…is believed to be material to the STATE.

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

SWORN TO AND SUBSCRIBED BEFORE ME, this <u>16TH</u> day of <u>APRIL</u>, 2010.

Gary Fitzsimmons, District Clerk
Dallas County, Texas

Issued By:

DATE:

DEPUTY DISTRICT CLERK
Form 39

SUBPAPP

184

## APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS CRIMINAL

To The Clerk Of The 282ND Judicial District Court, Dallas County, Texas

In the case of the STATE OF TEXAS Vs. **GARY GREEN**

CAUSE NUMBER: <u>F0959380</u> CHARGED WITH: <u>CAPITAL MURDER</u>

DATE SET FOR TRIAL: <u>10/19/</u>, 2010, at 9:00 A.M., you will please issue... subpoena...in accordance with the law, for the following named witness...residing in the County, as set out:

Phone #<u>903.875.6298</u>

.. BELINDA LACY

residing in <u>ELLIS</u> County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>3700 E. HWY 85 #11102 ENNIS, TEXAS 75119</u>

Phone #<u>UNK</u>

2. PATRICK MCGRORY M.D.

residing in <u>DALLAS</u> County, Texas, and whose vocation is <u>M.D.</u>

Location: <u>CMC 1935 MEDICAL DISTRICT DR. DALLAS, TEXAS 75235</u>

Phone #<u>UNK</u>

3. VON MILLER

residing in <u>ELLIS</u> County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>831 COCKRELL HILL RD. OVILLA, TEXAS 75154</u>

Phone #<u>UNK</u>

4. RAY MONTGOMERY

residing in <u>DALLAS</u> County, Texas, and whose vocation is <u>UNK</u>

Location: <u>UNK</u>

Phone #<u>903.928.2176</u>

5. CHARLES MOSS

residing in <u>DALLAS</u> County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>10699 N. US 287 TENNESSEE COLONY, TEXAS 75861</u>

Phone #<u>214.456.6040</u>

6. JOSEPH T. MURPHY M.D.

residing in <u>DALLAS</u> County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>CMC 1935 MEDICAL DISTRICT DR. DALLAS, TEXAS 75235</u>

The testimony of said witness...is believed to be material to the STATE.

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

SWORN TO AND SUBSCRIBED BEFORE ME, this <u>16TH</u> day of <u>APRIL</u>, 20<u>10</u>.

Gary Fitzsimmons, District Clerk
Dallas County, Texas

Issued By:

DATE:

DEPUTY DISTRICT CLERK
Form

SUBPAPP

185

# APPLICATION FOR SUBPOENA IN THE DISTRICT COURT/CRIMINAL

To The Clerk Of The 282ND Judicial District Court, Dallas County, Texas

In the case of the STATE OF TEXAS Vs. **GARY GREEN**

Cause Number: <u>F0959380</u> Charged With: <u>CAPITAL MURDER</u>

Date Set For Trial: <u>10/19/</u>, 2010, at 9:00 A.M., you will please issue… subpoena…in accordance with the law, for the following

named witness…residing in the County, as set out:

1. <u>JENNIFER WHEELER</u>      Phone #<u>UNK</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>UNK</u>

2. <u>DIMPLE PATEL</u>      Phone #<u>214.818.2637</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>DCAC - CPS</u>

3. <u>JESSIE GONZALEZ</u>      Phone #<u>214.818.2623</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>DCAC - FORENSIC INTERVIEW</u>

4. <u>DR. ASHELY LYNN</u>      Phone #<u>214.818.2603</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>DCAC - THERAPIST</u>

5. <u>SARAH RASCO</u>      Phone #<u>214.371.0474</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>METROCARE SERVICES - 1380 RIVERBEND DR. DALLAS, TEXAS 75247</u>

6. <u>PETA GAY HENRY</u>      Phone #<u>214.371.0474</u>

residing in <u>DALLAS</u>      County, Texas, and whose vocation is <u>WITNESS</u>

Location: <u>METROCARE SERVICES - 1380 RIVERBEND DR. DALLAS, TEXAS 75247</u>

The testimony of said witness…is believed to be material to the STATE.

