CAUSE NO. F00-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR DISCOVERY, PRODUCTION AND RULE 702/705 HEARING

COMES NOW, PAUL JOHNSON, attorney for the Defendant, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution, and further pursuant to Tex. R. Crim.P. 39.14 (a) and (b) and Tex.R.Evid. 104, 702, 703 and 705. In support thereof, the Defendant would show the following:

1. The Defendant has been indicted by the Dallas County grand jury for the offense of capital murder;

2. The State is seeking the death penalty;

3. The Defendant anticipates that during trial of this case the State will call one or more witnesses who will offer opinions that are either scientific in nature or are based upon personal training or experience. The admissibility of such opinions are governed by Tex.R Evid. 702, 703, 705 and *Daubert v. Merrell Dow*, 113 S.Ct. 2786 (1993), *Kumho Tire Company v. Carmichael*, 119 S.Ct. 1167 (1999), *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App. 1992) and *Jordan v. State* 928 S.W.2d 550 (Tex.Crim.App.1996) and *Nenno v. State*, 970 S.W. 2d 549 (Tex. Crim. App. 1998) (overruled in part on other grounds).

4. The proponent of scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable. This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory and (3) proper application of the technique on the occasion in question. *Kelly, supra.*

439

to consider ascertained;

(b) the qualifications of the expert(s) testifying;

(c) the existence of literature supporting or rejecting the underlying scientific theory and technique; specifically, this Court should be provided citations to empirical studies supporting the opinion and citations to articles or chapters in scientific treatises or journals supporting the opinion.

(d) the potential rate of error of the technique;

(e) the availability of other experts to test and evaluate the technique;

(f) the clarity with which the underlying scientific theory and technique can be explained to the court;

(g) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly,* at page 573.

8.  Should the Court determine that the testimony to be offered is in a field of science that is based upon experience and training, as opposed to a scientific method, the Court's review of the reliability of the science is even more important and the Court must find:

(a) whether the field of expertise is a legitimate one;

(b) whether the subject matter of the expert's testimony is within the scope of that field; and

(c) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.  *Nenno*, at page 561;

9.  The Court of Criminal Appeals in *Nenno v. State*, 970 S.W.2s 549 (Tex.  Crim.App.1998) said that not only were the criteria described in *Kelly, supra* (peer review, rate of error, etc.) not categorically ruled out when reviewing the reliability of opinions based on "soft science" but in addition, the Court listed the following **additional** criteria for the trial court

440

to consider technique used or relied upon by each State witness that will provide opinion

(i)  interviews conducted by the witness while in the field in which he is to express and opinion;

(ii)  the facts of the cases in which he conducted those interviews;

(iii)  statistical research performed in the field in which the witness is to express an opinion.  Specifically, the witness should provide to the Court data collected by the witness or those under his or her supervision and provide the data collection instruments that were used, the data collection procedures and the statistical analysis applied to the date in forming the opinion to be proffered.

10.    The United States Supreme Court has held that the reliability standard announced in *Daubert* applies to all expert testimony regardless of whether it is scientific expert testimony or clinical opinion expert testimony.  *Kumho Tire Company v. Carmichael*, 119 S.Ct. 1167 (1999).  All of the material that is sought by this motion is relevant to reliability of opinions based upon "soft or hard science" testimony.  The Supreme Court of Texas has held that *Daubert*, and therefore *Robinson*, applies to all expert testimony–"Whether the expert would opine on economic valuation, **advertising psychology** (emphasis added), or engineering, application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Gammill v. Jack Williams Chevrolet*, Inc., 972 S.W. 2d 713, 725 (Tex. 1998) (affirmed in part and reversed in part).

11.    So as to aid the Court in its "gatekeeping" function to determine the reliability of the offered opinion, the State should be required to provide the Court, at least _____ days prior to trial,  the following:

(a) a concise and specific statement of each expert opinion the State intends to introduce at trial;

(b) the name, address and curriculum vita of each witness the State intends to qualify as an exert in order to present such testimony;

(c) all  literature supporting or rejecting the underlying theory, methodology or

441

techniques sought to be relied upon by each State witness that will provide opinion testimony at trial. This information will allow the Court to determine if the relevant theory, methodology or technique has been subjected to review by the witnesses's peers and if the purported science is generally accepted in the field.

(d) the results of any tests that have been performed on the science or methodology relied upon by each State witness that will provide opinion testimony at trial. This information will allow the Court to determine if the basis for the opinion has been or can be subjected to testing to determine its reliability;

(e) the names of each person about whom a witness to be called by the state has expressed an opinion in the past and the opinion expressed as to each by the State's witness. This information will allow the Court to determine if a known or potential rate of error exists;

(f) a listing of any standards that control the technique or methodology used to arrive at any opinion that may be expressed at trial. This will allow the Court to determine if there is an accepted protocol for gathering relevant information and interpreting that information in arriving at an opinion;

(g) the qualifications that allow the witnesses to form and express the opinions. This will allow the Court to determine if the opinion of the witness is based on scientific knowledge and training or is merely an opinion based on personal belief, bias or prejudice.

(h) a list of each interview conducted by the witness while in the field in which he is to express and opinion;

(i) the facts in each of the cases in which he conducted those interviews;

(j) statistical research performed in the field in which the witness is to express an opinion with supporting documentation as outlined in Paragraph 9 (iii) above.

12. The Nenno Court, at page 562, said:

"To the extent that a fact finder could decide that the absence of peer

442

> review casts doubt on the credibility of the testimony, such affects the
> weight of the evidence rather than its admissibility"

If some of the described material goes to the weight that a jury should give the testimony, as is stated in Nenno, supra at page 562, then it should be provided to the Defendant as impeachment material under *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. In addition and as provided for in Tex. C.Crim. Proc. Art. 39.14(a) counsel for the Defendant should be given the opportunity to not only examine, but to copy any documents that are provided to the Court pursuant to its Order.

WHEREFORE, PREMISES CONSIDERED, Counsel for the Defendant prays that upon hearing of this motion the Court:

(1) Order the State to provide to the Court those documents that have been identified in this motion as being important to the Court's "gatekeeping" function;

(2) Order that counsel for the Defendant be allowed to photocopy each of the documents, if any, produced by the State in support of the witness's opinion testimony;

(3) Order that this matter be set for a pre-trial hearing at which the State be required to establish, under the cited authority, the reliability of any opinions that are to be offered at trial;

(4) Order that this hearing be set sufficiently in advance of trial so that the accused can arrange for necessary rebuttal testimony should any of the State's opinion testimony be found to be scientifically reliable and helpful to the trier of fact; and

(5) Such other and further relief to which the Defendant, or his counsel, may show himself to be entitled.

443

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the _12_ day of _AUG_ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

444

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## **MOTION FOR DISCOVERY, PRODUCTION AND RULE 702/705 HEARING ORDER**

On this the _____ day of _____, 2010, came to be heard Defendant's Motion and this Court, having heard the same, is of the opinion that the motion should be:

Denied_____

Granted_____

IT IS SO ORDERED.

_____
JUDGE PRESIDING

445

CAUSE NO. F09-59380

| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _282_ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## DEFENDANT'S WRITTEN OBJECTION TO ADMISSIBILITY OF EXTRANEOUS OFFENSES, REQUEST FOR PROCEDURAL DETERMINATION BY TRIAL COURT WITH FINDINGS OF FACTS AND CONCLUSIONS OF LAW AND FOR LIMITING INSTRUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes the Defendant herein, by and through Counsel, and files this his Written Objection to Admissibility of Extraneous Offenses, Request for Procedural Determination by Trial Court with Findings of Fact and Conclusions of Law, and for Limiting Instruction, and in support thereof would show the Court as follows:

### I.

The State of Texas is seeking the admission of extraneous offenses. Such evidence may be admissible where it makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Texas Rules of Evidence. "Evidence which is not relevant is inadmissible." Rule 402, Texas Rules of Evidence. Although evidence may be deemed relevant, such evidence is still not admissible if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Rule 403, Texas Rules of Evidence.

446

## II.

The Defendant objects to the admission of such extraneous offense evidence under Rules 401, 402, 403, and 404(b) and requests the State prove such evidence has relevance other than proving the character of the Defendant, or suggesting that he acted in conformance with a criminal propensity. *Montgomery vs. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991).

## III.

If the Court overrules the objection in paragraph II above, the Defendant hereby requests that the Court make findings of fact and conclusions of law supporting its determination that the evidence (1) establishes an elemental fact, (2) establishes an evidentiary fact that inferentially leads to an elemental fact, (3) rebuts a defensive theory, or (4) has some other logical relevance, and that the need for the evidence outweighs reasons for exclusion under Rule 403. See *Montgomery*, supra.

## IV.

Further, the Defendant requests that the Court properly instruct the jury to confine and limit its consideration of such evidence to the purpose articulated by the State, under the authority of Rule 105, Texas Rules of Evidence.

## V.

In support of the foregoing, Defendant makes these requests to preserve his rights to the effective assistance of counsel, due process and due course of law, in accordance with the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10, 13 and 19 of the Texas Constitution, and Articles 1.04, 1.05, and 1.051 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant requests this Honorable Court grant to Defendant all relief requested herein and such other relief to which he may be entitled.

447

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendant's Written Objection to Admissibility of Extraneous Offenses, Request for Procedural Determination by Trial Court with Findings of Facts and Conclusions of Law and for Limiting Instruction was served upon the attorney for the State on _____ 8 / 12 _____, 2010.

Paul Johnson

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## ORDER ON DEFENDANT'S WRITTEN OBJECTION TO ADMISSIBILITY OF EXTRANEOUS OFFENSES, REQUEST FOR PROCEDURAL DETERMINATION BY TRIAL COURT WITH FINDINGS OF FACTS AND CONCLUSIONS OF LAW AND FOR LIMITING INSTRUCTION

BE IT REMEMBERED, that on the _____ day of _____, 2010, came to be considered the above and foregoing Motion by Defendant.  After consideration of the same, it is the opinion of the Court that Defendant's Motion be:

_____  GRANTED as to paragraph(s) _____.

_____  DENIED as to paragraph(s) _____, to which ruling the Defendant timely excepts.

SIGNED on _____, 2010.


_____
JUDGE PRESIDING

449

CAUSE NO. F09-59380

| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR PRODUCTION OF IMPEACHMENT EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant in the above-cause, by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and files this Motion For Production of Witness Related Evidence, and for good and sufficient cause would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty.

3. The Defendant has a Constitutional right to confront and cross-examine witnesses that testify against him. Impeaching as well as exculpatory evidence is favorable to the accused under *Brady v. Maryland. United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

4. The State, and its prosecutors, should be Ordered (with a continuing duty to disclose newly discovered material previously and here ordered), to furnish defense with, and permit defense to inspect, copy and/or photograph the following information, objects or copies relating to expert and/or medical evidence within the possession, custody, control or knowledge of the prosecution or which by exercise of due diligence may become known

450

to the S(a)employment, including type of practice or work in the field of expertise, names

The identity of each expert witness the State consulted with or intends to call as a witness in

the instant matter, including:

    (a) name and title;

    (b)  work address and home addresses (if known);

    (d) work and home telephone numbers;

    (e) profession or occupation, and the field in which (s)he is allegedly an expert;

    (f) a copy of the witnesses' Curriculum Vitae that contains the formal education

and training, including the name and address of each school where special education

or training was received in this expert's field of expertise; the dates of said education

and training; the name or description of each degree (s)he received, including the

date when each was received and the name of the school from which received;

    (g) membership in any professional or trade association in that field of expertise

including the name of each professional or trade association, dates of membership

and description of office(s) held;

(h) authorship of any books, papers or articles, including title and subject matter of

book, paper or article, name and address of each item's publisher and each item's

date of publication;

(i) licenses to practice in the field of expertise, including the governmental authority

by whom licensed, the general requirements that had to be met and how these

requirements were fulfilled; and whether any license had ever been revoked or

suspended;

451

6. In support of said motion, the Defendant respectfully states that the of expertise, names and addresses of employers and/or associates, dates of said employment, positions held and/or duty performed.

(k)the identity of any object, sample or material tested, analyzed or examined by each  expert in regard to the instant matter, including as to said test, analysis and/or examination (all three are hereinafter called "exam")

    (1) the exam's date;

    (2) the exam's location;

    (3) the exam's purpose;

    (4) the steps or methods employed in said exam;

    (5) the information provided by another to the expert prior to said exam;

    (6) the identity of any other person(s) assisting in said exam; and

    (7) the present location of any samples or materials used in said exam.

(l) the results or conclusions reached by each expert the State consulted or intends to call  as a witness in the instant matter, including:

    (a) written reports;

    (b) oral opinions, including the date thereof and to whom reported.

5. The amount of compensation provided to each expert consulted or whom the State intends to call as a witness in regard to this matter.

452

6. In support of said motion, the Defendant respectfully states that the scientific complexity of the instant case requires that full discovery of medical and scientific facts and opinions be provided.  The prosecution had access and opportunity to perform scientific analysis prior to counsel's appearance in the case or in some instances, such analysis can no longer be replicated or reproduced by defense counsel.  The defendant requires a complete exposition of that information prior to the beginning of the introduction of evidence to the jury in the above case.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that relief be granted as prayed for herein.

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the 12 day of AUG 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

**Paul Johnson**

453

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _____OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

---

## MOTION FOR PRODUCTION OF IMPEACHMENT EVIDENCE
## ORDER

On this the _____ day of _____ 2010, came on to be heard the above and foregoing motion of the defendant herein and the Court having considered same is of the opinion that the motion should be (DENIED) (GRANTED)

SIGNED this the _____ day of _____, 2010.


_____
JUDGE PRESIDING

454

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. ___282___ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR PRODUCTION OF WITNESS STATEMENTS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, the Defendant in the above styled and numbered cause, by and through his undersigned attorney, and based upon the Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States of America, Article 1, Sections 10 and 19 of the Constitution of the State of Texas, Rules 612 and 615, Texas Rules of Evidence, and Article 39.14, C.C.P., and respectfully moves this Honorable Court to order the District Attorney or his Assistant to produce, after a witness called by the State has testified on direct examination, the following requested items, to-wit:

1.     All of the statements, whether in writing or however recorded and whether signed or unsigned, of any witness called to testify by the State, after his direct examination. Texas Rules of Evidence Rule 615(a).

_____GRANTED

_____DENIED

2.     All documents used by the witness to refresh his memory concerning the facts in this cause, either prior to his testimony in this case or as he was giving direct testimony in this cause before the trier of fact. Texas Rules of Evidence Rule 612.

455

presence of the jury.                                    _____GRANTED

                                                          _____DENIED

3.      A transcript of the Grand Jury testimony of any witness called by the State to testify after the witness has completed his direct examination.  Texas Rules of Evidence, Rule 615(a).

                                                          _____GRANTED

                                                          _____DENIED

4.      Any police report where same is shown to purport to be what the witness observed or did at the time in question and which concerns facts testified to by the witness on direct examination whether made by the witness or not as long as the witness has adopted same as correct.  Texas Rules of Evidence, Rules 615(a) and (f).

                                                          _____GRANTED

                                                          _____DENIED

5.      Any document, object, photo or chart, the contents of which may in any way be placed before the jury before or during direct examination of the witness.

                                                          _____GRANTED

                                                          _____DENIED

6.      The Defendant further requests the Court to order the District Attorney or his Assistant to not, in the presence of the jury, offer any of the foregoing statements, documents, charts, photographs or other requested objects in evidence until their admissibility has been established outside the

456

presence of the jury.

                       _____GRANTED

                       _____DENIED

7.      The Defendant further requests the Court to recess the trial upon production of the above requested statements for the purpose of allowing the Defense to examine the statement prior to cross examining the witness.  Texas Rules of Evidence, Rule 615(d).

                       _____GRANTED

                       _____DENIED

      As a basis for this motion, Defendant would show the Honorable Court that he cannot under the Sixth and Fourteenth Amendments of the Constitution of the United States and Article 1, Sections 10 and 19 of the Texas Constitution, properly cross examine the witnesses without the production of the material requested.

      WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays this Motion be in all things granted.

              Respectfully Submitted,

              Paul Johnson Attorney for Defendant
              1825 Market Center Blvd., 320
              Dallas, Texas 75207
              (214) 761-0707
              SBOT# 10778230

457

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the _12_ day of _AUG_ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

458

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## ORDER ON DEFENDANTS MOTION FOR PRODUCTION OF WITNESS STATEMENTS

On this_____day of_____, 2010, the Defendant's Motion For Production of Witness Statements was presented to the Court.  Upon consideration, the motion is hereby:

_____GRANTED as above indicated

_____DENIED as above indicated, to which action of the Court the Defendant duly excepts.

The prosecution is further ordered to have available in Court, after the witness testifies, all of the documents ordered produced herein.

SIGNED AND ENTERED this _____ day of _____, 2010.

_____
JUDGE PRESIDING

459

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd CRIMINAL DISTRICT |
| VS. | § | COURT OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR LIST OF STATE'S WITNESSES PRIOR TO TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, , Defendant in the above styled and numbered cause, by and through his attorneys of record, and respectfully moves the Court for an order directing the attorney for the prosecution to furnish the Defendant, prior to trial, a list containing the names, addresses and telephone numbers of all persons the prosecution intends to call as witnesses in the trial of this cause. In support of this request the Defendant would show the court as follows:

1.      In preparing the present information/indictment/complaint, the attorney representing the State failed to endorse thereon the names of the witnesses on whose testimony the allegations contained in the information/indictment/complaint are based;

2.      Article 20.20 of the Texas Code of Criminal Procedure requires the attorney who prepares an indictment for the State to endorse thereon the names of the witnesses on whose testimony the indictment is based;

3.      "Notice of the State's witnesses shall be given upon request." *Young vs. State*, 547 S.W.2d 23, 27 (Tex. Crim. App. 1977); *Martinez vs. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993). This court has authority to compel the State's attorney to endorse the names of such witnesses upon the information/indictment/complaint or to compel the State's attorney to furnish Defendant with

460

a list of said witnesses. *Jenkins v. State*, 468 S.W.2d 432 (Tex. Crim. App. 1971); *Mullins v. State*, 425 S.W.2d 354 (Tex. Crim. App. 1968);

    4.    To deny Defendant the opportunity to investigate the factual allegations against him by denying access to those persons who have information concerning those allegations would be a denial of due process of law and a denial of Defendant's right to effective assistance of counsel as guaranteed by the 5th, 6th and 14th Amendments of the United States Constitution, Article 1, Sections 10 and 19 of the Texas Constitution and Article 1.04 of the Texas Code of Criminal Procedure;

    5.    Effective confrontation and cross examination of witnesses against the Defendant can be accomplished only if the identity of these witnesses is known in advance of trial, thus enabling the Defendant to conduct the out of court investigation necessary to obtain information which might shed light on the witnesses' credibility. Failure to grant the Defendant's motion would deprive him of rights secured by the 6th and 14th Amendments to the United States Constitution, Article 1, Section 10 of the Texas Constitution and Article 1.05 of the Texas Code of Criminal Procedure.

    WHEREFORE, the Defendant prays that the court order the attorney for the prosecution, prior to trial, to furnish defense counsel with a list of the names, addresses and telephone numbers of all persons who the prosecution intends to call as witnesses in this case.

    Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207

461

(214) 761-0707
SBOT# 10778230

## <u>CERTIFICATE OF SERVICE</u>

I, Paul Johnson attest that on this the 12 day of _____AUG_____ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

462

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT _____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## <u>ORDER ON DEFENDANT'S MOTION FOR LIST OF STATE'S WITNESSES PRIOR TO TRIAL</u>

On this date came the foregoing Motion For List of State's Witnesses Prior to Trial was heard, and the Court, having considered the motion and argument of counsel, it is hereby:

_____ GRANTED, and the attorney for the State is ordered to furnish the attorney for the Defendant with a list of the names, addresses and telephone numbers of the state's witnesses on or before the _____ day of _____, 2010.

_____ DENIED, to which the Defendant duly excepts.

SIGNED on _____, 2010.

_____
JUDGE PRESIDING

463

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND DISTRICT |
| VS. | § | COURT OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR DISCOVERY OF PROSECUTION'S INFORMATION ON PROSPECTIVE JURORS

**NOW INTO COURT**, through undersigned counsel comes GARY GREEN pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Article 1, Sections 10, 13, and 19 of the Texas Constitution, and Article 2.01 of the Texas Code of Criminal Procedure, to order the prosecution to provide information it may possess or maintain concerning prospective, jurors. In support of his motion, defendant states as follows:

1. DEFENDANT was indicted by a Dallas County grand jury of capital murder. He is indigent and does not have access to private and confidential information gathered by law enforcement agencies regarding arrests and convictions of prospective jurors.

2. The recent trend among courts has been to allow discovery of prosecuting attorneys' information and reports on prospective jurors. See *People v. Aldridge*, 209 N.W.2d 796 (Mich. 1973); Uniform Rules of Criminal Procedure, Rule 421(a). Even where official rules of criminal procedure have not allowed such discovery, courts have recognized that it may be warranted where special need is shown. See *Commonwealth v. Galloway*, 352 A.2d 518 (Pa. Super. 1975); cf. *Atwell v. Blackburn*, 800 F.2d 502 (5th Cir. 1986). The fact that the State seeks to execute Mr. Medina for this crime justifies discovery beyond the contours of the Code of Criminal Procedure. "We hold that capital cases are sufficiently different by their very nature [to justify open file discovery]." *Ex Parte Monk,* 557 So.2d 832, 836-37 (Ala. 1989) (affirming trial court's order entitling capital defendant to open file discovery). "The hovering death penalty is the special circumstance justifying broader discovery in capital cases." *Id.* at 836. *See also  Brown v. State,*

464

515 So.2d 211, 213 (Fla. 1987) (discovery violation not harmless in "a complex trial involving a human's life").

3. The Supreme Court has required "extraordinary measures" to ensure the reliability of the process by which death is imposed. *Eddings v. Oklahoma*, 455 U.S. 104, 118, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (O'Connor, J., concurring); *see also Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). This requirement of enhanced reliability applies both to all stages of the proceedings. *Beck v. Alabama*, 447 U.S. 625, 63738, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

4. Even those courts that have not granted defendants a general right to discovery of the prosecution's investigation on jurors have recognized that prosecutors must share information which could not be obtained by defendants through other sources. *Atwell v. Blackburn*, 800 F.2d 502 (5th Cir. 1986); *State v. Bessenecker*, 404 N.W. 2d 134 (Iowa 1987); *Losavio v. Mayber*, 496 P.2d 1032 (Colo. 1972); *Com. v. Smith*, 215 N.E. 2d 897 (Mass. 1966); cf. *Turner v. State*, 527 S.W. 2d 580 (Ark. 1975).

5. Prosecutors frequently maintain information concerning jury service. Typically, this includes criminal histories of jurors who have served, along with the records of how they have voted in criminal matters.

6. Once the venire list is drawn, Defendant requests production of all the information in the prosecutor's file regarding prospective jurors including but not limited to jurors' criminal histories and voting records. *People v. Aldridge*, 209 N.W.2d 796 (Mich. 1973); *Losavio v. Maybe*, 496 P.2d 1032 (Colo. 1972). See *State v. Harvey*, 358 So.2d 1224, 1231-32 (La. 1978).

465

WHEREFORE, Defendant requests production of the material requested above.

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the 12 day of Aug 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

466

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd DISTRICT |
| VS. | § | COURT OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## <u>ORDER</u>
## <u>MOTION FOR DISCOVERY OF PROSECUTION'S INFORMATION ON PROSPECTIVE JURORS</u>

On this the _____ day of _____, 2010, came to be heard Defendant's Motion and this Court, having heard the same, is of the opinion that the motion should be:

Denied_____

Granted_____

IT IS SO ORDERED.

_____
JUDGE PRESIDING

467

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. 282 OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR HEARING ON ADMISSIBILITY OF ANY STATEMENT BY DEFENDANT WHETHER WRITTEN OR ORAL OR EVIDENCE RESULTING FROM SAME

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes, Paul Johnson, Attorney, for the Accused, GARY GREEN, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution, and further pursuant to Tex. R. Crim. P. Art. 28.01 and respectfully requests the Court to hold a hearing, in advance of the trial, on the admissibility of:

(a) statements made by the Defendant;

(b) acts that are tantamount to statements made by the Defendant;

(c) statements made in the presence of the Defendant which Defendant did not deny in response; or

(d) any physical items, statements or witnesses obtained as a result of same, or evidence/ testimony discovered from same. In support of this Motion, Defendant respectfully shows the Court as follows:

1. Defendant makes this request based upon the Constitutional provisions cited above and

468

Tex. C. Crim. P. Art. 38.21, 38.22 and 38.23 and the requirements of *Jackson v. Denno*, 378 U.S. 368, as well as the doctrine of the fruit of the poison tree of *Wong Sun v. United States*, 371 U.S. 471 (1963).

2. Defendant further alleges that at the time of various conversations with certain police officers, the Defendant was either under arrest or substantially deprived of Defendant's freedom by the attendant conduct of the officers and the surrounding circumstances.

3. In addition, Defendant would show that said statements and/or acts were the fruit of illegal arrest and/or search and seizure, and are therefore inadmissible.

4. This motion is sought by the defendant as a continuing motion to suppress any and all statements or acts. It is sought to suppress evidence as the same exists at the time of the hearing on this motion to suppress, or at any time during trial when evidence appears, subsequent to the initial suppression hearing, to be the subject of this motion. Defendant moves this honorable court to consider this motion as continuing from the date of filing to the time this case is finally concluded.

5. Defendant further requests the Court to instruct the District Attorney and his assistants to ask no questions in the presence of the jury concerning:

(a) statements made by the Defendant;

(b) acts or the failure to act that may be considered  tantamount to statements made by the Defendant; and

(c) statements made in the presence of Defendant which he did not deny in response, whether oral or written, or whether incriminating or exculpatory until hearing has been given the Defendant with findings of fact and conclusions of law made by this Court.

469

6. It is further urged, that this hearing be held prior to the empanelling of the jury. The jury would not then be needlessly idle during the time that this Motion would be heard outside the presence of the jury. This reasoning was endorsed by the Court of Criminal Appeals in *Martinez v. State*, 437 S.W.2d 842 in a parallel suppression situation.

7. Furthermore, a hearing on this Motion in advance of trial will avoid misleading and potentially harmful *voir dire* regarding the prospective jurors' attitudes toward a confession that may found to be inadmissible.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully requests that this Motion be in all things granted, and that a hearing be conducted prior to trial on the admissibility of any statements by Defendant, at the conclusion of which, such statements by Defendant be found to be inadmissible.

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., #320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

470

## CERTIFICATE OF SERVICE

I, PAUL JOHNSON attest that on this the ___12___ day of ___AUG___ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.


Paul Johnson

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. 282 OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

**ORDER**
**MOTION FOR HEARING ON ADMISSIBILITY OF ANY STATEMENT BY**
**DEFENDANT WHETHER WRITTEN OR ORAL OR EVIDENCE RESULTING FROM**
**SAME**

On this the _____ day of ____, 2010 came to be heard Defendant's Motion  and this Court, having heard the same, is of the opinion that the motion should be:

Denied_____

Granted_____

IT IS SO ORDERED.

_____
JUDGE PRESIDING

472

CAUSE NO. F09-59380

| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _282_ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

### MOTION IN LIMINE
**(Victim Impact Type Evidence)**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, by and through his attorneys of record, and pursuant to Rule 104 of the Texas Rules of Evidence and the 5th, 6th, 8th, and 14th Amendments to the United States Constitution and Article 1, Sections 1, 3, 10, 13, 19 and 29 of the Texas Constitution and Tex. C. Crim. P. Articles 1.05 and 1.09 and makes this his Motion in Limine. In support thereof, Defendant would show:

1. The Defendant requests that this Court order the State and its counsel, witnesses, and agents, to refrain from making any mention, reference, argument, or interrogation, either directly or indirectly, in any manner whatsoever, concerning any of the matters hereinafter set forth. In the alternative, Movant asks the Court to instruct the aforesaid individuals by appropriate order to refrain from making any such motion, reference, argument, or interrogation without first approaching the Bench and obtaining a ruling from the Court. The Court should further order that any argument as to the admissibility of any of the evidence set out below should be made outside of the presence of both prospective jurors and those jurors who are sworn to hear this case.

473

2. The State and its counsel, witnesses and agents, during the **guilt/innocence** phase of this trial, are not to allude to any evidence regarding the physical or psychological effect of the alleged crime on victims or their families or friends, including, but not limited to, any testimony that could be considered as "victim impact" as defined in *Lane v. State*, 822 S.W. 2d 35, 41 (Tex. Crim. App.1991). Such evidence does not make more or less probable any fact that is of consequence during the **guilt/innocence** phase of the trial. *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App.1990).

3. Further, the State, its witnesses and agents should be prevented by Order of this court from offering, at the guilt/innocence **OR** the penalty phase of the trial, any characterizations or opinions about the crime, the Defendant or the appropriate sentence. *Booth v. Maryland*, 482 U.S. 496 (1987) (overruled) and *Payne v. Tennessee*, 501 U.S. 808 (1991) or any evidence that tends to measure the worth of the victim as compared to other members of society. *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998); accord *Jackson v. State*, 992 S.W.2d 469, 480 (Tex. Crim. App. 1999).

4. Prior to the offer of any evidence, the court should perform a analysis under Rule 403 of the Texas Rules of Evidence to determine if the evidence is relevant. If the evidence is found not to be relevant, it should be inadmissible. If the evidence is found to be relevant, the Court should determine if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusion or the issues or misleading the jury. This analysis should consider the (a) nature of the testimony, (b) the relationship between the witness and the victim, (c) the amount of testimony to be introduced, (d) the availability of other testimony relating to victim impact and character and (e) mitigating

474

evidence introduced by the defendant.   Further, the Court should prevent evidence that is cumulative and place appropriate limits upon the amount, kind and source of victim impact and character evidence *Mosley*, at 62.  Specifically, the Court should preclude the use of friends and family to prove facts which can be established through less prejudicial witnesses.  As to "victim impact" evidence that is found to be relevant, the Court should appropriately instruct the jury on the limited purpose for which each juror may consider that evidence.

