REPORTER'S RECORD

VOLUME 13 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F09-59380-S

CASE NO. AP-76,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 282ND JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| GARY GREEN | : | DALLAS COUNTY, TEXAS |

**INDIVIDUAL VOIR DIRE**

\*\*\*\*\*\*\*\*\*\*

On the 1st day of September, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable James Fry, sitting for the Honorable Andy Chatham, Judge Presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

Darline King LaBar, Official Reporter

```
 1  A P P E A R A N C E S:

 2


 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Frank Crowley Criminal Courts Building
 4        Dallas, Dallas County, Texas 75207
          Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409

 8

 9                                    FOR THE STATE OF TEXAS;

10

11

12

13

14

15  MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
          311 N. Market Street, Suite 300
16        Dallas, Texas 75202-1846
          Phone:  214-761-0707
17
    MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
18        3300 Oak Lawn Avenue, Suite 600
          Dallas, Texas 75219
19        Phone:  214-559-9115

20  MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
          3838 Oak Lawn Avenue, Suite 1350
21        Dallas, Texas 75219
          Phone:  214-651-6250
22

23
                                      FOR THE DEFENDANT.
24

25
```

```
 1                    INDEX VOLUME 13

 2                   (INDIVIDUAL VOIR DIRE)

 3  September 1st, 2010                              PAGE    VOL.

 4  Proceedings.......................................  4     13

 5  PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE    VOL.

 6  ELIZABETH HORN            9                                 13

 7  Agreement to excuse venireperson..................  16     13

 8  DEFENSE WITNESS     DIRECT          CROSS         VD     VOL.

 9  GARY GREEN            17                                    13

10  Venireperson 936, Mavis Fulton, excused by

11  agreement, no discussion...........................  18     13

12  PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE    VOL.

13  JOHN DIFILIPPO           23               38                13

14  Venireperson challenged by the State...............  54     13

15  Challenge Denied...................................  55     13

16  State Peremptory Strike Number 2...................  55     13

17  Reporter's Certificate.............................  56     13

18

19                      ALPHABETICAL INDEX

20  DEFENSE WITNESS     DIRECT          CROSS         VD     VOL.

21  GARY GREEN            14                                    13

22  PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE    VOL.

23  ELIZABETH HORN            9                                 13

24  JOHN DIFILIPPO           23               38                13

25
```

## Page 1

```
                    REPORTER'S RECORD
                   VOLUME 13 OF 57 VOLUMES

            TRIAL COURT CAUSE NO. F09-59380-S
                    CASE NO. AP-76,458

  THE STATE OF TEXAS      :      IN THE 282ND JUDICIAL
  VS.                     :      DISTRICT COURT OF
  GARY GREEN              :      DALLAS COUNTY, TEXAS


                   INDIVIDUAL VOIR DIRE



                      ***********

       On the 1st day of September, 2010, the following
  proceedings came on to be heard in the above-entitled and
  numbered cause before the Honorable James Fry, sitting for the
  Honorable Andy Chatham, Judge Presiding, held in Dallas, Dallas
  County, Texas;
       Proceedings reported by machine shorthand computer
  assisted transcription.
```

## Page 2

```
APPEARANCES:

HONORABLE CRAIG WATKINS, Criminal District Attorney
    Frank Crowley Criminal Courts Building
    Dallas, Dallas County, Texas 75207
    Phone: 214-653-3600

BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
     MR. JOSH HEALY, A.D.A., SBOT # 24026288
     MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
     MR. HEATH HARRIS, A.D.A., SBOT # 00795409


              FOR THE STATE OF TEXAS;









MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
    311 N. Market Street, Suite 300
    Dallas, Texas 75202-1846
    Phone: 214-761-0707

MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
    3300 Oak Lawn Avenue, Suite 600
    Dallas, Texas 75219
    Phone: 214-559-9115

MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
    3838 Oak Lawn Avenue, Suite 1350
    Dallas, Texas 75219
    Phone: 214-651-6250



               FOR THE DEFENDANT.
```

## Page 3

**INDEX VOLUME 13**

(INDIVIDUAL VOIR DIRE)

September 1st, 2010                                PAGE  VOL.

Proceedings.......................................... 4   13

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| ELIZABETH HORN | 9 | 13 | |

Agreement to excuse venireperson..................... 16  13

| DEFENSE WITNESS | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GARY GREEN | 17 | | 13 | |

Venireperson 936, Mavis Fulton, excused by
agreement, no discussion............................. 18  13

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| JOHN DIFILIPPO | 23 | 38 | 13 |

Venireperson challenged by the State................. 54  13
Challenge Denied..................................... 55  13
State Peremptory Strike Number 2..................... 55  13
Reporter's Certificate............................... 56  13


**ALPHABETICAL INDEX**

| DEFENSE WITNESS | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GARY GREEN | 14 | | 13 | |

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| ELIZABETH HORN | 9 | 13 | |
| JOHN DIFILIPPO | 23 | 38 | 13 |

## Page 4

                    P R O C E E D I N G S

        THE COURT: All right. Where is our Defendant?

        THE BAILIFF: He's fetching him right now, Judge.

        (Defendant brought into courtroom.)

        THE COURT: All right. Counsel, do you want Fulton or Horn first? Don't everybody answer at one.

        MS. BENNETT: Well, I was going to wait and let Paul --

        MR. JOHNSON: Yes.

        MR. HEALY: Judge, the State is ready, and we will do whatever you please.

        THE COURT: It doesn't matter to me. Do y'all have a preference whether we take Fulton or Horn first?

        (Discussion off the record.)

        MR. JOHNSON: We're ready for Horn, Judge.

        THE COURT: All right. Horn.

        (Venireperson brought forward.)

        THE COURT: Y'all be seated.

        Now, you are Elizabeth Horn?

        VENIREPERSON: Yes, sir.

        THE COURT: All right. Ms. Horn, I am Jim Fry. I am a Senior District Judge from Grayson County, and I'm here for the purpose of handling some of the voir dire in this case.

        The case that we're picking a jury for is the

5

1  State of Texas versus Gary Green. Mr. Green stands charged by
2  indictment with capital murder, and the State is seeking the
3  death penalty.
4          Let me ask a quick question. Have you ever been
5  on jury duty before?
6          VENIREPERSON: Yes, sir.
7          THE COURT: Have you ever served on a jury?
8          VENIREPERSON: Yes, sir.
9          THE COURT: Okay. Was it in a capital case?
10         VENIREPERSON: It was a murder case. They did
11 not seek the death penalty.
12         THE COURT: Okay. What you went through in voir
13 dire was done in a group. In a capital case, we do it
14 individually one juror at a time.
15         VENIREPERSON: I've been through this, too.
16         THE COURT: You have been through this before?
17         VENIREPERSON: Yep.
18         THE COURT: Okay. I'm preaching to the choir.
19         Let me introduce you to the folks who are going
20 to be involved. State of Texas here represented by Mr. Josh
21 Healy.
22         MR. HEALY: Good morning, ma'am.
23         THE COURT: Ms. Jennifer Bennett.
24         MS. BENNETT: Good morning.
25         THE COURT: The Defendant is Mr. Gary Green.

