REPORTER'S RECORD

VOLUME 40 OF 57 VOLUMES


TRIAL COURT CAUSE NO. F09-59380-S

CASE NO. AP-76,458


THE STATE OF TEXAS            :            IN THE 282ND JUDICIAL

VS.                           :            DISTRICT COURT OF

GARY GREEN                    :            DALLAS COUNTY, TEXAS




**INDIVIDUAL VOIR DIRE**






\*\*\*\*\*\*\*\*\*\*\*

On the 11th day of October, 2010, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Quay Parker, sitting for

the Honorable Andy Chatham, Judge Presiding, held in Dallas,

Dallas County, Texas:

Proceedings reported by machine shorthand computer

assisted transcription.

```
 1  A P P E A R A N C E S:

 2

 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Frank Crowley Criminal Courts Building
 4          Dallas, Dallas County, Texas 75207
            Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6          MR. JOSH HEALY, A.D.A., SBOT # 24026288
            MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7          MR. HEATH HARRIS, A.D.A., SBOT # 00795409

 8

 9                              FOR THE STATE OF TEXAS;

10

11

12

13

14

15  MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
            311 N. Market Street, Suite 300
16          Dallas, Texas 75202-1846
            Phone:  214-761-0707
17
    MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
18          3300 Oak Lawn Avenue, Suite 600
            Dallas, Texas 75219
19          Phone:  214-559-9115

20  MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
            3838 Oak Lawn Avenue, Suite 1350
21          Dallas, Texas 75219
            Phone:  214-651-6250
22

23                              FOR THE DEFENDANT.

24

25
```

```
1                        INDEX VOLUME 40

2                      (INDIVIDUAL VOIR DIRE)

3    October 11th, 2010                          PAGE   VOL.

4    Proceedings........................................ 5   40

5    PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

6    SONYA COLEMAN            15                        40

7    Venireperson 4A, James Ng, excused by

8    agreement, no discussion........................... 25   40

9    Venireperson 15C, John Carpenter, excused by

10   agreement, no discussion........................... 26   40

11   Venireperson 31C, Andrew Acord, excused by

12   agreement, no discussion........................... 26   40

13   Agreement to excuse venireperson................... 26   40

14   PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

15   RANDALL HILDENBRAND      28                        40

16   Agreement to excuse venireperson................... 32   40

17   Venireperson 1A, Lisa Hogan, excused by

18   agreement, no discussion........................... 33   40

19   PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

20   SHANE JENSEN             34                        40

21   Agreement to excuse venireperson................... 41   40

22   PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.

23   LISA RHONE               42                        40

24   Agreement to excuse venireperson................... 51   40

25   PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE    VOL.
```

1   JANICE BURGESS            58                              40

2   Agreement to excuse venireperson..................... 64   40

3   PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE      VOL.

4   DAVID GRANT               65                              40

5   Venireperson challenged by the Defense............... 74   40

6   Challenge granted.................................... 74   40

7   PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE      VOL.

8   IRMA RAMIREZ              76                              40

9   Agreement to excuse venireperson..................... 79   40

10  Venireperson 22A, Irma Ramirez, disqualified........ 80   40

11  Reporter's Certificate............................... 81   40

12

13                    **ALPHABETICAL INDEX**

14  PROSPECTIVE JUROR   STATE VOIR DIRE   DEFENSE VOIR DIRE      VOL.

15  JANICE BURGESS            58                              40

16  SONYA COLEMAN             15                              40

17  DAVID GRANT               65                              40

18  RANDALL HILDENBRAND       28                              40

19  SHANE JENSEN              34                              40

20  IRMA RAMIREZ              76                              40

21  LISA RHONE                42                              40

22

23

24

25

```
 1                    P R O C E E D I N G S

 2               (Venirepersons brought forward.)

 3               THE COURT:  Come on in, gentlemen.  Thank you.

 4     Have a seat there a few minutes, if you would.  Go ahead and be

 5     seated.  Thank you, please.

 6               Good morning, ladies and gentlemen of the jury

 7     panel.  How are you all this morning?  I'm sorry we're getting

 8     started a little late.  I know you've been here since 8:30 or

 9     thereabouts, so we've been -- we've been working in here to

10     kind of try and work, grinding slowly down to the end of our --

11     of our quest here.

12               I'm Judge Quay Parker.  I'm a Senior District

13     Judge from McKinney.  Several months ago, Judge Andy Chatham,

14     who is the presiding Judge over this case, asked me if I would

15     assist him in the trial of a capital murder case, this case, by

16     presiding over the jury selection process.  We call it the

17     individual voir dire.  So that explains to you what I'm doing

18     here today instead of Judge Chatham, who you've already met at

19     the general voir dire session.  Judge Chatham incidentally is

20     right across the hall in his courtroom taking care of the

21     everyday matters of the court while I'm in the process of

22     picking this jury.  Once we get the jury selected, it will be

23     turned over to him, and he'll try the case.

24               Now, we have the case scheduled for October the

25     25th.  We anticipate it will take two weeks to try the case.
```

```
 1   So do any of you know off the top of your head any problems or
 2   scheduling problems that you might have with those two weeks?
 3   It would be the week of October 25th and then the following
 4   week of November the 1st.  Does anybody know of any
 5   scheduling -- yes, ma'am, and what's your name, please?
 6                    VENIREPERSON:  Lisa Hogan.
 7                    THE COURT:  Okay.  Ms. Hogan.
 8                    VENIREPERSON:  I have two very important
 9   business meetings the week of the 25th, but the next week I'm
10   available.
11                    THE COURT:  Okay.  Are these business meetings
12   that perhaps you could postpone or to reschedule or do them
13   prior to the 25th?
14                    VENIREPERSON:  Unfortunately, I can't.  They're
15   with prospective clients, and they are in two different cities,
16   Cincinnati and Phoenix.
17                    THE COURT:  Okay.  Well, they may want to talk
18   to you about that when it comes your turn.
19                    VENIREPERSON:  Okay.
20                    THE COURT:  When it comes your turn --
21                    VENIREPERSON:  Okay.
22                    THE COURT:  -- and they may discuss that.  Now
23   that you've brought that to the attention of the attorneys,
24   they can talk about that and may be able to resolve that
25   situation for you, all right?  But this is something that you
```

```
 1  couldn't -- you can't reschedule or anything?

 2              VENIREPERSON:  It's not on my schedule.  I'm so

 3  sorry.  It's on the prospective clients' schedule.

 4              THE COURT:  All right.  Yes, sir.

 5              VENIREPERSON:  Does that --

 6              THE COURT:  I'm sorry.  What is your name?

 7              VENIREPERSON:  Randy Hildenbrand.

 8              THE COURT:  Okay.  Thank you, Mr. Hildenbrand.

 9              VENIREPERSON:  Does that time span cover

10  election day?

11              THE COURT:  Yes, it would.  Let's see, about --

12  well, when is the first Tuesday?  I believe it is.

13              MR. HEALY:  Judge, Judge Chatham is going to

14  make accommodations.

15              THE COURT:  He's going to make accommodations.

16  Okay, so I guess he's either going to let you out early to go

17  vote or maybe just continue that one day, you know, election

18  day and let everybody go vote and then resume court then the

19  following day.  So anyway -- but, yeah, we want you to have an

20  opportunity to do that.

21              Anything else concerning the schedule?  Okay.

22  Well, that explains to you what I'm doing here today instead of

23  Judge Chatham.

24              Now, the reason you're here today is because in

25  a capital murder case where the State is seeking the death
```

```
 1   penalty, the law requires that each prospective juror be
 2   interviewed individually, so you're here today for your
 3   individual interview.
 4              Let me tell you where we are.  We have 11
 5   jurors.  We need one more juror, and we need two alternates --
 6   two alternate jurors.  And so we're right down at the end of
 7   our jury selection process.  I believe we're beginning our
 8   eighth week; is that correct?  Eighth week of jury selection,
 9   and so we're right down at the end.  We've been at this seven
10   whole weeks, and this is the beginning of our eighth week.  And
11   we anticipate we'll finish either today, tomorrow, or
12   Wednesday.  We've got people scheduled for the next three days.
13   Of course, we don't know, you know, when we're going to find
14   our last juror and we don't know, you know, how long it's going
15   to take.  We anticipate being finished by Wednesday.
16              So that's what you're doing down here today is
17   for your individual voir dire.
18              Now, let me take you back in time, a few weeks
19   ago, you met in -- I believe everybody met in the courtroom
20   with Judge Chatham, is that right, over here?  We've had about
21   five or six different panels come in on this capital case, and
22   Judge Chatham has addressed each one of those groups.  Two
23   things happened that day that I want to recall your attention
24   to.  And one of them is that at some point in the proceedings,
25   Judge Chatham had every panel member stand up, raise their
```

```
 1   right hand, and he administered the oath of a prospective juror
 2   to each panel member.  Do all of you recall that happening?
 3   Everybody is nodding their head yes.  The reason I'm repeating
 4   this is because my court reporter is writing everything down
 5   that I'm saying to you and everything you say to me.  That's
 6   why I get you to identify yourselves when you're talking to me
 7   for purposes of our record.
 8                 Okay.  Now, let me ask you.  Did every one of
 9   you -- did all five of you stand and take the oath at that
10   time?
11                 VENIREPERSONS:  (Collectively)  Yes.
12                 THE COURT:  Okay.  Very good.  I'll just remind
13   you that you're still under that oath.  And what you've been
14   sworn to do are basically two things:  First and foremost and
15   most important is you're sworn to give us truthful answers, to
16   tell the truth.  And we know you'd do that anyway.
17                 Secondly, you are also sworn to be responsive to
18   each and every question, and that means you can't pick and
19   choose what questions you want to answer.  You have to answer
20   all the questions that either I ask to you or that the
21   attorneys ask to you.
22                 Now, let me tell you.  There's no right or wrong
23   answers about any of their questions.  What's going to happen
24   here this morning is we figure everybody that comes in on this
25   jury as a prospective juror probably doesn't know anything
```

1  about the law as it applies to capital murder cases here in

2  Texas.  And I bet all five of you fit into that group; is that

3  correct?

4                    VENIREPERSON:  Yes.

5                    THE COURT:  Yes, okay.  Good.  That's the way we

6  like you, as a matter of fact.  Because we don't want you

7  coming in with any preconceived ideas about the law.  And so a

8  good part of our time with you this morning -- with each one of

9  you this morning will be with the attorneys explaining certain

10  aspects and principles of the law as it applies to capital

11  murder cases.  And in those -- in their explanation, they may

12  give you a fact situation, a fact scenario, a hypothetical fact

13  situation, if you will.  I don't want you to confuse those

14  facts with the facts in this case, because they're not.  They

15  can't tell you anything about the facts in this case.

16                    The reason for that is because if you wind up on

17  this jury as either a juror or an alternate, then we don't want

18  you being seated in this jury box with any preconceived ideas

19  about the facts in this case, or the outcome of the case.  In

20  other words, what your verdict would be before you've ever

21  heard any of the evidence in the case.  You understand?  So

22  that's why we like you not knowing anything about the law

23  because that's going to be Judge Chatham's responsibility to

24  give you the law at the conclusion of the evidence which he

25  will.

1              And secondly, we don't want you knowing anything

2   about the facts in this case until you hear them during the

3   trial at the presentation of the evidence, okay?  So you're not

4   going to find out anything much about the case.  A little bit

5   about the law as it applies to capital murder cases.  Not

6   anything about the facts.  That's just the way it is, all

7   right?  So that's why I'm telling you once you -- once the

8   attorneys feel like you understand the law, the principles of

9   the law, then they're going to ask you questions to get your

10  thoughts, your ideas, your opinions about it.

11             What we're trying to find out is how you feel in

12  your heart of hearts about the law.  Can -- do you agree with

13  the law?  Can you follow the law?  Can you even participate in

14  a trial of this magnitude?  That's what you need to tell us.

