1          REPORTER'S RECORD

2        VOLUME 42 OF 57 VOLUMES

3

4     TRIAL COURT CAUSE NO. F09-59380-S

5          CASE NO. AP-76,458

6

7  THE STATE OF TEXAS          :          IN THE 282ND JUDICIAL

8  VS.                          :          DISTRICT COURT OF

9  GARY GREEN                   :          DALLAS COUNTY, TEXAS

10

11

12                    INDIVIDUAL VOIR DIRE

13

14

15

16

17                    * * * * * * * * * *

18

19      On the 13th day of October, 2010, the following

20  proceedings came on to be heard in the above-entitled and

21  numbered cause before the Honorable Quay Parker, sitting for

22  the Honorable Andy Chatham, Judge Presiding, held in Dallas,

23  Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1  A P P E A R A N C E S:

 2

 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
         Frank Crowley Criminal Courts Building
 4       Dallas, Dallas County, Texas 75207
         Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409

 8

 9                            FOR THE STATE OF TEXAS;

10

11

12          .

13

14

15  MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
         311 N. Market Street, Suite 300
16       Dallas, Texas 75202-1846
         Phone:  214-761-0707
17
    MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
18       3300 Oak Lawn Avenue, Suite 600
         Dallas, Texas 75219
19       Phone:  214-559-9115

20  MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
         3838 Oak Lawn Avenue, Suite 1350
21       Dallas, Texas 75219
         Phone:  214-651-6250
22

23                            FOR THE DEFENDANT.

24

25
```

```
 1                        INDEX VOLUME 42

 2                    (INDIVIDUAL VOIR DIRE)

 3  October 13th, 2010                        PAGE   VOL.

 4  Proceedings............................................ 6     42

 5  Venireperson 54D, Randy Phillips; Venireperson 64C,

 6  Ruben Reynoso; Venireperson 39D, Randall Bell; and

 7  Venireperson 42B, Kenneth Horton, excused by

 8  agreement, no discussion.......................... 6     42

 9  Venireperson 37D, Melinda Gutierrez; Venireperson

10  3D, David Lee Wright; excused by agreement, no

11  discussion........................................ 7     42

12  Venireperson 43A, May Smith, excused by

13  agreement, no discussion.......................... 7     42

14  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE   VOL.

15  CATHRYN FAIRFIELD          15                          42

16  State peremptory strike number 1A................... 26    42

17  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE   VOL.

18  KAREN HUNT                 27                          42

19  Agreement to excuse venireperson.................... 28    42

20  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE   VOL.

21  MARY RODRIGUEZ             29                          42

22  Agreement to excuse venireperson.................... 34    42

23  PROSPECTIVE JUROR  STATE VOIR DIRE  DEFENSE VOIR DIRE   VOL.

24  VIRGINIA FARMER            35                          42

25  Agreement to excuse venireperson.................... 41    42
```

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| WENDALL VANDIVER | 52 | | 42 |

Agreement to excuse venireperson..................... 81     42

Venireperson 54B, Melody Tran, excused by
agreement, no discussion............................ 83     42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| TERRY MATHYS | 84 | | 42 |

Agreement to excuse venireperson..................... 87     42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| ROBERT CROW | 88 | | 42 |

Agreement to excuse venireperson..................... 99     42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| DON HOALDRIDGE | 100 | | 42 |

Agreement to excuse venireperson..................... 109    42

Reporter's Certificate.............................. 111    42

## ALPHABETICAL INDEX

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| ROBERT CROW | 88 | | 42 |
| CATHRYN FAIRFIELD | 15 | | 42 |
| VIRGINIA FARMER | 35 | | 42 |
| DON HOALDRIDGE | 100 | | 42 |
| KAREN HUNT | 27 | | 42 |
| TERRY MATHYS | 84 | | 42 |
| MARY RODRIGUEZ | 29 | | 42 |

```
 1  WENDALL VANDIVER          52                    42
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPORTER'S RECORD

VOLUME 42 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F09-59380-S

CASE NO. AP-76,458

| THE STATE OF TEXAS | : | IN THE 282ND JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| GARY GREEN | : | DALLAS COUNTY, TEXAS |

INDIVIDUAL VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \*

On the 13th day of October, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Quay Parker, sitting for the Honorable Andy Chatham, Judge Presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

---

APPEARANCES:

HONORABLE CRAIG WATKINS, Criminal District Attorney
Frank Crowley Criminal Courts Building
Dallas, Dallas County, Texas 75207
Phone: 214-653-3600

BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
MR. JOSH HEALY, A.D.A., SBOT # 24026288
MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
MR. HEATH HARRIS, A.D.A., SBOT # 00795409

FOR THE STATE OF TEXAS;

MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
311 N. Market Street, Suite 300
Dallas, Texas 75202-1846
Phone: 214-761-0707

MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
3300 Oak Lawn Avenue, Suite 600
Dallas, Texas 75219
Phone: 214-559-9115

MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
3838 Oak Lawn Avenue, Suite 1350
Dallas, Texas 75219
Phone: 214-651-6250

FOR THE DEFENDANT.

---

INDEX VOLUME 42

(INDIVIDUAL VOIR DIRE)

October 13th, 2010                     PAGE VOL.

Proceedings........................................ 6  42

Venireperson 54D, Randy Phillips; Venireperson 64C, Ruben Reynoso; Venireperson 39D, Randall Bell; and Venireperson 42B, Kenneth Horton, excused by agreement, no discussion.............................. 6  42

Venireperson 37D, Melinda Gutierrez; Venireperson 3D, David Lee Wright; excused by agreement, no discussion............................................ 7  42

Venireperson 43A, May Smith, excused by agreement, no discussion.............................. 7  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| CATHRYN FAIRFIELD | 15 | | 42 |

State peremptory strike number 1A................... 26  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| KAREN HUNT | 27 | | 42 |

Agreement to excuse venireperson.................... 28  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| MARY RODRIGUEZ | 29 | | 42 |

Agreement to excuse venireperson.................... 34  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| VIRGINIA FARMER | 35 . | | 42 |

Agreement to excuse venireperson.................... 41  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| WENDALL VANDIVER | 52 | | 42 |

Agreement to excuse venireperson.................... 81  42

Venireperson 54B, Melody Tran, excused by agreement, no discussion............................. 83  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| TERRY MATHYS | 84 | | 42 |

Agreement to excuse venireperson.................... 87  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| ROBERT CROW | 88 | | 42 |

Agreement to excuse venireperson.................... 99  42

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| DON HOALDRIDGE | 100 | | 42 |

Agreement to excuse venireperson................... 109  42

Reporter's Certificate............................. 111  42

ALPHABETICAL INDEX

| PROSPECTIVE JUROR | STATE VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
| ROBERT CROW | 88 | | 42 |
| CATHRYN FAIRFIELD | 15 | | 42 |
| VIRGINIA FARMER | 35 | | 42 |
| DON HOALDRIDGE | 100 | | 42 |
| KAREN HUNT | 27 | | 42 |
| TERRY MATHYS | 84 | | 42 |
| MARY RODRIGUEZ | 29 | | 42 |

---

**5**

```
 1   WENDALL VANDIVER    52        42
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**6**

```
                    P R O C E E D I N G S
 2        THE COURT:  Let the record reflect that
 3   Prospective Juror Number 54D, Randy Phillips; Prospective Juror
 4   64C, Ruben Reynoso, R-e-y-n-o-s-o; Prospective Juror Number
 5   39D, Randall Bell; and Prospective Juror Number 42B, Kenneth
 6   Horton, have all been excused by agreement of parties.
 7        Is that correct, Mr. Healy?
 8        MR. HEALY:  Yes, Your Honor.
 9        THE COURT:  Okay.  Mr. Warren?
10        MR. WARREN:  Yes, Your Honor.
11        (Venireperson 54D, Randy Phillips; Venireperson
          64C, Ruben Reynoso; Venireperson 39D, Randall
12        Bell; and Venireperson 42B, Kenneth Horton,
          excused by agreement, no discussion.)
13
14        THE COURT:  Okay.  Then Randy Phillips, 54D;
15   Ruben Reynoso, 64C; Randall Bell, 39D; and Kenneth Horton, 42B,
16   are all excused by agreement of parties.
17        MS. BENNETT:  Judge, there's two for this
18   afternoon and then there was a no show lady yesterday.  Maybe
19   we should get those on the record.
20        THE COURT:  Okay.  Just a second.  Okay.  The
21   other two scheduled for this afternoon, Melinda Gutierrez,
22   G-u-t-i-e-r-r-e-z, Number 37D; and David Lee Wright,
23   W-r-i-g-h-t, Number 3D, have both been excused by agreement of
24   parties.
25        Is that correct?
```

---

**7**

```
 1        MS. BENNETT:  Yes.
 2        MR. WARREN:  Yes, Your Honor.
 3        THE COURT:  All right.  And let the record
 4   reflect that 37D, Melinda Gutierrez, and 3D, David Lee Wright,
 5   have both been agreed by agreement of parties.
 6             (Venireperson 37D, Melinda Gutierrez,
             Venireperson 3D, David Lee Wright, excused by
 7             agreement, no discussion.)
 8        MS. BENNETT:  And the no show from yesterday.
 9        THE COURT:  And then we had one yesterday.
10        MS. BENNETT:  Yeah, that was May Smith, 43A.
11        MR. JOHNSON:  She never called?
12        MS. BENNETT:  No.
13        THE COURT:  Okay.  May Smith, Number 43A, who
14   was scheduled for yesterday morning never did show up and has
15   been excused by agreement of parties; is that correct?
16        MS. BENNETT:  Yes.
17        THE COURT:  Kobby?
18        MR. WARREN:  Who was that one?
19        THE COURT:  May Smith, 43A.
20        MR. WARREN:  Yes, yes.  Yes, sir, that is
21   correct.
22             (Venireperson 43A, May Smith, excused by
                agreement, no discussion.)
23
24        THE COURT:  All right.  Let the record reflect
25   May Smith, Number 43A, is excused by agreement of parties.
```

---

**8**

