1                        REPORTER'S RECORD

2                  VOLUME 46 OF 57 VOLUMES

3

4          TRIAL COURT CAUSE NO. F09-59380-S

5                CASE NO. AP-76,458

6

7  THE STATE OF TEXAS         :        IN THE 282ND JUDICIAL

8  VS.                   :        DISTRICT COURT OF

9  GARY GREEN              :        DALLAS COUNTY, TEXAS

10

11

12             **TRIAL ON THE MERITS BY JURY**

13

14

15

16

17

18                * * * * * * * * * *

19

20     On the 26th day of October, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24     Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1  A P P E A R A N C E S:

 2

 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
            Frank Crowley Criminal Courts Building
 4          Dallas, Dallas County, Texas 75207
            Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6          MR. JOSH HEALY, A.D.A., SBOT # 24026288
            MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7          MR. HEATH HARRIS, A.D.A., SBOT # 00795409
            MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
 8

 9
                                 FOR THE STATE OF TEXAS;
10

11

12

13

14

15
    MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
16          311 N. Market Street, Suite 300
            Dallas, Texas 75202-1846
17          Phone:  214-761-0707

18  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
            3300 Oak Lawn Avenue, Suite 600
19          Dallas, Texas 75219
            Phone:  214-559-9115
20
    MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
21          3838 Oak Lawn Avenue, Suite 1350
            Dallas, Texas 75219
22          Phone:  214-651-6250

