1

1          REPORTER'S RECORD

2       VOLUME 50 OF 57 VOLUMES

3

4     TRIAL COURT CAUSE NO. F09-59380-S

5          CASE NO. AP-76,458

6

7  THE STATE OF TEXAS          :          IN THE 282ND JUDICIAL

8  VS.                         :          DISTRICT COURT OF

9  GARY GREEN                  :          DALLAS COUNTY, TEXAS

10

11

12          **PUNISHMENT PHASE BY JURY**

13

14

15

16

17

18              * * * * * * * * * *

19

20      On the 2nd day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

Darline King LaBar, Official Reporter

```
 1  A P P E A R A N C E S:

 2

 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
          Frank Crowley Criminal Courts Building
 4        Dallas, Dallas County, Texas 75207
          Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A, SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409
          MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
 8

 9                          FOR THE STATE OF TEXAS;

10

11

12

13

14

15  MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
          311 N. Market Street, Suite 300
16        Dallas, Texas 75202-1846
          Phone:  214-761-0707
17
    MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
18        3300 Oak Lawn Avenue, Suite 600
          Dallas, Texas 75219
19        Phone:  214-559-9115

20  MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
          3838 Oak Lawn Avenue, Suite 1350
21        Dallas, Texas 75219
          Phone:  214-651-6250
22

23                          FOR THE DEFENDANT.

24

25
```

1                              INDEX VOLUME 50

2                         (TRIAL ON THE MERITS BY JURY)

3   November 2, 2010                                          PAGE  VOL.

4   Proceedings......................................... 5     50

5   STATE WITNESSES     DIRECT          CROSS          VD           VOL.

6   KEVIN ASHFORD        6, 22          15                           50

7   MELODYE NELSON      25, 58, 92     46, 86      65, 68, 70 50

8   RUTH LYONS          94, 109                   101, 103          50

9   RAY MONTGOMERY JR  114                                          50

10  JERRETT ARMSTEAD   116                                          50

11  JEROME ARMSTEAD    119                                          50

12  MARGARITA BROOKS   123                                          50

13  GILBERT MARTINEZ   128            128                           50

14  Reporter's Certificate............................ 142         50

15

16                    ALPHABETICAL WITNESS INDEX

17                      DIRECT          CROSS          VD           VOL.

18  JEROME ARMSTEAD    119                                          50

19  JERRETT ARMSTEAD   116                                          50

20  KEVIN ASHFORD        6, 22          15                           50

21  MARGARITA BROOKS   123                                          50

22  RUTH LYONS          94, 109                   101, 103          50

23  RAY MONTGOMERY JR  114                                          50

24  GILBERT MARTINEZ   128            128                           50

25  MELODYE NELSON      25, 58, 92     46, 86      65, 68, 70 50

1                          EXHIBIT INDEX

2  STATE'S                  OFFERED      ADMITTED      VOL.

3  155    Parkland Records      5            5         50

4  156    Jerrett DCAC Records  5                      50

5  157    Jerome DCAC Records    5                      50

6  158    Inmate Records        10           10        50

7  159    Disciplinary Records  94           94        50

8  DEFENDANT'S               OFFERED      ADMITTED      VOL.

9    2    Inmate Records        19           19        50

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S RECORD

VOLUME 50 OF 57 VOLUMES

TRIAL COURT CAUSE NO. F09-59380-S

CASE NO. AP-76,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 282ND JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| GARY GREEN | : | DALLAS COUNTY, TEXAS |

PUNISHMENT PHASE BY JURY

\*\*\*\*\*\*\*\*\*\*

On the 2nd day of November, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Andy Chatham, Judge Presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand computer assisted transcription.

A P P E A R A N C E S:

HONORABLE CRAIG WATKINS, Criminal District Attorney
Frank Crowley Criminal Courts Building
Dallas, Dallas County, Texas 75207
Phone: 214-653-3600

BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
MR. JOSH HEALY, A.D.A., SBOT # 24026288
MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
MR. HEATH HARRIS, A.D.A., SBOT # 00795409
MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262

FOR THE STATE OF TEXAS;

MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
311 N. Market Street, Suite 300
Dallas, Texas 75202-1846
Phone: 214-761-0707

MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
3300 Oak Lawn Avenue, Suite 600
Dallas, Texas 75219
Phone: 214-559-9115

MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
3838 Oak Lawn Avenue, Suite 1350
Dallas, Texas 75219
Phone: 214-651-6250

FOR THE DEFENDANT.

INDEX VOLUME 50

(TRIAL ON THE MERITS BY JURY)

November 2, 2010                          PAGE  VOL.

Proceedings.......................................... 5   50

| STATE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| KEVIN ASHFORD | 6, 22 | 15 | | 50 |
| MELODYE NELSON | 25, 58, 92 | 46, 86 | 65, 68, 70 | 50 |
| RUTH LYONS | 94, 109 | | 101, 103 | 50 |
| RAY MONTGOMERY JR | 114 | | | 50 |
| JERRETT ARMSTEAD | 116 | | | 50 |
| JEROME ARMSTEAD | 119 | | | 50 |
| MARGARITA BROOKS | 123 | | | 50 |
| GILBERT MARTINEZ | 128 | 128 | | 50 |

Reporter's Certificate............................. 142   50

ALPHABETICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| JEROME ARMSTEAD | 119 | | | 50 |
| JERRETT ARMSTEAD | 116 | | | 50 |
| KEVIN ASHFORD | 6, 22 | 15 | | 50 |
| MARGARITA BROOKS | 123 | | | 50 |
| RUTH LYONS | 94, 109 | | 101, 103 | 50 |
| RAY MONTGOMERY JR | 114 | | | 50 |
| GILBERT MARTINEZ | 128 | 128 | | 50 |
| MELODYE NELSON | 25, 58, 92 | 46, 86 | 65, 68, 70 | 50 |

EXHIBIT INDEX

| STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 155 | Parkland Records | 5 | 5 | 50 |
| 156 | Jerrett DCAC Records | 5 | | 50 |
| 157 | Jerome DCAC Records | 5 | | 50 |
| 158 | Inmate Records | 10 | 10 | 50 |
| 159 | Disciplinary Records | 94 | 94 | 50 |

| DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 2 | Inmate Records | 19 | 19 | 50 |

5

1  P R O C E E D I N G S

2          THE BAILIFF:  All rise.

3          (Jury returned to courtroom.)

4          THE COURT:  Thank you all.  Please be seated.

5  Good morning, ladies and gentlemen.

6          Let's see, does the State want to do something

7  real quick?

8          MR. BEACH:  Yes, sir.  At this time, Judge, we'd

9  offer into evidence State's Exhibit 155.  It's an additional

10  Parkland Health & Hospital System records.

11          (State's Exhibit 155 offered.)

12          MR. JOHNSON:  We have no objection 155.

13          THE COURT:  They are admitted.

14          (State's Exhibit 155 admitted.)

15          MR. BEACH:  The State would offer State's

16  Exhibits 156 and 157, which are the DCAC records involving both

17  boys.

18          (State's Exhibits 156 through 157 offered.)

19          MR. JOHNSON:  Judge, can I withhold my objection

20  to that until they are sponsored through the appropriate

21  witness?

22          THE COURT:  You -- you may.  We'll take that up

23  accordingly.

24          MR. BEACH:  The State would call Kevin Ashford.

25          (Witness brought forward and sworn.)

6

1          THE COURT:  Please have a seat.

2                  KEVIN ASHFORD,

3  was called as a witness by the State, and after having been

4  first duly sworn, testified as follows:

5                  DIRECT EXAMINATION

6  BY MR. BEACH:

7      Q.  Tell us your name, please.

8      A.  Kevin Ashford.

9      Q.  Kevin, you're going to need to keep your voice up,

10  kind of speak right into that microphone.  You've had a long

11  day already; is that right?

12      A.  A little bit, yes, sir.

13      Q.  What are you doing right now for a living?

14      A.  I'm an over-the-road trainer for a major motor

15  carrier.

16      Q.  And how much time do you spend on the road?

17      A.  I get home about 60 days a year.

18      Q.  You what?

19      A.  I get home about 60 days a year.

20      Q.  And where did you bed down last night?

21      A.  Salt Lake City, Utah.

22      Q.  And you were nice enough to fly down here from Salt

23  Lake and -- and tell these folks what you know about Gary

24  Green; is that correct?

25      A.  Yes, sir.

7

1      Q.  Back in the early 1990's, Kevin, how were you

2  employed?

3      A.  I worked for the Texas Department of Criminal

4  Justice Institutional Division.

5      Q.  Okay.  And what was your job with TDCJ?

6      A.  I was a correctional officer, third class, assigned

7  to the Beto 1 Unit, administrative segregation, in close

8  custody, high security area.

9      Q.  And do you recall what year you would have started

10  with the prison system?

11      A.  It was in -- approximately the middle of 1988.

12      Q.  Okay.  And the incident that we're here about today

13  happened on January the 9th of 1994.  About how long total were

14  you with the system?

15      A.  About four and a half -- close to five years.

16      Q.  You said you worked primarily in the Ag Seg --

17      A.  Ag Seg, close custody, yes, sir.

18      Q.  Okay.  And just tell the folks of the jury what Ag

19  Seg is?

20      A.  That's -- administrative segregation is -- is --

21  it's locked down within a prison system.  There's basically

22  three ways that you can be detained in administrative

23  segregation:  If you are a threat to other inmates, a threat to

24  officers, or an escape risk.  And that's who we house in

25  administrative segregation.

8

1      Q.  And that's where you spent the majority of your

2  time; is that correct?

3      A.  Yes, sir.

4      Q.  Now, we -- we talked last week.  What was going on

5  philosophy-wise in the prison system there in the -- say

6  mid-'93 through the first part of 1994?

7      A.  There was a -- there was a lot of tension in the

8  prison system because they had -- they had started different

9  policies about -- under integration, housing, classification,

10  and things like that.  There was a lot of tension.  There was a

11  lot of uses of force and things like that were going on.

12      Q.  Okay.  Trying to integrate inmates in their

13  living -- living quarters; is that correct?

14      A.  Yes, sir.

15      Q.  In the chow hall?

16      A.  Yes, sir.

17      Q.  Just trying to keep cliques of the different races

18  from spending 24 hours a day with each other?

19      A.  Yes, sir.

20      Q.  And you said that led to you and the other guards

21  having to do what?

22      A.  We -- they initiated policy that we would use force,

23  if necessary, to integrate.

24      Q.  Now, January 9th of 1994, why we're here today, did

25  they call you from the Ag Seg section and have you help out in

**9**

1 the cafeteria on that day?

2     A.   In the North Chow Hall, yes, sir.

3     Q.   And why would they call you from Ag Seg to help out

4 in the cafeteria?

5     A.   Several different reasons.  If they were short in

6 the building and needed somebody -- needed officers, if we had,

7 you know, some extra staff in high security, we would go down

8 and help.  Or if they thought that they had information that

9 there could be a possible incident, they would.  A lot of times

10 if close custody was going into the chow hall, they were always

11 a risk in an area like that.  You know, chow hall, rec yards,

12 anything like that, they would call us to go down and -- and

13 assist with that.

14     Q.   About 11:45 that day -- we've talked about this --

15 this happened over 16 years ago; is that correct?

16     A.   Yes, sir.

17     Q.   And -- but without even reviewing your report, do

18 you have a fairly good recollection of what happened that day

19 around 11:45?

20     A.   I do, sir.

21     Q.   Did you have an encounter with an inmate by the name

22 of Gary Green?

23     A.   I did.

24     Q.   And was his inmate number 553362?

25     A.   I don't know that right off the top of my head,

**10**

1 but --

2     MR. BEACH:  May I approach, Judge?

3     THE COURT:  You may.

4     Q.   (BY MR. BEACH)  I show you, Mr. Ashford, what's been

5 marked for identification as State's Exhibit 158.  Do you

6 recognize what that is?

7     A.   This is an inner office communication that I wrote

8 that day about the assault from inmate Gary Green, TDC Number

9 553362.

10     Q.   And from reviewing State's 158, you made note of Mr.

11 Green's inmate number; is that correct?

12     A.   Yes, sir.

13     MR. BEACH:  We'd offer 158 for record purposes,

14 Your Honor.

15     (State's Exhibit 158 offered.)

16     THE COURT:  It's admitted for record purposes.

17     (State's Exhibit 158 admitted.)

18     Q.   (BY MR. BEACH)  Prior to January 9th of 1994, to

19 your recollection, had you ever encountered Gary Green before?

20     A.   No, sir.

21     Q.   That day was that your only encounter being in Gary

22 Green's presence as far as you could remember?

23     A.   Yes, sir.

24     Q.   What were your responsibilities there in the chow

25 hall that day?

**11**

1     A.   Just conduct security, maintain custody and control

2 of the inmates while they were feeding.

3     Q.   Okay.  And the best you can recall before this

4 incident started, how far along the process had it gotten in

5 terms of that group of inmates coming in and getting their

6 trays and being seated?

7     A.   From what -- best I could tell, we weren't but maybe

8 30, 45 minutes into the chow procedure.

9     Q.   And how many other inmates would have been in the --

10 in the cafeteria at that time?

11     A.   There was probably close to around a hundred inmates

12 or so.

13     Q.   Now, was Mr. Green one of those inmates?

14     A.   Yes, sir.

15     Q.   And when you first encountered Gary Green, did he

16 have his food tray?

17     A.   Yes, sir.

18     Q.   And what were you trying to get Gary Green to do

19 that day?

20     A.   When I would conduct security in the chow hall,

21 inmates have a tendency to spread out and it's hard to control

22 what's going on.  So I would order the inmates to sit in

23 particular places where I could keep control over what was

24 going on, basically.  And I ordered him to sit down at a

25 particular table.  And for whatever reason, he didn't -- he

**12**

1 didn't like that I did that and became aggressive.

2     Q.   Mr. Green was going to go off by himself someplace

3 away from the main group, and you wanted him to sit near the

4 main group?

5     A.   Yes, sir.

6     Q.   And he didn't like you telling him to do that?

7     A.   It seemed that way, yes, sir.

8     Q.   What happened?  Did you then order him to get with

9 the main group?

10     A.   Yes, sir.  I gave him several orders to do so, and

11 he refused to do so and --

12     Q.   What happened then?

13     A.   I gave him a -- I told him at that time to put his

14 tray down, I was going to take him to the hallway.  We were

15 going to go out and address the lieutenant about his behavior

16 and what was going on and being disruptive in the chow hall.

17     Q.   Why would you want to take him out in the hall to

18 get him isolated from the rest of -- rest of the inmates?

19     A.   Because if we -- if something happened there in the

20 chow hall, I had no backup.  And there's a hundred inmates

21 standing there between me and the hallway door.  I want him

22 outside of the chow hall.  I don't want to be pinned down in

23 the corner with another hundred inmates.

24     Q.   And when you told Mr. Green that -- for him to step

25 out in the hall to talk to the lieutenant, what did he do at

13

1    that time?

2    A.    Threw his food tray at me.

3    Q.    And when you say threw it, can you describe how Mr.

4    Green threw the food tray?

5    A.    He just flung it like a Frisbee.

6    Q.    Where -- did it hit your body?

7    A.    Yeah, it me right in the midsection of the body.

8    Q.    Now, you're a pretty big guy; is that right?

9    A.    Yes, sir.

10   Q.    Were you a pretty big guy back in 1994?

11   A.    About the same size.

12   Q.    After Mr. Green threw his food tray and hit you in

13   the mid part of your body, what happened next?

14   A.    He came towards me, and I initiated a major use of

15   force to gain control of the inmate.

16   Q.    You're still there in the cafeteria?

17   A.    Yes, sir.

18   Q.    There are other inmates around watching this; is

19   that correct?

20   A.    Yes, sir.

21   Q.    And you didn't -- you didn't have any immediate help

22   from other correctional officers at that point?

23   A.    Not immediately, no, sir.

24   Q.    What happened then?

25   A.    We struggled, and I was attempting to gain control

14

1    of him. I did eventually get another officer to help me. We

2    did eventually gain control of him, got him down on the floor,

3    I handcuffed him, and another officer came and helped and we

4    got him out of the chow hall.

5    Q.    Okay. During the struggle, did any part of Mr.

6    Green's body come in contact with your body?

7    A.    Yeah, he was kicking and fighting, yes, sir.

8    Q.    What do you remember just generally about Mr.

9    Green's physical dimension, strength at that --

10   A.    He was a pretty good size guy from what I remember

11   back then, yeah.

12   Q.    He didn't go down easy; is that correct?

13   A.    No, sir.

14   Q.    Eventually you were able to get Mr. Green in

15   handcuffs and get him out of that situation?

16   A.    Yes, sir.

17   Q.    And afterwards, after he had been removed from the

18   cafeteria, you filled out the report that I just showed you; is

19   that correct?

20   A.    I did, yes, sir.

21   Q.    After that day, do you recall having any other

22   dealings with Gary Green as long as you worked there?

23   A.    I think that was the only time I ever dealt with

24   him.

25        MR. BEACH: I'll pass the witness, Judge.

15

1        THE COURT:  Cross.

2               CROSS-EXAMINATION

3    BY MR. JOHNSON:

4        Q.    Mr. Ashford, you -- policy of TDC, sir, if you -- if

5    you make a complaint or file a disciplinary action on a

6    prisoner for a major use -- for a major use of force, is that

7    what you're claiming this was?

8        A.    If I -- you're asking me if I used major use of

9    force on him?

10       Q.    You -- you responded with what you call a major use

11   of force; is that correct?

12       A.    Yes, sir.

13       Q.    And you -- and you made an allegation that the

14   Defendant committed an assault upon you with what would be

15   termed in TDC system as a weapon being the tray itself; is that

16   correct?

17       A.    That is correct.

18       Q.    And when you do that, will you tell this jury over

19   here -- those things aren't taken lightly, are they?

20       A.    No, sir, I wouldn't think so.

21       Q.    Well, in fact, this one here wasn't taken lightly

22   either, was it?

23       A.    I'm not sure what happened with it after -- after

24   the incident.

25       Q.    Are you sure -- are you telling this jury you don't

16

1    know what happened when this thing was followed up and

2    everybody was interviewed, including other guards?

3        A.    I don't know what happened after.

4        Q.    Can you tell me about a fellow -- do you know a

5    fellow by the name of James Williams?

6        A.    I don't recall.

7        Q.    You don't remember him being a fellow employee?

8        A.    I don't remember; it's been a long time ago.

9        Q.    Do you remember who the -- what the name of the

10   fellow was who came up and assisted you in this situation?

11       A.    I don't remember, no.

12       Q.    Were you aware of the fact that other -- other

13   guards were interviewed in response to the allegations you made

14   against the Defendant?

15       A.    I don't know that either.

16       Q.    Were you ever called upon, sir, to go down and

17   testify in regards to this -- to this case?

18       A.    I don't think so.

19       Q.    And you're telling this jury you don't know why?

20       A.    No, I don't.

21       Q.    You've -- you've never heard the reason?

22       A.    No, sir.

23       Q.    Sir, when you -- if you claim a prisoner has used

24   force against you, that case is referred to the Inspector

25   General's Office, is it not?

17

2    Q.   Do you recognize this being a criminal case
3 information work sheet that's prepared by the Internal Affairs
4 Division?
5    A.   I don't recognize that, to be honest.
6    Q.   You don't recognize any of these documents?
7    A.   No, sir, I don't.
8    Q.   And when you talk about people that were witnesses,
9 in fact, there was another guard standing right there when this
10 whole incident was alleged to have occurred, was there not?
11    A.   I don't remember.  I'm sure there was another
12 officer in the chow hall.
13    Q.   And were you aware of the fact that he was
14 interviewed and he disputes your -- your version of what you
15 said happened?
16         MR. BEACH:  Judge, I'm going to object to
17 comparing what someone else said from a hearsay document.  Mr.
18 Johnson's interpretation, I'm going to object.
19         MR. JOHNSON:  Can I have a stapler?
20         (Discussion of the record.)
21         MR. JOHNSON:  Can we approach real quick, Judge?
22         THE COURT:  Do we need to have a hearing?
23         MR. JOHNSON:  I don't think so.
24         (Sidebar conference.)
25         THE COURT:  Quick hearing, folks.

