1                    REPORTER'S RECORD

2                  VOLUME 51 OF 57 VOLUMES

3

4             TRIAL COURT CAUSE NO. F09-59380-S

5                    CASE NO. AP-76,458

6

7   THE STATE OF TEXAS          :        IN THE 282ND JUDICIAL

8   VS.                         :        DISTRICT COURT OF

9   GARY GREEN                  :        DALLAS COUNTY, TEXAS

10

11

12                **PUNISHMENT PHASE BY JURY**

13

14

15

16

17

18                    * * * * * * * * * * *

19

20      On the 3rd day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1   A P P E A R A N C E S:

 2

 3   HONORABLE CRAIG WATKINS, Criminal District Attorney
          Frank Crowley Criminal Courts Building
 4        Dallas, Dallas County, Texas 75207
          Phone:  214-653-3600
 5
     BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409
          MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
 8

 9
                            FOR THE STATE OF TEXAS;
10

11

12

13

14

15
     MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
16        311 N. Market Street, Suite 300
          Dallas, Texas 75202-1846
17        Phone:  214-761-0707

18   MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
          3300 Oak Lawn Avenue, Suite 600
19        Dallas, Texas 75219
          Phone:  214-559-9115
20
     MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
21        3838 Oak Lawn Avenue, Suite 1350
          Dallas, Texas 75219
22        Phone:  214-651-6250

23

24                          FOR THE DEFENDANT.

25
```

1                      INDEX VOLUME 51

2                   (PUNISHMENT PHASE BY JURY)

3  November 3rd, 2010                              PAGE  VOL.

4  Proceedings........................................  5    51

5  State rests........................................  5    51

6  DEFENSE WITNESSES  DIRECT          CROSS        VD       VOL.

7  SHIRLEY COLEMAN     6, 46          24, 44, 50   34       51

8  LENELLE WILLIAMS   52              83                    51

9  MARY SAMPSON       92, 157         136, 152             51

10 BERTHA CURRY       161, 192                            51

11 KELLIE GRAY-SMITH 193              199                  51

12 KELLIE GRAY-SMITH 204, 230         225, 233             51

13 Reporter's Certificate............................. 234  51

14

15                ALPHABETICAL WITNESS INDEX

16                 DIRECT             CROSS        VD       VOL.

17 SHIRLEY COLEMAN     6, 46          24, 44, 50   34       51

18 BERTHA CURRY       161, 192                            51

19 KELLIE GRAY-SMITH 193              199                  51

20 KELLIE GRAY-SMITH 204, 230         225, 233             51

21 MARY SAMPSON       92, 157         136, 152             51

22 LENELLE WILLIAMS   52              83                    51

23

24

25

1                              **EXHIBIT INDEX**

2    STATE'S                     OFFERED         ADMITTED        VOL.

3      8     Translation of SX7   150             150            51

4    160     Parole Board Letter  146                            51

5    DEFENDANT'S                  OFFERED         ADMITTED        VOL.

6      3     DISD School Records  220             220            51

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               REPORTER'S RECORD

2            VOLUME 51 OF 57 VOLUMES

3

4       TRIAL COURT CAUSE NO. F09-59380-S

5          CASE NO. AP-76,458

6

7  THE STATE OF TEXAS    :     IN THE 282ND JUDICIAL

8  VS.             :     DISTRICT COURT OF

9  GARY GREEN         :     DALLAS COUNTY, TEXAS

10

11

12         PUNISHMENT PHASE BY JURY

13

14

15

16

17

18             ...........

19

20     On the 3rd day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24     Proceedings reported by machine shorthand computer

25  assisted transcription.

---

**Page 2**

1  A P P E A R A N C E S:

2

3  HONORABLE CRAIG WATKINS, Criminal District Attorney
    Frank Crowley Criminal Courts Building
4    Dallas, Dallas County, Texas 75207
    Phone: 214-653-3600
5
BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
6    MR. JOSH HEALY, A.D.A., SBOT # 24026288
    MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
7    MR. HEATH HARRIS, A.D.A., SBOT # 00795409
    MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
8

9

10        FOR THE STATE OF TEXAS;

11

12

13

14

15
MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
16    311 N. Market Street, Suite 300
    Dallas, Texas 75202-1846
17    Phone: 214-761-0707

18  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
    3300 Oak Lawn Avenue, Suite 600
19    Dallas, Texas 75219
    Phone: 214-559-9115
20
MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
21    3838 Oak Lawn Avenue, Suite 1350
    Dallas, Texas 75219
22    Phone: 214-651-6250

23

24        FOR THE DEFENDANT.

25

---

**Page 3**

2       (PUNISHMENT PHASE BY JURY)

3  November 3rd, 2010          PAGE VOL.

4  Proceedings.......................................... 5  51

5  State rests.......................................... 5  51

| 6 | DEFENSE WITNESSES | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|---|
| 7 | SHIRLEY COLEMAN | 6, 46 | 24, 44, 50 | 34 | 51 |
| 8 | LENELLE WILLIAMS | 52 | 83 | | 51 |
| 9 | MARY SAMPSON | 92, 157 | 136, 152 | | 51 |
| 10 | BERTHA CURRY | 161, 192 | | | 51 |
| 11 | KELLIE GRAY-SMITH | 193 | 199 | | 51 |
| 12 | KELLIE GRAY-SMITH | 204, 230 | 225, 233 | | 51 |

13  Reporter's Certificate............................ 234  51

14

15       ALPHABETICAL WITNESS INDEX

| 16 | | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|---|
| 17 | SHIRLEY COLEMAN | 6, 46 | 24, 44, 50 | 34 | 51 |
| 18 | BERTHA CURRY | 161, 192 | | | 51 |
| 19 | KELLIE GRAY-SMITH | 193 | 199 | | 51 |
| 20 | KELLIE GRAY-SMITH | 204, 230 | 225, 233 | | 51 |
| 21 | MARY SAMPSON | 92, 157 | 136, 152 | | 51 |
| 22 | LENELLE WILLIAMS | 52 | 83 | | 51 |

23

24

25

---

**Page 4**

1        EXHIBIT INDEX

| 2 | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 3 | 8 | Translation of SX7 | 150 | 150 | 51 |
| 4 | 160 | Parole Board Letter | 146 | | 51 |

| 5 | DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 6 | 3 | DISD School Records | 220 | 220 | 51 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**5**

2    THE COURT:  Paul, you ready?

3    MR. JOHNSON:  Yes, sir.

4    THE COURT:  All right.  Bring them in.

5    THE BAILIFF:  All rise.

6    (Jury returned to courtroom.)

7    MR. JOHNSON:  Your Honor, we're going to waive

8  an opening statement.

9    THE COURT:  Okay.

10    MR. JOHNSON:  And, Judge, can we approach real

11  quick?

12    THE COURT:  Yeah.

13    (Sidebar conference.)

14    THE COURT:  Okay.  Thank you all.  Please be

15  seated.

16    Good morning, ladies and gentlemen.  Let's see,

17  State?

18    MR. BEACH:  Your Honor, members of the jury, the

19  State would rest in punishment.

20    (State rests.)

21    THE COURT:  Defense.  Do they wish to make an

22  opening statement?

23    MR. JOHNSON:  We're going to waive the right to

24  make an opening statement, Your Honor.  We're going to call

25  Shirley Coleman.

---

**6**

1    THE COURT:  Ma'am, come on up and have a seat.

2  You will recall that you are still under oath.

3    THE WITNESS:  Yes, sir.

4    THE COURT:  Thank you.

5    MR. WARREN:  May I proceed, Your Honor?

6    THE COURT:  Yes.

7    SHIRLEY COLEMAN,

8  was called as a witness by the Defendant, and after having been

9  previously duly sworn, testified as follows:

10    DIRECT EXAMINATION

11  BY MR. WARREN:

12    Q.   Ms. Coleman, if you would go ahead and state your

13  name for the record again.

14    A.   Shirley Coleman.

15    Q.   Okay.  Pull that a little bit closer to you,

16  Shirley.

17    A.   Shirley Coleman.

18    Q.   Okay.  And like the Judge just reminded you, you are

19  still under oath from testifying before, and you're that same

20  Shirley Coleman that testified in the guilt/innocence portion

21  of this case; is that correct?

22    A.   Yes, sir.

23    Q.   Okay.  And, Shirley, pretty safe to say you're a

24  little nervous this morning; is that right?

25    A.   Yes, sir.

---

**7**

1  I just have a few questions for you, okay?

2    A.   Yes, sir.

3    Q.   Now, you understand at this portion of the phase

4  that they've already found your nephew guilty of this offense.

5  Do you understand that?

6    A.   Yes.

7    Q.   Okay.  And you understand what this portion of the

8  trial is about; is that right?

9    A.   Yes, sir.

10    Q.   All right.  And like I said, we're going to talk

11  about, you know, your relationship with -- with Gary, and also

12  kind of your family -- some of your family history.  And, you

13  know, before we get started, I just want to let you know that

14  I'm not here to embarrass you, Gary, your family, anything like

15  that.  It's just we have to go through these things.  We've

16  already discussed that before; is that right?

17    A.   Yes.

18    Q.   Okay.  Are you okay?

19    A.   Yeah.

20    Q.   All right.  If you need to take a break or get some

21  water, I'll get you some.

22    A.   No, I'm good.  Thank you.

23    Q.   All right.

24    A.   I'm okay.

---

**8**

1    Q.   Now, Shirley, y'all are -- y'all are from the Dallas

2  area; is that correct?

3    A.   Yes, sir.

4    Q.   Okay.  And you've known Gary his entire life; is

5  that right?

6    A.   Yes.

7    Q.   Okay.  And his mother is -- is Mary Sampson; is that

8  right?

9    A.   Yes.  Yes.

10    Q.   And she's your what sister?

11    A.   My oldest sister.

12    Q.   Okay.  And how many siblings do you have?

13    A.   Three.

14    Q.   Three from your mother, and then you have a lot of

15  other half siblings and step siblings, things like that; is

16  that correct?

17    A.   Yes.

18    Q.   Okay.  Now, what's your mother's name, Shirley?

19    A.   Bertha Curry.

20    Q.   Bertha Curry.  And Gary's -- and I need you to keep

21  your voice up for me because, you know, all these people need

22  to hear you over here, okay?

23    A.   Okay.

24    Q.   So if you need to, pull it up a little bit.

25    A.   Is that okay?

---

9

2     A.    Okay.

3     Q.    Okay.  Now, you said your mother's name is Bertha;
4  is that correct?

5     A.    Yes.

6     Q.    Okay.  And what's your father's name?

7     A.    James Jones.

8     Q.    Okay.  And you were born and raised here in Dallas;
9  is that right?

10     A.    Yes.

11     Q.    And Gary's parents are?

12     A.    Mary -- Mary Sampson and Thomas Green.

13     Q.    Okay.  And we're just going to go kind of
14  step-by-step, okay?  Going to talk a little bit about your
15  family history and some of the issues that you know that your
16  family has had.  And then we're going to kind of finish up with
17  your relationship with Gary, okay?

18     A.    Okay.

19     Q.    Is that all right?

20     A.    Okay.

21     Q.    Okay.  Let's start off with your mother, Bertha --
22  Bertha Curry; is that right?

23     A.    Yes.

24     Q.    Okay.  And she still lives in the Dallas area?

25     A.    Yes.

10

1     Q.    And you -- how would you describe your relationship
2  with your mother?

3     A.    Not good.

4     Q.    Okay.  And there's a lot -- does a lot of that have
5  to do with kind of her mental issues that you've seen
6  throughout your life, your adult life?

7     A.    Yes.

8     Q.    As well as your childhood life; is that right?

9     A.    Yes.  Yes.

10     Q.    Now, as a child, you actually remember or recall
11  your mother, Bertha Curry, having what you would describe as
12  kind of a nervous breakdown; is that correct?

13     A.    Yes.

14     Q.    Okay.  Can you -- do you remember the details of
15  that at all or --

16     A.    She -- she went to the hospital for something.  I
17  think she had like a hysterectomy surgery, and then she like
18  had a new boyfriend or whatever, so like a few -- few months
19  later she was like -- she was pregnant and having a baby, but
20  she really wasn't.

21     Q.    Okay.  And that's -- that's one -- one of the
22  several strange and odd things your mother would do; is that
23  correct?

24     A.    Yeah.

25     Q.    Is that when other people would -- for instance, you

11

2     A.    Yeah.

3     Q.    I believe you told me something about -- she even
4  would put some raw meat in the toilet and say she had a
5  miscarriage and things like that?

6     A.    Yeah.

7     Q.    Okay.

8     A.    And then she'd tell her boyfriend or her husband
9  that she lost the baby and then flush it down the commode and
10  all that.

11     Q.    I mean, this happened kind of throughout your adult
12  life with your mother, is just seeing this kind of odd, strange
13  behavior from her, which is Bertha; is that right?

14     A.    Yes.

15     Q.    Like, for instance, you said right there -- when --
16  pretending she was pregnant because someone else was pregnant.
17  Would she pretending that she was injured when other people
18  were injured and things like that?

19     A.    Yes.

20     Q.    And now your mother does have some -- excuse me,
21  your mother does have some physical illnesses right now; is
22  that correct?

23     A.    Yes.

24     Q.    Okay.  She's on several medications for congestive
25  heart failure and things like that; is that right?

12

1     A.    Yes.

2     Q.    But she's also on some medications for her mental
3  well-being; is that right?

4     A.    Yes.

5     Q.    And she's been on those for as long as you can
6  remember; is that correct?

7     A.    Yes.

8     Q.    But you don't -- I mean, you can't sit here and tell
9  these people -- you don't know what her mental diagnosis is or
10  anything like that; is that right?

11     A.    No, I don't know.

12     Q.    Okay.  And now, Mary is -- is Gary's mother; is that
13  correct?

14     A.    Yes.

15     Q.    Okay.  And she's your oldest sister?

16     A.    Yes, sir.

17     Q.    Okay.  What's the age difference between you guys?

18     A.    About eight, nine years.

19     Q.    Okay.  And you recall when Gary was born; is that
20  right?

21     A.    Yes.

22     Q.    What's Gary's father's name?

23     A.    Thomas.

24     Q.    Is -- excuse me, is that Thomas Carter?

25     A.    Yeah, Thomas Carter.

13

2      A.   Probably about eight, nine.

3      Q.   Okay.  And everyone at that time kind of stayed with

4   Bertha over there in South Dallas; is that right?

5      A.   Yes, Oak Cliff.

6      Q.   Oak Cliff.  You guys -- when Gary was born, Mary and

7   Thomas were living there; is that right?

8      A.   Yes.

9      Q.   Now, as you were growing up, did you kind of

10  notice -- was -- well, let me strike that.  Let me ask you this

11  way.  As you got older, did you notice that Mary wasn't as

12  attentive to her children as she probably should have been in

13  regards to certain behavior and actions and things like that?

14     A.   Yes.

15     Q.   Okay.  Like, for instance, I believe there was a

16  time when there was a situation with a car when both the boys

17  were rather young?  You -- you recall telling me that?

18     A.   Yes.

19     Q.   Okay.  What was that situation?

20     A.   Nysasno had a car in his mamma yard that didn't have

21  no key or nothing to it, with the hole right there where the

22  key go.  And he would drive his mamma up and down the street,

23  and I would like, don't you know he stole that car.  And she

24  was like, no, he say a friend gave it to him.  And I'm like, I

25  know my kids couldn't bring nothing home and say nobody gave it

14

1   to them like that.

2      Q.   Right.  It just didn't make sense, that somebody

3   loaned them a car and the steering column busted out; is that

4   right?

5      A.   Yes, sir.

6      Q.   Okay.  Also, you've also known that your older

7   sister Mary has also had some -- a nervous breakdown or two

8   where she actually had to be hospitalized shortly; is that

9   correct?

10     A.   Yes.

11     Q.   Do you recall like the years or about how long ago?

12  Do you remember that at all?

13     A.   Huh-uh, I don't really remember how long it been.

14     Q.   Okay.  And you said you knew Gary's father which was

15  Thomas Carter; is that correct?

16     A.   Yes.

17     Q.   And tell me a little bit about Thomas.  He had quite

18  a few confirmed mental issues; is that right?

19     A.   Yeah, I -- yeah.

20     Q.   Okay.  He was -- he was in the Army; is that right?

21     A.   Yes.

22     Q.   And then he was actually sent to Leavenworth which

23  is military prison?

24     A.   Yes.

25     Q.   For assaulting his --

15

2   leading.

3           THE COURT:  Sustained.

4      Q.   (BY MR. WARREN)  Do you recall why he was sent to

5   that military prison?

6           MR. BEACH:  I'm going to ask if she has personal

7   knowledge versus hearsay.

8           THE COURT:  Could be.  Lay a better predicate.

9      Q.   (BY MR. WARREN)  And if you know, if you recall

10  by -- by your own personal knowledge, not from what someone

11  else told you or what you've heard.  Do you know what -- or do

12  you know why he went to that military prison?

13     A.   No, not really.

14     Q.   Okay.

15     A.   I know we went down there to see him.

16     Q.   So you did go visit him in that hospital, correct --

17  I mean, in that prison; is that right?

18     A.   Yes, sir, in Kansas.

19     Q.   I'm sorry?

20     A.   In Kansas.

21     Q.   Yes, ma'am.

22     A.   Yeah.

23     Q.   And do you have personal knowledge or -- well, do

24  you know that he was dishonorably discharged for that behavior

25  from the Army?

16

1           THE COURT:  Again, don't lead.

2      A.   Yes, I do know that.

3           MR. WARREN:  Sorry, Your Honor.

4           THE COURT:  Just --

5      Q.   (BY MR. WARREN)  Do you recall -- do you recall when

6   Gary was a child whether Thomas was abusive towards Mary?

7      A.   Yes.

8      Q.   Okay.  Can you describe some of that?

9      A.   He used to fight her, push her on the floor, grab

10  her by her head, and put her sleep.  Doing something like this

11  -- I don't know how he did it, but he used to just fight her

12  and knock her out and put her to sleep.

13     Q.   Was this in front of Gary, if you remember?

14     A.   Yeah, in front of everybody.

15     Q.   Gary and Nysasno?

16     A.   No, not Nysasno.  Nysasno wasn't just a little bitty

17  baby.

18     Q.   Okay.  But you do recall it being in front of Gary;

19  is that correct?

20     A.   Yes, sir.

21     Q.   And Aaron Green, that's one of your brothers; is

22  that correct?

23     A.   Stepbrother, yes.

24     Q.   Okay.  And are you aware of whether or not he's had

25  any kind of mental issues as he's grown -- as he's grown up?

17

```
 2      Q.   Okay.  What about your Aunt Levinia, or you call her
 3   Aunt Lou Valentine?
 4      A.   Yes.
 5      Q.   Okay.  Do you know if any of her children -- she
 6   has -- how many children does Aunt Lou have?
 7      A.   Nine.
 8      Q.   Okay.  And do any of her children also suffer from
 9   any kind of mental illness?
10      A.   Yes, sir.
11      Q.   Okay.  How many of those children?
12      A.   Four.
13      Q.   And do you know if those -- if any or all of those
14   actually go to like MHMR or any kind of facility where they
15   receive treatment and/or medication?
16      A.   Yes, I know.
17      Q.   Okay.  How many of those four?
18      A.   All four of them.
19      Q.   Okay.
20      A.   All of them.
21      Q.   And Aunt Levinia is your -- is she your aunt?
22      A.   Yes.
23      Q.   She's your --
24      A.   She's my mamma's sister.
25      Q.   Bertha's sister; is that correct?
```

18

```
 1      A.   Yes, sir.
 2      Q.   Okay.  And then you have an Aunt Fay?
 3      A.   Yes.
 4      Q.   Which is she also Bertha's sister?
 5      A.   Yes, sir.
 6      Q.   And does she also -- she also has some children --
 7   do -- does she have some children that suffer from mental
 8   illness?
 9      A.   I really don't know because they took her kids when
10   they was little, so I didn't get to really know them.
11      Q.   Okay.  Who -- who are they?
12      A.   I just know one of them name James, and there are
13   two girls.
14      Q.   You said they took?
15      A.   Oh, the -- the -- whatever it is, CPS.
16      Q.   CPS?
17      A.   Yes.
18      Q.   Okay.  Okay.  You also have -- who is Deborah?  Or
19   who is --
20      A.   My baby sister.
21      Q.   Okay.  And she's also -- she's had some confirmed
22   mental illnesses, as well; is that correct?
23      A.   Yes, sir.
24      Q.   Okay.  And did she ever go to any kind of facility?
25      A.   MHMR.
```

19

```
 1   Okay.  And ever been in a facility at all,
 2   do you remember?
 3      A.   Yes, sir.
 4      Q.   Okay.  Do you remember what --
 5      A.   In Vernon.
 6      Q.   Vernon State Hospital?
 7      A.   Yes, sir.
 8      Q.   And then you also have an Aunt Betty which is also
 9   one of your -- one of your aunts -- one of your mother's
10   sisters?
11      A.   The baby sister.
12      Q.   Does she also suffer from some form of mental
13   illness?
14      A.   Yes, sir.
15      Q.   Does she receive any kind of treatment, do you
16   recall?
17      A.   Yes, she goes to MHMR on Samuell.
18      Q.   Do you know what meant MHMR stands for?
19      A.   Mental health.
20      Q.   Mental Health and Mental Retardation?
21      A.   Yeah.
22      Q.   And, Shirley, you also -- in your family you've also
23   had some -- in dealing with the mental issue, has there also
24   been some violence in your family -- members that have had to
25   deal with some violence?
```

20

