1          REPORTER'S RECORD

2        VOLUME 52 OF 57 VOLUMES

3

4     TRIAL COURT CAUSE NO. F09-59380-S

5         CASE NO. AP-76,458

6

7  THE STATE OF TEXAS          :          IN THE 282ND JUDICIAL

8  VS.                         :          DISTRICT COURT OF

9  GARY GREEN                  :          DALLAS COUNTY, TEXAS

10

11

12              **PUNISHMENT PHASE BY JURY**

13

14

15

16

17

18              * * * * * * * * * * *

19

20      On the 4th day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

```
 1  A P P E A R A N C E S:

 2


 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
         Frank Crowley Criminal Courts Building
 4       Dallas, Dallas County, Texas 75207
         Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409
          MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
 8        MS. LISA BRAXTON-SMITH, A.D.A., SBOT # 00787131

 9
                              FOR THE STATE OF TEXAS;
10

11

12

13

14

15
    MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
16       311 N. Market Street, Suite 300
         Dallas, Texas 75202-1846
17       Phone:  214-761-0707

18  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
         3300 Oak Lawn Avenue, Suite 600
19       Dallas, Texas 75219
         Phone:  214-559-9115
20
    MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
21       3838 Oak Lawn Avenue, Suite 1350
         Dallas, Texas 75219
22       Phone:  214-651-6250

23

24                            FOR THE DEFENDANT.

25
```

Darline King LaBar, Official Reporter

```
1                    INDEX VOLUME 52

2               (PUNISHMENT PHASE BY JURY)

3  November 4th, 2010                        PAGE  VOL.

4  Proceedings...................................... 5    52

5  DEFENSE WITNESSES  DIRECT        CROSS      VD       VOL.

6  GILBERT MARTINEZ    5, 107, 122   67, 121           52

7  NYSASNO CARTER    126, 156       146, 158           52

8  GARY GREEN        159                              52

9  State Rests...................................... 178   52

10 Defense Closes................................... 178   52

11 State Closes..................................... 178   52

12 Reporter's Certificate........................... 182   52

13

14              ALPHABETICAL WITNESS INDEX

15               DIRECT        CROSS      VD          VOL.

16 NYSASNO CARTER    126, 156       146, 158           52

17 GARY GREEN        159                              52

18 GILBERT MARTINEZ    5, 107, 122   67, 121           52

19

20                   EXHIBIT INDEX

21 STATE'S                OFFERED     ADMITTED     VOL.

22 148A    Letter Excerpt      177         177        52

23 148B    Letter Excerpt      177         177        52

24 161     Dr. Martinez Test    77          78        48

25 162     Dr. Martinez Test    77          78        48
```

Darline King LaBar, Official Reporter

| | | | | | |
|---|---|---|---|---|---|
| 1 | 163 | Dr. Martinez Test | 77 | 77 | 52 |
| 2 | 164 | Trails A Test | 77 | 77 | 52 |
| 3 | 165 | Trails B Test | 77 | 77 | 52 |
| 4 | 166 | Dr. Goodness Documents | 96 | 96 | 52 |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
1                        REPORTER'S RECORD

2                   VOLUME 52 OF 57 VOLUMES

3

4            TRIAL COURT CAUSE NO. F09-59380-S

5                    CASE NO. AP-76,458

6

7   THE STATE OF TEXAS        :        IN THE 282ND JUDICIAL

8   VS.                       :        DISTRICT COURT OF

9   GARY GREEN                :        DALLAS COUNTY, TEXAS

10

11

12              PUNISHMENT PHASE BY JURY

13

14

15

16

17

18                   ...........

19

20        On the 4th day of November, 2010, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable Andy Chatham, Judge

23   Presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand computer

25   assisted transcription.
```

INDEX VOLUME 52

(PUNISHMENT PHASE BY JURY)

November 4th, 2010                          PAGE  VOL.

Proceedings.......................................... 5  52

DEFENSE WITNESSES  DIRECT      CROSS      VD     VOL.

GILBERT MARTINEZ    5, 107, 122   67, 121           52

NYSASNO CARTER      126, 156      146, 158          52

GARY GREEN          159                             52

State Rests......................................... 178  52

Defense Closes...................................... 178  52

State Closes........................................ 178  52

Reporter's Certificate.............................. 182  52


        ALPHABETICAL WITNESS INDEX

              DIRECT      CROSS      VD     VOL.

NYSASNO CARTER    126, 156      146, 158            52

GARY GREEN        159                               52

GILBERT MARTINEZ  5, 107, 122   67, 121             52


        EXHIBIT INDEX

STATE'S              OFFERED      ADMITTED      VOL.

148A  Letter Excerpt      177         177        52

148B  Letter Excerpt      177         177        52

161   Dr. Martinez Test    77          78        48

162   Dr. Martinez Test    77          78        48

163   Dr. Martinez Test    77          77        52

164   Trails A Test        77          77        52

165   Trails B Test        77          77        52

166   Dr. Goodness Documents 96         96        52

```
1   A P P E A R A N C E S:

2

3   HONORABLE CRAIG WATKINS, Criminal District Attorney
       Frank Crowley Criminal Courts Building
4      Dallas, Dallas County, Texas 75207
       Phone: 214-653-3600
5
    BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
         MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409
         MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
8        MS. LISA BRAXTON-SMITH, A.D.A., SBOT # 00787131

9

10                 FOR THE STATE OF TEXAS;

11

12

13

14

15
    MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
16      311 N. Market Street, Suite 300
        Dallas, Texas 75202-1846
17      Phone: 214-761-0707

18  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
        3300 Oak Lawn Avenue, Suite 600
19      Dallas, Texas 75219
        Phone: 214-559-9115
20
    MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
21      3838 Oak Lawn Avenue, Suite 1350
        Dallas, Texas 75219
22      Phone: 214-651-6250

