```
 1                      REPORTER'S RECORD

 2                  VOLUME 53 OF 57 VOLUMES

 3

 4              TRIAL COURT CAUSE NO. F09-59380-S

 5                   CASE NO. AP-76,458

 6

 7  THE STATE OF TEXAS          :         IN THE 282ND JUDICIAL

 8  VS.                         :         DISTRICT COURT OF

 9  GARY GREEN                  :         DALLAS COUNTY, TEXAS

10

11

12    PUNISHMENT PHASE BY JURY AND SENTENCING BY THE COURT

13

14

15

16

17

18                      * * * * * * * * * *

19

20       On the 5th day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand computer

25  assisted transcription.
```

```
 1  A P P E A R A N C E S:

 2

 3  HONORABLE CRAIG WATKINS, Criminal District Attorney
         Frank Crowley Criminal Courts Building
 4       Dallas, Dallas County, Texas 75207
         Phone:  214-653-3600
 5
    BY:   MR. ANDY BEACH, A.D.A., SBOT # 01944900
 6        MR. JOSH HEALY, A.D.A., SBOT # 24026288
          MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
 7        MR. HEATH HARRIS, A.D.A., SBOT # 00795409
          MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262
 8

 9
                            FOR THE STATE OF TEXAS;
10

11

12

13

14
    MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
15        311 N. Market Street, Suite 300
          Dallas, Texas 75202-1846
16        Phone:  214-761-0707

17  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
          3300 Oak Lawn Avenue, Suite 600
18        Dallas, Texas 75219
          Phone:  214-559-9115
19
    MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
20        3838 Oak Lawn Avenue, Suite 1350
          Dallas, Texas 75219
21        Phone:  214-651-6250

22  MR. JOHN GREGORY TATUM, Attorney at Law, SBOT # 19672500
          990 South Sherman Street
23        Richardson, Texas 75081
          Phone:  972-705-9200

24

25                          FOR THE DEFENDANT.
```

1      <u>INDEX VOLUME 53</u>

2      (PUNISHMENT PHASE BY JURY AND SENTENCING BY THE COURT)

3  November 5th, 2010                                    PAGE   VOL.

4  Proceedings.......................................... 4      53

5  Charge of the Court read............................. 8      53

6  Argument by Mr. Healy................................ 9      53

7  Argument by Mr. Warren.............................. 27      53

8  Argument by Mr. Johnson............................. 41      53

9  Argument by Mr. Beach............................... 64      53

10  Verdict on Punishment.............................. 79      53

11  Jury individually polled........................... 80      53

12  Sentencing by the Court............................ 81      53

13  Adjournment........................................ 82      53

14  Reporter's Certificate............................. 83      53

15

16

17

18

19

20

21

22

23

24

25

**Page 1**

1

1  REPORTER'S RECORD

2  VOLUME 53 OF 57 VOLUMES

3

4  TRIAL COURT CAUSE NO. F09-59380-S

5  CASE NO. AP-76,458

6

7  THE STATE OF TEXAS          :          IN THE 282ND JUDICIAL

8  VS.                         :          DISTRICT COURT OF

9  GARY GREEN                  :          DALLAS COUNTY, TEXAS

10

11

12  <u>PUNISHMENT PHASE BY JURY AND SENTENCING BY THE COURT</u>

13

14

15

16

17

18                  ............

19

20      On the 5th day of November, 2010, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable Andy Chatham, Judge

23  Presiding, held in Dallas, Dallas County, Texas:

24      Proceedings reported by machine shorthand computer

25  assisted transcription.

---

**Page 2**

1  A P P E A R A N C E S :

2

3  HONORABLE CRAIG WATKINS, Criminal District Attorney
      Frank Crowley Criminal Courts Building
4      Dallas, Dallas County, Texas 75207
      Phone: 214-653-3600

5

6  BY:  MR. ANDY BEACH, A.D.A., SBOT # 01944900
      MR. JOSH HEALY, A.D.A., SBOT # 24026288
      MS. JENNIFER BENNETT, A.D.A., SBOT # 24000091
7      MR. HEATH HARRIS, A.D.A., SBOT # 00795409
      MS. JACLYN O'CONNOR LAMBERT, A.D.A., SBOT # 24049262

8

9                  FOR THE STATE OF TEXAS;

10

11

12

13

14

15  MR. PAUL JOHNSON, Attorney at Law, SBOT # 10778230
      311 N. Market Street, Suite 300
      Dallas, Texas 75202-1846
16      Phone: 214-761-0707

17  MR. BRADY WYATT, III, Attorney at Law, SBOT # 24008313
      3300 Oak Lawn Avenue, Suite 600
18      Dallas, Texas 75219
      Phone: 214-559-9115

19

20  MR. KOBBY WARREN, Attorney at Law, SBOT # 24028113
      3838 Oak Lawn Avenue, Suite 1350
      Dallas, Texas 75219
21      Phone: 214-651-6250

22  MR. JOHN GREGORY TATUM, Attorney at Law, SBOT # 19672500
      990 South Sherman Street
23      Richardson, Texas 75081
      Phone: 972-705-9200

24

25                  FOR THE DEFENDANT.

---

**Page 3**

1                  INDEX VOLUME 53

2      (PUNISHMENT PHASE BY JURY AND SENTENCING BY THE COURT)

3  November 5th, 2010                    PAGE VOL.

4  Proceedings........................................ 4  53

5  Charge of the Court read........................... 8  53

6  Argument by Mr. Healy.............................. 9  53

7  Argument by Mr. Warren............................ 27  53

8  Argument by Mr. Johnson........................... 41  53

9  Argument by Mr. Beach............................. 64  53

10  Verdict on Punishment............................. 79  53

11  Jury individually polled.......................... 80  53

12  Sentencing by the Court........................... 81  53

13  Adjournment....................................... 82  53

14  Reporter's Certificate............................ 83  53

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4**

1                  P R O C E E D I N G S

2          THE COURT:  Both sides have had an opportunity

3  to review the charge, and -- and Mr. Tatum wished to make a

4  further objection.

5          Y'all be quiet.

6          MR. TATUM:  May it please the Court.

7          On behalf of the Defendant, we've come to have

8  the charge presented to us.  We've had a chance to review it.

9  There was one change that was made.  Some -- several words were

10  dropped from it, but our main objection still remains, as was

11  made before, as to what we call the 10/12 rule in that the law

12  in this State, as it is embodied in this charge, requires that

13  the jury have ten people to answer special issues that would

14  require a life sentence when, in fact, if any one individual

15  juror refuses to vote true on the special issues, then an

16  automatic life sentence is imposed.  We feel like this is not

17  -- it presents a non-truth or a lie to the jury,

18  misrepresenting the actual and true situation --

19          (Judge left courtroom.)

20          (Discussion off the record.)

21          (Judge returns to courtroom.)

22          MR. TATUM:  Okay.  So continuing -- The

23  statutory scheme as it is -- has been applied in this Court

24  presents a non-truth or a lie or deception to the jury.  And

25  because of that, it deprives this Defendant of his right to a

1  fair trial, based on due process of the United States
2  Constitution, the 8th Amendment, the 14th Amendment, the 5th
3  Amendment, the 6th Amendment of the United States Constitution.
4  And for that reason, we ask the Court to not present it that
5  way and to give an accurate instruction in which if one juror
6  finds that they are not convinced beyond a reasonable doubt or
7  wants to vote for mitigation, they can do so.  And the jury
8  dynamics are such that to require the 10 under the legislative
9  scheme puts a false pressure on somebody who may not hold out,
10  be subject to the majority people and would render possibly an
11  improper verdict.
12            THE COURT:  What says the State?
13            MR. TATUM:  Did you want to add anything?
14            MS. LAMBERT:  Your Honor, the 10/12 rule has
15  been repeatedly upheld by --
16            COURT REPORTER:  Ma'am, you're going to have to
17  come forward.
18            MS. LAMBERT:  Sorry.  The 10/12 rule has been
19  repeatedly upheld by the Court of Criminal Appeals.  The
20  Defendant hasn't presented any new argument or evidence in
21  support of his motion.  He's basically reurging his pretrial
22  motion, which the Court has already denied.  The State does not
23  believe that he's presented anything that would warrant further
24  review of his claim.
25            THE COURT:  What if the jury sends out a note

1  just based on case law.  I agree, it's silly.  It's not -- it's
2  not what the law says, but we tell them it is, so -- but the
3  law -- the case law goes -- goes against you.
4            MR. TATUM:  I know the case law, we just want to
5  definitely preserve it for future federal review, as we know
6  the federal courts have had to tell Texas how to implement due
7  process over the last 20 years and I assume they will continue
8  to do so.  So based on that, I assume that our request is
9  overruled?
10            THE COURT:  Yes, it's overruled.  Anything
11  further on the charge?
12            MR. TATUM:  No, sir.
13            MR. JOHNSON:  No, sir.
14            THE COURT:  Anything further from the State?
15            MS. LAMBERT:  No, Your Honor.
16            THE COURT:  Off the record.
17            (Discussion off the record.)
18            THE COURT:  All right.  Bring the jury in.
19            (Discussion off the record.)
20            THE BAILIFF:  All rise.
21            (Jury returned to courtroom.)
22            THE COURT:  Thank you all.  Please be seated.
23            Ladies and gentlemen, each side having rested
24  and closed, I'm prepared to give you the Charge of the Court.
25            "Members of the jury, by your verdict returned

6

1  saying, what happens if we don't agree?
2            MS. LAMBERT:  What happens if we don't agree?
3            THE COURT:  What.  What do I say if the State --
4  if we get a note from a juror -- jury that says what if we have
5  one holdout, what's that result?
6            MR. HEALY:  Keep deliberating.
7            MS. LAMBERT:  They keep deliberating.
8            THE COURT:  Don't I tell them what the law is?
9            MS. LAMBERT:  You can tell them what the law is,
10  but you're not allowed to tell them what happens if they don't
11  reach --
12            THE COURT:  Why not?  That's the law.
13            MS. LAMBERT:  The law says you're not allowed to
14  tell them that.
15            THE COURT:  No, it doesn't.
16            MS. LAMBERT:  Yes, it does.  It says it in the
17  statute.  You're not allowed to instruct them what happens if
18  they don't reach a unanimous decision.
19            THE COURT:  It doesn't seem very open.  It
20  doesn't seem very transparent to lie to the jurors.  Is that
21  what this government lawyer want me to do, lie to jurors?
22            MS. LAMBERT:  Of course not, Your Honor.  We
23  just want you to follow the law.
24            THE COURT:  And lie to jurors.  Very good.
25            Not going to grant the State's motion (sic),

8

1  in this case, you have found the Defendant, Gary Green, guilty
2  of the offense of capital murder, which was alleged to have
3  been committed on or about the 21st day of September 2009 in
4  Dallas County, Texas..."
5            (Charge of the Court read.)
6            THE COURT:  Signed by me, Andy Chatham, Judge,
7  282nd Judicial District Court, Dallas County, Texas.
8            Special Issue Number 1:  Do you find from the
9  evidence beyond a reasonable doubt that there is a probability
10  that the Defendant, Gary Green, would commit criminal acts of
11  violence that would constitute a continuing threat to society?
12  And then the answer -- if your answer to this special issue is
13  no and it is not unanimous, then the ten or more jurors who
14  agree should sign individually below.
15            If your special answer -- if your answer to
16  Special Issue Number 1 is yes, you shall proceed to Special
17  Issue Number 2.
18            If your answer to Special Issue Number 1 is no,
19  you shall cease your deliberations.
20            Special Issue Number 2:  Do you find, taking
21  into consideration all of the evidence, including the
22  circumstances of the offense, the Defendant's character and
23  background and the personal moral culpability of the Defendant,
24  Gary Green, that there is a sufficient mitigating circumstance
25  or circumstances to warrant that a sentence of life

1  imprisonment rather than a death sentence be imposed?  Answer

2  -- and then it's signed by the presiding juror.

3          If your answer to this special issue is yes and

4  is not unanimous, then the ten or more jurors who agree should

5  sign individually below.

6          And then like last time, of course, you will

7  take this copy back with you and you will use this for -- with

8  you in your deliberations.

9          10:31.  State.

10         (Argument by Mr. Healy.)

11         MR. HEALY:  Please the Court.

12         Mr. Johnson, Mr. Warren, Mr. Wyatt.

13         Ladies and gentlemen of the jury, what I want to

14  do is I want to go back to -- I think a few of y'all it was

15  late August, early September, and what we talked about in voir

16  dire.  I remember -- I know there's 14 of y'all sitting right

17  here.  I think I spoke with eight of y'all.  My co-counsels,

18  Ms. Bennett and Mr. Harris, spoke with the rest of y'all.  And

19  we talked to you about certain issues that may be coming up in

20  potential cases like this, but one thing we don't get to tell

21  you, and I think you understand now, is that y'all were at an

22  extreme disadvantage when we were talking with you.  You see,

23  because the 14 of y'all did not know the horrors that took

24  place on September 21st, 2009.  You did not know the damage

25  that Gary Green did to that family.  You did not know the

1  history of Gary Green and what he has done to this community.

