# TAMES Barcode Cover Sheet



3b61619d11954bcabdb40f98c520531f

| | |
|---|---|
| **Case Number:** | WR-81,575-01 |
| **Style:** | Green, Gary |
| **Event Date:** | 1/12/2015 |
| **Event Details:** | HABEAS CORPUS RECEIVED - 11.071/This Court/11.071 WRIT RECD/11.071/ |
| **Filename:** | WR-81,575-01 11.071 WRIT RECD 11.071 1-12-2015--Vol 2 of 5 Vols |
| **Document Description:** | RECORD |
| **Document Remarks:** | 5 Vols CR |
| **Document(s):** | |
| **Generated By:** | bhooper |
| **Generated On:** | 1/12/2015 1:58:14 PM |

SCANNED

JAN 1 6 2015

355

**EX PARTE:**

**GARY GREEN**

**CAUSE NO.:     W09-59380-S (A)**

**IN THE 282nd JUDICIAL DISTRICT**

**COURT OF DALLAS COUNTY, TEXAS**

This document contains some
pages that are of poor quality
at the time of imaging.

---

## POST CONVICTION WRIT OF HABEAS CORPUS

### (ART. 11.07, V. A. C. C. P.)

### D E A T H   P E N A L T Y

### V O L U M E   T W O

---

**ATTORNEY FOR APPLICANT:**
**Brad D. Levenson**
**Office of Capital Writs**
**1700 N. Congress Ave.**
**Suite 460**
**Austin, TX  78711**

**ATTORNEY FOR STATE:**

**HON.  SUSAN HAWK**

**FRANK CROWLEY COURTHOUSE**

**DALLAS, TX 75207-4313**

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 1 2 2015

Abel Acosta, Clerk

**FELICIA PITRE**

**DISTRICT CLERK**

**FRANK CROWLEY COURTHOUSE**

**133 N RIVERFRONT BLVD., LB 12**

**DALLAS, TEXAS 75207-4313**

EX PARTE:                           CAUSE NO:      W09-59380-S (A)

                                    IN THE 282nd JUDICIAL DISTRICT

GARY GREEN                          COURT OF DALLAS COUNTY, TEXAS

# I N D E X

## Volume Two

| | |
|---|---|
| Agreed Discovery Order    (09 Jul 12) | Vol. 2-367 |
| Notice of Filing Exhibit 66 in Support of Article 11.071 Application Filed Jun 15, 2012    (21 Sep 12) | Vol. 2-368 |
| State's Motion to Extend the Time for Filing Answer to Application For Writ of Habeas Corpus    (03 Dec 12) | Vol. 2-429 |
| State's Original Answer to Application for Writ of Habeas Corpus In Death Penalty Case    (04 Feb 13) | Vol. 2-433 |
| State's Objection to Designating Jurors Pozadzides, Short and Shropshire as Witnesses & Motion to Strike their Affidavits (14 Feb 14) | Vol. 2-476 |
| State's Proposed Order Designating Issues for Writ Hearing (14 Feb 14) | Vol. 2-481 |
| Response to State's Objection to Designating Jurors as Witnesses and Motion to Strike    (25 Feb 14) | Vol. 2-483 |
| Order Designating Issues and Witness    (28 Feb 14) | Vol. 2-499 |
| Order    (28 Feb 14) - Green's trial file | Vol. 2-500 |
| Attorney's Request for Bench Warrant    (21 May 14) - Gary Green | Vol. 2-501 |
| Motion to Permit Presentation of Some Witness Testimony By Affidavit    (22 May 14) | Vol. 1-502 |

GARY GREEN                                                    PAGE    2

W09-59380-S (A)

Motion to Permit Presentation of Some Witness Testimony        Vol. 2-510
By Affidavit    (22 May 14)

Bench Warrant      (29 May 14)                                 Vol. 2-518
- Gary Green

Order from the Court of Criminal Appeal      (15 Jul 14)       Vol. 2-519

Subpoena Application      (01 Jul 14)                          Vol. 2-521

Application for Subpoena      (18 Jul 14)                      Vol. 2-522

Subpoena      (18 Jul 14)                                      Vol. 2-523
- Custodian of Records for Inmate Classification Texas
   Department of Criminal Justice

Application for Subpoena Duces Tecum      (24 Jul 14)          Vol. 2-526
Custodian of Records TDCJ

Supplemental Briefing in Support of Application for Writ of    Vol. 2-527
Habeas Corpus    (19 Aug 14)

Order Setting Deadline      (22 Oct 14)                        Vol. 2-584

Supplemental Exhibit to State's Original Answer to Application for    Vol. 2-585
Writ of Habeas Corpus in Death Penalty Case

Court's Findings of Fact and Conclusions of Law/Denied        Vol. 2-589
(31 Dec 14)

True Bill of Indictment      (30 Oct 09)                      Vol. 2-686

Trial Docket                                                  Vol. 2-687

Charge of the Court    (09 Nov 10)                            Vol. 2-696
Guilt/Innocence

Jury Verdict on Guilt                                         Vol. 2-704

1   GARY GREEN                                                    PAGE   3

2   W09-59380-S (A)

3   _____

4   Charge of the Court     (09 Nov 10)                          Vol. 2-705
5   Punishment

6   Special Issue No. 1                                          Vol. 2-711

7   Special Issue No. 2                                          Vol. 2-712

8   Judgment/Sentence     (05 Nov 10)                            Vol. 2-713
    Judgment of Conviction by Jury

9   Certificate of Service                                       Vol. 2-716

10  Clerk's Certificate                                          Vol. 2-717

11

12

13

14

15

16

17

18

19

20

21

22

23

W09-59380-S(A)

| | | |
|---|---|---|
| Ex parte | § | In the 282nd Judicial |
| Gary Green | § | District Court of |
| | § | Dallas County, Texas |

## AGREED DISCOVERY ORDER

Pursuant to the parties' agreement, the District Attorney's Office has agreed to permit Brad Levenson, Director of the Office of Capital Writs, applicant's attorney of record in this writ proceeding, to review the trial files of this cause, including information protected from disclosure by statutory or constitutional law.

The Court recognizes that the State is not waiving any privileges applicable to the attached documents. The Court also recognizes that by agreeing to this discovery order, the State does not authorize the public release of this information.

The Court orders that the attorney of record may not disclose the contents of the District Attorney's files to anyone except: (1) a person who is a representative of the attorney of record, (2) an expert hired by the attorney of record, or (3) the applicant. The Court further orders that none of these individuals may disclose the contents of the District Attorneys' files to any other person.

The Court further orders that if applicant's attorney of record wishes to publicly disclose any protected information, he will first tender the information to the Court for in camera review and a determination as to whether due process necessitates its disclosure. The attorney of record will provide the State with notice of his desire for in camera review, notice of what information he seeks to disclose, and an opportunity to be heard by the trial court on the matter.

Signed July _____, 2012.

Judge Andy Chatham

Jaclyn Lambert
Assistant District Attorney

Brad Levenson
Applicant's Attorney of Record

367

**IN THE 282ND JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

FILED

2012 SEP 21  PM 1:25

G.     ........ORS
DIS...CT CLERK
BALLAS CO., TEXAS

$Am$_____ DEPUTY

———————————————  )
                 )     **Trial Cause No.**
                 )     **F09-59380-S**
**EX PARTE,**     )
**GARY GREEN,**   )
                 )
      **APPLICANT**  )
———————————————  )


## NOTICE OF FILING EXHIBIT 66 IN SUPPORT OF ARTICLE 11.071
## APPLICATION FILED JUNE 15, 2012
## (CAPITAL CASE)


BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail:Robert.Romig@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

368

## IN THE 282ND JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS

_____  )   Trial Cause No.
                         )   F09-59380-S
                         )
EX PARTE,                )
GARY GREEN,              )
                         )
            APPLICANT    )
_____  )


### NOTICE OF FILING EXHIBIT 66 IN SUPPORT OF ARTICLE 11.071
### APPLICATION FILED JUNE 15, 2012

**To Judge Andy Chatham of the 282nd District Court of Dallas County:**

Gary Green, by and through his attorneys, the Office of Capital Writs, files the attached supplemental exhibit, Exhibit 66 – Affidavit of Ms. Danalynn Recer, in support of Mr. Green's Application for relief under Article 11.071, filed in this Court on June 15, 2012. Specifically, Mr. Green files Exhibit 66 in support of Claims One through Six of his Application.

Respectfully submitted,

DATED:    September 21, 2012          By _____
                                      ROBERT ROMIG
                                      Post-Conviction Attorney

369

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Notice of Filing Exhibit to:

District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207
(Original and 1 Copy by hand)

Dallas County District Attorney
ATTN: Jaclyn O'Connor
133 N. Riverfront Blvd.
Lock Box 19
Dallas, Texas 75207-4399
(One Copy by email)

Gary Green
Polunsky Unit #999561
3872 FM 350 South
Livingston, Texas 77351
(One Copy by hand)

This certification is executed on September 21, 2012, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

ROBERT ROMIG

370

| STATE OF TEXAS | § | |
| | § | *EX PARTE* GARY GREEN |
| COUNTY OF DALLAS | § | |

## AFFIDAVIT OF DANALYNN RECER

1.      My name is Danalynn Recer. I am an attorney licensed in the states of Texas (bar #00792935) and Louisiana (bar #25485). I am the founder and executive director of the Gulf Region Advocacy Center (hereinafter GRACE), a non-profit law office devoted to capital representation. I have worked exclusively as an indigent capital defender for non-profit law offices since 1991, including four years as a capital defense investigator and mitigation specialist prior to becoming an attorney. I have been appointed as capital trial counsel by at least sixteen different state trial court judges in Louisiana and Texas, by a federal District Court in Alabama, and by an institutional defender in Georgia. I have been appointed as state appellate capital counsel by the high courts of both Texas and Louisiana, as state post-conviction counsel by four district court judges in Texas and the high courts of both Texas and Louisiana, and as federal capital habeas counsel by six different federal district court judges in Texas and Louisiana as well as the Fifth Circuit Court of Appeals. I also have been appointed as a mitigation specialist at either trial or post-conviction by at least twenty different state and federal court judges in Texas, Kansas, Virginia and California, and served as the mitigation specialist on eleven capital trials through institutional defenders in Louisiana and Mississippi. I have supervised the mitigation investigations in more than sixty capital cases in state and federal jurisdictions across the country. I have enrolled as *pro bono* or retained trial counsel in at least seventeen capital trial cases and four post-conviction cases in Texas. I have testified as an expert in the standard of care for capital counsel at least six times in state and federal courts in Oklahoma and Texas, and frequently provided affidavits. My resume is attached.

1

**371**

2.     Over the past twenty-one years, I have participated as either counsel, a mitigation specialist, or an investigator in the defense of over one hundred capital clients in all stages of proceedings, from pre-trial motions to clemency, in state and federal courts in Texas, Louisiana, Georgia, Virginia, Mississippi, Alabama, Oklahoma, Arkansas, Florida, Kansas, California, Michigan, Tennessee, North Dakota and Nevada. As an investigator and mitigation specialist with the Texas Resource Center from 1991 to 1995, I conducted life history investigations for approximately twelve federal habeas clients, and assisted in the preparation of many others. As a capital trial attorney with the Louisiana Crisis Assistance Center, now the Louisiana Capital Assistance Center (hereinafter LCAC), beginning in 1995, I have served as appointed capital trial counsel in fourteen of my own cases, conducted and supervised the investigation and preparation of approximately 30 capital other trial cases and assisted or consulted in dozens of others in Louisiana, Mississippi and Alabama. In that very high-volume, statewide capital trial office, I participated in the development of a system for evaluating capital cases pretrial and assessing the resources to be allocated. We developed a team approach to capital litigation that defined the minimal requirements for pretrial development of the case and streamlined the delivery of those services. In that capacity, I helped develop and implement a mitigation training program that is still used to train mitigation specialists in Louisiana, Mississippi, Alabama, Oklahoma, Arizona and Texas. I co-authored the Louisiana Capital Trial Manual, published by the Louisiana Indigent Defense Board, 1996 through 2000 editions. I also directed the Jefferson Parish Pre-Trial Project, a project of the LCAC to assist in the pretrial preparation of capital cases in the Louisiana Parish with the highest incidence of capital sentences.

3.     I was retained to represent the government of Mexico for nine years through the Mexican Capital Legal Assistance Program (hereinafter MCLAP), a program providing

2

**372**

assistance to Mexican nationals facing capital charges or convictions in the United States. In this capacity, I frequently appeared on behalf of Mexico in Texas, Oklahoma, Louisiana and Arkansas state courts, assisted appointed counsel in pretrial litigation of approximately three dozen capital cases, negotiated non-death settlements with prosecutors in numerous jurisdictions and conducted and/or assisted in the mitigation investigation of approximately eight post-conviction and over two dozen pretrial capital cases in Texas, Oklahoma, Arkansas, Louisiana and Florida. I have also been retained by Mexico to provide direct representation in one capital trial and one post-conviction capital case.

4.       I have regularly attended state and national training seminars and remained current with the literature in the field of capital mitigation investigation as well as relevant state and federal caselaw. I am the co-author of the 2006 Texas Capital Defender Manual, (hereinafter TCDLA Manual) published by the Texas Criminal Defense Lawyer's Association (hereinafter TCDLA), and distributed state wide at capital certification courses. As demonstrated by the attached resume, I have received extensive training in the development of capital cases and am well familiar with the standards and expectations of capital counsel in Texas and elsewhere.

5.       I have also done extensive speaking and teaching at capital training seminars and workshops for myriad state and national bar associations, as indicated on the attached resume. I am on the faculties of the National Capital Habeas College and the National Capital *Voir Dire* College and have trained trial attorneys to conduct capital jury selection in Mississippi, Pennsylvania, Arizona, Delaware, Louisiana, Oklahoma, Colorado, Ohio, Texas, and Georgia. I am also on the faculty of the National Consortium for Capital Defense Training, a federally-funded project which provides intensive, small group, case-based workshops to capital trial

3

373

defenders around the country. In that capacity, I have trained capital trial counsel, mitigation specialists and fact investigators in Tennessee, Alabama, Arkansas, Mississippi, Oklahoma, Louisiana, Missouri, Georgia, Ohio, Pennsylvania, Delaware, Kentucky, New Mexico, Indiana, Maryland, Virginia, California, Nevada, Washington, Texas, Florida, Arizona, South Carolina and New Hampshire. I have taught accredited capital litigation seminars on behalf of state and local bar associations and defender organizations in Texas, Louisiana, Mississippi, Florida, Oklahoma, Colorado, Pennsylvania, Ohio, Georgia, Utah, California, Maryland, Tennessee, Arizona and Missouri, as well as numerous programs offered by national defender organizations and the Capital training and assistance project of the Federal Defender Services branch of the Office of Courts Administration for the federal court system.

6.  From 2005 to 2007, I was part of a national group of mitigation specialists retained by the Public Interest Law Center to draft and comment upon a set of performance guidelines for mitigation specialists, intended to supplement and elaborate upon the mitigation function of the defense as set forth in the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. ABA GUIDELINE FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, reprinted in 31 HOFSTRA L. REV. 913 (2003) (hereinafter 2003 ABA Guidelines). The resulting Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (hereinafter Mitigation Guidelines) have now been adopted by the Capital Representation Project of the ABA and the National Association of Sentencing Advocates and published by Hofstra Law Review. SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, 36 HOFSTRA L. REV. 663 (2008).

7.  In 2002, I established GRACE, a non-profit law office in Houston, Texas,

4

**374**

dedicated to providing and supporting quality defense services to indigent capital defendants. Currently GRACE staff consists of four attorneys (all of whom, including myself, also work as mitigation specialists), three other mitigation specialists, a mitigation fellow, a law fellow an office manager, a bookkeeper, a Deputy Executive Director, Development Director, Communications Director and a rotating group of four to six interns.

8.     GRACE operates four programming areas:

a)  Training and education.  In addition to providing faculty on a *pro bono* basis to myriad defense trainings hosted by other organizations as described above, GRACE has sponsored mitigation skills workshops for mitigation specialists in Texas, Louisiana, Oklahoma, Georgia and Arizona, and received a grant from the U.S. Department of Justice in 2008 to provide an intensive, bring-your-own case three day workshop for Texas capital defense teams. GRACE also provides one-on-one mentorship to new mitigation specialists through several grant-funded nationwide programs.

b)  Consulting.  GRACE has provided intensive, case-specific consulting services to capital defense teams in Texas, Louisiana, Oklahoma, Georgia and Arkansas through several programs, including MCLAP, as described above, as well as our own Harris County Capital Pre-Trial Project (HCCPP), a project that was initially funded by the Texas Bar Foundation, Equal Justice Initiative and the Bar Foundation to provide assistance with pretrial motions practice, development of client relations and pursuit of non-death pretrial resolutions.  Through that project, GRACE staff have assisted in approximately one dozen Harris County capital pretrial cases, including many that were resolved without trial and two that proceeded to penalty phases. Building upon the motions developed in the context of our Harris County Project, GRACE produced TCDLA's Capital Trial Manual and motions discs that are now circulated at capital

qualification CLEs around the state. GRACE also provides intensive consultation through our Retrial/Resentencing Project, which aids clients returning from death row to Texas trial courts for retrial or resentencing after reversals.

c) Mitigation services. GRACE staff members are trained to fulfill the mitigation defense function as set forth in the 2003 ABA Guidelines for Capital Representation and the Mitigation Guidelines. GRACE has been appointed or retained to provide mitigation services to more than sixty capital clients in both trial and post-conviction cases in state and federal courts in Texas, Louisiana, Nevada, Kansas, Michigan, Tennessee, North Dakota, Virginia, Arkansas, Arizona, Alabama and California.

d) Direct representation. GRACE has been appointed, retained or enrolled *pro bono* to provide direct representation to at least nineteen capital trial defendants and nine in state and federal post-conviction. GRACE also provided legal counsel to the government of Mexico regarding its interests in 74 cases where Mexican nationals faced capital charges in Texas, Oklahoma, Arkansas, Louisiana and Florida, as described above.

9. These and other experiences have given me great familiarity with the specific tasks required to adequately investigate and prepare for both phases of a capital trial and the amount of time it takes to perform those tasks.

**Referral Question**

10. I have been asked by Gary Green's current post-conviction habeas counsel, the Office of Capital Writs ("OCW"), to render an opinion on the prevailing standard of care for capital trial counsel in Texas in 2009-2010 to investigate and develop mitigation evidence to present at the punishment phase of a capital case.

**Documents Reviewed**

6

11. In the formation of my opinion, I consulted the following references from my own files:

A. *Capital Sentencing Strategy: A Defense Primer*, State Bar of Texas 20th Annual Advanced Criminal Law Course, July 1994.

B. *Texas Criminal Appellate Manual, 1996*, Vol. I, State Bar of Texas Criminal Justice Section, 1996.

C. *Defending a Capital Case in Texas*, 1st Edition, Texas Resource Center, February 24, 1989.

D. *American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, with Commentary, 1989.

E. *American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, with Commentary, 2003.

F. *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 2008.

G. Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, The Champion, NACDL, Aug. 1985, at 27-31.

H. Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, The Champion, NACDL Mar. 1984.

I. David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion, NACDL, Aug. 1986.

J. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299 (1983).

K. James Hudson, Jane Core and Susan Schorr, *Using the Mitigation Specialist and the Team Approach*, The Champion, NACDL, June 1987.

L. *American Bar Association's Standards for Criminal Justice: Prosecution Function and Defense Function*, 3d ed. 1993.

M. Scott E. Sundby, *The Capital Jury And Absolution: The Intersection Of Trial Strategy, Remorse, And The Death Penalty*, Cornell Law Review Vol. 83:1557.

N. Training Agenda, 10/16/2003, AAPL Mock Trial, Capital Punishment With Insanity Defense, San Antonio, TX.

7

377

O. Training Agenda, 04/19-21/2004, The Habeas College, San Antonio, TX.

P. Training Agenda, 04/20-21/2006, TCDLA, Capital, Mental Health & Habeas, Dallas, TX.

Q. Training Agenda, 08/23-25/2006, The Punishment Phase Of A Capital Trial Center for American And International Law, Plano, TX.

R. Training Agenda, 03/23-24/2007, Capital Mitigation.

S. Training Agenda – 04/16-18/2007, Capital Trial Voir Dire For The Defense, Center for American and International Law, Plano, Tx.

T. Training Agenda – 05/10-12/2007, Bring Your Own Case Capita Defense Training, National Consortium for Capital Defense, Training, Center for American and International Law, Plano, Tx.

U. Training Agenda – 06/22-24/2007, Mexican Capital Legal Assistance Program, Mitigation Training, Houston, Tx.

V. Training Agenda – 06/19/21/2008, Bring Your Own Capital Case National Consortium for Capital Defense Training, Capital Defense Training, Houston, Tx.

**Basis And Standards For Review**

12.      For all opinions set out below, I rely upon *Strickland v. Washington*, the Supreme Court's definitive teaching on the Sixth Amendment right to the effective assistance of counsel. My opinion is also informed by the Court's application of the *Strickland* test in *Williams v. Taylor*, 529 U.S. 362 (2000) (regarding a 1994 trial), *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (regarding a 1989 trial), *Rompilla v. Beard*, 545 U.S. 374 (2005) (regarding a 1988 trial) and *Porter v. McCollum*, 130 S.Ct. 447 (2009) (regarding a 1988 trial).

## ESTABLISHING THE STANDARD OF CARE IN CAPITAL CASES

13.      Counsel in a capital case have specialized duties and functions that differ significantly from those in any other criminal case. *See McFarland v. Scott*, 512 U.S. 849, 855 (1994) (noting the uniqueness and complexity of death penalty jurisprudence); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 303-04 (1983); *see generally* Andrea D. Lyon, *Defending the Death Penalty Case: What*

8

**378**

*Makes Death Different?*, 42 MERCER L. REV. 695 (1990); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. ILL. L. REV. 323 (1993).

14.     Because "death is different," counsel at every stage of capital proceedings must make "extraordinary efforts on behalf of the accused." *See* ABA Standards for Criminal Justice: Defense Function, Standard 4-1.2 (c), in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

15.     The standard of care for capital defense teams is identified and articulated through guidelines promulgated by state and national bar associations and expanded upon through professional articles, practice manuals and sample litigation distributed to counsel through trainings, seminars and workshops.  There is also a growing body of social science literature that describes and quantifies the work of capital defense teams, providing objective data as to the success of various techniques.

16.     The American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases have "long . . . [been] referred [to]" by the U.S. Supreme Court "as 'guides to determining what is reasonable,'" *Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland v. Washington*, 466 U.S. 668, at 688-89 (1984) ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable"); *see also Evans v. Secretary, Dept. of Corrections*, 681 F.3d 1241, 1256 n.12 (11th Cir. 2012) (noting that the Supreme Court has relied on ABA Guidelines as support for a conclusion that counsel was ineffective); *Brawner v. Epps*, 439 Fed. Appx. 396, 402 (5th Cir. 2011) ("[W]e consider the first factor, objective reasonableness, by looking to 'prevailing professional norms' such as the ABA Guidelines"); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th. Cir. 2003) ("[T]he *Wiggins* case now stands for the proposition that the ABA

standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases."); *United States v. Karake*, 370 F.Supp.2d 275 (D.D.C. 2005) ("the Supreme Court has counseled that the ABA Guidelines for counsel in death penalty cases provide the governing norms.").

17.     The 2003 ABA Guidelines "set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction." Guideline 1.1. The Commentary to Guideline 1.1 emphasizes that "these Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases." 2003 ABA Guidelines at p. 2.

18.     The current ABA Guidelines were published in 2003 and widely distributed to capital counsel around the country by the American Bar Association, the National Legal Aid and Defender Association, the National Association of Criminal Defense Lawyers, and to Texas attorneys, through the Texas Criminal Defense Lawyers Association, the Center for American and International Law, the Texas Defender Service, and the Gulf Region Advocacy Center.

19.     These standards have been adopted by the State Bar of Texas. *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel,* (hereinafter Texas Guidelines) Guideline 11.1,[1] and implemented by the TCDLA, through the publication of the 2006 edition of its capital trial manual, which sets forth counsel's specific obligations under each guideline. *Losch's Texas Capital Defender Manual*, 8th ed., Texas Criminal Defense Lawyer's Association, 2006, and was authored by GRACE.

20.     In 2008, the Supplementary Guidelines for the Mitigation Function of Defense

---

[1] The Texas Guidelines were officially adopted by the State Bar of Texas in 2006 and are a state-specific version of the 2003 ABA Guidelines. They are *available at:* http://www.uta.edu/pols/moore/indigent/txcapitalguidelines.pdf.

Teams in Death Penalty Cases were published after a lengthy process of development which included the participation and input of mitigation specialists and capital defense attorneys from around the country. These Mitigation Guidelines first appeared in a volume of the Hofstra Law Review that included articles on the importance of mitigation investigation, the development of cohesive case theories, and how to work most effectively with mental health experts in a capital case. *See, e.g.* Helen G. Berrigan, *The Indispensible Role of the Mitigation Specialist in the Capital Case: A View from the Federal Bench*, 36 HOFSTRA L. REV. 819 (2008); Sean D. O'Brien, *When Life Depends On It: Supplementary Guidelines For The Mitigation Function Of Defense Teams In Death Penalty Cases*, 36 HOFSTRA L. REV. 693 (2008); Robin M. Maher, *The ABA And The Supplementary Guidelines For The Mitigation Function Of Defense Teams In Death Penalty Cases*, 36 HOFSTRA L. REV. 763 (2008); Richard G. Dudley Jr. & Pamela Blume Leonard, *Getting It Right: Life History Investigation As The Foundation For A Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008).

21.     This volume was also widely distributed at no cost to capital practitioners in Texas by the ABA, NLADA, NACDL, TCDLA, CAIL, TDS, and GRACE.

**Establishing Standards in Texas**

22.     The standards described in the 2003 and 2006 Guidelines were not brand new to Texas, but rather a reflection of prevailing practices.

23.     The State Bar of Texas 20th Annual Advanced Criminal Law Course took place in July of 1994. Materials distributed at the course included a primer on defending capital cases at the sentencing phase. *Capital Sentencing Strategy: A Defense Primer*, July 1994 (hereinafter 1994 State Bar Materials).

24.     Other early training materials distributed to capital defense attorneys in Texas are

11

381

*Defending a Capital Case in Texas*, 1st ed., Texas Resource Center, February 24, 1989 and the *Texas Criminal Appellate Manual, 1996*, Vol. I, State Bar of Texas Criminal Justice Section, 1996. Both of these documents discuss the need for extensive investigation in capital cases, with particular attention to the life history of the client.

25.     These 1989 materials began the process of establishing mitigation standards in Texas, consistent with the national capital defense norms. *See e.g.* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, CHAMPION, Aug. 1986, at 16–17 ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . . A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . . Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, CHAMPION, Aug. 1985, at 27-31 (instructing capital defense counsel to thoroughly investigate the client's background by collecting documentary evidence and interviewing witnesses related to family background, medical history, school performance, military experience, work history, psychological profile, criminal record, institutional record, significant others, religious background, drug/alcohol history, geography, skills and talents).

26.     In 1996, the Texas Criminal Defense Lawyer's Association (TCDLA) published the first edition of the Texas Capital Defender Manual (later renamed the Losch Capital Defender Manual after its original author, Steve Losch).     This Manual has been updated periodically and the current 8th edition was authored by GRACE on behalf of TCDLA in 2006. The manual contains detailed and practical explanations relating to all stages of a capital trial,

12

checklists, to-do lists and step-by-step guides for litigating a capital case from the moment of arrest through direct appeal.   To insure that this vital resource is widely available to all defenders, the Losch's Texas Capital Defender Manual is distributed for free to all capital defense attorneys on the capital appointment list in Texas.

27.   In 2001, the Texas legislature passed the Fair Defense Act (hereinafter FDA) which, for the first time, required all criminal courts in Texas to adopt formal procedures for providing appointed lawyers to indigent defendants. These procedures were required to be consistent in all courts of the same jurisdiction within any particular county (e.g., all district (felony) courts in a county must adopt consistent procedures), and counties may adopt unified procedures that apply to all criminal courts (felony and misdemeanor) in a county. The rules relating to the appointment of attorneys in death penalty cases received special attention by the House Research Organization in the passage of the Bill.  Accordingly, the requirements for lead counsel in the First Administrative Judicial Region of Texas, which includes Dallas County, provide:

1.   At least two attorneys shall be appointed for trial.  One designated as first chair, or lead attorney, the other as second chair;
2.   The first and second chair attorneys must be members of the State Bar of Texas;
3.   The first chair attorney must exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases.  The first chair must have at least five years criminal law experience;
4.   The first chair attorney must have tried to a verdict as lead defense counsel a significant number of felony cases, including homicide trials and other trials for offenses punishable as first or second degree felonies, or capital felonies;
5.   The first chair attorney must have trial experience in the use of and challenge to mental health of forensic expert witnesses, and in investigating and presenting mitigating evidence at the penalty stage of a death penalty trial;
6.   The first chair attorney must have participated in continuing legal education courses or other training relating to criminal defense in death penalty cases each reporting period and must have completed a minimum of twelve hours of such training over the previous two-year period; and

13

383

7.    First chair trial counsel must not have been found by any federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any capital case.

STATE OF TEXAS FIRST ADMINISTRATIVE JUDICIAL REGION, *Standards for Appointment of Counsel in Death Penalty Cases Promulgated Pursuant to Art. 26.052 C.C.P.*, revised Nov. 2009, http://tfid.tamu.edu/CountyDocuments/Region1/Attorney%20Qualifications%20for%20 Representation%20in%20Death%20Penalty%20Cases%20%282009%29.pdf.

28.    Beginning with the certification process required by the Texas Fair Defense Act, capital training and consultation with capital defense counsel in Texas became more formalized in 2001. TCDLA, CAIL, TDS, GRACE and the National Consortium for Capital Trial Training, the ACLU Capital Representation Project and NACDL have all been very active in providing frequent training events and ongoing intensive consultation services to capital defense counsel in Texas. Since at least 2003, every single attorney certified to receive capital appointments in Texas or enrolled or retained to represent a capital defendant has had available to them free training, trial manuals, litigation samples and consulting services. Many trainings also provide scholarships for transportation and lodging.

29.    These organizations have, additionally, distributed free disks of sample motions and trial workbooks, and created electronic listservs linking any capital defense lawyer who chooses to join them, where additional consultation, litigation samples and practice materials are made available at no charge.

30.    In April, 2006, the State Bar of Texas adopted Guidelines and Standards for Texas Capital Counsel, modeled after the ABA Guidelines, with the stated goal of setting forth "a state-wide standard of practice for the defense of capital cases in other to ensure high quality legal representation for all persons facing the possible imposition or execution of a death

14

**384**

sentence by any State of Texas jurisdiction."

31. In the five years leading up to Mr. Green's capital trial in 2010 there were no less than fourteen capital trainings available to Mr. Green's counsel in Texas and significantly more across the country:

- 04/20-21/2006, OK, Capital, Mental Health & Habeas, Dallas, TX (Training Agenda, 4/20-21/2006, TCDLA, Capital, Mental Health & Habeas, Dallas, TX)
- 08/23-25/2006, The Punishment Phase Of A Capital Trial – Center for American And International Law, Plano, TX (Training Agenda, 8/23-25/2006, The Punishment Phase Of A Capital Trial, Center for American And International Law, Plano, TX)
- 03/11-12/2006, NLADA, Life In The Balance 2007, Dallas, TX
- 03/23-24/2007, Plano 2007 Mitigation (Training Agenda, 3/23-24/2007, Plano 2007 Mitigation)
- 04/16-18/2007, Capital Trial Voir Dire For The Defense, Plano, TX (Training Agenda, 4/16-18/2007, Capital Trial Voir Dire For The Defense, Plano, TX)
- 05/10-12/2007, National Consortium for Capital Defense Training, Bring Your Own Capital Case, Capital Defense Training, Plano, TX (Training Agenda, 5/10-12/2007, National Consortium for Capital Defense Training, Capital Defense Training, Plano, TX)
- 06/22-24/2007, Mexican Capital Legal Assistance Program, Mitigation Training, Houston, TX (Training Agenda, 6/22-24/2007, Mexican Capital Legal Assistance Program, Mitigation Training, Houston, TX)
- 06/19-21/2008, National Consortium for Capital Defense Training, Bring Your Own Capital Case, Capital Defense Training, Houston, TX (Training Agenda, 6/19-21/2008, National Consortium for Capital Defense Training, Capital Defense Training, Houston, TX)
- 2/5-6/2009, TCDLA Capital Seminar, Houston, TX (Training Agenda, 2/5-6/2009, TCDLA Capital Seminar, Houston, TX)
- 4/15-17/2009, Capital Trial Voir Dire For The Defense, Plano, TX (Training Agenda, 4/15-17/2009, Capital Trial Voir Dire For The Defense, Plano, TX)
- 5/12-15/2009, Center for American and International Law, Capital Trial Advocacy Program for the Defense, Plano, TX (Training Agenda, 5/12-15/2009, Center for American and International Law, Capital Trial Advocacy Program for the Defense, Plano, TX)
- 10/22-23/2009, TCDLA, Forensics Seminar, Houston, TX (Training Agenda, 10/22-23/2009, TCDLA, Forensics Seminar, Houston, TX)
- 2/25-26/2010, TCDLA Capital Trial and Habeas Seminar, Austin, TX (Training Agenda, 2/25-26/2010, TCDLA Capital Trial and Habeas Seminar, Austin, TX)
- 3/15-17/2010, Center for American and International Law, Capital Voir Dire for the Defense, Plano, TX (Training Agenda, 3/15-17/2010, Center for American and International Law, Capital Voir Dire for the Defense, Plano, TX)

32. Available at these trainings were extensive materials and information on

15

385

conducting a capital trial. Sessions included "The Mitigation Process", "Developing and Coordinating Theories and Themes for the Punishment Phase", "Motions Practice for the Punishment Phase", "Challenging the State's Witnesses on Future Danger", *Williams, Wiggins and Rompilla* – Mitigation Ain't Optional Anymore", "Experts – There is More to Hiring One Than Writing a Check", "Using the [2003] ABA Guidelines to Meet the Standard of Care in Death Penalty Cases (aka Getting the Time and Money to do it Right)", "Social History Investigation – The Team Approach", "Identifying Signs and Symptoms of Mental Health Problems and Thinking About Psychological Evaluations in Capital Cases", "Investigation Issues in a Capital Case", "Storytelling and Presenting the Penalty Phase Case", and "Overview of the Colorado Method" to name a few. (Training Agenda, 08/23-25/2006, The Punishment Phase Of A Capital Trial – Center for American And International Law, Plano, TX; Training Agenda, 03/23-24/2007, Plano 2007 Mitigation; Training Agenda – 06/19/21/2008, National Consortium for Capital Defense Training, Capital Defense Training, Houston, TX; Training Agenda – 04/16/18/2007, Capital Trial Voir Dire For The Defense, Plano, TX.)

33.     The 2006 and 2008 "Bring Your Own Case" (BYOC) Capital Trial trainings sponsored by the National Consortium for Capital Defense Training held in Houston and presented in large part by GRACE staff, were intensive small group seminars using the curriculum as developed by the Defender Services Division of the Administrative Offices of the US Courts, Bureau of Justice, Department of Justice for capital trial teams. (National Consortium for Capital Defense Training in Houston TX, 6/19-21/2008).

34.     That BYOC curriculum emphasizes working within a multi-disciplinary defense team to identify, develop and present mitigating evidence in capital trials. At the 2008 BYOC in Houston, I gave the opening presentation entitled "How Death Is Different" setting out the

386

standard of care required of capital counsel, including the requirement to hire and supervise a mitigation specialist, the importance of a thorough life history investigation, the law requiring that mitigation evidence be considered by juries, and an overview of 8th Amendment jurisprudence applicable to individualized sentencing in capital cases such as *Woodson v. North Carolina*, 428 U.S. 280 (1976), *Penry v. Lynaugh*, 492 U.S. 302 (1989), *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and *Morgan v. Illinois*, 504 U.S. 719 (1992). The presentation included a summary of *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005) and a discussion of how counsel may not make any strategic decisions without first conducting a thorough mitigation investigation.

35. The Capital Mental Health seminar sponsored by TCDLA in 2006 included a skills track for mitigation specialists sponsored and staffed by GRACE, as well as sessions for capital trial counsel on the identification, development and presentation of mental health evidence in capital cases. (Texas Criminal Defense Lawyers Association, Capital, Mental Health and Habeas, 4/20/2006).

36. Also in 2006, the Court of Criminal Appeals clearly adopted and enunciated a framework of minimum standards which must be met in order for defense counsel to be deemed effective in a capital trial, finding that counsel in a capital case had rendered ineffective assistance with respect to investigating mitigating evidence by failing to ask the defendant, his mother, or his sister whether defendant had been abused as a child. It was further noted that "in determining whether counsel conducted a reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation should have uncovered the mitigating evidence." *Ex Parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).

## THE STANDARD OF CARE IN CAPITAL CASES

37.     These state and national references describe a core set of duties required of capital counsel at all stages in all cases.

### The Duty to Develop & Maintain an Effective Attorney-Client Relationship

38.     Capital counsel "at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client." 2003 ABA Guidelines, Guideline 10.5 A at 1005.