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

Sworn To And Subscribed Before Me, this <u>16TH</u> day of <u>APRIL</u> , 20<u>10</u>.

Gary Fitzsimmons, District Clerk
Dallas County, Texas

Issued By:

Date:

DEPUTY DISTRICT CLERK
Form 391

186

SUBPAPP

# APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL

To The Clerk Of The 282nd Judicial District Court, Dallas County, Texas

## In the case of the STATE OF TEXAS vs. **GARY GREEN**

CAUSE NUMBER: __F0959380__ CHARGED WITH: **CAPITAL MURDER**

DATE SET FOR TRIAL: __10/19/__, 2010, at 9:00 A.M., you will please issue… subpoena…in accordance with the law, for the following named witness…residing in the County, as set out:

1. LARS OLIVER     Phone #214.374.7554

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: DOLLAR GENERAL 3936 POLK ST. DALLAS, TEXAS 75224

2. SHULONDA RANSOM     Phone #214.281.7065

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: 423 ESSEX MESQUITE, TEXAS

3. MARY SAMPSON     Phone #214.398.2323

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: 415 KONAWA DR. DALLAS, TEXAS 75217

4. GABRIELLE SCOTT     Phone #214.339.8174

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: 4613 COUNTRY CREEK DR. #1028 DALLAS, TEXAS 75236

5. LATOYA SMITH     Phone #214.815.4988

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: 2060 SILVERADO DR. MESQUITE, TEXAS 75181

6. MARCUS WASHINGTON     Phone #214.587.8228

residing in DALLAS _____ County, Texas, and whose vocation is WITNESS

Location: 9249 JENNIE LEE DALLAS, TEXAS 75227

The testimony of said witness…is believed to be material to the STATE.

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

SWORN TO AND SUBSCRIBED BEFORE ME, this __16TH__ day of __APRIL__, 20__10__.

Gary Fitzsimmons, District Clerk
Dallas County, Texas

Issued By:

Date:

DEPUTY DISTRICT CLERK
Form 391

187

SUBPAPP

# APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL

To The Clerk Of The 282ND Judicial District Court, Dallas County, Texas

In the case of the STATE OF TEXAS VS. **GARY GREEN**

CAUSE NUMBER: **F0959380** CHARGED WITH: **CAPITAL MURDER**

DATE SET FOR TRIAL: **10/19/, 2010**, at 9:00 A.M., you will please issue... subpoena...in accordance with the law, for the following named witness...residing in the County, as set out:

1. JASON R. SCHAEFER M.D.                                     Phone #UNK

residing in DALLAS                    County, Texas, and whose vocation is M.D.

Location: PARKLAND HOSPITAL

2. STORMIE GARDNER                                       Phone #214.428.8338

residing in DALLAS                    County, Texas, and whose vocation is PAROLE

Location: 1010 CADIZ ST. #204B DALLAS, TEXAS 75215

3. SHARON KNIGHT                                         Phone #214.330.0800

residing in DALLAS                    County, Texas, and whose vocation is PAROLE

Location: 4535 HALF CROWN DALLAS, TEXAS 75237

4. LOTTIE TUCKER                                         Phone #214.330.0800

residing in DALLAS                    County, Texas, and whose vocation is WITNESS

Location: 4535 HALF CROWN DALLAS, TEXAS 75237

5. DR. PASCO                                             Phone #214.381.7181

residing in DALLAS                    County, Texas, and whose vocation is WITNESS

Location: TIMBERLAWN - 4600 SAMUEL BLVD. DALLAS, TEXAS 75228

6. KEVIN ASHFORD                                         Phone #UNK

residing in DALLAS                    County, Texas, and whose vocation is WITNESS

Location: UNK

The testimony of said witness...is believed to be material to the STATE.