5.  Further,  the State should be precluded from offering, at any time during the course of this trial,  any "victim impact" evidence from an alleged victim of an offense for which the Defendant is not indicted in this cause.  Such "extraneous victim impact evidence" is irrelevant to the special issues under Rule 401 of the Texas Rules of Evidence and Tex. C. Crim. P. Article 37.071.  The danger of unfair prejudice from such evidence is unacceptably high.  Cantu v. State, 939 S.W.2d 627, 635-38 (Tex. Crim. App. 1996).

6.  So as to provide the Defendant with effective assistance of counsel and due process of law, as guaranteed to him by the 6th and 14th Amendments to the United States Constitution and Article 1, Sections 10 and 13 of the Texas Constitution and Art. 1.09 of the Tex. Code Crim. Proc., the Defendant moves the Court to require the prosecutor to provide to counsel for the Defendant, well in advance of trial, the names of family and friends of the deceased who will testify and any other witnesses that will offer evidence that is any way related to what is described herein as "victim impact" evidence and the substance of that testimony.   Such notice is necessary so that counsel for the Defendant

475

can effectively advocate on behalf of the Defendant during the trial of this case generally, and specifically, when the court conducts its Rule 403 analysis.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Motion be sustained and relief be granted as prayed for herein by appropriate Order of the Court.

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## **CERTIFICATE OF SERVICE**

I, Paul Johnson attest that on this the 12 day of AUG 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

476

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## <u>ORDER</u>

On this the _____ day of _____ 2010, came on to be heard the above and foregoing Defendant's Motion In Limine (Victim Impact Type Evidence) herein and the Court having considered same is of the opinion that the motion should be (DENIED) (GRANTED)

SIGNED this the _____ day of _____, 2010.

_____
JUDGE PRESIDING

477

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _____OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION IN LIMINE (PHOTOGRAPHS)

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW, Defendant in the above-entitled and numbered cause, and moves the court to order the State not to proffer crime scene photographs in the presence of the jury until the court has conducted a hearing and had an opportunity to rule on their admissibility, and in support of such motion Defendant shows:

### I.

    The Defendant believes that at some point in the trial the State may attempt to introduce crime scene and/or autopsy photographs depicting the body of the complainant in the above referenced case.

### II.

    These crime scene and/or autopsy photographs are not relevant, as relevance is defined by Rule 401, TEX.R.CRIM.EVID. To the extent they might be relevant, the probative value of the photographs are greatly outweighed by their prejudicial effect and are inadmissible for all the reasons set out in Rule 403, TEX.R.CRIM.EVID. For this reason, Defendant would be denied a fair trial if such photographs were admitted.

    WHEREFORE, Defendant prays that the court grant this motion and order the District Attorney not to mention or allude to any such photographs, display any such photographs in the presence of the jury or proffer any such photographs without first advising the court of this intention, so that the jury may be removed and a hearing held to determine the admissibility of photographs.

478

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## **CERTIFICATE OF SERVICE**

I, Paul Johnson attest that on this the / day of _AUG_ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

479

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## **MOTION IN LIMINE (PHOTOGRAPHS**
## **ORDER**

On this the _____ day of _____, 2010 came to be heard Defendant's

Motion in Limine and it appears to the Court that this motion should be (GRANTED) (DENIED)

IT IS SO ORDERED.


_____
JUDGE PRESIDING

480

CAUSE NO. F09-59380

| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
|---|---|---|
| VS. | § | COURT NO. $282$ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## **MOTION IN LIMINE**
## **PRIOR CRIMINAL RECORD**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant in the above styled and numbered cause and respectfully requests this honorable Court to instruct the prosecution not to mention, allude to, or refer to, directly or indirectly, during any stage of this trial, including but not limited to the voir dire examination, opening statements of counsel, the direct and cross-examination of any witnesses, jury arguments, or during any part of the punishment hearing, if same becomes necessary, that the Defendant may have been previously convicted of any criminal law offense or may have been charged or arrested for any criminal offense or may have any criminal case presently pending against him/her, in the presence of the jury until a hearing has been held outside the presence of the jury to determine the admissibility of such testimony.

The Defendant further requests that this Court instruct the prosecution to advise the Court prior to eliciting any such testimony in order for the Court to excuse the jury and conduct a hearing outside the presence of the jury, without the necessity of counsel for the Defendant having to object to said testimony and request that the hearing be held outside the presence of the jury. In an effort to avoid prejudice by the jury and abuse of discretion by the court, Defendant urges this motion in

481

limine.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully prays that this honorable Court will grant this his Motion In Limine .

Respectfully Submitted,

Paul Johnson Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the 1 2 day of AUG 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

**Paul Johnson**

482

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## **MOTION IN LIMINE**

### **PRIOR CRIMINAL RECORD ORDER**

On this the _____ day of _____, 2010, came on to be heard the Defendant's Motion In Limine and the same is hereby GRANTED and the prosecution is ordered to advise the Court prior to eliciting any testimony concerning any prior record of arrest or conviction of the Defendant, in the presence of the jury, until a hearing has been held outside the presence of the jury to determine the admissibility of such testimony.

SIGNED this _____ day of _____, 2010.

_____

JUDGE PRESIDING

483

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO. _____OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## MOTION FOR COMPLETE RECORDATION OF ALL PRE-TRIAL AND TRIAL PROCEEDINGS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, PAUL JOHNSON, Attorney for the Accused, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution and moves this Court enter an order that a court reporter take down in shorthand or by any other reliable method, and record all of his pre-trial and trial proceedings. In support of his motion, Defendant states as follows:

1. This is a capital murder case. defendant, an indigent, faces the death penalty.

2. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and procedural safeguards than would be true in a noncapital case. Gilmore v. Taylor, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed.2d 306 (1993) and Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

3. In any capital case, there is a critical need for a complete record. This record should include, but not be limited to:
    a.) a complete transcript of all pre-trial proceedings (with the sole exception of telephone

484

calls reasonably necessary to the establishment of an agenda);
reporter makes a true, complete and accurate record of all proceedings."  American Bar
b.) all bench conferences;

c.) all discussions of any sort concerning the case which are held in chambers with or
without one or more of the counsel in the case;

d.) all objections and rulings thereon;

e.) all voir dire and the exercise of challenges for cause or peremptory challenges;

f.) the race of every venire person called for jury duty or excused from jury duty for any
reason;

g.) the race of all witnesses;

h.) all testimony of all witnesses, including a careful record of all exhibits relating to each
witness, and the inclusion of copies of all exhibits proffered, submitted and admitted into
evidence;

Ii.) all arguments, both to the jury and to the trial court;

j.) all contacts between the jury and any other person, except for contacts explicitly and
carefully allowed by the trial court, at a hearing, after consultation with defense counsel;

k.) any and all questions or written statements made by jurors;

l.) anything else which may transpire in the course of this case.

### A.  The need for a total record of the case.

4.  The State bears the burden of establishing a clear and complete record of criminal

proceedings.  Wright v. Lacy, 664 F. Supp. 1270, 1275 (D. Minn. 1987) (citing Golden v.

Newsome, 755 F.2d 1478, 1479 (11th Cir. 1985)).

5.  In light of the judge's role as arbiter of the accused's constitutional right to a fair trial,

the duty to ensure the complete recordation of the case rests with the court.  See United

States v. Garner, 581 F.2d 481 (5th Cir. 1978).  "The trial judge has a duty to see that the

485

report takes a more complete and detailed transcript of all proceedings. American Bar

Association, Standards Relating to the Trial Judge Section 2.5 (1972) (emphasis supplied).

6. A record must be made of all portions of the proceedings needed to ensure an adequate

defense or meaningful appeal. See, e.g., Doby v. State, 557 So. 2d 533, 536 (Miss. 1990)

(voir dire examination); Suan v. State, 511 So. 2d 144, 147 (Miss. 1987) (bench and

chambers conferences); Fountain v. State, 269 Ark. 454, 601 S.W. 2d 862 (Ark. 1980)

(bench conferences); Sheffield v. State, 777 S.W. 2d 743, 744 (Tex. App. 1989) (exhibits);

Bond v. State, 694 S.W. 2d 622, 623 (Tex. App. 9th Dist. 1985) (closing arguments);

Harris v. State, 552 So. 2d 866, 873 (Ala. Crim. App. 1989) (coram nobis proceedings).

## B. Transcription of Pre-trial proceedings.

7. In Roberts v. LaVallee, 389 U.S. 40, 88 S. Ct. 194, 19 L. Ed. 2d 41 (1967), the

Supreme Court recognized the right of the indigent accused in any criminal case (not simply

those where life is at stake) to a free copy of the preliminary hearing. This transcript must

be made prior to trial, to honor the accused's right to equal protection and to foster his right

to effective assistance of counsel.

8. As the Fifth Circuit recently explained in Tague v. Puckett, 874 F.2d 1013 (5th Cir.

1989): A state must provide an indigent with a transcript of prior proceedings when needed

for an effective defense. Id. at 1014 (quoting Britt v. North Carolina, 404 U.S. 226, 227, 92

S. Ct. 431, 433, 30 L. Ed. 2d 400 (1971)). See also Fisher v. State, 532 So. 2d 992, 999

(Miss. 1988) ("[t]here can be no doubt . . . that the state must provide an indigent defendant

with a transcript of prior proceedings when that transcript is needed for an effective

defense"); State v. Johnson, 261 La. 620, 260 So. 2d 645, 649 (1972); Carter v. State, 156

486

Ga. App. 633, 275 S.E.2d 716, 718 (1980) (transcript of prior trial);  Harris v. State, 582

So. 2d 857 (Ala. Crim. App. 1987);  People v. Wells, 776 P.2d 386 (Colo. 1989);  Matter

of Bullabough, 89 N.C. App. 171, 365 S.E.2d 642, 646 (N.C. App. 1988);  State v. Moss,

44 Ohio App. 3d 747, 748 (1988);  Billie v. State, 605 S.W.2d 558, 562 (Tex. Crim. App.

1980).

9.  Applying Roberts and Britt, many courts have ordered the transcription of pre-trial

hearings in preparation for trial.  See, e.g., State v. Lewis, 215 N.W.2d 293, 295 (Iowa

1974);  Hunter v. District Court for the Twentieth Judicial District, 184 Colo. 238, 519 P.

2d 941, 943 (Colo. 1974);  Hawkins v. State, 486 P.2d 743 (Okla. Crim. App. 1971);

People v. Montgomery, 18 N.Y. 2d 993, 224 N.E.2d 730 (1966); Graham v. State, 296

Ark. 400, 757 S.W.2d 538, 541 (Ark. 1988);  Gardner v. State, 296 Ark. 41, 754 S.W.2d

518, 524 (Ark. 1988)

WHEREFORE, Mr. *Green* ~~Roberts~~ moves that his motion be granted, and that all

proceedings be recorded, both prior to and during the trial.

Respectfully Submitted,

~~Paul Johnson~~ Attorney for Defendant
1825 Market Center Blvd., 320
Dallas, Texas 75207
(214) 761-0707
SBOT# 10778230

## CERTIFICATE OF SERVICE

I, Paul Johnson attest that on this the 12 day of Aυ☉ 2010, a true and accurate copy of the foregoing was served upon the District Attorney of Dallas County, Texas by hand delivery.

Paul Johnson

488

CAUSE NO. F09-59380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| VS. | § | COURT NO._____ OF |
| GARY GREEN | § | DALLAS COUNTY, TEXAS |

## <u>ORDER</u>

On this the _____ day of _____ 2010, came on to be heard the above and foregoing Defendant's Motion for Complete Recordation of All Pre-Trial and Trial Proceedings and the Court having considered same is of the opinion that the motion should be (DENIED) (GRANTED)

SIGNED this the _____ day of _____, 2010.

_____
JUDGE PRESIDING

489

# CERTIFICATION

The State of Texas     §

County of Dallas     §

I, Gary Fitzsimmons, Clerk of the __282nd  Judicial District Court__ , of Dallas County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5 (a) and all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5 (b).

GIVEN UNDER MY HAND AND SEAL at my office in Dallas County, Texas this __4th__ day of __March__ , __2011__ .

Signature of Clerk: _Ana McDaniel_

Name of Clerk:   Ana McDaniel

Title:      Deputy Clerk

490

## DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH

## APPOINTMENT OF ATTORNEY ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

    Comes now Defendant in the above cause and states: I am the defendant in the above cause, I was convicted in this cause and now give Notice of Appeal to the Texas Court of Appeals for the Fifth Supreme Judicial District of Texas of Dallas, Texas, and that I am penniless, destitute and indigent person, too poor to employ counsel to represent me on the appeal, and too poor to pay for or give security for the Statement of Facts and a true copy thereof herein. WHEREFORE, I pray that the Court will appoint an attorney to represent me in this appeal and that the Court will order the Court Reporter of this Court to prepare and deliver me or my appointed Counsel the original and a true copy of the Statement of Facts in this case, together with all exhibits attached thereto if practical.

_____
                Defendant

    BEFORE ME, the undersigned authority, personally appeared the above Defendant, known to me to be the person whose signature appears above, and after being duly sworn on oath states that he is the defendant in the above cause, and that the matters and things set forth in the foregoing are true and correct in all things.

JIM HAMLIN
DISTRICT CLERK
Dallas County, Texas

By _____
            Deputy District Clerk

FILED IN
COURT OF CRIMINAL APPEALS

NOV 18 2010

Louise Pearson, Clerk

## ORDER

    The Defendant having requested the Court to appoint Counsel,

    it is Ordered the Honorable _____

Address: _____
a regular licensed and practicing attorney of Texas, be, and he/she is hereby appointed to represent Defendant in prosecuting his/her appeal herein, and it is further Ordered that the Court Reporter is hereby directed to transcribe all of the notes as same may appertain to this cause and as taken during the trial of this cause which began on

_____, _____, and make Statement of Facts in duplicate and furnish same to defendant or his appointed Counsel.

_____
            Judge

FORM 40



# INDEX

# DEATH PENALTY

# GARY GREEN

# F09-59380-S

**FILED IN**
COURT OF CRIMINAL APPEALS

MAR 1 4 2011

**Louise Pearson, Clerk**

| | | |
|---|---|---|
| 1 | GARY GREEN | CAUSE NO.          F09-59380-S |
| 2 | VS | IN THE 282nd JUDICIAL DISTRICT |
| 3 | THE STATE OF TEXAS | COURT OF DALLAS COUNTY, TEXAS |

4 ═══════════════════════════════════════

# * INDEX *

| | |
|---|---|
| Clerk's Record Cover | Vol. 1-01 |
| Index | Vol. 1-02 |
| Caption | Vol. 1-06 |
| True Bill of Indictment   (30 Oct 09)<br>Affidavit for Arrest Warrant | Vol. 1-07 |
| Trial Docket | Vol. 1-09 |
| Writ/Officer's Return   (04 Nov 09) | Vol. 1-18 |
| Notice of Filing Discovery   (23 Feb 10)<br>envelope | Vol. 1-19 |
| Pretrial Scheduling Order   (15 Apr 10) | Vol. 1-22 |
| Writs for Special Venire   (21 Apr 10) | Vol. 1-23 |
| Defendant's Ex Parte Motion for Expert Assistance<br>in Indigent Case, Sealed/Granted   (07 May 10) | Vol. 1-25 |
| First Administrative Judicial Region   (26 Jul 10)<br>Order of Assignment by the Presiding Judge | Vol. 1-30 |
| Motion to Amend Indictment/Granted<br>(03 Aug 10) | Vol. 1-34 |
| Green's Discovery Supplement   (03 Aug 10)<br>envelope | Vol. 1-38 |
| Discovery Supplement   (03 Aug 10)<br>envelope | Vol. 1-40 |

GARY GREEN                                                    PAGE    2

F09-59380-S

=========================================================================

Order for Diffusion Tensor Imaging Tensor (DTI) or          Vol. 1-42
Magnetic Resonance Imaging (MRI) to be Conducted
on Defendant        (12 Aug 10)

Motion to Preserve Right to File Other Motions/Granted      Vol. 1-43
(01 Sep 10)

Motion to Amend the Indictment    (27 Sep 10)               Vol. 1-46

State's Motion for Psychiatric Examination of Defendant     Vol. 1-50
for Rebuttal Testimony    (27 Sep 10)

Notice of Extraneous Offenses    (27 Sep 10)                Vol. 1-53

State's Motion for Discovery of Expert Witnesses            Vol. 1-56
(27 Sep 10)

State's Designation of Expert Witnesses    (01 Oct 10)      Vol. 1-58

Motion to Set Aside the Indictment    (05 Oct 10)           Vol. 1-60
(Unconstitutionality of Statute)

Motion to Dismiss the Death Penalty in the State of Texas   Vol. 1-66
on the Ground that its Capital Sentencing Procedure is
Unconstitutional Due to its Failure to Meet Minimum
Requirements Set Forth in Furman V. Georgia and its
Progeny, as Evinced by the Findings of the Capital Jury
Project and Other Research   (05 Oct 10)

Order for Medical/Therapeutic/Psychiatric Record Release    Vol. 1-131
(05 Oct 10)

State's Notice of Intent to use Business Records Accompanied  Vol. 1-134
by Affidavit    (07 Oct 10)

Deputy Reporter Statement    (14 Oct 10)                    Vol. 1-137
Deborah Hamon

State's Supplemental Witness List    (19 Oct 10)            Vol. 1-138

GARY GREEN                                                    PAGE    3

F09-59380-S

==============================================================

Supplemental Notice of Extraneous Offenses              Vol. 1-139
(22 Oct 10)

State's Second Supplemental Witness List                Vol. 1-140
(22 Oct 10)

Appointment of Deputy Official Court Reporter           Vol. 1-141
Deborah Hamon     (22 Oct 10)

Supplemental State's Response to Motion to List         Vol. 1-142
Witnesses    (26 Oct 10)

Note to the Court:    Requesting Letters, Timberlawn    Vol. 1-143
Records, Person Records, Dr. Martinez Records,
Confession Transcript from interrogation, Video
Confession     (05 Nov 10)

Note to the Court:    13 documented incidents from      Vol. 1-144
prison    (05 Nov 10)

Charge of the Court - Guilt/Innocence                   Vol. 1-145
(09 Nov 10)

Jury Verdict on Guilt                                   Vol. 1-153

Charge of the Court - Punishment                        Vol. 1-154
(09 Nov 10)

Special Issues No. 1 & 2                                Vol. 1-160

Judgment/Sentence    (05 Nov 10)                        Vol. 1-162
Judgment of Conviction by Jury

Notice of Disposition    (09 Nov 10)                    Vol. 1-165

Trial Court's Certification of Defendant's Right of Appeal   Vol. 1-166
(10 Nov 10)

1  GARY GREEN                                                    PAGE    4

2  F09-59380-S

3  ============================================================

4

   Defendant's Notice of Appeal and Pauper Oath                 Vol. 1-167
5  Appointment of Attorney on Appeal    (10 Nov 10)

6  Appointment of Counsel for Indigent Defendant                Vol. 1-168
   John Tatum    (15 Nov 10)
7
   Order Appointing Writ Counsel    (10 Nov 10)                 Vol. 1-169
8  Brad Levenson

9  Motion for New Trial    (03 Dec 10)                          Vol. 1-170

10 Applications for Subpoenas                                   Vol. 1-177

11 Subpoenas                                                    Vol. 1-221

12 Pass Slips                                                   Vol. 1-289

13 Front Cover of Trial Jacket                                  Vol. 1-292

14 Clerk's Certification that Appellate Record is True and      Vol. 1-293
   Correct
15

16

17

18

19

20

21

22

23

24

1  GARY GREEN                                                    PAGE   5

2  F09-59380-S

3  ==================================================================

4
   Clerk's Record Cover                                          Vol. 2-294
5
   Index                                                         Vol. 2-295
6
   Pre-Trial Motions   (12 Aug 10)                               Vol. 2-297
7      Motion to Declare the Texas Capital Sentencing            Vol. 2-299
          Scheme Unconstitutional and Motion to Preclude
8         Imposition of the Death Penalty
       Motion to Declare the "10-12 Rule" Unconstitutional       Vol. 2-315
9      Motion Preclude the Death Penalty as a Sentencing         Vol. 2-337
          Option and Declare Article 37.071 Unconstitutional
10        (Jones V. US; Apprendi V. New Jersey and Ring V.
          Arizona)
11     Motion to Declare Texas Death Penalty Statute to be       Vol. 2-344
          Unconstitutional
12     Motion Preclude the Death Penalty as a Sentencing         Vol. 2-349
          Option
13     Motion to Declare the Texas Death Penalty - Capital       Vol. 2-355
          Murder Scheme Unconstitutional Based on the
14        Holding of the Supreme Court of the United States
          in Smith V. Texas
15     Motion to Hold Art. 37.01 Unconstitutional for Failure    Vol. 2-359
          to Define Terms
16     Motion to Hold Unconstitutional V.A.C.C.P. Article 37.07  Vol. 2-363
          Sec. 2(e) and (f) - Burden of Proof
17     Motion to Hold Unconstitutional V.A.C.C.P. Article 37.071 Vol. 2-368
          Sec 2(g) and (f) Failure to Require Mitigation to be
18        Considered
       Motion to Preclude Death Penalty as a Sentencing         Vol. 2-372
19        Option or in the Alternative to Quash the Indictment
          under Apprendi V. New Jersey/Ring V. Arizona/
20        Blakely V. Washington & Bush V. Gore, or in the
          Alternative Request to Voir Dire/Requested
21        Instructions/Motions in Limine, Related to Issues
          Raised by this Motion
22     Omnibus Pretrial Motion                                   Vol. 2-390
       Motion for Discovery and Inspection of Information        Vol. 2-393
23        Necessary to a Fair Trial
24

1 | GARY GREEN                                                        PAGE    6

2 | F09-59380-S

3 | ================================================================

4 |

| | |
|---|---|
| Motion for Court to Conduct In-Camera Inspection of District Attorney's File | Vol. 2-413 |
| Motion for Identification Hearing Out of Presence | Vol. 2-417 |
| Request for Disclosure of Underlying Data Relied Upon by Expert Witnesses | Vol. 2-421 |
| Motion for Evidence Favorable to the Defendant | Vol. 2-424 |
| Motion for Discovery and Limiting Instructions to the Jury | Vol. 2-429 |
| Defendant's Motion to Discover Any Concessions or Agreements with Third Parties | Vol. 2-433 |
| Motion for List of Witnesses to be Called or Used by the State at the Punishment Stage | Vol. 2-436 |
| Motion for Discovery, Production and Rule 702/705 Hearing | Vol. 2-439 |
| Defendant's Written Objection to Admissibility of of Extraneous Offenses, Request for Procedural Determination by Trial Court with Findings of Fact and Conclusions of Law and for Limiting Instruction | Vol. 2-446 |
| Motion for Production of Impeachment Evidence | Vol. 2-450 |
| Motion for Production of Witness Statements | Vol. 2-455 |
| Motion for List of State's Witnesses Prior to Trial | Vol. 2-460 |
| Motion for Discovery of Prosecution's Information on Prospective Jurors | Vol. 2-464 |
| Motion for Hearing on Admissibility of Any Statement by Defendant Whether Written or Oral or Evidence Resulting from Same | Vol. 2-468 |
| Motion in Limine   (Victim Impact Type Evidence) | Vol. 2-473 |
| Motion in Limine   (Photographs) | Vol. 2-478 |
| Motion in Limine Prior Criminal Record | Vol. 2-481 |
| Motion for Complete Recordation of All Pre-Trial and Trial Proceedings | Vol. 2-484 |
| Clerk's Certification that Appellate Record is True and Correct | Vol. 2-490 |

## JUDGMENT
## CERTIFICATE OF THUMBPRINT

**THE STATE OF TEXAS**                CAUSE NO. F 09-59380.

**VS.**                    JUDICIAL 282nd   DISTRICT COURT

Gary Green                      DALLAS COUNTY, TEXAS

RIGHT THUMB                    DEFENDANT'S right HAND

**THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.**

DONE IN COURT THIS 28 DAY OF October , 20 10 .

                                    BAILIFF/DEPUTY SHERIFF

*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:

_____ LEFT THUMBPRINT          _____ LEFT/RIGHT INDEX FINGER

_____ OTHER, _____

SIGNED AND ENTERED ON THIS _____ DAY OF _____, 20 ____.

                                    PRESIDING JUDGE

Cause No. F0959380-S       **TRN** 9175068125

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282nd JUDICIAL DISTRICT |
| v. | § | COURT |
| **GARY GREEN** | § | DALLAS COUNTY, TEXAS |

<u>SID</u>: **TX**04205494

## <u>CLERK'S CERTIFICATE</u>

I, Gary Fitzsimmons, Clerk of the District Courts within and for the State of Texas and Dallas County, do hereby certify that the above and foregoing is a true and correct copy of judgment and imposition of sentence in Cause No. F0959380-S, entitled The State of Texas vs. **GARY GREEN** as the same appears on record in **Volume** 673, **Page** 543 now on file in my office.

Given under my hand and seal of office in Dallas County, Texas on **11/5/2010**.

Gary Fitzsimmons
District Clerk
Dallas County, Texas

by: K. MATTHEWS-FREEMAN
Deputy District Clerk

AP-76458

VOL 673 PAGE 543

**THIS CASE IS ON APPEAL**

**CASE NO. F-0959380-S**
INCIDENT NO./TRN: 9175068125

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE **282nd JUDICIAL DISTRICT** |
| | § | |
| **v.** | § | **COURT** |
| | § | **FILED IN** |
| **GARY GREEN** | § | DALLAS COUNTY, TEXAS **COURT OF CRIMINAL APPEALS** |
| | § | |
| STATE ID No.: TX04205494 | § | **NOV 18 2010** |

**Louise Pearson, Clerk**

## JUDGMENT OF CONVICTION BY JURY

| | | |
|---|---|---|
| Judge Presiding: **HON. Andy Chatham** | Date Judgment Entered: | **11/5/2010** |
| Attorney for State: **Josh Healy** | Attorney for Defendant: | **Paul Johnson** |

Offense for which Defendant Convicted:
**CAPITAL MURDER MULTIPLE**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **19.03 Penal Code** |

Date of Offense:
**9/22/2009**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **CAPITAL FELONY** | **NOT GUILTY** |
| Verdict of Jury: | Findings on Deadly Weapon: |
| **GUILTY** | **YES, NOT A FIREARM** |

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |

| Punishment Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| **JURY** | **11/5/2010** | |

Punishment and Place of Confinement: **DEATH CONFINEMENT IN THE INSTITUTIONAL DIVISION, TDCJ UNTIL SENTENCE OF DEATH IS CARRIED OUT**

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| **$ -0-** | **$ 240** | **$ N/A** | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

**Sex Offender Registration Requirements do not apply to the Defendant.** TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

| | |
|---|---|
| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
| Time Credited: | From **9/22/2009** to **11/5/2010** From       to       From       to |
| | From       to       From       to       From       to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A** DAYS   NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel  (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

AP-76458

Cause No. _F0959300 S_

| | | |
|---|---|---|
| THE STATE OF TEXAS | ☐ | IN THE _Judicial_ |
| VS. _Casey Green_ | ☐ | DISTRICT COURT _JB2nd_ |
| | ☐ | DALLAS COUNTY, TEXAS |

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL*

I, judge of the trial court, certify this criminal case: _Non Negotia_

☒ is not a plea-bargain case, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial, and not withdrawn or waived, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal, [or]

☐ is a plea-bargain case, and the defendant has NO right of appeal, [or]

☐ the defendant has waived the right of appeal, [or]

☐ other (please specify): _____

_____    11/10/10
Judge                         Date Signed

FILED 2010 NOV 10 PM 3:03 GARY FITZSIMMONS DISTRICT CLERK DALLAS CO. TEXAS DEPUTY

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, as set forth below, including my right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeals judgment and opinion to my last known address and that **I have only 30 days** in which to file a *pro se* petition for discretionary review in the court of appeals. Tex. R. App. P. 68.2. I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit. I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a *pro se* petition for discretionary review.

FILED IN COURT OF CRIMINAL APPEALS

NOV 18 2010

Louise Pearson, Clerk

_Deft in jail_
Defendant
Mailing Address:

Telephone #:
Fax # (if any):

Defendant's Counsel   PAUL JOHNSON
State Bar No.:   10778230
Mailing Address:   311 N. MARKET ST. STE. 500
                   DALLAS, TX 75202
Telephone #:   214-761-0707
Fax # (if any):   214-202-8461 CELL

*A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case --- that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant ---- a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial; or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2). In order to perfect an appeal a written notice of appeal must be filed with the trial court clerk within **30 days (90 days if a timely motion for new trial is filed)** after the day sentence is imposed or suspended in open court or after the day the trial court enters an appealable order.

It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**Punishment Assessed by Jury / Court / No election  (select one)**

☒ **Jury**. Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court**. Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election**. Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options  (select one)**

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence  (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

## Furthermore, the following special findings or orders apply:

**The Court FINDS Defendant used or exhibited a deadly weapon, namely, A KNIFE, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. TEX. CODE CRIM. PROC. art. 42.12 §3g**

## Signed and entered on November 5, 2010

X _____
Andy Chatham
JUDGE PRESIDING

DEFENDANT EXCEPTS AND GIVES NOTICE
OF APPEAL TO THE COURT OF APPEALS,
FIFTH DISTRICT OF TEXAS AT DALLAS

Clerk: K. MATTHEWS-FREEMAN

*Thumbprint Certification attached.

GREEN GARY F-0959380 S                    Page 2 of 4          Right Thumbprint*

AR-76458

## CAUSE NO. F0R-59380-S

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

2010 DEC -3 PM 1:55

FILED

## MOTION FOR NEW TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Defendant, Gary Green, in the above styled and numbered cause and through his undersigned Attorneys and pursuant to Rule 21, et seq. Texas Rules of Appellate Procedure, files his Motion for New Trial and moves the Court to grant him a new trial herein for the good and sufficient reasons as follows:

I.