6

1  He's represented by Mr. Paul Johnson.
2          MR. JOHNSON: Good morning.
3          THE COURT: Mr. Brady Wyatt.
4          MR. WYATT: Good morning.
5          THE COURT: Mr. Kobby Warren.
6          MR. WARREN: Good morning.
7          THE COURT: First of all, let me swear you in as
8  a juror. Raise your right hand, please.
9          (Venireperson additionally sworn.)
10         VENIREPERSON: I do.
11         THE COURT: All right. Thank you.
12         Now, the -- this case, you will know this
13 morning whether or not you're going to be on this jury. This
14 case is scheduled to start October 25th. They anticipate it
15 will take one to two weeks. Any time problems?
16         VENIREPERSON: I'm scheduled to attend a
17 conference in Corpus Christi on the 26th and the 27th, but that
18 can be -- somebody can substitute for me.
19         THE COURT: Okay. So that's not a problem?
20         VENIREPERSON: No.
21         THE COURT: All right. Now, I've -- if there's
22 anything I can tell you about this process, it's to be candid.
23 And the reason is because for these folks to make an informed
24 decision, they need to know exactly how you feel about these
25 things. And since you've been through this process before, you

7

1  know kind of what I'm talking about.
2          Let me ask you one other question. Do you know
3  anything about this case?
4          VENIREPERSON: At the special venire when the
5  case was described, two cases came to mind without doing any
6  independent research, just thoughts. I think I recall reading
7  about this.
8          THE COURT: Okay. Anything -- are you sure that
9  you -- that what you read was about this case or you just
10 recall --
11         VENIREPERSON: Am I a hundred percent sure, no.
12         THE COURT: Okay. So you recall reading
13 something about a case that may have been this one?
14         VENIREPERSON: Uh-huh.
15         THE COURT: Anything about that that's going to
16 affect your ability to sit as a fair juror?
17         VENIREPERSON: No.
18         THE COURT: You could totally set aside what
19 you've read, understanding that the newspaper does not always
20 get it right, and -- and just listen to the evidence in this
21 case?
22         VENIREPERSON: Yes, sir.
23         THE COURT: All right. All right. Ms. Bennett.
24         ELIZABETH HORN,
25 was called as a venireperson by the parties, and after having

8

1  been previously duly sworn, testified as follows:
2                  STATE VOIR DIRE EXAMINATION
3  BY MS. BENNETT:
4  Q.   Good morning, Ms. Horn. How are you?
5  A.   I'm all right.
6  Q.   Good. I'm going to take a little bit of time to
7  talk to you. I'm going to spend some time talking to you about
8  your questionnaire.
9          Now, you said you've actually been through this
10 process, come down for individual voir dire on a capital murder
11 before?
12 A.   Yes, ma'am.
13 Q.   And when was that?
14 A.   It was one of the Chicago -- the Chicago 7 -- the
15 Texas 7, and I think Garcia comes to mind. I don't remember.
16 Q.   Oh, okay.
17 A.   I don't think -- he -- he wasn't the gentleman that
18 pulled the trigger that they knew of, but they were seeking the
19 death penalty.
20 Q.   Okay. So you came down and you spoke with the
21 attorneys one-on-one, and was it a process where they told you
22 that day whether or not you were on the jury?
23 A.   Yes, ma'am.
24 Q.   Okay. All right. Interesting. And then -- well,
25 you're an attorney?

9

1  A.  Yes, ma'am.
2  Q.  And you also served on a -- it looks like not just a
3  murder, but a capital murder, right?  You served the kind where
4  we don't seek the death penalty?
5  A.  Correct.
6  Q.  So was it one of those where it's an automatic life
7  sentence?
8  A.  It was a life sentence, yes.
9  Q.  And how long ago was that?
10 A.  Probably ten years.
11 Q.  Okay.  Okay.  Well, let me talk to you for a few
12 minutes about the fact that you're an attorney.  You
13 practice -- you said that you work with police officers.  What
14 exactly is it that you're doing now?
15 A.  I'm currently Assistant City Attorney for the City
16 of Carrollton.  I do all of their employment law and a lot of
17 the litigation management in the employment area.  I work with
18 Internal Affairs quite a bit.  And Carrollton is a civil
19 service city, so when there are appeals to arbitration or
20 discipline of police and firefighters, I represent the City in
21 the Civil Service Commission.
22 Q.  Okay.  Okay.  And, yeah, before that -- that was
23 kind of your line of work you did, was it labor?
24 A.  I've done quite a bit of employment.  And prior to
25 that, I was the General Counsel for the Dallas Housing

10

1  Authority.
2  Q.  Okay.  That's what it was.  I couldn't remember what
3  it was.
4  A.  That's okay.
5  Q.  Now, when you came down here and talked to the State
6  and the Defense -- you're a lawyer.  You obviously pick up on
7  things that we're asking or looking for.  Did you -- did you
8  know why you weren't seated on that jury?  Do you have any
9  ideas why?
10 A.  No, I really don't.  I was glad, but I don't -- I
11 have two -- I had two small children.  I'm a widow, and my
12 children were young.  And I mean, I made it really clear that
13 if there was any chance in the world that the jury was going to
14 be sequestered, that I absolutely could not serve.  I had help
15 during the day, but I did not have help at night.
16 Q.  Okay.  Did you talk to both sides?
17 A.  Yes.
18 Q.  Both sides spoke with you.
19         Well -- and -- and, you know -- just so you
20 know, there's a possibility in this case that -- it would only
21 be a sequestration for deliberations, but are you saying that
22 your children are older so that might not be a factor for you?
23 A.  My son will be 19 in two weeks, and my daughter is
24 15.
25 Q.  I wanted to ask you about -- and we don't like --

11

1  obviously, I don't want to pry into your personal life, but
2  some things you put on your questionnaire caused me a little
3  bit of concern, to be honest, about -- you mentioned your
4  husband's death at an early age and you said that that caused
5  you to kind of change your views on maybe the death penalty
6  because of how precious life is.  Can you -- can you tell me a
7  little bit about your thoughts on that?
8  A.  His life was cut short early.  He was 40 years old,
9  and it did change my -- I hadn't given it a lot of thought.  I
10 had heard about the death penalty -- I mean, obviously, I was
11 aware of the death penalty.  I think my moot court question
12 when I was in law school was the death penalty -- on the death
13 penalty, but I hadn't given it much personal thought at the
14 time.  And his death did make me face the questions of life and
15 death and the right to live or die or if punishment was
16 appropriate.  And where prior to then, I would have been more
17 inclined to say if the government says the death penalty is
18 appropriate, it's appropriate.  I -- that causes me to be more
19 thoughtful.
20 Q.  Sure.  And that's understandable.  Well, tell me
21 this.  Why do you think that the death penalty -- or do you
22 think the death penalty is a good option?
23 A.  I think it is appropriate in the right case.
24 Q.  Okay.  And can you tell me why you feel that way?
25 A.  I think that there are some crimes that are so

12

1  egregious, that a right to continue to live, even as horrible
2  as I imagine prison would be, is given up.
3  Q.  And what kind of crime in your mind would be the
4  kind of fact scenario that you would feel like would be
5  appropriate?
6  A.  Crimes -- when someone is intentionally tortured,
7  intentionally made to suffer prior to death, children, things
8  like that.
9  Q.  And why specifically children?
10 A.  Because, again, they're just starting out, and they
11 have their whole lives ahead of them, good, bad, or
12 indifferent, but they deserve the right to find their own path
13 and live their life.
14 Q.  So if the circumstances were appropriate, if you
15 felt like it was appropriate and we met our burdens and even
16 though you know about it, I'll talk to you a little bit about
17 it, you do feel like you could assess the death penalty?  I
18 mean, that's something that you feel like you could do?
19 A.  I could follow the law.
20 Q.  Okay.  And if the law means that answering those
21 special issues in such a manner so that the death penalty will
22 be assessed, that's not going to cause you any problems?
23 A.  I'm not going to say it wouldn't cause me any
24 problems, but I could -- if that's what the evidence was and
25 that's what the law was --

13

1  Q. You could do it. Maybe that's not really a fair way
2  to say it, because I understand we're talking about something
3  that is super serious here, but I guess the other thing is for
4  some people it would be a matter of answering questions and not
5  really reflecting too much about it because they understand
6  they're following the law, this is the circumstances, this is
7  the direction that led them, where others -- and that would be
8  my concern with you -- it might -- might, perhaps with your
9  personal experience, be more emotional. So what I'm trying to
10 get you -- there's no way for me to know that, only you would
11 know that.
12     A. Again, I would follow the law and consider the
13 evidence, consider the issues, and the questions. And if --
14 despite my personal feelings, render -- or answer the special
15 issues yes or no, as the evidence led me.
16     Q. Okay. And -- I mean, you -- when you were rating
17 it -- how you feel -- how strongly you feel about the death
18 penalty on a scale of 1 to 10, you gave it a 7, so that's a
19 fairly high rating. So in the proper circumstance you do
20 believe that it's appropriate?
21     A. Yes, ma'am.
22     Q. What about -- you know, we're talking here about a
23 factual scenario about the murder of more than one person in
24 the same criminal transaction. How do you feel about that?
25     A. I frankly haven't given it much thought. And I had