15  Because we don't want to seat you on this jury and then later

16  on Judge Chatham will give you the oath of a prospective juror

17  -- I mean, excuse me, will give you the oath of a juror, and at

18  that time you will be sworn to follow the law.  And that's the

19  whole point of this little exercise here with you today is to

20  find out ahead of time whether or not you can follow the law

21  and apply the evidence to the law and participate in a trial of

22  this magnitude, okay?

23             Because you all know what's at stake here.  We

24  all do.  And it will be -- become even more obvious to you

25  during your individual interview, but I'm telling you that

```
 1   there's no right or wrong answers.  This is not a quiz that you
 2   either pass and you're on the jury; if you don't pass, you're
 3   not.  It's nothing like that at all.  It's not an exam.  It's
 4   not a quiz.  It's not how well you understand the law.  It's
 5   more about we want you to understand certain aspects of the
 6   law, but mainly we want to find out if you can follow it and if
 7   you can participate in this trial, okay?
 8                   So that's what we need to know, and that's kind
 9   of the direction that the attorneys' questions are going to
10   take.
11                   Now, the second thing that you did that day with
12   Judge Chatham besides taking the oath, you filled out a
13   questionnaire.  And I know none of you have seen the
14   questionnaire since you've turned it in that day.  And I
15   realize that you probably don't remember many, if any, of the
16   responses and answers that you wrote down that day.  Certainly
17   you don't remember the details of it.  Each one of the
18   attorneys has a copy of that questionnaire.  They've read it.
19   They're going to have questions for you about some of your
20   answers and responses in regard to the law.  And so we -- we
21   give you that questionnaire -- well, we know you don't know
22   anything about the law -- to kind of get a gut check, as some
23   of the attorneys might call it, about how you feel about it,
24   really not knowing anything about the law.  And then once they
25   explain it to you, then your mind may change, your attitude may
```

```
 1   change about it or it may not.  But at least you'll know more
 2   about what you're -- what you're talking about than you did the
 3   day that you filled out your questionnaire.  And since you -- I
 4   know you don't remember that, and I'll have a copy of your
 5   questionnaire for you here on the witness stand.  This is where
 6   you'll be talking from right here because it's got a
 7   microphone.  You can see everybody.  It's just -- makes it a
 8   little more convenient for everybody.
 9             All right.  Now, I think I've talked enough, and
10   let's go ahead and let me introduce the attorneys to you and
11   then we'll get started with our individual voir dire.  And, of
12   course, the reason we have all of you come in at 8:30 is
13   because we don't know exactly who we're going to take.  We've
14   already excused, I think, one member of the group this morning.
15   We have the same number coming in this afternoon, for the next
16   three days.  And so we're really putting a rush on this trying
17   to get this thing finished up.
18             Seated at the counsel table directly in front of
19   the jury box here where you're seated is the prosecution table,
20   and seated there is Ms. Jennifer Bennett.
21             MS. BENNETT:  Good morning.
22             THE COURT:  And also Mr. Josh Healy.
23             MR. HEALY:  Good morning, ladies and gentlemen.
24             THE COURT:  They -- these two ladies and
25   gentlemen are the Assistant District Attorneys, and they are
```

```
 1   two members of a four-member prosecution team.  Mr. Heath

 2   Harris and Mr. Andy Beach are the other two members of the

 3   prosecution team, and neither one of them are in the courtroom

 4   with us today, but they come and go and so -- some of you may

 5   see one or the other of them in addition to -- and usually

 6   they're seated either at the back of the courtroom or right

 7   here at the counsel table with Mr. Healy and Ms. Bennett.

 8                   Then at the counsel table directly in front of

 9   the bench here and across from me, Mr. Paul Johnson --

10                   MR. JOHNSON:  Good morning.

11                   THE COURT:  -- lead counsel for the Defense.

12                   Seated next to him, Mr. Kobby Warren.

13                   MR. WARREN:  Good morning.

14                   THE COURT:  And also behind him, Mr. Brady

15   Wyatt.

16                   MR. WYATT:  Good morning.

17                   THE COURT:  These three fine attorneys are the

18   Defense team, and they represent the Defendant in this case,

19   Mr. Gary Green --

20                   THE DEFENDANT:  Good morning.

21                   THE COURT:  -- who's the gentleman seated on the

22   end.

23                   All right.  Who are you going to have first?

24                   MR. HEALY:  Ms. Coleman is the lucky number one.

25                   THE COURT:  Ms. Coleman.  All right.  Ms.
```

 1   Coleman, if you'll take the seat at the -- at the witness stand

 2   there.

 3                   And, ladies and gentlemen, if you'll accompany

 4   my bailiff, he'll take you back out here in the hall where

 5   we'll try to make you as comfortable as possible.  If you need

 6   water or restroom facilities, he'll show you where those are or

 7   tell you where those are.

 8                   (Venirepersons excused from courtroom.)

 9                   THE COURT:  Thank you, ladies and gentlemen.  Be

10   seated, please.

11                   And, Darline, let the record reflect this is

12   Prospective Juror Number 2C, Sonya, S-o-n-y-a, Coleman,

13   C-o-l-e-m-a-n.

14                   All right.  Mr. Healy.

15                   MR. HEALY:  Thank you, Judge.

16                   THE COURT:  Yes.

17                   MR. HEALY:  Please the Court.

18                   Counsel.

19                           SONYA COLEMAN,

20   was called as a venireperson by the parties, and after having

21   been previously duly sworn, testified as follows:

22                   STATE VOIR DIRE EXAMINATION

23   BY MR. HEALY:

24       Q.   Ms. Coleman, how are you doing this morning?

25       A.   I'm good.  How are you?

1      Q.    Good.   Excited to be here, right?

2      A.    Oh, yeah.

3      Q.    Sorry my voice is a little bad.   Last about two

4   weeks I've been struggling here, and then I was out of town

5   this weekend which hasn't helped.   But if you can't understand

6   anything I'm saying, please try to have me repeat it.   This is

7   a pretty important process.   I think you'd agree with that.

8      A.    Yes.

9      Q.    The way it's going to work is I'm going to talk with

10  you for up to 40, 45 minutes, if it goes that far, then Defense

11  will talk to you up to 40, 45 minutes.   What I mean by if it

12  goes that far is as the Judge said, we are looking for one more

13  juror and a couple of juror alternates and we'll be done.

14  We're starting testimony in two weeks, all right?   And both

15  sides think that you're a potential person that could sit on a

16  case like this, and so that's why we wanted to get you down

17  here to speak with you.

18          How does that make you feel knowing that you're

19  pretty close to being on a death penalty trial like this?

20     A.    A little pressure, but I think I can handle it.

21     Q.    And that was one thing I wanted to talk to you

22  about.   Right now, as the Judge said, you've taken an oath to

23  tell the truth.   I don't want you to try and answer a question

24  the way you think I want to hear it or the way I think Mr.

25  Johnson wants you to hear it.   This is your time to shine.

1    We're just looking for honest answers from you.

2         A.    Okay.

3         Q.    You're not going to offend any side no matter what.

4    And what I mean by that is if you tell just me, Mr. Healy, I

5    think everybody who commits a murder should get the death

6    penalty, I'll thank you for your honesty.  If you say, Mr.

7    Healy, I think nobody deserves the death penalty for committing

8    murder.  I'd say thank you for your honesty.  So I really want

9    to stress that -- how important that is for this process to

10   succeed.

11        A.    Okay.

12        Q.    Fair enough?

13        A.    Yes.

14        Q.    All right.  Well, Ms. Coleman, tell me about your

15   feelings on the death penalty.  I know you filled out this

16   questionnaire a while ago, but I want to hear you talk a little

17   bit.

18        A.    I believe in the death -- well, that's hard to

19   say -- I'm for the death penalty when it comes to -- as long as

20   it's -- the person accused is found guilty beyond a reasonable

21   doubt, as far as eyewitness testimony, DNA, if it's available,

22   and crimes against a child.

23        Q.    Okay.  And you said --

24                THE COURT:  Can you all hear Ms. Coleman?

25                VENIREPERSON:  Do I need to adjust it?

```
 1                  THE COURT:  Could you speak up just a little

 2   bit?

 3                  THE WITNESS:  All right.  I'm sorry.  Yes, yes.

 4                  THE COURT:  That's all right.  And that is a

 5   microphone.  It should be on, but I was just having a little

 6   difficulty hearing you.

 7                  VENIREPERSON:  Okay.  I'll speak up.  I'll speak

 8   up.

 9                  MR. HEALY:  Do you want me to tell you why,

10   Judge, really?

11                  THE COURT:  Why?  Because I'm deaf, and I'm old?

12        Q.   (BY MR. HEALY)  We've been doing this awhile, as you

13   can see, Ms. Coleman.  We've been in here -- so you were about

14   to say I believe in the death penalty, and then you kind of

15   stopped yourself.  Tell me about that.

16        A.   Right, because it's not something that you can

17   believe in.  You're either for or against it.  I don't believe

18   in, you know, I have the right to choose death for someone, but

19   I can't really explain it very well.  I'm for the death

20   penalty, but when the circumstances warrant it.

21        Q.   Okay.  And your circumstances include where the

22   proof is there or whether it's a child, you said?

23        A.   Well, all three have to -- well, not all three have

24   to be met.  At least the eyewitness testimony and DNA and, you

25   know, especially if it's a crime against a child.
```

```
 1        Q.    What about -- you know, sometimes in some cases you
 2   don't hear about DNA, you just -- the Defendant gives a full
 3   confession to the case, you know, something that would make you
 4   feel comfortable?
 5        A.    Yeah, that's -- that's -- you know, that's -- as
 6   long as it's able -- it's proven to me and the other jurors and
 7   beyond a reasonable doubt.
 8        Q.    Okay.
 9        A.    That there is no -- no reason to doubt that.
10        Q.    And why -- why did you say child --
11        A.    I think crimes against children -- well, murder --
12   murdering a child is especially heinous.
13        Q.    And I saw that you followed that case that happened
14   a couple of months ago when the couple locked the family or the
15   kids in the hotel bathroom?
16        A.    Yeah.
17        Q.    You know, you're the first person in all these
18   questionnaires who actually wrote about that.  We bring that up
19   a lot to potential jurors to see on a different issue, and
20   we'll get to that later.  But why did that case stand out to
21   you so much?
22        A.    It wasn't -- none of the children died.
23        Q.    No.
24        A.    The -- it was a crime, a very serious crime that --
25        Q.    They both got -- one got 99 years, one got life in
```

1   prison.

2       A.    Right, right.  When it's something like that, when

3   it's taking someone -- a child's innocence, their life, even

4   though they have survived, it's just going to be hard for them

5   to get over.

6       Q.    Okay.  Ms. Coleman, tell me -- you put on your

7   questionnaire -- do you feel the death penalty in Texas is used

8   too often or too seldom.  You said too seldom.  In some cases

9   it is not used -- and I can't read your writing.  I apologize.

10       A.    That's okay.  I've heard that before.

11       Q.    It's on page 3 in the middle.  What does that say?

12       A.    Oh, too seldom in some cases.  It is not used due to

13   extradition rules or plea bargains.

14       Q.    What did you mean by that?

15       A.    There was a case a few years back, a man killed a

16   young woman and he -- he ran away to Mexico, but the only way

17   to get him back was to agree.

18       Q.    That was in my court.  The North Texas woman?

19       A.    Yeah, the college student.

20       Q.    Yes.  Okay.  So you followed that one, as well?

21       A.    Yeah.

22       Q.    See, that would -- as you said, that's one of the

23   issues we're going to hit in a second, if he would have been

24   caught before he went Mexico, that in all likelihood would have

25   been a death penalty trial.

1      A.    Right, right.  That's what I mean by too seldom when

2  there's a plea arrangement.