```
 1        Okay.  I think that takes care of everybody now.
 2        All right.  If you'll bring in Ms. Fairfield,
 3   Ms. Farmer, Ms. Hunt, and Ms. Rodriguez.  We have four ladies
 4   this morning.
 5             (Venirepersons brought forward.)
 6        THE COURT:  Come in ladies, if you would.  Good
 7   morning to you.  Just come on up here to the -- right -- just
 8   pick a seat on the front row here in the jury box, and I'm
 9   going to visit with you for just a few minutes and then we'll
10   -- all right.  Thank you.
11        Thank you, ladies and gentlemen.  Be seated,
12   please.
13        And good morning, ladies of the jury panel.
14        VENIREPERSONS:  Good morning.
15        THE COURT:  Good to see all four of you here
16   this morning.  Sorry we're getting started a little bit late.
17   I know you've been here since 8:30, but we didn't know until we
18   got here that they were changing courtrooms on us.  And so they
19   put us actually a floor lower than where we have been -- our
20   normal courtroom, so we had to get all of our stuff down here,
21   and then we had to find you all and get you down here.  So
22   we've been delayed a little bit, but we'll pick up the pace
23   here and get everything -- get you all taken care of just as
24   quickly as we can.
25        I'm Judge Quay Parker.  I'm a Senior Judge from
```

---

9

McKinney.  And several months ago, Judge Andy Chatham, who is

2   the Judge presiding over this case, called and asked me if I'd

3   assist him in the trial of a capital murder case by presiding

4   over the jury selection process.  We usually call it the

5   individual voir dire.  That's why I'm here today, instead of

6   Judge Chatham, who you've already met in the general session.

7          And that's why you're here today, because what

8   the law requires in a capital murder case where the State is

9   seeking the death penalty, the law requires that we interview

10  each prospective juror individually.  So all four of you ladies

11  are here today for your individual interviews.  And since we

12  don't know who we're going to take first, nor how much time

13  that we're going to spend with any of you -- some of you we may

14  spend five minutes with, some of you -- one of you we may spend

15  an hour and a half with.  It just depends on -- on kind of your

16  responses and answers to questions that the attorneys are going

17  to ask you.

18          Now, then, let me kind of tell you -- well,

19  first of all, let me take you back in time a few weeks ago.

20  It's been several weeks ago actually now.  You met in Judge

21  Chatham's courtroom upstairs, and Judge Chatham went through

22  qualifications, exemptions.  And at some point in the

23  proceedings he had everybody on the panel stand up, raise their

24  right hand, he administered the oath of a prospective juror to

25  each panel member.  Do you four ladies recall that?

10

1          VENIREPERSON:  Yes.

2          THE COURT:  Okay.  Now, did all four of you

3   ladies, whatever session you were in, did you each stand and

4   take the oath at that time?

5          VENIREPERSONS:  (Collectively)  Yes.

6          THE COURT:  All right.  Very good.  I'll just

7   remind you that you're still under your oath, and what you've

8   been sworn to do are basically two things:  First of all, to be

9   responsive to each and every question that's asked to you

10  either by me or under my direction which would be by the

11  attorneys during your individual voir dire.  And also, the

12  second thing is to give us truthful answers, and we know that

13  you'll do that anyway.

14          All right.  Now, then, having said that, let me

15  just say that there's no right or wrong answers to any of the

16  questions that either I ask you, nor that the attorneys ask

17  you.  This is not an exam.  It's not a quiz.  It's not

18  something that if you answer so many questions right, you pass

19  and you're on the jury; or if you don't answer enough right,

20  well, you're not on the jury.  It's nothing like that at all.

21          What's going to happen here this morning is we

22  figure that everybody that comes in here probably doesn't know

23  anything about the law as it applies to capital murder cases

24  here in Texas.  And I see some of you nodding your head, so

25  I'm -- I'm thinking that you're probably in that group; is that

11

1   correct?

2          VENIREPERSONS:  (Collectively)  Yes.

3          THE COURT:  Well, as a matter of fact, that's

4   the way we like you.  We don't want you coming in here with any

5   predisposed ideas about the capital murder statute -- death

6   penalty statute -- sometimes we refer to it.  But also, we

7   recognize the fact that you don't know anything about it and it

8   is necessary for you to understand some of the basic principles

9   regarding the law, so the attorneys -- a good part of our time

10  with you this morning -- each of you this morning will be spent

11  with the attorneys explaining the law to you or certain aspects

12  of it, not in -- in its entirety, but certain aspects that you

13  need to understand to see if you agree with the law, to see if

14  you can follow the law, and to see if you can even participate

15  in a trial of this magnitude.  So that's why I say there's no

16  right or wrong answers, just answers that come from your heart

17  that tell us how you really feel about the situation, and

18  whether or not you can participate in this trial.

19          Now, then, I'll ask you to be as succinct in

20  your answers as you can.  Now, it's human nature -- I know when

21  you're asked difficult questions and a lot of our responses we

22  get are, well, I'd like to think I could or I'd try my best to

23  do that or, you know, something -- something of that nature,

24  kind of evasive answers.  We need succinct answers.  We need

25  yeses or nos.  And the attorneys are going to have to pin you

12

1   down to see if you can really do this or not, because we don't

2   want to seat you on this jury and then you walk in here the day

3   of trial and you start in this case and you figure out, hey, I

4   can't do this.  We need to find that out today, so we don't put

5   you in that position, okay?  So be honest, be truthful, which

6   we know you'll be, but also be very succinct in your answers,

7   and really let us know how you feel, all right?

8          Now, then, the attorneys are going to talk to

9   you.  I think what I'm going to do now is to -- I was trying to

10  think -- oh, the questionnaires.  I know you filled out a

11  questionnaire when that general session -- I know you haven't

12  seen it since you turned it in that day, and I doubt seriously

13  if you remember many of the answers that you wrote down.  So

14  I've provided -- I will provide for you -- I have a copy for

15  you of your individual questionnaire.  All of the attorneys

16  have copies of all four of yours.  They've all read them, and

17  I'm sure they'll have questions for you about them.

18          So -- now, has everybody been able to read the

19  little guide that my bailiff gave you this morning?  Okay.

20  That just kind of very briefly explains some of the law and

21  some of the things that we're going to be discussing here with

22  you this morning.  And so if you haven't read it yet or you

23  haven't had time, whoever -- we're going to take you one at a

24  time, and if you do have a chance, read it over.  It will

25  kind of help you, I think -- give a little introductory

**13**

1  education, shall we say, about what we're going to be talking

2  to you in more depth about this morning.

3          Okay.  So you will have your questionnaires to

4  refer to, to refresh your memory, and I'm sure the attorneys

5  are going to have questions for you about, you know, some of

6  your answers and responses that you wrote down to either

7  expound on them or explain them or something like that, okay?

8          Let me introduce you to the lawyers, and we'll

9  get started here.  Seated at the counsel table directly in

10  front of you right here is the prosecution table, Ms. Jennifer

11  Bennett --

12          MS. BENNETT:  Good morning, ladies.

13          THE COURT:  -- right there.

14          And next to her is Mr. Josh Healy.

15          MR. HEALY:  Good morning, ladies.

16          THE COURT:  And this fine young lady and

17  gentleman are two Assistant District Attorneys and they're two

18  members of a four-member prosecution team.  The other two

19  members are Mr. Heath Harris and Mr. Andy Beach.

20          And then seated at the counsel table right here

21  in front of me is the Defense counsel.  Mr. Paul Johnson is

22  lead counsel for the Defense.

23          MR. JOHNSON:  Good morning.

24          THE COURT:  Seated at the counsel table, Mr.

25  Kobby Warren.

**14**

1          MR. WARREN:  Good morning, ladies.

2          THE COURT:  Also next to him, Mr. Brady Wyatt.

3          MR. WYATT:  Good morning.

4          THE COURT:  And these three fine attorneys are

5  representing the Defendant in this case, and that is Mr. Gary

6  Green --

7          THE DEFENDANT:  Good morning.

8          THE COURT:  -- the gentleman on the end down

9  here.

10          All right.  Okay.

11          MR. HEALY:  It's going to be Ms. Fairfield, Your

12  Honor.

13          THE COURT:  Ms. Fairfield.  All right.  Ms.

14  Fairfield, if you'll -- let me just ask who you ladies are so

15  we can -- I probably should have done this in the beginning.

16  We know who Ms. Fairfield is.

17          Which one of you is Virginia Farmer?  Okay.  Ms.

18  Farmer.

19          And then Ms. Karen Hunt?

20          And Ms. Rodriguez?  Okay.

21          All right.  Then, Ms. Fairfield, if you'll just

22  come down here to the witness stand.

23          And you other three ladies, if you'll accompany

24  my bailiff, he'll seat you outside here and we'll call you when

25  it comes your turn to testify.

**15**

1          (Venirepersons excused from courtroom.)

2          VENIREPERSON:  Here?

3          THE COURT:  Yes, ma'am, just right there would

4  be fine.  Darline's got your questionnaire for you.  You can

5  just leave that right there.  You won't be needing it.

6          All right.  Thank you.  Be seated, please.

7          Darline, I'd like for the record to reflect this

8  is Prospective Juror Number 21B, Cathryn, C-a-t-h-r-y-n,

9  Fairfield, F-a-i-r-f-i-e-l-d.

10          All right.  Mr. Healy.

11          MR. HEALY:  Thank you, Judge.

12          THE COURT:  Please proceed.

13          MR. HEALY:  Please the Court.

14          Mr. Warren.

15          CATHRYN FAIRFIELD,

16  was called as a venireperson by the parties, and after having

17  been previously duly sworn, testified as follows:

18          STATE VOIR DIRE EXAMINATION

19  BY MR. HEALY:

20      Q.  Ms. Fairfield, how are you this morning?

21      A.  I'm great.  How are you?

22      Q.  Good.  You seem excited to be here.  Looking forward

23  to talking with us for a while, right?

24      A.  Yeah, of course.

25      Q.  Basically where we're at, we're looking for two more

**16**

1  jurors in this case.  We're almost finished.  We plan on

2  starting October 25th.  It's going to last up to two weeks,

3  Monday through Friday, break in the morning, break in the

4  afternoon.  I want to make sure the times are okay with you

5  before I kind of get into your questionnaire.

6      A.  I don't have a problem -- I do have a doctor

7  appointment on the 26th.  It could be changed.

8      Q.  It could be changed if you were --

9      A.  Yeah, yeah.  It's not a critical thing.

10      Q.  All right.  Fair enough.  Well, the way this works,

11  Ms. Fairfield, is I'm going to speak with you for a while, up

12  to 45 minutes.  It could be five minutes.  It could be the

13  whole 45 minutes.  After that, Mr. Warren or Mr. Wyatt will

14  speak with you for that time, and then we'll know whether

15  you're one of those two jurors we're looking for.

16          You were brought -- being brought down here

17  today because your questionnaire gives both sides a good

18  feeling that you could potentially be a type of juror on this

19  type of case.  And what I mean by that is you give enough

20  answers kind of right in the middle where we're looking for 12

21  fair and impartial people that could really judge this case and

22  assess the death penalty if it's warranted or assess life in

23  prison if it's warranted or assess a not guilty if it's

24  warranted.  So tell me how it feels, Ms. Fairfield, if you are

25  selected here that you could potentially hold the fate of that

17

1   man's life in your hands sitting in the corner over there?

2       A.   I think it's a very huge responsibility, very --

3   nothing that you would want to take lightly.  And I think every

4   aspect of it would be very, very important to listen to and to be

5   able to participate, you know, so that you really can make the

6   best decision --

7       Q.   Okay.

8       A.   -- based on what you hear.

9       Q.   Now, have you heard anything about this case before

10  coming into the room here today?

11      A.   Yes.

12      Q.   You did?

13      A.   Yes.

14      Q.   And how have you heard of something?

15      A.   I -- I remember the news from when it happened.

16      Q.   What do you remember?  Do you mind me asking?  I

17  apologize.

18      A.   Specifically?

19      Q.   Yes, ma'am.

20      A.   Oh, I just -- I remember -- I remember the newsreel

21  or whatever you want to call it, where the police chief is

22  talking about the arrest and that two people were killed, a

23  wife, one a child, and that there were two other children

24  involved that -- I can't remember if both were hurt or not, or,

25  you know, they were just saying what the basics were.  That's

18

1   pretty much all I know.

2       Q.   Let me ask you, Ms. Fairfield, and I've got to ask

3   you an honest question.  We really need an honest answer here.

4   There is only time we can ask these questions to you, and the

5   oath you've taken now is to only tell the truth.  There are no

6   right or wrong answers, but in listening to the news and what

7   happened, knowing that you know about this case, has that in

8   any way swayed your opinion as to the guilt or innocence of

9   that man sitting right there?

10      A.   Guilt or innocence?  No.

11      Q.   Okay.

12      A.   Because I personally believe there's circumstances

13  and details that -- that lead up to everything that happens

14  every day.  And, you know, I just don't think you can base a

15  guilt or innocence on what you hear on the news, first of all.

16      Q.   That's the perfect answer.

17      A.   I -- I can't tell you the number of times that I've

18  changed news channels and gotten conflicting information.

19      Q.   Let me ask you this.  What could be types of

20  circumstances that would affect the guilt of somebody who if

21  you knew killed two people?

22      A.   Say that again now.  What would be --

23      Q.   You talked about circumstances leading up to --

24      A.   I'm just referring to mental issues.

25      Q.   Okay.

19

1       A.   I'm pulling out of the -- out of my head here,

2   mental issues or people's life circumstances.  You know, we all

3   live different -- you know, different lives.

4       Q.   So are you saying that excuses the --

5       A.   No.

6       Q.   Okay.

7       A.   No.

8       Q.   That's what I want to concentrate on for a second

9   because you said I can't determine the guilt or innocence based

10  on just what I hear on the news, because I don't know the

11  circumstances leading up to it.  How would that affect whether

12  the person was, in fact, guilty of the crime, the circumstances

13  leading up to it?

14      A.   Well, the circumstances leading up to it, for me,

15  would just be what witnesses there are, what admissions, what

16  -- you know, what truths that would be presented in the trial,

17  not what the news people are saying they -- or think happened.

18      Q.   Okay.

19      A.   And what -- how they think it transpired up to the

20  point of the crime.  To me, a trial -- that's what a trial is.

21      Q.   Sure.

22      A.   That's where the -- supposed to be the true details

23  come out.

24      Q.   What about if you knew for certain that he did, in

25  fact, commit that crime, how would you feel about the death

20

1   penalty?

2       A.   I think there's a place for the death penalty, and I

3   think I've said it -- I think I remember saying it in here.  I

4   do think there's a place for it.  I never thought I would be --

5   you don't ever think that you would be in that position to make

6   that kind of decision, but if I was, I would look at all that

7   was brought out in the trial.

8       Q.   That's what I'm asking you.  I want you to assume

9   with me for a second --

10      A.   Okay.

11      Q.   -- what you heard on the news was true.

12      A.   Oh, the news.  Oh, if it was true --

13      Q.   Yes.

14      A.   -- what I heard?

15      Q.   Yes.  That he, in fact, killed his wife and his

16  child.

17      A.   Uh-huh.

18      Q.   No doubt he did it, no doubt, you know --

19      A.   Oh, okay, no doubt.

20      Q.   Tell me about your feelings on the death penalty for

21  that type of crime.

22      A.   I -- I wouldn't rule out a death penalty, but,

23  again, it would depend on the circumstances that led to the

24  truth that he did do it --

25      Q.   Okay.

21

A.   -- whether or not I think the murders warrant a
death penalty for him.

Q.   Well, let me ask you this, Ms. Fairfield.  Are there
any circumstances that could lead up to somebody justifiably
killing a child under the age of six?  That's -- I'm trying to
get a feel for where you're --

A.   And that's a tough one.  I know you want a -- yes or
no answers.

Q.   Well, I'm just trying -- I'm trying to get a feel --
because you're in a unique position that you know --

A.   Yeah.

Q.   -- some of the facts of the case.

A.   Uh-huh.

Q.   So I'm just asking you about that.

A.   Right, right.  And I understand.  I totally get
that.

Q.   I mean, somebody intentionally kills a child under
the age of six.  You keep talking about the circumstances
leading up to it.  I mean, is there anything that's justified
in doing that?

A.   I think a person would have to -- I would have to
feel like they really weren't in their right mind.  And --
but -- again, it's going to be -- it would be my belief and it
would have to be based on what I heard during the trial as to
whether I thought that might be the case.

22

Q.   Did the news report why he allegedly did these
crimes?

A.   I'm sorry?

Q.   Did the news report say why he allegedly did these
crimes?

A.   If it did, I don't remember.  I don't recall.

Q.   Okay.  Would it matter -- well, I guess -- I guess
what I'm hearing from you is it's more based on his mental
state.

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Obviously, I think you know here -- or you may not
know, he's not insane right now.  That's not an issue here.

A.   Right.

Q.   He's not mentally retarded.

A.   Okay.

Q.   So he's being accused of intentionally killing those
two individuals.  At the point -- if you found him guilty, and
I want you to assume with me you've found him guilty of doing
those crimes, brutally killing his wife and his -- you know,
wife's child under the age of six --

A.   Yes.

Q.   -- what types of circumstances do you think you
would consider that would push it over to a death sentence?

23

A.   I would have to say no -- no remorse, no evidence of
having any kind of mental issue whatsoever.  And I'm not even
saying that if -- if a person kind of flips out --

Q.   Sure.

A.   -- for whatever reason, of what's going on at that
time.  I'm not -- I'm not saying that that automatically gives
them a free ride.  I mean, I hate to say this, but -- I mean,
it -- it might come down to a judgment call on my part whether
I think that it was -- how it came about was heinous enough to
warrant the death penalty.

Q.   I mean, if I were to tell you right now if you're
getting to that point in the punishment phase, you know for
certain, 100 percent, he intentionally killed a five-year-old
girl.

A.   Uh-huh.

Q.   You would want to hear the circumstances of why he
did it and whether he was sorry for what he did?

A.   Yeah, I would want to know -- I would want to know
why.

Q.   Let me ask you this.  What happens if you heard
later on that he apologized for what he did and he seemed like
he really felt bad for what he did?

A.   Well, those are -- you kind of -- I mean, it's
words.  Apology doesn't -- doesn't always mean there's true
remorse.  And, again, it's -- you know, it's based on all the

24

details; again, it would be a judgment call as to whether or
not I felt there really was remorse.

Q.   Okay.  And I guess my last question for you, Ms.
Fairfield, is I'm trying to get a kind of good understanding.
I keep going back to the circumstances that led up to it.  I'm
trying to --

A.   Sure.

Q.   -- tell you in your head that he's not insane, he's
not retarded, it's not accidental.  It's an intentional,
cold-blooded killing of those two individuals.

A.   Okay.

Q.   Is there -- are there really circumstances that
would come up that would lead you to come back to life in
prison?  I mean, is there something that would excuse that type
of behavior?

A.   Maybe.

Q.   Can you tell me a little bit about that?

A.   This is the -- probably the moderate in me coming
out.  I might not know until I hear it.

Q.   Okay.  Is there anything you can come up in your
head right now that would excuse such behavior?

A.   No.

Q.   Okay.  All right.  Ms. Fairfield, I think you've
told me enough, and I appreciate your honesty.

MR. HEALY:  Judge, can we take a quick break?

**25**

```
1    THE COURT:  Yes, sir.  Yeah.  Ms. Fairfield, if
2  you'd step out with my bailiff for just a second, I'll confer
3  with the attorneys, and I'll bring you back.  You can just
4  leave everything right there.  Please watch your step.  It's
5  kind of tricky there.
6              (Venireperson excused to hallway.)
7              THE COURT:  Do we have an agreement?
8              MR. HEALY:  Judge, we're going to use our strike
9  on Ms. Fairfield.
10             THE COURT:  All right.  Ms. Fairfield.
11             MR. HEALY:  No matter what the Defense said,
12 Your Honor, it wasn't going to assist the State in maybe
13 keeping Ms. Fairfield.  So in the interest of saving time,
14 we're going to exercise our alternate strike.
15             THE COURT:  Okay.  That would be State Number
16 what?
17             MR. HEALY:  1A.  Our only alternate.
18             THE COURT:  Oh, on your alternate.  Okay.  I'm
19 sorry.
20             MR. HEALY:  That's okay.
21             THE COURT:  All right.  State's Strike 1A.  I'm
22 doing alternates with an A.
23             MR. HEALY:  Yes, Your Honor.
24             THE COURT:  Okay.  So State's 1A has been
25 struck, and if you'll bring Ms. Fairfield back in, I'll excuse
```

**26**

```
1  her.
2              What are y'all talking?
3              (State peremptory strike number 1A.)
4              MR. WYATT:  We need to take a break.
5              THE COURT:  Okay.  You need a five-minute break?
6              (Recess taken.)
7              THE COURT:  Bring in Ms. Hunt, if you would,
8  please.
9              (Venireperson brought forward.)
10             THE COURT:  Come in, Ms. Hunt.  Yes, ma'am, just
11 right down here to the witness stand, if you would, please,
12 ma'am.  And watch your step there, if you would, please, ma'am.
13 It's kind of tricky.  Those steps are kind of narrow there.
14             All right.  Thank you, ladies and gentlemen.  Be
15 seated, please.
16             And, Ms. Hunt, you may need to adjust that
17 microphone so you can speak directly into it for me, please,
18 ma'am.  And it will scoot up toward you if need be.
19             VENIREPERSON:  Okay.
20             THE COURT:  There you go.  Very good.  All
21 right.
22             Let the record reflect this is Prospective Juror
23 Number 32B, Karen, K-a-r-e-n, Hunt, H-u-n-t.
24             Ms. Bennett, you may proceed.
25             MS. BENNETT:  Thank you, Judge.
```

**27**