23

24                               FOR THE DEFENDANT.

25
```

## INDEX VOLUME 46

### (TRIAL ON THE MERITS BY JURY)

October 26th, 2010                                    PAGE   VOL.

Proceedings........................................... 5     46

Arraignment by the Court.............................. 5     46

Not Guilty Plea Entered............................... 7     46

| DEFENSE WITNESS | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GARY GREEN | 7 | | | 46 |

Jury finally sworn.................................... 14    46

Indictment read by Mr. Beach......................... 23    46

Not Guilty Plea Entered.............................. 24    46

Opening Statement by Mr. Beach....................... 24    46

Opening Statement by Mr. Johnson..................... 34    46

| STATE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MARGARITA BROOKS | 36 | | | 46 |
| LATASHA BRADFIELD | 59 | 78 | | 46 |
| JAMES JONES | 80 | | | 46 |
| JOSEPH MARTINEZ | 89 | 96 | | 46 |
| JEROME ARMSTEAD | 99 | 129 | | 46 |
| JERRETT ARMSTEAD | 132 | | | 46 |
| JASON GINDRATT | 148 | | | 46 |
| TROY SMITH | 164 | 170 | | 46 |

Reporter's Certificate............................... 176   46

1                    ALPHABETICAL WITNESS INDEX

2                        DIRECT        CROSS          VD          VOL.

3  JEROME ARMSTEAD     99            129                         46

4  JERRETT ARMSTEAD    132                                       46

5  LATASHA BRADFIELD   59            78                          46

6  MARGARITA BROOKS    36                                        46

7  JASON GINDRATT      148                                       46

8  GARY GREEN          7                                         46

9  JAMES JONES         80                                        46

10 JOSEPH MARTINEZ     89            96                          46

11 TROY SMITH          164           170                         46

12

13                        EXHIBIT INDEX

14 STATE'S                    OFFERED       ADMITTED       VOL.

15    1    Photograph         46            46             46

16    2    Photograph         46            46             46

17    3    Photograph         46            46             46

18    4    Photograph         46            46             46

19

20

21

22

23

24

25

Darline King LaBar, Official Reporter

**Page 1**

REPORTER'S RECORD

VOLUME 46 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F09-59380-S

CASE NO. AP-76,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 282ND JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| GARY GREEN | : | DALLAS COUNTY, TEXAS |

**TRIAL ON THE MERITS BY JURY**

...........

On the 26th day of October, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Andy Chatham, Judge Presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

**Page 2**

A P P E A R A N C E S :

HONORABLE CRAIG WATKINS, Criminal District Attorney
Frank Crowley Criminal Courts Building
Dallas, Dallas County, Texas 75207
Phone: 214-653-3600

BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
MR. JOSH HEALY, A.D.A., SBOT # 24026288
MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
MR. HEATH HARRIS, A.D.A., SBOT # 00795409
MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262

FOR THE STATE OF TEXAS;

MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
311 N. Market Street, Suite 300
Dallas, Texas 75202-1846
Phone: 214-761-0707

MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
3300 Oak Lawn Avenue, Suite 600
Dallas, Texas 75219
Phone: 214-559-9115

MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
3838 Oak Lawn Avenue, Suite 1350
Dallas, Texas 75219
Phone: 214-651-6250

FOR THE DEFENDANT.

**Page 3**

INDEX VOLUME 46

(TRIAL ON THE MERITS BY JURY)

October 26th, 2010                          PAGE VOL.

Proceedings............................................ 5  46

Arraignment by the Court............................. 5  46

Not Guilty Plea Entered.............................. 7  46

| DEFENSE WITNESS | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GARY GREEN | 7 | | | 46 |

Jury finally sworn.................................. 14  46

Indictment read by Mr. Beach........................ 23  46

Not Guilty Plea Entered............................. 24  46

Opening Statement by Mr. Beach...................... 24  46

Opening Statement by Mr. Johnson.................... 34  46

| STATE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MARGARITA BROOKS | 36 | | | 46 |
| LATASHA BRADFIELD | 59 | 78 | | 46 |
| JAMES JONES | 80 | | | 46 |
| JOSEPH MARTINEZ | 89 | 96 | | 46 |
| JEROME ARMSTEAD | 99 | 129 | | 46 |
| JERRETT ARMSTEAD | 132 | | | 46 |
| JASON GINDRATT | 148 | | | 46 |
| TROY SMITH | 164 | 170 | | 46 |

Reporter's Certificate............................. 176  46

**Page 4**

**ALPHABETICAL WITNESS INDEX**

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| JEROME ARMSTEAD | 99 | 129 | | 46 |
| JERRETT ARMSTEAD | 132 | | | 46 |
| LATASHA BRADFIELD | 59 | 78 | | 46 |
| MARGARITA BROOKS | 36 | | | 46 |
| JASON GINDRATT | 148 | | | 46 |
| GARY GREEN | 7 | | | 46 |
| JAMES JONES | 80 | | | 46 |
| JOSEPH MARTINEZ | 89 | 96 | | 46 |
| TROY SMITH | 164 | 170 | | 46 |

**EXHIBIT INDEX**

| STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Photograph | 46 | 46 | 46 |
| 2 | Photograph | 46 | 46 | 46 |
| 3 | Photograph | 46 | 46 | 46 |
| 4 | Photograph | 46 | 46 | 46 |

5

7

1         P R O C E E D I N G S

2              THE COURT:  All right.  The Court calls Cause

3 Number F09-59380, the State of Texas versus Gary Green.  The

4 case is set today for trial.

5              The State ready?

6              MR. BEACH:  The State's ready, Your Honor.

7              THE COURT:  Defense ready?

8              MR. JOHNSON:  Defense ready, Your Honor.

9              THE COURT:  The jury is not now present.  I

10 think it would be prudent at this time to do a formal

11 arraignment.

12              (Brief pause.)

13              (Arraignment by the Court.)

14              THE COURT:  Okay.  Mr. Green, what we're doing

15 right now is -- is called the formal arraignment.  This is when

16 I formally inform you of what you're -- what you're charged

17 with, and then I'm going to ask if you understand what you're

18 charged with.  And then I'm going to ask that you enter a plea.

19 And you can make three different types of pleas in any -- in

20 any case.  You can either plead guilty, not guilty, or no

21 contest to these charges.

22              But it is alleged that on or about the 21st day

23 of September, A.D., 2009, in the County of Dallas and State of

24 Texas, that you unlawfully then and there intentionally or

25 knowingly caused the death of an individual, to-wit:  Lovetta

6

1 Armstead, by stabbing Lovetta Armstead with a knife, a deadly

2 weapon, or by asphyxiating Lovetta Armstead, and during the

3 same criminal transaction said Defendant did then and there

4 intentionally or knowingly cause the death of another

5 individual, to-wit:  Jazzmen Montgomery, by drowning or

6 asphyxiating Jazzmen Montgomery.  Against the peace and dignity

7 of the State.

8              There are two enhancement paragraphs to this

9 case, but those are somewhat irrelevant in this -- in this

10 matter.  This case is a capital murder case.  The options, if

11 you are found guilty in this matter, are either life in prison

12 without the possibility of parole or if the jury so finds, the

13 death penalty.  Have you had an opportunity to discuss these

14 charges with your attorney?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Do you understand what you are

17 charged with in this case?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  Do you understand the effect of a

20 guilty verdict or a guilty plea in this matter?

21              THE DEFENDANT:  Yes.

22              THE COURT:  To the charge as -- as alleged, how

23 do you plead?

24              MR. JOHNSON:  Not guilty.

25              THE DEFENDANT:  Not guilty.

1              (Not Guilty Plea Entered.)

2              THE COURT:  Not guilty plea is entered for the

3 record.  You may be seated.

4              MR. JOHNSON:  Your Honor, at this time could I

5 make a -- I'd like to question the Defendant, make a record.

6              THE COURT:  You may.

7              MR. JOHNSON:  Can he be sworn for limited

8 purposes?

9              THE COURT:  Sure.

10              Sir, if you'd raise your right hand.

11              (Defendant additionally sworn.)

12              THE COURT:  Okay.  Please proceed.

13              GARY GREEN,

14 the defendant, was called as a witness in his own behalf, and

15 after having been previously duly sworn, testified as follows:

16              DIRECT EXAMINATION

17 BY MR. JOHNSON:

18     Q.    State your name, please.

19     A.    Gary Green.

20     Q.    And, Gary, as the Judge just formally read you the

21 charging instrument in this case, there's just a few things I

22 want to cover on the record to begin with.  This crime happened

23 a little over a year and couple of months ago, and I was

24 appointed immediately to represent you on this case, and you

25 and I have talked about it, you and I have stayed in touch.  In

8

1 fact, we've spent pretty much the last two and a half months

2 together on a daily basis; is that correct?

3     A.    That's correct.

4     Q.    And even prior to that -- those portions of the

5 proceedings, we had met, visited, and you have had occasions to

6 meet with several doctors and a psychologist, people that I've

7 hired and retained to assist and consult with me in the

8 preparation of any defensive issues that might be applicable in

9 your case; is that right?

10     A.    Yes.

11     Q.    And you have cooperated with those individuals, and

12 you have been made aware by me of the efforts that not only

13 myself but that Mr. Wyatt and Mr. Warren were making on behalf

14 of you and talking to people that you know, people from your

15 background and childhood, people from your more immediate past,

16 and talking to people that might have information that might be

17 relevant on any of the issues that would be before the Court in

18 this case.  And you understand those things; is that right?

19     A.    Yes, sir.

20     Q.    We spent the last couple of months selecting a jury

21 to hear this case.  You were present for all those proceedings.

22 You and I discussed with other co-counsel, we discussed all the

23 different people that we either agreed upon or objected to, and

24 those were decisions that we made as a group; is that right?

25     A.    Yes.

9

1  Q. As we come here today, the Court has asked us for an
2 announcement of ready to stand trial, and that means that all
3 the preliminaries and everything is over with.  And at this
4 point we move forward and address the two issues at hand, the
5 first issue being guilt.  And we have formally entered a plea
6 of not guilty to this indictment.  Second issue being, if we
7 get to that point, which we expect to, is the issue of what the
8 appropriate punishment would be.  And on your behalf a moment
9 ago, at the Court's request, I had indicated to the Court that
10 the Defense was announcing ready for trial.  And you understand
11 that?
12  A. Yes.
13  Q. And, in fact, you have instructed me that you are
14 ready for trial, correct?
15  A. Yes.
16  Q. You are comfortable and confident at this point in
17 time that we have discussed, we have talked about, and that we
18 have pursued any appropriate leads or things that -- tried to
19 find evidence that might be relevant and applicable in your
20 case; is that right?
21  A. Yes, sir.
22  Q. In fact, everybody you've asked me to try to contact
23 or try to find, I've tried to find -- I've tried contact, tried
24 to find; is that right?
25  A. Yes.

10

1  Q. And, in fact, tried -- found a lot of folks you'd
2 even forgot about; is that correct?
3  A. Yes, sir.
4  Q. Okay.  So you're comfortable and confident that at
5 this point in time that on behalf of the entire Defense counsel
6 in this case, that you are instructing us to announce ready on
7 your behalf?
8  A. Correct.
9    MR. JOHNSON:  Your Honor, that's all I have.
10    THE COURT:  All right.  Thank you.
11    MR. BEACH:  Before we bring the jury in -- is
12 that the next step?
13    THE COURT:  That's the -- that's the next step.
14    MR. BEACH:  I would like permission of the Court
15 to instruct family members and other folks here.
16    THE COURT:  That's what I was fixing to do.  You
17 can go ahead, too.  They like you better than me so far, so you
18 might as well --
19    MR. BEACH:  I doubt it, but --
20    We've talked about this, but if you're going to
21 sit in here starting like the next two or three minutes -- I
22 know that you will because I know y'all are good people -- I
23 know you want to see justice done in this case, but you have to
24 behave yourself.  If you feel the emotions starting to rise or
25 something going on, just get up and walk out, cool off,

11

1 whatever, okay?  And there are situations here starting this
2 morning where there are going to be some very, very bad
3 photographs.  And so if you don't think you can handle looking
4 at the photographs, you can look down, again, go back out in
5 the hallway, okay?  But for you to be able to stay in here,
6 you've got to assure the Court and the attorneys that there
7 isn't going to be any kind of drama, okay?  Everybody
8 understand that?  All right, very good.
9    MR. JOHNSON:  Your Honor, we're going to ask
10 also that the Court instruct everyone in the courtroom in
11 regards to -- if there's any kind of visible showing of support
12 or agreement or disagreement with any of the testimony, we're
13 going to ask that the Court formulate a rule that those
14 individuals would be removed from the courtroom and not allowed
15 to reenter.
16    THE COURT:  Right.  This isn't a sporting event,
17 folks, not allowed to cheer.  And it's hard -- and I know it's
18 hard, but you have to maintain your composure throughout this,
19 because I'll simply -- there's certain court rulings from the
20 Courts of Appeals that say emotional outbursts from the gallery
21 are -- are grounds for a mistrial.  And I -- we could have to
22 start this whole thing all over again, and nobody wants that.
23 We want to try this one -- one time, so I need your cooperation
24 in this matter, that if -- no matter how much you want to say
25 something or do something, you can't.  Leave, walk out, and

12

1 we'll let you -- we'll let you come back in, but if you screw
2 it up, there -- there is a chance that you won't be allowed
3 back in.
4    MR. JOHNSON:  Your Honor, also --
5    THE COURT:  Does anybody have any -- real quick,
6 does anybody in the gallery have any questions about that?
7 Just wanted to make sure.  Okay.
8    Go ahead.
9    MR. JOHNSON:  Your Honor, at this time, also,
10 the -- want the record to reflect that we do intend to invoke
11 the Rule of witnesses.  And that by agreement of the parties,
12 that both parties have agreed that family members, even though
13 it's members of the family who we do anticipate may be
14 witnesses in the case, we are going to allow those to remain in
15 the courtroom for testimony, as long as they follow the rules
16 of decorum set down by the Court.  And so we want -- I want the
17 record to reflect that the State has waived and agreed to that
18 in regards to not only my witnesses, but that we've agreed to
19 it in regards to the fact that they only have, I believe, one
20 witness in the courtroom that's a family member that's going to
21 testify and then ask to remain in the courtroom.
22    MR. BEACH:  That's correct.
23    THE COURT:  Okay.  Thank you all.
24    Oh, one other thing.  If you all happen to see a
25 juror on an elevator or downstairs in the cafeteria, just in

13

15

1 the hallway, don't talk to them. You may want to. Even if
2 you're on the same elevator and they -- they engage you, just
3 politely put your head down and just say, I can't talk to you.
4 We don't want to have even the -- even the possibility of an
5 allegation of -- of improper juror contact. I'm sure it won't
6 be intentional, but just in an abundance of caution, just put
7 your hands up and say, I know you're a juror on the case and I
8 -- I can't talk to you. I don't think it will come up, but
9 just in an abundance of caution, I thought I should bring that
10 up.
11         I think we're ready.
12         MR. JOHNSON: Judge, last thing before we begin
13 formally, I would request under 38.22, subsection 6, that in
14 regards to the Court's ruling in -- to the voluntariness of the
15 Defendant's confession, I think it's required that the Court
16 introduce or make formal findings of facts in regards to the
17 voluntariness. And we don't necessarily need that to be done
18 right this moment.
19         THE COURT: I thought I did that yesterday.
20         MR. JOHNSON: You made your conclusions of law,
21 but you didn't make any findings of fact.
22         THE COURT: All right. I mean, I thought --
23 okay. I guess I can make it clearer.
24         MR. JOHNSON: And I'm not saying that it needs
25 to be done right this minute. We just ask that that be done at

14

1 some point in the proceedings so it will be included in the
2 record for appellate purposes.
3         THE COURT: Okay. Y'all are -- I'll tell the
4 State to prepare a proposed findings of fact then.
5         MR. BEACH: We'll do that, Judge.
6         THE COURT: Okay. That's just something less
7 now I have to do, but -- so -- I'll make sure it's what I
8 really believe, not just their version of it.
9         MR. BEACH: Do you want it illustrated?
10         THE COURT: I'm sorry? I'm sure it was funny, I
11 just wasn't paying attention.
12         All right. Let's bring the jury in.
13         MR. JOHNSON: Judge, do you want the Defendant
14 to rise when the Defendant's arraigned outside the presence?
15         THE COURT: No, I'll tell everyone to stay
16 seated. You're going to be entering a plea on his behalf and I
17 make that clear to the jury that you will be the one doing it.
18         THE BAILIFF: All rise.
19         (Jury brought into courtroom.)
20         THE COURT: All right. If you all could -- the
21 jurors can remain standing, but the gallery can be seated.
22         Ladies and gentlemen, the first thing we do in
23 all these cases is that we get you sworn in as jurors. And if
24 you'd raise your right hand.
25         (Jury finally sworn.)

1         JURORS: I do.
2         THE COURT: All right. Please be seated.
3         Other protocol. When we bring you in to the
4 room, we will all be standing. You all simply come in and sit
5 down. We are standing for you. That is -- that's the time
6 honored tradition, and I'm not about to start betraying that
7 tradition. So you all just come in and sit down, and then I
8 will have everyone be seated.
9         The order of the case roughly is going to be --
10 the first thing that happens is that the State's attorney will
11 arraign or formally inform Mr. Green of what his charges is,
12 and we will affix his plea. "Affix" is a fancy word of enter.
13 And that will be done by his attorney, according to the Rules
14 of Criminal Procedure. And at that point each side will have
15 an opportunity, if they wish, to make an opening statement.
16 What the lawyers say is not evidence. It is simply a road map
17 of what they think the evidence is going to be in the case.
18         The State will then have -- put on witnesses in
19 their case in chief. Then the Defense will then put on
20 witnesses, if they wish -- they're not required to -- in their
21 case in chief. Then the evidence will close, and each side
22 will make their final argument. And then if the -- in the
23 event of a guilty verdict, we will then proceed into the
24 punishment phase of the case.
25         Do not make up your mind. This is a -- what's

16

1 called a bifurcated system. The first part is guilt or
2 innocence. The second part is the punishment phase. Do not
3 make a decision as to what -- before you've heard all of the
4 evidence, meaning don't decide after opening statement what --
5 what your verdict is going to be, either in the guilt/innocence
6 or in the punishment. You need to wait and hear all of the
7 evidence before you make a decision. Evidence comes from the
8 witness chair or exhibits that -- pieces of paper, pair of
9 glasses, a pen, physical evidence. And it can come from the
10 form of testimony coming from the chair, be it -- might be what
11 we call an expert witness testimony. It's not necessarily --
12 it doesn't mean that the -- they know what they're talking
13 about. Expert testimony is a term -- a legal term.
14         You are the exclusive judges of the evidence and
15 the testimony that's given, so you make that determination.
16         What is not evidence. Newspaper columns, like
17 the one this morning. Don't read the paper. And I know the
18 first thing that you're going to make -- you're going to --
19 people go do, wow, there's something in the paper, I'm going to
20 go read it now. Don't read the paper about this case. Read
21 about the Rangers. You can do that. Watch the Rangers. This
22 case is going to be -- it's in the news. We know that. Don't
23 pay any attention to it. If your neighbor calls up and says,
24 hey, how is jury duty, you say, I can't talk about it. Do not
25 go on the internet. The internet, believe it or not, will

17

1  sometimes get it wrong. I know that's hard to believe, but it
2  has a way of -- well, anyway, the witness -- the witness chair
3  is where you're going to get the evidence in the case. That's
4  where you need to make the decision -- not something you read
5  online, not something you hear about in the paper, not
6  something you read or hear about from a neighbor. Please,
7  please, focus the case on what you hear in the courtroom, and
8  in the courtroom only, because if we find out later -- and
9  there are cases of this, not in here, not in Dallas, that I
10 know of -- but in -- in New York because this was a big story
11 in the New York Times that a -- a huge case had to be redone
12 because a juror went online and read a bunch of things and that
13 influenced their decision. So it's very serious, and the case
14 will get overturned. We will have to do it again if you don't
15 follow these instructions specifically regarding making a
16 decision with outside influences and things like that.
17          You all will be down here for a while. You'll
18 see people in the gallery. If you see them out in the hallway
19 and they simply just walk away, they're not being mean. I've
20 told them to. If you get on the elevator and you see the
21 lawyers and the lawyers go, no, I'll take the next one.
22 They're not being mean. Why? Well, I told them to. We don't
23 want to have any possibility of even the appearance of
24 impropriety of a lawyer or a witness or somebody approaching a
25 juror. So -- so that's why I tell everyone just walk the other

18

1  way, and -- because they all know who you are, and you know who
2  they are. So just understand why we don't have any contact
3  like that.
4          You see the camera in the courtroom? I like
5  cameras in the courtroom. Why? Because that means this is an
6  open and fair proceeding. I think it's very important that the
7  courtrooms are open to the public. Anyone can come down here
8  and watch, and I also think that it's important that we have
9  exposure to show that what we're doing is -- is open and fair.
10 The TV cameras will not be showing you. You will not be shown.
11 I've told the cameramen, they -- they know me because I've
12 talked to them and we allow the cameras in the courtroom and
13 they know, the cameraman is going to jail, his producer is
14 going to jail, the weatherman is going to jail until I figure
15 out whose fault it is for putting a juror on television. So
16 they know. So you don't have any risk whatsoever of being on
17 television.
18          I think that covers all the groundwork. If you
19 all have any -- any questions, if anyone needs a break, raise
20 your hand and --
21          MR. JOHNSON: We have a matter we need to talk
22 to the Court about.
23          THE COURT: -- right now --
24          MR. JOHNSON: Yes, sir.
25          THE COURT: -- or can it wait 30 seconds.

19

1          MR. JOHNSON: Yes, sir. It can wait 30 seconds.
2          THE COURT: Oh, it can wait 30 seconds. Okay.
3          We take breaks from time to time. That's
4  expected, and that's okay. Don't concern yourselves with why
5  we do these breaks, just understand they're necessary. None of
6  these lawyers are frivolous or make frivolous arguments. They
7  all -- they're all experienced, and we all know each other,
8  too. There's a certain amount of familiarity that -- that we
9  do have in here, and it's simply because, well, we know each
10 other. And rather than doing some type of false formality, I'm
11 going to try to -- try to keep this as familiar as possible.
12          If anyone needs a break and you can't get my
13 attention, stand up.
14          So -- so before we arraign Mr. Green, I'm going
15 to ask that you all retire back to the jury room, and we'll get
16 started here in the next five or ten minutes. Thank you all so
17 much.
18          THE BAILIFF: All rise.
19          (Jury excused from courtroom.)
20          (Sidebar conference.)
21          (Retire to Judge's Chambers.)
22          THE COURT: Hi, come on in, please. Have a seat
23 right here. Pull that door shut, would you, Tony?
24          Okay. I'm not -- I'm not embarrassed, but I
25 don't know how to do this. You were in the courtroom

20

1  apparently this morning when we walked in. And I didn't see
2  you come in. I don't know how long you were there. Do you
3  know how long you were in the courtroom before we started?
4          JUROR: About 20 minutes, I guess.
5          THE COURT: Do you know about what time, from
6  when to when? Was it after 9 o'clock?
7          JUROR: Yeah, it was 9:00 to about 9:00 -- when
8  I looked at the clock, it was about 9:12, something like that.
9          THE COURT: Okay. So you got there, you saw me
10 walk in?
11          JUROR: I saw you walk in, yeah.
12          THE COURT: Okay. You saw, I think, Mr. Johnson
13 running in and out of the room a few times. Mr. Green wasn't
14 in the room. You saw Mr. Healy talking with Defense counsel.
15 Did you see or hear anybody talking about the case, the facts
16 of the case?
17          JUROR: No, I was pretty much in my own world.
18 I was pretty much looking down. I saw him once.
19          MR. JOHNSON: I asked you your name.
20          JUROR: He asked my name.
21          THE COURT: We want everyone to hear the
22 evidence at the same time, not have a preformulated opinion or
23 hear something they weren't supposed to hear before the trial
24 started, but do you recall anything that happened in the
25 courtroom aside from some of the irreverence --

21

1    JUROR:  I heard the cameraman -- you tell him
2    you would put him in jail.
3            THE COURT:  Okay.
4            JUROR:  Other than that, no.
5            THE COURT:  Do you have any -- anybody have any
6    questions?  I don't think it's wrong for you to ask questions.
7            MR. JOHNSON:  Once I saw you in the jury box
8    (sic), I asked you -- I asked you who you were, because I
9    recognized you out there and I was in and out all morning, so I
10   didn't know how long you were there.  A lot of times lawyers
11   say things back and forth to each other.  I want to make sure
12   as a juror you haven't seen or heard anything in the court that
13   would cause you to form any opinions at this point in time.
14           JUROR:  No, actually I was looking down most of
15   the time.
16           MR. JOHNSON:  That's fine.  That's all we had.
17           THE COURT:  That's fine.  If the other jurors
18   ask why you got brought back here, tell them.
19           MR. BEACH:  She's special.
20           THE COURT:  Because they are going to want to --
21   tell them, hey, I went into the courtroom and sat in there.
22           JUROR:  They knew when I came into the jury
23   room, they said they knew my name.  I said, yeah, I was sitting
24   out in the courtroom.
25           THE COURT:  The Judge wants to make sure you

22

1    didn't hear anything, weren't -- you know, that would cause you
2    to prejudge anything.  So just tell them why you came back
3    here.
4            MR. BEACH:  Thank you, Your Honor.
5            MR. JOHNSON:  Thank you, ma'am.
6            THE COURT:  Thank you so much.
7            (Juror excused from chambers.)
8            MR. BEACH:  Okay.  Obviously, Judge, based on
9    what she heard, doesn't sound like she should be disqualified,
10   so I think both sides, we need to proceed with her.
11           MR. JOHNSON:  That's correct.  I don't have any
12   problem.
13           MR. BEACH:  Okay.  I just wanted to put that on
14   the record.
15           (Return to courtroom.)
16           THE COURT:  I think we're ready.  All right.
17   Try again.
18           (Discussion off the record.)
19           THE BAILIFF:  All rise.
20           (Jury returned to courtroom.)
21           THE COURT:  All right.  Thank you all.  Please
22   be seated.
23           All right.  Ladies and gentlemen, that obviously
24   was a housekeeping matter.  We take them from time to time, and
25   that's -- that's okay.  You want us doing that, because

23

1    normally what happens is you all go out and then we start
2    talking about other things.  I can -- I can say we've already
3    saved 15 minutes this morning by some -- some agreements that
4    we had while you all were out there, so that worked out okay.
5            Please arraign the Defendant.
6            MR. BEACH:  May it please the Court.
7            May it please you, members of the jury.  My name
8    is Andy Beach.  I'm Assistant Criminal District Attorney here
9    in Dallas County.  It's my responsibility at this time to read
10   to you the true bill of indictment.  As the Judge will tell
11   you, it's no evidence of guilt in this case.  It simply tells
12   me what I have to prove beyond a reasonable doubt, and it tells
13   the Defendant what he's charged with.  It reads as follows:
14           "True bill of indictment.  In the name and by
15   the authority of the State of Texas, the grand jury of Dallas
16   County, State of Texas..."
17           (Indictment read by Mr. Beach.)
18           MR. BEACH:  "...against the peace and dignity of
19   the State.  It's signed by Craig Watkins, Criminal District
20   Attorney of Dallas County, Texas, and by the foreperson of the
21   grand jury."
22           THE COURT:  Mr. Johnson, to that charge, how
23   does your client plead?
24           MR. JOHNSON:  Your Honor, ladies and gentlemen,
25   the Defendant will formally enter a plea of not guilty.

24

1            (Not Guilty Plea Entered.)
2            THE COURT:  Thank you.
3            The State wish to make an opening statement?
4            MR. BEACH:  Yes, Your Honor.
5            THE COURT:  Please proceed.
6            (Opening Statement by Mr. Beach.)
7            MR. BEACH:  May it please the Court, again,
8    counsel.
9            Members of the jury, this is my opportunity to
10   preview the evidence that the State of Texas is going to bring
11   to you in this capital murder prosecution and the best I can to
12   prepare you for the abject horror choreographed by Gary Green
13   at 3844 Morning Springs Trail back on September 21st of 2009.
14           What you're going to hear, the first victim,
15   Lovetta Armstead, was 32 years old.  She was a graduate of
16   DeSoto High School.  She went to college out in Tyler.  She was
17   a substitute teacher in the DISD system.  She worked at day
18   care at Friendship West Baptist Church.  You're going to hear
19   that she was trying to get her teaching certificate.  It was
20   that she met Gary Green outside of a club in 2007, and they quickly
21   began a relationship.  Gary moved in with Lovetta and her three
22   children.  Lovetta had three children.  Gary had five children
23   of his own.  Gary wasn't working.  Gary had other girlfriends,
24   so you can imagine the relationship was tumultuous.  It was a
25   cycle of tranquility and then Lovetta kicking him out and then

25

1  reconciling, them getting back together.

2          The primary issue was Gary wouldn't work. He

3  just flat wouldn't work while she was working. And that was a

4  cause of friction in the relationship.

5          In April of 2007 -- in 2009, you will hear at

6  that time they were living at the house on Morning Springs

7  Trail, that Gary got a job, was actually working for a living

8  and in that in June of 2009 they got married there in the house

9  with Lovetta's family present. Got married there in the house.

10         Within three weeks of the marriage, Gary quit

11 his job, made a trip to Timberlawn, a psychiatric facility here

12 in Dallas, and immediately applied for Social Security

13 disability -- that is to get money from the government. Then

14 early September of 2009, Lovetta began the process -- realizing

15 she had made a mistake -- of getting the marriage annulled

16 because he wasn't going to work.

17         We know the week before the murders that she

18 kicked Gary out again, that he went to live with a friend of

19 his. The Wednesday before the murders, we know on Saturday,

20 September the 19th, two days before the murders, Lovetta's mom,

21 Margarita, who was a real estate agent on the side, showed her

22 a house out in Lancaster because Lovetta knew if this became

23 finalized, she was going to find a -- have to find a different

24 place to live. That's the last time Margarita saw her daughter

25 alive.

26

1          You're going to hear that on Sunday, one last

2  time, Lovetta let Gary Green back in the house. And he spent

3  Sunday night there. That Monday morning, Lovetta got ready to

4  go to work that day. She was going to be a substitute teacher

5  at her oldest son's school, at Atwell. Before she left that

6  morning, she wrote a one-page handwritten note to Gary. Very

7  nicely worded, I love you Gary, I know you love me, but this

8  isn't going to work. It's time for you to move out, and it's

9  time for us to get done with this so you don't have to be

10 dependent on no woman to make you happy. Tried to be nice,

11 left the note, came home later that day. Her youngest son

12 Jerrett had been suspended from school that day, so he's home

13 alone with Gary. He'll tell you that mamma came home a couple

14 of times that day.

15         Something happened during one of those times

16 where Lovetta wrote a second note, and you'll have that to read

17 and see -- that second note was a little more pointed. You

18 know, I tried to be nice, Gary, but this is the way you want

19 it. And, again, said, I've made up my mind. You're going to

20 get out today. And that is something the evidence is going to

21 show that Gary Green couldn't abide, because it was a nice

22 brick 3-2 house. He wasn't having to work. He can play his

23 video games. He had a nice setup, and she was telling him he

24 was going to have to leave.

25         We know sometime in the afternoon that Monday

27

1  afternoon of September 21st, Gary Green penned a five and a

2  half page missive explaining to Lovetta why that night he was

3  going to have to murder her. You wanted to see the monster,

4  now you're going to see the monster, bitch -- in his

5  handwriting, for your review, when you go back to deliberate

6  this case, and you'll see that here this morning.

7          Lovetta came home from work that day, got her

8  two boys ready to go to Friendship West for their Monday night

9  discipleship program. Took the boys, Jerome and Jerrett, and

10 that was the last time they ever saw their mother alive. She

11 came home that night. The evidence is going to show you that

12 when she got home, Gary Green gave her that five and a half

13 page letter, and she retired to her bedroom on her bed in her

14 house in her name to read this five and a half page letter.

15 And shortly thereafter, the evidence is going to show you that

16 Gary Green, with an assortment of butcher and kitchen knives,

17 came into that bedroom, got her -- his wife into the bathroom,

18 and began stabbing her over and over again, some 28 times with

19 assorted knives. One knife would break, he'd get another one

20 out.

21         But before he finished off his wife, that

22 32-year-old woman, the evidence is going to show you that she

23 fought and she fought with everything that she had, even to the

24 point where she actually was able to get a knife out of his

25 hand at some point in time during this apparently hour-long

28

1  struggle and reach around and stab Gary twice in his left back

2  area, two superficial stab wounds. She got the commode lid off

3  the toilet and tried to hit him with it. It shattered all over

4  that bathroom floor.

5          Unfortunately, you're going to see photographs

6  of that bathroom floor where she bled out from those 28 stab

7  wounds. And it's a grisly sight. It was a slow, painful,

8  agonizing death. But she had to fight, you see, with

9  everything that she had, and you're going to hear not only did

10 she fight physically, she tried to use her brain. She tried

11 talking to him. She tried reasoning with him. You need to

12 stop this, Gary, you're not that kind of guy, just take me to

13 the hospital, take me to the hospital, and I'll tell somebody

14 it was a burglar. I won't even implicate you, anything she

15 possibly could to stop this murderous assault.

16         And why did she fight so hard? Why did she try

17 so hard? Because the second victim had a ringside seat to this

18 hour-long butchery. The second victim had duct tape on her

19 mouth, duct tape on her hands, and duct tape on her feet to

20 where she was bound and hogtied laying there on her mamma's bed

21 watching this man kill her mother. You see, the second victim

22 in this case was 48 inches long, 49 pounds in weight, 6 years

23 and 11 months in age, and she made it all the way to her 21st

24 day in first grade.

25         The second victim in this case is Lovetta

**29**

Armstead's baby girl. This is Jazzmen Montgomery. And after
he finished off her mother and drug the mother from the bloody
bathroom into the bedroom where he lay Lovetta there dead on
the bedroom floor, he went and filled up the bathtub with
water. And once he got that done, he went and he picked up
that little 49-pound girl and carried her into the bathroom and
submerged her head under that water and drowned her. And it
even affected the monster because he told the detective, oh,
yeah, she fought, and it was bad. It was so bad I had to turn
my head away. That 49-pound girl was no match for this
350-pound 38-year old man who was bent and intent on murdering
Lovetta Armstead and her 6-year-old baby.

After he got done murdering Jazzmen, he laid her
there on the bathroom floor, took off his bloody clothes from
the struggle with Jazzmen's mom, stepped over the dead body of
that six-year-old girl and took a shower because his plan was
not complete yet. And he showered there in the same bathtub
where he just got done drowning that masterpiece from God, that
little six-year-old, changed clothes, put on his church clothes
to go pick up those two boys at Friendship West because it was
Gary Green's plan, folks, not just to kill Lovetta Armstead,
not just to kill her six-year-old daughter, but to kill her two
sons, as well.

And he drove that four miles down Polk to
Friendship West out there off of I-20 and got there around 8:30

**30**

that night in their mom's PT Cruiser and waited for the boys to
come out from their class. It was unusual for Gary to pick up
the boys. Mom always picked them up, but they got in the car
with Gary. He was acting normal, no problem, not acting mean,
and he took them on back to the house there at 3844 Morning
Springs Trail. Pulled into the garage, told the oldest boy,
JT, Jerome, to take a bath. Mamma told Gary to tell him to
take a bath, he wasn't smelling too good when he went to church
that night. JT obeyed, not knowing what was back there in that
master bedroom. JT starts his bath.

Little nine-year-old Jerrett, you'll see him.
He went to his bedroom, and shortly after getting to his
bedroom here, Gary called him into the kitchen. Come here,
Jerrett, and Jerrett obeyed. Jerrett went into the kitchen,
and Jerrett will tell you when he got in there, Gary grabbed
him by the neck and took one of those kitchen knives and kind
of started sawing on his neck, but luckily for Jerrett, Gary
had the dull side of the blade so it didn't cut his throat.
And Jerrett got away for a second and then Gary quickly stabbed
Jerrett in the stomach, drawing blood, and Jerrett started
screaming, JT, he's trying to kill me, JT, he's trying to kill
me. And the older brother poked his head out of the bathroom
to see this man pushing that little boy towards the bathroom.
And they all ended up in the bathroom there, Gary slamming that
little boy into the toilet, hollering at them, trying to stab

**31**

Jerrett again there in the bathroom.

But you're going to hear that little nine-year
old boy and you're going to get to meet him. You're going to
understand he is just a special young boy. And that special
young boy was able to accomplish something that his 32-year-old
mother could not accomplish that night. Something he said,
whether it was his presentation, whether it was in his words,
got through to Gary Green. Gary, we love you, we're too young
to die. You don't need to kill us. We're not going to tell.
Whatever that little boy could say, whatever it was, finally
penetrated into the meanness of this man, and he stopped. He
said, okay, I'm not going to kill you, I'm going to go kill
myself, and started playing that game. But before he did, he
took those two little boys back into that back bedroom and made
them look at their dead mother and made them look at their
little sister laying dead there on the bathroom floor. He told
those boys, I killed your mom because I loved her to death, and
I had to kill Jazzmen because she was going to tell it on me.
And he told the boys not to call 911 until he left or he'd come
back and kill them.

And Gary Green left the house that night with
those two little boys inside with those two dead ladies. He
left in the PT Cruiser. Those little boys called 911. You'll
get to hear the 911 tape -- 911 tape. You'll get to hear the
hysteria and just the unbelievable reaction of first JT and

**32**

then Jerrett screaming into that phone, he killed my mamma, he
killed my mamma. They had the presence of mind to go next
door, knock on the neighbor's door, get ahold of their
neighbor, Latasha Bradfield. She's going to come and tell you
what these boys' physical and emotional condition was that
night when they came screaming and knocking at her door, and
how she finally took the phone from those boys and talked to
the 911 operator and went next door because of what those boys
had told her. And went in through that unlocked open front
door, and went back towards the bedroom, and got as far as the
bedroom door and she saw her friend there, her friend Lovetta
Armstead laying there, face turned purple, not breathing, and
she reported all this to the 911 operator. I'm not going to
touch anything, I'm leaving. She never got back to see the
little girl laying there on the floor. The police came out and
paramedics came out, and you will hear from them, how that
scene affected them.

Little Jerrett was taken to Children's Medical
Center that night, eventually had surgery on that stab wound
inflicted by his stepfather. And luckily it didn't penetrate
into the stomach cavity. He was able to be discharged from the
hospital the next day.

You will hear that in the interim while all this
was going on, while the family is finding out about the murder
of their two loved ones and Jerrett going to the hospital, Gary

33

1  Green is driving around town trying to kill himself. This
2  350-pound man claims he took some Tylenol and some Benadryl.
3  We don't really know how much he took, but obviously he didn't
4  take enough. He ends up with his mother and his brother that
5  night. They had been contacted by the police. They talked
6  Gary into turning himself in because if he didn't, in all
7  likelihood the Dallas Police Department were going to kill him
8  out on the streets. So he turned himself in at the Southeast
9  Substation. You'll hear from police officers out there who
10 will tell you that mamma and brother and Gary walked into the
11 Southeast Substation on Jim Miller about 2:15 that morning.
12 And once they figured out what was going on, they arrested Gary
13 Green. Because he had these two little superficial stab wounds
14 on his back and claimed that he had tried to commit suicide,
15 they took him to Parkland. You'll hear from the Parkland
16 doctors, one of the Parkland doctors that treated him, he was
17 there about four hours. He was acting normal, able to follow
18 commands. They did his labs. They discharged him four hours
19 after he came. He was taken from the Parkland Hospital to the
20 Dallas Police Department where he's interviewed by a homicide
21 detective by the name of Robert Quirk. And you'll see a
22 videotaped confession -- about an hour and ten-minute
23 confession that will just chill you to the core of Gary Green
24 just very plainly and matter of factly telling how he killed
25 his wife and his six-year-old stepdaughter and to his way of

34

1  thinking why he did it.
2         That's the evidence that we bring to you in this
3  capital murder prosecution.
4         THE COURT: Does the Defense wish to make an
5  opening statement at this time?
6         MR. JOHNSON: Briefly, Your Honor.
7         THE COURT: Please proceed.
8         (Opening Statement by Mr. Johnson.)
9         MR. JOHNSON: May it please the Court.
10 Counsel.
11        Ladies and gentlemen, I'd like to take the first
12 opportunity to welcome you back. I know some of you, it's been
13 a few months since you were down here to the courthouse. I
14 want to just take a moment to tell you, as the prosecutor said,
15 this is an opportunity to tell you what we believe the evidence
16 in this case is going to show. And I want to go back and tell
17 you that as we did in the voir dire process that I believe
18 every one of you were told that the things that you may see and
19 that you may hear in this courtroom this week were going to be
20 things that were horrible and that they were terrible and they
21 were going to be tough to listen to and to look at. And I want
22 to remind each one of you, and as the Judge did this morning, I
23 want to ask you to make sure that as you hear of the horrible
24 things that you're going to hear about, that we all in this
25 courtroom understand that there's more than just one issue at

35

1  play in this courtroom.
2         We formally entered a plea of not guilty. We
3  are fully aware of the evidence in this case. We're going to
4  ask that as you see and hear things that are going to make you
5  sick, that are going to disgust you, that you do not lose sight
6  of all of the issues that we talked about. We spent a long
7  time picking you to hear this case. We've got a lot of issues
8  to talk about. I'm going to ask that none of you form a formal
9  opinion as to the results of this case until you've heard all
10 of the evidence that you may hear in this courtroom. Thank
11 you.
12        THE COURT: The State ready to call its first
13 witness?
14        MR. BEACH: Yes, sir.
15        THE COURT: Please do so.
16        MR. BEACH: The State will call Margarita
17 Brooks.
18        She has not been sworn, Judge.
19        THE COURT: Everyone gets sworn in.
20        I can't raise my right hand. If you would raise
21 your right hand, please.
22        (Witness sworn.)
23        THE COURT: Please have a seat.
24        Ma'am, if you would, would you pull that
25 microphone all the way up to you and you can adjust it so that

36

1  we can hear you. May sure to speak into the microphone so that
2  everybody can hear you.
3         When you're ready.
4         MR. BEACH: I guess -- is there any way to get
5  this room cooler? Like -- no? That's the only way. Outside
6  your jurisdiction.
7         THE COURT: Outside my pay grade.
8                 MARGARITA BROOKS,
9  was called as a witness by the State, and after having been
10 first duly sworn, testified as follows:
11             DIRECT EXAMINATION
12 BY MR. BEACH:
13    Q.   Okay. State your name, please.
14    A.   Margarita Brooks.
15    Q.   And, Margarita, you are the mother of Lovetta
16 Armstead; is that correct?
17    A.   Yes.
18        THE COURT: Actually, Andy, there is a way to
19 get it cooler.
20        Will you prop that door open just a little bit
21 -- about this much.
22        JUROR: Okay.
23        THE COURT: Open that door up in the back about
24 the same amount, if you would. Thank you, Pat.
25        Just about that -- that -- sometimes that works,

37

39

1    Andy.  Okay.  Go ahead.

2    Q.   (BY MR. BEACH)  Margarita, where were you born and

3    raised?

4    A.   Excuse me, I'm sorry?  I didn't hear you.

5    Q.   Where were you born and raised?

6    A.   Peoria, Illinois.

7    Q.   Okay.  So the folks on the jury that don't know, me

8    being from Illinois, is that where Richard Pryor was -- grew

9    up?

10    A.   Yes.

11    Q.   And how long did you spend up in the -- in the

12    Midwest -- part of your life was spent up there?

13    A.   Most of my life.

14    Q.   Okay.  When was Lovetta born?

15    A.   August 12th, 1977.

16    Q.   Okay.  And do you have other children besides

17    Lovetta?

18    A.   Yes.

19    Q.   And how many other children do you have?

20    A.   I have two other children.

21    Q.   Okay.  And who are they?

22    A.   Demetrius Armstead and Jeanette Brooks.

23    Q.   Okay.  And is Demetrius in the courtroom right now?

24    There he is right there.

25    A.   Yes.

1    A.   She went at a very young -- she graduated in her

2    senior year early, and she went half a semester at Prairie

3    View, and she didn't do well with her grades.  And shortly

4    after that, she conceived JT, and she went to a program for

5    single parents and transferred to Tyler.

6    Q.   Okay.  And did she actually get a four-year degree

7    from the college over there in Tyler?

8    A.   Texas College in Tyler, Texas.

9    Q.   And primarily what kind of work was Lovetta

10    interested in doing?

11    A.   Education.

12    Q.   And had she -- had she taught full time?

13    A.   Yes.

14    Q.   And where did she teach full time?

15    A.   At Gateway Charter School.

16    Q.   Okay.  And in the last year or so of her life, was

17    she doing some substitute teaching working for DISD?

18    A.   Yes.

19    Q.   And she also attended Friendship West Baptist

20    Church; is that correct?

21    A.   Yes.

22    Q.   And did she work there part-time in the day care?

23    A.   Yes.

24    Q.   Is that where her boys went?

25    A.   Yes.

38

40

1    Q.   That's your -- your second born; is that correct?

2    A.   Yes.

3    Q.   And Jeanette, she's a teenager?

4    A.   Yes.

5    Q.   And you adopted her; is that correct?

6    A.   Yes.

7    Q.   Okay.  Now, what brought you from the Midwest down

8    to Texas eventually?

9    A.   I worked for Greyhound Lines, and I transferred from

10    Des Moines, Iowa, to Texas.

11    Q.   And how old was Lovetta when you transferred down to

12    Dallas?

13    A.   I believe she would have been about 16.

14    Q.   Okay.  And she graduated from DeSoto High School; is

15    that correct?

16    A.   Yes.

17    Q.   And did Lovetta, after graduating from DeSoto, did

18    she -- did she go to college?

19    A.   Yes.

20    Q.   What was the first college that she went to?

21    A.   Prairie View.

22    Q.   And that didn't work out too well for her; is that

23    right?

24    A.   Right.

25    Q.   What happened?

1    Q.   During the week at night?

2    A.   Yes.

3    Q.   Now, you told us JT was -- when was he born?

4    A.   August the 12th, 1997.

5    Q.   So he was born on Lovetta's 20th birthday?

6    A.   Yes.

7    Q.   And Jerrett, the next -- next boy, when was he born?

8    A.   He was born June 2nd of 2000.

9    Q.   Okay.  And then the little girl, Jazzmen, that

10    they've seen a photograph of, when was she born?

11    A.   October the 3rd of 2002.

12    Q.   Okay.  And was she born over -- over in that -- in

13    the Tyler area while Lovetta was going to school over there?

14    A.   Yes, she was born in Jacksonville.

15    Q.   Now, Lovetta met a man by the name of Gary Green in

16    the year 2007; is that correct?

17    A.   Yes.

18    Q.   And did you meet Gary Green shortly after he moved

19    in with Lovetta and her children?

20    A.   Yes.

21    Q.   I'm going to ask you this one time, Margarita, to

22    look around the courtroom.  Do you see Gary here in court

23    today?

24    A.   Yes.

25    Q.   And is he the man at the end of the counsel table in

41

1  the dark suit?

2  A.   Yes.

3  Q.   It's the man you saw numerous times between when you

4  first saw him in 2007 and in the days leading up to Lovetta's

5  and Jazzmen's murders; is that correct?

6  A.   Yes.

7  MR. BEACH:  Let the record reflect, Your Honor,

8  that the witness has identified the Defendant in open court.

9  Q.   (BY MR. BEACH)  Now, you heard my opening statement.

10  Did I characterize their relationship accurately?

11  A.   Yes.

12  Q.   I mean, very tumultuous, love, hate; is that

13  correct?

14  A.   Yes.

15  Q.   What -- based on everything that you observed and

16  saw, what was the primary issue with Lovetta in her

17  relationship with Gary?

18  A.   That Gary didn't work.

19  Q.   And was that a source of contention really from the

20  time they started living together?

21  A.   Yes.

22  Q.   Now, they got married in her house there on Morning

23  Springs Trail in June of 2009, about three months before she

24  was murdered; is that correct?

25  A.   Yes.

42

1  Q.   And did you attend that -- that wedding?

2  A.   Yes.

3  Q.   That wedding excite you or make you happy?

4  A.   I was very disappointed.

5  Q.   At that time, to your understanding, was Gary, in

6  fact, gainfully employed?

7  A.   Yes.

8  Q.   And he was working for a corporate battery repair

9  company as far as you knew; is that correct?

10  A.   Yes.

11  Q.   And was that something, to your knowledge, that

12  Lovetta thought was a good thing and maybe he'd kind of change

13  his ways?

14  A.   Yes.

15  Q.   And did you learn shortly after they got married

16  there in the house, that Gary had quit his job?

17  A.   Yes.

18  Q.   And how did that make Lovetta feel?

19  A.   She was upset about him quitting the job and about

20  having financial --

21  MR. JOHNSON:  Judge, I'm going to object to

22  hearsay.

23  THE COURT:  Exception?

24  MR. BEACH:  I'm sorry?

25  THE COURT:  Is there an exception?

43

1  MR. BEACH:  State of mind, Judge.

2  THE COURT:  The objection is overruled.

3  Ladies and gentlemen, it's being offered to show

4  the state of mind of the person, not necessarily being offered

5  for the truth.

6  Please continue.

7  Q.   (BY MR. BEACH)  And, again, Ms. Brooks, is it your

8  understanding in September of 2009, in the days leading up to

9  the murders there on Morning Springs Trail, that Lovetta had

10  taken action in terms of getting the marriage annulled?

11  A.   Yes.

12  Q.   That week leading up to the murders, Ms. Brooks, was

13  it another situation where Lovetta had gotten Gary out of the

14  house?

15  A.   Yes.

16  Q.   And that had happened before; is that correct?

17  A.   Yes.

18  Q.   You knew about Lovetta's attempts to start the

19  annulment process by then?

20  A.   Yes.

21  Q.   That Saturday, two days before your daughter and

22  your granddaughter were murdered there in the house, did you

23  see Lovetta that Saturday?

24  A.   Yes, I did.

25  Q.   And what was your purpose for seeing your daughter

44

1  on that Saturday?

2  A.   To show her a property that she wanted to lease so

3  that she could move out of the house on Morning Springs.

4  Q.   Okay.  And the jury is going to see this here in a

5  bit, but just generally what part of the City of Dallas is --

6  was 3844 Morning Springs in?  And what kind of major streets is

7  it near?

8  A.   Oak -- it's in Oak Cliff off of Polk and Highway 67.

9  Q.   Okay.  Right there off of Polk and Highway 67, and

10  the house that you showed your daughter in Lancaster, obviously

11  Lancaster is quite a distance from Polk and 67?

12  A.   Yes.

13  Q.   I'm going to take you to that night, Ms. Brooks,

14  September 21st, 2009, that Monday night, and ask if you were

15  getting into your bath that night?

16  A.   Yes.

17  Q.   And did you hear your husband say something?

18  A.   Yes.  I heard my husband say, they're dead.  Who?

19  Lovetta and Jazzmen.  And --

20  Q.   What did you do?

21  A.   I just remember grabbing the phone and hearing

22  somebody on the other end hollering and screaming and never

23  making sense, and so I just grabbed my housecoat and I just

24  jumped in my car and I went to Lovetta's house.

25  Q.   You went there by yourself?

45