18

1         THE BAILIFF:  All rise.
2         (Jury excused from courtroom.)
3         THE COURT:  May I see that, please?
4         MR. JOHNSON:  Okay.
5         (Discussion off the record.)
6         THE COURT:  We're ready.
7         (Jury returned to the courtroom.)
8         THE COURT:
9         Thank you all.  Please be seated.
10         MR. JOHNSON:  May I continue, Your Honor?
11         THE COURT:  Please continue.
12    Q.   (BY MR. JOHNSON) State your name, please.  State
13 your name, please.
14    A.   Kevin Ashford.
15    Q.   You're the same person who is testifying before we
16 took our break; is that correct?
17    A.   Yes.
18    Q.   Mr. Ashford, now I'm going to ask you to look at
19 what's been marked for identification purposes as Defendant's
20 Exhibit Number 2.  And this is the same document I showed you a
21 moment ago; is that correct?  You had a chance to look at it a
22 moment ago, and you did not identify it, but there's been some
23 pages added to it.  Do you recognize this right here?
24    A.   Yes, sir.  That's the report I wrote that day.
25    Q.   Okay.  This is the statement that you made that day?

19

1    A.   Yes, sir.
2    Q.   And there is also a statement here by another
3 individual -- purports to be another guard there with you; is
4 that correct?
5    A.   Okay.
6    Q.   And another report by another officer; is that
7 correct?
8    A.   Yes, sir, it looks that way.
9         MR. JOHNSON:  Judge, at this time we're going to
10 offer for all purposes Defense Exhibit Number 2 which is
11 accompanied by a business record affidavit, and it also
12 contains what has been previously offered and admitted for
13 record purposes only as State's Exhibit 158 which is now for
14 all purposes part of Defense Exhibit Number 2.
15         (Defendant's Exhibit 2 offered.)
16         MR. BEACH:  No objection.
17         THE COURT:  It's admitted.
18         (Defendant's Exhibit 2 admitted.)
19    Q.   (BY MR. JOHNSON)  Now, when I talked to you a moment
20 ago, if there's a claim that an inmate has actually committed
21 an assault upon a guard, that is referred to the Inspector
22 General's Office for criminal prosecution; is that correct?
23    A.   I'm not sure about policy, sir.
24    Q.   Okay.  And when this case was filed, the -- does
25 this -- the report that you have here, these documents, does it

20

1 indicate -- and I'll ask you to look at this and can you
2 refresh your recollection by looking at that, if you can now
3 tell the jury why this case was never prosecuted?
4    A.   I don't know why it wasn't prosecuted.
5    Q.   Could you look on -- is this document here, that's
6 it's based on non-supporting officer testimony?
7    A.   That's what it says.
8    Q.   Okay.  And this page of the testimony, does it not
9 indicate on this document that is in evidence that he -- that
10 Officer James Williams observed this incident -- the entire
11 incident from the beginning, and that the tray struck the table
12 and not you?
13    A.   That's what it says, yes, sir.
14    Q.   Okay.  And so when I asked you earlier if, in fact,
15 you recalled ever going down and testifying, based on the fact
16 that there was conflicting witness statements in regards to
17 what happened, the Inspector General's Office refused to
18 prosecute this case, is that not -- you recognize that now, do
19 you not?
20    A.   Yes, sir, that's what you just showed me.
21    Q.   And is it also not, in fact, sir, that you testified
22 earlier -- and let me ask you this.  You had said earlier that
23 this thing -- you had an independent recollection of this; is
24 that correct?
25    A.   Of the general incident, yes.

21

1  Q.  A general recollection of -- or a clear, independent
2  recollection?
3      A.  I remember what happened.
4      Q.  Okay.  What caused you to remember this incident?
5      A.  I remember a lot of things that went on out there.
6      Q.  And what years were you there from, sir?
7      A.  Around the middle -- the late '88 to late '95, I
8  believe, because I took a -- I was -- I did take off though for
9  a little over a year in between that.
10     Q.  What was the purpose of that?
11     A.  I wanted -- I didn't want to be there anymore.
12     Q.  And when did you do that, sir?
13     A.  I don't remember exactly when.
14     Q.  Do you not recall or do you recall having a meeting
15  or having a problem with Gary Green in -- in the December
16  before this was alleged to have occurred in which he was asked
17  to file a complaint against you?
18     A.  I don't recall that, no.
19     Q.  You have no recollection of that?
20     A.  No, sir.
21     Q.  The fact of the matter, Mr. Ashford, is that TDC
22  would call this situation an assaultive offense against a
23  guard; is that correct?  These kind of situations are pretty
24  rare down there, aren't they?
25     A.  No, sir, they're not.

22

1      Q.  Well, I'm talking about the -- this one here
2  would -- it's called a major assault, is it not?
3      A.  Yes, sir.
4      Q.  Okay.  And you weren't injured, were you?
5      A.  No more than just minor stuff, just during the use
6  of force.
7      Q.  And is it unusual that you wouldn't recall that this
8  thing was never -- that this thing was never prosecuted?
9  Wouldn't you expect that if it was some kind of a big deal,
10  that it would of either been prosecuted or you would of been
11  made aware of why it wasn't?
12     A.  Not necessarily.  Once we write the reports and
13  everything, it goes up above our heads.  We -- I mean, the only
14  time we were ever -- anything is we were called as witnesses.
15          MR. JOHNSON:  I think that's all I have for you
16  right now, Mr. Ashford.
17              REDIRECT EXAMINATION
18  BY MR. BEACH:
19     Q.  I mean, having a food tray thrown at you, Mr.
20  Ashford, compared to getting stabbed in the back like you were;
21  is that correct?
22     A.  Yep.
23     Q.  That's a big deal, right?
24     A.  A little bit.
25     Q.  Okay.  And you also told us that during this time

23

1  frame in a single shift, one day, you had to have 17 major uses
2  of force?
3      A.  Yes, sir.
4      Q.  So this -- this was not an --
5          MR. JOHNSON:  Judge, this is outside the record
6  and I'm going to object to it.
7          THE COURT:  I'm a little confused.  Against Mr.
8  Green?
9          MR. BEACH:  No, no, no, in general, in one day
10  where he had to hit 17 --
11         THE COURT:  All right.  That's -- objection is
12  sustained.
13         MR. JOHNSON:  I'm going to ask that the jury be
14  instructed to disregard.  It is irrelevant, it's improper.
15         MR. BEACH:  May I respond?
16         THE COURT:  Yeah.
17         MR. BEACH:  He's trying to get him to say this
18  is a major deal.  His question's opened up the door that this
19  was a -- some kind of major unique deal, and it's not, Judge.
20  It happens every day.
21         MR. JOHNSON:  That's not -- that's not what --
22  that's not what I was saying at all, Judge.
23         THE COURT:  I just -- it's just a question of
24  what does he do.  What does Mr. Green do, not other people.
25         MR. BEACH:  He's trying -- he's trying to make

24

1  it a big deal.  That's all right, I'll move on.
2          THE COURT:  Let's just focus on Mr. Green and --
3  and the actions of him.
4          MR. JOHNSON:  And -- Well, Judge, my objection
5  to the question, and the whole line of questioning, is that
6  it's irrelevant, and it's improper.  The Court sustained it.
7  I'm going to ask the jury be instructed at this time to
8  disregard it.
9          THE COURT:  Well, it's just a question.  It's
10  not evidence that --
11         MR. JOHNSON:  Well, the way he -- the way he
12  phrased it to the witness, he stated it as a fact and it's
13  before this jury now be considered as fact.  We're going to
14  object and ask the jury to be instructed to disregard it.
15         THE COURT:  Okay.  In an abundance of caution,
16  the jury will disregard.  But the jury is reminded that the
17  questions the attorneys ask are not evidence.  The answers to
18  the questions -- that are evidence.
19         MR. JOHNSON:  And further, we move for a
20  mistrial at this -- at this point, because I believe this is
21  going to be a cumulative error that continues through this
22  portion of the punishment phase.
23         THE COURT:  Okay.  That's denied.
24         MR. BEACH:  I'll pass the witness.
25         MR. JOHNSON:  Nothing further.

25

```
1        THE COURT:  Okay.
2        MR. BEACH:  May he be excused?
3        THE COURT:  Yes, he may.  Sir, thank you very
4   much for coming IN.
5        MR. HEALY:  The State calls Melodye Nelson.
6        (Witness brought forward.)
7        THE COURT:  If you would.
8        (Witness sworn.)
9        THE COURT:  Please have a seat.
10       THE WITNESS:  Yes, sir.
11       MR. HEALY:  May I proceed, Your Honor?
12       THE COURT:  You may.
13       MR. HEALY:  Thank you, sir.
14            MELODYE NELSON,
15  was called as a witness by the State, and after having been
16  first duly sworn, testified as follows:
17            DIRECT EXAMINATION
18  BY MR. HEALY:
19       Q.   Ma'am, if you could, please state your name for the
20  record and spell your last name for the court reporter.
21       A.   Yes.  Melodye Nelson, N-e-l-s-o-n.
22       Q.   How are you employed, ma'am?
23       A.   I am a warden with the Texas Department of Criminal
24  Justice.
25       Q.   And what specific unit are you working at now?
```

26

```
1        A.   I am at the Dr. Lane Murray Unit in Gatesville,
2   Texas.
3        Q.   What kind of unit is that?
4        A.   It is a maximum custody female facility at this
5   time.
6        Q.   And are you the senior warden at that unit?
7        A.   Yes, sir, I am.
8        Q.   How long have you been doing that?
9        A.   Sixty-two days.
10       Q.   Okay.  Warden, if you could, please, familiarize
11  yourself with the jury and explain to them how many years and
12  what jobs you've held with the TDC system.
13       A.   Yes, sir.  I've been with TDCJ a little over
14  21 years -- almost 21 and a half.  Started my career out as a
15  correctional officer at Ramsey III Unit in Rosharon, Texas.
16  Promoted to sergeant of correctional officers there.  Was there
17  about three years, left that facility, took a promotion to
18  lieutenant of correctional officers at the Darrington Unit.  I
19  stayed there about six years.  Accepted a lateral transfer to
20  the Huntsville Unit in Huntsville, Texas.  Was a lieutenant for
21  about a year.  Then I promoted to captain of correctional
22  officers there.  Was there about a year and a half as a
23  captain.  Then I left Walls Unit, took a promotion to the Allan
24  B. Polunsky Unit in Livingston, Texas, where I was the major of
25  correctional officer overseeing death row.  And then I took a
```

27

```
1   promotion in 2008 to the Assistant Warden at the Gatesville
2   Unit, Gatesville, Texas.  And then about 62 days ago accepted
3   the promotion to Senior Warden at the Dr. Lane Murray Unit
4   there in Gatesville.
5        Q.   Are you on any committees or chair of any committees
6   within the prison system?
7        A.   Yes, sir.  Your majors, your assistant wardens, and
8   your senior wardens are what we call chairmen of the unit
9   classification committees on a daily basis to oversee our
10  classification of our offenders assigned to us.
11       Q.   And we're going to talk about classifications here
12  in a little while.  But so basically so the jury understands,
13  you've kind of spent your time over 21 years in -- in different
14  areas of the prison system from all the way from death row to
15  now you're the Senior Warden of the maximum security women's
16  prison?
17       A.   Yes, sir.
18       Q.   Okay.  What I want to do, Warden Nelson, if I could,
19  is just briefly before we get into the classification aspect of
20  the prison system, talk about the TDC system as a whole.  We're
21  talking about types of units, talking about minimum versus
22  maximum security, those sort of things.  First off, can you
23  start with kind of types of units we're dealing -- how many
24  types of units are here in the State of Texas?
25       A.   What we have -- basically we -- we currently oversee
```

28

```
1   the operations of 112 correctional facilities in this state.
2   We oversee everything from a private facility where we pay a
3   company to house some of our offenders.  And then we have
4   facilities that are substance abuse facilities.  Some of them
5   are facilities that are what we call minimum custody.
6   Basically they house some nonviolent offenders.  We -- we even
7   break it down into what we call a 2250 prototype.  Those were
8   -- we have ten facilities that are built identical in the
9   agency that were built to house 2250 offenders -- maximum
10  security offenders, and then we have -- they actually house
11  more than that now because we've added some dormitories and
12  expansion bed facilities on there.  We have thousand bed
13  facilities which are anywhere from minimum to medium, and some
14  have maximum security offenders there.
15            So we have -- and then we have psych facilities,
16  psychiatric inpatient facilities.  We have the Mountain View
17  Unit which it has 20 beds, psychiatric for females, Skyview
18  Hodge which is in the Rusk area is a psychiatric and mentally
19  retarded offenders for the males and does house some female
20  offenders on a temporary basis.  And the Jester IV Unit in
21  Richmond, Texas, is an in-patient psychiatric facility.  And
22  then the Crain Unit where I came from, the Gatesville Unit, has
23  an in-patient facility for psychiatric which is -- houses the
24  female which was formerly the mentally retarded offenders
25  program, but it's now called the DDP which is the
```

29

1   developmentally disabled program for the female offenders.

2      Q.   And I heard you spoke -- spoke earlier, you have the

3   Death Row Unit?

4      A.   Yes.  Female death row is housed at the Mountain

5   View Unit in Gatesville, Texas.  The male death row is housed

6   at the Allan B. Polunsky Unit in Livingston, Texas.

7      Q.   So basically the TDC system, you have a variety of

8   minimum security prisons, maximum security prisons, psych

9   prisons, psych prisons for males, psych prisons for females,

10  and so on?

11     A.   Right.  Yes.

12     Q.   And talk to me about the number of inmates statewide

13  in the TDC system right now.

14     A.   Currently give or take a couple of thousand, I think

15  we're right about 150,000 incarcerated inside of those

16  facilities.

17     Q.   And what about guards?

18     A.   I think we have around 25,000.  I believe we have

19  about 15,000 males and about 9,000 females, give or take some.

20     Q.   Okay.  So you're looking at about a 60 percent male

21  guard and 40 percent female guard, somewhere around there if my

22  math is correct?

23     A.   Yes, yes.

24     Q.   And when you're talking about a regular shift in any

25  of the normal prison units, how many guards per inmates usually

30

1   are there, approximately?

2      A.   Approximately, you're going to have -- depending on

3   your custody levels, because your higher custody levels require

4   more staffing, but on a general level, you're going to have

5   anywhere from 30 correctional officers potentially to 40

6   correctional officers per shift.  Some of the bigger facilities

7   may have 70 per shift, but those will have 3,000 or 4,000

8   offenders.  So it's about 30 to 1 on the offender population --

9   30 inmates to every one correctional officer on shift at any

10  given time.

11     Q.   Okay.  Now, Warden Nelson, what I want to do now

12  then, I want to talk to you about -- and we're going to get

13  specific here in a second with regard to the Defendant, Gary

14  Green.  But first off, if you can explain to the jury when an

15  inmate comes to TDC, how the process works to where they are

16  classified, and then we're going to go through the whole

17  classification process here.

18     A.   Okay.  Once an offender is received from a county

19  jail into one of our intake facilities, they get a jail report,

20  they get a background information, whatever crime they've

21  committed, things of that nature.  And then they are the -- we

22  have a group of individuals called state classification

23  committee, and they give a recommended custody level -- a

24  recommended assignment level, and so they could be a state jail

25  offender or an I.D. offender.  We have state jails also that --

31

1   that operate with our own.  And we have everything from state

2   jail and general population Level 1's, all the way up to Level

3   5's, and then we have Ag Seg, a custody called administrative

4   segregation that they could potentially be -- go directly into.

5      Q.   Okay.  And that's where I want to start, Warden

6   Nelson, with regards to the classifications.  First off, you

7   brought up the numbers -- the 1's to 5's.  In the most basic

8   terms so the jury can understand it, tell the jury when you're

9   talking about -- I think it's called G1 through G5, what we're

10  talking about there?

11     A.   G1's -- the G standing for basically general

12  population.  G1's is an offender assigned to a minimum custody

13  which is an outside trusty.  Whether they live inside the

14  perimeter or outside of our perimeters, they basically require

15  a minimum amount of supervision.  They're required physically

16  to be seen every two hours, so they can mow, they can ride our

17  tractors, they work out in our fields, and things of that

18  nature.

19          A lot of them are what we call the dog handlers

20  where they use our tracking dogs, our scent specific dogs.

21  Those -- those offenders are minimum custody.  Those offenders

22  are within one year of their eligibility to parole.  Doesn't

23  mean they're going to parole within it.  It just means that

24  they're eligible to parole within that one year and have -- do

25  not have a pattern of violent offenses, whether in any -- in

32

1   any arrests, but they don't have a pattern of those.

2          G2's are what we call general population.

3   They're minimum in.  They are supervised inside of our

4   correctional facilities, but when they're outside, they must

5   have armed supervision.  Our outside trusties, the only thing I

6   forgot to tell you is they don't require armed supervision, so

7   the officers -- the supervisors do not carry sidearms or

8   firearms.

9          Your minimum ins do require armed supervision

10  outside of our perimeter, not inside.  There, again, could be

11  because of their crime, could be their violent offenses, could

12  be different things of reason why they're not out -- considered

13  for outside trusties.

14          G3's are any offender that is doing 50 years or

15  more and has done less than ten years of that 50-year sentence.

16  They are general population.  They pretty much live, work, and

17  eat amongst our G2's, but they are housed with other G3's, if

18  possible.  And we restrict their jobs.  Basically they can't

19  have a job that takes them to multiple areas of our facilities,

20  so they can't work in maintenance, for instance, where they

21  would be escorted around to multiple areas.  They work out in

22  our fields.  They can work -- sometime -- they're S.S.I.,

23  support service inmates, where they can clean and be janitors,

24  things of that nature.  So they're limited on their jobs.

25          G4's are medium custody offenders, and those are

**33**

1    offenders who basically have had -- had some disciplinary
2    history, maybe not violent, but so much as repetitive
3    offenders.  They have chronic rule violations inside of our
4    prison system.  So we put them in G4.  They live in cell block
5    housing in 2 persons to a -- to a cell.
6           Our G5's which are -- was formerly known as our
7    close custody.  Those are our offenders who have disciplinary
8    issues, that are violent in nature.  Now, they live in cell
9    blocks two to a -- two to a cell, as well.  Now, their movement
10   is restricted -- is more restricted in their -- things like
11   their recreation time, their visitation.  Those are limited
12   from others -- what the others are allowed to get, so it's an
13   incentive not to go down there.
14          Administrative segregation are offenders who
15   have -- have a pattern of violence either against our staff or
16   other offenders or known gang members in one of our known gangs
17   that -- prison gangs, and they -- they are segregated, single
18   celled, recreated either one or two hours a day, depending on
19   their recreation schedule.  They are restricted, they --
20   everywhere they go they are in hand restraints and are escorted
21   by two correctional officers.
22      Q.   And death row is -- we're going to get to in a
23   second, but basically the same restrictions as --
24      A.   Death row is the same thing as administrative
25   segregation.  They are single celled.  They are restrained in

**34**

1    any -- any area that they are escorted to.  And they single rec
2    by themselves, and they -- obviously, like I said, are escorted
3    by two correctional officers anywhere that they go.
4       Q.   And you keep bringing up that point on the Ag Seg
5    and the death row, they're always escorted by two correctional
6    officers.  When you're being moved around as a G1 through G5,
7    are you handcuffed?  Are you moved --
8       A.   Your G5's are inside the housing areas and outside.
9    Their -- their movement is very restricted because of their
10   assaultive nature, but your G1's through G4's, on an ordinary
11   routine basis, no, are not.
12      Q.   Okay.  And how does one -- not talking about capital
13   murders yet, but how does one move up and down amongst the G
14   levels in general population?
15      A.   The G3's -- it's -- it's strictly based upon your --
16   your sentence.  If you receive a 60-year sentence and you've
17   only done five years, you're G3.  That's the only -- -- the only
18   way you can get to be a G3 is -- is strictly because of your
19   sentence.  However, your G1's, G2's, G4's, and G5's is because
20   of your institutional record and/or your crime.  Your G1's,
21   like I said, has to do with not only your institutional record,
22   however, your prior incarcerations, your prior arrests, things
23   of that nature.
24      Q.   Okay.  Warden Nelson, what I want to do now is I
25   want to now concentrate you a second about the G3 status.  You

**35**

1    told this jury here that it has to be something where you
2    receive a sentence of 60 years or greater?
3       A.   Fifty years --
4       Q.   Fifty years or greater, excuse me.  If somebody is
5    convicted of capital murder and receives life without parole
6    and not a death sentence, what classification would they go
7    into?
8       A.   G3.
9       Q.   G3 status.  So they're still going into general
10   population?
11      A.   Yes.
12      Q.   Now, when you talk about Ag Seg, that has nothing to
13   do with somebody who is convicted of capital murder and given
14   life without parole?  They're -- they're in the general
15   population?
16      A.   Correct.  Unless their behavior -- they -- a G3 can
17   go to Ag Seg.  I don't know if I was clear on that, but a G3
18   could, because of their institutional behavior, become
19   assaultive in nature and go to Ag Seg, but if he -- he or she
20   were to just come in with a 60 or 70 or life without parole,
21   yes, they would just go in as a G3.
22      Q.   Now, prior to this -- after -- prior to a few years
23   ago after ten years, those G3 inmates who were convicted of
24   capital murder could potentially go down to a G2 level; is that
25   correct?