```
 1      A.   Yes, sir.
 2      Q.   Okay.  Would that be -- one would be your sister
 3   Diane?
 4      A.   Yes, sir.
 5      Q.   Okay.  What happened with your sister Diane?
 6      A.   She was murdered.
 7      Q.   Do you know how long ago that was?
 8      A.   I want to say four years -- three or four years ago.
 9      Q.   And who -- who is Robert Burrow, Shirley?
10      A.   Stepbrother.
11      Q.   And he's -- and what happened with him, do you
12   remember a situation?
13      A.   He murdered his wife and killed his self.
14      Q.   And how long was that, do you recall?
15      A.   It had been awhile ago -- probably about 10,
16   11 years ago.
17      Q.   You said 10 or 11 years ago?
18      A.   Yes, sir.
19      Q.   And you also have an Aunt Thelma; is that correct?
20      A.   Yes, sir.
21      Q.   Okay.  And does she have any -- either herself or
22   any of her children or grandchildren, do they also have any
23   form of mental illness?
24      A.   Yes, sir.
25      Q.   Okay.  Which one and who?
```

21

2  Sabrina's two kids, Terrence and Tanto (phonetic) --

3        COURT REPORTER:  I'm sorry, what was the last

4  name?

5     A.    Mims -- their last name Mims.

6     Q.    (BY MR. WARREN)  So, Shirley, it's -- it's safe to

7  say that mental illness is kind of all throughout your family

8  on both sides.  Would you agree with that statement?

9     A.    Yes, sir.

10    Q.    Okay.  And like I told you, this is not to embarrass

11 you.  It's just -- I mean, it's just a matter of fact; is that

12 right?

13    A.    Yes.

14    Q.    Okay.  Now, I want to move on to kind of your

15 relationship with Gary.  Prior to him being incarcerated when

16 he was a teenager, were you guys pretty close or --

17    A.    Well, yeah -- I could -- yeah.

18    Q.    When he was in high school and as a teenager?

19    A.    Well, yeah.  I mean, like they all -- just always

20 come around me.

21    Q.    Okay.  How would you kind of describe Gary back in

22 high school?  I mean, did he -- was he standoffish, you know,

23 just how would you describe him back then?

24    A.    I don't know.  He just -- went to school, kind of

25 just come home, stay to his self or just, you know, gone -- he

22

1  acted kind of like a normal everyday kid.

2     Q.    Okay.

3        MR. BEACH:  I'm sorry, what?  Normal everyday

4  kid, okay.

5     Q.    (BY MR. WARREN)  Now, when he -- and then he went

6  away to prison; is that correct?

7     A.    Yes, sir.

8     Q.    And he went away twice; is that right?

9     A.    Yes, sir.

10    Q.    Okay.  It was almost like once because it was very

11 quickly in between the two; is that right?

12    A.    Yeah.

13    Q.    Okay.  And then when he came home, he actually lived

14 with you for a bit; is that right?

15    A.    Yes, sir.

16    Q.    How long -- how long did he live with you?

17    A.    Probably about a month or so.

18    Q.    A month after he got home?

19    A.    No, that's about how long he came to stay with me.

20    Q.    Okay.  Now, Shirley, you've known Gary his whole

21 life.  And when he came home from serving his sentence and was

22 paroled, was he -- was he different than when he left -- when

23 he went to prison?

24    A.    Yes.

25    Q.    Okay.  Kind of explain that to me.  How was he --

23

2     A.    When he came home, he had a wife, and he brung his

3  wife to live with his mamma.

4     Q.    Is that -- is that Belinda that you're speaking of?

5     A.    Yes, sir.

6     Q.    Okay.

7     A.    And he brung his wife to live with his mamma, but he

8  came to my house with his girlfriends.  And he would just

9  probably leave them, too -- you know, leave them there.  He

10 would be there just, you know, like ignoring them like they

11 ain't really there or something.  He wasn't Gary -- the same

12 Gary.

13    Q.    And that was very different than when he left; is

14 that right?

15    A.    Yes, sir.

16    Q.    Okay.  So I mean, his behavior was very different

17 when he came home.  Was he -- did he have any friends when he

18 came home?

19    A.    I ain't never meet no friends, just girls.

20    Q.    Would you ever -- would you kind of describe him

21 when he came back home as even being a little paranoid or

22 anything to that effect?

23    A.    I remember when he was staying with me, he used to

24 just to sit in the living room and bust out laughing for no

25 reason.

24

1     Q.    Okay.  And that seemed a little strange and odd to

2  you, didn't it?

3     A.    Yeah.

4     Q.    Would you -- would you describe him as he got back

5  as -- as being kind of clingy or needy or anything like that

6  where -- --

7     A.    What you mean?

8     Q.    Like -- well, I don't want to put words in your

9  mouth, but just his -- how was his behavior in regards to --

10 like in dealing with relationships?

11    A.    What --

12    Q.    I mean, it wasn't normal just like you stated,

13 correct?

14    A.    No, it wasn't normal.

15    Q.    Okay.

16        MR. WARREN:  Shirley, I thank you.  Appreciate

17 it.

18        THE COURT:  Cross.

19        CROSS-EXAMINATION

20 BY MR. BEACH:

21    Q.    Shirley, you're okay, aren't you?

22    A.    Yeah, I guess I'm okay.  I hope so.

23    Q.    I mean, you understood all the questions?  You and I

24 have talked two or three times?

25    A.    Yes, sir.

25

2  and what's going on; is that right?

3  A.  Yes, sir.

4  Q.  So somehow you escaped this -- this mental illness

5  cloud, is that right, that permeates your family?

6  A.  Yes, I hope so.

7  Q.  So far anyway.  You doing okay?

8  A.  Yeah.

9  Q.  You told us that when Gary came home from the pen,

10  he was different; is that right?

11  A.  Yes, sir.

12  Q.  Now, he did about ten years in the penitentiary,

13  didn't he?

14  A.  Yeah, ten or more.  Yeah.  He was there a long time.

15  Q.  And other than Belinda Lacy, is it fair to say that

16  when he was in the penitentiary, he didn't have access to women

17  on a regular basis?

18  A.  No, no, he didn't.

19  Q.  You kind of understand how it works down there at

20  the pen --

21  A.  Yeah.

22  Q.  -- they don't -- they're not around women?

23  A.  Yeah.

24  Q.  He gets out and he's got this 20-year older wife; is

25  that right?

26

1  A.  Yeah.

2  Q.  Belinda Lacy?

3  A.  Yes, sir.

4  Q.  He's got her put up over at his mom's house; is that

5  right?

6  A.  Yes, sir.

7  Q.  You're telling us he brings his younger girlfriends

8  over to your house?

9  A.  Yeah.

10  Q.  Okay.  I mean, that's a heck of a deal, isn't it?

11  You've got the old wife at the house, and I guess she was

12  supporting him financially?

13  A.  No, he wasn't -- he was staying over there at my

14  house.

15  Q.  I know, but Belinda was giving him money, right?

16  A.  I guess so.  I don't know.  I don't know.

17  Q.  He was bringing his young girls over to your house,

18  right?

19  A.  Yes, sir.

20  Q.  Okay.  And that may not be normal, but that happens

21  all the time, doesn't it?

22  A.  Well, he bring his girlfriends?

23  Q.  People do that.  They cheat on their wives, and they

24  got girlfriends on the side?

25  A.  Oh, yeah, yeah.

27

2  that right?

3  A.  I guess so.  I don't know.

4  Q.  Now, you've talked to my investigator before, Jimmy;

5  is that right?

6  A.  Yes, sir.

7  Q.  He talked to you about your relationship with Gary,

8  and you just told us a little while ago under oath, Shirley,

9  that at least before he went to the penitentiary, he'd go to

10  school just as kind of a normal kid; is that right?

11  A.  Yes, sir.

12  Q.  You were around him quite a bit, right?

13  A.  Yes, sir.

14  Q.  And he gets out of the penitentiary, and you knew he

15  had a job at Walmart; is that right?

16  A.  Yes, sir.

17  Q.  And that was for a couple of years?  A year, couple

18  of years, something like that?

19  A.  I don't know.

20  Q.  Okay.

21  A.  I don't know how long he stayed there.

22  Q.  But he was making a living, right?

23  A.  Yes, sir.

24  Q.  Now, he had -- Gary had a son from a relationship

25  before he went to the penitentiary on that robbery case; is

28

1  that right?

2  A.  Yes, sir.

3  Q.  And what's his name?

4  A.  Demarcus.

5  Q.  Okay.  Is he here in the courtroom today?  Has he

6  been down here these last couple of weeks?

7  A.  Yeah, I seen him.

8  Q.  And Demarcus is 20, 21, something like that?

9  A.  Yes, sir, I guess.

10  Q.  And then Gary gets out of the penitentiary, and he

11  gets to work pretty quick.  And he has four kids from three

12  different women in about a, what, year and a half span?

13  A.  Yep.

14  Q.  Okay.  We're talking about Gary, Jr. through

15  Shulonda, right?

16  A.  Yes, sir.

17  Q.  And Meionni through Shulonda?

18  A.  Yes, sir.

19  Q.  And he's got another son named Cameron; is that

20  right?

21  A.  Yes, sir.

22  Q.  And Cameron is about Gary, Jr.'s age?

23  A.  Yeah.  Yeah, he about -- he about eight, nine.

24  Q.  Okay.  And Gary, Jr., was born in '01, so he's

25  getting ready to turn or just turned nine; is that right?

29

2    Q.   Meionni was born in '02, and she just turned eight;
3  is that correct?
4    A.   Yes.  I never really been around the kids.
5    Q.   Okay.  So Cameron is about eight or nine, and then
6  is it La Jay?
7    A.   Yeah, La Jay.
8    Q.   La Jay, and that's --
9    A.   She's seven -- six --
10    Q.   She's seven?
11    A.   She fixing to be seven.
12    Q.   And she's staying with Mary; is that right?
13    A.   Yes, sir.
14    Q.   All these are Gary's biological children?
15    A.   Yes, sir.
16    Q.   Okay.  And Gary would work -- worked at Walmart and
17  really after that, to your knowledge, he didn't work much, did
18  he?
19    A.   He worked at McShan Florist.
20    Q.   I'm sorry?
21    A.   He worked at McShan Florist.
22    Q.   Okay.  And where else did he work?
23    A.   Them the only two jobs that I knew.
24    Q.   Okay.  So from 2000 when he got out of the
25  penitentiary on parole up until the time of the murders in

30

1  September of 2009, he worked at Walmart, at a florist shop, and
2  then did you know he was working for that battery repair
3  company there a few months before the murder?
4    A.   No, I didn't.
5    Q.   You didn't know that.  Now -- and these relatives
6  that you've told us about that have mental issues, are any of
7  them on S.S.I. disability right now?
8    A.   Yeah, I guess so.
9    Q.   Okay.  So that kind of runs out through your --
10  through your family, as well, people getting S.S.I. disability?
11    A.   I guess so.  I know -- I know that they got the
12  mental problems, but they ain't going to talk to you about they
13  money, so I don't know.
14    Q.   They're getting a check -- they're getting a check
15  from the government; is that right?
16    A.   I guess.
17    Q.   Now, were you aware that Gary applied for his S.S.I.
18  disability about a month before the murders?
19    A.   I didn't -- I heard it, but I didn't know.
20    Q.   And you also knew that these mothers of his
21  children, they were after him for child support?  You knew
22  that, didn't you?
23    A.   Yeah.
24    Q.   And Gary just -- he didn't like paying child
25  support, did he?

31

1  know.
2    Q.   He got way behind?
3    A.   Huh?
4    Q.   He got way behind?
5    A.   Who got?
6    Q.   He got way behind on his child support?
7    A.   I don't know.  He wasn't staying with me then, no
8  more.
9    Q.   Now, we talked about Gary is just kind of a normal
10  kid before he went to the pen, and then he had these
11  girlfriends.  And really in the time that you spent with him
12  leading up to the murders in 2009 -- I mean, Gary never told
13  you he was hearing voices or hallucinating or anything like
14  that, did he?
15    A.   No, he didn't.
16    Q.   You never saw with your own eyes, Shirley, any
17  evidence that -- other than maybe being quiet, you know,
18  Gary --
19    A.   And busting out laughing to his self.
20    Q.   He what?
21    A.   Bust out laughing for no reason.
22    Q.   I'm sorry?  I didn't hear you.
23    A.   Just crack up and laugh for no reason.
24    Q.   He would crack up and laugh?

32

1    A.   Yeah.
2    Q.   Okay.  And did you know if it was -- was he smoking
3  marijuana or anything like that back then?
4    A.   No, I ain't never -- I never seen Gary use drugs.
5    Q.   But people that smoke marijuana, sometimes they
6  crack up and laugh when they're still high; is that right?
7    A.   I guess.  Yeah, I guess.
8    Q.   Okay.
9    A.   I'm just saying because I don't do drugs.
10    Q.   I understand.  I'm not trying to imply.  Maybe you
11  heard tell of it.
12         Going back to before he went to the pen, did you
13  know his high school girlfriend, Jennifer Alcorn?
14    A.   I only seen her one time.
15    Q.   Okay.  And she's Lee Alcorn's daughter.  Did you
16  know that, the NAACP Lee Alcorn?
17    A.   I don't even know who he is.
18    Q.   But she was a nice girl as far as you can tell?
19    A.   Yeah, I met her when she was a -- yeah, nice, sweet
20  girl, yeah.
21    Q.   And did you ever talk to Gary after he, you know,
22  beat her up and tried to strangle her to death and stabbed her?
23  Did you ever talk to him why he had done that to that nice
24  girl?
25    A.   Yeah, I asked him.

33

2   A.   She was a fatal attraction.

3   Q.   She was a fatal attraction?

4   A.   Yes.

5   Q.   Was there a movie called that?

6   A.   Yeah, I think so.

7   Q.   Where the bunny rabbit was in the --

8   A.   Yeah, yeah.

9   Q.   She told you -- Gary told you that Jennifer was just

10  a fatal attraction?

11  A.   Yes, sir.

12  Q.   Did you also -- also talk to him about the fact that

13  he had robbed at gunpoint the place that employed him, that

14  grocery store?

15  A.   Yes, sir.

16       MR. BEACH:  Are we going to have a hearing?

17       Can we approach?

18       (Sidebar conference.)

19       THE COURT:  You don't need to -- do we need to

20  have a hearing?

21       MR. JOHNSON:  Yes, sir.

22       THE COURT:  Okay.  Folks, we're going to have a

23  short break.

24       THE BAILIFF:  All rise.

25       (Jury excused from courtroom.)

34

1        THE COURT:  May this witness be excused?

2        MR. BEACH:  No, we need to get a quick offer on

3   the record.

4        THE COURT:  Okay.  Have a seat.

5        Jury is not now present.

6        (Outside the presence of the jury, defendant

7            present.)

8            VOIR DIRE EXAMINATION

9   BY MR. BEACH:

10  Q.   Shirley, you talked to Gary about him robbing that

11  County Fair Food Store; is that correct?

12  A.   Yes, sir.

13  Q.   And that was on Loop 12?

14  A.   Yes, sir.

15  Q.   And when you talked to Gary about robbing that

16  store, did you ask him if he had been involved in any other

17  robberies, or did he tell you if he had been involved in any

18  other robberies?

19  A.   He just -- he just said he robbed that store, the

20  Hunt Store.

21  Q.   Gary -- when you're talking about robbing the County

22  Food Store, he admitted to you that he had robbed the Hunt

23  Store?

24  A.   Yes, sir.

25  Q.   Now is that pretty close to the County Fair Food

35

2   A.   Yes, sir.

3   Q.   Like right next door almost or right down the block?

4   A.   A block, yeah.

5   Q.   Okay.  Did you ask him why he -- why he was doing

6   it?

7   A.   I don't know.  I think I did, but probably not

8   really.

9   Q.   Can't remember what he -- what he told you about

10  that?

11  A.   It was just an easy thing to do.

12       MR. BEACH:  That's all, Judge.  And we've given

13  notice that Gary could -- talked to his aunt about robbing

14  another store.  So I would like to ask her those questions in

15  front of the jury.

16       MR. JOHNSON:  Well, Judge, we're going to object

17  to that.  That's just a statement without any factual basis.

18  There's no background factual basis for the statement.

19       THE COURT:  I don't think there has to be, does

20  there?  I mean, it's -- and then the jury is instructed that

21  they need to either believe it beyond a reasonable doubt or

22  not.  There's a limiting instruction that goes along with it.

23       MR. JOHNSON:  But I mean, it's strictly -- it's

24  strictly an assertion that she says that was made by the

25  Defendant.  There's no way to test the reliability of the

36

1   statement.  Well, if he had robbed -- I mean, the State has an

2   ability and the State -- they gave us notice that he had -- and

3   actually, they did give us -- they gave us notice that he had

4   he had robbed another store.  If they had the particulars of

5   it, they should have done due diligence and sought out to

6   determine whether or not that store had ever, in fact, been

7   robbed.

8        They had the ability to do that to give us

9   notice so that we could have examined it.  And they did not

10  give us notice as to the exact particulars of what they're now

11  claiming here in court.  And we haven't -- and so I haven't had

12  an opportunity to see if, in fact, that store had ever been

13  robbed.  If so, what was the description of the person that

14  robbed it.  And those issues are things that would have been

15  necessary and relevant for us to do.  And quite frankly, if the

16  Court is going to allow it, we need to ask for a continuance so

17  that we can, in fact, go back and see if that store was ever

18  robbed and do an investigation on it.

19       THE COURT:  When was the notice given?

20       MR. BEACH:  I mean, three months ago.

21       THE COURT:  Okay.

22       MR. BEACH:  And we've had conversations with

23  him.  He knows it was -- Shirley Coleman is the aunt that --

24  that Gary told this to and he -- Shirley is his witness.  I

25  mean --

37

2    heard that -- what -- that there was ever an allegation -- I

3    knew that -- I knew that -- what he said, after I've inquired

4    about that, but it was never told to anybody that it was a

5    particular store that had ever been robbed.

6           MR. BEACH: I said another store.

7           MR. JOHNSON: And my argument, Judge, goes to

8    the fact that if the State had that information, they're

9    required to turn it over in their notice. They're required to

10   give us particulars as to the date, the time, and if they have

11   an opportunity to say that we have extraneous material to prove

12   that this is more likely than not true, I submit they should

13   have had to turn that over under 404(b).

14         THE COURT: Okay. Well, here -- it's -- if they

15   tell you, Defense, we have evidence, or we believe that a

16   witness is going to testify that the Defendant told her he

17   robbed a store, but the State doesn't have any -- they don't

18   know what store, all they know is -- that's all she can say is

19   just that.

20         MR. JOHNSON: No, they say that now they have

21   the exact location of the store, the name of the store, the

22   location of the store. And they said that was the information,

23   and the notice that they've given us was that the -- this was

24   not the only robbery he had ever committed. I didn't know --

25   the notice doesn't go to the fact that he ever robbed another

38

1    grocery store, that he had ever robbed an individual.

2         MR. BEACH: I'll just raise the question. I'll

3    track the notice, Judge. I don't care if it's the store, I

4    don't care if it's, you know, a lingerie shop --

5         MR. JOHNSON: Judge, the notice --

6         MR. BEACH: -- he was involved in another

7    robbery.

8         MR. JOHNSON: If the notice is insufficient, it

9    doesn't matter. They had -- they had the opportunity and they

10   should have exercised due diligence --

11        MR. BEACH: It's not insufficient. He was

12   involved in another robbery.

13        THE COURT: Okay. All right. Let's -- the

14   notice of extraneous offense says: Defendant admitted to one

15   of his aunts that the robbery of Joe Johnson at County Fair

16   Foods was not the only robbery he had committed.

17        MR. JOHNSON: What was the name the Court said,

18   which aunt?

19        THE COURT: To one of his aunts.

20        MR. JOHNSON: And he's got -- he's got a dozen.

21        THE COURT: Well, then --

22        MR. JOHNSON: And I wasn't made aware that it

23   was this one until two days ago.

24        MR. BEACH: I don't think that's right.

25        MR. JOHNSON: It is correct.

39

2        MR. JOHNSON: Mr. Healy can attest to that.

3        MR. BEACH: You didn't even think it was on the

4    notice.

5        THE COURT: Stop. I think that it was probably

6    incumbent on the Defense at that point to say which aunt --

7    that this notice is insufficient, which aunt.

8        MR. JOHNSON: Judge, if the notice is

9    insufficient, it's insufficient. We're not -- we're not

10   required to play guessing games as to which aunt. We're not

11   required to ask for more particulars. We don't file a Motion

12   to Quash under 404(b) notice. The State -- it's incumbent upon

13   the State, if they intend to offer to the evidence, they --

14   they're required by the statute to give notice.

15        THE COURT: I understand. What I'm going to

16   allow the State to do is they can elicit testimony that the

17   Defendant admitted to one of his aunts that the robbery of

18   County Fair Foods was not the only robbery he had committed.

19   That's what the notice allows them to do. It can't go into any

20   further particulars other than that. The jury can either

21   believe it or not believe it.

22        MR. BEACH: Yes, sir.

23        MR. JOHNSON: Then that allows them to speculate

24   that the Defendant committed ten other robberies.

25        MR. HEALY: Then ask him about the specific

40

1    robbery.

2        MR. JOHNSON: That's the reason the notice is

3    insufficient, Judge. If the notice is insufficient, it just

4    can't become sufficient. I mean, we can call it up however we

5    want to, but if it's not sufficient and saying that they told

6    one of his aunts, that's absolutely insufficient. And I'll put

7    Mr. Healy on the witness stand to testify that we were only

8    made aware at the beginning of this week that it was even going

9    to be tried -- that it was even Shirley who -- I asked him

10   about it. I had to go back and see exactly which -- I didn't

11   even know where they had given it to us, and I was told it was

12   given in a supplemental notice of extraneous.

13        MR. HEALY: Back up. You didn't even know you

14   had the notice of the aggravated robbery.

15        MR. JOHNSON: That's what I said. I'll agree.

16        MR. BEACH: Judge, you made the ruling. I mean,

17   he can object to it. Let's move --

18        THE COURT: All right. I'm -- you've -- you

19   disagree with me, and that's fine. Maybe I'm wrong. It just

20   seems that this is sufficient, but to go into -- and then --

21   I'm not going to allow the State to go pull out the store that

22   got robbed and have them come in here and identify the guy and

23   say this is what happened and that there was a gun involved and

24   that, I mean -- no, I'm just saying I'm only going to allow

25   them to testify as to exactly what was in the notice. And that

41

2 MR. JOHNSON: Well, Judge, the Defendant making

3 a statement that he did something is not an extraneous act.

4 MR. BEACH: It's an admission.

5 MR. JOHNSON: The admission alone is not an

6 extraneous act that's sufficient. In order to prove an

7 extraneous act, they have to -- they have to be able to

8 convince the jury that the act, in fact, did occur beyond a

9 reasonable doubt.

10 THE COURT: I understand that.

11 MR. JOHNSON: If defendant -- if they said we're

12 going to put up one of his uncles to say that he killed Jimmy

13 Hoffa, then -- then I guess the Court is going to allow him to

14 say, yeah, he was actually involved in the Jimmy Hoffa murder.

15 I mean, that's basically what the Court is allowing him to do

16 and allowing them to sit up there and say he was involved in

17 more than this one robbery. It allows the jury to speculate.

18 It's highly prejudicial. And again, if the State had the

19 details, if they had the name of the individual or the witness

20 that he told and had the particulars of the place he robbed,

21 they're required to give that notice to us, Judge. And this is

22 inviting the jury to speculate.

23 MR. BEACH: We don't know the date. We don't

24 know, you know, the year. We have no idea. You know, a Hunt's

25 Grocery Store back in that time frame. That's all we know.

42

1 There's no way that we could have given him any more notice.

2 MR. JOHNSON: I think they just said that it's a

3 block from the other store. They certainly had enough

4 information to inquire, Judge.

5 THE COURT: Was it -- I don't know what

6 happened. I wasn't there. I'm just saying. It seems to me

7 that that's sufficient notice, and it's not just extraneous

8 offenses, it's bad acts.

9 MR. JOHNSON: Well, a bad act -- Judge, it's not

10 a bad act to say you did something. It's a bad act if they can

11 prove that it was done beyond a reasonable doubt. You can't --

12 you can't use the fact that -- you cannot use an extraneous act

13 or an extraneous bad act unless the jury believes beyond a

14 reasonable doubt that it, in fact, occurred. And that's the

15 problem that we have here. There's no basis to believe that

16 the underlying conduct actually occurred.

17 MR. BEACH: A nephew telling his aunt this isn't

18 the only robbery I was involved in, boy that's a -- that's a

19 Jimmy Hoffa analogy if I've ever heard one. I mean, that's a

20 real stretch, Judge. That's why they get the instruction that

21 you're going to give them on it. If they don't believe it,

22 they disregard it.

23 THE COURT: If they don't believe it, they can

24 disregard it. And she's here, and she's subject to

25 cross-examination. So I don't want you to go into the

43

2 particulars. I want you to limit it solely to this one

3 notice.

4 MR. BEACH: I don't know the particulars, but I

5 will abide by the Court's ruling.

6 THE COURT: All right. Bring the jury in.

7 Exception is noted.

8 Oh, while the jury is not here, we had an

9 off-the-record conversation.

10 MR. JOHNSON: Judge, it's -- that's not even

11 applicable, so it doesn't matter.

12 THE COURT: Okay.

13 (Discussion off the record.)

14 MR. JOHNSON: Judge, we are going to ask --

15 we're going to ask out of -- and certainly not waiving any

16 objection we made, we're going to ask that -- without going

17 into the particulars, that the prosecution because now the

18 notice is that there was only one other --

19 THE COURT: Hold on.

20 MR. JOHNSON: Hold on, Tony.

21 THE COURT: Hold on.

22 MR. JOHNSON: We are going to request at this

23 time -- and, again, without waiving any objection to what we

24 believe is completely inadmissible, we are going to ask that

25 the Court instruct the prosecution to make an allusion to the

26 fact that he said he had been involved in a single other

44

1 robbery. What the Court's allowing them to do with that

2 ruling --

3 THE COURT: I -- I agree. He never admitted

4 to -- he talked to her and indicated, it's my understanding,

5 that there was one. You can insert the word --

6 MR. BEACH: One.

7 THE COURT: -- one.

8 MR. HEALY: Uno.

9 (Jury returned to courtroom.)

10 THE COURT: Thank you all. Please be seated.

11 Please continue.

12 (In the presence of the jury, defendant

   present.)

13

14 CONTINUED CROSS-EXAMINATION

15 BY MR. BEACH:

16 Q. You are the same Shirley Coleman that was testifying

17 before the break; is that correct?

18 A. Yes, sir.

19 Q. Before the break, we were talking about you had a

20 conversation with Gary about him robbing that County Fair Food

21 Store off of Loop 12. Do you recall that?

22 A. Yes.

23 Q. And did Gary admit to you that his involvement in

24 the robbery of the County Food -- Fair Food Store, that he had

25 been involved in one other robbery?

45

2    Q.   Besides the County Fair Food Store robbery?

3    A.   Yes, sir.

4    Q.   And did he tell you why he had been involved in

5 these -- in these two robberies?

6    A.   No, not really.  No, not really.

7    Q.   Now, how did you find out about the murders of

8 Lovetta Armstead and Jazzmen Montgomery?

9    A.   My sister called me.

10   Q.   And you testified to your involvement in that whole

11 scenario the night of Gary eventually turning himself in to the

12 police; is that correct?

13   A.   Yes, sir.

14   Q.   Have you had any contact with your nephew since

15 September 22nd of 2009?

16   A.   No.

17   Q.   You haven't come to visit him?

18   A.   No.

19   Q.   Haven't written him?

20   A.   No.

21   Q.   Talked to him on the phone?

22   A.   No.

23        MR. BEACH:  That's all I have, Judge.

24        THE COURT:  Redirect.

25        MR. WARREN:  Just briefly, Your Honor.

46

1              REDIRECT EXAMINATION

2 BY MR. WARREN:

3    Q.   Now, Shirley, we've -- you know, we've spoke several

4 times, also; is that correct?

5    A.   Yes.

6    Q.   Okay.  And we've had several conversations about

7 your family and about your relationship with Gary; is that

8 right?

9    A.   Yes, sir.

10   Q.   Okay.  And you've told me on several -- me and the

11 rest of my co-counsel on our team, on several different

12 occasions that -- something a little different than what you

13 said earlier about -- as Gary grew up; is that correct?

14   A.   What you mean?

15   Q.   You never described to us the way he acted was a

16 normal child; isn't that true?

17   A.   No, I didn't.

18   Q.   Okay.  You actually said --

19        MR. BEACH:  Well, excuse me, Judge.  I'm going

20 to object to leading.

21        THE COURT:  Well --

22   A.   I didn't understand what he was saying --

23        THE COURT:  It's a prior inconsistent statement.

24 You need to do a better job of following the way the book tells

25 you to do it.

47

1        (BY MR. WARREN)  In previous conversations

2 that we've spoken about, we've asked you about your

3 relationship with Gary and how you observed him as he was

4 growing up; is that correct?

5    A.   Yes.

6    Q.   Okay.  And during that information that -- the

7 questions we asked, the information that you gave us, you did

8 not tell us that he was a normal child as he grew up; is that

9 correct?

10   A.   Yes, that's correct.

11   Q.   Okay.  But earlier today when I asked you that

12 question here in court under testimony -- under oath, you

13 stated that it was normal -- it was a normal childhood; is that

14 right?

15   A.   I mean, that just -- that was just part of my figure

16 of speech, you know, like -- just like my Aunt Lou kids, the

17 ones who we know that go to MHMR, if you would ask me how they

18 act, I would just -- I would probably just say normal.

19   Q.   And --

20   A.   Because that's normal to me because I've seen it all

21 my life.

22   Q.   And that's -- and Shirley, that's what I want -- you

23 know, that's what I want to get over to the jury is that

24 when -- a lot of things that you've seen your family -- you

25 know, the State made a statement to you about you were missed

48

1 by a lot of these things that -- as though you -- you were

2 lucky one.  But I mean, it may not surprise you that some

3 people think that you may have mental issues would it?

4    A.   No.

5    Q.   That wouldn't surprise you at all, would it?

6    A.   No.

7    Q.   Okay.  And, you know, same way with me and my

8 family.  If I point out at something and say somebody else,

9 they probably saying the same thing back?

10   A.   Yes, I guess.

11   Q.   Okay.  And you talked about Gary's daughter La Jay

12 that stays with your sister Mary; is that right?

13   A.   Yes.

14   Q.   Okay.  Do you know that she also has some mental

15 issues, as well?

16   A.   Yes.

17   Q.   Okay.  And what -- if you know, do you know what

18 kind they are?

19   A.   I think this -- that ADD, that she just don't be

20 still and real hyper and -- I don't -- I really don't know.

21   Q.   Okay, but she's on medication and under a doctor's

22 care for that --

23   A.   Yes -- yes, sir.

24   Q.   Okay.  And State also asked you about, you know,

25 Gary's other children and child support and things of that

49

2  want to pay, he was unable to pay most of the child support; is
3  that right?

4     A.   I don't know.  I really don't know.

5     Q.   I mean, a lot of the time when he got out of prison,
6  you knew him to have what, how many jobs, two; is that right?

7     A.   Yes.

8     Q.   Okay.  That was the florist --

9     A.   And --

10    Q.   -- and Walmart?

11    A.   Yes, sir.

12    Q.   All right.  How long had it been before the last
13  time you saw Gary before he was arrested for this offense,
14  Shirley?

15    A.   Probably about a year or so.

16    Q.   Okay.  And do you know where and under what
17  circumstances you saw him?

18    A.   I seen him going down the street on Military and --
19  Military and Forney, but -- I seen him in -- driving a car
20  going down the street, and we waved in passing.  But before
21  that, I just physically really just talked to my nephew -- it
22  was when my sister Deborah died and that was like two, three
23  years ago.

24    Q.   Okay.  And how was his behavior then during that
25  time?

50

1     A.   He walked in there and he was like -- if it wasn't
2  for her being dead, I wouldn't be here.  He had a cast on his