23

24                 FOR THE DEFENDANT.

25
```

**5**

1         P R O C E E D I N G S

2         THE COURT:  Everybody ready?

3         MR. BEACH:  Yes.

4         MR. JOHNSON:  Yes, Judge.

5         (Discussion off the record.)

6         THE COURT:  No.  Bring them in.  We'll take them

7    after you're done.

8         MR. JOHNSON:  Okay.

9         THE COURT:  Yeah, bring them in.

10        THE BAILIFF:  All rise.

11        (Jury returned to courtroom.)

12        THE COURT:  Thank you all.  Please be seated.

13        Please call your next witness.

14        MR. JOHNSON:  Call Dr. Gilbert Martinez.

15        THE COURT:  Doctor, if you would.

16        (Witness brought forward and sworn.)

17        THE COURT:  Please have a seat.

18        THE WITNESS:  Thank you.

19             GILBERT MARTINEZ,

20   was called as a witness by the Defendant, and after having been

21   first duly sworn, testified as follows:

22             DIRECT EXAMINATION

23   BY MR. JOHNSON:

24        Q.   Would you state your name, please.

25        A.   My name is Dr. Gilbert Martinez.

**6**

1        Q.   Dr. Martinez, where do you live?

2        A.   I live in the community of Boerne outside of San

3    Antonio, Texas.

4        Q.   Okay.  And, sir, how old a man are you?

5        A.   Forty-five years old.

6        Q.   How are you employed?

7        A.   I am the director and owner of South Texas

8    Neuropsychological Associates.  It's a practice that provides

9    neuropsychological and psychological services in the San

10   Antonio area and South Texas.

11        Q.   Okay.  And could you tell the jury about your

12   education and your background and training that enables you to

13   hold that position?

14        A.   Yes, I have a Bachelor's degree in Psychology and

15   Zoology from the University of Texas at Austin.  I have a

16   Master's and a Ph.D. in Clinical Neuropsychology from the

17   University of Houston.  I'm a licensed psychologist in the

18   State of Texas, and I have extensive training and experience in

19   evaluating and treating all different types of cognitive,

20   mental, and behavioral disorders.  I -- in addition to my

21   private practice, I also have a contract with the Veterans

22   Administration and regularly evaluate veterans and -- and

23   enlisted soldiers.  I am also a -- an oral examiner with the

24   state board where I evaluate individuals that are seeking

25   licensure as psychologists in the State of Texas.  I am a staff

**7**

1    neuropsychologist with two hospital systems in San Antonio,

2    including the Health South Hospital System and the Nix Health

3    Care System.  And we routinely conduct about -- anywhere from

4    400 to 600 psychological assessments during -- per year in my

5    practice.

6        Q.   When you say that you've performed these clinical

7    assessments, can you give the jury a little bit of an idea what

8    it is that you actually do?

9        A.   Yes.  I'm a clinical neuropsychologist, so I'm

10   commonly asked to evaluate a person's mental functioning.  Many

11   times these are people that suffer from neurological

12   conditions, like head injuries or strokes or things like that,

13   or they suffer from emotional problems like depression or

14   bipolar disorder.  And -- and I am a consultant where I -- when

15   a patient is referred to us, we administer a broad range of

16   psychological and neuropsychological tests.  These are

17   standardized tests that are designed to tell us at what level a

18   person is functioning and what kinds of emotional and cognitive

19   and mental problems they may be having.

20        Q.   What is the -- when -- you use the term

21   "psychological," as well as "neuropsychological."  Could you

22   tell the jury what the distinction is that you draw between the

23   two?

24        A.   Yes.  Psychological is a more general term that

25   refers to a lot of different aspects of a person's mental and

**8**

1    emotional functioning and behavioral functioning.  Whereas

2    neuropsychological refers more specifically to evaluating brain

3    behavior relationships, relationships between what's going on

4    with the person emotionally and behaviorally as it relates to

5    their brain function.  A clinical neuropsychologist typically

6    will have all the training of a clinical psychologist and they

7    have to be licensed in the same way as clinical -- as a

8    psychologist with the State of Texas, but then they also have

9    extra training and experience in working with brain-related

10   disorders, as well.

11        Q.   And is one of the aspects of your practice, is that

12   also consulting and -- with both -- both prosecutors and

13   defense attorneys in regards to performing analysis and

14   diagnoses on individuals?

15        A.   Yes.

16        Q.   Okay.  And when you are called upon by either the

17   prosecutor or a -- or a defense attorney to do this, what kind

18   of methodologies do you use to perform these analyses?

19        A.   We -- we administer standardized psychological and

20   neuropsychological tests.  These are tests that are designed to

21   evaluate a person's memory, their verbal memory, their visual

22   memory, tests that are designed to evaluate a person's

23   intelligence level.  We give tests that look at verbal

24   intelligence and non-verbal intelligence, tests that are

25   designed to evaluate a person's academic achievement, where

9

1  they fail academically in respect to -- with respect to their
2  abilities and -- and make comparisons with that -- with
3  intelligence and -- and other factors.  And then we also give
4  standardized tests that are designed to evaluate a person's
5  emotional functioning.  We -- we give tests that are designed
6  to evaluate whether a person might suffer from things like
7  depression or schizophrenia or problems with thought or other
8  problems with behavior or personality.
9        And we use different sources of information.
10  We -- we try to get as much medical history and personal
11  history as we can, both from the patient and then from other
12  medical records that are available.  And then we also, of
13  course, use a data gathered from our psychological tests, and
14  then we also form clinical impressions of the patient by
15  spending time with them and interviewing them and looking for
16  certain characteristics that meet symptomatic criteria.
17        Q.  And how important, Doctor, is it to know that
18  individual's -- or get a -- as clear picture as you can in
19  regards to that person's background and social history?
20        A.  We try to get as much social history as we can.  The
21  more history that we have for a person, obviously the more
22  accurate our diagnosis is going to be.  Oftentimes we don't
23  have as much information as we would like to have, but for the
24  most part, we try to get as much information as we can.  The
25  more, the better, so to speak.

10

1        Q.  Okay.  Could you tell the jury the -- what -- is
2  there any particular testing or tests themselves that you use
3  in doing these neuropsychological exams?
4        A.  Yes.  I have a standard neuropsychological test
5  battery.  Most neuropsychologists will either have a standard
6  battery that they administer to most or all of their patients
7  or they'll have what's called a flexible battery which means
8  that they'll pick and choose different tests.  I lean towards a
9  side of using a standard battery that I give to most of my
10  patients, and then sometimes I add or subject tests based on
11  the referral question.  But my standard battery includes tests
12  like the Wechsler Memory Scale that evaluates verbal memory.  I
13  give subtests of the Wechsler Memory Scale that evaluate verbal
14  memory.
15        I give a test called Rey-Osterrieth Complex
16  Figure that evaluates visual memory.  I give the Wechsler Adult
17  Intelligence Scale, Fourth Edition.  This is a comprehensive
18  test that's sort of like the gold standard.  It's the most
19  widely used test for evaluating intelligence -- both verbal and
20  non-verbal intelligence.  I do -- I give tests that are
21  considered academic screening tests that look at a person's
22  reading, writing, and arithmetic abilities.  And then I also
23  give tests like a test named the Trail Making Test that looks
24  at mental shifting and information processing speed.
25        We also -- I also use a test called the

11

1  Wisconsin Card Sorting Test which is a commonly used test to
2  look at a person's ability to -- to plan and learn visually and
3  to shift mentally/visually.  And all of these tests are
4  designed to basically look at a person's higher level mental
5  functions.  In other words, what level are they functioning at
6  with respect to their -- to -- to their cognitive functioning
7  and their intelligence.
8        And then we also look at -- give tests that are
9  designed to evaluate a person's emotional functioning.  I use a
10  personality assessment inventory which is a standardized test
11  that is written, that gives us information about a person's
12  mood and personality and behavior.  And I also use other tests
13  sometimes like the sentence completion test, or what I call
14  projective tests where a person draws something or has to look
15  at some pictures.
16        Q.  Doctor, these tests that you described, and I don't
17  know -- I don't think I'm going to ask you to describe them
18  again, but the tests that you've described that you use, are
19  those the standard -- or pretty much the standardized testing
20  that are done in -- by clinical psychologists across -- across
21  the land?
22        A.  Yes.  I -- I tend to lean toward using the most
23  commonly used tests.  There's a lot of different tests out
24  there, but these tests are some of the most commonly used
25  tests.  I think if you polled psychologists and

12

1  neuropsychologists across the country, you would find that
2  these are probably some of the most commonly used tests, and
3  these are -- this is the same test battery that I routinely use
4  in my everyday clinical practice.
5        Q.  And you had mentioned -- you used the term a moment
6  ago as to a "referral question".  What are you talking about
7  when you say a referral question?
8        A.  One of the -- one of the primary things that -- that
9  an evaluator, a neuropsychological evaluator has to consider
10  before they see a patient is what is the question that's being
11  asked.  And sometimes I'm being -- I get asked to evaluate a
12  person's intellectual functioning, for example, what's their
13  intelligence level.  Sometimes I get asked to evaluate a
14  person's neuropsychological functioning, and oftentimes I'm
15  asked to do what's called an independent medical examination
16  which is basically an examination that is independent of a
17  person's history where my job basically is to evaluate the
18  person and give my clinical impressions as to what I think is
19  going on with that person at that time without reference to any
20  other records.
21        Other times the referral question involves an
22  extensive review of records, and I do that quite a bit, as
23  well, where I don't actually evaluate the individual, but I
24  review records.  So there's sort of a broad range of referral
25  questions.  Referral questions typically include issues like,

13

1  please let us know what you think about this person's emotional
2  functioning.  Do they have a mental disorder?  Do they have a
3  cognitive disorder?  Do they have an intellectual disorder?
4  And there's different ways of approaching that referral
5  question, but basically that's the first thing that a
6  neuropsychologist has to consider whenever they get a referral.
7      Q.   And, Doctor, in this particular case were you asked
8  to perform an evaluation on an individual that you've come to
9  know as Gary Green?
10     A.   Yes, I was.
11     Q.   And is this Mr. Green sitting here to my right?
12     A.   Yes.
13     Q.   Now, Doctor, in regards to the referral questions
14 that were posed to you in regards to Gary Green, could you tell
15 the jury what it was that you were asked to do and what it was
16 you were asked to look for with -- in regards to Gary Green?
17     A.   Yes.  With Mr. Green, I was asked to conduct an
18 evaluation of -- of his cognitive functioning.  In other words,
19 I was asked to evaluate his memory, attention, reasoning, and
20 judgment, and to provide opinions regarding his level of
21 cognitive functioning.  I was also asked to evaluate his
22 intellectual functioning to determine if he suffered from any
23 type of mental retardation or intellectual deficiency.  And
24 then I was also asked to evaluate his emotional functioning.
25 In other words, does he suffer from a mental disorder like

14

1  depression or bipolar disorder or even a thought disorder like
2  schizophrenia.  So I was asked to look at basically the
3  clinical aspects of his functioning.
4      Q.   Okay.  And were you able to do so?
5      A.   Yes, I was.
6      Q.   Could you tell the jury how it was and what it was
7  that you did with Mr. Green that enabled you to formulate the
8  opinions that you're going to offer here in the courtroom this
9  morning?
10     A.   Yes.  I was -- I was provided access to his
11 psychiatric history by way of medical records, so I was
12 provided records regarding some of his previous psychological
13 and psychiatric evaluations and treatment.  And then I traveled
14 from San Antonio here to the jail, and I spent the better part
15 of a day with Mr. Green.  I interviewed him for about two
16 hours, and then I administered -- I personally myself
17 administered a battery of these psychological and
18 neuropsychological tests that I -- that I just mentioned which
19 took another five or six hours or so.
20     Q.   Okay.  And in -- is this -- as you've talked about
21 earlier, is this pretty much the standard neuropsychological
22 diagnoses and testing that is appropriate for this type of
23 referral questions?
24     A.   Yes, it is.
25     Q.   Other than -- other than talking and reviewing

15

1  the -- his medical records -- and, in fact, his medical records
2  in regards to actual past psychiatric or past mental health
3  evaluations are pretty scant, aren't they?
4      A.   Yes.  I -- I believe it was about half an inch worth
5  of records or something like that.
6      Q.   Okay.  And -- but were those helpful to you?
7      A.   Yes, they were.
8      Q.   Did you have an opportunity also to review -- and
9  not just review a synopsis of interviews that had been done on
10 some of his family members, but did you have -- also have an
11 opportunity to interview those people yourself?
12     A.   Yes, and I apologize, I forgot to mention that.  I
13 also interviewed Mr. Green's mother and his brother, as well,
14 as part of my assessment.  And I did have access to records
15 regarding some previous interviews that had been done with Mr.
16 Green's brother, I believe.
17     Q.   Okay.  Now, in that regard, one of the things that
18 we specifically asked you to exclude was going into the actual
19 details of the offense of what he's charged with; is that
20 correct?
21     A.   That's correct.
22     Q.   And as you talked about earlier, you are -- you are
23 cur -- you are oftentimes asked to exclude particular pieces of
24 information in regards to what effect that may have on the
25 diagnoses; is that right?

16

1      A.   That's correct.  As I mentioned earlier, it's -- the
2  concept is sort of an independent medical exam.  I do that a
3  lot with insurance companies or with other referral sources
4  where a person is referred to me and certain records are
5  omitted so that I can form sort of an independent evaluation of
6  the person without it being tainted by other aspects of the
7  history and so forth.
8      Q.   Okay.  And obviously, you were called upon and
9  came -- traveled to the Dallas County Jail to conduct your
10 interview process; is that right?
11     A.   That's correct.
12     Q.   So you knew the Defendant -- you knew he was charged
13 with murder and you knew he was in jail for it?
14     A.   Correct.
15     Q.   Could you tell the jury how Gary Green presented
16 himself to you when you came to meet him?
17     A.   Are you asking about what he said initially or what
18 his demeanor was?
19     Q.   His initial appearance to you --
20     A.   Uh-huh.
21     Q.   -- and if you could, just describe the -- not
22 necessarily the particulars of what he said to you, but could
23 you just tell the jury how he appeared emotionally?
24     A.   Yes, he was -- he was severely depressed and
25 despondent.  I had to provide considerable effort to get him to

17

1   answer questions. He tended to look down quite a bit. He was

2   basically in an extreme state of sadness and despondence

3   where -- where his mood was -- was severely depressed and --

4   and his affect -- in other words, his emotional tone, how he

5   presents with his facial expressions and so forth, was very

6   flat. In other words, it was blunted. He had some signs of

7   significant depression.

8       Q.   Okay. And -- and did that -- I mean, did it seem

9   unusual or was that somewhat appropriate, considering the

10  circumstances that you found him in?

11      A.   Well, I would expect somebody to have depression

12  when I -- when they're in -- in the prison system and they're

13  being charged with a capital crime, although I will have to say

14  that I have evaluated other individuals in similar

15  circumstances who did not suffer from depression.

16      Q.   Okay. And when you conducted your clinical analysis

17  of Gary Green, you said you spent a few hours that were

18  involved just in your clinical diagnoses that didn't really

19  involve the actual neuropsychological testing; is that right?

20      A.   That is correct.

21      Q.   Neuropsychological testing is going to tell you

22  about the brain function; is that right?

23      A.   That's correct.

24      Q.   And these are -- these are interrelated, but they're

25  a little bit different than just the mental and thought aspects

18

1   that you're looking at; is that right?

2       A.   That is correct. There -- there are different

3   sources of information. My clinical interview provides me

4   information about how the person appears, how they think about

5   themselves, how they think about their lives and their

6   problems, by me asking the person questions and then observing

7   their -- their body language and their demeanor and their

8   behavior clinically. And a psychologist obviously has training

9   in doing that. The psychological testing is a -- is a

10  standardized way of trying to measure a person's abilities,

11  what it is that they're able to do and at what level they're

12  functioning at.

13      Q.   Even though Gary Green was extremely depressed and

14  despondent when you were meeting with him, was he cooperative

15  with you -- throughout the interview and the testing process?

16      A.   Yes, he was.

17      Q.   Could you describe whether or not in this testing

18  process that you used for the neuropsych are there measures

19  that are evaluate -- or evaluational measures in the testing

20  themselves to give you a degree of confidence in the results

21  that you are getting?

22      A.   Yes. We use -- we use different techniques to try

23  to figure out whether the person is actually putting forth

24  their best effort, for example. So I gave a test called the

25  Test of Memory Malingering that is designed to evaluate whether

19

1   a person is trying hard enough and whether they're putting

2   forth their best effort, whether they have anything that's

3   called -- referred to as response bias, which is a term

4   basically for how hard somebody is trying and whether they're

5   putting forth as much effort as they should. And then I also

6   gave a test that's designed to evaluate whether a person is

7   over reporting their symptoms. In other words, is a person

8   telling me a lot of things that are unusual or unreasonable

9   based on what -- how he appears clinically. And these tests

10  give us some information as to whether a person is able to --

11  whether a person is -- is making any kind of an attempt to

12  misrepresent their problems or their symptoms or -- or their

13  cognitive ability.

14      Q.   And can you tell the jury if the Defendant and his

15  performance on those evaluation techniques there for confidence

16  level, did he perform within the acceptable levels that gave

17  you confidence in the results that you got across the board?

18      A.   On the -- on the cognitive test, he performed well

19  within the acceptable levels. And I didn't see any other

20  evidence or problems with cognitive -- with his cognitive

21  testing, so on the cognitive testing he did perform within

22  acceptable levels.

23           On the testing of reporting of emotional

24  symptoms, he had a tendency to record a lot of symptoms related

25  to depression and -- and to other aspects -- other problems

20

1   with mental functioning which, in my opinion, is consistent

2   with his clinical presentation since he was so severely

3   despondent. So in other words, he was endorsing a lot of

4   symptoms with depression which is consistent with what I was

5   seeing him -- seeing in him.

6       Q.   Could you tell me, in regards to the cognitive

7   aspects of the testing that you did -- and when you use the

8   word "cognitive," break that down into something simple. What

9   do you mean when you talk about cognitive functioning?

10      A.   Memory, attention, and reasoning.

11      Q.   Okay. Now, are these -- when you're testing for

12  these cognitive issues, are you testing to determine

13  something about the person's intellectual level?

14      A.   Yes. Cognitive is actually a little different than

15  intellectual, but they're related. They're both kind of the

16  same thing, but -- but intellectual is basically a person's

17  intelligence level, and that includes an evaluation of what

18  they know and how well they know this, in addition to how well

19  they can function and solve problems and think. Whereas, the

20  term "cognitive" refers more specific to specific aspects of

21  mental functioning, like your ability to store and retrieve

22  information or your ability to focus your attention on a task.

23           So they're related, but I gave certain tests

24  that were designed to look at his cognitive functioning, which

25  is his memory and his attention and thinking. And then I gave

21

1  other tests that were designed to evaluate his intellectual

2  functioning, his intelligence.  And even though they're similar

3  in -- in neuropsychological testing, they're sort of considered

4  as different things.

5      Q.   Were you able throughout these -- this comprehensive

6  testing, does this able you to come up with what we talk about

7  when we're talking about a full -- full scale intelligence

8  score?

9      A.   Yes, it does.

10     Q.   What does the full scale intelligence score tell you

11  about an individual?

12     A.   A full scale intelligence score is a way of

13  classifying where the individual falls in -- in the population

14  with respect to his intelligence level.  So basically it's the

15  I.Q. score.  It tells us where he falls in relation to

16  everybody else in the population.  It has an average of a

17  hundred, and then there's certain cutoffs for what we would

18  consider average and low average and so forth.  For example, 90

19  to 109 is within the average range; 80 to 89 is low average; 70

20  to 79 is borderline; and 69 and below is generally considered

21  to be in the extremely low or mental retardation range.

22     Q.   Okay.  And can you tell the jury what -- what you

23  found to be -- Gary Green's intelligence level or I.Q. level?

24     A.   Yes.  Mr. Green's I.Q. level was hovering right

25  around the upper end of the borderline range and the lower end

22

1  of the low average range, so his I.Q. -- I think his full

2  scale I.Q. was -- I think -- I believe it was a 78 or a 79,

3  which is -- which is sort of -- let's see here, let me just

4  confirm that.  But his I.Q. -- his full scale was a 78, which

5  places him in the upper end of the borderline range.  So in

6  other words, he's not -- his I.Q. was not average.  It wasn't

7  even really low average, although it's hovering pretty close to

8  there.  It was in the upper end of the borderline range.

9      Q.   And could you tell the jury briefly what you found

10  out in regards to the cognitive aspects of the testing?

11     A.   Yes.  On the cognitive aspects of the testing,

12  basically he didn't seem to have any real severe memory

13  problems, but he did have some attentional problems.  In other

14  words, he did have some difficulty focusing on tasks, and these

15  attentional problems caused some inconsistency in his scores

16  where there was some scores that were in the normal range and

17  some scores that were a little bit below normal.  But I didn't

18  really find a lot of evidence for a severe cognitive

19  disturbance like what you typically see with somebody who has a

20  lot of brain damage or a head injury or something like that.

21          And I did find that he did have some difficulty,

22  too, with what's called higher level thinking or higher level

23  mental functioning.  On one of the tests that I gave him, the

24  Wisconsin Card Sorting Test --

25          COURT REPORTER:  I'm sorry, one more time.

23

1      A.   The Wisconsin Card Sorting Test.  I apologize.  I'm

2  probably talking a little too fast.  On the Wisconsin Card

3  Sorting Test, he -- he did have quite a bit of difficulty

4  with -- with learning and mental shifting which is consistent

5  with his -- with his lower I.Q. scores.

6      Q.   In regards to the -- his percentile of how he would

7  fall in the population, could you tell the jury about what

8  range in regard to his cognitive functioning he would fall in,

9  as regards to the scale of normality?

10     A.   I would say if I had -- if I had to dis -- to put

11  one label on it, it would be more or less the low average

12  range, if you took all the -- all the test results altogether.

13  There were some areas of impairment, but I think it was

14  attentional, so -- so his -- his cognitive functioning was

15  pretty consistent with his intelligence which is sort of low

16  average to borderline.

17     Q.   His percentile rank -- what did you assign him in

18  regards to his percentile ranking for the population?

19     A.   Well, for -- for the cognitive functioning, we gave

20  a lot of different tests, and so there isn't a specific

21  percentile rank.

22     Q.   I'm just going by the full -- his full scale I.Q.

23     A.   Oh, his full scale I.Q. score was a 78.  And -- and

24  so his percentile rank there is a seven, which basically means

25  that -- that out of every hundred people he would theoretically

24

1  do better than seven of them.  And 93 of them would do better

2  than he would.

3      Q.   Okay.  And -- and so when you're talking about 93

4  out of a hundred people are going to have a higher cognitive

5  and full -- and I.Q., than you, you're -- and you even -- when

6  you say that's low average, I mean, that sounds awfully low,

7  does it not?

8      A.   It's -- it's pretty low in the population, compared

9  to the population.  And -- and this is -- this is actually just

10  focused on -- that particular score is just focused on

11  intelligence, but it is lower.  You know, as I mentioned

12  earlier, it's definitely not within average.  And -- and it's

13  actually hovering on -- on lower than low average.  So it's

14  sort of like a -- in the borderline range.  A lot of people

15  refer to this as borderline impaired.  And -- and sort of like

16  a step above mental retardation, but individuals with this

17  level of intellectual functioning, they can usually function

18  independently, but they will have some difficulty understanding

19  complicated information.  They may have difficulty with complex

20  things like -- like managing their finances if things get

21  complicated or -- or keeping track of complicated information

22  in their personal lives, but they can usually function on their

23  own.

24     Q.   Did you discover the presence of any formal learning

25  disability?

25

1  A.  No, I did not.

2  Q.  And when I asked you about a learning disability,

3  what is -- what are typically known as learning disabilities?

4  A.  A learning -- a learning disability by definition is

5  defined as a difficulty in acquiring information in a certain

6  area where there is a decrease in scores between intelligence

7  test scores and academic test scores.  So in other words, most

8  school systems will consider a -- a difference in 15 points

9  between intelligence test scores and academic ability test

10  scores to signify a learning disability.

11      If somebody has learning problems because of

12  intelligence, then -- then basically the learning problems can

13  be attributed to their low intelligence level.  But if somebody

14  has a high intelligence level and they have real low math

15  scores or low reading scores or low spelling scores, then we

16  start to -- to consider the possibility that they have a real

17  specific learning disability -- it's called a formal learning

18  disability -- in a particular area that's not due to problems

19  with intelligence.

20      Now, what ends up happening, as -- as the school

21  psychologist spoke to yesterday, is that there are a lot of

22  other factors that come into play, like emotional functioning

23  and things like that.  But for the most part, that's what a

24  learning disability refers to.

25  Q.  Okay.  And the point I would like to make or ask you

26

1  about here, you were present yesterday.  In fact, like --

2  again, you were able to sit in through -- yesterday throughout

3  the presentation of the family members and through the school

4  psychologist; is that right?

5  A.  That's correct.

6  Q.  And Dr. Gray-Smith told this jury that through her

7  evaluation of his history, as far as academic achievement and

8  testing, that he was -- he was basically chronic in academic

9  failure?

10  A.  That's correct.

11  Q.  And she told this jury that that would be looked at

12  to be determining whether it was due to a disability in a

13  learning -- a formal learning disability or whether or not it

14  was a result of mental disorder; is that correct?

15  A.  I believe that's what she was talking about, as

16  well, yes.

17  Q.  And are -- so you're here to tell the jury that

18  through your testing, you have ruled out a formal learning

19  disability?

20  A.  Yes.  With a test score, what happens is -- a person

21  who has chronic academic underachievement -- in other words,

22  they do poorly in school their whole lives, they don't develop

23  well academically, and they also don't develop well

24  intellectually.  It's difficult to -- to say too much about

25  whether one causes the other or how they contribute to each

27

1  other, but in Mr. Green's case, for example, he had low scores

2  on intelligence tests and he had low scores on academic tests.

3  And so what we're looking at in Mr. Green's case is a person

4  who has the low average intellectual functioning and academic

5  functioning together.  So that sets the stage for a pattern of

6  chronic academic under achievement and personal under

7  achievement.

8      And then, I think to -- to answer your question,

9  emotional problems and mental disorders definitely, as a -- as

10  they coexist with these issues come into play whereas the

11  academic and intellectual problems contribute to the emotional

12  problems, and the emotional problems also contribute to the

13  academic and intellectual problems, so it all develops together

14  in a person.

15  Q.  Now, Doctor, I want to move you to the area of the

16  actual mental diagnosis or the evaluation that -- and I think

17  as you just said, you really can't separate the intellect

18  from -- I mean that aspect from the mental part; is that

19  correct?

20  A.  It's difficult to do, yes.

21  Q.  Okay.  But as far as for purposes of the actually

22  coming in and making a diagnosis in regards to mood and thought

23  disorders or mental disorders, can you tell the jury what the

24  difference is between that?  What's the difference between a

25  mental illness, and what's the difference as opposed -- or just

28

1  a behavioral disorder?

2  A.  Yes.  A mental illness is -- refers basically to --

3  to a disorder of either emotional functioning, which is mood,

4  or thought.  So a disorder of mood or thought is presumed to be

5  due to sort of an imbalance in the brain functioning someway.

6  There's a lot of evidence that's coming out now in different --

7  different lines of research that show that people with severe

8  depressive disorders, for example, or with thought disorders

9  like schizophrenia, they actually have criminal imbalances

10  and -- and changes in metabolism in different parts of their

11  brain.  And -- and there's evidence coming out now that these

12  start to happen at a very early age in a person's life.  And

13  then as time goes on, they develop into more chronic

14  conditions.  Those are mental disorders -- disorders of mood

15  and thought.

16      Personality disorders are usually coded on

17  another axis on the DSM-IV which is our diagnostic and

18  statistical manual, and those refer to problems with

19  interpersonal behavior.  These are -- these are chronic

20  problems that a person tends to have throughout their lives in

21  the way that they behave with other people.  So -- so a thought

22  disorder basically refers to a problem with mental functioning

23  whereas a personality disorder is a way of classifying

24  problems with behavior that a person might be having.

25  Q.  Okay.  Is it possible for someone to have a -- a

2    A.   Yes, it is.

3    Q.   Okay.  Is it -- is it common?

4    A.   It's not very common.  Personality disorders result

5    in -- in a lot of maladaptive behavior during a person's life.

6    In other words, they have a lot of problems with their lives.

7    They don't really form strong positive relationships with

8    people, as well.  They don't really get along as well in the

9    world.  They don't really -- they aren't able to work as well

10   and -- and functioning well and -- and stay married and -- and

11   have healthy personal relationships.  And so -- so there's a

12   lot of what's called comorbidity, as -- as was referred to

13   yesterday where -- whereas mental disorders coexist with

14   personality disorders.  And, again, as is -- as is the case

15   with other types of conditions, these disorders sort of

16   perpetuate each other.

17            For example, depression can cause somebody to be

18   more isolated and more reclusive and not develop personal

19   relationships, that might cause that person to meet criteria

20   for a personality disorder, whereas a personality disorder,

21   because a person has difficulty in their relationships, can

22   make depression worse, so people start to have these

23   combinations of different conditions throughout their lives

24   that kind of make each other worse and coexist and -- and end

25   up causing the person a greater amount of dysfunction as they

30

1    develop.

2    Q.   Doctor, I want to back up just a second because I

3    want to make sure a couple of things are clear here.  We are

4    not -- you are -- you are not here to tell this jury that Gary

5    Green is what we would -- in the legal definition of mentally

6    retarded; is that correct?

7    A.   He is not mentally retarded.

8    Q.   Okay.  And we -- we were not -- you were not asked

9    and no one has ever claimed that the Defendant is insane.  You

10   were not asked to conduct anything in regards to a sanity

11   issue; is that correct?

12   A.   That's a legal term, and I was not asked to do

13   anything with that.

14   Q.   I mean, when you say a legal term, you're talking

15   about legal in the realm of what we call -- what we consider

16   forensic psychology?

17   A.   That is correct.

18   Q.   Are you -- are you a forensic psychologist?

19   A.   No, I'm not.

20   Q.   You're -- you're a clinical psychologist that

21   diagnoses mental illness, correct?

22   A.   That is correct.

23   Q.   Okay.  Can you tell the jury -- when you conducted

24   your examination of Gary Green, could you tell them the results

25   that you reached in regards to whether or not he had any actual

2    A.   Yes, I did.  In reviewing Mr. Green's history and my

3    test results and my clinical observation, I determined that Mr.

4    Green has suffered from severe chronic problems with mood that

5    include both depression and episodes of agitation and

6    irritability and elevated mood which are associated with manic

7    episodes or bipolarity.  And I also concluded that he has

8    difficulty with thought.  He has a lifelong history of

9    suspiciousness and paranoid thinking and paranoid behavior

10   where he -- he believes that other people are trying to -- to

11   hurt him or do him wrong.  And -- and he mistrusts other

12   people, and he's hypervigilant and suspicious.

13            When you have those two main categories of

14   problems together, they -- that meets diagnostic criteria for

15   schizoaffective disorder of the bipolar type.  It's a little

16   bit different from bipolar disorder whereas bipolar disorders

17   primarily involves rapid and extreme fluctuations in mood.  And

18   it's different from schizophrenia where a person may or may not

19   necessarily have problems with mood at the time that they're

20   having their thought disorder.  So with schizoaffective

21   disorder, the person is having problems with mood, and then

22   they have problems with thought.  And the problems with thought

23   happen during the problems with mood, but they also happen at

24   other times when the person is not having problems with mood.

25   Q.   And, Doctor, can you tell the jury some -- what are

32

1    the common features of an individual or how would the -- how

2    would a person suffering from a schizoaffective disorder

3    bipolar type, how that might affect that person's day-to-day

4    abilities to function?

5    A.   Well, they're going to have episodes of severe

6    depression where they become really withdrawn and they don't --

7    they don't do very much.  They have episodes of sadness.

8    They'll have what's called affective instability, which means

9    that they'll be depressed on some days, severely depressed, and

10   then other days they can be very anxious and agitated and --

11   and they can have an elevated mood.  And so -- so when they're

12   anxious and agitated, they're not going to really be able to

13   function well on those days.  And then -- and then they also

14   will have a disturbance in thought where they can have paranoid

15   delusions.

16            So in other words, during those times that

17   they're having those episodes of paranoid delusions, they're

18   going to -- they're going to believe things that are not true.

19   They're going to think that something is happening that is not

20   really actually happening, that people are trying to hurt them

21   or people are conspiring against them or -- or that people are

22   evil or people are trying to do something bad to them.  It

23   can -- it can even rise to the level where the delusions are a

24   severe break from reality to where a person believes that

25   there's -- you know, a plot for aliens to take over the world,

33

1  for example, or something like that, that causes them to — to

2  become extremely reclusive or something like that. So it can

3  affect a person in a lot of different ways because of their

4  problems with mood and their problems with thought.

5      Q.   Okay. And, Doctor, is schizoaffective that you have

6  diagnosed the Defendant, you said that you also went back and

7  — and the information that you had from his hospitalization

8  about a month before, you — you had the opportunity to look

9  and review and — let me just ask you outright. Your — your

10  actual clinical diagnosis is somewhat different than what he

11  was diagnosed with at Timberlawn; is that correct?

12      A.   Yes.

13      Q.   Can you tell the jury how it differs and — and if

14  you can — and we'll talk about it — how afterwards.

15      A.   Yes. In my review of the records from Timberlawn,

16  it appears that he was diagnosed with a major depressive

17  disorder with psychotic features, which basically means that

18  the person is believed to become psychotic only when they are

19  severely profoundly depressed. In other words, these are

20  people who get so depressed, that — that they lose touch with

21  reality and they become psychotic because of their depression

22  primarily.

23          And then he was also — there was also a —

24  what's called a rule out of bipolar disorder which basically

25  means that they felt that there was some indication that the

34

1  person suffered from bipolar disorder, but they didn't have

2  enough evidence and — and they felt that clinicians maybe

3  should get more — usually when people put a rule out is — is

4  an indicator that there needs to be more evidence in order to

5  formally make that diagnosis.

6      Q.   And did the records that you reviewed from

7  Timberlawn Hospital reflect that he was at Timberlawn for a

8  period of about five days?

9      A.   I believe so, yes.

10      Q.   And he was seen there by a couple of different

11  psychiatrists; is that right?

12      A.   That's correct.

13          MR. JOHNSON: May I approach, Your Honor?

14          THE COURT: You may.

15      Q.   (BY MR. JOHNSON) Doctor, I want to go through some

16  of these Timberlawn records with you, sir.

17      A.   Okay.

18      Q.   They've been admitted into evidence. I want to have

19  you look at my copy because I made some notes. You also have a

20  copy of these, also; is that correct?

21      A.   Correct.

22          MR. JOHNSON: Andy, do you remember the exhibit

23  number on these Timberlawns?

24          MR. BEACH: In the 140s maybe.

25          (Discussion off the record.)

35

1      Q.   (BY MR. JOHNSON) So what I'm going to ask you to

2  look at is — is included within — what's been offered and

3  admitted into evidence as State's Exhibit Number 145. I want

4  to go through a couple of the particulars here and talk to you

5  about the commonality between what he had described back at the

6  initial hospitalization and how that affects your

7  interpretation and diagnosis. Could you — let's talk about

8  this. Can you tell the jury what it was — that when he was in

9  Timberlawn Hospital, what it was that he was reporting as

10  the — why he was there?

11      A.   Yes, he — he was reported to be suffering from

12  depression, increased isolation, decreased energy, increased

13  hopelessness. The clinician described him as being passive.

14  In quotes, he stated just go to sleep and not wake up. He

15  denies suicidal ideation, but said I just want to escape the