2          And we talked in general terms because that's

3  all the law allows us to back then.  We talked in general terms

4  about an indictment for capital murder, and we said to y'all if

5  we proved each and every element beyond a reasonable doubt,

6  could you, in fact, return a verdict for capital murder of

7  guilty.  And every one of y'all said yes.  Well, you fulfilled

8  that obligation.  In about 16 minutes, you found the Defendant

9  guilty of capital murder.

10         The next set of questions we asked you, and this

11  is kind of -- if you remember, I said this is kind of the

12  serious part of the process.  This is -- I think I told y'all

13  the gut check time, because all of y'all who only at that point

14  in time took an oath to tell the truth, were asked, if the

15  State was able to prove Special Issue Number 1 yes beyond a

16  reasonable doubt, could you answer that special issue yes.  And

17  if the evidence showed that Special Issue Number 2 would be

18  answered no, could you, in fact, answer it no, knowing that the

19  end result would be Gary Green lying dead on a gurney in

20  Huntsville, Texas.

21         And if you remember what Ms. Bennett and myself

22  did to each one of y'all, we had you look at the Defendant.  We

23  described what took place when somebody is sentenced to die

24  here in the state of Texas.  We told you this isn't a joking

25  matter.  We told you this is serious.  We told you executions

1  take place all the time here in the state of Texas.  Every

2  single one of y'all put your eyes on this individual sitting

3  right here and said, Mr. Healy, Ms. Bennett, if you prove the

4  facts of this case, we'll find him guilty.  If you prove

5  Special Issue Number 1 beyond a reasonable doubt, we can answer

6  it yes, and if the evidence shows that there is no sufficiently

7  mitigating evidence, you will answer that no, knowing the

8  result would be Gary Green lying dead on a gurney.

9          I took you at your word back then.  Ms. Bennett

10  took you at your word back then.  All 14 of y'all after looking

11  at the Defendant, said you could participate in this process.

12         And remember what we told most of y'all -- I

13  think we told all of y'all sitting here.  It took us about

14  eight weeks to find the 14 of y'all.  We spoke to about six to

15  eight jurors a day.  We told you we spoke to almost a thousand

16  jurors.  We told you that 90 percent of those jurors were cut

17  right away because they couldn't participate in this process.

18  They couldn't, if the evidence took you in that route, answer

19  those issues that would end Gary Green's life.  You 14 said you

20  could.  You 14 said, assuming the evidence goes that way, yes,

21  Mr. Healy, we know what will happen, but we can participate.

22         Like I told you, I thought you were being honest

23  to us then, and I think you're being honest to us now.

24         Remember what we talked about on those special

25  issues, and we're going to go into those now, because remember

1  what we said before we started talking about them in voir dire,

2  we said you don't just say if somebody is guilty of capital

3  murder, it's going to be a death sentence.  You have to answer

4  these special issues, and that determines whether Gary Green

5  lives or dies after he's convicted of capital murder.  And I

6  know the Judge read it, but we're going to start with that.

7  Remember, that was the special issue we had in front of you

8  when the 14 of y'all were up on the jury?  Do you find from the

9  evidence beyond a reasonable doubt there's a probability that

10  the Defendant, Gary Green, would commit criminal acts of

11  violence that would constitute a continuing threat to society,

12  whether that society is prison society or outside world

13  society.

14         You remember one of the first things we all

15  talked about, and we asked you -- and we asked you in your

16  questionnaire -- I stayed up last night reading y'all's 14

17  questionnaires again.  And we asked you what would be the

18  number one, most important consideration when deciding whether

19  someone lives or dies.  Every single person sitting on this

20  jury said the facts of the offense.  The current facts of the

21  offense.

22         And you remember what we told you in voir dire?

23  The State can prove that special issue beyond a reasonable

24  doubt based on the heinousness, based on the horribleness of

25  the facts of the offense.

13

1    Ladies and gentlemen, you've heard for the last
2    week people testify about certain mental issues. You've heard
3    some punishment evidence that we put on, but for the next few
4    minutes I just want to kind of take us back to why we're here
5    and what we did last week and what we did in those two days
6    where you found the Defendant guilty of capital murder.
7            I'm not going to show you any more disgusting
8    photos. I'm assuming those photos are something that y'all are
9    never going to forget. I'm assuming those photos are something
10   that will be in y'all's heads for the rest of your lives. I am
11   going to show you these two photos, these two vibrant, living
12   human beings in these photos. And I'm going to tell you,
13   ladies and gentlemen, I'm going to ask you and I want you to
14   really think about what happened in this case. I know my
15   co-counsel, Ms. Bennett and Mr. Harris, in the guilt argument
16   talked about it, the heinousness, the brutality of what took
17   place that night. And I feel in these types of trials we kind
18   of get away from why we're here. We kind of get away from what
19   the true purpose is.
20           Because I don't want you to do -- and I really
21   want you to think about what took place on September 21st,
22   2009. And I really want you to think about when Lovetta,
23   writing a kind note saying, we need to move on, then he didn't
24   listen; wrote a little sterner note, saying we need to move on,
25   you need to move out. And I want you to think about the

14

1    actions Gary Green -- the actions that took place which caused
2    all of us to be here today.
3            I want you to think about when he writes that
4    letter back and he puts it in Lovetta's room. And the quote I
5    like to say, and you guys are going to have all this and I hope
6    you take it back there and listen -- or read it. First line of
7    this paragraph. You asked to see the monster, so here's the
8    monster you made me, bitch. That's the type of person we're
9    dealing with here. Because while Lovetta is reading that note
10   in her room, little Jazzmen, child, who nine of y'all put on
11   your questionnaire murder of a child is about as bad as it
12   gets -- is about as bad as it gets -- was sitting in her room
13   playing, either doing school work, playing with dolls, reading,
14   when the monster comes in. When the monster comes in with that
15   block of knives, when the monster duct tapes her hands, duct
16   tapes her feet, hog-ties her with the phone cord. When the
17   monster puts that duct tape on top of her mouth. When the
18   monster says, it's okay, everything is going to be fine. And
19   Jazzmen -- and you can read the questionnaire -- or excuse me,
20   read the confession again -- is just sitting there going,
21   what's going on. And imagine what's going on in her head, it's
22   okay, everything is going to be fine. See, what little Jazzmen
23   doesn't know at this point is that Gary Green has hatched his
24   plan.
25           You see, when you upset Gary Green, when you

15

1    make Gary Green mad, he reacts. And how does Gary Green react?
2    By carrying this 4 foot 9 -- 49-pound child into the room where
3    Lovetta Armstead is, carrying this precious young girl with all
4    the life ahead of her. And this precious young girl gets to
5    sit and watch Gary Green butcher her mother. I want you to
6    look at these. Because if you remember the medical examiner
7    testimony a week and a half ago, you remember some of the stab
8    wounds were 8 and a half inches deep, over 28 stab wounds to
9    Lovetta Armstrong (sic). I want you to look at the force that
10   it takes to break knives in half, the personalness of stabbing
11   someone repeatedly and repeatedly to the point where if you
12   break a knife, I'm going to grab another. And when I break
13   that one, I'm going to grab another.
14           And poor Lovetta. You know, I think we get lost
15   in this whole process sometimes, especially when a child is
16   involved, but poor Lovetta, who Defendant's own words states,
17   she fought back hard. It took over an hour and a half of
18   getting those 28 stab wounds. And, again, I'm not going to
19   show you those pictures, but if you look, the majority of those
20   all on her back while she lay there suffering, bleeding a slow
21   death. If that doesn't give you goose bumps, ladies and
22   gentlemen, maybe this will. Because what she had to endure,
23   not even during her death, but before her death, seeing her
24   mother butchered by that man.
25           But see, that's where Gary Green doesn't stop.

16

1    Gary Green is the type of person -- and Mr. Johnson used this
2    with every one of you guys in voir dire, and I wrote it down
3    each time because I knew I was going to use it in this closing
4    argument. The death penalty is reserved for the worst of the
5    worst. The death penalty is for somebody who commits such a
6    crime that is so horrible, that it's needed for society.
7            Well, after he butchers Lovetta Armstead 28
8    times, duct taped, hog-tied Jazzmen, watching everything, gets
9    carried for her second ride. See, the first ride was from her
10   room to Lovetta's room. The second ride is to that bathroom.
11           And, ladies and gentlemen, I can't imagine what
12   was going through this young child's head, when after seeing
13   her mother slaughtered, that bath water is filling up, she's
14   sitting there duct taped on the floor, that bath water is a
15   hundred percent full. He then takes her, puts her in that
16   bathtub so hard it chips the front of her mouth. The bruising
17   on the top of her head, holding her down, while she fights back
18   hard -- and you know that from his own words -- in that
19   bathroom, to the point where it drowns everything left in this
20   poor young child's life. His second murder. His second, as
21   you guys said in your questionnaire, cold-blooded, intentional,
22   premeditated murder, exactly what he wrote out to do.
23           See, but Gary Green, the worst of the worst, as
24   Mr. Johnson says, doesn't stop there. See, Gary Green at that
25   point, he has too much blood on his hands. He has too much

17

1  blood over his face. So he decides he's going to step over
2  that child who's lying dead on the floor. He's going to
3  shower. He's going to go then to pick up those two boys
4  sitting right over there, Jerrett and Jerome, from church. And
5  he's going to pick up Jerrett and Jerome and he's going to
6  continue the horrors of that night because -- and I'm not going
7  to play the 911 tape again. I think you guys heard it enough.
8  When they get home, they don't know what happened to their mom
9  yet. They don't know anything, except Jerome has told JT to
10  go -- excuse me, Jerome is told to go take a bath, clean up;
11  Jerrett is left with the monster. And the next minute we know
12  Jerrett comes running in screaming, crying, saying, Gary is
13  trying to kill me. Saying, Gary is trying to kill me. This
14  child was nine years old when this happened. He has to live
15  with that for the rest of his life. He has to live with what
16  Gary Green did.
17         Because see, at that point, Jerrett and Jerome
18  are trying to do everything in their power to prevent more
19  murders that night. And God bless, one of the smartest eight
20  or nine-year olds that I've ever seen in my life who convinced
21  that guy, Gary, we love you, please don't do this. Gary, we
22  think you're great. Please don't do this. But what does Gary
23  do? See, Gary gets asked a question -- or excuse me, Gary asks
24  the question, Jerome doesn't answer it. Jerrett does. And one
25  of these six knives goes right into his gut.

18

1         At that point luckily they are able to get out
2  of there. They are able to save their lives. And the
3  Defendant goes on his way. That's the facts of this offense.
4  I haven't even yet talked to you 14 about what else he's done
5  in Dallas County. That is the worst of the worst. That is
6  somebody who has no regard for any human life, any human being.
7         Ladies and gentlemen, if there is a crime where
8  the facts alone aren't enough for a death sentence and this
9  doesn't meet it, I don't know what will. But you see, some of
10  the questions we posed to you during voir dire was, would you
11  like to know anything else about the Defendant when answering
12  these special issues. Would you like to know maybe his
13  history? Would that be important? Four of y'all said that was
14  the most important thing. I want to know about the history of
15  the Defendant. I want to know how he acted before this
16  offense. See, with Gary Green, this wasn't a one-time thing.
17  He wasn't a choir boy coming up to this bad night. He has a
18  history dating back for a long time that you get to consider
19  when answering these special issues.
20         And remember we talked about it in the guilt
21  stage, it's about the crime itself. In the punishment stage,
22  you can use the crime itself and then you get to use the entire
23  life history of the Defendant. This is the type of person
24  we're dealing with.
25         July 28th, 1989, he's selling crack. He's

19

1  selling crack to the point he gets busted with a bag with 13
2  little bags in it, and receives four years probation on
3  August 4th, 1989. He waits a grand total of 48 hours --
4  48 hours to commit his next crime in Dallas County, the
5  aggravated assault with a deadly weapon on Jennifer Wheeler.
6         Now, ladies and gentlemen, I want to stop there
7  for a second to tell you -- and Mr. Beach read this at the end
8  and I know y'all heard a lot of evidence, but I think it's
9  important that we talk about this. I want to talk to you about
10  when the monster started his preying, because you remember this
11  letter -- it's in evidence and you get it, it's State's
12  Exhibit 148B. When he's in jail for what he did writing to
13  Jennifer and he says, I said if you ever blank, blank, blank,
14  blank over and think you can play with my feeling, I'll kill
15  you. Isn't that what I said? This is a letter written to
16  Jennifer Wheeler. With me doing the wrong things that place me
17  here, it wasn't the money mostly. It was the high of doing
18  wrong and getting away with it. I wasn't on drugs or alcohol.
19  Like to think I was completely sane. You see, I know what it
20  takes to make and be a success. Those are the words of the
21  monster.
22         Because I want you to think about Jennifer
23  Wheeler. I want you to think about Jennifer Wheeler who tried
24  in her power to get away from the monster and Jennifer Wheeler
25  who tried and tried, and finally thought she was away from him