39.     Counsel must make contact quickly. "Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case." 2003 ABA Guidelines, Guideline 10.5 B (1) at 1005. In addition to this, counsel should:

> . . . promptly upon entry into the case . . . communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

2003 ABA Guidelines, Guideline 10.5 B (2) at 1005.

40.     This early contact is crucial to developing a relationship with the client and building the trust needed for the development of both phases of a capital case. It can also prevent the client from causing grievous damage to his case, particularly in the form of making uncounseled confessions or admissions, thus injuring his Fifth Amendment right against self-incrimination. 2003 ABA Guidelines, Guideline 10.5 A at 1007.

41.     Once the relationship is established, counsel must make every effort to establish a rapport and relationship with his client to facilitate the gathering of information about the client's life, background, and the alleged crime and to be able to humanize him for the jury. Counsel must keep his client apprised of every step of the proceedings and every element of the defense

18

388

so his client can make informed decisions and aid counsel in developing his defense.

42.    Without this rapport-building contact from the onset of representation, the client is unlikely to feel he is being heard or respected by his counsel, and will therefore be less likely to cooperate fully with his defense team. This is especially true in the realm of capital defense, as recognized by the ABA Guidelines:

> Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence.

2003 ABA Guidelines, Guideline 10.5 A at 1007-08.

43.    With such impairments common in capital defendants, the capital defense team must make a greater effort than most to communicate with, build trust with, and counsel his client. This early meeting and initiation of the rapport-building process will also alert the attorney as to any suspected mental impairments, language barriers, cultural differences, or injuries his client may have that may be important to his mitigation and defense. Catching these potentially important mitigation factors early is crucial to building a successful and meaningful defense for his client, and in directing the mitigation specialists and other team members in preparing his client's case.

44.    The communication between an attorney and his client should be ongoing from this first meeting: "[c]ounsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have material impact on the case." 2003 ABA Guidelines, Guideline 10.5 C at 1005-1006. Counsel must spend enough time to build a rapport with his client:

389

> An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Even if counsel manages to ask the right questions, a client will not—with good reason—trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls.

2003 ABA Guidelines, Guideline 10.5 commentary at 1008-09.

45.     The 2003 ABA Guidelines also state that "immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:... explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors." 2003 ABA Guideline 10.7 Commentary, at 1023.

46.     Defense team members have a duty to "conduct in-person, face-to-face, one-on-one interviews with the client," not just quick phone calls whenever counsel finds a moment, or brief visits just to inform him of the status of the case and then leave again. Mitigation Guidelines Guideline 10.11 (C) at 689. Such contact is "necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding." Mitigation Guidelines Guideline at 10.11 (C) at 689.

47.     Counsel's duty to "establish a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea." ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-5.2 & cmt., in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

48.     This duty of contact and relationship-building extends not only to the client, but to

20

390

the client's family and close friends or associates as well.

> It is also essential to develop a relationship of trust with the client's family or others on whom the client relies for support and advice. . . . Even apart from the need to obtain vital information, the lawyer must understand the client and his life history. To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.

2003 ABA Guidelines, Guideline 10.5 commentary at 1008-09.

### The Duty To Assemble And Lead A Multi-Disciplinary Team

49.      It is well-established practice that effective capital defense counsel must, as soon as possible after appointment, assemble an appropriately qualified, multi-disciplinary, team. The 2003 ABA Guidelines provide that lead counsel must assemble a capital defense team consisting of no fewer than two qualified attorneys, an investigator, and a mitigation specialist – with at least one member of that team qualified by training and experience to screen for the presence of mental or psychological disorders or impairments.   2003 ABA Guidelines 4.1 and 10.4 C, Commentary, at 952 & 999.

50.      This requirement of at least four members of the defense team is borne out of necessity.  Counsel alone generally "lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case."   ABA Guidelines 4.1 and 10.4 C, Commentary, at 958. All four members of this core defense team should be brought into the case from the very beginning.   "[T]he mitigation specialist needs to be appointed early in the representation, preferably within weeks if not days of enrollment or appointment of counsel." Hon. Helen G. Berrigan, *The Indispensable Role of the Mitigation Specialist: A View From The Federal Bench,*

36 Hofstra L. Rev. 819, 825 (2008).

51.     The requirement expressed in ABA Guideline 4.1 that at least one member of the defense team be qualified by training and experience to screen for mental health issues is crucial as "evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend *Miranda* warnings, and competency to waive constitutional rights." ABA Guidelines 4.1, at 956.

52.     This role is often – but not always – undertaken by the mitigation specialist, who plays an ongoing and unique role on a capital defense team throughout proceedings. Mitigation specialists "have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf." ABA Guidelines 4.1, at 959.

### A Mitigation Investigation Should Be Undertaken by a Mitigation Specialist

53.     While all team members must work cooperatively to integrate a client's life history into the themes at both phases of a capital trial, it is generally the mitigation specialist who develops the evidence of that history. Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, INDIGENT DEFENSE (NLADA July/Aug. 1999).

> Generally, the defense team should be composed of, *inter alia*, attorneys, mitigation specialists, criminal investigators, psychologists, and psychiatrists. . . . The mitigation specialist is a professional who works collaboratively with the attorneys throughout an entire death penalty case providing expertise in the areas of psycho-social investigation, mitigation development and organization, coordination between other experts and lay witnesses, and preparation of

22

392

witnesses. . . . While the mitigation specialist can come from a variety of professional areas, to date, the field is dominated by those trained in social work and counseling.

James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, CHAMPION, NACDL (June 1987).

54. The 2003 ABA Guidelines state explicitly that the defense team should include a "mitigation specialist." 2003 ABA Guideline 4.1.A.1.

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse). . . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; . . . and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 ABA Guideline 4.1 Commentary.

55. Investigation performed by mitigation specialists must not be confused with evaluation performed by experts. While "[c]ompetent mitigation specialists are versed in various specialties of mental health," their role is one of investigation. Dudley & Blume Leonard, *Getting it Right, supra*, at 976. Mitigation specialists gather records and conduct interviews in order to compile a life history of the client. A mitigation specialist's knowledge of the signs and symptoms of mental illness is key in determining strategies for investigation and identifying "problems that need further exploration by a mental health expert." *Id.* at 967. However, it is not necessary that a mitigation specialist have any sort of specialized degree or certification in mental health. Many successful mitigation specialists were trained as journalists, attorneys, historians or social scientists.

56. The role of experts, on the other hand, is one of explanation. They analyze the

23

information collected during the mitigation investigation in order to identify and explain the client's mental or physical state and how that affected his behavior. An expert is retained to render an opinion on a particular legal question posed by the defense team, such as "how does this type of mental health difficulty explain or contribute to the behavior of this defendant?" *See Id.* at 984-85. While experts frequently evaluate the client, this evaluation is separate from the numerous client interviews a mitigation specialist conducts. "Counsel should never allow a mental health assessment to take the place of a comprehensive life history investigation." *Id.* at 975.

57. Mitigation specialists should be brought in immediately, whether or not the State has yet indicated an intention to seek the death penalty. The development of mitigation is often the key to persuading the prosecution not to seek the death penalty in the first place. Should the case proceed, "having a qualified mitigation specialist assigned to every capital case . . . insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict." ABA Guideline 4.1, Commentary, at 959.

58. Without mitigation specialists, attorneys often focus too exclusively on the culpability phase, and then they "are devastated when the client is convicted and afterward just throw in the towel." *See* Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, 18 N.Y.U. REV. L. & SOC. CHANGE 245, 250 (1991).

59. While the importance of the investigators and mitigation specialists in eliciting and recording information relevant to the defense cannot be overstated, it is lead defense counsel that "guides the defense team . . . and the analyses of the most effective manner in which to convey the mitigating information." Mitigation Guidelines, 4.1, at 668. Ultimately, "the duty to

24

investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision makers, rests upon defense counsel." Mitigation Guidelines, 4.1, at 678.

60.     The Supplementary Mitigation Guidelines expound upon the 2003 Guidelines to describe the duty of counsel to "supervise and direct the work of all team members... and must ensure on an ongoing basis that their work is of high professional quality." Mitigation Guidelines, Guideline 4.1(B) at 680. It is therefore the responsibility of the defense counsel to communicate regularly with the mitigation specialist to fulfill this duty.

61.     Mitigation specialists and fact investigators working as part of the defense team are therefore agents of defense counsel. Mitigation Guidelines, Guideline 4.1(C) at 680.

> Counsel bears the ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.

Mitigation Guidelines, Guideline 10.4(A) at 688.

62.     Counsel has a duty to "guide the defense team and, based on consultation with team members and experts, conduct ongoing reviews of the evidence, assessments of potential witnesses, and analyze the most effective manner in which to convey the mitigating information. Counsel decides how mitigation evidence will be presented." Mitigation Guidelines, Guideline 10.4(B) at 688. The attorney must be aware at all times of what his team members are doing and provide them with leadership and direction. Defense counsel must ensure that the mitigation specialist has interviewed all necessary parties, and fully explored all avenues of investigation.

63.     Counsel also has a duty to insure that all non-attorney members of the defense

team are made aware of the applicable laws governing the development and presentation of their case. Mitigation Guideline 4.1(D) at 680.

### The Duty to Conduct a Thorough Fact Investigation

64. At every stage in a capital case, counsel has the duty to conduct a thorough and independent investigation of the facts and circumstances of the alleged crime, regardless of whether the client admits or denies guilt. *See* ABA Standards for Criminal Justice: Defense Function, Standard 4-4.1, 4-6.1, in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993); Nat'l. Legal Aid and Defender Ass'n., Performance Guidelines for Criminal Defense Representation, Guideline 4.1 (1997) ("Investigation"); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, 1989 (hereinafter 1989 ABA Guidelines) 11.4.1.

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case... The duty to investigate exists regardless of the accused's admissions or statements.

ABA Standards for Criminal Justice: Defense Function, Standard 4-4.1, 4-6.1, in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

65. Such an investigation typically requires extensive record collection, client interviews, interviews of relevant witnesses and consultation with experts.

> GUIDELINE 11.4.1 INVESTIGATION
> D. Sources of investigative information may include the following:
>
> 1. Charging Documents: Copies of all charging documents in the case should be obtained and examined in the context of the applicable statutes and precedents, to identify (inter alia):
> > A. the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;
> > B. the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

26

**396**

C. any issues, constitutional or otherwise, (such as statutes of limitations or double jeopardy) which can be raised to attack the charging documents.

2. The Accused: An interview of the client should be conducted within 24 hours of counsel's entry into the case, unless there is a good reason for counsel to postpone this interview. In that event, the interview should be conducted as soon as possible after counsel's appointment. As soon as is appropriate, counsel should cover A-E below (if this is not possible during the initial interview, these steps should be accomplished as soon as possible thereafter):

A. seek information concerning the incident or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;
B. explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors;

3. Potential Witnesses: Counsel should consider interviewing potential witnesses, including:
A. eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself;
B. witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death;
C. members of the victim's family opposed to having the client killed. Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews.

4. The Police and Prosecution: Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports. Where necessary, counsel should pursue such efforts through formal and informal discovery unless a sound tactical reason exists for not doing so.

5. Physical Evidence: Where appropriate, counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.

397

6. The Scene: Where appropriate, counsel should attempt to view the scene of the alleged offense. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g. weather, time of day, and lighting conditions).

7. Expert Assistance: Counsel should secure the assistance of experts where it is necessary or appropriate for:
    A. preparation of the defense;
    B. adequate understanding of the prosecution's case;
    C. rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;
    D. presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law. Counsel and support staff should use all available avenues including signed releases, subpoenas, and Freedom of Information Acts, to obtain all necessary information.

1989 ABA Guidelines, 11.4.1.

### The Duty to Conduct a Thorough Life History Investigation

66.    As early as 1983, Professor Gary Goodpaster described trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-34 (1983).

In order to be able to give the jury a reason not to kill, you must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to the present. Talk to everyone that you can find who has ever had any contact with the defendant. . . .

28

**398**

Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, CHAMPION, NACDL (Mar. 1984). *See also* Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, CHAMPION, NACDL (Aug. 1985), ("There are no limits to the areas to be explored . . . . In broad terms, you're trying to discover people . . . . [who] can help explain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime"). David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, CHAMPION (Aug. 1986) ("A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present").

67. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood poverty and deprivation, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot determine which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

68. The areas to be covered in that life history are virtually unlimited, but the minimal areas of inquiry have been frequently described by courts, the 1989 ABA Guidelines and the 2003 ABA Guidelines.

69. The standard of care was outlined and adopted by the ABA in 1989: "investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." 1989 ABA Guidelines 11.4.1.C. A complete investigation is required because, "[w]ithout

29

399

investigation, counsel's evaluation and advice amount to little more than a guess." "This duty is intensified (as are many duties) by the unique nature of the death penalty." 1989 ABA Guidelines 11.4.1 Commentary.

70. A life history includes, but is not limited to "Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); Educational history (including achievement, performance and behavior), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof; Military Service; Employment and training history (including skills and performance, and barriers to employability); Family and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence); and other cultural or religious influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services); Rehabilitative potential of the client; Record of prior offenses (adult and juvenile), especially where there is no record, a short record or a record of non-violent offense; Expert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing." Guideline 11.8.6 The Defense Case at the Sentencing Phase, 1989 ABA Guidelines.

71. Materials distributed at criminal law courses in Texas as early as 1994 reflect the expectation that defense counsel will conduct a searching life history investigation:

> A thorough intergenerational life history *must* be developed, incorporating all life history documents and interviews with all first and second degree relatives, friends, [and] peers. As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain their medical and life history documents.

30

400

1994 State Bar Materials at 17–18 (emphasis added). The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the then-relatively new mitigation special issue made explicit that "everything about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue." *Id.* (emphasis in the original).

72.     The 1994 State Bar Materials document provided that counsel had a duty to independently investigate the wide range of social, psychological, medical, environmental, and other factors that shaped the client's life. Like the current 2003 ABA Guidelines, the 1994 State Bar Materials instructed counsel to both collect a comprehensive set of life history documents and interview people who can shed light on the client's background. To that end, the 1994 State Bar Materials provided counsel with "an *initial* list of essential people to talk to and records to obtain." *Id.* (emphasis added). The list was not intended to be comprehensive because "[e]ach person and document will have information that will lead to additional people and records that [counsel] will need to talk to or obtain." *Id.* Thus, the materials defined a starting point for a mitigation investigation that expands in the directions indicated by the information gathered by counsel.

73.     According to the 1994 State Bar Materials, an appropriate document collection began with: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney,

jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records. *Id.* at 18–21.

74.     The standard of care called for a thorough intergenerational life history, which included interviews with "all first and second degree relatives, friends, [and] peers." *Id.* at 17. Capital defense teams were expected to interview life history witnesses about a wide range of topics, and not merely ask "Is there anything you think we should know about the client?" Because the life history witnesses often have no concept of what is important or mitigating about a person's background, it was counsel's obligation to raise and explore the relevant areas with the witnesses. Hence the 1994 State Bar Materials specifically instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;
- medical care, education, and nutrition;
- difficulty reading, speech impediments;
- nightmares, sleep disturbances, fear of the dark;
- withdrawal, quietness, shyness;
- rocking, biting, head banging during early childhood;
- anxiety, nervousness, crying,
- superstitions;
- fears;
- the parents' socio-economic history;
- client and family physical illness and disabilities;
- client and family mental illness and/or mental retardation;
- family history of suicide;
- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id.* at 17-21.

75.     The extent of life history investigation required of the defense team was further developed in the 2003 ABA Guidelines.

76.     2003 ABA Guideline 10.7 provides that counsel "at every stage have an

32

402

obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." With regard to the penalty phase, the Commentary to Guideline 10.7 offers a lengthy and useful explanation of the indispensable nature of mitigation investigation:

Penalty

Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.

Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e. g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

4) Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services);

5) Employment and training history (including skills and performance, and barriers to employability);

33

403

6)   Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services); [sic]

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

a)   discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

b)   explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

c)   obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer. As noted *supra* in the text accompanying note 101, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records from courts, government agencies, the military, employers, etc. can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and

34

children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

2003 ABA Guidelines, Commentary at 1021 (extensive footnotes omitted).

### The Duty to Secure the Assistance of Experts and Provide Them with Data

77. Counsel has an obligation to secure the assistance of experts in a capital case. 1989 ABA Guideline 11.4.1 ("Counsel should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation"); *Sears v. Upton*, 130 S. Ct. 3259, 3264 (2010) (holding trial counsel ineffective, in part, for failing to present expert testimony that could have helped jury better understand defendant in a 1993 capital trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive").

78. "In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row... Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate." 2003 ABA Guidelines 4.1 Commentary at 955-957 (footnotes omitted).

79. The 1994 State Bar Materials also addressed the right to an expert in rebuttal of

future dangerousness. *Id.* at 23–36. The primer explains that *Ake v. Oklahoma*, 470 U.S. 68 (1985), entitles indigent defendants to the assistance of a psychiatrist when sanity or future dangerousness is likely to be a significant factor at trial. Of course, future dangerousness is at issue in every Texas capital prosecution. Thus, *Ake* established "a valuable right because expert testimony plays a major role in almost every capital murder trial." 1994 State Bar Materials at 23; *see also id.* at 26–27 ("a capital defendant in Texas is always entitled to the assistance of a psychiatrist to rebut testimony about future dangerousness because future dangerousness is always a significant aggravating factor at the sentencing phase").

### Experts Must Be Retained at the Right Time

80. The 1994 State Bar Materials included sample motions for expert assistance in preparation for the punishment phase. Those templates note that counsel has conducted a thorough investigation of the defendant's character and background (including reviewing the defendant's school records, prison records, medical records, and interviewing many witnesses), and argue that the available social history information indicates that mental health issues will be at issue in the punishment phase, and that funding for a mental health expert is necessary because the jury must be able to consider mental health evidence "when deciding the ultimate issues in this case." *Id.* at 125-28. Thus, for about twenty years, Texas capital counsel have been taught that a thorough social history must be done *before* selecting experts and the facts of that investigation provided to said experts.

81. Once they have identified and selected appropriate experts, it is the obligation of capital counsel to provide those experts with the information necessary to the formation of their expert opinion. In the case of mental health experts, this means a thorough life history of the client. Dudley & Blume Leonard, *Getting It Right, supra* at 963; *see also* Douglas Liebert and

36

**406**

David Foster, The Mental Health Evaluation in Capital Cases: Standards of Practice, 15:4 AM.

J. Forensic Psychiatry 43 (1994).

82.     Only by first conducting a thorough life history investigation can the defense team

even determine what types of mental health experts are needed:

> All too often, defense teams permit premature and inappropriate mental health evaluations to take place.  Sometimes this includes needless and potentially harmful psychological testing.  For example, unless the client has, or may have, a mental condition that relies on intelligence test scores, it is unnecessary to engage an expert to conduct such testing.

Dudley & Leonard, *Getting it Right*, *supra*, at 975.

83.     Discussions regarding the nature, scope, and timing of mental health evaluations

are often the most difficult and consequential that a capital defense team will have.

> [P]sychological testing of any kind must always be approached with caution— never unless needed, always with full knowledge of its limitations, and in any event only after the mental health professional who has been carefully selected by counsel to do the testing has been thoroughly prepared with the background information necessary to make the testing meaningful.

*Id.*

84.     A mental health expert cannot be expected to extract all the information necessary

for an assessment solely from interviewing the client.  "For example, the defendant often cannot

remember important events from his early childhood and he may be unable to recall subsequent

traumatic experiences." *Id.* at 981.  Before interviewing the client, the expert needs to have

reviewed the life history in order to properly tailor the assessment and form a reliable, informed

expert opinion.  Mental health experts are generally not given the entirety of the life history

investigation, which may easily reach into the tens of thousands of pages of collected records and

memoranda of hundreds of interviews.  Instead, it is the job of the mitigation specialist to

organize the data collected and then provide the experts with relevant life history data.

85.    Frequent, effective communication between defense counsel and the mitigation specialist is necessary for competent assistance of counsel. The mitigation specialist is an integral member of the defense team: "Mitigation specialists remain in frequent contact with defense counsel, use good judgment and initiative in independently following investigative leads, and work closely with other members of the defense team in thoroughly exploring the client's life history." *See* Dudley & Leonard, *supra*, at 974. Since mitigation specialists are bound by attorney-client confidentiality, it is beneficial for the defense team to share information freely with them. Often, the information that mitigation specialists uncover has relevance at the culpability phase as well. "The diligent work of the mitigation specialist is for naught if the results are not effectively communicated to counsel, who in turn makes it accessible to the life-or-death decision-maker". Sean D. O'Brien, *When Life Depends on It*, 36 Hofstra Law Rev. 693, 755 (2008).

86.    Clear, ongoing communication between the defense team and experts is also essential. Mental health experts are working at the direction of the defense team, and so defense counsel must take an active role in selecting experts:

> It is up to counsel to define the purpose of a mental health evaluation, discuss the purpose and scope of the assessment with the expert, explore biases and vulnerabilities of the expert, and conclude that the expert is suited to the case before engaging him.

*Id.* at 976.

87.    Once experts are retained, communication between the *entire* defense team and experts continues to be important. Defense counsel, mitigation specialists, and experts must:

> . . . work together to ensure that the expert's findings are supported by credible evidence, the testimony is comprehensible to the fact finder, everything the expert writes and says is integrated with other evidence, and all of their opinions and testimony relate to the comprehensive mitigation themes put forward by the defense.

*Id.*

## The Duty To Develop & Present A Cohesive Case Theory

88.     As the State Bar Materials noted in 1994, "Once you have assembled everything—both information and records—regarding your client's life, you must create a defense." *Id.* at 22. Counsel should seek to "humanize" the client and "explain as much as possible." *Id.* Because "[f]acts in a vacuum are what prosecutions are made of." *Id.* Counsel's duty during the punishment phase was to "[u]se [their] witnesses to fully develop the picture of a person who is life-worthy." *Id.*

89.     Lead defense counsel must evaluate and synthesize the information gathered by the team into a cohesive and integrated case theory which is suitable for the unique bifurcated nature of capital proceedings. ABA Guideline 10.10.1, Commentary, pg 1047. Taking contradictory positions at guilt/innocence and sentencing causes the defense to lose credibility with the jury and greatly reduce the chances of a life verdict. First phase defenses that "seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma." ABA Guideline 10.11, Commentary, pg 1059.

90.     Accordingly, it is critical that well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Having formulated the relevant case theory "counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument". ABA Guideline 10.10.1, Commentary, pg 1048.

## The Duty to Present All Reasonably Available Mitigating Evidence

91.     In a capital penalty phase, defense counsel is tasked with the duty to "relate [the] client's life story in a way that will make the jury want to give him a second chance on life." Dennis Balske, *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331 (1979).

> [T]he defense must attempt to show that the defendant's capital crimes are humanly understandable in light of his past history and the unique circumstances affecting his formative development, that he is not solely responsible for what he is. . . . Counsel's demonstration that upbringing and other formative influences may have distorted the defendant's personality or led to his criminal behavior may spark in the sentencer the perspective or compassion conducive to mercy.

Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. REV. 299, 344-45 (1983). *See also* Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, CHAMPION, NACDL (Aug. 1985) ("'[E]xplain to the jury how a child who was born into this world innocent developed into the person who committed this terrible crime. . . .'").

> Explaining the client's life, personality, and involvement in the crime goes beyond the diagnosis of a personality disorder to discover and show the jury why this client acts the way s/he does–how all of the factors of his or her life added up to create the person who, at the time of the crime, could commit such a heinous act. There is more to the explanation than presenting evidence of a "bad childhood" . . .

David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, CHAMPION (Aug. 1986).

92.     For these reasons, capital counsel are urged to "present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." Guideline 11.8.6, The Defense Case at Sentencing.

93.     "B. Among the topics counsel should consider presenting are:

> 1. Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays);

40

**410**

2. Educational history (including achievement, performance and behavior), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof;

3. Military service, (including length and type of service, conduct, and special training);

4. Employment and training history (including skills and performance, and barriers to employability);

5. Family, and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence); and other cultural or religion influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services);

6. Rehabilitative potential of the client.

7. Record of prior offenses (adult and juvenile), especially where there is no record, a short record or a record, of non-violent offenses.

8. Expert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing.

C. Counsel should consider all potential methods for offering mitigating evidence to the sentencing entity or entities, including witnesses, affidavits, reports (including, if appropriate, a defense presentence report which could include challenges to inaccurate, misleading or incomplete information contained in the official presentence report and/or offered by the prosecution, as well as information favorable to the client), letters and public records.

D. Counsel may consider having the client testify or speak during the closing argument of the sentencing phase.

1989 ABA Guidelines, 11.8.6 B-D.

94.     Simply put by the 2003 ABA Guidelines, "Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." 2003 ABA Guideline 10.11(L).

**Training for Texas Capital Defense Counsel Prior to Mr. Green's Trial**

95.     Due to the complexity of capital representation and the gravity of the interests at stake, dozens of conferences, seminars, intensive skills workshops, small group bring-your-own case intensive defense colleges and other CLE venues are available to capital counsel around the

41

**411**

country every year, generally at no cost. Many of them are hosted in Texas.

## THE LIFE HISTORY INVESTIGATION PUT INTO PRACTICE

### Mitigation Investigation is a Time Consuming, Painstaking Task

96. A social history cannot be completed in days or weeks. Long before 2010, it was widely accepted among national mitigation experts that a minimal social history investigation requires hundreds of hours. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, CHAMPION (May 1992) at 43-45.

97. As made evident by the 2003 ABA Guidelines, developing and presenting mitigating evidence is a complex and time-consuming process. An effective mitigation investigation requires a meticulous multi-generational biopsychosocial inquiry aimed at understanding who the client is. *See* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 2 U. ILL. L. REV. 323 (1993); Arlene Bowers Andrews, *Social Work Expert Testimony Regarding Mitigation in Capital Sentencing Proceedings*, SOC. WORK 36 (Sept. 1991); Russell Stetler, *Mitigation Evidence in Capital Cases*, CHAMPION, (Jan./Feb. 1999) at 35-40.

98. Russell Stetler, National Mitigation Coordinator for the Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel projects, has noted:

> Developing mitigation evidence through life-history investigation involves hundreds of hours of work - with meticulous attention to detail, painstaking efforts to decode and decipher old records, patience and sensitivity in eliciting disclosures from both witnesses and the client. Even when multiple compelling themes have been identified, the task of presenting the evidence effectively to a jury remains formidable.

Russell Stetler, *Mitigation Evidence in Capital Cases*, CHAMPION (Jan./Feb. 1999) at 39.

99. Mr. Stetler has identified three features of a life-history investigation which render the process laborious. First, the inquiry is multigenerational (to identify genetic

42

412

predispositions, *in utero* exposures, and historic influences of cultures and subcultures). Second, the investigation is multi-disciplinary (to identify biological, psychological, and social factors affecting the client's functioning). Finally, the process is non-linear (in the sense that the end point of the investigation cannot be determined at the beginning). Russell Stetler, *Why Capital Cases Require Mitigation Specialists* (visited Aug. 27, 2002) http://www.nlada.org/Defender/Defender_Technical/Defender_Technical_Publications.

100. It takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. A mitigation investigation necessarily requires delving into sensitive and intimate areas of a client's life. However, it is quite typical for a mitigation specialist to obtain incomplete and superficial information in her initial interviews with the client or other life-history witnesses. Witnesses may be defensive in answering questions about family dynamics, socio-economic status, religious or cultural practices, the existence of intra-familiar abuse, and family history of mental illness. The mitigation specialist's inquiries invade the darkest, most shameful secrets of the client's family – secrets that the family may have spent a lifetime trying to forget or escape. Barriers to disclosure of sensitive information may also include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation. Accordingly, it may take numerous visits to a single witness before meaningful information begins to emerge.

101. As the Texas Court of Criminal Appeals made clear when it reversed a 1997 death sentence in *Ex Parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), it is the duty of capital counsel to overcome these barriers to disclosure. *Id.* at 394. Only with time can an experienced mitigation specialist or investigator break down these barriers, and obtain accurate and

43

**413**

meaningful responses to these sorts of questions. Accordingly, it may take numerous visits to a single witness before meaningful information begins to emerge.

102. There is no substitute for in-person, on the ground investigation. In any capital case, phone interviews are simply not an option because the subject matter involved in establishing a client's life history is so sensitive. Such information is unlikely to be elicited over the phone, and usually requires multiple in-person, face-to-face interviews.

> Don't expect to find out everything in one visit or through one interview. . . . Realize that certain information such as child sexual abuse or drug problems will not be easily shared with a stranger. . . . [Y]ou may need to do repetitive interviews with various family members, especially if there is a good chance that you will use them as witnesses in the sentencing phase.

Jeff Blume, *Investigation in a Capital Case: Telling the Client's Story*, CHAMPION, NACDL (Aug. 1985).

103. Thus, the Mitigation Guidelines require that:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

Mitigation Guidelines, Guideline 10.11(C).

104. For these reasons, it is well understood among capital mitigation specialists that the preliminary life history investigation will require at least 500 hours and often much more. Once that investigation has identified the issues to be brought to experts and themes to be developed, additional time is needed to work with expert and lay witnesses and to prepare evidence to be presented.

### The Nature of Mitigation

105. Mitigation evidence is not developed to provide a defense to the crime or to

44

**414**

challenge evidence of guilt. Nor is it an excuse or explanation for a crime. Instead, it provides a

context for the crime by describing a set of life experiences that inspire compassion, empathy,

mercy and understanding. Unlike insanity and competency, both of which are strictly defined by

statute, mitigation need not involve a mental disease or defect. Indeed, mitigation is anything

that "*might* serve as a basis for a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274,

287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).

106.    Thus:

> Mitigation evidence includes, but is not limited to, compassionate factors
> stemming from the diverse frailties of humankind, the ability to make a positive
> adjustment to incarceration, the realities of incarceration and the actual meaning
> of a life sentence, capacity for redemption, remorse, execution impact,
> vulnerabilities related to mental health, explanations of patterns of behavior,
> negation of aggravating evidence regardless of its designation as an aggravating
> factor, positive acts or qualities, responsible conduct in other areas of life (e.g.
> employment, education, military service, as a family member), any evidence
> bearing on the degree of moral culpability, and any other reason for a sentence
> less than death.

Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty

Cases, Introduction.

107.    In many cases, defendants do suffer mental impairments that may not meet the

legal definition of insanity or incompetence, but are nevertheless powerfully mitigating

disabilities which are given great weight when juries are charged with assessing individualized

culpability. For clients who are psychiatrically disordered or brain damaged, mitigation evidence

may explain the succession of facts and circumstances that led to the crime, and how that client's

disabilities distorted his judgment and reactions.

108.    However, mitigating evidence does not have to have a "nexus" with the crime.

*Tennard*, 542 U.S. at 289.

109.    The Supreme Court has long held that "the Eighth and Fourteenth Amendments

45

415

require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, **any** aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586 (1978).

110.    A through and reliable evaluation does not require a diagnosis.  In fact, a diagnosis of a mental disorder can hurt a capital defendant.  Juries are more likely to vote for life when the defendant has been humanized.  "The more sympathy a juror feels for the defendant, the more likeable he finds the defendant to be, and the more able he is to imagine himself in the defendant's situation, the more likely a juror is to vote for life."  John H. Blume, Sheri Lynn Johnson, Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev, 1035, 1051 (2008). Diagnoses for mental disorders are most helpful in a clinical setting, as a way for one mental health professional to quickly convey to another mental health professional that a patient is suffering from particular symptoms.  "While handy as shorthand between colleagues, this method offers little insight into the cause of the diagnosed condition or the lived experience of the person who is diagnosed, including capital defendants."  Dudley & Leonard, *supra*, at 983. Merely providing a diagnosis of a mental illness or disorder does little to humanize the defendant, and oftentimes creates distance between the jury and the defendant.

### Building a Client's Life History

111.    The life history investigation generally begins with interview of the client.  The defense team must build a relationship of trust with the client from the outset to ensure that he is willing and able to assist the investigation into his life history.  Without building this crucial rapport, it is impossible to ensure that the client will be comfortable enough to be open with the

416

mitigation team about some of the worst experiences of his life.

112. The next step is to conduct a series of thorough social history intake interviews with the client's immediate family for the purposes of identifying potential mitigating themes, securing release of private records and collecting basic life history data.

113. This information is then used to begin the collection of objective, reliable documentation about the client and his family, including medical, educational, employment, social service, and court records. These records provide information regarding the client's life history that no other source may be able to provide, and lead to crucial mitigation themes. For instance, the client or his parents may not see the relevance of reporting the client's fall from a tree at age six, but his medical records may reveal his treatment. The head injury he sustained may develop into a mitigation theme if he has suffered neuropsychological effects as a result. Additionally, such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate.

114. Even the most cursory mitigation investigation in a capital case involves locating a client's elementary and high school records. These records can reveal learning disabilities, behavioral problems, or lack of attendance indicating disruption in a student's home life. They also direct the defense team to further witnesses such as teachers and counselors who can provide a critical and relatively objective viewpoint on the client's childhood development.

115. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in

47

417

turn, needs to be pursued.

116.     Also, it is the general practice to summarize and index all mitigation records, and incorporate new data from the records into a set of master documents. This master timeline and the indexed version of the records are typically provided to consulting and evaluating experts, in order to provide them with the background needed to render an accurate and reliable opinion.

117.     The defense team must also gather demonstrative evidence such as photographs, videotapes and physical objects and/or documents that humanize the client and portray him positively. *See* Mitigation Guidelines, Guideline 10.11(g).

118.     Using the data collected in these initial intake interviews and record collection, mitigators compile a list of potential life history sources, conduct database and records searches to identify and locate them, and then conduct multiple, in person, face-to-face interviews with those individuals. At a minimum, a mitigator should interview all available family members, as well as former teachers, neighbors, co-workers, classmates, co-defendants, cellmates and others who had an opportunity to observe the client's development and provide information critical to expert evaluations, as well as offer lay testimony and historical documentation descriptive of his life history. *See* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1144 (1997).

119.     There is no substitute for in-person, on the ground investigation. In any capital case, phone interviews are simply not an option because the subject matter involved in establishing a client's life history is so sensitive. As noted in the ABA Guidelines' Commentary addressing client interviews, "much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. [Sensitive topics] should therefore not be broached in an initial interview." Such information

48

**418**

may often be equally painful for family members to discuss and likewise will require repeated interviews. Such information is unlikely to be elicited over the phone.

120.     Throughout this process, a mitigator must communicate regularly with appointed counsel, consult with counsel regarding the investigation plan and produce chronologies, memos and other secondary source material to prepare counsel for the presentation of mitigating evidence to decision-makers, including the authorization committee of the District Attorney's Office as well as the court and, potentially, a jury. Guideline 10.11(d) of the Mitigation Guidelines requires the mitigation specialist to prepare documentary evidence of their investigation. These summaries and timelines assist the defense team in understanding the significance of the voluminous life history information obtained from social history records and witness interviews. The guidelines envision preparation of the following: genealogies; social history reports; timelines; and reports on relevant subjects including cultural, socioeconomic, environmental, racial, and religious issues in the client's life.

121.     The minimal social history investigation described in the preceding paragraphs typically requires hours of labor. Because these steps cannot be undertaken simultaneously or out-of-order, the process of developing the bio-psycho-social history as described by the Guidelines and required by the Courts typically requires at least eight to ten (8 – 10) months from the time of the mitigation specialists' appointment.

122.     Once the basic bio-psycho-social history investigation has developed to the point where significant mitigating themes and reliable life history sources have been identified, the mitigation team must then identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist counsel in locating such experts and providing documentary material for them to review. Because psychiatrically disordered or cognitively

49

**419**

impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

123.     Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology, psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; evaluatory experts; and testifying witnesses. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs to conduct a thorough social history investigation. The purpose of the life history investigation is not just to gather evidence to be used by mental health experts but also to identify and develop witnesses who will present that evidence to the jury.

124.     Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as

50

420

"hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (*See, e.g.*, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts). Capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation.

125.    However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities. Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

### Capital Defense Teams Must Pursue the Development of Mitigating Circumstances that Preliminary Investigation Indicates May Be Present

126.    Typically, a preliminary social history investigation will yield "red flags" indicating the likely existence of evidence in support of specific mitigating themes. For example, records may indicate a family history of mental illness that greatly increases the likelihood of the client suffering from the disorder. Or, interviews with family may suggest a history of domestic violence. As the defense team develops a relationship with the client, team members may observe signs and symptoms indicating the likelihood of intellectual impairments, mental illness, developmental delays and other issues.

127.    Once such a "red flag" has been raised so that counsel is on notice that this

evidence is likely to exist, counsel cannot choose not to investigate it. As noted in *Wiggins v. Smith*, 539 U.S. 510 (2003), counsel is ineffective if she "abandon[s her] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. *Cf.* ABA Guidelines, § 11.8.6 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences)." 539 U.S. at 524 (emphasis added).

128. A thorough investigation entails far more than a cursory attempt to locate family members or collecting a few client records. The tools use to search for a person depend entirely on how much information is available to locate them. When looking for individuals pertinent to the investigation, if a full name, rough age and a rough location is available, the individual is usually easy to find with a service such as Accurint, or even the White Pages. If that information is not all available, sometimes it is necessary to gather more information first before searching for the person. In that case, courthouse searches may provide a date of birth, social security number, and current or older address if the potential witness has a criminal history. Likewise, public data such as driver's licenses can provide much of the same information. Other tools such as school yearbooks (especially if looking for a classmate or teacher), Public Information Act requests, licensing boards for doctors, psychologists and psychiatrists, attorneys, and teachers can also provide additional information regarding the potential contact. Once sufficient information has been gathered to narrow down the pool of possible individuals, the mitigation specialist must begin knocking on doors. The threshold for deciding how narrow the pool must be before the "legwork" starts varies depending on the importance of the witness and other fact-specific circumstances. If the witness is extremely important to the case, a mitigation specialist

may be willing to drive to fifteen different houses and knock on doors until he finds them, but if they are not as crucial, he may try to narrow it down to two or three houses.