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

SWORN TO AND SUBSCRIBED BEFORE ME, this 16TH day of APRIL          2010.

Gary Fitzsimmons, District Clerk
Dallas County, Texas

Issued By:

DATE:

DEPUTY DISTRICT CLERK
Form 391

188

SUBPAPP

APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL....DUCES TECUM

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas:

FILED
10 MAY 12 AM II: 1 3
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
_____ Deputy

In the case of the STATE OF TEXAS VS. GARY GREEN

CAUSE NUMBER: F0959380, CHARGE WITH: CAPITAL MURDER SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: CUSTODIAN OF RECORDS OR DESIGNATE FOR PARKLAND HEALTH AND HOSPITAL SYSTEMS whose vocation is that of RECORDS and whose location is PARKLAND and that he/she bring with him/her and produce in said Court, at 10/19/ on 2010 2010:

CERTIFIED COPIES UNDER AFFIDAVIT: ANY AND ALL RECORDS PERTAINING TO MEDICAL / PSYCHOLOGICAL TREATMENT OF PATIENT GARY R. GREEN B/M 03/14/71.

In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: JIM SPURGER. Criminal Investigator, Frank Crowley Courts Building, 133 N. Riverfront Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.

The testimony of said witness is believed to be material to the State.

ANDY BEACH

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers: 214-653-3897

APPLIED FOR by the aforesaid Assistant District Attorney this 12TH day of MAY, 2010.

Issued by: _____

GARY FITZSIMMONS District Clerk

Dallas County, Texas

By: _____ District Clerk

Date Issued: 5/12

189

DUCESDIST/CRIMINAL COURT

[REV. DECEMBER 31, 2001]

CAUSE NO. F0959380

| | |
|---|---|
| STATE OF TEXAS | IN THE 282ND JUDICIAL |
| VS. | DISTRICT COURT OF |
| GARY GREEN | DALLAS COUNTY, TEXAS |

## ORDER FOR MEDICAL / THERAPEUTIC / PSYCHIATRIC RECORD RELEASE

On this the **12TH** day of **MAY,** 2006 the Court has reviewed the attached subpoena application for ANY AND ALL medical / therapy records of any kind from, **PARKLAND HEALTH & HOSPITAL SYSTEMS** pertaining to **GARY GREEN** and good cause has been shown for the issuance of the attached subpoena to further the prosecution of a criminal matter pending before this court.

**IT IS HEREBY ORDERED** that the health care provider named in the subpoena release all records designated therein.

SIGNED <u>MAY 12TH,</u> 2010

The Honorable Judge Presiding

JUDICIAL District Court #<u>282ND</u>

☒ **INVESTIGATOR WILL SERVE**          ☐ **CONSTABLE WILL SERVE**

190

APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL.....DUCES TECUM

FILED

'10 MAY 12 AM 11: 13

To The Clerk Of the 282ND Judicial District Court Of Dallas County, Texas.

In the case of the STATE OF TEXAS Vs. GARY GREEN

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

_____
DEPUTY

CAUSE NUMBER: F0959380, CHARGE WITH: CAPITAL MURDER SET FOR TRIAL: please issue a subpoena in accordance with the law, for the following witness: CUSTODIAN OF RECORDS OR DESIGNATE FOR PARKLAND HEALTH AND HOSPITAL SYSTEMS AT DALLAS COUNTY JAILS whose vocation is that of **RECORDS** and whose location is PARKLAND and that he/she bring with him/her and produce in said Court, at 10/19/ on 2010 2010:

**CERTIFIED COPIES UNDER AFFIDAVIT: ANY AND ALL RECORDS PERTAINING TO MEDICAL / PSYCHOLOGICAL TREATMENT OF INMATE GARY R. GREEN B/M 03/14/71.**

In lieu of personally appearing before the said court at said time place, the said witness may comply with this subpoena by furnishing true and correct certified copies of the aforesaid records to the following named person at the following address: **JIM SPURGER**. Criminal Investigator, Frank Crowley Courts Building, 133 N. Riverfront Blvd., LB 19, Dallas, Texas 75207-4399 (214) 653.3600.