Defendant was charged by indictment with the offense of Capital Murder.  The jury returned answers to special issues that resulted in a judgment of death.  Thirty days has not elapsed since the imposition of said sentence by the jury.

II.

The evidence is legally and or factually insufficient to support the jury's verdict that Defendant is guilty of the offense of capital murder.

FILED IN
COURT OF CRIMINAL APPEALS

JAN 26 2011

Louise Pearson, Clerk

III.

The evidence is legally and or factually insufficient to support the jury's verdict as to Special Issue No. 2 regarding the issue of future danger.

IV.

Defendant states that the State presented in jury argument a misleading emphasis on sympathy and emotion rather than arguing that the jury should consider only the narrowing defined special issues. This method of jury arguments contrary to the constitutional requirements that were put into place when the death penalty was reinstated in Texas using narrowly defined special issues.

It was stated by Judge John Paul Stevens:

"It is of vital importance . . . that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice and emotion."

The following is a quote from the Dallas Morning News Thursday December 2, 2010:

"At the time, states were pushing back against a court decision that essentially imposed a moratorium on executions. What followed was a movement toward narrowly crafted laws intended to root out emotion, build in safeguards and apply capital punishment fairly.

Stevens now writes candidly about a more recent and "regrettable judicial activism" that has loosened restrictions on capital punishment and opened the door once again to abrogation of justice. Prosecutors have a clarified freedom, for example, to root out potential jurors who have qualms about the death penalty and to seek it for non-triggermen.

Stevens now believes the death penalty represents "the pointless and needless extinction of life with only marginal contribution to any discernible social public purposes."

Stevens and Garland point out one benefit that is glaringly evident in Texas: support for the death penalty "wins votes," the justice say.  An NYU law and sociology professor, Garland wrote recently in the *Houston Chronicle* that "politicians give voters what they want by enacting capital punishment statues even when they will never be enforced."

A deterrent to crime is one supposed benefit for the death penalty but its imposition is not associated with lower murder rates in the 35 states that allow it.  Further consider this from Garland: Our of 14,000 homicides in the U.S. last year, juries imposed death sentence in only 106 cases.  Death is far from a sure punishment for taking a life, nor is it swift.  Some death row inmates have been there for decades.

Just in Texas, the sentence is far from evenly imposed.  Of the 316 people on Texas death row, more than a third are from Harris County.

In what should be particularly disturbing in Texas - for obvious reasons - Stevens mentions the "execution of innocents" as if a given.  Perhaps that, more than anything, has caused prominent Texans, from a former governor to former prosecutors, to adjust their thinking, as has Steven, and advocate a saner justice system that guards against a flawed but irrevocable sentence."

This misleading argument before the jury effectively denied the Defendant his right to due process and a fair trial.

In closing argument by the prosecutor, the State made erroneous and misleading statements to the jury members which influenced the jury verdict and substantially impaired the jury's ability to give meaningful consideration to the evidence put forth by the defense on the 2nd and 3rd special issues.  This action by the prosecutor was knowingly misleadingf based only on emotion and sympathy and its impression and denied the Defendant the constitutional guarantees

afforded him by the 4th, 5th, 6th, 8th and 14th amendments to the United States Constitution as well as the Texas Constitution Article 1 Sec. 10.

V.

Wherefore Premises Considered, Defendant prays this Honorable Court set this Motion for New Trial for an evidentiary hearing to fully develop the facts supporting the issues raised in this motion for new trial and after said hearing, that this motion be granted as to the hearing on punishment;  to which Defendant has shown that he is entitled to same.

Respectfully submitted,

John Tatum
990 S. Sherman
Richardson, Texas 75081
(972) 705-9200
State Bar No. 19672500
Attorney for Defendant
on Motion for New Trial and Appeal

## CERTIFICATE OF SERVICE

I, Attorney for Defendant, certify that I have hand delivered a copy of this motion to the Assistant District Attorney of Dallas County, Texas on _____, 2010.

John Tatum

CAUSE NO. F08-59380-S

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

## ORDER SETTING HEARING

On this _____ day of _____, 2010, the Defendant's Motion for a New Trial was timely presented to the Court by Defendant's counsel and it appearing that said Motion is supported by affidavit, the Defendant is entitled to an evidentiary hearing on the Defendant's Motion for New Trial.

It is therefore ordered that said Motion be set for hearing before this Court on the _ _____ day of _____, 2010 at ___ o'clock _ M.

_____
Judge Presiding

## CAUSE NO. F08-59380-S

| THE STATE OF TEXAS | § | IN THE 282ND JUDICIAL |
|---|---|---|
| VS. | § | DISTRICT COURT |
| GARY GREEN | § | DALLAS COUNTY , TEXAS |

## ORDER

This day came on to be heard the motion of Defendant Donald Bess to set aside the verdict and judgment herein rendered, and grant him a new trial of this cause; and the state being present in court by his assistant district attorney and the Defendant Donald Bess, being represented by John Tatum and Robbie McClung, appointed counsel on appeal, and the court having heard the said motion, and the evidence thereon submitted, is of the opinion the same should be granted in whole or in part as to punishment hearing only.  It is therefore considered, ordered and adjudged by the court that the said motion be and the same is granted; and the verdict, judgment of conviction and sentence entered against the said defendant Donald Bess  at a former day of this term are set aside and vacated, and the said defendant is granted a new trial of this cause.

Signed this the ____ day of _____, 2010.

_____
Judge Presiding

OR

## ORDER DENYING MOTION FOR NEW TRIAL

It is therefore considered, ordered, and adjudged by the court that the said motion for new trial herein be and the same is refused, and in all things overruled.

Signed this the _____ day of _____, 2010.


_____
Judge Presiding

# CCA Scanning Cover Sheet



2528921

CaseNumber: AP-76,458
EventDate: 06/07/2013
Style 1: GREEN, GARY
Style 2:
Event code: WRIT OF CERT USSC

EventID: 2528921
Applicant first name:
Applicant last name:
Offense: 19.03
Offense code: Capital Murder
Trial court case number: F09-59380-S
Trial court name: 282nd District Court
Trial court number: 320570282
County: Dallas
Trial court ID: 328
Event map code: GENERIC
Event description:
Event description code:
Remarks: June 3, 2013 as 12-8507

| Document Scanned | | Created or |
| --- | --- | --- |
| SCANNED | | Appended |
| Scanned by JUN 1 1 2013    date | | Image ID |
| Comment | SCAN & PLACE IN FILE | |

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

June 3, 2013

Clerk
Court of Criminal Appeals of Texas
P.O. Box 12308
Capitol Station
Austin, TX  78711

> Re:  Gary Green
>      v. Texas
>      No. 12-8507
>      (Your No. AP-76458)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*William K. Suter*

**William K. Suter**, Clerk

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 06 2013

**Abel Acosta, Clerk**

*AP-76458*

No. AP-76,458

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## GARY GREEN,
Appellant

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 01 2012

Louise Pearson, Clerk

v.

## THE STATE OF TEXAS,
Appellee

*On appeal from the 282nd Judicial District Court of Dallas County, Texas
In Cause No. F09-59380-S*

FILED IN
COURT OF CRIMINAL APPEALS

FEB 02 2012

## STATE'S BRIEF

Louise Pearson, Clerk

*Counsel of Record:*

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *Fax*

**SCANNED**
(CCA)

FEB 02 2012

*Attorneys for the State of Texas*

**ORIGINAL**

No. AP-76,458

## IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

---

## GARY GREEN,
Appellant

v.

## THE STATE OF TEXAS,
Appellee

---

*On appeal from the 282nd Judicial District Court of Dallas County, Texas*
*In Cause No. F09-59380-S*

---

## STATE'S BRIEF

---

*Counsel of Record:*

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *Fax*

*Attorneys for the State of Texas*

**ORIGINAL**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ v

STATEMENT REGARDING ORAL ARGUMENT.............................. xi

STATEMENT OF THE CASE ........................................................... 1

STATEMENT OF FACTS ................................................................ 1

  A. Evidence at Guilt-Innocence ..................................................... 1

  B. The State's Punishment Evidence .............................................. 15

  C. Appellant's Punishment Evidence.............................................. 23

SUMMARY OF ARGUMENT ........................................................ 32

ARGUMENT .................................................................................. 34

ISSUES 1-15: DENIAL OF DEFENSE CHALLENGES FOR CAUSE........................ 34

  *Applicable Law*........................................................................... 34

  *The Trial Court Properly Denied Appellant's Challenges for Cause* ...................... 37

    Issue 1: Billy Chancellor............................................................ 37

    Issue 2: Sheila Yrigollen ............................................................ 38

    Issue 3: Norma Wiley................................................................ 40

    Issue 4: Elizabeth Lopez ............................................................ 41

    Issue 5: Cathey Young ............................................................... 41

    Issue 6: Aneta Johnson.............................................................. 42

    Issue 7: Terry Crawford ............................................................ 44

    Issue 8: Barbara Garrett ............................................................ 44

    Issue 9: Thomas Frazier ............................................................ 45

    Issue 10: Sreenivasareddy Thallapareddy..................................... 47

    Issue 11: William Ogle.............................................................. 47

Issue 12: Charla Moe ..................................................................... 48

Issue 13: Jackie Brewer.................................................................. 49

Issue 14: Lisa Hensley ................................................................... 50

Issue 15: Debra Story ..................................................................... 50

*Conclusion*................................................................................... 51

ISSUES 16 & 17: CONSTITUTIONAL RIGHT TO FAIR AND IMPARTIAL JURY............... 51

ISSUE 18: ADMISSIBILITY OF APPELLANT'S CONFESSION ................................... 52

*Pertinent Facts* ............................................................................. 52

*Applicable Law*............................................................................. 54

*The Trial Court Properly Admitted Appellant's Statement* ...................... 56

*Error, If Any, Was Harmless*........................................................... 58

ISSUES 19-24: JURY ARGUMENT........................................................... 59

*Improper Jury Argument*................................................................ 59

Applicable Law .......................................................................... 59

Issue 19..................................................................................... 60

Issue 21 .................................................................................... 63

*Denial of Motion for Mistrial*.......................................................... 65

Applicable Law .......................................................................... 65

Issue 20..................................................................................... 66

Issue 22 .................................................................................... 70

Issues 23 and 24 ........................................................................ 72

*Error, If Any, Was Harmless*........................................................... 76

ISSUE 25: CONSTITUTIONALITY OF EXECUTING THE MENTALLY ILL ...................... 78

ISSUE 26: LEGAL SUFFICIENCY OF THE EVIDENCE OF GUILT ....................... 80

ISSUE 27: DENIAL OF MOTION FOR MISTRIAL................................................................ 85

ISSUE 28: LEGAL SUFFICIENCY OF FUTURE DANGEROUSNESS ISSUE ............................ 90

ISSUES 29 & 30: ADMISSIBILITY OF EXTRANEOUS EVIDENCE AT PUNISHMENT........ 95

    *Admission of Testimony Regarding An Extraneous Robbery* ................................... 95

        Applicable Law ..................................................................................... 95

        Pertinent Facts...................................................................................... 96

        Analysis................................................................................................ 97

    *Admission of Excerpts of Letters Written By Appellant*............................................ 99

        Pertinent Facts.................................................................................... 100

        Notice ................................................................................................. 101

        Rules 401 and 403 ............................................................................. 103

ISSUES 31-46: FEDERAL CONSTITUTIONAL ISSUES ................................................... 107

PRAYER ........................................................................................................................ 111

CERTIFICATE OF SERVICE ............................................................................................ 111

## TABLE OF AUTHORITIES

**Cases**

*Apolinar v. State*,
    106 S.W.3d 407 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 155 S.W.3d 184 (Tex.
    Crim. App. 2005) ................................................................................. 97, 98

*Barnes v. State*,
    No. 01-01-01086-CR, 2002 Tex. App. LEXIS 7602 (Tex. App.—Houston [1st Dist.]
    Oct. 24, 2002, no pet.) (not designated for publication) ............................... 69

*Battaglia v. State*,
    No. AP-74,348, 2005 Tex. Crim. App. LEXIS 47 (Tex. Crim. App. May 18, 2005) (not
    designated for publication).............................................................................. 79

*Brown v. State*,
    270 S.W.3d 564 (Tex. Crim. App. 2008)................................................... 77, 78

*Campbell v. State*,
    610 S.W.2d 754 (Tex. Crim. App. [Panel Op.] 1980) .................................... 59

*Carmouche v. State*,
    10 S.W.3d 323 (Tex. Crim. App. 2000).......................................................... 54

*Casey v. State*,
    215 S.W.3d 870 (Tex. Crim. App. 2007)...................................................... 106

*Cherry v. State*,
    507 S.W.2d 549 (Tex. Crim. App. 1974)........................................................ 68

*Coble v. State*,
    871 S.W.2d 192 (Tex. Crim. App. 1993) (en banc)........................................ 59

*Colburn v. State*,
    966 S.W.2d 511 (Tex. Crim. App. 1998)................................................. 35, 60

*Dowthitt v. State*,
    931 S.W.2d 244 (Tex. Crim. App. 1996)........................................................ 58

*Druery v. State*,
    225 S.W.3d 491 (Tex. Crim. App. 2007)........................................................ 92

*Emery v. State*,
    881 S.W.2d 702 (Tex. Crim. App. 1994)........................................................ 94

*Escamilla v. State,*
   143 S.W.3d 814 (Tex. Crim. App. 2004)..................................................... 110

*Estrada v. State,*
   313 S.W.3d 274 (Tex. Crim. App. 2010)..................................................... 91

*Fare v. Michael C.,*
   442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)................................ 56

*Feldman v. State,*
   71 S.W.3d 738 (Tex. Crim. App. 2002)................................................ 34, 35

*Freeman v. State,*
   340 S.W.3d 717 (Tex. Crim. App. 2011)..................................................... 59

*Gately v. State,*
   321 S.W.3d 72  (Tex. App.—Eastland 2010, no pet.) ............................... 57

*Gigliobianco v. State,*
   210 S.W.3d 637 (Tex. Crim. App. 2006)................................................... 105

*Green v. State,*
   934 S.W.2d 92 (Tex. Crim. App. 1996)................................................... 103

*Hawkins v. State,*
   135 S.W.3d 72 (Tex. Crim. App. 2004)........................................ 65, 76, 88

*Hernandez v. State,*
   176 S.W.3d 821 (Tex. Crim. App. 2005)............................................. 99, 103

*Jackson v. Denno,*
   378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)................................ 53

*Jackson v. Virginia,*
   443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)................................ 80

*Jaubert v. State,*
   74 S.W.3d 1 (Tex. Crim. App. 2002)........................................... 96, 97, 102

*Johnson v. State,*
   68 S.W.3d 644 (Tex. Crim. App. 2002)..................................................... 54

*Jones v. State,*
   944 S.W.2d 642 (Tex. Crim. App. 1996)................................................... 106

*Joseph v. State,*
    309 S.W.3d 20 (Tex. Crim. App. 2010)................................................. 54, 55, 56

*Joubert v. State,*
    235 S.W.3d 729 (Tex. Crim. App. 2007).............................................. 38, 39, 47

*Keeton v. State,*
    724 S.W.2d 58 (Tex. Crim. App. 1987)....................................................... 91

*King v. State,*
    29 S.W.3d 556 (Tex. Crim. App. 2000)....................................................... 80

*King v. State,*
    953 S.W.2d 266 (Tex. Crim. App. 1997)...................................................... 98

*Ladd v. State,*
    3 S.W.3d 547 (Tex. Crim. App. 1999)................................................ 65, 89, 90

*Lane v. State,*
    933 S.W.2d 504 (Tex. Crim. App. 1996).................................................... 106

*Laster v State,*
    275 S.W.3d 512 (Tex. Crim. App. 2009)...................................................... 80

*Linder v. State,*
    828 S.W.2d 290 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd.)..................... 62, 65

*Luna v. State,*
    301 S.W.3d 322 (Tex. App.—Waco 2009, no pet.)........................................... 98

*Mann v. State,*
    718 S.W.2d 741 (Tex. Crim. App. 1986)................................................. 69, 76

*Martinez v. State,*
    327 S.W.3d 727 (Tex. Crim. App. 2010).................................................... 104

*Mason v. State,*
    905 S.W.2d 570 (Tex. Crim. App. 1995).................................................... 104

*Mays v. State,*
    318 S.W.3d 368 (Tex. Crim. App. 2010)............................................ 78, 79, 80, 84

*McClure v. State,*
    544 S.W.2d 390 (Tex. Crim. App. 1976)................................................. 68, 70

*Miranda v. Arizona,*
   384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ........................................... 52, 54

*Moran v. Burbine,*
   475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) ................................................ 55

*Mosley v. State,*
   983 S.W.2d 249 (Tex. Crim. App. 1998) ...................................................................... 88

*Nance v. State,*
   946 S.W.2d 490 (Tex. App.—Fort Worth 1997, pet. ref'd) .......................................... 98

*North Carolina v. Butler,*
   441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) ................................................ 55

*Ovalle v. State,*
   13 S.W.3d 774 (Tex. Crim. App. 2000) ....................................................................... 89

*Palermo v. State,*
   992 S.W.2d 691 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ......................... 65

*Roethel v. State,*
   80 S.W.3d 276 (Tex. App.—Austin 2002, no pet.) ................................................. 97, 98

*Sadler v. State,*
   977 S.W.2d 140 (Tex. Crim. App. 1998) ..................................................................... 34

*Saldano v. State,*
   232 S.W.3d 77 (Tex. Crim. App. 2007) ........................................................ 35, 36, 110

*Sprouse v. State,*
   No. AP-74,933, 2007 Tex. Crim. App. LEXIS 1862 (Tex. Crim. App. Jan. 31, 2007)
   (not designated for publication) ................................................................................... 79

*State v. Oliver,*
   29 S.W.3d 190 (Tex. App.—San Antonio 2000, pet. ref'd) ......................................... 57

*Tabler v. State,*
   No. AP-75,677, 2009 Tex. Crim. App. LEXIS 830 (Tex. Crim. App. Dec. 16, 2009)
   (not designated for publication) ................................................................................... 79

*Templin v. State,*
   711 S.W.2d 30 (Tex. Crim. App. 1986) ..................................................................... 107

*Threadgill v. State,*
   146 S.W.3d 654 (Tex. Crim. App. 2004) ........................................................ 34, 35, 49

*Torres v. State,*
   92 S.W.3d 911 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ...................... 62, 65

*Turner v. State,*
   252 S.W.3d 571 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) .......................... 57

*United States v. Martinez-Salazar,*
   528 U.S. 304, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000) ............................................. 52

*Wardrip v. State,*
   56 S.W.3d 588 (Tex. Crim. App. 2001) ......................................................................... 91

*Washington v. State,*
   943 S.W.2d 501 (Tex. App.—Fort Worth 1997, pet. ref'd) ........................................ 102

*Watson v. State,*
   762 S.W.2d 591 (Tex. Crim. App. 1988) ....................................................................... 55

*Wead v. State,*
   129 S.W.3d 126 (Tex. Crim. App. 2004) ....................................................................... 88

*Wesbrook v. State,*
   29 S.W.3d 103 (Tex. Crim. App. 2000) ............................................................. 59, 60, 70

*Wiede v. State,*
   214 S.W.3d 17 (Tex. Crim. App. 2007) ......................................................................... 54

*Wood v. State,*
   18 S.W.3d 642 (Tex. Crim. App. 2000) ......................................................................... 65

*Wright v. State,*
   178 S.W.3d 905 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ................... 70, 76

*Young v. State,*
   283 S.W.3d 854 (Tex. Crim. App. 2009) ............................................................ 104, 105

**Statutes**

Tex. Code Crim. Proc. Ann. art. 35.16(a)(10) (West 2006) ............................................. 45

Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (West 2006) ............................................... 34

Tex. Code Crim. Proc. Ann. art. 35.16(b)(3) (West 2006) ............................................... 34

Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (West 2006) ............................................... 34

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (West 2003) .......................................... 95, 96

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1) (West Supp. 2011) .................... 95, 103

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West Supp. 2011) ........................... 90

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(c) (West Supp. 2011) ................................. 90

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (West Supp. 2011) .................................. 1

Tex. Code Crim. Proc. Ann. art. 38.22 (West Supp. 2011) ......................................... 52, 54

Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (West Supp. 2011) ....................................... 54

Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West Supp. 2011) ....................................... 54

Tex. Penal Code Ann. § 19.03 (a)(7)(A) (West 2003) ...................................................... 81

**Rules**

Tex. R. App. P. 33.1(a) ........................................... 39, 40, 43, 44, 48, 51, 61, 72

Tex. R. App. P. 38.1(h) ................................................................. 61, 64, 68, 72

Tex. R. App. P. 44.2(b) ........................................................................ 77, 78, 97

Tex. R. Evid. 401 ....................................................................................... 104

Tex. R. Evid. 403 ....................................................................................... 104

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The State requests the opportunity to present oral argument if the Court grants appellant's request to argue.

**TO THE HONORABLE COURT OF APPEALS**:

The State of Texas submits this brief in response to the brief of appellant, Gary Green.

## STATEMENT OF THE CASE

This is an automatic appeal from a sentence of death. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (West Supp. 2011). Upon hearing uncontroverted evidence that appellant stabbed and killed his wife and drowned her small child in the same criminal transaction, the jury returned a guilty verdict in sixteen minutes. (RR48: 35; RR53: 10). Appellant presents forty-six allegations of reversible error.

## STATEMENT OF FACTS

### A. Evidence at Guilt-Innocence

Margarita Brooks, the mother of victim Lovetta Armstead, testified that she was born and raised in the Midwest, but her job transferred her to Texas when Lovetta was about sixteen years old. (RR46: 36-38). Lovetta graduated from DeSoto High School and initially attended college at Prairie View A&M, but later transferred to Texas College in Tyler and graduated with a 4-year degree. (RR46: 38-39). Lovetta was interested in education, and she taught full-time at Gateway Charter School and was also a substitute teacher for Dallas Independent School District. (RR46: 39). She attended Friendship West Baptist Church and worked in their daycare part-time. (RR46: 39-40). Lovetta had three children – JT, Jerrett and Jazzmen. (RR46: 40). At the time of their murders, Lovetta was 32 years old and Jazzmen was six years old. (RR46: 37, 40).

1

Lovetta met appellant in 2007 and he moved in with her and her children shortly thereafter. (RR46: 40). Lovetta and appellant had a tumultuous relationship and the primary source of contention was the fact that appellant would not work. (RR46: 41). In 2009, appellant got a job with a corporate battery repair company. (RR46: 42). Lovetta thought appellant had "changed his ways," and they married in June of 2009. (RR46: 41-42). Shortly after the wedding, however, she learned that appellant had quit his job. (RR46: 42). Lovetta was upset and started the process of getting her marriage annulled. (RR46: 43). She also planned to move out of the house she had shared with appellant and went with her mother to look at a rental house in Lancaster. (RR46: 43-44).

The night of the offense, Margarita was just about to get into a bath when her husband came into the bathroom and told her that Lovetta and Jazzmen were dead. (RR46: 44). Margarita grabbed the phone from him and all she could hear on the other end was someone hollering and screaming, so she grabbed her housecoat and drove directly to Lovetta's house. (RR46: 44-45). Officers at the scene initially would not tell Margarita anything, but eventually they confirmed that there were two dead females in the house, one around the age of 32 and the other around the age of six. (RR46: 45). Margarita fell to the ground and starting crying. (RR46: 45). The officers also informed her that her grandson, Jerrett, had been stabbed and was at the hospital. (RR46: 45). Margarita identified Lovetta, JT, Jerrett and Jazzmen in four photographs for the jury. (RR46: 46-48; State's Exhibits 1-4). She also indentified the writing on two letters as her daughter's handwriting, and the writing on another letter as appellant's handwriting. (RR46: 48). Lovetta's letters were written to appellant on the day of the offense,

2

September 21, 2009, telling him that it was time for them to part and that he needed to move out. (RR46: 50-51; State's Exhibits 6 & 7). Appellant's letter, written that same day in response to Lovetta's letters, expressed his anger for Lovetta kicking him out and laid out his plan to murder the entire family. Specifically, he stated: "You asked to see the monster, so here he is, the monster you made me. Bitch. There will be 5 lives taken today, me being the 5th." (RR46: 51-58; State's Exhibit 8).

Latasha Bradfield testified that she lived next door to Lovetta and appellant for about two years. (RR46: 59-61). On the night of the offense, Latasha returned home around 8:30p.m. and saw appellant in his driveway. (RR46: 64). About forty minutes later, she heard banging on her door. (RR46: 64). Lovetta's two sons, Jerrett and JT, were at her door crying and screaming, "Gary killed my mom and my sister." (RR46: 64-65). Jerrett, who had a bloody shirt and was holding his stomach with one hand, told Latasha that appellant stabbed him too. (RR46: 65). Jerrett was on the phone with the 911 operator, so Latasha took the phone from him and spoke with the operator. (RR46: 66). She told the operator that the boys said their stepdad killed their mom and sister and tried to kill them. (RR46: 66-67). Latasha did not know if what the boys were saying was true, so she walked out of her house and next door to Lovetta's house while on the phone with the operator. (RR46: 67). As soon as Latasha entered the house, she opened the door leading to the garage and saw that Lovetta's car was gone. (RR46: 68). She then walked to the door of the master bedroom and saw Lovetta lying on the floor, not breathing. (RR46: 68-69, 72-73, 74-75; State's Exhibit 40). Latasha was startled, but tried to keep her composure and tell the operator what she saw. (RR46: 69, 71, 75). She did not go into

3

the bedroom or touch anything. (RR46: 75). Shortly thereafter, the paramedics arrived. (RR46: 76). They first went inside the house and then came to Latasha's to treat JT and Jerrett. (RR46: 76-77).

Lovetta's oldest son, Jerome "JT" Armstead, testified that he was twelve years old when his mother and sister were murdered. (RR46: 99-100). The night of the offense, Lovetta dropped off JT and his brother at Friendship West Baptist Church for their Disciples in Ongoing Preparation ("DIOP") class. (RR46: 104, 107-08). Usually their mom would pick them up after, but that night appellant picked them up. (RR46: 108-10). When they got back to the house, appellant told JT to take a bath. (RR46: 111-12). While JT was in the bath he heard his little brother scream, "JT, help, he's trying to kill me!" (RR46: 114). Just as JT jumped out of the bath to help his brother, appellant drug Jerrett by his collar into the bathroom. (RR46: 114). Appellant threw Jerrett up against the toilet and JT jumped back into the bathtub. (RR46: 114-15). Appellant closed and locked the bathroom door and laid three knives on the bathroom counter. (RR46: 114, 116). He asked the boys to give him some reason why he shouldn't kill them. (RR46: 115, 117-18). JT was shocked and scared, so Jerrett was doing all the talking. (RR46: 115, 117). Jerrett told appellant that they respected him and that they were too young to die. (RR46: 115-16, 117). Appellant asked JT a question, but he was too stunned to respond. (RR46: 116). When Jerrett started talking in JT's place, appellant stabbed him in the stomach and told him to "shut up." (RR46: 116). JT pushed appellant off of Jerrett and appellant tried to stab him too, but missed. (RR46: 116-17). Appellant told the boys that he was not going to kill them and that he wanted to show them something. (RR46: 118-19). As they

4

are about the leave the bathroom, however, appellant put the knife to Jerrett's throat and

tried to "screw it in." (RR46: 119). Jerrett ducked away and backed up toward the toilet

again. (RR46: 119). Appellant paused and then said, "All right, come on." (RR46: 119).

Appellant led the boys to the master bedroom where they found their mom lying

on the floor, not breathing. (RR46: 119-20). Appellant told the boys that he loved their

mom to death. (RR46: 127). The boys dropped to their knees and started crying. (RR46:

120-21, 125). JT suspected his sister might be there too, so he walked toward the

bathroom. (RR46: 121-22, 125). The bathroom was covered in blood and JT saw his

sister lying near the tub with her hands taped behind her back. (RR46: 121-22, 125).

Appellant ordered Jerrett to get him some clothes and ordered JT to go into the bathroom

where his sister was to get him pills from the medicine cabinet. (RR46: 123, 125). He

made the boys give him a hug, then he threw Lovetta's cell phone on the bed and told

them: "After I leave, call the police." (RR46: 124, 126). Appellant headed for the door

and the boys followed him. (RR46: 126). Appellant told them: "You know how I told

y'all to say see you later and never bye? Well, this is goodbye." (RR46: 127). Jerrett

started crying even more as appellant fled the scene in Lovetta's car. (RR46: 127).

Jerrett Armstead, the younger of Lovetta's sons, was nine years old at the time his

mother and sister were murdered. (RR46: 132). Jerrett stated that he had a hard time

testifying about what happened because he loved appellant and looked to him as a father.

(RR46: 134). Like JT, Jerrett testified that appellant picked him and JT up from DIOP

and took them back to the house the night of the offense. (RR46: 137-38). Appellant told

Jerrett to go to his room to change into his pajamas, and then he summoned him to the

kitchen. (RR46: 139-40). While Jerrett was explaining to appellant why he recently got in trouble at school, appellant grabbed him and stabbed him in the side. (RR46: 139-40). Jerrett started yelling for his brother, JT. (RR46: 141). Appellant pulled the knife to Jerrett's neck and drug him to the bathroom where JT was. (RR46: 141). Appellant pushed Jerrett inside the restroom and he almost hit toilet. (RR46: 142). Inside the bathroom, appellant tried to slice Jerrett's neck. (RR46: 142). Jerrett pleaded for his and his brother's life, telling appellant that they were too little to die and would not tell anybody about what had happened. (RR46: 143). Appellant then took them to the bedroom where they saw their mom and sister's dead bodies. (RR46: 144). Appellant explained to the boys that he killed their mom because she was about to divorce him and that he "loved her to death" and did not want her to divorce him. (RR46: 145). According to Jerrett, JT suspected that he killed Jazzmen because she saw what happened and was afraid she would tell. (RR46: 145). As appellant was leaving, he told the boys goodbye, which meant that he was leaving for good. (RR46: 145). Jerrett started crying because he loved appellant to death. (RR46: 145-46). Once the police arrived, Jerrett underwent surgery at Children's Hospital for his stab wounds. (RR46: 146-47). He has scars on his stomach and neck from where appellant cut and stabbed him with the knife (RR46: 147).