14

1  not realized that Texas law carried the death penalty if there
2  were two murders in the same instance. I wasn't familiar with
3  that, and so that was -- I learned that this morning.
4      Q. Okay.
5      A. It sounds egregious. Again, I'd have to know what
6  the facts were.
7      Q. And, again, though, if there's -- you feel very
8  strongly about if children are involved?
9      A. Yes.
10     Q. And if a child was involved in a multiple murder?
11     A. That would be very difficult.
12     Q. Okay. And when you say very difficult --
13     A. It would be difficult to consider, but that, for me,
14 would weigh in favor of imposing the death penalty.
15     Q. Okay. So for you, you would tend to trend more
16 towards the death penalty because of the child victim?
17     A. Because of the child, yes.
18     Q. Because of the innocence there?
19     A. Yes.
20     Q. Okay. Let me tell you what kinds of crimes in Texas
21 capital punishment is available for. It's murder plus certain
22 circumstances. Obviously, you're aware of murder of a police
23 officer, fireman in the commission of their duty, murder of a
24 child under six, murder of more than one person in the same
25 criminal transaction, murder in the commission of a felony, so

15

1  murder in the commission of burglary, robbery, sexual assault,
2  kidnapping, and murder for hire, okay? So those are some of
3  the circumstances that -- capital murder.
4       Do you remember the jury you sat on what -- what
5  the basis of the capital murder was?
6      A. I remember it was a drug case, and it was a group
7  of -- in my mind, they were kids, young boys. They weren't --
8  they were 19, 20, and they wanted to get back at this other
9  kid. And they set him up to sell drugs and lured him into a
10 garage and beat him. And there were a number of them involved.
11     Q. Okay.
12     A. That's what I remember.
13     Q. Okay. So probably for that one was murder in the
14 commission of a robbery. Murder in the commission of a
15 robbery.
16         MS. BENNETT: Judge, can we -- can we take a
17 moment? Can we take a break, please?
18         THE COURT: All right. Take a very short
19 recess.
20         (Venireperson excused from courtroom.)
21         (Recess.)
22         MR. WYATT: Okay. Judge, we're prepared to go
23 forward.
24         MS. BENNETT: With whether or not are we
25 doing --

16

1         MR. HEALY: Ready, Darline?
2         Judge, after talking with Defense counsel while
3  Ms. Horn was on the stand, I made it clear to lead counsel that
4  on paper Ms. Horn wasn't one of our favorites, but it's clear
5  from her answers with these facts that Ms. Horn would turn
6  into, the State's opinion, a pretty strong killer, so I talked
7  to Mr. Green's co-counsels and said, do y'all want to agree on
8  her because I don't want to put them in a position of having to
9  take someone that I've already told one of their attorneys that
10 we were not so much in love with Ms. Horn.
11        I think they agreed -- is that correct -- after
12 talking with their client?
13        MR. WYATT: Yes, we agree with that, Judge, by
14 agreement that we can let her -- we can excuse her from the
15 panel, but I'd also like to call Mr. Green briefly.
16        (Agreement to excuse venireperson.)
17        THE COURT: Sure.
18        GARY GREEN,
19 the defendant, was called as a witness in his own behalf, and
20 after having previously first duly sworn, testified as follows:
21                 DIRECT EXAMINATION
22 BY MR. WYATT:
23     Q. Mr. Green, we went back in the holdover and spoke
24 briefly about Juror Number 943, Ms. Horn, correct?
25     A. Correct.

17

1  Q. And you heard -- you've heard what she's got on her
2  questionnaire and you also heard about 15, 20 minutes of what
3  she said on the stand and you think that excusing this juror by
4  agreement is a wise decision, correct?
5  A. Correct.
6  Q. Okay. Anything about that that would cause you
7  any -- any kind of fear of losing a juror like that?
8  A. No.
9      MR. WYATT: I'll pass. Nothing further.
10     MR. HEALY: That's all, Judge.
11     THE COURT: All right. Ask her to come in.
12     (Venireperson returned to courtroom.)
13     THE COURT: Now, Ms. Horn --
14     VENIREPERSON: Yes.
15     THE COURT: -- we're going to excuse you from
16  this panel.
17     VENIREPERSON: Thank you very much.
18     THE COURT: I didn't think you would be too
19  terribly upset.
20     VENIREPERSON: Thank you very much.
21     THE COURT: We very much appreciate you being
22  here, and you are excused from jury service.
23     (Venireperson excused from courtroom.)
24     (Discussion off the record.)
25     MR. JOHNSON: Judge, just so the record is --

18

1  just so the record is correct, both sides have discussed Juror
2  Number 936 and due to some of the rather extreme answers she
3  had and certain position of the Defense counsel and the
4  Defendant that she's a little too extreme and we don't believe
5  she's the type juror that we would want to keep on this jury,
6  so we have agreed to -- and asked the prosecution agree to
7  excuse this juror and they have done so.
8      MR. HEALY: That's correct, Your Honor.
9      MR. JOHNSON: And the Defendant has been advised
10 and explained that.
11     THE DEFENDANT: Correct.
12     MR. JOHNSON: You are in agreement?
13     THE DEFENDANT: Yes.
14     (Venireperson 936, Mavis Fulton, excused by
              agreement, no discussion.)
15
16     MR. JOHNSON: That's all we have.
17     THE COURT: Okay. Ask Ms. Fulton to come in.
18     (Venireperson brought forward.)
19     THE COURT: Now, Ms. Fulton, we very much
20 appreciate your being here. We have -- we have gone through
21 your questionnaire and counsel has read it and we've decided
22 we're going to excuse you from this panel.
23     VENIREPERSON: All right.
24     THE COURT: This is a long, tedious process.
25 We're just in the second week of what will probably be several

19

1  weeks of this, so we appreciate you being here. And with that,
2  you're excused from jury service.
3      VENIREPERSON: All right. Thank you very much.
4      (Venireperson excused from courtroom.)
5      THE COURT: All right. We're now in -- waiting
6  for Mr. Difilippo.
7      MS. BENNETT: Yeah.
8      (Recess.)
9      (Venireperson brought forward.)
10     THE COURT: You'll be seated, counsel.
11     Now, you are John Louis Difilippo?
12     VENIREPERSON: Yes, sir.
13     THE COURT: All right. Mr. Difilippo, this is
14 -- I'm Jim Fry. I am a Senior District Judge from Grayson
15 County, and I'm sitting here for the purpose of helping pick
16 the jury in this case.
17     The case that we're picking the jury for is the
18 State of Texas versus Gary Green, and Mr. Green stands charged
19 by indictment with capital murder. And the State is seeking
20 the death penalty.
21     And this is what we call the voir dire
22 examination. Let me ask you a quick question. Have you ever
23 been on jury duty before?
24     VENIREPERSON: Yes, I have.
25     THE COURT: Okay. So you understand what voir

20

1  dire is, the process by which they pick a jury and they ask you
2  questions and they talk about the law.
3      VENIREPERSON: Yes.
4      THE COURT: Okay. In -- in non-capital cases,
5  that's done as a group. In capital cases, we do it one juror
6  at a time. This is our second week to do this, and we'll go
7  for several more until we get the jury picked.
8      These attorneys are not going to try and pry
9  into your private life. All they're trying to do is find out
10 if there's anything either in your background or in the way you
11 view the law in this case that would keep you from sitting as a
12 fair and impartial juror. And that's why we go through this
13 process.
14     The -- let me introduce you, first of all, to
15 the attorneys that are going to be involved. The State of
16 Texas here represented by Mr. Josh Healy.
17     MR. HEALY: Good morning, sir.
18     THE COURT: Ms. Jennifer Bennett.
19     MS. BENNETT: Good morning.
20     THE COURT: The Defendant, Mr. Gary Green, who
21 is here represented by Mr. Paul Johnson --
22     MR. JOHNSON: Good morning.
23     THE COURT: -- and Mr. Brady Wyatt.
24     MR. WYATT: Good morning.
25     THE COURT: They are two other lawyers who are