3      Q.    And then you said what's the most important thing in

4  deciding life or death on a death penalty case.  You said the

5  nature of the crime.

6      A.    Right.

7      Q.    You're just talking about the facts of the crime, or

8  how -- explain that a little bit.

9      A.    And I probably didn't read the last portion of a

10 capital murder case.  What I was thinking was for more of an

11 accidental killing.

12     Q.    Okay.

13     A.    Self-defense.

14     Q.    We wouldn't be here for an accidental killing.

15     A.    Right, right.  So that's what I meant by that.  I

16 didn't really read the last portion of the question.

17     Q.    Let me ask it to you then now, how you're

18 understanding it.  When you're thinking of a death penalty case

19 and you're thinking the State has proved it to you beyond a

20 reasonable doubt that man is, in fact, the person who did it,

21 and you have no doubt whatsoever, what would be most important

22 to you before we get to the law in deciding life or death?

23 What do you think is the most important thing?

24     A.    If the person would possibly re-offend.

25     Q.    Possibly re-offend?

1        A.    Yes.

2        Q.    Okay.

3        A.    If he could be rehabilitated.

4        Q.    Do you think somebody who commits a cold-blooded

5   capital murder -- and maybe this is a good time for me to

6   explain what capital murder is.  You read in your orientation

7   guide that it's murder of two or more individuals.  That's one

8   of the ways it could be capital murder.  Capital murder is also

9   murder of a child under the age of six.

10       A.    Right.

11       Q.    Murder of a policeman or fireman in the line of

12  duty.  Murder in the course of robbery, burglary.  And you kind

13  of nailed most of these in your answers to what crimes.  Murder

14  in the course of aggravated sexual assault.  That was that

15  North Texas one.

16       A.    Yeah.

17       Q.    Murder of a prison guard.  And so that's what

18  capital murder is.  Capital murder is the intentional taking of

19  those lives, so we're not talking about an accidental death.

20       A.    Accidental, okay.

21       Q.    We're not talking about in self-defense.  We're

22  talking about a cold-blooded intentional killing with some type

23  of aggravating circumstance.  And what I mean by that, it's

24  kind of like I always use the example of Ms. Bennett here.

25  During the eighth week now of jury selection, I'm just getting

1  tired of her.  Obviously, you can look at her, most people get

2  tired of her all the time, you know.  And I pull out my gun and

3  I shoot her in the head for no reason whatsoever.  I like it.

4  I get on that witness stand and say I'd do it again, okay?  I

5  wouldn't be eligible for the death penalty in the state of

6  Texas, because I didn't do one of those aggravating factors, as

7  well.

8        A.    Right.  You just --

9        Q.    Now, if I did that and stole her water bottle, even

10 though that water bottle probably cost $5, all right, then it

11 would be murder in the course of robbery.  Then I would be

12 eligible for a death sentence.

13       A.    Okay.

14       Q.    So when I ask you what's important in deciding life

15 or death, I want you to realize, you're talking about the worst

16 of the worst when you have found somebody guilty of a capital

17 murder.  You're talking about the intentional taking of another

18 person's life, whether it be a child under the age of six , two

19 or more individuals, a police officer, a fireman, and so on.

20 You're talking about the person was not insane.  You're talking

21 about it was not in self-defense, okay?

22            So you talked about would the person be able to

23 re-offend or -- I'm going to ask you, do you think those types

24 of people can re-offend or rehabilitate -- excuse me.

25       A.    No.  No, because if you kill someone, that -- that

```
 1    takes thought, that takes effort.  You can't -- if you already

 2    have that in your -- in you to do, you could possibly do it

 3    again.

 4         Q.   Okay.  Now, we get pretty personal in these

 5    questionnaires.  We apologize.  It kind of -- the only way this

 6    works, as I said earlier, is the honesty of both parties, us

 7    and you, and I'm going to lay out our position here in a

 8    second, but you put something in your questionnaire that I

 9    wanted to talk to you about, if it's okay.

10              You talk about that you're in counseling for

11    emotional trauma?

12         A.   Yes.

13         Q.   Can you tell me about that a little bit?

14         A.   Sexual abuse.

15         Q.   Okay.  And I'm going to try and do this in the most

16    couth way possible.

17         A.   Okay.

18         Q.   Was it a relative?

19         A.   Yes.

20         Q.   Boyfriend?

21         A.   A father -- my father.

22         Q.   Okay.

23              MR. HEALY:  Judge, may I have a second?

24              THE COURT:  Yes, sir.

25              MR. HEALY:  Judge, can we have a brief recess?
```

```
 1                      THE COURT:  Yes, sir.

 2                      All right.  Ms. Coleman, if you'd step out with

 3   my bailiff for just a second, let me confer with the attorneys

 4   and I'll bring you back in just a minute, all right?  Watch

 5   your step there, please, ma'am.  Yeah, go ahead and get your

 6   purse.

 7                      (Venireperson excused to hallway.)

 8                      MR. HEALY:  Can we just have a second, Judge?

 9                      THE COURT:  Yeah.

10                      (Discussion off the record.)

11                      THE COURT:  Let's get on the record here.  Let's

12   kind of clean a few things up here.  With regard to this

13   morning, Prospective Juror Number 6 -- James Ng, who is

14   Prospective Juror Number 4A, James Ng, was excused by agreement

15   of parties; is that correct?

16                      MR. HEALY:  Correct, Your Honor.

17                      THE COURT:  And --

18                      MR. WARREN:  This is correct, Your Honor.

19                      THE COURT:  Okay.  Thank you.  Then Mr. James Ng

20   will be excused.

21                      (Venireperson 4A, James Ng, excused by
                          agreement, no discussion.)
22

23                      THE COURT:  And then this afternoon, Number 15C,

24   John Carpenter, has also been excused by agreement of the

25   parties; is that correct?
```

```
 1                    MR. HEALY:  That's correct, Your Honor.

 2                    MR. WARREN:  Yes, Your Honor.

 3                    (Venireperson 15C, John Carpenter, excused by
                       agreement, no discussion.)
 4

 5                    THE COURT:  Okay.  And then also this afternoon,

 6     Prospective Juror Number 31A, Andrew Acord, excused by

 7     agreement?

 8                    MR. HEALY:  That's correct, Your Honor.

 9                    THE COURT:  And excused by agreement?

10                    MR. WARREN:  That is, Your Honor.

11                    (Venireperson 31C, Andrew Acord, excused by
                       agreement, no discussion.)
12

13                    THE COURT:  All right.  Very good.  Thank you.

14                    And also, Ms. Sonya Coleman is now excused by

15     agreement; is that correct?

16                    MR. HEALY:  I'm going to let Mr. Johnson put Ms.

17     Coleman on the record.

18                    THE COURT:  Okay.  Go ahead.

19                    MR. JOHNSON:  Yes, sir, Judge, she -- after

20     speaking with the client, he does not wish to go any further

21     with her and we're going to agree with the State to excuse.

22                    THE COURT:  Okay.  So Sonya Coleman is excused?

23                    MR. HEALY:  Correct, Judge.

24                    (Agreement to excuse venireperson.)

25                    THE COURT:  All right.  Very good.  Bring Ms.
```

```
 1  Coleman back.
 2                  (Venireperson brought forward.)
 3                  THE COURT:  Ms. Coleman, just go ahead and have
 4  a seat there, if you would, please.
 5                  Thank you, ladies and gentlemen.
 6                  I just wanted to bring you back and thank you
 7  personally for being here today.  I'm going to release you from
 8  any further responsibility in this case.  But thank you so much
 9  for your jury service and thank you so much for the time and
10  effort you've made to be with us today.
11                  VENIREPERSON:  Okay.
12                  THE COURT:  Have a good day.
13                  VENIREPERSON:  Thank you.
14                  THE COURT:  Thank you.
15                  (Venireperson excused from courtroom.)
16                  MS. BENNETT:  All right.  We're going to bring
17  in Mr. Hildenbrand.
18                  THE BAILIFF:  Mr. Hildenbrand.
19                  THE COURT:  Yes, sir.
20                  (Venireperson brought forward.)
21                  THE COURT:  Come in, Mr. Hildenbrand, if you
22  would, please, sir.  Just right down here to the witness stand
23  would be fine.  Thank you, sir.  Just go ahead and have a seat
24  there.
25                  Thank you, ladies and gentlemen.  Be seated,
```

```
 1  please.

 2              Mr. Hildenbrand, let me just remind you when you

 3  step down, watch your step because it's kind of tricky there.

 4  We've lost some jurors off that deal.  There's your

 5  questionnaire that I told you would be there for you.

 6              And, Darline, I'd like for the record to reflect

 7  this is Prospective Juror Number 10C, Randall, R-a-n-d-a-l-l,

 8  Hildenbrand, H-i-l-d-e -- Hildenbrand, correct?

 9              VENIREPERSON:  Yes.

10              THE COURT:  I don't think I was putting an N in

11  it.  H-i-l-d-e-n-b-r-a-n-d.

12              Okay.  Let's see, Mr. Healy.

13              MR. HEALY:  Thank you, Judge.  Please the Court.

14              THE COURT:  Mr. Healy.

15              MR. HEALY:  Counsel.

16                  RANDALL HILDENBRAND,

17  was called as a venireperson by the parties, and after having

18  been previously duly sworn, testified as follows:

19                  STATE VOIR DIRE EXAMINATION

20  BY MR. HARRIS:

21      Q.    Mr. Hildenbrand, how are you doing?

22      A.    Pretty good.

23      Q.    Didn't take too long to get to you, did it?

24      A.    No, no, not long at all I guess, what, three weeks?

25      Q.    Well, I'm talking about this morning.
```

```
 1          A.    Oh --
 2          Q.    Because we only talked to Ms. Coleman for about ten
 3   minutes.  The way -- the reason that is, is we have up to about