```
                         KAREN HUNT,
1  was called as a venireperson by the parties, and after having
2  been previously duly sworn, testified as follows:
3
4              STATE VOIR DIRE EXAMINATION
5  BY MS. BENNETT:
6     Q.   Good morning, Ms. Hunt.  How are you?
7     A.   Okay.
8     Q.   My name is Jennifer Bennett.  I'm going to be
9  talking with you this morning.  And first of all, I'd like to
10 thank you for waiting and apologize for it.  We just have a lot
11 of things that we have to get covered in the morning.
12    A.   I understand.
13    Q.   Secondly, you don't look very happy about being
14 here.  Tell me what's going on.
15    A.   Well, in the last two months, I've been under a lot
16 of stress.  My mother passed away August 3rd, and we're in the
17 process of trying to get -- in fact, there's no way I can be
18 here next week because I've got to be out of town to settle the
19 estate and sell the farm.
20             MS. BENNETT:  Actually, Judge, I think we're
21 going to just agree to let Ms. Hunt go take care of her
22 business, and we appreciate you being here.
23             VENIREPERSON:  Thank you so much.
24             THE COURT:  Thank you, Ms. Hunt, for being here.
25 We appreciate your time and effort you've made to be with us
```

**28**

```
1  today.  You can just leave that right there.  It's fine.  Now,
2  watch your step as you step down, please, ma'am.
3              VENIREPERSON:  Thank you so much.  I appreciate
4  it.
5              THE COURT:  Yes, ma'am.
6              VENIREPERSON:  Any other time it would have been
7  a little different, maybe.
8              MS. BENNETT:  Sure.  We're sorry for your loss.
9              THE COURT:  Yes, we are sorry for your loss.
10             MS. BENNETT:  Thank you.
11             (Venireperson excused from courtroom.)
12             THE COURT:  And let the record reflect that
13 Prospective Juror Number 32B, Karen Hunt, has been excused by
14 agreement of parties.
15             Is that correct, Ms. Bennett?
16             MS. BENNETT:  Yes, it is.
17             THE COURT:  And Mr. Warren?
18             MR. WARREN:  That is correct, Your Honor.
19             THE COURT:  And Mr. Green?
20             THE DEFENDANT:  Yes, sir.
21             (Agreement to excuse venireperson.)
22             THE COURT:  Yes, sir.  Thank you.
23             MS. BENNETT:  Mary Rodriguez.
24             THE COURT:  Okay.  We have Virginia Farmer and
25 Mary Rodriguez.
```

29

1    MS. BENNETT:  Mary Rodriguez.

2          THE COURT:  Mary Rodriguez, please, sir.

3          (Venireperson brought forward.)

4          THE COURT:  Come in, Ms. Rodriguez, if you

5    would, please, ma'am, all the way down here to the witness

6    stand.  Just go ahead and step up there.  Watch your step,

7    please, ma'am.  Those steps are kind of narrow and tricky

8    there.  Don't want you to have an accident there.

9          All right.  Thank you, ladies and gentlemen.  Be

10   seated, please.

11         And, Darline, I'd like for the record to reflect

12   this is Prospective Juror Number 44B, Mary Rodriguez.

13         And let's see --

14         MS. BENNETT:  Yes, I'll by talking to her.

15         THE COURT:  Okay.  All right.  Ms. Bennett.

16         MS. BENNETT:  Thank you.

17         THE COURT:  Yes, ma'am.

18                   MARY RODRIGUEZ,

19   was called as a venireperson by the parties, and after having

20   been previously duly sworn, testified as follows:

21              STATE VOIR DIRE EXAMINATION

22   BY MS. BENNETT:

23     Q.    Good morning, Ms. Rodriguez.  How are you?

24     A.    Just fine.  Thank you.

25     Q.    I'm great.  Thanks.  My name is Jennifer Bennett.

30

1    I'm going to be talking with you this morning for a little

2    while.  We're going to be talking first a little bit about how

3    you feel about the death penalty, and I want to thank you for

4    waiting on us.  We appreciate it.

5      A.    You're welcome.

6      Q.    I want to stress, again, like the Judge told you,

7    there's no right or wrong answers here.  We've been doing this

8    for two months.  We're looking for two more jurors.  This isn't

9    about knowing things that we want you to know or anything like

10   that.  We're just talking to people about their views and

11   really trying to find the best people that are going to be a

12   fit for this particular jury, okay?

13     A.    Okay.

14     Q.    So please feel free to just speak freely, and if you

15   have any questions about anything that we talk about, just let

16   me know, all right?

17     A.    Okay.  Thank you.

18     Q.    First of all, let me ask you this.  It appears that

19   you are in favor of the death penalty under the proper

20   circumstances; is that right?

21     A.    Correct.

22     Q.    Can you tell us why that is?

23     A.    Well, I think that no one should take anyone's life.

24   I just think that it's not right.  It's not -- it's not fair.

25   I mean, there's always other ways if you're having any kind of

31

1    problems or issues or anything like that, there's other ways

2    where you can either ask for help -- you know, ask for

3    counseling or ask your pastor, your priest, you know, whoever

4    you think that may be able to give you the -- the counseling or

5    head you in the right direction where you need to be at.

6      Q.    Now -- and I believe that, you know, most people

7    that are in favor of the death penalty -- I mean, clearly,

8    nobody is in favor of people murdering people, right?

9      A.    Correct.

10     Q.    And let me tell you -- and just kind of see how you

11   feel about it.  Let me explain what the law is because probably

12   even most attorneys don't know what the law is as far as the death

13   penalty is in the state of Texas.  And we purposely have you

14   fill out this questionnaire without telling you what it is

15   first because we kind of want to get your gut feelings.

16     A.    Okay.

17     Q.    So let me just tell you that it will surprise you to

18   know that not every murder is subject to the death penalty.  In

19   fact, if today right now I pull out a gun and shoot Mr. Healy

20   in the head three times for no reason in front of everybody

21   here and then tell you guys how happy I am that I just killed

22   him, that's a brutal, horrible, terrible crime that most people

23   feel like should be eligible for the death penalty.  And I

24   think you might agree with that?

25     A.    Uh-huh.

32

1      Q.    I feel that way, too, but it's not, okay?  Because

2    in the state of Texas, for a murder to rise to the level of

3    capital murder and be subject to the death penalty, there has

4    to be murder plus a certain set of circumstances.  Some of the

5    circumstances are, as you read in your pamphlet, murder of more

6    than one person in the same transaction.  Murder of a child

7    under the age of six.  Murder of a police officer or fireman in

8    the line of duty.  Murder for hire.  Murder in the commission

9    of several felony offenses, so someone murders a person while

10   they're burglarizing their home, robbing them, sexually

11   assaulting them, kidnapping them, murder in those situations,

12   then it's deemed capital murder.  And it's only those murders

13   that a person is even eligible for the death penalty.  Does

14   that make sense?

15     A.    Yes.

16     Q.    And do you feel like life in prison without the

17   possibility of parole -- I mean, would you agree that's a

18   pretty harsh punishment?

19     A.    Yes, it is harsh, but the way I see -- I mean, we

20   live in a society where everything or everyone is deemed to

21   have life -- I mean, that's the way it is.  But even though you

22   do have life in prison, you still have three hot meals a day,

23   you still have recreation time, you have education, and it's --

24   I mean, it's there for you.  It's really not -- my opinion, I'm

25   sorry, that's what it is.  But my opinion is it's not really a

35

1  punishment at all.

2  Q.   Life in prison with no parole?

3  A.   Correct.

4  Q.   Now, you did check on your questionnaire that if

5  you're in favor of the death penalty in some cases, do you

6  agree that a life sentence rather than death would be

7  appropriate.  I tell you what, actually -- Ms. Rodriguez --

8  A.   I'm sorry?

9  MS. BENNETT:  I think we're going to need to

10  take a break.

11  THE COURT:  Okay.  All right.

12  MS. BENNETT:  Sorry.

13  VENIREPERSON:  Okay.

14  THE COURT:  Ms. Rodriguez, if you step out with

15  my bailiff for just a second, let us confer with the attorneys.

16  Step right out there.  Watch your step.

17  THE BAILIFF:  Step right here just one second.

18  (Venireperson excused to hallway.)

19  THE COURT:  Okay.  Do we have an agreement?

20  MS. BENNETT:  Yes.

21  MR. WARREN:  Yes, Your Honor.

22  THE COURT:  Okay.  Let the record reflect that

23  the -- Prospective Juror Number 44B, Mary Rodriguez, is excused

24  by agreement of parties.

25  Is that correct, Ms. Bennett?

---

1  THE COURT:  I know.  Probably seems like way in

2  the afternoon to you.

3  VENIREPERSON:  Uh-huh.

4  THE COURT:  All right.  I'd like for the record

5  to reflect this is Prospective Juror Number 28B, Virginia

6  Farmer.

7  And Ms. Bennett or Mr. Healy -- which one?

8  MS. BENNETT:  Me, me, me.

9  THE COURT:  Okay.  Ms. Bennett, you may proceed.

10  VIRGINIA FARMER,

11  was called as a venireperson by the parties, and after having

12  been previously duly sworn, testified as follows:

13  STATE VOIR DIRE EXAMINATION

14  BY MS. BENNETT:

15  Q.   Good morning, Ms. Farmer.  How are you doing?

16  A.   Fine.

17  Q.   I'd like to thank you for waiting on us.  We know

18  you've been out there.  We appreciate your patience.  I'm going

19  to talk to you for a few minutes about some feelings as far as

20  the death penalty.

21  A.   Uh-huh.

22  Q.   I want to stress to you, like the Judge said, there

23  are no right or wrong answers.  Both sides are just trying to

24  feel you out, understand how you feel about things, and decide

25  whether or not we feel like you're the best fit for this

---

34

1  MS. BENNETT:  Yes.

2  THE COURT:  Okay.  And is that correct, Mr.

3  Warren?

4  MR. WARREN:  Yes, that is correct, Your Honor.

5  THE COURT:  Thank you.  Ms. Rodriguez will be

6  excused, so you can bring her back in.

7  (Agreement to excuse venireperson.)

8  THE BAILIFF:  Come on back in, please.

9  (Venireperson returned to courtroom.)

10  THE COURT:  Ms. Rodriguez, I'm going to relieve

11  you from any further responsibility in this case.

12  VENIREPERSON:  Okay.

13  THE COURT:  I just wanted to bring you back and

14  thank you personally for being here and the time and effort

15  you've made to be with us today.  We appreciate your jury

16  service.

17  VENIREPERSON:  All right.  Thank you.

18  THE COURT:  Thank you, ma'am.

19  MS. BENNETT:  Thank you.

20  THE COURT:  Okay.  And Virginia Farmer.

21  THE BAILIFF:  Yes, sir.

22  (Venireperson brought forward.)

23  THE COURT:  Ms. Farmer, how are you this

24  afternoon?  This afternoon -- seems like this afternoon.

25  VENIREPERSON:  Yeah, it does.

---

36

1  particular jury or not.  Is that fair?

2  A.   Fair.

3  Q.   How would you feel about sitting on a case such as

4  this?

5  A.   Fine.  I have no problems with it.

6  Q.   Okay.  How do you feel -- or why are you in favor of

7  the death penalty?

8  A.   I thought these were supposed to be yes and no

9  questions.

10  THE COURT:  Well, if you can answer them yes or

11  no.  Now, some of them do require some dialogue.

12  Q.   (BY MS. BENNETT)  I can tell you, my questions are

13  not going to be for the most part at least in the beginning yes

14  or no, sorry.

15  A.   I feel like that if you take someone else's life,

16  especially in a violent crime, you should be punished for it.

17  Q.   Okay.  And what kind of crimes do you feel like

18  would be appropriate for the death penalty?

19  A.   Murder.

20  Q.   Okay.  Any other crimes?

21  A.   No.

22  Q.   All right.  Any particular types of murder?

23  A.   Murder is murder, and I guess it depends -- violent

24  murders.

25  Q.   Okay.  All right.  Let me tell you what the law is,

---

37

39

1 because a lot of people -- I would say most of the attorneys
2 even, unless they practice criminal law, don't know the
3 difference between murder and capital murder.
4     A. Okay.
5     Q. And we personally -- we actually have you fill out
6 these questionnaires before we tell you what the law is because
7 we kind of want to get your gut feeling.
8     A. Okay.
9     Q. So in the state of Texas, for just what we call a
10 regular murder, the death penalty is not even an option, even
11 if it's violent and premeditated. So everyday I pull out a
12 gun, I shoot Josh Healy in the head during this process,
13 several times, and then I tell the courtroom how glad I am that
14 he's dead and that's going to be a violent, cold-blooded
15 murder.
16     A. Uh-huh.
17     Q. A lot of people, including myself -- a lot of people
18 that sit up there feel like a case like that should -- probably
19 be eligible for the death penalty, but it's not. In the -- I
20 would be eligible for all the way up to life in prison, but for
21 a case to be murder plus a certain set of circumstances, it has
22 to be murder plus a certain set of circumstances. So some of
23 those circumstances are murder of more than one person in the
24 same criminal transaction, which is what we're here about.
25 Murder of a child under the age of six. Murder of a policeman

38

1 or a firefighter in the line of duty. Murder for hire. Murder
2 while a person is burglarizing someone's home, robbing them,
3 sexually assaulting them, kidnapping them, things like that.
4 So -- and only under those circumstances is the death penalty
5 even an option, okay?
6     A. I agree, I do, with that.
7     Q. Okay. Now, out of those that I listed, are there
8 any that stand out or do they all sound about equal to you?
9     A. They all -- I mean, they all are equal to me.
10     Q. Okay. They are all bad, right?
11     A. Yes, absolutely.
12     Q. Okay. And then it also might surprise you to know
13 that the State of Texas doesn't even seek the death penalty for
14 every capital murder case. I mean, if you pick up the paper on
15 almost a daily basis, you can probably read about some type of
16 capital murder that's happened here in Dallas. So how it works
17 in Dallas County is your elected District Attorney and a
18 committee of people that he's selected, they review cases, all
19 the capital murder cases. They look at all the circumstances
20 surrounding everything, and they determine which cases the
21 State will seek the death penalty for and which cases we won't,
22 okay?
23     Now, in the cases that we don't seek the death
24 penalty for, a person convicted of capital murder for those
25 crimes receives an automatic life in prison with no possibility

40

1 of parole.
2     A. That sounds fair.
3     Q. Okay. What kind of -- but -- so that sounds fair to
4 you, correct?
5     A. Uh-huh.
6     Q. What do you -- like for you, what makes the
7 difference or what would be the difference in a case that would
8 be like life in prison versus death penalty, just kind of gut
9 feeling?
10     A. If you killed a child, if you killed more than two
11 people in the same crime.
12     Q. Okay.
13     A. If you kill someone that you've raped and mutilated,
14 that type of thing --
15     Q. Okay.
16     A. -- should be death.
17     Q. Okay. And would you though be open to hearing facts
18 and circumstances to -- before you would make a decision as to
19 whether or not somebody deserved the death penalty?
20     A. Yes.
21     Q. And then I need to ask you -- and we hate to pry
22 into people's personal lives, but it's just kind of part of
23 what we have to do here. You -- you were married once, and it
24 looks like you got a protective order --
25     A. Yes.

1     Q. -- against your spouse?
2     A. Yes.
3     Q. Do you mind telling us a little bit about that?
4     A. He was into drugs really bad and he just showed up.
5 He had been threatening me. And his mother and sister called
6 me and told me I needed to be cautious about him. And he
7 showed up on my patio with a gun, and that's why.
8     Q. Okay. All right. I'm sorry, and I'm sorry --
9     A. That's okay.
10     Q. I'm sorry to make you talk about it.
11     A. That's okay. It's been awhile.
12     Q. But obviously, it's still kind of fresh?
13     MS. BENNETT: Judge, can we take a quick break?
14     THE COURT: Yeah, why don't we -- I'm going to
15 ask you just to step out for a brief second with my bailiff.
16     VENIREPERSON: Yes.
17     THE COURT: Let me confer with the attorneys.
18 And watch your step there, please, ma'am.
19     (Venireperson excused to hallway.)
20     THE COURT: Do we have an agreement?
21     MS. BENNETT: Yes, Judge.
22     MR. WARREN: Yes, Your Honor.
23     THE COURT: Okay. Let the record reflect that
24 Prospective Juror Number 28B, Virginia Farmer, is excused by
25 agreement of parties.

41

1   Is that correct, Ms. Bennett?

2       MS. BENNETT:  That's correct.

3       THE COURT:  And, Mr. Warren, is that -- is that

4   also correct?

5       MR. WARREN:  Yes, Your Honor.

6       THE COURT:  Mr. Green, as well?

7       THE DEFENDANT:  Yes.

8       (Agreement to excuse venireperson.)

9       THE COURT:  All right.  Okay.  Go ahead and

10  bring Ms. Farmer back in.

11      (Venireperson returned to courtroom.)

12      THE COURT:  Ms. Hunt, I just wanted to bring you

13  back --

14      MS. BENNETT:  Farmer.

15      THE COURT:  Farmer.  I'm sorry, Ms. Farmer.  I

16  had Ms. Hunt -- I was looking at her name on my list.  She was

17  the lady we talked to just a minute ago.

18      VENIREPERSON:  Uh-huh.

19      THE COURT:  But anyway, I just wanted to have

20  you back, Ms. Farmer, and thank you for being here and tell you

21  we appreciate your jury service very much and the time and

22  effort that you've made to be with us today.

23      VENIREPERSON:  Okay.

24      THE COURT:  I'm going to release you from any

25  further responsibility --

42

1       VENIREPERSON:  Okay.

2       THE COURT:  -- in this case, but we do thank you

3   for your jury service.

4       VENIREPERSON:  Thank you.

5       THE COURT:  Thank you very much.

6       (Venireperson excused from courtroom.)

7       THE COURT:  Okay.  That's it for this morning.

8       MR. HEALY:  Judge, I just want to put on the

9   record that we are continuing our discovery towards defense,

10  now turning over a SWIFS report dated September 15, 2010, DNA

11  findings, and everything that I don't believe the Defense has

12  yet.

13      MR. WYATT:  We have accepted a copy.  Thank you.

14      THE COURT:  Okay.  All right.  Let the record

15  reflect that the prosecution has turned over to the Defense

16  discovery here in open court.

17      Okay.  Very good.  Thank you.

18      (Recess for lunch.)

19      THE COURT:  All right.  If you'll bring them all

20  in.

21      (Venirepersons brought forward.)

22      THE BAILIFF:  Guys and ma'am, y'all watch this

23  step.  Just go all the way down.  We lost a lot of good jurors.

24      THE COURT:  Thank you.  Ladies and gentlemen,

25  come on in and have a seat here for just a minute.

43

1       THE BAILIFF:  We lost a lot of good jurors on

2   that step.  Be careful.

3       THE COURT:  All right.  Thank you, ladies and

4   gentlemen.  Be seated, please.

5       And good afternoon, ladies and gentlemen of the

6   jury panel.  I'm Judge Quay Parker.  I'm a Senior Judge from

7   McKinney, Texas, and several months ago, Judge Andy Chatham,

8   who is the presiding Judge over this case, called me and asked

9   me if I'd assist him in the trial of a capital murder case,

10  this case, by presiding over the jury selection process.  We

11  call it the individual voir dire.  So that explains to you what

12  I'm doing here today, instead of Judge Chatham, who

13  incidentally is upstairs in his courtroom and taking care of

14  the everyday business of the court.  Once I get the jury

15  selected, then I'll turn it over to him and Judge Chatham will

16  try the case.

17      We have the case scheduled for trial

18  October 25th.  We anticipate it will take no more than two

19  weeks, so we're asking everybody to schedule two weeks for the

20  trial itself, beginning October 25th.  Do any of you know off

21  the top of your heads any conflicts that you might have for the

22  week of October 25th and the week of November 1st?

23      The two of you, okay.  And let's see, I've got

24  -- let's see, Ms. Tran; is that correct?

25      VENIREPERSON:  Yes.

44

1       THE COURT:  What do you have, Ms. Tran?

2       VENIREPERSON:  I have scheduled testing for the

3   15th, I think it is, for a CCA exam and I have to study for it

4   for the next couple of weeks.

5       THE COURT:  Okay.  And when is your test?

6       VENIREPERSON:  It's medical billing and coding.

7       THE COURT:  I'm sorry?

8       VENIREPERSON:  It's a medical billing and coding

9   test, certification test.

10      THE COURT:  Okay.  But I'm asking when is it

11  scheduled?

12      VENIREPERSON:  The 15th of November, around the

13  15th.

14      THE COURT:  We should be through by that time.

15  Is that -- does that mean you're going to cut into your --

16      VENIREPERSON:  It's going to cut into --

17      THE COURT:  -- study time; is that what you --

18      VENIREPERSON:  -- my study time at the school,

19  yes.

20      THE COURT:  And time at the school?

21      VENIREPERSON:  Yes.

22      THE COURT:  Are you taking classes?

23      VENIREPERSON:  Yes, I was taking classes.

24      THE COURT:  Okay.  And is this kind of a review

25  class that you're taking before you take the exam?

45