```
1      A.   Yes.
2      Q.   When you got there, what was the scene like, Ms.
3   Brooks?
4      A.   Police and Fire Department and everybody in front of
5   the house.  And when I started to try to get in the house, they
6   wouldn't let me go, and they wouldn't tell me anything.  I just
7   knew -- I don't know -- I just lost it.
8      Q.   When you found out it was confirmed to you that, in
9   fact, your daughter and your granddaughter were, in fact,
10   deceased, what do you remember doing?
11      A.   I remembered them saying, it's two females in there
12   dead, one about 32, and the other one about six.  And I just
13   remember falling in the street right there and just crying.
14   And it was raining and it was storming and just police
15   everywhere and people up in front of the house.  I don't know
16   who they were.  I just remember it just being chaotic and just
17   being out of it, just wanting to see my baby.
18      Q.   They didn't let you in the house, did they?  And by
19   then did you know that your youngest grandson had been stabbed?
20      A.   Yes.  They told me the boys were going to the
21   hospital.  The police say, why don't you just go to the
22   hospital, that's where the boys are at.  And I just didn't want
23   to leave.  I just wanted to stay right there until I could see
24   my daughter and my granddaughter.
25      Q.   Did you eventually take the police's advice and your
```

46

```
1   family's advice and go to Children's Medical Center to be with
2   your grandsons?
3      A.   I waited for my sister to bring me clothes because I
4   didn't have any clothes on.  I only had my housecoat on.
5      Q.   And eventually, Ms. Brooks, did you go to the
6   hospital and stay there until you made sure Jerrett was okay?
7      A.   Yes.
8          MR. BEACH:  May I approach, Judge?
9          THE COURT:  You may.
10      Q.   (BY MR. BEACH) Ms. Brooks, I'm going to show you
11   what's been marked for identification as State's Exhibits 1, 2,
12   3, and 4, and ask are these accurate photographs of your
13   daughter and your grandchildren as they appeared?
14      A.   Yes.
15          MR. BEACH:  The State would offer State's 1
16   through 4 into evidence at this time, Your Honor.
17          (State's Exhibits 1 through 4 offered.)
18          THE COURT:  Haven't they already been admitted?
19          MR. BEACH:  They have.
20          THE COURT:  Okay.
21          MR. BEACH:  I just didn't know if you wanted to
22   admit them in the presence of the jury.
23      Q.   (BY MR. BEACH) Can you see State's Exhibit Number 1
24   there, ma'am?
25      A.   Yes.
```

47

```
1      Q.   And this is Lovetta; is that correct?
2      A.   Yes.
3      Q.   And then this is JT, and this is little fat faced
4   Jerrett; is that right?
5      A.   Yes.
6      Q.   About how old do you think was Jerrett in that
7   photograph?
8      A.   Oh, about 2 -- about maybe 18 months going on 2.
9      Q.   Is it fair to say Jerrett has a little personality?
10      A.   Yes.
11      Q.   State's Exhibit 2, is that a photograph -- a recent
12   photograph of your daughter?
13      A.   Yes.
14      Q.   And then State's 3, it's kind of smaller -- just go
15   ahead and put this -- can you see there on the TV screen to
16   your left right there?
17      A.   Yes.
18      Q.   Okay.  That's going to be Jazzmen, and that's going
19   to be Jerrett and JT in a more recent photograph; is that
20   correct?
21      A.   Yes.
22      Q.   And Jazzmen -- at that times she would wear that
23   kind of ponytail on top of her head like that?
24      A.   Yes.
25      Q.   And then State's Exhibit Number 4, this is Jazzmen's
```

48