**36**

1       A.   That is correct.  Before we got the life without
2    parole, yes, G3 offenders and any G3 offender that is not doing
3    life without parole, after ten years, could go to G2.
4       Q.   Now that law has changed, right?
5       A.   Yes.
6       Q.   So somebody that goes in as a capital murder life
7    without parole, they're looking at the best G3?
8       A.   Right.
9       Q.   Okay.
10      A.   Yes, forever.
11      Q.   Now, Warden Nelson --
12      A.   At current.
13      Q.   I -- we've questioned you before on this issue --
14      A.   Yes, sir.
15      Q.   -- and a couple of trials ago you testified that a
16   capital murderer on a life without parole could potentially
17   after ten years get moved down to G2?
18      A.   Correct.  And at that time it was my understanding
19   when we testified -- and that is the way the classification
20   plan -- if you read our classification plan, that is exactly
21   how it reads.  However, there is an addendum -- a one-page
22   addendum that I was not aware of and -- but there is an
23   addendum now that says life without parole will remain a G3.
24      Q.   Okay.  Let's talk about the movement specifically
25   regarding G3 inmates now.  Are they locked up 23 hours a day?

37

1    Are they -- tell me just about that.

2        A.   No, sir.  G3 offenders basically have jobs.  Like I

3    said, they can be janitors.  They can work in our field.  They

4    recreate.  They go to a chow hall -- a dining area, eat with,

5    you know, 50, 60, 70, 80, whatever your dining facility holds,

6    they walk amongst our G1 and our G2's.  They go to school.

7    They can go to school.  They can go to the library.  They can

8    go to the law library.  Their only designator is we attempt --

9    we try to house them -- and when I say house, they can be in

10   the same cell block with G2's, but their particular cell

11   partner should also be a G3, okay, the partner that they're

12   living in that cell with will be a G3, but a few cells down may

13   be G2 offenders, depending on the custody level or the -- the

14   layout of your facilities.

15       Q.   And just so the jury is clear, we're not talking

16   about all capital murderers who receive life without parole.

17   We're talking about any inmate who receives a sentence greater

18   than 50 years?

19       A.   Correct, correct.

20       Q.   So there could be DWI third individuals with capital

21   murderers.  They could be theft people.  There could be

22   burglary people --

23       A.   Sure.

24       Q.   -- with these capital murderers?

25       A.   G3 offenders, I've seen them from -- anywhere from

38

1    possession of drugs, like you said, DWI, repeats, that come in

2    from these counties with, you know, even a 55-year sentence is

3    a G3 offender, 60 years, 70, life, whatever -- whatever

4    sentence.  And, no, it does not necessarily -- and we will not

5    house just capital murderers with capital murderers.  They'll

6    be in -- because their custody level, that's what we house

7    by, the G3 custody designation.

8        Q.   So really it's not so much the crime they committed,

9    it's just so much the matter of years they get when we're

10   talking --

11       A.   Correct.

12       Q.   -- about G3 status?

13       A.   G3's, yes.

14       Q.   Okay.  What about contact visits, are G3 status

15   allowed to have contact visits?

16       A.   Yes, but they have to be a certain time earning

17   status, and that's a whole different status from the custody

18   status.  But once they get to a State-approved trusty --

19   believe it not, that's the word -- but it's SAT 4 --

20            COURT REPORTER:  I'm sorry, what?

21       A.   S -- State-approved trusty which is what we call an

22   SAT 4, which is a time earning status.  Even though they don't

23   get that good time, they get to that custody level, they can

24   have contact visits.

25       Q.   (BY MR. HEALY)  Now, with regards to actually

39

1    staying in their cell with the bars shut, are we talking just

2    sleep hours here or what --

3        A.   Usually, yes, absolutely.  They're going to be at

4    work or recreation -- anytime an offender is not at work, they

5    have the opportunity to be recreating or going to school or

6    going to the law library.  Or like I said -- or they can stay

7    in their cell.  That's pretty much up to them, but lights out

8    at 10 o'clock and lights back on at 3:30 or 4 o'clock in the

9    morning, depending on your facility.

10       Q.   So just so this jury is clear, when we're talking

11   about somebody who is convicted of capital murder and given

12   life without parole, basically they would be mandatory in their

13   jail cell from 10:00 at night to 5:00, 6:00 in the morning,

14   that's about it?

15       A.   Yes, sir.

16       Q.   All right.  Talk to me about opportunities for

17   violence, and not specifically regarding this Defendant yet,

18   just opportunities for violence when we're talking about G3

19   status.

20       A.   Well, they're in population.  Like I said, even

21   though -- for the most part, not all, but they live in cell

22   blocks, but we do have dormitories with G3 offenders in it.

23   They're -- like I said, they have the opportunity to be with

24   other offenders so the opportunity -- and to be around other

25   staff members -- you know, to be around the staff members,

40

1    unrestrained, so, you know, the propensity for violence is --

2    is really up to what that individual chooses to do, whether he

3    gets into a confrontation with a staff member, gets into a

4    confrontation with his cell partner, gets in confrontation with

5    somebody in the chow hall, somebody in the school.  You know,

6    fights occur and -- amongst all the population, but G3's

7    certainly have that opportunity, as well.

8        Q.   So really it's up to that individual --

9        A.   Yes.

10       Q.   -- meaning the opportunities are there --

11       A.   Sure.

12       Q.   -- if he chooses?

13       A.   Sure.

14       Q.   Let me ask you this.  You spent some time on death

15   row as a Major; is that correct?

16       A.   I did, yes.

17       Q.   The most secure unit in the prison system.

18       A.   One would hope, yes, sir.

19       Q.   And they are locked down 23 of 24 hours on that

20   unit?

21       A.   Yes, sir.  They're allowed one hour of recreation

22   seven days a week.

23       Q.   By themselves; is that correct?

24       A.   Yes, sir, by themselves.

25       Q.   And even on the most secure unit in the prison

41

1  system, you still have violent encounters with those inmates;
2  is that correct?
3      A.   Yes, we do.
4      Q.   Now, Warden Nelson, I asked you if you could just to
5  bring some potential items that you have seized throughout your
6  time in the prison just to illustrate to the jury how creative
7  some inmates could get.  Did you, in fact, bring those here
8  today?
9      A.   Yes, sir, I did.
10     Q.   Do you mind pulling those out and describing what
11 you brought for the jury?
12          THE COURT:  Did you bring weapons into our court
13 building?  Just kidding.
14     A.   These are just some confiscated weapons that we
15 found in common areas.  Obviously, not in any type of
16 litigation at this time, but these were just some unique ones.
17 This one is made out of cardboard that they've taken, and this
18 is a typewriter rod out of a typewriter that we sell --
19 offenders are allowed to possess and even death row offenders
20 are allowed to possess a typewriter that they can purchase out
21 of a unit commissary.  And they take that rod out.  They can
22 split it in half so it makes two weapons because this is only
23 half of the rod.  They can take it and sharpen it on the
24 concrete.  This primarily is usually thrown or projected out of
25 a cell onto a passing by offender or staff member, either under

42

1  the cell or through the bars.
2          Same thing with this.  This is basically another
3  typewriter ribbon -- I mean, typewriter rod that they have
4  sharpened down.
5          Same thing with this one.  This one's got
6  newspaper wrapped up on it for the use of a handle to keep it
7  from -- from slipping if they're going to use it.
8          This was simple pencils that they can purchase
9  or are given.  They took the erasers off, took string out of a
10 commissary bag that we sell them, wrapped it for a handle.
11 This one is pretty old, but it -- it could obviously be
12 sharpened again and -- and utilized.
13          Again, another typewriter.  Obviously, those are
14 easiest and the most opportune with these typewriters.
15          And then we have one that's a broken broom
16 handle or mop handle that they had and they found a screw,
17 probably out of maintenance, and somehow was able to get it in
18 there.  And these really aren't even the creative ones.  Pork
19 chop bones, chicken bones, things that you and I would never
20 think.  We've actually seen those types of weapons, as well,
21 inside of our institution.
22     Q.   (BY MR. JOHNSON)  Is it fair to say, Warden, as best
23 as you guys try, if an inmate wants to commit any type of
24 violent act, he's going to have the chance to do it?
25     A.   Yes, sir.

43

1      Q.   Okay.  And that's no knocking of the prison system,
2  it's just y'all have fewer guards than -- I mean, you're
3  getting up to staff, but you have fewer guards than most?
4      A.   Right, absolutely.
5      Q.   All right.  Talk to me about contraband in the
6  prison systems.
7      A.   Contraband is any item that is not allowed for an
8  offender to possess, and whether it be something he made,
9  something that is brought in to them, or something he altered,
10 such as this, this would be contraband, something he altered
11 that would effectively change or alter our safe operations of
12 our facility.  Obviously, cell phones are a big thing right
13 now.  Probably seen it on the news.  Staff and visitors
14 bringing in -- attempting to bring in cell phones to our
15 offenders.  They're making illegal phone calls.  Tobacco,
16 marijuana, illicit drugs of all types are contraband, down to
17 pornography magazines, believe it or not, or simple pictures
18 out of -- out of pornographic magazines are considered because
19 they're not allowed in our prison system.  Those are often
20 found on offenders through some interdiction type, whether it
21 be by staff or their visitors or someone.
22          Shoes, offenders' family members will wear in a
23 new pair of shoes in the visitation room.  If they have a
24 contact visit, they slide them off.  Inmate slides it in his
25 feet, he -- they put on his shoes, they walk out.  He's got a

44

1  brand new pair of tennis shoes, because we restrict the types
2  of shoes that we sell them to prevent fights, obviously, and
3  things of that nature.
4          Money.  Money is a big contraband item inside of
5  our prison systems.  You got a little bit of money, it can go a
6  long way.  It can persuade a staff or someone else to give you
7  items that you're not -- not allowed to have.
8      Q.   Now, Warden, is it -- again, not to knock the prison
9  system, but is it fair to say you've had some issues with some
10 guards, either smuggling in some type of contraband relating to
11 cell phones, drugs, things like that?
12     A.   Yes, sir, it is one of our interdiction points.
13     Q.   Let me ask you this, Warden.  What about
14 relationships between guards and inmates?
15     A.   Although highly discouraged, it does happen.
16     Q.   Tell us why that's highly discouraged.
17     A.   Well, for the first thing, our security is our first
18 line of defense, and if that first line of defense becomes
19 tainted, we no longer have that.  Like I said, they are
20 allowing them to bring in -- they'll talk staff members into
21 bringing them the drugs, the cell phones, things where they're
22 there committing other offenses.  They're actually committing
23 other felonies by possessing the drugs, by possessing the cell
24 phones, making calls, things of that nature.  So that's our
25 first line of defense.  Our officers -- our correctional

**45**

1  officers are trained both at the beginning and yearly on
2  emergency responses.  And so offenders gather information about
3  our security systems and -- and our responses to our security
4  by these staff members, because they'll tell them, hey, what
5  are y'all doing about -- if I was to escape or if somebody was
6  to escape, where would y'all -- where would y'all go?  Oh, we
7  go out on this street, this street, and this street.  Well,
8  that tells the offender, don't go to that street and that
9  street, go to this one because we're going to go out there.
10  And so it causes a huge threat to the safety and security of
11  our institutions.
12      Q.   And in your experience of 21 years being a Warden
13  there, what type of guards do these inmates try and connect
14  with?
15      A.   They -- they try to find someone -- what I call a
16  weaker-minded individual, or someone that has a need that is
17  not being fulfilled in the world, whether that is a
18  relationship, whether it is money, something.  There is a need
19  out there -- a basic need that's not being met and the offender
20  can attempt to meet that, whether it's kind words -- and that's
21  usually how they start out is through kind words.  They will
22  listen to our staff.  They do what we call information
23  gathering.  And they may not use it themselves, but they'll
24  pass that information on.  Where do you live?  What kind of car
25  do you drive?  How many kids?  They try to build a commonality,

**46**

1  and then they build on a relationship from there.
2          MR. HEALY:  Thank you, Warden.
3          Judge, I believe that's all the questions I have
4  right now.
5          CROSS-EXAMINATION
6  BY MR. JOHNSON:
7      Q.   Ms. Nelson, the bottom line is -- the prosecutor
8  keeps saying not to blame the prison system, not to blame the
9  prison system, but the bottom line is the prison system is a
10  pretty well run organization, is it not?
11      A.   Yes, sir, absolutely.
12      Q.   And when we talk about absolutely well run, we're
13  talking about there are people down there that are well trained
14  -- I mean, they undergo -- they undergo constant training, do
15  they not?
16      A.   Our correctional officers undergo at least 40 hours
17  per year -- a minimum of 40 hours per year.
18      Q.   And they're trained before they come down there?
19      A.   Yes, they are.
20      Q.   And these individuals are -- are good at what they
21  do, are they not?
22      A.   For the most part, yes, sir.
23      Q.   And the bottom line here is that you have -- at the
24  prison system you have the mechanisms and the abilities to
25  control individuals and to do everything possible to prevent

**47**

1  them from being dangerous, do you not?
2      A.   As technology gets better, obviously, our security
3  practices get better.  But as we get better, so does the
4  offender population.  My staff are there 8 to 12 hours a day.
5  The offenders are there 24 hours a day, seven days a week, and
6  they observe our practices and our procedures.  So as they know
7  them, they can figure out how to countermand some of our
8  procedures, basically.
9      Q.   But the bottom line is in response to my question,
10  y'all are able to control individuals, are you not, by both
11  classification and housing -- housing alternatives?
12      A.   We -- yes, sir, we try and -- but obviously we don't
13  do it all, because we wouldn't have the introduction of
14  contraband and the assaults that we do, but, yes, sir, we -- we
15  have some tools to -- to prevent these things.
16      Q.   Right.  And the assaults and the things, the
17  contraband, those types of issues, those are the major
18  disruptive things that occur in the prison system environment;
19  is that correct?
20      A.   Say the first part of that again.
21      Q.   The assaultive type conduct and the contraband --
22      A.   Yes, sir.
23      Q.   -- those would be --
24      A.   Yes, sir, that would be --
25      Q.   -- disruptive to the prison system?

**48**

1      A.   That and our gang activity, yes, sir.
2      Q.   Okay.  And -- and just so the jury is aware, as far
3  as your gang activity -- I mean, if someone comes into the
4  prison classification system, no matter what their sentence is
5  or what their offense is, if they come in and they're one of
6  the members of the known violent prison gangs, they're
7  automatically going to go to Ag Seg, are they not?
8      A.   Yes, sir, if they're -- if they are a member of one
9  of our seven recognized gangs.  Now, we have other gangs that
10  are recognized, but they are not -- they're not automatically
11  placed into administrative segregation.
12      Q.   So you think -- I mean, so -- so when we're talking
13  about doing things to lessen the impact or the possibility even
14  of violence out of certain types of people, if you're a gang
15  member or one of those enumerated gangs and you come in for car
16  theft, you're going into Ag Seg?
17      A.   Yes, sir.  If they're one of our recognized -- our
18  seven recognized that we seg --
19      Q.   And you -- I'm sorry.  I didn't mean to speak over
20  you.
21      A.   I'm sorry, we place them in Ag Seg.
22      Q.   And y'all do that to maximize the environment of the
23  penitentiary for both safety and --
24      A.   Safety and security, yes.
25      Q.   Okay.  Now, Warden, the prison down there -- and

it's -- I mean, this is not a situation where -- I mean, we're talking this is all steel bars and concrete, is it not?

A. For the most part, yes, sir. I have open dorms that are very limited to bars, but, yes, sir.

Q. Okay. Are those open dorms -- are those open dorms the type that G3's would be housed in?

A. Could be. Possibly, yes, sir.

Q. Okay. You're talking about the cell block itself?

A. No, a dormitory situation which would house as few as 36 or as many as 107, and some of the dorms could house G3 offenders, as well.

Q. And the -- the staffing on each of these individual blocks is done by what?

A. Is done by a staffing plan. For each facility, it is proved -- obviously approved all the way through to our executive branch of our division -- of the Institutional Division. Based upon the custody levels that are kept, G1's, 2's, and 3's usually is one staff member per dormitory area. Cell blocks usually one. G5 there would be two to a cell block area.

Q. Okay. And when you described for the jury a little while ago, you talked about each person has a certain amount of time that they're -- we know they're going to be in their cell block for purposes of sleeping, and then we have a known amount of time that that person is going to be assigned to a work

detail; is that correct?

A. Correct. If they are work capable, yes, sir.

Q. Right. And basically everybody that is work capable is assigned to a -- to a job?

A. Yes, sir.

Q. And required to be there for a certain amount of time?

A. Yes, sir.

Q. And you told the jury that once those individuals -- if they're not sleeping, if they're not at work, then they're basically free to -- to go to the rec halls, the dining halls, or law library; is that correct?

A. Yes.

Q. And that's not really -- I mean, that's not completely an accurate picture as to how this -- this transport of these individuals occurs, is it? I mean, the prison system is not just like a college campus where if you're not asleep, you can just walk across campus and go over to do what you want to do, is it?

A. No, and -- like our library, we have particular hours for particular living areas, for instance. Open five days a week, and we will call a particular housing area -- so if there's 50 of them in there and they want -- all want to go to the library, we will -- they can all go to the library. They don't -- they're not necessarily escorted. We just call

them, say anybody want to go to the library. Same thing with commissary. We'll call -- we need 15 people that want to go to the commissary, they're let out of that housing area and they go. When --

Q. Whether --

A. -- we call -- I'm sorry. When we call for feeding, it's usually 20, 30 at a time. First 20, we let them out the door, they go to -- they walk unescorted to a dining hall. They eat in there. And then once they're through, they get up and then they walk back to their housing area.

Q. But they're -- but they're expected to be in one place or another, so y'all know where they're going to be; is that correct?

A. We should. Okay. Our staff members are supposed to log them out when they leave. Where are you going? Law library. You going to the regular library? Medical -- things of those nature -- medical and education we have what we call lay-ins or a pass. An offender would have one of those, would show the staff member, I have a lay-in to go to the Medical Department. They're supposed to log them in and out, but when you have mass turnouts, an inmate goes -- tells you he's going to the chow hall to eat, very possibly he could end up in the Medical Department. Very possible he could end up in the Education Department. He could end up in the mailroom without really a whole lot of confrontation between Point A and Point

B.

Q. Well, in fact, I mean, Warden, even when you travel -- when you travel around the penitentiary, I mean, when you go from one area to the next, even you -- the penitentiary that you're the senior warden of, you're required to show your badge before you can go through a door, aren't you?

A. Not once I'm inside my facility, no, sir. Once I'm inside, we have certain checkpoints at our front gates and at our -- what we call control pickets, but beyond those gates, then we can enter housing areas or any of that without an I.D. card.

Q. Okay. But when you're going from one of these control units, from one section of the penitentiary to the next section, you are required -- for even the Warden to show your I.D. to go from one area to the next?