3  leg and just saying, I don't have nothing else to say and then
4  walked out the door.

5     Q.   And that was speaking to all your family and things
6  at the funeral; is that right?

7     A.   Yeah, just stood up and said that.

8     Q.   And wasn't there -- excuse me, weren't there some
9  instances where Gary had spoke to you about kind of his issues
10  with his mother and not feeling --

11    A.   Yeah.

12    Q.   -- received (sic) and receptive of her --

13    A.   Yeah.

14         MR. BEACH:  Judge, I'm object to anything Gary
15  told her as hearsay.

16         THE COURT:  Is there an exception you want to
17  admit it under?

18         MR. WARREN:  I'll move on, Judge.

19         THE COURT:  Okay.

20         MR. WARREN:  All right.  Thank you, Shirley.  I
21  appreciate it.

22              RECROSS-EXAMINATION

23  BY MR. BEACH:

24    Q.   One more question, Shirley.  You told us about the
25  girlfriends that Gary had when he got out of the penitentiary;

51

2     A.   Yes.

3     Q.   You also had occasion in the, you know, mid-2000 to
4  2005, 2006 to meet another one of his girlfriends; is that
5  right?  Lenelle?

6     A.   Oh, yeah, Lenelle.

7     Q.   What do you call Lenelle?  Just Lenelle?

8     A.   Just call her Nell -- I just -- just Nell.

9     Q.   She's quite a bit older than Gary; is that right?

10    A.   Yes.

11    Q.   And how often would you see Gary with Lenelle?

12    A.   Every day.

13    Q.   For how long?

14    A.   For over a year.

15    Q.   Remember that last time we talked about it, you said
16  Old Crazy Lenelle?

17    A.   Yeah.

18    Q.   Is that what you called her or --

19    A.   Yeah, because that's the way she acted.  I said she
20  was slow.  I mean, that's what I think.

21    Q.   I just wanted to clarify that.  That's all I have.

22         MR. WARREN:  Nothing further, Your Honor.

23         THE COURT:  Thank you very much, ma'am.  You
24  may -- you're excused.  You can take a seat in the courtroom if
25  you want.

52

1         THE WITNESS:  All right.  Thank you.

2         THE COURT:  Next witness.

3         MR. WYATT:  Defense calls Lenelle Williams.

4         (Witness brought forward.)

5         THE COURT:  Ma'am, swear to tell the truth,
6  nothing but the truth.

7         THE WITNESS:  Yes.

8         (Witness sworn.)

9         THE COURT:  Please have a seat.

10              LENELLE WILLIAMS,

11  was called as a witness by the Defendant, and after having been
12  first duly sworn, testified as follows:

13              DIRECT EXAMINATION

14  BY MR. WYATT:

15    Q.   Lenelle, will you please state your name and spell
16  your last name for the record?

17    A.   Lenelle Williams, W-i-l-l-i-a-m-s.

18    Q.   And you can pull that microphone a little closer to
19  you so you don't have to lean over like that.

20    A.   Okay.

21    Q.   I notice you had a cell phone with you when I was
22  talking to you earlier.  Is the cell phone turned off?

23    A.   Yes.

24    Q.   Okay.  Just wanted to make sure.

25         You know why you're here today, right?

53

2    Q.   Okay.  You're here to testify in Gary's case, right?

3    A.   Yes.

4    Q.   You know that he's been convicted of capital murder,

5    right?

6    A.   Yes.

7    Q.   Okay.  Where are you from, Lenelle?

8    A.   I'm from Tyler, Texas, but I live in Arlington.

9    Q.   Okay.  Do you have any children?

10   A.   Yes.

11   Q.   How many?

12   A.   Two.

13   Q.   What are their names?

14   A.   Quincy Lomonte Brooks, Lorassos Andes Brooks

15   (phonetic).

16   Q.   And you've got a -- you've got some grandkids, too,

17   right?

18   A.   Yes.

19   Q.   How many grandkids do you have?

20   A.   Four now.

21   Q.   Where did you meet Gary Green?

22   A.   At my sister's birthday party.

23   Q.   And what were the circumstances of you meeting Gary?

24   How did you meet him?

25   A.   At my sister birthday party, they introduced --

54

1    Q.   Your sister's birthday party.  Did somebody

2    introduce you to him?

3    A.   Yes.

4    Q.   Okay.  Who was that?

5    A.   My sister's boyfriend.

6    Q.   And that was Gary's cousin?

7    A.   Yes.

8    Q.   That she was dating at the time?

9    A.   Yes.

10   Q.   Is that right?

11   A.   Yes.

12   Q.   Okay.  So how did you -- did you start talking to

13   Gary at the party?  How did that go?

14   A.   We was playing dominoes.  We just started talking.

15   Q.   Okay.  And after you were playing dominoes with him,

16   you got back together with him, y'all exchanged phone numbers?

17   A.   Yes.

18   Q.   And started calling each other?

19   A.   Yes.

20   Q.   Okay.  And then you got together a couple of weeks

21   later; is that correct?

22   A.   Yes.

23   Q.   How did that happen?

24   A.   He called and I went over my sister house that

25   weekend and he -- he came over.

55

2    A.   That was like on -- I got over there that Friday, so

3    it was like that Saturday night.

4    Q.   Okay.  And that was in December of 2003?

5    A.   Yes.

6    Q.   And your sister's birthday is December 6th?

7    A.   Yes.

8    Q.   So it was a couple of weeks after that --

9    A.   Uh-huh.

10   Q.   -- birthday party?

11   A.   Yes.

12   Q.   Okay.  And Gary came over there and y'all got

13   together, right?

14   A.   Uh-huh.

15   Q.   Okay.  And y'all started a relationship after that,

16   correct?

17   A.   Yes.

18   Q.   All right.  Describe that relationship for the jury,

19   please.

20   A.   We went out a couple of times.  He took me to his

21   mom house, his auntie house.  We just hit it off, and we just

22   digging our time together.

23   Q.   Okay.  So y'all spent a lot of time together?

24   A.   Uh-huh.

25   Q.   Would you describe it as an -- as an emotional

56

1    relationship?

2    A.   No.

3    Q.   Well, I'm saying emotional versus more of a physical

4    relationship?

5    A.   Yeah.

6    Q.   There was -- there was physicality to the

7    relationship.  Y'all had a sexual relationship, also?

8    A.   Yes.

9    Q.   But you describe it as more of a deep emotional

10   connection?

11   A.   Yes, we were friends.

12   Q.   Okay.  Friends a long time before you became

13   sexually involved?

14   A.   Yes.

15   Q.   How much time would you say that you spent around

16   Gary in the time leading up to y'all moving in together?

17   A.   A lot of time.

18   Q.   And then you --

19   A.   Maybe about -- some months.

20   Q.   And then y'all did move in together, correct?

21   A.   Yes.

22   Q.   Okay.  Where was that?

23   A.   At Mariah Vista Apartments in Dallas.

24        COURT REPORTER:  I'm sorry.  Say it again.

25   A.   Mariah Vista.

57

2   A.   Yes.

3   Q.   And what kind of apartment did y'all get?

4   A.   We got a one bedroom apartment.

5   Q.   Okay.  And at that point --

6   A.   Upstairs.

7   Q.   -- when was that?  What years were those that you

8   were at that apartment with Gary?

9   A.   I think it was around like 2004 or '05.

10   Q.   Okay.

11   A.   Maybe '06, I don't remember.

12   Q.   How long were y'all together in that apartment?

13   A.   We stayed there almost two years.

14   Q.   So y'all lived together?

15   A.   Yes.

16   Q.   Okay.  During that time Gary was working, right?

17   A.   Yes.

18   Q.   Were you working?

19   A.   No.

20   Q.   And during that time, you were still helping out

21   with your grandkids; right?

22   A.   Yes.

23   Q.   All right.  So the grandkids would come over

24   sometimes?

25   A.   Uh-huh, spend the weekends, sometime a week.

58

1   Q.   And what were your grandkids' names?

2   A.   Anthony and Anton, they're twins.  Aubrey, she's

3   three.  And I have a newborn.  She's seven months, and her name

4   is Alliah (phonetic).

5   Q.   And during the time that you were living with Gary

6   over at the Mariah Vista Apartments, the kids came over, your

7   sons came over, and your grandkids came over?

8   A.   Yes.

9   Q.   So they knew Gary, right?

10   A.   Yes.

11   Q.   Okay.  When -- and Gary would help out with the

12   kids.  He would do those kind of things that you asked him to

13   do?

14   A.   Yes.

15   Q.   Okay.  Describe Gary's demeanor to me in general

16   while y'all were living together.

17   A.   What --

18   Q.   I guess when I'm saying demeanor, did he go out a

19   lot, was he drinking, was he -- was he carousing, those kind of

20   things?

21   A.   Huh-uh, huh-uh.

22        THE COURT:  Ma'am, I need you to answer with

23   either a yes or no.

24   A.   Yes.

25   Q.   (BY MR. WYATT)  Did you say uh-huh or huh-uh?

59

2   Q.   I'm saying, did Gary go out a lot?

3   A.   No.

4   Q.   When y'all were there?

5   A.   No.

6   Q.   When y'all were living together?

7   A.   No.

8   Q.   Okay.  Did Gary have a lot of people over at the

9   apartment?

10   A.   No.

11   Q.   Did you ever see Gary ever bring a friend inside the

12   apartment?

13   A.   No.

14   Q.   Did you ever see Gary go out and be as social as you

15   were?

16   A.   No.

17   Q.   Would you describe yourself as definitely more

18   social than Gary?

19   A.   Yes.

20   Q.   Okay.  So you never came home one night and Gary had

21   a bunch of friends, party, beer drinking, pot smoking, nothing

22   like that you ever saw?

23   A.   No.

24   Q.   Okay.  Never came home and there were other women at

25   the apartment or anything like that?

60

1   A.   No.

2   Q.   Okay.  You wouldn't have been too happy with things

3   like that going on, would you?

4   A.   No.

5   Q.   Okay.  You're not drinking -- you weren't drinking,

6   smoking during that time, were you?

7   A.   No.

8   Q.   Okay.  And that's one of the things that you liked

9   about Gary, right?

10   A.   Uh-huh.

11   Q.   Okay.  I do want to talk to you about -- you know,

12   when I say his demeanor, I was talking about his actions, but

13   also about the way he acted inside the apartment when he was

14   there.  And when I talk about his demeanor, did he like to

15   spend time alone or was he social and gregarious like -- like

16   you were?

17   A.   No, he wasn't like I was.  He would go in the room,

18   listen to music, or watch TV.

19   Q.   Okay.  So -- I mean, would you consider that him

20   withdrawing from -- from you, spending time alone?  I mean,

21   it's a small apartment, right?

22   A.   Yes.

23   Q.   And he preferred to spend a lot of his time alone?

24   A.   Uh-huh.

25   Q.   Okay.  Kind of describe that for the jury, about the

61

2    spend time alone by himself.

3         A.   He would go in a room and listen to music.  Sometime

4    he would be saying stuff, but I mean, I'm in the other room.  I

5    couldn't understand what he was saying.

6         Q.   Were there anybody -- any other people in the room

7    with him when he was saying things?

8         A.   No.

9         Q.   Okay.  But you told me when we -- we were talking

10   that you sometimes talked to the TV, right?

11        A.   Well, yeah, I fussed at the TV sometimes.

12        Q.   Okay.  And you said you're from Tyler, so you're

13   kind of loud, right?

14        A.   Yes.

15        Q.   Is that what you told me?

16        A.   Uh-huh.

17        Q.   It wasn't that kind of loud talking though, was it?

18        A.   No.

19        Q.   You described it to me as kind of a mumbling or low

20   talking --

21             MR. BEACH:  Judge, I'm going to object to

22   leading.

23             THE COURT:  Sustained.

24        Q.   (BY MR. WYATT)  Describe the kind of talking that

25   Gary would do when he was alone in the room.

62

1         A.   I couldn't understand.  He would be sometime talking

2    to the TV -- I mean, answering back or something like that.  I

3    couldn't understand what he was saying.

4         Q.   Did you think that --

5         A.   I didn't hear it.

6         Q.   Go ahead.

7         A.   I could hear him saying something, but I couldn't

8    understand it like mumbling.  He always talk quiet.

9         Q.   Did you ever think that he was holding a

10   conversation in that room with somebody else?

11        A.   Sometime.

12        Q.   And did you go in there -- did you ever open the

13   door and say, hey, what's going on in here looking for

14   people -- other people in the room?

15        A.   I opened the door, but I didn't say anything.  I

16   just opened the door and looked in there.

17        Q.   But what were you looking for?

18        A.   Nothing.  Just like seeing if he was okay in there.

19        Q.   Okay.  You were worried about his safety and -- kind

20   of concerned about it?

21        A.   I just opened the door -- just opened the door.

22        Q.   Okay.  Could you ever understand -- I think you said

23   to the jury earlier, you couldn't understand what he was

24   saying.  Did he speak like that at times where he was kind of

25   nonsensical about what he was talking about at times?

63

2             THE COURT:  Again, don't -- don't lead.

3             MR. WYATT:  Okay.

4         Q.   (BY MR. WYATT)  Did you ever hear him speak

5    nonsensically?

6         A.   Yeah.

7         Q.   Okay.  Do you remember any specific instances?

8         A.   He used to talk about vampires.

9         Q.   Okay.  Let me ask you about the vampires.  What did

10   he say about vampires?

11        A.   He told me once when I first met him that when he

12   was younger, that one followed him home.  He was coming from

13   the store, he was going through a trailer behind his house, and

14   he thought that one was following him so he left the bike and

15   went home.

16        Q.   So he left his bicycle in the alley or on a street

17   or something?

18        A.   Yes.

19        Q.   Okay.  Did he speak with you about vampires other

20   than that instance?

21        A.   Yeah, he was talking about it one time, and he said

22   that -- that vampires are among us.  And he said that they

23   won't come in unless you invite them in.

24        Q.   Did you believe that Gary believed that there were

25   vampires?

64

1         A.   Yeah.

2         Q.   Why?

3         A.   Because he talked about it.

4         Q.   And he'd talk about it frequently?

5         A.   Yeah.

6         Q.   How often?

7         A.   A lot.

8         Q.   So you think he was serious?

9         A.   Yeah.

10        Q.   Okay.  That seem a little strange to you?

11        A.   Yeah, it did.

12        Q.   But you stayed with him, right?

13        A.   Yeah.

14        Q.   Why did you stay with somebody who is in your

15   apartment, kind of withdrawing from you in his room, and

16   talking about vampires, why did you stay with him?

17        A.   Because I didn't think that was a problem, and I

18   cared about him.  I loved him.  And he was always good, so -- I

19   mean, that didn't bother me.

20        Q.   There were some other times when Gary would tell you

21   about hearing things, right?

22        A.   Yeah.

23        Q.   What were those things that he was talking about?

24        A.   Rats.

25        Q.   Rats where?

65

2   Q.   Okay. Did you ever see any rats in your apartment?

3   A.   No.

4   Q.   Did you ever hear any rats in your apartment?

5   A.   No.

6   Q.   When Gary would say he heard rats, were you -- would

7   you come home and he would say, hey, I hear rats in the wall or

8   was it that -- when it was happening when you were in the

9   apartment?

10  A.   I be in the apartment, but I didn't hear them --

11  Q.   Tell me --

12  A.   -- sometimes he would turn the TV on.

13  Q.   Tell me what happened.

14  A.   Sometime he would say they was in the walls or he

15  would tell me to turn the TV down or he would turn the TV down

16  and tell me to listen.

17  Q.   Did you ever hear anything?

18  A.   Huh-uh.

19  Q.   Never?

20  A.   No.

21  Q.   Was he scared of them?

22  A.   Huh?

23  Q.   Was he scared of rats?

24  A.   Yeah, he said he was scared of them.

25  Q.   Y'all spent a lot of time together. That's a fair

66

1   statement, right?

2   A.   Yes.

3   Q.   You got to answer.

4   A.   Yes.

5   Q.   Okay. When you were with Gary, he had a car, he had

6   a job, right?

7   A.   Yes.

8   Q.   He wasn't a leech or a mooch, was he?

9   A.   No.

10  Q.   Okay. And you said that earlier to the jury that he

11  was good to you?

12  A.   Yes.

13  Q.   Okay. What do you mean by that?

14  A.   He would always worry about me at night. Wherever

15  we went, he would always say if I couldn't go, then he wouldn't

16  go. He cleaned up. He helped me with my grandkids. He was

17  good.

18  Q.   He'd help take care of your family?

19  A.   Yes.

20  Q.   When you said he'd clean up, he'd do some chores

21  around the house and things like that?

22  A.   Yeah.

23  Q.   Would you have to ask him to do those things --

24  A.   No.

25  Q.   -- or he'd do them on his own?

67

2   Q.   Was he ever violent with you?

3   A.   No.

4   Q.   Was he ever forceful with you, ever make you do

5   something you didn't want to do?

6   A.   No.

7   Q.   Now, that relationship did come to an end, right?

8   A.   Yes.

9   Q.   Okay. Was it a bad ending, or did it just kind of

10  trail off?

11  A.   No, I moved back to Arlington. I needed to go back

12  to Arlington.

13  Q.   Why did you need to go back to Arlington?

14  A.   Well, my son was having babysitting issues, and I

15  didn't have family over here, so I just wanted to go back home.

16  Q.   So y'all lived together you said about two years?

17  A.   Yeah. Yes.

18  Q.   So you moved back to Arlington. Where does Gary

19  Green move?

20  A.   With his mom.

21  Q.   And did Gary Green -- did y'all have any plans to

22  get together after that?

23  A.   Yes.

24  Q.   What were those plans?

25  A.   We were -- he was going to move back to Arlington.

68

1   We were going to get a place over there.

2   Q.   Okay. But that didn't happen, right?

3   A.   No.

4   Q.   Okay. What happened -- what caused that not to

5   happen, him moving back together with you?

6   A.   Well, once I was staying with my son, for one, and

7   after a while it just -- I don't know what happened. We just

8   stopped talking for a while.

9   Q.   Was that your son, Lorenzo?

10  A.   Yes.

11  Q.   Okay. And then you got your own place though

12  eventually, right?

13  A.   Yes.

14  Q.   Okay. And when you got your own place, who moved in

15  with you at your other place?

16  A.   My son Quincy.

17  Q.   Your other son?

18  A.   Yes.

19  Q.   So Gary couldn't move in with you at that point in

20  time; is that a fair statement?

21  A.   Yeah.

22  Q.   Okay. Lenelle, I want to kind of talk about the

23  relationship after -- after the living together arrangement

24  ended and that part of the relationship ended, y'all still did

25  maintain a relationship, correct?

69

2    Q.   Tell the jury about that relationship.

3    A.   We would always talk on the phone. He would call

4  me. Sometime he would call me, and I would call him, and we

5  would talk on the phone.

6    Q.   So y'all remained friends?

7    A.   Always.

8    Q.   Okay. You're still friends today?

9    A.   Yes.

10    Q.   You're going to be friends with Gary Green --

11    A.   No matter what.

12    Q.   -- no matter what?

13    A.   Yes.

14    Q.   Okay. Let's talk about what happened with your

15  relationship when you knew that Gary and Lovetta got together.

16  Okay. You knew that he was with Lovetta?

17    A.   Yes.

18    Q.   At some point in time?

19    A.   Yes.

20    Q.   And then y'all didn't talk -- did y'all talk when

21  they were together?

22    A.   Yeah, he called me sometimes.

23    Q.   So you talked every once in a while?

24    A.   Yes.

25    Q.   Okay. It was a friendly relationship, right?

70

1    A.   Yes.

2    Q.   Okay. At some point in time -- about a month before

3  this incident, did Gary Green contact you?

4    A.   Yes.

5    Q.   How many times did he call you?

6    A.   Three or four times.

7    Q.   Okay. Did you think that was kind of strange that

8  he would be calling you at that point in time?

9    A.   Yeah.

10    Q.   Why did you think it was strange?

11    A.   Because I hadn't heard from him for a while, and I

12  was just wanting to know why he had called.

13    Q.   And when he called you, what was the main theme

14  about what he was saying to you, about how he was feeling?

15          MR. BEACH: I'm going to object to anything that

16  the Defendant told her as hearsay. It's not an admission by a

17  party opponent. He's sponsoring his own client's testimony

18  through her.

19          MR. WYATT: It goes to his state of mind when he

20  called her, Judge.

21          MR. BEACH: It doesn't matter, Judge. It's --

22          THE COURT: Well, you can't --

23          MR. WYATT: I'm not offering --

24          THE COURT: All right. Ladies and gentlemen,

25  it's time for a break, anyway, so --

71

2          (Jury excused from courtroom.)

3          THE COURT: Ma'am, I'm going to ask you to step

4  down. We just need to talk about some things outside of your

5  presence, okay? I just don't want to give the answer before --

6          THE WITNESS: Okay.

7          (Witness leaves the courtroom.)

8          THE COURT: Okay. The jury is not now -- y'all

9  can sit down.

10          The jury is not now present.

11          MR. HEALY: One second, Your Honor.

12          THE COURT: Okay. Defense, you wish to elicit

13  testimony consisting of what? Make an offer of proof.

14          MR. WYATT: Judge, I'd like to make an offer of

15  proof as to my Defendant while he was talking on the phone with

16  the witness Lenelle Williams about his then existing mental,

17  emotional condition when he made that phone call to -- to

18  Lenelle Williams about what he was undergoing, what he was

19  going through, and how he was feeling -- his state of mind at

20  that point in time.

21          THE COURT: And you're offering this under

22  803(3) exception?

23          MR. WYATT: That is correct.

24          THE COURT: What's the State's response?

25          MR. BEACH: Tell me again the quote.

72

1          MR. WYATT: Saying that he was stressed at that

2  point in time, that was his mental condition, that he was

3  stressed and needed help.

4          MR. BEACH: This is before --

5          MR. WYATT: This is about a month before the

6  incident.

7          MR. BEACH: I would have no objection to that

8  statement, but I just --

9          THE COURT: You didn't want it to spiral out of

10  control?

11          MR. BEACH: Talking about vampires and things

12  like that. I can't cross him, obviously, so they're not

13  entitled to be offering his statements, you know.

14          THE COURT: Depends on what they're offering it

15  for.

16          MR. BEACH: If there's an exception. I

17  understand. I'm just asking them to be careful with it just

18  versus, you know, what did Gary say, what did Gary say.

19          MR. WYATT: And, Judge, there is more that I

20  would like to offer through her about this, under 803(3).

21          THE COURT: Well, that's what I said --

22          MR. WYATT: Let me --

23          THE COURT: -- that's what I said, then keep --

24  make an additional offer.

25          MR. WYATT: Absolutely. That at the point in

73

2   Lenelle Williams many times -- or about ten -- well, a lot of

3   times -- numerous times that weekend asking for Lenelle

4   Williams to come pick him up, that he needed to get away from

5   this situation, and that he was very stressed, and that he

6   needed her help. So we think that still goes under 803(3),

7   Judge. And then I'm going to ask -- which is going beyond

8   803(3), I'm going to ask what she felt about that. Now, I'm

9   entitled to ask how she felt about that and what her actions

10   were at that point in time, how she reacted to Gary Green's

11   statements.

12         THE COURT: What's the State's response?

13         MR. BEACH: Other than the statement, I'm

14   stressed, all the other stuff about calling her up and asking

15   her to come pick him up is -- is rank hearsay and it's offered

16   for the truth of the matter.

17         THE COURT: What's the truth of the matter?

18   That he wanted to go pick her up?

19         MR. BEACH: Right. Right.

20         THE COURT: Or that --

21         MR. BEACH: I don't know, pick him up from

22   where, where he was, you know, what -- what the reason was.

23         MR. WYATT: And, Judge, that's all the

24   information that she knows is that he called her, said he was

25   stressed, needed to get away from the situation, needed -- and

74

1   begged her to come get him.

2         Now, how she believes he sounded, how -- what

3   she believes he meant, obviously, that's all admissible anyway.

4         MR. BEACH: Admissible?

5         MR. WYATT: Well, how she felt? Absolutely how

6   she felt.

7         MR. BEACH: She's speculating as to how he's

8   feeling.

9         MR. WYATT: No, she's not speculating to how

10   he's feeling. She's saying about how she felt about the phone

11   call, what she thought about the phone call. It's her

12   thoughts. It's her feelings. That's not speculation.

13         MR. BEACH: Why is it relevant?

14         THE COURT: Yeah, why is it relevant?

15         MR. WYATT: It's relevant because of the actions

16   that she took or the lack of actions that she took at that

17   point in time. And that if she had taken those actions, I

18   don't know -- if she had come and gotten him, maybe we wouldn't

19   be here today. Judge, I don't know. But that -- that issue --

20   that issue is something that, you know, I think needs to come

21   up in front of this jury.

22         THE COURT: All right.

23         (Discussion off the record.)

24         THE COURT: I think that the appropriate way to

25   do it is you've got to ask her when the conversation took

75

1         MR. WYATT: Absolutely.

2         THE COURT: And the fact that he said something

3   to her.

4         MR. JOHNSON: Judge, can I ask the Court a

5   question?

6         THE COURT: Sure.

7         MR. JOHNSON: If -- the -- we can't put a

8   specific date really on these -- on all these phone calls.

9   There are a series of phone calls that took place in the -- in

10   the few weeks leading up to the incident, and -- I mean, I

11   would propose, and I think it would be admissible under 803(3),

12   if we just talk about it as far as did you get numerous phone

13   calls in the weeks leading up to it where he described

14   increasing stress and the need to get help and the need to get

15   away from the situation. And I think we offer them under kind

16   of a grouping like that, instead of trying to be -- get into

17   specifics as to any particular date of any particular call.

18   And if we just leave it as to the general nature of those

19   comments, because I think that's really about all she can

20   recall and testify to anyway.

21         So does the State have any objection to that?

22         MR. BEACH: I've got no problems with stress.

23   I've got problems with statements like, I need to get help.

24   That goes beyond the exception. I'm stressed is fine. That's

76

1   a mental condition, but I need to get help --

2         THE COURT: I understand, but if he needs --

3         MR. BEACH: She's driving me crazy? I mean --

4         THE COURT: She's driving me crazy.

5         MR. WYATT: She's not even testifying to that.

6         MR. BEACH: The mental?

7         MR. WYATT: She's not testifying to that

8   specific statement that you just made.

9         MR. JOHNSON: Well, Judge, 803(3) does allow it

10   if it describes the sensation of mental feeling or mental pain

11   that's stated. I'm just under increased stress. I'm under

12   lots of stress and I need to get help, that is -- that is, in

13   fact -- I believe that is admissible under just the exact

14   wording of 803(3).

15         THE COURT: It's 803(1) and 3, really.

16         MR. HEALY: I need to get help is a mental

17   feeling. I think the stress everybody agrees.

18         THE COURT: No, that's a present sense

19   impression.

20         MR. JOHNSON: And just really goes to the

21   context, Judge, and I'll submit that it's relevant, especially

22   on the issues we have before this trier of fact. And certainly

23   it would be -- in an abundance of caution, since we've limited

24   it to the nature of what we proposed to the Court, I would ask

25   that it be -- be allowed under 803(3) or under 803(1).

77

2    MR. JOHNSON: I don't -- I think it's certainly

3    admissible. I certainly think that there's --

4    THE COURT: I really think that it's not

5    question of close enough. I mean, it's right in line with

6    exactly what 1 and 3 talk about. Now, the better question is

7    the speculation as to what she was, you know -- to say, well,

8    what did Gary mean by that.

9    MR. WYATT: That's not what I'm asking.

10    THE COURT: Well, yes, it is.

11    MR. WYATT: Well, I'm asking what she thought

12    Gary meant by that. That is completely different. What she

13    thinks is not speculation. Absolutely not. And her actions,

14    based on what happened in those conversations, go directly to

15    what she was thinking at that point in time.

16    THE COURT: And -- okay, and that -- then why is

17    it relevant what she was thinking?

18    MR. WYATT: She was thinking that she wanted to

19    come help Gary, that she cared enough about him to come help

20    Gary, but she couldn't come help Gary because she was in

21    Houston with her family.

22    MS. BENNETT: Well, she can say that.

23    MR. BEACH: And I can see it going from there

24    to, and if she had of --

25    MR. WYATT: No, I'm not going to say that.

78

1    MR. BEACH: -- we wouldn't be here today. It's

2    Paul's draft.

3    MR. WYATT: No, I'm not saying that.

4    THE COURT: You better not say that.

5    MR. BEACH: It's Paul's draft.

6    MR. WYATT: I'm not saying but for her inaction,

7    this wouldn't have -- I'm not saying that, Judge.

8    MR. JOHNSON: Judge, we're not going to go --

9    the step Mr. Beach is correct -- or concerned in regards to,

10    we're not -- we're not going there. Weren't intending to go

11    there, so we'll --

12    THE COURT: Yeah, don't --

13    MR. WYATT: You can --

14    THE COURT: -- don't --

15    MR. WYATT: -- admonish her on the record not to

16    go into anything like that, and then I tell you, I'm not going

17    to elicit that testimony.

18    THE COURT: Okay. Don't elicit that testimony.

19    It's just -- we're just getting out what the conversation was.

20    Bring her in so she can be admonished.

21    MR. JOHNSON: While you're admonishing her,

22    Judge, can I step out in the hallway real quick?

23    MR. WYATT: Okay. So, Judge, I don't want to

24    overstep my bounds.

25    THE COURT: Just go get her and bring her in.

79

2    (Witness brought forward and retakes the stand.)

3    THE COURT: Okay. Ma'am, what we're talking

4    about is phone calls that happened leading up to -- in the

5    weeks prior to the murders, okay?

6    THE WITNESS: Okay.

7    THE COURT: And your conversation that you had

8    with the Defendant in which he made certain statements

9    regarding his state of mind, what he was feeling at the time,

10    you can talk about that, but what you can't talk about is you

11    can't speculate as to what you think he meant by those

12    statements, okay? What you think -- I realize it's important

13    to you, but you're not a clinical expert, and you can't testify

14    or project those opinions to this jury.

15    THE WITNESS: Okay.

16    THE COURT: Okay?

17    THE WITNESS: Yes.

18    THE COURT: So you need to limit what you say.

19    And if you think that you can't do that, say -- just look at me

20    and then we'll have them rephrase the question, okay? But you

21    do need to answer the question that's directly asked.

22    Is there a further admonishment that the State

23    wishes to have?

24    MR. BEACH: Other than to ask -- have them ask

25    her what did you take that to mean or what did you do or didn't

80

1    do, just ask her what did you do in response? I didn't do

2    anything, I was in Houston.

3    THE COURT: I think that's your -- probably your

4    question, but I don't think he's going to ask that.

5    MR. WYATT: Well, I was going to ask -- at that

6    point in time you couldn't really take any action based on

7    those phone calls, and she's going to say, I can't tell you.

8    THE COURT: You don't get to ask it like that.

9    Come on, you're not cross-examining her.

10    MR. BEACH: Ask her where she was, why she

11    didn't go. What was she doing.

12    THE COURT: Just can't help -- not like cross.

13    MR. WYATT: I understand, Judge.

14    THE COURT: Got to ask direct questions.

15    MR. WYATT: Okay. So nothing about what she

16    thought --

17    THE COURT: He meant.

18    MR. WYATT: -- or what she thought about what

19    Gary said to her. Okay. Fair enough.

20    THE COURT: Okay.

21    MR. WYATT: Lenelle, you understand?

22    THE WITNESS: I think so.

23    MR. WYATT: Okay.

24    THE COURT: All right. Let's get the jury in.

25    THE BAILIFF: All rise.

81

2  THE COURT: Thank y'all. Please be seated.

3  Please continue.

4  Q. (BY MR. WYATT) Lenelle, you're the same Lenelle

5  Williams that was testifying a few minutes ago in court?

6  A. Yes.

7  Q. Okay. I want to take you back to the weekend before