16  pain. The note indicates that there were no prior suicide

17  attempts. He also denied homicidal ideation. And — and

18  denied — as well as tendency to harm himself and others at

19  that time. He — he had racing thoughts saying I can't shut

20  off my thoughts.

21      Q.   Okay. Let me stop you right there. I want to talk

22  about a couple of these things and talk about how they are

23  clinically important in the diagnosis that you made. These are

24  the — this is the initial assessment that was done at

25  Timberlawn Hospital; is that correct?

36

1      A.   I believe so, yes.

2      Q.   And he's talking about — he's talking about high

3  levels of depression, correct?

4      A.   Correct.

5      Q.   High levels of isolation?

6      A.   Correct.

7      Q.   Very low energy?

8      A.   Correct.

9      Q.   High levels of hopelessness?

10      A.   Correct.

11      Q.   And racing thoughts, that he can't shut off his

12  thoughts?

13      A.   Correct.

14      Q.   Okay. And — and these — these are questions —

15  and these are put down here by — by the individuals that

16  are — and — and this isn't just tell me how you feel. He

17  starts saying, well, I have high energy, low energy, high

18  depression — I mean, these are in response to a clinical

19  evaluation that was done like you've described; is that

20  correct?

21      A.   Yes, this appears to be an intake assessment to

22  where — where they — he was evaluated.

23      Q.   Okay. And in that regard, the — they would have

24  been doing the type of evaluation and talking to him about the

25  things that were going on in his life and in his mind that they

37

1   could -- that they could use to try to form the initial
2   assessment, correct?
3       A.   I believe so, yes.
4       Q.   The fact that he reports high levels of depression,
5   obviously, since you said that their initial assessment of him
6   was that he suffered from major depressive disorder; is that
7   correct?
8       A.   Yes.
9       Q.   And then they said later that to rule out bipolar
10  disorder -- now, I want take back up on that just a moment.
11  When -- when you see rule out something in a clinical diagnoses
12  of an individual --
13      A.   Yes.
14      Q.   -- does that mean that they're saying that they
15  ruled out that that disorder is there, or what does that --
16  what is that telling you?
17      A.   No, typically clinicians use the term "rule out"
18  to -- to describe a -- a situation where they are suspecting
19  that the person has these types of symptoms, but they need more
20  information in order to fully provide that diagnosis.  So in
21  other words, they think that this person might have this
22  problem, but they need to know more in order to fully diagnosis
23  it.
24      Q.   Okay.  And when you have an individual that's
25  talking about racing thoughts --

38

1       A.   Yes.
2       Q.   -- okay, does that seem to show you a -- a
3   distinction as -- as someone would normally think of as a -- as
4   a major depressive state?
5       A.   No.  Most of the time when people have severe
6   depression, they don't have racing thoughts.  In fact, their
7   thinking slows down a lot, and they get into a state where they
8   have what's called psychomotor retardation which is their
9   thinking slows down to the point where they're very, very slow.
10  Racing thoughts is more consistent with a manic episode where a
11  person is not able to control their thinking, and their
12  thinking is happening -- happening very rapidly.  And -- and so
13  racing thoughts is not consistent with a major depressive
14  episode.
15      Q.   And when you have -- and when you used the term
16  awhile ago of "bipolar," bipolarity refers to someone who
17  suffers from periods of intense lows, as well as periods of
18  intense highs; is that right?
19      A.   Correct.
20      Q.   And so when you hear people talking about that,
21  that's what you're looking for is -- is the presence of
22  depression, as well as the -- the existence of psychotic
23  episodes for that individual also, correct?
24      A.   A lot of times the -- the manic episodes or the
25  depressive --

39

1       Q.   I'm sorry, manic instead of psychotic.
2       A.   Yes.  Could get so severe that it can lead to
3   psychosis.
4       Q.   Okay.  Going on further in this evaluation, they
5   talk there's high levels of anxiety?
6       A.   Yes.
7       Q.   High levels of irritability?
8       A.   Yes.
9       Q.   And mood swings?
10      A.   Correct.
11      Q.   And mood swings.  What is that telling you as a
12  clinical diagnostician?
13      A.   Well, it's telling me that -- that there's periods
14  of elevated mood and periods of depressed mood that is more
15  consistent with bipolarity.
16      Q.   Okay.  There's also -- he was also diagnosed and
17  questioned in regards to paranoia; is that correct?
18      A.   Correct.
19      Q.   And it -- it specifically states the presence of
20  paranoia, and probably one of the classic lines about
21  paranoia -- could you -- could you tell the jury what the
22  Defendant reported in regards to the fact that he thought
23  people were out to get him?
24      A.   Yes.  At first he said, people are plotting against
25  me, they're talking about me, and then he stated, I'm not

40

1   paranoid, I know this is happening.
2       Q.   And that's -- that's kind of the old joke, isn't it,
3   it's not paranoia if they're really out to get you?
4       A.   Sure.
5       Q.   Okay.  And so these -- these are the responses that
6   are being put down by the -- by the admitting individuals or
7   people.  And -- and finally in regards to this initial
8   diagnosis, talks about he can't sleep; is that right?
9       A.   Correct.
10      Q.   One of the questions here -- and one of the -- on
11  this form talks about the precipitating event -- why this
12  person came -- came to the hospital.  Can you tell the jury
13  what -- what is indicated in response to that?
14      A.   Yes.  Mr. Green said, I want to know the truth.
15      Q.   He wants to know the truth about what's causing --
16  appears to be in response to what's causing all of these
17  conditions and these things that he's going through.  Does
18  that -- does that appear to be accurate?
19      A.   I -- I would assume that.  I'm not sure what he was
20  referring to when he said, I want to know the truth.
21      Q.   We'll just take it at -- in fact, when it says there
22  that I want to know -- when it talks about the precipitating
23  event, it's in quotation marks, I want to know the truth?
24      A.   Yes, that's what he said.
25      Q.   Okay.  Can you tell the jury when Mr. Green was put

41

1    in Timberlawn Hospital, could you tell the jury what
2    medications he was prescribed to -- to have an effect upon the
3    conditions that he was reporting and the major depressive
4    disorder that he was being diagnosed with?
5        A.    Yes. I -- I can tell you the names of medications.
6    I'm not a psychiatrist, so a lot of detailed questions about
7    medications will be outside of my area of expertise. But it
8    appears that he was taking Risperdal and Remeron.
9        Q.    And is Risperdal typically used to treat evidence
10   and symptoms of schizophrenia?
11       A.    Yes. It's a medication that's commonly used for
12   thought disorders.
13       Q.    Okay. And the Remeron, that's something you
14   typically see for depression and --
15       A.    Correct.
16       Q.    Okay. I want to ask you now to look at the
17   diagnosis here that's -- that's contained within these records
18   by Dr. John Pascoe. The -- and this appears to be the final
19   diagnosis before Gary Green was discharged. I want to talk
20   about it again. He's found major depressive disorder,
21   recurrent with psychotic features. What is -- what is that
22   term -- what's psychotic features? What does that indicate to
23   you?
24       A.    That indicates that -- that the psychiatrist felt
25   that his depression was severe and that it was -- it was severe

42

1    enough to be promoting psychosis and that he saw psychosis at
2    the time of the assessment.
3        Q.    Okay. I want to look at the consultation notes made
4    by that doctor -- by that psychiatrist, also. It said that
5    after being in the hospital for a day or two -- let's see, he
6    was admitted -- on the 22nd, the psychiatrist made a note that
7    the Defendant felt that he was even more depressed being in the
8    hospital and was eager to be discharged. I want to ask you
9    something about that. Is there anything about that that would
10   surprise you?
11       A.    No, I -- I work in a -- on a locked unit in San
12   Antonio at the Nix Hospital System, and its not uncommon for
13   the patients to themselves feel like they are more depressed
14   after being in the hospital. Being in the hospital is not
15   pleasant. There's other people around that have mental or
16   emotional problems. And you're away from your everyday routine
17   and your home and your environment and your family, and so --
18   so it's not uncommon for people to -- to feel more depressed or
19   -- or believe that they're more depressed when they're in the
20   hospital.
21       Q.    Okay. And I want to ask you also, in regards to
22   the -- the diagnosis that was made by a couple of the different
23   psychiatrists there in regards to the major depressive
24   disorder. When we're talking about major depressive order, are
25   we talking about a severe mental illness?

43

1        A.    Yes.
2        Q.    And when I talk -- when I use the word "severe," I
3    mean, mental illness can -- doesn't have to always be severe,
4    does it?
5        A.    No, it does not.
6        Q.    But when you're talking about the type of diagnosis
7    that was made by these doctors, major depressive disorder,
8    recurrent with psychotic features, as well as your diagnosis of
9    schizoaffective -- and they're really not -- and there's not
10   really -- these are not mutually exclusive diagnoses at all,
11   are they?
12       A.    No, they're not. They actually share a lot of the
13   same common symptoms. It's just a matter of when the symptoms
14   are occurring in time and whether they occurred together or
15   not.
16       Q.    Okay.
17       A.    Uh-huh.
18       Q.    And the -- your diagnosis of schizoaffective of
19   bipolar type, is that a severe mental illness?
20       A.    Yes, it is.
21       Q.    And are you going to fully expect that a person
22   suffering from that mental illness to -- to behave differently
23   than obviously someone that doesn't have a mental illness?
24       A.    Yes.
25       Q.    And can you tell the jury how a schizo disorder of

44

1    the type that you diagnosed, how might that affect a person in
2    society?
3        A.    Well, as I mentioned earlier, the person is going to
4    have episodes where they're going to be severely depressed and
5    withdrawn. They're going to be unmotivated. They're going to
6    have difficulty sleeping. They're going to have problems with
7    their appetite. They're going to have episodes of intense
8    sadness. It could affect their judgment and their thinking.
9    And -- and then they might have episodes -- in schizoaffective
10   disorder where they have agitation or irritability or an
11   elevated mood. And off and on during that time other people
12   are going to see them as being suspicious. They're going to be
13   complaining of suspicious or paranoid thinking. These people
14   are going to be -- individuals with this diagnosis are going to
15   believe that people are trying to harm them or hurt them in
16   some way or that people are trying to do something bad to them.
17   They're going to be paranoid or delusional, or they're going to
18   have some sort of delusion where they believe something is
19   happening that is not really happening.
20       Q.    Doctor, I want to go forward some in these records
21   here, and basically I just want to point out some of the things
22   that were being reported and being diagnosed. I want to ask
23   you to look at this page, and these are not actually numbered.
24   I don't believe State's 145 are either. But included in these
25   records are indications, and during another psychiatric

45

1  evaluation, the Defendant had reported his history of

2  depression; is that correct?

3      A.  Yes.

4      Q.  Could you tell the jury what he -- how he reported

5  that to that psychiatrist at that time?

6      A.  Yes.  It states there that he said, I've had

7  depression basically all my life.

8      Q.  Okay.  Does he go on to state that he's been -- he's

9  misunderstood?

10      A.  Yes.  He says, I'm misunderstood.

11      Q.  People think that he's F'ing crazy?

12      A.  Yes.

13      Q.  That's what they're really thinking about him?

14      A.  Correct.

15      Q.  And that he can't interact with anyone?

16      A.  Correct.

17      Q.  And what does he -- how does he -- what does he

18  finally say in regards to those -- I think people have ulterior

19  motives?

20      A.  I think people have ulterior motives is what he

21  seems to say there, yes.

22      Q.  Next page, dealing with that same psychiatric

23  evaluation, he talks about passive suicidal ideation, does he

24  not?

25      A.  Yes.

46

1      Q.  And what does he report?

2      A.  He says that people are against him, but that he

3  doesn't have a suicidal plan.

4      Q.  Okay.  And then he does not want to -- he does not

5  ever want to wake up?

6      A.  Yes, I'm sorry, I didn't see that.  He does not want

7  to wake up.

8      Q.  It also talks in the -- in the initial plan of care

9  that was for this individual, talks about the fact that they --

10  that they are aware of there that there is a -- a possible

11  family history of bipolar disorder; is that correct?

12      A.  Correct.

13      Q.  Were you aware that after -- well, let me stop --

14  let me come back to that.  I want you to look at this note

15  that -- one of the group notes that was made in regards -- in

16  response to his treatment there at Timberlawn.  And we spoke

17  about it a moment ago that the Defendant -- how did the

18  Defendant report that he was doing based upon his

19  hospitalization there?

20      A.  On a note dated 8-22-09, it says:  Patient states he

21  feels more depressed being here.

22      Q.  Okay.  And let me stop you right there.  He's

23  reporting that his symptoms are actually getting worse; is that

24  correct?

25      A.  It appears to be so, yes.

47

1      Q.  Okay.  And, again, going back to what he said

2  earlier, being in a -- being in a, quote, unquote, mental

3  hospital, it's not a fun place to be, is it?

4      A.  No, it is not.

5      Q.  And -- I mean, the reporting and the psychiatric

6  notes and evaluations are clearly indicative of someone

7  suffering from severe mental illness.  In fact, he was

8  diagnosed with severe mental illness?

9      A.  Correct.

10      Q.  And by his own report, his depression is getting

11  worse due to the fact that he's being hospitalized and in that

12  environment.

13      A.  That's what he is reporting, yes.

14      Q.  Okay.  And finally, Doctor, I just want to ask you,

15  in regards to his -- is there a description in there about his

16  being withdrawn and isolated?

17      A.  Yes, on a note dated 8-21-09, by nursing, it

18  describes him as being withdrawn, blunted affect, and depressed

19  mood.  Patient isolating in his room most of the shift.

20      Q.  Okay.  In another group note -- and, again, these

21  are -- these are notes that are taken over the course of time

22  that he's there and these -- and these different psychiatric

23  evaluations and these different group meetings when people are

24  meeting with him; is that correct?

25      A.  Correct.

48

1      Q.  Can you tell how he's reporting on this particular

2  occasion?

3      A.  Yes.  It says:  Patient reported worthlessness, no

4  place here in this world at all.  I know life after death is

5  for me.

6      Q.  Okay.  And I mean, do these -- do these phrases --

7  and obviously, whoever is doing these evaluations, they're

8  including these -- these notes and these quotations in their

9  evaluation.  What is the significance of these type of things

10  when -- when -- for you when someone is reporting these things

11  to you?

12      A.  This is a very negative ideation, and it's

13  consistent with what we typically see in people that are

14  severely depressed, in other words, people who are so depressed

15  that they really, really think negatively about their

16  circumstances or their situation.  There's a lot of

17  hopelessness and helplessness in there.

18      Q.  You see the part in here where he's talking about

19  that he's really in this mental hospital just so he can --

20  because he's there for a good time so he can get him a

21  government check.  Do you see any part in the notes about that?

22      A.  I did not see anything to that effect, no.

23      Q.  Group -- group notes from later in the week, talking

24  about the Defendant, just sits quietly, doesn't participate.

25  Could you talk to us about that?  What does -- what does that

49

2     A.   That indicates to me that he's very withdrawn --

3   socially withdrawn, that he's in an emotional state where it's

4   probably very difficult for him to have enough initiation to

5   socialize with other people.   And -- and basically a person

6   who's -- who's mentally and emotionally isolated and withdrawn

7   themselves.

8     Q.   And finally, Doctor, on this last note that I want

9   you to review, could you talk and explain what the attending

10  psychiatrist put down in regards to his feelings?

11    A.   Yes.   Reported feelings of paranoia, and then in

12  parenthesis, everyone has hidden agendas, people exploit you.

13  Increased anxiety, increased depression, increased isolating

14  behaviors.

15    Q.   I want to stop you there.

16    A.   Yes.

17    Q.   This is -- this is a psychiatric note that the

18  person has -- has -- that his levels of anxiety are increasing,

19  his levels of depression are increasing, his level of isolated

20  behaviors are increasing?

21    A.   Correct.

22    Q.   Okay.   It doesn't sound like whatever they're doing

23  in there is actually -- is actually doing much to combat the --

24  the reported symptoms that he's been experiencing; is that

25  right?

50

1     A.   Well, it appears like he's still suffering from

2   severe symptomatology and -- and according to these notes, some

3   of it may be increasing.

4     Q.   There's a quotation -- in the next line, there's a

5   quotation coming from the Defendant.   Can you tell -- can you

6   tell them how he reported to the psychiatrist?

7     A.   Yes.   Well, the psychiatrist reports positive

8   suicidal ideation, passive.   And then in quotes it says:   I'd

9   be happy once I die.

10    Q.   And how did he report feeling?

11    A.   Patient identifies hopeless feelings, stating, I'm

12  worse than when I got here.

13    Q.   Okay.   And as we've talked about, also, Doctor, I

14  mean, not -- I mean, that's not the result that you're looking

15  for when you have a person that's hospitalized, is it?

16    A.   No, of course not.

17    Q.   Okay.   And you are aware that he was subsequently

18  discharged with the diagnosis and a referral for a follow-up

19  at -- I'm not -- you're not familiar with the North Star

20  program or the Metrocare Clinic here in Dallas, are you?

21    A.   I'm not familiar with those programs.

22    Q.   Are you familiar with the Timberlawn Hospital here

23  in Dallas?

24    A.   No, I'm not familiar with that hospital, either.

25    Q.   And you were also asked to review --

51

2   reporter --

3          What notes were the Metrocare notes?

4          COURT REPORTER:   146.

5     Q.   (BY MR. JOHNSON)  I want to ask you to look at my

6   copy of what's been offered and admitted into evidence as

7   State's Exhibit Number 146.   And I want to ask you if after

8   Gary Green was discharged from Timberlawn Hospital -- and let

9   me ask you this.   The notes reflect that Gary -- Gary Green was

10  discharged from Timberlawn because he requested to be

11  discharged; is that correct?

12    A.   I believe I recall reading that somewhere.

13    Q.   Okay.   And there is an actual way that you can

14  forcibly detain or hold someone in a mental hospital, correct?

15    A.   Correct.

16    Q.   And that's -- and what's the actual terminology for

17  that?

18    A.   Commitment.

19    Q.   Okay.   And in order to get a commitment, what's the

20  standard that has to be met?

21    A.   The person has to be determined to be an impending

22  danger to himself or others at that time.

23    Q.   Okay.   And stating that you think he'll be better

24  off when he's dead, I just want to -- I just don't ever want to

25  wake up again, things are -- those descriptions, they don't

52

1   meet the level of being able to actually get someone -- force

2   someone to stay, do they?

3     A.   It appears that the clinician did not feel that they

4   needed a commitment at that time.

5     Q.   Well, he's not actively saying, I'm going to kill

6   myself today, I'm going to kill myself tomorrow, or I'm cause

7   anybody else that kind of harm.   There's no impending actual

8   threat at that time?

9     A.   It appears to be so, yes.

10    Q.   Okay.   It appears that once he left Timberlawn

11  Hospital, they had given him instructions to follow this --

12  follow this up.   And when he left the hospital, he was -- he

13  left the hospital on those medications that had been given

14  for his depression and for his -- the treatment of the

15  schizophrenic type symptomatology; is that correct?

16    A.   Correct.

17    Q.   And he was referred over to North Star, and, in

18  fact, he did follow up over there a few days later; is that

19  correct?

20    A.   It appears that there's a clinical note dated

21  8-27-09.

22    Q.   Okay.   And so he did go back there at that time and

23  he was -- and he went in, they did the same type of evaluations

24  with him at that time speaking about the symptoms that he was

25  experiencing and the -- reporting basically the same

53

1  symptomatologies; is that correct?

2      A.   Correct.

3      Q.   Okay.  Now, Doctor, as far -- Doctor, the -- the

4  mental diagnosis that we have been talking about here -- and,

5  again, I just want to stress, when you talk about a

6  schizoaffective disorder bipolar type, we're talking about a

7  severe mental illness?

8      A.   Correct.

9      Q.   Is that -- is that consistent with the things that

10  he had been reporting not only when he was in the Timberlawn

11  Hospital, but also when he went to the North Star?

12      A.   Yes.

13      Q.   And is that consistent with the information and the

14  diagnosis that you formulated for this particular Defendant

15  yourself?

16      A.   Yes, it is.

17      Q.   Okay.  And that is the mental diagnosis or the

18  thought mood disorder that you described earlier; is that

19  correct?

20      A.   That is correct.

21      Q.   Okay.

22            MR. JOHNSON:  Judge, can we approach real quick?

23            THE COURT:  You may.

24            (Sidebar conference.)

25      Q.   (BY MR. JOHNSON)  Doctor, you had said earlier that

54

1  the -- other than the -- what we classified in regards to the

2  mental illness aspect of the diagnosis, there is also a --

3  behavioral disorders.  You talked -- you talked about those

4  being what is referred to as Axis II diagnoses; is that

5  correct?

6      A.   That is correct.

7      Q.   Could you -- without getting too technical, could

8  you tell -- tell the jury what's the distinction really between

9  an Axis I and Axis II diagnosis?

10      A.   Yes.  An Axis I diagnosis refers -- is where we code

11  mental disorders like depression, schizophrenia.  These are

12  serious problems that imply problems with brain function and

13  problems with mood and thinking, whereas Axis II is a place

14  where we code personality and behavioral problems.  These are

15  considered -- they can be serious, as well, but they're

16  considered to be -- to involve more how a person relates to

17  others around him or how a person behaves or -- acts in the

18  world.

19      Q.   Okay.  Now, Doctor, in regards to the -- Gary Green,

20  were you able to also diagnose him with personality disorder?

21      A.   Yes.  I wasn't able to diagnoses him with a specific

22  personality disorder, and I didn't do a thorough enough

23  assessment to do that, but I was able to diagnose him with

24  features of different personality disorders.

25      Q.   Okay.  And can you tell the jury what personality

55

1  disorders or what your actual Axis II diagnosis was?

2      A.   Yes.  In -- in my report with the information that I

3  had at that time, I felt that he had features of paranoid

4  personality disorder.  And this is very common in people with

5  schizoaffective disorder where their paranoid thinking is sort

6  of part of their personality.  These are people who -- people

7  who have this condition often believe that everybody is out to

8  get them, that people are trying to hurt them, they're very

9  mistrustful of others, they're very mistrustful of everybody

10  else's intentions.  And this is something that is occurring

11  every day in their lives, and it's affecting the way that they

12  interact with other people.  It can make them avoidant or make

13  them not have relationships with other people or make them be

14  more suspicious or hostile to other people because they feel

15  that other people are -- are doing something bad to them.

16            I also felt he had features of what's called

17  borderline personality disorder, which -- which includes a lot

18  of -- what's called behavioral decompensation.  People with

19  borderline personality disorder, whenever they feel threatened

20  or they feel that something bad is going to happen to them or

21  they feel abandoned, they -- they can go into a rage, they

22  become irritable, they lose control of their behavior, they --

23  they also have a lot of what's called suicidal gesturing, which

24  means that they tell people over and over again that they'd

25  rather die or that they want to kill themselves or things like

56

1  that.  So he had some features of that personality disorder.

2            He also had features of what's called avoidant

3  personality disorder.  People with this type of disorder,

4  they -- they tried to -- they tend to stay to themselves.  They

5  don't like to socialize.  They don't enjoy socializing.  They

6  would rather be in their room watching television than talking

7  with people.  They would rather be on their own.  And, in fact,

8  they get very nervous or anxious around other people.  And --

9  and they have difficulty relating to other people.

10            And then -- and then I also think that in

11  addition to his -- his depression, he also sort of has a

12  depressive personality.  In other words, he's the type of

13  person who's always thinking negatively about things.  You

14  know, people with depressive personalities, they don't always

15  have to be severely depressed, but just most of the time in

16  their lives, they're -- they -- they're -- they think

17  negatively about themselves.  They feel kind of hopeless and

18  helpless and they think that bad things are happening to them

19  all the time.  They sort see the glass as half empty, instead

20  of half full.  So at the time I felt that he had these

21  features.  I -- I have modified my opinion somewhat after

22  sitting in the courtroom, and I can discuss that if needed, as

23  well.

24      Q.   That's what I was going to talk to you about next.

25      A.   Yeah.

57

1      Q.   Again, going back to what we spoke about earlier in
2  regards to the referral questions that we asked, we were asking
3  you to perform a -- a mental diagnosis in regards -- well, a
4  complete mental diagnosis, but specifically in regards to
5  really the Axis I, the mental aspect.
6          In regards to the borderline personality or
7  the -- I'm sorry, the personality disorders, several of which
8  you've kind of defined and discussed, there's another
9  personality disorder known as antisocial personality disorder;
10 is that correct?
11     A.   That's correct.
12     Q.   Okay.  And in order to -- and one of the -- probably
13 the most common element or the common feature of the antisocial
14 personality disorder is a complete understanding and a complete
15 history in regards to the person's criminal behavior; is that
16 right?
17     A.   That's correct.
18     Q.   Okay.  And that information in regards to the mental
19 diagnosis, that information was not provided to you, was it?
20     A.   That's correct.  The referral question was to
21 evaluate his -- his mental functioning, his mental disorder,
22 and at the time that I conducted my assessment and -- and wrote
23 my report, although I knew that the Defendant was charged with
24 capital murder, I did not have information regarding his -- his
25 criminal history.

58

1      Q.   And it was not necessary for what you were asked to
2  do, was it?
3      A.   No, it was not.
4      Q.   Okay.  Now, as -- as you said just a moment ago, as
5  an expert witness in a case, you're allowed to sit in here and
6  actually hear -- hear testimony and you were able to hear the
7  testimony from the Defendant's family members, as well as Dr.
8  Gray-Smith; is that correct?
9      A.   That's correct.
10     Q.   After hearing this information, do you have any
11 opinions as to whether or not the Defendant does, in fact,
12 exhibit characteristics that would be consistent with
13 antisocial personality disorder?
14     A.   Yes, I think his -- his criminal history would meet
15 the criteria for -- one of the criteria for antisocial
16 personality features, as well.  One of the -- the things about
17 personality disorders is that in order to diagnose somebody
18 with a personality disorder, there has to be some evidence that
19 they don't demonstrate that particular issue as a result of
20 another condition.
21          In other words, if a person avoids other people
22 because they are depressed, then they may not meet the criteria
23 for avoidant personality disorder.  They'll only meet the
24 criteria for avoidant personality disorder if they avoid other
25 people when they're not depressed, as well.  And so -- so when

59

1  I'm diagnosing a mental disorder in somebody, I do extensive
2  testing and extensive assessment, but if I want to diagnose a
3  behavioral disorder, I have to be more specific, and I have to
4  be able to rule out that those features of those behavioral
5  disorders were not caused by another condition, such as a manic
6  episode or a depressive episode and so forth.
7          But I'm sorry for the long-winded answer, but to
8  answer your question, yes, I do feel that after what I've
9  learned since I've been here, that Mr. Green will -- will meet
10 DSM-IV diagnostic for antisocial personality features or
11 possibly an antipersonality disorder, as well.
12     Q.   Okay.  Is there also some things that -- and when we
13 spoke about this -- and -- and talking about it, you said that
14 there are some things about us that certainly need more
15 information in regards to a couple of the particular symptoms
16 that you looked for in your DSM-IV evaluation.  What -- what
17 particularly are those?
18     A.   Well, we're -- we're looking for -- in order -- in
19 order for a person to meet criteria, they have to -- they have
20 to exhibit certain symptoms and certain features or certain
21 behaviors.  And -- and when we're looking at mental disorders
22 -- for example, when we're looking at depression, we look for
23 disturbances in sleep and appetite, mood, sadness, lack of
24 initiation, lack of interest in -- in usual activities and so
25 forth.

60

1          When we're looking at Axis II diagnoses, we look
2  at what kinds of problems has this person had in their
3  interpersonal behavior that are causing them social and
4  occupational dysfunction in their lives.  In other words, what
5  kind of problems are they having that are interfering with
6  their everyday living?  And -- and oftentimes individuals
7  have -- and you've heard this term a lot lately -- is
8  comorbidity where they have a lot of different things.  And so
9  it's not uncommon for us to find an individual to have multiple
10 features of multiple personality disorders all mixed in
11 together.
12          In Mr. Green's case, I saw features of avoidant
13 personality disorder.  I saw features of paranoid personality
14 disorder.  I saw features of borderline personality disorder
15 and -- and depressive personality disorder.  And -- and the
16 more I learned about him, I also see features of antisocial
17 personality disorder, as well.
18     Q.   And the distinction between the actual personality
19 disorder and a mental illness -- a mental illness is -- I mean,
20 the personality disorder is your -- your behavior, your
21 interaction with others.  A mental illness, the Axis I
22 diagnosis goes to an actual chemical imbalance, something -- I
23 mean, something in the brain that can't be controlled by the
24 individual; is that right?
25     A.   The mental illness is -- is implied that there is --

61

1  that there is a much greater amount of dysfunction in thought
2  and mood and -- and implied brain functioning, as well.  And so
3  -- so as we mentioned before, the -- the personality disorder
4  describes a person's behavior, whereas a mental disorder
5  describes a person's functioning, their -- their mood and their
6  thinking on -- on a different kind of level.  And, yes,
7  people can -- and they often do, will have a mental disorder
8  and a personality disorder.
9          In Mr. Green's case, no matter what personality
10  disorder that he has, it doesn't matter if he has all of them,
11  he still has schizoaffective disorder and it's still severe.
12  He still has episodes of severe depression, mixed in with
13  agitation and mania and racing thoughts, and he still has a
14  lifelong history of paranoid and delusional ideation that
15  happens with the mood problems and without the mood problems.
16  So either way, regardless of how many personality disorders he
17  has, he's still going to meet diagnostic criteria for
18  schizoaffective disorder.
19      Q.   Schizoaffective disorder is an actual treatable
20  medical -- medical, slash, mental condition, is it not?
21      A.   It's treatable, yes.  I mean, there's medications
22  that are given to treat it.  It's a chronic condition, so it's
23  something that -- that happens throughout a person's life and
24  it will recur.  Just like all other mental disorders, it'll get
25  exacerbated in times of stress.  In other words, when people

62

1  get more stressed or more dysfunctional, the disorder will get
2  worse.  When people have good stability in their lives and good
3  support and good treatment, the condition will get better.  So
4  it's just like any other mental disorder where there are
5  treatment options, but there's a lot of different factors that
6  come into play as to whether a person does well or not.
7      Q.   But the drugs that we talked about earlier that the
8  Defendant was placed on and put on, those are drugs that are --
9  that are specifically designed -- are designed and used to
10  treat the symptomatology of both schizoaffective and
11  depression; is that correct?
12      A.   Correct.
13      Q.   Doctor, I want to ask you something -- briefly about
14  the comorbidity of drug usage in regards to behavioral
15  disorder -- or mental illness.  Do you often find that
16  individuals suffering from mental illnesses will self medicate?
17      A.   There is a -- there's a very high comorbidity
18  between mental disorders and substance abuse.  In other words,
19  those two things exist hand-in-hand in a large number of
20  people.  And -- and, yes, in -- in certain people, people with
21  untreated depression and anxiety or people who don't -- who
22  have all different types of mental disorders, schizophrenia or
23  whatever it may be, there is a much higher incidence of them
24  over using illicit drugs and alcohol.  And -- and, yes, the --
25  the -- it's commonly felt that they -- that they, quote,

63

1  unquote, self medicate.  In other words, they -- they're trying
2  to sort of get some relief from the -- the tension and pain and
3  emotional turmoil that they're experiencing as a result of
4  their mental disorder so they have a much higher tendency to
5  abuse legal drugs and illegal drugs.
6          And then with comorbidity, what ends up
7  happening is that the drugs can make the condition worse.  In
8  other words, it's not an effective treatment because it causes
9  the problems -- the person more problems in their life.  So as
10  they use drugs as an ineffective way of treating their mental
11  disorder, they get worse over time.  And so those two things
12  exist together in a large number of people that are
13  dysfunctional.
14      Q.   Okay.  Doctor, the last area I want to talk to you
15  about is an area -- I guess you're going to tell us.  Do you
16  have any expertise in the area of psychopathy?
17      A.   No, I do not.
18      Q.   And can you tell the jury what psychopathy is?
19      A.   Well, psychopathy is a term that is sometimes
20  mistakenly used as a synonym -- thought to be similar to
21  antisocial personality disorder or sociopathy, but it's a --
22  it's a specific term that's used clinically -- that people use
23  who do a lot of research in the area and -- and work in the
24  area of forensic psychology.  As clinicians, I don't have
25  specific training and experience in evaluating and treating

64

1  antisocial personality disorder.  For example, I can diagnose
2  it in a person who -- who comes into my office if -- if they
3  meet the diagnostic criteria, but psychopathy is a different --
4  is a term that refers to something related, but it does have
5  different meaning than antisocial.
6      Q.   And you are not -- again, you're not -- you're not a
7  forensic psychologist?
8      A.   Correct.
9      Q.   You weren't asked to perform a forensic evaluation
10  of the Defendant?
11      A.   Correct.
12      Q.   And you have no expertise in the area of psychopathy
13  or what's -- You're familiar with what's known -- or you're
14  familiar with the terminology of the HARE, PCL-R; is that
15  correct?
16          COURT REPORTER:  The what --
17      Q.   (BY MR. JOHNSON)  The h-a-r-e, hare, PCL-R -- PCL,
18  dash R -- Psychopathy Checklist Revised; is that correct?
19      A.   I'm -- I'm familiar with the terminology, but I've
20  never used or administered that test.
21      Q.   Doctor, I believe that's all the questions I have
22  for you now, sir, thanks.
23          THE COURT:  Ladies and gentlemen, we're going to
24  take our morning break.
25          THE BAILIFF:  All rise.

65

1  (Jury excused from courtroom.)

2  THE COURT: On the record. On the record.

3  MR. JOHNSON: Judge, at this time the -- comes

4  now the Defendant, we're going to move for a motion and ask the

5  Court to grant a Motion in Limine with regards to attempting to

6  question or trying -- or questioning this witness outside of

7  any of the areas that he's qualified to testify. He's already

8  testified -- he's already testified that he's not capable of

9  testifying in matters -- in relation to matters of forensic

10  psychology. And we're going to ask that the State not continue

11  to inquire of him in matters relating to forensic psychology

12  and matters relating to future dangerousness which would be

13  inappropriate and impermissible under the current status of the

14  law.

15  THE COURT: All right.

16  MR. BEACH: I'm not going to ask him his opinion

17  about future dangerousness. That motion is so broad that if

18  I -- if the word "murder" comes out of my mouth, you know, he

19  might object that I'm getting outside his area of expertise, so

20  I'm not going to ask him any kind of ultimate issue opinion

21  about future dangerousness.

22  MR. JOHNSON: Well, also, it goes to the issue

23  in regards to trying to have this witness come in and try to do

24  some type of psychopathy rating.

25  THE COURT: I -- I understand what -- what you

66

1  want. I think that --

2  MR. BEACH: It can be handled by objection,

3  hopefully --

4  THE COURT: I think it can be handled by

5  objection rather than Motion in Limine, so I'm not going to

6  grant a Motion in Limine, but feel free to object and we -- we

7  can talk about it.

8  MR. JOHNSON: Well, okay --

9  THE COURT: I'm just not going to grant a Motion

10  in Limine. I'm not saying that I wouldn't sustain that

11  objection -- that very objection that -- that you're making. I

12  notice that if you ask that in a very direct line which he

13  knows it will get sustained, but as far as --

14  MR. JOHNSON: Well, I can tell you, Judge,

15  there's about three minutes after we begin this examination,

16  that we're going to have to have another hearing because I'm

17  certain --

18  THE COURT: Okay, I disagree.

19  MR. JOHNSON: Okay.

20  THE COURT: I'm not saying that we won't have a

21  hearing. I think he's going to ask it right. So anyway --

22  (Discussion off the record.)

23  MR. BEACH: Judge, do I need to offer that

24  letter now?

25  THE COURT: It's already been admitted for

67

1  record purposes.

2  MR. BEACH: Oh, for record purposes.

3  THE COURT: All of those have been admitted for

4  record purposes.

5  MR. BEACH: He has no objection to me reading

6  that?

7  MR. JOHNSON: I have no -- what number is it?

8  MR. BEACH: It's 148.

9  MR. JOHNSON: I have no objection to him reading

10  the agreed-upon sentence from State's Exhibit 148 that's been

11  admitted for record purposes.

12  THE BAILIFF: All rise.

13  THE COURT: Okay.

14  (Jury returned to courtroom.)

15  THE COURT: Thank you all. Please be seated.

16  Cross.

17  CROSS-EXAMINATION

18  BY MR. BEACH:

19  Q.  State your name for the record again, please.

20  A.  My name is Dr. Gilbert Martinez.

21  Q.  And you are the same Dr. Gilbert Martinez that

22  testified before the lunch break; is that correct?

23  A.  Correct.

24  Q.  Doctor, let's just get set in stone what Gary Green

25  is not, okay?

68

1  A.  Okay.

2  Q.  Based on your training and experience and your --

3  you spent about six, seven hours total with Gary Green in your

4  lifetime; is that correct?

5  A.  Correct.

6  Q.  Gary Green is not schizophrenic?

7  A.  Correct.

8  Q.  Gary Green is not bipolar?

9  A.  Correct.

10  Q.  Gary Green is not mentally retarded?

11  A.  Correct.

12  Q.  And you did six separate I.Q. testing procedures; is

13  that correct?

14  A.  I gave -- I gave one I.Q. test that has 14 subtests.

15  Q.  Okay. And it yielded six different types of I.Q.

16  scores; is that correct?

17  A.  It yields -- I'm not sure if it's six different

18  types. I think it's five, if I'm not mistaken.

19  Q.  That's not a big deal. Five or six?

20  A.  It's five.

21  Q.  And the values fell between 78 and 84; is that

22  correct?

23  A.  That is correct.

24  Q.  And four of the five values you testified to fell in

25  the low average range; is that correct?

69