20

1  and then sees him at a bus stop, and sees on August 6, 1989,
2  the monster and courteously gives him a ride and gets in the
3  car. And y'all heard what happened then. You've heard the
4  fear in her eyes (sic).
5         Defendant -- and I want you to think about
6  this -- takes out his bootlaces -- takes out his bootlaces to
7  choke that poor, young 18-year old to the point where you saw
8  those pictures with the scars on her neck. You saw the
9  bruising to her face where he beat her so bad, she was in the
10  hospital for over a week. You saw the missing teeth. You
11  saw -- well, you didn't see, but you heard about the stab wound
12  in the chest.
13         See, ladies and gentlemen, we bring you people
14  like Jennifer Wheeler to show you this is a pattern of the
15  monster. If you upset Gary Green, you get hurt. If you do
16  potentially wrong in his mind to Gary Green, you get hurt.
17  Jennifer Wheeler just wanted to get away from him. She tried
18  everything in her power and look where it ended up for her. So
19  that's his first step where he gets sentenced to four years in
20  prison for that. And his probation gets revoked in his drug
21  case, and he does two 4-year sentences for the aggravated
22  assault and the possession of cocaine.
23         So on that four-year sentence, ladies and
24  gentlemen, he gets released from prison on December 2nd, 1989,
25  serving less than four months of those four years. Serving

21

1    less than four months on his four-year sentence, he waits

2    approximately another four months to cause the next havoc on

3    society.  You see, Joe Johnson, ladies and gentlemen, who runs

4    this store, the manager at the store says, I'm going to give

5    Gary a chance.  I know he's a convicted felon.  I know he went

6    to prison, but I'm going to do everything in my power to give

7    him a chance.  So Joe Johnson gives him a chance to work at his

8    store, and Gary Green calls in sick one day, very soon after he

9    got hired.  Gary Green then shows up at the store.  They fire

10   him.  Again, perceived wrong in his mind.  So what does Gary

11   Green do?  That's when the monster comes.  Because Gary Green

12   then goes with a friend with a .45-caliber handgun, his friend

13   with a shotgun, with masks, going into that store, shooting up

14   that store and robbing it for everything it has.  Less than

15   four months after he got out of prison for almost killing

16   Jennifer Wheeler.

17          That's the type of cases when we tell you and

18   Mr. Johnson tells you, the worst of the worst.  These are the

19   type of people we're talking about.  So he gets sentenced on

20   June 4th, 1990, to 20 years in prison.  Well, we know what

21   happened then.  Between the years of 1991 and '94, Defendant

22   had 13 violations in prison.  And we didn't waste y'all's time

23   in reading them specifically to you each time, but you can take

24   this back, State's Exhibit 159.  These are the 13 documented

25   violations in prison that he had, and you can see on that

22

1    screen, they ranged from failing to obey orders, indecent

2    exposure, refusing to work, not working correctly, violating

3    storage rules, fighting -- three separate instances of fighting

4    with other inmates, assaults, two assaults on prison guards.

5    That's what he did during those years in prison.  That's the

6    type of monster we're talking about.

7          But you see, after that, his violations kind of

8    stop until he gets released.  Because we know who comes into

9    his life at that time.  Belinda Lacy, the prison guard.  The

10   guard that works with Gary Green.  The guard who quit working

11   in prison to be with Gary Green.  The guard who went to visit

12   Gary Green weekly.  The guard who after Gary Green gets out,

13   gets married, and then he leaves her within a week.  We know he

14   used her.  We know he used her.  Because I want you to think

15   about this.  He's released from prison August 3rd, 2000.  He

16   served ten years and two months of a 20-year sentence.  He gets

17   out.  The monster is not done.  You see, he continues hurting,

18   violating other people's rights.

19          That's why we brought you the next victim of

20   Gary Green.  Shulonda Ransom.  Now, ladies and gentlemen, I

21   don't think I can tell you anything that would shock you any

22   more of what you heard the Defendant is capable of, but

23   Shulonda Ransom is pregnant with his baby.  And if she doesn't

24   cook or clean fast enough, she gets slapped around.  If she

25   doesn't do what the monster wants, she gets slapped around.

23

1    And you know what, it doesn't matter if she's pregnant or not

2    because that last time when she was pregnant, Gary Green takes

3    his hands, lifts her up by the throat, puts her on that

4    bathroom, and strangles her to the point where she loses

5    consciousness.  That's the type of person we're dealing with.

6    That's the type of person the death penalty is reserved for.

7          See, Gary Green has the personality of, you know

8    what, she's unconscious, she's there.  He takes everything in

9    that place, including the baby's diapers.  He ransacks

10   everything.  Do you remember what she said, how she felt there?

11   Do you remember seeing the fear and pain in her eyes when she

12   testified?  That's Gary Green.

13          Early 2008, chokes Lovetta Armstead.  Kind of a

14   preview of what we know happened September 22nd, 2009, where he

15   commits this offense, this double murder, while still on parole

16   for his aggravated robbery charge.

17          Ladies and gentlemen, I'm going to ask you this.

18   I want to go back to Jennifer Wheeler, and ask you if you -- if

19   a jury had to come in here and guess would Gary Green be a

20   future danger after Jennifer Wheeler, and said no, where would

21   we be?  If the jury had to guess in prison would Gary Green be

22   a future danger, where would we be?  If the jury had to guess

23   when he gets out of prison, would Gary Green be a future

24   danger?  Well, I think we know the answer to that again, with

25   Shulonda Ransom.  And if the jury had to guess again, would

24

1    Gary Green be a future danger, well, we know what he committed

2    on September 21st, 2009.

3          Ladies and gentlemen, I think a few of y'all

4    also mentioned in your questionnaire, the past is the best

5    predictor of the future.  Ladies and gentlemen, his history

6    starts in 1989, and I'm not even including where he was working

7    as a bodyguard for drug dealers.  His documented history starts

8    in 1989, all the way through 2009.  Adding up his criminal

9    history, adding up how he acted in prison, and the facts of

10   this capital murder, I submit to you we've proved to you beyond

11   any and all reasonable doubt that the answer to that first

12   special issue is yes.

13          So at that point what did we tell you in voir

14   dire?  We told you if you answered that first special issue

15   yes, Defendant's basically looking at a death sentence.  And we

16   kind of said this next special issue, it's kind of the safety

17   net provision.  Do you find, taking into consideration all of

18   the evidence, including the circumstances of the offense, the

19   Defendant's character and background and the personal moral

20   culpability of the Defendant, Gary Green, that there is a

21   sufficient mitigating circumstance or circumstances to warrant

22   that a sentence of life imprisonment without parole rather than

23   a death sentence be imposed?

24          Ms. Bennett and I talked to you about

25   sufficiently mitigating circumstances.  And I think y'all

25

1  remember we brought that out because -- was Gary Green
2  depressed?  Yes.  Was Gary Green antisocial?  Yes.  The
3  asphyxiating -- or a schizoid disorder with all the other
4  disorders that his $200 an hour doctor from San Antonio came in
5  and told you about, I don't know what to believe on that.  I
6  know when Mr. Beach questioned him, he wasn't bipolar, he
7  didn't have schizophrenia, he wasn't mentally retarded.  For
8  the life of me, I have no idea how being majorly depressed
9  causes you to drown and end the life of Jazzmen and stab
10 Lovetta Armstead 28 times.
11        Ladies and gentlemen, in no way -- in no way
12 does that rise to the level of being sufficiently mitigating to
13 lessen his moral blameworthiness.  No sufficiently mitigating
14 evidence to warrant sparing his life.
15        Mr. Johnson talked to you in voir dire that it
16 could be a tinkle in his eye (sic).  It could be how his mother
17 came on the stand.  It could be mercy.  Ladies and gentlemen, I
18 want you to look at this side of the family over here.  I want
19 everybody to turn around and look at that side of the family.
20 If for once you consider for mercy what he did to everybody
21 sitting over there, I want you to remember when I had you look
22 at them and think about what their lives are going to be.  How
23 many Christmases they're never going to see their children.
24 How many times those two boys are never going to see their
25 mother again.  How many times Jerrett and Jerome are going to

26

1  have to say, why did this happen to me.  How many times does
2  Mr. Montgomery have to say, I don't have my daughter for school
3  functions.  I can't talk to other teachers about my daughter.
4        So when he says mercy, I say to him and I say to
5  y'all, if you ever think somebody deserves mercy, I just want
6  you to think of the horror of what happened on this day in
7  question and the horror, what he has caused citizens of Dallas
8  County for over 20 years and think if that person truly
9  deserves mercy.
10        Ladies and gentlemen, the answer to that second
11 special issue, based on the evidence, is no.  That's everything
12 we heard.  I'm going to leave with you this, and then I'm going
13 to sit down.  Mr. Warren and Mr. Johnson are going to speak,
14 and then Mr. Beach is going to come back and speak one more
15 time.  I'm going to leave you with this, though.  If we're at a
16 point in society -- if we're at a point in the year 2010 where
17 you can stab someone 28 times to their brutal death and you can
18 choke a little baby girl and drown her so hard the way he did,
19 and the history he has and the victims that he has caused over
20 the years, and that person doesn't deserve a death sentence,
21 then we really need to take a step back and look at some
22 things.
23        Because, ladies and gentlemen -- and I keep
24 going back to it -- you're looking at the worst of the worst.
25 You're looking at evil.  You're looking at somebody who says

27

1  the reason I did these crimes is betrayal.  You're looking at
2  somebody who his family testifies that he wouldn't even say he
3  was sorry for what he did.  He said Lovetta started it.  He
4  said Jazzmen -- she was using Jazzmen as a shield.  You're
5  looking at somebody who has earned over the last 21 years of
6  his lifetime, the answers to those special issues yes on future
7  danger, no on sufficiently mitigating evidence, and follow your
8  oath and follow your duty.  And I feel that's where the
9  evidence will take you.
10        I want to thank y'all very much.  I know this
11 has been two weeks of some very dramatic testimony.  I know
12 every one of y'all have been listening intently, and from both
13 sides and both families, we do appreciate that.  Thank you.
14        THE COURT:  State, you have to clean up after
15 yourself.  That's kind of my rule in here.  That's all.  Thank
16 you.
17        Who is going first, Mr. Warren?
18        (Argument by Mr. Warren.)
19        MR. WARREN:  Yes, Your Honor.  Please the Court.
20 State.
21        Ladies and gentlemen of the jury, I want to
22 thank you all, first of all.  I want to thank you guys for your
23 time and your attention, taking away from your lives for the
24 last couple of weeks and even going back a few months -- even
25 back in voir dire.  I want to thank you 14 people first and

28

1  foremost for being special.  And you 14 people sitting here are
2  special because like Mr. Healy said, Defense and the State, we
3  went through thousands of potential jurors.  And it takes a
4  special kind of person -- a special kind of citizen to serve on
5  a jury like this.  I can't tell you how many hours I spent
6  reading the questionnaires, how much time I spent speaking to
7  each of you guys, and you guys are sitting here because you're
8  special.  And in that specialness, the uniqueness that makes
9  you special, has made a contract, you all and us, with both
10 sides.
11        You remember what that contract was?  Like Mr.
12 Healy said, to follow the law, plain and simple.  And that law
13 states the main thing that we spoke about to each and every one
14 of you during voir dire was no automatic answers.  No automatic
15 answers.  The majority of the people that we were unable to
16 seat on this jury was because of automatic answers.  Think back
17 about what we spoke about during that voir dire.  We couldn't
18 use particulars -- you had no idea.  You heard about the
19 indictment, but you had no idea about the particular facts of
20 this case.
21        But what did myself and Mr. Wyatt and Mr.
22 Johnson tell each one of you that we spoke to?  That it's going
23 to be bad.  It's going to be horrible.  It's going to be
24 brutal, and it's going to be heinous.  And that's exactly what
25 we have.  We prefaced everything, even going into the special

29

1  issues, with those -- with that understanding right there, that
2  you knew it was going to be bad. And with that understanding,
3  we followed that up. Are you telling me that not only can you
4  sit here and tell me, but can you actually do it? And do it
5  means not make any automatic answers based on the severity of
6  the offense and the facts that you're going to hear. And each
7  one of you 14 said that you could, because if you did not, you
8  would not be sitting here. And that's what I want to hold you
9  to. Because we told you, and you guys are smart enough, that
10  we absolutely expected to be where we are here today.
11        You heard Mr. Johnson in his closing argument,
12  he told you we're going to be here. We expect to be here, and
13  this is where we are.
14        We didn't put on any evidence in the
15  guilt/innocence phase, and you know why, don't you? Because he
16  was guilty. He is guilty of this brutal, heinous capital
17  murder. I know you heard those words all the time during voir
18  dire. He is guilty. But does that automatically equate to a
19  death sentence? Does that automatically equate to you
20  answering those answers yes and no, the special issues? Each
21  one of you said no. I would hold the State to its burden. I
22  would require them to prove to me -- bring me evidence and
23  prove to each and every one of you beyond a reasonable doubt
24  those special issues -- or Special Issue Number 1. That's what
25  you guys told us.