129. In *Wiggins*, trial counsel were found deficient in their performance, even though they had had their client examined by a mental health expert, because they failed to conduct a complete social history investigation. In *Rompilla*, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. *See Douglas v. Woodford*, 316 F.3d 1079, 1087-89 (9th Cir. 2003) (although counsel did uncover and present some mitigating evidence, his investigation "was constitutionally inadequate" for failing to dig deeply enough into client's social, medical, and psychological background; nor did counsel adequately prepare the penalty phase witnesses in order to present the material that he did have "to the jury in a sufficiently detailed and sympathetic manner").

### When the Preliminary Investigation Suggests Evidence of Mental Illness, It Must Be Investigated Before Decisions Can Be Made

130. The defense team is required to investigation the defendant's mental illness in every case because mental illness is a strong mitigating factor. *See Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009) (IAC where counsel failed to pursue evidence of mental health issues despite knowing about client's suicide attempts and taking of anti-depressants); *Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008), cert. denied, 129 S.Ct. 1579 (2009) (IAC for failure to investigate and present mitigation in relation to client's mental health); *Harries v. Bell*, 417 F.3d 631, 638-39 (6th Cir. 2005) (IAC for failure to investigate and present mitigation evidence including mental illness, troubled childhood, significant physical abuse, carbon monoxide poisoning from suicide attempt, front lobe damage, etc); *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), cert. denied, 541 U.S. 1095 (2004) (IAC for failure to investigate or present

evidence of brain damage affecting client's frontal lobe); *Glenn v. Tate*, 71 F.3d 1204, 1212 (6th Cir. 1995), cert. denied, 519 U.S. 910 (1996) (IAC for failure to develop and present evidence of brain damage due to birth trauma, among other things).

### Evidence of Psychological Trauma Must be Investigated and Developed

131.     Evidence of trauma is mitigating and must be investigated and presented to the jury. *See Van Hook v. Anderson*, 560 F.3d 523 (6th Cir. 2009) (amended opinion) (IAC for failure to investigate mitigation including childhood trauma). [*rev'd* by *Bobby v. Van Hook*, 130 S.Ct. 13 (2009) (per curiam) based on fact that sentencing happened in 1985 but 2003 standards were relied upon]; *Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007) (per curiam) (amended opinion), cert.denied, 128 S.Ct. 882 (2008) (IAC for failure to investigate and present adequate mitigating evidence, including evidence of traumatic experiences in Vietnam.)

### Evidence of Neuropsychological Impairment Must be Investigated and Developed

132.     The results of neuropsychological testing can be critical mitigation evidence so that, once the defense team is on notice that neuropsychological symptoms exist, capital defense counsel is required to pursue it. *See Jones v. Ryan*, 583 F.3d 626 (9th Cir. 2009) (IAC for failure to consult with a neurological expert despite knowledge of difficult birth, head injuries, abuse, and advice from a court-appointed expert that counsel seek neurological testing for client).

### Intellectual Disability (Mental Retardation) Must be Ruled Out

133.     Given the Supreme Court's categorical exclusion of the intellectually disabled from the death penalty, the ABA Guidelines insist on a thorough investigation of mental retardation in every capital case. *See* 2003 ABA Guidelines, commentary to Guideline 4.1 ("The Constitution forbids the execution of persons with mental retardation, making this a necessary

area of inquiry in every case").

### Evidence of Intellectual Impairment Must be Considered and Measured

134.     Even when the categorical exclusion does not apply, evidence of low intellectual functioning is strongly mitigating for capital juries. *See Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's borderline mental retardation); *Jells v. Mitchell*, 538 F.3d 478 (6th Cir. 2008) (IAC for failure to investigate educational history with records of significant impairments and difficulties); *Brownlee v. Haley*, 306 F.3d 1043, 1070 (11th Cir. 2002) (counsel ineffective for failing to "investigate, obtain, or present any mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse").

### The Underlying Causes and the Effects of Addiction Must Be Evaluated

135.     Addiction is a powerful mitigator and must be investigated.  *See Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007) (per curiam) (amended opinion), cert.denied, 128 S.Ct. 882 (2008) (IAC for failure to investigate and present adequate mitigating evidence, including extensive drug use); *Brownlee v. Haley*, 306 F.3d 1043, 1070 (11th Cir. 2002) (counsel ineffective for failing to "investigate, obtain, or present any mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's . . . history of drug and alcohol abuse").

### Evidence of Exposure to Environmental Toxins Must be Investigated and Developed

136.     Evidence of toxic exposure and the neuropsychological consequences is persuasive and mitigating to a capital jury such that it is the duty of defense counsel to pursue it. *See Douglas v. Woodford*, 316 F.3d 1079 (9th Cir.), *cert. denied*, 540 U.S. 810 (2003) (IAC at penalty phase for failing to investigate, among other things, the long-term exposure to toxic

425

solvents while restoring furniture).

### All Alleged Prior Crimes and Bad Acts Must Be Thoroughly Investigated

137.    The defense is also duty bound to investigate prior crimes that may be introduced in aggravation at the penalty phase. *See. e.g.,* 2003 Guideline 1.1, Commentary ("If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate – together with the defense investigator, a mitigation specialist, and other members of the defense team – the defendant's behavior and the circumstances of the conviction."); Guideline 10.7, Commentary ("Counsel must also investigate prior convictions, adjudications, or unadjudicated offenses that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction, adjudication, or unadjudicated offense.").

### The Client's Ability to Function Successfully in Prison Must Be Considered and Evaluated

138.    A capital defendant's conduct in jail awaiting trial and/or in prison during prior incarcerations is an unavoidable issue in the mitigation phase of the trial. *See, e.g.,* ABA Guidelines (2003), n. 275 (citing *Skipper v. South Carolina,* 476 U.S. 1, 4-5 (1986) for the proposition that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence"); *Williams v. Taylor,* 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of, inter alia, defendant's good conduct in prison); Commentary to Guideline 10.11 ("Studies show that 'future dangerousness is on the minds of most capital jurors, and is thus at issue in virtually all capital trials,' whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration. Accordingly, counsel

56

426

should make every effort to present information on this subject. Evidence that the client has adapted well to prison and has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence.")

139.     Investigation of prison life is particularly difficult and time consuming due to lack of access to state-controlled witnesses and records. Once complete prison records are finally obtained and witnesses interviewed (often requiring court orders or subpoenas to depositions where prison officials attempt to block access), defense counsel must seek assistance from consultants with expertise in corrections to properly interpret correctional records and advise the team as to whether expert testimony might be appropriate. If a testifying expert is to be used, he or she will need access to the witnesses and records prior to trial.

### Conclusion

140.     Based upon my own professional experience as a capital defense attorney and mitigation specialist in Texas and my experience training capital defense teams, the prevailing standard of care among capital defense counsel in Texas in 2009-2010 required a minimum core defense team of two attorneys, one fact investigator and a mitigation specialist, and the investigation, development and presentation of a thorough life history. Capital defense teams in 2009 and 2010 were being taught the standards described in the ABA Guidelines and the Supplemental Mitigation Guidelines as outlined above.

427

**Oath and Signature**

I swear upon pain and penalty of perjury that the foregoing statement is true and complete to the best of my knowledge and understanding.

_____
Danalynn Recer

Signed and sworn before me this 18th day of September, 2012,

_____
Notary Public

My commission expires: _10/17/2012_



58

428

W09-59380-S(A)

EX PARTE                    §              IN THE 282 JUDICIAL

                            §              DISTRICT COURT

GARY GREEN                  §              DALLAS COUNTY, TEXAS

## STATE'S MOTION TO EXTEND THE TIME FOR FILING ANSWER TO APPLICATION FOR WRIT OF HABEAS CORPUS

The State of Texas, respondent, by and through the Criminal District Attorney of Dallas County, Texas, respectfully requests that the time for filing its answer in this cause be extended. The State presents the following in support of this motion:

I.

Applicant, Gary Green, is confined pursuant to the judgment and sentence of the 282nd Judicial District Court of Dallas County, Texas. Applicant was convicted of murdering Lovetta Armstead and Jazzmen Montgomery in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced applicant to death on November 5, 2010. Applicant's judgment was affirmed on direct appeal on October 3, 2012. *See Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010 (Tex. Crim. App. Oct. 3, 2012) (not designated for publication).

Applicant filed his original application for writ of habeas corpus on June 15, 2012. The State received notice of the issuance of the writ on August 8, 2012. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 6 (West Supp. 2012). Thus, the State's answer to applicant's original writ application is due December 6, 2012. *See id.* art. 11.071, § 7. As

**429**

authorized by statute, the State requests an additional sixty days, or until February 4, 2013, to file its answer. *See id*. art. 11.071, § 7(a). The State has requested no previous extension of time.

II.

Since applicant filed his writ application, counsel has done the following work:

(1) prepared this case and one other capital case (*Ex parte Juan Lizcano)* for open file review by defense habeas counsel. This required reviewing and culling protected documentation from twenty boxes containing the State's trial records;

(2) filed the State's response in twenty-five non-capital applications for writ of habeas corpus;

(3) filed the State's brief in *Phillips v. State* (Nos. 05-11-01168-CR and 05-11-01169-CR);

(4) served as first-chair counsel in *Ex parte Estevan Espinoza, Jr.* (cause numbers W04-51774-Y(B) and W04-51775-Y(B)), a non-capital writ hearing held on August 15, 2012;

(5) filed the State's Petition for Mandamus in *In Re: Craig Watkins* (05-12-01315-CV) on September 26, 2012;

(6) attended a TDCAA project meeting in Austin on September 27-28, 2012;

(7) served as first-chair counsel in *Ex Parte Juan Lizcano*, a capital writ hearing held November 6-9, 2012 (and to be continued on December 13, 2012); and

(8) completed and submitted a publishing project for TDCAA on November 26, 2012.

The undersigned prosecutor has reviewed applicant's 341-page application. Applicant raises numerous grounds for relief and has attached several exhibits in support of his claims. The undersigned counsel needs the full, statutorily authorized 60-

2

430

day extension in order to thoroughly review the application and exhibits and to investigate the claims.

<center>III.</center>

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the Court extend the deadline for filing its answer to February 4, 2013.

<div style="text-align: right;">Respectfully submitted,</div>

Craig Watkins
Criminal District Attorney
Dallas County, Texas

Jaclyn O'Connor Lambert
Assistant District Attorney
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

<center>3</center>

<div style="text-align: right; font-size: 2em;">431</div>

**ORDER**

Having considered the foregoing motion, the Court hereby (GRANTS) (DENIES) the

requested extension.

                                                  _____

                                                  Judge Andy Chatham
                                                  282nd Judicial District Court
                                                  Dallas County, Texas

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing brief was served on appellant's attorney, Robert Romig, Office of Capital Writs, 1700 N. Congress Ave, Suite 460, Austin, Texas 78711, Robert.Romig@ocw.texas.gov, via email and U.S. Mail on December 3, 2012.

                                                  _____

                                                  Jaclyn O'Connor Lambert

4

432

FILED

2013 FEB -4 PM 4: 23

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
**Melissa Aven** DEPUTY

## No. W09-59380-S(A)

## In the 282nd Judicial District Court
## Dallas County, Texas

---

# EX PARTE GARY GREEN

---

## STATE'S ORIGINAL ANSWER
## TO APPLICATION FOR WRIT OF HABEAS CORPUS
## IN DEATH PENALTY CASE

---

*Counsel of Record:*

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., Lb-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *Fax*

*Attorneys for the State of Texas*

433

## TABLE OF CONTENTS

PROCEDURAL HISTORY ................................................................................ 3

FACTUAL SUMMARY ................................................................................... 4

    *Guilt Phase Evidence* ............................................................................ 4

    *The State's Punishment Evidence* .......................................................... 8

    *Applicant's Punishment Evidence* ......................................................... 13

STATE'S RESPONSE ................................................................................... 18

RESPONSE TO GROUNDS 1-10, 11A, 12, 14C AND 16A: EFFECTIVE ASSISTANCE OF TRIAL COUNSEL ............................................................................................. 18

    Punishment Phase .............................................................................. 19

    Other Portions of Trial ........................................................................ 20

RESPONSE TO GROUNDS 11B, 13, 16B AND 18B: EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ............................................................................................. 21

    Failure to Raise Certain Claims ............................................................. 22

    Failure to Allege Ineffective Assistance of Trial Counsel ............................. 24

    Failure to Appeal Denial of Pretrial Motion ............................................. 25

RESPONSE TO GROUNDS 13 AND 18A: TRIAL COURT ERROR ........................................ 26

    Use of Restraints During Trial .............................................................. 26

        *Procedural Bar* ............................................................................ 28

        *Applicant Was Not Harmed by the Use of Restraints* ............................. 29

    Denial of Pretrial Motion to Preclude Death Penalty ................................. 32

        *Procedural Bar* ............................................................................ *33*

        *The Court Properly Denied the Motion* ............................................. *33*

434

RESPONSE TO GROUNDS 14: MENTAL RETARDATION ....................................................33

RESPONSE TO GROUNDS 15: MENTAL ILLNESS ...........................................................36

RESPONSE TO GROUND 17: JURY SELECTION ...........................................................37

RESPONSE TO GROUNDS 19-20: CHALLENGES TO TEXAS' DEATH PENALTY STATUTE ...........39

PRAYER ....................................................................................................41

CERTIFICATE OF SERVICE ................................................................................42

435

TO THE HONORABLE COURT:

Respondent, the State of Texas, files this original answer to Gary Green's application for writ of habeas corpus filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.

## I.

## **PROCEDURAL HISTORY**

Applicant is confined pursuant to the judgment and sentence of the 282nd Judicial District Court of Dallas County, Texas. Applicant was convicted of murdering Lovetta Armstead and Jazzmen Montgomery in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced applicant to death on November 5, 2010. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West Supp. 2010). On October 3, 2012, the Court of Criminal Appeals affirmed applicant's conviction on direct appeal. *See Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010 (Tex. Crim. App. Oct. 3, 2012) (not designated for publication).

Applicant filed his original application for writ of habeas corpus on June 15, 2012. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 4. The State received notice of the issuance of the writ on August 8, 2012. *See id*. art. 11.071, §§ 6. The State

3

436

requested and received a 60-day extension from the trial court, making its answer

due February 4, 2013. *See id*. art. 11.071, § 7(a).

## II.

## FACTUAL SUMMARY

### GUILT PHASE EVIDENCE

In his statement to police, applicant detailed the facts of the horrific

double-murder he committed on September 21, 2009 at the home he shared with

his wife, Lovetta Armstead. Applicant stated that, the week before the offense, he

had discovered that Lovetta was going behind his back to get their marriage

annulled. The day of the offense, Lovetta wrote applicant two letters telling him

that it was time for them to part ways and that he needed to move out. Applicant

felt betrayed by Lovetta's actions. He wrote a response to Lovetta's letter in

which he detailed his plan to "take five lives" that night, including his own. While

Lovetta was reading the letter, applicant grabbed knives from the kitchen and

then went to the bedroom of Lovetta's daughter, Jazzmen. He told Jazzmen not to

worry as he hog-tied her arms and legs with duct tape and cords, and put duct

tape over her mouth. He then brought Jazzmen into the master bedroom where

Lovetta was and laid her on the end of the bed. He and Lovetta started tussling in

the bathroom and Lovetta tried to break the commode lid over his head, but

4

437

missed. The struggle lasted around an hour and a half and applicant recalled stabbing Lovetta around thirty times. Once Lovetta was dead, applicant took Jazzmen into the bathroom, filled up the tub, and held her underneath the water. She put up quite a fight and applicant had to turn his head away. Once Jazzmen was dead, he pulled her from the tub and laid her face-down onto the floor. He then stepped over her dead body, took a shower, and changed into his dress clothes. (State's Trial Exhibits 6-8, 91-92).

Applicant's plan, however, was not yet complete. He went to church to pick up Lovetta's two sons, JT and Jerrett. When applicant returned home with the boys, he told JT to take a bath because he planned to kill Jerrett while JT was in the bath. He stabbed Jerrett a couple of times, but Jerrett started screaming and his brother came out of the bath. Applicant forced both boys into the bathroom and asked them to give him some reason why he shouldn't kill them. Jerrett told applicant they loved him and respected him and they were too young to die. He also said that applicant did not have to kill them because they were not going to tell anybody about what happened. Because of what the boys said, applicant decided not to kill them. However, he took them into the bedroom to show them the dead bodies of their mother and sister. He then told them that this was goodbye and fled the scene in Lovetta's car. (RR46: 99-127, 132-46).

5

438

At his family's insistence, applicant turned himself into a police substation later that night after allegedly trying to overdose on Benadryl. Applicant was taken to Parkland Hospital to be treated for the ingestion of Benadryl and his superficial stab wounds. He was then returned to Dallas Police Headquarters, where he gave a voluntary oral statement to homicide detective Robert Quirk. During the interview, applicant stated his belief that he was a monster and said that he did not want a trial, he just wanted to tell the judge to give him the death penalty. (RR46: 90-95, 164-70; RR47: 5-17, 25-34; State's Trial Exhibits 91-92).

Applicant's confession was corroborated by the physical evidence and witness testimony. After applicant left the scene of the murder, the boys called 911 and ran next door to the home of their neighbor, Latasha Bradfield. The boys were frantic and Jerrett was injured and bleeding. Latasha took the phone, spoke to the 911 operator and told her that the boys were claiming applicant killed their mother and sister. She then went next door to Lovetta's house and verified that Lovetta was lying on the floor of her bedroom and not breathing. When police arrived at the house, the scene was exactly as described by applicant. The bathroom was covered in blood and the commode lid was broken on the floor. The knives from the butcher block in the kitchen were spread throughout the house, including in the boys' bathroom, the master bathroom, and master

6

439

bedroom. Lovetta's body was found on the floor of the master bedroom. Jazzmen, whose body was still wet, was found lying face-down on the floor of the master bathroom next to the tub. The officers found applicant's handwritten note lying on the bed in the master bedroom, and later found Lovetta's two handwritten notes under the mattress in the master bedroom. (RR46: 48-58, 59-77, 80-88, 148-63; RR47: 78-81).

DNA testing of the fingernail clippings and vaginal swab collected from the body of Lovetta matched that of applicant. Medical Examiner Dr. Jill Urban found 25 stab wounds on the body of Lovetta and ruled her manner of death a homicide. Dr. Urban testified that applicant's confession that he stabbed Lovetta nearly 30 times was consistent with her clinical findings as contained in the autopsy report. Medical Examiner Dr. Meredith Lann also ruled Jazzmen's manner of death a homicide. She testified that applicant's confession that he held Jazzmen's head in a tub full of water and drowned her was consistent with her findings. She also stated that putting together the hemorrhage below Jazzmen's ponytail, the hemorrhage to her left back area, and the injuries to her mouth and lip, it would be consistent to conclude that applicant pressed down on the back of Jazzmen's head and her left shoulder and held her under the water, possibly even

7

making contact with the bottom of the bathtub, until she drowned. (RR47: 83-90, 97-107, 110-121).

### THE STATE'S PUNISHMENT EVIDENCE

At punishment, the State first presented evidence of applicant's past criminal history and bad behavior while in prison. Dallas Police Officer Ray Cunningham testified about a drug possession offense committed by applicant on July 28, 1989. Applicant ran when he saw Officer Cunningham and his partner patrolling the area, but he was apprehended and found to have in his possession a large bag containing 13 individually wrapped baggies of crack cocaine. Applicant pled guilty to unlawful possession of cocaine and received probation, but he was later revoked and sentenced to four years' imprisonment. (RR49: 25-29; CR1: 53; State's Trial Exhibit 141).

Joseph Johnson, Jr., testified about an aggravated robbery committed by applicant against his former employer, County Fair Food Store, in 1990. Johnson was the store manager at that time and hired applicant shortly after he was released from prison because he wanted to give applicant a chance to turn his life around. However, after only a week of employment, he was forced to fire applicant for lying about his absence from work. About a week later, the store was robbed at gunpoint. In May of 1990, applicant gave a voluntary statement in

8

441

which he confessed that he and two other men robbed the County Fair Food Store at gunpoint. In June of 1990, applicant pled guilty to aggravated robbery and was sentenced to twenty years' imprisonment. (RR49: 71-75, 85-97; CR1: 53; State's Trial Exhibits 140 and 147). When applicant was considered for release onto parole in 1992 and asked about this aggravated robbery, applicant told the parole officer, "I was young and I wanted to see if I could do it." He also stated that he committed the robbery for a "thrill" and that "revenge for being fired could have been a factor." (RR49: 78-79, 81). Applicant also told his aunt, Shirley Coleman, that the robbery of the County Fair Food Store was not the only robbery he had committed. (RR51: 44-45).

Kevin Ashford, a former correctional officer, testified that he was assaulted by applicant on January 9, 1994, when applicant was an inmate in TDCJ. Ashford was working in the chow hall and directed applicant to sit at a particular table. Applicant became aggressive and refused. When Ashford asked him to step into the hall, applicant threw his food tray at Ashford, hitting him in the midsection, and then charged towards Ashford. Ashford initiated a use of force and still had to obtain assistance from another guard to gain control of applicant, wrestle him to the ground, and handcuff him. (RR50: 6-14; State's Exhibit 158).

9

442

The State also presented evidence of applicant's abusive and manipulative behavior towards his previous girlfriends. Jennifer Alcorn Wheeler, applicant's high school sweetheart, testified that she broke up with applicant in May of 1989. Three months later, on August 6, 1989, she saw him at a bus stop on her way to work and agreed to give him a ride home. When they got to applicant's house, he forced her into the passenger seat and took her to a nearby park, where he brutally assaulted her. Jennifer does not remember much about the assault, other than begging applicant not to do it and telling him that she loved him. The next thing she remembered was waking up in the hospital and learning that she had stabs wounds on her chest, ligature marks on her neck, black eyes, a swollen jaw and chest, and was missing a tooth. Applicant pled guilty to aggravated assault and was sentenced to four years in prison. (RR49: 31-44; CR1: 53; State's Exhibit 141). When applicant was asked by his aunt, Shirley Coleman, why he had beat up and tried to strangle Jennifer to death, applicant told her that Jennifer was a "fatal attraction." (RR51: 32-33).

Belinda Lacy, a former correctional officer, testified that she met applicant while he was incarcerated and they became romantically involved. Belinda quit her job, visited applicant regularly and wrote favorable letters to the parole board on his behalf. When applicant was released onto parole in 2000, he and Belinda

were married two weeks later. However, shortly after the wedding, applicant abandoned Belinda and stopped staying at the house where they were residing. After about six weeks of marriage, Belinda moved out and returned to her family in East Texas. (RR49: 103-12).

Shulonda Ransom testified that she started dating applicant in 2000 and that they had a son together in October of 2001. When Shulonda was five months pregnant with their first child, Gary, Jr., applicant began abusing her. According to Shulonda, anything would set applicant off, like if she did not "cook right" or did not clean up when he wanted her to. The final incident of abuse occurred when she was pregnant with their second child, Meionni. Applicant and Shulonda were fighting because applicant was unhappy about her returning to work. Applicant chased Shulonda into the bathroom, held her over the sink and choked her until she passed out. She woke some time later and went to work, but she came home that night to find that applicant had stolen everything from their apartment, including their baby's bed, diapers and clothes. Shulonda later learned that, while she was pregnant, applicant was cheating on her and had impregnated other women. Shulonda sued Gary for child support, but he owed $23,000 and never paid, so she just stopped asking for it. (RR49: 123-31).

11

444

Ruth Lyons testified about an incident of violence by applicant against Lovetta prior to the murders. Shortly after Lovetta moved into her house on Morning Springs Trail, Ruth came to live with her for about six months. In early 2008, Jerrett told Ruth about an incident of violence he had seen between applicant and Lovetta. Ruth confronted applicant about the violence and asked him, "Did you put your hands on Vetta?" When applicant admitted that he had, Ruth told him that if he ever put his hands on anyone else in that house she would kill him. Applicant apologized and started crying. (RR50: 94-113).

Melodye Nelson, a 21-year veteran of TDCJ, testified as an expert on the prison system in Texas. Warden Nelson testified generally about the types of facilities, the number of inmates and guards statewide, and how inmates are classified within the system. She explained that inmates on death row and in administrative segregation are housed in single cells, have limited recreation time and are restrained and escorted by armed guards anywhere they go within the prison. She stated that if a defendant is convicted of capital murder and receives a sentence of life imprisonment without parole, that offender would go into the general population and automatically be classified as a G3. An inmate classified as a G3 can work, go to school, go to the library, recreate and eat with all other inmates in the general population. She explained that G3's are also allowed

12

445

contact visits once they obtain a certain level of good time credit. Warden Nelson testified that, no matter what level of supervision an inmate has, if he wants to commit an act of violence he has the chance to do it. (RR50: 26-42).

Last, the family testified briefly about how Lovetta and Jazzmen's deaths have impacted their lives. (RR50: 114-16, 117-19, 119-23, 123-24).

### APPLICANT'S PUNISHMENT EVIDENCE

Shirley Coleman, applicant's aunt, testified about applicant's family and their history of mental illness. Shirley's oldest sister, Mary, is applicant's mother. According to Shirley, Mary was not always as attentive to her children as she should have been. Shirley recalled that Mary had a nervous breakdown and had to be hospitalized, but she could not remember when. Shirley stated that her and Mary's mother, Bertha Curry, has been taking medication for mental illness for as long as she can remember and that she did not have a good relationship with Bertha because of her mental issues. Shirley listed several of applicant's family members believed to have some sort of mental illness. With regards to applicant, she stated that he was not the same when he got out of prison the second time. He did not seem to have any friends, just girls, and he treated those girls poorly. When he married Belinda, he used Shirley's place to entertain all of his

13

446

mistresses. During this time, he had four more children within about a year and a half time span and never paid child support to any of the mothers. (RR51: 9-31).

Lenelle Williams, applicant's ex-girlfriend of two years, testified generally about applicant's behavior and demeanor when they dated. According to Lenelle, applicant worked and would help her take care of her four grandkids when they came to visit. She claims that he did not drink, go out or bring friends to the apartment, and that he preferred to spend time alone. Lenelle recalled the following strange behaviors and statements by applicant: he would mumble at the television; he told her he heard rats in the walls; and he told her that vampires were among them and that a vampire followed him home from school once when he was younger. Lenelle and applicant remained friends after their breakup and he stayed with her occasionally when he and Lovetta were fighting. Applicant called Lenelle several times the weekend before the murders and told her he was "stressed." Lenelle was shocked when she heard about the murders because that was not the applicant she knew. (RR51: 54-89).

Mary Sampson, applicant's mother, testified generally about her family, the abuse she suffered from her ex-husband, and her family's history of mental illness. She testified that she was "stressed" and was treated for mental illness when she was pregnant and after her brother died. She recalled that applicant, as

14

447

a child, stayed to himself, did not have a lot of friends and had a hard time completing work. When applicant was in middle school, he climbed on top of the elementary school and said he was going to jump, but his aunt talked him down off of the roof. From that point on, applicant was constantly complaining that he was "stressed" and that no one understood him. He would never sit with his back to a door, always had a bat with him and always thought people were talking about him and were out to get him. At some point during his relationship with Lovetta, Mary learned that applicant had checked himself into a mental hospital. When he called her from the hospital, he told her that he had committed himself because he had just "got to the end of his rope." He also told her that he wanted to go to sleep and never wake up. According to Mary, applicant has expressed remorse when she has visited him in jail. (RR51: 100-35).

Bertha Curry, Mary's mother and applicant's grandmother, testified that she did not think applicant was a "normal" child. Applicant preferred to play by himself, and when he was eight or nine years old, he would cry and say that he did not want to live. She recalled one instance where he pulled a snake from its nest and bit its head off. Bertha testified that she has been taking medication for depression and anxiety for 16 years. (RR51: 166-79).

15

448

Dr. Kellie Gray-Smith was called to testify as an expert on special education and the multicultural aspects of psychology. She testified that the African-American community seeks diagnosis and treatment for behavior problems and mental health issues far less than other cultures do. Dr. Gray-Smith also testified that there are genetic factors and genetic links for many mental illnesses. She explained that when there is a hereditary link within a family of individuals suffering from mental illness, oftentimes the individuals will fail to seek out treatment because their symptoms are seen as normal or as part of what the family is and how the family solves problems and copes with stressors. Dr. Gray-Smith examined the school records of applicant and testified that they reflect chronic school failure. Based on her training and experience, Dr. Gray-Smith believes that such chronic failure was likely due to either a learning disability or a mental problem. (RR51: 194-224).

Dr. Gilbert Martinez, a licensed psychologist, was hired by the defense to test applicant's cognitive, intellectual and emotional functioning. Dr. Martinez examined applicant's medical records, interviewed applicant's mother and brother, conducted a 2-hour interview with applicant, and then administered a battery of psychological and neuropsychological tests on applicant. With regard to his cognitive and intellectual functioning, applicant had an IQ level of 78, which

16

449

falls in the "borderline" range of IQ scores. According to Dr. Martinez, applicant has some "attentional" problems, but he does not have any kind of severe cognitive disturbance or formal learning disability and he is not mentally retarded. With regard to applicant's emotional functioning, Dr. Martinez diagnosed applicant with schizoaffective disorder, bipolar type. He explained that a person suffering from this disorder will have episodes of severe depression and intense sadness, and episodes of irritability or agitation; they will be unmotivated; they will have difficulty sleeping; and they will be paranoid or delusional. Dr. Martinez did not diagnose applicant with a specific personality disorder, but did diagnose him with having features of paranoid personality disorder, borderline personality disorder, and avoidant personality disorder. After sitting in the courtroom throughout the trial and hearing the testimony, Dr. Martinez formed the opinion that applicant also met the criteria for antisocial personality disorder. On cross-examination, Dr. Martinez clarified that applicant is not schizophrenic, bipolar or mentally retarded. (RR52: 5-69).

Applicant's brother, Nysasno Carter, testified that he has believed that applicant is mentally ill since they were little. As a child, applicant always talked about death, would say he heard things, did not have a lot of friends and kept to himself. Nysasno tried to talk his mother about his concerns regarding applicant,

17

450

but she brushed him off. Nysasno talked to applicant about his mental health issues about six months prior to the offense. Applicant told Nysasno that he was stressed, was hearing voices, and did not have anything to live for. Nysasno encouraged him to pray, and they talked about him going to see a psychiatrist. When Nysasno visited applicant in jail prior to trial, applicant told him that he is still hearing voices, specifically Lovetta's voice telling him that she forgives him. Applicant admitted to Nysasno that he murdered Lovetta, but would never admit to him that he killed Jazzmen. (RR52: 131-54).

<div align="center">

III.

### STATE'S RESPONSE

#### RESPONSE TO GROUNDS 1-10, 11A, 12, 14C AND 16A: EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

</div>

In grounds 1-10, 11A, 12, 14C and 16A, applicant contends that he was denied effective assistance of trial counsel. *See applicant's writ at 31-214, 220, 229, 246, 284 and 296.*

The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*,

<div align="center">18</div>

<div align="right">451</div>

726 S.W.2d 53, 57 (Tex. Crim. App. 1986). To prevail on a claim of ineffective assistance of counsel, applicant must prove by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the results of the proceedings would have been different in the absence of counsel's errors. *See Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (explaining the standard under *Strickland*).

Effective assistance of counsel does not mean errorless counsel. *See Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). To prevail on a claim of ineffective assistance, the applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005). This highly deferential review is applied to avoid "the distorting effect of hindsight." *Id.* (quoting *Strickland*, 466 U.S. at 689).

### (i) Punishment Phase

Applicant first contends that he was denied effective assistance of counsel during the punishment phase of his trial. Specifically, in grounds 1-8, applicant contends that trial counsel was ineffective in the following ways: (1) counsel failed to meet minimum standards in investigating and developing mitigation

19

452

evidence in support of a life sentence; (2) counsel failed to properly investigate and prepare lay witnesses who testified at punishment; (3) counsel failed to investigate and present evidence from additional witnesses that would have benefitted applicant's mitigation case; (4) counsel failed to develop and present sufficient expert testimony at punishment; (5) counsel failed to present a full history of applicant's life at punishment; (6) counsel failed to present the testimony of a competent social historian at punishment; (7) counsel failed to rebut aggravating evidence presented by the State at punishment; and (8) counsel failed to present evidence that applicant would not be a future danger. *See applicant's writ at 31-214*. Additionally, in ground 14C, applicant contends that he was prejudiced by counsel's failure to present evidence of his mental retardation and/or his low mental functioning as a mitigating factor. *See Applicant's writ at 284*.

### (ii) Other Portions of Trial

In grounds 10, 11A, 12 and 16A, applicant contends that he was denied effective assistance of counsel during the other portions of his capital trial. Specifically, he claims trial counsel was ineffective in the following ways: (1) counsel failed to rebut the State's evidence at the guilt-innocence phase by presenting available testimony which would have shown that applicant's actions

were motivated by mental illness rather than malice; (2) counsel failed to preserve a complete record of the trial; (3) counsel's deficient preparation for trial led counsel to abandon applicant's interests in order to protect his own, creating a conflict of interest; and (4) counsel failed to select an impartial jury. *See applicant's writ at 220, 229, 246 and 296.*

The State believes that further factual investigation is necessary to determine the merit, if any, to applicant's instant claims of ineffective assistance of trial counsel. The State requests that this Court issue an order designating issues to be resolved by affidavits, depositions, interrogatories, or evidentiary hearing. Pending production of evidence substantiating applicant's claim, the State denies applicant's allegations.

### RESPONSE TO GROUNDS 11B, 13, 16B AND 18B: EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In grounds 11B, 13, 16B and 18B, applicant contends that he was denied effective assistance of appellate counsel. *See applicant's writ at 241, 267 n. 36, 301, 312.*

The Sixth Amendment entitles a criminal defendant to effective assistance of counsel when pursuing a first appeal of right. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Similar to an ineffective assistance of trial counsel claim, a defendant

454

asserting that his appellate counsel was ineffective must satisfy the standard set out in *Strickland. See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694); *Ex parte Santana*, 227 S.W.3d 700, 705 (Tex. Crim. App. 2007). *Strickland* requires the defendant to show both that counsel's performance was deficient and that this deficient performance prejudiced the defense. *Santana*, 227 S.W.3d at 705 (*citing Strickland*, 466 U.S. at 687). In the appellate context, the defendant must first show that his counsel was objectively unreasonable, for example, in failing to raise arguable issues on appeal. *See Robbins*, 528 U.S. at 285. If he succeeds in such a showing, he must then demonstrate prejudice to his defense. *Id*. In other words, he must show a reasonable probability that, but for his counsel's failure, he would have prevailed on his appeal. *Id*. at 285-86. The presumption of effective assistance of counsel will only be overcome when the ignored issues are clearly stronger than those presented by the counsel on appeal. *Id*. at 288.

### (i) Failure to Raise Certain Claims

In ground 11B, applicant contends that appellate counsel was ineffective for failing to raise the issue of preserving the record on appeal. *See applicant's writ at 241*. Additionally, in a footnote in ground 13, applicant contends that appellate counsel was likewise ineffective for failing to challenge the trial court's

use of restraints on applicant. *See applicant's writ at 267 n. 36.*

However, applicant has not shown that counsel was deficient for failing to raise these issues. Appellate counsel need not raise all possible claims on appeal in order to be effective; rather, appellate counsel should "examine the record with a view to selecting the most promising issues for review." *Jones v. Barnes,* 463 U.S. 745, 752, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). As the United States Supreme Court reasoned,

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . "Usually, . . . if you cannot win on a few major points, the others are not likely to help . . . ." This has assumed a greater importance in an era when oral argument is strictly limited in most courts--often to as little as 15 minutes--and when page limits on briefs are widely imposed. . . . For judges to second-guess reasonable professional judgments and impose on [appellate] counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy.

*Id.* at 751-54, 103 S. Ct. at 3313-14.

The record reflects that applicant's appellate counsel filed a 125-page brief presenting 46 issues for review on direct appeal. Counsel also requested and presented oral argument before the Court of Criminal Appeals in applicant's case. Counsel's brief raised many necessary issues and contained cogent argument on applicant's behalf with appropriate citations to authority. There is simply nothing

456

in the record indicating that appellate counsel's performance fell below an objective standard of reasonableness. The fact that applicant and his habeas counsel would choose to raise additional or different claims does not show applicant received ineffective assistance of counsel. *See Miniel v. State*, 831 S.W.2d 310, 325 (Tex. Crim. App. 1992). Moreover, applicant has now shown that the issues presented in the instant writ are any stronger than those selected and presented by appellate counsel or that they would have been successful if raised on appeal. As such, applicant has not overcome the presumption of effective assistance. *See Robbins*, 528 U.S. at 288, 120 S. Ct. at 765. Therefore, these claims are without merit and should be denied.