The testimony of said witness is believed to be material to the State.

**ANDY BEACH**

Assistant District Attorney

133 North Industrial Blvd. LB 19

Dallas, Texas 75207-4399

Phone Numbers:  **214-653-3897**

APPLIED FOR by the aforesaid Assistant District Attorney this 12TH day of MAY, 2010.

Issued by: _____

Date Issued: ___5/12___

GARY FITZSIMMONS, District Clerk

Dallas County, Texas

By: _____

_____ Deputy District Clerk

191

DUCESDIST/CRIM....E COURT

[REV. DECEMBER 31, 2001]

CAUSE NO. F0959380

| | |
|---|---|
| STATE OF TEXAS | IN THE 282ND JUDICIAL |
| VS. | DISTRICT COURT OF |
| GARY GREEN | DALLAS COUNTY, TEXAS |

## ORDER FOR MEDICAL / THERAPEUTIC / PSYCHIATRIC RECORD RELEASE

On this the **12TH** day of **MAY,** 2006 the Court has reviewed the attached subpoena application for ANY AND ALL medical / therapy records of any kind from, **PARKLAND HEALTH & HOSPITAL SYSTEMS AT DALLAS COUNTY JAILS** pertaining to **GARY GREEN** and good cause has been shown for the issuance of the attached subpoena to further the prosecution of a criminal matter pending before this court.

**IT IS HEREBY ORDERED** that the health care provider named in the subpoena release all records designated therein.

SIGNED <u>MAY 12TH,</u> 2010

The Honorable Judge Presiding

JUDICIAL District Court #<u>282ND</u>

☒ **INVESTIGATOR WILL SERVE**      ☐ **CONSTABLE WILL SERVE**

192

### APPLICATION FOR SUBPOENA IN THE DISTRICT COURTS/CRIMINAL

To The Clerk Of The 282ND Judicial District Court, Dallas County, Texas

### In the case of the STATE OF TEXAS Vs. **GARY GREEN**

CAUSE NUMBER: **F0959380** CHARGED WITH: **CAPITAL MURDER**

DATE SET FOR TRIAL: **10/19**, 2010, at 9:00 A.M., you will please issue... subpoena... in accordance with the law, for the following named witness...residing in the County, as set out:

**FILED**

**10 MAY 12 AM 11: 13**
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
_____ DEPUTY

1. JOSEPH MARTINEZ _____ Phone #UNK

residing in DALLAS _____ County, Texas, and whose vocation is M.D. _____

Location: PARKLAND HOSPITAL _____

2. _____ Phone # _____

residing in _____ County, Texas, and whose vocation is _____

Location: _____

3. _____ Phone # _____

residing in _____ County, Texas, and whose vocation is _____

Location: _____

4. _____ Phone # _____

residing in _____ County, Texas, and whose vocation is _____

Location: _____

5. _____ Phone # _____

residing in _____ County, Texas, and whose vocation is _____

Location: _____

6. _____ Phone # _____

residing in _____ County, Texas, and whose vocation is _____

Location: _____

The testimony of said witness...is believed to be material to the STATE.

_____

ANDY BEACH
Assistant District Attorney
133 N. Industrial Blvd., Dallas, Tx. 75207

SWORN TO AND SUBSCRIBED BEFORE ME, this **12** day of **MAY**

GARY FITZSIMMONS, District Clerk
Dallas County, Texas

Issued By: _____

DATE: **5/12** _____

_____
DEPUTY DISTRICT CLERK
Form 391

193

SUBPAPP

# SUBPOENA APPLICATION – DUCES TECUM

TO THE CLERK OF THE _____ DISTRICT COURT, _____ DALLAS COUNTY TEXAS

IN THE CASE OF THE STATE OF TEXAS VS.