Dallas Police Officer James Jones responded to the 911 call reporting a stabbing at 3844 Morning Springs Trail. (RR46: 80-81). Officer Jones testified that the Dallas Fire Department was already at the scene when he arrived, and they notified him that there were two deceased victims inside the residence. (RR46: 81-82). Officer Jones and another officer entered the residence and found an adult female victim lying on the

6

bedroom floor and a young child lying face-down in the master bathroom. (RR46: 82-83). Officer Jones observed that the entire bathroom was covered in blood, including the walls, floor and door. (RR46: 83). The lid to the back of the toilet was broken on the floor and also covered in blood. (RR46: 83-84). Officer Jones testified that, in his five and half years with the police department, he had been to several homicide scenes but had never seen anything as "brutal or explicit" as this one. (RR46: 88). The officers searched and found no source of forced entry. (RR46: 84). The officers checked the house and yard to make sure there were no suspects or other victims and then secured the crime scene. (RR46: 84, 87-88).

Dallas Police Officer Jason Gindratt, a detective with the Crime Scene Section, was dispatched to the scene of the offense to photograph and collect evidence. (RR46: 148-49). After obtaining a search warrant, Officer Gindratt and his partner took several photographs of the crime scene and collected several pieces of evidence, including: one knife on the kitchen counter, one knife underneath the microwave, one knife under a couch cushion, a broken knife in the kids' bathroom, a knife and knife blade on top of the TV cabinet in the master bedroom, and a knife blade and two knife handles in the master bathroom. (RR46: 149, 150-63). The officers also collected a handwritten letter found on the bed in the master bedroom and a roll of duct tape on the counter in the master bathroom. (RR46: 157, 159, 162-63).

Dallas Police Officer Troy Smith was working at the Southeast Patrol Division the night of the offense. (RR46: 164-65). Around 2:15 a.m., a few hours after the murders, appellant came to the station with his mother and brother. (RR46: 165-66). Appellant's

7

mother told Officer Smith that her son might have been involved in a murder. (RR46: 166-67). Officer Smith made some phone calls and learned that appellant was the suspect of a double homicide that had occurred in Oak Cliff, so he arrested him. (RR46: 167). When the police learned that appellant had ingested some pills and also had some cuts on his back, they transported him to Parkland Hospital for an examination. (RR46: 168-69, 173). Once appellant was discharged from the hospital, he was taken to the homicide unit at the Dallas Police Department headquarters. (RR46: 169-70).

Shirley Coleman, appellant's aunt, testified that appellant's mother, Mary, called her the night of the offense and was hysterical. (RR47: 5-6). Shirley went over to Mary's house and found her on the floor crying. (RR47: 6). Mary told her that the police came by her house looking for appellant because they believed he was involved in some murders. (RR47: 8). Shirley called appellant and encouraged him to turn himself into the police because she was afraid they would kill him. (RR47: 9-10, 17). Appellant agreed, and Mary, Shirley and appellant's brother, Nysasno, went to pick up appellant from his friend's house. (RR47: 10-11, 17). Shirley drove separately and once she saw appellant come out and get into the car with Mary, she left and went to her house. (RR47: 12). She had left her house earlier that night without telling her husband where she was going and she was afraid that her husband would open the door if the family brought appellant over to her house. (RR47: 12-13). On her way home she saw flashing police lights, so she flagged down the officers and told them that the family had her nephew that was wanted for murder and planned to turn him in to the police. (RR47: 12-13). She told the officers she was anxious to get home to make sure her husband did not let him into her house.

8

(RR47: 13-14). After the police officers ascertained what offense Shirley was talking about, they followed her to her house to see if appellant was there. (RR47: 13-14).

Dallas Police Officer Kevin Kirchdorfer was finishing up a call in South Dallas when he came into contact with Shirley Coleman the night of the offense. (RR47: 19). Officer Kirchdorfer could see that she was visibly afraid. (RR47: 19-20). At the time he did not know anything about the double murder that appellant was wanted for, so he made some phone calls to gather information. (RR47: 20). He then followed Shirley home because she was afraid that appellant might come to her house. (RR47: 20). A short time later, while still at Shirley's house, Officer Kirchdorfer learned that appellant was in custody at the Southeast Division substation. (RR47: 20-21). Officer Kirchdorfer was called back to the station and assigned to ride in the ambulance with appellant to Parkland Hospital. (RR47: 21). During the ride, appellant told him: "I can't get the images out of my mind." (RR47: 22-23).

Dr. Joseph Martinez treated appellant when he was brought to Parkland Hospital after turning himself in to the police. (RR46: 90-91). The medical records reflect that appellant had attempted to commit suicide after killing his wife by taking 60 Tylenol and 60 Benadryl. (RR46: 93, 95). Dr. Martinez testified that appellant's ingestion of Tylenol was his main concern because Tylenol can effect the functioning of the liver but show no symptoms. (RR46: 93). During the examination, Dr. Martinez also observed that appellant had a number of cuts on his right hand, a small cut on his right forearm, and two superficial stab wounds on his left upper back, but there was no active bleeding from these wounds. (RR46: 92, 95). Appellant's speech and behavior were normal. (RR46:

9

95). Appellant underwent two liver function tests and, after the doctors received satisfactory results, he was released back to police custody. (RR46: 94).

Dallas Police Officer Robert Quirk, a detective in the homicide unit, was assigned to investigate the murders of Lovetta Armstead and Jazzmen Montgomery. (RR47: 25-26). Detective Quirk and his partner, Detective Mark Ahearn, first went to the scene of the murders and did a walk-through with the patrol officers who were the first responders. (RR47: 26-27). Detective Quirk decided that they needed a warrant to do a more thorough search and examination of the house, so he started the process of obtaining a warrant. (RR47: 27). During the hours they were waiting for the warrant, they continued their investigation by talking to several witnesses, including the neighbor, Latasha Bradfield, and the two young boys who were being treated at Parkland Hospital, JT and Jerrett Armstead. (RR47: 27-28). Once they obtained the warrant, Detective Quirk and Detective Ahearn went back to the house and completed their investigation of the crime scene. (RR47: 28). Based on the amount of blood, Detective Quirk recognized immediately that the master bathroom was the main crime scene and where the fight or struggle took place, as opposed the master bedroom where Lovetta's body was found. (RR47: 28).

Based on the witness interviews, Detective Quirk had a suspect and a description of the car he was driving. (RR47: 29). Several hours later, he learned that appellant had turned himself in at the Southeast Division patrol station. (RR47: 29). After appellant was treated at Parkland Hospital and then released back to police custody, Detective Quirk interviewed him at Dallas Police Headquarters. (RR47: 30). Detective Quirk read

appellant his *Miranda* rights and appellant agreed to waive those rights and give a voluntary confession. (RR47: 31; State's Exhibits 91-92). Appellant's recorded confession was played for the jury at trial. (RR47: 32-33). During his statement, appellant verified much of the information and evidence that Detective Quirk already knew about in the case. (RR47: 35). Appellant did, however, tell him about a piece of evidence he was unaware of, namely two handwritten notes that Lovetta had given him the day before the offense. (RR47: 35-36). After obtaining appellant's statement, Detective Quirk arrested appellant and booked him into the jail. (RR47: 34).

Following appellant's statement to Detective Quirk, Dallas Police Officer Bruce Chamberlain went back to the crime scene to collect additional evidence. (RR47: 78-79). Officer Chamberlain collected two handwritten notes that were found between the mattress and box spring in the master bedroom, just as appellant had described. (RR47: 80). He also collected an empty bottle of Tylenol. (RR47: 80). Officer Chamberlain went to Dollar General and collected a copy of the surveillance video from the store that showed appellant purchasing items at the store the previous day; however, the DVD was lost prior to trial. (RR47: 80-81).

Angela Fitzwater, a forensic biologist at the Southwestern Institute of Forensic Sciences (SWIFS), conducted DNA testing on the genetic material taken from the fingernail clippings of Lovetta Armstead. (RR47: 83-84). The DNA profile she obtained from the right hand was a mixture of at least two contributors. (RR47: 85). At nine of the areas on the DNA strand that she tested, the DNA profiles of Lovetta and appellant were detected in the mixture. (RR47: 85). There was also one additional genetic marker in the

11

mixture that she could not attribute to Lovetta or appellant. (RR47: 85-86). The DNA profile she obtained from the left hand was also a mixture of at least two contributors. (RR47: 86). At the nine tested areas, the DNA profile of a nonvictim contribution was from a single male and matched the DNA profile of appellant. (RR47: 86). Ms. Fitzwater also conducted DNA testing on the vaginal swab collected from Lovetta at the time of her autopsy. (RR47: 89). Ms. Fitzwater separated the two types of cells found on the vaginal swab into two fractions, a sperm cell fraction containing the sperm cells from the seminal fluid and a skin cell fraction containing the skin cells of the vaginal fluid of the victim. (RR47: 89). The DNA profile obtained from the sperm cell fraction was a mixture of at least two contributors. (RR47: 89-90). The DNA profile of the major contributor was from a single male and matched the DNA profile of appellant. (RR47: 90). The set of genetic markers she obtained in the minor contribution corresponded to the genetic markers observed in the DNA profile of Lovetta. (RR47: 90).

Dr. Jill Urban, a medical examiner at SWIFS, performed the autopsy on the body of Lovetta Armstead. (RR47: 97-98). Lovetta was 5'5" tall, weighed 250 pounds and was 32 years old at the time of death. (RR47: 99). During her external examination of the body, Dr. Urban observed 25 stab wounds on Lovetta's body. (RR47: 100-01). There were two stab wounds in the right upper quadrant of her abdomen, each with a depth of two inches. (RR47: 99-100). There was a cluster of 16 individual stab wounds on the back of her neck and right side of her upper back, each with a depth of up to two inches. (RR47: 100). She also had a single stab wound to the right side of her upper back with a depth of four inches that went through the muscles of her back, between the ribs and into

12

the right lung. (RR47: 100). On the left side of the back there was one stab wound with a depth of two inches, and two more stab wounds with depths of six inches each. (RR47: 100). The deepest wound was stab wound number 23, which was found on the back of the left thigh and had a depth of eight inches. (RR47: 100). The blade went very deep into the musculature of the thigh and there was a great deal of hemorrhage in the muscle. (RR47: 100-01). The two final stab wounds were observed on the back of the left elbow and on the back of the left hand and each had a depth of one inch or less. (RR47: 101). In addition to these 25 stab wounds, there were several small puncture marks on the body. (RR47: 101). Dr. Urban also observed evidence of possible asphyxia by strangulation. (RR47: 101-02). Specifically, she observed a bruise on the right side of the neck she believed was made with fingers and petechial hemorrhages on the surface of the eyes. (RR47: 101). During her internal examination, Dr. Urban observed hemorrhage around the cartilage that makes up the voice box or larynx. (RR47: 102). Dr. Urban classified Lovetta's manner of death a homicide. (RR47: 106). She stated that the numerous stab wounds suffered by Lovetta were, in and of themselves, sufficient to cause Lovetta's death. (RR47: 107). She also stated that appellant's confession that he stabbed Lovetta nearly 30 times was consistent with her clinical findings as contained in the autopsy report. (RR47: 106).

Dr. Meredith Lann, a medical examiner at SWIFS, performed the autopsy on the body of Jazzmen Montgomery. (RR47: 110-11). Jazzmen was four feet tall and weighed forty-nine pounds at the time of her death. (RR47: 113). At the outset, Dr. Lann observed that Jazzmen's body and hair were damp. (RR47: 113). Her hands were bound with duct

13

tape behind her back, and her ankles were bound with duct tape and a telephone cord. (RR47: 113). When Dr. Lann examined Jazzmen's face more closely, she noticed a small amount of adhesive residue and an L-shape on the left cheek which was consistent with her mouth previously having duct tape on it. (RR47: 113). There were no external injuries to the scalp, but the autopsy revealed hemorrhage on the top of her head, underneath her ponytail. (RR47: 114). She had a scrape on her bottom lip and a small tear in the lining of the lip. (RR47: 114). There were burst blood vessels, or petechiae, on the surface of the eyes, the thymus, the lining of the lungs and the epiglottis. (RR47: 114-15). She had hemorrhaging within the muscle of the right side of the neck and within one of muscles on the back of the left shoulder. (RR47: 114-15). There was also a frothy substance coming out of Jazzmen's nose at the time she arrived at the morgue. (RR47: 116). Dr. Lann's internal examination revealed that Jazzmen's upper and lower airways and lungs were also filled with this fluid. (RR47: 115-16). This condition is known as pulmonary edema and is the result of the body's reaction to a low state of oxygen, as well as a change in the blood flow through the lungs. (RR47: 116). Dr. Lann explained that the fluid migrates up from the lungs through the bronchial tubes, trachea, and out through the nose and mouth. (RR47: 116). Dr. Lann ruled Jazzmen's manner of death a homicide. (RR47: 119). She testified that appellant's confession that he held Jazzmen's head in a tub full of water and drowned her was consistent with her findings. (RR47: 119-20). In putting together the hemorrhage below her ponytail, the hemorrhage to her left back area, and the injuries to her mouth and lip, it would be consistent to conclude that appellant pressed down on the back of Jazzmen's head and her left shoulder and held her under the

14

water, possibly even making contact with the bottom of the bathtub, until she drowned. (RR47: 121).

## B. The State's Punishment Evidence

At punishment, the State presented evidence of appellant's past criminal history and bad behavior while in prison. Dallas Police Officer Ray Cunningham first testified about a drug possession offense committed by appellant in 1989. On July 28, 1989, he and his partner were patrolling a high-crime area in South Dallas. (RR49: 25). As they were driving through an apartment complex known for drug sales and other crimes, he observed appellant in a breezeway. (RR49: 25-26, 27). When appellant saw them, he took off running. (RR49: 25-26, 28). Officer Cunningham chased him through a field and eventually found him hiding under a car. (RR49: 28). Appellant had in his possession a large bag containing 13 individually wrapped baggies of crack cocaine. (RR49: 28-29). The officers placed appellant under arrest and, while in the police car, appellant admitted to the officers that the drugs belonged to him. (RR49: 29). Appellant pled guilty to unlawful possession of cocaine and received probation, but was later revoked and sentenced to four years' imprisonment. (CR1: 53; State's Exhibit 141).

The State also presented evidence of an aggravated robbery committed by appellant against his former employer. Joseph Johnson, Jr. was the store manager of County Fair Foods in 1990. (RR49: 85). Appellant applied for a position at the store and told Johnson that he had just gotten out of the penitentiary and was having a hard time finding a job. (RR49: 86-87). Johnson decided to give appellant a chance and offered him a job as a stocker. (RR49: 87). Johnson also offered himself up as a mentor to appellant

15

and told him he would teach him everything he knew about the grocery business if appellant was interested. (RR49: 87-88). Appellant worked at the store for a little over a week before Johnson had to fire him. (RR49: 89-90). He was terminated because he called in sick to work, but then showed up at the store later that day to buy bread. (RR49: 89-90). The owner directed Johnson to fire appellant because he believed that if appellant was truly sick he would not have come to the store to shop. (RR49: 90). Johnson called appellant and terminated him over the phone. (RR49: 90). About a week later, the store was robbed at gunpoint. (RR49: 90-96). In May of 1990, former Dallas Police Officer D.A. Watts took a voluntary statement from appellant in which he confessed that he and two other men robbed the County Fair Food Store at gunpoint. (RR49: 71-72, 74-75; State's Exhibit 147). In June of 1990, appellant pled guilty to aggravated robbery and was sentenced to twenty years' imprisonment. (CR1: 53; State's Exhibit 140). When Johnson learned it was appellant who had robbed him, he was very disappointed. (RR49: 97).

Charles Moss, a retired institutional parole officer, interviewed appellant for parole consideration in June of 1992. (RR49: 76-77). When asked about the aggravated robbery he committed in 1990, he told Moss, "I was young and I wanted to see if I could do it." (RR49: 78-79). He also stated that he committed the robbery for a "thrill" and that "revenge for being fired could have been a factor." (RR49: 81). Appellant admitted that he had sold crack cocaine for about a month because he "could get away with it." (RR49: 79). Prior to entering the prison system, appellant stated that he drank a pint of liquor a day and drank until he was intoxicated. (RR49: 80). He also smoked marijuana and obtained his drugs by acting as a lookout and body guard for drug dealers. (RR49: 80).

Appellant's prison medical records reflected that he received stress management treatments, but there were no indications of past mental illness or suicide attempts and he was not designated a mental health patient. (RR49: 81).

Kevin Ashford worked as a correctional officer in the administrative segregation section of TDCJ in the 1990's. (RR50: 6-7). On January 9, 1994, Ashford was assaulted by appellant. (RR50: 10; State's Exhibit 158). Ashford was called to the chow hall that day to assist with security while the inmates were eating. (RR50: 8-11). The inmates had a tendency to spread out, which made it difficult for the guards to keep order. (RR50: 11). Ashford usually had them sit in particular places so he could maintain control over what was going on. (RR50: 11). When Ashford ordered appellant to sit at a particular table, he became aggressive and refused to follow Ashford's order. (RR50: 11-12). Ashford directed appellant to put his tray down and step into the hallway so they could address the lieutenant about his disruptive behavior. (RR50: 12). Ashford wanted to avoid an altercation with appellant in the chow hall because he had no backup and would be pinned down with over a hundred inmates. (RR50: 12). Appellant threw his food tray at Ashford, hitting him in the midsection of his body, and then charged towards Ashford. (RR50: 13). Ashford initiated a use of force to gain control of appellant. (RR50: 13). Despite appellant's kicking and fighting, Ashford and another guard were eventually able to gain control of appellant, wrestle him to the ground, and handcuff him. (RR50: 13-14).

The State also presented evidence of appellant's abusive and/or manipulative behavior towards his previous girlfriends. In 1989, Jennifer Alcorn Wheeler was going to the health magnet high school and working at Presbyterian Hospital of Dallas. (RR49:

17

31-32). She met appellant at her bus stop and they began dating. (RR49: 33). Jennifer and appellant spent every day together and appellant often came with her to work at the hospital. (RR49: 33-34). Appellant did not have a job or a car, so Jennifer always paid if they wanted to go out. (RR49: 35). Jennifer's parents did not approve of her relationship with appellant and thought she spent too much time with him. (RR49: 35-36). Jennifer urged appellant to get a job or go back to school, but he never did. (RR49: 36-37). Jennifer broke up with appellant in May of 1989, right around the time she graduated from high school. (RR49: 37-38). Appellant did not want to break up and called her incessantly, but Jennifer did not answer or return his calls. (RR49: 37).

Three months later, on August 6, 1989, Jennifer saw appellant at the bus stop by her house as she was driving to work. (RR49: 38). Appellant flagged her down and asked if she could take him home. (RR49: 38-39). When they got to appellant's house, he took the laces out of his boots and told Jennifer to get in the passenger seat. (RR49: 39-40). Jennifer feared that appellant was going to choke her with the shoelaces. (RR49: 40). Appellant then drove to Crawford Park and brutally assaulted Jennfier. (RR49: 39). Appellant told Jennifer that everyone in his life had abandoned him and that he was going to kill her. (RR49: 39, 49). Jennifer does not remember much about the assault, other than begging appellant not to do it and telling him she loved him. (RR49: 40). The next thing she remembered was waking up in the hospital. (RR49: 40). She had been stabbed in the chest and had ligature marks on her neck from being choked. (RR49: 40). She had black eyes, a swollen jaw and chest, and was missing a tooth. (RR49: 40). Appellant initially told Jennifer's family that she was robbed and came to his house, but he later admitted to

18

assaulting her. (RR49: 41). Appellant pled guilty to aggravated assault and was sentenced to four years in prison. (CR1: 53; RR49: 44; State's Exhibit 141). Jennifer remained in contact with appellant after he went to prison and they exchanged a few letters. (RR49: 44). Appellant told Jennifer that he did not kill her that day because she told him she loved him. (RR49: 45). The last time Jennifer saw appellant was one day after he got out of prison, when he asked to borrow her car and never returned it. (RR49: 44-45).

Belinda Lacy met appellant when she was working as a correctional officer for the Texas Department of Criminal Justice ("TDCJ") back in the 1990's. (RR49: 103-04). Appellant had a work assignment in the kitchen where Lacy worked, so they got to know each other on a personal level and eventually became romantically involved. (RR49: 105). Because correctional officers are not permitted to date inmates, Lacy quit her job. (RR49: 106). Lacy had fallen in love with appellant and held herself out as his common law wife. (RR49: 107-08). She visited him on a weekly basis and wrote favorable letters to the parole board in hopes that they would release him onto parole. (RR49: 107-08, 115). Appellant was released onto parole in 2000 and he and Lacy were married two weeks later. (RR49: 107, 110). They planned to live together at his mother's house; however, shortly after the wedding, appellant abandoned Lacy and stopped staying at the house. (RR49: 110-11). After about six weeks of marriage, Lacy moved out and returned to her family in East Texas. (RR49: 110-11). During their relationship, Lacy never saw any indication that appellant had any kind of psychiatric or mental issue. (RR49: 112). Because Lacy was nice to appellant, he never laid his hands on her. (RR49: 112).

19

Shulonda Ransom met appellant when they were both working at Wal-Mart in late 2000. (RR49: 123). They started dating and had a son together in October of 2001. (RR49: 124-25). When Shulonda was five months pregnant with their first child, Gary, Jr., appellant began abusing her. (RR49: 125). The first incident occurred during a fight about money and appellant slapped Shulonda in front of his parents. (RR49: 125-26). They broke up for two months, but then got back together. (RR50: 126). Appellant continued to abuse Shulonda after the birth of Gary, Jr. and during her pregnancy with their second child, Meionni. (RR49: 127). According to Shulonda, anything would set appellant off, like if she did not "cook right" or did not clean up when he wanted her to. (RR49: 128). The final incident of abuse occurred in their bathroom one day when Shulonda was trying to leave for work. (RR49: 128). She and appellant had been fighting even more than usual and he was unhappy that she was going back to work. (RR49: 128). Appellant chased Shulonda into the bathroom, held her over the sink and choked her until she passed out. (RR49: 128). Shulonda woke up some time later and went to work. (RR49: 128). When she came back home that night, appellant had stolen everything from the apartment, including their baby's bed, diapers and clothes. (RR49: 129). She and appellant had no further contact and he was not even there for Meionni's birth. (RR49: 129-30). Shulonda later learned that, while she was pregnant, appellant had been out impregnating other people. (RR49: 129). Gary has a daughter with another woman and she is only two months older than Meionni. (RR49: 136). Shulonda sued Gary for child support, but he owed $23,000 and never paid, so she just stopped asking. (RR49: 131).

20

Ruth Lyons testified about an incident of violence by appellant against Lovetta prior to the murders. Ruth grew up in Peoria, Illinois with Lovetta's mother, Margarita, and had a romantic relationship with her for several years. (RR50: 94-95). They came together when Lovetta was around three years old and Ruth considered Lovetta her daughter. (RR50: 95). Shortly after Lovetta moved into her house on Morning Springs Trial, Ruth came to live with her for about six months. (RR50: 95-96). In early 2008, Jerrett told Ruth about an incident of violence he had seen between appellant and Lovetta. (RR50: 97-98). Ruth got everyone out of the house so she could talk to appellant alone. (RR50: 98, 109). They sat down in the bedroom and Ruth asked appellant, "Did you put your hands on Vetta?" (RR50: 110). When appellant admitted that he had, Ruth told him that if he ever put his hands on anyone else in that house she would kill him. (RR50: 111). Appellant apologized and started crying. (RR50: 111-12). Ruth told him that he was the man of the house and needed to set an example for JT and Jerrett. (RR50: 112-13).

Melodye Nelson, a 21-year veteran of TDCJ, testified as an expert on the prison system in Texas. (RR50: 26-27). Warden Nelson previously worked as a correctional officer on death row and is now the senior warden at the Murray Unit, a maximum security women's prison. (RR50: 26-27). Warden Nelson testified generally about the types of facilities, the number of inmates and guards statewide, and how inmates are classified within the system. (RR50: 27-29). She explained that inmates are classified as a "G1" through "G5," with G1 being the inmates with the least amount of supervision. (RR50: 31). The general population of the prison system is classified as a G2, unless they

21

are serving a sentence of 50 years or more and have served less than ten years, and then they are classified as a G3. (RR50: 31-32). Inmates classified as G4's are medium custody offenders who have generally had some disciplinary history. (RR50: 32-33). Inmates classified as G5's are close custody offenders who have had disciplinary issues and are violent in nature. (RR50: 33). There is also the Administrative Segregation section ("Ad Seg") for offenders who are known gang members or who have a pattern of violence against the prison staff or other inmates. (RR50: 33). Both Ad Seg and Death Row inmates are housed in single cells and have limited recreation time. (RR50: 33). Unlike inmates classified as G1 through G4, Ad Seg and Death Row inmates are restrained and escorted by armed guards anywhere they go within the prison. (RR50: 33). If a defendant is convicted of capital murder and receives a sentence of life imprisonment without parole, that offender would automatically be classified as a G3. (RR50: 35-36). An inmate classified as a G3 can work, go to school, go to the library, recreate and eat with all other inmates in the general population, including other G1's and G2's. (RR50: 37). And because G3 status is determined solely by the number of years on a sentence, a capital murderer who is classified as a G3 could be housed with any other inmate, no matter what crime they committed. (RR50: 37-38). G3's are also allowed contact visits once they obtain a certain level of good time credit. (RR50: 38). Warden Nelson testified that, no matter what level of supervision an inmate has, if he wants to commit an act of violence he has the chance to do it. (RR50: 40, 42). For demonstrative purposes, Warden Nelson brought some weapons she has confiscated from inmates over the years made

22

from cardboard, parts of a typewriter, screws, pencils, and animal bones, just to name a few. (RR50: 41-42).

Last, the family testified briefly about how Lovetta and Jazzmen's deaths have impacted their lives. (RR50: 114-16, 117-19, 119-23, 123-24). Jerrett testified that, since his mother's death, he has been having nightmares and hearing noises at night. (RR50: 117). He has a lot of anger and a lot of questions as to why appellant would do something like this. (RR50: 117-18). He has even blamed himself and felt he should have done something to stop it. (RR50: 118). JT testified that he misses being able to say good morning to his mother and being able to hug his sister before she leaves for school. (RR50: 120). Sometimes he wakes up too depressed to get up. (RR50: 120). Sometimes he breaks out crying in the middle of class. (RR50: 120). Seeing his grandmother and family crying over the murder during the trial has hurt him even more. (RR50: 120). He stated that if he could cut his own throat to bring his mom and sister back he would. (RR50: 120). JT has nightmares about the night of the murders and about appellant someday getting out of prison. (RR50: 121). JT is staying with his dad and Jerrett is staying with their grandmother. (RR50: 122). This is the first time they are not sharing a room and he misses his brother. (RR50: 121-22).

### C. Appellant's Punishment Evidence

Shirley Coleman, appellant's aunt, testified about appellant's family and their history of mental illness. Shirley stated that she did not have a good relationship with her mother, Bertha Curry, mostly because of her mother's mental issues. (RR51: 9-10). Shirley recalled one instance when her mother pretended like she was pregnant when she

23

really was not, and then put raw meat in the toilet and said she had a miscarriage. (RR51:

11). According to Shirley, her mother has been taking medication for her mental health

for as long as she can remember. (RR51: 11-12). Shirley testified that four of her cousins,

one of her aunts, and her baby sister all have mental issues and have been treated by

MHMR. (RR51: 17-19). She also had another aunt whose two children and two

grandchildren have some sort of mental illness. (RR51: 20-21). About eleven years

earlier, her stepbrother, Robert Burrow, murdered his wife and killed himself. (RR51:

20). Shirley's oldest sister, Mary, is appellant's mother. (RR51: 12). According to

Shirley, Mary was not always as attentive to her children as she should have been.

(RR51: 13). Shirley recalled that Mary had a nervous breakdown and had to be

hospitalized, but she could not remember when. (RR51: 14).

Shirley remembered appellant in high school as a normal everyday kid. (RR51:

21-22). When he got out of prison the second time, he was not the same. (RR51: 22-23).

He did not seem to have any friends, just girls, and he treated the girls poorly. (RR51:

23). He moved his wife, Belinda, into his mother's house and used Shirley's place to

entertain all of his mistresses. (RR51: 26-27). During this time, he had four more children

within about a year and a half time span. (RR51: 28). He had Gary, Jr. and Meionni with

Shulonda, had another son named Cameron around the same time as Gary, Jr., and then

he had a daughter named LaJay. (RR51: 28-29). Appellant did not pay child support to

any of the mothers. (RR51: 30-31). Shirley met appellant's high school girlfriend,

Jennifer, only once and she seemed like a nice, sweet girl. (RR51: 32). Shirley asked

appellant why he had beat up and tried to strangle Jennifer to death, and he told her that

24

Jennifer was a "fatal attraction." (RR51: 32-33). He also told her that the robbery of the County Fair Food Store was not the only robbery he had committed. (RR51: 44-45).