21

1 involved in this, but they are not in the courtroom presently.
2     Now, this case -- you will know this morning
3 whether or not you're going to be on this jury. This case is
4 set to go to trial on the 25th of October. They anticipate
5 that it will last one to two weeks. Do you have any time
6 problems with that?
7     VENIREPERSON: No, I don't. You said 25th of
8 October?
9     THE COURT: 25th of October.
10     VENIREPERSON: No, I don't, not that I know of.
11     THE COURT: Trying to make sure that -- you
12 know, sometimes you've got somebody who's got a -- has already
13 bought airplane tickets to go to Hawaii that are nonrefundable
14 or something. I want to make sure that you don't have any kind
15 of problem like that.
16     If you will raise your right hand, I'll swear
17 you in.
18     (Venireperson additionally sworn.)
19     THE COURT: All right. Now, let me -- first of
20 all, do you know anything about this case?
21     VENIREPERSON: No, I do not.
22     THE COURT: Okay. And let me tell you one other
23 thing. The attorneys in this case are not going to -- in their
24 voir dire will not talk about the facts of the case. They'll
25 talk to you about generally the law that applies in a case of

22

1 this type.
2     I have one word of advice to you, be as candid
3 as you can be. If they ask you how you feel, tell them exactly
4 how you feel. There are no right or wrong answers in this, but
5 for them to make an informed decision on who's going to be on
6 this jury, they need to know exactly how you feel, all right?
7     VENIREPERSON: Okay.
8     THE COURT: All right. Mr. Healy.
9     MR. HEALY: Please the Court. Counsel.
10     JOHN DIFILIPPO,
11 was called as a venireperson by the parties, and after having
12 been previously duly sworn, testified as follows:
13     STATE VOIR DIRE EXAMINATION
14 BY MR. HEALY:
15   Q.   Is it Mr. Difilippo?
16   A.   Difilippo.
17   Q.   Difilippo.
18   A.   Pronounce the I's like E's.
19   Q.   How are you doing this morning?
20   A.   Good. I apologize for being late.
21   Q.   Don't worry about it. Did you come from work?
22   A.   No, I didn't.
23   Q.   Okay. I thought I was told you came from work.
24 That's one of the things I wanted to touch on in your
25 questionnaire. Let me just briefly tell you how this is going

23

1 to work. I'm going to speak to you for a couple of minutes
2 about some questions in your questionnaire, maybe go over a
3 little bit of the law, and then I'll be done and then Defense
4 will get a chance to talk with you. And then you'll know for
5 sure whether you're on this jury today in probably less than an
6 hour. How does that make you feel?
7   A.   A little nervous. I guess I didn't realize it was
8 moving quite that quickly.
9   Q.   And I would like to ask jurors like yourself who are
10 very close to being on this jury, how would you feel about
11 being a juror in a capital murder case where the State is
12 seeking the death penalty?
13   A.   I wouldn't -- if I was picked, I wouldn't have any
14 problems serving.
15   Q.   You think you're the type of person who could
16 potentially end someone's life, depending on the evidence?
17   A.   Yes.
18   Q.   Okay. Fair enough. Let me do this, and I want to
19 talk to you a little bit about your questionnaire. You brought
20 up some interesting points in here that I wanted to touch on.
21 First off, it did say --
22     THE COURT: Hold on a second, counsel. Let me
23 give to the court reporter his questionnaire, so he'll have it
24 in front of him if he needs to review it.
25     VENIREPERSON: Okay. Thank you.

24

1   Q.   (BY MR. HEALY) It says that you are, in fact, in
2 favor of the death penalty. You said under specific
3 circumstances?
4   A.   Uh-huh.
5   Q.   And then earlier -- or later, excuse me, on page 3,
6 you were asked on a scale of 1 to 10, how strongly you believe
7 and you said 3.
8   A.   Uh-huh.
9   Q.   Can you kind of tell me about those two answers?
10   A.   It's just that I -- I think death penalty -- like
11 you said, you're ending someone's life. It needs to be deeply
12 considered before that choice is taken. But if -- I think if
13 the circumstances warrant it, I would have to agree with the
14 death penalty in that case.
15   Q.   And when you talk about circumstances, you know, we
16 can't talk to you about these facts. We can only kind of talk
17 to you in hypotheticals. What type of circumstance in your
18 mind -- kind of think of a case that may be eligible for the
19 death penalty?
20   A.   I can't think of a specific case, but I think it
21 would just have to be -- you know, in my mind if it's just such
22 a heinous crime and the person committed it in such a
23 deliberate way.
24   Q.   Nothing kind of comes to mind like a specific, you
25 know, fact scenario that you can think of?

25

1  A.  (No response.)
2  Q.  I'll be honest, based on your questionnaire, you're
3  a highly intelligent person who is very close to being on this
4  jury. So we're kind of trying to get a feel, you know, where
5  you stand on certain issues.
6  A.  Right. Well, I -- again, I think my -- my position
7  is it would just have to be a very serious case. It wouldn't
8  just have to be that -- you know, you always see on television
9  or you hear in the news about some prosecuting attorney who is
10 famous for, you know, always seeking the death penalty or
11 whatever. And, you know, for better or worse, I mean, Texas
12 has a reputation of pursuing the death penalty in more cases
13 than I think other states in the country. And I don't know if
14 in every case that that's the only course of action that they
15 could choose, but I think -- I'm certainly -- I think the point
16 I was trying to make in this is that, I'm certain if we would
17 go back and review every death penalty case in Texas over the
18 last few years, I could probably say these, I don't think the
19 circumstances would have warranted it. But I'm certain that
20 there may be one or two cases where I would say absolutely, I
21 agree in that case.
22 Q.  Well, let's talk about the ones that -- you know, I
23 know you don't know any specific facts, but let's talk about
24 the ones that you think in your opinion, what type of fact
25 scenario may not warrant the death penalty. And before you

26

1  answer that, let me kind of preface this by saying, you know,
2  to sentence someone to die in Texas, they have to be found
3  guilty of an intentional or knowing capital murder. What I
4  mean by that it has to be murder in the course of some other
5  aggravating factor, murder of a child under six, of two or more
6  individuals during the same criminal transaction, murder of a
7  policeman, fireman in the active line of duty, murder of a
8  prison guard, murder in the course of committing another
9  felony, such as aggravated robbery, aggravated sexual assault,
10 or aggravated kidnapping, murder for hire. So you see how
11 there's always something -- murder plus something. So just a
12 simple -- when I say simple, a cold-blooded killing -- if I
13 take out my gun out and shoot Ms. Bennett for no reason, I
14 would not be eligible for the death penalty in the state of
15 Texas. It has to be one of those types of scenarios that I
16 just stated. Does that make sense?
17 A.  Uh-huh.
18 Q.  So when you think about it now and you know kind of
19 the types of crimes where somebody is sentenced to die here in
20 the state of Texas, are you saying that you think there are
21 certain factors -- or let me just ask you. Knowing that, how
22 do you relate that to your answer that you just told me about,
23 there are certain death penalty sentences that you don't think
24 should be death?
25 A.  Well, no, I think that the point I'm making is --

27

1  what -- I would like to -- is our law stricter than other
2  states?
3  Q.  Probably.
4  A.  Okay.
5  Q.  I can't -- I can't confirm that because I don't work
6  in other states, but we seek the death penalty more than other
7  people.
8  A.  Okay. So I'm under the impression that we sentence
9  more people to death in our state than we do in other states.
10 Q.  We do. We actually sentence more people to death,
11 just Texas, than the rest of the country combined.
12 A.  Correct. That's -- that's the impression I was
13 under. So I think -- so is that because our laws -- there are
14 more circumstances under which we do that here, that other
15 states would not?
16 Q.  Generally because of some United States Supreme
17 Court rulings, everybody kind of has the same framework on
18 sentencing someone to die. It's usually -- you know,
19 obviously, the said person has to be found guilty, and then
20 there always has to be something else. In Texas, it's set up
21 with those two special issues right there. Other states have
22 some type of variety of those special issues, but in general,
23 to sentence someone to die, based on the United States Supreme
24 Court, you know, there has to be something similar to the way
25 we have it set up here.