 4   45 minutes to talk to each side, but we're asking for your
 5   honest answers on certain questions.  As the Judge said, we're
 6   looking for one more juror.  And sometimes people have past
 7   experiences with certain things that may not make them the best
 8   fit for this jury.  And we're just looking for honesty, and
 9   that's kind of what happened with Ms. Coleman.  She had
10   something that happened in her past where this probably wasn't
11   going to be the best case for her.  So both sides agreed on
12   that.  So that's what we're looking for, your honest beliefs
13   and your honest answers to both sides' questions, and I think
14   we'll all be okay.  Fair enough?
15          A.    Yes.
16          Q.    All right.  Anything changed in your questionnaire
17   since you last filled it out?
18          A.    I can't think of any.  I mean, I'd have to read
19   through the whole thing again, but --
20          Q.    Well, we don't want to do that, so we'll kind of
21   go -- let me ask you, Mr. Hildenbrand -- I'm sorry for my
22   voice.  I'm a little under the weather, but tell me about your
23   feelings on the death penalty.  I want your personal gut
24   feelings on it.
25          A.    Well, honestly, if you -- if the death penalty was
```

```
 1   abolished, I wouldn't have a problem with it, but I think of it

 2   as kind of -- the way the laws are now, it's kind of like

 3   raising kids.  If you -- you know, if you tell your children

 4   you're going to punish them in a certain way for a certain

 5   action and you don't follow through, that's not right either,

 6   so --

 7        Q.   So you're more of -- well, I don't want to put

 8   words -- let me just ask you this.  Do you believe in the death

 9   penalty, or are you more of a believer just it's on the law,

10   it's on the books, so I can do it if I'm called for it.  Like

11   what do you, Mr. Hildenbrand believe?

12        A.   I honestly haven't thought about it that much, but I

13   guess I would lean -- at this time in my life, I would say yes.

14        Q.   You are for it?

15        A.   Yes.

16        Q.   All right.  Can you tell me the types of crimes

17   you're for it, when you think it should be used?

18        A.   And, there again, I honestly haven't thought about

19   it that much -- I haven't had the opportunity to even think

20   about it that much, but I would say it was a crime that was,

21   you know, particularly horrific or a crime where it just -- you

22   know, there was no way of stopping the person from ever, you

23   know, repeating that kind of action.

24        Q.   Well, have you heard anything in the news where you

25   said this person should have gotten a death sentence or maybe
```

```
 1   this person got a death sentence and should not have gotten a

 2   death sentence?

 3        A.    Not really.

 4        Q.    Okay.  Can you think of an actual specific set of

 5   facts where you think the death penalty should be a viable

 6   punishment option, besides just saying heinous crime?  I'm

 7   assuming you're talking about murders?

 8        A.    Yes.  A set of -- let me -- repeat that.

 9        Q.    Sure.  When you're thinking about the death penalty,

10   you said should be a heinous crime, something horrible.  Can

11   you think of a certain specific set of circumstances when you

12   say, yeah, that should be a death penalty case, like a killing

13   of certain type of individual or killing -- you know, anything

14   like that?  We're just trying to get your gut feeling to see

15   where you stand on certain issues.

16        A.    Well, I never saw the movie, but I heard about it,

17   like the Texas Chain Saw Massacre.  You know, that would -- I

18   think that would fit.

19        Q.    Okay.

20             MR. HEALY:  Judge, can we have a brief recess?

21             THE COURT:  Yes, sir.

22             Okay.  Mr. Hildenbrand, if you would accompany

23   my bailiff out, if you'll -- he'll talk to you.

24             (Venireperson excused from courtroom.)

25             THE COURT:  Good morning, Andy.
```

```
 1                    MR. BEACH:  Hello.

 2                    (Discussion off the record.)

 3                    THE COURT:  Okay.  Do we have an agreement on

 4  Mr. Hildenbrand?

 5                    MR. HEALY:  Yes, Your Honor.

 6                    THE COURT:  Okay.  Let the record reflect that

 7  Randall Hildenbrand, Prospective Juror Number 10C, is excused

 8  by agreement of parties; is that correct, Ms. Bennett?

 9                    MS. BENNETT:  Yes.

10                    THE COURT:  And Mr. Johnson?

11                    MR. JOHNSON:  That's correct, Judge.

12                    (Agreement to excuse venireperson.)

13                    THE COURT:  Okay.  You want to put anything else

14  on the record?

15                    MS. BENNETT:  Well, hey, Paul, should we let the

16  lady go who has the out of --

17                    (Discussion off the record.)

18                    MS. BENNETT:  Okay.  Let's go ahead and put it

19  on the record then that because of --

20                    THE COURT:  Prospective Juror Number 1A, Lisa

21  Hogan --

22                    MS. BENNETT:  That's correct.

23                    THE COURT:  -- is excused because of her prior

24  commitment and -- business commitment, I believe she said.

25                    MS. BENNETT:  That's --
```

```
 1                    THE COURT:  Is that correct, Ms. Bennett?

 2                    MS. BENNETT:  That's correct.

 3                    THE COURT:  And Mr. Johnson?

 4                    MR. JOHNSON:  Yes, sir.

 5                    THE COURT:  Is that correct?

 6                    MR. WARREN:  It is, Your Honor.

 7                    (Venireperson 1A, Lisa Hogan, excused by
                       agreement, no discussion.)
 8

 9                    THE COURT:  All right.  So we can let Mr.

10   Hildenbrand go and also -- well, let me bring him in, and I'll

11   thank him.

12                    THE BAILIFF:  Mr. Hildenbrand, come on back,

13   sir.

14                    (Venireperson brought forward.)

15                    THE COURT:  Mr. Hildenbrand, thank you so much

16   for being here.  I just want to bring you back and thank you

17   personally for being here.  I'm going to release you from any

18   further responsibility in this case.  But we appreciate your

19   jury service and your cooperation in being here today.  Thank

20   you very much.  You're free to go.

21                    MR. HEALY:  Judge, can we have about five

22   minutes being we only have two left?

23                    THE COURT:  And, also, would you allow Ms.

24   Hogan -- because of her prior commitments, we discussed that.

25   If you just tell her from me thank you and we'll excuse her.
```

```
 1   And we'll be in recess for about five minutes, okay?
 2                    (Recess.)
 3                    (Venireperson brought into courtroom.)
 4                    THE COURT:  Come in, Mr. Jensen, if you would,
 5   sir, up here to the witness stand.
 6                    Thank you, ladies and gentlemen.  You may be
 7   seated.
 8                    Darline, I'd like for the record to reflect this
 9   is Prospective Juror Number 67B, Shane Jensen, S-h-a-n-e,
10   Jensen, J-e-n-s-e-n.
11                    Ms. Bennett.
12                              SHANE JENSEN,
13   was called as a venireperson by the parties, and after having
14   been previously duly sworn, testified as follows:
15                    STATE VOIR DIRE EXAMINATION
16   BY MS. BENNETT:
17        Q.    Good morning, Mr. Jensen.  How are you doing?
18        A.    Doing well.  Thank you.
19        Q.    Good.  My name is Jennifer Bennett, and I'm going to
20   be talking with you on behalf of the State --
21        A.    Uh-huh.
22        Q.    -- this morning.  Let me first of all thank you for
23   waiting on us.
24        A.    Uh-huh.
25        Q.    And let you know what we're going to do is we're
```

```
 1    going to talk for a little while about how you feel about the
 2    death penalty, okay?
 3         A.   Okay.
 4         Q.   And I'll tell you that there are no right or wrong
 5    answers.  You know, as the Judge said, we've been doing this
 6    for eight weeks now, so this isn't about getting something
 7    right or wrong.  This is about both sides kind of hearing how
 8    you feel about the death penalty and some other things maybe
 9    that were contained in your questionnaire and basically
10    deciding if both sides feel like you would be the best fit for
11    this case, all right?  So it has nothing to do with, you know,
12    right or wrong answers and whether you know the law or not, all
13    right?
14         A.   Uh-huh.
15         Q.   Now, I notice that you have a degree in criminal
16    justice you said.
17         A.   Uh-huh.
18         Q.   And I found one of your answers in the questionnaire
19    really interesting.  But first of all, let's talk about why
20    you're in favor of the death penalty.  Can you just tell us
21    kind of in your own words?
22         A.   Well, if you look through history and the events of
23    society, they've had it.  If you go all the way back to
24    Hamuarabi's Code and going all the way through --
25         Q.   What code?
```

```
 1        A.     Hamuarabi's Code -- up through today --

 2        Q.     Do you know how to spell Hamuarabi by any chance?

 3        A.     I belive it's H-a-m-u-a-r-a-b-i.

 4        Q.     Okay.  And so go ahead.

 5        A.     All the way through.  I teach history, so I -- if

 6   you look at, you know, any society that has been successful,

 7   they usually had that so -- and especially through most

 8   advanced -- you know, any type of advanced criminal justice

 9   system has had it.

10        Q.     Okay.  Why do you -- do you personally feel like

11   it's a good thing to have?

12        A.     Uh-huh.

13        Q.     Why is that?

14        A.     On one hand it does serve as a deterrent, and it

15   does serve as a deterrent for some.  You know, obviously, other

16   people -- you know, in certain situations, you know, people

17   lose sight of consequences and interactions.

18        Q.     All right.  And you teach history and coach; is that

19   right?

20        A.     Yes, ma'am.

21        Q.     Where do you -- where do you teach at?

22        A.     I teach at A.C. New Middle School for Mesquite ISD.

23        Q.     Okay.  And do you teach about criminal justice

24   issues as far as --

25        A.     Not really, no, ma'am.  I teach primarily Texas
```