```
1        VENIREPERSON: Yes.
2        THE COURT: Okay.
3        VENIREPERSON: And I won't be able to go every
4   day to it because I work full time, too, so that's -- that's
5   why it's been hard for me to get to take this test. When I got
6   this summons, I canceled it because it was supposed to be this
7   Saturday.
8        THE COURT: Would this -- if you were put --
9   placed on this jury, would you be thinking about that and
10  unable to concentrate --
11       VENIREPERSON: Probably.
12       THE COURT: -- on the case?
13       VENIREPERSON: Because I've been studying for
14  this for over a year now.
15       THE COURT: Okay.
16       MR. HEALY: Judge, can we wait and we'll handle
17  that individually?
18       THE COURT: Okay. All right.
19       MR. HEALY: Thank you.
20       THE COURT: All right. And who was the other
21  gentleman -- yes, sir, and what is your name, please, sir?
22       VENIREPERSON: Robert Crow.
23       THE COURT: All right. Mr. Crow, what do you
24  have?
25       VENIREPERSON: I'm supposed to start a job. I
```

46

```
1   retired not long ago from Halliburton. They called me back,
2   and they've not given me a date when it's supposed to start,
3   but I figure it's supposed to be pretty soon. It's for a
4   customer -- I have to go out on a customer location, as well.
5        THE COURT: Okay.
6        VENIREPERSON: I'm not sure if that can be
7   postponed that easily, but I don't know yet is what I'm saying.
8        THE COURT: Okay. But you don't have anything
9   -- you're just anticipating it could be fairly soon --
10       VENIREPERSON: Right.
11       THE COURT: -- that you would have to do this.
12  And would this be something that you couldn't do on weekends?
13  Let me just kind of tell you what's going to transpire in the
14  case when it starts trial. It will start Monday morning, be
15  probably from 9:00 to 5:00 with breaks during the day, for
16  lunch, and then, you know, breaks in the -- break in the
17  morning, break in the afternoon. And then you wouldn't be
18  sequestered. So you'd be free to go home your weekend -- the
19  weekend between the two weeks, you'd be off.
20       VENIREPERSON: Well, the problem is kind of like
21  this thing. When you start working on an oil well, when you
22  start, you don't stop until you're done.
23       THE COURT: Yeah.
24       VENIREPERSON: It's 24/7 for maybe a couple of
25  days. Once we start, we spend all this money and do all this
```

47

```
1   testing, we won't be able to stop until we finish. I don't
2   know if it's going to be a problem or not, but it could be --
3   very likely could be a problem.
4        THE COURT: Okay. I guess we can address his --
5   Mr. Crow's problem when we talk to him individually, as well.
6        MR. HEALY: Yes, Your Honor.
7        THE COURT: Okay. But I'm taking it then the
8   other three of you don't know of anything at least right now
9   that would conflict; is that correct?
10       All right. Very good. Okay. Well, let me just
11  take you back a little bit in time and tell you that -- well, a
12  few weeks ago, when you all met upstairs in Judge Chatham's
13  courtroom and he went over some things with the panel at that
14  time, some qualifications, exemptions. At some point in the
15  proceedings, he had every panel member stand up, raise their
16  right hand, and he administered the oath of a prospective juror
17  to each panel member. Do all of you recall that?
18       VENIREPERSONS: (Nod heads.)
19       THE COURT: All right. Did each one of you take
20  the oath at that time?
21       VENIREPERSONS: (Collectively) Yes.
22       THE COURT: All right. And just let the record
23  reflect that they all are indicating that they did take the
24  oath, and there's no one here that did not; is that correct?
25  No response. All right. I have to do that for the record,
```

48