```
1   kindergarten graduation photograph; is that right?
2      A.   Yes.
3      Q.   At the time of her death, she had just started the
4   first grade there at Mark Twain Elementary?
5      A.   Yes.
6      Q.   Now, I'm going to show you State's Exhibits 5, 6,
7   and 7, which have already been admitted into evidence, Ms.
8   Brooks.  You've seen these exhibits before; is that correct?
9      A.   Yes.
10      Q.   And 5 and 6 are going to be handwritten notes from
11   your daughter Lovetta; is that correct?
12      A.   Yes.
13      Q.   And State's Exhibit Number 7 is going to be a five
14   and a half page letter -- you recognize Gary Green's
15   handwriting; is that correct?
16      A.   Yes.
17      Q.   Is that -- State's Exhibit 7, is that in Gary
18   Green's handwriting?
19      A.   Yes.
20          MR. BEACH:  Permission to publish, Judge?
21          THE COURT:  You may.
22          MR. JOHNSON:  Your Honor, if I'm not mistaken, I
23   believe 7 was admitted yesterday for record purposes only.
24          MR. BEACH:  I'm going to read from 8.
25          MR. JOHNSON:  I just wanted to make sure the
```

49

1  record's clear.

2            THE COURT:  Yes, okay.  I see what you're

3  saying.

4            MR. BEACH:  I'd ask the court reporter to

5  segregate State's 7.

6            THE COURT:  Let me see the lawyers up here real

7  quick.  This is going to take a few minutes; is that right?

8            Ladies and gentlemen, let's take a quick break.

9  This is going to take -- take a little bit, and there's a

10  certain admonishment that I think I'm supposed to give, too,

11  but I want to clear it with the lawyers, so let's take a quick

12  break and -- and we'll reconvene.  We always go by that clock.

13  Sometimes it's right, but that's the clock we go by, just so

14  you know.  It's 10:46.  We'll reconvene by 11 o'clock on

15  that -- on that clock.

16            (Jury excused from courtroom.)

17            (Recess.)

18            (Jury returned to courtroom.)

19            THE BAILIFF:  All rise.

20            (Discussion off the record.)

21            THE COURT:  Yeah, about that much.  The

22  temperature is better in here, isn't it?  It's okay?  No, it's

23  cold.

24            Yeah, again, you all are in charge of that.  If

25  y'all are -- as a consensus too hot or cold, let me know, and

50

1  I'll try to do something.  I -- that worked.  I was amazed that

2  it did.  And it worked too well, apparently, so it will heat

3  back up.

4            Still on direct.

5            Ladies and gentlemen, I think what we're about

6  to do is we're going to read to you the contents of the letter.

7  You all will have an opportunity to have the actual words and

8  -- I guess what I'm trying to say, is the attorney is reading

9  it.  You are the exclusive judges of what that letter says and

10  how it's said and the wording.  And you are to make the

11  determination, not rely on what he says.  Instead, you are the

12  finders of fact, and you'll have the letter.  You'll be able to

13  read it for yourself.  So I just wanted to let that be known,

14  even though I was kind of muddled in my explanation.

15            MR. BEACH:  Okay.  Top line:  From Lovetta,

16  9-21-09, 7:30 a.m.  Gary, I know you think that this is all

17  some kind of plot to get revenge on you and because of me you

18  have no back-up plans or as you say no other bridges.  As much

19  as I want to believe we can work I know we can't.  I know you

20  love me and I love you but it's time we part.  I think you are

21  right when you said the timing wasn't right.  I want you to get

22  on your feet where you can have your own place and ain't got to

23  depend on no woman.  I want a lot of things to change in my

24  life as well.  I want to love me more and be a better mamma so

25  I don't have to depend on nobody else for my happiness.  Love

51

1  always, Lovetta.

2            Top line:  Call me evil, call me a bitch but

3  this is how I feel.

4            Gary -- and then from Lovetta, 9/21/09, 12:45

5  p.m.  Okay I didn't want to put this out there like this

6  because I was trying to keep the peace.  I understand where you

7  coming from and you're right because the truth of the matter is

8  I should have let you stayed gone.  Not for the reasons you

9  feel but because I already had doubts about us.  I thought if

10  we got married it would erase those doubts.  It didn't.  I'm

11  not trying to hurt you but I have to go do what's best for me

12  just like all those times you played me, you were doing what

13  you felt was best for you.  Just like when you went and spent

14  the rent money on a truck that you put in another woman's name,

15  you did what you had to do even though it left me stuck out.

16  So now it's time for me to do what I have to do and that's be

17  by my damn self so I can heal.  I love you but you got to go

18  today.  I can't get sucked back in.  My mind is made up.

19            September 21st, 2009, Lovetta.  You made me lose

20  everything, when we had broke up and I moved before you and the

21  kids went up state.  You said, if you let me come back home,

22  I'd have to marry you so we did two weeks later.  I lost my

23  truck being behind -- behind being with you when someone else,

24  another woman, helped me get it, but I didn't care about that

25  so much because I knew we had each other, but all alone you had

52

1  other plans.  You see you make all of this bullshit we've been

2  through is on me but you are the reason why I'm homeless.  You

3  had made plans to divorce me behind my back, and plus we

4  haven't been married 90 days.  Lovetta you telling me to get

5  out you house and we are married at that time for only one

6  month.  I was working to get me a truck because you said you

7  was going out of town but you popped on me at the last minute

8  saying we're going out of town for a week with yourself and the

9  kids.  So I would have to find me a way to work and back for a

10  week.  You see you just leave me without no transportation and

11  let your cousin drive all the way down here from Houston.  Her

12  and her son to get in the car with you and your kids which is

13  bullshit, bullshit.  When I married you I did no wrong by you

14  for to you act this way by me.  LeNell was a woman who really

15  did love me unconditionally and you take that from me because

16  you said you loved me and as my wife you would be a better

17  person and wife.  I'm truthfully I really believed you.  But no

18  matter how you try to keep the truth covered up you can't

19  because is the light the truth.  In the truth about you is you

20  was setting me up from the start.  Secrets, yes, I said with

21  your secrets live you was against me all alone.  Listening to

22  you momma who is a woman that doesn't know anything about

23  relationships.  She is married and always lived her life as a

24  single woman.  She doesn't know if she likes men or women and

25  for that matter can't stay devoted to anybody.  In all your so

53

1  called friends putting me down. In no one of the people you
2  talk to about me or our relationship is right in their
3  relationship. They cheat around and the ones who don't have a
4  man is just women of the world out there back fucking and
5  sucking and you take what these type of people say to heart.
6  The pastor said at church a couple of weeks ago that people in
7  the world are backward, evil life, is the same word, but our is
8  backward. There are backward people in this world. Lovetta I
9  be here with you your kids, more than you do one on one. I'm
10  around you and your family 24-7 and all they do is try to knife
11  me in the back. Lovetta, I'm not the best man in the world but
12  I was the best for you and I thought you was the best for me.
13  When I lost my job I talked it over with you three times the
14  day before I walked away from the job. I started my paperwork
15  for my SSI and disability and said that's cool by you three
16  different times. So after another side of you came out. You
17  never did enter into our marriage being a devoted wife. You
18  became worst with you trying to control me, but you don't never
19  try to control these little monster ass kids of yours once.
20  When they became sick I be the one who take care of them, not
21  you, me every time. Lovetta, since I have known you all I have
22  gave you my last money. You get some money, you play as if you
23  don't have any money. Lovetta, after we got married, you
24  called LeNell, texted her to let her know we got married. Why?
25  To sent in motion the fucking you had planned to put me. How?

54

1  You knew you didn't want me so you made it where she LeNell
2  didn't also. When I married you, I knew the type of money
3  LeNell would get, but I married you and for what? You left me
4  homeless because you don't want me and made where no one else
5  would.
6          No, I don't have anywhere here to live because
7  of your backward ass thinking. You never had planned on
8  getting your last name changed at all because you was and is on
9  some bullshit. And you have the nerve to say that I'm the
10  problem in our family. The kids don't think I like them and
11  all other bullshit. Hell, they are bad, that's the reasons why
12  you don't fool with them and never have. Here I am today at
13  your house with your 9-year-old son because the school said he
14  can't come back until Wednesday. Now keep in mind you come to
15  pick me up yesterday last night. But when I get here I find
16  out I had to keep him, which don't get me wrong, I don't have a
17  problem with it, but I'm just making a point. The point being
18  you too have made me out to be the bad guy. When something
19  happens at the schools with these kids, I was the one who went
20  to the schools when you was home with me when the schools
21  called at just one time, but all the times.
22          Lovetta, I'm tired of you making me out to be
23  the bad guys when you and your kids are backward because of
24  you. You don't have no guidance because your moma didn't give
25  it to you. Because she like to run the street. When your

55

1  sister at home now with your mother. Your mother don't be a
2  devoted mother to her because it's about what she want to do
3  comes first, run the streets, drinking and parties as you do.
4  I'm so tired of this bullshit, but I can't take it no more. So
5  you say fuck me, I say fuck you. So I'm going to end it all.
6  You are not going to fuck me like that and just walk away. So
7  you think I wish to die. No, but the fucking you have placed
8  on me I can't look the other way on this shit Lovetta. All the
9  shit I had to put up with the last almost three years. No more
10  Lovetta, no more. You have made my life a living hell on
11  earth. I'm up to my neck with this shit. Every time my back
12  is turned and your kids talking about me when I'm the one
13  who takes care of them. You yourself is a big baby who thinks
14  everything is suppose to go your way. Lovetta you killed us
15  all. It is what it is. Every time I try to talk to you you're
16  the victim. I am the fucking victim. When I got my truck
17  after you said you would be gone for a whole week. I was the
18  bad guy because of that let you tell it. But how many times
19  you have waited to pay a bill or two to get your hair done and
20  shit. Numerous times. Over $300 a pop. But when you did I --
21  when you -- I did at to get me some transportation because you
22  was going to leave me here with any way to or from work.
23  That's why I got the truck. You wanted me to pay the bills
24  which I did, and work which I did, but the price is showing me
25  no respect as a man or as a person. You asked to see the

56

1  monster, so here he is, the monster you made me. Bitch. There
2  will be 5 lives taken today, me being the 5th. You wished to
3  believe you can continue to play these games with me. There
4  was a woman who was going to give me $3500 cash just to give
5  her some, which she knew I had a woman at home. I told you
6  about it and Ruth. You said you don't need no woman to give
7  you nothing but you wouldn't help me or give me nothing. I
8  told you I would use the money to make a better life for all of
9  us. Ruth said in so many ways I was crazy. She would have got
10  that money. She would have got that me anyway. You was
11  getting when we first got together thousands of dollars every
12  90 days from the colleges, a refund check. Lovetta you
13  wouldn't do anything positive with money. You played me and
14  now the game is up. I pray that the Lord allows my soul to
15  enter heaven. If not, I will burn in hell forever. You knew I
16  was behind on my child support years before we became married,
17  but you were so much in a rush to marry me. But as soon as you
18  did you talking to all these bitches about me and our
19  relationship, you allowed the devil in to destroy us. But your
20  kids to fuck everyday and some type of way and you look the
21  other way as if it didn't happen. All your so called and
22  family all they do is fuck over and you always look the other
23  way. But the one people in your life that really try to look
24  out for us was all me and look out -- look how you fucked me.
25  I paid my money to get all of you plus some life insurance.

57

1  what man in your life ever did that for you and yours.  No.
2  Because we were a family so I got us insurance.  And you turn
3  around and say this or that.  You know, Lovetta, you never tell
4  the truth, just like when you were trying to go out when you
5  knew I was going so you wanted to leave the kids here at home
6  by their selves, but I wouldn't let you and I had to go through
7  all this bullshit with Ruth over that shit.  She's saying she
8  wanted to shoot me over me trying to stop you from leaving them
9  here alone which they were the kids at the time was 5, 8, and
10  10 years old.  So you see people calling me crazy, all they had
11  to put up with behind you and your family.  Your own family
12  didn't want to kept your kids because you never had time to
13  teach them anything because you as a mother was all about
14  yourself.  Herself.  I'm here today, you telling me I have to
15  get out today when you come home as if I had made your life a
16  living hell which, in fact, it was you and yours who made me
17  the victim.  I never tried to hurt you, but only help you and
18  yours.  When I first started working, I should have walked away
19  then when I had the chance to, but I didn't because I didn't
20  want to do that.  When I got a job, walk away from you, but
21  stay due to two working can make it together but all alone we
22  were working in secret against me.  And then you just flipped
23  the script on me without giving me no time to find me home to
24  live, just get out without nothing.  I worked hard on this
25  relationship to be fucked over from the bullshit you created

58

1  behind my back.  God, please have mercy on my soul.  I'm at my
2  breaking point which is my finally breaking point.  PS.  Why
3  the kids because they were a big part of the secret plot
4  against me by always talking behind my back that Gary and must be
5  that.  When mamma, you, never had time for them and must go
6  too.
7        THE COURT:  Members of the jury, like I said, at
8  the close of evidence when you begin your deliberations, if any
9  piece of evidence that has been admitted, will -- we have
10  those and you can request that and that can be sent back to the
11  jury room for you.  So don't feel like you have to memorize it
12  or anything like that.  All of the evidence will be available
13  to you when you begin your deliberations.
14        Please continue.
15     Q.  (BY MR. BEACH)  Ms. Brooks, it's a fact that Lovetta
16  loved the Defendant; is that correct?
17     A.  Yes.
18     Q.  And she thought by marrying him maybe she could
19  change him?
20     A.  Yes.
21     Q.  And I'm not going to get into all the he said or she
22  said, but did your daughter love her children, as well?
23     A.  Yes.
24     Q.  She took her boys to the church that night; is that
25  correct?

59

1     A.  Yes.
2        MR. BEACH:  I will pass the witness, Your Honor.
3        THE COURT:  Cross?
4        MR. JOHNSON:  Your Honor, I have no questions
5  for her at this time.
6        Thank you, ma'am.
7        THE COURT:  Thank you, ma'am.  You may retake
8  your seat.
9        Please call your next witness.
10        MR. HARRIS:  Call Latasha Bradfield.
11        (Witness brought forward and sworn.)
12        THE COURT:  Please have a seat.
13        LATASHA BRADFIELD,
14  was called as a witness by the State, and after having been
15  first duly sworn, testified as follows:
16        DIRECT EXAMINATION
17  BY MR. HARRIS:
18     Q.  Ma'am, go ahead and state your name for the record.
19     A.  Latasha Bradfield.
20     Q.  Okay.  Latasha, I know you're a little nervous,
21  okay?  Right?
22     A.  Yes, sir.
23     Q.  Okay.  So look -- that microphone actually moves so
24  you can actually pull it a little closer to you.  You can pull
25  it closer.  It's not going to break.

60

1     A.  It's going to fall.
2        THE COURT:  It's going to fall off.  You can
3  pull your chair up.  You can move the microphone up and down.
4     Q.  (BY MR. HARRIS)  Pull your chair up.  Yeah, scoot
5  the chair up, because you have a very soft voice.  Scoot your
6  chair up and relax.
7        Okay.  All right.  Go ahead and state your name
8  again.
9     A.  Latasha Bradfield.
10     Q.  All right.  And you know why you're here today,
11  right?
12     A.  Yes, sir.
13     Q.  Okay.  So we'll get right to the point.  Did you
14  know a person by the name of Lovetta Armstead?
15     A.  Yes, sir.
16     Q.  Do you know a person by the name of Gary Green?
17     A.  Yes, sir.
18     Q.  And do you see Mr. Green in this courtroom?
19     A.  Yes, sir.
20     Q.  Will you please point him out and describe an
21  article of clothing he's wearing?
22     A.  He's sitting over there with the dark suit and the
23  glasses.
24     Q.  Okay.  And can you tell the members of the jury how
25  you knew Lovetta and Gary?

61

| | |
|---|---|
| 1 | A.   They were my neighbors. |
| 2 | Q.   Okay.  And where exactly did you reside back in -- |
| 3 | A.   At -- |
| 4 | Q.   Hold on.  Let me finish. |
| 5 | A.   Okay. |
| 6 | Q.   Where did you reside in September of 2009? |
| 7 | A.   At 3848 Morning Springs Trail. |
| 8 | Q.   And they lived next door to you? |
| 9 | A.   Yes, they did. |
| 10 | Q.   At 3844? |
| 11 | A.   Yes, sir. |
| 12 | Q.   Now, are both those addresses here in Dallas County? |
| 13 | A.   Yes, sir. |
| 14 | Q.   State of Texas? |
| 15 | A.   Yes, sir. |
| 16 | Q.   Okay.  How long had you been living there, I guess, |
| 17 | when Lovetta moved there? |
| 18 | A.   Maybe about 10 days, 10 or 20 days. |
| 19 | Q.   How long were y'all neighbors? |
| 20 | A.   Since 2007.  I moved there September 2007.  She came |
| 21 | October 2007. |
| 22 | Q.   Did Lovetta have kids? |
| 23 | A.   Yes, she did. |
| 24 | Q.   How many kids did she have? |
| 25 | A.   Three. |

62

| | |
|---|---|
| 1 | Q.   And do you know their names? |
| 2 | A.   Yes, I do. |
| 3 | Q.   Can you tell the members of the jury? |
| 4 | A.   She had two sons -- she has two sons, Jerrett and |
| 5 | Jerome, and a daughter, Jazzmen. |
| 6 | Q.   And as far as those kids, they sometime come over |
| 7 | your house? |
| 8 | A.   Yes. |
| 9 | Q.   And you sometime babysit them? |
| 10 | A.   Yes. |
| 11 | Q.   Let me show you -- let's do this.  Can you tell |
| 12 | me -- I think you indicated that you had babysitted the kids on |
| 13 | occasion; is that right? |
| 14 | A.   Yes. |
| 15 | Q.   Okay.  And you were neighbors with Lovetta for about |
| 16 | two years? |
| 17 | A.   Yes. |
| 18 | Q.   How did you know Gary Green? |
| 19 | A.   From him being my neighbor. |
| 20 | Q.   Okay.  And how long did he live there? |
| 21 | A.   Same amount of time, from October 2007. |
| 22 | Q.   At some point were you aware of the fact that they |
| 23 | had gotten married? |
| 24 | A.   Yes. |
| 25 | Q.   Okay.  And I guess at some point during September of |

63

| | |
|---|---|
| 1 | '09, were you aware of the fact that -- I guess Lovetta was |
| 2 | trying to get an annulment? |
| 3 | A.   Yes. |
| 4 | Q.   Okay.  And I want to just go ahead and if you can, |
| 5 | just go ahead and direct your attention to September the 21st |
| 6 | of 2009. |
| 7 | A.   Yes, sir. |
| 8 | Q.   Do you remember what you were doing on that day? |
| 9 | A.   Yes, sir. |
| 10 | Q.   And is that a day you will ever forget? |
| 11 | A.   No. |
| 12 | Q.   Okay.  Can you tell the members of the jury, did you |
| 13 | come in contact with Jerrett and JT -- you call Jerome JT; is |
| 14 | that correct? |
| 15 | A.   Yes, sir. |
| 16 | Q.   Okay.  And did you come in contact with them that |
| 17 | day? |
| 18 | A.   Yes, sir. |
| 19 | Q.   Prior to you coming in contact with them, I guess |
| 20 | that night, can you tell the members of the jury I guess what |
| 21 | were you doing later that evening on that day? |
| 22 | A.   That evening? |
| 23 | Q.   Uh-huh. |
| 24 | A.   I was about to do laundry when they came. |
| 25 | Q.   Okay.  At some point on that day did you have to |

64

| | |
|---|---|
| 1 | pick your daughter up? |
| 2 | A.   Yes.  I picked her up from therapy, and we came home |
| 3 | like about 8:30. |
| 4 | Q.   Okay.  And can you tell the members of the jury when |
| 5 | you came home what happened? |
| 6 | A.   When I pulled into the driveway, I noticed that |
| 7 | my -- my neighbor, Gary Green, was outside with their car and |
| 8 | the trunk was open and the garage was open.  And I said to the |
| 9 | people that were in the car with me, I said, oh, he has the |
| 10 | right thing in mind, I'm going to pull my car in the garage, as |
| 11 | well, because it's about to rain -- |
| 12 | Q.   Okay. |
| 13 | A.   -- so I pulled in and went in. |
| 14 | Q.   All right.  Now, once you go inside the house, what |
| 15 | do you do next? |
| 16 | A.   I watch a program on TV, lasted about 40 minutes. |
| 17 | Q.   Okay.  And then what happens? |
| 18 | A.   I'm downstairs.  There's a lot of knocking at the |
| 19 | door, so I opened the door and the kids are screaming -- |
| 20 | Jerrett and JT, they're screaming different things. |
| 21 | Q.   Okay.  What are they saying? |
| 22 | A.   I can say what they said? |
| 23 | Q.   Absolutely.  What are they saying? |
| 24 | A.   They said that, Gary killed my mom and my sister. |
| 25 | Q.   Okay.  Now, are they as calm as you are today -- |

65

1   A.   No.

2   Q.   -- in this courtroom?

3   A.   No.

4   Q.   I mean, how -- tell the members of the jury -- I

5   mean, how were they acting?

6   A.   They were screaming, and Jerrett was holding his

7   stomach saying that he stabbed him, too.

8   Q.   Okay.  And -- and when you saw his stomach, did you

9   see any evidence of the fact that he had been stabbed?

10   A.   His shirt was bloody.

11   Q.   Okay.  And, again, you're pretty calm here today.

12   Were they -- you said they were yelling.  Were they crying?

13   A.   Yes, they were.

14   Q.   Okay.  At that point did you know what to believe?

15   A.   I didn't really know what they were saying and if

16   there was truth behind it.

17   Q.   Okay.  At some point you're trying to calm them

18   down?

19   A.   Yes, sir.

20   Q.   Now, when they come to your door beating on your

21   door and you get out and they're saying -- what are they

22   saying?

23   A.   Gary killed my mom and my sister.

24   Q.   Okay.  At that point did they tell you how he had

25   killed them?

66

1   A.   No.

2   Q.   Okay.  But they're at your door yelling, Gary killed

3   my mamma and my sister?

4   A.   Please help.  He killed my mamma and my sister.

5   Gary killed my mom and my sister.

6   Q.   Okay.  And at some point while they're at your door,

7   are they on the phone with the 911 operator?

8   A.   Jerrett is on the phone.  He's holding his stomach

9   with one hand, and he's holding the phone with the other hand.

10   Q.   When we say Jerrett, again, we're referring to the

11   youngest?

12   A.   The youngest.

13   Q.   Yeah, one is 12, and one is 9 --

14   A.   Yes.

15   Q.   -- at that time?

16   A.   Yes.

17   Q.   And do you take the phone from Jerrett?

18   A.   Yes, I do.

19   Q.   And what do you do?

20   A.   I start speaking with the operator, telling them --

21   telling the operator the things that they are saying to me.

22   Q.   Okay.  And what is that?

23   A.   I tell them -- the operator that they said that

24   their stepdad killed their mom and their sister and tried to

25   kill them.

67

1   Q.   Okay.  And, again, it's really calm in this

2   courtroom and -- but it was crazy out there that night?

3   A.   Yes, it was.

4   Q.   Okay.  But you're trying to do the best you can to

5   explain to her what they're trying to explain to you?

6   A.   Yes, sir.

7   Q.   And at some point do you walk away from them?

8   A.   Well, the operator says she can't hear me, so I have

9   to leave from my living room and try to come to my foyer.  She

10   said she still can't hear me because they're still screaming

11   and so I let her know that I'm going to go and see what they're

12   talking about.

13   Q.   Okay.  And do you -- and then what do you do?  Tell

14   the members of the jury what you do.

15   A.   I'm still on the phone with the operator, and I

16   leave from my home which is right next door to theirs.  And I

17   walk through the grass and go to their front door and I knock

18   on the door.  No one answers the door --

19   Q.   Okay.  Now --

20   A.   -- so I walk in.

21   Q.   Okay.  Now, let me stop you, Latasha, because you're

22   going a little fast.

23   A.   I'm sorry.

24   Q.   She's recording everything that you're saying, okay?

25   So at this point you leave your house because the boys are

68

1   yelling and it's so noisy that the 911 operator can't even hear

2   you?

3   A.   Yes.

4   Q.   And you go to their house?

5   A.   Yes.

6   Q.   Now, at this point do you know where Gary Green is?

7   A.   No.

8   Q.   Have you asked the boys?

9   A.   They said he left.

10   Q.   Okay.  Is that why you went ahead and went over to

11   the house?

12   A.   Honestly, I don't know.

13   Q.   Okay.

14   A.   I don't know.

15   Q.   All right.  But anyway, you're at the door and

16   you're knocking on the door, no answer.  Then what happens?

17   A.   I just heard a TV blaring, and so I walk in and

18   their garage door is right by the front door so I walk in, and

19   I look out the garage door and I see that the car is gone.  And

20   so I walk back toward the bedroom area.  I walk past the living

21   area, walked to the bedroom area.  And that's when I see

22   Lovetta.

23   Q.   Okay.  Now, you're standing at the bedroom door?

24   A.   Yes, sir.

25   Q.   And you're looking into the bedroom?

**69**

1     A.   Yes, sir.

2     Q.   And when you see Lovetta, are you on the phone with

3  the 911 operator?

4     A.   Yes, I am.

5     Q.   And are you trying to explain to her I guess what

6  you see and what's going on?

7     A.   Yes, sir.

8     Q.   Okay.  When you see Lovetta, are you startled?

9     A.   Yes, sir.

10    Q.   Okay.  Let me just real quickly --

11          MR. BEACH:  Your Honor.

12    Q.   (BY MR. HARRIS) I'm going to show you what's marked

13  as State's Exhibit Number 9.

14          MR. HARRIS:  And permission to publish?

15          THE COURT:  Yes.

16    Q.   (BY MR. HARRIS) Okay.  Now, that's a diagram of the

17  house at 34 -- 3844.  If you -- can you show the members of the

18  jury I guess exactly the -- what you did when you enter the

19  house?

20          THE COURT:  Ma'am, there's a pen or a stylus

21  right -- right there.  If you need to touch the screen, go --

22  go ahead, but you can use your finger just to demonstrate what

23  Heath is asking you.

24     A.   I came in through this way.

25    Q.   (BY MR. HARRIS) Uh-huh.

**70**

1     A.   And that's when I stopped, knocked on the door, and

2  then coming through the door because this part right here is

3  the door -- the actual door.  You come in and then there's the

4  garage door here.  And this is where I looked in the garage and

5  saw that the car was gone.  And then I walked real slowly down

6  this way.

7    Q.   Okay.  Now, when you say the car, what type of car

8  did she drive?

9     A.   A red PT Cruiser.

10    Q.   Okay.  And where -- just show me on there exactly --

11  let me get you to stop for a second and just show me on there

12  exactly where you would have been standing when you see the

13  vehicle.

14     A.   Right here.

15    Q.   Okay.  And approximately where is Lovetta?

16     A.   Wait a minute.

17    Q.   If you're looking into that bedroom.

18     A.   It's right here.  This is blocked off.  It's right

19  here.  This is the walkway into the bedroom.

20    Q.   Okay.  And where -- you're looking into the bedroom,

21  and where is she?

22     A.   She's right here.

23    Q.   Okay.  Okay.  Now --

24          MR. HARRIS:  You can go ahead and turn the

25  lights back on, Judge.

**71**

1     Q.   (BY MR. HARRIS) At some point -- at that point

2  you're on the phone with 911?

3     A.   Yes, sir.

4    Q.   And you're doing the best you can to -- I guess to

5  keep your composure and tell them what's going on?

6     A.   Yes, sir.

7    Q.   Do you stay in the house?

8     A.   Only for a brief minute.

9    Q.   Okay.  Now, as far as the 911 tape, you've heard

10  that tape, correct?

11     A.   Yes, sir.

12    Q.   And we actually transcribed the words from that

13  tape; is that correct?

14     A.   Yes, sir.

15    Q.   And you've seen that tape, correct?

16     A.   Yes, sir.

17    Q.   And I'm going to let you hear, with the Court's

18  permission, the 911 tape, and it's going to be State's Exhibit

19  Number 121.  I just want you to listen to this.

20          With the Court's permission, I'm going to hand

21  out these transcripts to the members of the jury.

22          Judge, can you turn the screen on?

23          (Exhibit played.)

24    Q.   (BY MR. HARRIS) Latasha, now, on that 911 tape, the

25  voices that we hear -- we obviously hear your voice on there

**72**

1  and you hear the 911 operator, correct?

2     A.   Yes, sir.

3    Q.   And then there's JT, being Jerome?

4     A.   Yes, sir.

5    Q.   The oldest?

6     A.   Yes, sir.

7    Q.   And we also hear Jerrett?

8     A.   Yes, sir.

9    Q.   Okay.  I'm going to ask you to look at these two

10  young men and tell us which one is JT.

11     A.   The one in the blue shirt.

12    Q.   Okay.  Which one is Jerrett?

13     A.   The one in the brown shirt.

14    Q.   And the voices, all the hollering and screaming that

15  we hear on this 911 tape, are these two guys; is that correct?

16     A.   Yes, sir.

17    Q.   Okay.  And at some point --

18          (Boys leave courtroom.)

19    Q.   (BY MR. HARRIS) You told the members of the jury

20  that you were actually at her bedroom door?

21     A.   Yes, sir.

22    Q.   And you could look off in that bedroom door?

23     A.   Yes, sir.

24    Q.   And you see Lovetta?

25     A.   Yes, sir.

73

1    Q. And I'm going to show you what's marked as State's
2  Exhibit Number 40. Is this what you see?
3    A. Yes, sir.
4    Q. Okay.
5       MR. HARRIS: Permission to publish, Judge?
6       THE COURT: We're going to take a break.
7       Ladies and gentlemen, we're going to break for
8  lunch. It's 11:45. Let's come back at 1 o'clock, okay? All
9  right.
10      THE BAILIFF: All rise.
11      (Jury excused from courtroom.)
12      THE COURT: Thanks. All right. The Court is in
13 recess until 1:00.
14      (Recess.)
15      THE BAILIFF: All rise.
16      (Jury returned to courtroom.)
17      THE COURT: Thank y'all. Please be seated.
18      Ladies and gentlemen of the jury, I apologize.
19 It's totally on me. I promised Elda I'd get her a Rangers
20 shirt. Who would ever thought you'd have trouble finding a
21 Rangers shirt. I went to five different places, and they
22 didn't have them, but I finally -- I finally got her a cloth
23 shirt that she wanted, so --
24      JUROR: You should have got one for us.
25      THE COURT: Probably should have.

74

1       All right. Please continue.
2    Q. (BY MR. HARRIS) Okay. Latasha, you're the same
3  Latasha Bradfield that was testifying earlier, correct?
4    A. Yes, sir.
5    Q. I think earlier we were listening to the 911 tape
6  that included JT. Go ahead and point out JT -- the taller --
7  taller kid who walked in earlier, right? And then Jerrett?
8  And that's little Jazzmen, right?
9    A. Yes, sir.
10   Q. Okay. And that's pretty much how they appeared back
11 in September of 2009?
12   A. Yes, sir.
13   Q. And then State's Exhibit Number 2 that I'm showing
14 you here is a photo of Lovetta; is that correct?
15   A. Yes, sir.
16   Q. Okay. Now, earlier I had just shown you a photo, I
17 guess, of one of the crime scene photos being State's Exhibit
18 Number 40, and I think you had just told the members of the
19 jury you're on the 911 -- when we cut off the 911 tape, you're
20 on the phone with the operator -- with the 911 operator and
21 you're standing in the door and this is basically what you see,
22 correct?
23   A. Yes, sir.
24      MR. HARRIS: Permission to publish, Your Honor?
25      THE COURT: You may.

75

1       (Exhibit published.)
2    Q. (BY MR. HARRIS) Now, as far as going into the
3  bedroom, did you ever go into the bedroom?
4    A. No, sir.
5    Q. All right. Did you make sure you didn't touch
6  anything?
7    A. Yes, sir.
8    Q. From where you were standing, could you tell whether
9  she was breathing?
10   A. I could tell she wasn't breathing.
11   Q. And, in fact, once you're observing her -- well,
12 let's just play the tape.
13      (Exhibit played.)
14   Q. (BY MR. HARRIS) Now, are you yelling to her?
15   A. Yes, sir.
16   Q. And there's no response?
17   A. No, sir.
18   Q. Okay. Now, at that point have you seen Jazzmen?
19   A. No, sir.
20   Q. Okay. So you don't go into that bedroom, right?
21   A. No, sir.
22   Q. And there's actually a bath -- you know there's a