A. What are you calling sections?

Q. Well, from going through the -- from like the housing units into the work units, like --

A. No. No, we're not required. It -- and it depends on the layout of your facility. Some of them you -- there are no gates or anywhere that you would require to be. If -- if we had it gated off and we have it staffed, potentially you may have to show your I.D. And the same thing with the offenders, they may have to show their I.D., but chances are, if they live in a particular building, they can walk in that building. Or

53

1 if they don't live in that building, they easily get over into
2 other -- other offenders' buildings.
3      Q.   And are these -- is this -- what you're talking to
4 now, is that in response to all offenders of all the different
5 levels or just through the G1 to the G3 levels?
6      A.   The G1's through the G3's.  Most of our G4
7 facilities now are -- that house them, we put wristbands on
8 them.  Of course, they're able to manipulate that, but we
9 attempt to identify them with a band -- a wristband of a
10 particular color.  But your G1's through G3's -- now, most of
11 your G1's in most of your facilities there, again, have a --
12 have a plastic wristband on because that allows them access to
13 our outer perimeters.
14      Q.   And these G3's -- as you testified, G3's are going
15 to be classified because -- as the same as anybody else doing a
16 50-year sentence and done less than 10 years of their
17 sentence --
18      A.   Yes.
19      Q.   -- is that correct?
20      A.   Yes, sir.
21      Q.   And you said earlier that one of the things that's
22 absolutely true is that the propensity for violence from a
23 particular offender, it's not correlated to -- to what crime
24 they're down there for, is it?
25      A.   Oh, no, absolutely not.

54

1      Q.   Okay.  So -- and so just saying that someone is
2 doing life without parole for capital murder, that as -- as a
3 Warden, you can absolutely tell this jury that doesn't mean
4 that that person is by study or by practice going to be having
5 more propensity to ever commit an act of violence, is he?
6      A.   No, anybody.
7      Q.   And, in fact, a person down there that's serving
8 life without parole for capital murder, it's strictly going to
9 be an individual -- trait of that individual as to whether or
10 not he is going to do something?
11      A.   Right.  I think I testified that it's up to that
12 individual person for that propensity.
13      Q.   Okay.  But you told -- you testified earlier that as
14 far as life without parole and -- I mean, what do you think are
15 the factors that are most important in looking at the
16 propensity of an individual to violate your rules?
17      A.   Mostly opportunity, honestly.  Opportunity and
18 attitude, you know.  And I think -- I have seen anything from
19 someone that's getting ready to parole may have less of a
20 propensity to commit a violent act than someone who's not ready
21 to -- that doesn't have -- hasn't seen parole or isn't going to
22 see -- see them for a while, but it's an individual character
23 basis.
24      Q.   And it has absolutely -- and you'll testify, it has
25 absolutely nothing to do with what they're down there for?

55

1      A.   Absolutely.  There's -- there's no studies to show
2 that capital murderers commit more violent offense once inside
3 prison walls than DWI people.  I mean, there's -- I don't know
4 of any statistics.
5      Q.   And in fact, ma'am, the truth of the matter is that
6 there is -- for the level of inmates that are there, there's a
7 -- there is actually a small amount of criminal acts of
8 violence committed by -- by a great proportion of the
9 prisoners; is that correct?
10      A.   That's -- that's fair.  That would be fair to say,
11 yes.
12      Q.   Okay.  And have you done anything or did the
13 District Attorney ask you to do anything in this case in
14 relation to this particular Defendant, or did you just come
15 down here to testify in general as to the information that
16 you've provided?
17      A.   I looked at his prior incarceration record as -- as
18 it's available to me on our computer system.
19      Q.   Okay.  And why did you do that?
20      A.   Just to see where he had been assigned and anything
21 that might trigger any -- any signs or activity that -- that
22 you may -- he may need to question.
23      Q.   Okay.  The weapons that you've brought out here -- I
24 mean, just -- I mean, I think you were clear, but just to make
25 sure, these are just things that you picked up over the years

56

1 of being down there?
2      A.   Yes, sir.
3      Q.   And -- and you're here -- I mean, it's obvious that
4 you know what the issue is, that these jurors have to decide in
5 this case -- is --
6      A.   Yes, sir.
7      Q.   -- is that correct?
8      A.   Yes, sir.
9      Q.   And that's -- that's basically -- how long have you
10 been doing this?
11      A.   Probably since I was assigned to death row which was
12 shortly after April of 2004.  I've testified in a selected
13 amount of trials.
14      Q.   Okay.  How many would you say you've testified in?
15      A.   Probably five -- four or five here in Dallas, and
16 several in Harris County, and a couple in Tyler -- I believe
17 two in Tyler.  But most of those were re-trials in Harris
18 County or mental retardation trials.
19      Q.   And what is it about you that brings you as the
20 spokesman, I guess, or do you consider yourself kind of the
21 spokesman for the -- for TDC --
22      A.   No, sir, I do not.
23      Q.   So what exactly -- what do you do?
24      A.   I have no idea.  I mean, if you're asking why I
25 received a subpoena, I don't have an answer to that.

57

1    Q.   Okay.  Do you know a fellow of named A.P. Merillat?

2    A.   I'm familiar with him.  I don't personally know him.

3    Q.   He's the guy that used to do this before you started

4  doing it, isn't he?

5    A.   I -- he's testified in a few of the trials.  I

6  believe one and maybe two.  Like I said, I've only heard his

7  name.  I've never -- I think I met him once in passing, but I

8  don't know him personally.  I don't know what he does.

9    Q.   Okay.  And you said earlier -- and -- and just in

10  response to the prosecutor had asked you, but you had given

11  some testimony in another death penalty case in which you had

12  testified incorrectly in regards to classification matters?

13    A.   Uh-huh.

14    Q.   And I mean, you've given us quite a bit of

15  information today that would -- I would assume we would be

16  applicable to -- in regards to classification housing and all

17  of these different areas.  What kind of assurance do we have

18  today that your testimony is accurate in regards to what you're

19  telling us today?

20    A.   Pull the classification plan behind me.  I would

21  imagine the -- the latest classification plan would be -- I

22  guess would be the only thing you would have to stand on behind

23  my testimony.

24    Q.   And you are familiar with the up-to-date

25  classification areas?

58

1    A.   Yes, sir.  Yes, sir.

2    Q.   Okay.  Warden, I believe that's all the questions I

3  have for you at this time.

4    A.   Okay.

5              REDIRECT EXAMINATION

6  BY MR. HEALY:

7    Q.   Warden Nelson, isn't it, in fact, true I told you

8  this morning I like bringing you down here because you just

9  tell it as it is?

10    A.   Okay.  He did say that.  You know, it's -- I receive

11  nothing for this, but, you know -- and like I said, I don't

12  have a clue why they just -- when I started doing them.

13    Q.   You present it in a fair, and you just basically say

14  what's there?

15    A.   I try to, yes, sir.

16    Q.   And we appreciate that.

17              Real quick, what I want to touch on, Mr. Johnson

18  brought up two issues, talking about parole and -- versus life

19  without parole.  And I wasn't going to talk about this in the

20  beginning, but would you agree, Warden, based on your 21 years

21  of history, that parole gives prisoner incentives to be good?

22    A.   Yes, sir.

23    Q.   I mean, is that a big kind of way the prison system

24  works?

25         MR. JOHNSON:  Excuse me, Judge.  Just so the

59

1  record is clear, unless I said it in my sleep, I don't recall

2  bringing up that particular issue.  I'm going to object to this

3  as being outside the direct -- or outside the scope of redirect

4  and it was not crossed on.

5         THE COURT:  Well, I'm going to overrule -- the

6  objection is overruled.  The Court finds that the response that

7  was given was an appropriate response to a question elicited

8  from the Defense lawyer -- Defense counsel.

9    Q.   (BY MR. HEALY)  You can answer it, ma'am.

10    A.   Yes, parole is -- is an incentive for some better

11  behavior, obviously.  They don't want -- they don't choose to

12  be there, and if they have that opportunity for parole, their

13  behavior obviously is -- is much better.

14    Q.   And obviously when somebody gets a life sentence

15  without parole, there's no incentive for parole?

16    A.   Yes, absolutely.

17    Q.   Okay.  And then also Defense counsel asked you, and

18  I didn't go into this on direct examination, about looking at

19  his records.  Do you remember that line of questioning?

20    A.   Yes.

21    Q.   And is it, in fact, true I had you look at his

22  records when he was in prison in the early 90's?

23    A.   Yes.

24         MR. HEALY:  Judge, can we approach real quick?

25  Take two seconds, Judge.

60

1         THE COURT:  Yes.

2         (Sidebar conference.)

3         THE COURT:  Ladies and gentlemen, we're going to

4  take a quick break and then finish -- we're going to finish up

5  here and then go to lunch.  We got to take up a couple of

6  things.

7         THE BAILIFF:  All rise.

8         (Jury excused from courtroom.)

9         MR. HEALY:  And, Judge, I may be able to clear

10  it up.  Can we go off the record a second, Judge?

11         THE COURT:  Off the record.

12         (Discussion off the record.)

13         THE COURT:  Go back on the record.

14         MR. HEALY:  Okay.  Judge, all I want to ask the

15  Warden is:  After looking at his records, did you determine

16  that he moved up and down the classification system when he was

17  in prison.  She knows why that is, based on her experience --

18         MR. JOHNSON:  Judge, I'm going to ask that the

19  witness be excused from this while we're arguing the point.

20         THE COURT:  Fair enough.

21         MR. BEACH:  That breaks your heart, doesn't it?

22         (Witness excused from courtroom.)

23         THE COURT:  What's the Defense's response?

24         MR. HEALY:  Do you want me to finish, Judge?  I

25  just want the record to be clear that Mr. Johnson asked the

**61**

```
1   question, did you look at his record personally, as well.
2           THE COURT:  I understand that.
3           MR. JOHNSON:  That's all I asked.  I didn't go
4   into a single thing about his records.  I just asked if she
5   had -- I didn't even ask her if she was asked to look at them.
6           THE COURT:  I understand that, I mean, but
7   you're objecting to this.  I'm not -- if it's objectionable,
8   I'm not going to find that you opened the door.  I don't even
9   know -- I don't know why that wouldn't be relevant.  Can we --
10  can we agree that it's relevant?  I'm just trying to frame the
11  issue right.  Are you saying that his -- that his prior actions
12  in prison were -- aren't relevant?
13          MR. JOHNSON:  Not through this witness.  This
14  witness is being offered --
15          THE COURT:  No, no, no.  It doesn't matter --
16  I'm talking -- so you're -- they're relevant, but you're saying
17  this is not the proper witness?
18          MR. JOHNSON:  If they're going to bring someone
19  in to actually prove that was -- there's some type of
20  infraction that caused his housing status to be changed, as
21  opposed to just offering a conclusionary statement that his
22  housing was -- if his housing status was changed, it was due to
23  a -- a disciplinary action because I know for a fact that the
24  State doesn't know what they're -- what allegations they're
25  claiming caused his housing status to be changed.
```

**62**

```
1           THE COURT:  Okay.  That -- that's the question.
2           MR. JOHNSON:  Yes.
3           THE COURT:  Okay.  Is this the proper witness to
4   talk about his prior conduct in jail?
5           MR. HEALY:  Specifically -- to each specific
6   instance?
7           THE COURT:  Yes.
8           MR. HEALY:  I'll concede, no, this isn't the
9   proper witness.
10          THE COURT:  Okay.
11          MR. HEALY:  But to say that they -- that she
12  reviewed his records as a classification expert and can see
13  from his records that he moved up and down the classification
14  system, I feel clearly in her 21 years she can explain that.
15          MR. JOHNSON:  They're asking her to explain
16  based on conclusions.
17          THE COURT:  But what happens when he asks her
18  why, and she says I don't know?
19          MR. BEACH:  She does know.
20          MR. HEALY:  Well, she does know.
21          MR. JOHNSON:  No, she doesn't.
22          MR. HEALY:  Yes, she does.
23          THE COURT:  Bring the witness in.
24          MR. HEALY:  Okay.  Ask her.
25          THE COURT:  Bring the witness in.  Let's find
```

**63**

```
1   out.
2           MR. JOHNSON:  But it goes back to the issue,
3   Judge, that this is not the proper witness to get into it with.
4           THE COURT:  Well, let's find out.  I don't know.
5           MR. JOHNSON:  Well, he already concedes that
6   she's not.
7           MR. HEALY:  To say specifically he fought
8   so-and-so, this may not be the proper witness, but not to --
9           (Witness brought forward.)
10          THE COURT:  Y'all can sit down.  Just because
11  I'm standing up doesn't mean y'all have to.  Sit down, please.
12          THE WITNESS:  Yes, sir.
13          THE COURT:  Warden, we had some other questions
14  regarding Mr. Green's records.  When you say you reviewed his
15  records prior to coming in, what does that mean?
16          THE WITNESS:  Well, we have access to what is
17  called the IMF, the inmate main frame.  Basically it has
18  visitation, his commitment screen, his assignment screen.  Now,
19  I did not get to see his -- any of his disciplinaries because
20  of his -- the length that he had been out has already gone to
21  archive.  And -- and so because of the massive amounts of
22  offenders that have come and gone in our prison system, we --
23  our database obviously is not large enough to maintain all of
24  those types of files, so a lot of things -- when you say I've
25  looked at his records, I was very limited because most of his
```

**64**

```
1   things have gone to archive.
2           I did see his -- his -- the disciplinaries that
3   he showed me this morning that reflect changes in custody
4   levels, and that's clearly marked on the top.  It's typed, and
5   it's clearly marked on the top where he went from -- at that
6   time they weren't G levels.  They were MI's -- or MO's, MI's,
7   ME's, and CC's.  That was the -- prior to the Texas 7, that was
8   our classification.  And when I looked at those disciplinaries,
9   he was an MO at one time, which was an outside trusty, a
10  minimum out.  He was an MI, which was a minimum in offender,
11  which was probably a general population at that time.  And at
12  one point he went ME, which was medium custody.  And there,
13  again, the classification system hasn't changed -- it's changed
14  dramatically since the Texas 7, but since -- and since those --
15  those disciplinaries, but it was medium custody, what we now
16  call G4's, but it was because of -- obviously, disciplinaries,
17  because that's why you got into medium custody.
18          And then CC, which at that time was close
19  custody, which is now what we consider our G5 custody levels,
20  but that's based upon that.  And I -- I can look at it and tell
21  you that he had an influx from -- everywhere from a minimum
22  outside all the way to a close custody.
23          Some of the disciplinary cases, I can explain
24  why he would have been in that -- that custody.  I wasn't on
25  that classification committee, so I can't tell you what their
```

**65**

1  vote was so now, but I can tell you based upon his -- those

2  disciplinaries, his custody level reflects every custody level

3  that we at that time had. That's -- that's what I can show.

4  THE COURT: Do you have some questions, Mr.

5  Johnson?

6  (Outside the presence of the jury, defendant

   present.)

7

8  VOIR DIRE EXAMINATION

9  BY MR. JOHNSON:

10  Q.  Yes, ma'am. But you're saying that the -- that the

11  classifications that you are now saying that he went through

12  are different than the ones that you've testified to today?

13  A.  Yes, sir, they are.

14  Q.  And as far as when you reviewed these records, these

15  are not anything that you did in response to the testimony that

16  you came down here to offer --

17  A.  No.

18  Q.  -- in regards to running of the prison system?

19  A.  No. No, sir. No, sir.

20  Q.  Okay. And in response to any questions that I asked

21  you -- or that he asked you in direct or I asked you in

22  redirect, you were never asked about any particulars of

23  anybody's records, were you?

24  A.  No, sir, I was not.

25  Q.  And as far as you said you were not able to review

**66**

1  a -- as an officer or as an administrator in your position as a

2  Warden, you did not review these records prior to coming down

3  here to testify. The things you're talking about that you

4  reviewed were spoon-fed to you this morning by the District

5  Attorney?

6  MR. HEALY: I love his characterizations.

7  A.  Okay. Yes, sir. I -- I was -- he -- he provided me

8  with his disciplinary cases, yes, sir.

9  Q.  (BY MR. JOHNSON) He basically showed you some

10  particular documents and said that he wanted you to look at

11  them and then come in here and be -- and hopefully the Judge is

12  going to let you testify about them; is that right?

13  A.  He asked me about the custody levels, yes, sir, and

14  asked me to review those disciplinaries.

15  Q.  Well, he didn't show you -- you haven't seen all the

16  records in response to this Defendant. You were just shown the

17  ones that the prosecutor spoon-fed you and wanted you to be

18  aware of in case some questions were asked?

19  A.  Yes, sir, I saw the disciplinaries, yes.

20  Q.  So if I had for you to -- when you said that you're

21  not aware of the disciplinary records and the reasons why any

22  status changed, it would all be conclusory on your opinion,

23  would it not?

24  A.  Yes.

25  Q.  And, in fact, it would be conclusory because a

**67**

1  person could go from what even at that time was MO to MI to ME,

2  and those things could have been due to not -- to strictly --

3  strictly and totally and completely minor infractions on a

4  repetitive basis, could it not?

5  MR. HEALY: Judge, are we going outside the

6  hearing?

7  A.  I'm not -- I --

8  THE COURT: The jury --

9  A.  I'm not going to testify to that one way or the

10  other.

11  THE COURT: The jury is not present --

12  MR. HEALY: I know, I'm just saying we're going

13  outside -- we're just going -- if she knows why somebody would

14  move up and down.

15  MR. JOHNSON: Well, Judge, let me tell the Court

16  what I'm asking.

17  THE COURT: Stop. Just -- just let him finish.

18  This is his time to ask questions, and then you can ask

19  questions.

20  Q.  (BY MR. JOHNSON) The classification now from MO to

21  MI to ME, even at that time could have been due to just

22  repetitive nature of minor infractions; is that not correct?

23  A.  I'm not going to testify to that because I --

24  honestly, I was not in the classification process as much

25  during that time. Like I said, I can tell you that --

**68**

1  according to those documents that he has, that he at one time

2  was a minimum outside, all the way to a CC which was a close

3  custody. Why, I can't tell you, and I can't tell you that it

4  was maybe because of minors or maybe because of major

5  infractions. I'm not going to testify to that, because I don't

6  know. I don't have his classification records, so I can't tell

7  you that.

8  Q.  Again, you weren't given the classification records

9  so you could come in and testify with authority as to these

10  classification procedures; is that correct?

11  A.  All I can testify to is what the documents provided

12  showed.

13  Q.  And he provided you with a few documents in regards

14  to particular infractions, correct?

15  A.  He provided me with 13, I believe, disciplinary

16  infractions.

17  Q.  If an individual, as it was classified at that time,

18  an individual was housed and was confined in close custody,

19  would he be allowed to work in the field?

20  A.  Yes.

21  MR. JOHNSON: Judge, I believe that's all I have

22  as far as the questions.

23  VOIR DIRE EXAMINATION

24  BY MR. HEALY:

25  Q.  Warden, did I spoon-feed these, or did I ask you a

69

1    couple of weeks ago to pull up all his --

2        A.    You -- you absolutely did, and I -- I think at that

3    time I did explain to you that some of those may be archived

4    due to the '91, '92 records. And you -- I explained that to

5    you, I think on the telephone, that I was not able to review

6    his disciplinaries. So I think his last visitation screen, I

7    think was pretty much all I saw. And then you provided the 13

8    disciplinaries to me this morning.

9        Q.    And shockingly, instead of driving out to where you

10   are, you driving out here, I said I'll give you the rest of

11   those records today when you get here?

12       A.    Yes, sir, you did.

13       Q.    And that's what we -- that's why I had you get here

14   early?

15       A.    Yes, sir, you did.

16       Q.    When the spoon-feeding took place?

17       A.    Yes, sir.

18       Q.    Now, let me ask you this, Warden. Just based on

19   your knowledge of being a -- a Warden for 21 years, there's no

20   doubt when he moved to close custody there was -- he was not a

21   model prisoner; is that correct?

22       A.    That would be correct.

23       Q.    And there's no doubt -- no doubt, 100 percent, based

24   on his disciplinary records, he moved from the worst of the

25   general population to the best of the general population?

70

1        A.    Yes, sir, he did.

2              MR. HEALY: That's all I have, Judge.

3              MR. JOHNSON: Still it's not relevant, Judge, or

4    this is not the proper witness to do it with. She's not --

5    she's not reviewed in entirety all of his different reasons.