8  the incident that we're about here today, okay? And you did

9  say that Gary called you numerous times that weekend, right?

10  A. Yes.

11  Q. And when he called you, he said he was stressed,

12  right?

13  A. Yes.

14  Q. Okay. And at that point in time where were you?

15  A. I was in Houston, Texas.

16  Q. And who were you with?

17  A. I was with my girlfriend. We went to visit her

18  daughter.

19  Q. And you heard about this incident, correct?

20  A. Yes.

21  Q. When you heard about this, what did you think?

22  A. I was shocked.

23  Q. Why were you shocked?

24  A. Because that is not Gary.

25  Q. From what you knew of him?

82

1  A. Yes.

2  Q. Because he was nice to you? He was never violent

3  with you?

4  A. Yes.

5  Q. Those things?

6  A. Yes.

7  THE COURT: Quit leading.

8  Q. (BY MR. WYATT) And are you still friends with Gary?

9  A. Yes.

10  Q. Let's be honest, you don't want to see him get the

11  death penalty, do you?

12  MR. BEACH: Judge, that's improper, what she

13  wants.

14  THE COURT: Well, it is and it isn't. What I

15  don't want you to do is answer -- you --

16  MR. WYATT: Okay.

17  THE COURT: You just ask her questions, not --

18  not your question that -- that is designed for her to see a yes

19  or a no answer.

20  MR. WYATT: Yes, Your Honor.

21  Q. (BY MR. WYATT) How would a death sentence affect

22  you, Lenelle?

23  A. Affect me.

24  Q. And what do you mean?

25  A. I would be sad.

83

1  A. Because he don't deserve it.

2  Q. If he's sent to the penitentiary, are you still

3  going to be friends with him --

4  A. Yes.

5  Q. -- no matter what? You're going to be friends with

6  him if he -- if he gets a death sentence?

7  A. Yes.

8  Q. Okay. If he is sent to the penitentiary, could you

9  say in front of this jury that -- at this point in time you'd

10  go down and visit him, do whatever you could for him?

11  A. Yes.

12  Q. Okay. Because you care about him?

13  A. Yes.

14  Q. What you testified to here today, those are your

15  true feelings?

16  A. Yes.

17  Q. Okay.

18  MR. WYATT: I'll pass the witness.

19  THE COURT: Cross.

20  CROSS-EXAMINATION

21  BY MR. BEACH:

22  Q. Lenelle, you told us that y'all met at the birthday

23  party playing dominoes; is that right?

24  A. Yes.

84

1  Q. Do you remember what game you were playing, what

2  kind of dominoes? 42?

3  A. Just dominoes. No, no 42. Dominoes.

4  Q. Okay. Was Gary playing dominoes?

5  A. Yes.

6  Q. Is he a good domino player?

7  A. Yes.

8  Q. Real good?

9  A. Yes.

10  Q. Hanging out there at the apartment in East Dallas

11  that year or so that you lived with Gary, are you saying that

12  you lived with him every day for a year? Would there be times

13  where he would go off and come back --

14  A. Yes.

15  Q. There would be times he would go off, right?

16  A. Yes.

17  Q. Okay. And you wouldn't see him for a little while

18  and he'd come back?

19  A. Yeah.

20  Q. Okay. And was that your apartment, or was that

21  Gary's apartment?

22  A. It was in my name, my apartment.

23  Q. Okay. Section 8 apartment?

24  A. No.

25  Q. You were paying for it?

85

2    Q.  Okay.  The apartment in Arlington, what was that?

3    A.  My apartment.

4    Q.  Was that government assisted, or was that your

5 apartment?

6    A.  My apartment.

7    Q.  And you weren't working at the time; is that right?

8    A.  No.

9    Q.  And you weren't -- aren't working now?

10    A.  No.

11    Q.  You get some kind of check, disability?

12    A.  Yes.

13    Q.  Okay.  So you're paying for your apartment through

14 the disability check?

15    A.  Yes.

16    Q.  What kind of disability do you have?

17    A.  I have total disability.  I'm disabled.  I have back

18 problems, knee problems.  I have asthma.  I have real bad

19 allergies.

20    Q.  Okay.  So it's not any kind of mental illness

21 disability?

22    A.  No.

23    Q.  It's a physical disability?

24    A.  Yes.

25    Q.  So about how long continuous would you and Gary --

86

1 would you stay together for two or three weeks and he's go off

2 or a month and go off or --

3    A.  No.  Every -- every now and then he'd go --

4    Q.  Okay.

5    A.  -- somewhere and he come back -- he would come back.

6    Q.  What would cause him to go?

7    A.  Huh?

8    Q.  Y'all have an argument and he'd go or he just

9 wanted --

10    A.  No.

11    Q.  -- wanted --

12    A.  He would go visit, I guess.

13    Q.  You told us he was working back then?

14    A.  Yes.

15    Q.  Florist -- florist company?

16    A.  Yes.

17    Q.  How long did he work?

18    A.  I don't know, probably about a year or so.

19    Q.  Okay.  Every day for a year?

20    A.  Well, sometimes if he felt bad, maybe a couple of

21 days, something.

22    Q.  Okay.  You're saying he was continuously employed at

23 the florist store for about a year?

24    A.  Yes.

25    Q.  Did you know him to work anyplace else in the four

87

2    A.  Yes.

3    Q.  Where was that?

4    A.  Walmart.  He worked --

5    Q.  That was before; is that right?

6    A.  Yeah.

7    Q.  After he quit the florist place, did he work

8 anyplace else?

9    A.  He worked at a restaurant.  I don't know the name of

10 it, off of Buckner.

11    Q.  And you are aware that Gary had four other children;

12 is that right?

13    A.  Yes.

14    Q.  And had child support?

15    A.  Yes.

16    Q.  Okay.  Did he ever talk to you about being behind in

17 his child support?

18    A.  Sometimes.

19    Q.  And it was a stressor on him?

20    A.  Yes.

21    Q.  Especially when he was working, he didn't like to

22 get his paycheck garnished by the A.G.'s office.

23    MR. WYATT:  Objection, speculation.

24    MR. BEACH:  If she knows.

25    MR. WYATT:  As to what he liked or didn't like?

88

1    THE COURT:  It may be something that they had a

2 conversation regarding, so you're going to have to set the

3 stage a little better.

4    Q.  (BY MR. BEACH)  Did Gary ever talk to you about

5 getting his -- his check from the florist company garnished by

6 the A.G.'s office?

7    A.  No.

8    Q.  Now, in 2005, y'all break up and you move back to

9 Arlington; is that right?

10    A.  Yes.

11    Q.  Okay.  Was there a time that after y'all broke up,

12 that, again, Gary would come from time to time and spend some

13 time with you?

14    A.  Yes.

15    Q.  At the apartment in Arlington?

16    A.  Yes.

17    Q.  Okay.  That happened even after he and Lovetta got

18 together; is that right?

19    A.  Yes.

20    Q.  It would be times he would get mad at Lovetta and

21 he'd come back to you for a while and then go back to Lovetta?

22    MR. WYATT:  Objection, assumes facts not in

23 evidence.

24    THE COURT:  I think he's trying to establish

25 through that -- that question.

89

2      THE COURT:  I'll --

3      MR. WYATT:  -- that he was mad, or that Lovetta

4  was mad at him is not in evidence.

5      MR. BEACH:  I'll rephrase then.

6      THE COURT:  Okay, yeah.

7  Q.   (BY MR. BEACH)  After you became aware that Gary had

8  a relationship with Lovetta, would there be times that he would

9  come back and stay with you in Arlington for a while?

10 A.   Yes.

11 Q.   Now, you found out -- or did you find out that Gary

12 and Lovetta got married there at the end of June of 2009?

13 A.   Yes.

14 Q.   Okay.  And before that, had you helped Gary to get a

15 truck?

16 A.   Yes.

17 Q.   And just tell the members of the jury how you -- you

18 helped him financially; is that correct?

19 A.   No.

20 Q.   You didn't give him any money?

21 A.   No.

22 Q.   Just put it in your name?

23 A.   No, he was working.

24 Q.   Okay.  You didn't give him $3500 for the truck?

25 A.   No.

90

1  Q.   Okay.  If there was a receipt found at the house

2  there on Morning Springs Trail to you for $500, you don't

3  remember writing a check for $500 for that truck?

4  A.   No.

5  Q.   You didn't help him in any way other than putting it

6  in your name?

7  A.   No.

8  Q.   Where was he working then?

9  A.   I don't know the name of the place.  It was, I

10 think, someplace that he worked -- he went out of town.

11 Q.   Did he ever talk to you about his job?

12 A.   No.  I just know he just had one.

13 Q.   He was taking overnight trips for his job; is that

14 correct?

15 A.   Yeah.

16 Q.   And that was even after he got married there at the

17 end of June?

18 A.   I don't know.

19 Q.   Okay.  You know when he quit his job?

20 A.   No.

21 Q.   You told us you talked to the TV every once in a

22 while?

23 A.   Yes.

24 Q.   Is that right?  You a baseball fan?

25 A.   No.

91

1  Q.   Okay.  And think of a particular time when

2  Renteria hit that home run a couple of nights ago were talking

3  to the TV?

4  A.   Yeah.

5  Q.   Whatever it was, it wasn't -- his talking to the TV

6  or talking about vampires, that didn't affect your

7  relationship, did it?

8  A.   No.

9  Q.   Okay.  You accepted him.  He treated you well.  You

10 treated him well; is that correct?

11 A.   Yes.

12 Q.   And I mean, the reality of it, Lenelle, is -- you

13 really didn't place any demands on him, did you?

14 A.   Say it again.

15 Q.   You didn't try to control him or say you had to be

16 at a certain place?

17 A.   No.  No.

18 Q.   He was there in your apartment and he could kind of

19 come and go as he pleased and it was a good -- a good

20 relationship?

21 A.   Yeah.  We were friends, yeah.

22     MR. BEACH:  That's all I have, Judge.

23     MR. WYATT:  Nothing further.

24     THE COURT:  Thank you.  Ma'am, you may remain in

25 the courtroom if you wish or you're free to go.

92

1      MR. JOHNSON:  Can we approach, Judge?

2      (Sidebar conference.)

3      THE COURT:  Ladies and gentlemen, I do know it's

4  lunchtime, but we've got two witnesses that we need to get on

5  and off and we'll proceed from there, so thank you.

6      MR. BEACH:  And may we approach real quick

7  before the next witness?

8      THE COURT:  Yeah.

9      (Sidebar conference.)

10     MR. JOHNSON:  Defense will call Mary Sampson.

11     THE COURT:  Ma'am, if you would.

12     (Witness brought forward and sworn.)

13     THE WITNESS:  Yes.

14     THE COURT:  Please have a seat.

15     THE WITNESS:  Thank you.

16         MARY SAMPSON,

17 was called as a witness by the Defendant, and after having been

18 first duly sworn, testified as follows:

19         DIRECT EXAMINATION

20 BY MR. JOHNSON:

21 Q.   Would you state your name please, Mary, and spell

22 your first and last name for the court reporter?

23 A.   Mary Sampson, S-a-m-p-s-o-n.

24 Q.   She can figure out Mary.

25     Mary, would you tell the jury, where do you

93

2   A.  At 415 Konawa Drive.

3   Q.  How long have you lived there?

4   A.  For 30 years.

5   Q.  All right.  And, Mary, will you tell the jury where

6 you were born and raised?

7   A.  Dallas, Texas.

8   Q.  Who is your mother and father?

9   A.  Bertha Curry and Irving Green.

10   Q.  Okay.  Is your father still alive?

11   A.  No, he's deceased.

12   Q.  How long ago did he pass?

13   A.  It's been some years -- over 20 something years.

14   Q.  Okay.  Your mamma is still alive; is that right?

15   A.  Yes.

16   Q.  And how old is Bertha?

17   A.  Sixty-nine or 70.

18   Q.  Okay.  And, in fact, Bertha is out in the hallway

19 and she's going to be coming in here and talking to these folks

20 next; is that right?

21   A.  Yes.

22   Q.  Now, Mary, I want to explain to this jury why I

23 asked the Court to work through the lunch hour.  There's some

24 -- y'all have some issues going on with both yourself and with

25 Bertha today that I need to try to get y'all in here into the

94

1 courtroom and -- and talk to this jury.  And in regards to

2 yourself, could you tell the jury what's going on in your

3 personal life that's taking place right now?

4   A.  My husband is getting ready to go on dialysis

5 today -- sometime today, maybe tomorrow.  I left him at the

6 V.A. Hospital.

7   Q.  Okay.  Is he actually having the shunts inserted

8 into him this morning and --

9   A.  Yes, uh-huh.

10   Q.  So this is a pretty serious thing that he's going

11 through today?

12   A.  Yes.

13   Q.  Okay.  And while you're over here testifying,

14 there's not really a family member because basically all your

15 family is over here with you today; is that right?

16   A.  Yes. Yes.

17   Q.  Okay.  Mary, I want to go through this as quick as I

18 can, but I want to make sure we take the time to let this jury

19 know about yourself and about your family.  Tell the jury how

20 many brothers and sisters were -- were in your family.

21   A.  It was five girls and two boys.

22   Q.  Okay.  How many of those are still alive?

23   A.  Two of us -- two sisters, me and my other sister,

24 and two brothers.

25   Q.  Okay.  And what does your family consist of now?

95

2 his name?

3   A.  Leon Sampson.

4   Q.  And how old is Leon?

5   A.  Sixty-three.

6   Q.  And how long have you and Leon been together?

7   A.  Thirty-one years.

8   Q.  Do you and Leon have any children together?

9   A.  No.

10   Q.  And you -- you yourself how many children do you

11 have?

12   A.  I have two.

13   Q.  And what are their names?

14   A.  Gary Green and Nysasno Carter.

15   Q.  Okay.  And Gary Green, the one you just named,

16 that's the Gary Green seated -- seated here to my right; is

17 that correct?

18   A.  Yes.

19   Q.  Okay.  Mary, I want to talk to you a little bit

20 about your family.  You -- you said that you had quite a few

21 brothers and sisters.  Could you tell me what it was like

22 growing up in a big family like that?

23   A.  It was pretty chaotic sometimes.

24   Q.  Where were y'all raised at?

25   A.  In Dallas -- in West Dallas.

96

1   Q.  Where did you go to school at?

2   A.  I went to South Oak Cliff High School, I went to

3 Roger Camille (phonetic) Elementary School, and K.B. Polk.

4   Q.  Okay.  Did you actually ever finish high school?

5   A.  No, I didn't.

6   Q.  How far did you get?

7   A.  To the 11th grade.

8   Q.  Okay.  Now, Mary, in talking about Gary, I'm going

9 to -- I'm going to kind of move around a little bit with you,

10 but I don't want to get -- get you confused.  You say you went

11 through the 11th grade, and -- and can you tell the jury how

12 far Gary was able to get through school?

13   A.  I think it was the 11th or the 10th grade.

14   Q.  Okay.  And, in fact, Mary, you have had occasion

15 to -- you've spoken to myself on many occasions; is that right?

16   A.  Yes.

17   Q.  And you, in fact, have talked to the prosecutor

18 on -- on occasions, have you not?

19   A.  Yes.

20   Q.  And they brought you down and asked you to testify

21 before the Dallas County Grand Jury, didn't they?

22   A.  Yes.

23   Q.  Do you remember -- and you and I have talked about

24 the things that you said to the grand jury.  Do you recall

25 telling the grand jury in regards to Gary -- do you recall what

97

2    A.   Pretty much, yeah.

3    Q.   Well, can you recall -- tell the jury what it was --

4  when they asked you about that, what did you -- what do you

5  recall telling them?

6    A.   I think I told them that he graduated.

7          MR. BEACH:  Judge, this is improper impeachment

8  of his own witness.  I mean, she hasn't been impeached yet.

9          MR. JOHNSON:  Judge, I'm just setting up the

10  context of the conversation or the testimony.

11          THE COURT:  Well, I mean, you can impeach your

12  own witness, but it's -- kind of an odd way to do it.

13          MR. JOHNSON:  It's going to -- it will make

14  sense in just a moment, Judge.  If the Court will give me just

15  a little leeway, I'll move through it.

16          THE COURT:  I'll give you a little leeway.

17          MR. JOHNSON:  Okay.

18    Q.   (BY MR. JOHNSON)  Mary, when -- when you and I spoke

19  about it, do you remember you -- you believed when you spoke to

20  the grand jury that Gary had graduated from high school; is

21  that right?

22    A.   Yes, uh-huh.

23    Q.   Okay.  And the reason I brought that up, and we --

24  and I gave you an opportunity to go back and -- and review all

25  of the stuff that you had said in front of the grand jury; is

98

1  that right?

2    A.   Yes, uh-huh.

3    Q.   And you can tell this jury right now that a lot of

4  the testimony you're going to give today is -- is somewhat

5  different than what you said a year ago; is that right?

6    A.   Yes.

7    Q.   Okay.  And, Mary, I'm going to ask you this.  In

8  your history and in your family, as you look back upon it now

9  and after -- after talking to not only me but to the

10  psychologists that are working with me, do you know now whether

11  or not your history -- your family has a history of people with

12  mental issues in it?

13    A.   Yes.

14    Q.   Could you tell the jury a little bit and describe

15  for us what you're talking about?

16    A.   My baby sister was seeing HMR (sic) doctors and was

17  treated for a mental illness.

18    Q.   And you talking about Deborah?

19    A.   Yes.

20    Q.   Okay.  And, in fact, when she -- you say she was

21  seeing a doctor, she was actually committed to a mental

22  hospital, wasn't she?

23    A.   Yes.

24    Q.   Okay.  What was -- what kind of problems was --

25  kind of problems did she have?

99

1  she was saying that the worms and little peoples

2  was inside her stomach cutting her up.

3    Q.   And the -- this kind of thing -- and did you have

4  other brothers and sisters that had other kind of issues in

5  that regard?

6    A.   My brother committed -- killed his wife and

7  committed suicide.

8    Q.   Okay.  Let me ask you this.  As far as your mom and

9  your daddy goes, could you tell the jury a little bit about

10  your mamma?  What kind of -- what kind of mental condition is

11  your mamma in?

12    A.   She's not pretty much -- just normal behavior, I

13  guess, where she -- she see a lot of doctors for medical

14  reasons and different things.

15    Q.   Do you know whether or not she's taking some

16  psychiatric medications?

17    A.   No, I don't.

18    Q.   Okay.  The -- as far as yourself, Mary, have you

19  yourself ever had what you would consider any kind of mental

20  problems?

21    A.   I had a nervous problem when I was pregnant with my

22  youngest son, Nysasno, and the doctor put me on Valiums.

23    Q.   Okay.  Let's talk about that a minute.  You said

24  you -- this occurred whenever you were pregnant with your son

25  Nysasno?

100

1    A.   Yes.

2    Q.   And Nysasno is the younger brother of Gary?

3    A.   Yes.

4    Q.   How much age difference is between them?

5    A.   About three and a half years.

6    Q.   Okay.  How old is Gary now?

7    A.   Gary is 38.

8    Q.   Okay.  Gary's father and Nysasno's father the same

9  individual?

10    A.   Yes.

11    Q.   And what was his name?

12    A.   Thomas Carter.

13    Q.   Would you tell the jury a little about Thomas?

14  How did you know Thomas and where did you meet him?

15    A.   I met him at -- it was a Walgreen where you sit and

16  eat.  I met him there.  And he went to the -- we got married

17  before he went to the military.

18    Q.   What kind of relationship did you have with Thomas?

19    A.   It wasn't very good.

20    Q.   Describe it a little bit.  Tell the jury what it was

21  about Thomas that caused you --

22    A.   During my pregnancy with Nysasno, he would jump up

23  in the middle of the night and say that we both was crazy and

24  that we needed to see a psychiatrist and that we both were

25  crazy.

101

2      A.   Thomas and myself.

3      Q.   Okay.  Was -- was Thomas ever abusive towards you or

4   abusive towards Gary?

5      A.   Yes, he were.

6      Q.   Describe that to the jury, if you could, please.

7      A.   Well, when I was pregnant with Nysasno, he would --

8   he kicked me in my stomach and he blackened my eye and beat me

9   a lot of times and then I left.

10     Q.   Okay.  When was it that you actually left him?

11     A.   In -- it was 1979 or '78, the year I left him.

12     Q.   Okay.  Now, when we first spoke, Mary, do you recall

13  telling me that you really hadn't ever had any kind of mental

14  problems yourself?

15     A.   Yes.

16     Q.   When we talked about it and -- and -- do you recall

17  what word you used to use when you described what would cause

18  you to have all your problems?

19     A.   Nervous breakdown.

20     Q.   Do you remember you always used to say, I was just

21  stressed real bad?

22     A.   Yes, that I was stressed.

23     Q.   Tell me -- what do you mean when you used the word

24  "stressed"?

25     A.   That I -- it was hard for me to function because I

102

1   just had -- was going through a lot.  And it was just hard for

2   me to get through the day with the things that was going on

3   with me.

4      Q.   Okay.  And you described that you had a period of

5   that --

6      A.   For some years.

7      Q.   -- while you were pregnant?

8      A.   Yes.

9      Q.   And you -- did you also have other periods of that,

10  like after your brother killed himself?

11     A.   Yes, I did.

12     Q.   Can you tell the jury -- and you -- you've gone to

13  the doctor for these issues?

14     A.   Yes.

15     Q.   Can you tell the jury what's the longest period that

16  you've ever been under what -- under one of these conditions

17  that you call being stressed or in a nervous breakdown?

18     A.   During my pregnancy, it was about six months.  And

19  when my brother committed suicide, I think it was about a year

20  and a half.

21     Q.   Did you ever try to go get any psychiatric help or

22  any help like that, or did you just go to your family doctor?

23     A.   I just went to my family doctor.

24     Q.   Okay.  And you said that at one time he -- how long

25  were you taking the Valium?

103

2      Q.   Okay.  The Defendant -- Gary's daddy, you said when

3   he was abusive towards you, did -- was he ever abusive towards

4   Gary?

5      A.   Yes, he were.

6      Q.   Can you tell the jury an example of that or --

7      A.   One day I had went to work and I came home and he

8   had some womens in my house.  And they had a son, and Gary's

9   dad wanted Gary to fight their son.  And I came home just to

10  intervene just in between that.

11     Q.   Okay.  Did -- was Gary ever a witness to Thomas's

12  violence towards you?

13     A.   Yes, uh-huh.

14     Q.   And can you recall any specific instances of that?

15     A.   One morning we were getting ready -- I was getting

16  ready to take him to day care and to go to work, and he jumped

17  up and hit me in front of Gary.

18     Q.   Okay.  While Gary was growing up, Mary, could you --

19  how would you describe him as far as having friends and stuff

20  like other children?

21     A.   He mainly stayed to himself.  The friends that he

22  had was -- was few, and he played to his self.

23     Q.   Okay.  And I had asked you earlier about how far he

24  had gone in school.  Do you -- do you recall now what kind of

25  grades he made in school?

104

1      A.   I don't think they were very good.

2      Q.   Okay.  As he was growing up, do you recall other

3   things about Gary?  I mean, did he -- did the things that Gary

4   was doing seem normal to you?

5      A.   No.  At first, I thought it was just normal juvenile

6   behavior, you know, but then as time went on, I kind of saw

7   some things.

8      Q.   How old was Gary when you and Leon got married?

9      A.   He was seven.

10     Q.   Okay.  And what kind of relationship did Gary have

11  with Leon?

12     A.   At first, it wasn't too good.

13     Q.   What do you think was the cause of that?

14     A.   He missed his -- his dad.  He wanted a relationship

15  with his dad that he never had.

16     Q.   Okay.  And what ended up happening to Thomas, to

17  your knowledge?

18     A.   Thomas died.

19     Q.   Okay.  Thomas died several years ago, but back at

20  that time, Thomas end up in the penitentiary?

21     A.   Yes, he was in the state -- or Fort Leavenworth

22  penitentiary.

23     Q.   Leavenworth in Kansas?

24     A.   Yes.

25     Q.   Do you know what he -- and -- well, you were married

2    A.  For something that he had did. I don't know exactly

3  what it was, but it was something that --

4        MR. BEACH: Judge, I'll ask not to speculate.

5  She doesn't know.

6        MR. JOHNSON: She knows -- she knows enough

7  about it, Judge.

8        THE COURT: Is that one of the close enough

9  exception in the book?

10    Q.  (BY MR. JOHNSON) Well, let me ask --

11        MR. JOHNSON: I'll -- I'll rephrase it, Judge.

12    Q.  (BY MR. JOHNSON) Mary, were you aware of an

13  incident that Thomas had with his military commander while he

14  was in the military?

15    A.  Yes, somewhat.

16    Q.  Okay. And -- and was that -- was that the basis for

17  what ended up putting him in the penitentiary?

18    A.  Yes, in Leavenworth, uh-huh.

19    Q.  Okay. Did -- describe a little bit more about

20  Thomas's behavior. Did Thomas act normal, or you said that he

21  was abusive. Was -- did he drink a lot or use drugs or --

22    A.  He drank a lot. As far as him using drugs, I have

23  no idea.

24    Q.  How did he act on a daily basis?

25    A.  He always acted like he was a karate expert or

1  something. He basically always thought he knew more about

2  karate than anybody, and he usually tried to demonstrate that

3  on somebody.

4    Q.  Okay. Did you see him violent with not only

5  yourself and -- and Gary, but was he violent with other people?

6    A.  One person that I know of was one of his brothers.

7    Q.  Okay.

8    A.  That he did that to.

9    Q.  And how -- how old was Gary when he went to the

10  penitentiary?

11    A.  I think Gary was probably about one or two.

12    Q.  When he went to the penitentiary?

13    A.  Probably. I don't know. I really don't -- can't

14  recall at the time.

15    Q.  Let me ask you -- okay, I'm sorry, go ahead.

16    A.  I was just saying I really can't recall at the time

17  Gary's age when his dad went to the penitentiary.

18    Q.  Okay. As far as -- you said that Leon and Gary's

19  relationship wasn't that good starting off. Did things try --

20  or seem to improve any as -- as Gary got older?

21    A.  A little bit, and then again it fell off again.

22    Q.  Okay. What -- what caused it to fall off again?

23    A.  Well, my husband believed that a man should work,

24  and that he always try to teach Gary to work with his hands and

25  took him on job sites to help, you know, so he can work.

2    A.  He was doing remodeling at the time.

3    Q.  Okay. And you said he used to try to show Gary how

4  to do it?

5    A.  Yes.

6    Q.  How did that work out?

7    A.  It didn't work out.

8    Q.  And why was that?

9    A.  Gary didn't want to do it.

10    Q.  Okay. Did he try to do it?

11    A.  He tried.

12    Q.  And did he have problems?

13    A.  He had a problem doing it.

14    Q.  Like what -- what do you mean by that?

15    A.  He -- he couldn't -- he just wouldn't -- he couldn't

16  do it. He tried to show him how to tear out things, and he

17  just wouldn't do it. He couldn't do it.

18    Q.  Okay. How was Gary around the house? Was Gary good

19  at doing things around the house and --

20    A.  No.

21    Q.  Describe that.

22    A.  He wouldn't do yard work.

23    Q.  Okay.

24    A.  And -- he would wash dishes, but he wouldn't -- he

25  couldn't do the yard work.

1    Q.  Okay. Did Gary ever used to have occasion where he

2  would take things apart and stuff at the house?

3    A.  Yeah, he would take the radios and clocks apart.

4    Q.  What was he doing that for?

5    A.  To see if he could put it back together. Well, he

6  would say he could put it back together, once you would

7  confront him about it.

8    Q.  Okay. When Gary was -- when Gary was growing up --

9  and did he -- did he do some things that caused you to be

10  worried about whether or not he ever wanted to hurt himself?

11    A.  Yeah, the time when he tried to jump off the school

12  building.

13    Q.  Okay. Tell the jury what happened then.

14    A.  He was, I guess, in junior high school, and he had

15  went up to the school, the elementary school there by my house,

16  and was on top of the building and said that he was going to

17  jump off. And a friend of his came and got me and my sister.

18    Q.  Okay. Did you -- did you go up to the school and

19  try to get him off the roof?

20    A.  Yes, I did.

21    Q.  How did that work out?

22    A.  I was talking to him, and he wouldn't listen to me.

23  And finally my sister coached him off the roof of the school

24  building.

25    Q.  Do you recall how old Gary was around that time?

109

2      Q.   Now, Mary, did -- I mean, what did -- what did that

3   indicate to you or what did that seem like to you?  Did you

4   talk to Gary about that?

5      A.   I did, and he would always -- from that point, he

6   was just constantly saying that he was stressed and that nobody

7   understood him.

8      Q.   Was -- was stress -- is that -- as I had said

9   earlier, that's the way you always described yourself.  Is that

10  the way you always would describe yourself to your children

11  when you were going through these rough periods, that you were

12  being stressed?

13     A.   Pretty much, yes.

14     Q.   And is that pretty much how Gary's learned to

15  describe the things he was going through?

16     A.   Yes.

17     Q.   How about as far as -- as he was growing up through

18  his teenage years, did he still continue to stay by himself a

19  lot, or did he seem like he blossomed out a little bit?

20     A.   He pretty much still stayed by himself.

21     Q.   Did you ever really know Gary to have, you know,

22  friendships and -- close friends?

23     A.   Maybe one.

24     Q.   Okay.  Who would that have been?

25     A.   Levi.

110

1      Q.   Okay.  Did you ever have occasion back while he was

2   in school -- did you ever think that because of his grades, he

3   needed to maybe get in any kind of special education or

4   anything?

5      A.   At no point -- I didn't think that a way.

6      Q.   Did you -- did you really stay on top of keeping

7   track of what kind of grades he was making?

8      A.   I thought I did.

9      Q.   Okay.

10     A.   I pretty much knew the grades that I saw.  You know,

11  when I did see them, I was pretty much satisfied with them.

12     Q.   Okay.  And as I said earlier, you told Mr. Beach

13  before that the Defendant made just regular grades, average

14  grades; is that right?

15     A.   Yeah, that's what I was under the impression that he

16  did.

17     Q.   Well, you and I have gone back over -- or you and I

18  have talked about his report cards now, haven't we?

19     A.   Yes.

20     Q.   And it wasn't a whole lot of average about his

21  grades, was there?

22     A.   No, it wasn't.

23     Q.   Okay.  Mary, can you tell the jury if in his later

24  teenage years, did you start seeing some behaviors out of Gary

25  that were -- that seemed strange to you as far as being a --

111

2      A.   Somewhat, yes.

3      Q.   How would you -- how would you define paranoid with

4   your understanding of it?

5      A.   Somebody who is fearful of something and thinks

6   somebody was after them or something.

7      Q.   Did you ever see anything out of Gary that you would

8   associate with -- with being paranoid?

9      A.   Yeah, he would sit with his back -- he wouldn't sit

10  with his back to a door or anything.  And he had a bat in his

11  room all the time.

12     Q.   Okay.  Did he always think that people were talking

13  about him?

14     A.   Yes.

15     Q.   Describe for the jury, if you can, something about

16  that, Mary.

17     A.   He just felt like somebody was always out to get him

18  and that people was trying to hurt him all the time.  And he

19  just was standoffish about it.

20     Q.   Did you ever really -- did you ever see anything

21  that -- that indicated that there was any truth to that or was

22  just the way Gary was thinking?

23     A.   I saw one time.

24     Q.   What was the one thing you saw?

25     A.   I had left the home and -- me and my husband -- and

112

1   went shopping and when we come back, Gary had said that he was

2   taking a shower and somebody came in the house.  And he had cut

3   his knee while he was in the shower.

4      Q.   How did -- how -- okay, I'm not sure if I understand

5   what you're saying, Mary.  Did someone actually come into the

6   house?

7      A.   I couldn't see how they could have gotten in because

8   we have burglar bars on our house, but he said that someone

9   came in the house and that he ran out the shower and went over

10  to a neighbor's house across the street.

11     Q.   Okay.  But when you got back the burglar bars --

12     A.   No, they were still locked.

13     Q.   Okay.  You said earlier -- and -- and who lives at

14  your home with you now?

15     A.   My two grandkids and my husband and myself.

16     Q.   What are your grandkids' names?

17     A.   Sequoria Frazier and La Jay Mosley.

18     Q.   And La Jay is Gary's daughter; is that right?

19     A.   Yes.

20     Q.   How old is La Jay now?

21     A.   She's seven.

22     Q.   She's seven years old?

23     A.   Uh-huh.

24     Q.   Can you tell the jury if -- what -- what kind of

25  mental shape is La Jay in?