```
1        A.   That is correct.
2        Q.   And were you provided Mr. Green's penitentiary
3   records, sir?
4        A.   No, I was not.
5        Q.   And since you were not provided his penitentiary
6   records, would it surprise you that his screened I.Q. in the
7   prison system was 105?
8        A.   Yes, I would be very surprised.
9             MR. BEACH:  May I approach, Judge?
10            THE COURT:  You may.
11            MR. BEACH:  Did you pull them out?  Are you
12   tricking me again?
13       Q.   (BY MR. BEACH)  This is a prison record.  I.Q. --
14   what does that say there?
15       A.   It says 105.
16       Q.   Okay.  Here's another prison record.  We can look
17   through all of them.  The same I.Q. of 105; is that correct?
18       A.   Yes.  I would be interested to see what test they
19   used.
20       Q.   Okay.  Do you have any explanation, Doctor, as to
21   why Mr. Green's I.Q. went from 105 down to 78 --
22       A.   Yes.
23       Q.   -- after he murdered Lovetta Armstead and Jazzmen
24   Montgomery?
25       A.   I would be very interested to see what test was used
```

70

```
1   because different tests have different reliability and
2   validity.  There are some tests that are just screening
3   measures -- in other words, a person can be asked a few
4   questions.  There's even tests on the internet that a person
5   can take to give you an I.Q., but it's really not considered
6   acceptable methodology for psychologists and
7   neuropsychologists, so I -- I would like to have more
8   information about that before I can explain a discrepancy.
9        Q.   You told us that Mr. Green has cognitive deficits;
10   is that correct?
11       A.   That is correct.
12       Q.   But, again, whether it's his I.Q. -- and you
13   differentiated I.Q. from cognitive deficits; is that right?
14       A.   That is correct.
15       Q.   But they're similar; is that correct?
16       A.   They have a -- there's a lot of overlap in
17   functioning, yes, correct.
18       Q.   You told us that based on his low average I.Q.'s in
19   four to five areas, you would expect that Mr. Green could live
20   independently; is that correct?
21       A.   People with I.Q.'s in that area usually are able to
22   live independently; that's correct.
23       Q.   And you sat in here yesterday and you heard the
24   education expert; is that correct?
25       A.   That is correct.
```

71

```
1        Q.   That Mr. Green wasn't -- should have been referred,
2   I guess, for some type of special ed evaluation?
3        A.   Correct, I did hear that.
4        Q.   And you've also -- you read a letter here -- or
5   excerpts from a letter here, Doctor, that Mr. Green wrote to
6   his girlfriend about 20 years ago while in the penitentiary
7   where he said, I'm currently attending college to get my
8   associate's and to hopefully start on my second degree before
9   my time of release is up.  Did you read that?
10       A.   Yes, I did just read that recently.
11       Q.   Now, you also administered cognitive -- ability
12   tests; is that correct?
13       A.   That is correct.
14       Q.   And you told us that you administered the Trails A
15   and B test; is that correct?
16       A.   That is correct.
17       Q.   And before we get to that, did you also utilize
18   certain psychological techniques to help you in your --
19   developing your opinions?
20       A.   Psychological techniques?  Do you mean the use of
21   psychological tests?
22       Q.   Specifically, did you utilize a draw a person
23   technique?
24       A.   Yes, I -- I administered that, but I -- I did not
25   rely heavily on that for my opinion.
```

72

```
1        Q.   Can you pull that out of your file, your neuropsych
2   testing and --
3        A.   Yes.
4        Q.   While you're at it, did you have him draw a family
5   technique, as well?
6        A.   Yes.
7        Q.   Is that the Trail 8 there?
8        A.   Yes.
9        Q.   Kind of keep that open.
10       A.   Uh-huh.
11       Q.   And you had Gary Green draw a person; is that
12   correct?
13       A.   That is correct.
14       Q.   And that was part of your psychological testing?
15       A.   Correct.
16            MR. HEALY:  Judge, can you dim the lights,
17   please?
18       Q.   (BY MR. BEACH)  And this is the person that Gary
19   Green drew during your neuropsychological testing of him; is
20   that correct?
21       A.   That's correct.
22       Q.   You've seen the Timberlawn records; is that -- is
23   that right?
24       A.   Yes, I have.
25       Q.   And one of the Timberlawn records they have -- they
```

73

1 have -- a certain five or six faces from smiling all the way to
2 frowning about how much pain he's in; is that correct?
3     A.   I believe so, yes.
4     Q.   And at least as of that day, the best of pain was 3
5 out of 5; is that correct?  Can you see that?  Can you look,
6 Doctor, there's a TV screen right there by your right hand --
7 by your right hand.
8     A.   Okay.  By my right hand.
9         JUROR:  No, down.
10     Q.   (BY MR. BEACH)  Other right.
11         JUROR:  That's your left hand.
12     Q.   (BY MR. BEACH)  There you go.
13     A.   I need testing.
14     Q.   We all do.
15         3 out of 5; is that correct?
16     A.   Okay.  Let's see here.  Current pain scale rating.
17 It does say 3 out of 5 there, yes.
18     Q.   Point to the -- the face which demonstrates the 3
19 out of 5.
20     A.   Okay.  Do I point to it up here?
21     Q.   Right there on the screen, just touch -- just touch
22 it with your hand or use that pointer there.
23     A.   Oh, this -- this screen here?
24     Q.   Yes.
25         COURT REPORTER:  No, no.

74

1     Q.   (BY MR. BEACH)  That screen -- that screen right
2 there.
3         MR. JOHNSON:  Bottom one.
4     A.   Bottom one, okay.  This one right here?
5     Q.   (BY MR. BEACH)  There you go.  Perfect.
6     A.   Okay.
7     Q.   That's the 3 out of 5?
8     A.   I believe so.  That one says 3 severe pain.
9     Q.   Okay.  And -- all right.  That's good.  Then you
10 also had Mr. Green draw a -- draw a family; is that correct?
11     A.   That is correct.
12     Q.   And this is Mr. Green's effort to do that?
13     A.   Yes.
14     Q.   And although you do not rely on these techniques
15 heavily, they did factor some -- somewhat into your -- your
16 opinions?
17     A.   These are referred to as projective tests, and they
18 do some standardization.
19     Q.   Okay.
20     A.   But I -- I do not use that standardization.  What I
21 mainly use these measures for is just to see -- to get a rough
22 idea of a person's perceptual ability, how they organize
23 information and things like that visually.  I don't use them in
24 the traditional sense where I try to read a lot into what
25 caused them to draw people a certain way or what caused -- you

75

1 know, other psychologists do in different contexts, but I don't
2 use them that way.
3     Q.   Now -- I'm sorry --
4     A.   Different tests can be used -- I'm sorry.
5     Q.   I'm sorry.
6     A.   -- different tests can be used in different ways by
7 psychologists, and I just give these -- they're sort of like
8 auxiliary measures that I don't rely on very much unless
9 there's something really unusual about them.
10     Q.   You also administered the Trails A cognitive test;
11 is that correct?
12     A.   That is correct.
13     Q.   And do you have that with you?
14     A.   Yes, I do.
15     Q.   Can I can get that displayed?  You're familiar with
16 where the TV screen is now?
17     A.   Yes, I think so.  I might miss it.
18     Q.   All right.  What are you trying to get Mr. Green to
19 do on this -- on this test?
20     A.   This test is a measure of psychomotor speed and
21 mental tracking, so basically what the person does is connect
22 the numbers in order beginning with number 1.  And this is the
23 sample.  It's the practice part.  And then the following page
24 has the actual test.  And it's a measure of how fast their
25 psychomotor speed is and how fast their tracking is.

76

1     Q.   And Mr. Green was able to complete that exercise
2 without any errors; is that correct?
3     A.   That's correct.
4     Q.   And the 34 up there, in the upper right, what does
5 that signify?
6     A.   That it took him 34 seconds to complete it.
7     Q.   Is that within average range?
8     A.   That's within the average range, yes.
9     Q.   Now, you have the Trails B test, as well.
10     A.   That should be on the --
11     Q.   The other side of that.
12     A.   -- the third page is where that would start, I
13 think.  The -- the second page there is actually going to be
14 the actual Trails A test.
15         MR. JOHNSON:  Judge, excuse me.  I don't believe
16 these -- I don't have any objection.  I don't believe any of
17 these documents have been offered or admitted.  Am I incorrect
18 on that?
19         MR. BEACH:  No, you're not incorrect.
20         THE COURT:  No, they need to be admitted.
21         MR. JOHNSON:  We need to do something so they --
22 for the purposes of the record.
23         THE COURT:  Yeah.  Go ahead and mark them.
24         MR. BEACH:  He wants his originals back.  Does
25 he need the originals back?

77

```
1    A.    That's the only copy that I have.  That is Trails A,
2  the actual test.
3          (Discussion off the record.)
4    Q.    (BY MR. BEACH)  That's the actual Trails B.
5    A.    That is Trails B; that's correct.
6          (Discussion off the record.)
7          MR. BEACH:  At this time, Judge, we would offer
8  into evidence State's Exhibits 161 through 165, inclusive, and
9  we would agree to make copies -- substitute the copies for the
10 record so the Doctor can have his originals back.
11         (State's Exhibits 161 through 165 offered.)
12         MR. JOHNSON:  We would have no objection.
13         THE COURT:  They are admitted.
14         (State's Exhibits 161 through 165 admitted.)
15   Q.    (BY MR. BEACH)  Going back to State's 164, Doctor,
16 this is the actual Trails A test; is that correct?
17   A.    That's -- yes, that is correct.
18   Q.    So you start at 1 and go all the way to the end; is
19 that correct?
20   A.    That is correct.
21   Q.    And State's 165 is the Trails B test?
22   A.    Yes, correct.
23   Q.    And what are you trying to see if Mr. Green can do
24 on this neuropsych test?
25   A.    This one is actually similar to Trails A in that
```

78

```
1  it -- it tests for psychomotor speed and mental tracking, but
2  in this one, as you can see, the subject has to alternate
3  between letters and numbers and so there's a mental shifting
4  component.  In other words, he has to shift his thinking from
5  numbers to alphabet, and he has to do this as quickly as he
6  can.  So it's measuring his -- the speed of his mental
7  shifting, as well.
8    Q.    And is the Trails B test thought of as a test for
9  higher level cognitive ability?
10   A.    Yes, to an extent.  It is -- it is thought of as a
11 test of what's called executive functioning, mental shifting.
12 It's not -- obviously, not a test of complex thinking or
13 anything like that.  It's more of a mental shifting test.
14   Q.    And was Mr. Green able to complete the Trails B test
15 without error?
16   A.    Yes, I believe so.
17   Q.    Can you move it down a little bit?
18   A.    Yes, he completed it without errors.
19   Q.    And the time that he completed it in, was that
20 within the average range?
21   A.    It's within -- yes, it's -- he fell in the 15th to
22 25th percentile which is -- sort of like the low average to
23 average range.
24   Q.    All right.  Thank you.
25   A.    Yes.
```

79

```
1    A.    And well get you your originals back here.
2    A.    Thank you.
3    Q.    Okay.  So you were not provided -- strike that.
4          You testified on direct -- the more information
5  that you had available to you prior to conducting your
6  neuropsych test, the better off you were going to be; is that
7  correct?
8    A.    A neuropsychologist always wants to get as much
9  information as possible before making a diagnosis, but we are
10 under some constraints sometimes.
11   Q.    Well, Mr. Green, as you know, spent ten years in the
12 penitentiary from 1990 to 2000 on an aggravated robbery
13 offense.  You were not provided with his penitentiary records,
14 whether it was his parole records or medical, psychological
15 records for that ten-year stay?
16   A.    That is correct.
17   Q.    And would it surprise you that nowhere in Mr.
18 Green's penitentiary records during that ten-year time frame
19 was he ever diagnosed with any kind of mental illness?
20   A.    It would -- it would surprise me in a sense, but it
21 wouldn't surprise me because it's not uncommon for people in
22 prisons, is my understanding, to not get care for mental
23 health.  So I guess -- I guess I would be a little bit
24 surprised, but not too surprised.
25   Q.    I mean, he was -- he was treated for stress
```

80