30

1        And Mr. Healy's theme for the voir dire was the
2  worst of the worst. And as you see, he took that from Mr.
3  Johnson, worst of the worst. Well, you know, the good thing
4  about -- the best thing about living in our country is the
5  legislature has the power to do what it wants. They could have
6  written that code any particular way they desired. They could
7  have put in if A, B, and C -- if it's a child, if it's this --
8  a stabbing, picks someone up at church, and attempts to kill
9  them after that, then that's sufficient, the death sentence.
10  But that's not what the code says. They have to prove to
11  you -- if they're -- their staple here is the facts of this
12  particular offense. That is sufficient enough for you to
13  answer that Special Issue Number 1 in the affirmative.
14  However, think about everything that they brought you in
15  regards to Special Issue Number 1, and think about a couple of
16  things we spoke about in voir dire.
17        One, we spoke about probability in Special Issue
18  Number 1. Do you remember our conversations on that? Our
19  example that we like to use is it possible for each one -- for
20  me to go home, buy a lottery ticket today and win and not come
21  back to work tomorrow. It's possible, and I wish it was
22  probable, but it's not. And that's the difference. Not is it
23  possible, but is it probable they would commit criminal acts of
24  violence in society.
25        And we're going to hit each one of them. We're

31

1  going to talk about probability and we're going to hit criminal
2  acts of violence and then we're going to get to society because
3  those are the things that they have to prove to you. Because
4  the guilt/innocence phase is done. All this -- all the
5  dramatics, all of this, we know that. It was unnecessary. You
6  have a confession. You have a letter. You have two little
7  boys. Actually Mr. Healy and I don't agree much, but I have to
8  agree those are some awesome boys right there. I have two
9  little girls myself, and those are some awesome children,
10  absolutely fabulous.
11        But they have to prove to you -- all that
12  evidence has to prove to you, probability, continuing criminal
13  acts of violence, and society. It's not just possible. It's
14  not just a possibility. Like I said, it goes back -- the
15  legislature can put the words in there how they desire, and
16  it's intentional they put in there probability and not
17  possibility. Because almost anything is possible. All 14 of
18  you said that.
19        Criminal acts of violence. Criminal acts of
20  violence. The example we used a lot in voir dire, if
21  someone -- if you saw me hit someone -- example I used, I hit
22  Mr. Johnson as he sat next to me. And all you guys said, yeah,
23  that's an act of violence, absolutely. But then you found out
24  later that he was trying to take my wallet, so I was protecting
25  my -- my property. So that act of violence would be justified.

32

1  Therefore, not criminal.
2        You see, the evidence that Mr. Healy brings to
3  you, and let's think -- let's think about this, ladies and
4  gentlemen. And in no way do you, you know, I want to belittle the
5  offense of this case or disrespect the victims in this case
6  because they are victims and they are innocent. You know,
7  don't misinterpret that. However, that's not enough. And
8  that's what you 14 stated that you would understand and follow.
9  We have victims here, that's right. And it was bad, it's
10  brutal, and it was horrible just like we told you it was going
11  to be. But you all promised me and Mr. Johnson and Mr. Wyatt,
12  that in and of itself would not lead to an automatic
13  answer on either of these special issues. So let's think about
14  what they brought to you. And -- for criminal acts of
15  violence, that they want to help you make your decision in
16  regards to probability.
17        They bring you these 12 -- 13, if you include
18  the detention officer that came down and spoke to you. And you
19  -- this is in evidence. You can take this back there with you.
20  I want you to take a look at it. Because this is the thing,
21  ladies and gentlemen. You think -- like I told you during voir
22  dire, you come in there, some of you guys have had jury duty
23  before, and normally it's like this, and I would have
24  40 minutes to talk to you. And you'd be sitting out here. I
25  couldn't concentrate much on one particular person. But in

**33**

1    here during our voir dire, we brought each of you here and we
2    spoke to you for almost an hour.  We had a 15, 16-page packet
3    of information.  So we knew a lot about you.  And we took the
4    time because we had to know a lot about you, because you're
5    unique and you're special, which is why you're on this jury.
6              And I bring that back to tell you that this is
7    the State of Texas sitting here, the great State of Texas.
8    They have unlimited resources to bring you -- the same way they
9    brought back that detention officer from Utah, their doctors,
10   all their witnesses, they brought here, so I promise you, if
11   they had anything and if they could find it, they -- it would
12   be here.  If they had these inmates, if they had these
13   officers, they would be here, I promise you that.  But it's not
14   there.  So they didn't talk about these on purpose.  Like I
15   said, these are 12 here, and you include the officer, that's
16   13.  But people -- Mr. Healy put them up there, but the
17   language in some of these is -- by throwing that -- a light
18   bulb and striking me, Officer Baker, on my right leg.
19             He lost his commissary.  Commissary is where he
20   can go to the little prison store and buy his food.  It didn't
21   say he threw it at me.  He said he threw a light bulb.  You
22   have where he failed to do sufficient work, he didn't go to his
23   doctor's appointment in TDC while he was there on two or three
24   occasions.  He didn't use the hoe in a particular manner that
25   the guard supervising him thought he should.

**34**

1              And then, what do you have -- if you read this,
2    it says fights, engage in a fight without a weapon.  You know,
3    I know none of you guys have, and I've only gone as a visitor
4    to prison, but I can tell you it's a place I don't want to go.
5    And I'm pretty sure it's violent down there.  You have a lot of
6    people in small places, certain rules, regulations,
7    restrictions.  And like Mr. Johnson likes to say, I'm pretty
8    sure it's a rough and tumble place.
9              So you're going to have altercations,
10   absolutely.  Absolutely.  And look at some of the hearing
11   times -- three minutes, two minutes.  What the Warden told you
12   is that -- Warden Nelson told you that what happens normally is
13   both of the individuals receive these -- engaging in a fight.
14   What is engage?  Mutual combat.  That is in ten plus years in
15   prison.
16             And then Mr. Green is almost 40 years old, so
17   over half of his adult life he has been incarcerated.  And
18   that's all they have to bring you.  And what makes that so
19   important is that goes back to society.  The society that we
20   will be talking about in Special Issue Number 1 is not proven
21   to you 14 beyond a reasonable doubt, the society that we will
22   be talking about is what?  Prison.  Life without parole.  And
23   that's important.
24             This isn't 30 years he becomes eligible, he gets
25   out.  This sentence of life without parole is in effect, the

**35**

1    same as a regular death sentence.  It's just a matter of time.
2    He leaves the exact same way, in a body bag.  So there is no
3    getting out.  So what's important to help you make this
4    decision of Special Issue Number 1 beyond a reasonable doubt?
5    It's his society.
6              And Mr. Healy says, well, if he would have the
7    opportunity to stand up -- I've known Mr. Healy a long time.  I
8    know he would respond to that, Belinda Lacy.  He says, well, we
9    know he used her.  Do we?  Used her how?  What -- what benefit
10   was it?  There's no benefit to that.
11             What did she tell you?  We struck up a
12   conversation.  It became emotional.  Then it got more -- so she
13   quit her job.  Let me ask you this.  What would make more sense
14   to an individual who's in TDC for 20 plus years and he has a
15   guard on his side?  Do you think it would be more advantageous
16   to him to have her quit her job, if he's this cunning
17   individual and wants to use her to his benefit?  He has plenty
18   of people to come visit him two or three times a week, his
19   brother, his mother, his grandmother.  If that's what he was
20   trying to do, not going to quit.  Makes more sense for you to
21   be here, if I'm going to use you, but he did not use her.  She
22   said she loved him.  They got married.  He loved her.  Did it
23   work out?  No.  But that's all they had.  That's what they
24   brought to you.  There is no evidence of him using Ms. Lacy.
25   For what?  What was the benefit?

**36**

1              And, you know, there are -- in that society,
2    it's just so important, is what you have to remember, ladies
3    and gentlemen -- last September was the last time that Gary
4    Green would ever be a free man.  You guys decided that last
5    Thursday.  In 16 minutes you decided that.  One way or the
6    other, that was the last time that Gary Green was ever going to
7    be a free man.  Because, you know, right now as you sit without
8    answering those special issues right now today -- or really
9    last Thursday -- the best that could ever possibly happen is
10   life without parole.  Meaning what?  That he will die in
11   prison.
12             And, you know, it doesn't say that I found the
13   facts of this offense are so heinous and horrible, that it's
14   the death sentence.  That's not how the statute is written.
15   That's not how the charge is written which is the Judge's
16   instructions to you.  You have to answer these special issues
17   beyond a reasonable doubt.
18             And, you know, has Mr. Green made some bad
19   decisions in his life?  Absolutely.  Can I sit here and justify
20   any of them to you?  Absolutely not.  However, if you are going
21   to use those and analyze though those in making your decision
22   with regard to Special Issue Number 1, you have to be able to
23   believe that those things that happened in the free world with
24   females would lead you to believe that he would continue to
25   commit criminal acts of violence while in prison.  How did we

1  phrase it? Continue to make people victims while in custody.

2  That's what you have to decide.

3  Because here's the thing. He'll never be in any

4  of these situations again. Think about it. Shulonda Ransom,

5  Ms. Wheeler, Ms. Armstead, the boys, Jazzmen, innocent victims.

6  But none of those or anything similar to that will be in the

7  society that we're speaking of. None. None of those. He will

8  never have another girlfriend. He'll never have any other

9  children because he will be in prison.

10  And think back on -- look at the dates on these

11  things, ladies and gentlemen. Look at the dates that Mr. Healy

12  put up on -- on this screen here. If you look at it, then just

13  think about the dates. On a 20-year sentence in the first

14  three years of that sentence is when these infractions, these

15  minor infractions, that they happen. Did he bring you anything

16  else? Look at the dates. Anything else after 1994? He didn't

17  get out until 2000. So from 1994 until 2009, no issues with

18  Mr. Gary Green.

19  And if you discount -- if you don't look at

20  the -- at the TDC disciplinaries, then it's over 20 years since

21  Mr. Green committed a criminal offense. So look at the past to

22  predict the future. Look at his -- look at his records. Look

23  where he's going to be -- where he is going to be for the rest

24  of his life one way or another, look at it. And this is the

25  best prediction. This is the best predictor, because this is

1  the society we're speaking of.

2  What did Warden Nelson tell you, the State's

3  witness? She told you she had been dealing with TDC and their

4  system for the majority of her life, all the way from detention

5  officer and now she's a Warden of her own prison. Mr. Johnson

6  asked her on cross-examination, was there any correlation

7  between the actual charge of an offender and their propensity

8  to commit violence while in custody. State's witness. No.

9  No, there's not. It's going to depend on that person. Warden,

10  did you get the opportunity to look at Mr. Green's TDC record?

11  I did. I pulled them up. And the State didn't even ask her

12  about that. You remember? Mr. Healy didn't even ask her about

13  that. That was Mr. Johnson. She said Mr. Healy didn't ask me

14  to look at them, but I looked at them anyway. Why? Because

15  there's nothing there. I promise you if there was, it would be

16  here.

17  And think about the detention officer they did

18  bring, the truck driver from Utah. It was referred to the --

19  to the Attorney General's Office and they denied to prosecute

20  it. Why? Because another officer said, I didn't see any of

21  that, what occurred. That's their biggest -- that's their big

22  witness, a case that the State declined to prosecute, because

23  of inconsistencies and not inmate testimony, in guard

24  testimony. Why would another guard who has to work in the same

25  environment around all these people -- the guard told you 30 to

1  1 is the ratio between inmates and guards. You tell me why a

2  guard would not have another guard's back? They would, and

3  they do. And it was dismissed because it didn't happen. Think

4  about that.

5  And in -- and in thinking about all these

6  issues, the probability, criminal acts of violence, the

7  society, it's all beyond a reasonable doubt. And it has to be

8  unanimous. That means each and every one of you have to

9  believe that he would continue to make people victims beyond a

10  reasonable doubt while in custody -- in prison. That's what it

11  means. Each and every one of you -- and if just one of you do

12  not, that's not unanimous, is it? It has to be unanimous. And

13  if it is not, then you do not go on to Special Issue Number 2.

14  Ladies and gentlemen, it's -- you know, it's --

15  I don't envy at all in your position because you have

16  before you some horrible, horrible facts, hurt some beautiful

17  children, heard about the death of a beautiful child, and it

18  can be easy to allow your emotions to be inflamed and outraged

19  and to forget your oath. But you 14 are here because you said

20  you would not allow that to happen. And that's what I'm going

21  to ask you to do is not to allow that to happen.

22  Because the facts of this instant offense are

23  what they are, and they are horrible. But you cannot

24  automatically link that to answering this Special Issue Number

25  1 in the affirmative. Like I said, break it down when you get

1  back there, Special Issue Number 1. Probability, criminal acts

2  of violence, society, beyond a reasonable doubt. Each and

3  every one of you, unanimous.

4  You know, we didn't -- we didn't argue that Mr.

5  Green was not guilty in the pun -- I mean, in the

6  guilt/innocence phase because he was. But we're certainly

7  arguing this, because we do not believe they brought you any

8  evidence to prove to you beyond a reasonable doubt to answer

9  that first issue -- Special Issue Number 1 in the affirmative.

10  Just briefly on Special Issue Number 2, as I

11  close. And then Mr. Johnson, my co-counsel, will get up and

12  will make final summations -- will be the last time you will

13  hear from our side of the room.

14  The one thing that we always spoke to you guys

15  about on Special Issue Number 2, the State harps on mercy.

16  That's one of the things that could be sufficiently mitigating,

17  but the beauty of Number 2 is, the only person that could tell

18  each one of you guys -- each one of you 14 what is sufficiently

19  mitigating is each one of you 14. You are the only ones that

20  can know what is sufficiently mitigating, whether it's a

21  circumstance or circumstances. It's up to you. Thank you.