### (ii) Failure to Allege Ineffective Assistance of Trial Counsel

In ground 16B, applicant contends that appellate counsel was ineffective for failing to raise on direct appeal the issue of ineffective assistance of trial counsel in jury selection. *See applicant's writ at 301*. However, the Court of Criminal Appeals has repeatedly asserted that the record on direct appeal is often inadequate to address a claim of ineffective assistance asserted against trial counsel. *See, e.g., Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004); *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003); *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Therefore, claims of ineffective

24

457

assistance should rarely be brought on direct appeal. *See Bone*, 77 S.W.3d at 835. Habeas corpus is the more appropriate vehicle for asserting a claim of ineffective assistance. *See Rylander*, 101 S.W.3d at 110 (citing *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)). Appellate counsel's decision not to assert this claim of ineffectiveness against trial counsel was an exercise of sound strategy. Accordingly, this claim is without merit.

### (iii)    Failure to Appeal Denial of Pretrial Motion

In ground 18B, applicant contends that appellate counsel was ineffective for failing to appeal the trial court's erroneous denial of his pretrial motion to preclude the death penalty. *See applicant's writ at 312*. This motion raised the issue that jurors, as lay persons, are not in the position to accurately judge whether a person is likely to commit acts of violence in the future. (CR: 344-48).

The trial court properly denied this pretrial motion. (RR36: 4). The United States Supreme Court has held that "the likelihood of a defendant's committing further crimes is a constitutionally acceptable criterion for imposing the death penalty." *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983). Moreover, the Court of Criminal Appeals has also rejected this same argument in previous cases. *McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993); *Joiner v. State*, 825 S.W.2d 701, 709 (Tex. Crim. App. 1992). Just as trial counsel is not deficient for failing to

458

make a futile objection that has no merit, appellate counsel is not deficient for failing to assert a non-meritorious claim on appeal. *See, e.g., Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (reasonably competent counsel need not perform a useless or futile act such as requesting a jury instruction to which the defendant is not legally or factually entitled); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (counsel not required to engage in the filing of futile motions). Moreover, applicant cannot show that he was prejudiced. Because the motion was properly denied and would have been again properly denied on appeal, applicant's was not prejudiced by counsel's failure to raise it on direct appeal. Therefore, this claim is without merit and should be denied.

### RESPONSE TO GROUNDS 13 AND 18A: TRIAL COURT ERROR

### (i) Use of Restraints During Trial

In ground 13, applicant contends that the Court abused its discretion by shackling him during trial. *See applicant's writ at 262*. In support of this complaint, applicant attaches affidavits from two jurors. *See Applicant's Exhibits 17 and 18*. These jurors recall seeing applicant in leg and/or hand restraints at some point during the proceedings, but they do not remember exactly when or how many times. *Id*.

26

459

The United States Supreme Court has recognized that a criminal defendant has the right to be tried without the use of restraints. *See Deck v. Missouri*, 544 U.S. 622, 630-31 (2005). The Supreme Court noted that restraining a defendant during trial proceedings threatens the defendant's presumption of innocence, right to a fair trial, and ability to effectively communicate with counsel. *Id*. Despite this general rule, courts recognize that it may be necessary for certain defendants to be restrained in exceptional circumstances. *See id*. at 629; *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). Prior to the use of shackles, however, a trial court must make a specific finding that they are necessary for reasons particular to a given case. *See Deck*, 544 U.S. at 627. The decision to use physical restraints must be made by the trial court on a case-by-case basis, and the use of such restraints will necessitate reversal only where the decision constitutes an abuse of discretion and results in harm. *Cooks v. State*, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992).

It is clear from the record that the trial court took measures to maintain security in the courtroom during the course of applicant's capital murder trial while still protecting his constitutional rights. (RR45: 33-37). Based on trial counsel's statements at a pretrial hearing, it appears that applicant was shackled during voir dire but that the Court took steps, at counsel's request, to make sure

27

460

that potential jurors were not aware of this fact. (RR45: 35). As for the rest of the proceedings, there is no indication in the record that applicant was shackled. The record also contains no other discussions or objections by counsel regarding applicant being shackled or otherwise restrained during his trial.

### *Procedural Bar*

This claim is procedurally barred for two reasons. First, applicant did not make an objection on the record at any time during his trial to the use of these alleged restraints in the jury's presence. Applicant's failure to object waived any error. *See* Tex. R. App. P. 33.1(a); *Taylor v. State*, 279 S.W.3d 818, 821 (Tex. App.—Eastland 2008) (holding that the defendant's failure to object to the use of restraints at his trial waived a subsequent due process complaint); *Cedillos v. State*, 250 S.W.3d 145, 150 (Tex. App.—Eastland 2008, no pet.) (same); *see also Estelle v. Williams*, 425 U.S. 501, 513 (1976) (holding that the defendant's failure to object to being tried in prison clothes waived error).

Additionally, applicant failed to raise this issue on direct appeal. It is well-settled that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal. *See Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991); *Ex parte Groves*, 571 S.W.2d 888, 890 (Tex. Crim. App. 1978). Since applicant should have presented this claim on direct

461

appeal, yet did not do so, applicant is procedurally defaulted from presenting this claim in the instant habeas application. *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998) (op. on reh'g).

### Applicant Was Not Harmed by Use of Restraints

Even if this Court were to entertain applicant's complaint, it is without merit. When a defendant complains of the use of shackles, the reviewing court first determines if the trial court abused its discretion by allowing the defendant to be shackled. If so, the reviewing court then determines whether the defendant suffered harm as a result. *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). In this context, courts have identified three ways a defendant can be harmed by the use of restraints: (1) prejudice felt by jurors who conclude that, because a defendant is shackled, the court has already decided that he or she is guilty, dangerous, and untrustworthy, (2) a restraint may interfere with the defendant's mental faculties and ability to communicate with counsel during trial, and (3) restraints are an affront to a court and its proceedings. *See Ziolkowski v. State,* 223 S.W.3d 640, 644 (Tex. App.—Texarkana 2007); *Cox v. State*, 931 S.W.2d 349, 353 (Tex. App.—Fort Worth 1996).

Because this error has constitutional implications, the reviewing court must reverse unless it determines, beyond a reasonable doubt, that the error did not

29

462

contribute to the conviction. *See* Tex. R. App. P. 44.2(a). When performing a harm analysis under Rule 44.2(a), courts may consider the following factors: (1) the nature of the error, (2) whether the error was emphasized by the State, (3) the probable collateral implications of the error, and (4) the weight the jury would likely have assigned to the error in the course of its deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). These factors are not exclusive; many other considerations may logically serve to inform a proper harm analysis in a given case. *Id.* The Court of Criminal Appeals stressed in *Snowden* that the prevailing consideration in reviewing constitutional error is whether the error contributed to the verdict. *Id.*

Here, there is some evidence from juror affidavits that applicant was shackled during the proceedings, but it is unclear to what extent and during what stage of the proceedings it occurred. The record is devoid of any specific findings of facts by the trial judge justifying the use of restraints. However, even assuming that the trial court abused its discretion by using restraints, applicant has failed to show that this error contributed to the verdict in his case.

The State acknowledges that the nature of the error is serious in that it violates well-established constitutional rights. Nevertheless, the other *Snowden* factors weigh against a finding of harm. Nowhere in the record was this error

30

463

emphasized by the State. In fact, the record seems to reflect that none of the parties where even aware of the error, as no mention is made of it by any party. Clearly, the State did not emphasize the error or seek in any way to benefit from the error. This factor weighs strongly in favor of a finding that the error is not harmful. *See, e.g., Bell v. State*, 356 S.W.3d 528, 538-539 (Tex. App.—Texarkana 2011, pet. granted).

Additionally, there is no evidence in the trial record or in the instant writ showing that the alleged error had any collateral consequences or that the jury gave it any weight during their deliberations. There is no evidence that the jury took the shackles to be a comment by the trial court on applicant's guilt, danger, or trustworthiness. The juror affidavits do not suggest in any way that the restraints impacted their decision regarding applicant's guilt or punishment. *See, e.g, Clark v. State*, 717 S.W.2d 910, 919 (Tex. Crim. App. 1986) (holding defendant was not harmed by the fact that jurors saw him in hand restraints where there was no evidence that it was discussed by the jurors or that it affected their decisions on guilt or punishment). Indeed, it was applicant who obtained affidavits from the jurors and he could have included the impact, if any, the restraints had on the jury's deliberations. The absence of this information in the affidavits demonstrates that it had no impact and weighs heavily against a finding

31

464

of harm.

Furthermore, there is no evidence or argument presented showing that applicant was hampered in his ability to communicate with his trial attorney. *See, e.g., Yglesias v. State*, 252 S.W.3d 773, 778 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (finding no harm in shackling of defendant where court could conclude from the record beyond a reasonable doubt that the shackles did not unduly interfere with the defendant's ability to communicate with his trial counsel).

The Texas Court of Criminal Appeals has instructed that a reviewing court's inquiry must be focused on whether the error may have contributed to this defendant's conviction. *See Snowden*, 353 S.W.3d at 822. In light of the foregoing considerations – taken together with the overwhelming evidence of guilt, the heinousness of applicant's crimes and the evidence of his future dangerousness – it is clear that the alleged error did not contribute to the judgment in this case. Accordingly, applicant was not harmed by the Court's use of restraints, and this claim should be denied.

### Denial of Pretrial Motion to Preclude Death Penalty

In ground 18A, applicant contends that the trial court erred in failing to grant his pretrial motion to declare the death penalty unconstitutional. *See applicant's writ at 312*. This motion raised the issue that jurors, as lay persons, are

465

not in the position to accurately judge whether a person is likely to commit acts of violence in the future. (CR: 344-48).

Applicant's claim is procedurally barred because it was not raised on direct appeal. It is well-settled that habeas corpus should not be used to litigate matters which should have been raised on direct appeal. *See Goodman*, 816 S.W.2d at 385. Since applicant should have presented this claim on direct appeal, yet did not do so, applicant is procedurally defaulted from presenting this claim in the instant habeas application. *See Gardner*, 959 S.W.2d at 199.

In any event, applicant's claim is without merit. As previously discussed in ground 18B, both the United States Supreme Court and the Court of Criminal Appeals has rejected this argument in previous cases. *See Barefoot v. Estelle*, 463 U.S. 880, 896 (1983); *see also McBride v. State*, 862 S.W.2d 600, 611 (Tex. Crim. App. 1993); *Joiner v. State*, 825 S.W.2d 701, 709 (Tex. Crim. App. 1992). Because applicant presented no new arguments for the trial court to consider, the motion was properly denied. As such, the instant habeas claim is without merit.

### RESPONSE TO GROUND 14: MENTAL RETARDATION

In ground 14, applicant contends that he is mentally retarded and thus ineligible for the death penalty pursuant to *Atkins v. Virgina*, 536 U.S. 304 (2002). *See applicant's writ at 271.*

33

466

In *Atkins*, the United States Supreme Court held that it is unconstitutional to execute one who is mentally retarded. 536 U.S. at 321. The Court left to the individual states the job of establishing the substantive and procedural mechanisms to implement that holding. *Id.* In Texas, courts follow the judicial guidelines established by the Court of Criminal Appeals in *Ex parte Briseno* in addressing *Atkins* claims. 135 S.W.3d 1, 5 (Tex. Crim. App. 2004). As outlined in *Briseno*, mental retardation is defined as a disability characterized by: (1) significantly subaverage general intellectual functioning, generally defined as an IQ of about 70 or below; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Id.* at 7.

Prior to trial, the defense retained neuropsychologist Dr. Gilbert Martinez to evaluate applicant's cognitive, intellectual and emotional functioning. (RR52: 5-6, 13-14). Dr. Martinez examined applicant's medical records, interviewed applicant's mother and brother, conducted a 2-hour interview with applicant, and administered a battery of psychological and neuropsychological tests on applicant. (RR52: 14-15). Dr. Martinez administered the WIAS-IV to applicant and he achieved a full scale IQ of 78. (RR52: 21-22).[1] Although this score falls within

---

[1] The State also pointed out on cross-examination that applicant received an IQ score of 105 when he was previously incarcerated. (RR52: 69-70).

34

the "borderline" range of IQ scores, Dr. Martinez specifically found and testified at trial that applicant is not mentally retarded. (RR52: 22, 24-26, 30, 67-68). Applicant relies on this same IQ score of 78 to assert his current mental retardation claim.

Applicant's *Atkins* claim is procedurally barred. *Atkins* was decided in 2002, well before applicant's trial in 2010. Applicant shows no reason why he could not have presented his claim sooner. Indeed, applicant could have presented this issue to the State or the Court prior to trial in an attempt to remove the death penalty as a possible punishment. Likewise, he could have submitted this issue to the jury to consider as a special issue or as a mitigating circumstance that warranted a life sentence. Applicant did neither. As such, he forfeited his right to raise this complaint in these post-conviction proceedings. *See Anderson v. State,* 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (numerous constitutional rights may be forfeited for purposes of appellate review unless properly preserved); *See Ex parte Bagley*, 509 S.W.2d 332, 334 (Tex. Crim. App. 1974) (failure of a defendant to pursue vindication of a constitutional right at the time of trial constitutes a waiver of the position on habeas); *Ex parte Boyd*, 58 S.W.3d 134, 136 (Tex. Crim. App. 2001) (the writ of habeas corpus may not be used to litigate matters that could have been raised at trial and on direct appeal).

35

468

## RESPONSE TO GROUND 15: MENTAL ILLNESS

In ground 15, applicant contends that his mental illness makes him ineligible for a death sentence under the Eighth Amendment and the reasoning in *Atkins*. *See applicant's writ at 290*. However, applicant raised this identical point on direct appeal and it was rejected by the Court of Criminal Appeals. *See Green v. State*, 2012 Tex. Crim. App. Unpub. LEXIS 1010, at *89-90 (Tex. Crim. App. Oct. 3, 2012) (not designated for publication). Issues which have been raised and rejected on direct appeal are not cognizable on habeas. *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984).

In any event, this claim is wholly without merit. There is no authority from the Supreme Court or the Court of Criminal Appeals suggesting that mental illness is enough to render one exempt from execution under the Eighth Amendment. *See Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010). Further, applicant has not shown that he suffered from some mental impairment at the time of these murders so severe as to categorically and necessarily render him less morally culpable than those who are not mentally ill. *Id.* at 379-80. As such, this ground for relief is without merit and should be denied.

36

469

### RESPONSE TO GROUND 17: JURY SELECTION

In ground 17, applicant contends that the State engaged in purposeful discrimination by using a peremptory strike to remove Juror Trevino, a minority venire member. *See applicant's writ at 303*. The record reflects that the State used a peremptory strike to remove Juror Trevino from the jury following her individual voir dire. The prosecutor explained that the State was striking Juror Trevino because "we can't accept somebody whose husband went to the penitentiary for a criminal offense." (RR39: 63). The defense voiced no objection to the State's strike at that time or at any other time during the proceedings.

The U.S. Constitution and the Texas Code of Criminal Procedure prohibit the use of peremptory challenges to exclude prospective jurors on the basis of race. *See Batson v. Kentucky*, 476 U.S. 79, 85 (1988); Tex. Crim. Proc. Code Ann. art. 35.261(a) (West Supp. 2009). In *Batson,* the Supreme Court set forth a three-part process for determining whether a peremptory strike has been exercised with improper discriminatory intent: (1) the objecting party must make a prima facie case of discrimination, (2) if a prima facie case is made, the striking party must tender race-neutral reasons for the strike, and (3) if race-neutral reasons are tendered, the objecting party must prove purposeful discrimination. *See Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012); *Johnson v. State*, 68 S.W.3d

37

470

644, 649 (Tex. Crim. App. 2002). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *See Purkett v. Elem*, 514 U.S. 765, 767 (1995).

A challenge to an opponent's peremptory strikes grounded upon *Batson* and its progeny is subject to principles of ordinary procedural default. *See Batiste v. State*, 888 S.W.2d 9, 17 n. 5 (Tex. Crim. App. 1994); *Rosales v. State*, 841 S.W.2d 368, 380 (Tex. Crim. App. 1992); *Mathews v. State*, 768 S.W.2d 731, 733 (Tex. Crim. App. 1989); *Brumfield v. Exxon*, 63 S.W.3d 912, 919 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *Flores v. State*, 33 S.W.3d 907, 925 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Article 35.261 provides that a *Batson* objection must be made "after the parties have delivered their lists to the clerk . . . and before the court has impanelled the jury . . .". Tex. Code Crim. Proc. Ann. art. 35.261(a). A jury is impanelled when it is sworn. *Hill v. State*, 827 S.W.2d 860, 864 (Tex. Crim. App. 1992). Thus, to preserve a *Batson* issue for appellate review, a party must object before the jury is sworn.

Here, applicant made no objection at the time the State used a peremptory strike to remove Juror Trevino, nor at any other time prior to the jury being sworn. It was applicant's duty to bring any alleged *Batson* error to the trial court's attention when the trial court was in a position to remedy the situation. *See*

38

471

*Brumfield*, 63 S.W.3d at 917, 919; *Flores*, 33 S.W.3d at 926. Applicant's failure to raise his complaint in the trial court waived any error on appeal. Accordingly, this ground should be denied.

### RESPONSE TO GROUNDS 19 AND 20: CHALLENGES TO TEXAS' DEATH PENALTY STATUTE

In ground 19, applicant contends that his death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty. *See Applicant's writ at 317*-18. In support of his argument, applicant cites the Sixth, Eighth and Fourteenth Amendments and the cases of *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). However, the "arbitrariness" of Texas' death penalty scheme was raised prior to trial and rejected by the trial court, as well as raised and rejected on direct appeal. *See Green*, 2012 Tex. Crim. App. Unpub. LEXIS 1010 at *107-08. As such, it is not cognizable in this proceeding. *See Acosta*, 672 S.W.2d at 472 (stating that issues which have been raised and rejected on direct appeal are not cognizable on habeas). To the extent that applicant is asserting new claims under this ground, they are likewise procedurally barred for applicant's failure to raise them at trial or on direct appeal. The writ of habeas corpus may not be used to litigate matters that could have been raised at trial and on direct appeal. *Ex parte*

472

*Boyd*, 58 S.W.3d 134, 136 (Tex. Crim. App. 2001); *Ex parte Bagley*, 509 S.W.2d 332, 334 (Tex. Crim. App. 1974).

In ground 20, applicant claims that the 10-12 Rule is unconstitutional because it prohibits the trial court from instructing the jury that a vote by one juror would result in a life sentence. *See applicant's writ at 329*. This claim, which was raised in a pretrial motion and re-asserted prior to the reading of the punishment charge, was properly overruled by the trial court. (RR36: 4; RR53: 4-7). Applicant then raised this and many other challenges to the 10-12 Rule on direct appeal and his claims were rejected. *See Green*, 2012 Tex. Crim. App. Unpub. LEXIS 1010 at *103-08. Therefore, this claim is not cognizable in this habeas proceeding. *See Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984). Likewise, to the extent that applicant is raising any new claims regarding the 10-12 Rule, these claims are procedurally barred. See *Boyd*, 58 S.W.3d at 136; *Bagley*, 509 S.W.2d at 334.

Based on the foregoing, applicant's challenges to the death penalty statute are without merit and should be denied.

## IV.

## HEARING ON INEFFECTIVE ASSISTANCE CLAIMS

In the interest of justice, the State agrees to further factual investigation

473

into applicant's allegations of ineffective assistance of trial counsel. Therefore, the State requests that this Court issue an order designating issues 1-12, 14 and 16 for a hearing and designating applicant's trial counsel as witnesses on those issues.

## V.

## **PRAYER**

Applicant has not yet provided this Court with any legal reason justifying the granting of this writ. Pending evidence substantiating applicant's claims, the State submits that this application for writ of habeas corpus is without merit and relief should be denied.

Respectfully submitted,

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

41

474

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on applicant's attorney, Robert Romig, Office of Capital Writs, 1700 N. Congress Ave, Suite 460, Austin, Texas 78711, Robert.Romig@ocw.texas.gov, via email on February 4, 2013.

_____
Jaclyn O'Connor Lambert

475



W09-59380-S(A)

| | | |
|---|---|---|
| Ex parte | § | In the 282nd Judicial District |
| | § | |
| Gary Green | § | Court of Dallas County, Texas |

### STATE'S OBJECTION TO DESIGNATING JURORS POZADZIDES, SHORT AND SHROPSHIRE AS WITNESSES & MOTION TO STRIKE THEIR AFFIDAVITS

The State of Texas, respondent, by and through the Criminal District Attorney of Dallas County, Texas, objects to applicant's request to designate Jurors John Pozadzides, Timothy Short and John Shropshire as witnesses at the hearing on applicant's writ application. The State presents the following in support of this motion:

### Procedural History

Applicant's original article 11.071 writ application (filed June 15, 2012) is currently pending before this Court. The State filed a response to applicant's writ application but has also agreed to an evidentiary hearing. The State has filed a proposed order designating the issues and witnesses for the hearing. The order designates every witness requested by applicant except for Jurors John Pozadzides, Timothy Short and John Shropshire. The order does not include these jurors because the State refused to agree to their designation.

476

**Jurors' Affidavits & Testimony Are Prohibited by Law**

Applicant seeks to offer the testimony of Jurors Pozadzides, Short and Shropshire in support of the allegation raised in Claim 13 of his application which asserts that the trial court abused its discretion in shackling him during the trial. Applicant also seeks to offer the testimony of Jurors Short and Shropshire in support of his claims of ineffective assistance of trial counsel during the punishment phase of trial.

The jurors' sworn statements and any related testimony from these jurors is barred by evidence rule 606(b). Tex. R. Evid. 606(b). The rule prohibits a juror's testimony about "any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." The rule also prohibits the admission of any juror's affidavit or statement concerning the same. Tex. R. Evid. 606(b). There are only two exceptions to this rule. A jury may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve. *Id*. Applicant has not shown that any of these jurors' affidavits or testimony is admissible under either exception to rule 606(b).

2

477

**Jurors' Affidavits & Testimony Are Prohibited by Law**

Applicant seeks to offer the testimony of Jurors Pozadzides, Short and Shropshire in support of the allegation raised in Claim 13 of his application which asserts that the trial court abused its discretion in shackling Green during the trial. Applicant also seeks to offer the testimony of Jurors Short and Shropshire in support of his claims of ineffective assistance of trial counsel during the punishment phase of trial.

The jurors' sworn statements and any related testimony from these jurors is barred by evidence rule 606(b). Tex. R. Evid. 606(b). The rule prohibits a juror's testimony about "any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." The rule also prohibits the admission of any juror's affidavit or statement concerning the same. Tex. R. Evid. 606(b). There are only two exceptions to this rule. A jury may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve. *Id.* Applicant has not shown that any of these jurors' affidavits or testimony is admissible under either exception to rule 606(b).

2

**478**

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the Court deny applicant's request to designate Jurors Pozadzides, Short and Shropshire as witnesses in the upcoming writ hearing. Moreover, the Court should strike these jurors' affidavits.

Respectfully submitted,

**Craig Watkins**
Criminal District Attorney
Dallas County, Texas

**Jaclyn O'Connor Lambert**
Assistant District Attorney
State Bar No. 24049262
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
joconnor@dallascounty.org

## CERTIFICATE OF SERVICE

The State emailed a copy of the foregoing pleading to applicant's attorney, Robert Romig, Office of Capital Writs, at Robert.Romig@ocw.texas.gov, on February 14, 2014.

Jaclyn O'Connor Lambert

3

479

## **ORDER**

Having considered the foregoing motion, the Court hereby (GRANTS) (DENIES) applicant's request to designate Jurors John Pozadzides, Timothy Short and John Shropshire as witnesses in the writ hearing.

Furthermore, the Court (GRANTS) (DENIES) the State's request to strike the affidavits of John Pozadzides, Timothy Short and John Shropshire.

---

Judge Andy Chatham
282nd Judicial District Court
Dallas County, Texas

4

480

W09-59380-S(A)

| Ex parte | § | In the 282nd Judicial District |
|---|---|---|
| | § | |
| Gary Green | § | Court of Dallas County, Texas |

## STATE'S PROPOSED ORDER DESIGNATING ISSUES FOR WRIT HEARING

Pursuant to section 9 of article 11.071 of the Code of Criminal Procedure, the Court determines that controverted, previously unresolved factual issues exist as to the following allegations in applicant's original application for writ of habeas corpus: Issues 1-18.

The Court orders the resolution of these issues by a hearing, scheduled for July 14-18, 2014, at which time the Court will hear either live or affidavit testimony from the following witnesses: Paul Johnson, Brady Wyatt, Kobby Warren, Kelly Goodness, John Tatum, Dr. Bhushan Agharkar, Dr. Valerie Wright, Dr. Kellie Gray-Smith, Dr. Gilbert Martinez, Dr. David Self, Michael Gross, Dannalynn Recer, Shirley Coleman, Nysasno Carter, Irvin Ray Green, Montrece Green, Willie Mae Green, James Jones, Leon Sampson, Mary Lee Sampson, Levi Smith, Raymond Smith, and Lenelle Williams.

BY THE FOLLOWING SIGNATURE, THE TRIAL COURT HEREBY ADOPTS THE ABOVE PROPOSED ORDER.



_____
Date

_____
Judge Andrew Chatham
282nd Judicial District Court

1

481

Respectfully submitted,

**Craig Watkins**
Criminal District Attorney
Dallas County, Texas

**Jaclyn O'Connor Lambert**
Assistant District Attorney
State Bar No. 24049262
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF SERVICE

The State emailed a copy of the foregoing pleading to applicant's attorney, Robert Romig, Office of Capital Writs, at Robert.Romig@ocw.texas.gov, on February 14, 2014.

Jaclyn O'Connor Lambert

2

**482**

# IN THE 282ND JUDICIAL DISTRICT COURT
# DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE,<br>GARY GREEN,<br><br>APPLICANT | )  Cause No.<br>)  W09-59380-S(A)<br>)<br>)<br>)<br>) |

**FILED**
2014 FEB 25 AM 11:13
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

## RESPONSE TO STATE'S OBJECTION TO DESIGNATING JURORS AS WITNESSES AND MOTION TO STRIKE

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail:Robert.Romig@ocw.texas.gov)
Post-Conviction Attorney
Office of Capital Writs
Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

483

**IN THE 282ND JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

|   |   |   |
|---|---|---|
| | ) | Cause No. |
| | ) | W09-59380-S(A) |
| EX PARTE, | ) | |
| GARY GREEN, | ) | |
| | ) | |
| APPLICANT | ) | |
| | ) | |

**RESPONSE TO STATE'S OBJECTION TO DESIGNATING JURORS AS
WITNESSES AND MOTION TO STRIKE**

Gary Green ("Green"), through his attorneys the Office of Capital Writs ("OCW"), files this Response to the State's "Objection to Designating Jurors Pozadzides, Short, and Shropshire as Witnesses and Motion to Strike Their Affidavits" ("Objection"), filed with this Court on February 14, 2014. The State's Objection argues that Pozadzides, Short, and Shropshire, who served as jurors during Green's capital trial, should not be designated as witnesses at the evidentiary hearing on Green's Application for Writ of Habeas Corpus ("Application") currently scheduled to start July 14, 2014. The State also requests that those jurors' affidavits filed as exhibits to Green's Application be struck. For the foregoing reasons, the State's objection should be overruled and denied.

In its Objection, the State cites to Rule 606 of the Texas Rules of Evidence as support for why these jurors should not testify or their affidavits be admitted as evidence. Specifically, the State argues the jurors should not be allowed to testify because their testimony would not fit into an exception to Rule 606's prohibition against jurors testifying about deliberations. However, the State's argument misstates the scope of Rule 606.

2

**484**

Rule 606(b) states that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring *during the jury's deliberations*, or on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." Tex. R. Evid. 606(b) (emphasis added). Texas courts have interpreted this rule as creating a balance between public interest in assuring a fair trial and in protecting the sanctity of deliberations and finality of verdicts. This balance is struck by limiting jurors' testimony about what occurs in the deliberation room. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000) (holding the rule "operates to prohibit jurors from testifying about matters and statements occurring during deliberations"); *McQuarrie v. State*, 380 S.W.3d 145, 151 (Tex. Crim. App. 2012) ("The rule prevents a juror from testifying that the jury discussed improper matters *during deliberation*.") (emphasis in original).

In interpreting Rule 606(b), which applies to both civil and criminal proceedings, the Texas Supreme Court found that the term "deliberations" means formal juror deliberations "when the jury weighs the evidence to arrive at a verdict" after the submission of all the evidence and instructions. *Golden Eagle Archery, Inc.*, 24 S.W.3d at 371. The Court specifically limited the scope of Rule 606(b) to that period of formal deliberations, and not to broadly cover any moment during the trial the jurors thought about or discussed the evidence. *Id.* "None of the rules contemplate that the jury may begin deliberating during a trial break. On the contrary, the approved jury instructions direct courts to admonish the jury against informal discussions of the case." *Id.* Thus, in *Golden Eagle*, the Court allowed the testimony of jurors regarding conversations during a trial break, even though it concerned potential misconduct of one of the jurors. *Id.* at 372. The Court held that a juror can "testify about reasons for disqualifying another juror

3

provided the testifying juror's knowledge was gained independent of deliberations." *Id.* at 370.

In the present case, the affidavits submitted with Green's Application from jurors Pozadzides, Short, and Shropshire (and thus their expected testimony) contain information that relates to facts of Green's capital trial that occurred outside the deliberation room. Specifically, jurors Pozadzides and Short would testify that they observed Green to be in hand and leg restraints during trial. (Ex. A at ¶¶3-4 [Aff. of Pozadides]; Ex. B at ¶3 [Aff. of Short].)[1] In addition, jurors Short and Shropshire offer their memory of what evidence was or was not presented by Green's trial counsel during the punishment phase of the trial. (*See, e.g.* Ex. B at ¶8 [Aff. of Short] ("I expected to hear more evidence from the defense about Green's mental health."); Ex. C at ¶¶4-5 [Aff. of Shropshire] ("I do not remember the defense presenting much details of Green's mental health.")). Both jurors indicate their willingness to have considered such evidence had it been presented. (Ex. B at ¶5 [Aff. of Short] ("I would have considered whatever mitigating information they presented to us."); Ex. C at ¶4 [Aff. of Shropshire] ("I would have been open to hearing and considering it.")).

None of the three jurors' affidavits discuss, nor would they be asked to testify regarding, what occurred in the deliberation room. None have been asked to describe how they weighed the evidence presented at trial or how they would have weighed new evidence. None have been asked to describe how other jurors behaved in deliberations or what was discussed. That is the category of information governed by Rule 606(b).

Rather, these jurors have only reported on their memories and impressions of what occurred in the courtroom during the presentation of evidence, including

---

[1] The exhibits referenced were also filed with Green's Application.

4

their impressions of the performance of Green's trial counsel. (Ex. B at ¶4 [Aff. of Short] ("Green's attorney did not do a good job of explaining the mitigating factors in Green's life); Ex. C at ¶3 [Aff. of Shropshire] ("I do not believe Green's attorneys did a good job representing him.")). This testimony is very relevant to issues raised in Green's Application, while falling short of the restrictions of Rule 606(b). Indeed, it is the type of juror testimony that has been previously allowed by the Texas Court of Criminal Appeals ("CCA"). *See Golden Eagle Archery, Inc.*, 24 S.W.3d at 371 ("None of the rules contemplate that the jury may begin deliberating during a trial break."); *see also Quinn v. State*, 958 S.W.2d 395, 397 (Tex. Crim. App. 1997) (juror testimony heard regarding a conversation he had with a co-worker about the case); *Clark v. State*, 717 S.W.2d 910, 918 (Tex. Crim. App. 1986) (juror testimony heard regarding jurors witnessing the defendant in handcuffs); *Chambliss v. State*, 647 S.W.2d 257, 264 (Tex. Crim. App. 1983) (juror testimony heard regarding juror conversation mid-trial with victim's relative).

The State's objection misconstrues Rule 606(b) by focusing on the two exceptions enumerated in the Rule, which state that a juror may testify regarding "(1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve." Tex. R. Evid. 606(b). The State conflates the enumeration of two exceptions to when a juror may testify regarding deliberations with the question of whether a juror may testify regarding matters outside of deliberations. As discussed, the answer to the latter question is clearly "Yes"—and the matters sought to be introduced through the testimony of these jurors is information outside of the deliberation room.

Rule 606(b) was "not intended to eliminate post-trial questioning altogether." *Golden Eagle Archery, Inc.*, 24 S.W.3d at 372. Further, the CCA has found that such a constrained interpretation of Rule 606(b) is an appropriate

5

**487**

balance between safeguarding juror deliberations while protecting against misconduct by jurors. *McQuarrie*, 380 S.W.3d at 153 ("Our construction has functioned well in the federal courts for years without opening the floodgates to the post-trial questioning of jurors."). Therefore, it is proper and necessary for this Court to consider both the affidavits and testimony of jurors Pozadzides, Short, and Shropshire, and overrule the State's objection.

## PRAYER FOR RELIEF

For the foregoing reasons, Green requests this Court issue the order designating witnesses and issues for the July 14, 2014, evidentiary hearing scheduled in this case, to include witnesses Pozadzides, Short, and Shropshire.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:   February 19, 2014            By: _Robert Romig_
                                      Robert Romig
                                      Post-Conviction Attorney

6

**488**

## IN THE 282ND JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  | ) | Cause No. |
| --- | --- | --- |
|  | ) | W09-59380-S(A) |
| EX PARTE, | ) | |
| GARY GREEN, | ) | |
|  | ) | |
| APPLICANT | ) | |
|  | ) | |

## ORDER DESIGNATING ISSUES AND WITNESSES

Pursuant to section 9 of article 11.071 of the Code of Criminal Procedure, the Court determines that controverted, previously unresolved factual issues exist as to the following allegations in applicant's original application for writ of habeas corpus: Issues 1-18.

The Court orders the resolution of these issues by a hearing, scheduled for July 14-18, 2014, at which time the Court will hear either live or affidavit testimony from the following witnesses: Paul Johnson, Brady Wyatt, Kobby Warren, Kelly Goodness, John Tatum, Dr. Bhushan Agharkar, Dr. Valerie Wright, Dr. Kellie Gray-Smith, Dr. Gilbert Martinez, Dr. David Self, Michael Gross, Danalynn Recer, Shirley Coleman, Nysasno Carter, Irvin Ray Green, Montrece Green, Willie Mae Green, James Jones, Juror Pozadzides, Leon Sampson, Mary Lee Sampson, Juror Short, Juror Shropshire, Levi Smith, Raymond Smith, and Lenelle Williams.

ORDERED AND SIGNED on this ___ day of February, 2014

_____
Andy Chatham
Judge, 282nd Judicial District

7

489

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Response to State's Motion to:

District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207
(Original and 1 Copy by mail)

Dallas County District Attorney
ATTN: Jaclyn O'Connor
133 N. Riverfront Blvd.
Lock Box 19
Dallas, Texas 75207-4399
(One Copy by email)

Gary Green
Polunsky Unit #999561
3872 FM 350 South
Livingston, Texas 77351
(One Copy by mail)

This certification is executed on February 19, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_
Robert Romig

8

490

EXHIBIT A

# AFFIDAVIT OF JOHN POZADZIDES

I, John Pozadzides, declare as follows:

1. My name is John Pozadzides. I sat on the jury at the capital murder trial of Gary Green. I was the jury foreman.

2. I was interviewed at my home on June 1, 2012 by an investigator from the Office of Capital Writs. He explained to me that his office currently represents Gary Green on his post-conviction litigation.

3. During the trial I noticed that Green was in leg restraints. I do not remember the exact number of times I saw the leg restraints, but it happened more than once. I saw them whenever Green walked in and sat down. It was evident to me that Green was restrained.

4. During the trial I also noticed that Green's hands were restrained. Again I don't remember the number of times I saw this, but it was when whenever Green walked into the trial and sat down.

5. I have read and reviewed this two page affidavit.

   I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the ___3rd___ day of ___June___ 2012 in Dallas, Texas.

_____
John Pozadzides

Subscribed and sworn to before me on _June 3rd,_____ 2012.

_____
Notary Public, State of Texas

BRIAN PATRICK FAYHEE
Notary Public, State of Texas
Commission Expires:
12-03-2014
Notary without Bond

9P

492



**EXHIBIT B**

## AFFIDAVIT OF TIMOTHY SHORT

I, Timothy Short, declare as follows:

1. My name is Timothy Short. I sat on the jury at the capital murder trial of Gary Green.

2. I was interviewed at my home on June 1, 2012 by an investigator from the Office of Capital Writs. He explained to me that his office currently represents Gary Green on his post-conviction litigation.

3. During the punishment phase of Green's trial, I saw him in leg shackles. I do not remember how many times I saw the shackles, but I know it was more than once. I remember seeing them when Green walked to his seat during punishment.

4. Green's attorneys did not do a good job of explaining the mitigating factors in Green's life. To me, it seems like they left out a lot of details.

5. I would have considered whatever mitigating information they presented to us, including the following.

   a. I would have considered information about Green's father forcing him to fight his female cousins when he was a small child.

   b. I also would have considered the fact that Green grew up in a neighborhood where he was forced to fight.

   c. If I had known that other members of Green's family also suffered from mental illness and how it tied to Green's own mental illness, then I would have considered it.

6. I felt like there was a discrepancy with the IQ test scores. The doctor who testified for Green talked about him having an IQ level lower than 80, but the prosecutors said his IQ was more than 100. I wanted to understand why there was such a big discrepancy between the two scores. If his IQ was really low, like in the 80s, then that might explain some of his difficulties in life.

7. We asked for more documents or records about Green's mental health and the IQ score. But they never brought us any evidence about the lower IQ score.

*JtS*

494

All we had was the prison records and the IQ over 100. If I had seen the other IQ score and evidence explaining the discrepancy, then I would have considered that information.