_Gary R. Green_

CAUSE NO. F- _07-59580-S_ (COURT LETTER REQUIRED, NOT OPTIONAL)

CHARGED WITH _CAP Murder (DP)_

DATE SET FOR TRIAL _6-9_ 20_10_ AT _9 A_ . M.

WILL YOU PLEASE ISSUE SUBPOENA IN ACCORDANCE WITH THE LAW, FOR THE FOLLOWING NAMED WITNESS:

_Custodian of Personnel Records_

AND WHOSE VOCATION IS THAT OF _____

RESIDING IN _____ COUNTY, TEXAS AND WHOSE LOCATION IS:

_Metropolitan Florists_

STREET ADDRESS/CITY/STATE/ZIP CODE/TELEPHONE NUMBER

AND SAID WITNESS BRING AND PRODUCE IN SAID COURT, AT SAID TIME AND PLACE THE FOLLOWING:

_Any and all records that pertain to ~~employee~~ Former employee Gary Renard Green, B/M, 3-14-1971, 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_

_In lieu of appearing, the records may be released to investigator Jeff Gardner, 214-994-3535._

THE TESTIMONY OF SAID WITNESS IS BELIEVED TO BE MATERIAL TO THE STATE/DEFENDANT (CIRCLE ONE)

_Paul Johnson_

ASSISTANT DISTRICT ATTORNEY / DEFENSE ATTORNEY

_Dallas, Tx_

ADDRESS/CITY/STATE/ZIP CODE

_____ . PHONE NUMBER

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____ 20 ____

GARY FITZSIMMONS, DISTRICT CLERK
DALLAS COUNTY, TEXAS

ISSUED BY _____

DEPUTY DISTRICT CLERK

194

TO THE CLERK OF THE _____ DISTRICT COURT, _____ DALLAS COUNTY TEXAS

IN THE CASE OF THE STATE OF TEXAS VS.

_GARY R. GREEN_

CAUSE NO. F- _09-59580-S_  (COURT LETTER REQUIRED, NOT OPTIONAL)

CHARGED WITH _CAP MURDER (DP)_

DATE SET FOR TRIAL _6-9_ 20_10_ AT _9_ A.M.

WILL YOU PLEASE ISSUE SUBPOENA IN ACCORDANCE WITH THE LAW, FOR THE FOLLOWING

NAMED WITNESS: _CUSTODIAN of PERSONNEL RECORDS_

AND WHOSE VOCATION IS THAT OF _____

RESIDING IN _____ COUNTY, TEXAS AND WHOSE LOCATION IS:

_MILLS ELECTRICAL CONTRACTORS_

STREET ADDRESS/CITY/STATE/ZIP CODE/TELEPHONE NUMBER

AND SAID WITNESS BRING AND PRODUCE IN SAID COURT, AT SAID TIME AND PLACE THE

FOLLOWING:

_ANY AND ALL RECORDS THAT PERTAIN_
_to Employee FORMER Employee_
_GARY RENARD GREEN, B/M, 3-14-1971,_
_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_

_In Lieu of Appearing, THE RECORDS MAY_
_BE RELEASED to INVESTIGATOR JEH_
_GARDNER, 214-994-3535_

THE TESTIMONY OF SAID WITNESS IS BELIEVED TO BE MATERIAL TO THE STATE/(DEFENDANT) (CIRCLE ONE)

_Paul Johnson_

ASSISTANT DISTRICT ATTORNEY / DEFENSE ATTORNEY

_Dallas, Tx_

ADDRESS/CITY/STATE/ZIP CODE

_____

PHONE NUMBER

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____ 20 ____

GARY FITZSIMMONS, DISTRICT CLERK
DALLAS COUNTY, TEXAS

ISSUED BY: _____

DEPUTY DISTRICT CLERK

195

# SUBPOENA APPLICATION – DUCES TECUM

TO THE CLERK OF THE _____ DISTRICT COURT, _____ DALLAS COUNTY TEXAS

IN THE CASE OF THE STATE OF TEXAS VS.