Lenelle Williams, appellant's ex-girlfriend, testified that she met appellant at her sister's birthday party in December of 2003. (RR51: 54-55). They began dating and moved in together several months later. (RR51: 55-56). During the two years they lived together, appellant worked and would help Lenelle take care of her 4 grandkids when they came to visit. (RR51: 57-58). According to Lenelle, appellant did not drink, go out or bring friends to the apartment and preferred to spend time alone. (RR51: 59-60). Lenelle recalled that sometimes appellant would mumble at the television. (RR51: 61-62). Appellant told Lenelle that vampires were among them and that a vampire followed him home from school once when he was younger. (RR51: 63-64). Appellant also told Lenelle that he heard rats in the walls. (RR51: 64-65). Their relationship ended when Lenelle moved back to Arlington to help babysit her grandchildren. (RR51: 67-68). Even after they broke up, Lenelle and appellant remained friends and talked occasionally. (RR51: 68-69). The weekend before the instant offense, appellant called Lenelle several times and told her he was "stressed." (RR51:70, 81). Lenelle later heard about the offense and was shocked because that was not the appellant she knew. (RR51: 81-82). On cross-examination, Lenelle admitted that when she and appellant were living together he would often leave for long periods of time. (RR51: 84, 85-86). When he was dating Lovetta, he would sometimes come and stay with Lenelle when he and Lovetta got into a fight. (RR51: 88-89).

Mary Sampson, appellant's mother, testified that she had two sons, appellant and Nysasno Carter, with her ex-husband Thomas Carter. (RR51: 95, 100). Mary met Thomas at a pharmacy and they got married before he went to the military. (RR51: 100). During her pregnancy with Nysasno, Thomas would jump up in the middle of the night, saying that they were both crazy and they needed to see a psychiatrist. (RR51: 100). Thomas also kicked her in the stomach and beat her. (RR51: 101). Not only was appellant a witness to Thomas's violence, he was a victim too. (RR51: 103). Mary eventually left Thomas in 1978 or 1979. (RR51: 101). Thomas ended up going to a military prison after an incident with his military commander. (RR51: 105). Mary also talked about her family's history of mental illness. (RR51: 101). She testified that she was "stressed" and was treated for mental illness when she was pregnant and after her brother died. (RR51: 102). Her younger sister, Deborah, was committed to a mental hospital. (RR51: 98). Her brother killed his wife and committed suicide. (RR51: 99).

Mary recalled that, as a child, appellant stayed to himself and did not have a lot of friends. (RR51: 103-04). During the grand jury proceedings, Mary testified that appellant made average grades and graduated from high school. (RR51: 96-97, 110). After reviewing appellant's school records with his attorneys, Mary realized that his grades were poor and that he only made it through tenth grade. (RR51: 96, 110). Appellant often took radios and clocks apart but could not put them back together. (RR51: 108). Mary's second husband, Leon Sampson, took appellant to work and tried to get him to work with his hands, but appellant could not or would not do the work. (RR51: 106-07). When appellant was in middle school, he climbed on top of the elementary school in Mary's

26

neighborhood and said he was going to jump, but Mary's sister talked him off of the roof. (RR51: 108). From that point on, appellant was constantly complaining that he was "stressed" and that no one understood him. (RR51: 109). He would never sit with his back to a door and always had a bat with him. (RR51: 111). He also thought people were talking about him and were out to get him. (RR51: 111). Appellant's seven-year-old daughter, LaJay lives with Mary. (RR51: 112). LaJay reminds Mary of appellant when he was a kid – she does not have any friends and keeps to herself. (RR51: 113).

At some point during his relationship with Lovetta, Mary learned that appellant had checked himself into a mental hospital. (RR51: 122). She called the house and Lovetta told her that she would have appellant call her back. (RR51: 122-23). Appellant called her immediately from Timberlawn Hospital. (RR51: 123). He told her that he had committed himself because he had just "got to the end of his rope." (RR51: 124). He also told her that he wanted to go to sleep and never wake up. (RR51: 124-26). After his visit to Timberlawn, Mary tried to talk to appellant on a more regular basis. (RR51: 126). According to Mary, appellant has expressed remorse when she has visited him in jail. (RR51: 135).

Bertha Curry, Mary's mother and appellant's grandmother, testified that she did not think appellant was a "normal" child. (RR51: 166-67). She recalled one instance where he pulled a snake from its nest and bit its head off. (RR51: 167, 170). According to Bertha, there were a lot of kids who wanted to be friends with appellant, but he preferred to play by himself. (RR51: 177). When appellant was eight or nine years old, he would cry and say that he did not want to live. (RR51: 179). Bertha's youngest daughter,

27

Deborah, was not "normal" either and was committed to a psychiatric hospital. (RR51: 173). Bertha has been taking medication for depression and anxiety for 16 years. (RR51: 171).

Dr. Kellie Gray-Smith was called to testify as an expert on special education and the multicultural aspects of psychology. (RR51: 194-99). Dr. Gray-Smith earned both a Masters degree and a Doctorate in school psychology and is currently employed by the Plano Independent School District as a licensed specialist in school psychology, a licensed psychologist and a special education coordinator. (RR51: 204-05). Dr. Gray-Smith testified that research has shown that there are different learning styles across different cultures and that, as a result, different cultures handle learning disabilities and emotional disturbances differently. (RR51: 208). She testified that, for example, the African-American community seeks diagnosis and treatment for behavior problems and mental health issues far less than other cultures do. (RR51: 208). She believes this is due to a number of reasons, including: (1) a lack of awareness or understanding about what a mental health issue is, thinking instead that it is bad behavior that should be addressed at home rather than by seeking professional help; (2) a misperception that seeking professional help would be more harmful than helpful or that it is not appropriate for their needs; and (3) a general distrust of medical professionals and mental health practitioners. (RR51: 208-09). She testified that these beliefs are often perpetuated by black leaders, especially in the church. (RR51: 210-11).

Dr. Gray-Smith also testified that there are genetic factors and genetic links for many mental illnesses. (RR51: 211). When there is a hereditary link within a family of

28

individuals suffering from mental illness, oftentimes all of the individuals will fail to seek out treatment because their symptoms are seen as normal or as part of what the family is and how the family solves problems and copes with stressors. (RR51: 212).

Dr. Gray-Smith examined the school records of appellant and formed the opinion that appellant was not successful as a student. (RR51: 219, 221-22). His records reflect chronic school failure. (RR51: 222). This failure started early in elementary school in the core academic subjects and went on throughout middle school and high school. (RR51: 222). The only exception was ninth grade, the year appellant played football; he received B's and high C's, which was very different from all the years prior and the year after. (RR51: 222). In her current position with Plano ISD, such a level of failure would not go unaddressed. (RR51: 223-24). Based on her training and experience, Dr. Gray-Smith believes that such chronic failure was likely due to either a learning disability or a mental problem. (RR51: 224).

Dr. Gilbert Martinez, a licensed psychologist and owner of South Texas Neuropsychological Associates, was hired by the defense to test appellant's cognitive, intellectual and emotional functioning. (RR52: 5-6, 13-14). In order to form the opinions offered by his testimony, Dr. Martinez examined appellant's medical records, interviewed appellant's mother and brother, conducted a 2-hour interview with appellant, and then administered a battery of psychological and neuropsychological tests on appellant. (RR52: 14-15). When Dr. Martinez did his initial interview, appellant appeared severely depressed and Dr. Martinez had to put forth a great deal of effort to get appellant to answer his questions due to his despondent state. (RR52: 16-17). With regard to his

29

cognitive and intellectual functioning, appellant had an IQ level of 78, which falls in the "borderline" range of IQ scores. (RR52: 21-22). According to Dr. Martinez, appellant has some "attentional" problems, but he does not have any kind of severe cognitive disturbance or formal learning disability and he is not mentally retarded. (RR52: 22, 24-26, 30). Dr. Martinez testified that individuals with this level of intellectual functioning can usually function independently but will have some difficulty understanding complicated information. (RR52: 24).

With regard to appellant's emotional functioning, Dr. Martinez diagnosed appellant with schizoaffective disorder, bipolar type. (RR52: 31). A person suffering from this disorder will have episodes of severe depression and intense sadness, and episodes of irritability or agitation; they will be unmotivated; they will have difficulty sleeping; and they will be paranoid or delusional. (RR52: 44). Appellant's medical records reflect that appellant spent five days in Timberlawn Hospital about a month before the offense and doctors there diagnosed him with major depressive disorder with psychotic features. (RR52: 33-34, 37). Their diagnosis was different from Dr. Martinez's diagnosis in that they ruled out bipolar disorder. (RR52: 33-34). However, according to Dr. Martinez, these are not mutually exclusive diagnoses; they share a lot of the same symptoms, it is just a matter of when the symptoms are occurring in time and whether they occurred together or not. (RR52: 43). Dr. Martinez did not diagnose appellant with a specific personality disorder, but did diagnose him with having features of paranoid personality disorder, borderline personality disorder, and avoidant personality disorder. (RR52: 54-56). After sitting in the courtroom throughout the trial and hearing the

30

testimony, Dr. Martinez formed the opinion that appellant also met the criteria for antisocial personality disorder. (RR52: 57-59). On cross-examination, Dr. Martinez clarified that appellant is not schizophrenic, bipolar or mentally retarded. (RR52: 67-68). Dr. Martinez was surprised to learn that appellant's IQ when he was tested in prison was 105. (RR52: 69).

Appellant's brother Nysasno Carter testified that appellant never had as good a relationship with their stepfather, Leon Sampson, as he did. (RR52: 129). Leon owned a remodeling company and tried to have appellant work for him, but appellant couldn't cope with learning how to use the tools. (RR52: 129-30). Nysasno has believed that appellant has been mentally ill since they were little. (RR52: 131). As a child, appellant always talked about death, would say he heard things, and did not believe in God. (RR52: 131). Appellant did not have a lot of friends and kept to himself. (RR52: 131-32). Nysasno tried to talk his mother about his concerns regarding appellant, but she brushed him off. (RR52: 133). Nysasno talked to appellant about his mental health issues about six months prior to the offense. (RR52: 136-38). Appellant told Nysasno that he was stressed, was hearing voices, and did not have anything to live for. (RR52: 137, 140). Nysasno encouraged him to pray, and they talked about him going to see a psychiatrist. (RR52: 137-38). When Nysasno visited appellant in jail prior to trial, appellant told him that he is still hearing voices, specifically Lovetta's voice telling him that she forgives him. (RR52: 145). Appellant admitted to Nysasno that he murdered Lovetta, but would never admit to him that he killed Jazzmen. (RR52: 154).

31

## SUMMARY OF ARGUMENT

*Issues 1-15*: The trial court properly denied appellant's challenges for cause against fifteen prospective jurors. All of the denials were proper, and appellant has not shown that he was denied the use of a statutorily provided peremptory challenge.

*Issues 16 & 17*: Appellant has not shown that the trial court's rulings on his challenges for cause resulted in the seating of a juror who was biased or prejudiced. In any case, his use of a peremptory strike to remove a juror who should have been challenged for cause would not rise to a violation of due process.

*Issue 18*: Based on the totality of the circumstances in this case, the record supports the trial court's finding that appellant knowingly, intelligently, and voluntarily waived his rights in accordance with *Miranda* and article 38.22. Therefore, the trial court did not err by denying appellant's motion to suppress and by admitting his videotaped statement into evidence.

*Issues 19-24:* Appellant has not shown that the prosecutor's arguments fell outside the permissible areas of jury argument or that the trial court's instructions were insufficient to cure any possible error. In any event, the argument taken as a whole was harmless in light of the overwhelming evidence of appellant's guilt.

*Issue 25:* This Court has previously held that there is no authority from the Supreme Court or this Court suggesting that mental illness that is a contributing factor in the defendant's actions or that caused some impairment or some diminished capacity exempts one from execution under the Eighth Amendment.

32

*Issue 26:* Considering all the evidence in the light most favorable to the jury's verdict, including appellant's handwritten letter outlining his plan to murder the family, the eyewitness testimony of JT and Jerrett, and appellant's voluntary confession to police, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt.

*Issue 27:* Given the strength of the evidence supporting the jury's answers to the special issues, the trial court's prompt instruction to disregard, and the inconsequential nature of the prison guard's complained-of testimony regarding incidents of violence he experienced while working for TDCJ, the trial court did not abuse its discretion in denying appellant's motion for mistrial.

*Issue 28:* Based upon the facts of the instant offense, as well as the evidence of appellant's past acts of crime and violence, a rational jury could find that appellant would constitute a continuing threat to society. As such, the evidence was legally sufficient to support the jury's answer to the future dangerousness special issue.

*Issues 29 & 30:* Appellant's arguments that the trial court erred by admitting extraneous offense evidence at punishment due to a lack of notice from the State are without merit as the State is not required to provide appellant with notice of its intent to introduce extraneous offense evidence during cross-examination of defense witnesses or when it is offered as rebuttal evidence.

*Issues 31-46:* Appellant's admittedly meritless federal constitutional challenges to the Texas death penalty statute are presented only to preserve the complaints for federal

33

habeas review. And while appellant invites this Court to revisit its prior holdings against his position, he provides no new authority for this Court or the State to address.

## ARGUMENT

### ISSUES 1-15: DENIAL OF DEFENSE CHALLENGES FOR CAUSE

In issues 1 through 15, appellant claims the trial court violated statutory and constitutional law by erroneously causing him to use his fifteen statutorily allotted peremptory strikes plus two additional strikes on persons who should have been removed for cause. As a result, he contends he was forced to accept an objectionable juror, Debra Story, after denying his request for additional strikes.

### *Applicable Law*

A veniremember may be challenged for cause if, among other reasons, he possesses a bias or prejudice in favor of or against the defendant or he possesses a bias against an aspect of the law upon which the State or the defendant is entitled to rely. *See* Tex. Code Crim. Proc. Ann. arts. 35.16(a)(9), (b)(3), (c)(2) (West 2006); *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). A "bias against the law" is the refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Threadgill*, 146 S.W.3d at 667.

Appellant has the burden of establishing that his challenge for cause is proper. *See Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002). Before a prospective juror can be excused for bias, the law must be explained to him and he must be asked whether

34

he can follow that law regardless of his personal views. *Threadgill*, 146 S.W.3d at 667. Appellant does not meet his burden of establishing that his challenge for cause is proper until he has shown that the veniremember understood the requirement of the law and could not overcome his prejudice well enough to follow it. *See Feldman*, 71 S.W.3d at 747.

When reviewing a trial court's decision to deny a challenge for cause, the appellate court looks at the entire record to determine if there is sufficient evidence to support the ruling. *Feldman*, 71 S.W.3d at 744. The appellate court reviews a trial court's ruling with "considerable" or "great" deference because the trial judge is in the best position to evaluate the prospective juror's demeanor and was present to observe the juror and listen to his tone of voice. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007); *Threadgill*, 146 S.W.3d at 667. Particular deference is given when the prospective juror's answers are vacillating, unclear, or contradictory. *Threadgill*, 146 S.W.3d at 667. The appellate court reverses a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). When the venireperson is persistently uncertain about his or her ability to follow the law, the reviewing court does not second guess the trial court. *Id.*

To prevail on a claim of erroneous denial of a challenge for cause, the defendant must object to the trial court that he is compelled to try his case with at least one individual on the jury who he would have removed with a peremptory challenge had one been available to him. Harm from the erroneous denial of a defense challenge for cause occurs: (1) when a defendant uses a peremptory challenge to remove a veniremember

35

whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use to remove another veniremember whom the defendant identifies as "objectionable" and who actually sits on the jury. *Saldano*, 232 S.W.3d at 91. When this occurs, the trial court's erroneous denial of a challenge for cause harms the defendant by wrongfully depriving him of at least one of his statutory peremptory challenges that he could have used to remove the juror whom he has identified as objectionable. *Id.*

The parties asserted their challenges for cause and peremptory challenges at the conclusion of each prospective juror's individual voir dire. Appellant exhausted all fifteen of his statutory peremptory strikes and two additional ones granted by the court. (RR41: 141). The court denied appellant's request for a third additional strike to exercise on Debra Story, the twelfth juror, whom appellant identified as objectionable. (RR41: 140-42). Since appellant received two extra peremptory challenges, appellant must show that the trial court erroneously denied at least three of his challenges for cause to the other veniremembers identified in issues one through fifteen. *See, e.g., Saldano*, 232 S.W.3d at 93 (noting that the defendant would have to show the trial court erroneously denied his challenges for cause to three of the complained-of venire members because he received two extra peremptory strikes).

### *The Trial Court Properly Denied Appellant's Challenges for Cause*

Issue 1: Billy Chancellor

Appellant first challenged Mr. Chancellor on the basis he would automatically assess the death penalty if he found the defendant guilty of capital murder, that he showed a lack of understanding of what was required of him in answering the first special issue, and that he simply parroted the prosecutor's statement that probability is "more than a mere possibility." (RR7: 193). Mr. Chancellor immediately showed an understanding of the two special issues and that the jury would have to consider those issues in determining appellant's sentence. (RR7: 147-48). Chancellor confirmed that he would not make an automatic decision, but would listen and consider all the evidence before answering the special issues. (RR7: 156-57, 161). Mr. Chancellor was not simply parroting the prosecutor; his testimony shows his understanding that the law requires probability to be more than a mere possibility, and said he could follow the law and would look to the evidence in determining whether the defendant is a future danger. (RR7: 149-50, 179-80). When questioned by the defense, he stated that he is not a person who would always vote yes on the first special issue just because he found the defendant guilty, but rather that he would evaluate all the evidence. (RR7: 173, 179-80). He also indicated on multiple occasions that he would follow the law. (RR7: 146, 161, 173, 176, 177-78).

Appellant also challenged Mr. Chancellor on the basis that he would want the defendant to show remorse for his actions, which would require him to testify. (RR7: 194). Mr. Chancellor confirmed his understanding of the Fifth Amendment and that a

37

defendant has a right not to testify. (RR7: 161-62, 175-76). Mr. Chancellor stated that he could follow the law and would not hold it against the defendant if he chose not to testify. (RR7: 162, 175-76)

Last, appellant challenged Mr. Chancellor on the basis that he could not consider certain evidence offered by the defense to be mitigating, specifically, the defendant's age or background. (RR7: 193). A venireperson is not challengeable for cause on the ground that he does not consider a particular type of evidence to be mitigating. *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007). Indeed, a party is not entitled to question a venireperson as to whether the venireperson could consider particular types of evidence to be mitigating. *Id*. In any event, Mr. Chancellor stated that he would listen to all of the evidence and answer the special issues based on the evidence. (RR7: 159-60). Based on the foregoing, the trial court did not abuse its discretion by denying appellant's challenge against Mr. Chancellor. Issue 1 should be overruled.

### Issue 2: Sheila Yrigollen

Appellant first challenged Ms. Yrigollen on the basis that she could not follow the law and hold the State to proving all of the elements beyond a reasonable doubt. (RR8: 79-80). Initially, Ms. Yrigollen stated she did not know what her verdict would be if the State proved murder but failed to prove an element, such as the county where the crime occurred. (RR8: 20-21). When explained the law and that the State has the burden of proof, she confirmed that she could follow the law and hold the State to their burden. (RR8: 21-22, 41-43). Although she gave a different answer to a long and confusing hypothetical posed to her by defense counsel, she was rehabilitated by the trial court and

38

confirmed that she would make the State prove each and every element contained in the indictment. (RR8: 77-78).

Appellant also challenged Ms. Yrigollen on the basis that she would not consider certain evidence offered by the defense to be mitigating, specifically, the defendant's age or background. (RR8: 80). Jurors, however, are not required to regard any particular type of evidence as mitigating. *See Joubert*, 235 S.W.3d at 734. Moreover, Ms. Yrigollen stated that she would keep an open mind and weigh all of the evidence in considering the mitigation issue. (RR8: 37-38).

Appellant also challenged Ms. Yrigollen on the basis she would automatically assess the death penalty if she found the defendant guilty of capital murder before she even got to the first special issue. (RR8: 80). However, Ms. Yrigollen stated that she could follow the law and not automatically give someone a death sentence just because they have been found guilty. (RR8: 23-24). She affirmed that she would keep an open mind and wait to hear all the evidence before she answered the first special issue. (RR8: 27, 32-33, 42-43).

On appeal, appellant argues that Ms. Yrigollen was also challengeable because she had a bias toward law enforcement. However, because this argument was not raised in the trial court, it is not preserved for review. *See* Tex. R. App. P. 33.1(a). In any event, Ms. Yrigollen affirmed that she would start off all witnesses equally and would not believe a police officer's testimony just because they were a police officer. (RR8: 39-40). Based on the foregoing, the trial court did not abuse its discretion by denying appellant's challenge against Ms. Yrigollen, and Issue 2 should be overruled.

Issue 3: Norma Wiley

Appellant challenged Ms. Wiley on the basis she would not be able to consider the mitigation special issue or any mitigating evidence after finding a defendant guilty and finding that he was a future danger. (RR12: 128-30). Once the special issues were explained to Ms. Wiley, she stated unequivocally that she would wait to hear all of the evidence before considering the special issues and that she would be open to considering mitigating circumstances. (RR12: 87-89). She stated that is seemed fair that she would be required to enter the punishment phase with an open mind and answer the special issues only after hearing all the evidence. (RR12: 79-80, 116).

On appeal, appellant also argues that Ms. Wiley was a strong supporter of the death penalty, believing it was sanctioned by the Bible; that she showed a bias toward law enforcement because she has two sons who are police officers; and that she would want the defendant to testify. The record reflects that these issues were not raised in the trial court and therefore are not properly before this Court. Tex. R. App. P. 33.1(a). In any event, the record shows that Ms. Wiley would not give police officers any more credibility just because they were police officers. (RR12: 90-91). Ms. Wiley understood a defendant's right to testify and affirmed she would not hold it against him. (RR12: 89-90). She also expressed on numerous occasions that she would follow the law. (RR12: 79, 88-89, 94-95, 122, 125-26). Based on the foregoing, the trial court did not abuse its discretion by denying appellant's challenge against Ms. Wiley. Issue 3 should be overruled.

Issue 4: Elizabeth Lopez

Appellant challenged Ms. Lopez on the basis of her answers on the questionnaire and in the courtroom in regards to being able to follow the law. (RR16: 83). This objection was not specific enough to preserve error for appellate review. Tex. R. App. P. 33.1(a). Nonetheless, Ms. Lopez affirmed her understanding that the State has to prove all of the elements and stated she would be able to follow the law and return a verdict of not guilty if they failed to meet their burden. (RR16: 34-36, 61-62, 82). She also stated that she would keep an open mind and listen to all of the evidence before making any decision on the special issues. (RR16: 36, 42, 46, 48, 68). Nothing in the record indicates that Ms. Lopez was not able to follow the law. As such, the trial court properly denied appellant's challenge against Ms. Lopez. Issue 4 should be overruled.

Issue 5: Cathey Young

Appellant challenged Ms. Young based on her statement that she does not believe in life without parole. (RR18: 58). Because of this statement, appellant argued that he did not believe that Ms. Young could give meaningful consideration to the mitigation evidence presented by appellant. (RR18: 58).

Ms. Young demonstrates no bias regarding life without parole. What Ms. Young actually said is that she does not believe in life in prison because of the financial burden in places on the State. (RR18: 49). However, she explained that she would look at the individual circumstances of the case and conceded that sometimes life in prison might be proper. (RR18: 49). She further stated that, as a juror, it would be her job to listen to what is presented and do what the law tells her to do. (RR18: 50). Ms. Young affirmed that she

41

could keep an open mind and listen to all the evidence before making a decision on the special issues. (RR18: 21-22, 26, 31). She also stated that she would give fair consideration to mitigating circumstances. (RR18: 30, 32-33). At every opportunity given, Ms. Young said that she could follow the law. (RR18: 19-20, 30, 34, 47). Her statements undoubtedly show that she could follow the law and examine all of the evidence, including mitigating circumstances, in determining her answers to the special issues. As such, the trial court properly denied appellant's challenge to Ms. Young, and Issue 5 should be overruled.

Issue 6: Aneta Johnson

Appellant challenged Ms. Johnson on the basis that she believed a finding of guilty to any type of premeditated, intentional act of murder would be sufficient for a sentence of death. (RR19: 132). Appellant characterized her as "death prone" and said that she equates guilt with death. (RR19: 132). Appellant also argued that, based on her answers, he did not believe she would be able to follow the law and give fair consideration to the mitigation special issue. (RR19: 132).

Ms. Johnson explained that she became more in favor of the death penalty in her thirties after having an experience with someone she knew committing an offense against a child. (RR19: 97-98). She stated, however, that she did not see her view of the death penalty as extreme and she would still be able to make a decision based on the circumstances of the case. (RR19: 98-99). And while premeditation was definitely something she considered important, she unequivocally stated that she could separate the crime itself from an automatic answer as to whether the person should receive a sentence

42

of death. (RR19: 100-01, 105-06, 129). Ms. Johnson stated numerous times that she could follow the law and that she would wait to hear all of the evidence during the punishment phase before deciding her answers to the special issues. (RR19: 78-79, 79-80, 86-87, 89, 111, 123, 127-28). Contrary to appellant's argument, Ms. Johnson confirmed she could be open, could give consideration to the mitigation evidence and could assess a life sentence if she felt it was appropriate under the circumstances of the case. (RR19: 89, 123-24, 126).

Appellant also challenged Ms. Johnson on the basis that she did not understand what constitutes capital murder as evidenced by her belief that he death penalty should not be available to anyone who was acting in self-defense. (RR19: 132). After Ms. Johnson was explained the law, she affirmed her understanding of what constitutes capital murder and even said she would not change the law as written. (RR19: 71, 99, 101-03).

On appeal, appellant also argues that Ms. Johnson was challengeable because she did not understand the meaning of "probable." However, this argument was not presented to the trial court and is not preserved for review. *See* Tex. R. App. P. 33.1(a). In any event, there is nothing in the record indicating that Ms. Johnson did not understand the meaning of probability and what was required of her in answering the first special issue. (RR19: 82). The trial court properly denied appellant's challenge to Ms. Johnson and Issue 6 should be overruled.

Issue 7: Terry Crawford

Appellant objected to Ms. Crawford on the basis that, because of her answers regarding her family and work schedule, she would not be able to devote her full attention to the case. (RR25: 73). On appeal, he also argues that she should have been disqualified because she was the only one who could use certain equipment at her job. (RR73: 50). The latter argument was not raised in the trial court and is not preserved for review. *See* Tex. R. App. P. 33.1(a).

Ms. Crawford explained that her husband, a firefighter, works 24-hour shifts and she watches their children when he is working. (RR25: 20-21). However, she stated that she has family in the area and should be able to make arrangements if selected as a juror. (RR25: 21). She also confirmed that she would be able to give the case her full attention and not be distracted by things at home. (RR25: 21). During defense questioning, she again stated that she was capable of putting personal things aside because she does it at her job all day every day. (RR25: 51-52). At the end of questioning by the State, Ms. Crawford did express some concern about being away from work for two weeks, but she was relieved when she learned she could not be fired for missing work due to jury duty. (RR25: 45-46). The trial court acted within its discretion in denying appellant's challenge to Ms. Crawford. As such, Issue 7 should be overruled.

Issue 8: Barbara Garrett

Appellant challenged Ms. Garrett for cause on the basis that she automatically equated a guilty verdict in a capital murder case with a death sentence. (RR27: 120). After the process and the special issues were explained to her, Ms. Garrett confirmed on

44

more than one occasion that she would not make an automatic decision after a guilty verdict, but wait to hear all of the evidence and consider it before answering the special issues. (RR27: 79, 87, 89-90, 113). Ms. Garrett also affirmed on many occasions that she could follow the law. (RR27: 74-76, 87, 103, 105, 116). Therefore, the trial court did not abuse its discretion by denying appellant's challenge to Ms. Garrett. Issue No. 8 should be overruled.

### Issue 9: Thomas Frazier

Appellant challenged Mr. Frazier on the following grounds: (1) that he is "death prone" and would automatically assess death; (2) that he did not seem to understand the issues and the law; and (3) that he had already made up his mind regarding the guilt of the defendant, in violation of article 35.16, section (a)(10). *See* Tex. Code Crim. Proc. Ann. art. 35.16(a)(10) (West 2006) (providing that a challenge for cause may be made against a juror if there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict).

Mr. Frazier initially stated that his knowledge of the law regarding murder and criminal trials was based on what he had seen on television. (RR27: 140). The prosecutor gave a through explanation of what constitutes capital murder in Texas, the two phases of a criminal trial, the State's burden of proof, the two special issues, the Fifth Amendment, weight to be given witness testimony, and the presumption of innocence. (RR27: 141-62). Once each of these topics was explained to him, Mr. Frazier showed a clear understanding and grasp of the law. (RR27: 141-62). Also, contrary to appellant's assertions, the record shows that Mr. Frazier would not automatically assess a death

45

sentence. Mr. Frazier confirmed his understanding that a guilty verdict does not automatically equate to a death sentence in Texas. (RR27: 157, 166). Not only did Mr. Frazier affirm that he would give consideration to mitigation evidence, he seemed eager to learn more about the defendant and his circumstances prior to deciding punishment. (RR27: 157-58). He stated he would take into account everything that he heard during the trial and would be fair in deciding the punishment. (RR27: 159). He also stated that he would never disregard any evidence that was presented to him and that he would never come to a decision based on emotion or anything that is unfair. (RR27: 179). Mr. Frazier believes in the law and stated numerous times that he would follow it. (RR27: 173, 178, 180, 188).

Mr. Frazier read between the lines of defense counsel's questioning and guessed that there was not going to be an issue of guilt in this case, only punishment. (RR27: 189-90). He said this was based on the fact that most of what had been said by defense counsel was regarding punishment. (RR27: 190). However, Mr. Frazier stated that it did not make a difference to him and, as a juror, he would have a duty to make his decision based solely on the evidence. (RR27: 190). Specifically, he stated: "As a juror, I can't...say that he's guilty at this point. I've got to wait. I don't have no way of knowing. And only ...at that point after – if there is a verdict of guilty, then and only then can I go back and consider the other aspect." (RR27: 191). Mr. Frazier's statements throughout the proceeding demonstrate that he had not yet formed an opinion as to the defendant's guilt, would do his job as a juror, follow the law and wait to hear all of the evidence

before rendering a verdict. Therefore, the trial court did not abuse its discretion in overruling appellant's challenge to Mr. Frazier. Issue 9 should be overruled.