28

1  A.  Right. So under the same circumstances, we have a
2  much higher rate of seeking the death penalty?
3  Q.  Correct. Tell me how that makes you feel.
4  A.  I don't -- I don't feel good about that.
5  Q.  Why is that?
6  A.  Because I -- I don't -- I don't think that's a
7  category, you know, that Texas needs to be leading the country
8  in. And I think we -- and that's the point I'm making. I --
9  that's why I would think in another state serving on juries,
10 although I grew up here, born a great Texan and I'm very proud
11 to be from Texas, but I think that there are -- but I would --
12 I would comply with Texas law, first of all.
13 Q.  Sure.
14 A.  It's our law, and I -- if I served on the jury, I
15 would follow the law. I wouldn't say, okay, they wouldn't kill
16 this guy in Massachusetts because their law is different or --
17 it's not as strict as Texas law, so therefore I'm not going to
18 vote or I'm not going to agree with that in this circumstance.
19 I would never do that. I would comply with the law. But the
20 point I was telling you is I -- I think the fact that we are
21 skewed relative to the rest of the country says that probably
22 we could find a different outcome for some of these cases
23 without pursuing the death penalty.
24 Q.  Life in prison, I guess?
25 A.  Correct.

29

Q. All right. Tell me how about you feel about that, between life in prison versus a death sentence. Obviously, in Texas, you know, if found guilty of a capital murder, it's life in prison without parole?

A. Correct.

Q. So my colleagues over here on the other side of me always like to say you're either going to die by lethal injection or you're going to sometime in the future in prison.

A. Right.

Q. Is there a difference to you?

A. Yes.

Q. And what is that?

A. I mean, I think someone serving in prison -- serving a life sentence without parole, you haven't -- you haven't put them to death. They're in prison. I think that's a more humane sentence for somebody that's guilty of a capital murder case.

Q. What about someone who potentially may have killed a police officer or a child or, you know, two individuals or a firefighter? Sentence them to life in prison is more humane?

A. Well, again, I think I would have to hear the facts of the case, but I think life in prison without parole is a reasonable alternative to the death penalty in some circumstances.

Q. Okay. And that kind of -- we've kind of gone full

30

circle now, and that was my original question to you. Can you give us a scenario -- and if you can't, that's great and we can't tie you down to that, but you say it's appropriate in some circumstances. What type of circumstances are you thinking about?

A. I don't know. I think that's a hard question to answer without, you know, sounding kind of cold-blooded. But I -- I think some of the cases, you know, if someone killed a child and -- or I think any of the cases, a policeman, a child, a spouse -- you know, I -- I think that if they -- they made -- they make a reasonable case, if it was a death penalty case, and the prosecution made a reasonable case and I think I could support the death penalty.

Q. I'm concerned with the other side of it, kind of what you said that there are circumstances in Texas where you think life would be a better option. Not so much concern because that's the type of juror we're looking for, someone that can consider both. But we're trying to get you -- your feelings. When you're considering the life part versus the death part what are you looking at?

A. Well, I guess I -- when it comes down to this, so -- and, again, I'm not an expert. The one jury I served on was just burglary, and it lasted like an afternoon. We're talking about convicting a person and then sentencing a person.

Q. After the second stage of the trial where you hear

31

the punishment evidence and then answering those special issues.

A. So in this case the jury will be responsible for not only deciding guilty or not guilty, but also the jury will be responsible for the --

Q. Sentence --

A. -- sentence?

Q. Correct.

A. Okay. And then when it's time to consider the sentence, what will the choices be?

Q. Life in prison without parole or the death penalty, based on the answers to those special issues. There's only two options when a person is found guilty of capital murder. So that's why I was kind of coming full circle. When you said that you think life would be appropriate under certain situations, I just want to kind of hear -- and I think both sides want to hear what are you feeling on that, like what types of situations that come to mind?

A. I think if -- I don't know, if someone had their niece or nephew with them in the car and they had a wreck and that niece or nephew died and whatever the circumstances were, they were seeking the death penalty for this person because they were driving horribly or whatever, you know, I -- I mean, I think that would warrant the death penalty.

Q. Okay. Remember what I said earlier, though --

32

people get confused on this part -- is when you're deciding the punishment stage based on those special issues, you have found somebody guilty of an intentional killing of either a child under the age of six, two or more individuals, a police officer, a firefighter, murder in the course of aggravated sexual assault, aggravated robbery, burglary, a prison guard, murder for hire. You have already found that person intended to cause that result, that killing, that cold-blooded, heinous killing.

A. Okay. So --

Q. So that scenario you gave, that wouldn't apply.

A. Right. I think in the cases that you've mentioned, I think I could support the death penalty in those cases.

Q. Okay. And could you also support life in prison for those cases?

A. Yes.

Q. And that's -- I'm just trying to figure out what someone like you would be looking at when deciding the punishment of somebody, based on one of those types of cases. What would be the most important thing for you? I mean, what happens if the Defendant was very remorseful, had a tough upbringing, things like that? Would that play a part for you? Knowing that they wouldn't get off scot-free, they would just be getting life in prison without parole.

A. Yeah, possibly. I mean, I think certainly attitude

### Page 33

1 of the person who committed that crime -- after the crime. I
2 don't know that I couldn't completely not consider that.
3    Q.   Okay. So you would be open-minded to hearing
4 everything?
5    A.   Yeah.
6    Q.   All right. Let me ask you a few questions about
7 your questionnaire, and then I'll be done here. You were
8 asked, have you ever written a letter to the editor, and you
9 said yes. And you said on creationism?
10   A.   Uh-huh.
11   Q.   Can you explain that a little bit?
12   A.   Well, there was an article in the paper about
13 creationism versus evolution.
14   Q.   And what are your beliefs, if you don't mind me
15 asking?
16   A.   I don't mind at all. I -- I see no issue with
17 teaching evolution in public schools, and I see no issue with
18 teaching creationism at churches.
19   Q.   Okay. And then what books have you ever read about
20 murder cases, and you said just the Kennedy assassination ones?
21   A.   Correct.
22   Q.   Tell me how you fall on that. We always have jurors
23 that fall on one side or the other on that.
24   A.   I'm not a conspiracy theory.
25   Q.   You're not a conspiracy theory?

### Page 34

1    A.   I've read Gerald Posner's book, and I -- I'm a huge
2 fan of people that present facts and back up those facts.
3    Q.   So we got it right on that one?
4    A.   I believe so.
5    Q.   All right. And then you also said you were
6 interested in such cases as the O.J. case and the Blagojevich
7 case in Chicago. What about those two individuals?
8    A.   Well, what was the question regarding those, just
9 other cases that --
10   Q.   Have you ever been interested in the outcome?
11   A.   Oh, yeah. Well, I was. I followed -- I followed
12 both of those cases. And I think on the -- I think on the O.J.
13 case -- I mean, I think, to me, that appeared to be that
14 prosecution just made a very bad job of prosecuting him.
15   Q.   Okay.
16   A.   And for Blagojevich, I think he did a very good job
17 of -- or his side did a good job of convincing the jury that
18 what he did was politics as usual and not a crime.
19   Q.   Do you think the governor -- do you think he
20 probably did what he was accused of doing, though?
21   A.   You know, based on some of the stuff -- I didn't
22 hear all the evidence, so, again, I'm going to answer just like
23 you guys usually answer. And that is I didn't hear all the
24 evidence. What I heard sounded pretty convincing. But, again,
25 you know, I didn't serve on the jury.

### Page 35

1    Q.   So that's my concern on a case like this for someone
2 like you. Because Mr. Green over here has three pretty slick
3 attorneys, and regardless if the facts are proven the right
4 way -- you know, they're going to be good at poking holes in
5 those facts. You know, we need jurors that can, you know, look
6 at both sides and truly look at what the evidence is.
7    A.   Okay. You -- you tell me then.
8    Q.   Yes, sir.
9    A.   If they do a good job poking holes in your facts,
10 who's -- who's -- what's the problem? You know, it's kind of
11 like when the salesman can't sell the car to the customer, is
12 it the customer's fault?
13   Q.   It's the salesman's fault. I agree.
14   A.   I agree. So I think -- again, I -- I told you, I'm
15 a huge fan of somebody who can present facts, back it up with
16 evidence. And if someone does that, I think I can recognize if
17 someone's obfuscating it or trying to tug on emotional, you
18 know, sentiments or something like that. But, again, if facts
19 aren't presented well and somebody does a good job of
20 presenting a counter argument, you've got to consider that.
21   Q.   Okay. Fair enough. Lastly, what I want to talk
22 about in your questionnaire is TV shows you've read -- or
23 excuse me -- you watch dealing with the death penalty. And you
24 checked, yes. You said TV show on the Innocence Project. What
25 was that about?