1    history.

2         Q.    Do you know anything about the facts of this case?

3         A.    Not really.

4         Q.    Not really?

5         A.    Not other than what was said, just that he was

6    accused of capital murder -- and the Defendant was accused.

7         Q.    Okay.  So you had never read or --

8         A.    No.

9         Q.    -- seen anything in the paper or anything like that?

10        A.    No.

11        Q.    Okay.  I was curious on your answer in the

12   questionnaire about -- on page 8, the group of ten people

13   charged with murder.

14        A.    Uh-huh.

15        Q.    You were talking about double jeopardy and crossing

16   state lines and all that.  I was just --

17        A.    Yeah, because in one of my justice courses, it says

18   that if the person is charged -- you can't -- you can't convict

19   an innocent person with a group of ten.  That just doesn't --

20   doesn't work.  However, because if you did that and all of a

21   sudden, of course, the case would be overturned on appeal, but

22   if you cross state lines then now you have -- now it would be

23   bumped up to a federal offense, so you get -- if the State

24   loses jurisdiction on that, the federal -- the government would

25   be able to step in and do prosecution, as well.

```
 1          Q.    To find -- you mean the one --

 2          A.    Yeah, yeah.  They would be able to omit the one, but

 3   prosecute the nine.

 4          Q.    But for you it would be important that -- obviously,

 5   that an innocent person not be convicted?

 6          A.    Correct.

 7          Q.    Now, tell me what kind of crimes you feel like the

 8   death penalty would be appropriate for, just kind of

 9   personally, if just -- if you know about the law -- or do you

10   know what the law is on that?

11          A.    Uh-huh.

12          Q.    Okay.

13          A.    Yep.

14          Q.    Because you're in a little bit of position than most

15   people that walk in here that don't know it.

16          A.    Uh-huh.

17          Q.    So I guess if you want to go by that, that's fine.

18          A.    Well, according to the Penal Code, it says it's

19   anybody -- like if you have officers -- you know, basically or

20   officer or fireman, you know, performing their duty, that would

21   be one.  If it's in commission of another offense, so, for

22   example, if somebody was robbing and, you know, in the process

23   of committing that crime, they killed somebody else or tried to

24   get away with whatever else, there, in essence, would be -- it

25   would be basically a capital offense according to Penal Code.
```

```
 1       Q.    Sure.  And also murder of a child under the age of
 2  six.
 3       A.    Correct.
 4       Q.    Murder for hire.
 5       A.    Yes.
 6       Q.    Murder of more than one person during the same
 7  criminal transaction.
 8       A.    Correct.
 9       Q.    So -- but kind of -- understanding that's what the
10  law is, what's your gut feeling about the kinds of cases that
11  should be appropriate for the death penalty?
12       A.    I believe those -- those pretty much are self
13  explanatory.  I completely agree with those.
14       Q.    Okay.  How do you feel specifically about children
15  victims -- child victims?
16       A.    Being that I have two young children, I think I
17  would probably hold that a little bit in the higher -- I mean,
18  that would be -- be a similar circumstance.  I mean, I would
19  hold that as --
20       Q.    Sure.
21       A.    -- in the same regard.
22       Q.    And I think -- I think most people would probably
23  agree with you, you know, children are innocent, right?
24       A.    Right.
25       Q.    And so they're -- when you think of victim, probably
```

```
 1  there's really no victim like a small child.

 2       A.   A small child, because they're defenseless and so

 3  they are innocent and they don't have --

 4       Q.   Right.  What about -- when did you apply to be a

 5  police officer?  When was that?

 6       A.   Oh, well, let's see that would have been -- I

 7  graduated in 2000, so from 2000 to about 2003.  And at that

 8  point I just -- I don't feel that's where God wanted me, so I

 9  went ahead and I went home prayed about it and gave it about a

10  year and felt like God was leading me to teach.

11       Q.   All right.  Perfect.  Okay.

12            MS. BENNETT:  I think we need to take a break,

13  if we could for just a moment.  Thanks.

14            THE COURT:  All right.  If you'll accompany my

15  bailiff, he'll escort you out for just a few minutes and then

16  I'll bring you back, Mr. Jensen.  Thank you.  Watch your step

17  there, too.

18            (Venireperson excused from courtroom.)

19            THE COURT:  Okay.

20            MS. BENNETT:  Judge, I think the State and the

21  Defense have reached an agreement in reference to 67B, Mr.

22  Jensen.

23            THE COURT:  To excuse him?

24            MS. BENNETT:  That's correct.

25            THE COURT:  Okay.  Is that correct, Mr. Johnson?
```

```
 1                    MR. HEALY:  Yes, Your Honor.

 2                    MR. JOHNSON:  Yes.

 3                    THE COURT:  67B.

 4                    (Discussion off the record.)

 5                    THE COURT:  67B is excused.

 6                    All right.  Bring Mr. Jensen back and let me

 7    excuse him.

 8                    (Agreement to excuse venireperson.)

 9                    (Venireperson brought forward.)

10                    THE COURT:  Mr. Jensen, thank you so much for

11    being here with us today.  We appreciate your time and effort

12    and your jury service.  Thank you very much.  You're free to

13    go.

14                    MS. BENNETT:  Thank you.

15                    THE BAILIFF:  This way.  Do you need a slip for

16    work or anything?

17                    VENIREPERSON:  No.

18                    THE BAILIFF:  Okay.  Thanks.

19                    VENIREPERSON:  Oh, actually, yes, I do, please.

20                    (Venireperson excused from courtroom.)

21                    THE COURT:  We're ready for Ms. Rhone.

22                    (Venireperson brought forward.)

23                    THE COURT:  Just go ahead and have a seat there.

24                    Thank you, ladies and gentlemen.  Be seated,

25    please.
```

```
 1                     And I'd like for the record to reflect this is
 2    Prospective Juror Number 33A, Lisa, L-i-s-a, Rhone, R-h-o-n-e.
 3                     Mr. Healy, are you going to talk to Ms. Rhone?
 4                     MR. HEALY:  Yes, sir.  Thank you, Judge.  Please
 5    the Court.
 6                     Mr. Johnson.
 7                              LISA RHONE,
 8    was called as a venireperson by the parties, and after having
 9    been previously duly sworn, testified as follows:
10                       STATE VOIR DIRE EXAMINATION
11    BY MR. HEALY:
12        Q.    Ms. Rhone, how are you doing this morning?
13        A.    Good.
14        Q.    Excited to be here?
15        A.    Oh, yes.
16        Q.    You were last on the list and you see how quickly we
17    got to you.  And I bring that up because this is kind of the
18    process we're -- the only oath you have taken is to tell the
19    truth.  There are no right or wrong answers.
20        A.    Okay.
21        Q.    Your fellow potential jurors had some answers that
22    would not work with this type of case, so both sides agreed to
23    move on to the next juror and that's kind of how we keep going
24    forward.  As the Judge said, we've been doing this eight weeks,
25    and we have 11 jurors.  We're looking for three more.
```

```
 1        A.    Okay.

 2        Q.    So it's obviously a lengthy process, and both sides

 3   think you could potentially be one of those jurors, so we

 4   wanted to talk to you about that.  Fair enough?

 5        A.    Fair enough.

 6        Q.    All right.  Now, tell me, Ms. Rhone, you have a lot

 7   in your questionnaire.  You've -- I'm going to say this as

 8   delicately as possible.  You have some very strong answers for

 9   the State with regards to your belief of the death penalty.

10        A.    Yes.

11        Q.    Then you have some answers that I think the Defense

12   likes in your questionnaire about some of the things that

13   happened in your family.  Tell me your personal beliefs on the

14   death penalty.

15        A.    I believe if the crime and the character of the

16   person meet certain criteria in my mind, that I wouldn't have a

17   problem sentencing him to death.

18        Q.    And what is the crime, when you're thinking of --

19        A.    Well, quite honestly, one of my main ones, if a

20   child is harmed or someone innocent is harmed.  And if it's not

21   -- I don't want to say if it's, oh, a drug addled brain, I

22   don't want to say that that makes it okay, but it maybe makes

23   it a little more understandable.  Like maybe the person under

24   normal circumstances wouldn't have done such a thing.

25        Q.    Okay.  And that's obviously one of the answers that
```

1  concerned us over on this table is you talked about if somebody

2  commits a cold-blooded intentional capital murder, but was

3  voluntarily intoxicated, whether it be drugs or alcohol, you

4  would take that into consideration in assessing his punishment.

5      A.    It doesn't mean that I would say, oh, well, they

6  were drunk and they're not responsible because I think even

7  under the influence of chemicals that don't belong in the body,

8  that you -- you're still -- your brain is functioning enough

9  that you know that it's wrong, you know, to murder somebody or

10  to rob a bank or, you know, to kidnap somebody or that kind of

11  thing.  You know it's wrong, even if you're drunk.

12      Q.    Talk to me about -- you said murder of a child would

13  be the worst for you?

14      A.    Yes.

15      Q.    What happens to that person -- I always like to give

16  an example -- you know, just decided one day I'm going to party

17  hard and do lines of cocaine, get drunk, out of their mind,

18  just completely annihilated and goes -- walks down the street

19  and sees a child, runs up and shoots him in the head.

20      A.    I would probably lean toward capital punishment for

21  that because the child -- first of all, it's a child, and it

22  hasn't harmed anyone and is still innocent and I just -- I just

23  don't believe that you can get impaired to that point.  Maybe

24  somebody can, but I just don't believe it.

25      Q.    And the reason I'm asking that question is because

 1   your answers on your questionnaire talks about you would

 2   consider the degree of impairment in deciding someone's

 3   punishment with regards --

 4        A.   Right.

 5        Q.   -- to a capital murder.

 6        A.   Right.

 7        Q.   And so I just kind of wanted to get your gut

 8   feelings on does that degree of impairment outweigh the actual

 9   brutal, horrible nature of a potential crime?

10        A.   I don't think so because in my opinion if you're so

11   impaired that you're incapable of realizing what you're doing

12   is wrong, you're probably unconscious.  I mean, that's just how

13   I feel about it.

14        Q.   Okay.

15        A.   You know, if you're that impaired, you're not awake,

16   you know.

17        Q.   We also asked you what would be important in

18   deciding whether a person received a death or life sentence,

19   and you said the reason for the murder, the brutality, whether

20   drugs, alcohol, or passion were involved.

21        A.   Right.

22        Q.   Explain that answer a little bit.

23        A.   Well, I think if, you know, a spouse comes home and

24   catches their spouse, you know, in a compromising position with

25   someone else and they just lose their temper and something

1  happens in that instance, is a different thing for me than if

2  someone were stalking their spouse or just angry at their

3  spouse and killed them --

4      Q.   Okay.

5      A.   -- for no reason.  You know, other than just that

6  spouse wasn't doing what they wanted them to do.  I think

7  that's different than if someone -- or if someone sees someone

8  harming their child or doing something destructive like that, I

9  can understand how they could lose their temper or lose their

10 train of thought and do something like that, or a parent

11 killing someone who harmed their child, I can understand that,

12 you know, I can.  I don't think that it's the right thing to

13 do.

14     Q.   Oh, I'm with you on that one.

15     A.   I can understand.

16     Q.   I have two young ones, so --

17     A.   Yeah.  I mean, I can understand why someone would do

18 that.

19     Q.   Okay.  You said if the -- it would be different if

20 the spouse is just mad at the other one or --

21     A.   Right.

22     Q.   Okay.

23     A.   Right.  If it's just angry, they've had an argument

24 and, you know, one spouse decides to kill the other, that's not

25 excusable to me.  But if it were in the heat of passion,

```
 1    something horrible, you know, like the spouse was threatening
 2    to harm them or had harmed them or, you know, they caught them
 3    with another person, I could understand why emotion would
 4    overrule that.
 5         Q.    Okay.  You've had some nephews, some nieces, some
 6    friends --
 7         A.    Oh, yes.  I have a very colorful family.
 8         Q.    Let me do it this way.  Instead of going one by one,
 9    how about -- were they all treated fairly?
10         A.    Mostly, yeah.
11         Q.    Okay.
12         A.    There have been a few, I think, got away with things
13    they shouldn't have gotten away with, but for the most part,
14    yeah.
15         Q.    Any -- any ill will towards this table or any type
16    of law enforcement?
17         A.    Oh, not at all.
18         Q.    In how they were dealt with?
19         A.    Not at all.
20         Q.    Okay.  And then any interest in a criminal case, you
21    said, yes, conviction of the man who molested children in your
22    family.
23         A.    Yes.
24         Q.    And the man who murdered your uncle.
25         A.    Yes.
```

```
 1        Q.    Tell me about that.
 2        A.    My uncle was staying with a couple and he was
 3   sleeping on the couch and the man -- the man that lived at the
 4   house had been drinking and got it into his head that my uncle
 5   had been having an affair with his wife, and while my uncle was
 6   sleeping on the couch, the man just walked in and shot him in
 7   the head with a deer rifle.  And the guy only got like eight
 8   years.  So, yeah, yeah, because they said it was a crime of
 9   passion so he only got eight years.
10        Q.    You obviously didn't think that was a crime of
11   passion?
12        A.    No, I didn't.
13        Q.    I'm assuming you'd want a heck of a lot more than
14   eight years?
15        A.    Yes, I would have.  The guy should have gotten life,
16   I think.  You know, he just killed my uncle in cold blood, not
17   that my uncle was the nicest guy in the world or even sober
18   most of the time, but I think just to do to someone when
19   they're sleeping and not even -- they don't even know what's
20   coming.  You know, they're not given a chance to defend
21   themselves is wrong.
22        Q.    And that -- that wouldn't be death penalty case in
23   the state of Texas.
24        A.    No, no.
25        Q.    That didn't rise to one of those elements we're
```

1   going to talk about in a second.

2       A.   No, I would -- no, I wouldn't think so, because he

3   just -- I mean, he didn't like torture him or -- kill a child

4   or kill other people or just go on a rampage.  He -- he

5   targeted my uncle, and he was drunk, you know.

6       Q.   Okay.  And then what about the man who molested

7   children in your family, what --

8       A.   I think there's nothing bad enough for him.

9       Q.   Okay.

10      A.   You know, I really don't.  I don't think there's

11  anything that could happen to him that would be bad enough.

12      Q.   And what -- what -- is that -- that case is still

13  pending?

14      A.   Yes.

15      Q.   Is it still pending to this day?

16      A.   Yes.

17      Q.   Is it in this courthouse?

18      A.   I think it's Collin County.

19      Q.   Okay.

20      A.   Collin County.  It was my niece's ex-husband.  We

21  found out after the fact that he had been using sex as

22  punishment for the girls.  If they didn't do what they wanted

23  or got grounded or got in trouble, that's his way of punishing

24  them.

25      Q.   How old were the girls?

```
 1        A.    From age five to eight at the time it happened.

 2        Q.    So that's where your strong beliefs are on the

 3   children?

 4        A.    Yes.  Yes.

 5        Q.    Fair enough.

 6              MR. HEALY:  Judge, I think we need to take a

 7   brief recess.

 8              THE COURT:  Okay.

 9              MR. HEALY:  If that's okay.

10              THE COURT:  All right.

11              (Venireperson excused from courtroom.)

12              THE COURT:  What do you think?

13              (Discussion off the record.)

14              THE COURT:  Okay.  So what are we doing with

15   Lisa Rhone, excusing her?

16              MR. JOHNSON:  Yes, sir, Judge.

17              (Discussion off the record.)

18              THE COURT:  All right.  I'd like for the record

19   to reflect that Prospective Juror Number 33A, Lisa Rhone, has

20   been excused by agreement of parties.

21              Is that correct, Mr. Healy?

22              MR. HEALY:  Yes, Your Honor.

23              THE COURT:  Mr. Johnson?

24              MR. JOHNSON:  Yes, sir.

25              THE COURT:  Okay.  We're done for the morning.
```

```
 1  Bring Ms. Rhone back in.
 2                   (Agreement to excuse venireperson.)
 3                   THE BAILIFF:  Come in, ma'am.
 4                   (Venireperson brought forward.)
 5                   THE COURT:  Okay.  Ms. Rhone, thank you so much
 6  for being here.  I'm going to excuse you --
 7                   VENIREPERSON:  Okay.
 8                   THE COURT:  -- from any further jury service in
 9  this case, but I wanted to thank you personally for your jury
10  service and for the effort you made to be with us this morning.
11                   VENIREPERSON:  Thank you.
12                   THE COURT:  Thank you very much.  You're free to
13  go.
14                   (Venireperson excused from courtroom.)
15                   (Lunch recess.)
16                   THE COURT:  Come on in, ladies and gentlemen.
17  Just have a seat right here in the jury box and let me talk to
18  you for just a few minutes and then we'll get this thing
19  underway.  We're running a little bit behind this afternoon.
20                   Okay.  Thank you.  Be seated, ladies and
21  gentlemen.
22                   And good afternoon, ladies and gentlemen of the
23  jury panel.  How are you all this afternoon?
24                   VENIREPERSON:  Fine.
25                   THE COURT:  Good.  I'm Judge Quay Parker.  I'm a
```

 1   Senior Judge from McKinney, just north of here and -- excuse

 2   me.  Several months ago, Judge Andy Chatham, who is the

 3   presiding Judge over this case, asked if I'd assist him in the

 4   trial of this capital murder case by presiding over the jury

 5   selection process, or more to the point, the individual voir

 6   dire examination.  And that's what I'm doing here, instead of

 7   Judge Chatham, who is across the hall in his courtroom taking

 8   care of the everyday matters of the court.