```
1   because everything is on the record.
2        So let me just remind you that you are -- all
3   five of you are still under the oath that Judge Chatham
4   administered to you at that time. And what you've been sworn
5   to do are basically two things: First of all, to give us
6   truthful answers or tell the truth. And secondly, to be
7   responsive. In other words, to answer each of the questions
8   that the attorneys ask to you or that I ask of you. So that's
9   -- that's basically it, so you're only sworn really to tell the
10  truth at this time.
11       And when the attorneys ask you questions, the
12  questions are going to be more about how you feel about the law
13  and -- and about -- and I know you don't know anything about
14  the law, and we give you that questionnaire you filled out that
15  day and turned it in -- and incidentally, I know you haven't
16  seen that since you turned it in that day and probably don't
17  remember all the answers that you wrote down or your responses
18  to many of those questions. And so I provided a copy of your
19  questionnaire that you'll have on the witness stand when it
20  comes your turn to testify.
21       All the attorneys have a copy of it. They've
22  read each one of your questionnaires. That's the reason you've
23  been invited to come down here because they've been through it
24  and they think you have potential as a juror or you wouldn't be
25  here. And so they will have questions for you, I'm sure, about
```

49

51

1   some of your answers and responses and maybe ask you to expound

2   on some or explain some, just things of that nature.

3         Now, let me tell you, to any of their questions,

4   there's no right or wrong answers.  In other words, this is not

5   an exam.  It's not a quiz.  It's not something that if you

6   answer so many questions correctly, you're on the jury; if you

7   don't, you're not.  It doesn't have anything to do with that at

8   all.  What you're -- what we're trying to do here today is to

9   tell you something about the general aspects of the law as it

10   applies to capital murder cases here in Texas.

11         Once we feel like you understand the law or

12   those certain aspects of the law that we want to ask you

13   questions about, then we will ask you questions to get your

14   thoughts, your ideas, your opinions concerning the law, whether

15   or not you can follow the law, whether or not you can even

16   participate in a trial of this magnitude.  And so it's not

17   anything that's right or wrong.  It's just really how you feel

18   in your heart about being on a case -- on a jury in a -- in a

19   capital murder case -- a case of this nature where the State is

20   seeking the death penalty.

21         So the reason for the individual interview is to

22   give you the opportunity to let us know whether or not you can

23   follow the law, whether or not you could even participate in

24   the trial, because we don't want to seat you on the jury and

25   then, lo and behold, you get about two days into it and you

**51 (right column):**

1        THE COURT:  And also Mr. Josh Healy.

2        MR. HEALY:  Good afternoon.

3        THE COURT:  They are two Assistant District

4   Attorneys here and two members of a four-member prosecution

5   team.  The other two attorneys are Andy Beach and Mr. Heath

6   Harris and neither one of them -- sometimes they come in and

7   out of the courtroom as we're doing this voir dire and -- but

8   they're not in the courtroom right now.

9        Defense counsel seated at the table right here

10   in front of me, and Mr. Paul Johnson over here --

11        MR. JOHNSON:  Good afternoon.

12        THE COURT:  -- is lead counsel for the Defense

13   team.

14        Mr. Kobby Warren is seated at the counsel table.

15   Next to him, Mr. Brady Wyatt.

16        MR. WYATT:  Hi.

17        THE COURT:  And these three attorneys are

18   representing the Defendant in case, and their client, Mr. Gary

19   Green --

20        THE DEFENDANT:  Good afternoon.

21        THE COURT:  -- who is the gentleman on the end.

22        All right.  Ms. Bennett.

23        MS. BENNETT:  I believe we're going to talk to

24   Mr. Vandiver first.

25        THE COURT:  Okay.  Mr. Vandiver.

**50 (left column):**

1   think to yourself, hey, I can't do this.  Then -- then we're

2   all messed up.  So we want you to be as succinct in your

3   answers as you can.  By that, I mean, it's kind of human nature

4   for people to want to say, well, I think I could follow the law

5   or I'd try to or I'd do the best that I could, you know, kind

6   of equivocate on your answers like that, but unfortunately, for

7   purposes of our record, we have to tie you down.  So if you can

8   answer it yes or no, well, answer it yes or no.  I assure you,

9   any of your answers are not going to offend anyone here,

10   whatsoever.  And if you just feel like you cannot do it, then

11   this is the time for you to tell us you cannot do it.  If you

12   think that you can, then tell us you can.  That's what we want

13   to know, okay?

14         So let me introduce the attorneys to you, and

15   then I'm going to turn it over to them.  We can only take you

16   one at a time, so we'll call you in order.  And some of you, it

17   might just take us five minutes to talk with you, and you'll be

18   gone, we'll be through with you.  Others it could take as long

19   as an hour to an hour and a half, and we just don't know until

20   we get into the interview, you know, which ones are going to

21   qualify and which ones are not.

22        Okay.  With that, then, let me introduce the

23   attorneys.  As I said, seated at the counsel table right in

24   front of you here is Ms. Jennifer Bennett.

25        MS. BENNETT:  Good afternoon.

**52 (right column):**

1        VENIREPERSON:  Vandiver, okay.

2        THE COURT:  Vandiver.  Vandiver, yes, sir.

3   Okay.

4        If the -- then the other four of you would just

5   join my bailiff, he'll take you outside here, and then we'll

6   call each of you when it's your turn.

7        (Venirepersons taken to hallway.)

8        THE COURT:  Mr. Vandiver, just go ahead and have

9   a seat there on the witness stand, if you would, please, sir.

10        Darline, I'd like for the record to reflect that

11   this is Prospective Juror Number 60B, Wendall, W-e-n-d-a-l-l,

12   Vandiver, V-a-n-d-i-v-e-r.

13        All right.  Ms. Bennett.

14        MS. BENNETT:  Yes, sir.

15        WENDALL VANDIVER,

16   was called as a venireperson by the parties, and after having

17   been previously duly sworn, testified as follows:

18        STATE VOIR DIRE EXAMINATION

19   BY MS. BENNETT:

20   Q.   Good afternoon.  How are you doing?

21   A.   Fine.  Thank you.

22   Q.   You drew the lucky Number 1 spot, so

23   congratulations.

24   A.   Thank you.

25   Q.   We're going to spend a little bit of time talking

53

1 about some of the things you told us about in your

2 questionnaire. A copy of it is up there if you need to refer

3 to it, but basically what we're going to be doing this

4 afternoon is both sides want to hear a little bit about how you

5 feel about the death penalty, okay?

6 A. Okay.

7 Q. And as the Judge said, and I'll stress it, there are

8 no right or wrong answers. All we want to do is kind of get

9 your feelings, and we're looking for the best fit for this

10 particular jury. So this isn't about what you know or what you

11 don't know or anything like that, all right?

12 A. I understand.

13 Q. And you don't look nervous up there. Are you doing

14 all right up there?

15 A. So far.

16 Q. Okay. Good. And I'll also just say that if you

17 need to stop me or ask me any questions or anything, please

18 feel free to do that, all right?

19 A. Thank you.

20 Q. Now, first of all, it appears that you are in favor

21 of the death penalty.

22 A. Yes.

23 Q. Can you tell us why?

24 A. I think that there are individuals out there that

25 can commit crimes over and over and so I think the death

54

1 penalty is -- is the right thing if they take someone else's

2 life and they are proven beyond a reasonable doubt.

3 Q. And when you said over and over, tell me -- tell me

4 what you mean by that.

5 A. Well, I mean, I don't want someone to be a threat,

6 and obviously we don't know who's a threat until something

7 happens. If something happens once, then I think they could be

8 a threat.

9 Q. Okay. So you don't see a death penalty crime as

10 necessarily having to be a repeat offender who's done things

11 over and over?

12 A. No, that's a poor choice of words, probably.

13 Q. Well --

14 A. Yeah, I think that -- I don't want there to be a

15 threat that's -- once something's happened, you know, it's

16 possible it could happen again. And so that's the kind of

17 threat that -- you know, when someone has taken someone's life,

18 I think that needs to be thought about.

19 Q. All right. And do you feel like the death penalty

20 is appropriate for all types of murders, or what kind of cases

21 do you feel like it's appropriate for?

22 A. Well, where there's an intentional disregard of

23 human life. You know, I can understand, you know, some passion

24 thing or something and someone -- you know, maybe he hasn't

25 thought this through, but if there is some intentional

55

1 disregard of human life or law, then I think that's worthy of

2 the murder sentence and the respective punishment for that.

3 Q. And you just mentioned a passion thing. What do you

4 mean when you say that?

5 A. Well, if -- you know, if someone, you know, murdered

6 one of my daughters and I saw it right there, if I had a gun,

7 I'd probably shoot the guy. I would think that that -- you

8 know, there should be some mitigating factor in that.

9 Q. Okay. Let me first -- well, before I go into that,

10 let me tell you this. You know, we've only brought down the

11 people that we think might be a fit for this jury, and you'll

12 know when you leave today whether or not you're on this jury.

13 I was interested -- you don't have to turn to it, I'll tell you

14 what it says. But the very last question asks you how you feel

15 about being chosen as a juror in this case. And you wrote

16 apprehensive, was chilled when it was announced as a murder

17 case, humbled at the responsibility. How would you feel about

18 being chosen as a juror in this kind of case where the State of

19 Texas is obviously seeking to end a person's life?

20 A. I would take it very seriously. I mean, I would be

21 very deliberative. I certainly don't want someone that's not

22 guilty to be sentenced to that. I mean, I understand that

23 that's the reason there are all kinds of, you know, second --

24 you know, trials and things like that. And I'm happy for that,

25 but I think that -- you know, if -- if beyond a reasonable

56

1 doubt that someone has murdered someone, then the death penalty

2 ought to be on the table.

3 Q. And you say on the table. And let me ask you this,

4 if you knew a hundred percent that someone is guilty of not

5 just murder, but capital murder -- and I'll explain what that

6 means -- but let's say a brutal, intentional, horrible killing

7 -- you know, we're here on a case of more than one individual.

8 You didn't have any issues about guilt or innocence, you knew

9 100 percent that they were guilty, on a scale of 1 to 10, with

10 1 being the least and 10 being the most, kind of what's your

11 gut telling you about that?

12 A. See, if I was a hundred percent, you know -- yeah,

13 if I was a hundred percent, it would be a 10, that there would

14 be a -- I would vote for capital murder.

15 Q. Okay.

16 A. I mean, death penalty, if that's what your question

17 is.

18 Q. It is. And I'll tell you that -- you know, we ask

19 you these questions, again, to get your gut feeling.

20 A. Right.

21 Q. But there's actually a lot more to it and a lot more

22 that has to be considered if you are actually a juror in that

23 case.

24 A. I understand.

25 Q. In a case such as this, there's actually more than

57

1  just a question of whether or not a person is guilty, but I
2  appreciate that. And, again, that's the kind of answer -- you
3  know, things that we're looking to find out what someone's gut
4  feeling is.
5      A.   Right.
6      Q.   Now, as far as on your questionnaire, it asks you
7  what would be important to you in deciding whether a person
8  would receive a death or life sentence. Let me read you what
9  your answer was. You said the death penalty if evidence beyond
10  a reasonable doubt of the crime and a lack of remorse or other
11  basis to believe that such a crime would not again be
12  committed, whether in jail or in a public square. So it sounds
13  like you would listen to other things, as well. Is that fair
14  to say?
15      A.   That's fair to say.
16      Q.   Let me tell you what the law is as far as capital
17  murder. Most people, I will tell you, don't know it and we
18  don't expect you to, because I will tell you that my friends
19  who are attorneys don't even know it. It is not -- you are not
20  eligible for the death penalty if you just murder someone in
21  cold blood, even if it's premeditated. So if I pull out a gun
22  right now and shoot Mr. Healy in the head because he's over
23  there whispering and distracting me, and then I get up and
24  dance around the courtroom and tell everybody in here that I'm
25  glad I just killed him, that would be a brutal, horrible crime

58

1  that a lot of people, including myself, feel should probably be
2  subject to the death penalty, okay? But in the state of Texas,
3  it would not be. I would be eligible all the way up to life in
4  prison, but in order for a murder to be elevated to what we
5  call capital murder, it has to be murder plus a certain set of
6  circumstances. And they're kind of set out, so murder of more
7  than one person during the same criminal transaction, as you
8  know from your pamphlet, as well. Murder of a police officer
9  or a fireman in the line of duty is another. Murder of a child
10  under the age of six is another. Murder for hire or murder in
11  the commission of several serious felony offenses. Murder of
12  someone while burglarizing a home, robbing someone, kidnapping
13  them, sexually assaulting them.
14      A.   Okay.
15      Q.   So those are the types of instances that take --
16  what's normally a murder and elevate it to the level of capital
17  murder, okay? And it's only those cases where a person is even
18  subject to the death penalty, all right?
19      A.   All right.
20      Q.   How do you feel about that?
21      A.   I'm -- I've learned something. I didn't know if it
22  was -- if it had to be quite to that level, actually, so I've
23  -- I feel stronger that -- that -- that Texas laws are probably
24  better than what I had envisioned before I sat down here.
25      Q.   So it sounds like then that you like the way the law

59

1  is written?
2      A.   Right. I mean, I -- you know, I -- I'm not
3  willy-nilly about the death penalty. I don't want to look back
4  a few years from now and somebody say, you know what, we put
5  that guy to death and we shouldn't have. I don't want to ever
6  see that, but if -- you know, in your example, if I'm a hundred
7  percent convinced that someone deserves or someone committed
8  capital murder, I believe they deserve the death penalty.
9      Q.   Okay. And like I said, we'll get to that, because
10  it's not just, as you'll find out, about whether or not
11  somebody did something really bad because I will tell you that
12  every capital murder is going to be really, really bad.
13      A.   Right.
14      Q.   Because we're not talking -- when we're talking
15  about capital murder, we're not talking about accidents. We're
16  not talking about self-defense. We're not talking about
17  insanity or defense of your family. We're talking about
18  intentional or knowing killings of another human being, plus
19  some other aggravating factor, okay? So -- but it's not just,
20  which we'll get into, did they do a really bad thing or not and
21  if they did, they get the death penalty. It doesn't work that
22  way. The State has to go on and prove something else that the
23  person is probably going to be a future danger. We have to
24  prove that beyond a reasonable doubt. And the jury has to
25  decide that there's no sufficiently mitigating evidence to

60

1  warrant sparing their life, so there's two other questions that
2  have to be answered before the death penalty would be assessed
3  in the affirmative and the negative, yes and no, on the special
4  issues; otherwise, a person is not going to get the death
5  penalty, even if they do something really terrible and
6  horrible.
7      So I just told you what capital murder is. I
8  will tell you that a majority of the cases in Dallas County
9  that are death penalty, the State -- or that are capital
10  murder, the State doesn't seek the death penalty for the
11  majority of those cases. I mean, you can read in the paper on
12  a weekly basis about a capital murder that's occurred here in
13  Dallas County. And so in Dallas County, how it works is your
14  elected District Attorney and a committee of people that he
15  selects, reviews all the cases, all the facts and circumstances
16  surrounding everything about that crime and that person, and
17  then they decide which cases the State will seek the death
18  penalty for, okay?
19      A.   Okay.
20      Q.   And it's only in those certain cases that we
21  actually go through this process, which obviously, you can tell
22  is a pretty long process. In those other cases, the majority
23  of cases, how it works is if that person is convicted of
24  capital murder, they receive an automatic life sentence without
25  the possibility of parole. So that's what happens actually in

61

1  the majority of capital murder cases, all right?

2      A.   Okay.

3      Q.   How do you feel about that?

4      A.   I feel better about that, again.  I mean, still, I

5  don't want to take lightly the death penalty, so I think that

6  the fact, you know, those additional steps are taken before you

7  even go through this process of bringing charges against

8  someone as a capital murder charge, I believe those laws are --

9  make a lot of sense.

10     Q.   Well -- and actually, how we even -- how we get to

11  capital murder is the same, though.  Any felony case is just

12  reviewed by a grand jury.  They decide whether to indict it as

13  a felony.  And -- but I will tell you that the fact that a

14  grand jury has indicted a person and the fact that our office

15  has decided to go forward with a death penalty case is no

16  evidence of anything, okay?

17     A.   Right.  I understand.

18     Q.   It doesn't mean a person that's charged is guilty,

19  and it doesn't mean that they're going to get the death

20  penalty.

21     A.   Right.

22     Q.   Does that make sense?

23     A.   It does.

24     Q.   Okay.  Now, before we go into me explaining how the

25  law works exactly, let me ask you a couple other questions

62

1  about your questionnaire.  On page 4 of your questionnaire, if

2  you wouldn't mind turning to it, see the -- I guess, second

3  half of the page where it has you check some answers?

4      A.   Okay.

5      Q.   Where it says most criminals are actually victims of

6  society's problems, you checked uncertain.  Can you tell me

7  what you meant by that?

8      A.   Well, I guess maybe that's the reason I put the

9  little blurb out to the side.  I mean, I think everybody's got

10  some problems.  I mean, everyone has something in their past.

11  I mean, you know, there's a broken heart on every pew in church

12  every Sunday.  I mean, there's -- there's -- so I'm uncertain

13  if it's necessarily -- I mean, there are people that overcome,

14  you know, problems, you know, because they weren't born to a

15  rich family or they weren't this or that.  I mean, I don't see

16  that just because someone had a hard time whenever they were

17  growing up or had bad parents or whatever that means that, you

18  know, it's okay to do criminal activity.  I mean, there are a