23 bathroom in that master bedroom?
24   A. Yes, sir.
25   Q. And you're telling the members of the jury you never

76

1  go in there and see where Jazzmen is?
2    A. No, sir.
3    Q. Okay. After you get off the phone with the 911
4  operator, do you eventually hear the sirens?
5    A. Yes, sir.
6    Q. And do the paramedics finally arrive?
7    A. Yes, sir.
8    Q. And when they arrive, are the boys still at your
9  house?
10   A. Yes, sir.
11   Q. Okay. And once the paramedics arrive, what do they
12 do?
13   A. They walk inside Lovetta's home, and they come back
14 out.
15   Q. Okay.
16   A. They just walk in and come back out.
17   Q. Okay. At some point do they start treating the
18 boys?
19   A. Yes.
20   Q. And --
21   A. But I was asking them --
22   Q. Okay.
23   A. -- what was going on, why they weren't over there
24 helping her.
25   Q. Okay. Well, let's -- let's just focus on -- what I

77

1  want to know is at some point the paramedics start working with

2  the boys; is that correct?

3      A.   Yes, sir.

4      Q.   They actually take them to the ambulance.  Do you

5  remember?

6      A.   Say that again.

7      Q.   Do they take them to the ambulance?  Or they work on

8  them right there at your house?  Just if you remember.  That's

9  fine.

10     A.   I think they led them to the truck from my house.

11     Q.   Okay.  At some point does some of Lovetta's family

12  members arrive?

13     A.   Yes, sir.

14     Q.   And can you tell the members of the jury what

15  happens when the family members arrive?

16     A.   Her brother comes first, and he's hysterical.

17     Q.   Okay.  At this point is Lovetta and Jazzmen still in

18  the home?

19     A.   Yes, they are.

20     Q.   Okay.  The brother is hysterical.  At some point

21  does the mother arrive?

22     A.   Yes, she does.

23     Q.   And can you tell the jury what happens when -- when

24  the mother arrives?

25     A.   She's -- she parked like by my home, which is on the

78

1  left side of that house, so she was coming up and she lost her

2  footing -- I mean, she -- she fell down.

3      Q.   Okay.  Then what happens?

4      A.   The officers start to comfort her.

5      Q.   Okay.  And at some point did you -- I guess, when

6  the police arrive, did you at some point give them a statement

7  and tell them, I guess, pretty much the same thing you told the

8  members of this jury?

9      A.   Yes, sir.

10     Q.   Okay.

11          MR. HARRIS:  Judge, I'll pass the witness.

12                    CROSS-EXAMINATION

13  BY MR. JOHNSON:

14     Q.   Ms. Bradfield, my name is Paul Johnson.  I have just

15  a couple of questions for you.

16          You said that you had moved into that location

17  over there on -- in September of '07; is that correct?

18     A.   Yes, sir.

19     Q.   And you said that soon thereafter in October of '07

20  that Lovetta and Gary had moved in; is that right?

21     A.   Yes, sir.

22     Q.   And so they had lived there for a couple -- two or

23  three years before this incident occurred, correct?

24     A.   Yes, sir.

25     Q.   Okay.

79

1          MR. JOHNSON:  I believe that's all I have for

2  you right now, ma'am.  Thank you very much.

3          THE WITNESS:  You're welcome.

4          THE COURT:  Anything further?

5          Ma'am, you may retake your seat.

6          MR. HARRIS:  Judge, can this witness be excused?

7          THE COURT:  She may be.  It's her choice if she

8  wishes to remain in the courtroom or -- or be excused.

9          MR. JOHNSON:  Judge, I'm going to need her for

10  recall at a later time.

11          THE COURT:  You are going to need her?  Okay.

12          MR. JOHNSON:  Yes.

13          THE COURT:  Ma'am, just make sure that we've got

14  a way to get in touch with you in the event we need for you to

15  come back, okay?

16          THE WITNESS:  Yes, sir.

17          MR. BEACH:  Officer Jones.  This witness has

18  been sworn in, Judge.

19          THE COURT:  Sir, if you would.

20          MR. BEACH:  He already has.  Oh, I'm sorry.

21          THE COURT:  I -- I do it for every single

22  witness.

23          (Witness sworn.)

24          THE COURT:  Please have a seat.

25          THE WITNESS:  Thank you.

80

1                    JAMES JONES,

2  was called as a witness by the State, and after having been

3  first duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5  BY MR. BEACH:

6      Q.   State your name, please.

7      A.   James Jones.

8      Q.   And how long have you been a Dallas Police officer?

9      A.   For approximately five and a half years.

10     Q.   And back in September of last year, to what division

11  were you assigned, sir?

12     A.   South Central Division.

13     Q.   And what part of the City of Dallas does the South

14  Central Division patrol?

15     A.   It's basically between I-35 and I-45.

16     Q.   Now, Officer, I'm going to make -- want you to make

17  believe that somebody is in your face out there off of Polk,

18  and I want you to keep your voice up just a little bit.

19     A.   Okay.

20     Q.   I know you can.

21     A.   I can.

22     Q.   I need to make sure we hear what you have to say.

23  Directing your attention back to September 21st of last year,

24  about 9:20 p.m. that night, were you dispatched to a location

25  of 3844 Morning Springs Trail?

81

1    A.   Yes, sir, I was.

2    Q.   And is that a residence?

3    A.   It is.

4    Q.   And is that a residential neighborhood?

5    A.   It is.

6    Q.   And is 3844 Morning Springs Trail, is that in the

7  City of Dallas?

8    A.   Yes, sir.

9    Q.   And is that Dallas County?

10   A.   It is.

11   Q.   Is that Dallas County, Texas?

12   A.   It is.

13   Q.   What kind of call were you dispatched on, sir?

14   A.   We were dispatched to a cutting, slash, stabbing.

15   Q.   Now, I take it when you're dispatched to a call like

16 that, that your senses are heightened and you're alert to

17 what's going on at the scene?

18   A.   Very much so.

19   Q.   Were you by yourself that night?

20   A.   Yes, sir, I was.

21   Q.   When you get out to the location of 3844 Morning

22 Springs Trail, who was out at the location at that time?

23   A.   The Fire Department.  I believe there was an

24 ambulance and a fire truck.

25   Q.   So DFD is already out there; is that correct?

82

1    A.   Yes.

2    Q.   And are they inside the house or outside when you

3  get there?

4    A.   They were standing outside of the front door.

5    Q.   And do you have a brief conversation with them?

6    A.   I did.

7    Q.   By that time, have any other Dallas police officers

8  arrived?

9    A.   Yes, one other.

10   Q.   Who was that?

11   A.   Officer Adler.

12   Q.   And just walk us through, Officer, once you had the

13 brief conversation with DFD, where do you go at that time?

14   A.   Once I approached them at the front door, I entered

15 the house.  They told me that there were two victims inside.

16 Myself and Officer Adler entered the front door, immediately

17 passed the kitchen where we noticed a trash can was knocked

18 over.  The living room, the TV was still on.  We proceeded to

19 the back bedroom -- the master bedroom.  Officer Adler checked

20 the hall bathroom and another room.  I went in the master

21 bedroom and found the complainant lying in front of the

22 bathroom door and also a young child in the bathroom.

23   Q.   The adult female victim was on the bedroom floor; is

24 that correct?

25   A.   Yes, sir.

83

1    Q.   And the little girl was face down in the bathroom?

2    A.   Yes, she was.

3    Q.   Now, when you're going in like that, are you kind of

4  lollygagging inside or what -- do you have your gun drawn or

5  what are you doing in a situation like that?

6    A.   Yes, sir.  The two of us, myself and Officer Adler,

7  we both had our guns drawn not knowing if a suspect was still

8  there or what exactly the situation was inside the house.  So

9  the two of us had our guns drawn.  We searched the house pretty

10 much together, within the eyesight of one another, in case

11 there was a suspect there or in case something did happen.

12   Q.   In terms of attempting CPR or doing anything in

13 relation to the bodies, tell us what you did in that regard.

14   A.   After entering the house, DFD -- the Fire Department

15 told us that both victims were deceased.  And upon seeing the

16 adult female lying on the floor and the extent of her injuries,

17 I did not attempt CPR.  And seeing the child in the bathroom, I

18 did not attempt CPR based on the Fire Department's comments and

19 the scene at hand.

20   Q.   Now, just briefly, if you can, describe that

21 bathroom, what you saw when you looked in that bathroom.

22   A.   The bathroom was covered in blood.  The floor was

23 covered in blood from the back wall to the door of the

24 bathroom.  There was blood on the walls.  There was blood on

25 the sink, on the toilet.  The lid to the back of the toilet was

84

1  broken on the floor and covered in blood, also.

2    Q.   Once you make these observations, what do you and

3  Adler do at that point in time?

4    A.   Once we see that, we made sure the house was empty,

5  no -- no other victims or a suspect, no persons in the house.

6  We exited the house, had other patrol officers stand at the

7  front door to make sure no one else went in the house.  And

8  Adler and I proceeded to check all the doors and windows on the

9  outside of the house to see if there was forced entry.  We

10 checked the backyard to make sure there was nobody else there.

11   Q.   Did you and/or Adler find any signs of forced entry

12 around that house?

13   A.   No, no signs of forced entry whatsoever.

14   Q.   And the suspect was gone?

15   A.   Yes, sir.

16   Q.   Show you what's been admitted into evidence already

17 as State's Exhibit Number 9, Officer Jones, and if you could

18 just kind of just walk us through.  There's a pointer there

19 just in front of that Kleenex box.  You see it there.  Just

20 kind of trace your steps once you go inside the front door

21 after having your conversation with the Fire Department.

22   A.   Okay.  I had the first conversation with the Fire

23 Department here.  I proceeded inside the house.  I could see

24 the TV on over here.  I proceeded straight down.  Officer Adler

25 checked the living room area and also the kitchen.  And at

85

1  about this point near the bathroom, we both paused, looked in
2  the bathroom.  There's no one in the bathroom.  I stood here,
3  as Officer Adler checked this bedroom and this bedroom.  I
4  proceeded in the master bedroom and saw the first victim here.
5  I went to the corner to check for anyone in the closet or the
6  corner of the room on the side of the bed.  And then I went
7  back towards the restroom where I saw the second victim,
8  stopped maybe a foot or so inside the door.  And there's no one
9  in the restroom.  After that, I just proceeded back out the
10  same way I came in.
11      Q.    We're going to see some photographs now and just to
12  -- hopefully to highlight what you've just told us -- showing
13  you State's Exhibit Number 10.  First of all, is that a
14  photograph taken showing the outside of 3844 Morning Springs
15  Trail as you saw it that night?
16      A.    Yes, sir, it is.
17      Q.    And it's a three bedroom, two bath brick house; is
18  that correct?
19      A.    Yes.
20      Q.    Okay.  State's Exhibit Number 11, tell us what that
21  photograph is.
22      A.    That's a photograph of the walkway between the
23  living room and the kitchen, immediately inside of the front
24  door.
25      Q.    Okay.  Kitchen is on your left, living room is on

86

1  your right, is that correct?
2      A.    That's correct.
3      Q.    State's Exhibit Number 12, what does that depict?
4      A.    That is the kitchen trash can that was knocked over
5  on the floor inside of the kitchen.
6      Q.    Okay.  State's Exhibit Number 13, is that a scene of
7  the living room with the TV on, as you told us?
8      A.    Yes, it is.
9      Q.    And then State's Exhibit Number 14, what does that
10  depict?
11      A.    That is the master bedroom.
12      Q.    Okay.  And is the TV on also there in the master
13  bedroom as -- as depicted in that photograph?
14      A.    Yes, it is.
15      Q.    Can you just kind of point to the closet you would
16  of gone to see if there were any victims or suspects?
17      A.    It was around this direction.
18      Q.    Okay.
19      A.    I'm not sure if it was here.  I believe so.
20      Q.    Very good.  State's Exhibit Number 15, you see the
21  left arm extended of the adult female victim, as you would have
22  come in through the bedroom -- bedroom door?
23      A.    Yes, sir.
24      Q.    And is that how she appeared when you first saw her
25  that night?

87

1      A.    Yes, sir.
2      Q.    And there appears to be -- we'll talk about this
3  later, but there appears to be some kind of letter or
4  handwritten note on the bed; is that correct?
5      A.    That is correct.
6      Q.    Next.  That's State's Exhibit 16.  You can see the
7  right leg of the adult female down there in the bottom corner
8  of the photograph; is that correct?
9      A.    Yes, sir.
10      Q.    And you see the little girl tied up and bound laying
11  face down in the bathroom; is that correct?
12      A.    Yes, sir.
13      Q.    Do you see some of the gore that you've told us
14  about already, that you saw in the bathroom that night?
15      A.    Yes, sir.
16      Q.    State's Exhibit 17.  Again, this is the kitchen,
17  with the cabinets underneath the sink; is that correct?
18      A.    Yes, that's correct.
19      Q.    Blood running down them?
20      A.    Yes.
21      Q.    And State's Exhibit Number 18.  Again, can you point
22  to some of the pieces of the broken commode lid back there in
23  the upper right that you talked about?
24      A.    Yes, sir.  There's one -- there's also a piece here.
25      Q.    Thank you.  After the crime scene is secure in terms

88

1  of you and Adler and the other patrol officers making sure no
2  other suspects, no other victims, how do we get crime scene and
3  then homicide -- how do those folks end up getting dispatched
4  out there?
5      A.    I notified crime scene and the on-call homicide
6  detective once we exited the house and secured the backyard.
7      Q.    You been doing this five and a half years; is that
8  right?
9      A.    At least.
10      Q.    Had you been in -- had you ever been to anything
11  like you saw that night in your five and a half years with the
12  Dallas Police Department?
13      A.    I've been to several homicides, several
14  murder-suicides, but nothing as brutal or explicit as this, no.
15      Q.    Now, once you make the phone calls, what is yours
16  and the other patrol officers' job in regards to the perimeter
17  of 3844 Morning Springs Trail?
18      A.    Our responsibility then becomes to preserve the
19  crime scene.  We cordoned off the area around the house,
20  approximately one house on either side of the house, and make
21  sure that no one entered the house other than detectives or the
22  crime scene investigators.
23      Q.    And how do you -- how do you specifically cordon off
24  an area like that?
25      A.    With yellow police crime scene tape.

89

91

1    Q.   And other than authorized personnel, nobody gets
2    into that location until orders otherwise; is that correct?
3        A.   Correct.
4        Q.   I appreciate you coming down.
5        A.   Absolutely.
6            MR. JOHNSON:  I have no questions.
7            THE COURT:  Thank you very much.  May this
8    officer be excused?
9            MR. BEACH:  No objections.
10           THE COURT:  Sir, you are free to go.  Thank you.
11           THE WITNESS:  Thank you.
12           MR. BEACH:  The State will call Dr. Martinez out
13   of order for a scheduling problem, Judge.
14           THE COURT:  Okay.  Doctor, if you would.
15           (Witness brought forward and sworn.)
16           · THE COURT:  Please have a seat.
17           DR. JOSEPH MARTINEZ,
18   was called as a witness by the State, and after having been
19   first duly sworn, testified as follows:
20               DIRECT EXAMINATION
21   BY MR. BEACH:
22       Q.   Doctor, good afternoon.  Can you tell us what your
23   name is, please?
24       A.   Joseph N. Martinez.
25       Q.   And how are you employed?

90

1        A.   I'm an emergency medicine faculty at UT
2    Southwestern, and we provide the medical faculty coverage for
3    Parkland Memorial Hospital.
4        Q.   And back in the early morning hours of
5    September 22nd of 2009, were you on duty in the emergency room
6    of Parkland Hospital at that time?
7        A.   Yes, I was.
8        Q.   And just tell us briefly what are your day-to-day,
9    night-to-night responsibilities there in the ER when you're --
10   when you're assigned?
11       A.   Well, basically emergency medicine, is we provide
12   care for anyone who presents in the emergency room, whether
13   it's from the simplest thing to the most complicated,
14   life-threatening or nonlife-threatening.
15       Q.   And are you supervising interns at that --
16       A.   I am a teaching faculty, so that means I teach
17   physicians, student physicians -- well, not really student
18   physicians, but physicians who just graduated from medical
19   school and they're learning their skill in emergency medicine.
20   And that's interns, residents, yes.
21       Q.   And when a patient comes in the ER there at
22   Parkland, are medical records generated concerning that
23   patient's stay there at the hospital?
24       A.   Yes, sir.
25       Q.   Showing you what -- Doctor, what's already been

91

1    admitted into evidence as State's Exhibit Number 85.  Just
2    briefly just kind of peruse these records, and can you tell us,
3    do those appear to be the medical records pertaining to
4    Parkland's care and treatment of Gary Green back on
5    September 22nd of 2009?
6        A.   Yes, they are.
7        Q.   Thank you, sir.  The records reflect that the
8    Defendant, Gary Green, was admitted approximately 2:56 that
9    morning and was discharged around 7:04 a.m. that morning, there
10   about four hours.  Does that square with your recollection?
11       A.   That sounds correct.
12       Q.   Now, were you personally involved in the treatment
13   of the Defendant in this case, Gary Green?
14       A.   Yes, I was.
15       Q.   And do you see Mr. Green here in court today?
16       A.   I believe so.  The gentleman on the -- far to the
17   left.
18       Q.   Good sized fellow in the --
19       A.   Yes.
20       Q.   -- dark suit there --
21       A.   Yes.  Far to left --
22       Q.   -- at the end of the table?
23       A.   Far to my left.
24           MR. BEACH:  Let the record reflect, Your Honor,
25   the witness has identified the Defendant in open court.

92

1        Q.   (BY MR. BEACH)  Showing you State's Exhibits 86, 87,
2    88, 89, and 90.  Those State's exhibits fairly and accurately
3    represent the way Mr. Green presented to you and the other
4    staff out there at Parkland on September 22nd of 2009?
5        A.   Correct.  We initially -- I initially saw him in
6    what's called our Apprehension By Police Without Warrant room.
7    This is after he was moved to the trauma room.  I personally
8    was the one who identified the stab wounds on the back.
9        Q.   And we're going to go put these up on the Elmo, and
10   they'll show up to your left there on the TV screen.
11       A.   Okay.
12       Q.   Showing you State's 86.  This is just a frontal shot
13   of Mr. Green as he appeared there in the trauma unit.  Has it
14   come up?
15       A.   Yes.
16       Q.   Okay.  Is that what that reflects, sir?
17       A.   Yes.
18       Q.   Showing you State's 87.  Are these the two
19   superficial stab wounds of the left upper back of Mr. Green
20   that you identified and -- and were treated in the early
21   morning hours of September 22nd?
22       A.   Correct.
23       Q.   And did Mr. Green also have a number of cuts on his
24   right hand that were identified and noted in the medical
25   records, sir?

93

1  A.   That looks correct.

2  Q.   And also a small cut on his right forearm?

3  A.   The forearm.  There it is.  I probably miss -- I

4  didn't -- I don't remember that one.

5  Q.   You don't remember that?

6  A.   No.

7  Q.   All right.  Just -- we know you have scheduling

8  conflicts.  We really appreciate you coming down here.

9  A.   No problem.

10  Q.   He's there about four hours.  Tell us what you and

11  the other staff out there, what you were concerned about and

12  what treatment Mr. Green received in that four-hour time frame.

13  A.   The concern was an ingestion that he did of Tylenol

14  and Benadryl.  And that was -- from what I remember either

15  10:00 p.m. or around there, maybe before then, he took it.  The

16  concern initially was the overdose because that can kill

17  someone with especially Tylenol.  Benadryl can give some other

18  symptoms.  So that was our major concern.  That's why he stayed

19  there that long.  I identified the stab wounds in the back, so

20  he had a brief trauma consult.  We have a trauma service that

21  by protocol any kind of penetrating wounds to the chest, the --

22  they have to see the patient.  That's why you saw the picture

23  of the patient -- of him in the trauma room.

24        The main concern for us was the Tylenol because

25  it is a toxin that can affect you later on and you can be

94

1  asymptomatic -- in other words, have no symptoms at all.  So

2  the reason why he was there is that we wanted to recheck his

3  Tylenol level -- really his liver function test.  The Tylenol

4  will injure the liver and often when we're not sure up front,

5  we'll wait about four hours or so and then recheck the blood

6  level, make sure the liver is not having an injury.  If not,

7  then whatever the circumstance of the ingestion or the overdose

8  is -- is non-toxic and then he can go where -- he would be

9  discharged to wherever he needs to go.

10  Q.   And is it fair to say that you and the staff at

11  Parkland, you would have had to have been fully satisfied that

12  Mr. Green's lab results were within normal range before you

13  would have discharged him?

14  A.   Correct.  I mean, we -- we err on the side of over

15  treating this kind of problem because it's -- it's just not

16  worth it to miss an injury that is preventable.

17  Q.   In State's 85, just the complete body of the medical

18  records from Parkland, I want to represent to you that one of

19  the records states:  The patient via EMS and police custody.

20  Is that how you remember Mr. Green, he was -- he was in police

21  custody when you would of first seen him?

22  A.   We have an area -- the APAL room which is like a

23  seclusion room.  I don't remember who was at the door.  It was

24  either -- actually I do remember this.  It was a police officer

25  there because of the circumstance of why he was there, and

95

1  that's where the person was, was in the APAL room.

2  Q.   Patient report states taking 60 Tylenol and 60

3  Benadryl at approximately 2200 at night.  Patient reports this

4  is a suicide attempt after, quote, killing my wife.  Patient

5  reports he was stabbed with a kitchen knife to upper left back,

6  no active bleeding noted.

7        And when you observed Mr. Green there at

8  Parkland, did you -- did you notice any kind of active bleeding

9  from those superficial wounds?

10  A.   No.  In fact, that's why they were initially missed

11  up in triage.  They're missed there.  The bigger concern was

12  the ingestion, so being a thorough physician, they found the

13  wounds, and then that's where trauma got involved.

14  Q.   Page 6 of the medical records on the psychiatric

15  exam states:  His speech is normal.  His behavior is normal.

16  Cognition and memory are normal.  He exhibits a depressed mood.

17  He expresses suicidal ideation.  Does that square with your

18  recollection of talking to Mr. Green and treating him there at

19  Parkland?

20  A.   I mean, when I saw him, he was just a very -- just a

21  very calm person.  He just didn't tell me much.  He was

22  cooperative.  I didn't really -- I personally don't really ask

23  patients questions about any kind of legal issue.  I just

24  basically say, where are your injuries, how are you feeling.

25  And he was cooperative, alert -- I mean, he was completely with

96

1  it.

2  Q.   Doctor, I appreciate you coming down here.

3  A.   No problem.

4        THE COURT:  Cross?

5                CROSS-EXAMINATION

6  BY MR. JOHNSON:

7  Q.   Doctor, as part of the admittance process to the

8  emergency room there at Parkland, the Defendant was evaluated

9  and screened not only for actual physical injuries, but also

10  for mental health type of an examination, was he not?

11  A.   What happens first is the medical issues are taken

12  care of first.  Then afterwards, he is seen by a psychiatrist

13  for a psychiatric clearance.

14  Q.   And, in fact, in this particular situation the

15  Defendant was, in fact, screened for psychiatric issues and

16  conditions; is that correct?

17  A.   I -- I don't know.  I saw him before.  Generally if

18  someone is trying to harm themselves, we'll make sure that

19  whatever injury is nonlife-threatening, or if it is

20  life-threatening, we fix it.  Upon that -- medical issue is

21  taken care of, then he is transferred over to see a

22  psychiatrist, and I do not attend over there.

23  Q.   Okay.  Did you have an opportunity to go back and

24  review your records that you were questioned about earlier

25  today?

97

1    A.   Briefly looked at it, like at work the other day.

2        Q.   Were you able to tell or do -- when you looked at

3    them, did you recall there being a psychiatric evaluation done

4    at that time?

5        A.   I don't think so, and I believe that it might be how

6    the protocol goes.  When someone is under arrest, often they'll

7    be taken to the jail and they'll see a psychiatrist at the

8    jail.

9        Q.   Are you the custodian of those records that you were

10   shown earlier?

11       A.   Parkland Memorial Hospital is the custodian.

12       Q.   So you wouldn't be the one that actually know -- or

13   be familiar with the actual details in regards to the psych

14   screen that would have occurred at that time; is that correct?

15       A.   Depends on what level of psychiatric screening you

16   mean.  Emergency physician, we're able to handle a lot of

17   different problems.  He wasn't actively trying to harm himself

18   there.  So I'm not sure what level of psychiatric coverage -- I

19   mean, screening do you mean.

20           MR. JOHNSON:  May I approach, Your Honor?

21           THE COURT:  Yeah.

22       Q.   (BY MR. JOHNSON) This appear to be the same records

23   that the prosecutor just showed you, at Parkland?

24       A.   This is jail health.

25       Q.   Okay.  This is jail --

98

1        A.   This is -- this is the jail screen.

2        Q.   Okay.  So this is not the record that --

3        A.   This is not the record that I was shown.

4        Q.   Okay.  This is not the one you saw before you came

5    down to testify today?

6        A.   The one that he has is the record -- is the proper

7    record.

8        Q.   Okay.  That's all I needed -- that's all I needed to

9    know.

10       A.   The first few pages, from what I've seen, is not

11   what -- is not part of -- under my supervision.  That is not

12   the Parkland record I was a part of.

13           MR. JOHNSON:  That's all the questions I have at

14   this time.

15           MR. BEACH:  May he be excused?

16           THE COURT:  You may.  Thank you, Doctor.

17           THE WITNESS:  No problem.

18           THE COURT:  If you would raise your right hand.

19           (Witness brought forward and sworn.)

20           THE COURT:  Please have a seat.

21           MR. HARRIS:  May I proceed, Judge?

22           THE COURT:  Yes.

23           MR. HARRIS:  Thank you, sir.

24               JEROME ARMSTEAD,

25   was called as a witness by the State, and after having been

99

1    first duly sworn, testified as follows:

2                  DIRECT EXAMINATION

3    BY MR. HARRIS:

4        Q.   Okay.  Go ahead and state your name for the record.

5        A.   My name is Jerome Armstead, but you can call me JT.

6        Q.   What's your friends and everybody call you, JT?

7        A.   Yes, sir.

8        Q.   What's your family call you, JT?

9        A.   Yes, sir.

10       Q.   All right.  So I'm going to call you JT.

11       A.   Yes, sir.

12       Q.   All right.  Now, as far as coming in here to testify

13   today, I think you were down here yesterday, remember?

14       A.   Yes, sir.

15       Q.   And we talked about you testifying and basically

16   telling this good Judge and the ladies and gentlemen on this

17   jury exactly what happened the night that your mom and your

18   sister was killed, okay?  All right?

19       A.   Yes, sir.

20       Q.   All right.  Are you prepared to do that?

21       A.   Yes, sir.

22       Q.   All right.  And I mean, how old are you now?

23       A.   Thirteen.

24       Q.   All right.  So you're 13, and this happened when you

25   were 12?

100

1        A.   Yes, sir.

2        Q.   Back in September of 2009, correct?

3        A.   Yes, sir.

4        Q.   And just to get over the formality, you understand

5    the difference between the truth and a lie, correct?

6        A.   Yes, sir.

7        Q.   And you understand you're here to tell the members

8    of the jury the truth about what happened, correct?

9        A.   Yes, sir.

10       Q.   All right.  Let's -- let's just go ahead and tell

11   the members of the jury back in -- let's just talk about

12   September of 2009.  Were you in school then?

13       A.   Yes, sir.

14       Q.   Where were you going to school at?

15       A.   I was going to Atwell Elementary.

16       Q.   Atwell Elementary?

17       A.   Well, it's an elementary and a middle school type

18   thing.

19       Q.   And let me tell you, JT, your voice is a little --

20   now I know your voice ain't soft because we've -- we've been

21   talking, right?

22       A.   Yes, sir.

23       Q.   All right.  So go ahead and speak up and -- because

24   I want to make sure that the court reporter and these -- the

25   men and women on this jury can hear everything you've got to

1  say. Can you do that for me?

2  A.   Yes, sir.

3  Q.   All right. So you're over there at Atwell?

4  A.   Yes, sir.

5  Q.   And what grade you in over there?

6  A.   Seventh.

7  Q.   Okay. And did your mom actually, I guess, sub at

8  Atwell, too?

9  A.   Yes, sir.

10  Q.   And was she subbing at Atwell back in September of

11  2009?

12  A.   Yes, sir.

13  Q.   Okay. Who else was in your family?

14  A.   My little brother and my little sister and Gary.

15  Q.   Okay. Well, let me just ask you this. Where did

16  y'all live in September of 2009?

17  A.   3844 Morning Springs Trail.

18  Q.   Okay. Is that over in what we call Oak Cliff?

19  A.   Yes, sir.

20  Q.   Okay. You act like you were trying to smile.

21  Again, you lived at that 3844 Morning Trail. Who all lived

22  there, September of 2009?

23  A.   Me, my little brother, my little sister, Gary, and

24  Ruthie stayed with us for a while.

25  Q.   Now who?

---

102

1  A.   Ruthie.

2  Q.   Ruthie? Okay. Ruthie is a friend of the family?

3  A.   She's my grandmother.

4  Q.   Oh, okay. Let me also ask you -- well, let's go

5  ahead and get this out of the way. You said -- you keep saying

6  Gary. Do you see Gary in the courtroom?

7  A.   Yes, sir.

8  Q.   All right. Can you just point him out and just

9  describe an article of clothing he's wearing?

10  A.   He's right over there beside the young man with the

11  pin-striped shirt. He's wearing a blue and silverish tie, a

12  black suit and glasses, with a white --

13  Q.   This is the person you're referring to as Gary?

14  A.   Yes, sir.

15  Q.   This is Gary Green?

16  A.   Yes, sir.

17  Q.   It would have been your stepdad back in 2009 --

18  September of 2009?

19  A.   Yes, sir.

20  Q.   All right. Now, what's your little brother name

21  again?

22  A.   My little brother's name is Jerrett Armstead.

23  Q.   And he came in the court with you a little earlier,

24  right?

25  A.   Yes, sir.

---

103

1  Q.   Okay. And as far as in September of 2009, what

2  grade was he in, do you remember?

3  A.   No, sir.

4  Q.   Okay. Let's just get right to that day. Do you

5  remember September the 21st of 2009?

6  A.   Yes, sir.

7  Q.   Hard -- hard to forget, huh?

8  A.   Yes, sir.

9  Q.   Okay. Let's talk about -- did you go to school that

10  day?

11  A.   Yes, sir.

12  Q.   Did Jerrett go to school that day?

13  A.   No, sir.

14  Q.   Why Jerrett didn't go to school that day?

15  A.   He got in trouble.

16  Q.   Okay. So where was Jerrett?

17  A.   He was at the house.

18  Q.   By his self?

19  A.   No, with Gary.

20  Q.   Okay. While he's at the house with Gary, anything

21  happen?

22  A.   No, sir.

23  Q.   At some point you get out of school; how do you get

24  home that day?

25  A.   I ride the bus.

---

104

1  Q.   You get home. Is your mom and Jazzmen there?

2  A.   No, sir.

3  Q.   Where are they, do you know?

4  A.   No, sir.

5  Q.   Okay. At some point does your mom come home?

6  A.   Yes, sir.

7  Q.   Is Jazzmen with her?

8  A.   Yes, sir.

9  Q.   Now, on that particular Monday -- that was a Monday

10  night, right?

11  A.   Yes, sir.

12  Q.   Monday, y'all go to --

13  A.   DIOP.

14  Q.   DIOP. Now, what is DIOP?

15  A.   Disciples in Ongoing Preparation.

16  Q.   And that's at a church?

17  A.   Friendship West.

18  Q.   What's the name of the church?

19  A.   Friendship West.

20  Q.   Okay. Who is your pastor over there at Friendship

21  West?

22  A.   Freddie Haynes.

23  Q.   You like going to Friendship West?

24  A.   Yes, sir.

25  Q.   Okay. And tell the members of the jury a little bit

105