6              MR. HEALY: I gave her exactly what TDC has,

7    unless you have something else to provide.

8              THE COURT: I know. I just think that there

9    is --

10             MR. JOHNSON: Plus, she's already testified,

11   Judge, that she wasn't familiar with the classification and the

12   classifications procedures made back at that time.

13             THE WITNESS: For him -- for particularly him.

14             THE COURT: I know.

15             MR. JOHNSON: Just for purposes of the record,

16   can I ask her a few more questions, Judge?

17             THE COURT: You may.

18                  VOIR DIRE EXAMINATION

19   BY MR. JOHNSON:

20       Q.    Warden, in fact, what you testified to earlier is

21   that due to certain events that have occurred in the last -- in

22   the last 20 years actually in the prison system, you have

23   actually -- TDC has changed its classification categories

24   completely, have they not?

25       A.    Yes, sir, they have.

71

1        Q.    And they've changed their classification decision

2    making process, have they not?

3        A.    Yes, they have.

4        Q.    They've changed their classification programs that

5    they use -- classification decisions are actually made by a

6    computer, are they not?

7        A.    They are recommended by a computer, yes, sir.

8        Q.    Right. Everybody that goes down to diagnostics is

9    going to be given a certain set of psychological and

10   psychosocial battery of tests. All of the information about

11   that offender is going to be placed in a computer program and

12   it's going to spit out a classification recommendation,

13   correct?

14       A.    It is.

15       Q.    And that's a relative -- that's a relatively new

16   feature, is it not?

17       A.    Yes, sir, it is.

18       Q.    And, in fact, after the classification decision is

19   made by a computer, then the -- the unit -- the classification

20   committee at the actual -- at the individual prison has an

21   opportunity to either overturn it themselves or seek to have

22   that classification decision overturned; is that not correct?

23       A.    Yes, sir, they do.

24       Q.    And that's a relatively new procedure, is it not?

25       A.    Yes, sir. Yes, sir, it is.

72

1        Q.    And that's a procedure that you're --

2              COURT REPORTER: I'm sorry, slow down.

3        Q.    (BY MR. JOHNSON) And that's -- that's the

4    procedures that you're familiar with, correct?

5        A.    Yes, sir, it is.

6        Q.    Okay. And the classification decisions that are

7    made on the unit are made by the actual unit -- at each

8    particular unit, are they not?

9        A.    Yes, sir, they are.

10       Q.    And so as to what the decision or what -- why the

11   decisions were made in regards to a particular individual

12   housed back in the 90's, you were not -- you were not privy to

13   those?

14       A.    Exactly.

15       Q.    You're not familiar with the criterion that was

16   actually used on those particular individuals, are you?

17       A.    Absolutely not, no, sir.

18       Q.    And you can't testify with authority as to why

19   anybody made a particular classification decision on any

20   particular inmate because you have not reviewed the entirety of

21   the records to have that information?

22       A.    That's correct.

23             MR. JOHNSON: And that's all I have, Judge.

24             MR. HEALY: Judge, that sounds like a great

25   cross examination right there.

73

1    MR. JOHNSON: It goes to the fact everything now
2  is conclusory.
3           MR. HEALY: Well, I mean, she said though --
4           THE COURT: Please don't talk over each other.
5           MR. HEALY: She said repeatedly somebody is
6  going to move up and down based on disciplinary action. Does
7  she know specifically what disciplinary -- I was not going to
8  go into those, because I didn't think those would be admissible
9  through this witness. But she knows for a fact --
10          THE COURT: Okay. I'll -- I'll try something.
11 All right. Will you hand her State's or Defense Exhibit 2?
12          (Document handed to witness.)
13          THE COURT: Ma'am, this is something that
14 earlier there was testimony regarding an incident that happened
15 in a dining hall. And there -- is that -- was that reviewed by
16 you?
17          THE WITNESS: This particular document?
18          THE COURT: Not the document, the incident.
19          THE WITNESS: No, I did not see anything that --
20 any -- anything in the 13 records that I reviewed.
21          MR. HEALY: Now, Judge, just to clarify, I did
22 show her the report.
23          THE WITNESS: It was the report. There was no
24 disciplinary record --
25          MR. HEALY: Not the OIG one, the actual --

74

1           THE WITNESS: I'd never seen anything of this
2  nature.
3           MR. HEALY: It's two different units or
4  entities.
5           THE COURT: Okay. But was the Defendant
6  sanctioned for a disciplinary reason on the classification
7  based on that event?
8           THE WITNESS: I -- I would have to look at
9  his -- at them again to -- to make sure, because he does move
10 from custody level to custody level, and I don't know -- I
11 don't have an exact time frame of when this incident occurred
12 to when he went to that more restrictive custody level.
13          (Document handed to witness.)
14          MR. JOHNSON: Well, Judge, I'm going to object
15 to the prosecutor up there handing her more things that he --
16 he wants her to look at. We don't know what these are.
17          MR. HEALY: The Judge told me to bring those.
18          THE COURT: No, no, I asked him to do that.
19 There's a point to what I'm doing. Just bear with me on this.
20 I'm trying to get to the bottom -- I'm trying to understand how
21 this classification system works. And the end question is, is
22 there a review procedure on disciplinary levels that's
23 reflective of -- if a mistake gets made, does a person go back
24 to the same level?
25          THE WITNESS: Any -- any major infraction which

75

1  on these -- if I may, on this disciplinary, where it says grade
2  and MI, any -- where there would be a major would be an MA.
3  Those disciplinaries -- here's -- here's one particularly, that
4  he will be seen by the Unit Classification Committee, so at
5  that point the Warden who signed down here, reviews his -- the
6  date and time he was notified, did we run it within the seven
7  days -- the required seven days, did we have the documentation,
8  did he plead none, guilty, or -- or guilty, and what were the
9  sanctions given in this disciplinary case. Then -- but
10 every --
11          THE COURT: This isn't just a computer --
12 there's more to it -- of the records that you've reviewed, so
13 you can talk about the different classifications or sanctions
14 that were given?
15          THE WITNESS: Yes, yes, because down here on the
16 bottom is basically who the hearing officer was, usually a
17 captain or above. These minors could be particularly run by a
18 lieutenant. Then the offender signed it. And then at this
19 point, a Warden signs it. At the end, once the case has been
20 processed, they're brought to our offices. And basically what
21 has happened, we review the time restraints to make sure that
22 we were well within our time restraints. Did we give them
23 something that wasn't within our minor -- our minor case, say
24 45 days of commissary restriction may not be applicable to a
25 minor, but it would be to a major so were we within these

76

1  realms, and then we signed off on them.
2           Now, with that being said, there, again, I don't
3  have his classification folder. And in all fairness, he has a
4  major case here, but he -- but he received what we call minor
5  placement, so it would have been documented as an MM, major
6  case given minor punishment, because he was given less than
7  solitary or less -- no good time lost, basically.
8           Here's he's got a major disciplinary case where he
9  got solitary, and he was reduced from an S -- SA3 to an SA4,
10 which means his time earning status reduced by about --
11 probably 15 days every 30 days or so.
12          THE COURT: What was that for?
13          THE WITNESS: This one is he had an assault on
14 another offender and --
15          THE COURT: Let me ask this. Two inmates get in
16 a fight. Are they both sanctioned?
17          THE WITNESS: Not necessarily. If one offender
18 obviously -- and it goes by the report of the staff and the
19 witnesses, both inmate and staff witnesses. If one offender
20 walks up, begins plummeting another offender, that offender
21 doesn't fight back or folds or stops when staff tells them,
22 he -- he or she may not receive a fighting case because it was
23 more of an assault with -- and -- and maybe some self-defense
24 to try to get them off, pushing them off or something of that
25 nature.

**77**

1    Now, they start swinging fists, kicking, they're
2    going to probably be sanctioned with a fight, but if they're
3    just pushing them off, trying to get away from them, holding on
4    to them to stop the assault, the aggressor would be the
5    assault -- would receive an assault. The other offender would
6    probably not receive anything. But if it's an equal fight,
7    both of them are swinging fists, both of them are kicking,
8    throwing things at each other -- and like I said, that's based
9    upon the statements of -- of staff and -- and witnesses in the
10   area.
11            THE COURT: Then that's considered an assault?
12            THE WITNESS: That's considered --
13            THE COURT: Even if it's mutual combat, that's
14   considered assault?
15            THE WITNESS: No, it would be considered a fight
16   with an offender. It's a separate code.
17            THE COURT: Separate code?
18            THE WITNESS: Yes, sir.
19            THE COURT: Okay.
20            MR. JOHNSON: Judge, if I might -- I mean, the
21   bottom line here is she's already testified she hasn't seen his
22   classification file, she's not familiar with the classification
23   decisions made at that time. She -- this is just not the right
24   witness to testify to these matters. And, Judge, I don't even
25   think that the State is arguing that she is the right witness

**78**

1    to testify to these matters. I mean, I think the -- I think
2    the Court is making more of a -- more of an inquiry in regards
3    to what the State is trying to do than the State is even
4    thinking that they're doing.
5            THE COURT: I'm just trying to get it right.
6            MR. JOHNSON: Well, I understand, and the way --
7    the way to get it right is to -- since this witness has
8    testified that she's not familiar with the classification
9    decisions made on this particular inmate, she's not -- she's
10   not qualified to testify to it. And the way -- and the records
11   that she reviewed that have nothing to do with these questions.
12   These are just things that she was given this morning by the
13   prosecutor. She's not reviewed the classification records on
14   this Defendant to be able to testify and be cross-examined in
15   regards to classification of this Defendant. How can I
16   cross-examine her?
17            THE COURT: That -- and that's -- that's the --
18   that's my issue, Mr. Healy, is -- is that -- is that you're
19   asking her these questions that -- that he -- that he has a
20   distinct inability to be able to cross-examine because the
21   response is going to be invariably, I don't know.
22            MR. HEALY: Cross-examine her why he moved up
23   and down, you mean?
24            THE COURT: Right.
25            MR. JOHNSON: And let me ask -- if I could add

**79**

1    this, Judge.
2            THE COURT: You've added plenty. It's his turn
3    to talk now.
4            MR. HEALY: I think it's being mischaracterized
5    what we're trying to do with the Warden here, Judge. And I
6    understand what the Court's concerns are in the sense of
7    questioning her why he was moved up or down. I think Mr.
8    Johnson does a great job of cross-examining witnesses. All
9    she's doing is looking at his disciplinary reports. I don't
10   know if maybe we should show the Court how it clearly states on
11   there --
12            THE COURT: I can -- I can see it well enough.
13            MR. HEALY: Okay. Where it states on there that
14   they are either minimum, inside minimum, outside, close
15   custody, and she's able to relate what that means in today's
16   terms of G1 through G5, that's all we're trying to get into
17   here. And --
18            THE COURT: Here's my question. Why hasn't
19   anyone done an intake on him? Then we'd know where he'd be
20   classified.
21            MR. HEALY: We do know.
22            THE COURT: No, you don't.
23            MR. HEALY: He will go in as a G3 status inmate.
24            THE COURT: We don't know where he's going to be
25   housed.

**80**

1            MR. HEALY: No, no, we don't know that.
2            THE COURT: Why hasn't anyone done that?
3            MR. HEALY: Because they'll never get that.
4            MR. JOHNSON: They don't do that until they get
5    to diagnostics. They won't do it until they get to
6    diagnostics.
7            MR. BEACH: Until he goes in this time.
8            MR. HEALY: Yeah. All she can do now is say if
9    he's convicted and given life without parole, he's going to go
10   as a G3 inmate somewhere across the state in some unit that
11   holds G3 inmates.
12            MR. JOHNSON: G3 at best. That's not -- I mean
13   he could go -- he could go directly into Ag Seg, but --
14            MR. HEALY: How is that?
15            THE COURT: Okay. Warden, could he go directly
16   into Ag Seg?
17            THE WITNESS: If he has a -- like I said, if
18   he's a member, a known admitted, recognized gang member, he
19   potentially could. They will take into consideration some of
20   his jail records. If he's had serious assaults, whether they
21   were with weapons or that required treatment beyond first aid,
22   he would have to have probably multiples of those. Chronic
23   rule violator, basically, in jail. It's -- it's very rare that
24   they go directly into administrative segregation, except for a
25   violence -- a propensity to violence even while in their jail

81

1  behavior.

2          THE COURT: What's the process of -- and how is

3  all of this determined? You said it's done by a computer.

4          THE WITNESS: Well, we have a computer program,

5  and it gives us a recommendation. Basically, everything -- his

6  confinement record will be input into -- into our computers,

7  and they'll pull up his -- his prior incarcerations and his

8  prior custody levels. And then they'll -- they'll input his

9  jail information. But like I said, in my history from intake,

10  most of them are gang members that go directly into

11  administrative segregation. Once that information goes into a

12  computer, it gives us a custody recommendation. Now, we can

13  override that and say -- if he's a G3, you can say, well, he

14  had a serious staff assault at county jail less than a year

15  ago, we would like to recommend him to be a G4 or a G5, okay?

16          Now, State classification can override that, and

17  say, no, we want him as a G3.

18          THE COURT: How -- how long would it take for

19  you to do that for Mr. Green, the Defendant in this case?

20          THE WITNESS: Once he's in the intake process --

21  the intake process can take 30 days or so, sometimes a little

22  longer, depending on -- they have to do sociological -- and his

23  probably wouldn't take as long because we have some of his

24  prior history of sociological -- his family history is probably

25  already done. But they're going to have to ask him his

82

1  questions. He has to go through a medical report. He has to

2  go through a battery of tests in that area, but it normally

3  takes around 30 days in our classification process. And then

4  State classification will give him a custody level, and then

5  they decide, based upon our -- our population where we have an

6  open bed, male -- on the male side that houses inmates of the

7  custody level that they're going to assign him.

8          MR. HEALY: Judge, I just talked to Mr. Johnson.

9  I think both sides are willing to rest on our arguments on

10  whether we get into what I wanted to ask her.

11          THE COURT: I'm going into something else.

12  This -- this is general.

13          MR. HEALY: Okay.

14          THE COURT: This is general. I've done two of

15  these cases now. Why on earth are we doing all this

16  speculation as to where he's going to be housed and guessing?

17  Why can't we make a determination of where he's going to be

18  housed?

19          MR. HEALY: Because they don't do that.

20          THE COURT: I want to know these things. I want

21  to know where he's going, and I want to know the security level

22  because that's really the indication of whether or not he's a

23  future danger is where he's going to be housed. Not all this

24  speculation that each side is -- is throwing out there. Why

25  can't we get a definite factor for a jury to look at and say he

83

1  is -- or he is or he's not going to be a future danger based

2  on where he is going to be in prison?

3          MR. JOHNSON: Well, Judge, we would certainly

4  argue -- from the Defense standpoint, we would certainly argue

5  that where he's going to be housed is not going to be

6  indicative at all as to whether or not he's going to be a

7  future danger. The future dangerousness issue is on the

8  propensity of the individual. We -- we both are in agreement

9  that his minimal level of security is going to be under a

10  classification of G3 in -- the truth of the matter, and

11  prosecution will agree, he could be a G4, he could be a G5, he

12  could be Ag Seg. That's based on other factors. Those --

13  those decisions aren't made about a particular individual until

14  he's gone through the Diagnostic Unit. And then -- so this

15  particular as to which prison facility he's going to be housed,

16  as the Warden just told you, that decision is going to be made

17  by a computer in response to whether -- where there's a bed

18  appropriate for the housing of him as he's classified by the

19  computer, unless it's overridden by the -- the Unit

20  Classification Committee.

21          THE WITNESS: Judge, if I can add one other

22  thing.

23          THE COURT: Sure.

24          THE WITNESS: When they get ready to be housed,

25  they look at different things, his needs, whether he has

84

1  psychological needs, whether he has medical needs, things of

2  that nature. We have what we call Type 1 chronic care

3  facilities, Level 1 facilities that are all on one level. So

4  -- and then, there again, bed space. Because of our capacities

5  on every facility, we have inmates at intake that basically are

6  awaiting a housing assignment and, there again, it's done by

7  our State Classification Committee.

8          The Wardens have no input into where an offender

9  is housed or not housed on that facility. I can't call and

10  say, hey, I want an inmate moved -- this inmate moved from Beto

11  to Coffield. I don't have that authority. State

12  classification can, based upon a need.

13          So with that, comes in -- once he goes through a

14  battery of tests, both medically, psychologically, they're

15  going to look at what needs he has. If he has a need for a

16  Type 1 chronic care, does he have a need for a -- like he said,

17  if he comes in as a G4, or a G5, those are our expansion bed

18  facilities. Our 2250's have a certain custody level. So

19  really, you know, it's -- you know, and he may not be perfectly

20  suited. We don't always get it right. We're obviously a

21  fallible system. We don't always get it right, but we try.

22          The State Classification Committee does put

23  forth the effort to get to know who this offender is, where he

24  was previously incarcerated, what his institutional record --

25  then at that institution, and is he -- is he capable or -- or

85

1  is it best suited to send him back to the same facility he was

2  originally incarcerated on prior. But there's no guarantees.

3  Just because he was assigned to the Beto Unit, he may end up

4  at, you know, Smith Unit or Clements in Amarillo. I mean --

5       THE COURT: Is -- is part of this test that is

6  given -- hold on a second. Y'all quit it.

7       I mean, is part of the test and what you're

8  gauging is -- is level of future danger to other inmates,

9  guards, or anything like that?

10       THE WITNESS: No, sir.

11       THE COURT: Okay. And it's -- but it's --

12       THE WITNESS: It's based upon his needs and

13  our -- and our capable -- our ability to house that custody

14  level on those facilities.

15       THE COURT: Okay.

16       MR. HEALY: Your Honor, I think I talked to Mr.

17  Johnson, we're just going to move on.

18       THE COURT: Fine. I'm just trying --

19       MR. HEALY: I understand.

20       THE COURT: -- to get a line on this.

21       MR. HEALY: I understand. We're -- we're --

22  we'll bring it through a different witness. It's in the

23  interest of the Court to move on.

24       THE COURT: Thank you. Okay. How many more

25  questions do we have of the Warden?

86

1       MR. HEALY: I think everybody is ready to go to

2  lunch, Your Honor.

3       THE COURT: So this witness can be excused?

4       MR. HEALY: I believe so, unless Mr. Johnson

5  would like to talk about parole because that's the only issue

6  that I brought up on redirect.

7       MR. JOHNSON: I do have a couple of questions in

8  regards to that, Judge.

9       THE COURT: All right. Let's get the jury in.

10  We're ready.

11       (Jury returned to courtroom.)

12       THE COURT: Thank you all. Please be seated.

13  Let's see, you were asking --

14       MR. HEALY: I'll pass the witness at this time,

15  Your Honor.

16       THE COURT: Okay.

17       (In the presence of the jury, defendant

18            present.)

19       RECROSS-EXAMINATION

20  BY MR. JOHNSON:

21       Q.  Warden, I just have a couple of other things to

22  touch with you briefly. The prosecutor asked you a minute

23  ago -- as he told you this morning, the reason he brings you

24  down here is because you just kind of tell it like it is. You

25  actually understand the -- the function that the prosecutor is

87

1  trying to accomplish in having you testify in these

2  proceedings?

3       A.  Sure.

4       Q.  You understand that, don't you?

5       A.  Sure.

6       Q.  That is to show that there is a -- a potential or

7  that in all aspects of life, even in the penitentiary, there's

8  a possibility that something -- something could occur if the

9  person has a propensity and the desire to engage in conduct?

10       A.  Yes, sir.

11       Q.  Okay. And again -- and in tying that to -- I mean,

12  so basically this is to kind of give the jury a picture that --

13  that's going to be a situation where if you have a bad person

14  that wants to hurt somebody, he may have that opportunity to do

15  that; is that correct?

16       A.  Yes, sir, in any level.

17       Q.  Okay. And it doesn't matter whether that prisoner

18  is classified as G1, G2, G3, G4 or G5 or Ag Seg, does it?

19       A.  We have less than our lower custody levels, but, no,

20  it doesn't matter.