113

2   herself, and she gets in trouble constantly at school.

3     Q.  Okay.  And you recall how you -- comparing her to

4   kind of -- as far as the isolation in being by herself to how

5   that reminded you of how Gary was when he was her age?

6     A.  Yes.  Yes.

7     Q.  When did all this kind of stuff start with La Jay?

8     A.  In kindergarten.

9     Q.  Okay.  So it's been going on for a while?

10    A.  Yes.

11    Q.  All right.  Is she seeing -- is she currently seeing

12  some mental health doctors?

13    A.  Yes, she is.

14    Q.  Is she currently taking medications?

15    A.  Yes.

16    Q.  When you told me that really to you she seemed a lot

17  like Gary back at that -- at that age, tell -- tell the jury

18  what you mean by that.

19    A.  Well, she would just -- she's a loving person, but

20  at the same time, people just see her different and then she

21  don't have the friends.  And she just stick -- stay in her room

22  and play to herself.

23    Q.  Okay.  Mary, as -- as Gary got older and -- and once

24  he left school, whether he graduated or not, he had had some --

25  he had had some trouble with the law; is that right?

114

1    A.  Yes.

2    Q.  And you are familiar when he was put on probation?

3    A.  Yes.

4    Q.  For the drug charge and then the incident with

5  Jennifer; is that right?

6    A.  Yes.

7    Q.  Did that -- did that just shock you when that

8  happened?

9    A.  Yes, it did.

10    Q.  Did this seem totally out of character for what you

11  knew of Gary?

12    A.  Well, the -- some of it did and some of it didn't.

13    Q.  Okay.  Explain to me what you mean when you say

14  that.

15    A.  Well, it was out of character for him to beat

16  somebody.  You know, I had never known him to beat anybody like

17  that before.  And, you know, and then taking them to the

18  hospital and then he waited for the police to get there.

19    Q.  Okay.  And what was -- you thought that was out of

20  character -- you thought that was out of character.  What did

21  you think was -- was -- you said part of it made sense to you

22  or you understood part of it; what are you talking about there?

23    A.  Is where he just basically just be there for

24  somebody.

25    Q.  Oh, okay.  Can you -- and he was in the penitentiary

115

1  for the other shorter period of time for the drug dealing on

2  Jennifer; is that right?

3    A.  Yes, uh-huh.

4    Q.  Did you ever go see him when he was in the

5  penitentiary for that?

6    A.  No, I didn't.

7    Q.  Okay.  When he got back out, did he come back and

8  stay with you?

9    A.  Yes, he did.

10    Q.  Could you tell the jury how he acted when he came

11  back?

12    A.  He seemed like he was just withdrawn.  And like I

13  say, he didn't want to sit with his back to the doors and

14  different things.  And he kind of pretty much stayed to

15  himself.

16    Q.  Okay.  A few months later, that's when he got

17  arrested for the -- robbing that grocery store?

18    A.  Yes.

19    Q.  And he went away for a long period of time; is that

20  right?

21    A.  Yes.

22    Q.  Did you have occasions, Mary, to go and to visit

23  with him while he was locked up for that?

24    A.  Yes.

25    Q.  Could you tell the jury, how did -- how did he act

116

1  on those occasions when you would go -- go back and visit with

2  him?

3    A.  He was kind of withdrawn and be glad to see me when

4  I got there, but he was kind of withdrawn from things.

5    Q.  How often would you visit with him?

6    A.  As much as I could.  More like two to three times

7  out of a month sometimes.

8    Q.  Okay.

9    A.  Depend on what was going on.

10    Q.  Would you go by yourself, or would anyone go with

11  you?

12    A.  I would go by myself the majority of the time.

13    Q.  And he was locked up a little over ten years on

14  that; is that right?

15    A.  Yes.

16    Q.  And once he was released from that incarceration

17  period, did you have occasion to come to know Belinda Lacy?

18    A.  Yes.

19    Q.  And could you tell the jury how it was that you met

20  her?

21    A.  He was -- Gary was still incarcerated, and I met her

22  through a visit.  We were visiting, and that's when I first met

23  her.

24    Q.  Okay.  And when you -- could you tell the jury when

25  you first -- how it was that she came about to live with you at

117

2    A.   She and Gary got -- was married and they stayed with

3    us.

4    Q.   Okay.  And, in fact, was it at your insistence that

5    they got married?

6    A.   Excuse me?

7    Q.   Was it -- was it, in fact, your and Leon's rule that

8    they couldn't stay with you unless they was married?

9    A.   That's right.

10   Q.   Tell the jury about that.  How -- had they -- had

11   they kind of told you that they were already married?

12   A.   Yeah, they did.  They said that they was married,

13   and we found out later that they wasn't.

14   Q.   And then you made them get married immediately?

15   A.   Yes.

16   Q.   All right.  Now -- and I'd -- I'd ask you about all

17   that and about how long that they was married and how long they

18   stayed with you.  Do you remember how long you told me they --

19   they was -- lived and stayed with you after they got married?

20   A.   I think I said about a year.

21   Q.   Okay.  And that's your best recollection is that

22   they were there together for a year?

23   A.   About a -- somewhere about -- maybe six months to a

24   year.

25   Q.   Okay.  How would you describe Belinda?

118

1    A.   She was a real nice person, easygoing.

2    Q.   Was she real quiet herself?

3    A.   She was very quiet.

4    Q.   Very quiet.  When -- how did that -- how did that

5    end up breaking up?

6    A.   Gary had left.  He had moved out the house.

7    Q.   Okay.  And do you know what it was that caused him

8    to move out?

9    A.   No, I don't.

10   Q.   Did -- during this period in time after him and

11   Belinda were married and staying with you for however long that

12   was, after Gary had left, did you know -- did you know of him

13   to hold jobs?

14   A.   Not too many jobs.

15   Q.   Okay.  What jobs were you aware of?

16   A.   Walmart and the job at the company that he was

17   working for that was doing some kind of batteries that they

18   would go out of town and have to set up.

19   Q.   And that's the job that he had in -- from March of

20   '09 until about sometime in August of '09; is that right?

21   A.   Yes, uh-huh.

22   Q.   Okay.  After Gary came back from the penitentiary

23   that second time when he had been locked up for a while, could

24   you tell the jury, did -- how did he appear to you?  Did he

25   ever talk to you about the -- about being stressed or anything

119

2    A.   He talked all the time about being stressed.

3    Q.   How did it -- tell me what the context was of it.

4    A.   He would call me, or if he was at my house, he would

5    say how stressed he were and that he was trying to get away

6    from his stress and he didn't know what to do and those type of

7    things.

8    Q.   Did -- and when we were talking about him working,

9    you said that you can only recall a couple of jobs that he had

10   for long.  Did Gary have some other short-term jobs where he

11   worked through a temporary agency?

12   A.   I think it was something like the Green Team,

13   something like that, yeah.

14   Q.   What did that -- what was your understanding of what

15   the Green Team was?

16   A.   It was jobs that was provided through a school

17   program.

18   Q.   Okay.  Now, Mary, while --

19   A.   Excuse me, summer program.

20   Q.   I'm sorry?

21   A.   Summer program.

22   Q.   Through a summer program?

23   A.   Uh-huh.

24   Q.   How often after Gary got out of prison and after he

25   married Belinda and then he left out of there, how often would

120

1    you see Gary after that?

2    A.   Not very often.

3    Q.   Tell the jury about that.  Was that unusual?

4    A.   Yes, it was.

5    Q.   What do you attribute that to?

6    A.   His stress and a lot of pressure that he was under.

7    Q.   Do you know what was causing that stress and that

8    pressure?

9    A.   A lot of it was some of the womens that he was

10   staying with at the time.

11   Q.   Tell me about what you know about the women that

12   he -- that Gary stayed with.  How many other -- how many -- did

13   you know them, or did you just know that Gary would be out

14   staying with somebody?

15   A.   I knew about Shulonda, his kids' mother.  I knew

16   about Lenelle.  He stayed with her about six to seven years.

17   And the last one that I knew about was Lovetta.

18   Q.   Okay.  And -- and the person that you said in the

19   middle there, that's Lenelle -- that's Lenelle Williams that

20   just testified here a little bit ago?

21   A.   Yes.

22   Q.   And you said that you -- to your understanding, they

23   was together for six or seven years?

24   A.   Yes, off and on.

25   Q.   On a typical -- if you could break it down to like a

121

1    month, on a typical month, how often might you see Gary or was
2    it -- was it even once a month?
3        A.    Probably about once a month.  Maybe once every three
4    months I would probably see him.
5        Q.    Okay.  And when was it that you came to know Gary to
6    become associated with Lovetta?
7        A.    I'm thinking it was the end of 2008 --
8        Q.    Okay.
9        A.    -- is when I think I first met her.
10       Q.    How was it that you came about meeting her?
11       A.    She went with us to La Jay's field trip.
12       Q.    Okay.  Where -- did you -- were you present when
13   they were married?
14       A.    No, I wasn't.
15       Q.    Did you even know they were getting married?
16       A.    No, I didn't.
17       Q.    Had the Defendant ever -- had Gary ever talked to
18   you about them getting married?
19       A.    No.
20       Q.    Okay.  When was -- how did you become aware of the
21   fact that they had been married?
22       A.    She called me.
23       Q.    How long after they were married had she called you?
24       A.    I think about a month or two, if it was that long.
25       Q.    Okay.  After they -- while they were married and the

122

1    months leading up to this incident that occurred, could you
2    tell the jury -- if you can recall in that period of time how
3    often you would see Gary?
4        A.    Probably about every three months, if I saw him
5    then.
6        Q.    And how did he act during those periods when you
7    would see him?
8        A.    He was in a hurry and smoking -- chain smoking and
9    just stressed.  And he was always telling me he wanted -- he
10   needed to get away and -- and he couldn't.  When he leave --
11   and when he leave, he will -- she will call.
12       Q.    Did you ever know Gary during this period of time to
13   ever have just like normal -- normal relationships with other
14   friends, or did you really ever see Gary friendly with just
15   other people or just with girls that he would be with?
16       A.    Just Levi.
17       Q.    Mary, did there come a period of time when you
18   learned and then you were aware of the fact that Gary had gone
19   and actually checked himself into a mental hospital?
20       A.    I had called Gary -- I had called they house and
21   Lovetta answered the phone and said that he wasn't home and
22   that she would have him to call me.
23       Q.    Okay.  And at this point in time this is right after
24   he had -- well, actually you believed he was still working at
25   the battery company at this time, didn't you?

123

1        A.    Yes.
2        Q.    And when he was working at that battery company,
3    would he go out on the road with the people from the company
4    and they'd work on jobs?
5        A.    Yes, uh-huh.
6        Q.    Okay.  When you spoke to Lovetta at that time, did
7    she, in fact, tell you that's where he was at?
8        A.    I think she did.  I'm not -- I can't remember for
9    sure.
10       Q.    Okay.  But she indicated that she would have him
11   call you.  And what was the next thing that occurred?
12       A.    About five minutes after I talked to her, Gary
13   called.
14       Q.    Okay.
15       A.    And I looked at my caller I.D., and it said
16   Timberlawn.
17       Q.    Okay.  Did you know what Timberlawn was?
18       A.    Yes, I had seen it.
19       Q.    How did you know what that was?
20       A.    Because it's a place across the street from where I
21   was taking my granddaughter at one time.
22       Q.    Okay.  And when -- when the phone rang and it said
23   Timberlawn, were you expecting that in any way to be Gary
24   calling you?
25       A.    No, I didn't.

124

1        Q.    Okay.  When you answered the phone, can you describe
2    that conversation for the jury?
3        A.    I asked him --
4             MR. BEACH:  Judge, again --
5             THE COURT:  Yeah -- I mean --
6             MR. BEACH:  What's the exception?
7             MR. JOHNSON:  It's going to be under 803(1) and
8    803(3), Judge, stating an existing mental state.
9             MR. BEACH:  Go ahead.  Move on.
10            MR. JOHNSON:  Judge, it's all -- it's all in the
11   business records, also.  It's already been admitted.
12       Q.    (BY MR. JOHNSON)  You can go ahead tell the jury
13   what -- describe that conversation.
14       A.    I asked Gary why was he calling me from Timberlawn,
15   and he said that he was there -- he had committed himself there
16   at Timberlawn because he was -- just had got to the end of his
17   rope.
18       Q.    He had gotten what?
19       A.    To the end of his rope.
20       Q.    Okay.  He didn't tell you he was there so he could
21   get him a check?
22       A.    No, he didn't.
23       Q.    Okay.  Did he make any statements to you about
24   wanting to go to sleep and never wake up again?
25       A.    Yes, he did.

125

1   had as I have ever made statements like that to
2   you in the past?
3   A.   No.
4   Q.   Tell me -- tell the jury, if you can, what he said
5   on that particular time and subsequent to that about wanting --
6   I mean, what did -- what did you take that to mean that he was
7   telling you?
8   A.   At what time?
9   Q.   When he told you -- when he called you from the
10  hospital and said that he wanted -- basically he was telling
11  you he wanted to die; didn't he?
12  A.   Yeah, he was saying that he was stressed and he
13  was -- he had been trying to get help and that's why he was
14  there.
15  Q.   Okay.  And how often -- do you recall any of the
16  other of the conversation or anything else that he described to
17  you about the way he was feeling emotionally or mentally at
18  that time?
19  A.   Yeah.  He said that he just wanted to go to sleep
20  and never wake up again.
21  Q.   Okay.  Did you ever have occasion to talk to him
22  again while he was in Timberlawn?
23  A.   No.
24  Q.   Did you have occasion to speak to your son Nysasno
25  and talk to him about what -- what Gary was doing?

126

1   A.   Yes, I called Nysasno right after I got off the
2   phone talking to Gary.  And Nysasno -- and I explained to him
3   what Gary was telling me, and Nysasno was telling me --
4   Q.   You can't say what Nysasno was telling you, Mary.
5   A.   Okay.
6   Q.   Let me just ask you this.  Was the things that you
7   were hearing from Gary, were they -- were they things that were
8   causing you to become alarmed about Gary's well-being?
9   A.   Yes.
10  Q.   No question about that, is there?
11  A.   No question about it.
12  Q.   And the thing that -- the things that you were
13  describing for the jury that were occurring, this was just
14  about one month almost to the day from the time that this --
15  that this incident happened with Gary and Lovetta; is that
16  right?
17  A.   Pretty much, as far as I know.
18  Q.   So you had occasion then to speak to Nysasno about
19  it.  Did you ever -- did you do anything else at that point in
20  time in regards to Gary?
21  A.   Yeah, I called him as much as I could and talked to
22  him, and each time he was continuing to say that.
23  Q.   And he was there for about five days; is that right?
24  A.   Yes.
25  Q.   Do you know any of the circumstances about how it

127

1   A.   Lovetta came and picked him up.
2   Q.   Okay.  Mary, could you tell the jury from the date
3   that he left Timberlawn, did you ever have another occasion to
4   see Gary until the day this occurred?
5   A.   The next time I think I saw Gary is when all of this
6   had happened.
7   Q.   The night that y'all ended up picking him up over
8   at --
9   A.   Whatever house they was, yes.
10  Q.   Okay.  I want to just go back a little on that day;
11  did you have occasion to speak to Gary that afternoon?
12  A.   Yes, I did.
13  Q.   And what was the nature of that -- or how did that
14  conversation come about?
15  A.   He called me.  It was about 5:00, and he asked me
16  did I have information on my phone -- 411 information.
17  Q.   Did he explain to you what that was all about?
18  A.   No.
19  Q.   Okay.  Do you recall what you said to him or what
20  took place next in that conversation?
21  A.   I told him I didn't have it.
22  Q.   How did Gary sound to you at that time?
23  A.   He pretty much sound different, and I asked him what
24  was he doing.

128

1   Q.   What did he tell you?
2   A.   He told me he was washing dishes.
3   Q.   Did he have -- did he end up that day having a
4   conversation with his daughter?
5   A.   Yes.  He was hanging up, and she was saying bye.
6   And he didn't -- he had already hung up, so I called back so
7   she could talk to him.
8   Q.   When was the next time that you -- that something
9   happened that evening?  Did the police contact you sometime
10  that night?
11  A.   Yes.
12  Q.   Can you tell the jury what you were doing when you
13  were contacted?
14  A.   I was sitting in my living room.
15  Q.   Okay.  Do you remember if you recall what time of
16  the evening it was?
17  A.   It was about 10:00 -- 10:00 or 11:00.
18  Q.   And when you were contacted, what -- what exactly --
19  what exactly -- who -- did someone call you or did they come
20  over to your home?
21  A.   They rung the doorbell, and it was the Dallas Police
22  Department.
23  Q.   Did they talk to you about what had happened?
24  A.   They asked me was Gary there, and I told them no.
25  And they asked me could they come in.  And they came in, and

2   the girls up. And for some reason they didn't. They was still

3   asleep.

4      Q. Okay. Did you start making some attempts after that

5   to locate Gary?

6      A. Yes, I did.

7      Q. What did you do?

8      A. I looked back on my caller I.D. from where he had

9   called me on Sunday, and I saw that number and I called that

10   number.

11      Q. Okay. Did you talk to somebody at that -- did

12   someone answer the phone over at that number?

13      A. Yes.

14      Q. And were you able at that time to get Gary on the

15   phone?

16      A. Yes.

17      Q. Could you tell the jury at that point in time, Mary,

18   how did Gary sound to you when you was talking to him?

19      A. He sound like he had been under anesthesia or

20   something or he was asleep -- in a deep sleep or something.

21      Q. Do you recall what was said by yourself?

22      A. I asked him -- I had asked Gary what was wrong.

23      Q. I'm sorry, ma'am. Will you repeat?

24      A. I asked him what was wrong.

25      Q. Okay.

130

1      A. And he told me that he was -- just wanted to go to

2   sleep and never wake up.

3      Q. What -- what was the next -- if you can, Mary, if

4   you can recall, could you tell me what the next thing that was

5   said or who said what?

6      A. I asked Gary what had happened, and he told me if

7   the police was there and had talked to me, then I should

8   already know what had happened.

9      Q. Did he repeat to you that all he wanted to do was

10   die?

11      A. He did.

12      Q. How did that make you feel, Mary?

13      A. It did not make me feel good at all.

14      Q. What -- what did you say to him? How did that

15   conversation end?

16      A. I talked to him and told him that he needed to

17   come -- let me come and get him and take him to the police

18   station to turn his self in.

19      Q. What did he say about that?

20      A. He didn't want me to, but I kept talking to him and

21   I talked to him the whole time while we was on our way there

22   after he finally told Nysasno how to get there.

23      Q. You -- the first phone call that you had with

24   Gary -- I mean, there was more than one phone call that night,

25   wasn't there?

131

2      Q. And you ended up -- because Gary -- Gary told you he

3   didn't want you to come?

4      A. No, he didn't. He said he just wanted to lay down,

5   go to sleep and die.

6      Q. Okay. You got Nysasno involved in this, did you

7   not?

8      A. Yes, I did.

9      Q. And Nysasno got ahold of Marcus, the fellow whose

10   house he was at?

11      A. Yes.

12      Q. And y'all were able to get him to get Gary back on

13   the telephone?

14      A. Yes.

15      Q. And you got enough information to where you knew you

16   could try to go over there and find Gary?

17      A. Yes.

18      Q. Did y'all -- who ended up driving over to get Gary?

19      A. Nysasno.

20      Q. Okay. Who else was in the vehicle?

21      A. Myself and my daughter-in-law.

22      Q. Nysasno's wife?

23      A. Yes.

24      Q. And as you --

25      MR. JOHNSON: Judge, can we give her some water?

132

1      A. Thank you.

2      MR. WARREN: Sure.

3      Q. (BY MR. JOHNSON) Mary, when y'all -- when y'all got

4   over there, do you know what part of town that was in?

5      A. It was in the Pleasant Grove area.

6      Q. Could you tell the jury when you got over to that

7   location, where did -- how did it come about that you saw Gary?

8      A. He was still on the phone, and he was talking to

9   Nysasno. And he came out and we got out of the truck and

10   walked up to where he were, and I gave him a hug and told him

11   that -- you know, he needed to get in the truck with us.

12      Q. Okay. What did he say?

13      A. He didn't want to at first.

14      Q. When you first had occasion that night, Mary, to

15   actually see Gary and to observe him, could you -- could you

16   tell the jury how he appeared to you both physically and

17   mentally?

18      A. He was just steady smoking cigarettes after

19   cigarettes and he -- I couldn't hardly make out what he was

20   saying and he --

21      Q. Why was that?

22      A. Because he had tooken all those pills.

23      Q. Could you -- could you see and detect in him both

24   physical and -- and a change -- I mean, he was different than

25   he normally was?

133

2   Q.   Okay.  How long did you talk to him there at that

3   location?

4   A.   Talked to him about -- pretty much seemed like about

5   35 to 40 minutes in the truck.

6   Q.   Were y'all in the truck driving, or were y'all in

7   the truck just sitting at the house?

8   A.   We was sitting there at the house.

9   Q.   Okay.  And where -- where was Gary sitting at?

10   A.   He was sitting in the back behind me.

11   Q.   And you said y'all talked for 30, 40 minutes?

12   A.   Yes.

13   Q.   Did y'all end up going somewhere?

14   A.   I took him to the police station on Jim Miller.

15   Q.   Okay.  How did that come about that y'all ended up

16   at the police station?

17   A.   Because I had -- me and Nysasno had talked to him to

18   going in there and just drove there.

19   Q.   Okay.  Who drove?

20   A.   Nysasno.

21   Q.   When you got to the police station, what -- what

22   occurred over there?

23   A.   Gary got out the truck and then some later I got out

24   behind him, and we walked up to the door and one of the

25   sergeants let him in.

134

1   Q.   Okay.  How was Gary acting at that point in time?

2   A.   He was still acting out of it.  And when I was

3   standing behind him, I noticed that he had been stabbed in his

4   back.

5   Q.   Okay.  And what was it that you noticed in that

6   regard?

7   A.   That it was blood on his shirt in the back.

8   Q.   Okay.  Did you have -- did you talk to him about

9   that at all?

10   A.   Yes, I did.

11   Q.   Okay.  Did he explain to you how that had happened?

12   A.   Yes.

13   Q.   Mary, what was the next thing that happened at that

14   point in time that you recall?

15   A.   That I told the police that -- this sergeant what

16   had happened and everything and they came out and Gary went in,

17   and he went in with his arms behind him and the sergeant called

18   for them to come and take him.  And they came and got him, and

19   then they started to search my son's truck.

20   Q.   And they were searching his truck because Gary had

21   been in there?

22   A.   Yes.

23   Q.   All right.  Gary was arrested that night; is that

24   right, Mary?

25   A.   Yes.

135

2   that time; is that right?

3   A.   Yes, yes.

4   Q.   Have you had occasions to come and -- come and see

5   Gary and to talk to him?

6   A.   Yes.

7   Q.   How many times do you think you've seen Gary?

8   A.   I don't know.  So many times, I can't count.

9   Q.   Mary, have you spoken to Gary and not necessarily in

10   particular to the details of what had happened, but have you

11   had occasion to talk to Gary about and observe him regarding

12   how he feels about what had occurred?

13   A.   Yes.

14   Q.   Have you seen remorse in Gary?

15   A.   Yes, I have.

16   Q.   How does he act when you -- and how -- let me go

17   back to the time that this occurred.  Could you describe for

18   the jury how Gary would act when you'd go talk with him?

19   A.   He would say that he would see Lovetta sitting at

20   the foot of his bed and that she would be talking to him.

21   Q.   Did Gary express to you any more or has Gary

22   expressed to you any other -- any other feelings that he wanted

23   to kill himself?

24   A.   No.

25   Q.   Mary, I think that's all the questions I have for

136

1   you right now, ma'am.  Thank you.

2          THE COURT:  Yeah, we're going to take a break.

3          MR. BEACH:  We can take a five-minute break and

4   come back and get rid of her, but I've got to have a little

5   break.

6          THE COURT:  I understand.

7          MR. JOHNSON:  And, Judge, also, just so the

8   Court -- I've got -- I've got the grandmother who's out there

9   that's ill.

10          THE COURT:  I know, but we're not just going to

11   plow through witnesses.

12          MR. JOHNSON:  I understand.  I appreciate that.

13          THE COURT:  We're going to do it --

14          THE BAILIFF:  All rise.

15          (Jury excused from courtroom.)

16          THE BAILIFF:  All rise.

17          (Jury returned to courtroom.)

18          THE COURT:  Thank you.  Y'all be seated.

19          CROSS-EXAMINATION

20   BY MR. BEACH:

21   Q.   You are the same Mary Sampson that was testifying

22   before the break; is that correct?

23   A.   Yes.

24   Q.   Ms. Sampson, do your best to keep your voice up.

25   Maybe scoot forward just a little bit.

137

2  front of the grand jury back in October of last year?

3  A.  Yes.

4  Q.  And I asked you some questions and you realize you

5  were under oath; is that correct?

6  A.  Yes.

7  Q.  And I did ask you specifically about your

8  ex-husband, is that correct, Mr. Carter?

9  A.  I believe so.

10  Q.  And I asked you -- first of all, did Mr. Carter have

11  any kind of a relationship with Gary.  And your answer was no.

12  Do you recall that?

13  A.  Yes.

14  Q.  Basically Gary is what, two, three years old, just

15  about the time Nysasno is getting ready to be born, that you

16  cut the strings with Mr. Carter; is that right?

17  A.  No, Gary -- Nysasno and Gary is like three -- three

18  and a half to four years different in they ages.

19  Q.  Okay.  How old is Nysasno right now?

20  A.  Nysasno will be 36 on the 14th of this month.

21  Q.  Okay.  And Gary just turned 39?

22  A.  Thirty-eight.

23  Q.  He was born in '71?

24  A.  Yes.

25  Q.  March of '71?

138

1  A.  Uh-huh.

2  Q.  So he's 39 now.  It's not a big deal.  So three,

3  three and a half years apart?

4  A.  Yeah, whatever.

5  Q.  Now, was Mr. Green -- Mr. Carter then, was he out of

6  the house by the time Nysasno was born?

7  A.  Mr. Green?

8  Q.  Mr. Carter?

9  A.  Yes.

10  Q.  You had gotten rid of him before Nysasno was

11  actually born?

12  A.  Yes.

13  Q.  So whatever their age difference is, Gary was three,

14  three and a half by the time his biological father was -- was

15  out of the house?

16  A.  Yes.

17  Q.  And I asked you specifically did Mr. Carter, your

18  ex-husband, have any kind of a criminal record and you said,

19  none that I know of.  Do you recall that?

20  A.  Yes.

21  Q.  And now you're telling us he -- he did some time in

22  Leavenworth?

23  A.  Yes, Fort Leavenworth.

24  Q.  I asked you did Mr. Carter have any kind of

25  psychological or psychiatric issue, and you said none, no.  Do

139

2  A.  Not at the time that I knew of, yes.

3  Q.  I then asked you, Ms. Sampson, if anybody in your

4  family that you knew of had ever been committed or gone to a

5  psychiatric hospital, and your answer was no.  Do you recall

6  that?

7  A.  Yes.

8  Q.  You're telling us today that you've had sisters or

9  relatives that have gone to the hospital?

10  A.  Yes.

11  Q.  I asked you if anyone in your family had any kind of

12  psychiatric, bipolar, depression, anything like that.  And,

13  again, your answer was none that you knew of; is that correct?

14  A.  Yes.

15  Q.  And since you testified in front of the grand jury,

16  you spent a lot of time with Mr. Johnson and the lady there in

17  the front row, Kelly Goodness; is that correct?

18  A.  I wouldn't say I've spent a lot of time with them,

19  no.

20  Q.  Okay.  You've spent with some time with them; is

21  that correct?

22  A.  I spent some time with them, yeah.

23  Q.  And Kelly Goodness is Mr. Johnson's -- she's

24  responsible for trying to find things out about Gary's

25  background; is that correct?

140

1  A.  Yes.

2  Q.  So she's talked to you and other family members; is

3  that correct?

4  A.  She talked to me.  I have no recollection of her --

5  what she talked to my family member.

6  Q.  Where did she talk to y'all, out at your house?

7  A.  She talked to me down here.

8  Q.  Down here at the jail?

9  A.  No, downstairs.

10  Q.  Okay.

11  A.  Uh-huh.

12  Q.  Now, I also asked you a lot about Gary's upbringing

13  and you told me -- and I think this is the truth, that you were

14  there for Gary all the time; is that correct?

15  A.  Exactly.

16  Q.  Now, you had to work nights; is that right?

17  A.  Yes.

18  Q.  And you worked nights as a nurse's aide?

19  A.  Yes.

20  Q.  Okay.  And Mr. Sampson worked during the day?

21  A.  Yes.

22  Q.  So somebody was always there in the house when the

23  boys were young and -- and growing up?

24  A.  Yes.

25  Q.  And you said you may not have been in the PTA or

1  things next that, Jay, you know you needed something for, he
2  needed something; if he was sick, you made sure he was taken
3  care of?
4      A.  Yes.
5      Q.  You have -- you testified that you had no knowledge
6  when Gary was young of Gary having any kind of mental issues.
7  Do you recall that?
8      A.  Yes.
9      Q.  And you also had no knowledge that he was slow in
10 school or mentally retarded or anything like that?
11     A.  Yes.
12     Q.  I asked you some questions about did Gary ever at
13 any time in his life ever tell you about being sexually abused
14 by one of your relatives.  Do you recall that?
15     A.  Yes, I do recall you asked me that.
16     Q.  And you answered that at no time did Gary ever tell
17 you that he had been sexually abused; is that correct?
18     A.  That's true.
19     Q.  Now, you told us that you were surprised about Gary
20 getting in trouble for almost killing Jennifer Alcorn; is that
21 correct?
22     A.  Yes.
23     Q.  Okay.  He does some time in the penitentiary, he
24 comes back out, within four months he's arrested again for that
25 aggravated robbery; is that correct?

1      A.  Yes.
2      Q.  Where was he staying during that four-month period
3  of time?
4      A.  He was staying at my house.
5      Q.  At your house?
6      A.  Yes.
7      Q.  Was he there most of the day, most of the night, or
8  was he going out or what?
9      A.  He was at home most of the time when he wasn't at
10 the -- at work.
11     Q.  Okay.  You told us about his friend Levi; is that
12 correct?
13     A.  Yes.
14     Q.  Okay.  Did you know any of the guys that Gary
15 committed that aggravated robbery with?
16     A.  No, I didn't.
17     Q.  Kenneth or Big E or any -- any of the three that --
18     A.  No.
19     Q.  -- were involved in that robbery?
20     A.  No, I don't.
21     Q.  Did you ever hear him talking about any of those
22 guys?
23     A.  No.
24     Q.  They had to be some kind of associates or friends;
25 is that correct?

1  about it.
2      Q.  You ever heard of a guy named Bow -- nickname,
3  street name Bow?
4      A.  No.
5      Q.  Okay.  And I guess Gary never told you about his
6  drug dealing --
7      A.  No.
8      Q.  -- that he was a bodyguard for drug dealers, and
9  that's how he paid for his marijuana?  You didn't have any
10 knowledge of that?
11     A.  No, I didn't.