```
1  management, had some insomnia and anxiety and stress, but never
2  was diagnosed with any kind of either mental illness -- with
3  any kind of mental illness; that wouldn't surprise you?
4    A.    It would -- it would be the same answer.  I would be
5  a little surprised, but I wouldn't expect it to be outside of
6  the realm of possibilities.
7    Q.    Now, you also were provided Mr. Green's Parkland
8  jail and health records; is that correct?
9    A.    Yes.
10   Q.    Okay.  And in those records, we have records going
11 back to 2006 where Mr. Green was in the Dallas County Jail.  Do
12 you recall that?
13   A.    Yes.
14   Q.    And let's just start with '06 to '08.  Did you see
15 anywhere in there -- in those records where Mr. Green was
16 diagnosed with schizoaffective or any other kind of mental
17 illness?
18   A.    I do not recall seeing that.
19   Q.    In the 2008 records, it does state that Mr. Green
20 used marijuana on a daily basis.  Do you recall seeing that?
21   A.    I do recall seeing that, yes.
22   Q.    And an individual that uses marijuana on a daily
23 basis, combined with morbid obesity, combined with very high
24 blood pressure, that could lead to depressive looking symptoms,
25 couldn't it?
```

81

1    A.    No, not -- not necessarily.  I -- I wouldn't be able

2    to answer yes to that question.

3    Q.    I'm not asking -- it can, though?

4    A.    I -- I don't really know how to answer that

5    question.  Obesity can be linked to depression.  Hypertension

6    in itself is not directly associated with depression that I

7    know of.  And -- and chronic marijuana use can contribute to

8    depressed affect in some people or it can contribute to the

9    opposite in others.

10   Q.    Can't it make you apathetic, it kind of look like

11   you have flat affect and make you want to sit on the couch and

12   play video games, too; is that correct?

13   A.    That -- that can happen in some people, and so I

14   guess the answer would be yes, but not everybody.

15   Q.    Now, you've also -- you were shown extensively the

16   Timberlawn records while you were testifying on direct, and,

17   again, you would agree with me that the psychiatrist out at

18   Timberlawn did not diagnose Mr. Green with schizoid-affective

19   disorder; is that correct?

20   A.    That is correct.

21   Q.    And he was there for four and a half days?

22   A.    I believe so, yes.

23   Q.    That's longer than seven hours that you spent with

24   him; is that correct?

25   A.    That's correct.

82

1    Q.    And we've gone through the -- the complaints -- and,

2    again, this is a situation where Gary Green wasn't taken

3    kicking and screaming in a straightjacket to Timberlawn, was

4    he?

5    A.    I -- I believe that he checked himself in is what

6    the records reflect.

7    Q.    He drove himself down there and checked himself in;

8    is that correct?

9    A.    I believe so, yes.

10   Q.    And I'm -- I'm not remembering, Doctor.  When you

11   talked about your credentials and your experience, you just do

12   some work on the civil side; is that correct?

13   A.    I do some work on the civil -- most of my practice

14   is clinical.  And then a percentage of my practice is -- is --

15   involved in evaluating people in civil litigation, and then a

16   very small percentage is in death penalty and capital murder

17   cases.

18   Q.    Civil litigation, car wrecks, head -- closed head

19   injuries, you do neuropsych tests and come in and tell a jury

20   a guy, you know, is messed up to the tune of $10 or $500,000 -- I

21   mean, you don't make them -- but you're coming in to try to

22   tell a jury if he's hurt or not; is that correct?

23   A.    Yes.  I'm not a life care planner, so I don't -- I

24   usually don't talk too much about dollar amounts.  I just --

25   Q.    I understand.  I understand.

83

1    A.    -- evaluate people to see if they have mental

2    problems.

3    Q.    Have you ever done any work in the Social Security

4    income disability arena?

5    A.    Very little.  We -- we don't do that -- that much

6    work with that.  Occasionally I've evaluated a few people, but

7    there are some people that specialize in that and do a lot of

8    work in that and I -- I don't.

9    Q.    Do you know one way or the other, Doctor, if -- if

10   you're awarded Social Security income disability from the

11   government, if that is exempt from being garnished for child

12   support?

13   A.    That, I do not know.  I don't know about that.

14   Q.    And Mr. Johnson asked you -- I know it's tongue in

15   cheek, but there was nowhere in the Timberlawn records where

16   Gary Green walked in and stood in front of the admissions desk

17   and said, I'm here for a crazy check.  There's nothing in the

18   records about that, is there?

19   A.    I don't recall seeing that.

20   Q.    I'm guessing if he did say that, that they probably

21   would not have admitted him?

22   A.    I -- I really can't speak for what they would have

23   done or not done at that point.

24   Q.    You talked about the symptoms, the conditions that

25   Gary Green self reported once he was admitted to Timberlawn; is

84

1    that correct?

2    A.    Yes, I -- I believe we reviewed that.

3    Q.    Trouble sleeping, racing thoughts, you know,

4    depression, those kinds of things; is that correct?

5    A.    Correct.

6    Q.    He's also complaining that he just was kind of tired

7    of life, wanted to die, just wanted to go on with it; is that

8    correct?

9    A.    That's correct.  That's my impression.

10   Q.    And as a result of that, they placed Mr. Green on

11   what's called close observation; is that correct?

12   A.    Yes.

13   Q.    That wouldn't surprise you when a patient comes in,

14   is talking about killing himself, they've got liability so

15   they're going to make sure that they keep a close eye on a

16   fellow that's talking about killing himself while he's inside

17   their perimeter?

18   A.    I'm sure they have policies and procedures for how

19   they handle those circumstances that they have to follow.

20   Q.    Okay.  And in the Timberlawn records -- and the jury

21   can see -- see them if they want to -- I mean, they're

22   monitoring him every 15 minutes 24 hours a day; is that

23   correct?

24   A.    I -- I don't know if it was that much, but I know --

25   I do know, though, that in -- that in those settings they do

85

1  monitor people pretty regularly.

2      Q.  I'm showing you what's been admitted as State's

3  Exhibit 145, Doctor.  Just for example here, we've got a flow

4  sheet; is that correct?

5      A.  Yes.

6      Q.  And it's got different codes about what's going on

7  in 15-minute intervals all the way throughout the day; is that

8  correct?

9      A.  That's correct.

10     Q.  Okay.  And if you look at P, what's that a code for?

11     A.  Sleeping.

12     Q.  Sleeping.  And 4 is where he's sleeping; is that

13  right?

14     A.  Yes.

15     Q.  So every 15 minutes the staff is coming in to make

16  sure that Gary Green is sleeping in his room?

17     A.  It looks like that's what they're coding there, yes.

18     Q.  So from midnight on the 22nd, all the way to at

19  least 7:45 that morning, Mr. Green at least is -- denoted in

20  the flow sheet as sleeping in his room?

21     A.  It appears that way, yes.

22     Q.  Let's see if we can go back to the day before and

23  see if Mr. Green went beddy-bye before that.  It looks like he

24  went to sleep that night around 2200 -- be what, 10 o'clock?

25     A.  Yes.

86

1      Q.  So from 10 o'clock the night before until 7:45 that

2  next morning, this man that's having trouble sleeping is

3  sleeping?

4      A.  That's -- that appears to be what's documented

5  there, yes.

6      Q.  And he spends four and a half days there and checks

7  himself out; is that correct?

8      A.  That was my understanding, yes.

9      Q.  And when he checks himself out, there's a discharge

10  diagnosis?

11     A.  Yes.

12     Q.  Okay.  And that discharge diagnosis was depression?

13     A.  Yes, it was depression with psychotic features and a

14  rule out of bipolar.

15     Q.  The psychotic features were he was talking about

16  killing himself?

17     A.  The psychotic features probably refers to him -- him

18  having delusions that people are trying to harm him or hurt him

19  that were alluded to in the initial intake.

20     Q.  And then you've also -- then once he's taken into

21  custody for the murders of his wife and his stepdaughter, he's

22  brought back to Parkland.  You've seen those records; is that

23  correct?

24     A.  Yes, I have, recently.

25     Q.  And he's been in the jail here since September 22nd

87

1  of last year?

2      A.  I believe, so, yes.

3      Q.  And you've reviewed all those records, including his

4  mental health records up in the jail; is that correct?

5      A.  Yes, I've reviewed them briefly since I've been

6  here.

7      Q.  And are you surprised that nowhere in the Parkland

8  records since September 22nd of last year was Mr. Green

9  diagnosed with any kind of mental illness?

10     A.  Again, it is a little surprising, but unless

11  somebody does a thorough, comprehensive psychological

12  assessment of Mr. Green, they're probably not going to have

13  enough information to provide a thorough diagnosis.  So I'm not

14  fully surprised.

15     Q.  Actually -- I mean, he has been diagnosed with some

16  kind of disorder.  He's been diagnosed with adjustment

17  disorder; is that correct?

18     A.  I believe I remember seeing that in the records,

19  yes.

20     Q.  And he's being treated right now with an

21  antihistamine, an antihypertension medication, and an

22  antidepressant; is that correct?

23     A.  Yes.

24     Q.  Okay.  Can you tell the members on the jury what is

25  the most commonly prescribed category of medication currently

88

1  going on here in the United States?

2      A.  I'm not a physician, and so I really don't know the

3  answer to that question, unless -- unless, you know, I guess it

4  would be antidepressant medication.

5      Q.  That's where I'm going.  That's the most --

6      A.  I have a lay -- lay knowledge of that.  I mean, as

7  psychologists, we work with medication, but we try not to get

8  too involved in it.

9      Q.  And you've told us your concerns with Mr. Green's --

10  his cognitive limitations and his intellectual low average to

11  even below that; is that correct?

12     A.  Can you rephrase the question?

13     Q.  You told us on direct about your opinions and --

14  concerning his intellectual capabilities, as well as his

15  cognitive limitations?

16     A.  Yes, I did.

17     Q.  Showing you a page from his Parkland jail records,

18  pointing right here, can you read that part about where he

19  generally talks about people judging others and is very

20  philosophical and analytical.  He asked for a magazine in our

21  last discussion, Psychology Today?

22     A.  Correct.

23     Q.  So Mr. Green is up there reading Psychology Today in

24  the jail, or he's asking for it?

25     A.  It sounds like he was, yes.

89

1    Q.   And for the -- I mean, just for the jury's benefit,
2    what is adjustment disorder?
3        A.   Adjustment disorder is -- it's a diagnosis that's
4    used when somebody is having emotional problems and reaction to
5    something.  In other words, they're having difficulty adjusting
6    emotionally to a loss or a death or a stressful situation.  It
7    has to occur for a certain length of time, and -- and it has to
8    not meet criteria for a depressive disorder or other emotional
9    disorder at that time.  In other words, it doesn't fully meet
10   the criteria for depression, but the person is having some
11   emotional problems adjusting to something.
12       Q.   An adjustment disorder, Doctor is not a severe
13   mental illness, is it?
14       A.   In most people it is not.  It can become chronic and
15   severe in some people, but generally it's a -- it's in response
16   to stressors and it's not considered as severe as major
17   depressive disorder or schizophrenia or schizoaffective
18   disorder.
19       Q.   And if you're a diehard Texas Ranger fan, there
20   might be some adjustment disorder issues going on right now
21   that may linger, you know, in the next week, maybe the next
22   month; is that right?
23       A.   They're going to kick up the numbers on the
24   antidepressant medication.
25       Q.   There you go.  Doctor, the best I can tell in the

90

1    seven hours you spent with Mr. Green, you are the only human
2    being here on this earth in his over 20 years now in and out of
3    the jail system, going to Timberlawn, that's ever diagnosed him
4    with a severe mental illness.  Would you agree with me?
5        A.   No.  Did you say except Timberlawn?
6        Q.   Yes.
7        A.   Okay.  It appears to be from the records that I have
8    that he's never been diagnosed with a severe mental illness;
9    that's correct, except for Timberlawn.
10       Q.   And do you know whether or not Mr. Green did, in
11   fact, as soon as he left Timberlawn, put in his application for
12   Social Security income disability?
13       A.   I -- I remember hearing that somewhere or reading
14   that somewhere recently, so -- so I guess the answer would be,
15   yes, I believe so, but I'm not sure.
16       Q.   Now, we talked to you -- today is Thursday, right?
17       A.   Yes.
18       Q.   We talked to you Tuesday afternoon; is that correct?
19       A.   That's correct.
20       Q.   And that was outside the presence of the jury; is
21   that right?
22       A.   That's correct.
23       Q.   And we were able to elicit what opinions you had
24   formed as of Tuesday afternoon; is that correct?
25       A.   That's correct.

91

1        Q.   And you told us Tuesday afternoon under oath that
2    you did not think Gary Green met the antisocial personality
3    disorder criteria; is that correct?
4        A.   That's correct.
5        Q.   And let's just start with -- the antisocial
6    personality disorder criteria; they're found in the DSM-IV; is
7    that correct?
8        A.   That's correct.
9        Q.   Tell the folks of the jury what the DSM-IV is.
10       A.   The DSM-IV is the Diagnostic and Statistical Manual
11   of Mental Disorders.  It's basically the reference book that
12   most mental health clinicians, psychiatrists, psychologists,
13   school counselors and so forth, use to diagnose and classify
14   and categorize the mental disorders and behavioral disorders
15   that people have.  So in other words, it's the reference book
16   that everybody looks at that tells you how to diagnose people
17   and what's required to diagnose somebody.
18       Q.   And just give me ballpark.  How many -- in the year
19   2010 now, how many different clinical diagnoses are in the
20   DSM-IV?
21       A.   Oh, boy.
22       Q.   Hundreds?
23       A.   Yeah, probably.  Yeah, maybe -- maybe over a
24   hundred.  If you break up all the subcategories and things like
25   that, it will probably be in the hundreds.

92

1        Q.   And do you know when the first DSM was -- was
2    published?
3        A.   I think the first DSM was published -- maybe in
4    1952.  There was obviously a I, a II, a III, a IV.  Then
5    there's been a text revision in 2000, and then the V is coming
6    out in 2013.  I know that's more than what you asked, but
7    that's my understanding of the time line.
8        Q.   So depending on what you believe, for 3000 years,
9    the world operated without any kind of DSM; is that correct?
10       A.   Yes, I believe so.
11       Q.   Okay.  And that means there wasn't anything called
12   schizo -- schizoid-affective before 1952?
13       A.   It hadn't been labeled, and I think actually
14   schizoaffective came later than that, so it's probably in the
15   version III or IV, so probably not until the 1980's or 90's is
16   when schizoaffective became to be understood.
17       Q.   Did you -- agree with me, Doctor, there are just
18   some -- just mean people in the world?
19       A.   Yes.
20       Q.   Mean people without any kind of severe mental
21   illness?
22       A.   Yes.  Those people would be antisocial, uh-huh.
23       Q.   Mean people who are capable of doing just hideous,
24   monstrous acts; is that correct?
25       A.   We see -- we see it every day in the news,

93

1  unfortunately, yes.

2       Q.   And if one of those really mean people walks into

3  your office -- into your clinical practice and says, Doc, I'm

4  just a mean, lazy, son of a gun, I need you to treat me --

5       A.   Uh-huh.

6       Q.   -- could you bill an insurance company for that?

7       A.   Could I bill an insurance company for -- for that?

8  Well, we -- we would have to figure out what was really wrong

9  with the person, you know, and -- and depending on what's

10  really wrong with them, then, you know, some of the -- some of

11  the things are covered by insurance and some of them aren't.

12      Q.   But you can't bill an insurance for somebody that's

13  just mean, can you?

14      A.   For somebody who's just mean?

15      Q.   Right.

16      A.   Well, if the person is having interpersonal problems

17  as a result of their behavior -- in other words, they have a

18  behavior problem or a personality disorder that causes them to

19  be mean and to have problems in their relationships with other

20  people, actually a lot of insurance companies will pay

21  for that -- will pay for therapy for that.

22      Q.   You can't -- you can't write the insurance company

23  and say, this guy is just mean.  You've got to have one of

24  those clinical diagnoses to reference before they're going to

25  pay you, right?

94

1       A.   Well, if you say a guy is just mean, then it would

2  show that you don't have the training and experience in order

3  to be able to interpret the person's real problems.

4       Q.   Okay.  You told us that if they are just plain mean,

5  that would correlate to be -- being antisocial; is that

6  correct?

7       A.   Well, that would be one -- a lay person's

8  description of a behavior of somebody who might be antisocial,

9  yes.

10      Q.   Let's talk about the clinical or the DSM-IV criteria

11  for antisocial personality disorder.

12      A.   Okay.

13      Q.   The first thing you've got to be able to show is --

14           MR. BEACH:  Judge, I'm sorry.

15      Q.   (BY MR. BEACH)  There's evidence of conduct disorder

16  with onset before age 15; is that correct?

17      A.   Yes, but that's not the first thing.  Are we missing

18  the first part?

19      Q.   I want to start -- we'll go -- we'll go to --

20      A.   Okay.  So we're going to go --

21      Q.   -- 15 after this.

22      A.   Go in reverse.  Okay.

23      Q.   I want to take it chronologically.

24      A.   Okay.

25      Q.   So you've got to have evidence of conduct disorder

95

1  with onset before age 15?

2       A.   Yes.

3       Q.   And do we have that in this case?

4       A.   Again, I didn't have all of the information that I

5  needed, but -- but as -- as I sit here and learn more about Mr.

6  Green's behavior, it does appear that he had conduct problems

7  before age 15, so I'm a little uncomfortable saying yes for

8  sure, because I'm not an expert in that area either and I don't

9  evaluate to an in depth extent, but it does appear that there

10  were some problems with conduct.

11      Q.   Doctor, I'm going to show you what's been marked for

12  identification as State's 165, and are you familiar with

13  State's 165?

14      A.   Yes, I am.

15           COURT REPORTER:  Oh, I'm sorry.  It needs to be

16  167.

17           (Discussion off the record.)

18      Q.   (BY MR. BEACH)  We'll start over.

19      A.   Okay.

20      Q.   Showing you what's been marked as State's

21  Exhibit Number 166.  Are you familiar with State's 166?

22      A.   Yes, I believe so.

23      Q.   Is this information that was supplied to you by

24  Kelly Goodness who was working for the Defendant in this case?

25      A.   Yes.

96

1       Q.   And that was supplied to you back in January of

2  2010?

3       A.   That's correct.

4       Q.   And you've reviewed the contents of State's 166?

5       A.   Yes, I have.

6       Q.   And did they help you in forming your opinions in

7  this case?

8       A.   Well, that was a letter -- the referring letter that

9  specified what I was being asked to do in this case.

10      Q.   Also, with her summaries of interviews contained --

11  attached to your matching orders, basically?

12      A.   Yes, the -- the first two pages are the referral

13  letter asking me what to do, and the -- it looks like the next

14  six pages after that are -- is some of the information that was

15  provided to me from Dr. Goodness's office regarding interviews

16  and history for the subject that was to be interviewed.

17      Q.   And you relied on those interview summaries; is that

18  correct?

19      A.   That is correct.

20           MR. BEACH:  We'd offer State's 166 at this time,

21  Your Honor.

22           (State's Exhibit 166 offered.)

23           MR. JOHNSON:  No objection.

24           THE COURT:  It's admitted.

25           (State's Exhibit 166 admitted.)

97

1    Q.   (BY MR. BEACH)  As part of the interview summaries
2    provided to you by Dr. Goodness -- and she's -- she's here in
3    the courtroom today, the lady in the front row with the dark
4    hair; is that correct?
5    A.   That's correct.
6    Q.   And she's also a psychologist here in the Metroplex?
7    A.   Yes.
8    Q.   Apparently the Defendant's brother, Nysasno Carter,
9    was interviewed.  Are you aware of that?
10   A.   Yes, I am.
11   Q.   You've also talked to him in person; is that right?
12   A.   Yes, I talked to him over the telephone.
13   Q.   You see that highlighted area there?
14   A.   Yes.
15   Q.   Mr. Carter reported that the Defendant and he had
16   two dogs together as children, and Mr. Green and a friend
17   Marcus set fire to the dogs; is that correct?
18   A.   That's correct.
19   Q.   Now, would that help you in making your
20   determination as to whether or not Mr. Green exhibited conduct
21   order behavior just before age 15?
22   A.   Yes, I would be interested to know whether that was
23   due to psychosis or whether --
24   Q.   I didn't ask you what it was due to.  Would that
25   help you in -- in --

98

1    A.   It would be an important piece of information, yes.
2    Q.   Cruelty to animals by individuals before age 15,
3    that's a big one, isn't it?
4    A.   That is a symptom that is exhibited by children with
5    conduct disorder; that's correct.
6    Q.   And, also, I guess you've learned either here in the
7    courtroom or from other additional records that Mr. Green had
8    truancy issues; is that correct?
9    A.   That's my understanding, yes.
10   Q.   That he began smoking marijuana at age 12 which is a
11   violation of the criminal law; is that correct?
12   A.   Yes.
13   Q.   So you would agree with me that Mr. Green has
14   exhibited behavior of conduct disorder before age 15?
15   A.   Yes.
16   Q.   So that criteria -- criterion is met?
17   A.   There is evidence for that criteria, yes.
18   Q.   Now, let's go to the part that you were talking
19   about.  We have to find three of the following -- yeah, three
20   of -- yeah, we'll take it back a little bit -- the following
21   categories within -- to conclude your -- your diagnosis as to
22   antisocial personality disorder; is that correct?
23   A.   That's correct.
24   Q.   The first is failure to conform to social norms with
25   respect to lawful behaviors as indicated by repeatedly

99

1    performing acts for grounds for arrest.  No question Mr. Green,
2    he aces that -- that first criteria?
3    A.   Yes.
4    Q.   Deceitfulness is indicated by lying, use of alias,
5    or conning others for personal profit or pleasure.  Do you have
6    any evidence of that?
7    A.   I -- I didn't have specific evidence of that, and --
8    when I conducted by assessment and -- and I can't think of any
9    right now.  I guess I'm just not sure.
10   Q.   I want you assume with me, Doctor, that Mr. Green
11   did go through that exercise at Timberlawn to start the process
12   of -- of obtaining money from the government, okay?  I want you
13   to assume with me that that's a truism, okay?
14   A.   Okay.
15   MR. JOHNSON:  Judge, I object to that because
16   there's absolutely no evidence of that -- that being a factor.
17   That's assuming facts not in evidence, not proven by any
18   testimony in the case.
19   MR. BEACH:  I'm just setting up my hypothetical,
20   Judge.
21   THE COURT:  Well, call it a hypothetical rather
22   than a truism.  That's -- that's not -- call it a hypothetical.
23   Q.   (BY MR. BEACH)  That's why I said to assume it.
24   But, yeah, consider this a hypothetical.  That's why he went to
25   Timberlawn, okay?

100

1    A.   Okay.
2    Q.   And that would be to -- for his personal profit -- I
3    mean, if he was going to get a check from the government,
4    that's something that -- if he went there to lie about that and
5    set that up, that would be for his personal profit?
6    A.   If a -- if a person faked having psychiatric
7    symptoms and checked themselves into a psychiatric hospital for
8    five days for personal profit, yes, that would be a pretty
9    major lie -- attempt to lie.
10   Q.   And you reviewed the Timberlawn records; is that
11   correct?
12   A.   Yes, I have.
13   Q.   And one of the things that Mr. Green was claiming in
14   the Timberlawn records is he had been sexually abused as a
15   child; is that right?
16   A.   That is correct.
17   Q.   He also claimed that he was laid off of his job a
18   month before at Timberlawn; is that correct?
19   A.   I -- I believe so.  I don't remember all of the
20   details off the top of my head, but that sounds reasonable.
21   Q.   And if Mr. Green was not laid off, but if he just
22   voluntarily quit his job, that would be a lie; is that right?
23   A.   If he said he was laid off, but he really quit his
24   job, then, yes, that would be a -- an untruth.
25   Q.   Patient told that he was sexually molested by his

101

1    aunt, mother's sister, when he was three years old, and he
2    never told anyone except his mother when he was age 17.  His
3    mom told him he was most likely mistaken, and he has never
4    mentioned it again.  That's in the Timberlawn records.  Do you
5    recall that?
6        A.   I recall reading something about that, and he told
7    me the same thing in my interview with him.
8        Q.   You were sitting in here yesterday when Gary Green's
9    mother testified; is that right?
10       A.   Yes.
11       Q.   And Gary Green's mother testified under oath that
12   was all news to her, she had never heard anything about Gary
13   coming to her saying that he had been sexually abused by one of
14   her sisters?
15       A.   I believe that's what she testified to, yes.
16       Q.   So if you believe her, Gary is lying at Timberlawn
17   about something, I guess, that's causing him stress?
18       A.   I would suppose so, yes.  There's some inconsistency
19   there.
20       Q.   Number three, impulsivity or failure to plan ahead.
21   He's all over that one, isn't he?
22       A.   When I -- when I evaluated him, I didn't see a lot
23   of evidence for impulsivity during the assessment, but usually
24   people with criminal histories do have problems with
25   impulsivity.

102

1        Q.   Irritability and aggressiveness as indicated by
2    repeated physical fights or assaults.  And we've heard about
3    how he treated his girlfriends and --
4        A.   Yes.  There -- there's evidence for that in his
5    history.
6        Q.   Reckless disregard for safety of self or others?
7        A.   Yes, obviously, there's record of that in his
8    history, as well.
9        Q.   Consistent irresponsibility as indicated by repeated
10   failure to sustain consistent work behavior or honor financial
11   obligations?
12       A.   That -- there was -- there was some allusions to
13   that in the information that I've had so far.  It wouldn't
14   surprise me.
15       Q.   Okay.  And finally, lack of remorse as indicated by
16   being indifferent to or rationalizing, having hurt, mistreated,
17   or stolen from another.  There's certainly evidence of that; is
18   that correct?
19       A.   That was something that I -- that I had questions
20   about in my clinical -- in developing my clinical opinions
21   regarding the Defendant because it seemed like Mr. Green was --
22   when I -- when I was speaking with him at least, I felt like he
23   was being -- like he did have some remorse, or at least he was
24   expressing remorse.  And so -- so, you know, people who don't
25   have any remorse, they typically not -- don't get depressed by

103

1    their behavior, the things that they do, they don't brood on
2    it, they forget about it, and they move on.  And it seems like
3    Mr. Green was thinking about things a lot and brooding over
4    things.  So -- so I'm not sure about that one on -- from what
5    I've seen.
6        Q.   Well, I mean, the first step in true remorse is
7    accepting responsibility.  Wouldn't you agree with me?
8        A.   Yes, sure.
9        Q.   So if he's telling his mother and his brother that,
10   you know, his wife came at him with the knife and somehow he
11   was able to miraculously get the knife away from her and start
12   stabbing at her and then the wife picked up the baby and then
13   that's how the baby got stabbed, that wouldn't be accepting
14   responsibility, would it?
15       A.   Well, we're kind of getting into an area that I'm
16   not an expert in, you know.  And so I -- I didn't really do
17   that much of an assessment regarding that.  So I guess I should
18   be a little more careful about talking about actual remorse and
19   things like that.
20       Q.   Now --
21       A.   I -- I haven't seen a lot of evidence for a lack of
22   remorse, but it wouldn't surprise me if it's there.
23       Q.   You read the five and a half page letter that Mr.
24   Green wrote to his wife right before he murdered her and the --
25       A.   Yes, I did.

104

1        Q.   Where he's talking about he's the victim?
2        A.   Yes.
3        Q.   It's all her fault?
4        A.   Yes.
5        Q.   Because she wanted to put him out?
6        A.   I believe so, yes.
7        Q.   Finally, Doctor, your marching orders from Kelly
8    Goodness included not to discuss the alleged offense with the
9    Defendant; is that correct?
10       A.   That's correct.
11       Q.   So you didn't talk to the Defendant about the crime
12   itself?
13       A.   That's correct.
14       Q.   You were not provided by the defense, for instance,
15   the videotaped hour and a half confession taken within 12 hours
16   of the murder of Mr. Green?
17       A.   No, I was not provided that.
18       Q.   You didn't ask for that?
19       A.   I did not.
20       Q.   You didn't think that would help you in forming your
21   opinions as to whether or not Mr. Green had a mental -- mental
22   illness?
23       A.   I was -- I was asked -- the referral question was to
24   evaluate him without any reference to the crime.  And so I
25   wasn't allowed to have that information, and I did not require

105

1  it because I agreed to evaluate him without reference to the
2  crime. I'm not a forensic psychologist.
3      Q.  What does forensic psychology mean?
4      A.  Forensic psychology is the study of all the mental
5  aspects of -- of criminality and the law. For example, a
6  forensic psychologist can specialize in things like future
7  dangerous or culpability or insanity, whether somebody was --
8  knew right from wrong at the time that they committed an
9  offense. It's a very specialized area that people need
10  training and experience in order to be able to conduct. I'm a
11  clinical neuropsychologist. My job is to diagnose people with
12  mental conditions and mental disorders, but I do very little
13  legal work, and I don't have extensive training and experience
14  in it, as you can probably tell.
15      Q.  We're here in a courtroom today, though, right?
16      A.  Yes, we are.
17      Q.  It doesn't get any more forensic than being here in
18  the punishment phase of a death penalty case, does it?
19      A.  It's pretty intense for me.
20      Q.  You're telling these folks that you're not here to
21  offer any opinion as to whether or not Mr. Green's so-called
22  schizoid-affective severe mental illness had anything to do
23  with what happened on September 21st, 2009?
24      A.  That is correct. I'm just saying that he's -- that
25  he's mentally ill. I'm not saying that that's what caused him

106

1  to do that.
2      Q.  And how much an hour are we paying you to come in
3  here and say that?
4      A.  I don't know yet. I -- I haven't determined how
5  much I bill, but I -- I would imagine it's going to be
6  something like around $200 an hour or something like that.
7      Q.  You don't have a standard rate?
8      A.  I don't have a standard rate. I don't do this often
9  enough and haven't really developed one yet for this. I -- I
10  do have a standard rate for -- for my civil work, but I haven't
11  figured out what the Court will pay me to come here.
12      Q.  It's a heck of a lot more intense than a car wreck
13  case, isn't it?
14      A.  It's a lot more intense, yeah. But -- but I don't
15  think I'm going to get paid as much as I do in those cases.
16      Q.  And you've met Randy Price; is that correct?
17      A.  Yes, I have. I've met Dr. Price.
18      Q.  And he's -- is he still here? Okay. He's sitting
19  here in the front row in the brown tie.
20      A.  Yes.
21      Q.  And he's a board certified forensic psychologist?
22      A.  I -- I believe so. I -- I don't really know very
23  much about his training and certification.
24      Q.  And he's up here in the Dallas area; is that right?
25      A.  That is correct, I do know that.

107

1      Q.  Doctor, do you have any idea why Kelly Goodness had
2  to go all the way to San Antonio to find an expert to come in
3  here and say that Mr. Green had a severe mental illness?
4      A.  Well, people in my field, we -- there aren't very
5  many of us around that work in the public sector. And, for
6  example, in San Antonio, there's maybe about four people that
7  do what I do. And a lot of them won't take legal work because
8  of all of this. I've been here for three days now, and all of
9  my patients -- I've had to reschedule and things like that, so
10  I would assume it's a similar situation here in Dallas where
11  it's hard to find a neuropsychologist who is willing to take
12  the time to do this, and also to be put up on the stand and
13  questioned like this and so forth. You know, there's not very
14  many neuropsychologists that are willing to do that.
15      Q.  Would you be surprised, Doctor, there are
16  approximately 20 full-time forensic psychologists here in the
17  Metroplex that do this for a living full time?
18      A.  I wouldn't be surprised. Dallas is a pretty big
19  area.
20          MR. BEACH: I appreciate your patience with me.
21  And I'll pass the witness, Judge.
22          THE WITNESS: Okay. Thank you.
23              REDIRECT EXAMINATION
24  BY MR. JOHNSON:
25      Q.  Doctor, the last question Mr. Beach just asked you,

108

1  I guess he's still confused about the terminology. He's
2  talking about forensic psychologists. We're talking about
3  neuropsychology, are we not?
4      A.  That's what I believed we were talking about, yes.
5      Q.  Okay. When he asked about how many forensic
6  psychologists are in -- in Dallas, that has nothing to do with
7  the amount of neuropsychologists that are even within the State
8  of Texas that are willing to take on these kind of diagnoses;
9  is that correct?
10      A.  I would imagine that for neuropsychology, the number
11  is going to be a lot lower than 20. I -- I don't think that
12  there would be that many.
13      Q.  Again, there's a lot of people that won't accept any
14  kind of this stuff because of the time that it puts on your
15  practice; is that right?
16      A.  That's correct.
17      Q.  And when we talk about the diagnoses or the -- the
18  referral letter Mr. Beach has alluded to, that's -- you
19  understand what you were asked to do, and that was to find out
20  for evidence of a mental illness?
21      A.  That's correct.
22      Q.  Is there any doubt whatsoever in your mind, sir,
23  that Gary Green is -- has a severe mental illness?
24      A.  No, there's no doubt that he's mentally ill. He
25  is -- he's very mentally ill.

109

1    Q.  And in fact, as Mr. -- Mr. Beach has gone over some

2  of the symptomatologies of -- of -- that would fit in the

3  criteria to -- for a diagnoses of antisocial personality

4  disorder.  That is not something that you were asked to do in

5  particular because ASPD is a behavioral disorder, correct?

6    A.  That's correct.

7    Q.  And behavioral disorder is -- we were asking for you

8  to find evidence of behavioral disorders in context of mental

9  illness; is that correct?

10    A.  That's correct.

11    Q.  Okay.  So he's asking you to compare apples to

12  oranges in a way here, is he not, if he's saying that you just

13  ignore one thing.  We're asking you to look at -- for the big

14  picture of mental illness.

15    A.  Yes.  That's correct, and -- and you really can't

16  separate them all apart.  You know, people suffer from

17  comorbidity, and so they suffer from a lot of different mental

18  conditions.

19    Q.  Right.  And when he -- and I guess he's -- he's

20  making reference -- he made references to several things here.

21  Let's go through a couple of them.  This -- his -- you

22  understand when he talks to you about, do you understand that

23  the Defendant applied for SSDI.  Do you remember him -- he

24  mentioned that?

25    A.  Yes, I do remember that.

110

1    Q.  And you said that you think you have heard that or

2  saw that somewhere here in the last few days?

3    A.  I -- I don't remember specifically.  I --

4    Q.  I'm guilty.

5    A.  Okay.

6    Q.  You don't remember me and you talking about it back

7  there that Mr. Beach was going to be questioning you about all

8  of his -- his theories of this case?

9    A.  There's been a lot going on in the last three days,

10  and, yes, I guess I would say that I do remember that.

11    Q.  Okay.  So his -- and you understand -- and you

12  understand that as he's questioning you here today, his theory

13  is --

14           MR. BEACH:  Judge, I'm going to object to what

15  my theory is.  It's in the -- it's in the evidence that he

16  applied, so I'm going to object to the form of the question.

17  It's an attack on me personally.

18           THE COURT:  Object to the form -- form of the

19  question.  Rephrase your question, please.

20    Q.  (BY MR. JOHNSON)  When Mr. Beach questioned -- when

21  Mr. Beach asked you about that, sir, did you -- did you

22  understand that to be for a particular reason that he was

23  asking you that question?

24    A.  Okay.

25    Q.  I'll withdraw that for right now.

111

1  Let me -- let me go to -- let me go to another

2  point first.

3    A.  Okay.

4    Q.  Do you remember when he asked you about the question

5  about can you bill an insurance company just because a fellow

6  is mean?

7    A.  That was an unusual question, yes.

8    Q.  Do you think maybe that might have something to do

9  with his theory that the only reason that Timberlawn diagnosed

10  him with something was because they wanted to bill the

11  insurance?

12           MR. BEACH:  Same objection to form, Your Honor.

13           MR. JOHNSON:  Judge, I think it's a fair

14  question.

15           THE COURT:  That's overruled.

16    Q.  (BY MR. JOHNSON)  Do you think it -- you think it

17  might have anything to do because that's Mr. Beach's theory in

18  this case?

19    A.  Well, you know, it does -- it does seem to be the

20  case that -- that there may have been -- he's trying to present

21  the argument that he was hospitalized for disability.

22  Obviously, anybody can see that, and so -- so I guess the

23  answer would be yes.

24    Q.  Let me ask you something, Doctor.  If you think that

25  a fellow was going to go to a mental hospital and check himself

112

1  in, do you think if he was looking for a surefire way to get

2  SSDI, that he probably wouldn't (sic) come up with some greater

3  symptoms than what Gary Green is down there describing?

4    A.  Well, I don't think somebody would go to that extent

5  and do it that way.  There's a lot easier ways to get Social

6  Security disability, and then also, I don't -- these symptoms

7  are consistent with what I've observed clinically and what's

8  been observed clinically in other places and what his family is

9  reporting, so I -- I -- I guess if we have to use the word

10  "theory," I don't really buy into that theory at all myself

11  personally.  I really think that he was having a mental and

12  emotional breakdown at the time and that's why he sought

13  treatment.  He was hospitalized for a while.  He didn't enjoy

14  the hospital experience and -- and signed himself out which is

15  not unusual in psychiatric hospital type settings.  People sign

16  themselves out pretty quick usually, if they go in.

17    Q.  And if you -- if you want to go down there and --

18  and really paint the case for your crazy check -- I mean, you

19  can paint feces on the wall.  You can stand on your head naked.

20  You can do a whole lot better than just telling people that I

21  think the world would be -- it would be a better thing for me

22  if I was dead.

23    A.  I -- I think --

24    Q.  I mean, it seems to be -- it seems to be a minor

25  report of symptomatologies, if it's for the purpose of getting

113

1    yourself a crazy check, doesn't it?

2        A.   It would be extremely unusual.  I -- I've never seen

3    anything to that extent before --

4        Q.   Okay.

5        A.   -- that way, and so, yeah, I don't think so.

6        Q.   Okay.  And, again, when we asked you to do this

7    diagnosis for the purpose of mental illness -- and -- and

8    Timberlawn -- I mean, but apparently from all the records

9    you've reviewed, when Gary Green was at Timberlawn, he saw

10   several psychiatrists, did he not?

11       A.   I believe so, yes.

12       Q.   And these psychiatrists diagnosed him with a severe

13   mental illness; is that correct?

14       A.   That's correct.

15       Q.   Is schizoaffective disorder bipolar type, is that

16   somehow a better mental illness than major depressive disorder?

17       A.   No.  There's actually going to be more impairment

18   associated with schizoaffective disorder than there is with

19   simple major depressive order.

20       Q.   Did I come to you and say, Doctor, could you try to

21   beef up this little -- this -- this major depressive order

22   recurrent with psychotic episodes?  Did I tell you we needed

23   something a little fancier than that for trial?

24       A.   No, nobody told me to do that.

25       Q.   And Mr. Beach questioned you earlier about these --

114

1    about this dichotomy between being diagnosed and treated in an

2    institutional setting.

3        A.   Yes.

4        Q.   And you alluded to that.  Would you tell me -- would

5    you tell us again why it doesn't surprise you that when Gary

6    Green is either sitting in the penitentiary or sitting in the

7    jail, that he's not being diagnosed and treated for a

8    recognized mental type of an illness?

9            MR. BEACH:  Judge, wait a second.

10           THE COURT:  I don't understand the question.

11           MR. BEACH:  He's not qualified -- he said he's

12   not a forensic psychologist.  How -- how could he answer that?

13           MR. JOHNSON:  Mr. Beach -- No, Mr. Beach asked

14   him if he was surprised he hadn't been diagnosed.

15           MR. BEACH:  Talking about the penitentiary

16   setting, though.  That takes specialized expertise apparently

17   that he doesn't have.  He's a clinical psychologist.

18       Q.   (BY MR. JOHNSON)  Let's do this, then, Doctor.  You

19   and I have gone over his prison records; is that correct?

20       A.   Yes.

21       Q.   And you remember awhile ago Mr. Beach told you,

22   well, he was in prison, he may have complained a little bit

23   about a little bit of insomnia and a little bit of stress.

24   Remember him asking you that question?

25       A.   Yes, I do.

115

1        Q.   I'm going to ask you --

2            MR. JOHNSON:  What number is the TDC records?

3            (Discussion off the record.)

4        Q.   (BY MR. JOHNSON)  Okay.  I'm going to show you some

5    portions out of the -- what's been marked and admitted for --

6    as State's Exhibit 103.  I want to talk to you about some --

7    some of the psychiatric notes from the Defendant while he was

8    in the penitentiary.  Do you see where the Defendant is in

9    there and he's being -- there being treated for depression?

10       A.   Yes.  It says he was angry and depressed.

11       Q.   Do you -- these are -- these are in different years.

12   Do you see where he's -- can you tell me what he's being

13   treated for in this instance?

14       A.   Yes.  On September 20th, 1994, he's having a nervous

15   breakdown, saying no one cares, has been thinking about hurting

16   someone.  And I can't -- I can't see --

17       Q.   In the fields?

18       A.   In the fields.

19       Q.   Okay.  He's in there having a nervous breakdown, and

20   he's exhibiting the same symptomatologies that you've

21   described; is that correct?

22       A.   Yes.

23       Q.   Can you -- can you read to the jury this other

24   report on a different occasion?

25       A.   On August 19th, 1994, it says he's had thoughts of

116

1    killing himself.

2        Q.   Okay.  Does he talk about in 1995 that -- become

3    closed off from the rest of the people and says he's going to

4    join the French Foreign Legion?

5        A.   Yes.

6        Q.   Does that make a lot of sense, Doc?

7        A.   No, not really -- not when you're imprisoned for

8    that long.

9        Q.   And -- and he's in there -- and he's in there

10   talking about -- he's in there talking about killing himself.

11   That's a little bit more than a little insomnia, isn't it, Doc?

12       A.   Yes, it is, and I would attribute that to -- and I'm

13   not a forensic psychologist, so I don't know how prison systems

14   work, but I do know from my own personal experience and working

15   in many types of hospitals and clinical settings over the

16   years, that there's different levels of assessment and

17   different standards for assessment.  There's certainly a big

18   difference between sort of observing somebody for a few

19   minutes, asking them a few questions, and writing something

20   down, as opposed to doing a more comprehensive assessment that

21   involves testing and evaluating records.

22           In other words, there's -- you can -- you can,

23   you know, do an X-ray or you can do an MRI.  The MRI is going

24   to give you a lot more information than an X-ray.  And so --

25   so, you know, in a lot of these cases I suspect he was just

117

1    getting a simple X-ray that really wasn't going to find the

2    tumor, for example, that an MRI would find if you went into a

3    lot more detail and more in depth, you know.  Out of all the

4    evaluations that I can see, I'm confident that mine has been

5    the most thorough of any evaluation that's been done with Mr.

6    -- with Mr. Green so far.

7         Q.   And when you were talking about the comparison you

8    were given a moment ago as to the MRI, as opposed to maybe

9    simple X-ray, the prosecutor came to you and showed you a piece

10   of paper stating the Defendant was tested in the penitentiary

11   and they say his I.Q. was 105.  You said that absolutely

12   surprised you; is that correct?

13        A.   Yes.

14        Q.   Do you believe that the -- that Gary Green was

15   tested in the penitentiary to the extent of the

16   neuropsychological testing and cognitive testing that you

17   performed upon him?

18        A.   Well, as I mentioned earlier, there's very --

19   there's -- there's hundreds of different types of I.Q. tests.

20   Some of them will ask you three questions, and if you can

21   answer those, it will give you an I.Q. score, on the internet,

22   for example.  So I really need to know what tests was used

23   before I can rely on that -- on that score or comment on that

24   score.

25        Q.   And Mr. Beach asked you about your knowledge at

118

1    Timberlawn, and that's a facility here in the Dallas area; is

2    that correct?

3         A.   That's my understanding, yes.

4         Q.   And they know that several of the doctors over there

5    at Timberlawn, when they evaluated him, interviewed him, that

6    they are aware that they all diagnosed Gary Green with a severe

7    mental illness; is that correct?

8         A.   Yes, it has both mood and thought disturbance.

9         Q.   Okay.  And so I guess if you were -- if you're going

10   to try to convince -- convince a bunch of people to execute or

11   to put a man to death for something -- for doing something and

12   they disagree with what these people are diagnosing him with, I

13   guess they could call them down here and -- and pick them apart

14   what they diagnosed him with, could they not?

15        A.   I suppose so.

16        Q.   There's -- there's not really -- in regards to being

17   severe mental illness, major depressive disorder is an Axis I

18   diagnosis, the same as schizoaffective; is that correct?

19        A.   And it can be severe in some people, especially once

20   a person gets to where they have psychotic features, and that

21   falls into the severe category; the diagnostic category is

22   major depressive disorder, severe with psychotic features.

23   That's the way that it's supposed to be coded.  They coded part

24   of the diagnosis, but they didn't code the number and -- and

25   the actual descriptor on there.

119

1         Q.   And -- and, Doctor, is there -- is there any doubt

2    whatsoever in your mind as you're sitting here in this

3    courtroom testifying to this jury today that Gary Green is a

4    severely mentally ill man?

5         A.   No, I think there's an overwhelming amount of

6    evidence that he is mentally disturbed and that he is -- that

7    he has a severe mental disorder.

8         Q.   And the prosecutor in his final question to you

9    awhile ago was you can't sit here and say that he did this

10   killing simply because he's mentally ill?  You can't say that,

11   can you?

12        A.   I can't -- I can't say anything about why he would

13   kill somebody.

14        Q.   There's not anybody that's going to be able to say

15   exactly why.  That's just somebody else's theory, isn't it?

16        A.   I -- I don't know of anybody who can explain why a

17   person would do something like that.  It's -- you know, people

18   with expertise can try to explore that, but I don't have that

19   kind of expertise, and I don't really know of anybody who could

20   really tell you.

21        Q.   They may have an opinion?

22        A.   Yes.

23        Q.   Or a theory?

24        A.   Yes.

25        Q.   But opinions and theories are just as good as the

120

1    people that formulate them, aren't they?

2         A.   I -- I suppose so, yes.

3         Q.   And I -- they pointed out Dr. Price here; is that

4    correct?

5         A.   Yes.

6         Q.   And he's a fellow that's been feeding them all the

7    letters or the notes --

8              MR. BEACH:  Judge, I'm going to object to the

9    form of the question.

10             THE COURT:  Sustained.

11        Q.   (BY MR. JOHNSON)  Well, have you seen him passing

12   notes back up to the prosecutors to hand to Mr. Beach so he can

13   think of things to ask him?

14             MR. BEACH:  I'm sure they're really concerned

15   about him passing me notes.  I'm going to object.  It's outside

16   the record.

17             THE COURT:  All right.  You referenced -- you've

18   referenced their experts, too.  What's good for the goose is

19   good for the gander.  I think that's in the book somewhere,

20   too.

21             MR. BEACH:  Very good.

22        A.   So, yes, I did observe them pass notes.

23        Q.   (BY MR. JOHNSON)  Doctor, I think that's all the

24   questions I have for you at this time.  Thank you.

25             THE COURT:  Recross.

121

RECROSS-EXAMINATION

BY MR. BEACH:

Q.   And, Doctor, as you sat in that chair Tuesday, you told me flat out under oath that Gary Green was not antisocial; is that correct?

A.   Yes, and I may have --

Q.   That's a yes or no.  You told me that.  He can come back and get you to explain it.

A.   Sure.  Yes.

Q.   You told me that.  Sitting in here yesterday, that changed your mind; is that correct?

A.   Over the last couple of days sitting in here and reviewing records -- yes, more records -- changed my mind.

Q.   And why it's so important, Doctor, is -- I mean, the corner -- one of the cornerstones, linchpins of that antisocial personality disorder is someone who is a deceitful, manipulative, conscienceless individual; is that correct?

A.   That's correct, and that's one of my concerns in diagnosing him with antisocial.

Q.   And how that plays into this case, when he checks himself into Timberlawn, even though they're professionals, who are they relying on to make that diagnosis?

A.   They're relying on their clinical expertise.  A psychiatrist -- it's hard to fool a psychiatrist.

Q.   Who's giving them the information?

122

A.   They're -- they're -- they're taking an oral history, but they're also observing the patient visually and getting -- making clinical impressions based on what they're seeing in the patient.

Q.   Who are they getting the oral history from?

A.   From the patient usually.

Q.   From Gary Green, the deceitful, manipulative, antisocial personality disorder individual; is that right?

A.   "Deceitful" and "manipulative" are terms that people use.  I'm a clinician.  I -- I don't really think in terms of -- and that wasn't what I was called here to do, so I can't say yes to that because you're -- there's a lot in there that -- that I don't have any mandate to opine on.

MR. BEACH:  That's all I have.

FURTHER DIRECT EXAMINATION

BY MR. JOHNSON:

Q.   And when Mr. Beach keeps saying the words "deceitful" and "conning", those -- you said a moment ago that those -- that's the aspect, and that's really one of the major cornerstones of any kind of an ASPD diagnosis.  There's no clear evidence of that in this record, is there?

A.   I don't see clear evidence, and that's one of the problems with a full blown antisocial diagnosis.  I will say that as I mentioned earlier, regardless of what -- whether he's antisocial -- and I do believe that he has antisocial traits,

123

you know -- there's no question about it -- he still has schizoaffective disorder.  He still has a severe mental disorder.  No matter how many personality disorders he has -- there's 13 of them.  He has features of about seven -- six or seven of them probably, if we sat here and looked at each and every one.  The mental disorder is still there.  It coexists with low intellect and the personality disorder, altogether.

Q.   And when Mr. Beach put up his flashcard on the wall that deals with the lack of remorse, lack of the ability to accept responsibility, would it surprise you that the first assault that he's accused of, he actually drove the victim to the hospital and waited there until he was arrested there by the police?

A.   I -- I heard about that yesterday, and that's not consistent with a lack of remorse.

Q.   How about -- how about going in and robbing a grocery door and getting caught and giving a full confession?

A.   Aside from not being a very smart thing to do, that's not what you typically expect an antisocial person to do.  An antisocial person usually tries to get away from things, they don't care, they don't feel guilt, they don't feel remorse.  Oftentimes they don't feel any depression because they blame all their problems on everybody else, and they're generally pretty happy and charming sometimes.

Q.   Okay.  And let's talk about that.  When you talk

124

about happy and charming, you're talking about an individual that exhibits -- that -- that visually exhibits signs that he's just a happy-go-lucky, charming person, gets along with everybody?

A.   People with antisocial personality disorder, a large percentage of them tend to be really outgoing.  They're very social.  They trick people.  They're very charming.  They're sort of like con artists, and -- and so there's definitely a move based on literature to -- to include more of that in the next diagnostic manual, to include more of the behavioral features and the emotional features that go along with a disorder like that.

Q.   What about the first time, would you expect a fellow the first time they get in trouble with the law and -- and he runs from the police and they find him and they find some narcs, they find some crack cocaine down laying on the ground, and the Defendant says, yeah, that's my drugs.  That's -- that seems to be an acceptance of responsibility, doesn't it?

A.   I -- I would assume so.  I am getting a little uncomfortable because I mentioned -- I mentioned earlier that I'm not an expert in antisocial and things like that and so I need to probably limit that.

Q.   I just want to make sure that when Mr. Beach keeps using -- when he keeps saying deceitful and cunning and failing to accept any responsibility, I just want to make sure it's

125

1   clear that in this courtroom on this day, that's his theory,
2   that's not your assent to his theory, is it?
3       A.   That's correct.  I -- I didn't use that terminology,
4   and -- and I haven't seen a lot of evidence for that.  My -- my
5   evidence for the antisocial features comes from his criminal
6   history that I've learned about over the last few days.
7       Q.   And the criminal history, in closing, doesn't affect
8   his diagnosis of his mental illness, does it?
9       A.   That is correct.
10      Q.   And that's what we were asked -- that's what you
11  were asked to do so that you could come in and talk, if you
12  found one, and explain that to the people that were going to be
13  making decisions in this case; is that right?
14      A.   That's correct.  If I diagnose him with antisocial
15  personality disorder at this point, it does not change any of
16  my other diagnoses.  He still has a low average to borderline
17  I.Q.  He still has academic dysfunction.  He still has
18  schizoaffective disorder with disturbed mood and thought.  All
19  of that is exactly the same.  There's no changes there.  I
20  would just add antisocial features to my personality disorder
21  diagnosis, which I would like to do.  That's essentially what
22  I'm doing.
23          MR. JOHNSON:  Thank you, Doctor.  That's all I
24  have.
25          MR. BEACH:  That's all I have, Judge.

126

1           THE COURT:  Thank you very much.  You are free
2   to go.
3           THE WITNESS:  Thank you.
4           THE COURT:  Anybody need a bathroom break?
5           All right.
6           THE BAILIFF:  All rise.
7           (Jury excused from courtroom.)
8           THE BAILIFF:  All rise.
9           (Jury returned to courtroom.)
10          THE COURT:  Thank you all.  Please be seated.
11          Please call your next witness.
12          MR. JOHNSON:  Your Honor, the State calls
13  Nysasno Carter.
14          THE COURT:  Sir, if you would.
15          (Witness brought forward and sworn.)
16          THE COURT:  Please have a seat.
17              NYSASNO CARTER,
18  was called as a witness by the Defendant, and after having been
19  first duly sworn, testified as follows:
20              DIRECT EXAMINATION
21  BY MR. JOHNSON:
22      Q.   Would you state your name, please, and definitely
23  spell your first name for the court reporter.
24      A.   Nysasno Carter, N-y-s-a-s-n-o.
25      Q.   Okay.  Nysasno, how old are you?

127

1       A.   Thirty-five.
2       Q.   Okay.  Where do you currently live?
3       A.   Mesquite, Texas.
4       Q.   What kind of work do you do, Nysasno?
5       A.   I own a trucking company.
6       Q.   What kind of trucking do y'all do?
7       A.   We haul dry goods.
8       Q.   Okay.  How many people do you have working for you
9   over there?
10      A.   Two.
11      Q.   Nysasno, are you the brother of the Defendant in
12  this case, Mr. Gary Green?
13      A.   Yes.
14      Q.   And I think this jury has heard your name quite a
15  few times during the course of this trial.  I want to ask you a
16  little bit about -- about yourself growing up.  Could you tell
17  the jury where you and Gary were raised?
18      A.   Excuse me?
19      Q.   Could you tell the jury where you and Gary were
20  raised?
21      A.   Dallas, Texas, Pleasant Grove.
22      Q.   Okay.  And your mamma is Mary Sampson who testified
23  earlier?
24      A.   Yes.
25      Q.   Your grandma, Bertha Curry, testified earlier?

128

1       A.   Yes.
2       Q.   You have an Aunt Shirley Coleman?
3       A.   Yes.
4       Q.   You have a whole bunch of people in your family?
5       A.   Correct.
6       Q.   I mean, there's people splintered out everywhere?
7       A.   Correct.
8       Q.   Did you ever know your father?
9       A.   Not until I got older.
10      Q.   How old were you -- your father -- your father and
11  Gary's father is the same individual?
12      A.   Correct.
13      Q.   What's his name?
14      A.   Thomas Carter.
15      Q.   And how was it that you came to know him later in
16  life?
17      A.   I think I was like nine or ten.
18      Q.   Do you recall -- and your stepfather is who?
19      A.   Leon Sampson.
20      Q.   Could you tell the jury how it was that you and your
21  stepfather got along -- or get along, still?
22      A.   Get along good.
23      Q.   Okay.
24      A.   We --
25      Q.   Leon a good man?

129

1    A.    Yes, he is.  He's a good father.

2    Q.    And could you tell the jury how Gary and Leon ever

3  got along?

4    A.    They didn't get along as well as me and Leon did.

5    Q.    Okay.  Could you -- what was it about him that

6  causes you to say that?  What -- what was different?

7    A.    Gary couldn't really -- my dad had a -- owned a

8  remodeling company, and Gary couldn't really cope with learning

9  how to use the tools and what -- things like that.

10   Q.    How did they get along as far as on a personal

11 relationship?

12   A.    They had their good and bad days.

13   Q.    Okay.  And did Gary have problems accepting Leon as

14 his father?

15   A.    Yes.

16   Q.    You pretty much -- you considered Leon Sampson to be

17 your father; is that right?

18   A.    Yes.

19   Q.    Did Gary and Leon ever bond in that same way that

20 you and your father bonded?

21   A.    No, sir.

22   Q.    You talked, again, about working in the

23 construction, and a lot of things -- you and I have met on many

24 occasions and we've talked and we talked to different family

25 members.  And in that family history of yours, is there all

130

1  different kinds of people in your family?

2    A.    Yes, it is.

3    Q.    When you were growing up, did you have a lot of

4  interaction with those different people?

5    A.    Yes, I did.

6    Q.    And when you said that -- when you and Gary -- part

7  of the things that y'all did growing up was working with your

8  dad.  You've described for me before, you've described for my

9  psychologist, you've talked to Dr. Goodness, you've talked to

10 Dr. Martinez, and they've talked to you about all these things

11 that went on back in Gary's background; is that right?

12   A.    Yes.

13   Q.    And you described some of these areas that even in a

14 very early age, problems that Gary had doing things; is that

15 right?

16   A.    Correct.

17   Q.    Give them -- can you give us some examples of those

18 things that you recall?

19   A.    Several incidents as far as in -- on a -- used to

20 work on Saturdays, and Gary didn't know how to use a hammer.

21 And he would -- used to get mad, and he didn't want to go

22 anymore.  And then as far as in working on cars, he didn't want

23 to -- he put oil in the gas tank and

24 messed it up.

25   Q.    Okay.  I mean, did Gary just have problems when he

131

1  was growing up, trying to same things that seemed kind of

2  natural to you?

3    A.    Yes.

4    Q.    Nysasno, let me ask you a question.  As you sit here

5  on the witness stand today, do you believe your brother is

6  mentally ill?

7    A.    Yes, I do.

8    Q.    Could you tell the jury how long and how far back

9  you started believing that?

10   A.    Ever since I was little -- years.

11   Q.    Okay.  And you -- and you haven't been able to sit

12 in the courtroom because you were going to be a witness in this

13 part.  Tell the jury what it is about Gary that even when you

14 were little, that you thought was different about him or what

15 you thought was strange about Gary Green.

16   A.    He used to always talk about death, that he don't

17 have nothing to live for.  Used to say that he hear things.  He

18 don't believe in God.  He don't understand why God got him this

19 way, those type of things.

20   Q.    Why God got him what way?

21   A.    The way that he is, that he don't understand.

22   Q.    How did -- how did Gary get along with his

23 schoolmates?

24   A.    He was off to his self.

25   Q.    Did -- did Gary really ever have a lot of close

132

1  friends or a lot of friends at all?

2    A.    No.

3    Q.    Did you think that was strange?

4    A.    Yes.

5    Q.    Did you -- did you have friends?

6    A.    Yes, I did.

7    Q.    Did you have a lot of friends?

8    A.    Yes, I did.

9    Q.    Did you try -- I mean, how did you and Gary get

10 along?

11   A.    We got along good to -- you know, as brothers.

12   Q.    Did you try to do things to help him?

13   A.    Yes, I did.  By me being the baby brother, I did.

14   Q.    Did it seem kind of weird that the baby brother is

15 trying to help the bigger brother?

16   A.    Yes, it did.

17   Q.    Okay.  And is that really truthfully been the way

18 it's kind of been your whole life?

19   A.    Yes.

20   Q.    Nysasno, when you said that Gary was always by

21 himself, what -- what about that seemed strange to you?

22   A.    It all seemed strange to me.  As far as in -- a

23 young man, you know, want to be by his self, didn't want to

24 play, isolated his self from everybody.

25   Q.    How did Gary do in school?

133

1    A.    Such as --

2    Q.    Do you know what kind of grades Gary made in school?

3    A.    He didn't make good grades.

4    Q.    Did you know -- did you know if your mamma was ever

5    aware or did your mamma ever say anything to you about Gary

6    having a problem?

7    A.    No.

8    Q.    Did you ever say anything to your mamma about your

9    concerns in regards to Gary?

10   A.    Yes.

11   Q.    How did she react to that?

12   A.    She kind of brushed me off.

13   Q.    Didn't want to hear it?

14   A.    Yes.

15   Q.    Nysasno, when you look around and you look

16   throughout your extended family tree, is there quite a few

17   folks in your family that have mental problems?

18   A.    Yes.

19   Q.    Is there quite -- is there very many of them willing

20   to admit it?

21   A.    No.

22   Q.    Very many of them getting help for it?

23   A.    Correct.

24   Q.    No, I say are very many of them getting help?

25   A.    No, sir.

134

1    Q.    You said earlier that -- that you and Gary were

2    close.  Were you close with Gary up to the point wherever he

3    quit high school?

4    A.    Yes.

5    Q.    How old -- what grade was Gary in when he quit high

6    school?

7    A.    I believe it was the 11th grade.

8    Q.    Do you know why he quit?

9    A.    No, sir.

10   Q.    How -- did you know -- do you recall back then as to

11   how Mary and Leon responded in reaction to that?

12   A.    No, sir.

13   Q.    But all of a sudden just one day Gary quit and you

14   don't -- didn't seem to be that big of a deal in the family?

15   A.    Correct.

16   Q.    What about as far as -- did you know Jennifer

17   Alcorn?

18   A.    Know a little, yes.

19   Q.    Okay.  And you are familiar that Gary got in trouble

20   for assaulting her, went to the penitentiary?

21   A.    Correct.

22   Q.    How was Gary -- when Gary went to the penitentiary,

23   he was just there for -- for several months for that; is that

24   right?

25   A.    Correct.

135

1    Q.    He got out for a couple of months and went back for

2    a robbery?

3    A.    Correct.

4    Q.    Did you have occasion to visit him when he was in

5    the penitentiary?

6    A.    Which time, the first time?

7    Q.    Or either of the two times.

8    A.    Yes, I did.

9    Q.    You see him both the first time he went and the

10   second time?

11   A.    Not the first time.

12   Q.    You didn't see him the first time?

13   A.    No.

14   Q.    Okay.  How about the second time, did you have a

15   chance to talk to him?

16   A.    Yes.

17   Q.    And how often would you see him while he was in the

18   penitentiary?

19   A.    Two or three times a month.

20   Q.    You saw him that often?

21   A.    Yes.

22   Q.    As -- as the Defendant got out of the penitentiary,

23   about how old was he when he got out of that penitentiary the

24   second time?

25   A.    I don't recall.

136

1    Q.    Okay.  Did there come a time whenever you and him

2    got a job together after that?

3    A.    Yes.

4    Q.    Where was y'all working at?

5    A.    Walmart.

6    Q.    Okay.  How was Gary acting around that point in time

7    in his life?

8    A.    Acting the same, strange.

9    Q.    Okay.  Has Gary ever -- in your way of thinking, has

10   Gary just acted -- been a normal person?

11   A.    No.

12   Q.    I mean, any doubt about that whatsoever?

13   A.    I have my doubts.

14   Q.    No, I'm saying is there any doubt -- when you say

15   you have doubts, do you have any doubts as to whether or not

16   there's something wrong with Gary?

17   A.    Yes, I do.

18   Q.    All right.  I think -- I think we may be talking --

19   using the same word in different ways.

20   THE COURT:  Paul, slow down.

21   MR. JOHNSON:  Okay.

22   Q.    Nysasno, the things that you've seen wrong with

23   Gary, have you ever had occasion to talk to him about those

24   things?

25   A.    Yes.

137