22  THE COURT: You need a break? Okay. Ladies and

23  gentlemen, we're going to take a break. We've all been working

24  while y'all are -- I mean, we were getting the charge together,

25  putting things together. I know -- I understand your

41

1  frustrations, but it's okay, I promise.

2           (Jury excused from courtroom.)

3           MR. JOHNSON:  Is it going to be short, Judge?

4  Is it going to be very short?

5           THE COURT:  Yeah.  I can't imagine it being very

6  long.

7           THE BAILIFF:  All rise.

8           (Jury returned to courtroom.)

9           THE COURT:  Thank you all.  Please be seated.

10  Mr. Johnson.

11           (Argument by Mr. Johnson.)

12           MR. JOHNSON:  May it please the Court.

13  Counsel.

14           Ladies and gentlemen, I'd like to take this

15  final opportunity to thank you for being here, and I know we've

16  had a lot of starts and stops in the process of this trial, and

17  I've seen some of your faces as you come and go out of the

18  courtroom.  And I want you to know that we're not doing these

19  things to try to put you out.  There's nothing more serious

20  than the decision you're going to be making in the next few

21  hours.  And it's got to be done right, and it's got to be done

22  the only way possible and that is to make sure that everything

23  that is brought to you in this courtroom is brought to you for

24  your consideration and these two special issues that are going

25  to decide the fate and life of that man sitting at the end of

42

1  the table.

2           Now, folks, I'm going to -- normally what we do

3  is the -- as Mr. Warren did, he gets up here and he'll talk to

4  you about Special Issue Number 1.  I'll talk to you about the

5  issues of mitigation, but what we have really in this case is a

6  little bit of a more broad issue -- a little broader issue

7  because -- because of the fact that the person that you are

8  considering these issues about, Gary Green, is a man with a

9  severe mental illness.  And we talked to you in voir dire --

10  every one of you told me, because I spoke to pretty much all of

11  you -- or most of you myself.  And every one of you told me

12  that you understood that in the spectrum of mental issues, from

13  insanity to what we call completely normal, some people fall

14  somewhere in the middle.  And we know that Gary Green is not in

15  the middle.  He's towards the end.

16           And, folks, what I'm going to talk to you about

17  in these issues -- because when you consider the -- whether or

18  not you're going to put a man to death for a horrible crime --

19  and I'll tell you right now, folks, I -- I suggest to you now

20  that the only appropriate verdict in this case is a sentence of

21  life without parole.  That's what the evidence in this case

22  shows.  That's what they have brought to you.  I submit to you

23  that they have failed to prove the first special issue

24  completely, failed to prove it to you.  And we have brought

25  forth evidence that I submit to you is sufficiently mitigating

43

1  even on the -- on the farthest stretch of the imagination, if

2  you believe that there's nothing left as an alternative to

3  ending his life besides execution.

4           The only way that you can go back, and I submit

5  to you come back, is if you go back and are inflamed by the

6  arguments taking you back to the horrible nature of what Gary

7  Green did.  And what he did was horrible, folks.  I told you

8  that, and we told you -- every one of you that what you would

9  hear in this courtroom would probably never leave your minds.

10  And I think that's borne true.  But everyone of you told us not

11  that only would you look at that, but that you would look and

12  understand these issues.  And none of you understood what these

13  cases were all about.  None of you knew how a person got a

14  sentence of death in the state of Texas.  And see, the state of

15  Texas is a state that actually takes people and executes them.

16  And they used to take the mentally ill -- we used to just lock

17  them away either in prisons or institutions.  We used to

18  execute them if they committed crimes.  And the Supreme Court

19  said, wait, that's not right.  You have to analyze the life of

20  that individual to determine whether or not there are reasons

21  and other alternatives to execution when you're dealing with

22  people's lives.  And mental illness is one of the main ones you

23  look at.

24           Our society, folks, is going to be judged by how

25  we treat those that have problems that not all of us share.

44

1  Gary Green is sick.  Gary Green, I submit to you, is before you

2  now, and I'm going to talk to you -- and it's going to be a

3  little bit difficult because of the nature of some of the

4  testimony in this case, but I'm going to talk to you about some

5  of the issues about why we're here.  And I submit to you we are

6  here now because 30 something years ago this man developed some

7  mental problems, and I suggest to you and submit to you from

8  what you've heard in the testimony in this court, heredity,

9  genetics, is a major reason.  Gary Green has a family history

10  of mental problems, people with mental illnesses, some

11  diagnosed, some not, and you've heard the doctors come in here

12  and tell you that these are the kind of things that are passed

13  down -- passed down from family member to family member.  And

14  way back when it was passed down to Gary Green, and that

15  started the spiral that's got us here in this courtroom today.

16           How can you separate the issues of future danger

17  from Gary Green's life?  How can you separate that knowing

18  about his mental illness?  And I want to make sure everybody

19  backs up here because I don't want anybody to have the

20  impression that what I'm arguing to you now is that his conduct

21  should be excused.  That is absolutely not what we're talking

22  about here.  In no way is his conduct excused at all based on

23  any mental problem he may have.  We're not talking about

24  insanity.  We're not talking about he goes home.  We're talking

25  about he stays the rest of his life in the penitentiary.

45

1    Mental illness, folks. The doctor told you this
2    isn't something that you pick up. This is something -- it is a
3    brain disorder. It is a disease. You know, folks, most people
4    have a pretty good understanding of the diseases of the body.
5    If you have a cancer or a heart problem, people understand
6    that, but I think it's harder to really get your hands around
7    and to grasp and to understand when we're talking about a
8    person with a disease of the mind.
9        I don't know if any of you have ever been
10   touched by a family member or a friend suffering from a mental
11   illness, but I'm -- I suggest to you as horrible as this crime
12   is in and of itself -- and, folks, I -- I've been around for a
13   few years, and this is one of the worst I've ever seen. And I
14   couldn't stand before you and tell you otherwise. But knowing
15   what we know now about the person who committed it, you cannot
16   go back there, as Mr. Beach wants you to do, and separate the
17   illness from the action. You know, some people when you look
18   at the paper or you see on the news somebody has done something
19   of just a horrible despicable nature, a lot of times people
20   say, God, that guy must be crazy. She must have been crazy.
21       Folks, I'm going to stand right here before you
22   today and tell you that at the time Gary Green committed these
23   actions, he was crazy. Not insane. Not -- not excusing what
24   he did, but he wasn't normal. And that's what it gets down to,
25   folks, and we're going to talk about these issues. Was he

46

1    normal? Was he normal, and what do we do with him now?
2        And I'm going to suggest to you something else.
3    When we're talking about the issues in this case -- and you
4    have heard me in talking to a lot of these witnesses talk about
5    theories. Y'all remember when I talked to you about -- well,
6    this is Mr. Beach's theory of the case. Because, folks, I
7    promise you, I've been working on this case for over a year. I
8    know what the evidence is. I didn't get a chance to hear Mr.
9    Beach's theory of this case until he sprung it on us in opening
10   statements. And apparently this is a case of the crazy check.
11   It's all -- it's all about this mental illness is really just
12   an attempt to get a crazy check. And where is the evidence of
13   that, folks? Where is the evidence of that? What do we really
14   know to be the truth? I suggest to you that when the State has
15   a case that is as horrible as this, if they make their theory,
16   they put their blinders on and they're going to plow through to
17   the conclusion that they want you to reach.
18       But where is the -- where's the real evidence?
19   They know -- they know because they had his brother down there
20   at the grand jury a year ago and he told them, Gary has been
21   hearing voices for years. I've been trying to get him help for
22   years.
23       Now, you heard about how he took his mother in
24   there in front of the grand jury, started saying is Gary crazy?
25   No. Is anybody in the family crazy? No. You saw some of the

47

1    family members. I think you can tell from listening to them
2    that they're not all running with a full deck of cards. And,
3    folks, I'm not here to say anything ugly about anybody, but in
4    order to understand the person that you have in this courtroom,
5    you have to understand where he came from. A history of
6    problems, a history of denial, a lack of anybody ever seeing,
7    recognizing, and understanding that Gary Green was not normal.
8        His grandmother knew it. Sat there and told us.
9    I told her mother that -- or his mother that all the time. And
10   it got between us. The brother, always saw that Gary Green was
11   not normal.
12       The State's theory is Gary Green is not mentally
13   ill. He's mean. And, folks, I apologize when I put on the
14   psychiatrist -- or the psychologist that you heard from in this
15   case. It gets a little technical, but I want to point out a
16   few things to you because this is a capital murder prosecution.
17   They've got half the prosecutors in the entire courthouse down
18   here working on it, half of the investigators. They're flying
19   people in. They have the ability to do anything they want to
20   do and bring you any piece of evidence that they want to bring
21   you. And what have they done to rebut our proof that Gary
22   Green is suffering from severe mental illness? Not a thing.
23   Not a thing. And you know they have the opportunity and the
24   ability to do so, if they wish to. If they think that they
25   have something that they can bring before you to show that he's

48

1    not mentally ill, they can sure put it up there.
2        When I say, Judge, that's all I've got, they
3    have an opportunity to bring their witnesses down here. See,
4    now, again, I didn't really understand because I don't have the
5    way to know that Mr. Beach's theory is going to be the crazy
6    check theory, no mental illness, he's just mean. He developed
7    that one through the trial. This is really just meanness.
8        Well, folks, what do we know about that? Well,
9    you heard in the testimony from the family, and what they
10   describe about Gary Green, total isolation even as a child. No
11   friends. No real interaction. No real bonding with his
12   stepfather. And this goes on through his high school years.
13   We're talking about a mother who doesn't -- who thinks her
14   child graduated high school and we know he quit in the 11th
15   grade. We're talking about a family whose parents think
16   they're making good grades when you have failed basically
17   everything you've ever done in your life. Does that sound
18   normal to any of you in this courtroom today?
19       Now, does that excuse anything that he's done?
20   No. But it tells you something about the person that did it.
21   We're talking about a person -- and this is what really -- I
22   don't understand because Mr. Beach can -- can pull from the
23   shattered life that Gary Green has led, he can try to pull
24   something out, because Jennifer Wheeler comes up on the witness
25   stand, describes the horrible beating she received at his hand,

49

and Mr. Beach says to the doctor, well, apparently he's had good some relationships in his life. That girl testified she didn't even know if he graduated from high school, didn't know if he quit high school. I submit they weren't really all that close.

But what do we know? We know that when Gary Green started going out with her, she became his life. And that's the problem with Gary Green. That's his problem. Due to his mental illness, he's never formed those bonds. He's never had those kind of relationships. And when he gets in one and when he's losing it, what did the doctor tell you? His mental illness takes over.

Schizoaffective disorder, I'll talk about it briefly. He told you what it is. It is when an individual is driven by delusions and false beliefs. Paranoia. And you cannot separate it. Personality disorder present, also? Absolutely. We're not here to try to say that that's not true. But you cannot separate the severe mental illness from the personality disorder.

What about the history that's been brought to you about the people that Gary Green was around? He's never even had a relationship with his children. Got several. Doesn't have -- never been a father to any of them. State wants you to sit there and say that's just because he's mean. No, it's because he's sick. He doesn't have the ability

50

like you and I to form the bonds. He doesn't have it. It's not in his -- it's not in the chemical makeup of his brain to be able to do so. It never has been. And unfortunately, it never will be.

But now it's been diagnosed. We know that throughout his life he has suffered from major depression. He told the doctors at Timberlawn, I have been depressed since I was a child. The State has all that information, every bit of it. Do you not think that they haven't interviewed every psychiatrist over at Timberlawn? See, I didn't know that was going to be their theory that he's not really ill, that he's just mean. See? And if the doctors over at Timberlawn had something different to say, don't you think the State would have called them? Because we already had the information to you and in front of you.

Dr. Martinez says, I came here and did a particular job for you. I have reviewed all those records. There's no doubt in my mind that that man is severely mentally ill. And what did he tell you -- and I'm going to talk to you about the diagnosis, because when he went to Timberlawn after years of urging by the people that knew him, his grandmother, his brother -- when he finally goes, he goes in there and describes the clear symptoms of a mental disorder. He's -- he is diagnosed by more than one psychiatrist. Different people at Timberlawn diagnose him -- major depressive disorder with

51

psychotic features. We're talking about psychotic episodes, folks.

And Dr. Martinez told you, you lose touch with reality. When you feel that something is being pulled or taken away from you, you lose the ability to process and respond in an appropriate manner. And we know -- and see, we know -- and this letter, in fact -- I urge you to read this letter, too. He described himself as a monster. Read that letter in its entirety. It shows you that he's lost touch with reality.

Dr. Martinez comes up here, and there's a reason why Dr. Martinez came up here, because when you expect to find the type of problems that Gary Green has, you expect to find a pattern of them throughout his life.

Dr. Gray-Smith came in here. State tried to attack her, couldn't, because everything she told us is absolutely correct. The worst thing you can say about her is, God, we need to get you hired over here in Dallas. When you have a person with chronic failure -- chronic failure, and this is what she does, studies records just like she had with Gary Green. Said it's going to be either a mental illness or a learning disability. That's why Dr. Martinez -- and the State says, well, Doctor, why did they get you? Because he's a neuropsychologist. This is what he does. He tests -- he tests not only for the mental illness, but he tests for the cognitive disabilities that would have explained the chronic academic

52

failure.