8. It did not seem like there was very much professional support for the defense's argument that Green was mentally ill. The one expert witness the defense put on about Green's mental health was just not convincing. I expected to hear more evidence from the defense about Green's mental health.

9. I would like to see Green's full mitigation story told to twelve new people.

10. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the ___3rd___ day of ___June___ 2012 in Dallas, Texas.

_Timothy Short_

Timothy Short

Subscribed and sworn to before me on ___June 3rd___ 2012.

_B. P. Fayhee_

Notary Public, State of Texas


BRIAN PATRICK FAYHEE
Notary Public, State of Texas
Commission Expires:
12-03-2014
Notary without Bond

*JS*



# EXHIBIT C

496

# AFFIDAVIT OF JOHN SHROPSHIRE

I, John Shropshire, declare as follows:

1. My name is John Shropshire.  I sat on the jury at the capital murder trial of Gary Green.  I was one of the alternate jurors.

2. I was interviewed at my home on June 2, 2012 by an investigator from the Office of Capital Writs.  He explained to me that his office currently represents Gary Green on his post-conviction litigation.

3. I do not believe Green's attorney did a good job representing him.  I particularly thought the issue of mitigation wasn't explained well by the defense.

4. I do not remember there being many details about Green's life, such as the abuse from his father.  I do not remember hearing anything about Green being sexually assaulted or that Green was made to fight other children as a child.  If the defense had presented evidence of these types of experiences, I would have been open to hearing and considering it.

5. I do not remember the defense presenting much details of Green's mental health.  I remember some evidence about Green's IQ.  I do not remember hearing details about Green's family having mental illnesses.  Had I heard details about Green's mental health, I would have been open to hearing and considering them.

6. I believe that Green should have a full explanation of mitigation evidence, including his mental health, told to a jury.

497

7. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _3rd_ day of _June_ 2012 in Dallas, Texas.

John Shropshire

Subscribed and sworn to before me on _June 3rd_ 2012.

Notary Public, State of Texas



**BRIAN PATRICK FAYHEE**
Notary Public, State of Texas
Commission Expires:
12-03-2014
Notary without Bond

# IN THE 282ND JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Cause No. |
| | ) | W09-59380-S(A) |
| EX PARTE, | ) | |
| GARY GREEN, | ) | |
| | ) | |
| APPLICANT | ) | |
| | ) | |

## ORDER DESIGNATING ISSUES AND WITNESSES

Pursuant to section 9 of article 11.071 of the Code of Criminal Procedure, the Court determines that controverted, previously unresolved factual issues exist as to the following allegations in applicant's original application for writ of habeas corpus: Issues 1-18.

The Court orders the resolution of these issues by a hearing, scheduled for July 14-18, 2014, at which time the Court will hear either live or affidavit testimony from the following witnesses: Paul Johnson, Brady Wyatt, Kobby Warren, Kelly Goodness, John Tatum, Dr. Bhushan Agharkar, Dr. Valerie Wright, Dr. Kellie Gray-Smith, Dr. Gilbert Martinez, Dr. David Self, Michael Gross, Danalynn Recer, Shirley Coleman, Nysasno Carter, Irvin Ray Green, Montrece Green, Willie Mae Green, James Jones, Juror Pozadzides, Leon Sampson, Mary Lee Sampson, Juror Short, Juror Shropshire, Levi Smith, Raymond Smith, and Lenelle Williams.

ORDERED AND SIGNED on this 28 day of February, 2014.

Andy Chatham
Judge, 282nd Judicial District

FILED

2014 FEB 28 AM 12: 21

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

7

**499**

## IN THE 282nd JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS

|                          |     |                              |
|--------------------------|-----|------------------------------|
|                          | )   | Cause No.                    |
| EX PARTE                 | )   | W09-59380-S(A)               |
| Gary Green,              | )   |                              |
|        APPLICANT | ) |                              |
|                          | )   |                              |
|                          | )   |                              |

### ORDER

By this discovery order, the Court orders the State may review Green's trial files relating to Green's post-conviction habeas application, including information protected from disclosure by statutory or constitutional law, insofar as it relates to Green's claims of ineffective assistance of counsel.

The Court orders that the State may not disclose the contents of Green's trial files for any purpose other than litigating Green's state application for writ of habeas corpus.

If the State wishes to disclose the contents of Green's trial files for the purposes of a future retrial or other proceeding, the State will first tender the information to the court presiding over the proceeding for in-camera review and a determination as to whether due process necessitates its disclosure. The State will provide Green with notice of its desire for an in-camera review, notice of what information it seeks to disclose, and an opportunity for Green to be heard by the presiding court on the matter.

ORDERED AND SIGNED on this 28 day of February 2014.

_____
Andy Chatham
Judge, 282nd Judicial District

FILED
2014 FEB 28 AM 12: 21
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
_____ DEPUTY

500

DRAWER 028

THE STATE OF TEXAS          CAUSE NO. W-09-59380-A

VS.                                      282nd DISTRICT COURT

Gary Green                          DALLAS COUNTY, TEXAS

ATTORNEY'S REQUEST FOR BENCH WARRANT

TO THE HONORABLE JUDGE OF SAID COURT:

    Comes now the undersigned attorney, and requests that
the Court issue Bench Warrant in this cause for the
following person located at the following place:

    Name Gary Green    TDCJ # 999561
    Location Polunsky Unit - Livingston, Texas

Said person is needed by the undersigned party for the
following date and purpose:

    Date July 8 - July 18
    Purpose Evidentiary Hearing

WHEREFORE, Premises considered, the undersigned party
requests the Court issue a Bench Warrant for said person.

Respectfully submitted,

_Brad D._

Attorney for (State) (Defendant)

O R D E R

The foregoing application having been considered by the
Court, same is hereby (granted) (denied).

_____
Judge

FILED
2014 MAY 21 AM 10: 17
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

501

# IN THE 282ND JUDICIAL DISTRICT COURT
# DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| ) | Cause No. |
| ) | W09-59380-S(A) |
| **EX PARTE,** ) | |
| **GARY GREEN,** ) | |
| ) | |
| **APPLICANT** ) | |
| ) | |

## MOTION TO PERMIT PRESENTATION OF SOME WITNESS
## TESTIMONY BY AFFIDAVIT

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
RYAN CARLYLE KENT (No. 24090205)
(E-Mail: Ryan.Kent@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

FILED
2014 MAY 22 AM 11: 02
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY
CHAD HAMILL

502

**IN THE 282ND JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS**

|  |  |
|---|---|
| | ) Cause No. |
| | ) W09-59380-S(A) |
| EX PARTE, | ) |
| GARY GREEN, | ) |
| | ) |
| APPLICANT | ) |
| | ) |

**MOTION TO PERMIT PRESENTATION OF SOME WITNESS
TESTIMONY BY AFFIDAVIT**

Gary Green, by and through his attorneys the Office of Capital Writs ("OCW"), offers notice to this Court and the State of his intentions regarding the calling of witnesses for live testimony at the evidentiary hearing scheduled July 14 through July 18, 2014. Green has proposed to schedule a status conference with this Court for the week of May 26, 2014, to argue this Motion. Green respectfully requests the State provide similar notice of its intentions regarding the calling of witnesses for live testimony at or before the status conference.

**A. Live Testimony Versus Affidavits**

Under Article 11.071, this Court is authorized to rely on "affidavits, depositions, interrogatories, and evidentiary hearings," as well as personal recollection, to resolve factual disputes created by the Application and the State's response. TEX. CODE CRIM. PROC. art. 11.071, §9(a). Some factual disputes are of such a nature that an evidentiary hearing is necessary, and, absent this hearing, the Court would be unable to fully weigh the information provided by witnesses and to assess those witnesses' credibility. *See Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to

2

503

convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *Hall v. State*, 160 S.W.3d 24, 41 (Tex. Crim. App. 2004) (Price, J., concurring) ("[I]f the convicting court conducts a hearing by affidavit, and the affidavits are inadequate for us to review the convicting court's findings, we will be forced to remand to the convicting court for a live hearing.").

On the other hand, time and resources of both the Court and the parties may be conserved through the use of affidavits and other paper evidence. *See Ex parte Hines*, 2005 WL 3119030, at *1 (Tex. Crim. App. Nov. 23, 2005) (per curiam) (unpublished) (("The judge of the convicting court entered these findings after reviewing the evidence presented by affidavit in the application, the response of the State and the record from trial. While the habeas judge did not hear the testimony at trial and did not conduct a [sic] evidentiary hearing, we review with deference his findings of fact unless they are clearly erroneous."); *In re J.W.A.*, 2005 WL 2574024, at *5 (Tex. App.—Austin Oct. 13, 2005) ("Under the facts in this case, we find that the trial court's review of the evidence submitted by J.W.A. was an acceptable evidentiary hearing, albeit on paper rather than live.").

The touchstone is whether the combination of live testimony and affidavits in a particular case provides the Court with a procedure "adequate for reaching reasonably correct results." *Ex parte Davila*, 530 S.W.2d 543, 545 (Tex. Crim. App. 1975) (noting that an evidentiary hearing is not always required by Article 11.071 and concluding that "the proper standard . . . is whether 'the fact-finding procedure there employed was . . . adequate for reaching reasonably correct results.'") (quoting *Townsend v. Sain*, 372 U.S. 293, 316 (1963)). Here, Green believes this Court may rely on affidavits as evidence for specific witnesses, where live testimony is not necessary for the Court to adequately weigh their information.

3

504

Importantly, should this Court rely on affidavits and other paper evidence, that material must be officially made part of the habeas record in order to be considered in later appellate review. The Court of Criminal Appeals has stated explicitly that any materials not made part of the habeas record will not be considered by it on review of Article 11.071 applications. *See Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004) ("There is no provision in article 11.071 that permits either the State or the habeas applicant to submit original evidence directly to this Court. Evidentiary affidavits, letters, transcripts, or other documents relating to a habeas claim should not be attached to motions or briefs, and they shall not, and will not, be considered by this Court."); *Ex parte Williams*, 2011 WL 3768657, at *1 (Tex. Crim. App. Apr. 24, 2011) (per curiam) (unpublished) (requiring the trial court to prepare a "supplemental transcript containing all affidavits and interrogatories or the transcription of the court reporter's notes from any hearing or deposition").

**B. Green's Witnesses**

The Order Designating Issues and Witnesses ("Order") entered by this Court on February 28, 2014, identified twenty-six witnesses, including three trial counsel, one appellate counsel, and eight expert witnesses, from whom to hear either live or affidavit testimony. The five days currently set aside for the evidentiary hearing will likely be insufficient to allow live testimony from all twenty-six witnesses (as well as any additional witnesses identified by the State). Following the status conference held with the Court on April 11, 2014, the State informed Green that it was not willing to waive cross-examination of any of the witnesses designated in the Order.

Green has considered which witnesses he believes are necessary to present for live testimony and believes the Court would benefit from hearing live testimony from the following witnesses, either because of the important role they

4

505

played at Green's trial or because the Court has not yet had the opportunity to see their live testimony to judge their demeanor and credibility:

1. Paul Johnson (trial counsel)
2. Kobby Warren (trial counsel)
3. Brady Wyatt (trial counsel)
4. Dr. Bhushan Agharkar (expert witness) – Exhibit 1[1]
5. Dr. Valerie Wright (expert witness) – Exhibit 2
6. Michael Gross (expert witness) – Exhibit 5
7. Mary Sampson (lay witness) – Exhibit 13
8. Nysasno Carter (lay witness) – Exhibit 7
9. Leon Sampson (lay witness) – Exhibit 12
10. Montrece Green (lay witness) – Exhibit 9
11. James Jones (lay witness) – Exhibit 11
12. Irving Ray Green (lay witness) – Exhibit 8
13. Willie Mae Green (lay witness) – Exhibit 10
14. Levi Smith (lay witness) – Exhibit 14
15. Raymond Smith (lay witness) – Exhibit 15
16. Juror Pozadzides – Exhibit 17
17. Juror Short – Exhibit 18[2]

Green asks that the Court rely on affidavit testimony from the following witnesses:[3]

1. Dr. Kelly Gray-Smith (expert witness) – Exhibit 3
2. Dr. Gilbert Martinez (expert witness) – Exhibit 4
3. Danalynn Recer (expert witness) – Exhibit 66
4. Lenelle Williams (lay witness) – Exhibit 16

These witnesses either: (1) testified at Green's trial, such that this Court already has had an opportunity to judge their credibility, or (2) will present strictly

---

[1] For the Court's convenience, exhibit numbers refer to the affidavits attached to the Initial Application filed on June 15, 2012.

[2] Green has proposed a stipulation of fact to the State regarding expected testimony from Juror Pozadzides and Juror Short. If the State agrees to this stipulation, live testimony would no longer be necessary from either witness or other witnesses relating to Green's trial restraints (Claim Thirteen of the Initial Application).

[3] Green reserves the right to call these witnesses for live testimony in the event that their testimony becomes necessary.

objective information and, therefore, may have their credibility assessed based on their background and experience (which is supplied in their affidavits).  Green also would be satisfied to have his appellate counsel, John Tatum, address via affidavit the issues raised in Green's Application pertaining to his representation of Green on direct appeal (see Claims Eleven, Thirteen, Fourteen, Sixteen, Seventeen, and Eighteen of the Initial Application).

Unless the Court feels particular need for one of these witnesses to appear live before it, Green is prepared to rely on as evidence the information contained in their affidavits.  Green estimates that by relying on affidavit testimony from these witnesses, he would be able to present his case in four days, with the State presenting any witnesses on the fifth day.  Otherwise, Green estimates that the hearing may need to be extended beyond the scheduled five days to allow time for each side to present its case.  Relying on affidavits from these witnesses would save Court and party resources and also allow for sufficient development of the live testimony from the witnesses who will be called.  The State can subpoena and call these witnesses if it wishes to cross-examine them.

## C. Request for State's Notice

Green requests the State provide notice of whether it intends to seek Evidence Code 702 hearings or otherwise challenge the credentials and qualifications of Green's expert witnesses.  Further, Green requests the State provide notice of any witnesses it intends to call at the evidentiary hearing.

## IV.

## CONCLUSION

Unless this Court rules otherwise, Green intends to rely on the affidavits of five witnesses (Gray-Smith, Martinez, Recer, Williams, and Tatum) at the upcoming July hearing.  Green proposes to schedule a status conference with this Court for the week of May 26, 2014, to argue this Motion.  Green requests this

6

507

Court order the State to supply its witness list, if any, by the date of the status conference.

Respectfully submitted,

DATED:    May 16, 2014

By _Robert Romig_____
ROBERT ROMIG


By _____
JOANNE HEISEY

7

508

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion to Permit Presentation of Some Witness Testimony by Affidavit to:

District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207
(Original and one copy, by mail)

Dallas County District Attorney
ATTN: Jaclyn O'Connor
133 N. Riverfront Blvd.
Lock Box 19
Dallas, Texas 75207-4399
(One copy, by e-mail)

Gary Green
Polunsky Unit #999561
3872 FM 350 South
Livingston, Texas 77351
(One copy, by mail)

This certification is executed on May 16, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

JOANNE HEISEY

8

509

# IN THE 282ND JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE, | ) | Cause No. |
| GARY GREEN, | ) | W09-59380-S(A) |
|  | ) |  |
| APPLICANT | ) |  |
|  | ) |  |

## MOTION TO PERMIT PRESENTATION OF SOME WITNESS TESTIMONY BY AFFIDAVIT

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
RYAN CARLYLE KENT (No. 24090205)
(E-Mail: Ryan.Kent@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

FILED
2014 MAY 22 AM 11: 02
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

510

**IN THE 282ND JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

|  |  |
|---|---|
| EX PARTE, ) | Cause No. |
| GARY GREEN, ) | W09-59380-S(A) |
| ) | |
| APPLICANT ) | |

**MOTION TO PERMIT PRESENTATION OF SOME WITNESS**
**TESTIMONY BY AFFIDAVIT**

Gary Green, by and through his attorneys the Office of Capital Writs ("OCW"), offers notice to this Court and the State of his intentions regarding the calling of witnesses for live testimony at the evidentiary hearing scheduled July 14 through July 18, 2014. Green has proposed to schedule a status conference with this Court for the week of May 26, 2014, to argue this Motion. Green respectfully requests the State provide similar notice of its intentions regarding the calling of witnesses for live testimony at or before the status conference.

**A. Live Testimony Versus Affidavits**

Under Article 11.071, this Court is authorized to rely on "affidavits, depositions, interrogatories, and evidentiary hearings," as well as personal recollection, to resolve factual disputes created by the Application and the State's response. TEX. CODE CRIM. PROC. art. 11.071, §9(a). Some factual disputes are of such a nature that an evidentiary hearing is necessary, and, absent this hearing, the Court would be unable to fully weigh the information provided by witnesses and to assess those witnesses' credibility. *See Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to

2

511

convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *Hall v. State*, 160 S.W.3d 24, 41 (Tex. Crim. App. 2004) (Price, J., concurring) ("[I]f the convicting court conducts a hearing by affidavit, and the affidavits are inadequate for us to review the convicting court's findings, we will be forced to remand to the convicting court for a live hearing.").

On the other hand, time and resources of both the Court and the parties may be conserved through the use of affidavits and other paper evidence. *See Ex parte Hines*, 2005 WL 3119030, at *1 (Tex. Crim. App. Nov. 23, 2005) (per curiam) (unpublished) (("The judge of the convicting court entered these findings after reviewing the evidence presented by affidavit in the application, the response of the State and the record from trial. While the habeas judge did not hear the testimony at trial and did not conduct a [sic] evidentiary hearing, we review with deference his findings of fact unless they are clearly erroneous."); *In re J.W.A.*, 2005 WL 2574024, at *5 (Tex. App.—Austin Oct. 13, 2005) ("Under the facts in this case, we find that the trial court's review of the evidence submitted by J.W.A. was an acceptable evidentiary hearing, albeit on paper rather than live.").

The touchstone is whether the combination of live testimony and affidavits in a particular case provides the Court with a procedure "adequate for reaching reasonably correct results." *Ex parte Davila*, 530 S.W.2d 543, 545 (Tex. Crim. App. 1975) (noting that an evidentiary hearing is not always required by Article 11.071 and concluding that "the proper standard . . . is whether 'the fact-finding procedure there employed was . . . adequate for reaching reasonably correct results.'") (quoting *Townsend v. Sain*, 372 U.S. 293, 316 (1963)). Here, Green believes this Court may rely on affidavits as evidence for specific witnesses, where live testimony is not necessary for the Court to adequately weigh their information.

3

512

Importantly, should this Court rely on affidavits and other paper evidence, that material must be officially made part of the habeas record in order to be considered in later appellate review. The Court of Criminal Appeals has stated explicitly that any materials not made part of the habeas record will not be considered by it on review of Article 11.071 applications. *See Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004) ("There is no provision in article 11.071 that permits either the State or the habeas applicant to submit original evidence directly to this Court. Evidentiary affidavits, letters, transcripts, or other documents relating to a habeas claim should not be attached to motions or briefs, and they shall not, and will not, be considered by this Court."); *Ex parte Williams*, 2011 WL 3768657, at *1 (Tex. Crim. App. Apr. 24, 2011) (per curiam) (unpublished) (requiring the trial court to prepare a "supplemental transcript containing all affidavits and interrogatories or the transcription of the court reporter's notes from any hearing or deposition").

**B. Green's Witnesses**

The Order Designating Issues and Witnesses ("Order") entered by this Court on February 28, 2014, identified twenty-six witnesses, including three trial counsel, one appellate counsel, and eight expert witnesses, from whom to hear either live or affidavit testimony. The five days currently set aside for the evidentiary hearing will likely be insufficient to allow live testimony from all twenty-six witnesses (as well as any additional witnesses identified by the State). Following the status conference held with the Court on April 11, 2014, the State informed Green that it was not willing to waive cross-examination of any of the witnesses designated in the Order.

Green has considered which witnesses he believes are necessary to present for live testimony and believes the Court would benefit from hearing live testimony from the following witnesses, either because of the important role they

4

**513**

played at Green's trial or because the Court has not yet had the opportunity to see their live testimony to judge their demeanor and credibility:

1. Paul Johnson (trial counsel)
2. Kobby Warren (trial counsel)
3. Brady Wyatt (trial counsel)
4. Dr. Bhushan Agharkar (expert witness) – Exhibit 1[1]
5. Dr. Valerie Wright (expert witness) – Exhibit 2
6. Michael Gross (expert witness) – Exhibit 5
7. Mary Sampson (lay witness) – Exhibit 13
8. Nysasno Carter (lay witness) – Exhibit 7
9. Leon Sampson (lay witness) – Exhibit 12
10. Montrece Green (lay witness) – Exhibit 9
11. James Jones (lay witness) – Exhibit 11
12. Irving Ray Green (lay witness) – Exhibit 8
13. Willie Mae Green (lay witness) – Exhibit 10
14. Levi Smith (lay witness) – Exhibit 14
15. Raymond Smith (lay witness) – Exhibit 15
16. Juror Pozadzides – Exhibit 17
17. Juror Short – Exhibit 18[2]

Green asks that the Court rely on affidavit testimony from the following witnesses:[3]

1. Dr. Kelly Gray-Smith (expert witness) – Exhibit 3
2. Dr. Gilbert Martinez (expert witness) – Exhibit 4
3. Danalynn Recer (expert witness) – Exhibit 66
4. Lenelle Williams (lay witness) – Exhibit 16

These witnesses either: (1) testified at Green's trial, such that this Court already has had an opportunity to judge their credibility, or (2) will present strictly

---

[1] For the Court's convenience, exhibit numbers refer to the affidavits attached to the Initial Application filed on June 15, 2012.

[2] Green has proposed a stipulation of fact to the State regarding expected testimony from Juror Pozadzides and Juror Short. If the State agrees to this stipulation, live testimony would no longer be necessary from either witness or other witnesses relating to Green's trial restraints (Claim Thirteen of the Initial Application).

[3] Green reserves the right to call these witnesses for live testimony in the event that their testimony becomes necessary.

5

objective information and, therefore, may have their credibility assessed based on their background and experience (which is supplied in their affidavits). Green also would be satisfied to have his appellate counsel, John Tatum, address via affidavit the issues raised in Green's Application pertaining to his representation of Green on direct appeal (see Claims Eleven, Thirteen, Fourteen, Sixteen, Seventeen, and Eighteen of the Initial Application).

Unless the Court feels particular need for one of these witnesses to appear live before it, Green is prepared to rely on as evidence the information contained in their affidavits. Green estimates that by relying on affidavit testimony from these witnesses, he would be able to present his case in four days, with the State presenting any witnesses on the fifth day. Otherwise, Green estimates that the hearing may need to be extended beyond the scheduled five days to allow time for each side to present its case. Relying on affidavits from these witnesses would save Court and party resources and also allow for sufficient development of the live testimony from the witnesses who will be called. The State can subpoena and call these witnesses if it wishes to cross-examine them.

## C. Request for State's Notice

Green requests the State provide notice of whether it intends to seek Evidence Code 702 hearings or otherwise challenge the credentials and qualifications of Green's expert witnesses. Further, Green requests the State provide notice of any witnesses it intends to call at the evidentiary hearing.

## IV.

## CONCLUSION

Unless this Court rules otherwise, Green intends to rely on the affidavits of five witnesses (Gray-Smith, Martinez, Recer, Williams, and Tatum) at the upcoming July hearing. Green proposes to schedule a status conference with this Court for the week of May 26, 2014, to argue this Motion. Green requests this

6

**515**

Court order the State to supply its witness list, if any, by the date of the status conference.

Respectfully submitted,

DATED:     May 16, 2014          By _Robert Romig_____
                                ROBERT ROMIG


                                By _____
                                JOANNE HEISEY

7

516

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion to Permit Presentation of Some Witness Testimony by Affidavit to:

District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207
(Original and one copy, by mail)

Dallas County District Attorney
ATTN: Jaclyn O'Connor
133 N. Riverfront Blvd.
Lock Box 19
Dallas, Texas 75207-4399
(One copy, by e-mail)

Gary Green
Polunsky Unit #999561
3872 FM 350 South
Livingston, Texas 77351
(One copy, by mail)

This certification is executed on May 16, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

JOANNE HEISEY

8

517

BENCH WARRANT

THE STATE OF TEXAS                          CAUSE NO.  W-0959380-S
VS.                                         282ND JUDICIAL DISTRICT COURT
GARY GREEN                                  DALLAS COUNTY, TEXAS
OFFENSE: 1107 PEN WRIT
==============================================================================
GREETINGS TO:  THE HONORABLE WARDEN OF TEXAS DEPARTMENT OF CRIMINAL JUSTICE

    THE FOLLOWING PRISONER IS SAID TO BE IN YOUR OFFICIAL CUSTODY:

GARY GREEN
RACE:          SEX: U     DOB: 00-00-00     TDC NO: 999561
INCARCERATION UNIT: POLUNSKY UNIT

THE ABOVE CAUSE IS SET FOR TRIAL/HEARING ON THE FOLLOWING DATE: 07/07/14 .

    YOU ARE HEREBY REQUESTED AND DIRECTED TO DELIVER TO THE BEARER HEREON,

THE SHERIFF OF DALLAS COUNTY, TEXAS, OR ANY OF HIS DEPUTIES, THE CUSTODY

OF SAID PRISONER SO THAT HE MAY BE TRANSPORTED TO THE DALLAS COUNTY JAIL

PREPARATORY TO HIS APPEARANCE IN THIS COURT.

    WITNESS MY HAND AT DALLAS COUNTY, TEXAS, THIS 29TH DAY OF            MAY,

2014.

                                        _____
                                        JUDGE ANDY CHATHAM
                                        282ND JUDICIAL DISTRICT COURT
ATTEST:
 GARY FITZSIMMONS, DISTRICT CLERK, DALLAS COUNTY, TEXAS

BY: _____ , DEPUTY

==============================================================================
TO:  THE HONORABLE SHERIFF OF
     DALLAS COUNTY, TEXAS

    YOU ARE HEREBY DIRECTED TO RETURN THE ABOVE NAMED PRISONER TO THE
ABOVE CUSTODIAN AS SOON AS DIRECTED BY THE COURT, BUT IN NO EVENT LATER
THAN 07/07/14 .



            ORIGINAL OF THIS WARRANT TO BE RETURNED TO COURT
            PROMPTLY SHOWING HOW YOU HAVE EXECUTED
_____
                        SHERIFF'S RETURN
CAME TO HAND ON THIS _____ DAY OF _____ A.D., 20 ____ .

RETURNED ON THIS THE _____ DAY OF _____ A.D., 20 ____ .

MILEAGE.....$_____        _____

FEES........$_____        SHERIFF, DALLAS COUNTY, TEXAS

TOTAL.......$_____        BY: _____

                                SQD _____

518



FILED

2014 JUL 15 PM 2: 18

GA~ ~ ~S
~ ~. CLI~ K
DALLAS CO.. TEXAS
A~~ . DEPUTY



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-81,575-01

### EX PARTE GARY GREEN

### ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
### CAUSE NO. F09-59380-S IN THE 282ND DISTRICT COURT
### DALLAS COUNTY

*Per curiam.*

### O R D E R

In November 2010, a jury found applicant guilty of the offense of capital murder.

The jury answered the statutory punishment questions in such a way that the trial court set

applicant's punishment at death.  On February 2, 2012, the State filed in this Court its

brief on applicant's direct appeal.  Pursuant to Article 11.071 §§ 4(a) and (b)[1], applicant's

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

519

Green - 2

initial application for a writ of habeas corpus was due to be filed in the trial court on or before June 18, 2012, assuming a motion for extension was timely filed and granted. It has been nearly two years since the application was due in the trial court. Accordingly, we order the trial court to resolve any remaining issues within 120 days from the date of this order. The clerk shall immediately thereafter transmit the complete writ record to this Court. Any extensions of time shall be obtained from this Court.

IT IS SO ORDERED THIS THE 18TH DAY OF JUNE, 2014.


Do Not Publish

## SUBPOENA APPLICATION

TO THE CLERK OF THE 282nd JUDICIAL DISTRICT COURT, DALLAS COUNTY TEXAS
IN THE CASE OF THE STATE OF TEXAS VS.

### Gary Green

CAUSE NO. W09-59380-S(A)          (COURT LETTER **REQUIRED**, NOT OPTIONAL)

CHARGED WITH **CAPITAL MURDER**

MATTER PENDING: WRIT HEARING

DATE TESTIMONY NEEDED: **July 14-18, 2014 AT 9:00 A.M.**

WILL YOU PLEASE ISSUE SUBPOENA IN ACCORDANCE WITH THE LAW, FOR THE FOLLOWING
NAMED WITNESS:

Dr. Kellie Gray-Smith, 1128 Patch Grove Drive, Frisco, Denton County TX 75034

Dr. Gilbert Martinez, 3603 Paesanos Pkwy Ste 300, San Antonio, Bexar County, TX 78231

Kelly Goodness 121 Olive St, Keller, Tarrant County, TX 76248

David Self M.D.  17844 Sunset Strip, Flint, Smith County, Texas 75762

Timothy Short  11219 Whisper Falls Street, San Antonio, Bexar County, TX 78230

John Pozadzides  3737 O'Henry Drive, Garland, Dallas County, TX 75042

THE TESTIMONY OF SAID WITNESS IS BELIEVED TO BE MATERIAL TO THE **STATE/DEFENDANT** (CIRCLE ONE)

I CERTIFY THAT THIS APPLICATION COMPORTS WITH CHAPTER 24, ARTICLE 24.01, OF THE TEXAS CODE OF CRIMINAL
PROCEDURE.

_____
ASSISTANT DISTRICT ATTORNEY
133 N Riverfront Blvd.
Dallas, TX 75207

214-653-3640
_____
PHONE NUMBER

SWORN TO AND SUBSRIBED BEFORE ME, THIS _____1_____ DAY OF _____July_____ 20 _14_

GARY FITZSIMMONS, DISTRICT CLERK
COUNTY, TEXAS

ISSUED BY: _____          _____
DEPUTY DISTRICT CLERK

**THIS PROCESS NOT PREPARED
BY THE DALLAS COUNTY
DISTRICT CLERK'S OFFICE**

521

*IN will Serve*
*Do NOT FOLD*

## APPLICATION FOR SUBPOENA IN THE DISTRICT/CRIMINAL COURTS....DUCES TECUM

TO THE CLERK OF THE:          **282rd Judicial District Court**
DALLAS, COUNTY, TEXAS:

**In the case of the STATE OF TEXAS v: GARY GREEN**

Cause Number:     **W09-59380-S(A)**          Charged with:    CAPITAL MURDER

Date set for hearing:   **08-18-2014**          at 9:00 AM. Will you please issue a subpoena in

accordance with the law, for the following witness:   **Custodian of Records or Designee**
whose vocation is that of:
**CUSTODIAN OF RECORDS, Inmate Classification, Texas Department of Criminal Justice**

residing in Walker County, Texas, and whose location is:
**Texas Department of Criminal Justice, Inmate Classification**
**P.O.Box 99, Huntsville , Texas 77342**

and that he/she bring with him/her and produce in said court, at said time and place the following:
Copies of the entire Inmate Classification File for Gary Green, **TDCJ No. 00999561**,
including but not limited to disciplinary records, cell inventories, visitation records and commisary
records.  In lieu of appearing on the listed date, the certified records can may be mailed to Assistant
District Attorney **Jaclyn O'Connor** at 133 N. Riverfront Blvd., LB-19, Dallas TX 75207-4399.

The testimony of said witness is believed to be material to the State.

Jaclyn O'Connor
Assistant District Attorney
Dallas County Criminal District Attorney
133 N. Riverfront Blvd., LB19
Dallas, Texas 75207-4313
Phone Number:     214-653-3600

SWORN TO AND SUBSCRIBED before me, this_____day of _____200__

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS COUNTY, TEXAS

ISSUED BY:

DATE:
DEPUTY

522

THE STATE OF TEXAS

**TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER**
**OF THE STATE OF TEXAS – GREETINGS:**
**YOU ARE HEREBY COMMANDED TO SUMMON**

CUSTODIAN OF RECORDS FOR INMATE CLASSIFICATION TEXAS DEPARTMENT OF
CRIMINAL JUSTICE
P.O. BOX 99
HUNTSVILLE, TX 77342

To be and appear before the JUDICIAL District Court 282ND of Dallas County, Texas at the courthouse of said
County, in the City of Dallas, on the 18TH day of AUGUST, 20 14, at 9:00 o'clock A. M., Then and there to
testify as a witness in behalf of the STATE in a criminal Action pending in said court, wherein THE STATE OF
TEXAS is Plaintiff, and GARY GREEN, Defendant No. W09-59380-S

DUECES TECUM (IF APPLICABLE)                                                    ☐ NOT APPLICABLE
and that he bring with him and produce in said Court, at said time and place,

*SEE ATTACHMENT....*

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

OUT OF COUNTY (IF APPLICABLE)                                         ☒ NOT APPLICABLE
DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as
Fines and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE, THIS 18TH day of JULY , 20 14
GARY FITZSIMMONS
Clerk, District Courts
Dallas, County Texas
By_____
D. SANCHEZ                          Deputy

---

NO. W09-59380-S

JUDICIAL DISTRICT COURT 282ND
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS
VS.

GARY GREEN
CAPITAL MURDER

SUBPOENA

ISSUED
This 18TH day of JULY, 20 14
GARY FITZSIMMONS
Clerk, District Courts
Dallas County, Texas
By D. SANCHEZ Deputy

ATTORNEY:
JACLYN O'CONNOR ASST.D.A
133 N. RIVERFRONT BLVD
DALLAS TX 75207
214-653-3600

REPORT TO:
FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD.
DALLAS, TEXAS 75207

523

## OFFICER'S RETURN

CAME TO HAND on the ...... day of ....................................... 20 ..... and executed by delivering a copy of the within Subpoena to the following within named witnesses, all of whom were summoned in ...................................... County, on the dates and at the places hereinafter set forth, as follows:

| NAME | NAME | DATE | WHERE | COURSE | DISTANCE |
|------|------|------|-------|--------|----------|
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |
| ........................................................... | ........................................................... | ...... miles | ............... from | ......................................... | miles |

I actually and necessarily traveled ................... miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.
AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS................................

| | | |
|---|---|---|
| ........................................................... | ............................. | $ .................... |
| ........................................................... | ............................. | $ .................... |
| ........................................................... | ............................. | $ .................... |

TOTAL ...........

The following named witnesses not summoned for the reasons set opposite their names:

........................................................................................................................................
........................................................................................................................................
........................................................................................................................................
........................................................................................................................................
........................................................................................................................................
........................................................................................................................................

To total amount of money furnished ................
witnesses ........................................ $....................
For summoning ................ Witnesses
at ................... each ...............      ....................
Mileage ........... miles at ...........      ....................
TOTAL ................................   $....................
Subscribed and sworn to before me, this ................. day of

Sheriff ................................................. County, Texas
By ................................................... Deputy

......................................................................... 20........
........................................................................................
........................................................................................

524

and that he/she bring with him    and produce in said court, at said time and place the following: Copies of the entire Inmate Classisfication File for Gary Green, **TDCJ No. 00999561**, including but not limited to disciplinary records, cell inventories, visitation records and commisary records.  In lieu of appearing on the listed date, the certified records can may be mailed to Assistant District Attorney **Jaclyn O'Connor** at 133 N. Riverfront Blvd., LB-19, Dallas TX 75207-4399.

The testimony of said witness is believed to be material to the State.

525

*SEND A REQUEST*
*Do NOT FOLD - IN-SERVE*

## APPLICATION FOR SUBPOENA DUCES TECUM IN THE DISTRICT COURTS/CRIMINAL

## TO THE CLERK OF THE 282ND JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS,

In the case of Ex parte Gary Green, Cause No. W09-59380-J (A), charged with CAP MURDER MULTI, set for writ hearing on August 18, 2014 at 9:00 a.m., you will please issue subpoena in accordance with the law for the following named witness residing in the County, as set out:

Custodian of Records, Texas Department of Criminal Justice (TDCJ), residing in Walker County, TX. Whose location is Texas Department of Criminal Justice, Classification and Records Division, P.O.Box 99, Huntsville, TX 77342

And that he/she bring with him/her and produce in said Court at said time and place the following: a certified copy of the contents of the inmate classification file of Gary Green TDCJ# 00999561, DOB 03/14/1971, specifically, disciplinary records, visitation records, telephone records, cell inventories, and commissary records.

In lieu of appearing on the listed date, certified copies may be mailed to Asst. DA Jaclyn O'Connor, Appellate Division, 133 N Riverfront Blvd., LB-19, Dallas, TX 75207-4399; 214-653-3600.

The testimony and records of said witness is believed to be material to the State.

Jaclyn O'Connor
Assistant District Attorney
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207-4399
(214) 653-3772

Sworn to and subscribed before me, on July _24th_, 2014.