_GARY R. GREEN_

CAUSE NO. F- _09-59880-S_ (COURT LETTER REQUIRED, NOT OPTIONAL)

CHARGED WITH _CAP MURDER (DP)_

DATE SET FOR TRIAL _6-9_ 20_10_ AT _9_ A.M.

WILL YOU PLEASE ISSUE SUBPOENA IN ACCORDANCE WITH THE LAW, FOR THE FOLLOWING NAMED WITNESS: _Custodian of Personnel Records_

AND WHOSE VOCATION IS THAT OF _____

RESIDING IN _____ COUNTY, TEXAS AND WHOSE LOCATION IS: _Your Guardian, Inc_

STREET ADDRESS/CITY/STATE/ZIP CODE/TELEPHONE NUMBER

AND SAID WITNESS BRING AND PRODUCE IN SAID COURT, AT SAID TIME AND PLACE THE FOLLOWING:

_Any and all records that pertain to ~~employee~~ former employee Gary Renard Green, B/M, 3-14-1971, 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_

_In lieu of appearing, the records may be released to investigator Jeff Gardner, 214-994-3535._

THE TESTIMONY OF SAID WITNESS IS BELIEVED TO BE MATERIAL TO THE STATE/DEFENDANT (CIRCLE ONE)

_Paul Johnson_
ASSISTANT DISTRICT ATTORNEY / DEFENSE ATTORNEY

_Dallas, Tx_
ADDRESS/CITY/STATE/ZIP CODE

_____
PHONE NUMBER

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF_____ 20____

GARY FITZSIMMONS, DISTRICT CLERK
DALLAS COUNTY, TEXAS

ISSUED BY _____

_____
DEPUTY DISTRICT CLERK

196

TO THE CLERK OF THE _____ DISTRICT COURT, _____ DALLAS COUNTY TEXAS

IN THE CASE OF THE STATE OF TEXAS VS.

_GARY R. GREEN_

CAUSE NO. F- _09-59880-S_ (COURT LETTER REQUIRED, NOT OPTIONAL)

CHARGED WITH _CAP MURDER (DP)_

DATE SET FOR TRIAL _6-9_ 20_10_ AT _9_ A. M.

WILL YOU PLEASE ISSUE SUBPOENA IN ACCORDANCE WITH THE LAW, FOR THE FOLLOWING NAMED WITNESS: _CUSTODIAN of PERSONNEL RECORDS_

AND WHOSE VOCATION IS THAT OF _____

RESIDING IN _____ COUNTY, TEXAS AND WHOSE LOCATION IS:
_WAL-MART STORE # 2976_
STREET ADDRESS/CITY/STATE/ZIP CODE/TELEPHONE NUMBER

AND SAID WITNESS BRING AND PRODUCE IN SAID COURT, AT SAID TIME AND PLACE THE FOLLOWING:

_Any and ALL RECORDS THAT PERTAIN_
_to ~~Employee~~ FORMER Employee_
_GARY RENARD GREEN, B/M, 3-14-1971,_
_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_

_In Lieu of APPEARING, THE RECORDS MAY_
_BE RELEASED to INVESTIGATOR JEH_
_GARDNER, 214-994-3535._

THE TESTIMONY OF SAID WITNESS IS BELIEVED TO BE MATERIAL TO THE STATE/(DEFENDANT) (CIRCLE ONE)

_Paul Johnson_
ASSISTANT DISTRICT ATTORNEY / DEFENSE ATTORNEY
_Dallas, Tx_
ADDRESS/CITY/STATE/ZIP CODE

_____
PHONE NUMBER

SWORN TO AND SUBSCRIBED BEFORE ME, THIS _____ DAY OF _____ 20 _____

GARY FITZSIMMONS, DISTRICT CLERK
DALLAS COUNTY, TEXAS

_____
DEPUTY DISTRICT CLERK

ISSUED BY _____

197