Issue 10: Sreenivasareddy Thallapareddy

Appellant challenged Mr. Thallapareddy because he did not believe he could follow the law. (RR29: 70). This objection was not specific enough to preserve error for appellate review. Tex. R. App. P. 33.1(a). In any event, Mr. Thallapareddy's answers during questioning indicated otherwise. Mr. Thallapareddy confirmed that he could follow the law and hold the State to their burden of proof at guilt. (RR29: 43-45, 56, 65-66). He confirmed that he could follow the law and listen to all of the evidence before answering the special issues. (RR29: 45-46, 49, 57). He confirmed that he could follow the law and hold the State to their burden of proof on the first special issue. (RR29: 51, 57, 69). He also stated that he could follow the law on the second special issue, keep an open mind and spare someone's life if he heard sufficiently mitigating evidence. (RR29: 54-56, 58, 67-68). As such, the trial court properly overruled appellant's challenge to Mr. Thallapareddy. Issue No. 10 should be overruled.

Issue 11: William Ogle

Appellant challenged Mr. Ogle on the basis that he could not consider certain mitigating evidence, namely genetics, circumstances of birth, upbringing, and environment. (RR30: 76-77). However, as previously stated, jurors are not required to regard any particular type of evidence as mitigating. *See Joubert*, 235 S.W.3d at 734. In any event, Mr. Ogle stated unequivocally that he could give meaningful consideration to mitigation evidence. (RR30: 72-76). He also stated numerous times that he would follow

47

the law, keep an open mind and would listen to all of the evidence in determining his answers to the special issues. (RR30: 40, 41, 45-46, 48-49, 64, 71). Mr. Ogle even stated his belief that "not in every case do I think that you should get the death penalty for capital murder." (RR30: 56).

On appeal, appellant also argues that Mr. Ogle was challengeable because (1) he would automatically assess death if the defendant was found guilty of capital murder, and (2) he thinks the death penalty should be reserved for "multi-murder" capital offenses, such as the base at bar. These arguments were not presented to the trial court and therefore are not preserved. *See* Tex. R. App. P. 33.1(a). Thus, the trial court properly denied appellant's challenge to Mr. Ogle. Issue 11 should be overruled.

Issue 12: Charla Moe

Appellant challenged Ms. Moe because on her questionnaire she stated that she would not consider the factors listed in the mitigation issue, but changed her answer when she was questioned. (RR31: 161). Appellant seemed to be arguing at trial, and is now arguing on appeal, that she would automatically assess the death penalty after finding the defendant a future danger and would not give meaningful consideration to mitigation evidence.

The record demonstrates that Ms. Moe knew nothing about the law or process governing a capital murder trial prior to the voir dire proceedings. (RR31: 131-32, 141, 148, 149, 154). She stated that she understood the second issue much better after the prosecutor's explanation and that she now believes there are circumstances that would change her thoughts on mitigation from what she originally wrote on her questionnaire.

48

(RR31: 131-32, 141, 154). Ms. Moe affirmed that she would be able to keep an open mind and give fair consideration to all of the evidence presented, including those factors listed, in determining her answer to the second special issue. (RR31: 129-32, 146, 148, 149, 159). She also stated multiple times that she could follow the law. (RR31: 121-22, 131-32, 159). There is nothing wrong with Ms. Moe changing her opinion once she had all the necessary information and was informed of the law. Moreover, all that is required of her is that she is able to follow the law, which she stated she could do. Therefore, the trial court did not abuse its discretion is overruling appellant's challenge to Ms. Moe. Issue 12 should be overruled.

Issue 13: Jackie Brewer

Appellant challenged Mr. Brewer on the basis that he gave answers during the voir dire proceedings that conflicted with the answers in his questionnaire and because he would not give meaningful consideration to mitigation evidence. (RR32: 103-04). After learning more about the law and the second special issue, Mr. Brewer said that he could keep an open mind and consider all of the evidence, including the factors listed, in deciding the mitigation special issue. (RR32: 70-71, 72, 93, 94-95). Specifically, he said he "could swing from the death penalty to life in prison" if the evidence "hit [him] in the right way." (RR32: 68-70). Appellant argues on appeal that Mr. Brewer had difficulty even imagining under what circumstances he could change his mind from a death sentence to a life sentence. However, a juror is not required to give examples of factors they view as mitigating. *Threadgill*, 146 S.W.3d at 668.

49

Mr. Brewer also showed that he could follow the law and that he would not make automatic decision, but would wait to consider all of the evidence before determining his answer to the two special issues. (RR32: 60-61, 62, 66, 71, 80). To the extent that his answers on the questionnaire differed from those at the voir dire proceedings, this was entirely proper after being informed of the applicable law. Accordingly, the trial court did not abuse its discretion by denying appellant's challenge to Mr. Brewer. Issue 13 should be overruled.

Issue 14: Lisa Hensley

Appellant objected to Ms. Hensley on the basis that she is death prone and would automatically assess a death sentence if she found the defendant guilty of capital murder. (RR39: 52). However, contrary to appellant's argument, Ms. Hensley indicated that she would not make an automatic decision, but would wait to hear all of the evidence presented at punishment. (RR39: 21-22). She even stated that she agreed with the process because, in some cases, there could be "extenuating circumstances" that should be considered that might warrant a life sentence. (RR39: 43-44). She also indicated on multiple occasions that she could follow the law. (RR39: 19-20, 22, 28, 38, 40-41). The court properly overruled appellant's challenge to Ms. Hensley. As such, Issue 14 should be overruled.

Issue 15: Debra Story

Appellant objected to Ms. Story too on the basis that she is death prone and would automatically assess a death sentence if she found the defendant guilty of capital murder. (RR: 140-41). Again, contrary to appellant's argument, Ms. Story indicated that she

50

would not make an automatic decision, but would be open and listen to all of the evidence before answering the special issues. (RR41: 71-73, 91, 94, 95, 114, 123, 125). She indicated that "it's a very big responsibility" and she believed it was important to hear everything before deciding whether someone lives or dies. (RR41: 84, 138). Each time she was asked, she stated she would do what was required of her and follow the law. (RR41: 81, 111, 120, 123, 137). ON appeal, appellant also argues that Ms. Story was challengeable because she had a bias toward law enforcement. However, because this argument was not presented to the trial court, it is not preserved for review. *See* Tex. R. App. P. 33.1(a). The trial court properly overruled appellant's challenge to Ms. Strong. Issue 15 should be overruled.

### *Conclusion*

Appellant has not shown even one erroneous ruling on his challenges for cause, much less three erroneous rulings. Therefore, he has not shown this Court that he was denied the use of a statutorily provided peremptory strike. Issues 1 through 15 should be denied.

### ISSUES 16 & 17: CONSTITUTIONAL RIGHT TO FAIR AND IMPARTIAL JURY

In Issues 16 and 17, appellant contends the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury and that he suffered a violation of his rights under the state and federal constitutions and under article 35.16 of the code of criminal procedure.

Appellant's contentions are meritless. His argument is founded on inapposite authority, i.e., caselaw relating to the erroneous granting of a State's challenge for cause

51

rather than the denial of a defense challenge. (App. Brief, pp. 73-75). Under controlling precedent, a defendant's use of a peremptory strike to "cure" an improper denial of a challenge for cause does not violate due process. *See United States v. Martinez-Salazar*, 528 U.S. 304, 317, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). Moreover, appellant has not shown that the trial court's rulings on his challenges resulted in the seating of a juror who was biased or prejudiced. This Court should overrule Issues 16 and 17.

## ISSUE 18: ADMISSIBILITY OF APPELLANT'S CONFESSION

In Issue 18, appellant contends that the trial court erred in overruling his objection to the introduction of his videotaped statement to police. Appellant contends that, because he did not expressly waive his rights, his statement was involuntary and therefore its admission violated article 38.22 of the Code of Criminal Procedure and *Miranda v. Arizona*. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West Supp. 2011); *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

### *Pertinent Facts*

Appellant voluntarily turned himself into a police substation the night of the offense. After being treated at Parkland Hospital, he was taken to Dallas Police Headquarters where he was interviewed by homicide detective Robert Quirk. (RR47: 30). At the start of the interview, Detective Quirk introduced himself and asked appellant if he needed anything (i.e., water, bathroom break, or cigarette). (RR47: 31; State's Exhibit 92 at 1-3). The following exchange then occurred:

O: Umm...before we start I need to read you your rights though, ok?

O: Let me read them to you...you follow along with me...ok?

52

O: Do you want to read these while I do this? You can. Ok.

O: You have the right to remain silent and not make any statement at all. Any statement you make may be used…may be used against you at your trial. Any statement you make may be used as evidence against you in court. You have the right to have a lawyer present to advise you prior to and during any questioning. If you are unable to employ a lawyer you have a right to have a lawyer appointed to advise you prior to or during any questioning. And you have the right to terminate the interview at any time. Do you understand your rights?

G: Yes, sir.

O: Yes?

G: Yes.

O: Ok. Umm. Like I said I got a whole lot of unanswered questions. And I'd like to talk to you about all this. Are you good with that?

G: Yes, sir.

(State's Exhibit 92 at 3).

Prior to trial, appellant objected to the admission of his statement to police on the basis that he did not make a knowing, intelligent, and voluntary waiver of his rights under article 38.22 and *Miranda*. (RR45: 47-49). The court held a *Jackson v. Denno* hearing to determine whether appellant's statement to Detective Quirk was voluntary and thus admissible. *See Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The trial court found that appellant understood his rights, voluntarily waived those rights and made his statement to police voluntarily. (RR45: 61-62). The videotaped statement was admitted at trial, as well as a typed transcript of the interview. (RR47: 32; State's Exhibits 91 and 92).

53

## *Applicable Law*

In reviewing a trial court's decision on the admission of a confession, an appellate court defers to the trial court's determination of historical facts while reviewing the trial court's application of law de novo. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). The trial court, as the sole trier of fact, evaluates the credibility of the witnesses and determines the weight to be given to their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007).

Article 38.22 of the Code of Criminal Procedure establishes procedural safeguards for securing the privilege against self-incrimination. *See* Tex. Code Crim. Proc. Ann. art. 38.22; *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). Among its requirements, it provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless (1) the statement was recorded and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. Tex. Code Crim. Proc. Ann. art. 38.22, § 3. To satisfy the requirements of article 38.22, the State must prove by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See Miranda*, 384 U.S. at 444; *Joseph*, 309 S.W.3d at 24.

Appellant concedes that he was warned of his rights. Indeed, the warnings given by Detective Quirk included all of the rights found in *Miranda* and Article 38.22. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. Ann. art. 38.22, § 2. Nonetheless,

54

appellant claims that because he did not make an "express" waiver, he did not knowingly, intelligently and voluntarily waive his rights. However, this argument is contrary to the general rule that neither a written nor an oral express waiver is required. *Joseph*, 309 S.W.3d at 24 (citing *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988)). While a valid waiver of rights will not be presumed from the silence of the accused after warnings are given, a waiver need not assume a particular form and, in some cases, a "waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)).

The proper inquiry is not whether appellant explicitly waived his *Miranda* rights, but rather whether the waiver was knowing, intelligent, and voluntary under the standard outlined in *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). *See Joseph*, 309 S.W.3d at 25. Under this standard, a court must determine whether: (1) the relinquishment of the right was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141. "Only if the totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id.* The totality-of-the-circumstances approach requires consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and

55

conduct. *Joseph*, 309 S.W.3d at 25 (citing *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

### The Trial Court Properly Admitted Appellant's Statement

In the present case, the record supports a conclusion that appellant's waiver resulted from a free and deliberate choice without intimidation, coercion, or deception. The record shows that, after receiving the warnings and indicating that he understood them, appellant participated in an interview which lasted over an hour and he did not ask for an attorney or to terminate the interview at any time. Appellant was offered water, a cigarette, and a bathroom break. Detective Quirk did not threaten appellant or use physical or psychological coercion and did not make him any promises in order to obtain the statement. In fact, it was appellant who came to the police station voluntarily, and his conduct throughout the interview demonstrates that he was eager to talk to Detective Quirk about the offense and his motivations behind the murders. Thus, the totality of the circumstances surrounding the interrogation shows appellant's waiver was voluntary.

In addition, the record shows that appellant's waiver was made with full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. At the start of the interview, Detective Quirk read appellant the *Miranda* warnings. Detective Quirk showed appellant a card containing the written warnings and asked appellant to read the warnings along with him. As stated in *Joseph*, the warnings read by Detective Quirk made appellant aware of the rights set forth in Article 38.22, as well as the consequences of abandoning those rights. *Joseph*, 309 S.W.3d at 27. When asked if appellant understood his rights, appellant replied, "Yes, sir."

Detective Quirk then stated, "Like I said I got a whole lot of unanswered questions. And I'd like to talk to you about all this. Are you good with that?" Appellant responded, "Yes, sir." By indicating his understanding of the rights and then freely answering the detective's questions without ever asking the interview to cease, appellant's conduct undoubtedly demonstrated his awareness of his rights and a knowing waiver of those rights. *See, e.g., Gately v. State*, 321 S.W.3d 72, 78 (Tex. App.—Eastland 2010, no pet.) (finding that although the defendant never expressly waived his rights, a waiver could be inferred from his affirmation that he understood his rights and his willing participation in the interview immediately after being warned of his rights); *Turner v. State*, 252 S.W.3d 571, 583 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (finding defendant validly waived his rights when he affirmed that he understood his rights and proceeded to answer questions); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.—San Antonio 2000, pet. ref'd) (finding that despite lack of explicit waiver, accused knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder). In addition, appellant was not a novice to the criminal justice system at the time of the interview, as he had already been to prison twice and had given a voluntary confession to aggravated robbery in 1990. (RR45: 56-58).

Based on the totality of the circumstances in this case, the record supports the trial court's finding that appellant knowingly, intelligently, and voluntarily waived his rights in accordance with *Miranda* and article 38.22. Therefore, the trial court did not err by

denying appellant's motion to suppress and by admitting the videotaped statement into evidence.

### *Error, If Any, Was Harmless*

Even if there were error in the admission of appellant's statement into evidence, any such error would be harmless beyond a reasonable doubt. *See Dowthitt v. State*, 931 S.W.2d 244, 263 (Tex. Crim. App. 1996). There was overwhelming evidence proving appellant committed the murders, even without his statement. The neighbor, Latasha Bradfield, saw appellant and Lovetta's car at the house when she came home the night of the offense. A short time later, JT and Jerrett ran to her house and told her that appellant had killed their mother and sister. When Latasha went next door to investigate, Lovetta was lying dead on the floor of her bedroom and appellant and Lovetta's car were both gone. All of this was captured on the 911 tape, which was played at trial. At the crime scene, the police found several murder weapons and a handwritten note from appellant to Lovetta in which he outlined his premeditated plan to kill her and her three children. There was no evidence of forced entry at the house. JT and Jerrett both testified that appellant showed them the dead bodies of their mother and sister and admitted to them that he killed their mom because she was planning to divorce him and he "loved her to death." The DNA profile obtained from Lovetta's fingernail clippings and vaginal swab matched appellant. Thus, even without appellant's statement, there was overwhelming evidence of his guilt. As such, any error in the admission of the statement was harmless, and Issue 18 should be overruled.

## ISSUES 19-24: JURY ARGUMENT

### *(1) Improper Jury Argument*

In Issues 19 and 21, appellant contends that the trial court erred in denying his objections to the State's closing argument. Appellant, however, fails to show that either of the complained-of arguments were improper.

Applicable Law

The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone and not on any fact not admitted into evidence. *Campbell v. State,* 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980). Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Freeman v. State,* 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). Counsel is generally afforded wide latitude in drawing inferences from the record, as long as the inferences are reasonable and offered in good faith. *Coble v. State,* 871 S.W.2d 192, 205 (Tex. Crim. App. 1993) (en banc).

Even when an argument exceeds the permissible bounds of these approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Id.* An

59

instruction to disregard, which the jury is presumed to follow, will generally cure the improper argument. *Id.*; *Colburn*, 966 S.W.2d at 520.

Issue 19

In Issue 19, appellant contends that the trial court erred in overruling his objection to the State arguing outside the record in the guilt-innocence stage of trial. The complained-of argument went as follows:

> (BY MS. BENNETT): Can you even imagine what she went through, all the while knowing that her little baby girl was laying there on the bed watching this? Can you even imagine what the last moments of her life must have been like? And all the while, while she's being stabbed and bleeding and choked, wondering what is to become of her family at that point.

> And it didn't end there, did it? Because the monster wasn't done yet. Can you imagine the last hours of this little girl's life? When she got home with her mom and went into her room, did she get up on her bed and play with her dolls, or was she on the floor working on her school work when the monster walked into her room? What was she saying and what was she thinking when he put that duct tape over her mouth? And when he told her everything is going to be okay, as he was putting her arms behind her back and binding her feet, and what was she thinking about when she laid on that bed? Did he tie her to that bed with that phone cord to make her stay, or did she just stay because she didn't know what else to do while she laid there and watched her mother beg and plead for her life and get stabbed and choked and God knows what else happened in that bedroom that night while that little girl watched.

> Can you imagine what she must have been thinking when this man picked her up and took her over her dead mother's body into that bathroom, that bathroom covered in blood, her mother's blood? The man that had blood all over his face took her, and while he filled up that bathtub with water, was he talking to her? Was she crying.

> MR. JOHNSON: Excuse me, Judge. Your Honor, I'm going to object -- I'm going to object to the entire tone of the argument. This -- the issue is guilt and guilt alone. And the argument prosecution is presenting to the jury has no relation to the issue of guilt of the Defendant. We're going to object

60

to this opinion. It's outside the scope of this -- this portion of the proceeding. We're going to object to it.

THE COURT: And it's overruled. It's – it's – what the attorneys say is not evidence. It's simply a closing argument.

(RR48: 12-14).

Neither defense counsel nor appellant explains how the State's argument fell outside the record or why it was improper. Because appellant's trial objection lacked sufficient specificity to make the trial court aware of the complaint, this issue was not properly preserved for appellate review. Tex. R. App. P. 33.1(a). In addition, appellant fails to make any argument or cite any caselaw in support of his position that this argument was improper. Rule 38.1 of the Texas Rules of Appellate Procedure requires that a brief contain a clear and concise argument for the contentions made with appropriate citations to authorities and to the record. Tex. R. App. P. 38.1(h). Because appellant has wholly failed to make a clear argument and cite appropriate authorities, his argument is inadequately briefed and should be summarily denied.

Even if the State can assume that appellant is complaining about the State's characterization of the offense from Lovetta's and Jazzmen's perspective, this argument fell within the permissible areas of argument. Appellant's confession indicated that, while Lovetta read his letter, he went to Jazzmen's bedroom, duct-taped her hands, legs, and mouth and told her that everything was going to be okay. He then brought Jazzmen into the master bedroom and laid her on the bed, where she was forced to watch appellant struggle with her mother for an over an hour and stab her nearly thirty times. It was a reasonable deduction from the evidence that Lovetta put up a significant fight because

she knew, from appellant's letter and from Jazzmen's presence in that room, that Jazzmen was his next victim. It was also a reasonable deduction that Jazzmen, who was only six years old at the time, was terrified by having to watch her mother's murder and fear that she was next.

The argument in this case is similar to one made by the prosecutor in *Linder v. State*, 828 S.W.2d 290, 302-03 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). In *Linder*, the court found the following argument to be proper:

> "Can you imagine what it's like to know that someone has gone into your home … Imagine what it's like and what kind of person it takes to go back and pick up an innocent defenseless woman whose son is sleeping right next to her … Can you imagine what it was like to be that woman?"

*Linder*, 828 S.W.2d at 303. The appellate court noted that each detail was a summation of the evidence of the record and it focused on the defendant's blameworthiness. Accordingly, it was a legitimate appeal to the jury to apply their general knowledge and experience to the evidence adduced at trial. *Id.*

Likewise, here, each detail in the prosecutor's argument was either a summation or reasonable deduction from the evidence, most of which came from appellant's own statement describing the offense. The State was appealing to the jury to apply their general knowledge and experience in deducing the degree of terror experienced by the victims at the hand of the defendant. This was entirely appropriate. *See Linder,* 828 S.W.2d at 302-03; *see also Torres v. State*, 92 S.W.3d 911, 920-22 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (finding prosecutor's argument stating "I want you to close your eyes and think of how that young man felt" asked the jury to make reasonable

62

deductions from the evidence regarding the degree of terror and pain experienced by the complainant shortly before his death and was permissible). Therefore, the trial court did not err by overruling appellant's objection to this argument.

Issue 21

In issue 21, appellant contends the trial court erred in overruling his objection to the State's closing argument in the guilt-innocence stage of trial. Specifically, appellant complains about the following:

> (BY MR. HARRIS): I want to talk to you about and ask you to recall, you know, when -- when he's back there with Lovetta and she's trying to find, you know, some decency, she's trying to tell him, you're a good man, you're not a monster, but she was wrong. Almost 30 stab wounds. Remember, he said we tussled for an hour and a half? About an hour and a half, they tussled in that bloody bathroom. She's trying to not only save her life, but at least don't kill Jazzmen, stab the baby, as her baby lays on the bed basically hogtied with duct tape. You know, can you imagine what it must have been like for Lovetta, a mother? You know, even after you take those first few stab wounds, what it must have been like for a mother.
>
> MR. JOHNSON: Your Honor, again, I'm going to object. I want the record to formally reflect that I believe this -- the entire scope of this argument is outside the issue as to the guilt or innocence of the Defendant and it is improper. And I think the Court certainly has within its discretion the ability to limit argument to the issue before the trier of fact at the particular time. This is the guilt phase, not the punishment phase --
>
> MR. HARRIS: Judge, I'll move on.
>
> THE COURT: I understand. Record's made. Okay.
>
> MR. HARRIS: I want you to -- when you think about the horror that Gary Green inflicted and who we're dealing with, who we're talking about, and what type of person can look into the eyes of this little girl -- what type of person can look into the eyes of this little girl --

63

MR. JOHNSON: Judge, again, I'm going to renew my objection at this point in time. This argument is completely outside the scope of guilt argument.

THE COURT: Objection's overruled.

MR. JOHNSON: And I'd ask that – I'd ask that – I'm sorry, Mr. Harris. So I'd ask that so I don't be required -- and I apologize for interrupting --

THE COURT: You want a running objection?

MR. JOHNSON: I want a running objection to the entire argument.

THE COURT: All right. You have a running objection. I think if -- I think that it's going to cross -- crosses the line, I will, at that time sustain an objection.

(RR48: 23-25).

Neither defense counsel nor appellant explains how the prosecutor's statements were improper. Defense counsel's vague objection and request for a blanket "running objection" to the entire argument was not specific enough to preserve this error for appeal. Tex. R. App. P. 33.1(a). Additionally, this issue is inadequately briefed and should be summarily denied. Tex. R. App. P. 38.1(h).

Nonetheless, the record reflects that each detail in the argument was a summation or reasonable deduction from the evidence presented at trial. Appellant explained in his statement that, when he brought Jazzmen into the bedroom, Lovetta began to plead with him and told him that he was a good man. As previously stated, it's a reasonable deduction from the evidence that Lovetta fought to save Jazzmen, who was lying helpless on the bed. The prosecutor merely illustrated the circumstances of the offense for the jury and asked that the jurors imagine the terror that the victims felt. *See Palermo v. State*, 992

64

S.W.2d 691, 696 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (stating that the prosecutor has the right to vividly recount the events and, by way of illustration, personalize the circumstances of the crime). Further, by talking about the kind of person it takes to look a six-year-old-girl in the eye and drown her, the prosecutor was focusing on the heinousness of the crime. This was permissible jury argument. *See Torres*, 92 S.W.3d at 920-22; *Linder*, 828 S.W.2d at 302-03. Therefore, the trial court did not err by overruling appellant's objection to this argument.

### *(2) Denial of Motion for Mistrial*

In Issues 20, 22, 23 and 24, appellant contends that the trial court erred in denying his motions for mistrial. His contentions are without merit.

#### Applicable Law

An appellate court reviews the trial court's denial of a motion for mistrial under an abuse-of-discretion standard. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Hawkins*, 135 S.W.3d at 77; *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). A mistrial should only halt trial proceedings when an error is so prejudicial that continuing the trial would be wasteful and futile because an impartial verdict cannot be reached or a conviction would have to be reversed on appeal due to obvious error. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). The particular facts of the case determine whether an error requires a mistrial. *Id.*

Issue 20

In Issue 20, appellant contends that the trial court erred in denying his motion for mistrial when the prosecutor argued improperly in the guilt-innocence stage of trial. During closing argument at the guilt-innocence phase, defense counsel made the following argument:

> MR. JOHNSON: May it please the Court. Counsel. Ladies and gentlemen, I'm going to be extremely brief in my comments to you. I would like to take this opportunity to thank you again for being here and having to go through what you've had to listen to in this courtroom.
>
> I don't really understand exactly what the purpose of these proceedings are this morning, other than I thought both sides would probably stand up and tell you that there's really no issue in dispute here for you to decide this morning. I think they're in voir dire process, and I think I spoke to pretty much to all of you or most of you individually and we told you that through this process when we came before you and entered a formal plea of not guilty, that means we were going to hold the State to come in here and do the things they had to do to entitle them to a verdict of guilty.
>
> Folks, I can't stand before you and tell you and argue in good faith that they failed to do so. I understand what this verdict is about to be. The important thing this morning is just to remind you and to -- and to impress upon you, because I don't like to stand up and object when someone is giving a closing statement, but that entire statement that I just heard was not about the evidence in this case in relation to guilty or not guilty. The State's trying to get a leg up on this thing in the punishment case. They want to show you pictures. They want to remind you of the horrible things that happened. But, folks, the issue of who did this is really -- is it really in dispute? Is there anything else that the State can get up here and say to you that relates to the issue of guilt, or is it just an effort to try to inflame your passion?
>
> Every one of you told us that you understood the process. The first portion is just to decide whether or not the Defendant is guilty. And we pretty much told you in voir dire that the Defendant was guilty. I think all of you as you came through this process, you expected what you were going to hear was a situation where the proof was undeniable. And it has been. But every one of you assured us that you understood that this process does not allow you to

66

go back and become inflamed by what you hear about the crime itself and blind you to the next portion of this process.

And the State comes before you now and says, Mr. Johnson interjects these things about Timberlawn. Well, I suggest to you, folks, that the State suggested a whole lot of things to you that they failed to prove in regards to the factual basis of what led up to this incident.

And whether they do so or not, we'll see in the next few days, because the next few days are going to be the days that are going to be -- contain the evidence that I think is going to be germane and relevant to this issue.

So as I sit down now and fully expecting you to return a swift verdict, because I don't know if there's any other kind of verdict that would be appropriate, considering the type of evidence we have. I wonder what the State can say to you now that has anything to do with the issues in this portion of the case or whether or not they're just going to sit here and try to show you crime scene photos to inflame you. I'm going to ask that nobody be blinded by what takes place. I expect you're going to go back and find my client guilty. And once that happens, then I expect we'll go on to the punishment phase of this process. And I appreciate -- I appreciate and I hope and I trust that all of you are going to give us the consideration in the punishment phase of this trial that you assured us that you would do. Thank you.

(RR48: 17-19). In response to this argument, the prosecutor started his closing argument

with the following:

MR. HARRIS: Blind you? Ladies and gentlemen, we told you from the beginning that this was a horrific case, and that we start off with the guilt and innocence phase and then we move to the punishment phase. And in that punishment phase you would do what? You'd be asked to reconsider some of the evidence from the guilt and innocence phase. Remember, you got those two special issues you got to address? You got those two special issues you got to address. We told you that there would come a time when you would have to reconsider the evidence from the guilt and innocence phase. That's what we're talking about right now.

MR. JOHNSON: Judge, I want to object, that is absolutely improper --

THE COURT: Sustained.

67

MR. JOHNSON: -- and I'm going to ask the jury to be instructed.

THE COURT: Jury, do not even consider the second half of this. Don't consider it. Don't think about it. I -- I cannot be clearer, that there is time and place. This is guilt and innocence only.

MR. JOHNSON: And I'm asking –

THE COURT: Guilt and innocence only.

MR. JOHNSON: And I'm asking – I'm asking – at this time, Your Honor, I'm going to move for a mistrial based on that argument.

THE COURT: It's denied. Jury, I've instructed the jury to disregard. I know they will. Sometimes the -- sometimes you hear things and there's just an instruction to say – it's like the Jedi mind trick, these are going like that. And you don't -- just -- you put it out of your head and you don't think about it, because why? Now is not the time and place, so in the – I trust that you will not think about it in considering your verdict of guilty or not guilty. And that you will wait until the appropriate time to think about the two special issues that are down the road. So we'll wait for that until –

(RR48: 20-21).

Defense counsel's vague objection that the argument was "improper" was insufficient to preserve this issue for appeal. Tex. R. App. P. 33.1(a). Further, because appellant makes no specific argument as to why the prosecutor's statement was improper, this issue is inadequately briefed and should be denied. Tex. R. App. P. 38.1(h).

Despite appellant's inadequate briefing, the State will attempt to address this complaint. The State presumes that appellant is complaining about the prosecutor's mention of the two special issues at the start of his closing argument at guilt-innocence. It is generally improper for the State to comment on punishment during the guilt-innocence stage of the trial. *See McClure v. State*, 544 S.W.2d 390, 393 (Tex. Crim. App. 1976); *Cherry v. State*, 507 S.W.2d 549 (Tex. Crim. App. 1974). However, not every reference

68

to punishment at the guilt-innocence stage is improper. *See Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986) (prosecutor's argument stating "I believe (sic) that y'all know that the real reason we tried this case was not to determine guilt or innocence, but to determine what kind of punishment that is going to be set on this particular kind of crime" was harmless when the context surrounding the remark emphasized the overwhelming evidence of guilt and not punishment); *see also Barnes v. State*, No. 01-01-01086-CR, 2002 Tex. App. LEXIS 7602, at *2 (Tex. App.—Houston [1st Dist.] Oct. 24, 2002, no pet.) (not designated for publication) (holding prosecutor's isolated argument referencing punishment was not improper because it was responsive to evidence in the record and was not intended to inflame the jury).