### Page 36

1    A.   It was about -- I think I've just seen like maybe
2 on -- and I don't know if it was specifically on Front Line
3 but, you know, I've seen cases where people have gone in years
4 later and then looked at -- especially DNA evidence.
5    Q.   Okay.
6    A.   And then been able to prove that the person wasn't
7 at the scene of the crime or whatever, where these people have
8 gotten off years later based on better scientific analysis of
9 the evidence.
10   Q.   Now, was that death penalty crimes or was that --
11 because I don't know if there has ever been --
12   A.   Right. I -- I think the program that I saw was very
13 clear that they hadn't overturned a case where someone had been
14 convicted of the death penalty. And, in fact, I remember one
15 crime in particular where the person claimed they were innocent
16 and the Innocence Project got involved, and I don't understand
17 exactly what the circumstances were, but after this person was
18 put to death, they were able to analyze his DNA and he was
19 adamant that he was innocent and so were the people on the
20 Innocence Project and it turned out that the DNA was, in fact,
21 his, so that was one case where --
22   Q.   The DNA showed --
23   A.   -- DNA proved that it was him and the conviction was
24 warranted in that case.
25   Q.   Let me ask you this, and I'll kind of wrap up with

37

1  this. In your opinion, do you think we've executed someone who
2  was innocent?
3      A.  I have no evidence to say that we have.
4      Q.  So no?
5      A.  So no.
6      Q.  Okay. Sir, I appreciate your time.
7          MR. HEALY: Judge, I'll pass the witness at this
8  time.
9          MR. WYATT: Can we have a brief recess, Your
10 Honor?
11         THE COURT: All right. Brief recess.
12         VENIREPERSON: Should I just leave this here?
13         THE COURT: Yes, sir, please.
14         (Venireperson excused from courtroom.)
15         THE COURT: All right. Bring him back in.
16         (Venireperson returned to courtroom.)
17         THE COURT: Y'all be seated.
18         Go ahead, counsel.
19         MR. WYATT: Thank you, Your Honor.
20              DEFENSE VOIR DIRE EXAMINATION
21 BY MR. WYATT:
22     Q.  Good morning. We appreciate you being here.
23 Without you being here, this system doesn't work. My name is
24 Brady Wyatt. Along with Paul Johnson and Kobby Warren, we are
25 the Defense team for Mr. Gary Green. And as Mr. Green sits

38

1  here today, he has been charged with capital murder, okay? And
2  just like Mr. Healy said, you know, they want this man to be
3  dead. That's their goal is to have this man be dead in
4  Huntsville, lying on a gurney at the end of this whole process,
5  no matter how long it takes.
6          And I want to talk to you -- a few things about
7  your questionnaire, kind of touch on some of the things that
8  Mr. Healy said. We were talking about the -- it kind of struck
9  me when you said some prosecutors have gotten famous seeking
10 the death penalty. And the first person that popped in my mind
11 is Bugliosi in California. Is that who you were kind of
12 thinking about?
13     A.  No. In fact, I'm glad he didn't ask me for names.
14     Q.  Okay.
15     A.  I'm not sure if it's more impressions I've gotten
16 from television shows or from what I've heard in the news.
17     Q.  What kind of really drew me to my question was not
18 only the answer that you gave to that question, but also about
19 the Kennedy assassinations. Have you read Reclaiming History
20 that Bugliosi wrote about the Kennedy assassination?
21     A.  No, I haven't.
22     Q.  Okay. I was just wondering if you had. It's a very
23 interesting, very, very long book. It was very interesting
24 about how the whole process worked out in California.
25     A.  He also wrote about Manson.

39

1      Q.  Yes.
2      A.  Didn't he prosecute Manson?
3      Q.  Yes.
4          MR. HEALY: It's a good book.
5      Q.  (BY MR. WYATT) Of course, he was a prosecutor --
6      A.  Right.
7      Q.  -- and seeking the death penalty, and just like we
8  were talking about earlier, some of those laws have shifted
9  back and forth. At times other states have said we're not
10 going to seek the death penalty, period. We're going to outlaw
11 the death penalty. And other states, the federal government
12 has given the states the right to make their own laws as
13 regards to this. And your feelings about Texas, I know you
14 said you didn't have any, you know, empirical evidence to back
15 it up, but when you say the -- on your questionnaire that the
16 death penalty is used -- you believe it's used too often, how
17 did you come up with that and give me your impressions on what
18 you think about that.
19     A.  I think just by the sheer statistic that I think
20 Texas sentences more people to death than the rest of the
21 states put together. That's an accurate statement, isn't it?
22     Q.  I'm not 100 percent sure. I think --
23     A.  It's close.
24     Q.  If it's not, it's probably up there. And I kind of
25 wanted to segue into a point of law about capital murder, that

40

1  there can be people -- not only if you were in another state
2  where they didn't seek the death penalty where, say, the exact
3  same facts, the exact same facts happened in two different
4  states and one state has the death penalty and one state
5  doesn't have the death penalty, obviously you've voiced your
6  feelings on how you feel about that, that that's just not
7  right. You would agree with that, right?
8      A.  Yes. My desire would be that they both be judged on
9  the same standards.
10     Q.  I want to take it out of another state. Obviously,
11 I don't know the laws of every state. I don't know all the
12 laws in the state of Texas. But in Texas you can also be
13 charged with capital murder where it could be a horrible,
14 heinous, terrible crime, just like Mr. Healy said, you know,
15 the death of a police officer, death of a fireman, death of a
16 child under six, and the State doesn't seek the death penalty.
17 Same exact set of circumstances, same exact county, and the
18 D.A.'s office in Dallas County says, you know what, we're going
19 to go for the death penalty on this guy, but we're not going to
20 go for the death penalty on this guy. And there may be
21 different circumstances that go into that decision, but how do
22 you feel about that? A person -- you know, two people in the
23 exact same circumstance and the State is seeking the death
24 penalty on one person but not the other? That cause you some
25 concern?

41

1     A.    Yeah, I mean, I -- that bothers me.
2     Q.    Is it one of those things where -- I mean, it's not
3 going to bother you enough where you say, you know what, I'm
4 going to go back there, if I'm chosen as a juror on this case,
5 and I believe the answers you gave Mr. Healy were that in the
6 appropriate circumstances, you could give the death penalty?
7     A.    That's correct.
8     Q.    Okay. And even if you -- knowing that, you know, in
9 a capital murder that some people are given a life sentence if
10 they're convicted by a jury and some people are given a death
11 sentence if the special issues -- if the jury believes beyond a
12 reasonable doubt the person is guilty of that capital murder
13 and Special Issue Number 1 is answered yes and Special Issue
14 Number 2 is answered no, then that person is sentenced to
15 death. And that does give you some pause. And it sounds like
16 you're a very thoughtful person when thinking about something
17 in the matter -- especially in the matter of life and death,
18 correct?
19     A.    Correct.
20     Q.    I want to ask you, if you're chosen as a juror on
21 this case and you're back there and you find this person
22 guilty, okay, of a terrible, horrible, heinous crime, you
23 believe beyond a reasonable doubt that the person is guilty,
24 all right? There's no justification, there's no self-defense,
25 defense of a third party, defense of property, the person is