 9                Your reason for being here today is because the

10   law requires in a capital murder case where the State is

11   seeking the death penalty, that each prospective juror be

12   interviewed individually.  And so you're here this afternoon

13   for your individual interview.

14                Now, then, let me -- so that's why you're here

15   today.

16                Let me take you back in time a little bit to --

17   I believe all of you met in Judge Chatham's courtroom over here

18   across the hall sometime ago for the general session; is that

19   correct?  All three of you, you all recall that?

20                VENIREPERSON:  Yes.

21                VENIREPERSON:  I believe that I was in this

22   courtroom.

23                THE COURT:  You were in this courtroom?  Okay.

24   One courtroom or another for the general session.  Judge

25   Chatham addressed the group at that time, introduced himself,

 1   went over some qualifications and exemptions.  At some point in

 2   the proceedings, he had everybody on the panel stand up, raise

 3   their right hand, he administered the oath of a prospective

 4   juror to each panel member.  Do you all recall that?

 5                    VENIREPERSONS:  Yes.

 6                    THE COURT:  All right.  Very good.  And did all

 7   three of you stand and take the oath at the time that Judge

 8   Chatham addressed the panel?

 9                    VENIREPERSONS:  Yes.

10                    THE COURT:  Okay.  And I'll remind you, you're

11   still under your oath.  What you've been sworn to do are

12   basically two things:  To be responsive to each question that

13   the attorneys ask you.  And secondly, to give us truthful and

14   honest answers.  We know you'll do that anyway.

15                    All right.  Now, then, there's no right or wrong

16   answer to any of their questions because they -- what they're

17   going to do, they're going to ask you questions probably first

18   concerning answers or responses that you have given on your

19   questionnaires.  I know you haven't seen those questionnaires

20   since you turned them in that day, but we do have copies for

21   each one of you of your individual questionnaire.  And so

22   you'll have that available.  It will be -- it will be laying on

23   the witness stand here for you when it's your turn to do your

24   individual interview.

25                    And so I know you probably don't remember the

1  answers or the responses that you wrote down, so it will be

2  there for you to refresh your memory.  And then the attorneys

3  will probably ask you to either expound on or to explain some

4  answer or response that you've written down.

5              Now, we know you didn't know anything about

6  capital murder law when we fill -- when you filled out your

7  questionnaires, and that was the purpose of it, simply to kind

8  of get a gut check response.  The attorneys may use that

9  terminology, but anyway, it's not a legal term by the way.  You

10  probably didn't know that, did you?  A gut check response.

11  Anyway, to -- just kind of get an idea of how you thought about

12  the capital murder law without knowing anything about it.  We

13  know you still probably don't know anything about it, and so a

14  good part of our time with you this -- each one of you this

15  afternoon is going to be spent with the attorneys explaining

16  certain aspects of the law as it applies to capital murder

17  cases and then to ask you questions about it now that you

18  understand more about it, whether or not your ideas have

19  changed, whether or not now that you know the law, you can

20  follow the law, and whether or not you could even participate

21  in a trial of this magnitude.  That's what the questions are

22  really going to be about.

23              So I'm telling you there's not any right or

24  wrong answers to any of these questions.  This is certainly not

25  a quiz or an exam that if you answer all the questions right,

1   you get to be on the jury; if you don't, then you're not on the

2   jury.  It doesn't have anything to do with it at all.  What

3   we're trying to find out and what we're going to prevent is if

4   you either don't agree with the law and can't follow the law or

5   if you just simply can't participate in a trial of this

6   magnitude, we don't want to put you on the jury and have you

7   over here and then you realize that after you're already on the

8   jury.  So that's kind of what this whole individual interview

9   is all about, okay?

10           Now, then, have all three of you had time to

11   read your little jury -- juror guide or introductory pamphlet

12   that my bailiff has given to each one of you?

13           VENIREPERSON:  Yes.

14           THE COURT:  Okay.  I didn't know if you had been

15   here long enough to be able to read that or not, but if you --

16   if you haven't completed it, it just simply gives you kind of

17   some idea about what's going to happen here this afternoon with

18   each one of you and to kind of preview you on some of the

19   special issues that the jury will be asked to answer during the

20   course of the punishment phase of the trial, if we get to the

21   punishment phase, if the punishment -- if we reach the

22   punishment phase.

23           So anyway, those are some of the things that --

24   and just kind of acquaint you with perhaps some of the

25   terminology, as well, that you will hear the attorneys

1   referring to as they go over some of the questions with you,

2   okay?

3            I believe that's all I'm going to talk with you

4   about.  Now I'm going to introduce you to the attorneys that

5   are going to participate in this voir dire examination and in

6   this trial, and then we'll bring you in one at a time and visit

7   with you individually.

8            Seated at the counsel table directly in front of

9   you is just Mr. Josh Healy right now -- Josh Healy.

10           MR. HEALY:  Good afternoon, ladies and

11   gentlemen.

12           THE COURT:  He's also assisted by Jennifer

13   Bennett, and she was in here a minute ago.  I'm sure Jennifer

14   just stepped out.  She'll be back in a moment.  And then

15   there's two other members of the prosecution team, Mr. Heath

16   Harris and Mr. Andy Beach.  And if they're here -- I don't see

17   them in the courtroom right now -- but if they're here, they'll

18   either be seated at the back of the courtroom and once in a

19   while, they'll come down and have a seat right behind the

20   prosecutors here at the -- at the counsel table here for the

21   State.

22           And then over in front of the bench here, in

23   front of me is the Defense team, Mr. Paul Johnson --

24           MR. JOHNSON:  Good afternoon.

25           THE COURT:  -- who is lead counsel for the

```
 1   Defense.
 2                   Seated next to him, Mr. Brady Wyatt.
 3                   MR. WYATT:  Good afternoon.
 4                   THE COURT:  And then the gentleman seated behind
 5   Mr. Johnson and Mr. Wyatt, Mr. Kobby Warren.
 6                   MR. WARREN:  Good afternoon.
 7                   THE COURT:  And these three attorneys make up
 8   the Defense team, and they represent their client, the
 9   Defendant in this case, Mr. Gary Green.
10                   THE DEFENDANT:  Good afternoon.
11                   THE COURT:  He's seated on the end down here.
12                   All right, Mr. Healy.
13                   MR. HEALY:  Judge, we're going to start with --
14                   THE COURT:  Who would you like to --
15                   MR. HEALY:  Ms. Burgess.
16                   THE COURT:  Ms. Burgess.  Okay.  All right.
17                   And if -- let's see, Mr. Grant and Ms. Ramirez,
18   if the two of you would step out with my bailiff.  And then,
19   Ms. Burgess, if you'll take your place on the witness stand.
20                   (Venirepersons excused to hallway.)
21                   THE COURT:  Looks like Darline has already found
22   your -- your questionnaire, so just go ahead and have a seat
23   there.
24                   And, Darline, I'd like for the record to reflect
25   this is Prospective Juror Number 31C, Janice Burgess.
```

```
 1                    Okay.  Mr. Healy.
 2                    MR. HEALY:  Thank you, Judge.  May it please the
 3  Court.
 4                    THE COURT:  Yes, sir.
 5                    MR. HEALY:  Counsel.
 6                         JANICE BURGESS,
 7  was called as a venireperson by the parties, and after having
 8  been previously duly sworn, testified as follows:
 9                  STATE VOIR DIRE EXAMINATION
10  BY MR. HEALY:
11      Q.   Is it Ms. Burgess?
12      A.   Burgess.
13      Q.   Burgess.  How are you doing this afternoon?
14      A.   Okay.
15      Q.   Obviously, you know why you were brought down here.
16  We are here to talk with you for up to the next 40, 45 minutes,
17  and then the Defense will talk to you for that time determining
18  if you will be a good fit for this jury.  We're almost done
19  with jury selection.  We're looking for a few more people, and
20  both sides thought you may be the type of person that could be
21  a juror on this case.  How does that make you feel?
22      A.   Kind of floored.
23      Q.   Why?
24      A.   Honestly.  I don't know.  I just never thought
25  anybody would think that -- I mean, I've actually been picked,
```

```
 1  but it was an individual that picked me that was representing

 2  herself for a jury about a year or so ago.

 3         Q.    Where was that?

 4         A.    In Irving.  We came out here, and then we all had to

 5  go back to Irving.

 6         Q.    Was it a traffic ticket or something?

 7         A.    A lady that -- her car had been hit by another

 8  woman.

 9         Q.    Okay.

10         A.    And she didn't like the repair job.  She was suing

11  to have it done again.

12         Q.    Did she win?

13         A.    No.

14         Q.    Tell me why you don't think you would be picked for

15  this type of case.

16         A.    I think I'm kind of weird, actually -- you know, for

17  normal, whatever.  That sounds strange.

18         Q.    I'm about as strange a man as they can be.  So tell

19  me why you're weird in your opinion.

20         A.    I just have radical views on a lot of things.  I

21  mean, to me, I'm -- you know -- but I would -- I mean, I'm kind

22  of involved in Native American stuff.  My mother was half

23  Indian, so, you know, that sort of stuff.  I'm not real

24  trusting of authority type figures.  I mean, I -- you know, I

25  know some really great police people, and then I've had some
```

 1  friends that had experiences that were pretty bad, so --

 2      Q.    Tell me about that, the bad experiences.

 3      A.    One of my Sioux friends had his house broken into

 4  and had his Native American religious items taken.  And they

 5  called it Satanic stuff.  And I'm like, I don't know.  They had

 6  to apologize eventually for doing that, but, you know, just

 7  things like that.

 8      Q.    Okay.  Let me ask you -- part of my ignorance, but

 9  the type of religious beliefs you have?

10      A.    That's another one.

11      Q.    I can't even pronounce.  I apologize.  I'm very

12  different religiously from most, so I -- but I've never -- I

13  don't -- is it Asatru?

14      A.    Asatru.

15      Q.    Asatru.  Is it A-s-a-t-r-u?

16      A.    Uh-huh.

17      Q.    What -- what is that based on?

18      A.    It's the -- like pre-Christian Viking era type, like

19  Norse, Scandinavian.

20      Q.    Okay.  Do they have any core beliefs?  I mean, what

21  are their main core beliefs?