19  lot of people that overcome that, and so I don't think that

20  it's an excuse.  So I don't, you know, like the idea of using

21  excuses for rule breaking.

22     Q.   Okay.  Because you see how I could have interpreted

23  the answer to that question is you may be thinking that it was

24  -- you're saying for you that you wouldn't be an excuse to bad

25  behavior?

63

1      A.   Right.  Yeah, that's --

2      Q.   And then that bottom question right there, where it

3  says criminal laws treat criminal defendant too harshly, you

4  checked uncertain.

5      A.   Well, I -- I guess I would say that because I'm kind

6  of a facts guy, and I don't know the facts necessarily.

7      Q.   So you just put that because you -- you didn't --

8      A.   Yeah, I don't have any real quantitative or

9  qualitative or anything kind of information to let me know that

10  so --

11     Q.   Okay.  And then a son of a coworker went to prison

12  and then you had a friend -- a former business partner under

13  scrutiny by the Department of Justice.  Did either one of those

14  people feel like they were treated unfairly by law enforcement?

15     A.   No.  Neither of those people thought -- the one

16  that did serve time, he totally understood it and now he's a

17  graduate from college and he's doing well.  I mean, I think

18  that helped him.

19     Q.   Okay.  And then as far as you had mentioned about

20  running your business, but then when the Judge was asking, you

21  didn't say you had any conflicts.  We're talking about two

22  weeks or less.  We're asking the jurors to schedule two weeks,

23  starts a week from Monday.  How do you -- is that going to work

24  for you with your schedule, if you need to?

25     A.   Obviously, it's a hardship, but I mean, I'm not

64

1  going to say that I can't serve if, you know, because --

2  somebody has got the same problem I've got somewhere, so --

3      Q.   Sure.  Well, I think probably most people, right?

4      A.   Right.

5      Q.   All right.  At least hopefully if they are gainfully

6  employed?

7      A.   Right.

8      Q.   How does your church -- you're pretty active in your

9  church.  Does your -- you said that your -- in the

10  questionnaire that your church, whether or not they had a

11  position on capital murder, you said not formally stated, to my

12  knowledge.  Have you found out anything different in the

13  interim?

14     A.   I haven't even looked or tried or anything, no.

15     Q.   So there is nothing about your church or your

16  religious views that would keep you from being able to -- if

17  the evidence led you in that direction, assess a death

18  sentence?

19     A.   No.

20     Q.   And then also, before we go forward, I just want to

21  make sure -- you know, we ask people such as yourself that are,

22  you know, potentially going to sit on this jury -- this is kind

23  of like the gut check time -- to actually take a moment and

24  take a look at Mr. Green.  I mean, as he sits there today, he

25  is a living, breathing human being.  And what we're asking

65

1  jurors to do and what we believe is going to happen after this
2  trial is we believe that a jury is going to find him guilty of
3  capital murder and then after hearing the punishment evidence,
4  we believe that the jurors are going to find beyond any
5  reasonable doubt that he is probably going to continue to be a
6  future danger and that there's no sufficiently mitigating
7  evidence to spare his life.  At that time, Judge Chatham would
8  have no choice but to sentence him to die by lethal injection.
9  So our hope, our goal, and what we expect to happen at this
10  table is for some day in the future Gary Green to be lying dead
11  on a gurney in Huntsville, Texas.  So, you know, asking you to
12  kind of take a look at him, is that a process that you feel
13  like you would be able to participate in if the evidence led
14  you there?
15      A.   If the evidence led me there, I would.
16      Q.   Okay.  Any questions about that?
17      A.   No, ma'am.
18      Q.   All right.
19           MS. BENNETT:  Hold on just a second.
20           (Discussion between counsel off the record.)
21      Q.   (BY MS. BENNETT)  Again, you know, obviously, we
22  only have opportunities to ask you, and I have no idea what
23  you're thinking right now, but it seemed like when I said that,
24  maybe you got a little choked up and maybe I misread you or
25  maybe I didn't.  You know, we do have people that come in here

66

1  and say while they're in favor of the death penalty very much
2  so, they -- they might not feel comfortable participating in
3  the process.  When I say feel comfortable, that's probably not
4  the right way to describe it.  But, you know, at this point the
5  only oath that you've taken is to tell the truth.
6      A.   Right.
7      Q.   The 12 jurors who are seated are going to take a
8  totally different, oath and that's to follow the law.  So, you
9  know, if this is something that you feel like you would be
10  uncomfortable taking that oath, you know, again, this is gut
11  check time.  Now -- if you tell us that, you're not going to
12  hurt our feelings.  We're just going to move on to the next
13  person sitting outside.
14      A.   No, I -- and I think maybe I mentioned that in this,
15  that I'm kind of a rule follower guy.  I mean, that's kind of
16  my line of work, and that's the way I've been always.  And
17  it's -- you know, me getting choked up about something, it's
18  about -- it's about the people, not the process.  I mean, if
19  the process is right, I'm going to follow through with the
20  process, I mean.
21      Q.   But is it going to be something that is going to be
22  so hard for you that, you know, we don't -- I don't want you if
23  you're on this jury to be reading the paper in a few years,
24  after the appeals has run out, and it says Gary Green was
25  executed today and that's something that is going to haunt you.

67

1  Does that make sense?
2      A.   It does make sense, but if the case is there and
3  it's beyond a reasonable doubt, I would vote for the death
4  penalty.
5      Q.   Okay.  Well, again, and we're going to get there in
6  just a second.  And I want to make sure you can do this.  It's
7  just not -- well, I hear what you're saying.  If the whole case
8  is there.  Let me explain the process to you then and see how
9  you feel about it.
10           MS. BENNETT:  Again, just one second.
11           (Discussion between counsel.)
12      Q.   (BY MS. BENNETT)  All right.  And have you ever sat
13  on a jury before?
14      A.   I have.  I was on a -- it was a civil trial once.
15      Q.   That's right.
16      A.   Yeah.
17      Q.   And they settled in the middle of trial?
18      A.   Right.
19      Q.   Okay.  Let me tell you kind of how it works.  Excuse
20  me.
21      A.   Uh-huh.
22      Q.   In any criminal trial, there's two parts to a trial,
23  okay?  There's the guilt/innocence phase, and then there's a
24  separate and distinct punishment phase.  During the
25  guilt/innocence phase, it's only about did the State prove its

68

1  case or not.  Did we prove -- meet our burden beyond a
2  reasonable doubt, which I know you understand because you feel
3  strongly about it.
4      A.   Right.
5      Q.   And if we -- if the jury finds someone guilty, okay,
6  then they go into the punishment phase, and they get much more
7  information for the punishment phase.  They're going to get to
8  hear good acts, bad acts, prior criminal history if there is
9  any, or lack of criminal history if there is not.
10      A.   Right.
11      Q.   And it's only in a capital murder, after hearing the
12  punishment evidence, that a jury can even think about the
13  special issues and how they're going to answer them.  And it's,
14  again, only after Special Issues 1 and 2 are answered yes and
15  no that a death sentence would be appropriate, okay?  Because
16  like I told you, in the majority of cases where the State
17  doesn't seek the death penalty, where we're not going forward
18  through all this, a guilty sentence means life in prison with
19  no parole.
20      A.   Okay.
21      Q.   So let's first talk about the guilt/innocence phase.
22  There's -- the State has to prove our case beyond a reasonable
23  doubt, and how that works is we set out what we call elements
24  of an offense.  We have to prove each one of those beyond a
25  reasonable doubt.  In this case we have to prove that the right

69    71

1   person, obviously the Defendant, on or about a certain date
2   here in Dallas County, Texas, intentionally or knowingly killed
3   two people during the same criminal transaction, and we have to
4   prove how they -- set out how they were killed.
5       A.   Okay.
6       Q.   Okay.  And in order to be a qualified juror, you
7   have to hold the State to its burden of proof on each and every
8   one of those elements, okay?
9       A.   Okay.
10      Q.   No one is more or less important than the other.  So
11  if we fail in proving even one of those elements, the jury's
12  job is to find the Defendant not guilty.  And to be a qualified
13  juror, you have to be the type of person that would be able to
14  do that.  And I think by your earlier answers that you would be
15  able to do that.
16      A.   I believe so.
17      Q.   Let me -- let me give you a hard example, and I give
18  this not expecting it to happen, okay, but just to make sure
19  you are the type of person that would be able to follow the
20  law.
21           Let's say we proved all the elements, except
22  that we had set out in our charging instrument that the victims
23  were stabbed to death and, in fact, it turned out that they
24  were shot to death, okay?  Do you see how we would have failed
25  in our burden of proof?

1   found somebody guilty of doing something just terrible, and you
2   have found them guilty beyond a reasonable doubt.  You don't
3   have any questions about their guilt.  At that point, right
4   after you found them guilty, but before you have heard the
5   punishment evidence, you cannot have already decided this is a
6   death case, okay?  The laws says that you have to go on and
7   hear the punishment evidence before you can make any decisions
8   as far as how the two special issues that we're getting ready
9   to talk about can be answered.
10      A.   Okay.
11      Q.   So in other words, it's not just did someone do
12  something really terrible and horrible, but then the jury has
13  to go on, they have to hear the punishment evidence, and decide
14  if we met our burden in Special Issue Number 1.  And then also
15  look at Special Issue Number 2.
16           Let me explain -- I think it will make more
17  sense when we talk about what those special issues mean, but do
18  you kind of understand, though, because you haven't heard the
19  punishment evidence, kind of like the rest of the story, why
20  it's important that a juror's mind not be made up about whether
21  or not this is a death case?
22      A.   Okay.
23      Q.   And you see how earlier when you were saying, well,
24  if they did that, I would be for the death penalty, because
25  it's not just about did someone do something really bad, okay?

70    72

1       A.   I do.
2       Q.   What would your then verdict have to be?
3       A.   It would have to be not guilty.
4       Q.   Exactly.  And, again, we use extreme examples,
5   obviously, not expecting anything like that to happen.
6       A.   Right.
7       Q.   But just to illustrate a point and to make sure
8   you're the type of person that would keep an open mind and that
9   would hold the State to its burden.  And you're fine with that?
10      A.   I am.
11      Q.   And I will tell you that for the -- when we have the
12  burden of proof, which is on guilt/innocence and then the
13  punishment phase, Special Issue Number 1, which we're getting
14  ready to talk about, the Defense doesn't have to do anything.
15  They don't have to show you anything, bring you anything.  By
16  appearing in court they have done everything that they're
17  supposed to do, all right?  I can promise you, these are very
18  good attorneys and they will not just be sitting there.  But if
19  they wanted to, they could, all right?
20      A.   Okay.
21      Q.   So assume with me now -- and we can't talk about the
22  facts of this case, but assume with me now that you have found
23  a Defendant guilty of a horrible, terrible, brutal capital
24  murder, okay?  Again, we're not talking about accidents,
25  insanity, defense of your family, defense of others.  You have

1       A.   Okay.
2       Q.   So if you're on a jury, you've found someone guilty
3   of a capital murder, and it's really bad, at that point, again,
4   you could not have made up your mind, okay?  It's only after
5   hearing the punishment evidence that the jury would go back and
6   start deliberating on those two special issues, okay?
7       A.   Okay.
8       Q.   Does that make sense?
9       A.   It does.
10      Q.   Do you feel like you're the type of person that
11  would be able to do that?
12      A.   Yes.
13      Q.   All right.  Let's talk about Special Issue Number 1.
14  And before we do, let me tell you just like we have the burden
15  of proof in proving someone guilty, we also have the burden of
16  proving Special Issue Number 1 beyond a reasonable doubt, okay?
17      A.   Okay.
18      Q.   So if you take a moment and read that to yourself
19  and then we're going to talk about it.
20      A.   Okay.
21      Q.   Do you see how that's kind of asking a jury to make
22  a prediction about future behavior?
23      A.   Yes.
24           MS. BENNETT:  Give me a second.
25      Q.   (BY MS. BENNETT)  Okay.  So -- sorry, but -- from

73

1 time to time, you might see the two tables -- from time to
2 time, we're going to have to talk and from time to time I might
3 have to ask them some questions.
4     A.   I understand.
5     Q.   I want to go back to assuming with me that you have
6 now found someone guilty of -- let's just say it's a brutal
7 capital murder, okay?  And the situation I described where
8 there's, you know, innocent victim or victims situation.  How
9 do you feel about the fact -- or are you okay with the fact
10 that the law says that you can't have automatically decided
11 that that's a death case?
12     A.   Yeah, I mean, I think that at least, you know, my
13 charge initially would be guilt or innocence, and then we look
14 at something else.  I'm a little confused, and I don't know --
15 I mean, we're already talking about this particular case that
16 the death penalty is on the table.  And when you talked about
17 these others, capital murder and then, but you don't know what
18 the ultimate penalty is -- I mean, I'm not -- I'm a little
19 fuzzy on what you're talking about there, but if that's what
20 you're talking about is this case and that's my understanding
21 is that you are seeking the death penalty -- I mean, if Special
22 Issue 1 is met, you know, and Special Issue 2, when we get to
23 it is met, and, you know, I find -- or the jury finds beyond a
24 reasonable doubt, then I see the death penalty being
25 administered.

74

1     Q.   Right.  And I apologize for -- I'm probably asking
2 the question in a poor fashion, but I guess the question is
3 this.  Before you came in here, you didn't know the law --
4     A.   Right.
5     Q.   -- and that's understandable.  And I guess the
6 concern would be that before you came in here, before I
7 explained the law to you, you were saying, initially -- the
8 most important thing to you before you understood what the law
9 was is that if someone was guilty of doing something really
10 bad, that you'd probably lean towards the death penalty?
11     A.   Right.
12     Q.   Now that you understand that the law says that's not
13 what it's all about, but we still have to prove Special Issues
14 1 and 2, I guess, are you okay with that?
15     A.   I am.
16     Q.   And would you follow -- be able to follow it?
17     A.   Yes.
18     Q.   And would you agree that life without parole is a
19 pretty severe sentence?
20     A.   I would, yeah.
21     Q.   Okay.  All right.  So let's go back to talking about
22 what Special Issue Number 1 means, which, again, what we have
23 to prove is not only that someone committed a terrible, brutal
24 capital murder, but it's not just did they do something really
25 bad, then we have to prove beyond a reasonable doubt that

75

1 there's a probability that they're going to continue to make --
2 continue to make victims is basically the easiest way to kind
3 of boil that down, all right?
4     A.   Okay.
5     Q.   So obviously, that's asking the jury to make a
6 prediction about future behavior, is it not?
7     A.   It is.
8     Q.   Can you think of some things that might be helpful
9 to a jury to decide if a person is probably going to be making
10 victims in the future?
11     A.   Prior acts --
12     Q.   Okay.
13     A.   -- basically.
14     Q.   Right.  And then also, I will tell you that the law
15 does allow for a juror -- jury to find that because of the
16 facts alone, because somebody did something that was so brutal,
17 so terrible, so heinous, that that alone might be able to
18 answer the special issues for you, but what you just can't do
19 is do it automatically.  In other words, you cannot just say
20 because someone committed a bad act, that it's automatically
21 going to be this way.  You have to listen to the punishment
22 evidence before you make any decisions, but you are allowed to
23 use the facts of the crime to answer those questions for you.
24     A.   Right.
25     Q.   Does that make sense?

76

1     A.   It does.
2     Q.   So you have obviously the facts of the case.  You
3 talked about criminal history you could also have.  And, again,
4 we're talking about somebody potentially making future victims.
5 Now, all the law says is these words are not going to be
6 defined for you -- or terms, but probability has to mean more
7 than a mere possibility.  Does that make sense?
8     A.   That makes sense.
9     Q.   Because anything is possible, right?
10     A.   Right, absolutely.
11     Q.   So some jurors have told us more likely than not,
12 greater than 50 percent.  It's whatever it means to you, so
13 long as it means more than a mere possibility.
14     A.   Right.
15     Q.   Criminal acts of violence.  Do you see how that's a
16 wide range of behaviors?  It doesn't just say murder, right?
17     A.   Right.
18     Q.   If I go to punch him for no reason, would that be a
19 criminal act of violence?
20     A.   It would.
21     Q.   Sure.  So it's ranging anything from an assault all
22 the way up to murder and anything in between that you would
23 deem it is.  Now, obviously, it has to be criminal, so if I'm
24 trying to grab his phone and he punches me and he's defending
25 his property, that's not criminal, okay?

77

1    A.   Okay.

2    Q.   But for criminal acts of violence.

3         And then a continuing threat to society.  If

4    you're ever looking at this special issue, then a jury has

5    already convicted a person of capital murder.

6    A.   I understand.

7    Q.   Which means the best they're ever going to look at

8    is going to be life in prison with no possibility of parole.

9    So when we talk society, it's wherever the Defendant may find

10   themselves.  So can you see how there might be a society in

11   prison?

12   A.   Society in prison?

13   Q.   Prison might be its own society.

14   A.   Oh, I see -- right.  Yes, I understand what you're

15   saying.

16   Q.   Because I mean, you've got people in prison like

17   your friend's son-in-law, right?

18   A.   Right.

19   Q.   Then you've got guards that work in prisons?

20   A.   Right.

21   Q.   Clergy that go to prisons, doctors, kind of the

22   gamut, right?

23   A.   Right.  I understand now.

24   Q.   All right.  And do you see that there would be a

25   society within prison?

78

1    A.   I do.

2    Q.   Okay.  And you might get to hear things, such as

3    what prison life is like, how much freedom a person has or

4    doesn't have that would give them opportunity to continue to be

5    a threat or not.