```
1    about that DIOP program.  What do y'all do at DIOP?
2        A.   In DIOP we have different lessons relating to
3    teenagers about like everything that's going on in everyday
4    life because, you know, there's a big kid church and there's a
5    kids' church and sometimes we don't understand what they're
6    talking about towards y'all.  So DIOP was like something that
7    would help us out understanding what they were saying to y'all,
8    but it related to us.
9        Q.   Okay.  Let me show you what's marked as State's
10   Exhibit Number 126.  That look like Friendship West?
11       A.   Yes, sir.
12       Q.   Okay.  125, is that the front part of Friendship
13   West?
14       A.   Yes, sir.
15       Q.   Okay.  124, is that just a different angle of
16   Friendship West?
17       A.   That would be the back of Friendship West.
18       Q.   The back of Friendship West Baptist Church?
19       A.   Yes, sir.
20       Q.   And can you tell if that's -- State's Exhibit 123 is
21   an aerial of Friendship West Baptist Church?
22       A.   Yes, sir.
23       Q.   And then State's Exhibit Number 122 is actually an
24   aerial that has Friendship West here and where you live at 3844
25   Morning Springs Trail up here?
```

106

```
1        A.   Yes, sir.
2        Q.   All right.  Going from your house, how would y'all
3    normally go to the church?
4        A.   I really can't remember.
5        Q.   You don't remember?
6        A.   No, sir.
7        Q.   Okay.  Was it -- safe to say -- let me show you
8    this -- this aerial.  And if you live here and the church is
9    here, you are familiar with Polk Street?
10       A.   Yes, sir.
11       Q.   All right.  Did y'all sometime go down Polk Street
12   to get to the church?
13       A.   Yes, sir.
14       Q.   All right.  Or you could take 67, correct?
15       A.   Yes, sir.
16       Q.   Okay.  Well, which way would y'all normally go?
17   Would y'all go this way over here to 67, or would y'all take
18   Polk?
19       A.   We would usually take 67.
20       Q.   Okay.  But it's -- it's a -- how long did it take
21   you to get from the church to your house?
22       A.   Not very long, probably about five to ten minutes.
23       Q.   Okay.  And as far as this -- I guess Friendship
24   West, when y'all go to that church, it's a pretty big church,
25   isn't it?
```

```
1        A.   Yes, sir.
2        Q.   And when you go to the DIOP class, which one of
3    these doors would -- would you normally enter on a Monday
4    evening to go to your class at the church?
5        A.   It's not that one.  It's like -- if you go to the
6    side, there's going to be a gate.  And then you drive into the
7    parking lot and there's a side door and we go in through that
8    door.
9        Q.   Okay.  So if this is the -- let me show you -- if
10   this is the front of the church -- is that the front of the
11   church?
12       A.   Yes, sir.
13       Q.   Okay.  Would you go in this entrance here?
14       A.   No, sir.
15       Q.   Okay.  So you see this would be the side of the
16   church, right?
17       A.   Yes, sir.
18       Q.   Is that the door that you would go in?
19       A.   Yes, sir.
20       Q.   Okay.  So if that -- would be this door here?
21       A.   Yes, sir.
22       Q.   Correct?  Is that correct?
23       A.   Yes, sir.
24       Q.   Okay.  Now, at some point during that afternoon,
25   your mom would have dropped you and Jerrett at the church?
```

108

```
1        A.   Yes, sir.
2        Q.   Who else would have been with her when she dropped
3    you off?
4        A.   My little sister.
5        Q.   Okay.  And about what time would that have been?
6        A.   7:30.
7        Q.   So was it -- are you sure it was 7:30?
8        A.   Like 7 o'clock -- never mind.  7 o'clock, because
9    that's what time DIOP starts.
10       Q.   Okay.  About what time do y'all get out of DIOP?
11       A.   8:30.
12       Q.   So your mom and your sister dropped you off?
13       A.   Yes, sir.
14       Q.   Who ends up picking you up?
15       A.   My mom and my little sister.
16       Q.   No, who picks you up?
17       A.   Oh, my mom.
18       Q.   On -- I'm talking about on Monday, September the
19   21st of 2009.
20       A.   Oh, Gary.
21       Q.   Okay.  Now, after your mom drops you off, would that
22   have been the last time you spoke to your mom?
23       A.   Yes, sir.
24       Q.   Would that have been the last time you seen your mom
25   alive that day?
```

109

1    A.    Yes, sir.

2    Q.    Let's talk about what happens when Gary picks you

3  up.  Now, when y'all get out of DIOP, does Gary actually come

4  into the building to pick y'all up or does he stay out in the

5  car?

6    A.    He comes into the building and sits on the bench by

7  the door.

8    Q.    Okay.  So as soon as you go into this door here,

9  there is -- when you go -- when you enter into here, there's a

10  seat -- a sitting area?

11    A.    Yes, sir.

12    Q.    And he's sitting in that area?

13    A.    Yes, sir.

14    Q.    Can you tell the members of the jury if you remember

15  what he was wearing?

16    A.    He was wearing a black dress shirt, some black

17  slacks, and some black dress shoes.

18    Q.    Do you remember him having on a tie?

19    A.    No, sir.

20    Q.    You don't remember that?

21    A.    No, sir.

22    Q.    Okay.  But he's dressed in all black?

23    A.    Yes, sir.

24    Q.    When Gary comes to pick you and Jerrett up, are you

25  surprised to see him?

110

1    A.    Yes, sir.

2    Q.    And why is that?

3    A.    Because he usually never picked us up.

4    Q.    Who would normally pick you up?

5    A.    My mom.

6    Q.    Okay.  That's from church, right?

7    A.    Yes, sir.

8    Q.    At some point y'all start going back to your house;

9  is that correct?

10    A.    Yes, sir.

11    Q.    Do you ask Gary where your mom is?

12    A.    No, sir.

13    Q.    Do you know where your mom is?

14    A.    Yes, sir.

15    Q.    Where is she?

16    A.    He says they were -- my mom was out clubbing with

17  her friend Shante and that my little sister was over my Granny

18  Margarita's house.

19    Q.    Okay.  That's what he tells y'all when y'all are

20  leaving the church?

21    A.    Yes, sir.

22    Q.    After you leave the church, where do y'all go?

23    A.    To our house.

24    Q.    When you get to your house, tell the members of the

25  jury what -- what happens.

111

1    A.    When we get to our house, we stop at the garage and

2  it was raining so Gary send me to the garage to open it.  And

3  then he went and he said he was about to call our mom to see if

4  she wanted us to get dropped off at our granny house.  And then

5  he come back a few minutes later and said that she said no.  So

6  we parked the car in the garage, and then he told me that I

7  needed to go take a bath because my mom said I was ripe.

8    Q.    Okay.  Let me -- let me ask you.  When you -- when

9  he -- when you see him at the church, anything unusual about

10  how he's acting?

11    A.    No, sir.

12    Q.    When y'all drive from the church back to your house,

13  anything unusual about the way he's acting?

14    A.    He was smiling, and he was asking us what happened

15  at church, like what did we talk about in DIOP and stuff.

16    Q.    Okay.  And I guess once y'all get back to the house,

17  after he's asked you about what you learned at this Disciple

18  program, is there -- is there anything unusual about the way

19  he's acting?

20    A.    No, sir.

21    Q.    Anything that causes you to have any type of pause?

22    A.    No, sir.

23    Q.    Okay.  So he tells you to take a shower or to take a

24  bath?

25    A.    Yes, sir.

112

1    Q.    Because your mom said you were ripe?

2    A.    Yes, sir.

3    Q.    And when you say ripe, you mean a little musty,

4  right?

5    A.    Yes, sir.

6    Q.    Like little boys sometimes get, right?

7    A.    Yes, sir.

8    Q.    Okay.  And do you do that?

9    A.    Yes, sir.

10    Q.    Okay.  So you go to take a bath; is that correct?

11    A.    Yes, sir.

12    Q.    And you take a bath or you take a shower?

13    A.    A bath.

14    Q.    Now, most little boys try to take showers, but you

15  sure you take a bath?

16    A.    Yes, sir.

17    Q.    So you go in and start running your water, right?

18    A.    Yes, sir.

19    Q.    And where is Jerrett while you're doing all that?

20    A.    In our room.

21    Q.    So Jerrett goes to your room, and you go to take a

22  bath?

23    A.    Yes, sir.

24    Q.    Okay.  Now, remember we talked about how you can

25  touch that screen?

113

1   A.   Yes, sir.

2   Q.   And the arrows come up, remember that?

3   A.   Yes, sir.

4   Q.   Let me fold that down a little bit for you.  Yeah.

5   And we're going to get real fancy today.  We're going to use

6   the pointer rather than your finger, okay?

7          THE COURT:  Hold on, hold on.

8          MR. HARRIS:  That won't go up?  Okay.

9          THE COURT:  That thing is really sensitive --

10          MR. HARRIS:  Okay, Judge.

11          THE COURT:  And Becky will have your head.

12          MR. HARRIS:  We won't touch it, Judge.

13   Q.   (BY MR. HARRIS)  Okay.  What I want you to do is

14   show the members of the jury, first of all, which restroom you

15   take a bath in.

16   A.   (Witness so indicates.)

17   Q.   So you're in there running the water, and which room

18   is Jerrett in?

19   A.   (Witness so indicates.)

20   Q.   Okay.  So that particular room would be the room

21   that you and Jerrett slept in, right?

22   A.   Yes, sir.

23   Q.   And the other room next to that would have been

24   Jazzmen's bedroom?

25   A.   Yes, sir.

114

1   Q.   And then your mother had the master bedroom,

2   correct?

3   A.   Yes, sir.

4   Q.   Okay.  Now, at some point you're in taking a bath.

5   Then what happens?

6   A.   The next thing I know my little brother is screaming

7   my name, talking about JT, JT, help, he's trying to kill me.

8   So I took my clothes and I ran out of the bathroom.  And then I

9   stopped at the door and then Gary was holding Jerrett by his

10   collar and bringing him to the restroom with me.

11   Q.   Okay.  Now, does he -- when he's screaming JT, JT,

12   help, he's trying to kill me, is he doing it as calmly as you

13   did just then?

14   A.   No, sir.

15   Q.   Okay.  So he's screaming for his big brother?

16   A.   Screaming and crying.

17   Q.   Okay.  And the next thing you know, they're at the

18   bathroom door.  And then what happens?

19   A.   And then he throws Jerrett up against the toilet,

20   and then I jump back up in the bathtub.  And then he comes in

21   and sits on the counter and locks the bathroom door.

22   Q.   Okay.  Let me stop you there.  So you hear your

23   brother screaming for you?

24   A.   Yes, sir.

25   Q.   Saying he's trying to kill me?

115

1   A.   Yes, sir.

2   Q.   When you peep out the bathroom door, there your

3   brother and Gary Green is.  And then Gary forces him into the

4   bathroom where you are?

5   A.   Yes, sir.

6   Q.   And once he forces him into the bathroom, he throws

7   him onto the toilet?

8   A.   When he throws him in, Jerrett goes into the toilet.

9   Q.   Okay.  Goes into the toilet.  You jump back in the

10   bath?

11   A.   Yes, sir.

12   Q.   Now, when all this goes down, do you have your

13   clothes on?

14   A.   No, sir.

15   Q.   Okay.  So you're naked at this point?

16   A.   Yes, sir.

17   Q.   Okay.  And I mean, do you know what's going on?

18   A.   No, sir.

19   Q.   Tell the members of the jury what happens after he

20   throws Jerrett into the -- the toilet.

21   A.   When he throws Jerrett into the toilet, he's asking

22   us like questions like now give me some reasons why I shouldn't

23   kill y'all.  And then my little brother is doing all the

24   talking because I'm scared and I don't know what to say.  So my

25   little brother is telling him we're too young to die and we --

116

1   yes, we do respect you and all this stuff.  And Gary asked me a

2   question, and I didn't answer.  And my little brother starts

3   talking, so he stabbed Jerrett in the stomach and told him to

4   shut up.

5   Q.   Okay.  Let me stop you there.  Now, this whole time,

6   again, you're -- you're standing back in the tub, right?

7   A.   Yes, sir.

8   Q.   And Jerrett is over by the commode?

9   A.   Yes, sir.

10   Q.   And this Defendant is standing there by the counter?

11   A.   Yes, sir.

12   Q.   Now, you said that he stabbed him.  What did he stab

13   him with?

14   A.   He had three knives.  There was one skinny one, one

15   medium sized one, and one that was like -- it was kind of like

16   a butter knife, but it was like really sharp.

17   Q.   Okay.  What makes you think he had three knives?

18   A.   Because he sat them on the counter.

19   Q.   You saw him sit three knives on the counter?

20   A.   Yes, sir.

21   Q.   And at some point he grabs one of the knives and

22   stabs your brother?

23   A.   Yes, sir.

24   Q.   Okay.  Then what happens?

25   A.   And then after he stabs my brother, I push him off

117

1  my little brother. And he goes up with the knife like that, to
2  try and cut me, but he missed.
3      Q.   Okay.  So he doesn't cut you?
4      A.   No, sir.
5      Q.   When that happens, what is -- what is Jerrett doing?
6      A.   Jerrett is holding his stomach, and then he's crying
7  and trying to move out of the way.
8      Q.   Okay.  Then what happens?
9      A.   And then after that, Gary was like, come on, I got
10 to show y'all something.  And then --
11     Q.   Okay.  Let me stop you there.  Now, I think you told
12 the members of the jury that your little brother is telling
13 this Defendant that y'all are too young to die?
14     A.   Yes, sir.
15     Q.   Plead -- pleading for y'all's life?
16     A.   Yes, sir.
17     Q.   And you're -- at that point you're shocked?
18     A.   Yes, sir.
19     Q.   And you're not saying anything?
20     A.   No, sir.
21     Q.   And did you -- you -- you said that Gary asked
22 y'all -- tell y'all -- tell him why y'all shouldn't die?
23     A.   He said give us some reasons.
24     Q.   What did he say?
25     A.   He said give me some reasons why I shouldn't kill

118

1  y'all.
2      Q.   Okay.  And at that point is -- is Jerrett basically
3  giving him those reasons?
4      A.   Just blurting out reasons.
5      Q.   Okay.  At some point he decides not to kill you,
6  right?
7      A.   Yes, sir.
8      Q.   Does he actually tell you, I'm not going to kill
9  you?
10     A.   Yes, sir.
11     Q.   All right.  Then what happened?
12     A.   And then when my little brother -- when he said
13 that, I got to show y'all something, my little brother walks
14 out and he tells me to put on some clothes.  So I put on my
15 boxers and my shorts and then I walk behind my little brother.
16     Q.   Let me stop you there.  Let me ask you.  Now, up to
17 this point, do you know where your mother is?
18     A.   No, sir.
19     Q.   Up to this point, do you know where your sister is?
20     A.   No, sir.
21     Q.   Okay.  So up to this point, all you know is that he
22 stabbed your -- your little brother?
23     A.   Yes, sir.
24     Q.   And -- and -- and basically tried to kill both of
25 y'all?

119

1      A.   Yes, sir.
2      Q.   But now he's told you that he's going to let y'all
3  live, and he wants to show you something?
4      A.   Yes, sir.
5      Q.   Well, why -- why don't you run?
6      A.   He's a really big dude.
7      Q.   Okay.
8      A.   And then our door has like -- like four locks on it,
9  and it wouldn't have -- it would have took a real long time
10 because we're under pressure, so kind of shaking our hands, and
11 then it would have been pretty hard to get it unlocked fast
12 enough to get out the door.
13     Q.   Okay.  So at some point he says, I've got to show
14 y'all something, what -- and then what happens?
15     A.   My little brother walks out.  He tells me to put on
16 some clothes, so I put on my boxers and my shorts.  When my
17 little brother is about to walk about the door, Gary takes the
18 knife and put it up to Jerrett's neck and start kind of like
19 trying to screw it in.  And then my little brother ducks down
20 and he backs up and then he gets back against the toilet.  And
21 then he just kind of sat there.  And then Gary was like, all
22 right, come on.  So the second time when we walked out, we made
23 it to my mom's room.
24     Q.   Okay.  Show us on the -- the diagram where y'all
25 would have walked to.

120

1      A.   (Witness so indicates.)
2      Q.   Now, do y'all actually go inside the room?
3      A.   Yes, sir.
4      Q.   Once you get to the room, tell the members of the
5  jury what you see.
6      A.   When we get to the room -- when Gary takes the knife
7  to unlock the door, when we see our mom's body, we just like
8  fall on our knees and start crying.  And we were screaming and
9  yelling.  And next Gary was asking Jerrett to get him some
10 clothes, and then he just starts --
11     Q.   Okay.  Let me stop you there.  Now, y'all getting to
12 the door of your mother's bedroom?
13     A.   Yes, sir.
14     Q.   Is that door open or closed?
15     A.   It's closed.
16     Q.   Is it locked or unlocked?
17     A.   Locked.
18     Q.   Who unlocks the door?
19     A.   Gary.
20     Q.   Then he opens the door, and you see -- you and your
21 brother see your mom where?
22     A.   On the floor.
23     Q.   Okay.  When you see your mom on the floor, does she
24 appear to be breathing?
25     A.   No, sir.

121

```
1         Q.   Did you see any blood?
2         A.   Yes, sir.
3         Q.   So once you and your brother see your mom, I think
4    you told the members of the jury that you just fall to your
5    knees and start crying?
6         A.   Yes, sir.
7         Q.   What does this Defendant do?
8         A.   He's just like -- just sitting there looking at us,
9    and then he tells my little brother to grab him some clothes
10   while he's ripping off his dress shirt and taking off his pants
11   and stuff.
12        Q.   Okay.  And where is he doing that at?  Is he in the
13   room?
14        A.   Yes, sir.
15        Q.   Okay.  Does your brother get up and -- and get him
16   some clothes?
17        A.   Yes, sir.
18        Q.   And while he's doing that, what are you doing?
19        A.   Still looking at my mom.
20        Q.   At this point do you have any idea where your sister
21   is?
22        A.   No, sir.
23        Q.   Then what happens?
24        A.   Then we start -- when I got up, me and my little
25   brother walked towards the bathroom, and then when we looked in
```

122

```
1    the bathroom, my little sister was against the tub with her
2    hands taped behind her back.
3         Q.   Okay.  Why do y'all -- why do y'all walk toward the
4    bathroom?
5         A.   Because we knew if our mom was there, our sister had
6    to be there.
7         Q.   Okay.  And when you looked in that bathroom, tell
8    the members of the jury -- that you said your sister had her
9    hands behind her back?
10        A.   They were taped behind her back.
11        Q.   Taped with what, could you tell?
12        A.   The little gray tape.
13        Q.   Duct tape?
14        A.   Yes, sir.
15        Q.   What about her feet?
16        A.   No, sir.
17        Q.   You couldn't tell?
18        A.   No, sir.
19        Q.   Was -- did you see blood there?
20        A.   Yes, sir.  It was all over the bathroom.
21        Q.   Okay.  And when you see your -- your baby sister,
22   does she appear to be breathing?
23        A.   No, sir.
24        Q.   Okay.  After you see your baby sister on the floor,
25   duct tape, blood all over the bathroom, what happens next?
```

123

```
1         A.   Then Gary asked me to hand him these pills that were
2    up in the dresser.
3         Q.   Okay.  Let me stop you there.  Do you have to go
4    into the bathroom where your little sister is or --
5         A.   Yes, sir.
6         Q.   -- or -- what dresser do you go to?
7         A.   The middle one where all the medicine is.
8         Q.   In the bathroom?
9         A.   Yes, sir.
10        Q.   So why do you go into the bathroom to get the pills?
11        A.   Because that's where all our medicine and stuff was
12   at.
13        Q.   Does he tell you to go into the bathroom to get the
14   pills?
15        A.   He just tells me to get the pills, and I knew that's
16   where they was at.
17        Q.   So he makes you go into the bathroom where your
18   little sister is on the floor with all that blood?
19        A.   Yes, sir.
20        Q.   And was it a bottle of pills?  What was it?  Do you
21   remember?
22        A.   The little tablets where you can like pop them out,
23   the aluminum.
24        Q.   Okay.  And while he's giving all these orders, where
25   is he?
```

124