21       Q.  The truth of the matter is there's not -- as far as

22  we discussed earlier, in regards to the type of crime that was

23  committed, there's no correlation to their propensity to commit

24  violence -- criminal acts of violence?

25       A.  No, sir.

88

1       Q.  And the prosecutor asked you about parole and the

2  fact that parole is used in the penal system as kind of a -- as

3  a carrot, so to speak.

4       A.  Sure.

5       Q.  And the prosecutor asked you if the -- if the parole

6  is something that you dangle out in front and hope for better

7  behavior; is that right?

8       A.  Yes, sir.

9       Q.  And since we've started housing individuals that

10  have been sentenced to life without parole -- in fact, there's

11  been no correlation to show that someone that's serving life

12  without parole is more -- has a greater propensity towards any

13  violent act, is there?

14       A.  No, sir, not at this time.

15       Q.  Okay. So just in response to what they were asking

16  earlier, just because you've taken away that person's

17  opportunity or ability to ever get parole, we know they're not,

18  that doesn't mean that that individual is going to be any more

19  or less likely to commit acts of violence than G1 offenders?

20       A.  It's an individual -- individual choice.

21       Q.  And -- correct. And the fact is that even someone

22  serving a life without parole, you do have some -- you have the

23  ability to curtail their -- their movements and their

24  amenities, so to speak, that is in and of itself a carrot, is

25  it not?

89

1      A.  Yes, sir, we have -- we have management tools.
2      Q.  You have management tools.  You have the ability to
3  restrict them, to -- to increase their level of housing.  You
4  have the ability to take away their commissary.  You have the
5  ability to take away their mail, to keep television privileges,
6  their dining privileges, or recreation privileges -- you have a
7  way to do all of those things, do you not?
8      A.  Not their mail.
9      Q.  I'm sorry, maybe not mail.
10     A.  No, sir, not their mail, but for the most part, yes,
11  their -- their movements and their possessions.
12     Q.  And the truth of the matter is, ma'am, for the --
13  for an individual that's -- even if he's not looking at the
14  possibility of having parole, those -- those are the basic
15  necessities of life, are they not?
16     A.  Yes, sir.
17     Q.  And those are of great incentive to encourage an
18  individual to act right?
19     A.  Yes, sir.
20     Q.  You have included in each penal unit, I think you
21  said there's 112?
22     A.  Yes, sir, currently.
23     Q.  How many of those 112 units have the ability or
24  the -- to house prisoners of a G3 or above status?
25     A.  I couldn't give you a number right off the top of my

90

1  head, probably half or better.
2      Q.  And when you include amongst the individuals in
3  those particular institutions, there are -- both housing --
4  there's housing and there's facilities and there's treatments
5  available to individuals that are housed there, suffering from
6  mental illnesses, are there not?
7      A.  Yes, sir.
8      Q.  And those -- individual on one of those facilities
9  that has a mental illness that is treatable, then they
10  certainly have the ability to be treated at your facility,
11  correct?
12     A.  At most, yes, sir.  We have -- we have psych
13  facilities or -- or what we call responsible psychotherapists
14  or counselors on -- on most of our facilities.
15     Q.  And the psych units that you're talking about --
16  when you talk about psych, you're talking about someone with a
17  chronic psychiatric condition that's got to be basically
18  watched 24/7?
19     A.  Someone who requires an inpatient medication or
20  inpatient type treatment.
21     Q.  But for the vast majority of inmates that are housed
22  in the penal system that suffer from mental illnesses that
23  don't require that type of chronic care, you certainly have the
24  abilities to treat them and to house them and -- and put them
25  in a position that makes them best able to control through

91

1  medication or -- or through counseling, any of the problems
2  that may be causing them or that had caused them to engage in
3  the behavior that led them to the penitentiary?
4      A.  Yes, sir.
5      Q.  No question about that, is there?
6      A.  No, sir.
7      Q.  And you would agree with me, ma'am, that there's a
8  lot of folks in the penitentiary that are at this very moment
9  are being treated for mental illness?
10     A.  Yes, sir.
11     Q.  People who are in the penitentiary because they've
12  committed criminal acts of -- acts of crime or criminal acts as
13  a result of their mental illness?
14     A.  Sure.  Yes, sir.
15     Q.  And you would agree with me, also, that you can
16  treat those individuals, and that is going to greatly, greatly
17  lessen their both propensity, their desire, their ability to
18  engage in further criminal acts?
19     A.  It's certainly our goal, yes, sir.
20     Q.  It's not just your goal, but you're quite successful
21  at that, would you not agree?
22     A.  I think our -- our penal system is very successful
23  for the amount of offenders that we have.  I think we are
24  successful.
25     Q.  How many people -- how many people -- and if you

92

1  don't -- I may be asking you something you have no answer to,
2  but do you have any knowledge as to the amount of offenders in
3  the penal system, percentage-wise, that are actually suffering
4  from diagnosed mental illness?
5      A.  No, sir, I don't -- I don't have those -- I don't
6  have that type of information.
7      Q.  Okay.  That's all I have, Warden.  Thank you.
8                   FURTHER DIRECT EXAMINATION
9  BY MR. HEALY:
10     Q.  There would be a lot of them, though, wouldn't
11  there, Warden?
12     A.  I would assume so, yes, sir.
13     Q.  And you still have that many acts of violence, don't
14  you?
15     A.  Yes, sir, we still have acts of violence.
16     Q.  And just briefly, just so the jury is understanding,
17  Mr. Johnson asked about studies done on the life without parole
18  on capital murder cases.  When did that law go into effect?
19     A.  2006, I believe -- 2005, 2006.  I think we went into
20  effect one year, and it was almost a year before we began
21  seeing anyone come into our system with the life without
22  parole.  So it hasn't been very many years.
23     Q.  So fairly recent?
24     A.  Yes, sir.
25                MR. HEALY:  Okay.  That's all I have, Your

**93**

1 Honor.

2          MR. JOHNSON:  Nothing further.

3          THE COURT:  Thank you very much.

4          THE WITNESS:  Thank you.

5          THE COURT:  She's free to go?

6          MR. HEALY:  Subject to recall, Your Honor.

7          THE COURT:  All right.  Subject to recall.

8          MR. HEALY:  Thank you.

9          THE COURT:  All right.  Ladies and gentlemen,

10 we're going to go to lunch, 12:40.  You want to say -- we're

11 not going to get started back until 2 o'clock -- I'm sorry.

12 We've got some other things that we got to grind out.  Give

13 me -- give me five minutes so I can figure out the rest of

14 today.  So just go on back to the jury room.  Let me see the

15 lawyers up here.

16          THE BAILIFF:  All rise.

17          (Jury excused from courtroom.)

18          (Discussion off the record.)

19          THE COURT:  Okay.  So we're ready for the jury.

20          THE BAILIFF:  All rise.

21          (Jury returned to courtroom.)

22          THE COURT:  Okay.  State, please call your next

23 witness.

24          MR. BEACH:  Before, Your Honor, the State would

25 offer into evidence State's Exhibit 159.

**94**

1          (State's Exhibit 159 offered.)

2          MR. JOHNSON:  Judge, we're going to have no

3 objection to those documents in their entirety.

4          THE COURT:  They're admitted.

5          (State's Exhibit 159 admitted.)

6          MR. BEACH:  The State would call Ruth Lyons.

7          (Witness brought forward and sworn.)

8          THE COURT:  Please have a seat.

9          RUTH LYONS,

10 was called as a witness by the State, and after having been

11 first duly sworn, testified as follows:

12          DIRECT EXAMINATION

13 BY MR. BEACH:

14      Q.   Tell us your name, please.

15      A.   Ruth Lyons.

16      Q.   And, Ruth, how old are you?

17      A.   I'm 50.

18      Q.   That ain't old.  Where were you born?

19      A.   Peoria, Illinois.

20      Q.   And you and Margarita grew up in Peoria; is that

21 correct?

22      A.   That is.

23      Q.   And is it fair to say that you and Margarita had a

24 lengthy exclusive romantic relationship in Margarita's younger

25 years?

**95**

1      A.   We did.

2      Q.   And how old was Lovetta when you and Margarita came

3 together?

4      A.   Just a little bit over three years old.

5      Q.   And what do you -- I mean, what did you consider

6 Lovetta as?

7      A.   That was my daughter.

8      Q.   And you basically raised her from age three all the

9 way up until September 21st, 2009?

10      A.   That is correct.

11      Q.   Now, when did you come down to the Dallas area?

12      A.   It was October of '95.

13      Q.   And are you employed right now?

14      A.   I am.

15      Q.   Where do you work?

16      A.   Tuesday Morning Corporate Headquarters here in

17 Dallas.

18      Q.   And I'm going to direct your attention back to late

19 2007, early 2008, and ask if you had come to live with Lovetta

20 and her children and a man that you knew as Gary Green out at

21 3844 Morning Springs Trail?

22      A.   That is correct.

23      Q.   Had they just moved into the house on Morning

24 Springs Trail when you came to live with them?

25      A.   Yes.

**96**

1      Q.   And do you see Gary Green here in court today?

2      A.   Yes.

3      Q.   Is he the man at the end of the counsel table?

4      A.   He is.

5      Q.   And about how long did you live there in the house

6 with the five of them?

7      A.   About six, maybe seven months.

8      Q.   And what was the reason why you were there versus

9 out on your own at that point in time?

10      A.   Well, I was getting ready to buy a house, and in the

11 transition from my apartment, the house wasn't quite ready yet.

12 So Lovetta had -- Lovetta had called me -- I call her Vetta --

13 had called me and said, well, why don't you come stay here

14 versus me having to go get another apartment or end up out in

15 Irving with a friend because she could use the help.  So I

16 transitioned over and stayed with her.

17      Q.   And even before you came to live with them for those

18 five or six months, had you maintained a relationship with

19 Vetta?

20      A.   Yes.

21      Q.   Would there be times when Vetta would bring JT and

22 Jerrett and little Jazzmen over to you?

23      A.   Yes.

24      Q.   And you had an ongoing relationship with her three

25 children?

97

```
1    A.   Yes.
2    Q.   The five or six months that you lived there on
3  Morning Springs Trail, did Gary Green work gainfully while you
4  were there?
5    A.   Not once.
6    Q.   Just in general, what was Gary Green's daily routine
7  in terms of what would he do around the house?
8    A.   Played video games, watched soaps.
9    Q.   Didn't work?
10   A.   No.
11   Q.   I'm going to direct your attention to early 2008,
12 after New Years and ask you if JT came to you one morning and
13 told you -- told you something?
14   A.   Well, it was Jerrett.
15   Q.   It was Jerrett?
16   A.   It was Jerrett.  Friday nights, I played poker.
17        MR. JOHNSON:  Objection to responsive, Judge.
18   Q.   (BY MR. BEACH)  We'll just go question and answer.
19        Did Jerrett come and tell you something early
20 one Saturday morning?
21   A.   Yes.
22   Q.   Without going into what Jerrett told you, who was
23 the next person that you went to see?
24   A.   Well, Jerrett sent JT in.
25   Q.   Okay.  JT came and talked to you?
```

98

```
1    A.   Uh-huh.
2    Q.   And let me just stop right there.  Did you get JT
3  and Jerrett and Jazzmen and Lovetta out of the house?
4    A.   Yes.
5    Q.   And was that for a specific reason?
6    A.   Yes, it was.
7    Q.   What was that?
8        MR. JOHNSON:  Object to hearsay, Judge.
9        MR. BEACH:  No, why she got them out of the
10 house.
11   Q.   (BY MR. BEACH)  Who did you want to talk to by
12 yourself?
13   A.   I needed to talk to Gary.
14        MR. JOHNSON:  I object to hearsay, and ask to
15 approach the bench.
16        THE COURT:  Okay.  Come on up.
17        (Sidebar Conference.)
18        THE COURT:  Ladies and gentlemen, we are
19 required under the law to -- to have a hearing outside of your
20 presence regarding this, and I appreciate it.  Just -- book
21 says I have to do it.
22        THE BAILIFF:  All rise.
23        (Jury excused from courtroom.)
24        MR. BEACH:  Proceed?
25        THE COURT:  Jury is not now present.  We're
```

99

```
1  having a hearing.  I'm not sure quite on what, but --
2        MR. JOHNSON:  Well, Judge, just so the record is
3  clear, I was made aware of something under 404(b) notice in
4  regards to a specific act of -- the Defendant having committed
5  an assaultive conduct and the way -- and I'm -- just out of an
6  abundance of caution, want to make sure that because of the way
7  he's setting this predicate, it doesn't appear that she's a
8  witness to it, and I want to make sure that before she goes
9  into something that would be objectionable under either a 404
10 objection or under a hearsay type of objection, I want -- I
11 need to know the parameters of what it's being -- I didn't have
12 any objection if she was going to say I saw something happen,
13 because I had notice of that.  But this is -- it's just the way
14 it's being presented.
15        THE COURT:  Andy, do you want to make a quick
16 offer of proof?  Would that be the fastest way to do this?
17        MR. BEACH:  The boys saw Gary choking their mom
18 one night.  The next morning Jerrett -- JT went and told Ruthie
19 about it, and Ruthie goes and confronts Gary.  What's this
20 about you putting your hands on Lovetta?  Gary admits to it,
21 starts crying, and just her conversation with him after that.
22        MR. JOHNSON:  And we're going to object to that,
23 Judge, because by her -- him using the statement, and what's
24 this about you putting your hands on her or choking her, that's
25 using the hearsay statements by the -- by the two boys.  That's
```

100

```
1  introducing -- introducing hearsay.
2        THE COURT:  Well, it's -- can you elicit your
3  testimony without back dooring what the boys said to her?
4        MR. BEACH:  Yeah.  Did you -- what's this -- I
5  mean, just even the question -- it would be like saying, she
6  has a good faith basis to ask the question.
7        THE COURT:  I understand that.
8        MR. JOHNSON:  She asked him a question.
9        THE COURT:  If you just said -- and, Paul, what
10 do you think about this?  In an abundance of caution, him just
11 saying, on such and such a date, did you have a conversation
12 with Gary Green?  Yes.  What did you ask him?  Is that --
13        MR. JOHNSON:  Well, Judge, the problem is -- I
14 mean, it's certainly -- the question itself is -- implies the
15 truth of the matter of the hearsay statements made by the
16 children.
17        MR. BEACH:  And he confirms it -- Gary confirms
18 it.  It is the evidence we're trying to --
19        MR. JOHNSON:  Well, again, I haven't heard --
20 I'd have to -- Judge, instead of just an offer of proof, I
21 think I need to hear the testimony and see if whether -- what
22 type of statement he made and if it was an actual verbal --
23 verbal affirmation or not or --
24        THE COURT:  Okay.  That's -- that's fair.  Go
25 ahead, Andy, ask your question.
```

101

```
 1    Ma'am, you're free to -- you're free to answer --
 2    We're trying to get it right.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Okay?
 5              THE WITNESS:  Okay.
 6              (Outside the presence of the jury, defendant
 7    present.)
 8              VOIR DIRE EXAMINATION
 9    BY MR. BEACH:
10        Q.   All right.  Ruthie, what specifically did JT tell
11    you before you got everybody out of the house and confronted
12    Gary Green?
13        A.   Jerrett --
14              COURT REPORTER:  I'm sorry, one more time.
15    Before you got everybody -- I didn't hear you.  I'm sorry.
16        Q.   (BY MR. BEACH)  Who came -- let me just back up.
17    Who came and told you that morning about Gary doing something?
18        A.   Jerrett woke me up and told me.
19        Q.   Okay.  Jerrett told you?
20        A.   Yes.
21        Q.   JT did not tell you?
22        A.   JT did not tell me.  JT confirmed it.
23        Q.   I got you.  What did Jerrett tell you?
24        A.   Jerrett said that Gary had choked Vetta and he had
25    his hands around Vetta's throat choking her.
```

102

```
 1        Q.   And JT confirmed that?
 2        A.   He did.
 3        Q.   Okay.  You get everybody out of the house; is that
 4    right?
 5        A.   I did.
 6        Q.   And -- because you wanted to talk to Gary alone?
 7        A.   That's correct.
 8        Q.   So where did you confront Gary Green about this
 9    allegation?
10        A.   In his -- in that bedroom.
11        Q.   Just walk us through what happened.
12        A.   I told him -- my exact words to him was, Player, I
13    need to talk to you.  He said, okay.  We went back into Vetta's
14    bedroom.  He pulled up a chair at the end of the bed, and I sat
15    down on Vetta's side of the bed.  And I asked him, did he put
16    -- my exact words were:  Did you put your hands on Vetta?  And
17    he dropped his head.  And I told him right then and there, as
18    long as he live, he better not never put his hands on nobody
19    else in that house or I'd kill him.
20        Q.   And did he ever -- after he dropped his head, did he
21    ever deny doing it, say he didn't do it, anything like that?
22        A.   He said that he did it.  He said that he did it and
23    that he was sorry.  And he began to cry.  And at that point in
24    time I talked to him and I told him, I said, you're the man in
25    this house.  You're supposed to be setting an example for these
```

103

```
 1    two boys.  Is this the kind of stuff you want them doing to
 2    their wives and their girlfriend, and he told me --
 3              MR. BEACH:  That's all I'd offer through her,
 4    Judge.
 5              VOIR DIRE EXAMINATION
 6    BY MR. JOHNSON:
 7        Q.   Ms. Lyons, is that the exact words that you recall?
 8        A.   Those are the exact words.
 9        Q.   Okay.  There was no other words said by you or said
10    by him to your recollection?
11        A.   No.
12        Q.   And you're positive as to the phrasing that you just
13    gave us is the phrasing that you recall?
14        A.   That's as -- that's as close as I can remember, yes.
15        Q.   Okay.
16              MR. JOHNSON:  Judge, that's all -- that's all
17    the questions I have of her -- well, let me ask this.
18        Q.   (BY MR. JOHNSON)  You said he dropped his head, and
19    that's when you told him if you ever put your hands on her
20    again, you'll kill him?
21        A.   That's what I told him.
22        Q.   Then when is it that he said he did it?
23        A.   That's what he said.  When -- we knew -- I knew he
24    had done it.  He said that he had done it.
25        Q.   When did he say that?
```

104

```
 1        A.   He said that in the midst of the conversation.
 2        Q.   Okay.
 3              MR. JOHNSON:  Judge, that's all I have of her at
 4    this time.  I'd like the witness to be excused while we argue
 5    what legal points, if the Court would allow.
 6              THE COURT:  Ma'am, would you mind stepping down,
 7    please?
 8              THE WITNESS:  I will.
 9              (Witness excused from courtroom.)
10              MR. JOHNSON:  Judge, our specific objection is
11    going to be that, number one, that this testimony does not
12    match the 404(b) notice that we were given.  And she claims
13    that in response or that -- or that she asked some question
14    about putting your hands on her.  That does not imply that the
15    Defendant ever assented either orally or by non-verbal conduct
16    that he had choked her.  And so this does not -- this proof
17    doesn't match what we were given by way of 404(b) and it allows
18    the jury to speculate as to what putting your hands on her
19    means.  And that's just completely improper to allow the jury
20    to start drawing some kind of inferences from a statement like
21    that.
22              THE COURT:  What's the State's response?
23              MR. BEACH:  Ruthie is not going to say -- when I
24    said did you put your hands on her, did I mean, did you put
25    your hands around her waist or her knee or her, you know,
```

105

1  little arm. I mean, that's what it means to Ruthie. When you
2  put your hands on someone, a man puts their hands on you, that
3  means you put your hands on her neck.
4          MR. JOHNSON: Judge, that's why I specifically
5  asked her the exact phraseology, and she did not say it. And
6  what she assumed it to mean, that's not sufficient 404 notice.
7          MR. BEACH: That's cross. That's not notice.
8          THE COURT: Well --
9          MR. BEACH: The boy is going to come in and say,
10  I saw him put his hands on her neck and I went and told my, you
11  know, granny, Ruthie.
12         THE COURT: I know.
13         MR. BEACH: Why are we fighting this battle?
14         THE COURT: I see what you're saying. The
15  404(b) notice was, for instance, that the lady was getting
16  ready to fight -- I mean, just an absurd example. The lady is
17  getting ready to fight and the testimony she took her shoes
18  off. Well, we all know what that means, right? If she takes
19  her shoes off, takes her earrings off, she's fixing to get in a
20  fight.
21         MR. JOHNSON: I'm not sure if I --
22         THE COURT: I don't think that's a big leap for
23  them. I'm just saying, it's -- it's somewhat of a term of art,
24  but I don't think that it's a cause for a jury to reach some
25  ridiculous conclusion.