12     Q.  So there was a whole separate side of Gary's life
13 you had no knowledge of?
14     A.  No, I didn't.
15     Q.  That's understandable.  You know, son is not going
16 to tell his mother he's out selling drugs or, you know, being a
17 bodyguard.  So that's not -- not unusual.  But you had no
18 knowledge of that?
19     A.  No, I didn't, none whatsoever.
20     Q.  Did you ever suspect that he was high on marijuana?
21 Could you ever smell any marijuana in his clothes --
22     A.  No.
23     Q.  -- or anything like that?
24         All right.  He gets 20 years on the aggravated

1  robbery, and it's fair to say that you still support your son
2  Gary, you go visit him in the penitentiary; is that correct?
3      A.  Yes.
4      Q.  About -- would you go visit him every month, three
5  or four times a year, did it vary?
6      A.  I would go to visit him as much as I could, and
7  during that time I can't just sit here and say how many times I
8  was there.  I was there as much as I could be there.
9      Q.  And other than -- and other than visiting Gary,
10 would you write him letters?
11     A.  Yes.
12     Q.  And would he write you letters?
13     A.  Yes.
14     Q.  And Gary was at the Beto I Unit, is that correct,
15 out in Tennessee Colony?
16     A.  Yes.
17     Q.  You're familiar with your son's handwriting; is that
18 right?
19     A.  Yes.
20     Q.  Showing you State's 142A.  Is that a letter --
21     A.  That's not Gary's handwriting.
22     Q.  That's not Gary handwriting?
23     A.  No, it's not.
24     Q.  Okay.  Even though it's signed by Gary Green, it's
25 not his handwriting?

145

2    Q.    Let me show you one -- State's 148, does that appear

3  to be Gary's handwriting?

4    A.    Yes.

5    Q.    Okay.  Same for 149?

6    A.    Uh-huh.

7    Q.    150?

8    A.    Yes.

9    Q.    151?

10   A.    Yes.

11   Q.    152?

12   A.    Uh-huh.  Yes.

13   Q.    And 153?

14   A.    Yes.

15   Q.    Those are all -- State's 148 through 153, those are

16  all in your son's handwriting?

17   A.    Yes.

18   Q.    And you wrote letters to the parole board in an

19  effort to help them make a decision to eventually parole your

20  son; is that correct?

21   A.    I never wrote the parole board.

22   Q.    You never wrote a letter to the parole board?

23   A.    No, I did not.  I wrote -- there was a list of

24  peoples put their name on a list that sent to the parole board

25  for Gary Green, but I never wrote them a letter.

146

1    Q.    Okay.  I'm going to show you, Ms. Sampson, State's

2  Exhibit 160.  Do you recognize the handwriting on State's 160?

3    A.    This is not my handwriting.

4    Q.    Is it your husband's handwriting?

5    A.    No, it's not.  It's Gary's handwriting.

6    Q.    That's Gary handwriting?

7    A.    Yes.

8              MR. BEACH:  And we'd submit -- offer State's 160

9  into evidence at this time.

10             (State's Exhibit 160 offered.)

11             MR. JOHNSON:  Can we approach, Judge?

12             THE COURT:  You may.  May I see it?

13             (Sidebar conference.)

14             THE COURT:  All right.  Ladies and gentlemen,

15  we're going to -- we're going to take our lunch break.  Sorry.

16  It's just -- we're going to take our lunch break.

17             THE BAILIFF:  All rise.

18             THE COURT:  We will start back at 2:15.

19             (Jury excused from courtroom.)

20             THE BAILIFF:  All rise.

21             THE COURT:  Ma'am, you're free -- I know you've

22  got your family obligations, but we just need to --

23             MR. JOHNSON:  I'll be right out to talk to you.

24  We'll make it work out, Mary.

25             (Discussion off the record.)

147

1  what?

2              MR. BEACH:  160.

3              THE COURT:  -- 160 which the State believed was

4  written by -- I'm sorry, what's her name?

5              MR. JOHNSON:  It's not -- Judge, the State

6  doesn't believe it was written by the witness on the witness

7  stand.  They know exactly what -- who wrote the letter, and

8  they knew it when they took it in front of this witness.  It's

9  not purported to be a letter signed -- written by this witness.

10             THE COURT:  Oh --

11             MR. JOHNSON:  And that's what I'm saying.

12             MR. BEACH:  You think I knew that?

13             MR. JOHNSON:  You absolutely did, Mr. Beach.

14             MR. BEACH:  That's rank speculation.

15             MR. JOHNSON:  No, it's not.

16             MR. BEACH:  She said the one I thought was his

17  handwriting, that's signed by him, is not his handwriting.

18             MR. JOHNSON:  Well, we went through this

19  yesterday with the other letters.  You're telling me all of a

20  sudden it just dawned upon you when you're standing before the

21  witness?  It's ridiculous.

22             MR. BEACH:  Okay.  And so I'm supposed to know

23  that a letter signed by Gary Green was not written by Gary

24  Green?

148

1              MR. JOHNSON:  Did you have a good faith basis

2  that that letter was written by Leon Sampson?

3              THE COURT:  Let me see it.

4              MR. BEACH:  By Mary Sampson, yeah.

5              MR. JOHNSON:  It doesn't purport to be written

6  by Mary Sampson.

7              MR. BEACH:  By the Sampsons -- by the Sampsons.

8  Parents sometimes write letters about their son, you know, to

9  get them out on parole.  I didn't have these letters, you know,

10  looked at by a handwriting expert.

11             MR. JOHNSON:  You don't need to.

12             MR. BEACH:  I took it, you know, at face value

13  the signature was who was writing the letter.

14             MR. HEALY:  What is the objection?

15             MR. JOHNSON:  Putting in there 404 material.

16             MR. BEACH:  It's already in evidence.

17             MR. JOHNSON:  Not the allegations that it's a

18  forgery -- not for the allegations that it's a forgery.

19             What is the relevance of it, Andy?

20             MR. BEACH:  Well, if you're not going to put

21  your psychologist on the witness stand, we'll just forget about

22  the whole thing.  That he's not manipulative and he has

23  cognitive functioning, we'll just forget about the whole --

24             MR. JOHNSON:  Oh, so the purpose was to prove up

25  it was a forgery?

149

1  looked at them, they sure all look the same. The T's are the
2  looked at them, they sure all look the same. The T's are the
3  same, the Y's are the same, the G's are the same.
4       MR. JOHNSON: There is not a question.
5       MR. BEACH: Judge, do you understand what she
6  just said? She said the one on the left is not his
7  handwriting, his own mother. So I'm supposed to have a good
8  faith basis that it's his handwriting? I mean, that's
9  ridiculous.
10      MR. JOHNSON: He's got -- he's got a dozen
11 letters written by the Defendant, Judge. He knows what his
12 handwriting is.
13      MR. BEACH: It doesn't look nothing like the
14 ones that she just identified.
15      THE COURT: Could I see the ones that -- we know
16 were written 20 years ago, weren't they?
17      MR. JOHNSON: Yes, sir.
18      MR. BEACH: Yeah, 20 years ago to his
19 girlfriend.
20      THE COURT: All right. Well, then I can't -- I
21 mean, I -- I'm not that good at it. I mean, my handwriting
22 doesn't look the same either. Let me see it. Let me see one.
23      MR. BEACH: That's like calligraphy, those
24 pen -- those pen --
25      MR. HEALY: Judge, can we give Darline a break,

150

1  go off the record while we're all just --
2       MR. JOHNSON: She doesn't need a break.
3       COURT REPORTER: I don't need a break. I just
4  need y'all to know I'm writing everything everybody is saying
5  because I'm on the record.
6       MR. JOHNSON: Let's go off the record.
7       (Discussion off the record.)
8       THE COURT: T's are different. Slant is the
9  same, though.
10      My office -- let's go back to my office. Off
11 the record. Y'all go to lunch.
12      (Lunch recess.)
13      THE COURT: Okay. On the record.
14      MR. BEACH: The court reporter was looking for
15 State's Exhibit 8. Somehow the exhibit got into my file, and I
16 highlighted it last night, so I would like to substitute a
17 clean copy of State's 8 and make that a part of the record.
18 I'll give it to Mr. Johnson to make sure it's an exact copy.
19      (State's Exhibit 8 offered.)
20      MR. JOHNSON: That's fine.
21      THE COURT: That's fine. It's admitted. It's
22 substituted.
23      (State's Exhibit 8 admitted.)
24      THE COURT: Okay. We've got a light.
25      (Recess.)

151

1  Do you want me to bring it back on it?
2       MR. BEACH: I'm going to go with the original.
3  We'll wait until their expert testifies, so I'm going to move
4  on right now.
5       (Discussion off the record.)
6       MR. JOHNSON: Am I mistaken or are the documents
7  already in evidence?
8       MR. BEACH: Yeah.
9       MR. JOHNSON: Why do we have to re-offer a
10 document that's already in evidence? I mean, that's what I'm
11 saying --
12      THE COURT: I didn't know it was part of the
13 profile. I didn't know they had been admitted.
14      MR. JOHNSON: Yeah, they've already been
15 admitted. That's why -- that's why I'm saying to re-offer it
16 is -- it is -- again, I don't understand the whole purpose of
17 re-offering documents that are already admitted in evidence.
18      THE COURT: I didn't know --
19      MR. JOHNSON: All right.
20      THE COURT: I don't keep a list of --
21      MR. BEACH: The entire file is in evidence.
22      THE COURT: I probably should have, but I don't.
23 I rely on you for that.
24      Okay. Get the jury in.
25      THE BAILIFF: All rise.

152

1       (Jury returned to courtroom.)
2       THE COURT: Thank you all. Please be seated.
3  Thank you. Please continue.
4              CONTINUED CROSS-EXAMINATION
5  BY MR. BEACH:
6       Q.  You are the same Mary Sampson that was testifying
7  before the lunch break?
8       A.  Yes.
9       Q.  Just a few more questions, ma'am.
10      You told us that after your son was arrested for
11 murdering his wife and his stepdaughter, you had been to visit
12 him in the jail; is that correct?
13      A.  Yes.
14      Q.  And you told these jurors that your son is
15 remorseful for these murders; is that correct?
16      A.  Yes.
17      Q.  I talked to you in front of the grand jury on
18 October the 16th, which would have been about three and a half
19 weeks after the murders. Do you agree with me?
20      A.  It was somewhere about that, yeah.
21      Q.  And you had seen your son in jail between the
22 murders and when you came down and testified in front of the
23 grand jury?
24      A.  I don't know if I had at that time or not. I know I
25 had visited with him. I don't know if it was during that time.

153

2 of the grand jury a question on page 45: Gary has been in jail
3 since that night. Have you come down to visit him? And your
4 answer was: I've probably seen him about three times.
5     A.   Okay. Well, then, I probably did.
6     Q.   Okay. And I asked you had he given you any
7 explanation as to why he did what he did. And you said, he
8 won't talk about it, he just broke down, he was crying about
9 it, and I just told him, you've just got to give it to the
10 Lord.
11     A.   Yes, I did.
12     Q.   And I then asked you: He's not trying to blame it
13 on anybody else or anything else?
14           MR. JOHNSON: Judge, this is improper.
15           THE COURT: Sustained.
16           MR. BEACH: Okay. All right. I'm sorry, Judge.
17           THE COURT: Just ask him a question. If she
18 gives an inconsistent response --
19           MR. BEACH: I understand.
20     Q.   (BY MR. BEACH) When you talked to Gary in the jail
21 those three or four times between the murders and you came down
22 in front of the grand jury, was he trying to blame the murders
23 on anybody else?
24     A.   No.
25     Q.   And you asked him about how he got stabbed; is that

154

1 correct?
2     A.   Yes.
3     Q.   And what did Gary tell you between the murders and
4 you testifying in front of the grand jury about how he got
5 stabbed?
6     A.   Can you repeat that?
7     Q.   Yeah. What did he tell you about how he came to get
8 stabbed that night when you visited him in jail?
9     A.   He told me that she did it.
10     Q.   Yeah. Did he tell you that Lovetta had stabbed him
11 while they were arguing?
12     A.   No.
13     Q.   I'm going to ask if you recall me asking you, and
14 he's not trying to blame it on anybody else or anything else,
15 he's just owning up to what he did that night. And your answer
16 was he just said he was stressed, he was tired, and he did what
17 he did. And when I asked him about his back, how did he get
18 stabbed in his back, that's when he told me how everything
19 started out. She stabbed him when they was arguing, and he
20 took the knife from her and started, you know, stabbing her.
21 Do you recall telling me that?
22     A.   No, I don't. I don't recall telling you that.
23     Q.   Let me see if I can refresh your recollection,
24 ma'am.
25     A.   Yeah, please do so.

155

1 read my question and your answer to yourself and see if that
2 accurately states what I just read into the record.
3     A.   This -- this wasn't -- I didn't see this when you
4 asked me the question that day.
5     Q.   No, that's the typed transcript.
6           THE COURT: Mr. Beach, why don't you tell her
7 exactly what that is.
8     Q.   (BY MR. BEACH) Yes, I'm sorry. I'm not trying to
9 trick you. This is a transcript of your grand jury testimony
10 typed up by the court reporter --
11     A.   Okay.
12     Q.   -- just like the lady that's here.
13     A.   Okay. I recall some of it, and I don't recall some
14 of it.
15     Q.   I just -- from what you read, did I accurately state
16 what your answer was in front of the grand jury about how she
17 stabbed him and then he took the knife from her and then
18 started stabbing her? Did I read that correctly?
19     A.   Yes.
20     Q.   Do you recall Gary telling you when you visited him
21 in jail, mamma, I just don't know, I just grabbed the knife
22 from her and started stabbing her. That's the only thing he
23 said about that night. Do you recall telling me that in front
24 of the grand jury?

156

1     A.   No, because Gary never told me that and -- while he
2 was in jail.
3     Q.   Okay.
4     A.   And I don't recall telling you that.
5     Q.   Gary --
6     A.   I mean, you can show me that, but I don't recall
7 telling you that.
8     Q.   I just want to make sure I read it right.
9     A.   Well, you -- probably so, but I don't recall telling
10 you that.
11     Q.   Okay. And there was a court reporter down there
12 just like this lady?
13     A.   Well, could have been, but I don't recall telling
14 you that, sir.
15     Q.   All right.
16     A.   Okay.
17     Q.   And you recall Gary telling you about how Jazzmen --
18           MR. JOHNSON: Judge, this is improper
19 impeachment.
20           THE COURT: Yeah, just ask a question and then
21 if she --
22           MR. BEACH: I am.
23           THE COURT: I know, but you said do you recall,
24 which -- it needs to be just ask a question, and then if she
25 answers inconsistently, you can go through it that way.

157

2  Sampson, what did Gary tell you about what happened to Jazzmen?

3      A.   He didn't.  Gary never told me anything about what

4  happened to Jazzmen.

5      Q.   Do you recall answering about that in front of the

6  grand jury that Lovetta, the second night I went down there, I

7  asked him about Jazzmen.  I said, Gary, what happened to

8  Jazzmen.  And he told me that Lovetta picked up Jazzmen and

9  held her up in front of her like a shield.  Now, that's what he

10  told me.  You don't recall testifying that --

11     A.   I recall telling you that, yeah, but you didn't

12  finish telling me what you was saying.  You just asked me the

13  question the first time.

14     Q.   I apologize my question confused you.  So what did

15  Gary tell you at the jail --

16     A.   He said that Lovetta picked up Jazzmen while they

17  was fighting and held her up to her as a shield.

18     Q.   And that's all he told you about what happened to

19  Jazzmen?

20     A.   Yes.

21          MR. BEACH:  That's all I have, Judge.

22              REDIRECT EXAMINATION

23  BY MR. JOHNSON:

24     Q.   Mary, the bottom line is whatever you told the grand

25  jury at the time you told the grand jury that, you was trying

158

1  to do your best to be honest, were you not?

2      A.   Yes, I were.

3      Q.   Okay.  And just as the prosecutor has asked you

4  about some statements and things that you told the grand jury

5  back then, you remember earlier when after -- when he first

6  started questioning you, he went back and was talking to you

7  about how he had asked you if you or Gary or if any of your

8  family members had ever had any kind of issues that would be

9  considered mental issues; is that right?

10     A.   Yes.

11     Q.   And -- and I think he showed you and asked you if

12  you had said yes or no, that you hadn't, that Gary hadn't, your

13  family hadn't?

14     A.   Yes.  Yes.

15     Q.   Can you tell the jury why it was that your testimony

16  is so different here today than it was back then?

17     A.   Because we wasn't treated for anything, and so I

18  didn't think that we were -- anything that was wrong.  The

19  only -- somebody that was actually treated was my sister.

20     Q.   And -- well, in fact, you had -- some of your other

21  relatives have been in mental hospitals, have they not?

22     A.   Yes.

23     Q.   But as far as -- can you tell me how it is in your

24  family to -- to talk about or to criticize somebody for being

25  kind of mental or -- or different?

159

2  family, to you know --

3      Q.   Is it something that you talk about much?

4      A.   No.

5      Q.   How is your mamma's mental health?  Did I ask you

6  that already?

7      A.   Yes, you did.

8      Q.   And how would you describe that?

9      A.   She's pretty much normal for me.

10     Q.   Pretty much what you always just kind of remember?

11     A.   That I remember her to be, yes.

12     Q.   And you know that -- do you know -- do you know if

13  your mom right now is taking medication for psychiatric issues?

14     A.   No.

15     Q.   Mary, I think that's all the questions I have.

16  Ma'am, thank you.

17          MR. BEACH:  That's all, Judge.

18          THE COURT:  Thank you, ma'am.  You may return

19  back to your family.  Thank you.

20          MR. JOHNSON:  Do you need to go now?

21          THE WITNESS:  In a little bit, yeah.  I'm fixing

22  to go.

23          MR. JOHNSON:  Can she be excused, Judge, or --

24          THE COURT:  Yeah.

25          MR. JOHNSON:  -- subject to recall?

160

1          MR. BEACH:  Yes.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you, ma'am.

4          MR. HEALY:  Thank you.

5          THE COURT:  Next witness.

6          MR. HEALY:  Paul?

7          MR. JOHNSON:  He went to get her, Judge.

8          THE COURT:  Oh, okay.

9          (Witness brought forward.)

10         MR. JOHNSON:  Your Honor, the State is going to

11  call Bertha Curry -- or excuse me, the Defense is going to call

12  Bertha Curry.

13         THE COURT:  Ma'am, if you'd raise your right

14  hand.

15         (Witness sworn.)

16         THE COURT:  Please have a seat.

17         THE WITNESS:  Thank you.

18         THE COURT:  You can adjust that microphone.

19         THE WITNESS:  Thank you.

20         THE COURT:  Just if you can -- that's -- thank

21  you.

22         THE WITNESS:  Thank you.

23              BERTHA CURRY,

24  was called as a witness by the Defendant, and after having been

25  first duly sworn, testified as follows:

161

DIRECT EXAMINATION

BY MR. JOHNSON:

Q.   Would you state your name, please, and spell your last name and first name for the court reporter?

A.   My first name is Bertha Curry.

Q.   What's your last name?

A.   My last name is Curry.

Q.   Okay.

A.   My first name is Bertha, I'm sorry.

Q.   Okay.  Can you spell that for the court reporter, please?

A.   Bertha, B-e-r-t-h-a.

Q.   And Curry is C-u-r-r-y?

A.   C-u-r-r-y.

Q.   Okay.  Ms. Curry, could you tell the jury here where you live?

A.   I lives in Dallas.

Q.   Okay.  And how long have you lived in Dallas?

A.   All my life.

Q.   And how old a lady are you?

A.   I'm 71 years old.

Q.   Okay.  And who do you currently live with?

A.   I live with my son, James Jones.

Q.   Okay.  Ms. Curry, how many children do you have?

A.   Right now I only have four.  I'm a mother of seven.

162

Q.   Okay.  And what's happened to the other children?

A.   One of them just died, and two of them was -- was killed.

Q.   Okay.  Which one of them died?

A.   Linda -- Linda Green.

Q.   Okay.  Can you tell us which one of them was killed?

A.   Diane Green.

Q.   Okay.

A.   Oh, I'm sorry.  Linda Green was the one -- she was the one that was killed.  And Diane Green.  And Deborah Jones is the one was just died natural from a heart attack.

Q.   Okay.  We'll talk about Deborah in a moment.  Could you tell me where -- you are the mother of Mary Sampson; is that right?

A.   Yes, I am.

Q.   Okay.  And that was Mary that just testified here before you?

A.   Yes, it were.

Q.   And you are the grandmother of Gary Green?

A.   Yes, I am.

Q.   And this is Gary here to my right in the courtroom today; is that correct?

A.   Yes.

Q.   Okay.  Could you tell me a little bit about Mary growing up?  Where was Mary born and raised?

163

Q.   Okay.  And how many children does she have?

A.   She only had two.

Q.   Okay.  And is that Gary and Nysasno?

A.   That's Gary and Nysasno.

Q.   Okay.  As -- as Mary grew up, were you familiar with her husband and Gary and Nysasno's father?

A.   Say that again.  I didn't quite understand you.

Q.   Okay.  Were you familiar with Thomas Carter who was Gary and Nysasno's father?

A.   Yes.

Q.   Could you tell the jury a little bit about Thomas and how you knew him?

A.   How did I know Thomas?

Q.   Yes, ma'am.

A.   I knew Thomas from my daughter meeting him, you know, on Beckley where we lived in Oak Cliff.  And from what I knew that -- you know, they met in -- in a washateria, so I don't know about -- when she tells me that, she tells me different, but I just thought she met him there.

Q.   At the washateria?

A.   At the washateria, because it came from that direction.  When they came over to the house, they were coming in that direction from the washateria, so I just presumed, you know, that he walked her to the house from the washateria, you

164

know.

Q.   So you can recall back to the day he met her?

A.   Yes, that was the day he met her.

Q.   Could you tell the jury your impressions of Thomas Carter?

A.   Say that again.

Q.   Could you -- what did you think about Thomas Carter?

A.   I did not think he was a very good person.

Q.   Can you tell us why?

A.   Because he used to beat on my daughter all the time, and he used to beat on my grandson all the time.  He used to take him and sling him and throw him around, catch him by his neck, you know, sling him around.  So me and him got into it about that.  I told him, you know, I just don't like nobody doing that to my child.

Q.   Let me -- let me back up.  How long did your daughter and -- and Thomas -- how long did they go out before they were subsequently married?

A.   Well, at first I can't remember.  I think she married him in -- in about -- in about a year, in -- about a year -- nine months to a year.

Q.   Okay.  Do you remember how Thomas -- other than being abusive, do you remember how he acted mentally?

A.   I don't hear that well, so I mean --

MR. BEACH:  Do you want to stand up there?

165

2  Can you remember how Thomas acted mentally whenever you was

3  talking to him and how he acted around other people?

4      A.   Yes, I do, I remember.

5      Q.   Can you tell the jury what you recall?

6      A.   I mean, he would -- he just was a violent person.

7  He was real violent, you know.  And actually he would coat it

8  with -- with -- what you call it, Kung Fu.  He -- I mean, when

9  she was pregnant with her youngest child, he called himself

10  doing Kung Fu on her, and he just kicked her in the stomach,

11  you know, and knocked her out of breath, you know what I'm

12  saying?  But I'm seeing as why -- I don't know why I thought

13  it.

14      Q.   Okay.

15      A.   I don't know why he done what he done.

16      Q.   And you said that he used to beat on Gary quite a

17  bit?

18      A.   A lot -- a lot.  He -- and he would just -- I mean

19  he would just practically beat him unmercy (sic).  He did.

20      Q.   Okay.

21      A.   So and I told him he put a hand on him again -- I

22  won't repeat what I said --

23      Q.   Okay.

24      A.   -- up in here.

25      Q.   Okay.

166

1      A.   I mean, but you can just read from lips about what I

2  said.

3      Q.   Okay.  Well, Bertha, let me ask you this.  Did you

4  know many of Thomas's family?

5      A.   I don't know them real well.

6      Q.   Okay.

7      A.   I don't know them real well.

8      Q.   How old was Gary whenever Thomas kind of got out of

9  the picture?

10      A.   He was real young.  As a matter of fact, his -- his

11  little -- his little brother wasn't even born yet.  That's the

12  one that, you know, I was talking about a few minutes ago.

13      Q.   Okay.  And after -- after Mary and Thomas were

14  separated and finally -- and they ended up getting divorced,

15  was Thomas still around to some extent in any of Gary's or

16  Nysasno's life?

17      A.   No, he was not.  Not of my knowledge, he was not.

18  Unless, you know, it was something I didn't know about, I sure

19  didn't know about it.

20      Q.   Okay.  Growing -- let me ask you this.  Whenever --

21  whenever Gary was born, when Gary was young, did Gary seem like

22  a normal child to you?

23      A.   No, he did not.

24      Q.   Okay.  And could you explain to the jury what it is

25  or why it is that you didn't feel like Gary was just your

167

2      A.   I mean, actually from the day he -- you know, he was

3  big enough to talk and walk around, I didn't think he was

4  normal because he acted different from the other kids I had

5  around there, you know what I'm saying?

6      Q.   In what way?

7      A.   In what way?  You know, we had a big backyard in the

8  back, and every time this child go outside, I try to be out

9  there with him.  And on this particular day he walked over

10  there to that fence -- you know, and there was a lot of -- it

11  was a snake bed around -- it was a big old snake bed.  You

12  know, we had a wire fence, and the post at the wire fence had a

13  great big old concrete thing to where was coming up and that's

14  where those snakes was -- was -- I guess you could say nesting

15  in there or something.  They're different color.  And he would

16  reach in there and get those snakes and bring it out and he

17  took it and bit his head off.  I don't know where the head went

18  to.  But he just bit the snake's head off, and the rest of it

19  come -- with his hand -- the rest of the snake was wiggling in

20  his hand and he said, huh, mamma, huh, mamma, I got something

21  for you.  I said, you ain't got nothing for mamma.  Mamma gone.

22  You know, because I couldn't stand that, you know.

23      Q.   Okay.  And did --

24      A.   And I told her, he's not normal.

25      Q.   Okay.

168

1      A.   You know, but she got angry with me.  You know, she

2  didn't want to hear that.

3      Q.   Why was that?

4      A.   Because I told her it's something wrong with this

5  baby.  You should get him help while he little.  And she said,

6  mamma, there ain't nothing wrong with my baby.  He's just as

7  normal as the rest of your children's babies.  Said, no, he

8  isn't.  You know, he isn't.

9      Q.   Did Mary -- did Mary not want to talk about it or --

10      A.   No, she -- in fact, she got angry with me.  It was a

11  long time before she talked to me.  Right now she don't want to

12  talk to me about it, you know.

13      Q.   Now, Bertha, I want -- I want to talk to you about

14  something, and the truth of the matter is you didn't want to

15  come down here in the courtroom, did you?

16      A.   No, I did not.  I'm here because -- May I say the

17  reason why I didn't want to come?

18      Q.   Yes, ma'am, I was going to ask you.

19      A.   I mean, because, you know, with me being a mother,

20  you know what I'm saying, and I was single -- I was a single

21  parent, you know what I'm saying?

22      Q.   Uh-huh.

23      A.   And I did the best I could for my childrens, you

24  know.  I'm sure everyone else did, too.  But this -- this is

25  what I'm saying.  I didn't want to come and face these peoples

---

**169**

2  thing that they have went through, you know what I mean, but

3  just a little bit different. You know what I'm saying? And I

4  just didn't want to come.

5  Q.  And I've been out -- I've been out in your home and

6  I met with you at your daughter's home and we've talked on the

7  telephone?

8  A.  Yes.

9  Q.  And I want to talk to you about a meeting we had I

10  think last week over at your daughter's home. And you and I

11  had a chance to sit there with Mr. Warren and we talked about

12  some of the things that we've talked about over the past year;

13  is that right?

14  A.  Exactly, exactly.

15  Q.  And we told you that we wanted to talk to you about

16  some things in front of a jury and talk about some things about

17  your family; is that right?

18  A.  Exactly.

19  Q.  And you remember calling me out into the front yard?

20  A.  Yes, I do remember calling you out in the front

21  yard --

22  Q.  Can you tell me --

23  A.  -- because I figured it was important. It was

24  something that, you know, we didn't talk about when I was in

25  there.

---

**170**

1  Q.  You told me some things about your family and you

2  told me that you didn't want to come down in front of a bunch

3  of people and say anything that would make your family look

4  bad, didn't you?

5  A.  That's right, I did not.

6  Q.  Okay. Bertha, the first time I ever mentioned --

7  did you tell me that it's your honest belief that Gary was

8  never normal from the time he was a young child?

9  A.  Deep down in my heart, I do not believe that. You

10  know, I'm not a doctor or anything like that, but actually I

11  have told a lot of people -- I think I told my children, my

12  mother, and everything -- you know, I told my family that I

13  don't think this child is normal.

14  Q.  Okay. And nobody -- there's a lot of people in your

15  family that got mental problems; is that right?

16  A.  Yes, they does.

17  Q.  And nobody wants to admit to these things?

18  A.  Nobody want to admit the problems.

19  Q.  And you told me that you don't want me to sit here

20  and ask you to -- make you name names of people because you

21  don't want to hurt anybody's feelings?

22  A.  I don't want to hurt anybody feelings.

23  Q.  You understand it's important for these folks over

24  here to know -- know the truth about Gary and his life?

25  A.  Yeah, it's important all right, but you know -- but

---

**171**

2  it on that, but, you know, the truth will set you free and, you

3  know, it's -- I mean, I have to tell the truth.

4  Q.  Now, Bertha, you yourself -- I think the first time

5  I came to your house awhile back, and you went in and brought

6  out a whole big sack of medicine that you're taking; is that

7  right?

8  A.  That's right.

9  Q.  And you're taking medicines that the doctor gave you

10  for some issues that you have with depression and anxiety and

11  some other issues; is that right?

12  A.  Exactly. I been -- I been taking the anxiety and --

13  and pills and things now for about -- I think for about

14  16 years.

15  Q.  Okay. And have you ever -- do you know if you've

16  actually been formally diagnosed with some specific mental

17  issues yourself?

18  A.  You know, I didn't know at first. I didn't know

19  exactly what was going on, you know, and maybe I still in

20  denial -- didn't know what was going on, you know what I'm

21  saying? But I knew there was -- something was going on in me

22  that wasn't right, you know. I just didn't know exactly what

23  was going on with me. You know what I'm saying?

24  Q.  Yes, ma'am.

25  A.  Until I asked my doctor what did that mean about

---

**172**

1  those -- all those different type of pills she was giving me,

2  you know.

3  Q.  Uh-huh.

4  A.  So then she told me it was for my anxiety and my

5  nerves.

6  Q.  And also, you're taking some antidepression

7  medications, are you not?

8  A.  Excuse me?

9  Q.  You're taking some antidepression medications?

10  A.  Yes, I am.

11  Q.  I mean, you take -- you've got a whole sack of

12  medicine, don't you?

13  A.  Yes, sir, a big old case like this and about like

14  that.

15  Q.  Okay. Now, Bertha, you told me that there was a lot

16  of issues and a lot of things that -- from your family, from

17  your mother and your father when you was a kid that you saw

18  these same issues that had come down through your father and

19  his family; is that right?

20  A.  Exactly.

21  Q.  Okay. You said earlier and we spoke about it

22  briefly, you said that several -- several of your own children

23  have had some issues that you knew were mental issues and you

24  spoke about Deborah. Could you tell the jury a little bit more

25  about Deborah?

---

173