```
1      Q.   Tell the -- tell the jury how those conversations
2   came about.
3      A.   When I was on the road driving to 48 states, I used
4   to talk to him, and we would start off talking about something,
5   you know, which state I'm in or something, and he'll say,
6   well --
7           MR. BEACH:  Judge, unless there's some kind of
8   exception, I'm going to have to object to hearsay of what he
9   said.
10          MR. JOHNSON:  I'll -- I'll make -- state it.
11     Q.   (BY MR. JOHNSON)  And let me -- let me ask you as
12  far as time frame, when were you driving on the road?
13     A.   Three years ago.
14     Q.   Okay.  And -- on the course of your -- the times
15  that you were driving, starting back three years ago, did it
16  come to have conversations with Gary in which he would describe
17  for you certain things in regards to his mental state, his
18  emotional state at the time that he was describing it to you?
19     A.   Yes.
20     Q.   Could you tell the jury what it was that he was
21  talking about in that regard?
22     A.   He was saying he was hearing things.  He -- he don't
23  need to -- he doesn't have nothing else to live for.  All I
24  used to tell him, he just need to pray.
25     Q.   Why did you tell him he just needed to pray?
```

138

```
1      A.   That's the typical thing that you need to do when
2   you're going through something.
3      Q.   Okay.  What about going to see a psychiatrist?
4      A.   Yes, we talked about that.
5      Q.   Okay.  Did you ever have any thoughts -- did you
6   talk to Gary about going to see a psychiatrist?
7      A.   Yes, I did.
8      Q.   This incident that Gary is being convicted of that
9   occurred a year ago, how -- how soon or how far prior to this
10  incident do you recall having conversations with Gary about
11  needing to go -- he needed to go to the hospital?
12     A.   About six months prior to this -- prior to the case.
13     Q.   Okay.  And -- and what was it that precipitated or
14  what was it that caused you to start really thinking that he
15  had a real need to go into the hospital?
16     A.   Because he was constantly talking about he was
17  tired.  It would just sound like he was really ready to just
18  give up.
19     Q.   Okay.  And when he was saying about these voices
20  that he was hearing, what was he describing, or did he ever
21  describe anything in particular about those voices?
22     A.   Just described that he hearing demons.
23     Q.   Okay.  Did he say anything about what the demons
24  were telling him to do?
25     A.   No, sir.
```

139

```
1      Q.   And how -- when you were driving the truck
2   throughout the different states, how often were you gone?
3      A.   Weeks at a time.
4      Q.   How often would you talk to Gary?
5      A.   Two or three times a week.
6      Q.   And were you -- how serious were you concerned about
7   what he was describing to you?
8      A.   I was very serious.
9      Q.   Did you ever think about trying to get him committed
10  yourself?
11     A.   Yes, I did.
12     Q.   Did you talk to Gary about that?
13     A.   We talked about it on one occasion, and I told him
14  when I get back in, that we was going to try to go to the
15  doctor.
16     Q.   Okay.  But that never came about, did it?
17     A.   No, sir.
18     Q.   Why not?
19     A.   When I came back in, I couldn't get in contact with
20  him.
21     Q.   Whenever these -- whenever this was going on and you
22  were out on the road quite a bit, how often would you
23  actually -- not talking to him on the phone, but how often
24  would you actually see Gary?
25     A.   When I was home, probably twice -- two times if I
```

140

```
1   was at home, depending on how long I was home.
2      Q.   Okay.  Did he talk to you about what he calls --
3   what he has always called being stressed?
4      A.   Yes.
5      Q.   What -- how did he -- how did he use that term or
6   what did -- what did that mean to you when he talked to you
7   about being stressed?
8      A.   It meant to me, you know, something was wrong, that
9   he was having a major breakdown.
10     Q.   Did that -- is that the way that he always seemed to
11  be?
12     A.   Yes.
13     Q.   Leading up to the time before this incident
14  occurred, do you recall the circumstances for how you became
15  aware of the fact that Gary was in Timberlawn Hospital?
16     A.   Yes.
17     Q.   Tell the jury how that came about.
18     A.   I had called his cell phone one day, and Lovetta
19  answered his phone, said that he was at work.  And I thought it
20  was kind of strange that she answered his phone because I know
21  he don't normally leave his phone.  And she said when he called
22  back, she would have him to call me.  Like 30 minutes later he
23  called me back.  The caller I.D. said Timberlawn, and I asked
24  where he was.  And he said where he was, said he needed to get
25  some help.
```

141

1   Q.   Okay.  What did you think about that?

2   A.   I think that was the best idea.

3   Q.   Okay.  Did he tell you he was over there so he could

4   get some -- get some crazy checks?

5   A.   No, sir.

6   Q.   Did -- do you think this was some kind of ruse Gary

7   was going through to try to get some kind of crazy checks?

8   A.   I think he was trying to get some help.

9   Q.   Is that what he told you?

10  A.   Yes.

11  Q.   And you and him had talked about that and discussed

12  it before?

13  A.   Correct.

14  Q.   Was there any doubt in your mind that Gary needed

15  help?

16  A.   A lot of time.

17  Q.   How long was Gary actually in Timberlawn, do you

18  know?

19  A.   I believe three or four days.

20  Q.   Okay.  And after -- how often did you talk to him

21  while he was in Timberlawn?

22  A.   Just that one time.

23  Q.   You just talked to him that once.  Did you ever see

24  Gary again after he got out?

25  A.   No, I didn't.

142

1   Q.   Did you ever talk to him again?

2   A.   I talked to him on that Monday.

3   Q.   On which Monday?

4   A.   The Monday to the -- prior to the case.

5   Q.   Okay.  And what was the circumstance, or how did

6   that conversation come about?

7   A.   He said that --

8        MR. BEACH:  Judge, I'm going to object to what

9   he said.

10  Q.   (BY MR. JOHNSON)  Okay.

11       THE COURT:  Sustained.

12  Q.   (BY MR. JOHNSON)  Did -- when he was talking to you

13  on that particular occasion, was he -- was there anything about

14  his emotional state or his mental state that y'all discussed?

15  A.   Yeah, he sounded slow, sounded, you know, like he

16  was really tired, said that he was cleaning up.

17  Q.   Now, are you talking about the day of the incident

18  that happened?

19  A.   Yes.

20  Q.   Okay.  Let me ask you this question, then.  After he

21  got out of Timberlawn, do you recall if you spoke to him again

22  until the time that this incident occurred?

23  A.   No.

24  Q.   Okay.  But you talked to him on that particular day?

25  A.   Correct.

143

1   Q.   All right.  And you said you spoke to him and

2   without going into what he told you at that point in time, you

3   talked to him in the afternoon?

4   A.   Yes.

5   Q.   Okay.  And you didn't talk to him again until that

6   night, did you?

7   A.   Correct.

8   Q.   Could you tell the jury how it was that night -- how

9   that night came about -- I mean, you got started with a phone

10  call from your mom?

11  A.   Correct.

12  Q.   I think the jury has heard several times about how

13  y'all got together and went to find him, so I'll skip over

14  those particular details.  But I want to ask you this.  Can you

15  tell this jury how Gary appeared to you whenever you first came

16  in contact with him that night?

17  A.   Really spaced out.

18  Q.   Did he -- did he seem even different than he

19  normally did when he was always depressed, or did he seem

20  different?

21  A.   Seemed very different.

22  Q.   In what way, Nysasno?  If you can describe it for

23  this jury, can you tell them?

24  A.   He -- he felt like -- it felt like someone who have

25  been -- done went through something real bad.  And that -- that

144

1   he made a mistake on.

2   Q.   And you ended up taking him to the police station?

3   A.   Correct.

4   Q.   And he told you about him taking all -- did he tell

5   you about him taking all the pills that he took?

6   A.   No, sir.

7   Q.   How -- when did you find out about that?

8   A.   When we got into the police station.

9   Q.   Okay.  But you -- how long -- how long were you with

10  Gary that night?

11  A.   Roughly, 30, 45 minutes.

12  Q.   Okay.  And after the police took him off, what was

13  the next really -- did you have any other involvement with this

14  case after that?

15  A.   No, sir.

16  Q.   Have you had occasions, Nysasno, to see Gary in the

17  penitentiary -- or while he's been locked -- not in the

18  penitentiary, but here in the county jail --

19  A.   Yes, I have.

20  Q.   -- Since this happened.  Have you had occasions to

21  talk with him about what had happened?

22  A.   Yes.

23  Q.   Has he -- has he talked to you about his feelings in

24  regards to what had happened?

25  A.   Yes, he has.

145

```
1        Q.   Can you tell the jury what he's told you?
2             MR. BEACH:  Judge, I'm going to object to what
3    his feelings are.
4             MR. JOHNSON:  I'm sorry?
5             MR. BEACH:  His feelings.
6             THE COURT:  Well, okay, I know, I know.
7             MR. JOHNSON:  I'll rephrase the question, Judge,
8    maybe --
9             THE COURT:  All right.
10       Q.   (BY MR. JOHNSON)  Nysasno, have you had occasions to
11   talk to Gary and -- and when you've seen Gary, has he been
12   normal, or has he been still in that depressed state that
13   you've talked about him always being in?
14       A.   Still in that depressed state.
15       Q.   Has he told you that he's been hearing -- that he's
16   still hearing voices?
17       A.   Yes, he have.
18       Q.   Can you tell the jury what voice it is that he's
19   telling you he's hearing?
20       A.   Lovetta -- Lovetta voice.
21       Q.   And what's Lovetta telling him?
22       A.   That she forgive him.
23       Q.   How -- what's the context of how he's told you he's
24   heard -- that he's talked to her?
25       A.   As he was sitting on the end of his bunk -- on the
```

146

```
1    end of his bed, she came to him like she was on the side of
2    him.
3        Q.   Do you know there's a lot of folks in this room
4    that -- that may not have forgiven Gary for what he's done, and
5    you understand this jury has got a -- some very serious
6    decisions to make about Gary?  Do you understand that?
7        A.   Yes.
8        Q.   Nysasno, I want to ask you a question.  Is Gary
9    Green -- any doubt the brother that you love, is there any
10   doubt whatsoever that he's -- that he's got a very severe
11   mental problem?
12       A.   Yes, he does.
13            MR. JOHNSON:  That's all the questions I have
14   for you right now, Nysasno.
15            THE COURT:  Cross.
16            CROSS-EXAMINATION
17   BY MR. BEACH:
18       Q.   Nysasno, I've got to ask you this.  What were the
19   names of those two dogs?
20       A.   Excuse me?
21       Q.   The name of those two dogs.
22       A.   What two dogs are you referring on?
23       Q.   That Gary and Mark burned up?
24       A.   Gary and who?
25       Q.   Mark -- Marcus?
```

147

```
1        A.   I don't know.
2        Q.   You don't remember telling that lady out there that
3    when Gary and you were living together, you had two dogs and he
4    and his friend set them on fire?
5        A.   What lady are you speaking to?
6        Q.   The one in the front row there with the dark hair,
7    Kelly?  You know Kelly, don't you?
8        A.   Yes, I do.
9        Q.   I mean, it's in her report that you told her that.
10   Were you telling her a lie when you told her that, or did it
11   not happen or what?
12       A.   You said a name that I didn't know.
13       Q.   Okay.
14       A.   Yeah.
15       Q.   Who -- who is the guy?
16       A.   Demarcus.
17       Q.   Demarcus?
18       A.   Yes.
19       Q.   I'm sorry.  So going back to my original question,
20   what were the names of the two dogs?
21       A.   Cain and White.
22       Q.   Cain and White?
23       A.   Yes.
24       Q.   Now, we met when you came down to testify with your
25   mom to the grand jury about a year ago; is that right?
```

148