We put one -- we're putting two pieces of this puzzle together for you. I mean, this isn't something we just dreamed up and all of a sudden put before you. As we studied the life of Gary Green, these are the things that jumped out at us as people are telling us, he never had a normal childhood. He never did well. He never really had a friend. He never had a normal relationship. We looked to see if we could find the root cause, and we brought that to you. And that's why we brought Dr. Martinez.

And the State wants to belittle Dr. Martinez. Well, Doc, how much you charging old Mr. Johnson over there to come down here and testify? And -- and they pointed out that in the courtroom sat their expert who's been here just as long as Dr. Martinez listening to everything that Dr. Martinez -- I would imagine he's probably getting paid.

And you know what, folks, you know, talked about him passing notes to them to try to say, Mr. Beach, Mr. Beach, ask him this, ask him this. This might make him look bad. Might make that diagnosis look a little suspect. If he didn't agree with what the doctor was saying, why didn't they get his butt out of there and put it there? See, why? Ask yourself that one question.

The State of Texas has the burden to prove the first special issue to you, and if they want to say that it's

53

1  just meanness, not illness, they have the burden, the right,

2  and they had the opportunity to put him up there. And I can

3  tell you right now, he could have gone and interviewed the

4  Defendant, did all the same tests with the Defendant, and then

5  if he wanted to come up and say Dr. Martinez was wrong, they

6  could have done it. Didn't see him do it, did you?

7          Now, if that doesn't at least cause you to go

8  back there and pause when you know that they have the burden, I

9  don't know what else will. They have the right and the

10  opportunity to put on their doctors; I guess their doctor is

11  supposed to be better than my doctor. And the best they can

12  come up with is, well, Doctor, isn't it true that he may have

13  another personality disorder, also? And the doctor said, well,

14  he does have characteristics of it, but I wasn't retained to

15  look at that. Why is that? Well, see, I can't stand here

16  before you -- and the doctor can't sit here and testify that

17  the only reason Gary did what he did was just because of that

18  mental illness. Can't do it. But you cannot separate it.

19  It's impossible to do so. They don't have a witness that can

20  get up there and say that that's not the reason. That's a

21  decision that you guys have to factor in. That's something

22  that you have to help decide.

23          Why didn't they put him up there, if he had a

24  disagreement? Why didn't they call some of these other

25  psychiatrists? Oh, that's right, the only -- the reason the

54

1  other psychiatrist diagnosed them was just so that they could

2  get the insurance money. That's -- remember those questions?

3  And then, the crazy check was because he didn't want to work

4  because they couldn't garnish the crazy checks. Well, where's

5  evidence of any of this? It's all a great theory, but see,

6  folks, that's what the law says and the Court's told you, what

7  the lawyers tell you and what the lawyers say, it's not

8  evidence. It's not evidence. Where he comes up with it, who

9  knows. If he wants to prove it to you, you do it off that

10  witness stand. You don't just throw out these accusations and

11  these innuendos.

12          The Defendant's mentally ill. How does that

13  factor into the first issue? I want to do it briefly. Future

14  danger. The State of Texas walked up here a minute ago and

15  said, folks, we're not -- we didn't even waste your time

16  talking to you about how the Defendant acted in the

17  penitentiary. We're not going to waste your time. Well,

18  folks, exactly what are we talking about here? Wasting your

19  time? If you want to know how the Defendant is going to be

20  when he's locked up in the penitentiary, this will tell you.

21  Nothing at all. Nothing at all in over ten years. Nothing at

22  all.

23          And the Warden -- see, when they kept telling

24  you in voir dire that the case itself can be sufficient, well,

25  their witness came down here and said, you can't look at that.

55

1  That doesn't really tell me. That tells me from my experience

2  nothing. But they want to ask it to tell you something. They

3  want to blind you by the facts of the case. And you can't do

4  that.

5          Where -- the Defendant has now been sitting in

6  jail for over a year. Where is all the jail guards to come

7  over here and say how bad he's been acting? You don't think

8  they've interviewed every one of them? They don't have this

9  evidence, folks, because it doesn't exist. And they have the

10  burden to prove that.

11          See, the bottom line is -- is truly, folks, what

12  Gary Green did is so bad, so horrible, that the day it happens,

13  the bandwagon -- the bandwagon gets started -- or whatever the

14  expression you want to use -- the train starts down the track,

15  and it's brought us here to this point. Because what he did

16  was so horrible, it closed everybody's minds to the other

17  considerations that you have to decide. And that's why I

18  submit to you this should be a very difficult decision. You

19  can't -- I don't -- I submit to you that if you go back there

20  and when we talk about killing the worst of the worst, that's

21  the worst of the worst of the criminals. You know, our

22  society, we can just -- we can just -- as we used to, kill the

23  mentally ill. We can. You can by your verdict, if you ignore

24  the evidence and the law that's before you.

25          You know, in -- in talking about what this will

56

1  do -- and I'm sure that Mr. Beach is going to get up here and

2  he's going to talk to you about what kind of message your

3  verdict is going to send. And I'll tell you right now, I don't

4  get a chance to get up and talk again after Mr. Beach does. He

5  gets to get up here, and I have to try to anticipate somewhat

6  what he might say to you. And I don't -- and say in all -- in

7  all the testimony that you've had before you, I can't pick out

8  which little pieces he may use, but it seems funny to me,

9  because of one thing in a report about the life of Gary Green

10  talking about that he had set some dog -- set a dog on fire,

11  okay? Y'all remember that. And when Nysasno, the Defendant's

12  brother, is up here describing the turmoil that was Gary

13  Green's life, first question from Mr. Beach was, what's the

14  name of those dogs? You know. What was the names of those

15  dogs? What's the relevance? See, it's no relevance to the

16  names, but it's to create in everybody's mind just how could

17  you hurt an animal? How could you hurt that animal? And see,

18  consider that back what we talked about earlier. Would any

19  normal person do that? Would any sane -- well, "sane" is the

20  wrong word. Would anybody without a mental illness ever do

21  anything like that? Evidence from throughout his lifetime,

22  Gary Green has been sick for a long time. And it has

23  culminated in these charges that we have here.

24          It's culminated in the decision that you now

25  have to make. The decision that you will make in this case

1  will tell us something -- and Mr. Healy touched on it. He said
2  if we're to the point that you can do this and not be put to
3  death, then maybe we have to take a step back.  Well, I suggest
4  that that's wrong.  Folks, I suggest to you that the true
5  measure of a society is not how you treat -- it's not how you
6  treat the best person in your society.  It's not how you treat
7  those that are out accomplishing things and doing things well
8  and helping others.  The true measure of society is how you
9  treat the people in it that need help, how you treat the worst
10  people.
11            And I'll agree -- I'll agree with the State,
12  forks, if you believe that an individual is just mean, that's
13  one thing.  When you have absolute evidence and absolute proof
14  before you that he's mentally ill, that's another.  You don't
15  take a person and treat him the way that you would treat
16  somebody that is just mean.  Mental illness affects the
17  individual, takes certain things out of their control that we
18  take for granted.  And you may not even understand how it can
19  do so.  But I submit to you, folks, that the -- the issues in
20  regards to this antisocial personality -- see, that's what
21  Mr. -- I submit, that's where his argument is going to be.
22  This is just antisocial personality.
23            And the doctor said, I do agree, now that this
24  criminality has been brought before me, that a lot of those
25  characteristics are met.  But he said I have a problem with it

1  because the foundation -- the foundation of antisocial
2  personality disorder is what?  Always blaming others, being
3  charming, witty, always blaming others, never accepting
4  responsibility.
5            How many examples did I give him?  Gary Green,
6  the first time he ever got in trouble with the dope, dope is on
7  the ground, he said that's mine.  When he did what he did to
8  Jennifer Wheeler, took her to the hospital, waited to be
9  arrested.  When he robbed the store, gave a confession.
10            While he's in jail -- the State wants you to use
11  the excerpt from this letter, to show that he's just a cunning
12  criminal.  Tells Jennifer in the best way that his diseased
13  mind knows, I'm here because of what I did.  He's never tried
14  to blame anybody else.  And when he committed this horrible act
15  out there that night, he went down there and sat and explained
16  everything that he did, everything that he did.
17            Folks, when we're talking about mitigation and
18  Special Issue Number 2, is there anything here in the evidence
19  sufficient to warrant saving his life -- and I -- I submit to
20  you, as I told you earlier, I don't think you should ever get
21  to that issue.
22            When you go home and put your head on your
23  pillow at night, the question that you have to really ask
24  yourself on Special Issue Number 1, was there any alternative
25  to causing the death of another human being, because that's

1  what Special Issue Number 1 is.  That's the way it was
2  explained to you.  Is there no other way to protect society
3  than to execute an individual?
4            And I agree with the State that if their -- if
5  their pattern of conduct was such that it led you to believe
6  that he was going to be a danger in the penitentiary, then they
7  would be entitled to that verdict.  But for them to sit there
8  and say we're not going to waste your time and talk to you
9  about what he's done his whole life while he's in prison, which
10  is nothing, I find it offensive on the issue of Special Issue
11  Number 1 because that really is the heart of the matter.  And,
12  again, when you ask yourself, really, do we have to execute
13  Gary Green because you have to separate that question from how
14  bad it is or how horrible a crime that he committed.
15            The Warden told you the prison is a good, secure
16  place run by professional well-trained people.  I asked her,
17  you can handle people down there that have problems, can't you?
18  She said, yeah, we certainly -- we certainly do, and we
19  certainly try to do so.  They can handle Gary Green.
20            Prosecutor wants you to think that Gary Green is
21  faking this mental illness.  Asked my witness up there on the
22  stand, oh, you looked at his prison records from when he was in
23  prison for ten years, told him maybe he had a little bit of
24  insomnia, a little bit of stress.  I walked right up there with
25  the records and had him read for you portions of those records

1  where he was there having nervous breakdowns, suffering from
2  major depression, talking delusionally, see?  And they want you
3  just to ignore that.  They say that -- oh, he was never
4  diagnosed while he was in prison.  He was never treated.
5  That's right.  They don't do that for you in the penitentiary,
6  folks, unless you've been diagnosed -- unless you've been
7  diagnosed like Gary Green has been diagnosed now, he's not
8  going to be a future danger down there, and I can tell you our
9  society will be just as well if he's allowed to live.
10            Is it mitigating?  Absolutely.  Absolutely.  Is
11  it sufficient?
12            You know, one of the biggest things we talked
13  about in regards to mitigation is that every single one of you
14  who decides this case has the power in your hands -- each one
15  of you has the power today to decide a man's life.  I may be
16  speaking to only one of you, and I may be speaking to all of
17  you, I may be speaking to half, I don't know.
18            I will agree with the State.  We -- we spent
19  almost two months to get this group of folks together, and you
20  -- I took every one of you at your words that you would not let
21  the crime blind you.  You told me that.  I'm going to hold you
22  to that.  You told me that you would look at this evidence,
23  anything that was brought before you, and try to determine
24  first if Special Issue Number 1 was met.  But, second, that you
25  would look and consider in Gary Green's background and look and

61

1   search for any piece of evidence that would warrant saving his
2   life. And I'm going to hold you to that, also.
3        Is there no other alternative than to execute
4   him? What I'm asking you to do, folks, in this courtroom
5   today, I know it's not the popular thing. You know, the State
6   wants to say, look over here at the family of the deceased,
7   look at the -- look at them, see the hurt in their eyes. Look
8   at the -- look at the children. Is that really the only
9   consideration, or is this the type of thing that they're asking
10  you to do, to turn the focus away from the fact that -- the
11  evidence clearly shows he's not going to be a danger.
12       I submit to you, folks, if you come back in this
13  courtroom with a verdict that results in the death of that man
14  right there, we have perpetuated -- we have continued to show
15  the community here that violence begets more violence, that
16  death leads to more death. That's what a verdict in this case
17  will do.
18       What I'm asking you to do is not going to be the
19  popular thing because as everybody -- as everybody from the
20  State's side and their witnesses and their families, they
21  want -- they want to win. They're here now because they want
22  to see Gary Green executed. But you know that this is not a
23  decision that's going to be made on what's the popular
24  decision. I want you to do what you told me that you would do
25  when we talked about the issue of mercy alone.