Gary Fitzsimmons
District Clerk, Dallas County, TX

_____
Deputy District Clerk

Issued By: _____

Date: _____

526

# IN THE 282ND JUDICIAL DISTRICT COURT
# DALLAS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE, ) | Cause No. |
| GARY GREEN, ) | W09-59380-S(A) |
| ) | |
| APPLICANT ) | |

**FILED** 14 AUG 19 AM 9: 31 GARY FITZSIMMONS DISTRICT CLERK DALLAS CO. TEXAS _____ DEPUTY

## SUPPLEMENTAL BRIEFING IN SUPPORT OF
## APPLICATION FOR WRIT OF HABEAS CORPUS

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

527

**IN THE 282ND JUDICIAL DISTRICT COURT**
**DALLAS COUNTY, TEXAS**

|  |  |
|---|---|
| ) | Cause No. |
| ) | W09-59380-S(A) |
| EX PARTE, ) | |
| GARY GREEN, ) | |
| ) | |
| APPLICANT ) | |
| ) | |

**SUPPLEMENTAL BRIEFING IN SUPPORT OF**
**APPLICATION FOR WRIT OF HABEAS CORPUS**

Gary Green, by and through his attorneys the Office of Capital Writs ("OCW"), offers this supplemental briefing and exhibits in support of his Application for Writ of Habeas Corpus filed with this Court on June 15, 2012. Following an evidentiary hearing held before this Court on July 14, 2014 through July 18, 2014, the Court identified several areas it requested be supplemented to the writ record. The following discussion and attached exhibits are offered to address the Court's request. [1]

**A. Trial Counsel Performed Deficiently in Their Investigation of Green's Capital Case**

In Claims One through Six of the Application, Green presents evidence that his trial counsel failed to meet professional standards and norms for capital counsel during their representation and investigation of his capital case. This Court requested further briefing on the specific ways in which trial counsel performed deficiently in their representation of Green.

---

[1] Citations to Exhibits 1 through 73 refer to exhibits filed by Green during the July 2014 evidentiary hearing. The additional exhibits included with this briefing will be numbered Exhibit 74 and subsequent, for consistency.

2

**528**

### 1. Counsel Failed to Begin Their Investigation of Green's Case Until Months After Being Appointed

The prevailing standard of professional norms at the time of Green's trial required that trial counsel begin their mitigation investigation immediately upon appointment to a capital case. The ABA Guidelines stipulate that "[t]he mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses…, decisions about the need for expert evaluations…, motion practice, and plea negotiations." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 2003, Guideline 10.7, Commentary, 31 HOFSTRA L. REV. 1023 (2003). In light of this requirement, a mitigation specialist must also be hired as close to the time of appointment as possible, "whether or not the State has yet indicated an intention to seek the death penalty." (Ex. 66 at ¶57 [Aff. of Danalynn Recer].)

In Green's case, trial counsel have testified that they decided to wait until after the State announced they would seek death to begin their investigation.[2] The State did this on February 11, 2010, nearly five months after lead counsel was appointed to the case. (4 RR.)

In reality, trial counsel's investigation of Green's case did not occur until much later. Counsel did not retain an investigator or mitigation specialist to begin work on the case until late into March 2010. (Ex. 34 at 3 [Dr. Goodness Payment Requests]; Ex. 36 at 2 [Investigator Payment Requests].) Further, the defense's first applications for subpoenas of life history records did not occur until June 2010. (1 CR at 194.) The first substantive witness interview did not occur until June 14, 2010, when counsel had Green's mother, brother, and stepfather meet for a brief interview at the Dallas County Courthouse. (Ex. 73 [Witness Interview Memos].) This was 264 days—nearly nine months—after lead counsel was first

---

[2] The Reporter's Record from Green's evidentiary hearing is not yet available.

3

appointed to Green's case. It was also only 133 days—half that time—from the day trial began.

Trial counsel performed deficiently by failing to begin their investigation until months after being appointed to Green's case. By waiting to begin their mitigation investigation until the state announced its intent to seek the death penalty or later, Green's trial counsel violated the standard of care for representation in a capital case.

### 2. Once Started, Counsel's Investigation of Green's Case Fell Short of Expectation for Capital Cases

At the time of Green's trial, prevailing standards of professional norms required that trial counsel conduct an exhaustive investigation into a capital defendant's life history. This investigation involves identifying and interviewing as many potential witnesses as possible, including the client's family members and virtually everyone else who knew the client and his family. (Ex. 5 at ¶11 [Aff. of Michael Gross]; Ex. 66 at ¶¶74, 118 [Aff. of Recer].) Because these life history interviews often involve discussion of sensitive subject matter, the defense team must conduct in-person interviews; phone interviews are not appropriate. (Ex. 66 at ¶¶102, 119 [Aff. of Recer].) Moreover, eliciting such information usually requires multiple interviews. (*Id.* at ¶¶100, 102; Ex. 5 at ¶11 [Aff. of Gross].) Prevailing standards of professional norms also require that counsel retain expert witnesses as early as possible in order to "give themselves enough time to develop their case based upon their experts' findings, as well as time to seek additional or alternate experts." (Ex. 5 at ¶14 [Aff. of Gross].)

Ultimately, trial counsel conducted only seven in-person interviews during the investigation of Green's case, not including Green himself. Eleven other

interviews were conducted by phone, and there is no indication that any follow-up in-person interviews occurred. (Ex. 73 [Witness Interview Memos].)[3]

In addition, because counsel began their investigation so late, their consultation with potential expert witnesses was also delayed. Several witnesses were not contacted until the eve of trial, which began on October 26, 2010. For example, Dr. Kellie Gray-Smith was not retained until early September 2010. (Ex. 67 [Letter from Goodness to Gray-Smith].)  S. O. Woods was not retained until October 1, 2010. (Ex. 37 at 17 [Expert Witness Payment Requests].)

The defense team's limited investigation into Green's social history did not comport with prevailing standards of professional norms at the time of his trial. (Ex. 5 at ¶25 [Aff. of Gross] ("I do not believe trial counsel sufficiently investigated Green's life story in preparation for his capital trial, as required under prevailing professional norms and *Strickland v. Washington*.").)  Trial counsel's late retention of expert witnesses also led to deficient performance in their preparation for trial. (Ex. 5 at ¶28 [Aff. of Gross] ("Green's trial counsel did not adequately develop their expert witnesses.").)

### 3.  Lead Counsel Failed to Limit His Other Case Workload During His Representation of Green

Trial counsel's failure to conduct a thorough and constitutionally adequate investigation of Green's case can likely be attributed directly to lead counsel's failure to limit his workload of other criminal appointments.  Because a capital case requires an extraordinary amount of investigation and preparation, the ABA

---

[3] Trial counsel testified that they believed they had conducted more interviews than their written memos reflected.  However, counsel was not able to recall any specific details of these other interviews and offered no written records of them occurring.  Even assuming counsel did conduct other interviews and merely did not create any record of those interviews (a claim that is simply not credible), such failure to create any record of witness interviews would itself be evidence of deficient performance by trial counsel.

531

Guidelines stipulate that "[c]ounsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 2003, Guideline 10.3, 31 HOFSTRA L. REV. 913 (2003). The Texas Guidelines mirror this requirement. State Bar Tex., *Guidelines and Standards for Texas Capital Counsel*, Guideline 9.3 (April 21, 2006).

In Green's case, lead counsel Paul Johnson appears to have done little or nothing to limit the amount of cases he was working on during his representation of Green. As a result, he spent considerable time working on large numbers of other felony cases during that period. Mr. Johnson acted as lead counsel on at least six other jury trial during his representation of Green. (Ex. 68 [Paul Johnson Trial Judgments].) Two of these trials were capital murder trials where the State was not seeking the death penalty. Each trial presumably required significant time and attention on the part of Mr. Johnson, taking him away from work on Green's case. In addition, Mr. Johnson settled approximately eighty felony cases in some form of plea agreement between the time counsel began their investigation of Green's case (March 2010) and the end of Green's trial (November 2010). (Ex. 69 [Paul Johnson Plea Agreements].) Two of these plea agreements were negotiated and entered on days when Green's case was in the middle of his capital trial. (*Id.*) In total, Mr. Johnson received over $300,000 in legal fees from appointments in Dallas County from the time he was appointed in Mr. Green's case to the end of trial, including Green's case. (Ex. 70 [Paul Johnson Dallas Auditor Report].)

### 4. Lead Counsel's Lack of Attention to Green's Case Lead to a Breakdown in the Trial Team

Ultimately, lead trial counsel's failure to sufficiently attend to the investigation and development of Green's case led to significant breakdowns in the

6

532

relationships that were supposed to be established within the defense team. These breakdowns impaired the work that was done on Green's behalf.

It is counsel's duty to "guide the defense team." ABA, *Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases*, Guideline 10.4(B), 36 Hofstra L. Rev. 677, 689-90 (2008). Counsel must "supervise and direct the work of all team members…and must ensure on an ongoing basis that their work is of high professional quality." *Id.* Specifically, "[f]requent, effective communication between defense counsel and the mitigation specialist is necessary for competent assistance of counsel." (Ex. 66 at ¶85 [Aff. of Recer].)

Records show that Paul Johnson was not acting as lead counsel is required to under the ABA guidelines and that it negatively impacted the development of Green's case. For example, emails from the mitigation specialist Dr. Kelly Goodness show that Mr. Johnson frequently stopped communicating with the team, including when direction was needed about the investigation of Green's case or consultation with experts. (Ex. 35 [Dr. Goodness Investigation Records].) Despite their post-conviction testimony denying any problems, co-counsel Brady Wyatt and Kobby Warren evidenced their own frustration with Mr. Johnson prior to trial and that they were worried about the amount of investigation that had not occurred on Green's case. (*Id.* at 29-31.) Finally, the expert witnesses retained to testify at Green trial each noted a lack of involvement and preparation by Mr. Johnson, finding that it was the mitigation specialist who provided all their guidance. (Ex. 3 at ¶¶11-13 [Aff. of Dr. Kellie Gray-Smith]; Ex. 4 at ¶11 [Aff. of Dr. Gilbert Martinez].)

As a result, trial counsel's failure to timely begin their investigation of Green's case and lead counsel's lack of attention to Green's case, led to an incomplete investigation and a breakdown in the performance of Green's trial

7

**533**

team.  These problems led counsel to deficiently perform their duties as capital counsel on behalf of Green, and led to significant prejudice to Green's trial as identified in his Application before this Court.

### B. Trial Counsel's Deficient Performance Prejudiced the Presentation of Green's Mental Health Evidence During the Punishment Phase of Trial

Specifically, in Claim Four of the Application, Green provides evidence that trial counsel's deficient performance in the investigation of Green's case prejudiced the presentation of mental health expert testimony during the punishment phase of trial.  As part of that evidence, Green presented the testimony of Dr. Bhushan Agharkar during the July 2014 evidentiary hearing before this Court.  Dr. Agharkar is a forensic psychiatrist who has extensive experiencing treating, teaching, publishing, and testifying about mental illnesses such as Schizoaffective Disorder. (Ex. 1 at ¶¶2-6 [Aff. of Dr. Bhushan Agharkar].)

Based on his evaluation of Green, as well as review of life history records and testimony, Dr. Agharkar concludes that Green suffers from Schizoaffective Disorder. (Ex. 75 at ¶4 [Supp. Aff. of Dr. Agharkar].)  This conclusion aligns with the diagnosis Green's trial counsel chose to present as mitigating evidence during the punishment phase of trial, through the testimony of Dr. Gilbert Martinez. (*See* 52 RR at 31.)

However, trial counsel's failure to sufficiently investigate and develop Green's punishment case meant that the evidence of Schizoaffective Disorder presented by the defense was limited to Dr. Martinez's clinical explanation of the disorder.  Dr. Martinez is a clinical psychologist and is neither trained in forensics nor was he asked in Green's case to testify forensically. (52 RR at 30; Ex. 4 at ¶¶6, 9-14 [Aff. of Dr. Gilbert Martinez]; Ex. 75 at ¶5 [Supp. Aff. of Dr. Agharkar].)

Yet both Dr. Martinez and Dr. Agharkar agree that forensic testimony would have provided Green's jury with information about why they should find the

8

**534**

diagnosis of Schizoaffective Disorder was mitigating in Green's life. (Ex. 75 at ¶6 Supp. Aff. of Dr. Agharkar]; Ex. 4 at ¶9 [Aff. of Dr. Martinez].)   Green's Schizoaffective Disorder caused him to experience paranoid delusions, as well as "mood swing, depression, social isolation, and disorganized speech" throughout his life. (Ex. 75 at ¶7 [Supp. Aff. of Dr. Agharkar].)  These symptoms not only impaired Green's ability to form relationships—the paranoid delusions he experiences appear to have directly contributed to his actions surrounding the time of the crime.  (*Id.* at ¶¶8-10.)  The absence of this sort of forensic testimony prejudiced Green's punishment phase of trial by failing to make the connections between the clinical diagnosis identified by Dr. Martinez and why the jury should find it to be a mitigating circumstance in Green's life.

Importantly, the failure by trial counsel to present this sort of forensic testimony was not relieved by their consultation with other mental health professionals.  As described more fully in Green's Application, trial counsel's approach to and preparation of these experts was deficient.  The reports from Dr. David Self and Dr. Kristi Compton highlight many of the same symptoms identified by Dr. Martinez and Dr. Agharkar in reaching a diagnosis of Schizoaffective Disorder. (Ex. 75 at ¶16 [Supp. Aff. of Dr. Agharkar].)  Yet trial counsel did not approach either of these experts with the goal of confirming or refuting the diagnosis they had (and ultimately presented).  The scope and direction of an expert witness's referral question greatly impacts whether the expert is able to give back useful information to the attorney. (*Id.* at ¶18.)

Counsel's developing an appropriate referral question depends on their having already completed the life history investigation.  The standard of care for capital representation therefore requires that counsel fully develop the client's life history before having experts conduct mental health evaluations of the client. (Ex. 66 at ¶¶80-84, 123 [Aff. of Recer] ("[F]or about twenty years, Texas capital

9

535

counsel have been taught that a thorough social history must be done *before* selecting experts and the facts of that investigation provided to said experts….Before interviewing the client, the expert needs to have reviewed the life history in order to properly tailor the assessment and form a reliable, informed expert opinion.").) In Green's case, trial counsel had their mental health experts conduct evaluations while their limited life history investigation was still ongoing. Both Dr. Self and Dr. Compton were therefore given a too open-ended referral question and were not provided enough information for their assessments. Thus, the fact that neither initially reported a finding of Schizoaffective Disorder does not diminish or repudiate the findings of Dr. Martinez and Dr. Agharkar.

Regardless of the reports from these other potential expert witnesses, trial counsel made the decision to present Green's mental impairments, and specifically Schizoaffective Disorder, as their primary mitigation evidence. In adopting that line of evidence, trial counsel had the duty to sufficiently investigate and present information of Green's mental health to the jury. Their failure to present a complete explanation of Schizoaffective Disorder, including how it impaired Green's behaviors throughout his life and surround the crime, constituted deficient performance that prejudiced Green's trial.

## C. Trial Counsel's Deficient Performance Prejudiced the Presentation of Future Dangerousness Evidence During the Punishment Phase of Trial

In Claim Eight of the Application, Green presents evidence that trial counsel's deficient performance in the investigation of his case prejudiced the presentation of evidence during the punishment phase of trial that would have shown Green would not be a continuing threat of violence in the future. During the punishment phase of Green's trial, counsel acknowledged that they had not presented any evidence on the issue of Green's probability of future dangerousness. (52 RR at 168.) Yet, as this Court recognized, evidence that

Green suffered from a severe mental illness, without further explanation, could mistakenly be viewed by a jury as evidence that Green *would* constitute a threat in the future.

Substantial evidence exists, however, that should have been presented to the jury that Green's Schizoaffective Disorder is a very treatable condition, and that the treatment options available in the TDCJ system make it highly unlikely that Green would be a future danger. Had someone like Dr. Agharkar testified, the jury would have learned that Schizoaffective Disorder is effectively treated by a combination of anti-psychotic medication and mood stabilizing agents. (Ex. 75 at ¶13 [Supp. Aff. of Dr. Agharkar].) These medications are able to target both types of symptoms (psychosis and mood swings) that appear in Schizoaffective Disorder. (*Id.*) In addition, the fact that Green would be housed in the structure environment of a prison for the rest of his life would also have a moderating effect on his symptoms, making it further unlikely that his mental illness would create a risk of future violence. (*Id.* at ¶14.)

There is also substantial information about the TDCJ prison system and its ability to treat mental illness that should have been presented to Green's jury. For most of the TDCJ prisons throughout the state, the medical and mental health care is provided by the University of Texas Medical Branch ("UTMB") through a contract with TDCJ. (Ex. 74 at 1 [Letter of Dr. Joseph Penn].) Someone associated with UTMB, such as Dr. Joseph Penn, the Director of Mental Health Services in the Correctional Managed Care division of UTMB, could have explained to the jury the numerous treatment options and safeguards available in TDCJ. (*Id.*)

UTMB staff are able to evaluate and identify those inmates in need of psychiatric or other mental health care immediately upon entering the prison system. (Ex. 74 at 2 [Letter of Dr. Penn].) Those inmates who need urgent care

11

537

can be sent to crisis management, while others can be referred to diagnostic programs. (*Id.*) Those inmates with the most chronic or critical symptoms can be sent to one of three different psychiatric prisons through the state. In addition, UTMB staff work in conjunction with TDCJ staff to monitor all inmates' conduct to determine whether any show signs of needed psychiatric or mental health care intervention. (*Id.*)

For those inmates that do require treatment, a variety of options are available. In addition to traditional psychopharmacology (medications), UTMB offers group and individual therapy sessions, anger management courses, psycho-education programs, and crisis intervention groups. (Ex. 74 at ¶3 [Letter of Dr. Penn].) Individuals are given treatment plans based on their specific needs. (*Id.*) Depending on the needs of the individual, UTMB can house them at the psychiatric hospitals for days, weeks, months, or even years—or can return inmates back to crisis care if necessary even after they have been returned to a regular prison facility. (*Id.*)

Throughout this provision of mental health care, UTMB staff are trained to identify and prevent risks of violence by inmates. (Ex. 74 at ¶3 [Letter of Dr. Penn].) Any inmate who appears to be a risk of violence to himself or others is referred for treatment. UTMB utilizes national treatment guidelines and is very experienced at treating mental illnesses ranging from Schizoaffective Disorder (like Green) to even more severe, chronic, and psychotic illnesses. (*Id.*) Because of the structured prison setting, UTMB staff are able to monitor daily medication compliance, changes in dosage, how the inmate is functioning, and whether the inmate behavior changes over time. (*Id.*) Finally, in extreme cases, UTMB is able to seek approval to forcibly medicate an inmate with psychotropic medication to treat inmates who are a danger to themselves or other. (*Id.* at 4.)

12

538

All of these treatment options and institutional structures allow UTMB and TDCJ to properly treat and monitor inmates with mental illness. Testimony from someone like Dr. Penn would have not only explained why Green's mental illness should not be considered dangerous, but would also have offered affirmative evidence of why Green was unlikely to pose any future risk of violence while being housed and treated in the TDCJ system. Trial counsel's failure to present this information, or any information relating to future dangerousness, was deficient performance that prejudiced Green's trial.

## CONCLUSION

For the foregoing reasons, and for the reasons expressed in Green's initial state habeas application, and as supported by exhibits and testimony presented before this Court in July 2014, Green respectfully requests this Court enters findings of fact and conclusions of law to the Court of Criminal Appeals recommending his conviction and sentenced be reversed.

Respectfully submitted,

DATED:     August 15, 2014          By _____
                                    ROBERT ROMIG


                                    By _____
                                    JOANNE HEISEY

13

539

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Supplemental Briefing to:

District Clerk, Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207
(Original and one copy, by mail)

Honorable Andy Chatham
282nd District Court
133 N. Riverfront Blvd.
5th Floor
Dallas, Texas 75207
(One courtesy copy, by email)

Dallas County District Attorney
ATTN: Jaclyn O'Connor
133 N. Riverfront Blvd.
Lock Box 19
Dallas, Texas 75207-4399
(One copy, by e-mail)

Gary Green
Polunsky Unit #999561
3872 FM 350 South
Livingston, Texas 77351
(One copy, by mail)

This certification is executed on August 15, 2014, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

ROBERT ROMIG

14

540



# Exhibit 74





Joseph V. Penn, MD, CCHP FAPA
Clinical Professor
UTMB Dept. of Psychiatry and Behavioral Sciences
Director, Mental Health Services
UTMB-Correctional Managed Care
200 River Pointe Drive, Suite 200
Conroe, TX 77304
Phone: 936-494-4183
Fax: 936-494-4194
jopenn@utmb.edu

August 8, 2014

To Whom It May Concern,

My name is Dr. Joseph Penn and I am the Director of Mental Health Services at the University of Texas Medical Branch ("UTMB") Correctional Managed Care division. I have been asked by the Office of Capital Writs to provide information regarding the available medical and mental health treatment under the auspices of UTMB's correctional care in conjunction with the Texas Department of Criminal Justice ("TDCJ"). The following is an overview of UTMB's Correctional Managed Care system.

**What is the history of UTMB's involvement in providing medical care to Texas prisons?**

Prior to 1994, the Texas Department of Criminal Justice provided medical and mental health care to TDCJ offenders in the Texas prison system. TDCJ directly employed a staff of physicians, nurses, psychologists, psychiatrists, and other types of care providers. In 1994, in efforts to assure quality care was provided across the prison system, TDCJ began partnering with both UTMB and Texas Tech University to provide medical, nursing, dental, other specialty health care and psychiatric and mental health care to Texas inmates.

Currently, TDCJ contracts with both UTMB and Texas Tech to provide the care needed by Texas inmates. Instead of providing direct care, TDCJ audits and monitors the compliance of both UTMB and Texas Tech to ensure quality care is being delivered and that there is timely access to care.

**What is the scope of the care provided by UTMB in the TDCJ system?**

The Texas prison system consists of 111 prison units throughout the state. UTMB provides care to approximately 80% of those units, ranging from far east Texas, north to the Dallas-Fort Worth metro area, and south into the Rio Grande Valley. This means UTMB is responsible for the medical and mental health care of roughly 120,000 offenders in the TDCJ system. Most care is delivered directly on-site at the prison units. However, off-site and emergency care is available. UTMB also runs both a medical school and a prison hospital in the Galveston area. In addition, three TDCJ units are specific psychiatric care facilities—the Jester IV unit in Sugarland, Texas, and the Skyview Unit in Rusk, Texas, both in the UTMB sector, and the Montford Unit in Lubbock, Texas, in the Texas Tech sector.

Exhibit 74 - Page 1

1

542

Regarding specific medical and mental health care, UTMB provides a full continuum of care to prison inmates. This means that regardless of the level of seriousness of the illness or the treatment required, and regardless of when the need arises, UTMB is responsible for the care. UTMB employs around 2,800 staff statewide for this purpose

## How are needs for medical or mental health care identified by UTMB?

UTMB staff work to identify the medical, dental, other health care needs, and psychiatric and mental health needs of Texas inmates from the time they enter the prison system throughout their stay with TDCJ. Upon entry into the TDCJ system, inmates are sent to an intake unit for processing. At that unit, inmates are immediately seen by UTMB nursing staff for evaluation to determine whether care is needed. Additional medical and mental health screenings and evaluations are conducted within an established period of time. Additional chronic care and sick call request processes are available. Staff are also able to access medical records, particularly from county jails. In particular, past mental health treatment, such as past histories of state hospitalizations or treatment at community mental health centers, is also carefully reviewed to ensure continuity of care.

For those inmates who require crisis management, emergency psychiatric hospitalization, or other urgent mental health care, nursing and qualified mental health staff are able to immediately begin the process for establishing that care. There is an on-call psychiatrist afterhours and on weekends and holidays, and there is a system of mental health staff triage and referral processes. Outpatient mental health treatment services can range from a mental health assessment to additional individual or group therapy if clinically indicated. Offenders may be referred for a diagnostic evaluation and medication evaluation by a psychiatric provider. If an offender is experiencing risk of harm to self or others, there is a crisis management evaluation and referral process including suicide prevention processes by correctional staff. For example, those inmates with serious psychotic mental illnesses who are experiencing critical symptoms can be admitted directly into a crisis management program or the diagnostic and evaluation programs at one of the two psychiatric prison units within UTMB sector, or the one psychiatric unit at Texas Tech.

In addition, inmates are able to access routine or urgent medical or mental health care throughout their stay at TDCJ. Inmates can put in sick call requests to be seen by a provider. For administrative segregation or other restrictive housing settings within different facilities, nursing staff make weekly rounds to assess whether further care is needed. Mental health staff also make additional mental health rounds on offenders to confirm access to care in restrictive housing settings.

Finally, UTMB staff are trained to identify inmates with mental illnesses even when the inmates do not self-report symptoms. UTMB staff work together effectively with TDCJ correctional staff and leadership and are kept abreast of inmate behavior in order to monitor the need for care or intervention. For example, when an inmate appears before a disciplinary board because of a violation of prison rules, nursing and mental health staff evaluate the incident to determine whether the behavior of the inmate indicates a need for further medical or mental health evaluation or treatment services/level of care.

Exhibit 74 - Page 2

**2**

**543**

**What range of mental health care treatment options are available to Texas inmates through UTMB?**

UTMB offers a wide variety of treatment options and programs for mental health care in the Texas prison system. Probably the most commonly associated with mental illness is treatment through psychopharmacology (psychotropic medications). In addition, UTMB offers various outpatient options depending on an individual's circumstances. This can include group and individual therapy sessions, anger management courses, psycho-educational programs, and crisis intervention groups. UTMB develops an individualized treatment plan based on the needs of the individual offender. In general, an inmate housed in general population, who is not under special restrictions or administrative segregation, will have access to these programs.

The ultimate goal of the mental health treatment by UTMB staff is to stabilize the inmate and reduce or eliminate the signs and symptoms of clinical impairment or other disturbances. To meet this goal, UTMB is able to do what many free world psychiatric hospitals and State hospitals cannot provide in terms of lengths of stay and care. Rather than a few days or weeks at an inpatient facility, inmates in the Texas prison system are able to receive diagnostic and treatment programs at the three psychiatric prison facilities for extended periods of time, lasting from a few days, or if clinically warranted, up to months or even years, depending on the needs of the individual. Once an inmate is transitioned away from inpatient care, UTMB staff are able to monitor the inmate's transition into another unit and return the person for further care if decompensation starts to occur. The long-term stability of the inmate is pursued through monitoring, follow-up by mental health staff, psychiatric medication monitoring by psychiatric providers, and making clinically indicated adjustments to treatment.

**What processes are in place to identify and prevent risks of violence or dangerous behavior from mentally ill inmates?**

First, it should be noted that the scientific community is still studying whether and what is the relationship between mental illness and violence. To a certain degree, having mental illness by itself does not put someone at a greater risk of violence. In addition, there are several aspects of the mental health care in Texas prisons that reduces what risk there is of violence from mentally ill inmates.

For example, UTMB staff are trained to evaluate an individual's risk of harm to themselves or others. An inmate who appears to be suffering mental illness as manifested by problem behaviors, signs or symptoms that correctional or health care staff believe do pose a risk to the inmate or others, then the offender will be referred for further mental health evaluation and treatment.

Next, UTMB utilizes nationally recognized treatment guidelines for the evaluation and treatment of mental illness. Through its provision of care across the Texas prison system, UTMB has treated all manners of mental illnesses, including psychotic illnesses such as Schizophrenia, Schizoaffective Disorder, Bipolar disorder, Major Depression, as well as other more severe, chronic, and psychotic illnesses. The structured setting of the prison environment allows UTMB the ability to monitor information often not available to free-world physicians: the medication compliance regarding the exact dosage and frequency of medication being prescribed across time, whether the inmate does in fact take the medication and how often, functioning within a highly structured setting with limited access to alcohol and illicit substances, and whether the inmates behavior changes over time.

Exhibit 74 - Page 3

544

In addition, for extreme cases, and only when clinically determined and indicated on an individualized basis, UTMB mental health and psychiatric staff are able to request permission for forced or compelled psychotropic medication via administrative hearings with due process protections in order to treat acutely or chronically psychotic individuals who are a danger to themselves or others.

In conclusion, the following information is meant to provide a broad overview of the medical, dental, other health care, and psychiatric and mental health services available through the Correctional Management Care program at UTMB. It is my understanding that this information is being provided by the Office of Capital Writs to the 282nd District Court of Dallas County, within the framework of a state habeas proceeding. If further detail or clarification of this information is desired, I am available to speak to the Court by phone or via live testimony.

Respectfully,

Joseph V. Penn, MD

**State of Texas**

**County of Montgomery**

This instrument was acknowledged before me on _____ 8th day of August, 2014 by Joseph V. Penn, MD.

(Personalized Seal)

_____
Notary Public's Signature

OLA A. PORTILLA
Notary Public, State of Texas
My Commission Expires
August 19, 2015

Exhibit 74 - Page 4

545

## Joseph V Penn, MD CCHP FAPA
DIRECTOR MENTAL HEALTH SERVICES
UTMB CORRECTIONAL MANAGED CARE

Dr. Penn received his medical degree from the University of Texas Medical Branch (UTMB) in Galveston, Texas, he completed a residency and chief residency in psychiatry, and a fellowship in child and adolescent psychiatry, in the Department of Psychiatry and Human Behavior, Brown University, Providence, Rhode Island. He completed an additional fellowship in forensic psychiatry at Yale University, New Haven, Connecticut. Board certified in general and forensic psychiatry, he has served as a board examiner for the American Board of Psychiatry and Neurology, on the general psychiatry recertification committee, and is currently on the forensic psychiatry committee.

Dr. Penn is a Clinical Professor, Department of Psychiatry and Behavioral Sciences, UTMB, Galveston, Texas. He was previously Clinical Associate Professor in the Department of Psychiatry and Human Behavior, at Brown University and the Warren Alpert Medical School. He was the principle author of the American Academy of Child and Adolescent Psychiatry (AACAP) Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities among other writings.

Dr. Penn has performed numerous civil, criminal, and other independent psychiatric evaluations of children, adolescents, adults, and has been qualified and testified as an expert witness in state and federal courts. He has served as a consultant regarding correctional and non-correctional mental health care delivery and standards of care. He has presented on law and psychiatry issues, including seclusion and restraint, use of psychotropic medications, access to mental health care in correctional settings, suicide prevention, and prediction of future violence. He is the AACAP's representative to the Board of Directors of the National Commission on Correctional Health Care (NCCHC), and is also on the Board of Directors of the Society of Correctional Physicians (SCP).

Exhibit 74 - Page 5

546

June 15, 2014

CURRICULUM VITAE
# JOSEPH V. PENN, MD CCHP FAPA

| | |
|---|---|
| Business Address: | University of Texas Medical Branch (UTMB)<br>Correctional Managed Care (CMC)<br>Mental Health Services<br>200 River Pointe Drive, Suite 200<br>Conroe, Texas 77304 |
| Business Telephone: | (936) 494-4170 |
| Business Fax | (936) 494-4195 |
| E-mail: | jopenn@utmb.edu |

## EDUCATION

Undergraduate

1987  B.S. in Biology
University of the Incarnate Word (formerly Incarnate Word College), San Antonio, Texas
Honors: Alpha Chi, Academic All-American, Who's Who in American Universities & Colleges, Graduated Summa Cum Laude

Medical School

1992  M.D.
University of Texas Medical Branch, Galveston, Texas
Honors: Who's Who in American Colleges/Universities, Junior Marshal

## POSTGRADUATE TRAINING

Residency

1992-1996    General Psychiatry
1995-1996    Chief Resident
Department of Psychiatry and Human Behavior, Brown University, Providence, Rhode Island

Residency

1996-1998    Child and Adolescent Psychiatry
Department of Psychiatry and Human Behavior, Brown University, Providence, Rhode Island

Fellowship

1998-1999    Forensic Psychiatry
Department of Psychiatry
Yale University, New Haven, Connecticut

Exhibit 74 - Page 6

547

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## POSTGRADUATE HONORS AND AWARDS

1994   ACNP Program for Minority Research Training in Psychiatry
1994   Center for Mental Health Services Scholarship
1995   Mead Johnson Fellow, Association for Academic Psychiatry
1995   Laughlin Fellow, American College of Psychiatrists
1996   Outstanding Young Men of America
1996   Chester M. Pierce, M.D., Sc.D. Resident Research Award
1997   Lebensohn Award, American Association of General Hospital Psychiatrists
1997   Rappeport Fellow, American Academy of Psychiatry & the Law
1999   Presidential Scholar, American Academy of Child & Adolescent Psychiatry
2000   Pilot Research Award, American Academy of Child & Adolescent Psychiatry
2001   America's Registry of Outstanding Professionals
2002   Who's Who in Medicine and Healthcare
2003   Who's Who in America
2003   Who's Who in Science and Engineering
2003   Junior Faculty Development Award, Association for Academic Psychiatry
2004   Brown Medical School Teaching Recognition Award
2004   Distinguished Alumnus, University of the Incarnate Word
2004   Strathmore's Professional Honor Society
2005-  Best Doctors in America
2006   Madison Who's Who
2006   Fellow, American Psychiatric Association
2007   Who's Who Among Executives and Professionals
2007   Fellow, The Lloyd Society
2008   Member, American College of Psychiatrists
2011   Cambridge Who's Who Registry among Executives and Professionals in the field of Research, Medicine, and Healthcare

## MILITARY SERVICE                    None

## PROFESSIONAL LICENSES AND BOARD CERTIFICATION

1993   Rhode Island Medical License # 8849
1997   Diplomate, American Board of Psychiatry & Neurology # 43847
1998   Additional Certification, Child and Adolescent Psychiatry # 4583
1998   Connecticut Medical License # 36678
1999   Texas Medical License # K7081
1999   Massachusetts Medical License # 161086
2003   Additional Certification. Forensic Psychiatry # 1438
2004   Certified Correctional Health Care Professional (CCHP), National Commission on Correctional Health Care
2007   Re-Certification, American Board of Psychiatry & Neurology # 43847
2013   Re-Certification, Forensic Psychiatry, American Board of Psychiatry & Neurology # 1438

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1995-1996 | Assistant Instructor in Psychiatry |
| 1998-2007 | Clinical Assistant Professor of Psychiatry, Department of Psychiatry and Human Behavior, Brown University School of Medicine, Providence, Rhode Island |
| 2007-2012 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Human Behavior, Warren Alpert Medical School of Brown University, Providence, Rhode Island |
| 2009-2013 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |
| 2014- | Clinical Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |

## HOSPITAL APPOINTMENTS

| | |
|---|---|
| 1994-1997 | Psychiatric House Officer, Landmark Medical Center, Woonsocket, RI |
| 1994-1998 | Psychiatric House Officer, St. Joseph Center for Psychiatric Services, Providence, RI |
| 1999-2008 | Medical Staff, Rhode Island Hospital, Providence, RI |
| 1999-2008 | Medical Staff, Emma Pendleton Bradley Hospital, East Providence, RI |
| 1999-2008 | Director, Child and Adolescent Forensic Psychiatry, Rhode Island Hospital, Providence, RI |
| 2008- | Director, Mental Health Services, University of Texas Medical Branch (UTMB), Correctional Managed Care (CMC), Huntsville, Texas |

## OTHER APPOINTMENTS

| | |
|---|---|
| 1995- | Reviewer, Hospital Physician |
| 1996 | Reviewer, Academic Psychiatry |
| 1996 | Reviewer, Journal of Nervous and Mental Disease |
| 1997 | Reviewer, Journal of Clinical Psychiatry |
| 1997 | Staff Psychiatrist, Kent County Mental Health Center, Warwick, RI |
| 1998-2001 | Consultant, New Haven State's Attorney Office, New Haven, CT |
| 1998-2000 | Consultant, Capital Defense and Trial Services Unit, Office of the Chief Public Defender, Hartford, CT |
| 1998-2001 | Consultant, Office of the Public Defender, Bridgeport, CT |
| 1998-1999 | Psychiatrist, New Haven Court Clinic, New Haven, CT |
| 1998-1999 | Consultant, Disabilities Clinic, Yale Law School, New Haven, CT |
| 1998-1999 | Psychiatric Expert Witness, Trial Practice Course, Yale Law School, New Haven, CT |
| 1998-1999 | Consultant, Special Populations Unit, CT Department of Mental Health and Addictions Services, Hartford, CT |
| 1998-1999 | Genesis Group Co-leader and Individual Therapist, Whiting Forensic Institute, Middletown, CT |
| 1998-1999 | Child Custody and Placement Clinic, Yale Child Study Center, New Haven, CT |
| 1998-2001 | Consultant, Superior Court, Juvenile Matters, Stamford, CT |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| | |
|---|---|
| 1999 | Consultant, Psychiatric Security Review Board, Middletown, CT |
| 1999 | Consultant, United States Department of State, Washington, DC |
| 1999-2001 | Staff Child Psychiatrist, The Family Health Center at SSTAR Program, Fall River, MA |
| 1999-2008 | Director of Psychiatric Services, Rhode Island Training School, Cranston, RI |
| 1999-2008 | Consultant, Rhode Island Family Court |
| 1999-2008 | Consultant, Rhode Island Department of Children, Youth, and Families |
| 1999-2008 | Consultant, RI Department of Disability Determination Services, Providence, RI |
| 1999-2000 | Consultant, Providence Police Department, Kid's INC. Program, Providence, RI |
| 1999-2001 | Consultant, Office of the Attorney General, Providence, RI |
| 2000-2001 | Consultant, Superior Court, Juvenile Matters, Hartford, CT |
| 2000-2001 | Consultant, United States Attorney, District of Rhode Island, Providence, RI |
| 2001 | Consultant, Butler Hospital, Providence, RI |
| 2001 | Consultant, Northwest Special Education Region, Scituate, RI |
| 2001 | Consultant, Qualidigm, Middletown, CT |
| 2001-2003 | Consultant, Town of Narragansett, Narragansett, RI |
| 2001-2002 | Consultant, Office of the Public Defender, Enfield, CT |
| 2001-2002 | Consultant, Medical Consultants Network, Seattle, WA |
| 2001-2002 | Advisory Board, HELP Mental Health and Wellness Initiative, Providence, RI |
| 2002 | Consultant, Yarmouth Police Department, Yarmouth, MA |
| 2002-2003 | Consultant, Office of the Mental Health Advocate, Cranston, RI |
| 2002 | Consultant, Commonwealth of Massachusetts, Committee for Public Council, Boston, MA |
| 2002- | Editorial Board, Hospital Physician |
| 2002- | Reviewer, Journal of Correctional Health Care |
| 2003- | Consultant, Bradley Hospital, East Providence, RI |
| 2003- | Representative, American Academy of Child & Adolescent Psychiatry to the National Commission on Correctional Health Care, Chicago, Illinois |
| 2003- | Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2003 | Advisory Panel, ADHD in Correctional Institutions, National Commission on Correctional Health Care, Chicago, Illinois |
| 2004 | Consultant, Town of West Warwick, RI, Pension Board |
| 2004 | Consultant, Rhode Island Department of Corrections |
| 2004 | Reviewer, Journal of the American Medical Women's Association |
| 2004- | Editorial Board, Psychiatry |
| 2005 | Consultant, Florida Department of Juvenile Justice |
| 2005-2008 | Consultant, Office of the Public Defender, Providence, RI |
| 2005 | Consultant, Bradley School, Portsmouth, RI |
| 2005-2006 | Consultant, Office of the Attorney General, Hartford, CT |
| 2006-2007 | Consultant, Phoenix House, New York, NY |
| 2006- | Editorial Board, Correctional Health Report |
| 2006-2008 | Consultant, Physicians and Lawyers for National Drug Policy |
| 2006-2008 | Board of Directors, Academy of Correctional Health Care Professionals |
| 2007-2009 | Consultant, Town of East Providence, RI, Police Department |
| 2007-2009 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Various Correctional Facilities, Valhalla, New York |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| | |
|---|---|
| 2007-2010 | Chair (Chair-Elect, Chair, Immediate Past), Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2008 | Consultant, National Institute of Mental Health (NIMH), Bethesda, MD |
| 2009 | Consultant, Kansas Department of Juvenile Corrections |
| 2009 | Consultant, Philadelphia Department of Behavioral Health and Mental Retardation Services |
| 2009 | Reviewer, Ambulatory Pediatrics |
| 2009- | Board of Directors, Society of Correctional Physicians (SCP) |
| 2011- | Editorial Board, Journal of Correctional Health Care |
| 2011 | Technical Assistance Project Consultant, U.S. Department of Justice, National Institute of Corrections (NIC) |
| 2011 | Consultant, Rhode Island Department of Corrections |
| 2011- | Consultant, Agency for Health Research and Quality's (AHRQ) Effective Health Care (EHC) Program |
| 2011 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2011 | Consultant, Vermont Department of Corrections |
| 2012 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Idaho Department of Corrections |
| 2012 | Consultant, National Commission on Correctional Health Care, US Immigration and Customs Enforcement (ICE) San Diego Contract Detention Facility, San Diego, California |
| 2012 | Surveyor, National Commission on Correctional Health Care, Orleans Parish Criminal Sheriff's Office, New Orleans, Louisiana |
| 2012 | Surveyor, National Commission on Correctional Health Care, Hudson County Correctional Center, Kearny, New Jersey |
| 2012 | Reviewer, Academic Pediatrics |
| 2012-2013 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2013- | Consultant, Polk County Juvenile Detention Center/Polk County Jail, Bartow, Florida |
| 2013-2016 | Member, Council on Psychiatry and Law, American Psychiatric Association, Arlington, Virginia |
| 2013 | Surveyor, National Commission on Correctional Health Care, Harris County Jail, Houston, Texas |
| 2013 | Surveyor, National Commission on Correctional Health Care, Rio Grande Detention Center, Laredo, Texas |
| 2013- | Consultant, Juvenile Justice Commission (JJC) State of New Jersey, and the University of Medicine and Dentistry of New Jersey (UMDNJ)-University Behavioral HealthCare/University Correctional HealthCare, Trenton, New Jersey |
| 2013- | Reviewer, Suicide and Life-Threatening Behavior |
| 2013- | Consultant, Division of Health Services, Arizona Department of Corrections, Phoenix, Arizona |
| 2013 | Surveyor, National Commission on Correctional Health Care, El Paso Service Processing Center, El Paso, Texas |
| 2013- | Consultant to Special Master, *Coleman v. Brown, Governor of California, et al.*, United States Court of Appeals, Ninth Circuit, Pasadena, California. |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

ADDITIONAL INFORMATION

2007-2011   Contributor and Consultant to the American Academy of Child and Adolescent
            Psychiatry (AACAP) Work Group on Quality Issues. Practice Parameter for Child
            and Adolescent Forensic Evaluations. J Am Acad Child Adolesc Psychiatry 2011;
            50:1299-1312.