Here, the record shows that the prosecutor was responding directly to the argument of defense counsel. During argument, defense counsel conceded guilt and basically told the jury not to dwell on the heinous facts of the offense, that the determination of guilt was a waste of time and not the real issue, and that the verdict in the guilt-innocence phase should be decided quickly. The prosecutor's argument was a direct response to that. The prosecutor's argument did not encourage the jury to ignore their duties to decide guilt or innocence, nor did it suggest that punishment was the only real issue. To the contrary, the prosecutor was urging the jury to remember and consider all of the facts of the offense and not just return a swift and unthoughtful verdict, as defense counsel suggested. He was also reminding the jury that the facts were not only important at this phase of the trial, but also at the next phase, which defense counsel was so anxiously previewing. Specifically, the prosecutor stated: "We told you that there

69

would come a time when you would have to reconsider the evidence from the guilt and innocence phase. That's what we're talking about right now." (RR48: 20). Thus, the argument was in answer to opposing counsel's argument and was not improper. *See Wesbrook*, 29 S.W.3d at 115 (a permissible area for jury argument is answer to argument of opposing counsel); *see also Wright v. State*, 178 S.W.3d 905, 930-31 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (holding prosecutor's argument referencing the punishment phase was not improper because it did not encourage the jury to ignore their duties to decide guilt or innocence nor suggest that punishment was the only real issue, but rather was made in response to defense counsel's argument that appellant acted in self-defense).

In any event, the trial court sustained appellant's objection and gave a prompt curative instruction, reminding the jurors that the only issue for their consideration at this stage was guilt or innocence. (RR48: 20). Ordinarily, any harm from a prosecutor's remarks on punishment during the guilt-innocence stage of trial will be cured by an instruction to disregard. *See McClure*, 544 S.W.2d at 393. Therefore, the trial court did not abuse its discretion in denying appellant's motion for mistrial.

Issue 22

In Issue 22, appellant contends that the trial court erred in denying his motion for mistrial when the prosecutor improperly argued in the guilt-innocence stage of trial. Specifically, he complains about the following portion of the prosecutor's argument:

> (BY MR. HARRIS): But, again, he doesn't stop there. Now he showers. He puts on all black. All black. That's the evidence in this case. Why all black? Grim reaper? He knows exactly what he's doing. He's carrying out his

70

manuscript. He's carrying out his plan. And the reality of it, ladies and gentlemen is, see, once he does that, once he brings Jazzmen in that room -- remember, all that week, oh, Lovetta, she wouldn't listen. Oh, she wouldn't listen. Oh, she listened when he walked Jazzmen in that room. She listened then. Oh, she told him, I love you, I love you. Oh, it's a reasonable deduction from the evidence that she told him, I love you. We can work this out. I just need time. See, she would have said anything. She would have done anything for him to stop. But that's domestic violence.

But it doesn't stop there. He puts his black on and he goes up to the church. He goes to the church. That's the evidence in this case. And he goes and gets Jerrett and he goes and gets JT. He's sitting in church and not -- not just talking about some little old small church. You're talking about a huge cathedral of worship. He's sitting in the church waiting on the boys. That's the predator we're talking about.

When the boys come, what did y'all -- what did y'all talk about in church today? That's the cold-hearted monster we're talking about.

THE COURT: We're outside the scope of this case.

MR. HARRIS: That's what the boys told you, ladies and gentlemen. That's what the boys told you. He said, what did y'all learn in church today as he drove them back to their home where their mother and their sister lie dead in the bathroom. He drove them back to the home to --

THE COURT: And these are not issues of guilt and innocence. It's not going to show intentional or knowing, or that this was part of the same criminal episode.

MR. HARRIS: He intentionally wrote out – he intentionally sat down, put pen to paper, he intentionally wrote out exactly what he was going to do. He knowingly went to that church. He intentionally took those boys back to that house to finish off his plan.

THE COURT: Well, okay. Stop. We have a running objection that he's not on trial for assaulting the boys. If he was on trial for assaulting the boys, I -- I -- remember, it's not -- these are not --

MR. HARRIS: I'll move on.

THE COURT: -- not issues for guilt or innocence. The jury will disregard.

71

(RR48: 27-29).

Appellant did not object to this testimony, and his running objection did not extend to the prosecutor's summation of same transaction contextual evidence.[1] In addition, defense counsel did not move for a mistrial or obtain ruling. As such, this issue has not been preserved for appellate review. Tex. R. App. Proc. 33.1(a). Further, because appellant has failed to explain why the argument was improper or cite relevant caselaw, the issue is inadequately briefed and should be denied. Tex. R. App. P. 38.1(h).

Should this Court examine this issue, despite the fact that it is not preserved or adequately briefed, the record reflects that appellant's argument was a proper summation of the evidence. The testimony of JT and Jerrett was same transaction contextual evidence and entirely admissible. Indeed, their testimony came in at trial without objection. As such, it was proper for the prosecutor to include this evidence during his summation of the evidence at closing. Even assuming there was any error in the prosecutor's argument, this error was cured by the trial court's actions in sua sponte sustaining appellant's running objection and instructing the jury to disregard.

Issues 23 and 24

Last, in Issues 23 and 24, appellant contends the trial court erred in denying his motion for mistrial when the prosecutor improperly argued in the guilt-innocence stage of the trial. The complained-of argument was as follows:

---

[1] Appellant's running objection seemed to pertain only to jury argument speculating about what appellant or his victims were feeling at the time of the offense.

MR. HARRIS: Ladies and gentlemen, there is no doubt that Gary Green is a capital murderer. You knew that from the time you heard the 911 tape and you hear those boys on there yelling, he killed my mamma, he killed my mamma and my little sister. You knew that then. From the time those boys walked in, you knew exactly what happened. Now, we're just simply asking -- you make it official. You put the world on notice that Gary Green is a capital murderer. And just as he told you in his confession, he's a capital murderer that deserves the death penalty --

THE COURT: Okay --

MR. JOHNSON: Judge --

MR. HARRIS: That's what --

THE COURT: All right. That's it. That's it. We're done with closing argument. All right. Ladies and gentlemen, sometimes we're going to have -- we got ahead of ourself. It's okay. Sometimes we get ahead of ourselves. Emotions are running high, but it's not time -- it's just not time for that, okay? This is guilt or innocence. That's all we can talk about at this time. I'm going to ask that you retire back to the jury room, and if you need any evidence whatsoever, ask for it, and we will -- we'll make sure that it is provided to you in this matter.

Read the charge, elect a foreman. The time is now yours. You will have all the time you need to deliberate. If you need to take breaks, take a break. If you -- but the only thing that I do ask is that you all deliberate all together, okay? You can't -- three can't go downstairs, three can't hang out up here. Anyway, deliberate all together, if you would.

MR. JOHNSON: Your Honor -- Your Honor, if I may --

THE COURT: Not right now. I will give you all kinds of opportunity to make a record, but I'm going to excuse the jury.

MS. LAMBERT: Judge, what about the alternates?

THE COURT: I will take care of that, too.

MS. LAMBERT: They can't leave the building.

THE COURT: I know. Please go -- go with the bailiff.

73

THE BAILIFF: All rise.
(Jury excused from courtroom.)

THE COURT: Okay. We're pulling the alternates. We have that already -- already planned.

MR. JOHNSON: Your Honor, I'm required in the presence of the jury to secure a ruling, not only to the objection of that comment, but also to secure the Court's admonishment to the jury that they be instructed to disregard it.

THE COURT: I did -- one, I sustained it. Two, I shut down the argument. And, three, I did admonish them and told them only to consider that. I did all three of those things.

MR. JOHNSON: But then I'm also required to request a mistrial in the presence of the jury.

THE COURT: You're not required to request a mistrial in front of the jury. You're required to request -- you are required to request a mistrial. I understand that, but I'm denying that request. The request is timely made. It's made. The jury is not now present. There's -- you want to make -- make the record and make the point, I think there are certain things that should -- that are not to be made in front of the jury.

MR. JOHNSON: The only point I want to be on the record, Judge, is that I request an instruction to the jury in the presence of the jury that they be instructed to disregard in its entirety the last comment in regards to what the Defendant deserves as a result of anything he may or may not have done. And I -- if the Court's ruling is that you believe that was done following objection and that it complies with the requirements, that's all I -- that's all that's necessary from me.

THE COURT: Yes, I believe that it was done. I think the Defense made a timely objection, and that the Defense didn't need to request an admonishment because I made an admonishment that I think addressed the issue in telling the jury to disregard and not to consider issues that -- that are not -- not before them. They understand, I think, that the State was getting ahead of themselves in their argument. State wish to respond?

MR. BEACH: I understand the Court's ruling, Judge. Other than the fact that it is in evidence that the Defendant says, I deserve the death penalty, that was a direct quote from the Defendant, so that is in evidence, and that goes to show his guilty state of mind in terms of guilt or innocence.

74

THE COURT: Well --

MR. BEACH: Which I'm just saying --

THE COURT: That is not at all what the -- what the argument -- the State's argument was.

MR. HARRIS: That is exactly what I said, Judge. I said, even in his own words he said he deserved the death penalty.

THE COURT: No --

MR. HARRIS: Which is --

THE COURT: -- no, no. That was not what -- that wasn't what happened.

MR. HARRIS: That's exactly what I said, Judge, sir.

THE COURT: I understand that, but it is -- it is -- the Defense had previously made an objection regarding getting ahead, and it was --

MR. BEACH: I -- we understand why you did what you did, so I mean, we're -- we're going on from there.

THE COURT: Okay.

MR. BEACH: We're going on from there.

THE COURT: Okay. All right. We're off the record.

(Recess for deliberations).

(RR48: 29-33).

On appeal, appellant contends that the prosecutor's improper remark injecting the death penalty as a punishment in the guilt-innocence phase of the proceedings effectively told the jury to find appellant guilty of capital murder so the jury could assess the death sentence without any reference to the special issues. (*See* App. Br at 90). However, as previously discussed, not every reference to punishment at the guilt-innocence stage is

75

improper. *See Mann*, 718 S.W.2d at 744; *Wright*, 178 S.W.3d at 929. In his confession, appellant vividly explained and admitted every element of the capital murder. He labeled himself a "monster" and stated he wanted to tell the judge "just give me the death penalty" because "I deserve to die." (*See* State's Exhibit 92 at 24, 26). He also stated that he would rather his case did not go to trial because he would "rather just get the death penalty and be through with it." (*See* State's Exhibit 92 at 33). Here, the prosecutor quoted a portion of appellant's statement to show his guilty state of mind, which was relevant and germane to the issue of guilt or innocence. The prosecutor was not urging the jury to disregard the guilt-innocence stage or consider punishment at that time; rather, he used appellant's own words to demonstrate the overwhelming evidence of his guilt. As such, the argument was not improper.

In any event, the trial court sustained appellant's running objection, stopped the argument, and instructed the jury to disregard. The trial court's prompt instruction cured any error. *See Hawkins*, 135 S.W.3d at 84 (an instruction to disregard will in most cases be considered effective to cure the harm from an improper argument). Under the circumstances, the trial court was reasonable in believing that its instruction to disregard was effective and that appellant suffered no prejudice from the prosecutor's remark. Therefore, the trial court did not err in denying appellant's motion for mistrial.

### (3) Error, If Any, Was Harmless

As demonstrated herein, appellant has failed to show error in any of the complained-of closing arguments. However, even if this Court were to find that any of the foregoing arguments were improper, any error was harmless.

Improper argument is non-constitutional error, and a non-constitutional error that does not affect substantial rights must be disregarded. *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); Tex. R. App. P. 44.2(b). To determine whether an appellant's substantial rights were affected, an appellate court balances three factors: (1) the severity of the misconduct (i.e., the prejudicial effect), (2) any curative measures, and (3) the certainty of conviction absent the misconduct. *See Brown*, 270 S.W.3d at 572-73. In evaluating the severity of the misconduct, the reviewing court must assess whether the argument injected new and harmful facts or was, in light of the entire argument, extreme or manifestly unjust and willfully calculated to deprive appellant of a fair and impartial trial. *Id.* at 573.

Viewing the State's closing argument as a whole, the record does not show that there was a willful and calculated effort to deprive appellant of a fair and impartial trial. The prosecutor's arguments were proper summations and reasonable deductions from the evidence presented at trial. It is clear from the context of each argument that the prosecutor did not have an improper motive. The arguments did not inject new facts into the proceeding and were not severe in light of the tenor of defense counsel's closing argument, in which he conceded guilt and opened the door to a discussion about the punishment phase. In addition, the trial court gave prompt curative instructions, which the jury is presumed to have followed. When the trial court felt (reasonably or not) that the argument crossed the line, it stopped argument and gave the jury a final curative instruction before retiring them to the jury room. These measures were more than adequate to cure any error.

77

Finally, the evidence of appellant's guilt was overwhelming. Appellant wrote a letter prior to the offense laying out his plan to murder Lovetta and her children. After killing Lovetta and Jazzmen, appellant decided to spare JT and Jerrett, but only after he told them what he had done and showed them the dead bodies of their mother and sister. He turned himself into the police station later that evening, where he gave a voluntary statement detailing the murders. Appellant's statement was corroborated by witness testimony, physical evidence and DNA evidence. Appellant conceded guilt during his closing argument and encouraged the jury to return a swift verdict so that they could move on to the punishment phase. Based on the evidence presented, the jury most certainly would have convicted appellant regardless of the prosecutor's statements. Thus, any error in the prosecutor's arguments did not affect appellant's substantial rights. *See Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b). Based on the foregoing, Issues 19 through 24 are without merit and should be overruled.

### ISSUE 25: CONSTITUTIONALITY OF EXECUTING THE MENTALLY ILL

In Issue 25, appellant contends that the execution of a severely mentally ill person is prohibited by the Eighth Amendment ban on cruel and unusual punishment and violates the equal protection clause of the Fourteenth Amendment. Appellant asserts that the evidence shows that he was mentally ill before and at the time of the commission of the offense and therefore the assessment of the death penalty in his case is a violation of his constitutional rights. Appellant acknowledges this Court's ruling in *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010), but claims he is submitting this issue to preserve his complaint for federal review in the event that the rules announced by the Supreme Court

in *Atkins v. Virginia*,[2] banning the execution of the mentally retarded, and in *Roper v. Simmons*,[3] banning the execution of juvenile offenders, are extended to the mentally ill. (*See* App. Br. at 92-93).

Appellant fails to cite any case from any American jurisdiction that has held that the *Atkins* rule or rationale applies to the mentally ill.[4] Indeed, this Court has previously held that there is no authority from the Supreme Court or this Court suggesting that mental illness that is a contributing factor in the defendant's actions or that caused some impairment or some diminished capacity is enough to render one exempt from execution under the Eighth Amendment. *See Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *see also Tabler v. State*, No. AP-75,677, 2009 Tex. Crim. App. LEXIS 830, at *1 - 2 (Tex. Crim. App. Dec. 16, 2009) (not designated for publication); *Sprouse v. State*, No. AP-74,933, 2007 Tex. Crim. App. LEXIS 1862, at *8 (Tex. Crim. App. Jan. 31, 2007) (not designated for publication); *Battaglia v. State*, No. AP-74,348, 2005 Tex. Crim. App. LEXIS 47, at *10 & n.39 (Tex. Crim. App. May 18, 2005) (not designated for publication) (citing *Colburn v. State*, 966 S.W.2d 511 (Tex. Crim. App. 1998)). Furthermore, appellant has not demonstrated that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill

---

[2] 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[3] 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

[4] To the contrary, several state courts have expressly declined to extend the *Atkins* ruling to the mentally ill. *See, e.g., Johnston v. State*, 27 So.3d 11, 26-27 (Fla. 2010); *State v. Ketterer*, 111 Ohio St. 3d 70, 2006 Ohio 5283, 855 N.E.2d 48 (Ohio 2006); *Matheney v. State*, 833 N.E.2d 454 (Ind. 2005); *Hall v. Brannan*, 284 Ga. 716, 670 S.E.2d 87 (Ga. 2008); *see also Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 Tenn. Crim. App. LEXIS 36, 2010 WL 118696 (Tenn. Crim. App. Jan. 13, 2010) (not designated for publication); *Johnson v. Comm.*, No. 2006-SC-000548-MR, 2008 Ky. Unpub. LEXIS 13, 2008 WL 4270731 (Ky. Sept. 18, 2008) (not designated for publication).

offenders. *Mays*, 318 S.W.3d at 379. Lastly, appellant has not shown that he suffered from some mental impairment at the time of these murders so severe as to categorically and necessarily rend him less morally culpable than those who are not mentally ill. *Id.* at 379-80. Therefore, Issue 25 is wholly without merit and should be overruled.

### ISSUE 26: LEGAL SUFFICIENCY OF THE EVIDENCE OF GUILT

In Issue 26, appellant contends the evidence presented at trial was not sufficient to support the conviction for capital murder. He claims that he was suffering from mental illness and was not cognizant of what he was doing during the murders.

#### *Applicable Law*

When reviewing a challenge to the sufficiency of the evidence, an appellate court considers all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Laster v State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319. The appellate court does not reweigh the evidence or substitute its judgment for that of the factfinder. *See King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

To obtain a conviction for capital murder, as charged in this case, the State was required to prove that appellant intentionally or knowingly murdered more than one

person during the same criminal transaction. (CR1: 7). *See* Tex. Penal Code Ann. § 19.03 (a)(7)(A) (West 2003).

### The Evidence is Legally Sufficient

In his statement to police, appellant detailed the facts of the horrific double-murder he committed on September 21, 2009 at the home he shared with his wife, Lovetta Armstead. Appellant stated that, the week before the offense, had discovered that Lovetta was going behind his back to get their marriage annulled. The day of the offense, Lovetta wrote appellant two letters telling him that it was time for them to part ways and that he needed to move out. Appellant felt betrayed by Lovetta's actions. He wrote a response to Lovetta's letter in which he detailed his plan to "take five lives" that night, including his own. While Lovetta was reading the letter, appellant grabbed knives from the kitchen and then went to the bedroom of Lovetta's daughter, Jazzmen. He told Jazzmen not to worry as he hog-tied her arms and legs with duct tape and cords, and put duct tape over her mouth. He then brought Jazzmen into the master bedroom where Lovetta was and laid her on the end of the bed. He and Lovetta started tussling in the bathroom and Lovetta tried to break the commode lid over his head, but missed. The struggle lasted around an hour and a half and appellant recalled stabbing Lovetta around thirty times. Once Lovetta was dead, appellant took Jazzmen into the bathroom, filled up the tub, and held her underneath the water. She put up quite a fight and appellant had to turn his head away. Once Jazzmen was dead, he pulled her from the tub and laid her face-down onto the floor. He then stepped over her dead body, took a shower, and changed into his dress clothes.

81

Appellant's plan was not yet complete. He went to church to pick up Lovetta's two sons, JT and Jerrett. When appellant returned home with the boys, he told JT to take a bath because he planned to kill Jerrett while JT was in the bath. He stabbed Jerrett a couple of times, but Jerrett started screaming and his brother came out of the bath. Appellant forced both boys into the bathroom and asked them to give him some reason why he shouldn't kill them. Jerrett told appellant they loved him and respected him and they were too young to die. He also said that appellant did not have to kill them because they were not going to tell anybody about what happened. Because of what the boys said, appellant decided not to kill them. However, he took them into the bedroom to show them the dead bodies of their mother and sister. He then told them that this was goodbye and fled the scene in Lovetta's car. At his family's insistence, appellant turned himself into a police substation later that night after allegedly trying to overdose on Benadryl. Appellant was taken to Parkland Hospital to be treated for the ingestion of Benadryl and his superficial stab wounds. He was then returned to Dallas Police Headquarters, where he gave his voluntary oral statement to homicide detective Robert Quirk. During the interview, appellant stated his belief that he was a monster and said that he did not want a trial, he just wanted to tell the judge to give him the death penalty.

Appellant's confession was corroborated by the physical evidence and witness testimony. After appellant left the scene of the murder, the boys called 911 and ran next door to the home of their neighbor, Latasha Bradfield. The boys were frantic and Jerrett was injured and bleeding. Latasha took the phone, spoke to the 911 operator and told her that the boys were claiming appellant killed their mother and sister. She then went next

door to Lovetta's house and verified that Lovetta was lying on the floor of her bedroom and not breathing. When police arrived at the house, the scene was exactly as described by appellant. The bathroom was covered in blood and the commode lid was broken on the floor. The knives from the butcher block in the kitchen were spread throughout the house, including in the boys bathroom, the master bathroom, and master bedroom. Lovetta's body was found on the floor of the master bedroom. Jazzmen, whose body was still wet, was found lying face-down on the floor of the master bathroom next to the tub. The officers found appellant's handwritten note lying on the bed in the master bedroom, and later found Lovetta's two handwritten notes under the mattress in the master bedroom.

DNA testing of the fingernail clippings and vaginal swab collected from the body of Lovetta matched that of appellant. Medical Examiner Dr. Jill Urban found 25 stab wounds on the body of Lovetta and ruled her manner of death a homicide. Dr. Urban testified that appellant's confession that he stabbed Lovetta nearly 30 times was consistent with her clinical findings as contained in the autopsy report. Medical Examiner Dr. Meredith Lann also ruled Jazzmen's manner of death a homicide. She testified that appellant's confession that he held Jazzmen's head in a tub full of water and drowned her was consistent with her findings. She also stated that putting together the hemorrhage below Jazzmen's ponytail, the hemorrhage to her left back area, and the injuries to her mouth and lip, it would be consistent to conclude that appellant pressed down on the back of Jazzmen's head and her left shoulder and held her under the water, possibly even making contact with the bottom of the bathtub, until she drowned. The foregoing

testimony, coupled with appellant's detailed confession, was more than sufficient to prove the essential elements of capital murder beyond a reasonable doubt.

Appellant claims the evidence was insufficient because he was suffering from mental illness and was not cognizant of what he was doing during the murders. He appears to be arguing that his mental illness negated the required *mens rea* for the offense. However, the evidence of appellant's mental illness was not presented until punishment, so it was not before the jury for their consideration at the guilt-innocence stage. In any event, even if this evidence was before the jury, it actually would have proven the charged offense, not negated it. All of appellant's mental-illness evidence showed why he intentionally and knowingly killed Lovetta and Jazzmen and tried to kill Jerrett and JT: He was paranoid that they were plotting against him behind his back, and he thought they had betrayed and mistreated him. Thus, his argument that his mental illness in some way negated the required *mens rea* is wholly without merit. *See, e.g., Mays*, 318 S.W.3d at 381 (finding mental-illness evidence inadmissible at guilt stage because it did not directly rebut the culpable mental state, but rather showed why appellant intentionally and knowingly killed the deputies, i.e., because he was paranoid and thought they had mistreated him).

Considering all the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt. As such, the evidence is legally sufficient to support the conviction. Issue 26 should be overruled.

84

## ISSUE 27: DENIAL OF MOTION FOR MISTRIAL

In Issue 27, appellant contends that the trial court erred in denying his motion for mistrial when the State questioned a witness about extraneous bad acts that were committed by others because the testimony was irrelevant and prejudicial to the defendant.

### *Pertinent Facts*

During the punishment phase, the State called Kevin Ashford, a retired TDCJ correctional officer, to testify about an assault that appellant committed on him when he was in prison in 1994. (RR50: 6-14). The day of the assault, Ashford was called to the chow hall to assist with security while the inmates were eating. (RR50: 8-11). The inmates had a tendency to spread out in the chow hall, making it difficult for the guards to keep order, so Ashford usually had the inmates sit in particular places so he could maintain control over what was going on. (RR50: 11). When Ashford ordered appellant to sit at a particular table, he became aggressive and refused to follow Ashford's order. (RR50: 11-12). Ashford directed appellant to put his tray down and step into the hallway so they could address the lieutenant about his disruptive behavior. (RR50: 12). Appellant threw his food tray at Ashford, hitting him in the midsection of his body, and then charged towards Ashford. (RR50: 13). Ashford initiated a use of force to gain control of appellant. (RR50: 13). Despite appellant's kicking and fighting, Ashford and another guard were eventually able to gain control of appellant, wrestle him to the ground and put him in cuffs. (RR50: 13-14).

85

On cross-examination, defense counsel questioned Ashford about what came of the case and Ashford did not recall. (RR50: 15-17). Counsel showed Ashford the report from the incident, which indicated that the case was never prosecuted because there was conflicting witness testimony. (RR50: 19-20). Through his questioning, counsel attacked the credibility of Ashford's recollection of the event and created the misconception that such an assault on a guard was a major incident and that it was unusual that appellant was not prosecuted. (RR50: 21-22).

On redirect examination, the prosecutor attempted to rebut misconception created by counsel that this particular assault was a major or unique incident within the prison system. The redirect testimony was as follows:

> Q (MR. BEACH): I mean, having a food tray thrown at you, Mr. Ashford, compared to getting stabbed in the back like you were; is that correct?
>
> A: Yep.
>
> Q: That's a big deal, right?
>
> A: A little bit.
>
> Q: Okay. And you also told us that during this time frame in a single shift, one day, you had 17 major uses of force?
>
> A: Yes, sir.
>
> Q: So this – this was not an –
>
> > MR. JOHNSON: Judge, this is outside the record and I'm going to object to it.
> >
> > THE COURT: I'm a little confused. Against Mr. Green?
> >
> > MR. BEACH: No, no, no, in general, in one day where he had to hit 17 –

86

THE COURT: All right. That's – objection is sustained.

MR. JOHNSON: I'm going to ask that the jury be instructed to disregard. It is irrelevant, it's improper.

MR. BEACH: May I respond?

THE COURT: Yeah.

MR. BEACH: He's trying to make him say this is a major deal. His questions opened up the door that this was a – some major unique deal, and it's not, Judge. It happens every day.

MR. JOHNSON: That's not – that's not what – that's not what I was saying at all, Judge.

THE COURT: I just – it's a question of what does he do. What does Mr. Green do, not other people.

MR. BEACH: He's trying – he's trying to make it a big deal. That's all right, I'll move on.

THE COURT: Let's just focus on Mr. Green and – and the actions of him.

MR. JOHNSON: And – Well, Judge, my objection to the question, and the whole line of questioning, is that it's irrelevant, and it's improper. The Court sustained it. I'm going to ask the jury be instructed at this time to disregard it.

THE COURT: Well, it's just a question. It's not evidence that –

MR. JOHNSON: Well, the way he – the way he phrased it to the witness, he stated it as a fact and it's before this jury now be considered a fact. We're going to object and ask the jury to be instructed to disregard it.

THE COURT: Okay. In an abundance of caution, the jury will disregard. But the jury is reminded that the questions the attorneys ask are not evidence. The answers to the questions – that are [sic] evidence.

MR. JOHNSON: And further, we move for a mistrial at this – at this point, because I believe this is going to be a cumulative error that continues through this portion of the punishment phase.

87

THE COURT: Okay. That's denied.

MR. BEACH: I'll pass the witness.

MR. JOHNSON: Nothing further.

(RR50: 23-24).

### *Applicable Law*

When the trial court sustains an objection and instructs the jury to disregard the testimony but denies a motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins*, 135 S.W.3d at 76-77. An appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). Generally, an instruction to disregard cures any prejudicial effect. *Hawkins*, 135 S.W.3d at 77. The law requires a mistrial only if the prejudice is incurable. *Id.* In determining whether the trial court abused its discretion in denying the mistrial, an appellate court considers the following factors: (1) severity of the misconduct (the magnitude of the prejudicial effect); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

### *The Trial Court Did Not Abuse Its Discretion*

The trial court did not abuse its discretion in denying appellant's motion for mistrial because the testimony was not irrelevant. As previously noted, the testimony

88

corrected the false impression left by defense counsel during his cross-examination of Ashford. Therefore, the prosecutor committed no misconduct in eliciting it.

Even assuming the testimony was improper, it was inconsequential and likely had no prejudicial effect. It was a brief and general reference to prior violence in prison. Warden Nelson's unobjected-to testimony about violence within the prison system was far more specific and detrimental to appellant's defense. (RR50: 25-46). Additionally, the cautionary measures taken by the judge were more than sufficient to cure the misconduct, if any. Following appellant's objection, the trial court promptly gave a curative instruction and reminded the jury that the questions posed by the lawyers are not evidence. (RR50: 24). The State asked no further questions and the witness was dismissed. Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). When the trial court instructs a jury to disregard certain testimony, an appellate court presumes the jury followed the trial court's instructions. *Ladd*, 3 S.W.3d at 567. There is nothing in the record which would suggest that the questions and answers provided here were of such a nature that they could not be cured by an instruction to disregard.

Furthermore, the evidence supporting the jury's answers to the special issues is strong. Appellant stabbed his wife nearly thirty times with various kitchen knives and drowned her six-year-old daughter in the bathtub. He then went to the church and picked up her two sons, whom he also planned to murder. He stabbed one son, but apparently had a change of heart and decided to let them live. Before fleeing the scene, he took the

two boys into the bedroom and forced them to view their dead mother and sister's bodies. In addition to the gruesome facts of the primary offense, the State put on evidence of appellant's past criminal history, including convictions for drug possession, aggravated robbery and aggravated assault, as well as evidence of his manipulative and violent behavior towards all of his previous girlfriends.

Given the strength of the evidence supporting the jury's answers to the special issues, the trial court's prompt instruction to disregard, and the inconsequential nature of the complained-of testimony, the trial court did not abuse its discretion in denying appellant's motion for mistrial. As such, Issue 27 is without merit and should be overruled.

### ISSUE 28: LEGAL SUFFICIENCY OF FUTURE DANGEROUSNESS ISSUE

In Issue 28, appellant contends that there was insufficient evidence of future dangerousness because, with treatment for his mental illness, appellant is not a future danger.

#### *Applicable Law*

The State has the burden of proving the punishment issue of future dangerousness beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1), 2(c); *Ladd*, 3 S.W.3d at 557-58. In other words, the State has the burden of proving beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison. *See* Tex. Code Crim. Proc. Ann. art. 37.071 §§ 2(b)(1), 2(c). In its determination of the

90

issue, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. *Id.*

A jury may consider a variety of factors when considering the future dangerousness issue, including: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence. *See Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). In assessing the legal sufficiency of the evidence to support future dangerousness, this Court reviews the evidence in the light most favorable to the jury's affirmative answer and determines whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat to society. *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010).