42

1 not mentally retarded, the person wasn't acting with any legal
2 excuse, he wasn't insane at the time. You find this person
3 guilty beyond a reasonable doubt, and at that point in time the
4 law presumes that the life sentence is appropriate. The person
5 has been convicted of capital murder, and just like I said
6 earlier, sometimes the State seeks the death penalty, sometimes
7 they don't. If they don't seek the death penalty, when the
8 person is convicted, they get an automatic life in prison
9 without parole sentence. But if the State is seeking the death
10 penalty, we've got to move on to Special Issue Number 1.
11     A.    Uh-huh.
12     Q.    Special Issue Number 1, it's still the State's
13 burden. They must prove Special Issue Number 1 beyond a
14 reasonable doubt. They have to prove that the Defendant that
15 you just convicted of capital murder, they're seeking the death
16 penalty on -- that there is a probability that the Defendant
17 would commit criminal acts of violence that would constitute a
18 continuing threat to society. And basically what they're
19 asking for is a prediction, right?
20     A.    Uh-huh.
21     Q.    How do you feel about trying to make a prediction
22 about somebody's future behavior?
23     A.    I think that's the case where I -- I think knowing
24 their past behavior would be helpful.
25     Q.    Okay. And this would be in the punishment portion

43

1 of the trial, and you gave the exact right answer, okay? The
2 good things they've done, the bad things they've done, all
3 those things will come into -- to play in the punishment phase
4 of the trial.
5     And there's a few words that I want to talk to
6 you about specifically, and the first one is "probability".
7 You're an electrical engineer. You've dealt with probably a
8 lot more mathematics than I've ever dealt with sitting at a
9 lawyer's table, okay? What does probability mean to you?
10     A.    The likelihood of something occurring.
11     Q.    And what I always said is, you know, if somebody
12 always said, hey, you know what, possibly if I go out and buy a
13 lottery ticket tonight, I could possibly win, right?
14     A.    Yep.
15     Q.    It's not a very good probability though, right?
16     A.    Correct.
17     Q.    Okay. And probability -- there's no real definition
18 in the state of Texas of what probability is, and sometimes the
19 State legislature has left it up to each individual juror,
20 which is a good thing, you know, let each individual juror make
21 their own decision in a case like this about what probability
22 is. But does it mean to you specifically any kind of
23 percentage or --
24     A.    I think it's hard to think about probability without
25 putting it in percent, but it seems like greater than a

44

1 50 percent chance of --
2     Q.    Okay. And it says up there, also, commit criminal
3 acts of violence. What, to you, is a criminal act of violence?
4 If I turn around and punch Mr. Warren in the face right there,
5 would that be a criminal act of violence?
6     A.    It seems like it to me it would be.
7     Q.    Right. And he didn't pose any threat to me. It
8 wasn't self-defense. It wasn't defense of property, just
9 walked up to him and cold cocked him. That would be a criminal
10 act of violence. That would be an assault, right?
11     A.    Correct.
12     Q.    But if I walked up to you right there and I tried to
13 grab your wallet or grab your car keys and you punched me in
14 the face, you would agree that's -- that's an act of violence,
15 right? You just punched me in the face?
16     A.    Uh-huh.
17     Q.    But it's not criminal because you're defending
18 either yourself or you're defending property. Or you could
19 come over here and punch me to defend Mr. Warren -- defense of
20 a third party, even though you don't know him.
21     A.    Yeah.
22     Q.    So that wouldn't be criminal, correct?
23     A.    Correct.
24     Q.    What do you think about somebody who -- let me move
25 on to society. I'm going to loop back around to criminal acts

**Page 45**

1  of violence. When you say -- when you think of continuing
2  threat to society, what's the first thing that pops in your
3  mind when you see the word "society"?
4    A.  Anybody that -- anybody in the community that that
5  person is in that they would be coming in contact with.
6    Q.  You gave the exact -- that's a perfect answer,
7  absolutely. The community where they live.
8    A.  Correct.
9    Q.  If they're in prison, then their community is the
10 prison community, right?
11   A.  Yes.
12   Q.  And there's a society within that prison, and those
13 are the people who are there, the inmates, cell mates, guards,
14 doctors, all those people, correct?
15   A.  Correct.
16   Q.  And you're asked to make a prediction about whether
17 or not this person is going to be a threat to that society by
18 committing future acts of criminal violence. Like we said
19 earlier, you're going to be making a prediction. We kind of
20 walk you through all these things because we want to know how
21 you feel about all the different aspects of Special Issue
22 Number 1. You can see why it's so important to the Defense
23 side and the prosecution, and especially Mr. Green?
24   A.  Yes.
25   Q.  In a situation like this, if the society -- you're

**Page 46**

1  sitting there with a cell mate and the cell mate comes over and
2  says, hey, you know what, I want your -- I want your roll off
3  your dinner tray tonight, and the person punches that person in
4  the face, would you consider that to be a criminal act of
5  violence?
6    A.  No.
7    Q.  Okay. And why not?
8    A.  I think it's the same circumstances of him trying to
9  take my wallet and me punching him.
10   Q.  Exactly. Do you think there's a lesser -- you know,
11 some people say, you know what, Brady, this guy is in jail,
12 he's in the penitentiary, he has got a life without parole, you
13 know, I can imagine that prison is going to be a pretty --
14 pretty rough place, right?
15   A.  Correct.
16   Q.  And you know what, when people are in prison,
17 there's -- there's going to be violence in a prison. You would
18 expect that to happen, right?
19   A.  Yes. I know that happens in prison.
20   Q.  I'm sorry, I didn't hear you.
21   A.  I said, I know that happens in prison.
22   Q.  Right. It's one of those things when you're asking
23 to make a prediction, you can see how difficult that would be
24 about how somebody is going to react or act when they're in
25 prison, right?

**Page 47**

1    A.  Uh-huh.
2    Q.  In a situation like this, if you're asked to make
3  that decision, you found the person guilty beyond a reasonable
4  doubt of a horrible, heinous capital murder. Like I said,
5  there's no justification. The person wasn't insane. The
6  person wasn't mentally retarded. You found him guilty beyond a
7  reasonable doubt of that act. You come in as a juror, and you
8  say, you know what, I've got to make a decision about Issue
9  Number 1. And you said, you know what, I'd like to hear some
10 of the history of Mr. Green -- like I said, or any defendant,
11 you know, you can hear about good acts, bad acts at that point
12 in time.
13      There's a constitutional provision that we have,
14 the Fifth Amendment. You've heard of that before, right?
15   A.  Yes.
16   Q.  And the Fifth Amendment means, you know, a person
17 doesn't have to get up and testify. A person doesn't have to
18 say a word. And just like Mr. Healy said, we've done
19 everything that we have to do by showing up. We have to answer
20 the charge. We have to stand up and say, not guilty, and
21 that's it. We take a very different tack on things than
22 obviously the prosecution. We're going to hotly contest these
23 issues about whether or not guilt, innocence, whether or not if
24 we get to Special Issue Number 1 and Special Issue Number 2,
25 whether it's yes or no. And what I want to see is, you know,

**Page 48**

1  now that we've walked through Special Issue Number 1, what are
2  your personal feelings about making a prediction about how
3  somebody is going to act in prison knowing that they have life
4  without parole? How do you feel about that?
5    A.  If I can make a prediction of how they will behave
6  in prison, once they're convicted?
7    Q.  Yeah.
8    A.  Life without parole.
9         Again, I would like to understand the
10 circumstances of the crime they committed, the circumstances of
11 their life. I'm assuming that -- that's all I can do is, you
12 know, based on that evidence, I would -- I would have to make
13 whatever -- my best judgment that I could make.
14   Q.  Absolutely. You could follow the law and do that,
15 correct?
16   A.  Yes.
17   Q.  I want to take you to another hypothetical
18 situation, and the hypothetical situation is that if you're a
19 juror, you've been chosen in this case, and just like we just
20 talked about, you have found the Defendant guilty beyond a
21 reasonable doubt of the crime, capital murder. At that point
22 in time the law presumes that it's a life without parole, and I
23 kind of like to think of it as a light switch. The light
24 switch is down, and you flip it up to life without parole.
25 Okay. You found the person guilty beyond a reasonable doubt,