22      A.    It's very individual.  There's not like really --

23  like a one set piece of literature, like the Bible would be for

24  Christians or whatever.  It's very individual oriented and

25  pretty much that you're responsible for what you do.  And if

```
 1   there are consequences, you've got to pay them, you know.

 2        Q.    So it sounds like they are pro death penalty then?

 3        A.    It would depend probably on the person.  There are a

 4   lot of military -- ex-military people that are Asatru.

 5        Q.    Okay.

 6        A.    Police people -- people like that that are actually

 7   involved in law enforcement.

 8        Q.    And you said other than attendance, what other

 9   activities are you involved in at your church.  Again, pardon

10   my ignorance, but Gythia of a Kindred?

11        A.    Kindred is like a -- a -- well, they're kind of

12   considered like a family grouping of probably close friends, or

13   it could be family members that follow the same religious path

14   that you do.

15        Q.    And what do you -- do y'all do something?

16        A.    Yeah, there are holidays, yules -- it was a big one.

17   That was one of the really big ones.  It's a solar festival we

18   associate with Asatra.  It's one of the deities.

19        Q.    Do they celebrate Christmas?

20        A.    It's -- well, the Christmas true, yule log, and all

21   that stuff came from the word "yule."  It was the Nor

22   celebration that happened at that time, so, yeah.

23        Q.    Okay.

24        A.    Yep.

25        Q.    There's nothing wrong with that.  I'm learning
```

1  something new every day.

2     A.    And it has nothing to do with -- you know, a lot of

3  stuff people see it and go, oh, my God, you're like gay

4  bashing, you know, racist or whatever and it's nothing -- you

5  know, I mean, some of the Oden people that are in prisons and

6  stuff do that kind of stuff, but the general Asatra community,

7  that is definitely not what it is.

8     Q.    It sounds like it's a personal responsibility type

9  religion.

10    A.    It's very associated with that, and it's

11  reciprocating things.  There are a lot of, you know, things

12  about guests in your home and how you treat them.  And it's

13  very much of keeping things even and, you know, you putting out

14  an effort to maintain your friendships and your relationships,

15  and like I said, very much taking, you know, responsibility for

16  your actions and what you do.

17    Q.    That's why I was -- it shocks me that they don't

18  have a certain belief on the death penalty, or I guess --

19    A.    So that's probably going to be an individual, you

20  know, thing.

21    Q.    Okay.

22    A.    Because it's not -- it's not organized as in they're

23  so set, you know -- and there are different types, just like

24  there are different types of Christianity things and different

25  sects.  Asatru is different, too.  Some of them are folkish and

 1  they're, you know, way over on one side of things and then some

 2  are, you know, not as much that way at all and they're more

 3  liberal oriented.  I'm fairly eclectic myself, but, yeah, some

 4  of them are like, no, we just have to do this one thing and

 5  that's it.

 6      Q.    What do you think honestly of the death penalty?

 7      A.    I think sometimes, you know, that it would be a good

 8  thing, depending on the circumstances.

 9      Q.    And when do you think it would be a good thing?

10      A.    It would depend, to me, on what the person did and

11  probably, you know, if they had a history of doing that type

12  thing or not.

13      Q.    And you keep saying what they did.  I want to --

14      A.    Oh, somebody that -- I guess like, you know, some

15  serial killer that was out, you know, killing women or, you

16  know, somebody that killed little kids, you know, that type of

17  thing.  Maybe if it was an accident of some kind, they had

18  never done it ever, you know, anything like that, you know.  It

19  would depend on the circumstances to me and what the -- you

20  know, the issue was and what had happened and what that person

21  was like, you know.

22      Q.    Okay.

23           MR. HEALY:  Give me one second, Ms. Burgess.

24           (Discussion off the record.)

25           MR. HEALY:  Judge, can we --

```
 1                    Ms. Burgess, we're going to take a brief recess
 2    real quick.
 3                    THE COURT:  All right.  Ms. Burgess, if you'd
 4    just step out with my bailiff for just a moment, let me confer
 5    with the attorneys, and I'll bring you right back.
 6                    (Venireperson excused to hallway.)
 7                    THE COURT:  Okay.  Do we have an agreement on
 8    Ms. Grant?
 9                    MR. WYATT:  Ms. Burgess.
10                    MS. BENNETT:  Ms. Burgers.
11                    THE COURT:  I mean, Ms. Burgers.  What am I
12    saying?
13                    Ms. Burgess.  Let the record reflect that
14    Prospective Juror Number 31C, Janice Burgess, has been excused
15    by agreement of parties.
16                    Is that correct, Mr. Healy?
17                    MR. HEALY:  Yes, Your Honor.
18                    THE COURT:  Mr. Johnson?
19                    MR. JOHNSON:  Yes, sir.
20                    (Agreement to excuse venireperson.)
21                    THE COURT:  Bring Ms. Burgess back.
22                    (Venireperson brought forward.)
23                    THE COURT:  Ms. Burgess, I just wanted to bring
24    you back in and thank you very much for being here.  I'm going
25    to excuse you from any further responsibility.
```

```
 1                    VENIREPERSON:  Okay.

 2                    THE COURT:  But we do thank you for being here

 3   -- your time and effort to be with us.  Thank you, ma'am.

 4                    VENIREPERSON:  Thanks.

 5                    (Venireperson excused from courtroom.)

 6                    (Recess.)

 7                    (Venireperson brought forward.)

 8                    THE COURT:  Come on in, Mr. Grant.  Have a seat

 9   right there.  I'd like for the record to reflect this is

10   Prospective Juror Number 57B, David Grant, and --

11                    All right.  Ms. Bennett, are you ready to talk

12   to Mr. Grant?

13                    MS. BENNETT:  I am, yes.

14                    THE COURT:  Yes, ma'am, go ahead.

15                            DAVID GRANT,

16   was called as a venireperson by the parties, and after having

17   been previously duly sworn, testified as follows:

18                   STATE VOIR DIRE EXAMINATION

19   BY MS. BENNETT:

20        Q.    Good afternoon, Mr. Grant.  How are you doing today?

21        A.    Great.  Thanks.

22        Q.    My name is Jennifer Bennett, and I'm going to be

23   going through this process with you.  First of all, we'd like

24   to thank you for coming down this afternoon.  I was looking to

25   see what time it was, to see how long you had been waiting.
```

 1   Not too long, but we do appreciate it.

 2                  I want to let you know that what we're going to

 3   do is we're first going to spend some time talking about your

 4   feelings about the death penalty.  And there's no right or

 5   wrong answers.  No matter what you say, you're not going to

 6   offend our table or their table.  We just kind of want to see

 7   how you feel about this case -- or not this case, but the death

 8   penalty.  And we're basically just trying to find the twelfth

 9   juror, the person that's going to be the best fit for this

10   jury, okay?

11                  So there's no quiz, no right or wrong answers,

12   nothing like that, all right?  So first of all, before we go

13   into that, I want to talk to you about your job.  The Judge --

14   did the Judge tell you the date of the case when you were in

15   here earlier?

16        A.    Not today.  They just said it would be the end of

17   October.

18        Q.    Right.  We're scheduled to start October 25th, and

19   it will last no longer than two weeks, maybe less, but no more.

20   We're asking people to schedule out two weeks, just in case.  I

21   know you have put in your questionnaire in a couple of places

22   concerns about work.  Obviously, we need jurors who are

23   responsible citizens who have jobs, and anybody, you know,

24   leaving their job for a couple of weeks is probably not going

25   to be easy.  The question is, is it something you are able to

 1    do if called to?

 2         A.    Yes.

 3         Q.    Okay.  And I know -- I notice -- we'll get to that

 4    here in a minute, but you've been on -- is it four separate

 5    juries, or was it one case?

 6         A.    No, four separate over the years.

 7         Q.    And each one of them plea bargained in the middle of

 8    trial?

 9         A.    Right.

10         Q.    I can guarantee, that's not going to happen in this

11    case.

12         A.    I can tell.

13         Q.    So you've been through this process before, so you

14    kind of understand how it works.  But can you tell us why you

15    believe in the death penalty?

16         A.    I just -- I don't know.  I just feel strongly that

17    if someone takes someone life and there's -- the reason, that

18    person needs to give up his life and that's what should happen.

19         Q.    And you did say that you don't believe in an

20    eye-for-an-eye?

21         A.    Right.

22         Q.    And you don't believe that the death penalty is a

23    deterrent to other criminals?

24         A.    No.  It takes so long for those things to happen and

25    appeals process, I think it just -- I don't think it's a

1  deterrent.

2      Q.   So for you is it more of a punishment type -- I

3  mean, what is it for you that you're in favor of it under

4  certain circumstances?

5      A.   Well, I just think if someone -- like I said, if

6  someone takes someone else's life and there's not a mitigating

7  reason, I'm just trying to figure out why that person should

8  continue to live.  I mean, I don't believe in an

9  eye-for-an-eye, but I also believe that there's got to be

10  justice meted out in that circumstance.

11      Q.   I tell you, some parts of your questionnaire, you

12  seem like you're sounding now, you know, pretty law and order

13  oriented.  But then in other parts of your questionnaire, like

14  where we had you put the order of -- you know, what you believe

15  was important as far as objectives of punishments and asked you

16  to rate rehabilitation, deterrence, and punishment, you rated

17  rehabilitation first and then punishment second and then deter

18  last, so --

19      A.   Well, rehabilitation, I -- was I supposed to answer

20  based on the death penalty?

21      Q.   You mean based on capital murder?

22      A.   I'm sorry, based on capital murder?

23      Q.   Well, we don't do that because we're just trying to

24  get gut feelings, but would you --

25      A.   I always believe in rehabilitation, unless

```
 1   there's -- unless it's something along the line of capital
 2   murder where the person is found guilty, then I don't think
 3   rehabilitation is in the cards.
 4        Q.   Right.  And what we talk about later is, you know,
 5   the best case scenario for someone convicted of capital murder
 6   is going to be life in prison with no possibility of parole.
 7   So I always say when people talk about rehabilitation a lot,
 8   you know, I'm not sure what you're thinking, but the best
 9   they're ever going to get for capital murder is life in prison
10   with no parole.
11        A.   Right.  I understand.
12        Q.   Do you feel that life in prison without parole is a
13   pretty harsh punishment?
14        A.   I do.
15        Q.   You mentioned when you were saying unless --
16             MS. BENNETT:  Hold on one second.
17             (Discussion between counsel off the record.)
18        Q.   (BY MS. BENNETT)  You mentioned unless there were
19   special mitigating circumstances.  What -- what were you
20   thinking about when you said that?
21        A.   It would be rare.  I mean, for me, it would be --
22   they'd have to prove beyond a shadow -- a reasonable doubt that
23   the person was not in his full faculties, I guess you could
24   say.  I don't know what the term is.  But they weren't mentally
25   competent.
```

1      Q.   Okay.

2      A.   That would probably be about the only thing I could

3  think of.

4      Q.   Well, I thought it was interesting, though, because

5  on page 8 of your questionnaire where it said -- and you can

6  turn to it if you like or I'll read it to you --

7      A.   Sure.

8      Q.   -- in about the middle of page 8, it says, some

9  people feel that genetics, circumstances of birth, upbringing,

10  and environment should be considered in determining punishment.

11  And you said it depends on the crime.  Murder, incest, rape,

12  child abuse cannot use the above as excuses.  But it sounded

13  like then in certain situations you're open to at least

14  considering things like that.

15      A.   You think that's confusing?  I thought it was pretty

16  clear.  I mean, I think what I'm saying there is, I don't think

17  you can use the excuse of your background, your environment

18  when it comes to something like murder.  And now, again, some

19  of these other scenarios, depending on what -- what it is -- I

20  mean, I'd have to hear it, obviously -- but then there might be

21  some way to look at rehabilitation for those types of crimes,

22  but, I guess I should have answered it specifically for capital

23  murder.