6    A.   I understand.

7    Q.   Do you think some of those things might be helpful

8    to you?

9    A.   Yes.

10   Q.   Okay.  All right.  Do you have any questions about

11   Special Issue Number 1?

12   A.   I don't think so.

13   Q.   All right.  Now, if the jurors unanimously answer

14   yes to Special Issue Number 1, they would then go on to Special

15   Issue Number 2 which is very wordy.  Why don't you take a

16   moment and read that to yourself.

17   A.   Okay.

18   Q.   I'll tell you none of us wrote that, the way that

19   is.  But I will tell you that Special Issue Number 2 is unique,

20   okay, because the State -- we don't have a burden of proof on

21   this issue, so we don't have to prove any of this to you.  The

22   Defense doesn't have to prove it to you.  It just asks the jury

23   to look back at everything, right?  Look back at the offense,

24   the character, the background, the personal responsibility, all

25   of that, and decide is there anything -- anything that is not

79

1    only mitigating, but sufficiently mitigating to warrant sparing

2    a person's life, okay?  And this one sometimes for law-abiding

3    citizens or especially law-abiding is sometimes the hardest one

4    to contemplate, okay?  Because what we're talking about here

5    is, we're talking about someone that's been found guilty of a

6    terrible, brutal crime and we've also then found beyond a

7    reasonable doubt that they're going to continue making victims.

8    And yet it's asking the jury to go back and still look at

9    everything and decide does anything basically warrant sparing

10   that person's life.  I mean, that's essentially what it's

11   asking.

12        And you might hear a lot of mitigating evidence,

13   but it has to reach the level of sufficiently mitigating to

14   warrant answering that question no and sparing that person's

15   life.  And because of what we're talking about, because we're

16   talking about a person who would have been convicted of

17   something terrible and making future victims, a lot of times

18   it's a hard special issue for a juror to say, you know, I can

19   honestly give it some consideration, but I will tell you that

20   it could be one in a million case for you personally, it could

21   be one in a hundred case for someone else.  Nobody can tell you

22   what would be sufficiently mitigating.  Nobody can ask you what

23   would be sufficiently mitigating, but it just means that you

24   would be open to looking back at everything and making that

25   determination.  And if you felt like it was sufficiently

80

1    mitigating, you could spare his life.  And if not, then you

2    wouldn't.

3         And we like to give an example of -- it doesn't

4    have to be this extreme, but we like to give the example of

5    somebody that is raised in a closet, okay?  Because there was

6    that girl a few years back -- and treated in the most horrific

7    of living conditions.  I think she was fed dog food, she was

8    sexually abused, mentally abused, she suffered, you know, every

9    kind of abuse you could think of.  If she grew up to be a

10   criminal -- a career criminal and committed a capital murder, a

11   jury might say, you know what, she is guilty of the capital

12   murder, you know, based on the person that she has become --

13   had become under those circumstances, she's probably going to

14   continue to commit -- to make other victims.  However, you

15   know, just her background was so terrible and horrible, we're

16   going to spare her life.  So, again, that's not what it has to

17   be.  It's just an example.  Because a lot of people have a hard

18   time thinking of what it could be.  So it's, again, whatever it

19   would mean to you.

20   A.   Right.

21   Q.   Does that make sense?

22   A.   That does make sense.

23   Q.   Do you feel like you're the type of person that

24   would be able to give fair consideration to that special issue?

25   A.   Yeah, I could give fair consideration.

81

83

1  Q.  And you put on your questionnaire that if you found
2  someone guilty, that those factors should all be reviewed
3  actually.  You put that on your questionnaire.  So you feel
4  like something like that could be important to you?
5  A.  Yes.  Uh-huh.
6  MS. BENNETT:  Hold on just a second.
7  Q.  (BY MS. BENNETT)  So that's kind of how the process
8  works.  Do you have any questions about any of that?
9  A.  No.
10  Q.  All right.  All right.  I believe that's all I have
11  for you.  Thank you very much.
12  MR. WARREN:  May we take a break, Your Honor?
13  THE COURT:  Yes, take a short break.  If you
14  need a drink of water, my bailiff will help you with that,
15  anything that you need.  And we'll be back in just a moment,
16  okay?
17  (Venireperson excused from courtroom.)
18  THE COURT:  Okay.  What's the situation?
19  MS. BENNETT:  I guess -- I guess the State and
20  the Defense have reached an agreement to excuse Mr. Vandiver.
21  MR. JOHNSON:  That's correct, Your Honor.
22  THE COURT:  Okay.  All right.  So Mr. Vandiver
23  excused by agreement of parties.
24  (Agreement to excuse venireperson.)
25  (Recess.)

1  she would be unable to concentrate on the case, if she were on
2  the jury, because of the pending exam.
3  MR. JOHNSON:  Correct.
4  THE COURT:  And so is that -- Ms. Bennett, does
5  the State agree to that -- to excuse Ms. Tran on that basis?
6  MS. BENNETT:  Yes, we do.
7  THE COURT:  And does the Defense, Mr. Johnson?
8  MR. JOHNSON:  We do, Your Honor.
9  THE COURT:  Ms. Tran will be excused.
10  (Venireperson 54B, Melody Tran, excused by
    agreement, no discussion.)
11
12  (Discussion off the record.)
13  THE COURT:  Come in, Mr. Mathys.
14  (Venireperson brought forward.)
15  THE COURT:  Go ahead and have a seat right
16  there, if you would, please, sir.
17  Am I -- thank you, ladies and gentlemen.  Be
18  seated.
19  Am I pronouncing your name correctly?  Is it
20  Mathys?
21  VENIREPERSON:  Mathys.
22  THE COURT:  Mathys.
23  VENIREPERSON:  Yes, sir.
24  THE COURT:  You were right, Josh.
25  MR. HEALY:  Common trend here.

82

84

1  THE COURT:  All right.  So we're going to
2  excuse.
3  MS. BENNETT:  Yes.
4  (Discussion off the record.)
5  THE BAILIFF:  Come on back in.
6  (Venireperson returned to courtroom.)
7  THE COURT:  Come on in, Mr. Vandiver.
8  VENIREPERSON:  All right.
9  THE COURT:  Thank you.  Be seated, please.
10  Mr. Vandiver, I just wanted to invite you to
11  come back and thank you personally for being here today.  We
12  appreciate the time and effort that you've made to be with us.
13  I'm going to release you from any further responsibility in
14  this case, but we do thank you for your jury service.
15  VENIREPERSON:  Okay.
16  THE COURT:  Thank you, sir.  Watch your step
17  down there, please, sir.
18  (Venireperson excused from courtroom.)
19  THE COURT:  Okay.  Let's go on the record,
20  Darline.
21  This is Prospective Juror Number 54B, Melody
22  Tran.  Ms. Tran indicated to the Court during the opening
23  remarks to the panel that she had an exam coming up, needed to
24  be studying for that exam.  I think the parties have agreed to
25  excuse her, based on that.  Also, she related to the Court that

1  THE COURT:  Okay.  Let the record reflect this
2  is Prospective Juror Number 35B, Terry, T-e-r-r-y, Mathys,
3  M-a-t-h-y-s.
4  VENIREPERSON:  Yes, sir.
5  THE COURT:  Thank you.
6  MR. HEALY:  Thank you, Judge.
7  THE COURT:  Mr. Healy.
8  MR. HEALY:  Please the Court.
9  Counsel.
10  TERRY MATHYS,
11  was called as a venireperson by the parties, and after having
12  been previously duly sworn, testified as follows:
13  STATE VOIR DIRE EXAMINATION
14  BY MR. HEALY:
15  Q.  Mr. Mathys, how are you doing today?
16  A.  Nervous.
17  Q.  Nervous.  What are you nervous about?
18  A.  First time having jury duty.
19  Q.  All right.  Well, hopefully we can put you at ease a
20  little bit.  This may take five minutes.  It may take up to
21  about an hour and a half, as the Judge said.  We're just
22  looking for your honest, honest answers.  I'm going -- because
23  I'm going to be completely honest with you.  Right now, just
24  looking at your questionnaire, this table thinks you'd be very
25  strong for the State on a case like this.  They're obviously

85

1  very worried with some of your answers, and just we need to
2  know if what you put on paper is the type of person you really
3  are, or are you the type of person who really kind on paper may
4  be that strong, but when it comes to real life and deciding
5  life or death for this man sitting right there, you'd want to
6  be fair and impartial and judge the evidence as it comes out.
7  So tell me how you honestly feel about the death penalty.
8       A.   I feel that -- you know, if need be and if that's
9  what the conviction needs to be, I don't have a problem.
10      Q.   What do you mean need be?
11      A.   I guess depending on the evidence needed.  If the
12 evidence proves that that's what needs to -- the conviction
13 that needs to be given, then that's what I would give.
14      Q.   You said, I believe that if you take a life, you
15 don't deserve your life.
16      A.   Uh-huh.
17      Q.   Is that how you feel?
18      A.   Yeah.
19      Q.   Is that an eye-for-an-eye type of feeling?
20      A.   Yes.
21      Q.   Okay.  And then you were asked, if you believe in
22 using the death penalty on a scale of 1 to 10, you put 10.
23      A.   Yeah, that's true.
24      Q.   So we just need to know, are -- and just be honest
25 with us, we just need to know, are you the type that are a

86

1  little more moderate than what you put on your questionnaire
2  or, you know, really deciding the life or death of that man, or
3  are you the type that, you know, if someone is found guilty of
4  a capital murder, it's going to be a death sentence for you?
5       A.   No, if it's capital murder, the death penalty.  I
6  don't see any other way.
7            MR. HEALY:  Judge, I believe that's all the
8  questions the State has.  He's perfectly fine for the State.
9            THE COURT:  Any questions, Mr. Warren?
10           MR. WARREN:  No.  May we take a break?
11           THE COURT:  Take a break?
12           MR. WARREN:  Yes, Your Honor.
13           THE COURT:  Okay.  All right.
14           (Venireperson excused from courtroom.)
15           THE COURT:  Okay.  Do we have an agreement?
16           MR. WARREN:  Yes, Your Honor.
17           THE COURT:  Okay.  Mr. Mathys will be excused by
18 agreement of parties; is that correct?
19           MR. JOHNSON:  Yes, sir, Judge.
20           THE COURT:  Mr. Healy?
21           MR. HEALY:  Yes, Your Honor.
22           THE COURT:  Mr. Green?
23           THE DEFENDANT:  Yes.
24           THE COURT:  Mr. Mathys is excused.
25           Okay.  Bring him back in.

87

1            (Agreement to excuse venireperson.)
2            (Venireperson returned to courtroom.)
3            THE COURT:  Thank you, Mr. Mathys, for being
4  with us today.  I'm going to relieve you from any further
5  responsibility in this case, but we do thank you for your jury
6  service.  Thank you for the time and effort you made to come
7  down here today.
8            VENIREPERSON:  Thank you, Your Honor.
9            THE COURT:  Thank you very much.  You're free to
10 go.  Thank you very much.
11           MS. BENNETT:  Thank you.
12           THE COURT:  Okay.  So who do you want now?  Give
13 me another name.
14           MR. HEALY:  Mr. Crow.
15           THE COURT:  Mr. Crow, please.
16           (Venireperson brought forward.)
17           THE COURT:  Come in, Mr. Crow, if you would,
18 please, sir, right up here to the witness stand.
19           VENIREPERSON:  Thank you.
20           THE COURT:  Just go ahead and have a seat there.
21           Thank you, ladies and gentlemen.  Be seated,
22 please.
23           I'd like for the record to reflect this is
24 Prospective Juror Number 46B, Robert Crow.
25           And let's see, Mr. Bennett or Mr. Healy?  Mr.

88

1  Healy.
2            MR. HEALY:  Thank you, Judge.  Please the Court.
3  Counsel.
4            THE COURT:  Proceed.
5                   ROBERT CROW,
6  was called as a venireperson by the parties, and after having
7  been previously duly sworn, testified as follows:
8            STATE VOIR DIRE EXAMINATION
9  BY MR. HEALY:
10      Q.   Mr. Crow, how are we doing this afternoon?
11      A.   Pretty good.
12      Q.   Pretty good.  We appreciate your honesty when you
13 told the Judge about your potential work conflict.  If it's
14 okay with you, I'd like to proceed forward with the
15 questioning, and then if you make this jury as one of those
16 two -- unless you absolutely, absolutely think your employer
17 would not take this seriously, which usually they're pretty
18 good about it, they can't penalize you in any way for being on
19 a jury, then we can reevaluate it maybe.  Is that all right?
20      A.   That's fine.  I don't know if it will even be a
21 conflict or not.  I just wanted to let you know it keeps me in
22 a little bit of a bind here.
23      Q.   Yeah, work usually isn't a legal excuse.  Now, both
24 sides are pretty nice people.  We work with each other all the
25 time.  And, also, we're not going to force somebody to be on

89

1  this jury that, you know, financially it's going to be such a
2  hardship or a hardship of not being able to concentrate on the
3  evidence at hand. I don't think that's an issue with you. I
4  just -- I just want to make sure before I get going here.
5      A.   That's fine.
6      Q.   Does that make sense?
7      A.   Yeah.
8      Q.   Well, here's what I want to do, Mr. Crow, I'm going
9  to talk to you for up to about 40, 45 minutes. I'm going to
10 get your feelings on certain issues. Then Defense is going to
11 get to talk to you. You'll know at that point whether you're
12 on this jury or not. We're looking for two more people. We're
13 down to the wire to start in, I guess, less than two weeks or
14 two weeks -- less than two weeks now. And both sides think
15 you're the potential person that could be that -- one of those
16 two sides -- one of those two jurors that we're missing right
17 now. So you're pretty close to being on this jury, and I say
18 that to let you know and to ask you initially how does that
19 make you feel knowing that you may potentially be on a death
20 penalty case?
21     A.   Makes me a little nervous. It's a big
22 responsibility.
23     Q.   You think you can do it, though?
24     A.   Somebody's got to do it.
25     Q.   Okay.

90

1      A.   I can do it.
2      Q.   All right. And let me tell you, I would hope you
3  would say something like that, because both sides don't want
4  somebody to come up here and say, yeah, I'm excited to be on
5  this case. I'm excited to end that man's life.
6      A.   It's the least of my being excited to be on anything
7  like this. It's just one of those things where it's important
8  that somebody has to do these things.
9      Q.   Okay. Well, let me ask you this, Mr. Crow. It
10 seems from your questionnaire that you are, in fact, in favor
11 of the death penalty in the right situations, and that you
12 also agree that a life sentence is a proper verdict in the
13 right situations. So it seems to me it depends on the
14 circumstances.
15     A.   Yes.
16     Q.   Is that correct?
17     A.   Yes, sir.
18     Q.   And tell me why you're in favor of the death
19 penalty.
20     A.   Oh, man, I guess the biggest thing is in this world
21 we -- I don't think America or any country can afford to keep a
22 bunch of people around that are -- don't want to be a part of
23 the good of the nation.
24     Q.   Okay.
25     A.   The part that bothers me is, that got me a long time

91

1  ago when I was a kid was, it takes more money to send a guy to
2  death row than it does to send him to Harvard. That's
3  pathetic. That's an awful thought to say there's a man that I
4  could have sent to Harvard, had he not done what he did, and
5  spend that much money to put somebody just through death row or
6  them waste their life in prison. Both of those are -- I was --
7  I was discussing the other day -- I'm not sure it's the point
8  now where I would want to -- which one of those choices if I
9  was in this predicament would I want life in prison or death
10 row -- death by hanging or firing squad or something like that
11 is kind of same as they've been doing, but now that -- I've
12 been put to sleep several times in my later years in my life to
13 have lots of things poked and prodded, but, you know, if you're
14 going to get put to sleep, you're not going to get back up,
15 it's not bad a deal, but you're not going to be a problem
16 anymore.
17     Q.   Okay.
18     A.   It's actually -- to me, it's almost more crueler to
19 me to be in prison the rest of your life. I can't imagine
20 anything worse than that.
21     Q.   Let me ask you this. Would the way you feel about
22 prison, do you know anything about the prison system? I don't
23 think you've ever been in prison.
24     A.   No, no, no.
25     Q.   Okay.

92

1      A.   The first time that ever crossed my mind, when I was
2  -- I turned 17 years old, now all of a sudden it was no longer
3  just a joke. The cops in those days would scare you to death
4  and say they're going to take you here or do this to you and
5  then they'd let you go. Nowadays, it's not like that. You're
6  going to go, you're going to go. And prison is something that
7  I just can't imagine -- I don't like being locked up in a big
8  room --
9      Q.   Sure.
10     A.   -- during the day, but having somebody tell me when
11 I go, when I can't go, and then you don't get to pick your
12 friends or your neighbors in prison. I just -- that would be a
13 disgusting way to spend the rest of my life.
14     Q.   Let me ask you this. Do you -- are you familiar
15 with like how much freedoms and things like that that inmates
16 have in prison?
17     A.   No, not really. No more than what you learn from
18 watching TV and stuff like that. I've had a couple of friends
19 who had friends in the county jail, and the county jail stories
20 I heard about that were -- definitely made me not want to go to
21 prison.
22     Q.   Okay.
23     A.   And I don't need that many tattoos.
24     Q.   Let me ask you this -- let me ask you this, Mr.
25 Crow, and it we'll get more into this when we get to explaining

93

1  the punishment issues in a case like this, but do you think it
2  would be something you'd want to hear about, like how much
3  freedoms they would have in prison, how much movement they
4  would have in prison?
5       A.   Not really.  It's one of these things, I'd just as
6  soon get this done and done.
7       Q.   Okay.
8       A.   I don't want to hear -- it's one of those things, I
9  wouldn't want to go watch somebody be put down either.
10      Q.   We're not talking about that.
11      A.   I mean, just hearing it -- explained things -- it's
12  not a subject I'm interested in.  Crime is something that --
13  they have a lot of crime on TV, you can watch murder mysteries
14  and stuff like that.  I'm not into that stuff.
15      Q.   Obviously, you know, that's not real life, or at
16  least --
17      A.   That's why I watch it.  That's why it scares me so
18  badly to watch shows that you go, that is real and there are
19  people that do those things.
20      Q.   Okay.
21      A.   And that is scary to me.
22      Q.   Now, Mr. Crow, you seem very law and orderly in your
23  questionnaire, and there's nothing wrong with that.  That's
24  great.  I think both sides appreciate that.
25           Your wife, you said, is against the death

94

1  penalty.
2       A.   Yes, very much so.
3       Q.   Y'all ever have talks about that?
4       A.   Oh, yes, we do.
5       Q.   I think my wife is like that, as well, so we -- and
6  me being a prosecutor --
7       A.   She -- she appreciates life a lot more.  I guess men
8  don't get to the point where they don't have the -- not used to
9  them having -- where women want to get involved with killing
10  people.  But it seems like she likes animals.  She likes -- she
11  appreciates life a lot.  Everybody's life is precious to her.
12  And I'm a hunter, a fisherman.  I've shot things when I was