```
1         A.   Putting on his clothes -- the new clothes that he
2    told Jerrett to get him.
3         Q.   I mean, is he standing up in the bedroom?  Is he
4    sitting on the bed?  What is he doing, do you know?
5         A.   He's standing up.
6         Q.   Standing up just giving you and Jerrett orders?
7         A.   Yes, sir.
8         Q.   You get the pills or you give them to him?
9         A.   I give them to him.
10        Q.   Does he still have the knives at that point?
11        A.   No, sir.
12        Q.   Then what happens?
13        A.   He throws my mom's cell phone on the bed and says:
14   After I leave, call the police.  And then he starts walking
15   towards the door, and then I was --
16        Q.   All right.  Let me stop you there because I want to
17   make sure -- now, from the master bedroom -- now, that master
18   bedroom, you got the bathroom about right here, right, in that
19   corner?
20        A.   Yes, sir.
21        Q.   Look at me.  Right?  If your mom's bed is here,
22   right?
23        A.   Yes, sir.
24        Q.   Then you got -- you got -- that master bathroom is
25   here, right?
```

125

1    A.    Yes, sir.

2    Q.    Okay. Now, when you first are looking -- let's say

3    this is your -- your -- the door to your mom's bedroom. When

4    you look into that door, y'all go ahead and come into the room,

5    right? Right?

6    A.    Yes, sir.

7    Q.    And both y'all just collapse to your knees because

8    you're crying because your mom is on the floor?

9    A.    Yes, sir.

10   Q.    All right. At some point y'all come down and you're

11   looking into the bathroom?

12   A.    Yes, sir.

13   Q.    And you see your baby sister on the floor?

14   A.    Yes, sir.

15   Q.    Okay. Then he makes you go into the bathroom?

16   A.    Yes, sir.

17   Q.    When you go into the bathroom, do you have to step

18   over your -- over your mom?

19   A.    Yes, sir.

20   Q.    So you step -- because your mom is right there near

21   the bathroom door, right?

22   A.    Yes, sir.

23   Q.    So you have to step over your mom, walk right by

24   your sister to get this medicine?

25   A.    Yes, sir.

126

1    Q.    To get these pills?

2    A.    Yes, sir.

3    Q.    And then you come back across your sister, across

4    your mom, to give the pills to this Defendant; is that correct?

5    A.    Yes, sir.

6    Q.    I mean, is there blood on the floor?

7    A.    Yes, sir.

8    Q.    Do you have to step through your mom and your

9    sister's blood?

10   A.    Yes, sir.

11   Q.    So you give him the pills, he takes the cell phone,

12   throws it on the bed, and tells you what?

13   A.    To call the police after he leaves.

14   Q.    Okay. Then what happens?

15   A.    Then when he was walking towards the door, I started

16   to dial the numbers. And he turns around and he sees me, and

17   he says, I said after I leave, JT. And then I was like, oh, my

18   bad. And then when he walks out the door, we followed him.

19   And then he's in the car. And then he says: You know how I

20   told y'all to say, see you later, never bye?

21   Q.    Okay. Slow down. You're going too fast. As he's

22   getting ready to go, he tells y'all, you know, I tell you, see

23   you later?

24   A.    Never bye.

25   Q.    And never bye. What does that mean?

127

1    A.    See you later -- say see you later and never bye,

2    means like -- bye means you're never going to see somebody

3    again. And see you later means you're going the see them. It

4    might not be today or the next day, but you're still going to

5    see them again.

6    Q.    Okay. So what exactly does he tell y'all?

7    A.    He says: You know how I told y'all to say, see you

8    later and never bye? And then he said, pauses for a minute,

9    and he says, well, this is good-bye. And then Jerrett starts

10   crying even more, and then he drives off with the car.

11   Q.    All right. Let me take you back to when y'all first

12   go into that bedroom and you see your mom. You realize that

13   your mom and your sister are -- are dead?

14   A.    Yes.

15   Q.    Or appear to be dead, correct?

16   A.    Yes, sir.

17   Q.    Did he tell you he had killed them?

18   A.    Yes, sir.

19   Q.    Okay. Do you remember him saying something about he

20   loved your mom?

21   A.    Yes, sir.

22   Q.    What exactly did he tell y'all?

23   A.    He said he loved our mom to death.

24   Q.    Before he left the house and before y'all left that

25   bedroom where your mom and sister lie dead, did he make y'all

128

1    give him a hug?

2    A.    Yes, sir.

3    Q.    Once he leaves, do you call 911?

4    A.    Yes, sir.

5    Q.    And while you're calling 911, tell the members of

6    the jury what's going on.

7    A.    When I called 911, we ran over to our next-door

8    neighbor, Ms. Tasha's house, because my little brother was hurt

9    and I didn't know what to do. So we're banging on her door,

10   and then when she opens the door and we were like, our mom and

11   our sister are dead. She was like, y'all don't need to be

12   playing like that. We was like, no, seriously, they're dead.

13   So she was like, are you serious? And then she -- we were

14   talking to the police, so she grabbed the phone and then she

15   starts walking over to our house. And then from there she was

16   talking to the police and we were up in the house. And her

17   daughter was cleaning up my brother's stab wound.

18   Q.    At some point the paramedics arrive?

19   A.    Yes, sir.

20   Q.    The police arrive?

21   A.    Yes, sir.

22   Q.    Do they, I guess, take y'all off in the ambulance?

23   A.    Yes, sir.

24   Q.    Does your brother get treated for his wounds?

25   A.    Yes, sir.

129

1    Q.   Okay.  Were you there when your -- your grandmother
2    made it there?
3    A.   No, sir.
4    Q.   What about your uncle?
5    A.   Yes, sir.
6    Q.   You were there when your uncle made it?
7    A.   Yes, sir.
8    Q.   Okay.  Do you remember the last thing your mother
9    said to you?
10   A.   Huh-uh, no, sir.
11   Q.   Okay.  You just remember that she left both of y'all
12   at church?
13   A.   Yes, sir.
14   Q.   Okay.
15        MR. HARRIS:  I'll pass the witness, Judge.
16        THE COURT:  Cross?
17              CROSS-EXAMINATION
18   BY MR. JOHNSON:
19   Q.   JT, do you remember what kind of pills it was that
20   Gary had told you to go get for him?
21   A.   No, sir.
22   Q.   Did he tell you what he wanted the pills for?
23   A.   No, sir.
24   Q.   Did he tell you that he was going to take the pills
25   and kill himself?

130

1    A.   No, sir.
2    Q.   Did he ever tell you that he was going to kill
3    himself?
4    A.   Yes, sir.
5    Q.   When did he tell you that?
6    A.   When he was driving off.
7    Q.   I'm sorry?
8    A.   When he was driving off.
9    Q.   When he was driving home?
10   A.   When he was driving off.
11   Q.   He never told you that inside the house?
12   A.   No, sir.
13   Q.   What kind of pills did he tell you to get?
14   A.   I can't remember the name.
15   Q.   And when he was leaving, he told you that this time
16   he was saying good-bye which meant y'all would never see him
17   again?
18   A.   Yes, sir.
19   Q.   What did you take that to mean?
20   A.   That he was going to go kill himself.
21   Q.   JT, that's all the questions I have for you right
22   now, sir.  Thank you.
23        THE WITNESS:  Thank you.
24        THE COURT:  Anything else?
25        MR. HARRIS:  Nothing else.  Nothing further,

131

1    Judge.
2        THE COURT:  Thanks, JT.
3        THE WITNESS:  You're welcome.
4        THE COURT:  Ladies and gentlemen, we're going to
5    take a quick break.
6        THE BAILIFF:  All rise.
7        (Jury excused from courtroom.)
8        THE COURT:  Okay.  We're ready.  Everyone can
9    stay seated.
10       (Recess.)
11       THE BAILIFF:  All rise.
12       THE COURT:  Everybody can stay seated.
13       (Jury returned to courtroom.)
14       THE COURT:  Everyone stay seated.  Just
15   everybody sit down.  We're fine.  We're breaking protocol.
16   Everyone is staying seated, changing it up on you.
17       It got cold in here.
18       All right.  Raise your right hand, if you would.
19       (Witness sworn.)
20       THE WITNESS:  I promise to tell the truth, the
21   whole truth, but nothing but the truth.
22       THE COURT:  Very good.  Your witness.
23            JERRETT ARMSTEAD,
24   was called as a witness by the State, and after having been
25   first duly sworn, testified as follows:

132

1              DIRECT EXAMINATION
2    BY MR. BEACH:
3    Q.   What's your name?
4    A.   Jerrett Armstead.
5    Q.   And, Jerrett, what day were you born?
6    A.   June 2nd, 2000.
7    Q.   So now you are a whole big, what, ten years old?
8    A.   Yes.
9    Q.   Okay.  Where are you going to school right now?
10   A.   Alexander.
11   Q.   And you had a great day last Friday, didn't you?
12   Remember Friday?
13   A.   Yes, sir.
14   Q.   What happened that was so good last Friday?
15   A.   I finally got out the Summit.
16   Q.   Now, your Grand Daddy West, he's figured out
17   whipping you doesn't do much good; is that right?
18   A.   Yes.
19   Q.   When he takes those video games away, that gets your
20   attention, doesn't it?
21   A.   Yes.
22   Q.   And last Friday you got out of alternative school,
23   you got your games back, right?
24   A.   Yes.
25   Q.   So what's the lesson you learned from all that?

133

1      A.   That I need to start being good.

2      Q.   That a boy.  Okay.  We know who your mom was and

3  your sister, and we just heard from JT.  You got a lot of

4  family here in court today, don't you?

5      A.   Yes.

6      Q.   Okay.  And they're here to support you.  Back in

7  2009, you were living out there on Morning Springs with your

8  mom and your brother and your sister and Gary Green; is that

9  right?

10     A.   Yes.

11     Q.   You've seen Gary here in court today, and it's hard

12  for you to see Gary, isn't it?

13     A.   Yes.

14     Q.   Is he the man there at the end of the counsel table

15  in the navy blue suit?

16     A.   Yes.

17     Q.   And Gary lived with you and your mom and your

18  brother and your sister off and on for a little over two years;

19  is that right?

20     A.   Yes.

21     Q.   And actually near the end there, Gary and your mom

22  got married there in the house?

23     A.   Yes, sir.

24     Q.   Were you there when they got married?

25     A.   Yes, sir.

134

1      Q.   Fact of the matter is, Jerrett, it's hard for you

2  because you loved Gary, didn't you?

3      A.   Yes.

4      Q.   Gary was nice to you from time to time, wasn't he?

5      A.   Yes.

6      Q.   Really, you didn't really have a dad around, did

7  you?

8      A.   No.

9      Q.   And that's what makes this so much harder because

10  you kind of trusted him and you did love him, didn't you?

11     A.   Yes.

12     Q.   Now, let's just go right to that day, Jerrett.  Get

13  through this as fast as we can.  You had to -- you had to stay

14  home from school that day; is that right?

15     A.   Yes, sir.

16     Q.   Because you had been bad at school, right?

17     A.   Yes.

18     Q.   And Gary -- Gary was in the house that Monday,

19  wasn't he?

20     A.   Yes.

21     Q.   Now, did Gary like --

22         MR. JOHNSON:  Excuse me, Judge.  I'm going to

23  have to ask that this be done in question and answer, just a

24  little bit too much leading here.

25         MR. BEACH:  Well, I can get to -- one more --

135

1  just one more quick question.

2         THE COURT:  One more leading question.

3         MR. BEACH:  Thank you.

4      Q.   (BY MR. BEACH)  Did Gary like to play video games

5  there at the house?

6      A.   Yes.

7      Q.   Now, that Monday, Jerrett, before you and your

8  brother were taken to DIOP at the church, did anything really

9  unusual happen that day?

10     A.   No, sir.

11     Q.   Okay.  Just kind of a normal Monday where you were

12  in trouble at school and you stayed home and waited for your

13  brother and sister and mom to get home?

14     A.   Yes, sir.

15     Q.   Now, we've heard about DIOP.  You would have been in

16  what grade back in 2009 -- third grade or second grade?

17     A.   Fourth.

18     Q.   You were in fourth grade then.  Okay.  So you were

19  in the fourth grade.  How many people were in the DIOP class

20  there?

21     A.   A lot.

22     Q.   Okay.  What kinds of things were you learning, do

23  you remember?

24     A.   About God, like why he died for our sins.

25     Q.   And you and your brother, you didn't just go there

136

1  Monday night, you -- you took some other classes there at the

2  church; is that right?

3      A.   Yes.

4      Q.   What kinds of other activities did you and your

5  brother do at the church?

6      A.   Karate.

7      Q.   Okay.  And when you and your brother normally were

8  at the church, whether it was Monday night or Tuesday or

9  Wednesday, would your mom go and work at the day care there at

10  the church?

11     A.   Yes.

12     Q.   We've also heard -- what other kind of jobs did your

13  mom have?

14     A.   Working at my school and working at Atwell.

15     Q.   Okay.  Substitute teacher?

16     A.   Yes.

17     Q.   Now, do you remember, Jerrett, what time you were

18  supposed to be at the church for DIOP?

19     A.   8:30.

20     Q.   Now, what time did it start?  Do you remember?

21     A.   No, sir.

22     Q.   Okay.  But it was sometime after your mom got home

23  from work and she would take you and your brother to church; is

24  that correct?

25     A.   Yes.

137

1  Q.   And we've seen a photograph of where the church was

2  in relation to where your house was.  Do you remember how that

3  night, how your mom -- I guess if you were paying attention,

4  how you all would have gotten to church that night, what road

5  you would have taken?

6  A.   Yes.

7  Q.   Where did you go?

8  A.   On the side where the -- where the freeway is.

9  Q.   Okay.  That's the door that you would have gone in?

10  A.   Yes, where the bench was.

11  Q.   And what time did DIOP normally end that night?  Is

12  that about 8:30?

13  A.   Yes.

14  Q.   And usually when DIOP was over, who would pick you

15  up?

16  A.   My mom.

17  Q.   She wasn't working, would she pick you up anyway,

18  usually?

19  A.   Yes.

20  Q.   Now, who did -- who actually picked you up that

21  night?

22  A.   Gary.

23  Q.   And you remember what kind of clothes Gary had on

24  when he came and picked you up at church that Monday night?

25  A.   Yes.

138

1  Q.   What did he have on?

2  A.   All black.

3  Q.   Kind of like his church clothes, almost?

4  A.   Yes.

5  Q.   And on the ride home, he was in your mom's Cruiser;

6  is that correct?

7  A.   Yes.

8  Q.   On the ride home that night, did anything unusual

9  happen one way or the other in the car on the ride home?

10  A.   No.

11  Q.   Did you think Gary was acting pretty normal on the

12  ride home?

13  A.   Yes.

14  Q.   Now, when you got back to the house, had Gary told

15  you where your mom was and where your sister was?

16  A.   He told us while we was in the car.

17  Q.   Okay.  And what -- what -- first of all, where did

18  he tell you your mom was?

19  A.   At the club.

20  Q.   And where did he tell you that Jazzmen was?

21  A.   With my granny.

22  Q.   So when you got back to the house that night, you

23  thought it was just going to be you and JT and Gary for a

24  while; is that correct?

25  A.   Yes.

139

1  Q.   And once you got inside, where did -- where did Gary

2  park the PT Cruiser?

3  A.   In the garage.

4  Q.   Once you got inside, where did -- what did Gary tell

5  JT to do?

6  A.   Take his bath.

7  Q.   Okay.  And what did he tell you to do and where did

8  you go once you got inside the house?

9  A.   Went to my room and changed -- changed out of my

10  clothes and put on my sleeping clothes.

11  Q.   Okay.  And as you were -- as you went back to your

12  bedroom, were you actually able to change out of your --

13  A.   Yes.

14  Q.   -- clothes?

15  A.   Yes.

16  Q.   So you had your sleeping clothes on?

17  A.   Yes.

18  Q.   After you put your sleeping clothes on, did Gary

19  call you?

20  A.   Yes.

21  Q.   And where was Gary when he called you to come and

22  see him?

23  A.   Walking to -- walking -- walking to my -- he was in

24  front of my door.

25  Q.   And did you follow Gary?

140

1  A.   Yes.

2  Q.   Where did you follow him to?

3  A.   In the kitchen.

4  Q.   Just tell the members of the jury, what -- what did

5  Gary do to you once you got to the kitchen?

6  A.   He -- he talked about me.  He talked to me about

7  school, and then -- then he said that -- then I explained to

8  him what happened.

9  Q.   Okay.  And that's why he was talking to you about

10  why you got in trouble at school?

11  A.   Yes.

12  Q.   And after you explained to him what happened, what

13  happened after that?

14  A.   He grabbed -- grabbed me by my -- my -- like this to

15  where I couldn't breathe, and then I -- then he slid down on

16  the counter and then kept moving his hand yelling for my

17  brother and then he stabbed me.

18  Q.   Where did he stab you?

19  A.   On -- close to my side.

20  Q.   And could you actually feel the knife going in?

21  A.   No.

22  Q.   You told me it kind of tickled or something,

23  didn't -- didn't you?

24  A.   Yes.

25  Q.   Is that what it felt like?



141

```
1     A.   Yes.
2     Q.   Now, at some point in time did he bring the knife up
3   to your neck area?
4     A.   Yes.
5     Q.   When was that?
6     A.   When we was going to -- to the restroom.
7     Q.   And what did you feel on your neck at that time?
8     A.   He -- he was trying to slice my neck.
9     Q.   And what side of the knife was against your skin?
10    A.   Right here.
11    Q.   Okay.  Did he have the sharp side or the dull side
12  against --
13    A.   The dull side.
14    Q.   And that saved your life, don't you think?
15    A.   Yes.
16    Q.   What were you screaming then when you got a chance?
17  What were you hollering once Gary stabbed you and he tried to
18  cut your -- cut your neck?
19    A.   Well, we were in the kitchen, and I kept -- he was
20  -- when he slid down, I kept moving his hand, yelling for JT.
21  I said -- I said, JT, JT, help, help.  And then JT didn't -- JT
22  must have didn't know what I meant.  Then I said -- then I
23  moved his hand again and I said, JT, help, he trying to kill
24  me.  And then my brother came out of the restroom.
25    Q.   And were you trying to break free from Gary or get
```

142

```
1   away from him?
2     A.   Yes.
3     Q.   He's bigger than you, obviously, right?
4     A.   Yes.
5     Q.   But you didn't have any -- you didn't have any duct
6   tape on you, did you?
7     A.   No.
8     Q.   You didn't have any duct tape on your mouth or your
9   hands or your feet, so you were able to move around and try to
10  get away from him; is that right?
11    A.   Yes.
12    Q.   And did you end up back in your bathroom where JT
13  was taking a bath?
14    A.   Yes.
15    Q.   What happened once you got back to the bathroom?
16    A.   I got pushed into the restroom, and then I almost
17  hit the toilet.  And then he tried to slice my neck again.
18    Q.   In the bathroom there?
19    A.   (Nods head.)
20    Q.   At some point in time, Jerrett, was Gary asking you,
21  give me some reasons why I shouldn't kill you?  Do you remember
22  him asking you that?
23    A.   Yes.
24    Q.   And were you doing most of the talking, little guy?
25    A.   Yes.
```

143

```
1     Q.   And JT, your bigger brother, was just kind of in the
2   shower just -- he couldn't talk at all, could he?
3     A.   Yes.
4     Q.   Now, you're very soft spoken right now.  Try to keep
5   your voice up a little bit.
6              What kind of reasons were you trying to give
7   Gary that -- that night in the bathroom that -- you know,
8   you're nine years old, what were you trying to convince Gary as
9   to why he shouldn't kill you?
10    A.   Told him because we're too little to die and we
11  won't tell anybody about it.
12    Q.   Did you ever tell him that you did love him there in
13  the bathroom?
14    A.   Yes.
15    Q.   And for some reason, whatever you told him there,
16  Gary stopped trying to cut you; is that right?
17    A.   Yes -- no.
18    Q.   He try one more time?
19    A.   (Nods head up and down.)
20    Q.   Where did -- did he get you one more time?
21    A.   No, he didn't get me.
22    Q.   He tried to cut JT?
23    A.   No, he tried to cut me.  When we was walking to my
24  mom's room, he pushed my neck, and -- but it didn't work.
25    Q.   Okay.  At some point in time he stopped trying to
```

144