106

1          MR. JOHNSON: Judge, it's -- this is not a
2  question of the jury drawing a ridiculous conclusion because
3  the jury -- the jury is not supposed to -- in any situation
4  when you're involved in the death of a human being, they're not
5  supposed to have any opportunity to speculate or draw
6  conclusions at all. We were given a 404(b) notice to a
7  particular act of violence against a particular individual in a
8  particular time frame. This proof does not match up to the
9  404(b) notice we were given and it does allow them to
10  speculate. And having the jury speculate to an act of violence
11  against the complainant in the case, it would be improper under
12  any circumstance, whether it be a commonly understood term or
13  phrase of art or whether it would be just to this particular
14  Ruthie Lyons, and I -- Judge, I don't -- I don't agree that
15  there's -- that there is anything about this testimony that
16  matches the notice we were given.
17         THE COURT: May I see the notice?
18         (Document handed to Court.)
19         THE COURT: Is this something that -- that you
20  say that the boys are going to testify --
21         MR. BEACH: Yes, sir.
22         THE COURT: -- about?
23         MR. BEACH: Yes, sir. And I wasn't going to ask
24  them about it, but now -- I mean, I didn't think it was going
25  to be this big an issue. So, yeah, they will confirm that they

107

1  saw it and went and told Ruthie.
2          And, Judge, it's in his letter, too, about
3  Ruthie trying -- or saying that she was going to shoot me.
4          THE COURT: Okay. Here's my ruling. I'm going
5  to allow the line of questioning over the Defense's objection.
6  I understand the objection. I find that the notice is
7  sufficient, and that they can proceed with this line of
8  questioning. Is there a -- is there an additional -- is there
9  a bill you want to make or anything additional you think needs
10  to be put on the record?
11         MR. JOHNSON: Judge, just to make -- just to
12  make sure that -- I just showed the Court my file stamped copy
13  of the supplemental notice of extraneous, and it specifically
14  said that in late 2007 and/or early 2008, Gary Green choked
15  Lovetta Armstead at their house at 3844 Morning Springs Trail
16  in Dallas County, Texas. And we're going to ask that the Court
17  require strict proof of that if they're going to allow this
18  line of testimony and that means that -- I mean, we're
19  certainly objecting to the ruling. We think it's improper,
20  but -- we think it's going outside the notice that we were
21  given.
22         THE COURT: Well, and your specific objection is
23  that when she says that JD said --
24         MS. BENNETT: JT.
25         THE COURT: -- JT said to her that -- all right.

108

1  I'm going to allow it. I -- I think the notice is sufficient.
2  It's not perfect, but I think it's sufficient.
3          MR. JOHNSON: In the notable words of Paul
4  Brauchle, note our exception.
5          THE COURT: No comment.
6          MR. BEACH: Who signed -- who signed the
7  notice -- supplemental notice? Me. So that's why it's not
8  perfect, okay? I didn't have one of the appellate --
9          MR. JOHNSON: Judge, it's my understanding that
10  the Court is going to -- is allowing this testimony based on
11  the representation that it's going to be proven up through
12  other witnesses, or you're just allowing the testimony through
13  this witness and that's going to satisfy the -- that the Court
14  feels that the notice was appropriate?
15         THE COURT: I -- it's twofold. One, it's -- you
16  will have -- you have the opportunity to question other
17  witnesses regarding this offense, or alleged offense. And --
18  so I'm not going to require them, but you certainly will have
19  witnesses available to be able to question those witnesses
20  regarding this alleged offense.
21         MR. JOHNSON: Okay.
22         THE COURT: All right. We're ready.
23         (Witness returns to courtroom.)
24         THE BAILIFF: All rise.
25         (Jury returned to courtroom.)

109

```
1      THE COURT:  Thank you.  All please be seated.
2           All right.  Please continue.
3           (In the presence of the jury, defendant
4      present.)

5           CONTINUED DIRECT EXAMINATION
6   BY MR. BEACH:
7      Q.   State your name, please.
8      A.   Ruth Lyons.
9      Q.   And you are the same Ruth Lyons that was testifying
10  prior to the break; is that correct?
11     A.   I am.
12     Q.   Now, we're to the point, Ruth, that you get Lovetta
13  and the children out of the house; is that correct?
14     A.   It is.
15     Q.   And did you want to talk to Gary Green just
16  face-to-face?
17     A.   I did.
18     Q.   Did you talk to Gary Green face-to-face?
19     A.   I did.
20     Q.   And where did this happen there in the house?
21     A.   In Lovetta's bedroom.
22     Q.   Same bedroom where she was murdered about a year and
23  a half later, in the same area where Jazzmen was murdered; is
24  that correct?
25     A.   That is correct.
```

110

```
1      Q.   And what's the first thing that you said to Gary?
2      A.   The very first thing was I had told him:  Player, I
3   need to talk to you.
4           MR. JOHNSON:  Judge, if I might -- just so the
5   record is clear, that we do object to this testimony and I
6   understand the Court's ruled and we just want to make sure that
7   the record shows that --
8           THE COURT:  Yeah, the objection is -- your
9   objection is -- is noted and overruled.
10     Q.   (BY MR. HEALY)  Go ahead, ma'am.
11     A.   I told him:  Player, I need to talk to you.
12     Q.   Player?
13     A.   Player.
14     Q.   Okay.  And after you said that, what's the next
15  thing that was said?
16     A.   He said, okay.  And we began to walk back to the
17  bedroom.  At that time he grabbed a chair and opened it up and
18  sat it down by the foot of the bed.
19     Q.   Okay.
20     A.   And I sat down on the side of the bed that Vetta
21  sleeps on -- slept on, and he sat down.
22     Q.   What did you say to him?
23     A.   I asked him -- I said, did you put your hands on
24  Vetta?
25     Q.   Now, does that have a common understanding from
```

111

```
1   where you come from?  I mean, what did you mean by that?  Did
2   he put her hands on her leg or arm or what?
3      A.   Well, based on what I had -- the information that I
4   had --
5           THE COURT:  No, ma'am, you need to answer --
6      A.   My question was --
7           THE COURT:  I understand.  He asked you a
8   specific question, and you can only answer the question.  Will
9   you please repeat the question and just answer the question as
10  he asks it.
11     Q.   (BY MR. BEACH)  Well, what were you meaning when you
12  asked Gary, is it true you put your hands on Vetta?
13     A.   Did he put his hands on Vetta.
14     Q.   And what did he say at that point in time?
15     A.   He said yes.
16     Q.   Okay.  And then what happened?
17     A.   And I told him then -- I said, if he ever put his
18  hands on anybody else in that house I'd kill him.
19     Q.   Now, you were here last week during the trial of the
20  first part; is that correct?
21     A.   It is, yes.
22     Q.   And let me ask you this, Ruth.  When you said that
23  to Gary, you weren't playing around, were you?
24     A.   Not at all.
25     Q.   Did he know that you weren't playing around?
```

112

```
1      A.   He knew it.
2      Q.   And you heard the letter read last week that he
3   wrote to Lovetta there the last day of her life?
4      A.   I did.
5      Q.   And there was a reference in there about, I had to
6   go through all this bullshit with Ruth over that shit, she
7   saying she wanted to shoot me over me trying to stop you from
8   leaving them here alone.  I mean, do you remember hearing that
9   in the --
10     A.   I do.
11     Q.   Was that why you were threatening bodily harm to him
12  because something about him trying to keep her in the house?
13     A.   Well, yes.
14     Q.   And him putting his hands on her?
15     A.   That is correct.
16     Q.   That was the main thing that you were concerned
17  with; is that correct?
18     A.   It is.
19     Q.   Now, after he admitted to it, what happened next?
20     A.   After I told him that I'd kill him, he began to cry.
21     Q.   And was he looking at you?  Did he have his head
22  down?  What was he doing?
23     A.   He said that he was sorry, he was just sorry.  I
24  went on to tell him, you know, Gary, you are the man in this
25  house.  You the man in the house.  And JT and Jerrett have to
```

113

1  look up to you. They look up to you. This is not -- you know,
2  this is not what men do. They -- now they thinking that maybe
3  this is what they need to be doing to they wives or girlfriends
4  or -- you know, this is not the way we do things around here.
5      Q.   How did he react to that?
6      A.   Still sobbing, said that he was really sorry.
7           MR. BEACH: That's all I have, Judge.
8           THE COURT: Cross?
9           MR. JOHNSON: I have no questions, ma'am. Thank
10 you.
11          THE COURT: Thank you very much. Ma'am, you may
12 step down.
13          MR. BEACH: You may step down.
14          (Witness excused from courtroom.)
15          MR. BEACH: We call Ray Montgomery, Judge.
16          THE COURT: Is she subject to recall?
17          MR. BEACH: No.
18          THE COURT: Can she retake her seat?
19          MR. BEACH: You're excused.
20          He's already been sworn.
21          THE COURT: Oh, you testified earlier. Please
22 have a seat.
23          Sir, you will recall being previously sworn.
24 You are still under oath.
25          (No omissions.)

114

1                    RAY MONTGOMERY,
2  was called as a witness by the State, and after having been
3  first duly sworn, testified as follows:
4                  DIRECT EXAMINATION
5  BY MR. BEACH:
6      Q.   Tell us your name again, please.
7      A.   Ray Montgomery, Jr.
8      Q.   You are the same Ray Montgomery, Jr., father of
9  Jazzmen Montgomery, that testified at the first part of this
10 trial?
11     A.   Yes, sir.
12     Q.   You understand that you're still under oath?
13     A.   Yes, sir.
14     Q.   You and I talked along with some of the other
15 relatives of Lovetta and Jazzmen that you have the opportunity
16 now under the law to express to the jury just how the murder of
17 your daughter has affected your life since September 21st of
18 2009. You understand that?
19     A.   Yes, sir.
20     Q.   You have that opportunity. We've talked about what
21 you -- what you can't -- you can't go into anything other than
22 just how Jazzmen's death -- you know, the hole it's left in
23 your life and how you've -- how you've dealt with it. Do you
24 understand that?
25     A.   Yes, sir.

115

1      Q.   Okay. With that -- that in mind, can you tell the
2  folks of the jury what impact your daughter's death has had on
3  your life? How has it affected you?
4      A.   It has affected me a great deal because I always
5  tried to be a great father for her. I always tried to be a
6  part of her life. I always tried to be a great role model for
7  her, and I never expected this to happen. And when it
8  happened, it just really changed my life and the direction my
9  life was going in. And it's still hard, you know, to know
10 that, you know, my daughter is not in my life anymore and she
11 is gone. And the things that normal people do with their
12 children, it hurts to see them do that because I can't do it
13 with her anymore because I don't have her.
14     Q.   Anything else you want to say in that regard, sir?
15     A.   It's been stressful. It's been stressful dealing
16 with -- just dealing with this. Like I say, I didn't -- I
17 didn't -- couldn't imagine this ever happening to me. And then
18 when it did, it's -- it's really -- it's different. It's very
19 different. Working with kids every day -- I'm an educator, and
20 I work with kids every day. And it's hard to look at these
21 kids and see them doing things and getting awards and things
22 and in the back of my mind I'm like -- I won't be able to go to
23 my daughter's graduations and things like this because she's
24 not here. It was all taken from me, and it's hard -- it's hard
25 because the kids at school want me to be happy for them, and

116

1  I'm trying to be happy. But then in the back of my mind, I'm
2  like, I'm not -- I don't want to be like jealous of them or
3  anything, but I don't have a daughter that I could -- my
4  daughter that I could go and -- and visit her at school and go
5  on field trips and things like that with. And it's very hard.
6      Q.   Thank you, sir.
7      A.   Yes, sir.
8           MR. BEACH: Pass the witness.
9           MR. JOHNSON: I don't have any questions, Mr.
10 Montgomery.
11          THE COURT: Thank you, sir.
12          Sir, you may retake your seat.
13          (Witness brought forward, previously sworn.)
14          MR. BEACH: Is that a real tie? Man, I never
15 wore one of those when I was your age.
16          THE COURT: Come on up and have a seat. You
17 will recall that you previously testified in this matter and
18 you are still -- promise to tell the truth, right?
19          THE WITNESS: Yes.
20          THE COURT: Your witness.
21               JERRETT ARMSTEAD,
22 was called as a witness by the State, and after having been
23 first duly sworn, testified as follows:
24                 DIRECT EXAMINATION
25 BY MR. BEACH:

117

1    Q.  Tell us your name one more time, okay?

2    A.  Jerrett Armstead.

3    Q.  Jerrett, we've talked about this -- this time, and

4 this is your opportunity to tell these people how your life has

5 been affected by what happened back at your house on

6 September 21st, 2009; is that correct?

7    A.  Yes.

8    Q.  Okay.  And you know really what you can say and what

9 you can't say, so just listen real close to my question.  We've

10 already heard about you having to see your mom there on her

11 bedroom floor that day, and you went your mom's funeral.  How

12 has your mom being gone -- being gone the rest of your life,

13 how has that affected you since -- since that night?

14    A.  I have been having weird dreams lately.

15    Q.  Okay.

16    A.  And that night, now I hear noises at night.

17    Q.  Have you been going to counseling out at the

18 Children's Advocacy Center?

19    A.  Yes.

20    Q.  And you've been with Dr. Ashley Lynn really since

21 about a week or so after this happened; is that right?

22    A.  Yes.

23    Q.  And you've had a lot of -- a lot of anger since the

24 murder; is that correct?

25    A.  Yes.

118

1    Q.  And just a lot of questions as to why Gary would do

2 something like this?

3    A.  Yes.

4    Q.  Have you had nightmares?

5    A.  Yes.  I had one last night.

6    Q.  You had one last night.  And, Jerrett, is it true

7 that even -- there's been times when you kind of have blamed

8 yourself for all of this; is that right?

9    A.  Yes.

10    Q.  Like you could have done something to stop it?

11    A.  Yes.

12    Q.  But you understand this isn't your fault, you

13 understand that, don't you?

14    A.  Yes.

15    Q.  Now, I know every brother has kind of an interesting

16 relationship with their baby sister, but can you just tell us

17 now that Jazzmen is out of your life, how has that made you

18 feel?

19    A.  Sad because now I ain't got nobody that when I try

20 to hug them, they say -- when I try to give them kisses, they

21 say eeeh.  And now that she can't -- now that she can't come to

22 my room, so she can be with me.

23    Q.  You miss your little sister?

24    A.  Yes.

25    Q.  That's all I have.  Thanks for coming down, Jerrett.

119

1    A.  You're welcome.

2    MR. JOHNSON:  I have no questions.  Thank you.

3    THE COURT:  Thank you very much for coming in.

4 You are free to just go with the investigator.

5    (Witness brought forward, previously sworn.)

6    THE COURT:  Sir, you will recall that you are

7 still under oath and promise to tell the truth.  You understand

8 that?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  All right.  Please continue.

11    MR. HARRIS:  Thank you, Your Honor.

12    JEROME ARMSTEAD,

13 was called as a witness by the State, and after having been

14 first duly sworn, testified as follows:

15    DIRECT EXAMINATION

16 BY MR. HARRIS:

17    Q.  Go ahead and state your name again for the record.

18    A.  My name is Jerome Armstead, but my friends and

19 family call me JT.

20    Q.  Okay.  And, JT, you're the same young man that

21 testified for this jury earlier; is that correct?

22    A.  Yes, sir.

23    Q.  Earlier during this trial?

24    A.  Yes, sir.

25    Q.  During this portion of the trial, main thing I want

120

1 to give you an opportunity is basically to let the ladies and

2 gentlemen of the jury -- tell them how the loss of your mother

3 and your sister has affected you.

4    A.  Yes, sir.

5    Q.  You want to tell them?

6    A.  Having my mom and my sister gone, a lot of things

7 are different.  I can't wake up and say good morning to my mom

8 anymore.  I can't hug my little sister every time she goes to

9 school anymore.  And sometimes I wake up too depressed to get

10 up.  And then when I go to school, I have to bottle up my

11 emotions.  That way no one can bother me anymore.  And

12 sometimes I just break out crying in the middle of class, and I

13 really don't talk to anybody or tell anybody what's going on,

14 because all it's going to do is make it worse.  And seeing my

15 granny and the rest of my family cry over this, it hurts me

16 even more.  And if I could cut my own throat to bring my mom

17 and sister back, I would.

18    Q.  As far as this whole incident, you're still in

19 counseling?

20    A.  Yes, sir.

21    Q.  Doing the best you can?

22    A.  Yes, sir.

23    Q.  And you try to, I guess, put on a pretty good act as

24 far as trying to be strong for your little brother?

25    A.  Yes.

121

1   Q.   And the rest of your family, but sometimes it gets
2   hard, doesn't it?
3       A.   Yes, sir.
4       Q.   Okay.  And the truth of the matter is you still have
5   nightmares about that night, don't you?
6       A.   Yes, sir.
7       Q.   And to be honest with the ladies and gentlemen of
8   this jury, I mean, you're still angry now, aren't you?
9       A.   Yes, sir.
10      Q.   Okay.  And I think in the counseling you've even
11  shared with them that you've had nightmares about this
12  Defendant getting out?
13      A.   Yes, sir.
14      Q.   Is that true?
15      A.   Yes, sir.
16      Q.   And if you're really honest with them, you're still
17  worried about him getting out some day, aren't you?
18      A.   Yes, sir.
19      Q.   Okay.  But you're doing the best you can in
20  counseling?
21      A.   Yes, sir.
22      Q.   And just so the members of the jury will know, at
23  the time your mother and sister were brutally murdered, you and
24  JT, you shared a room, didn't you?
25      A.   Yes, sir.

122

1       Q.   Y'all still able to share a room right now?
2       A.   No, sir.
3       Q.   Okay.  Does he stay with your grandmother?
4       A.   Yes, he stays with my grandmother, and I stay with
5   my dad.
6       Q.   Okay.  You miss him?
7       A.   Yes, sir.
8       Q.   Miss your little brother?
9       A.   Yes.
10      Q.   I know sometimes it's hard having a little brother
11  and sharing the same room.
12      A.   Yes, sir.
13      Q.   And as far as being the oldest, the night all this
14  happened, you still kind of, you know, feel some responsibility
15  for it?
16      A.   Yes, sir.
17      Q.   But in your counseling, you understand it's not --
18  not your fault?
19      A.   Yes, sir.
20      Q.   Okay.  Anything else you want to share with this
21  jury or this good Judge?
22      A.   No, sir.
23           MR. HARRIS:  That's all I have, Judge.
24           THE COURT:  Any questions?
25           MR. JOHNSON:  No, sir.

123

1           THE COURT:  Thank you.  You're free to go.
2           MR. BEACH:  Call Margarita Brooks.
3           THE COURT:  Ma'am, you will recall you're still
4   under oath.
5           THE WITNESS:  Yes, sir.
6           THE COURT:  Please continue.
7               MARGARITA BROOKS,
8   was called as a witness by the State, and after having been
9   first duly sworn, testified as follows:
10              DIRECT EXAMINATION
11  BY MR. BEACH:
12      Q.   Take a deep breath, and let's get through this,
13  okay?  Will you state your name?
14      A.   Margarita Brooks.
15      Q.   And really, seeing your two grandsons up there,
16  that's just kind of a microcosm of what these last 14 months
17  have been for you; is that right?
18      A.   Yes.
19      Q.   And the minute that you run that bathtub at your
20  house and your husband is saying they're dead, they're dead,
21  and you're rushing over to your daughter's house, just tell us,
22  Ms. Brooks, what your life has been like since the murder of
23  your daughter and your granddaughter.
24      A.   It's been very difficult.  It's been difficult for
25  myself, as well as seeing the boys go through the suffering

124

1   that they have went through.  It's been difficult just making
2   sure that we all get to our appointments with therapists and
3   psychiatrists.  And it's been difficult because we have had to
4   have so much help to just make it through the day.  It's been a
5   lot of pressure on our family.  Jerrett and I have had to have
6   medication which was terrible, dealing with the things that the
7   insurance companies would cover and wouldn't cover.  And then
8   the body, just rejecting certain medicines and trying different
9   ones and -- it's just been difficult.  No one could imagine
10  what this has done to our family, and it's so complicated.  I
11  really can't even sit here and explain.
12      Q.   Has your family -- has your family stayed together
13  and kind of just come together over this to where -- this isn't
14  going to defeat y'all?
15      A.   No, it's not going to defeat us.  It's brought some
16  strife and challenges, but we'll make it through.  Our family
17  bond is close.
18      Q.   Thank you, ma'am.
19           MR. BEACH:  That's all I have, Judge.
20           MR. JOHNSON:  No questions.
21           THE COURT:  Thank you, ma'am.  You may retake
22  your seat.
23           MR. BEACH:  May we approach?
24           THE COURT:  You may.
25           (Sidebar conference.)