```
 1    A.   It was my grandbaby's -- my granddaddy's, I
 2    mean, she the one that I said died from congestion (sic) heart
 3    failure.  I have congestion heart failure, you know.  But what
 4    I'm saying is, she wasn't a normal person.  I don't know
 5    whether it was the medication or what was doing -- what was
 6    making her like that.  Whatever it was doing it, she was not
 7    normal.
 8         Q.   And was she -- was she actually committed to
 9    psychiatric hospitals during her lifetime?
10         A.   Yes, she was admitted at first before she went to --
11    out of town to a state hospital, she was admitted to Parkland's
12    saturation -- whatever you call it.  I don't know
13    what you call it.  I don't know how to pronounce it, but she
14    was admitted there before she went to -- it was in East Texas
15    -- West Texas somewhere.  I forget the name -- Vernon,
16    that's --
17         Q.   Vernon --
18         A.   That's what she --
19         Q.   Vernon State Hospital?
20         A.   Yeah, uh-huh.
21         Q.   And you described another one of your sons -- one of
22    your sons and he had actually had some problems and he ended up
23    killing himself and -- and his wife; is that right?
24         A.   My brother?
25         Q.   I'm sorry, your brother.  No, it was your son,
```

174

```
 1    wasn't it?
 2         A.   My son that killed himself?
 3         Q.   Yes, ma'am.
 4         A.   My stepson.
 5         Q.   Your stepson.  Okay, your stepson.
 6         A.   Yeah, I mean, I want to get -- to keep it right.
 7    That's the reason why I say, huh.
 8         Q.   Okay.
 9         A.   No.  He's my stepson.  He's my husband's son.
10         Q.   Okay.
11         A.   Uh-huh.  He -- he killed his wife and then he turned
12    around and killed himself.  And, you know, he locked them --
13    locked them in the house where they couldn't get out, where
14    nobody couldn't come in and stuff, you know.
15         Q.   How long ago did your husband pass?
16         A.   He been dead ever since -- I think it was '68.  He
17    died in '68.
18         Q.   In 1968?
19         A.   Uh-huh.
20         Q.   Okay.  And how would you describe your life now?
21    Are you close with your remaining children?
22         A.   Yeah.  As close, you know, as you can expect.  It's
23    as close as they let me do.
24         Q.   Okay.  Describe -- what do you mean when you say it
25    that way?
```

175