```
1        A.   Correct.
2        Q.   And I'm going to get through this real quick,
3    Nysasno.  You came from the same biological parents as Gary
4    Green; is that correct?
5        A.   Correct.
6        Q.   And how old were you -- excuse me, was your
7    biological dad Thomas Carter; is that right?
8        A.   Yes.
9        Q.   Was he still around when you were born?
10       A.   What do you mean?
11       Q.   I mean, was he still in the house -- when your mom
12   brought you home from the hospital, it's your understanding,
13   was your biological father still in a relationship with your
14   mom?
15       A.   No.
16       Q.   So you never had any relationship with Thomas
17   Carter?
18       A.   When I got older.
19       Q.   Okay.  But in the -- in your infancy, toddler years,
20   he was not around?
21       A.   No.
22       Q.   Okay.  And Gary is three and a half years older than
23   you?
24       A.   Yes.
25       Q.   So is it fair to say that Gary would have been
```

149

1    three, three and a half by the time that your -- your
2    biological father was out of the picture?
3        A.    Yes.
4        Q.    Okay.  So he would have only been exposed to Thomas
5    Carter on a full-time basis for about three years?
6        A.    Yes.
7        Q.    You've told us that Leon Sampson is a good man, hard
8    working man, he's your father; is that correct?
9        A.    Correct.
10       Q.    And you looked up to him and he instilled in you a
11   work ethnic and good values, knowing the difference between
12   right and wrong; is that right?
13       A.    Correct.
14       Q.    And Leon Sampson tried to do the same thing with
15   Gary; is that right?
16       A.    Correct.
17       Q.    You told us that growing up Gary didn't have any
18   friends. Was Demarcus a friend of his?
19       A.    No.
20       Q.    Just an acquaintance?
21       A.    Yes.
22       Q.    Okay.  Remember a guy named Levi?
23       A.    Yes.
24       Q.    Was that a friend of Gary's?
25       A.    He was a friend of everybody's.

150

1        Q.    Okay.  Gary hang out with Levi?
2        A.    On occasion.
3        Q.    And then after Gary got out of the penitentiary for
4    the robbery, do you recall him having any friends?
5        A.    I don't recall.
6        Q.    Other than girlfriends?
7        A.    I don't recall.
8        Q.    He had a lot of girlfriends, didn't he?
9        A.    Sir?
10       Q.    He had a lot of girlfriends, didn't he?
11       A.    He had a lot of friends.
12       Q.    I can't remember -- were you in here yesterday when
13   any of this testimony was going on?
14       A.    No, I've been sitting in the hall.
15       Q.    So you didn't hear Shirley Coleman testify; is that
16   right?
17       A.    No.
18       Q.    When Gary got out of the penitentiary, he married
19   that older lady Belinda Lacy; is that right?
20       A.    Yes.
21       Q.    And were you there when they got married?
22       A.    No.
23       Q.    Okay.  And that marriage lasted about three weeks?
24       A.    Somewhere up in there, yes.
25       Q.    And you and Gary were working together at that time?

1        A.    Yes.
2        Q.    Okay.  And Gary was spending a lot of time with you;
3    is that right?
4        A.    Yes.
5        Q.    Both at work and away from work?
6        A.    Mostly at work.
7        Q.    Okay.  So we know Gary during that about year and a
8    half time frame was fathering four different children; is that
9    correct?
10       A.    Correct.
11       Q.    Okay.  And that's always been a bone of contention
12   between you and Gary; is that right?
13       A.    Been a what?
14       Q.    Bone of contention that he's not taking care of his
15   kids, and you've been telling him he needs to do that; is that
16   right?
17       A.    Yes.
18       Q.    You've been more of a father to Gary's biological
19   kids than Gary ever was; is that --
20       A.    No, I've been an uncle to them.
21       Q.    I'm sorry?
22       A.    I've been an uncle to them.
23       Q.    Uncle to them.  But I mean, going to their games --
24   athletic games, giving them money, buying them things, you were
25   doing that; is that correct?

152

1        A.    Yes, because my kids were on the same team.
2        Q.    Okay.  Was Gary at their games?
3        A.    No.
4        Q.    Was Gary giving them money?
5        A.    No.
6        Q.    You told us that a bunch of your family members have
7    had psychological or psychiatric issues; is that right?
8        A.    Yes.
9        Q.    And y'all don't talk about it?
10       A.    No.
11       Q.    Some of them have actually been hospitalized; is
12   that correct?
13       A.    I don't recall.
14       Q.    You don't know?
15       A.    No.
16       Q.    Okay.  And whatever the stigma is -- I mean, Gary
17   was able to get over at it at least that time he went to
18   Timberlawn; is that right?
19       A.    Yes.
20       Q.    He checked himself in?
21       A.    Yes.
22       Q.    You didn't force him to do that; is that right?
23       A.    No.
24       Q.    You told me at the grand jury that your
25   understanding as to why Gary was there, because he was feeling

153

1 a lot of pressure; is that correct?

2     A.   Correct.

3     Q.   You were aware that Gary had that job from March to

4 August with the -- with Power Guardian; is that correct?

5     A.   Yes.

6     Q.   Did you ever meet any -- his employer or any of his

7 co-employees?

8     A.   No.

9     Q.   Didn't ever meet Vonn Miller?

10     A.   No.

11     Q.   What was your understanding as to what Gary was

12 doing on a day-to-day basis for Power Guardian?

13     A.   Installing batteries.

14     Q.   Installing batteries?

15     A.   Yes.

16     Q.   We're not talking about flashlight batteries, we're

17 talking big corporation batteries; is that correct?

18     A.   Correct.

19     Q.   I mean, it was -- it was a technical job, wasn't it?

20     A.   Probably so, yes.

21     Q.   Gary was going out of town and being with people,

22 his co-employees and spending nights out of town; is that

23 correct?

24     A.   Correct.

25     Q.   And Gary quit that job, didn't he?

155

1 didn't do it?

2     A.   He didn't say.

3     Q.   The night you and your mom and your wife and your

4 aunt end up meeting up with Gary over there on Jennie -- Jennie

5 Lee; is that correct?

6     A.   Yes.

7     Q.   He was at a friend's house that night; is that

8 correct?

9     A.   Correct.

10     Q.   That's Mark?

11     A.   Yes.

12     Q.   And Gary had enough of a relationship with Mark that

13 he had -- he had spent the days and nights leading up to this

14 over there; is that right?

15     A.   I don't know.  My first time seeing him.

16     Q.   Your first time seeing Mark?

17     A.   Yes.

18     Q.   You knew he was over at his friend's house in

19 those -- in the week leading up to the murder; is that correct?

20     A.   No, I don't.

21     Q.   Had he ever called you from over there?

22     A.   No, he didn't.

23     Q.   How did you know that Mark was a friend of his?  He

24 talked about him?

25     A.   No, he didn't.

154

1     A.   I don't recall what happened.

2     Q.   You told us that Gary calls you from Timberlawn and

3 then he gets out.  The records show August 24th, whatever they

4 show.  You didn't see him between August 24th and the date of

5 the murders; is that correct?

6     A.   Correct.

7     Q.   Talked to him one time on the phone?

8     A.   Correct.

9     Q.   Now, you do recall when you came down and testified

10 in front of the grand jury that I asked you about what Gary

11 told you about what happened that night.  Do you recall that?

12     A.   Yes.

13     Q.   Okay.  You've see your grand jury testimony in the

14 last couple of weeks; is that right?

15     A.   Correct.

16     Q.   Gary told you that he did, in fact, murder Lovetta;

17 is that correct?

18     A.   Yes.

19     Q.   But he would never admit to you that he killed the

20 little girl; is that right?

21     A.   Correct.

22     Q.   You asked him what happened to the baby; is that

23 right?

24     A.   Correct.

25     Q.   And he just wouldn't talk about it, or said he

156

1           MR. BEACH:  That's all I have, Judge.

2                 REDIRECT EXAMINATION

3 BY MR. JOHNSON:

4     Q.   Nysasno, in regards to that -- the way you found out

5 where he was at that night was calling back a number off of

6 caller I.D.; is that right?

7     A.   That my mom got off of caller I.D., yes.

8     Q.   The person that -- the person whose house y'all went

9 to, that's not someone you had ever seen, heard of, or knew at

10 all before this night; is that right?

11     A.   Correct.

12     Q.   And you didn't know if that was just someone Gary

13 was staying with because Lovetta had put him out of the house

14 the week before?

15     A.   Right.

16     Q.   Mr. Beach asked you a question over there a minute

17 ago about the way Gary took care of his life, took care of his

18 personal business, took care of his children.  He asked you if

19 that was a bone of contention amongst you and him; is that

20 right?

21     A.   Yes.

22     Q.   Gary didn't -- Gary really didn't do nothing in his

23 life the normal way, did he?

24     A.   No.

25     Q.   And you always knew, didn't you, or did you not

157

1  always know that that's because there was something wrong with
2  him?
3      A.   Yes.
4      Q.   He -- he asked you if Gary got over the stigma
5  about -- about being mentally ill or being crazy, whatever word
6  you want to use, long enough to go to Timberlawn Hospital.  In
7  fact, when he went and checked himself in, Lovetta was lying to
8  you about where he was at, wasn't she?
9      A.   Correct.
10     Q.   And you wouldn't have known that he was in
11 Timberlawn if he hadn't -- if it hadn't come up on your caller
12 I.D.?
13     A.   Correct.
14     Q.   When you -- you said something to him about, I know
15 where you are, that's when he admitted to you what was going
16 on, didn't he?
17     A.   Yes.
18     Q.   So it wasn't like he was calling you up, saying,
19 well, hey, I'm -- I found a way to get me a crazy check,
20 Nysasno?
21     A.   Right.
22     Q.   He -- he was actually trying to keep it from you
23 that he was in Timberlawn at first, was he not?
24     A.   Correct.
25          MR. JOHNSON:  I don't have anything further for

158

1  you, Nysasno.  Thank you very much.
2          RECROSS-EXAMINATION
3  BY MR. BEACH:
4      Q.   Nysasno, I can't call Lovetta to say whether or not
5  she was lying or not, can I?
6      A.   No.
7          MR. BEACH:  That's all I have.
8          MR. JOHNSON:  Nothing further, Judge.
9          THE COURT:  Thank you, sir.  You may step down.
10         MR. JOHNSON:  Your Honor, I have a brief matter
11 that needs to be on the record outside the presence.
12         THE COURT:  All right.  Ladies and gentlemen, we
13 need you to please step out.
14         THE BAILIFF:  All rise.
15         (Jury excused from courtroom.)
16         THE COURT:  All right.  Jury is not now present.
17         Y'all can sit down.
18         MR. JOHNSON:  Your Honor, at this time I need to
19 put something on the record from my Defendant who has
20 previously been sworn.  But before we do, Judge, could I have
21 just one moment to consult with him?
22         THE COURT:  Yeah.
23         MR. JOHNSON:  Come on, Gary.
24         (Recess.)
25         (Defendant and counsel return to courtroom.)

159

1          MR. JOHNSON:  Your Honor, you want me to go
2  ahead and make a record?
3          THE COURT:  Go ahead, please.
4              GARY GREEN,
5  the defendant, was called as a witness in his own behalf, and
6  after having been previously duly sworn, testified as follows:
7              DIRECT EXAMINATION
8  BY MR. JOHNSON:
9      Q.   Your name is Gary Green?
10     A.   Correct.
11     Q.   Gary, we've just called your brother and he was the
12 last witness that we had intended to call on the issue of
13 punishment.  And you understand that at this time, again, that
14 you have an opportunity and the right to make -- to take the
15 witness stand and testify if you choose to do so.  I want to
16 make sure that you fully understand that right.  And it's
17 just -- basically I'm going to ask you the same things that I
18 asked you before.  This jury is about to go back and decide two
19 special issues which will determine the sentence in this case.
20 And you were present for about two months of voir dire, and you
21 understand what the questions are and what the -- what those
22 decisions and those question answers will decide?  You
23 understand all that, right?
24     A.   Correct.
25     Q.   Gary, if you wish to testify on the issues of

160

1  punishment, if you have anything to say to the jury, you
2  understand you have the absolute right to do so.  You have an
3  absolute right not to do so, if that's how you decide to
4  proceed.  If you decide that you want to testify, no matter how
5  I've advised you, if it's my advice that you shouldn't, but you
6  wish to do so, that I would put you up there and I would
7  question you in such a way as to bring forth anything that you
8  wish to say to the jury, bring that out in the light that would
9  be most favorable to you.  Do you understand that?
10     A.   Correct.
11     Q.   The bottom line is, this is a right that you have
12 and only you have.  And for all intents and purposes, unless
13 there's something that may happen that we have no control over
14 and no power or ability to control, the decision that this jury
15 is about to make is going to be the final decision in this
16 case.  So when you exercise your right to make a decision this
17 afternoon, it's not going to be a decision that you can come
18 back later and say, well, you know, I should -- I should have
19 done something different because the decision you make today is
20 going to be pretty much binding upon you.  And that's why I
21 want to make sure that you recognize that you have that right
22 and you have the ability to exercise it.  Is that fair enough?
23     A.   I understand.
24     Q.   After knowing all those things, Gary, and after
25 you've had an opportunity and we've gone back into the holdover

161

1  cell and you've spoken to Kobby and Brady and myself about this

2  and we talked about the status of the case, you've indicated to

3  us in talking to you going through the trial preparation and

4  talking to us about the people that we might have potentially

5  called, you've indicated to us that we have called the people

6  that you wanted to speak on your behalf; is that right?

7      A.   Correct.

8      Q.   And we've called the doctors that we wanted to have

9  come in here and talk and try to offer the jury information

10  they can use in answering these questions; is that right?

11     A.   Correct.

12     Q.   There's not anybody at all that you've asked us to

13  call or to talk to on your behalf that we've refused to do so,

14  is there?

15     A.   No.

16     Q.   In fact, we've been pretty exhaustive in talking to

17  you about anybody that might have any information that would be

18  relevant to these issues.  And, in fact, we've talked to a

19  whole lot of folks and interviewed a whole lot of folks that

20  we've interviewed and talked to you about, and we've just all

21  decided that they wouldn't have anything to say.  And you're in

22  agreement with those decisions; is that correct?

23     A.   Correct.

24     Q.   Gary, knowing that this will be the end of the case,

25  this will be the end of the evidence on your behalf, are you

162

1  satisfied with our efforts?

2      A.   Extremely satisfied.

3      Q.   And do you have any complaints at all that you want

4  to make about either my representation or the representation of

5  Mr. Wyatt and Mr. Warren?

6      A.   I think you three gentlemen went way beyond the

7  scope of your -- your job or your duties, so I'm overly

8  satisfied.

9      Q.   Okay.  What is your decision in regards to taking

10  the witness stand in this portion?  Do you wish to exercise

11  your Fifth Amendment rights?

12     A.   Yes.

13     Q.   Okay.  And so we're going to request that the Court

14  instruct the jury to disregard or not to consider that for any

15  purpose and that's the way you wish to proceed?

16     A.   Correct.

17         MR. JOHNSON:  Judge, that's all I have.

18         THE COURT:  All right.  So it's your intention

19  to rest?

20         MR. JOHNSON:  Yes, sir.

21         THE COURT:  What's the State going to do after

22  that?

23         MR. BEACH:  Offer that one portion, Judge, the

24  highlighted letter.

25         THE COURT:  What says the Defense?

163

1          MR. JOHNSON:  How are we going to do it, Judge?

2          MR. BEACH:  I'd like to just read it which will

3  be the easiest, from there to there and here, here.

4          (Document handed to counsel.)

5          (Discussion off the record.)

6          THE COURT:  All right.  What does the State want

7  to offer in rebuttal?

8          MR. BEACH:  Excerpts of a couple of letters that

9  the Defendant wrote to his girlfriend, specifically:  But I

10  know that's all behind us now.  Jennifer, when we first became

11  as one, I said if you ever blank, blank, blank over me, think

12  you can play with my feeling, I'll kill you.  Isn't that what I

13  said, question mark, question mark, question mark.  I see you

14  and nobody else can just --

15         COURT REPORTER:  I'm sorry, I cannot hear you.

16         MR. BEACH:  You see and nobody else can just

17  turn on my feelings and turn them off when you get ready.  I'm

18  not make out that can of material.

19         That's one excerpt.

20         The second is:  I have associated with people on

21  both sides of the laws.  I just choose to go the wrong way.

22  With me doing the wrong thing, that placed me here.  It wasn't

23  the money mostly.  It was the high of done wrong and getting

24  away.  I wasn't on drugs or alcohol.  Like to think I was

25  completely sane at that time.  You see, I know what it takes to

164

1  make and be a success, but this place at this time is the best

2  place for me.  Understand what I'm talking about first before

3  you make a judge of my sanity.  When I was out, my people will

4  tell you that if I wasn't incarcerated at that time of the

5  summer of 1990, I would have killed up a lot of people or been

6  killed.  Really because I was gone, I really was living day to

7  today, not caring about life and people.

8          Those two excerpts, Your Honor.

9          THE COURT:  What says the Defense?

10         MR. JOHNSON:  Judge, we -- we are going to

11  object to these -- these portions of these letters.  We are --

12  our first objection is going to go to the fact that we had not

13  been tendered any of this material until just three days ago,

14  and we feel we've been surprised by the production of these

15  documents.  At this time the State's intending to use them, and

16  we feel we are being unfairly prejudiced by the admission of

17  these letters -- these threats at this time, and due to the

18  fact that we weren't being allowed to use them in any way in

19  any of our consultation with expert witnesses and the analysis

20  by our experts in regards to any of these statements.  And we

21  feel like the Court -- or the State should have exercised due

22  diligence in seeking out to determine whether or not there was

23  anything such as these letters in existence which may have been

24  useful or -- or -- in their case.

25         So bringing them up here on -- while we're in

165

1   the punishment phase of a -- of a capital crime, Judge, I think
2   is -- and certainly a case that the Court has discretion to
3   decide whether or not the admission of them at this time would
4   be violative of the Defendant's due process rights and
5   violation of the State, as well as the 8th and 14th Amendments
6   to the United States Constitution.  And we're going to object
7   to them on that basis.
8           THE COURT:  I -- I --
9           MR. JOHNSON:  I have another objection, also.
10          THE COURT:  Well, let's just -- one objection at
11  a time.  I'm looking at Article 37.07(g).  Where is your
12  appellate lawyer?
13          MR. HEALY:  She went to get cases on argument.
14          THE COURT:  Okay.  That's nonsensical.
15          MR. HEALY:  I'm just telling you where they
16  went.
17          (Counsel returns to courtroom.)
18          THE COURT:  Okay.  37.07(g), untimely request of
19  the Defendant --
20          MS. LAMBERT:  37.07 or 37.071?
21          THE COURT:  37.07(g).
22          MS. LAMBERT:  Which section?
23          THE COURT:  G.
24          MS. LAMBERT:  It's numbered.  37.07?
25          THE COURT:  Section 3(g).

166

1           MS. LAMBERT:  Okay.  That's due to extraneous
2   offenses.
3           THE COURT:  Yes.
4           MS. LAMBERT:  Did I miss something?
5           THE COURT:  And bad acts.
6           MS. LAMBERT:  Okay.
7           MR. BEACH:  He objects that we were going to --
8   did not exercise due diligence in giving them to them, so we
9   never gave them notice until --
10          MS. BENNETT:  We're in rebuttal.
11          MR. BEACH:  -- when he first found out about it.
12          MS. LAMBERT:  We already talked about this.
13          THE COURT:  No, listen.
14          MS. LAMBERT:  I'm listening.  I'm sorry, I
15  missed the -- I missed the beginning.
16          THE COURT:  It has to do with punishment.  This
17  is punishment, okay?
18          MS. LAMBERT:  Okay.  So the letters were given
19  to him last Monday?
20          THE COURT:  Monday.
21          MS. LAMBERT:  And we've been talking about them
22  for four days?  That would be considered reasonable notice.
23          THE COURT:  When was notice given?
24          MR. JOHNSON:  There was never notice given,
25  Judge, or they -- we were never given notice before trial.  We

1   were given notice during the punishment phase.
2           MS. LAMBERT:  You were given notice as soon as
3   we received the letters.
4           MR. JOHNSON:  I'm sorry?
5           THE COURT:  I understand that.
6           MR. BEACH:  Last Friday -- last -- didn't you
7   tell them last Friday?  Jennifer called Paul last Friday when
8   she found out about the letters.
9           MR. JOHNSON:  We were told last Friday that
10  there were some letters, but we weren't told -- we obviously
11  didn't see the contents of the letters until --
12          MR. BEACH:  Monday.
13          MR. JOHNSON:  -- until during the punishment
14  phase.
15          THE COURT:  So Monday is when you actually saw
16  them?
17          MR. BEACH:  Saw them.
18          MR. JOHNSON:  Yes.
19          MS. BENNETT:  The same day the State saw them,
20  we -- yes.
21          THE COURT:  I understand that, but --
22          MS. LAMBERT:  Okay, Judge, the case law says
23  that they're not required to receive notice of rebuttal
24  evidence.
25          THE COURT:  It's not rebuttal evidence.  It's

168

1   punishment evidence.
2           MS. LAMBERT:  We're rebutting the --
3           MR. JOHNSON:  What are you rebutting?  We
4   haven't offered any future danger testimony.
5           THE COURT:  It's punishment evidence.  Just --
6   I'm reading the section -- the code section that this is under
7   is under punishment.
8           MS. LAMBERT:  So the objection is that you
9   didn't receive adequate notice, or what's your objection?
10          MR. JOHNSON:  Number one, we didn't receive
11  adequate notice, and, number two, we haven't offered any future
12  dangerous testimony.  How can you say you're offering rebuttal
13  testimony, when we haven't offered any?
14          (Discussion off the record between counsel.)
15          THE COURT:  Okay.  And just -- just for the
16  record, too, just so we know exactly where we are, I want to
17  point out Section 37.071, Section 2, the introduction of
18  evidence of extraneous conduct is governed by the notice
19  requirements of Section 3(g), Article 37.07.  Just so we know
20  that -- where -- where we are.  And this is -- this is
21  specifically talking about being found -- after being found
22  guilty, so the punishment stage.  Doesn't say anything about
23  rebuttal.  It just says the punishment stage.
24          So here's my question.  If notice of something
25  has not been given until after the punishment stage is begun --

169

1   MS. LAMBERT: Well, we got -- you had -- Friday

2   is when we gave it to them?

3           MR. JOHNSON: We were given it Monday.

4           MR. BEACH: Before the punishment started.

5           MS. LAMBERT: Right. And you were notified on

6   Friday --

7           MR. JOHNSON: We were notified of the existence

8   of the letters --

9           MS. LAMBERT: -- of the existence of the

10  letters, and then you were given the letters on Monday when we

11  actually received them, correct?

12          MR. JOHNSON: Correct.

13          THE COURT: Follow me.

14          MS. LAMBERT: I'm with you, Judge.

15          THE COURT: Okay. Trial starts. Verdict of

16  guilt is returned. After the verdict of guilt is returned, but

17  before evidence is presented in the punishment phase, notice is

18  given to the Defense of evidence that they wish to bring up

19  during the punishment phase.

20          We're all in agreement that 404(b) talks about

21  case in chief, but the question is the punishment phase. It

22  doesn't talk about rebuttal in the State's case or even the

23  State's portion. It just says evidence of bad acts shall be --

24  the Defense shall be given notice prior to its introduction.

25  That's 37.07(g) as referenced by 37.071, Section 2.

170

1           MS. SMITH: Okay. So what's your argument about

2   why it's unreasonable?

3           MR. JOHNSON: It's not timely.

4           MS. SMITH: Well, it's timely in the sense that

5   we gave it over as soon as we had it, so how does it --

6           MR. LAMBERT: And you have to show surprise,

7   which obviously you're not surprised because we've been talking

8   about it for four days.

9           MR. JOHNSON: I was -- I was surprised.

10          MS. SMITH: Well, how are you prejudiced?

11  You've had time to find a way to respond to them. You've had

12  plenty of time to come up with this argument, try to exclude

13  it. Show me how you're prejudiced. Just so it might come in

14  doesn't mean you're prejudiced, too, by the way.

15          MR. JOHNSON: Well, Judge, there's such a

16  remoteness to the language. It has no probative value as to

17  the special issues.

18          MS. LAMBERT: Oh, so now it's 403?

19          MR. JOHNSON: Well, it's 403, it's 404.

20          THE COURT: No, we're not going to argue 403

21  right now. I'm more concerned about this.

22          MS. LAMBERT: The notice?

23          THE COURT: Yes.

24          MS. SMITH: Okay. Well, it doesn't give a

25  number, doesn't tell us -- it just says timely, right, or

171

1   reasonable?

2           MS. LAMBERT: Reasonable. And case law doesn't

3   put a number on what reasonable is. And considering the fact

4   that he was told as soon as we knew and the fact that we've

5   been talking about it for four days and he's still -- has never

6   raised this argument until right now, I don't see how he can

7   complain that he wasn't reasonably notified.

8           MR. JOHNSON: Well, Judge, as I just -- as I

9   stated a moment ago in regards to my due process argument, the

10  fact --

11          MS. LAMBERT: So now it's due process?

12          MR. JOHNSON: That's what I objected to a moment

13  ago.

14          MS. LAMBERT: Okay.

15          MR. JOHNSON: And the -- we're claiming that --

16  that it's -- it's unfair at this time to allow the admission of

17  this evidence because as I said a moment ago, we were not

18  allowed to have this information prior to trial and prior to

19  the formulation of our defensive strategy and prior to the

20  formulation in the consultations with our expert witnesses and

21  had we, in fact, had this information, then we may have changed

22  our whole strategy in how to try the case.

23          MS. LAMBERT: Your expert witnesses reviewed the

24  letters today.

25          MR. JOHNSON: Our expert witnesses had

172

1   formulated their opinions prior to coming to the courtroom.

2           MS. LAMBERT: And changed them when they were

3   here, so they could have taken this information and used it to

4   form the basis of their expert opinion.

5           MR. JOHNSON: But we don't have an

6   opportunity to change the formulation of our strategy to

7   proceed with the whole trial.

8           MS. LAMBERT: You could have done so on Friday

9   or on Monday.

10          MR. JOHNSON: That's a little bit --

11          THE COURT: Don't -- don't say Friday. It was

12  Monday. For the record, it's Monday.

13          MS. SMITH: But punishment still hadn't started.

14          MR. JOHNSON: Well, I'm talking about --

15          THE COURT: I understand that, but I don't want

16  the record to be confused as to what my opinion of when they

17  received notice.

18          MS. LAMBERT: I got it.

19          THE COURT: So I don't want to -- don't -- I

20  just want it to be clear that the Court believes it was -- it

21  was Monday morning prior to punishment beginning, but it was

22  still Monday, not Friday.

23          MR. JOHNSON: So that's the nature of our --

24  that's the nature of our objections, Judge. We feel -- and

25  it's strictly within the discretion of the Court. And this is

173

1 a capital crime. And certainly -- the Court can certainly

2 err -- err on the side of caution in order to protect the

3 constitutional rights of the Defendant.

4 THE COURT: All right. The Court makes the

5 following finding -- the Court finds -- the Court finds that

6 the State did not discover the -- the letters until the Friday

7 prior to the beginning of -- of punishment. The Court finds

8 that the State at that time gave notice to the Defense of their

9 intent to introduce these records as bad acts and included

10 within that the name of -- of all of the parties and all

11 identifying information and turned over these letters to the

12 Defense on Monday prior to the beginning of -- of punishment.

13 The Court finds that introduction of them now at

14 this time satisfies the timely notice requirement to which the

15 Defense has excepted. The exception is noted.

16 Now, next argument. Content. Content

17 objections?

18 MR. JOHNSON: Judge, we're just going to object

19 to the content of the letters is -- the -- of the information

20 contained in the letters is at least 20 years ago. It's --

21 it's too remote, has no bearing on the issue as to the future

22 dangerousness issue of the Defendant or in regards to

23 mitigation as he sits in this courtroom today.

24 THE COURT: What says the State?

25 MS. SMITH: I'm sorry, I did not hear what you

174

1 just said, Paul. We were busy.

2 MR. BEACH: Let me try to handle this.

3 MS. SMITH: Okay.

4 MR. BEACH: I don't know how many times we've

5 heard in the last day and half that the Defendant has been

6 mentally ill his entire life. Well, his entire life includes

7 when he was in the penitentiary writing letters to his ex-high

8 school girlfriend about, you know, how he made choices and he

9 was sane and it wasn't for the money, it was for the thrill of

10 getting away from it. So that -- that's -- that goes to his

11 antisocial personality versus his mental illness, and they've

12 opened all that up for our ability to rebut it with these

13 letters.

14 THE COURT: And which -- and what -- what do you

15 want to introduce?

16 MR. BEACH: Those two excerpts that I read,

17 Judge, into the record.

18 THE COURT: And how do you -- how do you

19 propose -- how do you all -- okay, I'm going to rule that those

20 are admissible over Defense's objection which is timely made.

21 Now, how are we going to get it in?

22 MR. BEACH: I would suggest to read it.

23 THE COURT: You're not waiving anything by --

24 you're not waiving anything by coming to an agreement on how

25 it's delivered.

175

1 MR. JOHNSON: No, I understand. And, Judge, the

2 only problem -- the only problem with reading it again is I

3 don't have an objection to Mr. Beach reading it if there's

4 absolutely no inflection and if he reads it in the same manner

5 in which it's written, because there were -- several words were

6 misspelled. They need to be read phonetically and not what his

7 assumption of the wording -- or the letters are supposed to be.

8 MR. BEACH: I can do that.

9 MR. JOHNSON: And with absolutely no inflection,

10 and so I don't have a problem with him doing it in that regard.

11 And we -- absolutely, it's imperative that since this is going

12 to be read to the jury, it would be considered an exhibit that

13 -- that they bring a -- in some fashion they have these things

14 bracketed on a separate exhibit so that the jury is not allowed

15 to even inadvertently see the remaining portions of those

16 letters.

17 THE COURT: Is that -- does the State agree to

18 that stipulation?

19 MR. BEACH: Yes, sir.

20 THE COURT: All right. Then that's -- that's

21 how we will proceed.

22 MR. JOHNSON: And just out of an abundance of

23 caution, Judge, at this time all of these letters -- and I know

24 Ms. LaBar is very good at what she does. There's -- there's

25 been several exhibits in the trial so far that have been

176

1 admitted for record purposes only, and we just want to reurge

2 the Court and the reporter to exercise extreme caution and make

3 sure that the jury is not given any access to any of the

4 exhibits that have been introduced for record purposes only.

5 THE COURT: All the hand -- the handwritten

6 letters to the girlfriend of which the State gave notice of on

7 -- on Monday, those are admitted for record purposes. Now, the

8 other letters, it's my understanding, were admitted for all

9 purposes.

10 MR. BEACH: That's correct.

11 MR. JOHNSON: That's correct.

12 THE COURT: And we've had a conversation.

13 MR. JOHNSON: They were -- they were included in

14 the business record affidavits.

15 THE COURT: Okay. Right. Then we're --

16 we're -- in agreement.

17 MS. LAMBERT: Judge, did -- did you get --

18 regarding closing argument?

19 THE COURT: Did I get what? Yeah, I looked. I

20 know that. I know that section. That's not 37.071. Go get

21 the jury.

22 MS. BENNETT: Yeah, we'll do it after. You

23 found a case on point.

24 Lisa did.

25 (Discussion off the record.)

177

1    THE BAILIFF:  All rise.

2         (Jury returned to courtroom.)

3    THE COURT:  Thank you all.  Please be seated.

4    Defense.

5         MR. JOHNSON:  Your Honor, ladies and gentlemen,

6    Defense is going to rest.

7         THE COURT:  State?

8         MR. BEACH:  The State at this time would offer

9    into evidence two excerpts from a letter written by the

10   Defendant to Jennifer Alcorn while he was in the penitentiary,

11   those being State's Exhibits 148A, that's already been

12   published to the jury about the college, and now State's 148B.

13        (State's Exhibits 148A and 148B offered.)

14        THE COURT:  Please proceed.

15        MR. JOHNSON:  Your Honor, if the Court would

16   note our previous objection.

17        THE COURT:  Previous objection is noted.

18        MR. BEACH:  And are they admitted?

19        THE COURT:  They're admitted.

20        (State's Exhibits 148A and 148B admitted.)

21        MR. BEACH:  That I know that's all behind us

22   now.  Jennifer, when we first came as one, I said if you ever

23   blank, blank, blank, blank over, and think you can play with my

24   feeling, I'll kill you.  Isn't that what I said, question mark,

25   question mark, question mark.  You see, you and nobody else can

178

1    just turn on my feelings and turn them off when you get ready.

2    I'm not make out of that can of material.

3              I have associated with people on both sides of

4    the laws.  I just choose to go the wrong way.  Me doing the

5    wrong thing that placed me here, it wasn't the money mostly, it

6    was the high of done wrong and getting away with it.  I wasn't

7    on drugs or alcohol.  Like to think I was completely sane at

8    that time.  You see I know what it takes to make and be a

9    success, but this place at this time is the best place for me.

10   Understand what I'm talking about first before you make a judge

11   of my sanity.  When I was out, my people will tell you if I

12   wasn't incarcerated at the time of the summer of 1990, I would

13   have killed up a lot of people or been killed.  Really because

14   I was gone, I really was living for day-to-day, not caring

15   about life and people.

16        The State rests.

17        (State Rests.)

18        THE COURT:  Defense rest?

19        MR. JOHNSON:  Close.

20        (Defense Closes.)

21        THE COURT:  Close?

22        MR. BEACH:  Close.

23        (State Closes.)

24        THE COURT:  Ladies and gentlemen, you've heard

25   all the evidence you're going to hear in this case.  We are

179

1    going to reconvene tomorrow morning at 10:00 a.m., at which

2    time you will hear arguments from counsel.  The -- I don't know

3    what that's going to be yet, but you will find out then.  Do

4    not start making up your mind until you've been given what's

5    called the charge of the Court.  Just like in the first stage

6    of this case, you will get jury instructions on how to proceed

7    and what you are to look at and how to proceed.  You cannot

8    make your decision as to what you think should happen until

9    then.  You can't discuss it amongst yourselves until you have

10   been so told to do so by the Courts.  So until tomorrow

11   morning, we will read the charge at 10:00 a.m., each side will

12   have a chance to -- to make an argument, and then we will let

13   you make up your mind then.

14             Lunch will be provided to you tomorrow.  It will

15   be delivered here.  You'll get a chance to order it and things

16   like that.  So until tomorrow morning, 10 o'clock.  Jury --

17        MR. JOHNSON:  Judge, we need to approach about a

18   matter.  Could we have the jury remain in the jury room until

19   the bailiff excuses them?

20        THE COURT:  In the jury room, yes, you may.

21        (Jury excused from courtroom.)

22        (Discussion off the record.)

23        THE COURT:  Bring them in.  Bring them in.

24        (Jury returned to courtroom.)

25        THE COURT:  Thank you all.  Please be seated.

180

1              Ladies and gentlemen, one other -- one other

2    thing, and this is -- this is important.  Again, this is book

3    stuff.  That -- I'm going to ask that you all pack a bag

4    tonight, okay?  Going to have to be couple days worth -- worth

5    of clothes, just -- just to make sure.  Because once we start

6    the deliberation process, you all are going to be stuck.  And

7    that's a good thing.  It really is.  I know you're not -- you

8    don't like it, but it's -- it's part of the process.  It's part

9    of how things work, just to make sure that the decision is not

10   tainted, make sure the decision is not rushed, that you simply

11   race at the end of the day and go, oh, boy, it's 4:15, we

12   better make a decision.  You can't do that in this case.

13             You all know how important this is, so pack a

14   bag tomorrow.  Don't know if it's going to be needed or not,

15   but make sure to pack a bag.  I know one person has -- has

16   airport duty.  Try to make other arrangements, if that can be

17   done ahead of time rather than at the last minute.  Like I

18   said, just in an abundance of caution, I don't want you to rush

19   through your decisions.  I want them to be made according to

20   the rules so that we don't have to do this again.  But one of

21   the things is that you will be required to stay together.

22        Yes, sir?

23        JUROR:  Should we bring our things in the

24   morning or leave them --

25        THE COURT:  You can always bring them in.  We've

1    got a safe location -- a lot safer in here in my office than

2    they are in your car, so I would say go ahead and bring -- and

3    bring them in. And if you get stopped by security and they say

4    you're not allowed to bring something in, you -- we will --

5    we'll come downstairs and make sure that it gets brought in.

6    You tell them just talk -- talk to Judge Chatham, and he told

7    me to bring this, okay? So we'll make sure that that gets --

8    gets brought in.

9                 So, ladies and gentlemen, until tomorrow.

10               (Jury excused from courtroom.)

11               (Recess of proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

182

1                  Reporter's Certificate

2    THE STATE OF TEXAS:

3    COUNTY OF DALLAS:

4         I, Darline King LaBar, Deputy Official Court Reporter in

5    and for the 282nd District Court of Dallas County, State of

6    Texas, do hereby certify that the above and foregoing volume

7    constitutes a true, complete and correct transcription of all

8    portions of evidence and other proceedings requested in writing

9    by counsel for the parties to be included in the Reporter's

10   Record, in the above-styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15        WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16   on the 16th day of March, A.D., 2011.

17

18

19

20              DARLINE KING LABAR
                Official Court Reporter
21              363rd Judicial District Court
                Dallas County, Texas
22              hpdkfaith@msn.com
                (214) 653-5893
23

24
     Certificate No: 1064
25   Expiration Date: 12/31/2012