62

1        What I'm asking for in this case, ladies and
2   gentlemen, I'm asking for justice. I'm asking for justice, and
3   I'm asking for mercy. And I think the prosecution is going to
4   get up here and they're going to say, well, there can be no
5   justice if there is mercy. And I submit to you that that's
6   wrong, folks. That's wrong. Gary Green is going to die in the
7   penitentiary, absolutely. You have already returned a verdict
8   that's going to result in his death in the penitentiary. What
9   are we going to accomplish if it comes ten years from now,
10  instead of -- by whatever cause and whatever times it does,
11  he's never going to enjoy freedom. He's never going to enjoy
12  life out again. He's never going to be around his loved ones
13  or -- or anyone else that -- that he has a propensity and a
14  tendency to -- to harm. What's he going to accomplish? And
15  that's what the death penalty does is it only -- it's a
16  situation where if you do not find an alternative.
17       You know, Mr. Beach is probably -- I'll tell you
18  this right now, and he's extremely eloquent and a lot more so
19  than myself. And, again, I don't know what he's going to say.
20  And I don't get a chance to get up here and respond. All I can
21  tell you is I've tried to bring to you the things that I would
22  ask you to consider. I would hope that these things mean
23  something to you. We've tried to -- we've tried to put this
24  thing together in a package that makes sense to you.
25       When he gets up here before you and he starts to

63

1   say, well, Mr. Johnson -- see, when I -- when I'm talking to
2   you, I have to give him -- he gets a preview of what I'm
3   telling him because that's -- I have to stand here and say, Mr.
4   Beach didn't do this, Mr. Beach didn't do that. So now he's
5   going to get up here and explain it. And he may say to you,
6   well, Mr. Johnson got up here, didn't touch on this or didn't
7   mention this, but I promise you, if we get to the end of that,
8   I'll ask for more time to talk about it because there's nothing
9   he can say in this case. There's nothing he can say in this
10  case that I can't argue based on the law and the facts that
11  have been brought to you.
12       What message are we going to send in here in
13  this courtroom today? Nothing. It will be a blurb on the --
14  it will be an inch and a half in the paper tomorrow. There's
15  no cameras, no nothing. What message are we going to send if
16  we start telling people that we kill our ill? That we kill the
17  ill? The people in our society that are unable -- unable at no
18  fault of their own to conform their behaviors to what's
19  expected of the people that are unfettered by mental illness,
20  and that's really the issue here. I'm going to ask that you go
21  back and I'm going to ask that you answer Special Issue Number
22  1, no, he will not be a future danger, because it has been
23  proven and shown to you that we can house him capably and
24  punish him for what he's done. And, folks, I'm going to -- I
25  can't -- I can't strongly enough stand here -- and as I said

64

1   when I started my remarks, normally that's really what the
2   first guy talks about. I don't think we should ever get to
3   mitigation.
4        But if you believe that that answer could be
5   yes, I'm going to ask you to consider the fact that he's ill
6   and we should not do what the State is punishing him for, to
7   the ill. First Commandment says thou shalt not kill, and,
8   folks, I'll tell you as everyone in this room agrees, what Gary
9   Green did was horrendous and it was wrong. And it doesn't make
10  it right for the State of Texas to do it back.
11       I appreciate your time and your attention this
12  morning, ladies and gentlemen. I'll ask you to return a
13  verdict that will result in life without parole. Thank you.
14       THE COURT: The State.
15       (Argument by Mr. Beach.)
16       MR. BEACH: May it please the Court.
17  Counsel.
18       May it please you, members of the jury.
19       The really good news is, I'm the last lawyer
20  that you're going to have to listen to. I appreciate your
21  patience. I know that you have gotten a belly full of lawyer
22  talk, objections, arguments. Appreciate you sticking in there
23  with us.
24       And what I'm about to say -- I want the record
25  to reflect, and I want y'all to understand I say this without

65

1  an ounce of cynicism or sarcasm.  Paul Johnson is a tremendous

2  advocate.  He's a tremendous lawyer.  Kobby and Brady will get

3  there some day.  They're well on their way, but I have all the

4  respect in the world for Paul Johnson and his talents and his

5  abilities in representing his clients.  But that's the last

6  time that you're going to hear those two words come out of my

7  mouth.  Those two words being Paul Johnson.  Because Paul

8  Johnson -- the lawyers in this case are a side show.

9          I would submit to you, you can collect and

10  gather into this courtroom the greatest thinkers, philosophers,

11  wordsmiths, leaders of free men throughout the pages of

12  history, and they could not begin to explain away, to mitigate

13  away, to even begin to comprehend these three words.  And those

14  three words are six years old.  Six years old.  You can't begin

15  to explain it away, to mitigate it away, even begin to

16  comprehend it.  And it wasn't just any six-year-old.  You know,

17  she was fearfully and wonderfully made.  She was knitted

18  together in her mother's womb back in 2002.  And we -- we can

19  only speculate that she was well on her way, maybe some day to

20  being a Dr. Gray-Smith, getting her Ph.D., being an asset to

21  society.

22          But what we do know is and what is the issue in

23  this case -- not I'm asking you to exorcise your raw emotion.

24  You can't separate the facts of this case from the emotions in

25  this case.  You know, Gary created that, okay?  Gary created

66

1  the central issue of this case.  If Gary had stopped short and

2  just killed his wife, we wouldn't be here today.  We have 112

3  prison units for husbands who kill their wives.  Even if they

4  half kill their high school girlfriend, even if they sold

5  drugs, even if they blew apart a grocery store that had just

6  hired him, even if he goes on to choke out, while pregnant, his

7  baby's mamma.  If he had stopped short that day and just

8  murdered Lovetta, we wouldn't be here today.

9          I can't separate that out, and you can't either.

10  That's why we're here today.  That little girl was in what

11  should have been the safest place for her on this earth that

12  afternoon, in her own bedroom in her own house with her own

13  dolls and her own school work, four weeks into her first grade

14  year.

15          And I'm going to disagree a little bit with my

16  co-counsel, just his characterization.  Gary Green, he's not a

17  monster, and that's a scary thing about him.  He's capable of

18  incomprehensible, monstrous acts, and he's demonstrated that

19  throughout his life, but he's not a monster.  You saw Gary

20  Green walking down the street, you know, you wouldn't say,

21  there goes the monster.  You would say, there goes Gary Green,

22  someone who is capable of holding a job, repairing batteries

23  for corporations within two months of these murders.  Capable

24  of strong interpersonal relationships, capable of a three-year

25  relationship in high school with the daughter of Lee Alcorn.  I

67

1  mean, exclusive, intense relationship, this severely mentally

2  ill man.

3          Capable of gaining the confidence of that

4  nine-year-old boy out there, who even last week on the witness

5  stand, even after Gary Green had murdered his mother and his

6  sister, told you, I loved him.  Gary Green is not a monster.

7  He's capable of monstrous conduct.  Nowhere in that charge that

8  the Judge just read to you does it say we have to prove beyond

9  a reasonable doubt that Gary Green is a monster.  We have to

10  prove that he's probably going to be a danger in the future,

11  and we have to -- no one has to prove the second question, the

12  mitigation question.

13          And he takes that little girl from her bedroom

14  into her mother's bedroom, and the condition that you know she

15  was, I just want to freeze it right there.  Let's just stop it

16  right there.  And the question you have to ask yourself --

17  literally this comes down simple as this; why?  Why?  Why did

18  he take her in there?  Why did he put her on the bed?  Why did

19  he bring that first knife out?  And why did he start in?  Well,

20  they would have you to believe -- and there's lots of

21  undertones.  You know, one of the undertones is, it's his

22  mother's fault.  She wasn't attentive enough, you know.  She's

23  out there working at night, doing the best she can, trying to

24  raise Gary and Nysasno.  Nysasno came out of the same parenting

25  as Gary Green, and Nysasno has made something of his life.  Or

68

1  maybe it's Leon Sampson's fault, the hard working stepfather

2  who tried to get Gary to work a little bit.  Maybe Leon put too

3  much pressure on Gary.

4          Now, maybe it's Granny's fault.  You know, maybe

5  Granny should have done something more to get on mamma when she

6  saw Gary biting the heads off those snakes.  Maybe it's the

7  school district's fault, you know, for not putting him in

8  special ed.  But if you don't believe any of that, they bring

9  in Dr. Martinez.  And Dr. Martinez for the first time in Gary

10  Green's 39 years -- and you can characterize the Timberlawn

11  records -- we'll talk about those in a second -- any way you

12  want to.  I'm submitting to you Dr. Martinez is the only human

13  being on the face of this earth that has ever diagnosed Gary

14  Green with any kind of a mental illness.

15          You know he's not schizophrenic.  He's not

16  bipolar.  He's schizoid-affective, a diagnosis that didn't even

17  exist until 1985.  That DSM book didn't even exist until 1952.

18  And how does he do that?  Well, he spends six hours with Gary,

19  and he talks to Gary.  And he gives him those tests that you

20  saw.  He has Gary draw a picture of himself.  He has Gary draw

21  a picture of his family.  You know, he has Gary connect dots,

22  and whatever else he does.  And somehow based on those six

23  hours, Dr. Martinez can come in here and in very assuredly -- I

24  mean, there wasn't any hesitation, was there, can come in here

25  and tell you, no question in his mind, Gary Green is severely

69

1    mentally ill.

2         But, Doctor, he was in the penitentiary system

3    for ten years. You know, where in his medical records during

4    those ten years -- and you heard from the Warden. There are

5    four psychiatric hospitals in the prison system. Where in that

6    ten-year time frame with all the mental health professionals

7    was Gary Green ever diagnosed with a mental illness? Well,

8    first of all, he never even got the records. But you can go

9    back there, and you can look at the records. And we may

10   disagree on what the records show, but basically Gary Green had

11   some anxiety, some insomnia, and some stress. And one time he

12   talked about joining the French Foreign Legion, and the next

13   page he told the counselor, I've decided that's not such a good

14   idea. I think I'll just stay right here, okay?

15        And they talk about how Gary after 1994 was not

16   a problem in the prison system. And that's the key to Special

17   Issue Number 2. Forget about all the carnage Gary Green has

18   left behind him in his lifetime. Let's talk about being down

19   there in the prison system, and then absolutely tells you how

20   to answer that question.

21        Well, what has changed? You know, that's why

22   lawyers', you know, speeches and talk is not evidence in this

23   case. They tell you now -- I mean, obviously, Gary is

24   completely decompensated since he got out of prison. I mean,

25   we know from Dr. Martinez, he's all the way down to a 78 I.Q.

70

1    now. Gary, not only has become more severely mentally ill,

2    he's become a whole lot dumber because he had a 105 I.Q. in the

3    penitentiary. Does that surprise you, Doctor -- well, it would

4    surprise me. You know, maybe -- you know, there's

5    three-question I.Q. tests on the internet. Well, folks, this

6    is back in 1991, and I'm not even sure Gore had invented the

7    internet back in 1991, okay? He's an advocate. He certainly

8    is an advocate. He wasn't going to have any of it because he

9    firmly believes what he did shows Mr. Green to be severely

10   mentally ill.

11        But, Doctor, he gets out of the penitentiary.

12   You know, he has these four children, he has these

13   relationships, he works. He's working up until a month or so

14   before the murders. And my theory about the S.S.I. check, I'll

15   leave it up to you. It comes from the horse's mouth himself in

16   his manifesto there, that five and a half page letter laying

17   out how he was going to murder those folks. Talking to Lovetta

18   now, when I lost my job, I talked it over with you three times,

19   the day before I walked away from the job. Now, you look in

20   those employment records. Gary Green didn't lose his job. He

21   just quit. You look in those employment records, and they're

22   full of the A.G.'s office sending letters to his employer

23   saying, we're going to start garnishing his checks. We're

24   going to take about a third of what he's making out so maybe

25   somehow, someway his four children will get some of the money

71

1    he's earning. That's why he walked away from the job.

2         Working. I started my paperwork for my S.S.I.

3    and disability and said that's cool by you three different

4    times. Theory? You call it whatever you want. But here's

5    Gary hours before he murders that lady telling her, you know,

6    you're being unreasonable. I told you why I was walking away

7    from the job. I started my S.S.I. disability, and you were

8    cool with it. Well, apparently something must have changed.

9    She must not have been cool with it. You know, we know from

10   her letters she was done with him. She was going to put him

11   out. You don't need no woman taking care of you.

12        You go to the Parkland records, the Parkland

13   jail records. Again, before September 21st, 2009, never

14   diagnosed with any kind of a mental illness. The only thing

15   he's diagnosed with or talks about is chronic marijuana use and

16   high blood pressure. Those are his two medical psychological

17   problems.

18        And then we know he goes -- about a month before

19   this, he goes to Timberlawn. He gets over the stigma of the

20   whole mental illness issue that apparently had afflicted him

21   all of his life and goes in and spends four days there. And

22   you go look at the -- you look at the records. See if I was

23   being honest yesterday talking to the doctor about it. The

24   best I can tell he's there four days, sleeping ten hours a day,

25   eating three square meals a day, watching TV, smoking

72

1    cigarettes, and he checks himself in and he checks himself out.

2    And he starts the S.S.I., okay? No diagnosis of bipolar. He's

3    diagnosed with depression, okay?

4         And where is that coming from? Okay. That's

5    coming from Gary Green. I'm depressed. I'm suicidal. You

6    have to rely on Gary Green to believe at Timberlawn he was

7    severely depressed. But, again, no bipolar diagnosis, no

8    schizophrenia diagnosis. He walks out of there four days

9    later, and he's on about his business.

10        But, Doctor, he's been in jail now for the last

11   year since the murders. Show me where in the jail records he

12   now has been diagnosed with any kind of severe mental illness.

13   He's up there reading Psychology Today, you know? The only

14   disorder he's been diagnosed with is personality -- is

15   adjustment disorder, a personality disorder. No Axis I

16   diagnosis at all, with all the health care professionals they

17   have over there. And they ask me why I didn't put up my

18   expert. You know, what's he going to say? Yeah, I agree with

19   every other professional that has been in contact with this guy

20   the last 20 years. There's one person that says he's severely

21   mentally ill, the man that's getting paid $200 an hour, who

22   spent six hours of his life with Gary Green.