HOSPITAL COMMITTEES

1994-96     Pharmacy and Therapeutics Committee, Butler Hospital, Providence, RI
1995-96     Outpatient Specialty Program Directors Group, Butler Hospital, Providence, RI

UNIVERSITY COMMITTEES

Brown University Department of Psychiatry and Human Behavior
1992-96     Policy Committee, Residency Training Program
1992-96     Selection Committee, Residency Training Program
1994        Residency Recruitment Coordination Committee
1994-96     SDDS/Primary Care Psychiatry Research Committee
1994        Search Committee, Director of General Psychiatry Residency Training Program
1998        Selection Committee, Child and Adolescent Psychiatry Residency Program

Brown University School of Medicine
2000-2002   Search Committee, Department of Pediatrics
2003-2007   Search  Committee,  Post-Doctoral  Training  Program  in  Juvenile  Forensic
            Psychology

University of Texas Medical Branch Correctional Managed Care
2008-       Continuing Medical Education (CME) Committee
2008-2010   County Jail Pharmacy and Therapeutics Committee
2008-       Mental Health Services Policy Committee
2008-       Quality Council
2008-       Mental Health Inpatient Leadership Group (Chair)
2009-2011   Medical Executive Committee (Chair)
2009-       Executive Council

NATIONAL COMMITTEES

Academy of Correctional Health Care Professionals
2003-2004   Education Committee
2005-2008   Membership Committee
2006-2008   Board of Directors
2007-2008   Education Committee

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

American Academy of Child and Adolescent Psychiatry
1997-2000      Television and the Media Committee
1999-          Rights and Legal Matters Committee
1999-2002      Task Force on Juvenile Justice Reform
2002-2006      Committee on Juvenile Justice Reform

American Board of Psychiatry and Neurology
1998-2001      Psychiatry Re-Certification Committee
2001-2004      Re-appointed, Psychiatry Re-Certification Committee
2001-2006      Examiner, Part II General Psychiatry Examination Committee
2002-2006      Examiner, Child and Adolescent Psychiatry Examination Committee
2007-2014      Forensic Psychiatry Examination Committee

American Academy of Psychiatry and the Law
1998-          Rappeport Fellowship Committee
2006-          Suicidology Committee
2010-12        Institutional and Correctional Psychiatry
2011-          (Chair) Suicidology Committee

American College of Psychiatrists
2014-2017      Committee on the Education Award

American Correctional Association
2013-          Health Care Committee
2013-          Mental Health Committee

American Psychiatric Association
2012-          Workgroup on Persons with Mental Illness in the Criminal Justice System

Association for Academic Psychiatry
2003-2004      Program Committee

Coalition for Juvenile Justice
2001-2002      Membership Committee

National Commission on Correctional Health Care
2003-          Juvenile Health Committee
2003-2004      Standards Revision Task Force, Standards for Health Services in Juvenile Detention and Confinement Facilities
2005           Program Committee
2005           (Chair) Clinical Guidelines Monitoring Subcommittee
2006-2007      (Vice-Chair) Clinical Guidelines Monitoring Subcommittee
2006-2010      Executive Committee, Member At-Large
2007-2008      (Chair) Juvenile Health Committee
2007-2008      Clinical Guidelines Monitoring Subcommittee
2008-2010      Finance Committee
2011-2014      (Chair) Juvenile Health Committee

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| 2011- | Executive Committee |
| 2011- | Accreditation Committee |
| 2012-2014 | (Vice Chair) Accreditation Committee |
| 2013 | Standards Revision Task Force, Standards for Health Services in Jails and Prisons |
| 2014- | (Chair) Accreditation Committee |
| 2014- | Certified Correctional Health Professional-Mental Health (CCHP-MH) Committee |
| 2014- | Mental Health Standards Revision Task Force, Standards for Mental Health Services in Correctional Facilities |

## STATE AND LOCAL COMMITTEES

Rhode Island Psychiatric Society
| 1995-1996 | Executive Committee |
| 2006-2008 | (Chair) Public Affairs Committee |

Rhode Island Training School
| 2000-2001 | Health, Mental Health, and Suicide Prevention Work Group |
| 2002 | Resocialization Steering Committee |
| 2003-2008 | Pharmacy and Therapeutics Committee |
| 2004-2008 | Risk Management Committee |
| 2004-2008 | Suicide Prevention Work Group |

Rhode Island Department of Children, Youth, and Families
| 2003 | Article 23 Committee and Subcommittee |
| 2004 | Psychotropic Medications and Chemical Restraints |

Rhode Island Department of Health
| 2006-2008 | Suicide Prevention Subcommittee |

Texas Department of Criminal Justice
| 2008- | Correctional Managed Care Pharmacy and Therapeutics Committee |
| 2008- | Psychiatry Subcommittee |
| 2008-2009 | Drug Withdrawal/Benzodiazepine Discontinuation Subcommittee |
| 2008- | Joint Suicide Prevention Operational Workgroup |
| 2008- | Joint Mental Health Committee |
| 2008- | Suicide Prevention Working Group |
| 2008- | System Leadership Council |
| 2009-2011 | Joint Mental Health Committee (Chair) |
| 2012- | Joint Gender Identity Disorder Committee |
| 2012- | Integrated Mental Health Procedure Committee |

Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI)
| 2009- | Advisory Committee |

Texas Juvenile Justice Department (formerly known as the Texas Youth Commission)
| 2008- | Youth Health Services Leadership Council |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

2008-          Youth Services Pharmacy and Therapeutics Committee
2008-          Mental Health Subcommittee
2008-          Psychiatry Subcommittee

Texas Society of Psychiatric Physicians
2009-          Government Affairs Committee
2009-2012      Public Mental Health Services Committee
2009-          Strategic Planning and Coordinating Committee
2012-2013      (Vice-Chair) Forensic Psychiatry Committee
2013-          Continuing Medical Education Committee
2013-          (Chair) Forensic Psychiatry Committee
2013-          Executive Council


## MEMBERSHIP IN SOCIETIES

1987-99        American Medical Association
2002-2003      American Medical Association
1992-          Theta Kappa Psi Medical Fraternity Alumni
1992-          American Psychiatric Association
1993-2008      Rhode Island Psychiatric Society
1995-          American Academy of Child and Adolescent Psychiatry
1996-2004      Association for Academic Psychiatry
1996-98        Rhode Island Medical Society
1997-98        American Association of General Hospital Psychiatrists
1997-98        Brown University Housestaff Association
1999-2008      Rhode Island Council of Child and Adolescent Psychiatry
1997-          American Academy of Psychiatry and the Law
1998-99        Connecticut Psychiatric Society
2002-          Academy of Correctional Health Professionals
2008-          Texas Society of Psychiatric Physicians
2008-          Texas Society of Child and Adolescent Psychiatry
2009-          American College of Psychiatrists
2011-          American College of Physician Executives


## PUBLICATIONS

1. Jenkins M, Malloy P, Cohen R, Salloway S, Neeper R, **Penn JV**, Chang K. Attentional and Learning Dysfunction Among Adults with History of Childhood ADHD Journal of the International Neuropsychological Society 1996;2:209.

2. **Penn JV**, Boland RJ, McCartney JR, Kohn R, Mulvey T. Recognition and Treatment of Depressive Disorders by Internal Medicine Residents and Attendings General Hospital Psychiatry 1997;19:179-184.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

3. Jenkins M, Cohen R, Malloy P, Salloway S, Gillard E, **Penn JV**, Marcotte A. Neuropsychological Measures which Discriminate Among Adults with Residual Attention Deficit Disorder and Other Attentional Complaints Clin Neuropsychologist 1998;12:74-83.

4. **Penn JV**, Esposito CL, Schaeffer LE, Fritz GK, Spirito A. Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility J Am Acad Child Adolesc Psychiatry 2003; 7:762-769.

5. Zonfrillo MR, **Penn JV**, Leonard HL. Pediatric Psychotropic Polypharmacy. Psychiatry 2005 2005; 8:14-19.

6. Stein, LAR, Lebeau-Craven, R, Martin R, Colby SM, Barnett, NP, Golembeske, C, **Penn, JV**. Use of the Adolescent SASSI in a Juvenile Correctional Setting. Assessment 2005, 12:384-394.

7. **Penn JV**, Thomas CR. AACAP Work Group on Quality Issues. Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities. J Am Acad Child Adolesc Psychiatry 2005; 10:1085-1098.

8. **Penn JV**, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated Juveniles. J Correctional Health Care 2006; Volume 11, Issue 4: 333-346.

9. Cascade EF, Kalali AH, **Penn JV**, Feifel D. Recent Changes in Prescriptions for Antipsychotics in Children and Adolescents. Psychiatry (Edgmont). 2006 Volume 3, Issue 9:18-20.

10. Esposito-Smythers CL, **Penn JV**, Stein LAR, Lacher-Katz M, Spirito A. A Test of Problem Behavior and Self-Medication Theories in Incarcerated Adolescent Males. J Child Adol Substance Abuse 2008; Volume 17, Issue 4: 41-56.

11. Baillargeon J, Binswanger IA, **Penn JV**, Williams BA, Murray OJ. Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door. The American Journal of Psychiatry 2009; Volume 166, Issue 1:103-109.

12. Baillargeon J, **Penn JV**, Thomas CR, Temple JR, Baillargeon G, Murray OJ. Suicide in America's Largest Prison System. Journal of the American Academy of Psychiatry and the Law 2009; Volume 37, Number 2: 188-193.

13. Garvey KA, **Penn JV**, Campbell AL, Esposito-Smythers CL, Spirito A. Contracting For Safety with Patients: Clinical Practice and Forensic Implications. Journal of the American Academy of Psychiatry and the Law 2009; Volume 37, Number 3: 363-370.

14. Ochoa KC, Pleasants GL, **Penn JV**, Stone DC. Disparities in Justice and Care: Persons With Severe Mental Illnesses in the U.S. Immigration Detention System. Journal of the American Academy of Psychiatry and the Law 2010; Volume 38, Number 3: 392-399.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

15. Baillargeon J, Hoge SK, **Penn JV**. Addressing the Challenge of Community Reentry among Released Inmates with Serious Mental Illness. American Journal of Community Psychology 2010; Volume 46, Number 3-4: 361-375.

16. Baillargeon J, **Penn JV**, Knight K, Harzke AJ, Baillargeon G, Becker EA. Risk of Reincarceration among Prisoners with Co-occurring Severe Mental Illness and Substance Use Disorders. Adm Policy Ment Health 2010; Volume 37, Number 4:367-74.

17. Harzke, AJ, Baillargeon J, Baillargeon G, Henry J, Olvera R, Torrealday O., **Penn, JV**, Parikh, R. Prevalence of Psychiatric Disorders in the Texas Juvenile Correctional System. Journal of Correctional Health Care 2012; Volume 18, Number 2: 143-157.

18. Harzke AJ, Baillargeon J, Baillargeon G, Olvera R, Torrealday O, **Penn JV**, Parikh R. Co-occurrence of Substance Use Disorders with Other Psychiatric Disorders in the Texas Juvenile Correctional system. International Journal of Prisoner Health [In Press].

19. Hilliard WT, Barloon L, Farley P, **Penn JV**, Koranek A. Bupropion Diversion and Misuse in the Correctional Facility. Journal of Correctional Health Care 2013; Volume 19, Number 3: 211-217.

20. McKee J, **Penn JV**, Koranek A. Psychoactive Medication Use and Misadventuring Issues in Correctional Healthcare – What all Clinicians Should Know. Journal of Correctional Health Care [In Press].


OTHER PEER-REVIEWED PUBLICATIONS

1. Chang K, Neeper R, Jenkins M, **Penn JV**, Bollivar L, Israeli L, Malloy P, Salloway SP. Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:400-1.

2. **Penn JV**, Salloway SP. Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:406-7.

3. **Penn JV**, Child and Adolescent Forensic Psychiatry, Medicine and Health Rhode Island 2005;9:310-317.


OTHER NON-PEER REVIEWED PUBLICATIONS

1. **Penn JV**, Martini J, Radka D. Weight Gain Associated with Risperidone (Letter to Editor) Journal of Clinical Psychopharmacology 1996;16:259-260.

2. **Penn JV**, Leonard HL, March J: OCD in Children and Adolescents. In M.T. Pato, G Steketee (eds.), OCD Across the Life Cycle, Annual Review of Psychiatry, Volume 16. Washington, DC: American Psychiatric Press, 1997, pp 7-53

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

3. **Penn JV**, Hagino 0: Child and Adolescent Psychiatry. In R.J. Goldberg, <u>Practical Guide to the Care of the Psychiatric Patient</u>, 2nd Edition. St. Louis: Mosby, 1998, pp 340-374

4. **Penn, JV**, Casoli-Reardon M. <u>Antisocial and Violent Youth</u> (Book Review) Shamsie Lugus et al., Journal of the American Academy of Child and Adolescent Psychiatry 2001;12:1483-1484

5. **Penn, JV**, Casoli-Reardon M. <u>Antisocial and Violent Youth</u> (Book Review) Shamsie Lugus et al., Journal of Developmental and Behavioral Pediatrics 2001; 22: 258-259

6. **Penn JV**. Attention-Deficit/Hyperactivity Disorder: Review Questions. <u>Hospital Physician</u> 2001; 6:27-28

7. **Penn JV**. Quick to Cry? <u>Parenting</u> 2001; 4:185

8. **Penn JV**, Leonard HL: Diagnosis and Treatment of Obsessive-Compulsive Disorder in Children and Adolescents. In M.T. Pato, J. Zohar (eds.), <u>Current Treatments of Obsessive-Compulsive Disorder</u>, 2nd Edition. Washington, DC: American Psychiatric Press, 2001, pp. 109-132

9. **Penn JV**. Justice for Youth? A History of the Juvenile and Family Court. <u>The Brown University Child and Adolescent Behavior Letter</u> 2001; 9:1-4

10. **Penn JV**. Child and Adolescent Depression: Review Questions. <u>Hospital Physician</u> 2002; 1:39-40

11. Thomas CR, **Penn JV**: Juvenile Justice Mental Health Services, In <u>Child and Adolescent Psychiatric Clinics of North America</u>. Edited by Haller L. Philadelphia: WB Saunders, 2002, pp 731-748

12. **Penn JV**: Use of Psychotropic Medications with Incarcerated Youth. <u>Standards for Health Services in Juvenile Detention and Confinement Facilities</u> National Commission on Correctional Health Care, 2004, 263-265

13. Carlsen AB, **Penn JV** <u>Kids Who Commit Adult Crimes: Serious Criminality by Juvenile Offenders</u> (Book Review) Flowers RB, Journal of Developmental & Behavioral Pediatrics 2005; 26:390-391

14. Kraus LJ, **Penn JV**: Standards for Juvenile Detention and Confinement Facilities. <u>In Recommendations for Juvenile Justice Reform</u>. (Monograph) 2nd Edition. American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform, 2005, p.40-47.

15. Masters KJ, **Penn JV**: Seclusion and Restraint: Juvenile Justice Plus Restrictive Interventions Equals Fragmentation. <u>AACAP News</u>, 2005, p. 164, 172

16. **Penn JV**: Safe Use of Psychotropic Medications with Confined Youth. <u>Correct Care</u>, 2005, Volume 19, Issue 2, p. 12

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

17. Murakami S, Rappaport N, **Penn JV**: An Overview of Juveniles and School Violence. In <u>Psychiatric Clinics of North America</u>. Edited by Scott C. Philadelphia: Elsevier, 2006, pp. 725-741.

18. **Penn JV**: Expert Commentary: Antipsychotic Use Among Children and Adolescents. <u>Psychiatry 2006</u>. 2006; 9:19.

19. **Penn JV**: Child and Adolescent Psychiatry. In R.J. Goldberg, <u>Practical Guide to the Care of the Psychiatric Patient,</u> 3rd Edition. Elsevier: Philadelphia, PA, 2007, pp 389-441.

20. Romero L, **Penn JV**. Ethical Issues of Youthful Offenders: Confidentiality, Right to and Right to Refuse Treatment, Seclusion and Restraint. In C. Kessler and L. Kraus, <u>The Mental Health Needs of Young Offenders,</u> Cambridge University Press, Cambridge, UK, 2007, pp.401-422.

21. **Penn JV**, Thomas CR. Mental Health Care in Juvenile Detention Facilities: A Review (Letter to Editor) <u>Journal of the American Academy of Psychiatry and the Law.</u> 2006; 34:570-571.

22. Faille L, Clair M, **Penn JV**. Special Risk Management Issues in Child and Adolescent Psychiatry. <u>Psychiatric Times</u>. 2007; 7:64-67.

23. **Penn JV**. Invited Editorial: "Psychotropic Medications in Incarcerated Juveniles: Over versus Under-Prescribed?" <u>Arch Pediatr Adolesc Med</u>. 2008 Mar;162(3):281-3

24. Baillargeon J, Paar DP, **Penn JV** Psychiatric Disorders and HIV/Hepatitis Coinfection <u>CorrDocs</u>. Volume 11, Issue 3: 12.

25. Baillargeon J, **Penn JV**, (Letter to Editor) <u>The American Journal of Psychiatry</u> 2009; 166:490.

26. **Penn JV**. Suicide Prevention Strategies for Juveniles in Correctional Settings. In <u>Condotte Suicidarie: Un'analisi Nel Sistema Degli Istituti Penali Minorili (Suicide Behavior: An Analysis of the Juvenile Justice/Correctional System).</u> Numeri Pensati: Gangemi Editore, Rome, Italy, 2010, pp 66-76.

27. Clair M, Faille L, **Penn JV**. Prevention and Treatment of Violent Offending/Offenders. In Ferguson CJ, <u>Violent Crime: Clinical and Social Implications</u>, Sage Publications, Thousand Oaks, CA, (in press).

28. **Penn JV**. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In <u>Oxford Textbook of Correctional Psychiatry</u>. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY (in press)

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## ABSTRACTS

1. Penn JV, Phillips KA. (1995). Body Dysmorphic Disorder and Social Phobia, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting, Miami, Florida.

2. Penn JV, Boland RJ, McCartney JR. (1995). Recognition and Treatment of Depressive Disorders Among Internists, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. Miami, Florida.

3. Penn JV, Salloway SP. (1995). Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

4. Chang K, Neeper R, Jenkins M, Penn JV, Bollivar L, Israeli L, Malloy P, Salloway SP. (1995). Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

5. Penn JV, Zimmerman M, Mattia J. (1996). Screening for Psychiatric Disorders in Medical Outpatients: A Patient Acceptance Study, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. New York, New York.

6. Jenkins M, Malloy P, Cohen R, Salloway SP, Neeper R, Penn JV, Chang K. (1996). Attentional and Learning Dysfunction among Adults with History of Childhood ADHD, Poster Session, International Neuropsychological Society Annual Mid-Year Meeting. Veldhoven, The Netherlands.

7. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and Housestaff, Annual Chester M. Pierce, M.D., Sc.D., Resident and Medical Student Research Symposium, National Medical Association 101st Scientific Assembly, Chicago, Illinois.

8. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and Housestaff, Poster Session, Annual Lifespan Hospitals Research Celebration, Providence, Rhode Island.

9. Penn JV, Holden P, Hendren RL. (1997). Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes? Workshop Presentation and Poster Session, Annual Meeting Association for Academic Psychiatry, Albuquerque, New Mexico.

10. Leonard HL, Penn JV, March J. (1997). OCD in Children and Adolescents, Review of Psychiatry, Obsessive-Compulsive Disorder Across the Life Cycle, American Psychiatric Association Annual Meeting. San Diego, California.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

11. Penn JV, Esposito C, Spirito A. (2001). Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility, Poster Session, American Academy of Child and Adolescent Psychiatry Annual Meeting, Honolulu, Hawaii.

12. Penn JV, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. (2003) Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated Juveniles, Poster Session, American Academy of Psychiatry and the Law Annual Meeting, San Antonio, Texas.

13. Penn JV. (2005) AACAP Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities, Symposium, Emerging Frontier of Psychiatry: Juvenile Justice, American Psychiatric Association Annual Meeting, Atlanta, Georgia.

14. Penn JV. (2005) Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies, Symposium, Juvenile Justice and Mental Health, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Paris, France.

15. Merideth P, Janofsky J, Penn JV. Phillips RTM, Recupero P. (2005) Difficult Case? Consult Your Colleagues, Workshop, American Academy of Psychiatry and the Law Annual Meeting, Montreal, Canada.

16. Chen JT, Hunt J, Penn JV, Spirito A. (2006) Psychiatric Differences Among Adolescents in a Psychiatric Hospital Versus a Juvenile Correctional Facility, Poster Session, American Psychiatric Association, Institute on Psychiatric Services, New York, New York.

17. Penn JV. (2006) Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility, Symposium, Recent Developments in the Research of Juvenile Offenders, American Academy of Child and Adolescent Psychiatry Annual Meeting. San Diego, California.

18. Penn JV. (2007) Acting Out: How to Manage Difficult Adolescents in Correctional Settings, Symposium (Chair), Novel Approaches to the Evaluation and Treatment of Juvenile Offenders, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Padua, Italy.

19. Garvey KA, Penn JV. (2007) Contracting for Safety with Adolescents: Is This an Empirically-Based Practice? Poster Session, American Academy of Psychiatry and the Law Annual Meeting, Miami, Florida.

20. Ryan E, Penn JV. (2007) Juvenile Sexual Offenders: Update on Clinical and Forensic Evaluation Strategies, Workshop Presentation, American Academy of Child and Adolescent Psychiatry Annual Meeting. Boston, Massachusetts.

21. Baillargeon J, Penn JV. (2008) The Prevalence and Treatment of Psychiatric Disorders in a State Prison System, Academic and Health Policy Conference on Correctional Health, Quincy, Massachusetts.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

22. Garvey KA, Penn JV, Campbell AL, Esposito-Smythers CL, Spirito A. (2008) Contracting for Safety: Clinical Practice and Forensic Implications, Paper Session, American Academy of Psychiatry and the Law Annual Meeting, Seattle, Washington.

23. Baillargeon J, Penn JV, (2009) Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, New York, New York.

24. Baillargeon J, Penn JV, (2009) Psychiatric Disorder and Parole Revocation Among Texas Prison Inmates, Academic and Health Policy Conference on Correctional Health, Fort Lauderdale, Florida.

25. Dingle AD, Zito JM, Sharma S, Zima BT, Varley CK, Carlson GA, Penn JV. (2010) Psychotropic Medication Use in Vulnerable Child and Adolescent Populations, Symposium, American Academy of Child and Adolescent Psychiatry Annual Meeting, New York, New York.

26. Penn JV, (2011) Framework of Correctional Managed Care Models: Formulary Development and Implementation, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Berlin, Germany.

27. Ochoa K, Penn JV, Venters H, Hustings E, Mehta S, Belous L. (2011) Seriously Mentally Ill Persons in U.S. Immigration Detention, Panel, American Academy of Psychiatry and the Law Annual Meeting, Boston, Massachusetts.

28. Penn JV, Harzke AJ, Baillargeon J, (2012) Risk of Reincarceration among Prisoners with Co-Occurring Serious Mental Illness and Substance Use Disorders, Academic and Health Policy Conference on Correctional Health, Atlanta, Georgia.

29. Penn JV, (2012) Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry, Symposium, Forensic Psychiatry: Informing Clinical Practice, American Psychiatric Association Annual Meeting, Philadelphia, Pennsylvania.

30. Torrealday O, Penn JV, (2013) Juveniles Behind Bars: Meeting Treatment Needs Through a Statewide Academic and Correctional Managed Care Partnership, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

31. Penn JV, (2013) Psychiatric Services in Jails and Prisons: An Update on the APA Guidelines, American Psychiatric Association Annual Meeting, San Francisco, California.

32. Penn JV, (2013) Psychiatric Comorbidity in Secure Juvenile Settings: How Complex an Issue is It Really? International Academy of Law and Mental Health, International Congress on Law and Mental Health, Amsterdam, The Netherlands

33. Torrealday O, Penn JV, Parikh R, (2014) Meeting Complex Mental Health Needs of Youthful Offenders, Academic and Health Policy Conference on Correctional Health, Houston, Texas.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

34. Parikh R, Torrealday O, Penn JV, (2014) Save Money and Get Better Care? Cost Effective Health Care Delivery in Juvenile Corrections, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

INVITED PRESENTATIONS

1. "Cognitive Behavioral Treatment of Panic Disorder," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1993.

2. "Social Phobia: An Overview of Treatment Strategies," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1994.

3. "Paraphilias and Sexual Deviations," Butler Hospital, Outpatient Department Case Conference, Providence, Rhode Island, 1995.

4. "Cultural Competence in the Delivery of Mental Health Services," Rhode Island Psychological Association 1995 Annual Convention, Providence, Rhode Island, 1995.

5. "Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes?" Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

6. "Consulting to the Community: A Challenge for the Child and Adolescent Psychiatrist," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

7. "A School-Based Approach to Selective Mutism," Elmhurst Elementary School, Portsmouth, Rhode Island, 1977.

8. "Moodiness and Depression in Children and Adolescents," WLNE ABC Channel 6, Providence, Rhode Island, 1997.

9. "Moodiness and Depression in Adolescents," Mount Hope High School, Bristol, Rhode Island, 1997.

10. "Moodiness and Depression in Children and Adolescents," Lifespan Health Connection, Speaking of Kids, Parenting Education Series, Bradley Hospital, East Providence, Rhode Island, 1997.

11. "Career Opportunities in Child and Family Psychiatry," Junior Explorers, Miriam Hospital, Providence, Rhode Island, 1998.

12. "The Crisis of School Violence: How Do We Help Our Children," Testimony before the Congressional Children's Caucus, Washington, District of Columbia, 1999.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

13. "Assessment of Violent Behavior in Adolescents," Department of Pediatrics, Division of Adolescent Medicine, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 1999.

14. "Overview of Child Psychiatric Consultation at the Rhode Island Training School to the Rhode Island Family Court," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 1999.

15. "The New Law and Psychiatry Service at Brown," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1999.

16. "Violent Threats Made by Adolescents: An Approach to Assessment and Treatment," The Family Health Center at SSTAR Program, Fall River, Massachusetts, 1999.

17. "Introduction to Child and Adolescent Psychopharmacology," Miriam Hospital, Rhode Island Nursing Association, Clinical Nurse Specialists Continuing Education Seminar, Providence, Rhode Island, 2000.

18. "What We Don't Want to Happen to Our Youth," Adolescent Mental Health and School Success Conference, Rhode Island Department of Health, Providence, Rhode Island, 2000.

19. "Psychiatric and Abuse Issues Affecting Incarcerated Youth," Justice for All Youth Conference, Rhode Island Office of the Child Advocate, Warwick, Rhode Island, 2000.

20. "Juvenile Violence," Grand Rounds, Newport Hospital, Newport, Rhode Island, 2000.

21. "Demystifying the Courts and the Legal Process for Juveniles," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2000.

22. "Warning Signs in Adolescents: A Practical Guide for Families and Educators," Lifespan Health Connection, Parenting Matters, Parenting Education Series, Tollgate High School, Warwick, Rhode Island, 2000.

23. "Mood Dysregulation and Mood Disorders in Incarcerated Youth," Grand Rounds, Judge Baker Children's Center, Boston, Massachusetts, 2001.

24. "The Crisis of School Violence: How Do We Help Our Children," Grand Rounds, Department of Psychiatry, State University of New York, Buffalo, New York, 2001.

25. "Mental Health Evaluation and Treatment of Incarcerated Youth," Child Psychiatry Fellowship Seminar Series, New England Medical Center, Boston, Massachusetts, 2001.

26. "Mood, Substance Abuse, and Other Mental Disorders in Violent Youth," St. Anne's Hospital, Fall River, Massachusetts, 2001.

27. "Teen Violence: Risk Management and Malpractice Issues" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

28. "Mental Health Needs of Incarcerated Youth" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

29. "Children's Mental Health Issues in Rhode Island: Problems and Solutions" Testimony before Congressional Committee Hearing, Rhode Island State House, Providence, Rhode Island, 2001.

30. "Mental Health Evaluation and Treatment of Incarcerated Youth," Sixth New England Correctional Health Conference, Sturbridge, Massachusetts, 2001

31. "When Psychotherapies Are Not Enough: Medical Management of Aggression," Pediatric Psychopharmacology: An Update for Primary Care Practitioners, Providence, Rhode Island, 2001.

32. "Mental Health Evaluation and Treatment of Incarcerated Juveniles," The Providence Center, Providence, Rhode Island, 2001.

33. "School Shootings and Youth Violence," Truman Taylor Show, WLNE ABC, Channel 6, Providence, Rhode Island, 2001.

34. "Juveniles Presenting with Violent or Threatening Behaviors" Greater Fall River Child Protection Council and St. Anne's Hospital Lecture Series, Fall River, Massachusetts, 2001.

35. "School Shootings and Youth Violence," Healthwatch, NBC, WJAR Channel 10, Providence, Rhode Island, 2001.

36. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2001, Toll Gate High School, Warwick, Rhode Island, 2001.

37. "School Violence: Strategies for Schools and Families," N.A. Ferry Middle School, Johnston, Rhode Island, 2001.

38. "School Violence: Strategies for Schools and Families" CBS, WPRI, Channel 12, Providence, Rhode Island, 2001.

39. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2001.

40. "Bullying, Beatings & Beyond: Assessment and Treatment of Youth Violence," Rhode Island Psychological Society, Pawtucket, Rhode Island, 2001.

41. "Psychiatric Services for Incarcerated Juveniles," Annual Meeting, National Commission on Correctional Health Care (NCCHC), Albuquerque, New Mexico, 2001.

42. "Assessment and Treatment of Juvenile Sexual Offenders," (Discussant) Grand Rounds, Rhode Island Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, Providence, Rhode Island, 2001

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

43. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Rhode Island Training School, Clinical Staff In-Service, Cranston, Rhode Island, 2002.

44 "Youth Violence: Evaluation and Treatment Approaches," University of Texas Medical Branch, Department of Psychiatry, Psychiatry Resident's Journal Club, Galveston, Texas, 2002.

45. "Youth Violence: Practical Strategies for Clinicians," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2002.

46. "Redefining the Use of Psychotropic Medications in Juvenile Justice Populations," 7th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2002.

47. "Profile of a Columbine Type Perpetrator: What to Look for and What to do About it," Annual Juvenile Probation and Justice Management Conference (Juvenile Probation Track): National Council of Juvenile and Family Court Judges Conference, Tucson, Arizona, 2002.

48. "Conduct Disorder: Evaluation and Treatment Approaches," Plymouth, Massachusetts, 2002.

49. "Conduct Disorder: Evaluation and Treatment Approaches," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

50. "Redefining the Use of Psychotropic Medications in Children and Adolescents," Kent County Mental Health Center, Warwick, Rhode Island, 2002.

51. "The Project Hope Experience: Evaluation and Treatment of Mental Health Issues in Incarcerated Juveniles," Children's Mental Health - A System of Care Approach, American Academy of Child and Adolescent Psychiatry, Boston, Massachusetts, 2002.

52. "Clinical Challenges in Child and Adolescent Psychiatry," Beaumont, Texas, 2002.

53. "Recognizing Other Psychiatric Disorders" American Academy of Pediatrics: DB:PREP An Intensive Review Course of Developmental and Behavioral Pediatrics, Providence, Rhode Island, 2002.

54. "Youth Violence: Practical Strategies for Clinicians," Family Service Association of Greater Fall River, Inc., Fall River, Massachusetts, 2002.

55. "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2002.

56. "Psychotropic Medications: What They Do, What They Don't Do," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2002.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

57. "Recognition and Management Strategies of Youth Violence for Mental Health Professionals," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

58. "Suicide Prevention in Juvenile Correctional Facilities," Staff Training Program, Rhode Island Training School, Cranston, Rhode Island, 2002.

59. "The Elephant in the Room: How the Legal System Can Impact Therapy," (Discussant) Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2003

60. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2003, Toll Gate High School, Warwick, Rhode Island, 2003.

61. "Identification and Treatment of Mental Health Issues in Incarcerated Youth," 8th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2003.