### The Evidence is Legally Sufficient to Support the Jury's Finding of Future Dangerousness

The gruesome facts of the offense, alone, were sufficient to support a finding of future dangerousness. Appellant's wife, Lovetta, decided that she could no longer be married to a man who refused to work, so she had started the process of getting their marriage annulled. Appellant felt betrayed and was angry because he had no one else to

91

take care of him, so he hatched a plan to murder Lovetta, her three children, and himself. Appellant duct-taped and hog-tied Lovetta's six-year-old daughter, Jazzmen, brought her into the bedroom and forced her to watch him slaughter her mother. He tussled with Lovetta for over an hour and stabbed her nearly thirty times, all while Jazzmen was lying on the bed and watching. He then took Jazzmen into the blood-filled bathroom, filled the tub, and held her under the water until she drowned. As Jazzmen struggled, he pushed her head so hard against the bottom of the tub that he chipped her tooth and bruised the top of her head. He placed her wet, dead body on the floor, then stepped over it and took a shower.

After changing into dress clothes, appellant picked up Lovetta's two sons from church and brought them home with the intent to finish his plan of taking five lives. He stabbed one of the boys, but they spoke kindly to him and promised they would not tell anyone about what happened, so he decided to let them live. However, he took them to the master bedroom and forced them to view the dead bodies of their mother and sister before saying his final goodbye. One of the police officers who responded to the scene said that, in his five and half years with the police department, he had never seen such a brutal homicide. The calculated and deliberate nature of appellant's actions in committing this violent and heinous double-murder was sufficient to support the jury's finding of future dangerousness. *See Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007) (the circumstances of an offense can be some of the most revealing evidence of future dangerousness and may be sufficient to independently support an affirmative answer to the future dangerousness issue).

The State, however, did not rely solely on the facts of the offense. At the punishment phase, the prosecutor introduced appellant's penitentiary packets and disciplinary records. The jury learned that appellant sold drugs, acted as a bodyguard for drug dealers and was previously convicted of drug possession, for which he received a four-year sentence. They learned that appellant strangled, beat, and nearly killed his high school girlfriend, Jennifer Alcorn Wheeler, in retaliation for breaking up with him, resulting in a conviction for aggravated assault and a four-year-sentence. After being released from prison on these two offenses, appellant was taken under the wing of local grocer Joseph Johnson, Jr., who employed him and planned to teach him the business. However, when appellant was fired for falsely calling in sick, he robbed the grocery store at gunpoint in retaliation, resulting in a conviction for aggravated robbery and a twenty-year sentence. Appellant later admitted that he committed the robbery for a thrill and to see if he could get away with it, and that this was not the only robbery he had committed.

While he was in prison for the aggravated robbery, appellant committed 13 disciplinary violations. In one instance, he assaulted prison guard Kevin Ashford in the chow hall when he did not like the orders given. The jury also heard that appellant entered into a romantic relationship with prison employee Belinda Lacy, who due to appellant's manipulation, quit her job at the prison and wrote favorable letters to the parole board on his behalf. When appellant was released on parole, he married Belinda at the insistence of his mother, but then immediately abandoned her and began cheating on her with several other women. He moved in with Shulonda Ransom, whom he repeatedly physically abused while she was pregnant with two of his children. During one instance,

he picked Shulonda up by her throat and choked her until she was unconscious, then he stole everything from their apartment, including their baby's diapers. He also impregnated two other women during this time, resulting in four children over a time span of one and a half years, and paid child support for none of them. The jury also heard evidence that, prior to the primary offense, appellant was physically abusive towards Lovetta in front of the children. Appellant's history of crime and violence was ample evidence of future dangerousness.

On appeal, appellant contends that all of the instances of violence occurred with women he was involved with at the time and when he was not taking medication for his documented mental illness. However, this argument is unpersuasive as appellant would have ample access to women within the prison system. This is supported by the testimony of Warden Nelson, who testified that forty percent of the prison guards within TDCJ are female, as well as the evidence of appellant's previous relationship with former prison employee, Belinda Lacy, whom he managed to persuade to quit her job and assist him in gaining release onto parole. Appellant also argues that the State failed to present any evidence of future dangerousness that would overcome his "peaceful, nonviolent twenty year history" in prison. The record does not support appellant's statement, considering that appellant only served ten years in prison and during that time he assaulted prison guard Kevin Ashford and committed 13 other disciplinary violations. Nonetheless, even if appellant had been a model prisoner, good behavior in prison is only one factor to consider and does not preclude a finding of future dangerousness. *See Emery v. State*, 881 S.W.2d 702, 707 (Tex. Crim. App. 1994).

94

Viewed in the light most favorable to the verdict, there is sufficient evidence for a rational jury to find beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Thus, the evidence was legally sufficient to support the jury's answer to the future dangerousness special issue, and Issue 28 should be overruled.

### ISSUES 29 & 30: ADMISSIBILITY OF EXTRANEOUS OFFENSE EVIDENCE AT PUNISHMENT

#### (1) Admission of Testimony Regarding an Extraneous Robbery

In Issue 29, appellant contends that the trial court erred in overruling his objection to the testimony of Shirley Coleman on cross-examination regarding an extraneous unadjudicated robbery committed by appellant. Specifically, he claims that the State's notice of its intent to present the evidence was inadequate under article 37.07 of the Texas Code of Criminal Procedure in that it failed to include the date of the offense and county in which the offense occurred.

### Applicable Law

The introduction of extraneous conduct evidence in the punishment phase of a capital murder trial is governed by the notice requirements of Article 37.07, section 3(g) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1) (West Supp. 2011). Article 37.07, section 3(g) requires the State, on timely request, to give the defendant reasonable notice of extraneous crimes or bad acts that the State intends to use at trial. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (West 2003) (incorporating Texas Rule of Evidence 404(b)'s reasonable notice requirement).

95

This statute also requires the State to give additional notice if it intends to use an extraneous offense that has not resulted in a final conviction. To be reasonable, the notice must include the date on which the offense occurred, the county where it occurred, and the name of the alleged victim. *Id.* However, the notice provision applies only to evidence introduced in the State's case in chief. *See Jaubert v. State*, 74 S.W.3d 1, 3 (Tex. Crim. App. 2002). When the State presents extraneous offense evidence in rebuttal or during cross-examination, appellant is not entitled to notice of the extraneous offenses. *Id.* at 4.

Pertinent Facts

Prior to trial, the State notified appellant of its intent to introduce evidence of extraneous convictions, crimes, wrongs, or acts pursuant to Texas Rules of Evidence 404(b) and 609 and article 37.07 of the Texas Code of Criminal Procedure. (CR1: 53-55). The notice informed appellant that the State intended to introduce evidence that appellant admitted to one of his aunts that the robbery of Joe Johnson at County Fair Foods was not the only robbery he had committed. (CR1: 53; RR51: 38).

Appellant called Shirley Coleman as a witness during punishment. (RR51: 6). The State sought to cross-examine her regarding the extraneous robbery that appellant told her he committed. (RR51: 34-35). At a hearing outside the presence of the jury, appellant's counsel objected to the admission of this testimony on the grounds that the State's notice was insufficient. (RR51: 35-39). Appellant's counsel conceded that he knew the aunt referred to in the notice was Shirley Coleman, but argued the notice was still inadequate because it did not specify the date of the offense, the county in which the offense

96

occurred, or any other particularized facts about the offense. (RR51: 35-39). In response, the prosecutor explained that they did not know the date of the offense or any other facts, only that it was around the same time frame as the aggravated robbery already admitted into evidence. (RR51: 36, 41-42). The prosecutor also indicated that defense counsel could have obtained more information about the extraneous robbery since he knew the aunt referred to in the notice was Shirley and she was his witness at punishment. (RR51: 36). The trial judge allowed the State to cross-examine Shirley about appellant's admission of an extraneous robbery, but strictly limited the testimony to what was in the notice provided. (RR51: 39-43).

### Analysis

The State did not question Shirley on this matter during its case in chief on punishment, but rather during its cross-examination of her. Accordingly, the notice requirements of article 37.07, section 3(g) did not apply to the evidence of appellant's extraneous robbery. *See Jaubert*, 74 S.W.3d at 4. Accordingly, appellant's complaint regarding lack of notice is without merit and should be overruled.

Should this court entertain appellant's complaint regarding lack of notice, any error in the admission of this testimony was harmless. Error in admitting evidence with insufficient notice under article 37.07, section 3(g) is non-constitutional error. *See Apolinar v. State*, 106 S.W.3d 407, 414 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 281 (Tex. App.—Austin 2002, no pet.). Accordingly, an appellate court must disregard any error that does not affect a substantial right. Tex. R. App. P. 44.2(b). An error affects a defendant's

substantial rights when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

The purpose of article 37.07, section 3(g) is to avoid unfair surprise and to enable the defendant to prepare to answer the extraneous-offense evidence. *See Luna v. State*, 301 S.W.3d 322, 326 (Tex. App.—Waco 2009, no pet.); *Apolinar*, 106 S.W.3d at 414-15; *Roethel*, 80 S.W.3d at 282; *Nance v. State*, 946 S.W.2d 490, 493 (Tex. App.—Fort Worth 1997, pet. ref'd). To determine harm in light of that purpose, an appellate court should examine the record to determine whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial. *Roethel*, 80 S.W.3d at 281-82. In determining the latter, appellate courts look at whether the defendant was surprised by the substance of the testimony and whether that affected his ability to prepare cross-examination or mitigating evidence. *Id*. at 282.

The record contains no indication that the State acted in bad faith when it failed to comply with article 37.07, section 3(g). To the contrary, the record demonstrates that the State provided appellant notice of the extraneous robbery to the best of its ability and that the only reason the notice did not include additional facts was because no other facts about the offense were known to the State. Thus, there is no indication from the record that the omission was intended to mislead appellant or prevent him from preparing a defense. Additionally, appellant was not surprised by the substance of the testimony. Appellant received notice of the extraneous robbery well in advance of trial, and defense counsel admitted on the record that he knew the aunt the notice was referring to was Shirley Coleman. (RR51: 37). Shirley was a defense witness at punishment and the

98

defense team met with her several times prior to trial. As such, counsel could have exercised due diligence in finding out more information from her about the extraneous robbery in order to prepare cross-examination or mitigating evidence. Appellant can hardly show surprise or harm when he made no effort to find out more information from his own witness.

Appellant does not point to anything in the record that would support the notion that his ability to mount an adequate defense was hindered by the lack of notice; nor does appellant argue on appeal that his ability to prepare cross-examination or mitigating evidence was affected by the lack of adequate notice. Appellant has failed to make any showing of how his defense strategy might have been different had the State adequately notified him of its intent to introduce evidence of the extraneous robbery during punishment or how his defense was "injuriously" affected by the State's lack of notice. *See, e.g., Hernandez v. State*, 176 S.W.3d 821, 825-26 (Tex. Crim. App. 2005) (finding any error in admitting evidence of extraneous offense during punishment phase harmless despite failure to provide notice because appellant did not contend that witness's testimony caused him surprise, that omission from notice prevented him from preparing a defense, or that had he known, his defense would have differed). As such, any error by the trial court in admitting evidence of this offense was harmless. Issue 29 is without merit and should be overruled.

### (2) Admission of Excerpts of Letters Written By Appellant

In Issue 30, appellant complains about the trial court's admission of State's Exhibits 148A and 148B, excerpts from letters written by appellant while in prison to his

high school girlfriend, Jennifer Alcorn Wheeler. Appellant again argues that the State failed to provide adequate notice of this evidence under article 37.07 of the Texas Code of Criminal Procedure. He also claims that, because the letters were 20 years old, they were too remote to be relevant to the issue of mitigation, thereby rendering them more prejudicial than probative.

Pertinent Facts

The Friday before the punishment phase of trial began, the State learned that one of their punishment witnesses, Jennifer Alcorn Wheeler, had letters that appellant wrote to her while in prison in the 1990's. (RR49: 9-10; RR52: 163, 167, 173). The State immediately notified appellant of the existence of the letters and its intent to present the evidence at punishment. (RR49: 9-10; RR52: 167, 169, 173). The following Monday, when Jennifer brought the letters to the courthouse, the State made copies of the letters and tendered them to defense counsel. (RR52: 167, 169, 172-73).

The State sought to admit two excerpts from the letters as rebuttal evidence. The first excerpt, State's Exhibit 148A, read as follows:

> I'm currently attending college to get my associates and to hopefully start on my second degree before my time of release comes.

The second excerpt, State's Exhibit 148B, read as follows:

> But I know that's all behind us now. Jennifer, when we first came as one, I said if you ever _ _ _ _ over and think you can play with my feeling I'll kill you. Isn't that what I said???

> You see you & nobody else can just turn on my feelings and turn them off when you get ready. I'm not make out of that can of material.

100

I have associated with people on both sides of the laws. I just choose to go the wrong way. With me doing the wrong thing that placed me here. It's wasn't the money mostly, it was the high of dong wrong and getting away with it. I wasn't on drugs or alcohol like to think I was completely sane at that time. You see I know what it takes to make and be success. But this place at this time is the best place for me.

Understand, what I'm talking about first before you make a judge of my sanity. When I was out my people will tell you that if I wasn't incarcerated at the time of the summer of 1990 I would have killed up a lot of people or been killed!! Really, because I was I really was livin for day to day…Not caring about life and people.

(State's Exhibits 148A and 148B) (grammatical errors in original).

Appellant first objected to the admission of this evidence on the basis that he did not receive adequate notice. (RR52: 164, 168). He also objected to the content of the letters on the basis that the letters were too remote and had no probative value as to the special issues. (RR52: 170, 173).

Analysis

(a) Notice

At the punishment phase of trial, appellant presented evidence that his family has a history of mental illness and, that as a young child, appellant was not normal. His ex-girlfriend, Lenelle Williams, testified that appellant frequently talked to the television, heard rats in the walls, and told her he believed vampires walk among us. Appellant's mother, Mary Sampson, testified that appellant previously checked himself into Timberlawn Hospital because he was stressed and had gotten to the end of his rope. .Bertha Curry, appellant's grandmother, testified about an instance when appellant was a child where he allegedly bit the head off of a snake in the backyard. Dr. Kellie Gray-Smith, an expert on special education and the multicultural aspects of psychology,

101

testified that appellant's school records indicate chronic school failure and that appellant was not a successful student, likely due to an unaddressed learning disability or mental problem. Dr. Gilbert Martinez, a licensed psychologist hired by the defense to evaluate appellant, testified that appellant had a borderline IQ score, and he diagnosed appellant with schizoaffective disorder bipolar type.

State's Exhibit 148A was offered in rebuttal to appellant's evidence that he had a borderline IQ and chronic school failure. This letter, in which appellant tells Jennifer that he is attending college to get his associates degree and to hopefully start on a second degree before he is released from prison, rebuts appellant's defensive theory that he was not capable or smart enough to succeed. State's Exhibit 148B was also offered in rebuttal. The theme of appellant's punishment evidence was that appellant's behavior could not be separated from his mental illness and that he would not be a future danger now that he has been properly diagnosed and can be treated. Appellant's statements contained in State's Exhibit 148B, including that he chose to break the law because of the high of getting away with it and that he was completely sane, supported the State's theory that appellant was antisocial and rebutted appellant's theory that his actions were linked to mental illness. Because State's Exhibits 148A and 148B were offered in rebuttal, the State was not required to give appellant notice. *See Jaubert*, 74 S.W.3s at 4; *Washington v. State*, 943 S.W.2d 501 (Tex. App.—Fort Worth 1997, pet. ref'd). Therefore, appellant's complaint regarding lack of notice is without merit and should be denied.

Should this Court entertain appellant's notice argument, any error in the admission of this evidence was harmless. The record reflects that the State learned about the letters

102

the Friday before punishment began and immediately notified appellant. When Jennifer brought the letters to the courthouse the following Monday, the State immediately turned them over to the defense. The record clearly reflects that the State was not acting in bad faith by not including this evidence in their notice or providing notice sooner; they simply did not know about it until the moment they turned it over. Appellant received the letters before punishment began and there were several discussions about the letters prior to their admission, so counsel had four days to prepare a defense. Appellant has not shown that his ability to mount an adequate defense or to prepare cross-examination or mitigating evidence was hindered by the lack of adequate notice. Further, appellant has failed to make any showing of how his defense strategy might have been different had he had the letters sooner, or how his defense was "injuriously" affected by the State's lack of notice. *See, e.g., Hernandez*, 176 S.W.3d at 825-26. Accordingly, any error by the trial court in admitting this evidence was harmless.

(b) Rules 401 and 403

An appellate court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Green v. State*, 934 S.W.2d 92, 104 (Tex. Crim. App. 1996). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

At the punishment stage of a capital murder trial, evidence may be presented by the State "as to any matter that the court deems relevant to sentence." Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1). Generally, evidence of extraneous bad acts committed by the defendant is relevant and admissible at the punishment stage of a capital murder

103

trial, so long as the State "clearly proves" that the misconduct occurred and that the defendant was the perpetrator. *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). Here, the complained-of evidence was excerpts of letters written by appellant while in prison. Appellant's own mother, Mary Sampson, examined the handwriting and verified that the letters were written by her son. (RR51: 145). As such, the State clearly proved that appellant was the author and, therefore, that the statements and admissions contained in the letters were his.

Relevant evidence is evidence that has a tendency to make the existence of any fact more or less probable than it would be without the evidence. Tex. R. Evid. 401. This Court has held that future dangerousness is an issue relevant to the punishment phase of a capital murder trial. *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (citing *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995)). The statements and threats contained in the letters were relevant to the jury's determination of appellant's future dangerousness under Rule 401 because they had a tendency to make the existence of appellant's future dangerousness more probable than it would be without the evidence. *See, e.g., Garcia v. State*, 887 S.W.2d 862, 879 n.19 (Tex. Crim. App. 1994) (noting that the defendant's threat to kill a witness was admissible at punishment as substantive evidence of future dangerousness).

Under Texas Rule of Evidence 403, evidence that is relevant and admissible may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant

evidence is more probative than prejudicial. *See Young*, 283 S.W.3d at 876. A trial court, when undertaking a rule 403 analysis, must balance the inherent probative force of the proffered evidence and the proponent's need for that evidence against competing factors including (1) any tendency of the evidence to suggest decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

Given the similarity between the threats contained in the letter and the primary offense, the trial court could have reasonably concluded that the complained-of evidence was extremely probative as to appellant's future dangerousness. The letters also had a strong tendency to rebut appellant's claims that his behavior was the result of mental illness rather than an antisocial personality. As to the counter-factors, the trial court could have also reasonably concluded that the letters did not tend to suggest that the jury decide the case on an improper basis. The evidence at issue was no more serious and potentially inflammatory than the facts of the offense and the other punishment evidence admitted without objection. There is also nothing in the record to indicate that the jury was not equipped to evaluate the probative force of the evidence. The letters did not concern complicated or technical subject matters. Moreover, the trial court instructed the jury that any testimony regarding extraneous offenses committed by appellant could be considered only if they believed appellant committed the offenses beyond a reasonable doubt and

even then only in determining their answers to the special issues.[5]   (CR1: 158). This minimized any potential for improper influence on the jury. *See, e.g., Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). In addition, the State did not spend a great deal of time developing this testimony.  The prosecutor admitting and publishing the exhibits to the jury took only two typed pages in a trial record that consists of seven volumes. (RR52: 177-78).   The State only briefly mentioned the letters in closing argument. (RR53: 73). Thus, the trial court also could have reasonably concluded that the testimony did not tend to confuse or distract the jury from the primary issues and that it did not cause undue delay or constitute the needless presentation of cumulative evidence.

Although the excerpts from appellant's letters were undoubtedly prejudicial, they were not "unfairly prejudicial" under rule 403. Unfair prejudice does not arise from the mere fact that evidence injures a party's case. It is a given that virtually all testimony and evidence will be prejudicial to the opposing party, as that is the central point of offering evidence. *See Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). It is only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value that rule 403 is applicable. *See Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996). In light of the foregoing discussion, it is clear that the complained-of evidence was not so prejudicial as to require exclusion.

---

[5] Specifically, the limiting instruction stated: "You are further instructed that if there is any evidence before you in this case regarding the Defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the special issues." (CR1: 158).

Appellant contends that the letters were too remote to be relevant on the issue of mitigation, thereby rendering them more prejudicial than probative. However, this Court has specifically declined to fashion a "per se" rule that a transaction is too remote in time to be introduced into evidence at trial. *See Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986). Appellant's remoteness argument is also nonsensical considering the numerous other pieces of evidence presented, without objection, that were equally old, including appellant's previous drug-possession conviction in 1989, his aggravated assault of Jennifer Wheeler in 1989, and his aggravated-robbery conviction in 1990. Indeed, the 13 disciplinary violations appellant committed in prison occurred between 1990 and 1994, 16 years prior to trial, and defense counsel relied heavily on these to rebut future dangerousness during closing argument. (RR53: 32-34, 37-39, 54).

Based on the foregoing, the trial court could have reasonably concluded that the evidence was more probative than prejudicial. This decision was not outside of the zone of reasonable disagreement. Accordingly, the trial court did not abuse its discretion in admitting the evidence. Issue 30 should be overruled.

### ISSUES 31-46: FEDERAL CONSTITUTIONAL ISSUES

In Issues 31 through 46, appellant challenges the constitutionality of the Texas death penalty statute. He acknowledges that these issues argue for a change in the present state of the law and are asserted mainly to preserve the issue for further review in the federal courts.

In Issue 31, appellant contends that the statute under which he was sentenced to death is unconstitutional in violation of the cruel and unusual punishment prohibition of

107

the Eighth Amendment because it allows the jury too much discretion to determine who should live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty.

In Issue 32, appellant contends that the statute under which he was sentenced to death violates the Eighth Amendment because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to that special issue intolerable and unreliable.

In Issue 33, appellant contends that the statute under which he was sentenced to death violates the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on appellant rather than requiring a jury finding against appellant on that issue under the beyond a reasonable doubt standard.

In Issue 34, appellant contends that the trial court erred in denying his motion to hold Article 37.071, § 2(e) and (f) concerning burden of proof unconstitutional as a violation of Article I, §§ 10 and 13 of the Texas Constitution.

In Issue 35, appellant contends that the Texas death penalty scheme violates due process protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny.

In Issue 36, appellant contends that the Texas death penalty scheme violated his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues.

In Issue 37, appellant contends that the Texas death penalty scheme violated his rights against cruel and unusual punishment, to an impartial jury and to due process of law under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty.

In Issue 38, appellant contends that the Texas death penalty scheme denied him due process of law, and imposed cruel and unusual punishment in violation of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against the imposition of the death penalty. In Issue 39, he claims that this also denied him due course of law, and imposed cruel and unusual punishment, in violation of Article I, §§ 13 and 19, of the Texas Constitution.

In Issue 40, appellant contends that the trial court erred in overruling his motion to hold Art. 37.071, § 2(e) and (f) unconstitutional because said statute fails to require the issue of mitigation be considered by the jury.

109

In Issue 41, appellant contends that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence. In Issue 42, he claims that the mitigation special issue is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

In Issue 43, appellant contends that Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review.

In Issue 44, appellant contends that the trial court erred in overruling his motion to quash the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital-murder death-penalty law.

In Issue 45, he contends that the cumulative effect of the above-enumerated constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Finally, in Issue 46, he claims that this also denied him due course of law under Article I, § 19 of the Texas Constitution.

Appellant invites the Court to revisit its stand on these issues, which he agrees have all been previously overruled. *See* App. Brief, p. 110; *Saldano*, 232 S.W.3d at 107-09 (overruling multiple challenges to death penalty statute); *Escamilla v. State*, 143 S.W.3d 814, 838-829 (Tex. Crim. App. 2004) (same).

Appellant presents no new arguments for the State to address. This Court should decline appellant's invitation to revisit these legal claims and overrule issues 31 through 46.

**PRAYER**

The State prays that this Honorable Court will overrule appellant's issues on appeal and affirm the trial court's judgment.

Respectfully submitted,

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Industrial Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing brief was served on appellant's attorney, John Tatum, 990 S. Sherman Street, Richardson, Texas 75081, by depositing same in the United States mail, postage prepaid, on January 31, 2012.

Jaclyn O'Connor Lambert

111

AY-16458

LM

DEFENDANT Green, Gary _____ B M 03141971 CHARGE CAP MUR MULT/3RD

AKA:

ADDRESS   3844 Morning Springs Trail, Dallas, Tx _____   LOCATION DSO _____

FILING AGENCY TXDPD0000   DATE FILED October 30, 2009 _____   COURT _____ JDC282 _____

COMPLAINANT Armstead, Lovetta _____   F-0959380 _____ VT#: _____

C/C _____

---

### TRUE BILL INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:  The Grand Jury of

Dallas County, State of Texas, duly organized at the _____ October _____ Term, A.D., _____ 2009 _____ of the

_____ Criminal District Court 7 _____, Dallas County, in said Court at said

Term, do present that the _____ **GREEN, GARY** _____, Defendant,

On or about the _____ 22nd _____ day of September A.D. 2009 _____ in the County of Dallas and said State, did

unlawfully then and there intentionally and knowingly cause the death of an individual, to-wit: LOVETTA
ARMSTEAD, by BY STABBING LOVETTA ARMSTEAD WITH A KNIFE, A DEADLY WEAPON,
and during the same criminal transaction said defendant did then and there intentionally and knowingly
cause the death of another individual, to-wit: JAZZMEN MONTGOMERY, by ASPHYXIA BY
DROWNING.

And it is further presented to said Court that prior to the commission of the offense or offenses set out
above, the defendant was finally convicted of the felony offense of AGGRAVATED ROBBERY WITH A
DEADLY WEAPON, in the 292ND JUDICIAL DISTRICT COURT of DALLAS County, Texas, in
Cause Number F-9031096, on the 4TH day of JUNE, 1990,

And that prior to the commission of the offense or offenses for which the defendant was convicted as
set out above, the defendant was finally convicted of the felony offense of AGGRAVATED ASSAULT
WITH A DEADLY WEAPON, in the 194TH JUDICIAL DISTRICT COURT of DALLAS County,
Texas, in Cause Number F-8989526, on the 7TH day of SEPTEMBER, 1989,

FILED
09 OCT 30 PM 12:33
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

against the peace and dignity of the State.

_____ **CRAIG WATKINS** _____      _____ Gayle C. Cowart _____

Criminal District Attorney of Dallas County, Texas          Foreman of the Grand Jury.

COURT

**STATE OF TEXAS**      **AFFIDAVIT FOR ARREST WARRANT**      **COUNTY OF DALLAS**

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant who, after

being duly sworn by me, on oath stated: My name is <u>Detective Robert Quirk #5809</u>

and I am a peace officer of the City of Dallas, Dallas County, Texas. I, the affiant, have good reason and

do believe that on or about the <u>21</u> day of <u>September</u>, 20 <u>09</u>, one (name of suspect)

<u>Gary Green, B/M/03-14-1971</u> did then and there in the City of Dallas, Dallas County, Texas

commit the offense of <u>Capital Murder</u>

a violation of Section <u>19.03</u> of the <u>Texas Penal Code</u>,

a <u>Capital Felony</u>

Affiant's belief is based upon the following facts and information which Affiant received from:

☒ Affiant's personal investigation of this alleged offense.

☐ _____, a fellow peace officer of the City of Dallas, Dallas County, Texas, who personally participated in the investigation of this alleged offense, providing this information to Affiant, and whose information Affiant believes to be credible.

On September 21, 2009, between the hours of 5:30 p.m. and 8:00 p.m. suspect Gary Green, B/M/03-14-1971, committed the offense of Capital Murder, 19.03, a Capital Felony, against complainant's Lovetta Armstead, B/F/32, and Jazzmen Montgomery, B/F/6, by inflicting homicidal violence upon them causing their deaths. The offense occurred at 3844 Morning Springs Trail, Dallas, Dallas County, Texas.

At about 5:30 p.m. complainant Armstead dropped her two son's ages 12 and 9 off at church for the evening. At about 8:00 p.m. suspect Green returned to the church to pick the children up alone and returned home. Shortly afterwards suspect Green grabbed the 9 year old and in front of the 12 year old stabbed the child once in the torso. Suspect Green then forced the two children to a rear bedroom where she showed them the deceased bodies of their mother and 6 year old sister, and admitted to causing their deaths. Suspect Green told the children he would allow them to live and then fled the offense location in complainant Armstead's vehicle. The two boys called 9-1-1 and ran to a neighbor's house for help. When Dallas Police Officers arrived they discovered complainant's Armstead and Montgomery deceased. The two young boys were transported to Children's Hospital for treatment.

On September 22, 2009, at 2:15 a.m. suspect Green arrived at the Southeast Patrol Division and turned himself in. A short time later officers recovered complainant Armstead's vehicle near the intersection of Buckner Boulevard and Prairie Creek Road. Detective Quirk interrogated suspect Green in the homicide unit, and Detective Quirk obtained a videotaped voluntary statement in which Green admits to this Capital Murder.

<u>_____</u>
**AFFIANT** #5809

WHEREFORE, Affiant requests that an arrest warrant be issued for the above accused individual in accordance with the law.

SUBSCRIBED AND SWORN TO BEFORE ME on the

<u>22</u> day of <u>Sep</u>, 20 <u>09</u>    MAGISTRATE, IN AND FOR DALLAS COUNTY, TEXAS

**MAGISTRATE'S DETERMINATION OF PROBABLE CAUSE**

On this the <u>22</u> day of <u>Sep</u>, 20 <u>0 9</u>, I hereby acknowledge that I have examined the foregoing affidavit and have determined that probable cause exists for the issuance of an arrest warrant for the individual accused therein.

_____
MAGISTRATE, IN AND FOR DALLAS COUNTY, TEXAS

S/N 2761-01-207
POL-01529B