49

1  and you flip the light switch up so it's life without parole.
2  That's what the law presumes.
3      A.  All right.
4      Q.  That's not for sure it's going to be a hundred
5  percent, but that's what the law presumes at this point. The
6  State presents you evidence that you believe Special Issue
7  Number 1 the answer is yes, that there's a probability that the
8  Defendant is going to commit future acts of violence in this
9  society.
10     A.  Uh-huh.
11     Q.  And you flip that light -- you answer that question
12 yes, and you flip that light switch down. So right now
13 basically you're sitting on a life sentence. You haven't made
14 the decision yet because we haven't gotten to Special Issue
15 Number 2, but right now you're heading towards a death
16 sentence. The Defendant is getting death. And you look at
17 Special Issue Number 2. After taking into consideration all
18 the evidence, you look at the Defendant's character,
19 background, the circumstances of the offense, all the things
20 that are listed there in Special Issue Number 2. And if you
21 could read that for me -- read the whole --
22     A.  Just it --
23     Q.  No, just to yourself, sorry.
24     A.  Okay. Okay.
25     Q.  I want to put you in a tough position. I want to

50

1  put you in a position where it's 11 people against you, and
2  you're standing alone in that jury room. And you think the
3  answer to Special Issue Number 2 is yes, that there are
4  sufficient -- there is a sufficiently mitigating circumstances
5  or circumstance that would warrant a sentence of life in
6  prison. And that could be for whatever reason you want it to
7  be. Okay. That could be you've heard about something in the
8  Defendant's past, you've heard about the nature of the crime,
9  you've heard about -- about all types of things that could --
10 that could happen in a punishment hearing. And you're sitting
11 back there, and you think, you know what, I think life without
12 parole -- I've heard this. I think he's going to be a
13 continuing threat to society, but you know what, I think life
14 without parole is the appropriate punishment, okay? And some
15 people even say, you know what, it's even worse than death,
16 okay?
17     A.  Right.
18     Q.  But you say to yourself, I believe that there's a
19 sufficiently mitigating circumstance or circumstances to
20 warrant a sentence of life, so you flip the light switch back
21 to a life sentence, but you're standing alone back there. I
22 mean, it's the whole group against you. And that's all it
23 takes. Now, I want you to understand in your individual
24 decision, the State puts that power into each individual's hand
25 back there. And you don't have to explain it. You don't have

51

1  to argue about it. You can say, this is my decision. It could
2  be more mercy alone, that I don't think it's right for the
3  State to kill people in this situation. And you know what,
4  taking into consideration everything that you heard that I've
5  got -- I've got my own power back there. And what I really
6  need to know is, you're sitting back there, you're isolated,
7  you have your beliefs, you've heard about this terrible crime,
8  and you're making that decision. You don't have to explain it
9  to anybody. You don't have to do anything. There's a button
10 in the jury rooms in this building, and you can hit that button
11 and the light right next to you right there flips on and you
12 can say, you know what, Judge, I've made my decision, I've
13 listened to everything, I've deliberated. It's not that you
14 didn't participate in what was going on. But if I think this
15 is the right thing to do, I don't even have to explain it to
16 anybody why I think it's the right thing to do.
17         Are you the kind of person that can -- can stand
18 up against 11 people that want to kill somebody if you think
19 it's the right thing to do and say, you know what, it's a life
20 sentence?
21     A.  I would not do that.
22     Q.  You would not do that?
23     A.  If I couldn't enunciate to someone -- if I could not
24 explain to them why I felt the way I felt, then I would
25 probably suspect that there was a flaw in my thinking. I'm

52

1  telling you just like I told them. I think if they made a
2  case, if they presented evidence to me that made me feel like
3  we had met that criteria, and I could enunciate that, I think I
4  would --
5      Q.  You wouldn't have a problem enunciating your
6  feelings in a situation like that, when you're dealing with
7  something this important, would you? If you felt that way?
8      A.  Correct.
9      Q.  Okay. So you could do that. You could follow the
10 law and do that?
11     A.  I would -- I would -- I -- I'm just telling you now,
12 I believe I would do my utmost to follow the law. And, again,
13 if I -- and I assume they would present me evidence that I
14 could defend myself, but if I'm in the room and somebody -- you
15 know, 11 guys say, I think this guy needs the death penalty and
16 I'm -- and at first I say, hey, I don't think so, they go tell
17 us why, I don't know. I just -- I don't feel like you should
18 be killing people in Texas, I would never do that.
19     Q.  You would never do that?
20     A.  I would say these are -- this is what I think the
21 Defense had the responsibility or the prosecution had the
22 responsibility of doing. They didn't do it.
23     Q.  And what you're telling me right now -- what I'm
24 getting from you, is that you respect the process and you
25 respect not only the law, but you also respect the other 11

53

1 people that have sacrificed their time and effort to come down
2 to make this tough decision; is that correct?
3    A. Absolutely.
4    Q. In a situation like that where you're back there,
5 you say, you know what, I've enunciated my -- my beliefs, I've
6 told the jurors what I think, you've deliberated and told them
7 exactly how you feel. At that point in time you've made your
8 decision. If the other 11 are trying to bully you or if the --
9 you know, if somebody is trying to change your mind -- I'm not
10 talking about beyond deliberation, they're actually trying to
11 change the way you think, that you've enunciated to them your
12 beliefs and they're trying to change your beliefs, are you the
13 kind of person who's strong enough to say, you know what, I'm
14 not changing my beliefs. I've explained to you the way I feel,
15 and I'm standing by my decision?
16    A. I think I'm the kind of person that can do that,
17 but, again, we need to talk probabilities. And a probability
18 of something like that coming up where I have 11 people that
19 are completely wrong and I'm completely right? I'm able to
20 state why I'm right and they're totally unreasonable, I think
21 that probability is extremely low. There's -- and, you know --
22 and I'm assuming that I have served on a jury before (sic).
23    Q. That was the burglary case?
24    A. Burglary case.
25    Q. And you said the Judge set punishment in that case?

54

1    A. Correct.
2    Q. Okay. Did you stick around to find out what the
3 Judge gave in that case?
4    A. No, I didn't.
5    Q. So you never formed an opinion about whether you
6 thought it was a good -- a good just punishment or not?
7    A. Yes, I did not (sic). I -- I was -- I only formed
8 the opinion that this person was completely guilty of the
9 charge brought against him.
10    Q. Thank you very much for your time. We appreciate
11 you being down here. This is -- like I said before, the system
12 doesn't work without you. Thank you.
13      THE COURT: I'll let you pass back into the jury
14 room.
15      VENIREPERSON: Okay.
16      (Venireperson excused from courtroom.)
17      THE COURT: All right. What says the State?
18      MR. HEALY: Judge, the State is going to
19 challenge Juror 948 as not being truthful on his answers.
20 Based on his questionnaire and based on his beliefs, it's very
21 clear to the State that he would never, never answer those
22 special issues with a yes and no answer that would end Gary
23 Green's life, so we -- we feel it would be unjust for us to
24 have to burn a strike on Juror 948.
25      (Venireperson challenged by the State.)

55

1      THE COURT: All right. Overrule the objection.
2      (Challenge Denied.)
3      MR. HEALY: The State will then unfortunately
4 have to burn it's second peremptory challenge.
5      (State Peremptory Strike Number 2.)
6      THE COURT: State's 2.
7      All right. Ask Mr. Difilippo to come back in.
8      (Venireperson returned to courtroom.)
9      THE COURT: Mr. Difilippo, we very much
10 appreciate you being here and going through this. I'm going to
11 excuse you from this panel.
12      VENIREPERSON: All right.
13      THE COURT: This is a long process, and we're
14 just in the second week. It takes awhile, but you've been
15 very, very patient. We appreciate it.
16      VENIREPERSON: All right.
17      THE COURT: But you're excused from jury
18 service.
19      (Venireperson excused from courtroom.)
20      THE COURT: All right. Lunch until 1:00.
21      (Recess.)

56

Reporter's Certificate

THE STATE OF TEXAS:
COUNTY OF DALLAS:

    I, Darline King LaBar, Deputy Official Court Reporter in and for the 282nd District Court of Dallas County, State of Texas, do hereby certify that the above and foregoing volume constitutes a true, complete and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

    WITNESS MY OFFICIAL HAND this the Reporter's Certificate on the 9th day of February, A.D., 2011.

DARLINE KING LABAR
Official Court Reporter
363rd Judicial District Court
Dallas County, Texas
hpdkfaith@msn.com
(214) 653-5893

Certificate No: 1064
Expiration Date: 12/31/2012