24      Q.   Now, you are Mormon, correct?

25      A.   Yes.

```
1      Q.    And pretty -- it looks like pretty active in your

2  church?

3      A.    Uh-huh.

4      Q.    As far as your church's stance on the -- on capital

5  punishment, you said they don't officially, but overall

6  teachings lean towards capital punishment.  So there's nothing

7  about your religion or your religious beliefs that would keep

8  you from considering the death penalty?

9      A.    No.  If anything, it would more than point to that

10  versus the other.

11      Q.    And you have a lot of children?

12      A.    We do.

13      Q.    With a wide range of ages, from 23 to 35?

14      A.    Uh-huh.

15      Q.    All right.  As far as your friend that had a fraud

16  case in the 90's, anything about that that would affect

17  anything?

18      A.    No.

19      Q.    Okay.  Oh, yeah, and your daughter is an attorney,

20  correct?

21      A.    Uh-huh.

22      Q.    Where does she --

23      A.    She's in a small private practice in Frisco.  It's

24  just a -- in fact, I forget the name of the firm she's

25  associated with, but it's more family law and wills and things
```

```
 1    like that.
 2         Q.    Do you -- and you said you had a lot of friends that
 3    were attorneys, also.  Do you know anyone who practices
 4    criminal law?
 5         A.    I don't.  One thing I didn't put on there, which I
 6    didn't think about at the time because I'm trying to remember
 7    the questions.  I think it asked if I knew anybody on the
 8    Dallas police force.  I don't know if it said that or not.  One
 9    person I do know, but he retired at the first of the year, was
10    Assistant Chief of Police Tom Ward, and we've been very good
11    friends for 10 to 12 years.  We've discussed a lot of things
12    over the years versus different things that have gone on here,
13    so I -- I told him I was going to be interviewed for this.  He
14    said, well, bring it up because you don't want to get halfway
15    into it and then find out that you knew me and it might make a
16    difference, so I'm bringing it up.
17         Q.    Okay.  Yeah, always better to say too much than not
18    enough, right?
19         A.    Right.
20         Q.    Well, do you know anything about this case?
21         A.    I vaguely remember it from a year or so ago, but I
22    did not go and look it up online, as they asked us not to do.
23         Q.    What do you remember reading about it?
24         A.    Just a woman was killed and then a child was killed,
25    and I can't remember whose child it was.  So I -- that's really
```

1    basically all.

2         Q.    And did you form any opinions?

3         A.    Well, when you hear something like that, you always

4    think how awful and -- so, yeah, I mean --

5         Q.    I think -- yeah, anyone hearing that type of fact

6    scenario would think how terrible, but as far as reaching any

7    conclusions about whether or not, you know, this Defendant, as

8    he sits here today, would be presumed innocent or not, is there

9    anything about reading that article that you feel like would

10   affect you if you were to be -- to sit on this jury?

11        A.    Well, after reading the article, just remembering

12   what I -- it's hard to remember a year ago what exactly that

13   article really said.  But I mean, you form an opinion.  I mean,

14   you can't help but form an opinion, especially when a child is

15   involved.  So it's like -- it will be tough for me to be overly

16   objective.

17        Q.    And when -- and when you say you formed an opinion

18   because we're talking about -- we might be talking about -- I

19   mean, either you formed an opinion about this particular

20   Defendant or -- which is not okay -- or you formed an opinion

21   that if a child is killed, that's a terrible thing, which is

22   okay.  Does that kind of make sense, a distinction?

23        A.    Yeah, but I think anytime a woman is killed in a

24   brutal fashion like that and then a child is killed along or

25   about the same time, that's -- that was just very horrific.

```
 1  I'll put it that way.

 2      Q.   So you remember the details about --

 3      A.   Not really.  I mean, I just remember what happened.

 4  That's all.

 5                  MS. BENNETT:  Give me just a second.

 6                  Judge, can we have a brief recess?

 7                  THE COURT:  All right.  If you'll just step out,

 8  Mr. Grant, for just a moment with my bailiff, I'll bring you

 9  back in in just a minute.

10                  (Venireperson excused to hallway.)

11                  MR. JOHNSON:  Your Honor, we're going to

12  challenge this juror for cause under 35.16, subsection 10.

13                  (Venireperson challenged by the Defense.)

14                  COURT REPORTER:  35.16?

15                  MR. JOHNSON:  Yes.

16                  THE COURT:  Any objection from the State?

17                  MS. BENNETT:  No.

18                  THE COURT:  Granted.  Challenge granted.

19                  Huh?

20                  (Challenge granted.)

21                  MR. HEALY:  In good faith.

22                  THE COURT:  In good faith.  Yeah.

23                  MR. HEALY:  He said he's formed an opinion.

24                  THE COURT:  Yeah.

25                  (Discussion off the record.)
```

```
 1                      (Venireperson brought forward.)

 2                      THE COURT:  Okay.  Mr. Grant, thank you so much

 3   for being here.  I am going to excuse you from any further

 4   involvement in this case and responsibility, but thank you so

 5   much for being here.  We appreciate your time and effort.

 6                      VENIREPERSON:  Okay.

 7                      THE COURT:  And your jury service.

 8                      MR. JOHNSON:  Thank you, sir.

 9                      MS. BENNETT:  Thank you.

10                      (Venireperson excused from courtroom.)

11                      (Recess.)

12                      (Venireperson brought into courtroom.)

13                      THE COURT:  Come in, Ms. Ramirez, if you would,

14   please, ma'am, just up here to the -- thank you, ma'am.  Just

15   go ahead and have a seat there, if you would, please.

16                      Be seated, please, ladies and gentlemen.

17                      Let the record reflect this is Prospective Juror

18   Number 22A, Irma Ramirez.

19                      And Mr. Healy.

20                      MR. HEALY:  Thank you, Judge.  Please the Court.

21                      THE COURT:  Mr. Healy.

22                      MR. HEALY:  Counsel.

23                           IRMA RAMIREZ,

24   was called as a venireperson by the parties, and after having

25   been previously duly sworn, testified as follows:
```

```
 1                STATE VOIR DIRE EXAMINATION

 2   BY MR. HEALY:

 3        Q.    Good morning, Ms. Ramirez.  How are you doing this

 4   afternoon?

 5        A.    Fine.  Thank you.

 6        Q.    I appreciate you coming down here.  I know you're

 7   busy based on your questionnaire.

 8        A.    Yes, sir.

 9        Q.    How is work going?

10        A.    Busy.

11        Q.    Busy?

12        A.    Extremely busy, yes.

13        Q.    What exactly do you do for Bank of America?

14        A.    I do quality assurance of reviewing renewal

15   insurance policies for the bank.  It's collateral that they've

16   taken as collateral on their loans for commercial and small

17   business banking loans, and I just make sure that the insurance

18   team that we have that obtain the renewals are in accordance

19   with the regulations of the bank, what we need in order to be

20   sure that the bank is not at risk.

21        Q.    And you've been doing that at this point 22 years?

22        A.    Well, no, I've been with the bank 22 years, but I've

23   been doing this maybe -- almost seven years, this particular

24   position.

25        Q.    Okay.  Do you like it?
```

1      A.    Yes, I do.

2      Q.    Okay.

3      A.    Very busy though.

4      Q.    And that's what concerns me a little bit.  And I say

5   concerns me, nothing you did wrong.  I just want to make sure

6   -- I don't know if the Judge covered the exact trial dates for

7   this.  We're starting October 25th --

8      A.    Uh-huh.

9      Q.    -- working through that week and then probably the

10  middle of the following week and then we'll be done.

11     A.    Uh-huh.

12     Q.    Obviously, we can't excuse you just because of work.

13  However, if it's something that's so, so, so horrible that

14  would basically ruin your ability to concentrate on the

15  evidence at hand, we take that into consideration.

16     A.     It definitely will because it is a very stressful

17  job at this point in time with not just myself, but with the

18  unit that I'm in.  We are very backlogged on our work as it is

19  right now, and it's all about the numbers and production, so I

20  have to be honest and it is stressful.  I have lost sleep over

21  it, you know, and -- I could not honestly say that I would be

22  100 percent in my mind concentrating on what, you know, this

23  would require, because I give 100 percent plus to my job

24  position.  You know, to me, it's that important.

25     Q.    We think you would be a good juror here.

```
 1        A.    Honestly.  Well, I mean, I don't know what to say.
 2   You want me to be honest.
 3        Q.    Yes, that's all I ask you.
 4        A.    I'm being honest.  I'm not the only one in our -- in
 5   that department -- in my team that is under a lot of stress.  I
 6   mean, even my manager, we're all under stress.  Because we all
 7   have to answer to somebody up higher.
 8        Q.    Well, I guess I can only ask you the same question
 9   I've asked every other juror, Ms. Ramirez.  Do you think if you
10   were selected as a juror on this case, your ability to
11   concentrate on the evidence would be hampered by your job?
12        A.    Well, knowing that my position -- that other
13   coworkers would have to incur my -- my workload, I would
14   honestly have to be -- I would have to say yes.
15        Q.    All right.  Ms. Ramirez, I appreciate your honesty.
16   We would have loved to have you.
17                    THE COURT:  Do we have an agreement?
18                    MR. HEALY:  I think she legally disqualified
19   herself.
20                    THE COURT:  Okay.
21                    MR. HEALY:  Do you agree, Judge?
22                    THE COURT:  Yes.
23                    MR. HEALY:  Mr. Johnson?
24                    THE COURT:  Okay.
25                    VENIREPERSON:  I'm sorry.
```

```
 1                    MR. HEALY:  That's okay.

 2                    VENIREPERSON:  I'm being honest.

 3                    THE COURT:  No, we needed that from you.

 4                    VENIREPERSON:  Okay.

 5                    THE COURT:  Ms. Ramirez, thank you for being

 6   honest and forthright with us.

 7                    VENIREPERSON:  Thank you.

 8                    THE COURT:  Thank you very much, and you are

 9   excused.

10                    VENIREPERSON:  Thank you.

11                    (Agreement to excuse venireperson.)

12                    THE COURT:  All right.

13                    VENIREPERSON:  I'm off of work today.  It's a

14   bank holiday.  Thank you.

15                    THE BAILIFF:  Thank you for being with us,

16   ma'am.

17                    (Venireperson excused from courtroom.)

18                    THE COURT:  Okay.  Do you want to put anything

19   on the record other than what we've already got?

20                    MR. HEALY:  Can we just pull some people out of

21   the hallway and make them fill out questionnaires?

22                    THE COURT:  Okay.  So she was disqualified.  I

23   mean, is that the best way?

24                    MR. HEALY:  We agreed on her, but, yes.

25                    THE COURT:  Yeah, I mean, you agreed on her, but
```

```
 1   I think she --
 2                   MR. JOHNSON:  We agree she's disqualified under
 3   the law, Your Honor.
 4                   THE COURT:  Let the record reflect that
 5   Prospective Juror Number 22A, Irma Ramirez, was disqualified.
 6                   (Venireperson 22A, Irma Ramirez, disqualified.)
 7                   (Recess of proceedings.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    Reporter's Certificate

2  THE STATE OF TEXAS:

3  COUNTY OF DALLAS:

4      I, Darline King LaBar, Deputy Official Court Reporter in

5  and for the 282nd District Court of Dallas County, State of

6  Texas, do hereby certify that the above and foregoing volume

7  constitutes a true, complete and correct transcription of all

8  portions of evidence and other proceedings requested in writing

9  by counsel for the parties to be included in the Reporter's

10 Record, in the above-styled and numbered cause, all of which

11 occurred in open court or in chambers and were reported by me.

12     I further certify that this Reporter's Record of the

13 proceedings truly and correctly reflects the exhibits, if any,

14 admitted by the respective parties.

15     WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16 on the 8th day of March, A.D., 2011.

17

18

19

20                    _____
                      DARLINE KING LABAR
                      Official Court Reporter
21                    363rd Judicial District Court
                      Dallas County, Texas
22                    hpdkfaith@msn.com
                      (214) 653-5893
23

24
   Certificate No:  1064
25 Expiration Date:  12/31/2012