13  younger.  I don't do that anymore.  I don't do any hunting.
14      Q.   Okay.
15      A.   Life is getting to be more precious to me, but it's
16  hard -- it's hard for me when somebody takes a life --
17      Q.   Sure.
18      A.   -- to let that not go properly --
19      Q.   Sure.
20      A.   -- done, to say you get to spend the rest of your
21  life in prison when this other person is dead, or even worse,
22  crippled for the rest of their life.  They serve a punishment
23  for their entire life, too.  I have a problem with that.
24      Q.   Okay.  Well, how do you think she would feel or
25  would you be able to do this, if you are selected, and the

95

1  evidence takes you down that road to where a death sentence was
2  the proper verdict?  Would --
3       A.   That wouldn't be her concern.  She --
4       Q.   I just want to make sure I wouldn't be ruining a
5  marriage here.
6       A.   No, no.  I'm working hard on that already.
7       Q.   Okay.  Mr. Crow --
8       A.   That's just a funny.
9       Q.   Well, let me kind of just explain capital murder
10  versus murder and then kind of go into my position, and then
11  we'll go through some special issues here that may come up and
12  then Defense will get to talk to you.
13      A.   Okay.
14      Q.   Difference between murder and capital murder.  We
15  always like to tell jurors this, so they know what they're
16  dealing with here.  I turn around to Ms. Bennett, you know,
17  she's my work wife here at this office.  I've worked with her
18  for almost ten years, and she drives me nuts, all right?
19  That's a fact.  And I turn one day and for no reason, I pull
20  out my gun and shoot her in the head.  Horrible crime.  Meant
21  to do it, wanted to do it.  Happy I shot her.  Happy she lays
22  dead on this table.  Unfortunately in my mind -- maybe
23  fortunately for some other people -- but fortunately in my
24  mind, I wouldn't be eligible for a death sentence in the state
25  of Texas because that's just what we call -- and I hate to use

96

1  this word -- regular, but that's just an intentional,
2  first-degree murder.  That is not a capital murder.
3           To be capital murder in the state of Texas, you
4  have to have murder plus some other -- we always like to say,
5  aggravating circumstance.  And what we mean by aggravating
6  circumstance, we're talking about a special type of victim or
7  some other type of crime, so there's a certain set of listed
8  out crimes that equal capital murder.  And that would be murder
9  of a policeman or fireman in the active line of duty.  Murder
10  of a child under the age of six.  Murder of two or more
11  individuals during the same criminal transaction.  Murder of a
12  prison guard.  Murder for hire.  Murder in the course of
13  robbery, aggravated sexual assault, burglary, and so on.  So do
14  you see the distinction?
15      A.   I'm not sure I understand the distinction, but, yes,
16  I see it's a distinction.
17      Q.   Okay.  We see a lot of people in here --
18      A.   When I first read it, it sounded like you got a
19  twofer -- if you did two, you're in worse trouble than you did
20  one.
21      Q.   Two or more -- when I say two or more individuals,
22  that's one of the ways you can get to capital murder.  That's
23  one of the things I listed out.  So that -- yes, two -- two
24  intentional killings is considered a capital murder here in the
25  state of Texas, if it's during the same criminal transaction.

97

1  We just like to tell jurors that because that's the type of

2  crime we're dealing with here, and you know how you said -- you

3  come in here and said you don't want to do this, this isn't

4  something you take lightly.  We're dealing with one of those

5  types crimes.  Specifically in this case we're dealing with the

6  killing of two or more individuals during the same criminal

7  transaction.  Now, I can't go into any more about the facts of

8  this case except to know that -- Mr. Crow, you've been around

9  while.  Like you said, you've hunted, you've kind of seen a lot

10  in your lifetime.  This is going to be a horrible situation.

11          What we're looking for is 12 fair and impartial

12  people who can really judge the facts of this case based on the

13  evidence.  Does that make sense?

14     A.   Yeah.

15     Q.   Do you think you can do that?

16     A.   I think I can.  Never done it before, but it's one

17  of those things you -- I'm not going to go there.  I had a

18  story, but --

19     Q.   I like stories.

20     A.   No, it was like -- guy told me one time -- we're

21  dove hunting and you shoot the birds and you really don't want

22  the birds to suffer.  And the guy said, well, you just pull

23  their heads off, and I was like okay, I'll do that.  And I shot

24  the bird and I was picking the bird up and I was thinking I

25  shouldn't have shot the bird anyway.  Now, I have to pull the

98

1  bird's head off and I was just having a real problem with that.

2  I just did it -- I did it, but I didn't want to do it.  It's

3  the same thing.

4     Q.   Sure.

5     A.   It's one of those things that -- maybe it doesn't

6  feel that good to you or sound good to you, but it's one of

7  those things that if somebody doesn't do that, what's going to

8  happen.  It's -- I said I could do it.

9     Q.   Okay.

10          MR. HEALY:  Give me one second here, Mr. Crow,

11  okay?

12          Judge, can we take a brief recess?

13          Mr. Crow, give us a second.

14          THE COURT:  Sure.  Mr. Crow, if you'd step out

15  with my bailiff for just a second, I'll bring you -- yeah, just

16  right out there.  I'll bring you right back in just a minute.

17          THE BAILIFF:  Right out here.

18          (Venireperson excused from courtroom.)

19          THE COURT:  Okay.  What are you thinking?

20          (Discussion off the record.)

21          THE COURT:  Do we have a deal on this guy or

22  not?

23          MR. JOHNSON:  Yes, sir, we agree.

24          THE COURT:  Does the State agree to it?

25          MR. HEALY:  Yes, sir.

99

1          THE COURT:  All right.  Then, Darline, we're on

2  the record.  Prospective Juror Number 46B, Robert Crow, is

3  excused by agreement of parties; is that correct?  Is that

4  correct?

5          MR. HEALY:  Yes, Your Honor.

6          THE COURT:  And Mr. Johnson.

7          MR. JOHNSON:  Yes, sir.

8          THE COURT:  Robert Crow is excused.  Okay.

9  Bring Mr. Crow back.

10          (Agreement to excuse venireperson.)

11          THE BAILIFF:  Mr. Crow, come on back.

12          (Venireperson returned to courtroom.)

13          THE COURT:  Mr. Crow, I just wanted to invite

14  you back and thank you for being with us today.  I'm going to

15  excuse you from any further responsibility in this case, but I

16  do want to thank you for your jury service, for the time and

17  effort that you've made to come down here today and be with us.

18          VENIREPERSON:  Thank you.

19          THE COURT:  Thank you.

20          MR. HEALY:  Thank you, sir.

21          (Venireperson excused from courtroom.)

22          MS. BENNETT:  All right.  Bring in Mr.

23  Hoaldridge.

24          (Venireperson brought forward.)

25          THE COURT:  Just go ahead and have a seat there,

100

1  if you would, Mr. Mr. Hoaldridge.

2          Thank you.  Be seated, ladies and gentlemen.

3          I'd like for the record to reflect this is

4  Prospective Juror Number 36B, Don Hoaldridge; is that correct?

5          VENIREPERSON:  Yes.

6          THE COURT:  Okay.  H-o-a-l-d-r-i-d-g-e.  Thank

7  you.  All right.

8          MR. HEALY:  Ms. Bennett is going to do this

9  juror.

10          THE COURT:  Ms. Bennett, you may proceed.

11          DON HOALDRIDGE,

12  was called as a venireperson by the parties, and after having

13  been previously duly sworn, testified as follows:

14          STATE VOIR DIRE EXAMINATION

15  BY MS. BENNETT:

16     Q.   Good afternoon, Mr. Hoaldridge.  How are you doing?

17     A.   I'm doing fine.

18     Q.   Okay.  I want to thank you for waiting for us, thank

19  you for your patience.

20     A.   That's good.

21     Q.   What I want to do is talk to you for a few minutes

22  about the law -- I'm sorry, about your feelings about the death

23  penalty.

24     A.   Uh-huh.

25     Q.   Then we may or may not go into the law about this

101

1  case.
2      A.   Okay.
3      Q.   I'll go ahead and let you know that -- you know, the
4  Judge told you there are no wrong or right answers, and that's
5  true.  This isn't some type of quiz or if you get the answers
6  right, you're on the jury.
7      A.   Right.
8      Q.   This is just us all trying to understand how you
9  feel and then decide who's going to be the best fit for this
10 particular jury, okay?
11     A.   Okay.
12     Q.   I first want to ask you about your job because you
13 had put on the questionnaire that you're part-time, you're paid
14 only when you work, and a trial of a week or two would create a
15 financial hardship.
16     A.   More than two weeks -- within two weeks, it should
17 be fine.
18     Q.   Okay.  Because we're asking jurors to plan for this
19 trial to last for two weeks.
20     A.   That should be fine.
21     Q.   So you don't have any problems with that?
22     A.   No.
23     Q.   Okay.  Now, tell me why you are in favor of the
24 death penalty.
25     A.   Why I'm in favor of it?

102

1      Q.   Yes -- or are you in favor of it?
2      A.   Under the right circumstances, yes.
3      Q.   Okay.  And why?
4      A.   Okay.  It would be easier to say why I'm not in
5  favor of it, why I would not be in favor of it.
6      Q.   Okay.  Well, then let's do that first then.
7      A.   Okay.
8      Q.   Why are you not in favor --
9      A.   The death penalty is -- is final.  Once a person is
10 dead, they can't be brought back to life.
11     Q.   Okay.
12     A.   God can do that, but we're not God.  I would only be
13 for the death penalty -- obviously, if the crime warranted it,
14 and if I was absolutely certain that the person was guilty.
15     Q.   Okay.  And you also put on your questionnaire that
16 you thought that the death penalty is used too often.
17     A.   In Texas, I think it can be.  That would be my
18 guess.  I don't have any statistics.
19     Q.   So you don't know any instances of when the
20 death penalty was used --
21     A.   No, no particular case or anything, no.
22     Q.   And what kind of crimes for you would the death
23 penalty be warranted?
24     A.   Taking of another life, intentionally.
25     Q.   Okay.  Any other crimes?

103

1      A.   That's probably -- right now that's the only one I
2  can think of.
3      Q.   And do you -- as far as the death penalty being used
4  too often, is that just from things you've heard or read in the
5  media?
6      A.   From -- maybe people discussing cases that I heard
7  about, you know, among friends.
8      Q.   Okay.
9      A.   And just -- I guess sort of a -- a cavalier attitude
10 maybe on the part of some that discuss that.  That bothers me a
11 bit.
12     Q.   Okay.
13     A.   Death penalty is nothing flippant at all.  When I
14 hear people talking about it in a flippant manner, it disturbs
15 me.
16     Q.   And did you say that you have friends talking about
17 specific cases?
18     A.   Friends of friends -- just in general -- just terms
19 in general, and I think it's a very serious matter and taken
20 very seriously.  And for people to joke about it or talk
21 lightly about it, I think is absurd.
22     Q.   Obviously, it's the ultimate punishment, right?
23     A.   Yes. .
24     Q.   Now, you know, we're only bringing and talking
25 individually to people who could potentially sit on this jury.

104

1      A.   I understand.
2      Q.   And you understand that the State of Texas is
3  seeking to take that man right down there, sitting on the end
4  of that table in that suit, that's living and breathing right
5  now, what we're seeking, hoping, and expecting to happen after
6  this process is that for what -- one day in the future for him
7  to lie dead on a gurney in Huntsville, Texas, with some IVs in
8  his arms and some drugs pumped into his body that are
9  ultimately going to stop his heart.
10     A.   Uh-huh.
11     Q.   How do you feel about the prospect of being a person
12 who if the evidence led you there, would -- would be
13 responsible for that?
14     A.   Well, certainly not a pleasant experience, but if
15 the evidence pointed to that, I would be willing to do it.
16     Q.   Okay.  And you talked on your questionnaire about --
17 that you're probably more sensitive to punishment than your
18 brother.  What is happening --
19     A.   That's my twin brother.  We are exact opposites.
20     Q.   What does that mean?
21     A.   He sees everything -- he sees everything black and
22 white, everything right or wrong.  He's just like my father.
23     Q.   Okay.
24     A.   And I see -- I've lived long enough, I've
25 experienced life long enough, I've made a lot of mistakes where

105

1    I know there is a lot of grey, and that grey area would come

2    into play when I would make a decision.

3         Q.   Is there any -- is there any grey area or can you

4    find any justifications as far as if you knew someone was

5    guilty of committing a very heinous crime, such as walking up

6    and shooting a five-year-old in the head for no reason?

7         A.   Okay.

8         Q.   How would you feel about that?

9         A.   That would be heinous.

10        Q.   All right.  And if somebody had done a crime like

11   that and you didn't have any doubts about whether or not they

12   were guilty, how would you feel about the death penalty for

13   those circumstances?

14        A.   I think it would be warranted.

15        Q.   Okay.

16        A.   Let me say something else on that, because it has to

17   do with the form that y'all gave us to read, the Number 2, I

18   believe it is.

19        Q.   The jury orientation guide?  Yeah, and that's --

20        A.   Oh, here?  Okay.  No, I don't know that it would

21   come into play as far as I was concerned dealing with the --

22   the guilt or innocence phase of the trial, but it would

23   certainly come into play in the punishment phase, and that

24   would be that any kind of circumstances in the background of

25   the accused -- I'm having a senior moment.  Restate your

106

1    question again.  Make sure I'm going the right direction.

2         Q.   You're doing fine.  What kind of circumstances for

3    you would be important as far as assessing whether or not

4    someone got the death penalty, if they killed a five-year-old

5    child for no reason, shot them in the head?

6         A.   The simple answer would be if it were done

7    intentionally, I would have no problem giving the death

8    penalty.  If a person -- if there were extenuating

9    circumstances, if a person were, say, insane at the time.

10        Q.   Okay.  Well --

11        A.   Then I would certainly consider that and probably go

12   into lesser than a death penalty.

13        Q.   All right.  Well, if someone is insane, they would

14   be not guilty.

15        A.   Okay.

16        Q.   So -- so are there any other circumstances where you

17   feel like that, you know, to be okay?

18        A.   Using the same example you gave me of killing a

19   small child?

20        Q.   Right.

21        A.   That particular case?

22        Q.   Yes.

23        A.   It would have to be a very, very extreme

24   circumstance for me not to give the death penalty.

25        Q.   If they were --

107

1         A.   Excuse me.

2         Q.   So depending on how they were raised or their

3    background?

4         A.   Possibly.

5         Q.   That might --

6         A.   But in the case you gave me of killing an innocent

7    child, deliberately or intentionally, it would have to be a

8    very, very severe background situation.

9         Q.   Like what?

10        A.   I'm not sure I can think of one.  These are hard

11   questions.

12        Q.   I'm sorry.

13        A.   I'm having to think about them.  Something -- a

14   flashback of something that happened in an accused mind that

15   would cause -- like you said, he might be -- he would be

16   considered temporarily insane, therefore he would be innocent,

17   or he would be not guilty.  So I guess that answers that

18   question, I guess.

19             Basically the only one I can think of in that

20   situation would be someone who is -- that would be considered

21   temporarily insane.

22        Q.   And -- you've served on a couple of criminal trials.

23   In 2003, you said there was a not guilty for a drug case.  Can

24   you tell us about that one?

25        A.   Yes.  He was accused of being in possession with

108

1    intent to sell of a large amount of crack cocaine.  There was

2    crack cocaine there exposed on the table, so by definition he

3    was in possession of crack cocaine, but there was much more

4    cocaine -- cocaine in the clothes of the woman whose room it

5    was, that the -- that the prosecution never ever made us aware

6    that he was even aware that it existed.  He was a guest in the

7    room.  And the room belonged to a lady, and there was crack

8    cocaine in all of her clothes.

9         Q.   So even though --

10        A.   There was no evidence given that he was aware of

11   that, so he was -- he was charged being in possession of all of

12   that crack cocaine, and no evidence was given that he was even

13   aware that cocaine existed, so we found him innocent.

14        Q.   Oh, okay.

15             MS. BENNETT:  Judge, I think -- can we take a

16   break?

17             THE COURT:  Yes, uh-huh.  All right.

18             MS. BENNETT:  Thank you.

19             THE COURT:  Mr. Hoaldridge, I'm going to ask you

20   to step out with my bailiff for just a minute --

21             VENIREPERSON:  Okay.

22             THE COURT:  -- if you would, please sir.  Just

23   leave everything there if you'd like, and we'll get you back

24   here in just a second.

25             (Venireperson excused to hallway.)

109

1    THE COURT:  We have an agreement?

2    MR. JOHNSON:  Yes, sir.

3    THE COURT:  Okay.  All right.  Mr. Hoaldridge is

4  excused by agreement; is that correct?

5    MS. BENNETT:  That's correct.

6    THE COURT:  Defense?

7    MR. JOHNSON:  That's correct.

8    THE COURT:  Mr. Green?

9    THE DEFENDANT:  Yes, sir.

10    (Agreement to excuse venireperson.)

11    THE COURT:  All right.  Thank you.  Bring Mr.

12  Hoaldridge back.

13    (Venireperson returned to courtroom.)

14    THE COURT:  All right.  Mr. Hoaldridge, thank

15  you so much for being here.  We're going to excuse you from any

16  further responsibility in this case, but we wanted to thank you

17  personally for coming down here and being with us today, taking

18  your time --

19    VENIREPERSON:  You're very welcome.

20    THE COURT:  -- to do that.  Thank you so much

21  for your jury service.

22    VENIREPERSON:  Thank you.

23    THE COURT:  You're now excused, free to go, and

24  thank you for your service.

25    VENIREPERSON:  Thank you.

110

1    MR. WYATT:  Thank you, sir.

2    (Recess of proceedings.)

111

1              Reporter's Certificate

2  THE STATE OF TEXAS:

3  COUNTY OF DALLAS:

4    I, Darline King LaBar, Deputy Official Court Reporter in

5  and for the 282nd District Court of Dallas County, State of

6  Texas, do hereby certify that the above and foregoing volume

7  constitutes a true, complete and correct transcription of all

8  portions of evidence and other proceedings requested in writing

9  by counsel for the parties to be included in the Reporter's

10  Record, in the above-styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by me.

12    I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15    WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 10th day of March, A.D., 2011.

DARLINE KING LABAR
Official Court Reporter
363rd Judicial District Court
Dallas County, Texas
hpdkfaith@msn.com
(214) 653-5893

Certificate No:  1064
Expiration Date:  12/31/2012

Darline King LaBar, Official Reporter