```
1   cut you; is that right?
2     A.   Yes.
3     Q.   He took you back to your mom's bedroom?
4     A.   (Nods head up and down.)
5     Q.   Is that right?
6     A.   Yes.
7     Q.   What did you see when you got back to your mom's
8   bedroom?
9     A.   Our mom -- our mom's body and my -- and our
10  sister's.
11    Q.   Did Gary change clothes back there in the bedroom?
12    A.   Yes.
13    Q.   And did you actually -- did you help him find some
14  clothes or get some clothes for him?
15    A.   No.
16    Q.   He got his own clothes?
17    A.   (Nods head.)
18    Q.   Do you remember what clothes he put on?
19    A.   Yes.
20    Q.   What did he put on?
21    A.   Some of the clothes -- one of his outfits -- one of
22  his clothes that he would wear all the time, a white -- a white
23  shirt and an orange -- with orange pants.
24    Q.   Okay.  Now --
25    A.   Orange shorts.
```

145

1    Q.   Kind of checkered orange shorts?

2         Now, why did Gary tell you that he had to kill

3    your mom?  Why did Gary tell you he had killed your mom?

4    A.   Because she was fixing to divorce him and he -- and

5    he said he loved her to death and he didn't want her to

6    divorce -- he didn't want her to divorce him.

7    Q.   Did he say anything about why he killed Jazzmen?

8    A.   Yes.

9    Q.   What did he tell you about that?

10   A.   Well, he didn't say nothing.  We thought that

11   because he killed Jazzmen, that because he -- that Jazzmen was

12   going to tell it.

13   Q.   She was a witness?

14   A.   Yes.

15   Q.   And that's what you thought?

16   A.   But that's what my brother know.

17   Q.   Did Gary -- eventually after he changed his clothes,

18   did Gary leave the house that night?

19   A.   Yes.

20   Q.   What did he tell you to do with regards to calling

21   the police once he left the house?

22   A.   He said call the police and then he said -- then he

23   said, y'all know when I tell y'all -- he said, y'all know --

24   y'all know when I tell y'all to never say good-bye, and we

25   said, yes.  And he then he said, well, this is a good-bye, and

146

1    then I started crying again because I loved him to death.

2    Q.   And when he told you that -- when Gary told you

3    that, you took that to mean that he was leaving for good?

4    A.   Yes.

5    Q.   And he said something about trying to kill himself?

6    A.   Yes.

7    Q.   And did Gary finally drive off in your mom's car?

8    A.   Yes.

9    Q.   At this time, Jerrett, your mom there and your

10   sister there and just the emotion of everything that happened

11   to you, did you really know that you were hurt at that point in

12   time?

13   A.   Yes.

14   Q.   What -- what -- what was going on with your stomach

15   at that time?

16   A.   It started hurting, and then my blood just started

17   getting worser and worser.

18   Q.   And did you and JT then take the phone and

19   eventually did you go next door and knock on Tasha's door?

20   A.   Yes.

21   Q.   The jury has heard all about what happened over

22   there and they've heard you on the 911 call.  Did they take you

23   to the hospital eventually once the ambulance got out there?

24   A.   Yes.

25   Q.   And they did surgery on you out there at Children's;

147

1    is that correct?

2    A.   Yes.

3    Q.   Now, can you step down for just a second, and we'll

4    be done, okay?

5         (Witness leaves the stand.)

6    Q.   (BY MR. BEACH)  Just come right here.  Now, you're a

7    little flat bellied fellow, so you shouldn't be embarrassed.

8    Can you pull your shirt up and show the jury where your scar is

9    from the stab wound?

10   A.   (Witness complies)

11   Q.   And they went in and did surgery and made sure you

12   were okay; is that correct?

13   A.   Yes.

14   Q.   Do you have any kind of scars from your neck where

15   he was trying to hurt you on your neck?  Right there?

16   A.   Yes.

17   Q.   Why do you think it was the dull side and not the

18   sharp side?

19   A.   Because he was -- he was sticking his -- we were on

20   the ground and he was reaching up his hand to get a knife and

21   he thought that he was -- get the sharp side, but he got the

22   dull side.

23   Q.   Thank you for coming down here.  I appreciate you

24   coming down.  I appreciate you being strong.

25   A.   You're welcome.

148

1         MR. JOHNSON:  We have no questions, Your Honor.

2         THE COURT:  All right.  Thank you very much for

3    coming down.

4         THE WITNESS:  You're welcome.

5         THE COURT:  We'll see you later.

6         (Witness brought forward and sworn.)

7         THE WITNESS:  Yes, sir, I do.

8         THE COURT:  Please have a seat.

9         JASON GINDRATT,

10   was called as a witness by the State, and after having been

11   first duly sworn, testified as follows:

12        DIRECT EXAMINATION

13   BY MR. BEACH:

14   Q.   Tell us your name, please.

15   A.   My name is Detective Jason Gindratt with the Dallas

16   Police Department.

17   Q.   Back on September 21st of 2009, what were your daily

18   responsibilities and duties?

19   A.   At the time I was a detective in the Crime Scene

20   Section.  That basically included us going out to crime scenes

21   of offenses and processing the scene, whether it be taking

22   pictures or collecting evidence.

23   Q.   And were you dispatched to a location about 9:40

24   that night, 3844 Morning Springs Trail?

25   A.   Yes.

149

1    Q.   And were you working alone that night, or did you

2    have a partner?

3    A.   That night Detective Will Vick responded out there

4    with me.  We pretty much took care of the scene together.

5    Q.   Now, when you -- just walk us through very briefly

6    when you get out to a crime scene like that and by the time you

7    get out there, you know it's a homicide; is that correct?

8    A.   Yes, sir.

9    Q.   What is your -- just procedure in terms of how you

10   conduct your investigation once you get to a crime scene like

11   that?

12   A.   Well, when we get there, we basically make sure that

13   the scene is secured.  At the time the homicide detectives had

14   already been out there, so we basically walked the scene with

15   them after it's been secured, see -- see what's there, see just

16   the over -- overall look at the scene, and see what evidence,

17   if any, needs to be collected.

18   Q.   And at some point in time was there a decision made

19   to go ahead and get a search warrant before you went back and

20   fully conducted your investigation?

21   A.   Yes.

22   Q.   So did you pull back outside the house and wait for

23   the search warrant --

24   A.   Yes, we --

25   Q.   -- to arrive?

150

1    A.   Yes, we did.

2    Q.   And after about 1 o'clock in the morning of

3    September 22nd, then did y'all go back inside and start your

4    actual investigation?

5    A.   Yes.

6    Q.   So you're looking for evidence; is that correct?

7    A.   Yes.

8    Q.   Looking for instrumentalities of the crime?

9    A.   Yes.

10   Q.   And once you make your full search of the house,

11   then what's the next step in terms of your investigation?

12   A.   Once we do the initial walk-through, we -- like you

13   said, we identify any particular instruments or evidence.  We

14   basically -- then we go back through and take photographs.  And

15   after we take the overall photographs, we go back through and

16   mark all pieces of evidence that we plan to collect.  Then we

17   go back through and take photographs again of all those that

18   we've marked for collection.

19   Q.   And you, at our request, generated the crime scene

20   diagram in that case; is that correct?

21   A.   Yes.  We also took a -- after that, we go back

22   through the walk-through, I do a general drawing of the layout.

23   And then after that, we go back through and pick up all the

24   evidence.

25   Q.   Now --

1    MR. BEACH:  Judge.

2    Q.   (BY MR. BEACH)  The jury has seen the diagram

3    previously, Detective.  It's not to scale; is that correct?

4    A.   Yes, that's correct.

5    Q.   And -- but it does fairly and accurately just

6    represent the layout of the house out there on Morning Trail

7    Springs?

8    A.   Yes, it does.

9    Q.   Where the dining room was, the kitchen, the living

10   room, both bathrooms, and the master bedrooms; is that correct?

11   A.   That's correct.

12   Q.   And on the diagram, State's Exhibit 9, you have a

13   number of items listed out to the left side in terms of what

14   evidence was collected out there at the scene.

15   A.   That is correct.

16   Q.   Is it fair to say a number of knives and knife

17   blades and knife handles were collected out there at the scene?

18   A.   Yes.

19   Q.   All right.  You told us you took some photographs;

20   is that correct?

21   A.   That is correct.

22   Q.   Is it fair to say you took, in a situation like

23   this, a lot of photographs?

24   A.   I took a lot of photographs of that scene.

25   Q.   We've got it culled down to State's Exhibits 20

152

1    through 62, approximately, if my math is anywhere close --

2    about 43 exhibits.  You took more than 43 photographs; is that

3    right?

4    A.   Yes.

5    MR. BEACH:  Could we have the lights, Judge?

6    Q.   (BY MR. BEACH)  I'm showing you State's Exhibit 20.

7    Again, this is a -- just a look at the outside of the front of

8    3844 Morning Springs Trail?

9    A.   Yes, it is.

10   Q.   Again, for the record, that location at 3844 Morning

11   Springs Trail, that's located in the City of Dallas, Dallas

12   County, Texas?

13   A.   Yes, it is.

14   Q.   Okay.  As you go in the front door in State's

15   Exhibit 21, just to the right of the front door, what door do

16   we see?

17   A.   That is the door leading to the garage.

18   Q.   So front door immediately to your right as you walk

19   is the door to the garage?

20   A.   Yes.

21   Q.   Just point there, the garage door.  No, you can

22   point on the screen there.  You've got a little pointer there

23   or your finger, either one.

24   A.   Okay.

25   Q.   That goes into the garage; is that correct?

153

1   A.   Yes.

2   Q.   Next.  Is that a view inside the garage there at

3   3844 Morning Springs Trail?

4   A.   Yes, it is.

5   Q.   That's looking from the door you just pointed to?

6   A.   Yes.

7   Q.   Okay.  State's 23 is a photograph of the kitchen?

8   A.   Yes.

9   Q.   State's 24 is a photograph of a garbage can knocked

10   over; is that correct?

11   A.   Yes, it is.

12   Q.   What do we see here in State's 25?

13   A.   We see a knife block with several knives in it, and

14   several knives missing.  That was on the counter of the

15   kitchen.

16   Q.   Okay.  Next.  From the top now do we actually see at

17   least three or four slots of knives missing from that -- from

18   that butcher block?

19   A.   Yes, we do.

20   Q.   State's 27, another photograph of the kitchen; is

21   that correct?

22   A.   Yes.

23   Q.   State's 28 is a photograph of the inside of one of

24   the kitchen drawers?

25   A.   Yes.

154

1   Q.   The various knives and -- is that correct?

2   A.   Yes, sir.

3   Q.   All right.  What do we see in State's 29?

4   A.   We see a knife that was located on the kitchen

5   counter.

6   Q.   You've got that yellow cone with five on it.  What

7   is the significance of that?

8   A.   That identifies it as the fifth item that we're

9   marking.

10   Q.   And on -- just a second.  On the -- again, on the

11   left side of your crime scene diagram, you have 25 items, so

12   that knife there would be Item Number 5 on your crime scene

13   diagram?

14   A.   Yes, it would.

15   Q.   Next.  Another knife there underneath the microwave;

16   is that correct?

17   A.   Yes.

18   Q.   And that's Item Number 6?

19   A.   Yes, sir.

20   Q.   Next.  Now, we have a view looking -- basically

21   again the front door, kitchen on the left, living room on the

22   right, down the hall leading to the bedrooms; is that correct?

23   A.   That's correct.

24   Q.   Okay.  And State's 32 shows the TV on; is that

25   right?

1   A.   Yes.

2   Q.   I don't mean to be silly, but the police wouldn't

3   have turned that on when they went out there?

4   A.   No.

5   Q.   You're photographing it just as it would have been

6   just as the police officer would have gone in there?

7   A.   Yes, sir.

8   Q.   Next.  Under one of the couch cushions you found

9   another knife; is that correct?

10   A.   Yes.

11   Q.   And that's your Item Number 8?

12   A.   Yes, sir.

13   Q.   Next.  This is a view from the boys' bedroom.  They

14   got bunk beds in there; is that correct?

15   A.   Yes.

16   Q.   Looking across the hall into their bathroom; is that

17   right?

18   A.   Yes.

19   Q.   In the boys' bathroom, you have Item 24.  That's a

20   broken off knife; is that correct?

21   A.   Yes.

22   Q.   Blood spot on the shower curtain there in the boys'

23   bathroom?

24   A.   Yes.

25   Q.   Just another scene of the bathroom as it -- as it

156

1   appeared to you with clothes and socks and things like that on

2   the floor?

3   A.   Yes, sir.

4   Q.   State's 33; is that right?  38.  Piece of knife

5   blade that was broken off; is that correct?

6   A.   Yes.

7   Q.   Now we go back to the hallway, and could you just

8   point again with that pointer the door leading into the boys'

9   bathroom?

10   A.   This door right here.

11   Q.   Okay.  And at the end of the hall there, that's

12   going to be the wall that's part of the little girl's bedroom;

13   is that correct?

14   A.   Right here, yes, sir.

15   Q.   And that last door on the left, that leads into the

16   master bedroom?

17   A.   Yes, sir, right here.

18   Q.   Next.  As you first come around that corner of the

19   door and make that left-hand turn, we see a number of item

20   markers in that photograph; is that correct?

21   A.   Yes, sir.

22   Q.   And that's State's what?

23        MR. HEALY:  41.

24   Q.   (BY MR. BEACH)  That's State's Exhibit Number 41?

25        On the bed just from this distance is readily

157

1 apparent right in the middle of the bed, looks like some pieces
2 of paper; is that correct?
3     A.   That's correct.
4     Q.   That's going to be your Item Number 11?
5     A.   Yes.
6     Q.   And that turned out to be a handwritten letter; is
7 that correct?
8     A.   Yes.
9     Q.   Next.  This is a close-up of the handwritten letter,
10 your Item Number 11, and in this trial State's Exhibit
11 Number -- State's Exhibit Number 7; is that correct?
12    A.   Yes, sir.
13    Q.   And that appears to be a bloodstain on -- on the
14 letter?
15    A.   Yes.
16    Q.   And that was pretty much found right in the middle
17 of the bed in the master bedroom?
18    A.   Yes, sir.
19    Q.   Next.  State's 43, what's the significance of that
20 photograph?
21    A.   That's Item Number 13, and right there to the left
22 of the sign is another knife and a knife blade, so I believe I
23 had another angle of that.
24    Q.   State's 44 shows the knife -- the knife blade that
25 you just described?

158

1     A.   Yes, sir.
2     Q.   That's going to be your item exhibit or Item Number
3 13?
4     A.   Yes.  Yes, sir.
5     Q.   Next.  Looking at State's 45, is this a view someone
6 would have had from that bed in the master bedroom into the
7 master bath?
8     A.   Yes.
9     Q.   And if you were on that bed looking through the door
10 of the bathroom, you would have that very view?
11    A.   Yes.
12    Q.   Next.  State's 46 depicts just the condition -- part
13 of the condition of that master bathroom?
14    A.   Yes.
15    Q.   How would you describe -- just in general,
16 Detective, how would you describe this scene in that bathroom?
17    A.   I would describe it as very bloody.  Blood was
18 smeared everywhere.  There were several items that we found
19 that were used during the offense, as well, so it -- it was
20 basically part of -- definitely part of the main offense where
21 that occurred at.
22    Q.   And that little girl is laying there in the floor;
23 is that right?
24    A.   Yes, sir, that is her on the side of the bathtub on
25 the floor.

159

1     Q.   Next.  State's 47, another view of the little girl
2 laying face down in the floor; is that correct?
3     A.   Yes, sir.
4     Q.   Does she appear to be laying on top of some kind of
5 clothing?
6     A.   Yes.
7     Q.   Do you remember, Detective, was any part of her or
8 the clothing underneath her still wet?
9     A.   Yes.
10    Q.   Next.  State's 48, another view of the bathroom; is
11 that correct?
12    A.   Yes, sir.
13    Q.   Next.  State's 49, does it show where the commode
14 lid once was on top of the commode and the -- its final resting
15 place?
16    A.   Yes.
17    Q.   Is there a lot of blood back in that toilet area?
18    A.   Yes, sir.
19    Q.   Pool of dried blood?
20    A.   Yes, sir, and several pieces of the broken top.
21    Q.   What do we see in State's 50?
22    A.   We see the roll of duct tape that was on the
23 counter.
24    Q.   And that's going to be your Item 17?
25    A.   Item Number 17, yes, sir.

160

1     Q.   Next.  Item 18 is going to be an orange T-shirt?
2     A.   Yes, sir.  That was also located on the bathtub -- I
3 mean, the bathroom counter.
4     Q.   Sink counter?
5     A.   Sink counter, and it also had a couple of holes in
6 it, as well.
7     Q.   And then in State's 52 we see the -- the defects in
8 that -- that orange man's T-shirt; is that correct?
9     A.   Yes, sir.
10    Q.   Next.  State's 53, what is underneath the bath mat
11 there as your Item 19?
12    A.   That's another knife blade that we located.
13    Q.   And was it the blade itself or was it attached to a
14 knife handle?
15    A.   I believe it was just the blade itself.
16    Q.   Pretty good size blade?
17    A.   Yes, sir.
18    Q.   Next.  Knife handle -- your Item 20; is that
19 correct?
20    A.   Yes, sir, two knife handles.
21    Q.   Two knife handles.
22         Next.  21, what does that depict?
23    A.   That's part of the broken pieces of the toilet top.
24    Q.   That's State's 55, your Item 21.
25         Next.  What do we see in State's 56?

161

1    A.   Twenty-three, that was a piece of metal.  We weren't
2    exactly sure if it was part of a blade or a spoon, but it is
3    definitely a piece of broken off metal.
4    Q.   Next.  Another view in State's 57?
5    A.   Yes, sir.
6    Q.   Next.  State's 58 shows some of the blood dripping
7    down the sink cabinet?
8    A.   Yes, sir.
9    Q.   Now, in State's 59, at this time, is it true,
10   Detective, that Ms. Armstead's body had been moved from her
11   original position; is that correct?
12   A.   Yes, sir, that is.
13   Q.   Now she's laying basically parallel to the bed and
14   parallel to that exercise machine; is that right?
15   A.   Yes, sir.
16   Q.   And it does not appear to be nearly as much blood
17   underneath where she was compared to the blood you saw in the
18   bathroom?
19   A.   No, sir.
20   Q.   Next.  Again, once she was turned over, you're
21   looking for evidence of injury; is that correct?
22   A.   Yes, sir.
23   Q.   Next.  And you have a little dried trickling of
24   blood out of one of the back wounds when you turn her over?
25   A.   Yes, sir.

162

1    Q.   No active bleeding, obviously, at that time?
2    A.   Not at that time.
3    Q.   Next.  And the little girl, once you turned her
4    over, she had this -- this foamy substance coming out of her
5    nose; is that right?
6    A.   Yes, sir, out of her nose, and there was a little in
7    her mouth, as well.
8    Q.   And you didn't find any evidence of stab wounds,
9    obviously, gunshots, anything like that on the little girl?
10   A.   No, sir.
11   Q.   And you collected, again, a number of items of
12   evidence at the scene, and we're not going to go through all of
13   them, but --
14        MR. BEACH:  Is 63 the first one?
15        MR. HEALY:  Yes.
16   Q.   (BY MR. BEACH)  State's 63, your Item Exhibit Number
17   5, that was found in the kitchen; is that correct?
18   A.   Yes, sir.
19   Q.   Sixty-four, your Item 6, that was found also in the
20   kitchen underneath the microwave; is that right?
21   A.   Yes, sir.
22   Q.   State's Exhibit 65, your Item Number 24, that's the
23   broken off knife that you found in the boys' bathroom?
24   A.   Yes, it is.
25   Q.   Item 66, that's going to be the knife and the knife

163

1    blade that you found on top of the TV cabinet, your Item Number
2    13?
3    A.   Yes, sir.
4    Q.   State's Exhibit 67 is going to be your Item Number
5    19, that large broken off blade that you found underneath the
6    bath mat in the master bathroom; is that correct?
7    A.   Yes, it is.
8    Q.   State's Exhibit 68 is going to be what you couldn't
9    really tell was either a knife or a kitchen utensil?
10   A.   Yes.
11   Q.   And State's 69 is going to be the -- your Item
12   Number 8, the knife that you found underneath the couch cushion
13   in the living room?
14   A.   Yes, it is.
15   Q.   And State's Exhibit 70, Item Number 17, the roll of
16   duct tape you found in the master bathroom?
17   A.   Yes, sir.
18   Q.   And obviously, all of these exhibits were seized out
19   there at the crime scene by yourself and your partner and
20   preserved for future purposes; is that correct?
21   A.   Yes, sir.
22        MR. BEACH:  That's all I have, Judge.
23        MR. JOHNSON:  No questions.
24        THE COURT:  Thank you very much, sir.  You may
25   step down.  Do you mind grabbing all that and just handing it

164

1    back to the court reporter?
2         MR. BEACH:  We call Officer Jen -- excuse me,
3    Whitsitt, Your Honor.
4         Could we have a brief recess, Judge, five
5    minutes?
6         (Jury excused from courtroom.)
7    THE BAILIFF:  All rise.
8         (Jury returned to courtroom.)
9    THE COURT:  Thank y'all.  Please be seated.
10   MR. BEACH:  Call Officer Smith.
11   THE COURT:  Sir, if you would --
12        (Witness brought forward and sworn.)
13   THE COURT:  Please have a seat.
14        TROY SMITH,
15   was called as a witness by the State, and after having been
16   first duly sworn, testified as follows:
17        DIRECT EXAMINATION
18   BY MR. BEACH:
19   Q.   Tell us your name, please.
20   A.   Officer Troy Wayne Smith.
21   Q.   And, Officer Smith, how long have you been with the
22   Dallas Police Department?
23   A.   Twenty-two years.
24   Q.   Back in September of 2009, to what division were you
25   assigned?

165

1   A.   Southeast Patrol Division.

2   Q.   And what were and what are your responsibilities

3   with Southeast Patrol?

4   A.   Answer -- basically call answer for Southeast Patrol

5   Division, first responder.

6   Q.   About 2:15 a.m., were you on duty the early morning

7   hours of September the 22nd of 2009?

8   A.   Yes, I was working police -- inside the police

9   station at Southeast.

10   Q.   And who else was there with you, sir?

11   A.   Officer Tom Mortl.

12   Q.   And this is a Monday night, going into Tuesday

13   morning.  Not too many folks that are hanging around the

14   substation at that time?

15   A.   No, between midnight to 8:00, it's quiet working in

16   the station, other than answering the phones.

17   Q.   About 2:15 a.m., did three individuals walk into the

18   Southeast Substation, sir?

19   A.   Yes, one older female and two gentlemen.

20   Q.   And do you see here in court today, Officer Smith,

21   one of the men that walked in that morning and eventually you

22   ended up arresting and taking to Parkland Hospital?

23   A.   Yes.

24   Q.   Is he the man in the navy blue suit at the end of

25   the counsel table?

166

1   A.   Yes.

2   Q.   Is he a man that you came to know that night as Gary

3   Green?

4   A.   Correct.

5   Q.   So Gary, his mother, and his brother that you

6   learned, is that correct, Nysasno?

7   A.   Yes.

8   Q.   They walk in together, and just very briefly

9   describe the -- the setup inside that front door area.

10   A.   Once you come into the Southeast Patrol Station, you

11   come into a glass door.  In between the glass door -- and it's

12   a secure area.  It's probably a space of 15-square foot,

13   because you have no -- no admittance into the secure area, so

14   everything is handled right through a glass window with a

15   speaker.

16   Q.   So are you talking -- who's doing the talking

17   initially?

18   A.   I -- I talked to the mother, yes.

19   Q.   So you and the mom are talking; is that correct?

20   A.   Correct.

21   Q.   Through the glass?

22   A.   Correct.

23   Q.   At some point in time do you go around and go out

24   and talk to her in another location?

25   A.   Sometimes it's hard to hear through that little

167

1   speaker thing, since it's 20 years old, at the station.  She

2   mentioned her son might have been involved in a murder, so at

3   that time I went outside the secured door and talked with her.

4   Q.   At that point in time, Officer, were you and Officer

5   Mortl aware of a double homicide that occurred on another

6   channel earlier that same night?

7   A.   No, we were totally -- we didn't have no clue what

8   was going on that night.

9   Q.   So you didn't know if she was pulling your leg, you

10   didn't know what the situation is, and that's why you came

11   around to investigate it further?

12   A.   Correct.

13   Q.   And just to get through this as quickly as we can,

14   were you and Officer Mortl eventually able to confirm that Gary

15   Green was wanted for a double murder over in the Oak Cliff

16   section of town?

17   A.   We confirmed, with the information we had, he was a

18   suspect of a murder that occurred in Oak Cliff.

19   Q.   And once you confirmed that, did you place Gary

20   Green under arrest?

21   A.   After that, we confirmed it through the channels, we

22   placed him under arrest in front of the unsecured area of the

23   police station.

24   Q.   And the time it took -- you know, from when they

25   first walk in, the three of them, the mother and the two

168

1   brothers walk in, the time you place him in handcuffs, can you

2   just give us an estimate of how long we're talking about?

3   A.   Trying to get ahold of certain investigative units

4   to confirm that he was a suspect in a murder and getting a

5   supervisor toward the front trying to make some phone calls for

6   us, I would say anywhere between 15, 20 minutes before we

7   actually placed him under arrest.

8   Q.   And the Defendant remained there in the outer area

9   of the -- that outer area the entire time?

10   A.   Yes.

11   Q.   Never gave you any problems, didn't try to run,

12   nothing like that?

13   A.   No.  The only time we moved from that area is when

14   he had a small cut on the back of his back.  We notified DFD.

15   The Fire Department arrived, and we walked him outside to the

16   back of the ambulance.

17   Q.   He's handcuffed at that point in time; is that --

18   A.   Correct.

19   Q.   And you walk out to the ambulance with -- with the

20   Defendant?

21   A.   Correct.

22   Q.   Is he able to walk on his own, or are you having to

23   help him out there?

24   A.   No, he walked to the back of the ambulance on his

25   own.

169

1      Q.   Did you have any problems just doing basic
2    communication with him, any problem with him following your
3    commands, anything like that?
4      A.   No, he -- he responded to us, all commands and
5    everything.
6      Q.   And did you assign an officer to ride with the
7    Defendant in the back of the ambulance to go to Parkland
8    Hospital?
9      A.   Yeah, because I still had to make some contacts.
10   Officer Kirchdurfer, he rode in the back of the ambulance. We
11   assigned him to ride in the back of the ambulance, and we had
12   an element follow -- two other officers follow behind in a
13   police car because we didn't know -- based on the situation, we
14   didn't know how he was going to respond.
15     Q.   And did you eventually make your way to Parkland
16   Hospital that night?
17     A.   Correct.
18     Q.   And we've heard from Dr. Martinez.  The Defendant
19   was discharged from Parkland around 7:00 that morning.  How did
20   the Defendant, Gary Green, get from Parkland Hospital down to
21   the police station on Lamar?
22     A.   Once the doctor signed off on his release, we took
23   him, along with his paperwork, up to the Homicide Unit at 1400
24   South Lamar.
25     Q.   And how was Green transported from the emergency

170

1    room to your squad car?
2      A.   He basically walked out of the hospital on his own
3    in handcuffs.
4      Q.   Again, any trouble walking from the ER to your car?
5      A.   No, sir.
6      Q.   Any trouble following your commands?  Any indication
7    that he wasn't oriented to time, place, and person?
8      A.   No, sir.
9      Q.   And for the folks that don't know, once you get to
10   the Crimes Against Person Section or get to the police station
11   there on Lamar, where do you pull into?
12     A.   There at the main police headquarters where homicide
13   is located, we pull into a sally port which is underneath the
14   building which is a secure area.
15     Q.   And get him out of the car, elevator him up to which
16   floor, do you recall?
17     A.   I believe it's the 5th floor, I believe.
18     Q.   And then you release him into the custody of the
19   homicide detectives?
20     A.   Well, at that point in time, once we get there, we
21   place him inside the interview room, and the detective takes
22   over the investigation and questioning at that time.
23           MR. BEACH:  That's all I have, Judge.
24           THE COURT:  Cross.
25           CROSS-EXAMINATION

171

1    BY MR. JOHNSON:
2      Q.   Officer Smith, you said that he was transported to
3    Parkland.  What was the reason he was transported to Parkland?
4      A.   Because of the cut on his back.
5      Q.   Okay.  Was it a single cut, or was it more than one
6    cut?
7      A.   I don't recall, but I believe it was one.
8      Q.   And also, did you have a conversation with the
9    Defendant, or did you become aware of the fact that he had
10   ingested quite a few pills?
11     A.   I don't recall if we had that conversation or not,
12   but we dealt mostly with his mother.
13     Q.   Okay.  Well, the prosecutor was asking you a
14   question a moment ago about whether or not the Defendant was
15   acting and responding in a normal fashion.  You had indicated
16   to his questions that you believed that he was; is that
17   correct?
18     A.   Believe that he was what?
19     Q.   That he was responding and -- and following commands
20   in a normal fashion; is that right?
21     A.   Yes, he -- he -- he did everything we asked of him.
22     Q.   Okay.  But, in fact, you really had no conversation
23   with him, did you?
24     A.   No, sir, we did not, other than us giving him
25   certain things and telling him where to go, that's how he

172

1    responded.
2      Q.   Okay.  So he responded to what you told him, but he
3    didn't respond -- in response -- he didn't make oral statements
4    to you in response to anything you asked him, did he?
5      A.   No, we didn't ask no questions due to the fact
6    because it was a double homicide.
7      Q.   And how was -- and how was his affect at that time?
8    How was he -- how was he acting at that time?
9      A.   I'd say a little depressed, down.
10     Q.   And you're saying that you don't recall anything
11   being said in regards to him having ingested any pills?
12     A.   I don't recall it, but in a situation like that, I
13   don't believe the cut was minor.  And DFD -- they instructed us
14   that he needed to go to Parkland, so that's one reason why we
15   went Parkland, based on DFD's information, also.
16     Q.   Officer, if I show you -- you made a report that
17   night, did you not?
18     A.   I just made a -- small investigative notes to
19   homicide -- to homicide detectives.
20     Q.   Let me ask you to -- if that's a copy of that report
21   that you made?
22     A.   Yes, sir.
23     Q.   Let me ask you -- take your attention here to this
24   portion that's highlighted --
25     A.   Which, top or bottom?

173

2    A.   Okay.

3    Q.   And if you'll read through that real quick.

4    A.   Yes, okay.

5    Q.   In fact, does that reflect that in -- does that help

6  you refresh your memory --

7    A.   Yes, sir.

8    Q.   -- as to what you had been told that night?

9    A.   Yes.

10    Q.   And does it, in fact, reflect that the Defendant had

11  more than one wound to his back?

12    A.   Yes, sir.

13    Q.   And also, does it reflect that you had information

14  at that time that he had, in fact, ingested a number of pills?

15    A.   Correct, sir.

16    Q.   Was that the reason that y'all had transported him

17  then?

18    A.   Well, based on -- on the wounds and the pills would

19  be the reason why we transported him.

20    Q.   You normally wouldn't transport someone to Parkland

21  in response to a superficial wound, would you?

22    A.   When we -- when we transport to Parkland, we don't

23  transport for superficial wounds or nonlife-threatening. We

24  only transport to Parkland when DFD gives clear. If it's

25  life-threatening or something like that, DFD takes the

174

1  initiative and they do the transport.

2    Q.   So someone out there made the decision that there

3  was a need for transport to Parkland at that time?

4    A.   Well, we made the decision to transport to Parkland

5  because if there's an injury or they've taken pills up in our

6  jail, the jail nurses up there will not take him. So they're

7  going to -- they're going to automatically send you to

8  Parkland.

9    Q.   Okay.

10         MR. JOHNSON:  That's all I have, sir.  Thank

11  you.

12         MR. BEACH:  Nothing else, Judge.  Thank you.

13         THE COURT:  Thank you.  You may step down.

14         MR. BEACH:  May he be excused?

15         THE COURT:  Yeah.  You can be excused.

16         All right.  Ladies and gentlemen, we're going to

17  break for the day.  We'll start back up tomorrow morning at

18  9:30.  As you can see or feel, the temperature is in here ranges.

19  Bring a sweater, bring a sweatshirt, something you can take on,

20  off.  I really don't have any control over -- I figure -- I

21  guess we figured out a way to make it colder, but I just can't

22  do anything else.  Sorry.  So feel free to bring your morning

23  coffee in in the morning or whatever else you want to have to

24  drink.

25         So until tomorrow morning at 9:30.  The Court's

175

1  in recess.

2         THE BAILIFF:  All rise.

3         (Jury excused from courtroom.)

4         (Recess of proceedings.)

176

1                 Reporter's Certificate

2  THE STATE OF TEXAS:

3  COUNTY OF DALLAS:

4      I, Darline King LaBar, Deputy Official Court Reporter in

5  and for the 282nd District Court of Dallas County, State of

6  Texas, do hereby certify that the above and foregoing volume

7  constitutes a true, complete and correct transcription of all

8  portions of evidence and other proceedings requested in writing

9  by counsel for the parties to be included in the Reporter's

10  Record, in the above-styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by me.

12      I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15      WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 13th day of March, A.D., 2012.

17

18

19

20              Darline King LaBar

21              Official Court Reporter

22              363rd Judicial District Court

23              Dallas County, Texas

                hpdklfaith@msn.com

                (214) 653-5893

24  Certificate No:  1064

25  Expiration Date:  12/31/2012