125

1  THE COURT: All right. Ladies and gentlemen, as
2  promised, we are closing up for the day. You'll come back here
3  at -- let's shoot for 9 o'clock tomorrow morning.
4  THE BAILIFF: All rise.
5  (Jury excused from courtroom.)
6  THE COURT: All right. What hearings do we need
7  to have right now?
8  MR. BEACH: We just need to go over these
9  counseling reports and see what we can agree on in terms of
10  what --
11  THE COURT: So we're not going to have a 705
12  hearing on any of the experts today?
13  MR. BEACH: We can do that or we can do that
14  first thing in the morning, whatever you want to do.
15  THE COURT: I'd rather do it now.
16  MR. BEACH: That's fine.
17  THE COURT: If we have people available.
18  MR. JOHNSON: That's fine.
19  THE COURT: Okay.
20  MR. BEACH: We need about a ten-minute break in
21  between. You want to do it right now -- right now?
22  THE COURT: No, let's do this. Let's do
23  counseling records first. Then you can take a break and
24  then -- is that -- I mean --
25  MR. BEACH: Sure.

126

1  MR. JOHNSON: Counseling records first?
2  THE COURT: Counseling records first.
3  Can you all set the stage real quick just for
4  the record as far as the -- what the counseling records are,
5  who made them, when they were made, and approximately how many
6  pages?
7  MR. JOHNSON: Judge, there's approximately --
8  I'd say 80 pages, maybe 100.
9  MR. BEACH: Total for both of them?
10  MR. JOHNSON: Yeah. Probably a hundred pages
11  total for both -- kind of both of the kids made by --
12  What was the name of the doctor?
13  MR. BEACH: Lind, L-i-n-d.
14  MR. JOHNSON: And they're going to go through
15  them real quick and see if they can -- if we can agree on what
16  to offer.
17  THE COURT: Oh, okay. So you think there is
18  some possibility of an agreement from the Defense because that
19  is not what I understood the facts to be.
20  MR. JOHNSON: Well, Judge, again, if the Court's
21  going to -- if the Court's of the opinion that you're going to
22  allow either one or other -- one or the other or both, then I'm
23  certainly in a much more agreeable position.
24  THE COURT: Well, I understand. The Court's
25  concern is that counseling records -- the records themselves

127

1  can't be cross examined.
2  MR. JOHNSON: Correct.
3  THE COURT: And the counseling records may
4  contain items that are -- satisfy one prong of the
5  admissibility, but not another. And that a jury starts reading
6  these, and one juror may have an interpretation based on their
7  own personal experience of what something means in a record, a
8  counseling record, that differs from another juror. And if we
9  don't have the counselor here to testify --
10  MR. BEACH: We do.
11  THE COURT: -- what things mean, I think we just
12  run the risk of someone getting a misunderstanding of what the
13  records are.
14  All right. We're off the record.
15  (Discussion off the record.)
16  THE COURT: You swear to tell the truth, nothing
17  but the truth?
18  THE WITNESS: Yes.
19  (Witness brought forward and sworn.)
20  THE COURT: Please proceed.
21  (Outside the presence of the jury, defendant
22  present.)
23  DR. GILBERT MARTINEZ,
24  was called as a witness by the Defendant, and after having been
25  first duly sworn, testified as follows:

128

1  DIRECT EXAMINATION
2  BY MR. JOHNSON:
3  Q.  State your name, please.
4  A.  My name is Dr. Gilbert Martinez.
5  Q.  Hold on one second, Doctor.
6  (Discussion off the record.)
7  MR. BEACH: Paul, do you want me to do it?
8  MR. JOHNSON: Do you want to do it? That's
9  fine.
10  MR. BEACH: I'll do it. Do you want me to go
11  ahead?
12  MR. JOHNSON: We need the Defendant.
13  (Defendant returned to courtroom.)
14  MR. BEACH: Judge, I think I'm going to conduct
15  this interrogation with the Defendant's permission.
16  THE COURT: Okay, go ahead.
17  MR. BEACH: Just to shorten the time.
18  CROSS-EXAMINATION
19  BY MR. BEACH:
20  Q.  Dr. Martinez, my name is Andy Beach. I'm a
21  prosecutor. I want to find out, first of all, have you
22  prepared a report in this matter?
23  A.  Yes, I have.
24  Q.  Could I see it?
25  A.  Yes.

129

1    MR. JOHNSON:  Judge, we're going to object to
2  the report at this time.
3         THE COURT:  I won't get a copy of the report?
4         MR. JOHNSON:  After he testifies.
5         705 only goes to underlying data from the
6  report, Your Honor.
7         MR. BEACH:  He's reviewed his report, I take it,
8  before he's testified, so I'm entitled to look at whatever he's
9  reviewed.
10        MR. JOHNSON:  Not if it was prepared after the
11 diagnosis.  The report was prepared just for consultation
12 purposes.  It's discoverable after he testifies --
13        COURT REPORTER:  I'm sorry.  You're going to
14 have to slow down.  I can't understand you.
15        THE COURT:  It's late in the day.
16        MR. JOHNSON:  Okay.  Well, Judge, the objection
17 is as far as his -- 705 goes to the underlying data from which
18 the opinions were formed.  A report that's consultive in nature
19 will go to the testifying for cross-examination and
20 cross-examination --
21        THE COURT:  Okay --
22        MR. JOHNSON:  -- purposes.
23        THE COURT:  Hold on.  I might as well just say
24 this on the record.  I have no idea who this doctor is and
25 which side he's testifying for.  I don't have any ideas if this

130

1  is a State's witness or a Defense witness.
2         MR. JOHNSON:  Judge, I'll tell the Court so
3  you'll understand.  It is late in the day, we've been working
4  hard, we're trying to save a little time.  This is a witness
5  for the Defense that's going to testify in regards to
6  conducting neuropsychic exams on the defendant and clinical
7  psychological exams on the defendant.  He has formed opinions
8  in regards to his cognitive disorders and to his mental
9  disorder, and he is going to offer an opinion in regard to
10 those particular areas.
11        THE COURT:  Okay.
12        MR. JOHNSON:  I was going to allow the State to
13 do it just in order to cut some time.
14        MR. BEACH:  You're saying I'm not entitled to
15 his opinions?
16        MR. HEALY:  You are.
17        MR. JOHNSON:  Absolutely.
18        MR. BEACH:  His opinions are in the report.
19        MR. JOHNSON:  I know, but he can testify to
20 them.
21        MR. BEACH:  That's fine, I'll go on.
22    Q.    (BY MR. BEACH)  Doctor, you have a report; is that
23 correct?
24    A.    That is correct.
25    Q.    How many pages is it?

131

1    A.    Seventeen pages.
2    Q.    Okay.  And does it contain all your opinions in this
3  matter?
4    A.    Yes.
5    Q.    All right.  Have you interviewed the defendant Gary
6  Green in this case?
7    A.    Yes, I have.
8    Q.    How many times?
9    A.    One time.
10   Q.    And when was that?
11   A.    That was on May 25th, 2010.
12   Q.    Okay.  And about how long was he interviewed?
13   A.    He was interviewed for about two hours and then he
14 was tested for about five hours.
15   Q.    Okay.  And prior to the May interview of the
16 defendant were you provided any materials to review?
17   A.    Yes, I was.
18   Q.    What were you provided?
19   A.    I was provided records from a facility named
20 Timberlawn, I believe.
21   Q.    Yes, sir.
22   A.    And I was also provided records from Parkland
23 Medical Services, I believe, reflecting evaluation and
24 treatment that Mr. Green had had over the last maybe 15 or
25 20 years or so.  And I believe that that was the majority of

132

1  the records that were provided to me.  I was also provided --
2  I'm sorry, I was also provided with a summary of some
3  interviews by Dr. Kelly Goodness.
4    Q.    Okay.  And do you have that summary here?
5    A.    Yes, I do.
6    Q.    Can I take a look at that real quick?
7         MR. BEACH:  And can I get a copy of his file?
8         MR. JOHNSON:  I don't have an objection.  I have
9  no objection.
10        MR. BEACH:  We can make a copy of everything he
11 has and we can get through this very quickly.
12        THE COURT:  Okay.  Let me ask -- so -- just so I
13 know.
14        MR. BEACH:  Yes, sir.
15        THE COURT:  We're not having any 702 problems or
16 anything like that, or are we?  That's -- You're not saying --
17 You're saying he's qualified to be here and testify?
18        MR. BEACH:  I'm not contesting his
19 qualifications.
20        THE COURT:  Okay --
21        MR. BEACH:  All I want, Judge, is all the
22 underlying data that he's reviewed and then the opinions that
23 he's reached.
24   A.    Okay.  This is the information that I received from
25 Dr. Goodness that was aside from the medical records, and then

133

1  these were the medical records that I had received at the time
2  prior to my assessment.
3              I should say around the time of the assessment.
4  I don't actually whether I received them right before or right
5  after, but I included a review of that in my report.
6      Q.   (BY MR. BEACH)  So the summary from Dr. Goodness,
7  and then Parkland Health and Hospital System Jail Records; is
8  that correct?
9      A.   Correct.
10     Q.   Anything else in terms of records provided to you to
11 help you reach your opinions in this case?
12     A.   Those were the records that were provided to me
13 around the time of my evaluation.  I was recently provided more
14 records, including a letter by Mr. Green, and also a social
15 history summary, and then several other medical records.
16 Actually this was something else that I was working on for a
17 separate file, so --
18     Q.   That doesn't have anything to do --
19     A.   That's another case, that's a different case.  I'm
20 sorry.  I was out there working while I was waiting for this
21 and so I accidentally mixed up some records.
22             And I was provided these records as well today.
23     Q.   Today?
24     A.   Yes.
25     Q.   You're talking about some additional --

134

1      A.   Additional medical records --
2      Q.   -- from Parkland --
3      A.   -- from Parkland.  It seems like most of those or
4  all of those are from Parkland.
5      Q.   Okay.
6      A.   And I -- it appears that they are reflecting
7  intervention and evaluation of Mr. Green after my assessment.
8      Q.   And a letter from Mr. Green to the -- one of the
9  victims in this case; is that correct?
10     A.   I believe so, yes.
11     Q.   And who generated the social history summary, do you
12 know?
13     A.   I don't know who generated that; it was provided to
14 me today to review.
15     Q.   Anything else in your file that was provided to you
16 to help you reach your opinions in this case?
17     A.   No, everything else was generated by me.
18     Q.   Where are the Timberlawn records, do you know?
19     A.   The Timberlawn records are --
20     Q.   One of these files?
21     A.   Part of the first file that I gave you.
22     Q.   Okay.  Anything else?
23     A.   The only other thing is the Court Order to evaluate
24 Mr. Green, and I believe that is it.
25             MR. BEACH:  So, Paul, the only thing I don't

135

1  have is the Goodness summary and the social history summary?
2      Everything else are just copies of records that are in
3  evidence?
4              MR. JOHNSON:  That's fine.
5              And, Andy, just so we're clear, I can do it on
6  cross, we've also discussed, and I believe he's seen the TDC
7  psych records.  I don't know if he's specified to that.
8      Q.   (BY MR. BEACH)  Do you have those with you, the TDC
9  psych records?
10     A.   I think -- I think those are the Parkland -- What
11 we're referring to as the Parkland records, I believe.
12     Q.   No, that's going to be separate.  Parkland is the
13 county jail records, and TDC are going to be the records from
14 his ten-year stint in the penitentiary.
15     A.   Those are included in the first -- in the first
16 batch of records that I gave you, or everything that I reviewed
17 is included, in is there.
18     Q.   So if they're not in here you haven't reviewed them?
19     A.   Correct.
20             MR. BEACH:  I guess we need to make copies of
21 those then.
22             How do you propose doing this?  Now or before he
23 leaves tonight?
24             MR. JOHNSON:  I want him to take whatever he's
25 got.  We need to do it --

136

1              MR. HEALY:  She can do it right now.
2              MR. BEACH:  Okay.  Amy, what's it's going to be?
3              (Documents handed to intern.)
4      Q.   (BY MR. BEACH)  And based on your interview and
5  testing of the defendant as well as the records that were
6  provided to you, have you formed certain opinions in this case?
7      A.   Yes, I have.
8      Q.   And just tell me step by step what each individual
9  opinion is as detailed as you can.
10     A.   Yes.  My first opinion is that Mr. Green suffers
11 from a mental disorder that affects his thinking and his mood.
12 His symptoms meet diagnostic criteria for schizoaffective
13 disorder.
14     Q.   Okay.
15     A.   Bipolar type.
16     Q.   Okay.
17     A.   He suffers from a history of paranoid delusions and
18 behavior, mixed in with episodes of depression that varied in
19 severity over time.  Those symptoms do not appear to meet
20 diagnostic criteria for schizophrenia and they exceed criteria
21 for major depressive disorder.  So I feel that they meet the
22 criteria for a -- for a schizoaffective disorder.  I also
23 found -- My second opinion is that Mr. Green does suffer from
24 some deficiencies in his intellect.  His intellectual
25 functioning I believe is in the low average range.  And

137

1    specifically in the lower end of the lower average range. And
2    he has -- These deficiencies both with respect to verbal and
3    non-verbal abilities, and then I also feel that he has
4    cognitive dysfunction that is partially associated with these
5    intellectual disabilities that has, and the cognitive
6    dysfunction is in the form of difficulty with his higher level
7    thinking and reasoning, and mental shifting and learning.
8              And then my third opinion is that Mr. Green also
9    has characteristics of a personality disorder, and mixed
10   characteristics of different types of personality disorders.
11   He has paranoid thinking and behavior as mentioned earlier that
12   is also a personality characteristic.  He also has a tendency
13   towards emotional decompensation, and he has a tendency to have
14   difficulty in maintaining interpersonal relationships.  He's
15   also avoidant.  He avoids other people in social situations and
16   social relationships.
17             And then he also has a depressive personality in
18   addition to the mood disorder where he has major depressive
19   symptoms that are severe.
20             He also has the type of personality that's prone
21   towards depressive behavior and thinking that is ongoing.  And
22   I felt that these -- that these symptoms were going to
23   compromise his ability to understand complicated information
24   and -- and I feel that these symptoms can be moderated with
25   treatment and it's also my opinion that he did not receive

138

1    adequate treatment and attention for his mental disorder
2    throughout his life.
3         Q.   Have you diagnosed Mr. Green with a specific
4    personality disorder?
5         A.   No, I have not.  I diagnosed him with a -- what's
6    called Personality Disorder NOS which basically indicates that
7    my opinion is that he does not have a specific personality
8    disorder, but that he has features of several different
9    personality disorders.
10        Q.   Okay.  Features of several different personality
11   disorders.  Do any of those include Antisocial Personality
12   Disorder?
13        A.   No, that was not my opinion.
14        Q.   So your opinion, Doctor, is not Mr. Green is anti --
15   meets the criteria of anti-personality disorder; is that
16   correct?  I mean, antisocial personality disorder?
17        A.   That is correct.
18        Q.   Specifically in regards to your diagnosis of
19   schizoaffective disorder, what are you basing that on?
20        A.   I'm basing that on Mr. Green's history as obtained
21   from various sources, including medical records, interviews
22   with his mother, and his brother, and an interview with Mr.
23   Green.  I am also basing that on the results of my
24   psychological testing.  I administered standardized
25   psychological tests that are designed to evaluate a person's --

139

1    individual's mental functioning.  And I am also basing that on
2    my clinical impressions, my observations of Mr. Green during
3    the seven hours or so that I spent with him during the
4    assessment.
5         Q.   Okay.  Did you personally interview any of Mr.
6    Green's family members?
7         A.   Yes, I interviewed Mr. Green's mother, and Mr.
8    Green's brother.
9         Q.   When did that happen?
10        A.   I would have to refer to my records to tell you
11   exactly when it happened.
12             THE COURT:  Why does it matter?
13             MR. BEACH:  Excuse me?
14             THE COURT:  Why does it matter?
15             MR. BEACH:  I just wanted to know if he talked
16   to them today versus six months ago or --
17             MR. JOHNSON:  It was months ago.
18             THE COURT:  Okay.  I should have asked the
19   question, I should have said, are we talking about today or
20   four or five months ago.
21             THE WITNESS:  No, I interviewed them shortly
22   after my evaluation of Mr. Green, within the two weeks after my
23   evaluation.
24        Q.   (BY MR. BEACH)  And so you were telling me what you
25   based your opinion in terms of the schizoid affective disorder?

140

1         A.   Yes.  And in summary it was a -- my review of
2    records, my interviews with the patient and their family, my
3    test results and my clinical impressions of the patient.
4         Q.   You've told us that in your opinion Mr. Green is not
5    antisocial; is that correct?
6         A.   That is correct.
7         Q.   You told us, or in your opinion is Mr. Green
8    mentally retarded?
9         A.   No, he is not mentally retarded.
10        Q.   Did you do any kind of I.Q. testing?
11        A.   Yes, I did.
12        Q.   What were the results of that?
13        A.   The results were a -- and I can give you the exact
14   numbers here.  The results were a full scale I.Q. score of 78,
15   which is in the borderline range.  And -- and the verbal I.Q.
16   and the perceptual I.Q. were 81 and 84 respectively.
17        Q.   Any evidence that Mr. Green was malingering or
18   exaggerating, trying to fake you out during your seven hours of
19   testing or five hours, whatever it was?
20        A.   No, I do not believe that there was any events of
21   that.
22        Q.   And Mr. Green in your opinion is not schizophrenic?
23        A.   I do not believe that he is schizophrenic.
24        Q.   Not bipolar?
25        A.   There is a chance that he may be bipolar.

1    Q.   Well, that's why I'm trying to find out today,

2   Doctor.  Can't talk about possibilities or chances.  In your

3   opinion, based on all the information available to you today

4   and your testing, is Mr. Green bipolar as he sits here?

5        A.   He is a bipolar type of schizoaffective disorder

6   which shares a lot of common features with bipolar disorder,

7   but I do not believe he meets the diagnostic criteria for

8   bipolar disorder.

9              MR. BEACH:  That's all, Judge.

10             THE COURT:  Are we done?

11             MR. JOHNSON:  I don't think I have anything.

12       Q.   (BY MR. BEACH)  Are those all of the opinions that

13   you've told me about?

14       A.   Yes.

15             MR. BEACH:  Okay.  That's all.

16             THE COURT:  Is there any objection to him

17   testifying?

18             MR. BEACH:  No, sir.

19             THE COURT:  Okay.

20             (Recess.)

21

22

23

24

25

142

1                    Reporter's Certificate

2   THE STATE OF TEXAS:

3   COUNTY OF DALLAS:

4        I, Darline King LaBar, Deputy Official Court Reporter in

5   and for the 282nd District Court of Dallas County, State of

6   Texas, do hereby certify that the above and foregoing volume

7   constitutes a true, complete and correct transcription of all

8   portions of evidence and other proceedings requested in writing

9   by counsel for the parties to be included in the Reporter's

10  Record, in the above-styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 14th day of March, A.D., 2011

17

18

19

20                  DARLINE KING LABAR
                    Official Court Reporter
21                  363rd Judicial District Court
                    Dallas County, Texas
22                  hpdkfaith@msn.com
                    (214) 653-5893
23

24
    Certificate No:  1064
25  Expiration Date:  12/31/2012