```
 1    for Gary, and when I try to go -- when I try to talk to Gary,
 2    she won't let me get close to her, you know, especially because
 3    I be want to talk to her about different things in our life,
 4    you know, and stuff.  And she just --
 5         Q.   Pulls away?
 6         A.   Yeah, she gets away from me.
 7         Q.   Okay.  And you talked about that being something
 8    that started back when Gary was young and you would try to talk
 9    to her about Gary?
10         A.   Yes, and she don't want to talk to me about it.  She
11    told me it wasn't no use in me spreading something in the
12    family, you know, that's -- that's going to have a hold on her,
13    you know.  But I told her I'm not doing that to have a hold on
14    her.  I want my child to be well and normal.  He don't want to
15    live like this.  He want to live a normal life --
16         Q.   Okay.
17         A.   -- like everybody else.
18         Q.   Let me ask you this.  Did there come a time when
19    Gary was younger that he actually came to live with you for a
20    time?
21         A.   Excuse me?
22         Q.   Was there a time when Gary was younger that he would
23    come stay with you for a time?
24         A.   Yes, he did.
25         Q.   Did he spend quite a bit of time with you when he
```

176

```
 1    was growing up?
 2         A.   Yes, he did.
 3         Q.   And were you -- did you feel like you were close to
 4    him?
 5         A.   Yeah, I was very close to Gary, and he was very
 6    close to me.
 7         Q.   As he was growing up through his teenage years and
 8    growing up into young adulthood, do you know how far he got in
 9    school?
10         A.   You know, I don't know exactly, but I think he
11    didn't get no farther than probably the 10th grade or about the
12    9th or the 10th.
13         Q.   Okay.
14         A.   You know.  And it may even been -- even less than
15    that -- or more than that, but I don't think he got no further
16    than the 9th or the 10th grade.
17         Q.   Okay.  Did you ever know what kind of grades Gary
18    made?
19         A.   No, not really, because his mother wouldn't talk to
20    me about it.
21         Q.   When Gary was younger, did he have a lot of friends?
22         A.   Well, yes, he did.  He had friends.  He had a lot of
23    friends.
24         Q.   He had a lot of friends?
25         A.   Yes, he did.
```

2    A.   Most of the time he stayed by himself, but, you

3 know, the friends that called him his friend. You know, but he

4 wasn't with them all the time, but they would say Gary is my

5 friend; you know what I'm saying?

6    Q.   Okay. You said that he stayed by himself a lot of

7 times. What -- was that -- did that seem normal to you?

8    A.   No. That wasn't normal when -- I knew he had a lot

9 of friends that -- that peoples that cared about him and wanted

10 to be around him, and he didn't want to be around them. He

11 just wanted to withdraw from them. He didn't want to be around

12 them. He like to play himself, stay by himself. You know, he

13 just like to stay around in the room and stay by himself.

14    Q.   As Gary was growing up, Bertha, did you ever talk to

15 him or anything and talk to him about his behavior and anything

16 about his behavior when he was in high school and such?

17    A.   Well, you know, to be honest with you, I never

18 mentioned his behavior to him when he was in high school.

19    Q.   Why is that?

20    A.   Because of his mother. You know, I didn't want her

21 to go around, you know, already resenting me. I love all of my

22 kids, and I wanted them to be close to me, you know. And I

23 didn't want to say something, you know, to make her resent me;

24 do you know what I'm saying?

25    Q.   Do you remember back whenever Gary went to the

178

1 penitentiary when he was 19 years old?

2    A.   When he finished school, when he was 19?

3    Q.   When he went to the penitentiary, when he got in

4 trouble?

5    A.   I don't know exactly how old he were.

6    Q.   Okay. But --

7    A.   But I do remember him going.

8    Q.   Okay. Could you tell me what you knew about that?

9    A.   What did I do about it?

10    Q.   What you knew about that?

11    A.   The first time he ever went?

12    Q.   Yes, ma'am.

13    A.   The first time I ever know he went, that he had a

14 problem with his girlfriend down there at Lincoln Memorial

15 Cemetery, you know. And the first I know about -- I wasn't

16 there. I remember just going about, you know, what I -- what

17 people told me that happened down there.

18    Q.   Okay.

19    A.   You know what I'm saying?

20    Q.   But it doesn't matter what people told you. What I

21 was wanting to ask you about is did you notice any kind of

22 change in Gary's behavior when he got out -- when he was in the

23 prison or after he got out of the prison?

24    A.   Yes. He still liked to stay by himself and he said

25 he wasn't happy. You know, he just -- he wasn't happy at all.

179

2    A.   He said he wasn't happy with his life and the way he

3 was living his life. He don't -- he don't know what's wrong

4 with him, but he just wasn't happy with his life.

5    Q.   Did Gary ever talk about killing himself?

6    A.   Yes, he did --

7    Q.   Committing suicide?

8    A.   -- a lot, and I told him, you know, if you couldn't

9 give a life, you shouldn't take one.

10    Q.   Could you tell me what -- how -- did Gary talk about

11 that at any certain part of his life, or has he talked about

12 that over the -- over the course of his life?

13    A.   Gary been talking about that ever since I known that

14 he's turned, you know, old enough to know the difference and --

15 you know, and death life, you know what I'm saying? What I

16 mean by that, living and life, you know what I'm saying?

17    Q.   Not exactly, Bertha. Could you explain that to me,

18 please?

19    A.   I mean, what I'm saying is he been saying that ever

20 since he was big enough to talk about his life, that he didn't

21 want to live because the devil was after him or something. He

22 not happy with his life. He can't be normal like -- like his

23 friends, and that's the reason why he don't hang out with them,

24 he stay to his self.

25    Q.   Okay.

180

1    A.   And that made me feel bad that he feel like, you

2 know, he couldn't be a normal child.

3    Q.   Okay. Did you ever see -- did you ever see Gary

4 talk to himself or do anything like that?

5    A.   All the time, you know.

6    Q.   What --

7    A.   I just -- I would see him cry. You know, he just

8 wasn't happy with his life.

9    Q.   Now, when you say that, Bertha, can you tell the

10 jury how old was Gary when you were seeing this kind of

11 behavior?

12    A.   When I first start seeing him kind of behaving, he

13 was about nine -- eight or nine years old. And he was at my

14 house, you know, and I had got off of work that evening. And

15 he was sitting on the side of my bed, you know, and he didn't

16 want to go outside with the rest of the kids. And I said,

17 Gary, why don't you want to go out? I don't want to, mamma.

18 Can I please stay in here with you? I said, you can. You can

19 stay in here with me if you -- if you choose to.

20    Q.   Bertha, Gary went to prison. When he went prison

21 the second time, he was gone for a long time, wasn't he?

22    A.   Yes. I think he was gone for -- I'm not sure about

23 how many years, but I know he was gone a long time.

24    Q.   Okay.

25    A.   And I don't remember the amount of the years, but I

181

2      Q.   Did you ever go down to the penitentiary and visit

3   with him?

4      A.   Once or twice.

5      Q.   Okay.  Did you go by yourself or --

6      A.   No, I went with his mom.

7      Q.   Okay.

8      A.   I went down there with his mom.

9      Q.   So you and -- you and Mary did have -- were still

10  seeing each other and talking to each other some during that

11  period of time?

12     A.   Yes, we went -- we went down there to visit him down

13  there, but as far as being real close, no, we was not.

14     Q.   Okay.  After he got out of prison that second time,

15  could you tell the jury what your relationship was like with

16  him?

17     A.   My relationship with him?

18     Q.   Yes, ma'am.

19     A.   My relationship with him was very good, except, you

20  know -- may I say what I think?

21     Q.   Bertha, I don't think I can stop you, ma'am.  Go

22  ahead.

23     A.   I mean, you know, can I say what I'm thinking.

24     Q.   Yes, ma'am.

25     A.   I just wasn't satisfied what he would always tell

182

1   me, you know.  It would -- it just would make me depressed.

2   You know, he wasn't satisfied with his life.  He just wanted to

3   kill his self.  And I'd be -- always try to tell him and make

4   him read the Bible, you know.  This is not what the Lord wants

5   you to do.

6      Q.   Okay.

7      A.   You know, you're not supposed to sit up and take

8   your life.  You know, no one should take -- take their life or

9   anyone else life; you know what I'm saying?

10     Q.   Bertha, the truth of the matter is you were probably

11  the closest one to Gary, weren't you?

12     A.   Huh?

13     Q.   Were you probably the closest family member to Gary?

14     A.   Yes, I were.

15     Q.   You and his brother Nysasno?

16     A.   Yes.

17     Q.   Did you ever talk to Gary or did Gary ever talk to

18  you about whether or not he ever heard voices or ever -- he

19  heard people inside his head talking to him?

20     A.   He said that's the reason why he didn't want to be

21  with his friends, because he said he thought they were going to

22  be making fun of him.

23     Q.   That he thought -- he thought the people -- his

24  friends were going to make fun of him?

25     A.   His thought his friends would make fun of him

183

1   because they was out there and they couldn't see nobody but just

2   talking to them, but they don't see nothing around but them and

3   him, you know what I'm saying?  He said he didn't want them

4   making fun of him.

5      Q.   Are you familiar really, Bertha, with Gary's work

6   history?

7      A.   Not all of it, but, you know --

8      Q.   Did he -- did he have jobs after he got out of

9   prison that second time?

10     A.   Yes, he did.

11     Q.   Can you tell the jury what kind of jobs you recall

12  him having?

13     A.   I remember -- I remember him working at some type of

14  warehouse or something.  And I remember him working at a

15  grocery store.  And I remember him working at some more places,

16  but I don't remember the name of the places; you know what I'm

17  saying?  So y'all got to forgive me because I don't remember

18  what the -- the name of the places, you know.  I just remember

19  some of the places.

20     Q.   Did Gary ever seem like he -- did it ever seem like

21  Gary was able to really keep a job?

22     A.   Sometimes -- I mean, sometimes yes and sometimes no.

23  I mean, I never knowed him to keep a job over a year.  I never

24  knowed him, you know, to be faithful to a job like that.

25     Q.   Bertha, as -- as things got worse in Gary's -- or

184

1   did you notice things getting worse in Gary's life as the time

2   went closer to when this -- when these things happened?

3      A.   Yes, I noticed him changing a lot after all these

4   things took place in his life from the first time; you know

5   what I'm saying?  And he just started changing, you know.

6      Q.   Bertha, did --

7      A.   He even started trying -- you know, kind of

8   different from me.  He wouldn't talk to me too much about stuff

9   after then.

10     Q.   When did -- when did that change come about between

11  you and Gary?  When did he kind of withdraw from even you?

12     A.   When he start withdrawing from me, I think it was

13  something like '07.

14     Q.   Okay.

15     A.   '07 or '08 or something when he start withdrawing

16  from me.

17     Q.   Did you quit seeing him as much after that?

18     A.   No, I didn't -- I didn't stop seeing him, you know,

19  but he start withdrawing a lot from me.

20     Q.   Tell the jury how he would was different whenever he

21  would be around you.

22     A.   He just seemed more like, you know, a person that --

23  you know, that was real nervous and, you know, just really

24  wasn't focused on -- on normal things; you know what I'm

25  saying?  That's -- that's the way he struck me, you know.

185

1    you could tell me by how he -- his demeanor, that
2    you had seen Gary before the -- before the night that he did
3    what he did?
4        A.   He was over to my house -- him and his fiancée and
5    three kids, they was over my house that -- that December -- you
6    know, that December of '08.
7        Q.   Of '08?
8        A.   Uh-huh.   That -- you know, that was Christmas, you
9    know, in '08 before -- before this happened --
10       Q.   Okay.
11       A.   -- you know.
12       Q.   And did you not -- did you never see Gary again
13   until this happened?
14       A.   No, I saw him after then.
15       Q.   Okay.
16       A.   If I'm -- if I can think very well after then, it
17   was in '09.   It was either in January or February; you know
18   what I'm saying?
19       Q.   Where would you have seen him at at that time?
20       A.   He was at my house.
21       Q.   And could you tell us how was he acting then?
22       A.   He was just telling me that they was going --
23            MR. BEACH:   Excuse me, Judge.   I need to object.
24       A.   -- that she wanted him --
25            THE COURT:   Excuse me, ma'am, hold on, hold on.

186

1        Q.   (BY MR. JOHNSON)   Let me -- let me stop you there.
2    Let me just ask you -- not what he said to you, Bertha.   Could
3    you tell the jury how was he acting as far as --
4        A.   Oh, okay.   He was just -- seem like somebody real
5    nervous and, you know, feeling going on -- just feeling.
6        Q.   What word are you using there?
7        A.   He was just really feeling like he was real nervous
8    like.
9        Q.   Okay.
10       A.   You know, that's the way he seems to me.   He was
11   just picking at his fingers and stuff and feeling around.
12       Q.   Okay.   Was that the last time that you saw Gary?
13       A.   That's the last time I saw him.
14       Q.   Did you ever have occasion where you talked to him
15   on the telephone or anything after that?
16       A.   I talked to him -- as I can remember, one time
17   before then -- after then, you know.   And like I said, that was
18   around about January, too -- had to have been around January or
19   February, too.
20       Q.   And -- and for the next several months you didn't
21   see Gary at all; is that right?
22       A.   No, I did not.
23       Q.   Did that seem very strange to you?
24       A.   That was real strange to me because he usually
25   called me and talked to me all the time, you know.   So that was

187

1    strange, you know.   And I would -- and I began to worry about him,
2    you know.   And I would ask questions of people, you know, ask
3    them have they saw him or whatever.   That was very strange.
4        Q.   Okay.   What did you think, Bertha, when you heard
5    what had happened and what Gary had done?
6        A.   What he had done last year?
7        Q.   Yes, ma'am.   What did you think -- how did you first
8    become aware of it?
9        A.   I didn't know what to think.   I was crying,
10   screaming.   I didn't know what to think.   I just knew that
11   wasn't him.   That's not something that he would do as a normal
12   person.   I just wasn't happy about it.
13       Q.   And, Bertha, you're here to tell this jury that you
14   know Gary better than anybody in this world probably and you're
15   telling this jury without a doubt that he just never was
16   actually a normal child or a normal young person, is that
17   right?
18       A.   He wasn't, but I -- I just wasn't happy about what
19   he done.
20       Q.   I understand, ma'am.
21       A.   I'm still not happy about that.
22       Q.   I understand.   Bertha, I think that's all the
23   questions I have for you, ma'am.   Thank you.
24       A.   Okay.
25                        CROSS-EXAMINATION

188

1    BY MR. BEACH:
2        Q.   Ms. Curry, would you agree with me that Gary is
3    capable of being kind?
4        A.   Sometimes.
5        Q.   Sometimes.   Did you ever meet his high school
6    girlfriend, Jennifer Alcorn?
7        A.   Yes, I met her.   She was a very nice person.
8        Q.   Very nice young lady, wasn't she?
9        A.   She was a very nice person.
10       Q.   Very attractive?
11       A.   Yes.
12       Q.   She was smart, right?
13       A.   Yes.
14       Q.   And really when Gary wasn't in your presence -- I
15   mean, this is kind of a silly question, but you didn't know how
16   he was acting, did you, when he wasn't around you?
17       A.   Well, it would be kind of -- it would be kind of
18   strange and -- I mean, if I knew how he was acting and when he
19   wasn't around me when I couldn't see him, I couldn't -- I
20   really can't answer that question.
21       Q.   Sure.   I agree.
22       A.   You know.
23       Q.   Bad question.   But somehow Gary was able to have a
24   very intense three-year relationship with this attractive,
25   intelligent, kind female back in high school; is that right?

189

2 Q. Yeah, he dated Jennifer for all the way through high

3 school. You knew that, didn't you?

4 A. I didn't know he dated her all throughout high

5 school, but I know he dated her a long time.

6 Q. And went to the prom together?

7 A. But you know what -- excuse me, but you're going to

8 have to talk a little louder to me because I don't hear good.

9 Q. They went to the prom together, right? Did you know

10 that?

11 A. I heard he did went to the prom with her, but

12 knowing the person, I didn't know.

13 Q. So your grandson was able to maintain a male-female

14 relationship when he was in high school. Would you agree with

15 me?

16 A. I don't know.

17 Q. Okay.

18 A. Because I know they wasn't getting along good -- not

19 too good. She -- she was the type of person, she loved him a

20 lot. So I wouldn't agree that they were getting along that

21 good.

22 Q. They had a bad ending up, but until then -- I mean,

23 they -- they were pretty exclusive, weren't they?

24 A. I -- I guess, I really -- I wouldn't say that, you

25 know.

190

1 Q. Did you ever meet Shulonda Ransom? Shulonda is the

2 mother of Gary, Jr. and Meionni. Did you ever meet her?

3 A. Yes, I did.

4 Q. Okay. And somehow Gary was nice to her, and they --

5 they began living together and she had two children by him.

6 A. Yes.

7 Q. You're aware of that, right?

8 A. Yes, I remember that.

9 Q. Okay. And you met Belinda Lacy, the former female

10 prison guard. You remember Belinda?

11 A. Yes, I do.

12 Q. Somehow Gary was nice to her and got, you know, her

13 to trust in him to the point where they ended up getting

14 married, didn't they?

15 A. Yes.

16 Q. And did you know Gary was working for this battery

17 repair company in '09? Did you ever hear anything about that?

18 A. No.

19 Q. Never -- you never knew that, because you weren't

20 seeing him in '09; is that right?

21 A. No, that's what I was telling you. I didn't see him

22 that much in '09.

23 Q. Okay.

24 A. You remember me telling you that?

25 Q. Yes, ma'am.

191

2 Q. And last question, the people that you didn't want

3 to see, why you didn't want to come down to the courthouse,

4 you're talking about --

5 A. That family there.

6 Q. Right there?

7 A. Because -- I mean, to me, I didn't -- I didn't want

8 to see them because I know what happened to me and how I felt.

9 Q. But your daughter was more than six years old,

10 wasn't she?

11 A. Huh?

12 Q. Your daughter was older than six years old when she

13 was murdered, wasn't she?

14 A. Yes, she were. But still, the way she was murdered,

15 you know. May I say?

16 Q. No, we don't need to hear about that.

17 A. Okay.

18 Q. You didn't want to see them, and you -- you

19 understand because of what happened to you, you understand what

20 they're --

21 A. Exactly, and I know how they feel, you know, from

22 being a mother myself and been in those shoes, you know. It

23 wasn't a little child, but it was my child.

24 Q. Yes, ma'am.

25 A. You understand what I'm saying?

192

1 Q. Yes, ma'am.

2 MR. BEACH: Thank you.

3 THE WITNESS: You're welcome.

4 THE COURT: Anything further?

5 REDIRECT EXAMINATION

6 BY MR. JOHNSON:

7 Q. Let me ask -- Ms. Curry, I just want to ask you one

8 question. When he asked you if the people that you didn't want

9 to -- to see you in here was that family, you had also asked me

10 to have your family step out of the courtroom --

11 A. Exactly, exactly. I wanted my family to be out when

12 I be -- when I be talking.

13 Q. Right. That's what we were talking about --

14 A. Oh, that's what --

15 Q. -- when we said that earlier?

16 A. That's what he was talking about?

17 Q. That's what I say -- when I asked you about that

18 earlier, we were talking about that you wanted me to have your

19 family step out because you didn't want to hear them -- you

20 didn't want them to hear you talking; isn't that right?

21 A. That is correct.

22 MR. JOHNSON: Okay. Bertha, that's all I have,

23 ma'am. Thank you.

24 THE WITNESS: Thank you.

25 MR. JOHNSON: And Judge, can this witness be

193

2        THE COURT: You may. Ma'am, thank you for

3  coming down. You are free to go.

4        THE WITNESS: Okay. Thank you.

5        MR. JOHNSON: Judge, can we have about a

6  three-minute break?

7        THE COURT: Yeah.

8        MR. JOHNSON: If there's anything such as a

9  three-minute break.

10       THE COURT: Yeah, that's what I say. Nobody

11  believes you.

12       (Jury excused from courtroom.)

13       (Recess.)

14       (Witness brought forward.)

15       THE COURT: Are we ready?

16       MR. BEACH: Yes.

17       THE COURT: On the record.

18       (Outside the presence of the jury, defendant

        present.)

19

20       DR. KELLIE GRAY-SMITH,

21  was called as a witness by the Defendant, and after having been

22  first duly sworn, testified as follows:

23        DIRECT EXAMINATION

24  BY MR. JOHNSON:

25    Q.  Will you state your name, please?

194

1    A.  Kellie Yvonne -- Kellie Gray-Smith.

2    Q.  Ms. Gray-Smith, can you tell us where you are

3  employed?

4    A.  I'm employed with Plano Independent School District.

5    Q.  Can you tell us your educational background that

6  enables you to -- what is your position at the Plano

7  Independent School District?

8    A.  I'm a licensed psychologist, a licensed specialist

9  in school psychology and the special education coordinator.

10    Q.  Okay. Could you tell the jury -- or the -- can you

11  tell the Court what your educational and background experience

12  is to hold that position?

13    A.  I received my Bachelor's in Psychology from Texas

14  A&M in College Station. I received my Master's in School

15  Psychology from the University of North Carolina at Chapel

16  Hill. My doctorate from the University of North Carolina at

17  Chapel Hill. Became licensed in 2002 as an LSSP or a licensed

18  specialist in school psychology, and licensed psychologist in

19  2003 and --

20    Q.  Can you keep your voice up for me, Doctor?

21       THE COURT: Pull that microphone, and it moves

22  and just talk right into it.

23    A.  Bring it closer, okay. Is that better?

24    Q.  (BY MR. JOHNSON) Yes, ma'am.

25    A.  Okay.

195

1      And ... can you tell us your -- about your

2  work experience since you got your doctorate?

3    A.  I have worked in Houston -- in Cy-Fair Independent

4  School District --

5       COURT REPORTER: I'm sorry? Cy --

6    A.  Cy-Fair -- Cypress-Fairbanks -- sorry -- in Houston.

7  I have also worked in Houston Independent School District and

8  had a multicultural -- multiculturally-based psychological post

9  doctoral residency there that focused on how to evaluate with a

10  multicultural focus, how to evaluate students, and intervene in

11  crises. And then I moved to Katy Independent School District

12  and was the lead psychologist on their autism and developmental

13  evaluation team in special ed. And then moved to Plano ISD

14  where I was the lead psychologist on their autism evaluation

15  team and specialty evaluation team. And then became a special

16  education coordinator for them. And I supervise all of the

17  psychologists, the specialists in school psychology there, and

18  the special education counselors, those who are in charge of

19  the most severe behavior disordered students -- emotionally

20  disordered students in the district and the classroom programs

21  for them.

22    Q.  And in that role are you responsible not only for

23  the daily operation of those -- of those duties, but also are

24  you in charge of all training and staff development in all of

25  those areas?

196

1    A.  Yes, sir.

2    Q.  Okay. And I had retained you for the purpose of

3  looking at a couple of rather narrow areas in regards to an

4  individual by the name of Gary Green; is that correct?

5    A.  Yes.

6    Q.  And in regards to Gary Green, I -- you were provided

7  with a -- not a lot, but the most -- or all the school records

8  that we could find that were in existence for Gary Green; is

9  that correct?

10    A.  Yes, sir.

11    Q.  And have you had an opportunity to review those

12  records?

13    A.  Yes.

14    Q.  And for purposes of the evaluation that I asked you

15  to perform in this case, you were not asked to interview the

16  Defendant, were you?

17    A.  No.

18    Q.  In fact, you were never even told what the Defendant

19  had actually done, were you?

20    A.  No, not at all.

21    Q.  When did you first learn about what the Defendant

22  had done?

23    A.  Last week.

24    Q.  Okay. And you saw that on TV, didn't you?

25    A.  Yes.

197

2  do, this is what you do on a daily basis, review a person's

3  records, review their academic performances, and try to see

4  whether or not they would be diagnostically suitable to be

5  placed in special education procedures; is that correct?

6     A.  That's right, that's right.

7     Q.  Okay.  And for purposes of testimony before this

8  jury today, do you -- are going to offer an opinion that the

9  Defendant is an individual that should have been diagnosed with

10  and developed as a candidate for special education and placed

11  in those -- in those procedures; is that right?

12     A.  Yes, he should have been looked at for a special

13  education evaluation.

14     Q.  Okay.  And I asked -- also asked you to -- as a

15  person with a doctorate in psychology and school psychology, if

16  you have opinions in relation to the actual cultural

17  distinction throughout the different classes of races; is that

18  right?

19     A.  Yes.

20     Q.  And you have received training not just in

21  psychology, but you have received actual specialized training

22  in the area of cultural diversity and cultural differences,

23  have you not?

24     A.  Yes, that's right.

25     Q.  You wrote a doctoral thesis in regards to specific

198

1  distinction between African-Americans' views on education, as

2  opposed to other cultures, correct?

3     A.  Yes, that's right.

4     Q.  And is that a -- is that a recognized area of study

5  and of dissertation, being that of cultural differences in

6  regards to not only schooling, school work, but of mental

7  illness and treatment and diagnosis of those mental illnesses?

8     A.  Yes.

9     Q.  And are you an expert in those areas?

10     A.  Yes.

11     Q.  I also asked you to -- if you had received training

12  and have knowledge in regards to the area of the distinctions

13  in regards to the recognition -- the diagnosis and treatment of

14  individuals by members of their family in regards to

15  individuals who may be suffering from mental illnesses or

16  disorders themselves; is that right?

17     A.  Yes.

18     Q.  And is this an area that -- that is known -- that is

19  studied and there's a great area of material in regards to that

20  issue?

21     A.  Yes, there is.

22     Q.  And are you an expert in those issues?

23     A.  Yes.

24     Q.  And are you here to offer an opinion in regards to

25  that?

199

2     Q.  And the opinion in regards to that is -- it sounds

3  like common sense, but the opinion you're going to offer is

4  that individuals that suffer from mental illnesses themselves

5  or within their family, that those individuals are less able or

6  unlikely to spot, to -- and seek out treatment for their loved

7  ones, correct?

8     A.  That's right.

9     Q.  And also the fact that in regards to the cultural

10  aspect, that the African-American community is much more

11  distrustful than other cultures and are less likely to

12  recognize and seek out treatment for individuals in the

13  African-American community that may be suffering from mental

14  diseases?

15     A.  That's right.

16     MR. JOHNSON:  And that is the nature of the

17  opinions, Your Honor.

18          CROSS-EXAMINATION

19  BY MR. BEACH:

20     Q.  Doctor, what are you basing your opinion on that Mr.

21  Green should have received a special ed evaluation?

22     A.  The only source of information that I had available

23  to me was his school records that were produced, his -- his

24  cumulative school records.

25     Q.  And do you have a copy of those today?

200

1     A.  I do, but not up here with me.

2     Q.  I just need you to walk me through specifically what

3  in his school records led you to believe that he would have

4  been a candidate for --

5     A.  An evaluation?

6     Q.  -- special ed evaluation.

7     A.  He had chronic school failure and underperformance,

8  below grade level performance, based on his elementary, middle

9  school, and high school records, with the exception of one year

10  and then also his performance in physical education and arts.

11  He seemed to do better in those areas, but -- but in his core

12  academic subjects, he -- on standardized testing, as well as

13  his report card grades, from elementary through --

14     MR. JOHNSON:  Excuse me, Judge.  I'm going to

15  object at this time.  It's outside the scope of the 705

16  hearing, under 705(b).  They're only -- they're only entitled

17  to ask the opinions and the underlying facts, not the

18  underlying reasoning behind the opinion.

19     THE COURT:  Well, why isn't her reasoning part

20  of the underlying facts, as the sufficient basis for the

21  experts' opinion?  If I can't understand what the reasoning is

22  behind her opinion -- aren't I supposed to consider that?

23     MR. JOHNSON:  No, sir.  The statement -- you're

24  allowed to consider it as far as the relevance of testimony.

25  The State's not entitled to go back through and ask for a

201

2    allows them to see the underlying data that she used.

3    THE COURT:  What says the State?

4    MR. BEACH:  The underlying data, Judge, is what

5    specifically in his school records leads her to the opinion

6    that he should have been a candidate.

7    MR. JOHNSON:  That's two steps, Judge.  There's

8    data, there's opinions, and then there's the information in

9    between, which is the subject of her testimony.  That's -- I'm

10   only required to show her -- to make them aware of the opinions

11   and make them have an opportunity to examine the data.  And

12   then they can -- if they wish to cross-examine, they can do so.

13   MR. BEACH:  I've got to --

14   THE COURT:  Directed to the underlying facts or

15   data --

16   MR. JOHNSON:  Correct.

17   THE COURT:  -- upon which their opinion is

18   based.  So what you're saying is --

19   MR. JOHNSON:  That's correct.

20   THE COURT:  -- technical reading only says what

21   facts or data is the opinion based, and the answer to that

22   would be test scores, right?

23   MR. BEACH:  Exactly.

24   MR. BEACH:  That's what --

25   MR. BEACH:  That's all I'm asking.  Test -- what

202

1    is she basing -- what'S the underlying facts or basis for her

2    opinions.

3    MR. JOHNSON:  She's already said his grades and

4    test scores that are reflected in the records.  We've --

5    they've got a copy of the records, we'll be glad to give them

6    another copy if they want it, but I mean, she's already

7    testified to what she used.

8    MR. BEACH:  I'm just trying to get the answer

9    out.

10   MR. JOHNSON:  Well, I understand, Judge, that

11   everybody wants what they want, but that's not the proper place

12   for it.  They do that -- that's what cross-examination is for.

13   THE COURT:  You don't think it would help your

14   expert to have her --

15   MR. JOHNSON:  Judge, I don't --

16   THE COURT:  -- give her a trial run at this

17   first?

18   MR. JOHNSON:  We don't need practice, Judge.

19   We're ready to offer testimony.

20   THE COURT:  Okay.  You know what the opinion is.

21   Next question.

22   Q.    (BY MR. BEACH)  Were you through telling me, Doctor,

23   what all the underlying facts and data were?

24   A.    Yes.

25   Q.    Test scores --

203

2    Q.    -- grades, and that's it?

3    A.    Yes.

4    Q.    And the second opinion is about -- specifically

5    about -- specifically the African-American culture is -- is

6    more hesitant to discuss mental health issues?

7    A.    Yes.

8    Q.    Therefore, more hesitant to seek out mental health

9    treatment?

10   A.    Yes, sir.

11   Q.    What is that based on?

12   A.    That's based on the fact that he did not receive any

13   treatment that was evident in his school records through the

14   school system for any kind of emotional or behavioral problems.

15   Q.    You're limiting your opinion to his school age

16   years?

17   A.    His school age years, that's right, sir.  That's

18   what I had access to.

19   Q.    So you have no opinion about that he would have been

20   more hesitant or his family would have been more hesitant to

21   have him seek out mental health treatment after the high school

22   years?

23   A.    That's right.  I have no opinion about that.

24   MR. BEACH:  That's all, Judge.

25   THE COURT:  Any objection to this witness

204

1    testifying?

2    MR. BEACH:  No, Your Honor.

3    THE COURT:  All right.

4    (Discussion off the record.)

5    THE BAILIFF:  All rise.

6    (Jury returned to courtroom.)

7    THE COURT:  Ma'am, if you would.

8    (Witness sworn.)

9    THE WITNESS:  Yes, I do.

10   THE COURT:  Please have a seat.  Please be

11   seated.

12   MR. JOHNSON:  May it please the Court.

13   (In the presence of the jury, defendant

14   present.)

15   DR. KELLIE GRAY-SMITH,

16   was called as a witness by the Defendant, and after having been

17   first duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. JOHNSON:

20   Q.    Will you state your name, please?

21   A.    Dr. Kellie Yvonne Gray-Smith.

22   Q.    Dr. Gray-Smith, can you tell the jury how it is that

23   you're employed, ma'am?

24   A.    I'm employed with Plano Independent School District

25   as a licensed specialist in school psychology, a licensed

2    Q.   How long have you been so employed?

3    A.   I've been employed with Plano ISD for almost eight

4  years.

5    Q.   Could you tell the jury about your background --

6  your educational experience first that has prepared you to hold

7  that position?

8    A.   Okay.  I completed my Bachelor's of Science at Texas

9  A&M in College Station, my Master's in school psychology at the

10  University of North Carolina at Chapel Hill, and my doctorate

11  in school psychology at the University of North Carolina at

12  Chapel Hill.  I then -- I then went on to do internships and

13  residency in Houston, Texas, starting at Cypress-Fairbanks

14  Independent School District and at Houston Independent School

15  District.  And at Houston Independent School District there was

16  a -- my focus was on the multicultural aspects of evaluation

17  and services, psychological services provided to students.  And

18  then moved from that -- and that was in crisis intervention and

19  -- and evaluation.

20         Moved out of that into Katy Independent School

21  District, and I was their lead psychologist on their specialty

22  evaluation team, primarily for students with significant

23  behavioral and emotional issues in autism.  And then went on to

24  Plano where I am now and started off as their lead psychologist

25  on their specialty evaluation team, primarily looking at

1  students with strong emotional behavioral concerns and

2  suspicions of autism -- kind of the spectrum -- and then became

3  the lead supervisor for all the psychologists and the licensed

4  specialists in school psychology, also the special education

5  counselors, the behavior specialists who work with the students

6  with the most severe emotional and behavioral problems,

7  providing training and programming for teachers who head up the

8  classrooms for students with the most severe emotional and

9  behavioral problems in the district, and special education

10  coordinator for Plano.

11    Q.   Could you tell the jury what it is you do on a daily

12  basis in regards to being the coordinator for the special

13  education in the Plano Independent School District?

14    A.   I train teachers, parents, I train staff members who

15  are specialists in -- in a variety of areas that I've already

16  talked about.  I work directly with programming for students.

17  When -- when teachers don't know what to do for a student who

18  has -- who has very severe emotional and behavioral problems

19  and their -- and their assigned school psychologist or

20  specialist in school psychology and behavior specialists,

21  counselors have not been able to provide them with effective

22  intervention ideas in programming, I step in and -- and assist

23  and provide that information.

24         I also on any given day will do evaluations --

25  again, the ones that are the most difficult or the most

2  education services.  I provide supervision to a variety of

3  different people who are seeking licensing through the State in

4  school psychology, and I also provide training directly to the

5  teams that I supervise on any given day.

6    Q.   You are responsible for actually the training and

7  supervision, the training coordinator for all -- anybody

8  involved in the entire school district in regards to

9  individuals with either learning or emotional and mental

10  disturbances; is that correct?

11    A.   That's right.

12    Q.   Okay.  Ms. Gray-Smith, you had mentioned earlier

13  that you have training in the multicultural aspects of

14  psychology; is that correct?

15    A.   That's right.

16    Q.   And are you talking about -- when you're talking

17  about multicultural, you're talking not just by -- by way of

18  race, but by socioeconomic and age differences and biases?

19    A.   That's right, language differences, age.

20    Q.   When we're talking about that, that's an actual area

21  of psychology all of its own, is it not?

22    A.   Yes, it is.  It's a -- it's a new area that is all

23  of its own, but it's been well studied.

24    Q.   Okay.  And you are an actual licensed practicing

25  psychologist in the state of Texas?

1    A.   Yes, I am.

2    Q.   Would you tell the jury what it is about the

3  cultural aspect of learning disabilities that might make sense

4  to them in regards to is there a difference between the way

5  different races handle both learning disabilities and emotional

6  disturbances?

7    A.   Yes, there is.  Research has -- has shown that there

8  are different learning styles across many different cultures.

9  And the perceptions of the differences that -- that children

10  show and how they learn, how they behave, how they manage their

11  emotions, how they relate to others socially, and -- and

12  that -- those differences lead to -- in terms of -- for

13  example, African-American -- the African-American community,

14  lead to differences in seeking treatment, seeking a diagnosis

15  for those -- those differences, those behavior problems, and --

16  and what -- and most cases, the African-American community

17  seeking less treatment and seeking out mental health support

18  for those differences, far less than other cultures do.

19    Q.   Could you tell -- could you tell the jury, if you

20  could briefly, what are the reasons that the -- that the actual

21  seeking out of treatment and mental health services, why that

22  is kind of looked down upon in the African-American community?

23    A.   There are a couple of different factors involved.

24  The first is just a lack of awareness, a lack of understanding

25  about what it is, misperceiving it as bad behavior, as problems

**209**

2   in the home, without seeking professional help.

3           Other factors include, again, mis --

4   misperception of the treatment that -- that would be effective

5   for it, thinking that the treatments are -- are more harmful

6   than helpful, are not appropriate for their needs, their

7   cultural lifestyle. And then also, just a distrust of mental

8   health practitioners, mental health professionals. And in some

9   ways grouping mental health professionals with medical

10  professionals and there's -- there is evidence that there's a

11  distrust in general of medical -- some types of medical

12  treatments and mental health treatments, especially that it's

13  not for them, it's -- that, you know, for lack of a better way

14  of saying it, you know, that black people don't commit suicide,

15  black people don't get depressed, black people don't -- you

16  know, that it's -- it's a misunderstanding and kind of a

17  normalization of those kinds of behaviors and those kinds of

18  symptoms.

19      Q.   Is it -- is it a known fact in your area of

20  expertise, ma'am, that oftentimes that the black people or

21  African-Americans perceive these things -- these mental

22  illnesses or the symptomologies of mental illness as just bad

23  behaviors and something that's just somewhat normal in that

24  community?

25      A.   That it's -- it's -- it's bad behavior, and that

**210**

1   it's not rising to the level of needing professional treatment

2   or professional care, that there are treatments that are

3   available. The treatments that are most often talked about are

4   medication, and there's a distrust of what that medication will

5   do, that it will be effective or that it will cause more harm

6   than good, especially for children. And so there's a -- just a

7   blanket lack of access or seeking the treatment that is

8   available.

9       Q.   What about the role of the fear of a stigma attached

10  to somebody that receives mental health treatment?

11      A.   That's huge. That's seen across -- across cultures

12  to some degree, but especially in the African-American culture,

13  and the African-American communities that students who are

14  labeled will then have another disadvantage -- especially black

15  males will have another kind of mark against them when they are

16  trying to seek employment or trying to seek other

17  opportunities, that they're going to be seen as crazy, or even

18  worse than they really are, that they don't warrant that kind

19  of stigmatization.

20      Q.   Does this -- is this feeling or these beliefs, have

21  you -- have you found in the study and the literature involved,

22  are these things that are kind of perpetuated by the leaders in

23  the black community?

24      A.   To some degree, yes, definitely. Especially in the

25  church. In the black community, the church is -- is looked to

**211**

2   information about a variety of things and how to treat problems

3   in the family, how to treat medical conditions, and definitely

4   how to -- how children -- how children can receive help in

5   school.

6           And I've been in churches, not just my own, but

7   visiting churches even, where I've heard the pastor say, you

8   know, don't let them medicate your child, don't let them in

9   special ed, don't let that happen to them. You can -- there

10  are other ways to get help for your kids. You know, spare the

11  rod, spoil the child. And they -- they can pray about it.

12  There's all kinds of ways outside of going through that formal

13  process which in some -- in some cases is viewed as a negative

14  thing. So they're being discouraged -- actively discouraged

15  from seeking treatment, seeking help in that avenue.

16      Q.   Dr. Gray-Smith, in the -- in your training and your

17  experience, is there also a -- is there a strong and proven

18  genetic and hereditary link between individuals passing on

19  traits and symptomologies of mental illness and emotional

20  behaviors?

21      A.   Yes, the research is becoming very clear about that,

22  that there are -- among environmental factors, there are

23  genetic factors, genetic links for many mental illnesses.

24      Q.   Okay. And is there also in regards to -- when you

25  talked a moment ago about the cultural aspect of failing to

**212**

1   seek out treatment, is there -- when there is a hereditary link

2   within a family of individuals that suffer from varying forms

3   of mental illness, do you see in those types of situations a

4   failure to seek out treatment, as well?

5       A.   Oftentimes, yes, because it's -- the behaviors, the

6   symptoms aren't recognized as being pathological or -- or

7   problematic. They are seen as normal, as part of what the

8   family is and how the family solves problems and copes with

9   stressors and handles situations. It's just what -- you know,

10  it's not identified as something atypical for most people of

11  that age or of that gender, so it's -- it's -- it's not that

12  it's minimized, it's just normalized oftentimes. When someone

13  has a mental illness, their judgment and their reasoning is

14  often impacted by that mental illness and -- and so there's a

15  deficit there, as well.

16      Q.   Okay. So in situations -- and particularly more

17  sensitive in the African-American community, if someone is

18  suffering from either an emotional disturbance or a mental

19  illness, with those cultural and those hereditary or genetic

20  factors, when they come together, does that, in fact, in some

21  ways self perpetuate the problem?

22      A.   It can. It definitely can. It's -- when you put

23  multiple risk factors in -- in one situation, you oftentimes

24  find that what should happen doesn't happen. And -- and that

25  -- once that -- the case for lack of access for treatment, lack

213

2 symptoms or behaviors, would be altered or -- or impaired. And
3 -- and then that can definitely impact how -- how those
4 symptoms are perpetuated or reinforced even if it's
5 unintentional.
6     Q. And, Doctor, the two areas that we just spoke about,
7 both cultural and the hereditary aspects, are these things that
8 you are -- you use or that you are confronted with on a daily
9 basis?
10     A. Definitely, yes. We -- for that very reason in
11 special ed we provide a related service that's called in home
12 and -- in home and community based training and parent and
13 family training. And that's to help families understand how
14 they can address mental illnesses for their children who are in
15 the public school system and in the private school system
16 actually. We provide services to them, too. But how they can
17 address those issues in the home, in a therapeutic and in an
18 adaptive way so they're not enforcing the unwanted problematic
19 difficult behaviors, but they are, in fact, minimizing those
20 and helping their children learn how to cope and problem solve
21 and have better social skills, better self care skills.
22     Q. And could you tell the jury how important it is
23 to -- to diagnose and detect these things early to begin a plan
24 of intervention?
25     A. Early intervention, just like with medical

214

1 conditions is -- is definitely critical in treating mental
2 illness. Secondary illnesses, secondary conditions, can
3 surface when a primary condition is not -- is not addressed
4 properly. And early intervention helps us or gives us the
5 opportunity to prevent those secondary conditions from
6 developing, and also gives us the opportunity to get in and
7 minimize the negative effects of the primary condition, to
8 teach social skills and problem solving and coping skills and
9 how to work with or compensate for that impairment. And we can
10 do that from an early age.
11     In the public schools, I'm on teams where we
12 evaluate and diagnose and intervene early -- as early as three
13 years old, so we start really young if we can.
14     Q. Okay. And, Doctor, when we're talking about -- and
15 you use the term "special education;" most people think of
16 special education as simply taking people that have a learning
17 disability and working with them. You -- that's the perception
18 of special education, isn't it?
19     A. Yes.
20     Q. And, in fact, would you tell the jury what the three
21 areas that special education is -- is designed to deal with?
22     A. Education -- special education is -- is definitely
23 one avenue that would address learning disabilities, but it
24 also is designed to address emotional or behavioral and social
25 problems that kids have. Some of the students that I work with

215

1 mean, they are well above grade level, have superior I.Q.'s,
2 are in the gifted classrooms, but they don't know how to relate
3 socially and/or they have behaviors and/or they have behaviors
4 that are very difficult and interfere with their learning and
5 the learning of others.
6     So they have the -- they have the cognitive
7 potential and -- and more than other kids their age, but we are
8 charged by law to address all three areas. And if there's a
9 problem -- a significant problem in any one of those three
10 areas, then we are -- we are charged to look at special
11 education as a way to support those students and -- and help
12 them remedy those issues and progress through school.
13     Q. And, Doctor, what is -- what are the risks of --
14 let's -- let's say the example you just gave, that you have a
15 kid that's doing well in school, that doesn't have a learning
16 disability or an academic problem, what are the risks that are
17 known to be associated with failing to address the social and
18 behavioral aspects of -- of special education needs?
19     MR. BEACH: Objection. These are opinions that
20 were not gone into in the 705 hearing and we're talking about
21 two opinions and I haven't heard either one of them yet.
22     MR. JOHNSON: Judge, this is -- this right here
23 is just a basis of the -- basis of the opinions that she's
24 going to give. She's not giving specific opinions. She's --

216

1 at this point she's just educating the jury to explain to them
2 so that her later opinion will make sense. This is -- this is
3 the background or the mid part that we talked about awhile ago.
4 This is the basis of what she -- her opinion states. The State
5 can cross-examine on it all they want.
6     THE COURT: Well --
7     MR. BEACH: I'll withdraw it, Judge, if we can
8 just get to her opinions.
9     THE COURT: Okay. Can we move it along just a
10 little bit?
11     MR. JOHNSON: I'm trying, Judge.
12     Q. (BY MR. JOHNSON) Ms. Gray-Smith, go ahead, you can
13 answer that question. Can you tell the jury what is -- what --
14 what kind of problems can be avoided or what type of behaviors
15 are commonly and expected to be seen in people who don't have
16 their social behavioral problems looked at?
17     A. Definitely difficulty relating to peers, difficulty
18 relating to adults, poor problem solving skills, not knowing
19 how to solve basic problems, or using aggression to solve
20 problems, difficulty with stressors that are -- you know,
21 everyday stressors. They typically start to see themselves
22 differently than others. Low self esteem. They start to
23 isolate themselves because they typically are unsuccessful
24 maintaining or even initiate -- or initiating friendships
25 and -- and making those last, so that they feel supported. So

217

2      They're at risk for developing -- for having
3  those issues escalate so that they develop depression or
4  anxiety that they may not have developed otherwise. They also
5  are at risk for -- for being dropouts -- high school dropouts,
6  not completing school, although they academically have the
7  potential to do that. And if that's the case, that leads to
8  being underprepared and unprepared for contributing to their
9  communities.
10     Q.  Okay. And, Doctor, in your training, your
11 experience, and on your daily basis, you don't -- we're not
12 just talking about people that have just slight emotional
13 problems or mental illnesses. You are -- you are called on a
14 daily basis to deal with individuals in the school districts
15 who suffer from even the full spectrum of mental disease and
16 mental illness; is that correct?
17     A.  That's right. We diagnose -- I diagnose and work
18 with students and teachers who teach students who have
19 schizophrenia, who are actively psychotic and hallucinating,
20 who have autism, severe and profound mental retardation, some
21 medical conditions that have secondary emotional disturbances
22 associated with it. Some who have conduct disorder, which is
23 not an emotionally-based problem, more of a personality
24 disorder, but if a child at adolescent level --
25     Q.  Without -- without proper treatment of these

218

1  different emotional issues, these mental illnesses, what --
2  what kind of behaviors are commonly associated with that later
3  in life?
4      A.  I'm sorry, can you repeat that?
5      Q.  What kind of behaviors and expectations do you have
6  of an individual that goes through a course of his life without
7  treating any of these -- any of these issues?
8      A.  The prognosis is very poor. It's very, very poor if
9  there's not -- if there's not any effective intervention
10 throughout the course of, at least the school career.
11     Q.  Does it seem to affect their abilities in regards to
12 employment?
13     A.  Definitely. Because of the lack of -- of age
14 appropriate social skills which are desperately needed on any
15 job, you have to relate to people, you have to solve problems,
16 however minor, and if they don't have those skill sets to get
17 through the day-to-day stressors of a job, they typically are
18 un -- unable or -- or lack the skills to be able to keep that
19 job. And so you see a lot of job turnover, underemployment,
20 unemployment, and not a stable career path that -- that they
21 can access, difficulty with relationships in the family,
22 difficulty with relationships with friends, people in their
23 neighborhood.
24     Q.  Okay. Doctor, in regards to what we asked you -- or
25 I asked you to come down here and explain to this jury today,

219

1  we asked you to review some of his actual school records; an individual
2  and review those for me, didn't I?
3      A.  Yes. Yes, you did.
4      Q.  Okay. And in particular, I told you really it
5  wasn't relevant as to what the individual had done.
6      A.  That's right. I didn't know.
7      Q.  And, in fact, you didn't even know what this
8  individual had done until last week, did you?
9      A.  That's right.
10     Q.  How did you find out last week what the person had
11 done?
12     A.  TV.
13     Q.  You saw it on the TV?
14     A.  Yes.
15     Q.  Did you have an occasion to examine and review all
16 of these school records that we could find for an individual
17 that you know to be Gary Green?
18     A.  That's right. Yes, I did.
19     Q.  I -- back that up. It's the person that I told you
20 was Gary Green; is that correct?
21     A.  That's right.
22     Q.  You don't know the fellow sitting down here at the
23 end of the table, do you?
24     A.  No, never met him.
25     Q.  Dr. Gray-Smith, I want to show you what's marked for

220

1  identification purposes as Defendant's Exhibit Number 3, and
2  I'm going to ask you to review that document and tell me if you
3  recognize it.
4      A.  Yes. This is -- this is what I received to review,
5  the school records.
6      Q.  Okay. And there's not a whole lot to it, is there?
7      A.  Not at all.
8      Q.  From a subpoena, that's all the school records they
9  could locate on the schooling history of a person that you know
10 as Gary -- or believe to be Gary Green, correct?
11     A.  That's right.
12         MR. JOHNSON:  Your Honor, we're going to offer
13 Defendant's Exhibit 3 at this time.
14         (Defendant's Exhibit 3 offered.)
15         MR. BEACH:  No objection.
16         THE COURT:  It's admitted.
17         (Defendant's Exhibit 3 admitted.)
18     Q.  (BY MR. JOHNSON) Dr. Gray-Smith, for purposes of
19 what I've asked you to do and for the opinions that I've asked
20 you and the information I've asked you to come down and provide
21 to this jury, was it necessary for you to conduct any kind of
22 an actual face-to-face interview of the person?
23     A.  No, not at all.
24     Q.  And is that what you do on a daily basis?
25     A.  Yes.

221

2  academic failures, is the -- is the problem -- when you have a
3  chronic academic failure, is the problem going to be either
4  located in a learning disability or an emotional or mental
5  disturbance?
6      A.  Yes.
7      Q.  Could you describe how it is that those -- it's one
8  of those two components that are going to lead to that chronic
9  failure?
10         MR. BEACH:  Judge, we didn't hear any of this in
11 the 705 hearing.  She had two opinions.
12         THE COURT:  I know, just --
13         MR. BEACH:  I'm going to object.  This is
14 outside the scope of the 705 hearing, the opinions that were
15 elicited that were going to be presented to this jury.
16         MR. JOHNSON:  I'll go to the opinion first and
17 come back to it, Judge, if that would be easier.
18         THE COURT:  That would be better.
19         MR. JOHNSON:  Okay.
20     Q.  (BY MR. JOHNSON)  Doctor, let me ask you this.
21 Could you tell the jury from your review of the academic
22 records that you have before you, whether or not that person
23 was successful as a student throughout the history of him in --
24 in formal education?
25     A.  I would not describe this student as being

222

1  successful.  There appears to be evidence of chronic school
2  failure, starting early on in elementary school in the core
3  academic subjects that went on throughout middle school and
4  high school, with the exception of one -- one grade in high
5  school where there was -- where there was what I would consider
6  to be academic progress at grade level academic success.
7      Q.  Okay.  And was there a correlation between that one
8  particular year that seems to document academic progress and in
9  any particular event in that student's lifetime?
10     A.  Well, what I noticed was in the 9th grade year,
11 based on these records -- in the 9th grade year, there was --
12 the student achieved B's and high C's, and in athletic
13 football, 100, for that entire school year.  And that was very
14 different from all the years prior and the year after.
15     Q.  So the year -- so the year that he was on the
16 football team, his grades were all of a sudden -- all of a
17 sudden he started passing everything?
18     A.  Yes.
19     Q.  Let me ask you this, Doctor.  In your professional
20 knowledge and experience, is it unusual to have that type of
21 social promotion or the movement of an individual that may be
22 on -- be an athlete?
23         MR. BEACH:  Again, Judge, this is outside the
24 scope of the 705 hearing.  It's speculation.
25         MR. JOHNSON:  It goes to the opinion, Judge.

223

2          THE COURT:  Okay.  All right.  I get the
3  objection on this, but -- we can have a hearing and then she
4  will disclose, but I know where he's going.  You know where
5  he's going.  You know what the answer -- everyone knows what
6  the answer is going to be.  So go ahead and ask the question
7  and give the answer.
8      A.  Okay.  Can you repeat?
9      Q.  (BY MR. JOHNSON)  It's not unusual at all when an
10 individual is put on a football team or the track team and all
11 of a sudden, the teacher's going to perceive them and the
12 grades are going to improve?
13     A.  It's not supposed to happen, but it does happen.
14     Q.  Okay.
15     A.  Yeah.
16     Q.  And, again, on the review of these records right
17 here, how would you characterize the academic failure that you
18 have seen in the records that are before you?
19     A.  I characterize them as chronic, pervasive, alarming.
20 I don't -- I wouldn't in my role with the school district that
21 I work in, I would -- I would not expect that this kind of
22 failure would go unaddressed based on the records and there not
23 being any other -- any other record to show that they were
24 addressed through a special education evaluation.  When I
25 receive records that look like this, we immediately think about

224

1  there being some type of problem because it started so early,
2  some type of problem that needs to be evaluated.  And it may be
3  that -- that that evaluation provides, you know, the
4  understanding that we need on how to help.
5      Q.  And in your -- in your training and your experience
6  and your area of expertise, the chronic failure is going to be
7  due to either learning disability or emotional, mental problem?
8      A.  That's right.  And -- and special ed, those are the
9  two broad areas that we look -- that we would consider.
10     Q.  As a review of those grades could tell you, can
11 you -- can you give this jury an estimate of the percentile
12 that that individual would fall under in regards to these
13 normal -- both age and grade expectations?
14     A.  In the core academic areas, he definitely appears to
15 be, in the lowest percentile, the lowest ten percent of what we
16 would expect for students his age, looking at how he performed
17 across many different grade levels.
18     Q.  And, Dr. Gray-Smith, I met with you, I think, a week
19 or two ago or maybe just last week after we had spoken on the
20 phone a few times and talked about this.  And, again, I
21 didn't -- as far as I was aware, you didn't even know of the
22 nature of what this was all about, did you?
23     A.  No, I didn't.
24     Q.  Okay.  Does the -- does the fact of what this is all
25 about, does that change in any way any of the opinions and the

225

2    A.   No, it doesn't.

3    Q.   When we talked about this and I brought up the

4  factor to you in regards to the fact that the person's mother

5  that -- of this individual reflected in those school records

6  thought that that child had done fairly well in school, made

7  pretty average grades, and graduated from high school, what was

8  your thoughts when I told that you?

9    A.   I was surprised.  Very surprised.  I couldn't see

10  how looking at these records would lead to that understanding

11  or that perception.

12    Q.   Okay.  And, again, if -- with a failure to diagnose

13  and try to seek out whether this chronic failure was due to

14  either an academic disability -- learning disability or a

15  mental illness or mental disturbance, all of those things that

16  you said would be possible, perpetual -- in fact, somewhat

17  expected of an individual, those things -- it wouldn't surprise

18  you at all, would it?

19    A.   No, not at all.

20    Q.   Doctor, that's all the questions I have, ma'am.

21  Thank you.

22              CROSS-EXAMINATION

23  BY MR. BEACH:

24    Q.   Doctor --

25          MR. BEACH:  I'm sorry, Judge.

226

1    Q.   (BY MR. BEACH)  Doctor, where were you in 1985 and

2  '86 and 87?

3    A.   I was in school.

4    Q.   Okay.  And are you using today standards in terms of

5  giving your opinions as to that Gary Green might have been a

6  candidate for special ed?

7    A.   No, I'm not.  The law that I'm -- that I'm

8  referencing is the Education Law of Handicapped Children law

9  that was enacted in 1975.

10    Q.   So the same standards apply then as they do today?

11    A.   They've been more refined and now they're better

12  articulated, but the same general mandates were -- were in

13  place when that law became enacted.

14    Q.   And you're not here to tell this jury, Doctor, that

15  Gary Green had a mental illness when he was in third grade or

16  fifth grade?

17    A.   I don't know that, no, I'm not.

18    Q.   You don't know if Gary Green was out smoking

19  marijuana during the day, not going to class, not making the

20  effort; is that correct?

21    A.   That's right.  I don't know that.

22    Q.   You do know -- like you said, in the 9th grade he

23  was making 80's and 89's in -- in math that he -- he passed his

24  scale score test out data, was passing for math and reading; is

25  that correct?

227

2    Q.   And you don't know if he was the third string water

3  boy or the star quarterback --

4    A.   I have no idea.

5    Q.   -- so whether or not he was on the football team in

6  9th grade when he was making his 80's and 90's, you have no

7  idea?

8    A.   It says athletic football, so that's what I'm going

9  on, that he participated in athletic football during that year.

10    Q.   You talked about one of the behavioral issues that

11  you deal with on a daily basis is something called conduct

12  disorder; is that correct?

13    A.   That's right.

14    Q.   And that's a personality disorder?

15    A.   For -- for an adolescent, it's considered a

16  personality disorder -- a behavioral disorder --

17    Q.   I'm sorry?

18    A.   A behavioral disorder rather than emotional.

19    Q.   A kid that's constantly skipping school, getting in

20  trouble, ending up in juvie?

21    A.   Yes.

22    Q.   That's what you're talking about when you talk about

23  conduct disorder?

24    A.   Yes.  Sometimes they don't make it to juvie, but

25  they do -- they have disrespect of authority, lack of empathy,

228

1  lack of consideration of others, violation of school rules;

2  that's what we see.

3    Q.   The little fellow, they saw him last week, little

4  Jerrett.  He just got done doing a 30-day stint in alternative

5  school.  I mean, that's -- I mean, if you act up in class or

6  violate one of their rules or punch one of the classmates,

7  that's something that can happen; is that correct?

8    A.   It could be that that person has conduct disorder.

9    Q.   And conduct disorder is kind of the precursor, if it

10  continues, to antisocial personality disorder; is that correct?

11    A.   That's right.

12    Q.   And antisocial personality disorder, we used to call

13  those people sociopaths?

14    A.   That's right.

15    Q.   People with very little conscience, remorse --

16    A.   That's right.

17    Q.   -- respect for the rights of others?

18    A.   That's right.

19    Q.   And you deal with men and women, young boys and

20  girls that have that disorder on a daily basis; is that

21  correct?

22    A.   Yes, it's -- the kids that I deal with, because

23  they're in special ed, conduct disorder is not an eligibility

24  category for special ed.  The kids that I deal with and in many

25  kids with conduct disorder have a mixed presentation so they

229

2  component, or ADHD or whatever it is, and also those conduct
3  issues, so I deal with kids who have a mixed presentation,
4  usually. If they have just conduct disorder and that's it,
5  they would not be in special ed and I wouldn't deal with them.
6      Q. And finally, Doctor, you do deal with -- in your job
7  with young boys and girls, men and women who have serious
8  mental illnesses?
9      A. Definitely, yes.
10      Q. I mean, schizophrenia?
11      A. Yes.
12      Q. Bipolar disease?
13      A. Yes.
14      Q. I mean, diagnosed serious mental illnesses that
15  require treatment, medication --
16      A. Hospitalization sometimes.
17      Q. Hospitalization, the whole works?
18      A. That's right.
19      Q. And that surfaces in early teen years?
20      A. Early child -- child school age. Sometimes,
21  especially nowadays, it's being -- especially bipolar disorder
22  and schizophrenia being diagnosed earlier, but on average,
23  probably middle school years, 5th grade to 8th grade.
24      Q. And finally, for the second time, you're not telling
25  these folks that if they went to Metrocare Services or

230

1  Timberlawn on any day of the week, they wouldn't find
2  individuals of all races in those facilities? You're not
3  telling them that, would you?
4      A. No, I'm not.
5      Q. You're going to find African Americans, whites,
6  Hispanics, Asian-Americans, the whole gamut of people who have
7  sought out and received mental illness treatment?
8      A. It's very possible.
9      MR. BEACH: That's all I have, Judge.
10              REDIRECT EXAMINATION
11  BY MR. JOHNSON:
12      Q. Dr. Gray-Smith, what -- the facts that Mr. Beach
13  just asked you about, these different -- he went through a
14  spectrum of different mental disorders and behavioral
15  disorders, and when you talked about that, you said that you
16  often deal with what you're terming a mixed presentation. Will
17  you tell the jury what you're talking about when you say a
18  mixed presentation?
19      A. Yes. We call -- the clinical term is "comorbid".
20  You can -- it's -- it's rarely the case that a person with
21  mental illness has just one thing -- one condition. There are
22  symptoms that are overlapping. And on any -- with any student
23  or child that I work with up through 21 years of age, by the
24  time they get to be in their older childhood adolescent years,
25  they've often had multiple diagnoses. They have behaviors that

231

1  indicated earlier or behaviors that have become really
2  ingrained. And if left untreated, especially if we can get to
3  them early enough, a lot of those behavior problems like the
4  disrespect, the poor social skills, the -- the aggression, the
5  verbal or physical aggression, those things oftentimes look
6  like conduct disorder. And so they had that -- they have that
7  -- that label, in addition to depression or ADHD or bipolar
8  disorder, those clinical diagnoses, they also have some of
9  those same exact symptoms -- those same behaviors.
10      Q. So you're talking about -- when you're talking about
11  a mixed presentation, you're talking about an actual -- what
12  we'll call an Axis I diagnosis of an actual mental illness?
13      A. Yes.
14      Q. With an Axis II diagnosis of a behavioral disorder?
15      A. That's right.
16      Q. And you said just a moment ago that it's very
17  uncommon to see an individual present themselves with -- with
18  just one or the other. There's usually some type of a
19  combination of the two?
20      A. When we're talking about those kinds of mental
21  illnesses, yes.
22      Q. Okay. And the -- finally, you said that the -- left
23  untreated, these things perpetuate and they worsen, do they
24  not?
25      A. They do.

232

1      Q. Can you tell the jury why that is?
2      A. Because the appropriate skills to compensate for
3  those conditions are not learned, and so those -- those
4  symptoms shape the behaviors that we see in children. They
5  shape how they relate to other people. Those symptoms kind of
6  -- that's where their social skills are filtered through, and
7  they don't have any other recourse, so we see them get worse.
8  We see one problem turn into two. The -- the inability to
9  relate to others in an effective way makes them feel isolated
10  or leads them to be isolated and rejected by their peers, to
11  perform poorly in the classroom because of the acting out
12  behaviors or the withdrawn behaviors, shutting down.
13      So they typically don't perform very well, even
14  if they have the cognitive and academic potential to do so.
15  And that failure -- that sense of failure or difference between
16  themselves and others -- and the other peers who are more
17  typically developing, reinforces the feelings of isolation, low
18  self-esteem, not being good enough. And so there -- there
19  sometimes is resentment towards those who are successful.
20  There sometimes is just a need to withdraw and pull away.
21  There is sometimes a need to lash out and act out to get
22  attention because they don't know how to get attention any
23  other way. So those problems that are left untreated -- and
24  when I say untreated, untreated through medication and also
25  untreated through the behavioral component where we teach them

2    differently, how to solve problems differently. They lead to,

3    as the kids get older, more severe ways of doing those things.

4    So they -- their behaviors escalate with their age and how

5    they -- they kind of act out.

6        Q.  Does one failure build upon another and the next?

7        A.  Yes, oftentimes.

8           MR. JOHNSON:  That's all I have, Doctor.  Thank

9    you.

10                 RECROSS-EXAMINATION

11   BY MR. BEACH:

12        Q.  Any chance we can get you to come down to DISD?

13        A.  I'm very happy where I am.

14        Q.  Okay.  All right.  That's all I have.

15           THE COURT:  Thank you, ma'am.  You are -- you

16   are excused.

17           Ladies and gentlemen, that will do it for the

18   day.  We'll start back tomorrow morning at 9:30.  If they're

19   not ready tomorrow --

20           THE BAILIFF:  All rise.

21           (Recess of proceedings.)

22

23

24

25

234

1               Reporter's Certificate

2   THE STATE OF TEXAS:

3   COUNTY OF DALLAS:

4      I, Darline King LaBar, Deputy Official Court Reporter in

5   and for the 282nd District Court of Dallas County, State of

6   Texas, do hereby certify that the above and foregoing volume

7   constitutes a true, complete and correct transcription of all

8   portions of evidence and other proceedings requested in writing

9   by counsel for the parties to be included in the Reporter's

10   Record, in the above-styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by me.

12      I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15      WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 15th day of March, A.D., 2011,

17

18

19

20          DARLINE KING LABAR
             Official Court Reporter

21             363rd Judicial District Court
             Dallas County, Texas

22             hpdkfaith8msn.com
             (214) 653-5893

23

24         Certificate No:  1064

25     Expiration Date:  12/31/2012