23        So let's go back to the bedroom. Why? Severely

24   mentally ill? Or it was just Gary Green being Gary Green? I

25   mean, that excerpt of the letter from Jennifer Alcorn that he

73

1  wrote to her after he almost killed her back in 1989, what an
2  unbelievable foreshadowing of what happened out there on
3  September 21st of 2009. I told you if you ever blanked me
4  over, I would kill you. And what was Jennifer Alcorn's sin?
5  She wanted rid of him. I mean, did she not have the right to
6  be rid of him, to go on with her life, to be shed of him? But
7  he wasn't going to abide by it. Not Gary. Like he's the only
8  jealous, envious male that's ever lived. He's unique in the
9  course of human history, that he gets mad, that he gets
10 jealous, that he gets violent when a woman leaves him.
11      We have a big section here in this office and
12 it's not called Schizoaffective Division. It's called Family
13 Violence Division. Boyfriends hurt their girlfriends, husbands
14 hurt their wives every day. Was it like Shulonda, not cooking
15 for him right or talking to him right or letting him watch TV,
16 the show that he wants? Or like Jennifer or Lovetta. All they
17 want to do is -- you know, we tried, it didn't work out, let's
18 move on. People do that all the time.
19      So why was that little girl on the bed? Why is
20 Lovetta reading that five and a half page letter? Because he's
21 severely mentally ill, or because it's Gary being Gary?
22      And I have issue -- on Question Number 1. As
23 that mother sees Gary Green bringing that little six-year-old
24 into the bedroom and that look of shock on her face and she
25 drops that letter and she heads for the commode and takes the

75

1  Back to the bedroom -- back to what's important
2  in this case. He could have stopped. And if you freeze frame
3  it right there when that commode lid comes off and she tries to
4  hit Gary Green and she starts fighting for the life not only of
5  herself but of her daughter -- and I asked you right there and
6  then, do you think there's a probability that Gary's going to
7  stop, that Gary's not going to be violent, that this isn't
8  going to go any further?
9      And they would ask you to say, no, I don't think
10 he is going to be violent. I think he's going to stop right
11 here. Well, you would have been wrong, wouldn't you? You
12 would have been dead wrong. Because that eight-inch blade goes
13 into the back of her leg, the torturous hour-long process
14 begins where she's doing everything she can to save herself, to
15 save her little girl, whether it's trying to fight him, was
16 trying to stab him, whether it's trying to talk to him, whether
17 it's trying to reason with him.
18      But Gary has a plan. And when you're a part of
19 that plan -- and in his mind -- and I agree, he thinks
20 different than anybody else in this courtroom. That's why he's
21 sitting there. He's not severely mentally ill, but he sure
22 thinks different than anybody I hope you ever know or will ever
23 come in contact with. And he continues to stab her, and he
24 finishes her off. Not only did Gary Green want to physically
25 finish her off, he wanted to emotionally destroy that lady.

74

1  lid off that commode, Gary could have stopped right there.
2  When you're considering Question Number 1, I'm not asking you
3  to consider, you know, what he did in the penitentiary. Let's
4  talk about that very briefly.
5      What's changed about his situation now that was
6  different when he was in the penitentiary the first time? He
7  was eligible for parole. You look at his penitentiary records.
8  The only thing that was causing Gary Green any real stress was
9  when he came up for parole and got denied. And even Gary,
10 who's taking 48 hours of college in the penitentiary, getting
11 his Master's -- or Bachelor's, this severely mentally ill man,
12 finally snaps on the fact, I keep acting up, I'm going to do 20
13 for 20. I'm going to do the whole 20 years. And so he
14 conforms his conduct. But that carrot is gone now, folks. You
15 know, he has no possibility of parole. He has no incentive to
16 behave. And they want you to put him down there with 20-year
17 old kids doing 50 on a drug case. They want you to put him
18 down there in the midst of 40 percent female prison guards who
19 might betray him some day, who may not do what he wants them to
20 do, expose them to who you know him to be. That's their prison
21 argument. That's what they're asking you to do. Are you going
22 to expose them to Gary Green, who is walking around, no
23 handcuffs, no leg irons, no nothing, walking around free all
24 day long, just looking to see who he can lure in just like he
25 did Belinda Lacy? You going to expose them to Gary Green?

76

1  Why else would he have that little girl hog-tied on the bed,
2  watching that entire horrific scene? He wasn't satisfied with
3  just murdering his wife that betrayed him. He wanted to
4  devastate her.
5      Let's just stop it right there. Is he done? Is
6  there a probability now that -- he's just butchered his wife,
7  is there a probability now that Gary Green is going to -- going
8  to be a continuing threat to society? That little girl still
9  out there on the bed. She's still alive, still has the duct
10 tape over her mouth. If I asked you that question then as he
11 starts to run that bath water, your answer would have been no,
12 and you know what, I think Gary has learned his lesson. I
13 think he understands now he can't continue with this. Well,
14 guess what? You would have been wrong again, wouldn't you? As
15 he fills up that tub, I'm going to submit to you, folks, beyond
16 any doubt whatsoever, we have proved beyond a reasonable doubt
17 that this man will always be a threat, no matter where he is.
18 In prison, escape from prison, wherever he is, Gary Green will
19 always be a threat. The answer to that question is yes.
20      And when we get to that mitigation question, I
21 go back to where I start. Three words. How do you begin to
22 explain away, mitigate away, begin to comprehend six years old?
23 When you're back there talking about Question Number 2, just
24 look at your watch. Three minutes, four minutes, long time
25 when you're just looking at it. How long it took him to fill

77

1 that bathtub up. How long he had to stop what he was doing.

2 How long he had to just walk away. But he went and got that

3 little girl and took her in and he drowned her like you would

4 drown a runt puppy. Even for him, as he told you, it was so

5 bad, he had to turn his head away. Six years old.

6　　　　I, too, am going to ask for justice in this

7 case. And y'all have your own definition, and there's no

8 definition in the charge. But I would submit to you that

9 justice is that mysterious phenomenon which corrects the wrongs

10 of mankind. It's mercy for those who deserve it, and it's

11 swift and uncompromising punishment for those who don't. But

12 justice here in this courtroom, justice here for Gary Green

13 today in the final analysis is going to be you 12 people

14 getting together, exercising your collective conscience and

15 courage. And when you answer yes to Question Number 1, and no

16 to Question Number 2, you tell Gary Green and all those

17 similarly situated out there, that when you destroy one of our

18 little ones, we're coming after you. When you destroy one of

19 our little ones, we're coming after you.

20　　　　It was written a long time ago, that woe to him

21 who harms one of my little ones, it would be better for him to

22 have a large millstone tied around his neck and thrown into the

23 deepest part of the ocean. Well, folks, you can't do that.

24 But what you can do, when you answer Question Number 1 yes and

25 Question Number 2 no, is make sure to the fullest extent of the

78

1 law you've done everything you can to ensure that Gary Green

2 will never have access, never have the opportunity to harm

3 another living, breathing human being.

4　　　　So I implore you to go back there to deliberate

5 efficiently and cohesively. And he's been waiting a long time

6 since he talked that man out of killing him and his brother,

7 and he'll be here when you come back and he will be waiting

8 patiently.

9　　　　THE COURT: Thank you very much.

10　　　　Ladies and gentlemen, please retire to begin

11 your deliberations. My previous admonishments regarding

12 deliberating altogether still remains. The time is now yours.

13 We will stay as late as you wish tonight, but if you have not

14 yet reached a decision, you will be going to a hotel. That is

15 how the law works in these types of cases. So you will be

16 going to a hotel.

17　　　　And in that case, we'll resume tomorrow morning.

18 And -- and we will -- we will work with your schedules the best

19 that we can, but we're going to keep working, and we will stay

20 as late as you wish to tonight. You've all -- are all night

21 owls and say, we're going to go to dinner and we're going to

22 reconvene back here at 10 o'clock, well, by God, that's --

23 that's what we will do, because the time is now yours. So

24 please go with the bailiff.

25　　　　THE BAILIFF: All rise.

79

1 (Jury excused from courtroom.)

2　　　　THE COURT: Okay. Are we ready --

3　　　　MR. BEACH: Yes, sir.

4　　　　THE BAILIFF: All rise.

5　　　　(Jury returned to courtroom.)

6　　　　THE COURT: Thank you all. Please be seated.

7　　　　Mr. Pozadzides, it is my understanding the jury

8 has reached a unanimous verdict; is that correct?

9　　　　PRESIDING JUROR: Yes, Your Honor.

10　　　　(Verdict on Punishment.)

11　　　　THE COURT: In Special Issue Number 1, do you

12 find from the evidence beyond a reasonable doubt that there is

13 a probability that the Defendant, Gary Green, would commit

14 criminal acts of violence that would constitute a continuing

15 threat to society? Your answer is "yes"; is that correct?

16　　　　PRESIDING JUROR: Yes, it is.

17　　　　THE COURT: If that is, in fact, the unanimous

18 verdict of all the jurors, please indicate by raising your

19 right hand.

20　　　　The record will reflect all jurors have raised

21 their right hand.

22　　　　Special Issue Number 2, do you find, taking into

23 consideration all of the evidence, including the circumstances

24 of the offense, the Defendant's character and background, and

25 the personal moral culpability of the Defendant, Gary Green,

80

1 that there is a sufficient mitigating circumstance or

2 circumstances to warrant that a sentence of life imprisonment

3 rather than a death sentence be imposed, and I have the answer

4 as "no". Is that, in fact, your verdict?

5　　　　PRESIDING JUROR: Yes.

6　　　　THE COURT: If that is, in fact, the verdict of

7 all jurors, please indicate so by raising your right hand. All

8 jurors have raised their right hand.

9　　　　MR. JOHNSON: I'm going to ask for an individual

10 poll of the jurors on both special issues.

11　　　　(Jury individually polled.)

12　　　　THE COURT: All right. I'm going to ask each

13 individual juror whether or not this is your unanimous verdict

14 in Special Issue Number 1. I'm going to start in the back left

15 corner and go 1, 2, 3, 4, and so on that way. In the back, is

16 that your verdict?

17　　　　JUROR: Yes.

18　　　　JUROR: Yes.

19　　　　JUROR: Yes.

20　　　　JUROR: Yes.

21　　　　JUROR: Yes.

22　　　　JUROR: Yes.

23　　　　JUROR: Yes.

24　　　　JUROR: Yes.

25　　　　JUROR: Yes.

81

83

1       JUROR:  Yes.

2       JUROR:  Yes.

3       JUROR:  Yes.

4       THE COURT:  All right.  Same order for Special

5  Issue Number 2.  Is that, in fact, your verdict?

6       JUROR:  Yes.

7       JUROR:  Yes.

8       JUROR:  Yes.

9       JUROR:  Yes.

10       JUROR:  Yes.

11       JUROR:  Yes.

12       JUROR:  Yes.

13       JUROR:  Yes.

14       JUROR:  Yes.

15       JUROR:  Yes.

16       JUROR:  Yes.

17       JUROR:  Yes.

18       THE COURT:  Is that satisfactory?

19       MR. JOHNSON:  Yes, sir.

20       (Sentencing by the Court.)

21       THE COURT:  Mr. Green, a unanimous verdict in

22  this case has been -- has been rendered in Special Issue Number

23  1 and Special Issue Number 2.  Having previously been found

24  guilty, the Court hereby orders that a sentence of death be

25  carried out in accordance with the laws prescribed by the State

1                    Reporter's Certificate

2  THE STATE OF TEXAS:

3  COUNTY OF DALLAS:

4       I, Darline King LaBar, Deputy Official Court Reporter in

5  and for the 282nd District Court of Dallas County, State of

6  Texas, do hereby certify that the above and foregoing volume

7  constitutes a true, complete and correct transcription of all

8  portions of evidence and other proceedings requested in writing

9  by counsel for the parties to be included in the Reporter's

10  Record, in the above-styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15       WITNESS MY OFFICIAL HAND this the Reporter's Certificate

16  on the 16th day of March, A.D., 2012.

17

18

19

20                    DARLINE KING LABAR

21                    Official Court Reporter

                       363rd Judicial District Court

22                    Dallas County, Texas

                       hpdkfaith@msn.com

23                    (214) 653-5893

24

25  Certificate No:  1064

    Expiration Date:  12/31/2012

82

1  of Texas and the Code of Criminal Procedure.

2       The appeal in this case is automatic.  The

3  appellate court will receive the record in its entirety, and

4  you while you wait -- you will be immediately transported to

5  the Texas Department of Criminal Justice.  Is there reason at

6  law why sentence should not pronounce at this time?

7       MR. JOHNSON:  No reason at law, Your Honor.

8       THE COURT:  It is so ordered.

9       MR. BEACH:  The State calls Margarita Brooks.

10       THE COURT:  Ladies and gentlemen of the jury,

11  this does conclude your jury service in this matter.  Sentence

12  has been rendered.  You're free to go, or you're free to stay.

13  What we have right now is going to be what's called the victim

14  impact testimony that will be -- that will be given, at which

15  time the family members can address the Defendant in this case.

16  It's not part of the record.  It's not on the record, anOd --

17  but your jury service is now complete.  I would ask that you

18  all stay.  If someone has to leave, they are free to go, but,

19  again, you are free to stay, as well.

20       We are off the record.

21       (Recess of proceedings.)

22       (Adjournment.)

23

24

25