62. "Missed Opportunities and Challenges: Identifying Mental Health and Substance Abuse Issues in Today's Youth," Physician Leadership on National Drug Policy Conference: Adolescent Substance Abuse and Mental Health: A Public Health Priority, Providence, Rhode Island, 2003

63. "Evaluation and Treatment of Incarcerated Juveniles with Mental Health Issues: Challenges, Frustrations, and Solutions," Butler Hospital, Child and Adolescent Services Program Lecture Series, Providence, Rhode Island, 2003

63. "Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies," National Conference on Correctional Health Care, Austin, Texas, 2003

64. "Redefining the Use of Psychotropic Medications in Children," Annual Meeting of the RI Chapter of the American Academy of Pediatrics, Providence, Rhode Island, 2003

65. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Brown University, Behavioral Misadventures Symposium, Providence, Rhode Island, 2003

66. "Understanding and Defusing Explosive Kids," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004

67. "Mixing Legal and Street Drugs: A Cocktail for Disaster," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004

68. "Promising Programs: Suicide Prevention/Good Practices," 23 rd Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

69. "Challenging Youths, Families & Systems: Implementing Psychiatric Strategies and Risk Management Principles," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004

70. "Acting Out Youths: Practical Evaluation & Treatment Strategies," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004

71. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics PREP Course: Costa Mesa, California, 2004

72. "Risky Behavior: How to Keep Youth Safe in Inpatient and Community Settings," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2004

73. "ADHD Co-Morbidity: Practical Evaluation and Treatment Approaches," 2004 Fall CME Conference, New York State Society of Physician Assistants, Albany, New York, 2004

74. "Behavioral Health Issues for Juvenile Offenders," 3rd Annual Behavioral Health in Corrections Conference, University of Rhode Island, Kingston, Rhode Island, 2004

75. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004

76. "Surviving Juvenile Corrections: Timely Suicide Prevention Strategies," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004

77. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2004

78. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Miami, Florida, 2005

79. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Office of the Public Defender, Providence, Rhode Island, 2005

80. "Juvenile Suicide Risk in Congregate Care Settings, "Suicide Prevention Promises and Practices – Focus on Youth Conference, Rocky Hill, Connecticut, 2005

81. "Profile of a Columbine-Type Juvenile: What to Look for and What to Do About It," Juvenile Courts Association of Georgia 2005 Annual Seminar, Pineisle Resort at Lake Lanier, Georgia, 2005

82. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Portland, Oregon, 2005

83. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: Practical Pediatrics Course: Beaver Creek, Colorado, 2005

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

84. "Strategies for Resident Advocacy at the State Legislature," 2nd Northeast Pediatric Resident Advocacy Conference, Hasbro Children's Hospital, Brown Medical School, Providence Rhode Island, 2005

85. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2005

86. "Suicide Prevention/Intervention Training," Staff Training Seminar Series, Rhode Island Training School, Cranston, Rhode Island, 2006

87. "ADHD and Juvenile Delinquency," Annual Meeting, American Society for Adolescent Psychiatry, Miami, Florida, 2006

88. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Criminal Division, Office of the Attorney General, Providence, Rhode Island, 2006

89. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, San Diego, California, 2006

90. "Berber v. Mellott, MD: Lessons from a Medical Malpractice Mock Trial," Continuing Medical Education Program, Professional Risk Management Services, Inc., Providence, Rhode Island, 2006

91. "How to Respond to Mentally Ill and Substance-Abusing Youth in the Juvenile Justice System," 25th Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Providence, Rhode Island, 2006

92. "Acting Out: How To Manage Difficult Adolescents," National Conference on Correctional Health Care, Atlanta, Georgia, 2006

93. "You Be the Judge: A Mock Trial Involving an Inmate's Claim," National Conference on Correctional Health Care, Atlanta, Georgia, 2006

94. "Assessment and Treatment of Court-Involved Youth in Juvenile Corrections and Other Settings: Challenges, Frustrations, and Solutions," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2006

95. "Mental Health Services for Juvenile Offenders," Grand Rounds, Department of Psychiatry, Maine Medical Center, Portland, Maine, 2007

96. "Strategies to Avoid the Courtroom – The Case for Thorough Medical Documentation," UNAP/Rhode Island Health Care Education Trust Seminar Series, Rhode Island Hospital, Providence, Rhode Island, 2007

97. "Suicide Prevention Strategies for Juveniles in Correctional Settings," Congress: Prevention of Suicidal Conduct in Incarcerated Minors, Campidoglio, Sala Della Protomoteca, Rome, Italy, 2007

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

98. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, Las Vegas, Nevada, 2007

99. "Civil Commitment of Adolescents," Rhode Island/Hasbro Hospitals Department of Pediatric Emergency Medicine, Case Conference, Providence, Rhode Island, 2007

100. "Emerging Issues in Forensic Psychiatry," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2007

101. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2007

102. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, Nashville, Tennessee, 2007

103. "Lessons Learned from Inside the Fence: Juvenile Offenders, the RI Training School and Family Court Systems," Rhode Island Psychiatric Society, Providence, Rhode Island, 2007

104. "Use of Psychotropic Medications for Incarcerated Youth," Updates in Correctional Health Care, National Conference on Correctional Health Care, San Antonio, Texas, 2008

105. "Mentally Ill Juveniles," American Correctional Association, New Orleans, Louisiana, 2008

106. "Identification and Management of Juvenile Mental Disorders," National Conference on Correctional Health Care, Chicago, Illinois, 2008

107. "Identification and Management of Juvenile and Adult Mental Disorders," Texas Corrections Association, Austin, Texas, 2008

108. "Use of Psychotropic Medications Within Correctional Settings," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2008

109. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2008

110. "Mental Health Services within the Texas Correctional System," National Institute of Mental Health (NIMH) and UTMB: Mental Illness, Incarceration and Community Re-Entry: Telepsychiatry and Continuity of Mental Health Care, Austin, Texas, 2008

111. "Essentials of Correctional Juvenile Health Care," Updates in Correctional Health Care: Transforming Principles to Practice, Las Vegas, NV

112. "Preventing Suicide in Corrections: Timely Collaboration Between Administration, Custody, and Clinical Staff," UTMB CMC Annual Conference, Galveston, Texas, 2009

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

113. "Psychotropic Medication Education for Non-Psychiatrists," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009

114. "Malingering: Practical Evaluation and Management Approaches," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009

115. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009

116. "Rational Approach to Psychotropic Medications in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009

117. "Behind the Bars and Razor Wire: Mental Health Disorders Within Correctional Settings," Texas Department of Criminal Justice (TDCJ) Community Justice Assistance Division (CJAD) Skills Conference, Austin, Texas, 2009

118. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Orlando, Florida, 2009

119. "Evaluation and Treatment of Personality Disorders," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2009

120. "Mental Health Issues of the Female Offender," Texas Corrections Association Annual Conference, Galveston, Texas, 2010

121. "Identification and Management of Adult and Juvenile Mental Health Disorders in Correctional Settings, National Conference on Correctional Health Care, Boston, Massachusetts, 2010

122. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010

123. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010

124. "Mental Health Formulary and Disease Management Guidelines Development and Utilization with the Texas Department of Criminal Justice," Mental Health Conference, United States Bureau of Prisons-Health Services Division, Oklahoma City, Oklahoma, 2010

125. "Competency to Assist in Immigration/Deportation Hearings: Application of Existing Competency Evaluation Models to Immigration Context (Non-Citizens with Mental Disabilities)," United States Immigration and Customs Enforcement (ICE)/Office for Civil Rights and Civil Liberties (CRCL) Mental Health Roundtable, Washington, D.C., 2010

126. "Mental Health Systems of Care, Formulary and Disease Management Guidelines Development and Utilization within the Texas Department of Criminal Justice," Forensic Best Practices Conference, Houston, Texas, 2010

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

127. "Juvenile Waiver and Transfer to Criminal Court," Conference Update on Juvenile Forensic Evaluations, Capacity for Justice, Austin, Texas, 2010

128. "Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry" Grand Rounds, UTMB Department of Psychiatry and Behavioral Sciences, Galveston, Texas, 2010

129. "Behind the Bars and Razor Wire: Mental Health Disorders within Correctional Settings" University of Texas Arlington, Annual Psychiatric Nursing Symposium, Arlington, Texas, 2011

130. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Phoenix, Arizona, 2011

131. "Medical Conditions That Can Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Baltimore, Maryland, 2011

132. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Baltimore, Maryland, 2011

133. "Containing Your Psychotropic Medication Expenses: Strategies for Formulary Development and Implementation," American Correctional Association, Phoenix, Arizona, 2012

134. "Child and Adolescent Forensic Psychiatry," International Conference on Forensic Psychiatry, Santiago, Chile, 2012

135. "An In-Depth Look at NCCHC's 2008 Standards for Health Services in Prisons and Jails, National Conference on Correctional Health Care, San Antonio, Texas, 2012

136. "Acting Out" Offenders: Implementing Mental Health/Psychiatric Strategies and Risk Management Principles, National Conference on Correctional Health Care, San Antonio, Texas, 2012

137. "Save Pharmacy Dollars: Contain Your Psychotropic Medication Use and Expenses" American Correctional Association, Denver, Colorado, 2012

138. "Practicing Behind Bars: Challenges and Opportunities within Correctional Psychiatry" Grand Rounds, Keck School of Medicine of the University of Southern California, Department of Psychiatry, Los Angeles, California, 2012

139. "Review of NCCHC's Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012

140. "Medical Conditions That Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

141. "Mad Versus Bad Offenders: Implementing Mental Health Strategies and Risk Management Principles," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012

142. "Contain Your Psychotropic Medication Use and Expenses," American Correctional Association, Houston, Texas, 2013

143. "Evaluation and Management of Juvenile Offenders," American Correctional Association, Houston, Texas, 2013

144. "Integrating Mental Health and Medical Issues in the Complex Environment of Corrections," Society of Correctional Physicians, Denver, Colorado, 2013

145. "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Advocacy Center, Columbia, South Carolina, 2013

146. "Identification and Prevention of Suicide and Self Injurious Behaviors in Correctional Settings," American Association of Suicidology, Austin, Texas 2013

147. "'Acting Out' Adolescents: Pearls for Effective Evaluation and Management," American Correctional Association, National Harbor, Maryland, 2013

148. "Preventing Suicide Behind Bars: Real World Approaches," American Correctional Association, National Harbor, Maryland, 2013

149. "DSM-5: An Overview and Its Impact on Correctional Mental Health," UTMB CMC Annual Conference, Galveston, Texas, 2013

150. "Overview of UTMB CMC Mental Health Services," Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) Advisory Committee, Austin, Texas, 2013

151. "An In-Depth Look at NCCHC's 2014 Standards for Health Services in Prisons," National Conference on Correctional Health Care, Nashville, Tennessee, 2013

152. "Institutional Self-Injury: Managing the Self-Destructive Juvenile," National Conference on Correctional Health Care, Nashville, Tennessee, 2013

153. "Medical Conditions That Present as Psychiatric in Nature," National Conference on Correctional Health Care, Atlanta, Georgia, 2014

154. "Guidelines for Treatment of Adolescents with ADHD," National Conference on Correctional Health Care, Atlanta, Georgia, 2014

155. "Correctional Psychiatry: The Final Frontier of Psychiatry," Psychiatry Grand Rounds, John Peter Smith (JPS) Health Network, Fort Worth, Texas, 2014

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

156. "DSM 5: What Pediatricians Need to Know," "Psychopharmacology in Primary Care: Practical Strategies," "Adolescent Substance Abuse," and "Adolescent Suicide and Self-Injurious Behaviors," American Academy of Pediatrics: Practical Pediatrics CME Course, Hilton Head, South Carolina, 2014

157. "Mental Health Issues of Female Offenders," and "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Corrections Academy, Aurora, Colorado, 2014

## GRANTS

1. Penn (PI)                                    1/1/02-1/1/03
   "Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility." Source: American Academy of Child and Adolescent Psychiatry, Eli Lilly and Company. $ 9,000.
   Role: Principal Investigator

2. Penn (PI)                                    1/1/03-5/31/04
   "Correlates of Suicidal Behavior in Incarcerated Juveniles." Source: Lifespan Developmental Grant, Lifespan. $ 29,451.
   Role: Principal Investigator

3. Penn (PI)                                    6/30/04-12/31/05
   "Liability Prevention for Hasbro Hospital Staff: Practical Strategies for Youths with Mental Health and Substance Abuse Issues." Source: Lifespan Risk Management, Lifespan. $12,200.
   Role: Principal Investigator

4. 5K23DA021532 (PI: Tolou-Shams, Ph.D.)       2/1/08-1/13/13
   "HIV Prevention in the Family Drug Court." Source: National Institute of Drug Abuse (NIDA)
   Role: Consultant

## UNIVERSITY TEACHING ROLES

Brown University, Residency in Psychiatry, 1995: "Effective Documentation and Medical Record Strategies for Psychiatrists," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Antipsychotics: An Introduction and Rational Clinical Approach," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Cultural Psychiatry," PG-3 Seminar Series, Seminar Leader (weekly seminars).

Brown Medical School, 1997: "Biomed 278: Introduction to Clinical Psychiatry," Small Group Leader, (weekly meetings).

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

Brown University, Residency in Psychiatry, 1997: " PG-2 Seminar: Mood Disorders in Children and Adolescents" (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1998: "Children's Testimony in Court: Roles of the Expert Witness and Videotaped Interviews," Child and Adolescent Forensic Psychiatry Seminar Series, (single seminar).

Yale University Law School, Disabilities Clinic, 1999: "Introduction to Child and Adolescent Psychopharmacology," (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Risk Assessment of Youth Violence," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Rhode Island Mental Health Law," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University Residency in Psychiatry, 1999: "Introduction to Child and Adolescent Forensic Psychiatry," PG-3 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999: Community Mental Health Center Rotation, Family Health Center at SSTAR, Fall River, Massachusetts, Clinical Supervisor, (weekly clinic and supervision).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008:  Clinical Supervisor, Brown University Child Psychiatry Forensic Psychiatry Elective, (weekly supervision)

Brown University Residency in Psychiatry, 2000-2001: "Disruptive Disorders, Antisocial Behaviors, and Legal Issues," PG-2 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 2000-2008: "Child and Adolescent Forensic Psychiatry" Seminar Leader, (four seminars).

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2002: Clinical Supervisor, Community Mental Health Center Rotation, Kent County Mental Health Center, Warwick, Rhode Island, (weekly clinic and supervision).

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2008: Clinical Supervisor, Forensic/Juvenile Justice Rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Brown Medical School, 2002-2008: Clinical Supervisor for 3rd and 4th year medical students, Longitudinal elective, 4th year elective, and psychiatry rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

Brown University Residency in Psychiatry, 2002-2003: Tutor-Advisor to Nada Milosavljevic, M.D., J.D., PG-2 Psychiatry Resident

Brown University Residency in Psychiatry, 2003: "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Noon Seminar, (single seminar).

Brown University Post-Doctoral Juvenile Forensic Psychology Training Program, 2003-2008: Core Supervisor and Seminar Leader

Brown University Psychology Intern and Post-Doctoral Fellowship Training Program, Child Track Seminar Series Presenter, 2004-2008: "The Law and Psychiatry/Psychology" (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Risk Assessment of Potentially Violent Juveniles," PG-3 Resident Seminar, (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Divorce, Custody and Visitation Issues: The Psychiatrist Facing Court Systems," PG-2 Resident Seminar, (single seminar).

Brown University Residency in Child and Adolescent Psychiatry, 2005-2008: "Evaluation and Treatment of Conduct Disorder," Child and Adolescent Psychiatry Developmental Psychopathology Seminar Series, (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2008-present: "Opportunities and Challenges within Correctional and Forensic Psychiatry," (single seminar).

UT Health Science Center at Houston, Department of Psychiatry and Behavioral Sciences, Residency in Child Psychiatry, 2008-present: "Juvenile Correctional Mental Health Services in Texas," (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2010-present: "Suicide Prevention and Litigation: Timely Risk Management Approaches," Forensic Psychiatry Seminar Series, (single seminar).

HOSPITAL TEACHING ROLES

Butler Hospital, 1993-1996: Seminar Leader, Various Psychiatry Topics, Brown University Medical Students' Psychiatry Clerkship, (multiple seminars).

Rhode Island Hospital, 1995: Psychiatry Preceptor and Consultant to Internal Medicine Housestaff Clinic, (twice weekly clinic).

E. P. Bradley Hospital, 1997: Adolescent Program Training, "The Use of Antipsychotics in Adolescents," (one seminar).



# Exhibit 75



## AFFIDAVIT OF DR. BHUSHAN AGHARKAR

I, Bhushan Agharkar, M.D., declare as follows:

1.      My name is Bhushan Agharkar.  I was previously retained by post-conviction counsel for Gary Green, the Office of Capital Writs ("OCW"), to perform a comprehensive evaluation of the medical and mental health history of Green.  Based on that evaluation, I provided an affidavit that was dated May 31, 2012.  In addition, I testified as an expert witness for Green on July 16, 2014.

2.      During my testimony, a number of questions arose from the State and the Court regarding the scope of my testimony.  Particularly, the Court raised questions regarding the evidence of Green's mental illness that was in the possession of Green's trial counsel, and whether I was disagreeing with the diagnosis presented by Green's counsel during Green's capital trial.

3.      The following is offered to clarify my findings and opinions.

**Diagnosis of Schizoaffective Disorder**

4.      First, I agree with the diagnosis given by Dr. Gilbert Martinez during Green's capital trial that Green suffers from Schizoaffective Disorder, Bipolar Type.  Based on my assessment of Green, the information related during his capital trial, and my review of various records and affidavits, I also conclude that Green is suffering from Schizoaffective Disorder. Thus, I believe Green's trial counsel were correct in their presentation of this diagnosis to Green's capital jury.

5.      However, based on my review of Dr. Martinez's testimony and his own affidavit dated April 30, 2012, it is clear that Dr. Martinez's ability to communicate information regarding Green's mental illness and its application to his capital trial was limited by his lack of forensic training.

6.      Forensic testimony is not solely applicable for a jury's consideration of guilt or innocence.  Based on my experience testifying as a forensic expert in numerous cases, including capital trials, forensic mental health testimony is also specifically applicable to a jury's decision regarding whether mitigating information weighs in favor of a sentence other than death.  Rather than hearing about a mental health diagnosis in a vacuum, forensic testimony can explain the interaction of a person's mental illness with the behaviors and actions of the person surrounding the time of the crime.

7.      In Green's case, I believe Green's jury would have benefited from an explanation of how symptoms of Schizoaffective Disorder impacted Green's specific behaviors over time and why they should be considered mitigating. Schizoaffective Disorder is characterized by both a

1

Exhibit 75 - Page 1

578

loss of contact with reality (or psychosis) and mood swings. Essentially, it is a combination of the psychotic symptoms of Schizophrenia with the mood problems of Bipolar disorder. In Green's life, his psychotic symptoms particularly manifested as paranoid delusions. He also showed signs throughout his life of mood swings, depression, social isolation, and disorganized speech.

8.      These symptoms likely contributed to multiple instances of Green having problems with relationships. His beliefs in things like vampires, his mood swings, and instances of talking to himself or saying nonsensical things, all would have made it difficult for Green to form close, normal relationships. The resulting stigma from his mental illness symptoms would have led to further isolation. In addition, it likely furthered his feelings of paranoia and beliefs that others were out to harm him.

9.      Green's mental illness, and specifically his paranoid delusions, appear to have directly contributed to his actions surrounding the time of the crime. Records from his time at the Timberlawn facility shortly before the crime indicate Green was experiencing an upsurge of his mental illness symptoms including paranoia. In addition, Green's explanation of his thoughts around the time of the crime indicate he was suffering from a paranoid delusion that his family was plotting to hurt him.

10.      The problems Green's mental illness symptoms caused in his relationships would also have directly impacted the romantic relationships the prosecution offered as aggravating evidence during the punishment phase of Green's trial. It would not be unusual for paranoid delusions coupled with mood swings to cause romantic partners to seek to end a relationship. It would also, sadly, not be unusual for those same symptoms to lead a person with Schizoaffective Disorder to react angrily or even violently to the end of the relationship.

11.      It is important to note that this explanation of how Green's mental illness symptoms impacted his actions is not offered as a justification or rationalization. A common mistake among those not familiar with mental illness is to try to make rational sense of the actions of someone who is mentally ill. Paranoid delusions are by their nature false beliefs, and thus any actions taken by someone in furtherance of those delusions are not the actions that would be taken by a healthy, rational individual.

**Treatment of Mental Illness**

12.      Based on questions from the Court during Green's hearing, I understand another issue of concern is whether or not Green's mental illness would place him at a high risk of committing violence in the future. To be able to effectively weigh this question, Green's jury needed to be given information regarding the ability to treat Schizoaffective Disorder and the impact on mental illnesses generally when in a structured environment like prison.

2

Exhibit 75 - Page 2

579

13.     Schizoaffective Disorder is a treatable condition.  Specifically, the usual treatment is a combination of anti-psychotic medication and mood stabilizing agents.  This combination has been shown to be effective in controlling the mood lability and psychotic symptomatology inherent in this illness.  If possible, combined medication and talk therapy offer a person the best chance at recovery and symptom remission.  Importantly, these treatment modalities have long been shown to be effective in the treatment of Schizoaffective Disorder so there is no reason to think they would not be effective in Green's case.

14.     Further, simply being in a structured prison environment will often have a moderating effect on many symptoms of mental illness.  While we do not know exactly why this is so, structured hospital environments have been used for decades for the treatment of mental illness.  In part, it is believed that taking away many life decisions (about food, shelter, and work, for example) decreases the number of stressors in a person's daily life that exacerbate symptoms of mental illness.

**Information From Trial Expert Reports**

15.     At the July 2014 hearing, it appeared the State believed my testimony was being offered to contradict the findings submitted by several expert witnesses in reports to Green's trial counsel.  That was not the purpose of my testimony.  Again, regarding the specific diagnosis of Green, I reached the same conclusion as Dr. Gilbert Martinez, the expert witness Green's trial counsel chose to present during trial.  My testimony was offered to show what additional information was necessary to understand this same diagnosis and that was not presented to Green's jury.

16.     Regarding the other reports submitted to Green's counsel, there are a few points that should be noted.  First, to a large degree, the symptoms identified in the reports of Dr. Kelly Goodness, Dr. David Self, and Dr. Kristi Compton are strikingly similar to those identified by Dr. Martinez, myself, and the physicians at the Timberlawn facility.  Across all the reports, it is clear that Green suffers from mood swings, depression, beliefs in things that did not exist, and paranoia, among other symptoms.

17.     Next, I disagree with the prosecution's questions that suggest the findings by these experts should be understood as solely diagnosing Green as suffering from a personality disorder.  I do not read the reports from these experts as supporting such a statement.' And as discussed in my prior affidavit, standard medical practice at the time dictated that you should refrain from diagnosing a personality disorder until mental illness symptoms that can be attributed to an Axis I disorder like Schizoaffective Disorder had been treated.1 While Green may or may not suffer from a personality disorder, that cannot be reliably determined while his Schizoaffective Disorder remains untreated.  Further, a diagnosis of a personality disorder is not exclusive, and would not negate the diagnosis of Schizoaffective Disorder.

3

Exhibit 75 - Page 3

580

18.     Finally, the limitations I find in the trial reports of Dr. Self and Dr. Compton are not a disagreement with their findings so much as concerns regarding the way in which these experts were directed by Green's trial counsel. For any expert witness, the scope and direction of a mental health evaluation greatly impacts the conclusions that the expert reaches. Attorneys must direct the expert toward the information they are seeking to confirm or reject. Otherwise, the expert will have no guidance in determining what particular aspect of a defendant's history to focus on. For example, the report of Dr. Compton makes clear that she was retained for the purpose of a competency examination. Although it appears she did a basic mental health examination, she was not given the necessary medical and life history information to perform a full mental health assessment. In addition, she was not directed to do more than just generally report on Green's mental health. Dr. Self also appears to have been given only open ended instructions to look for mitigating information. In addition, it appears that Dr. Self was missing life history information, including family mental health history, which is necessary to ensure an accurate assessment.

19.     I have read and reviewed this four page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 6th day of August, 2014, in Atlanta, Georgia.

Dr. Bhushan Agharkar

Subscribed and sworn to before me on Aug 8th, 2014.

Notary Public, State of Georgia

CAROL B. RUSSELL
NOTARY
My Commission Expires
October 4, 2017
PUBLIC
GWINNETT COUNTY, GA

4

Exhibit 75 - Page 4

581



## Office of Capital Writs



Brad D. Levenson
Director

August 15, 2014



Dallas County District Clerk
Writ Desk
133 N. Riverfront Blvd.
Lock Box 12
Dallas, Texas 75207

To the Writ Desk of the District Clerk,

    Enclosed is Supplemental Briefing to be filed in *Ex Parte Gary Green*, W09-59380-S(A). Attached to this letter, please find a copy of the face page of this briefing as well as a self-addressed, stamped envelope. Please file stamp this page and return it to me in the included envelope.

Respectfully,

Robert Romig

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

582

FedEx

fedex.com 1.800.GoFedEx 1.800.463.3339

XH NKIA

MON – 18 AUG AA
STANDARD OVERNIGHT

75207
TX-US
DFW

earthsmart
FedEx carbon-neutral
envelope shipping

8037 2333 1134

**1** Date 8-15-14

Sender's Name MUSTAFA Rasic

Company Office of CAPITAL WRITS

Address 1700 N. CONGRESS AVE. SUITE 460

City AUSTIN   State TX   ZIP 78701   Phone 512-463-8522

**2** Your Internal Billing Reference

**3** To
Recipient's Name WRIT DESK

Company DALLAS COUNTY DISTRICT CLERK

Address 133 N. RIVERFRONT

Address L-K BOX 12

City DALLAS   State TX   ZIP 75207   Phone 214 653-5472

8037 2333 1134

Recipient's Copy

583

fedex.com 1.800.GoFedEx 1.800.463.3339

W09-59380-S(A)

| EX PARTE | § | IN THE 282nd JUDICIAL |
|----------|---|----------------------|
| GARY GREEN, | § | DISTRICT COURT |
| Applicant | § | DALLAS COUNTY, TEXAS |

## ORDER SETTING DEADLINE

The Court orders the parties to submit proposed findings of fact and conclusions of law by November 7, 2014.

SIGNED this _22_ day of _10_____, 2014.

_____

HONORABLE ANDY CHATHAM
282nd Judicial District Court

FILED

2014 OCT 22  PM 1:52

GARY FITZ~~~~
DISTRICT CLERK
DALLAS CO. TEXAS

_____ DEPUTY

584

## No. W09-59380-S(A)

In the 282nd Judicial District Court
Dallas County, Texas

## EX PARTE GARY GREEN

## SUPPLEMENTAL EXHIBIT TO
## STATE'S ORIGINAL ANSWER TO
## APPLICATION FOR WRIT OF HABEAS CORPUS
## IN DEATH PENALTY CASE

*Counsel of Record:*

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., Lb-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *Fax*

*Attorneys for the State of Texas*

ORIGINAL

585

TO THE HONORABLE COURT:

The State of Texas files the attached supplemental exhibit, an affidavit by appellate attorney John Tatum, in support of its original answer to Gary Green's application for writ of habeas corpus.

Respectfully submitted,

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing supplemental exhibit was served on applicant's attorney, Robert Romig, Office of Capital Writs, 1700 N. Congress Ave, Suite 460, Austin, Texas 78711, Robert.Romig@ocw.texas.gov, via email on October 21, 2014.

Jaclyn O'Connor Lambert

**586**

STATE'S
EXHIBIT
13
PENGAD 800-631-6989

# AFFIDAVIT OF JOHN TATUM

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Before me, the undersigned authority, personally appeared John Tatum who, being by me duly sworn, did on his oath depose and state the following:

"My name is John Tatum. I am a duly-licensed attorney. I am over eighteen years of age and fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

"I am a practicing criminal defense attorney, principally in Dallas and Collin Counties. I became licensed to practice law in 1974. I meet the requirements under article 26.052 of the Texas Code of Criminal Procedure for first-chair appointment in death penalty cases and have been responsible as trial counsel in approximately 6 death penalty cases. I also meet the requirements for appellate appointment in death penalty cases in the administrative district that includes Dallas County. I have represented numerous defendants in appeals to the Court of Criminal Appeals, the Fifth Circuit, and the United States Supreme Court. I have been regularly doing death penalty appeals for approximately 10 years.

"In the death penalty cases I handle on direct appeal, my general practice is to read the entire record, outline every issue I find and generally research each one. Due to the page and word count limitations in the Rules of Appellate Procedure, I cannot always raise every single identifiable issue. I generally filter out the issues that could be more thoroughly investigated and raised in an application for writ of habeas corpus because I do not want to jeopardize writ counsel's opportunity to properly litigate these claims. I then prioritize the remaining issues and select the ones that I believe are the strongest and most supported by the trial record. I also generally raise several constitutional challenges to Texas' death penalty scheme in order to preserve those issues.

"I was appointed as appellate counsel for Gary Green prior to trial. My role was to assist the trial lawyers during the trial as needed and to represent the defendant on direct appeal. To the best of my recollection, my involvement during the trial was minimal and was limited to assisting trial counsel with some of the constitutional pretrial motions and reviewing the proposed jury charges. On direct appeal, I filed a 125-page brief raising 46 points of error and presented oral

587

argument before the Texas Court of Criminal Appeals. Following the court's affirmance of Green's conviction and sentence, I filed a petition for writ of certiorari in the United States Supreme Court.

"I have read Green's habeas application and the allegations of ineffective assistance of appellate counsel contained therein. I did not raise claims relating to the failure to preserve a complete trial record, the trial court's use of shackles, or mental retardation because these issues were not supported by the trial record. I did not raise a claim of ineffective assistance of trial counsel during jury selection because I believe that claims of ineffective assistance can be more thoroughly investigated and litigated in a habeas proceeding and I did not want to impede writ counsel's ability to do so. I did not raise a *Batson* claim with regard to Juror Trevino because there was no *Batson* objection made during voir dire and therefore this issue was not preserved for appellate review. Last, I saw no reason to challenge the trial court's denial of Green's pretrial motion to preclude the death penalty because this ruling was consistent with well-established law from the United States Supreme Court and the Texas Court of Criminal Appeals.

John Tatum

SWORN TO AND SUBSCRIBED before me on October 21, 2014, to certify which witness my hand and seal of office.

LASHANA ALEXANDER
Notary Public
SEAL STATE OF TEXAS
My Comm. Exp. Dec. 27, 2016

Notary Public, State of Texas

LaShana Alexander

Notary's Printed Name

588

No. W09-59380-S(A)

In the 282nd Judicial District Court
Dallas County, Texas

---

**EX PARTE GARY GREEN**

---

COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW

---

589

# TABLE OF CONTENTS

PROCEDURAL HISTORY .................................................................6

FACTUAL SUMMARY .................................................................8

    *Guilt Phase Evidence* .................................................8

    *The State's Punishment Evidence* .................................11

    *Applicant's Punishment Evidence* .................................16

GENERAL FINDINGS OF FACT.................................................21

SPECIFIC FINDINGS OF FACT .................................................22

**Effective Assistance of Trial Counsel**.................................................22

    Applicable Law .................................................................22

    Qualifications of Counsel .................................................23

    GROUND 1: Mitigation Investigation .................................24

        *Composition of the Defense Team and Their Strategy* .................25

        *Timing of Counsel's Mitigation Investigation* .................27

        *Adequacy of the Defense Team's Investigation* .................28

    GROUNDS 2 and 3: Lay Witness Testimony.................................29

        *Preparation and Presentation of Lay Witness Testimony* .................29

        *Decision Not to Present Additional Lay Witness Testimony* .................32

    GROUND 4: Expert Testimony .................................33

        *Preparation and Presentation of Expert Testimony* .................33

        *Decision Not to Present Forensic Expert Testimony*.................36

    GROUNDS 5 and 6: Applicant's Social History .................................37

        *Counsel's Strategy and Presentation of Applicant's Social History* .................37

        *Decision Not to Present Testimony of Social Historian* .................41

590

GROUND 7: Rebuttal of State's Aggravating Evidence ........................................43

    *Prior Conduct in Prison* ........................................43

    *Prior Domestic Relationships* ........................................45

    *Other Criminal Offenses* ........................................47

GROUND 8: Evidence of Future Dangerousness ........................................48

GROUND 9: Advice Regarding Plea ........................................51

GROUND 10: Rebuttal of State's Evidence During Guilt Phase ........................................53

GROUND 11A: Preservation of Complete Trial Record ........................................55

GROUND 12: Alleged Conflict of Interest ........................................56

GROUND 14: Mental Retardation ........................................60

GROUND 16A: Counsel's Strategy During Jury Selection ........................................62

    *Procedural Bar* ........................................62

    *Counsel were not deficient for agreeing to exclude 1's, 4's, and 5's* ........................................63

    *Counsel were not deficient for agreeing to seat jurors Bruce and Jones* ........................................64

**Effective Assistance of Appellate Counsel** ........................................66

  Applicable Law ........................................66

  Qualifications of Appellate Counsel ........................................67

  GROUND 11B: Decision Not to Raise Claim Regarding Preservation of the Trial Record ........................................68

  GROUND 13: Decision Not to Raise Claim Regarding Court's Use of Restraints ..69

  GROUND 16B: Decision Not to Raise Claim of Ineffective Assistance of Trial Counsel During Jury Selection ........................................70

  GROUND 17: Decision Not to Raise *Batson* Claim ........................................71

  GROUND 18B: Decision Not to Appeal Trial Court's Denial of Pretrial Motion to Preclude the Death Penalty ........................................72

591

Conclusion ..................................................................................................... 74

**GROUND 13: Use of Restraints** ............................................................... 75

    Applicable Law ......................................................................................... 76

    Applicant Was Not Harmed by the Court's Use of Restraints ................. 76

        *Applicant offers no admissible evidence that jurors saw the restraints* ........... 77

        *Even if admissible, the juror testimony is not credible* ..................................... 79

        *Even if jurors saw the restraints, this error did not contribute to Applicant's conviction or punishment* ............................................................................... 80

**GROUND 14: Mental Retardation** ............................................................. 82

    Applicable Law ......................................................................................... 82

    Procedural Bar .......................................................................................... 84

    Applicant Is Not Mentally Retarded ........................................................ 85

**GROUND 15: Mental Illness** ...................................................................... 87

    Procedural Bar .......................................................................................... 87

    *Atkins* Does Not Extend to the Mentally Ill ........................................... 88

**GROUND 17: State's Use of Peremptory Strike Against Prospective Juror Trevino** ...................................................................................................... 90

**GROUND 18A: Court's Denial of Pretrial Motion to Preclude the Death Penalty** .. 91

**GROUNDS 19 and 20: Constitutional Challenges to the Texas Death Penalty Statute** ...................................................................................................... 92

CONCLUSION ............................................................................................... 94

ORDER ........................................................................................................... 95

5

592

The Court, having considered (1) the allegations contained in Gary Green's Application for Writ of Habeas Corpus, (2) the State's Response, (3) testimony and documentary evidence filed in the Court and offered at the writ proceedings held February 28, July 14-16, and July 18, 2014, (4) official court documents and records, and (5) the Court's personal experience and knowledge of the case, makes the following findings of fact and conclusions of law:

## I.

## PROCEDURAL HISTORY

Applicant is confined pursuant to the judgment and sentence of the 282nd Judicial District Court of Dallas County, Texas. Applicant was convicted of murdering Lovetta Armstead and Jazzmen Montgomery in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death on November 5, 2010. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West Supp. 2013). On October 3, 2012, the Court of Criminal Appeals affirmed Applicant's conviction on direct appeal. *See Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010 (Tex. Crim. App. Oct. 3, 2012) (not designated for publication).

Applicant timely filed his original application for writ of habeas corpus on June 15, 2012. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 4. The State received

6

593

notice of the issuance of the writ on August 8, 2012. *See id.* art. 11.071, § 6. The State received a statutorily-authorized extension and filed its response on February 4, 2013. *See id.* art. 11.071, § 7(a). Pursuant to a request from both parties, the Court agreed to conduct a live evidentiary hearing to resolve the claims raised in the application. On February 28, 2014, the Court entered an order (1) setting the live evidentiary hearing for July 14-18, 2014, (2) designating the issues to be resolved at the hearing, and (3) designating the witnesses from whom the Court would hear testimony in order to resolve these issues.[1]

At the evidentiary hearing, Applicant presented live testimony from the following witnesses: (1) Dr. Valerie Wright, (2) Deputy Tony Lancaster, (3) Juror Timothy Short, (4) Juror John Pozadzides, (5) Paul Johnson, (6) Mary Sampson, (7) Nysasno Carter, and (8) Dr. Bhushan Agharkar. The State presented live testimony from the following witnesses: (1) Dr. Kellie Gray-Smith, (2) Brady Wyatt, (3) Kobby Warren, (4) Dr. David Self, and (5) Dr. Kelly Goodness. Following the hearing, Applicant filed supplemental briefing and letter from Dr. Joseph Penn, the director of Mental Health Services at the Univeristy of Texas Medical Branch Correctional Managed Care Division, and the State filed an affidavit from appellate counsel, John Tatum.

---

[1] The live hearing was initially scheduled for October 22-24, 2013. Due to a scheduling conflict with one of Applicant's expert witnesses, the parties agreed to reschedule the hearing for January

7

594

The Court, having considered (1) the allegations contained in Gary Green's Application for Writ of Habeas Corpus, (2) the State's Response, (3) testimony and documentary evidence filed in the Court and offered at the writ proceedings held February 28, July 14-16, and July 18, 2014, (4) official court documents and records, and (5) the Court's personal experience and knowledge of the case, makes the following findings of fact and conclusions of law:

## I.

## PROCEDURAL HISTORY

Applicant is confined pursuant to the judgment and sentence of the 282nd Judicial District Court of Dallas County, Texas. Applicant was convicted of murdering Lovetta Armstead and Jazzmen Montgomery in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Applicant to death on November 5, 2010. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West Supp. 2013). On October 3, 2012, the Court of Criminal Appeals affirmed Applicant's conviction on direct appeal. *See Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010 (Tex. Crim. App. Oct. 3, 2012) (not designated for publication).

Applicant timely filed his original application for writ of habeas corpus on June 15, 2012. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 4. The State received

6

595