

VOL 489 PAGE 313

## CASE NO. F-1058082-W
INCIDENT NO./TRN: 9175368412

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE **363rd** JUDICIAL DISTRICT |
| | § | |
| v. | § | COURT |
| | § | |
| QUINCE EDWARD TUCKER | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX 02774030 | § | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| Judge Presiding: | Hon. **Tracy Holmes** | Date Judgment Entered: | **10/12/2010** |
|---|---|---|---|
| Attorney for State: | **Elaine Evans** | Attorney for Defendant: | **Paul Johnson** |

Offense for which Defendant Convicted:
**DEL CS**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **481.112 Health and Safety Code** |

Date of Offense:
**7/14/2010**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **STATE JAIL FELONY-sec 12.44(a) PC** | **GUILTY** | **N/A** |

Terms of Plea Bargain:
**210 DAYS COUNTY JAIL**

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |
| Date Sentence Imposed: | **10/12/2010** | Date Sentence to Commence: | **10/12/2010** |

Punishment and Place of Confinement:
**210 DAYS COUNTY JAIL**

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ **N/A** | $ **304.00** | $ **N/A** | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **N/A** .

| Time Credited: | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. | | | | |
|---|---|---|---|---|---|
| | From **7/14/2010** to **10/12/2010** | From | to | From | to |
| | From | to | From | to | From | to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. | | | | |
| | **N/A DAYS**   NOTES: **N/A** | | | | |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.



Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options (select one)**

☐ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, State Jail Division, TDCJ.** The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☒ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY.** The Court ORDERS Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

_____

**Signed and entered on October 12, 2010**

X _____
Tracy Holmes
JUDGE PRESIDING

Clerk: ROSA OROZCO

\*Immediately upon release, defendant must report in person to the Felony Collections Dept., 2nd fl., Rm. C2-3, Crowley Courts Bldg., Dallas, TX, for payment arrangement of court ordered costs, fines and/or attorney fees.

Right Thumbprint\*

\*Thumbprint Certification attached.

## JUDGMENT
## CERTIFICATE OF THUMBPRINT

**THE STATE OF TEXAS**          CAUSE NO. F *10 58082*

VS.                              JUDICIAL **363rd**   DISTRICT COURT ____

*Q Tucker*                       DALLAS COUNTY, TEXAS

RIGHT THUMB                    DEFENDANT'S ____ HAND

**THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.**

DONE IN COURT THIS *12* DAY OF *Oct* , 20 *10* .

_____
BAILIFF/DEPUTY SHERIFF

*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:

_____ LEFT THUMBPRINT          _____ LEFT/RIGHT INDEX FINGER

_____ OTHER, _____

SIGNED AND ENTERED ON THIS *12* DAY OF *Oct* , 20 *10* .

_____
PRESIDING JUDGE



VOL 807 PAGE 0265

### CASE No. F-1033129-J
INCIDENT NO./TRN: 0107886227

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| v. | § | COURT #3 |
| | § | |
| NATHANIEL BROOKS JR. | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX06961687 | § | |

## ORDER OF DEFERRED ADJUDICATION

| Judge Presiding: | Hon. **Gracie Lewis** | Date Order Entered: | **10/14/2010** |
|---|---|---|---|
| Attorney for State: | **Myra Mcintosh** | Attorney for Defendant: | **Paul Johnson** |

Offense:
**ASSAULT BI/FV ENH**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **22.01 Penal Code** |

Date of Offense:
**1/20/2010**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **3RD DEGREE FELONY** | **GUILTY** | **N/A** |

Terms of Plea Bargain:
**5 YEARS DEFERRED PROBATION FINE $1500**

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |

### ADJUDICATION OF GUILT DEFERRED;
### DEFENDANT PLACED ON COMMUNITY SUPERVISION.
### PERIOD OF COMMUNITY SUPERVISION: 5 YEARS

| Fine: | Court Costs: | Restitution: | Restitution Payable to: | |
|---|---|---|---|---|
| **$ 1500** | **$ 244** | **$ N/A** | ☐ VICTIM (see below) | ☐ AGENCY/AGENT (see below) |

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **N/A** .

| Time Credited: | **N/A DAYS** |
|---|---|
| | NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney as named above.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.



Both parties announced ready for trial. Defendant waived the right of trial by jury and entered a plea as indicated above. The Court admonished the Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court FINDS such evidence substantiates Defendant's guilt. The Court FINDS that, in this cause, it is in the best interest of society and Defendant to defer proceedings without entering an adjudication of guilt and to place Defendant on community supervision.

The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS that Defendant is given credit noted above for the time spent incarcerated. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

The Court ORDERS that no judgment shall be entered at this time. The Court further ORDERS that Defendant be placed on community supervision for the adjudged period so long as Defendant abides by and does not violate the terms and conditions of community supervision. See TEX. CODE CRIM. PROC. art. 42.12 § 5(a).

**<u>Furthermore, the following special findings or orders apply:</u>**

**Signed and entered on October 14, 2010**

X _Gracie Lewis_

Gracie Lewis
JUDGE PRESIDING

Clerk: L.STOKES

Right Thumbprint*

*Thumbprint Certification attached.

Page 1 of 3     CONDITIONS OF COMMUNITY SUPERVISION

THE STATE OF TEXAS                    IN THE CRIMINAL DISTRICT COURT 3
                                      DALLAS COUNTY, TEXAS
Vs.
NATHANIEL JUNIOR BROOKS          OCTOBER     Term, 2010

Cause No. F1033155J                        REGULAR SUPERVISION_____
Offense  ASSAULT FV/ENH          F3        DEFERRED ADJUDICATION XXX
Cause No. P1033129J                        SHOCK PROBATION_____
Offense  ASSAULT FV/ENH          F3        ML. No. 340422

In accordance with the authority conferred by the Community Supervision
and Parole Law of the State of Texas you have been placed on Community
Supervision on this date 10-14-10 for a period of ____5____ years. It is
the order of this Court that you comply with the following conditions of
supervision:

(a)  Commit no offense against the laws of this or any other State or the
     United States, and do not possess a firearm during the term of
     Supervision;

(b)  Avoid injurious and vicious habits, and do not use marijuana,
     narcotics, dangerous drugs, inhalants or prescription medication
     without first obtaining a prescription for said substances from a
     licensed physician;

(c)  Avoid persons or places of disreputable or harmful character and do
     not associate with individuals who commit offenses against the laws
     of this State or the United States;

(d)  Obey all rules and regulations of the Supervision Department, and
     report to the Supervision Officer as directed by the Judge or
     Supervision Officer, to-wit:
     WEEKLY/TWICE MONTHLY/OR MONTHLY ON APPOINTED DATE/TIME.

(e)  Permit the Supervision Officer to visit you at your home or
     elsewhere, and notify the Supervision Officer not less than
     twenty-four (24) hours prior to any changes in your home or
     employment address;

(f)  Work faithfully at suitable employment as far as possible, and seek
     the assistance of the Supervision Officer in your efforts to secure
     employment when unemployed;

(g)  Remain within a specified place; to-wit: Dallas County, Texas, or
     Approved Supervising County, and do not travel outside Dallas
     County, or Approved Supervising County, without first having
     obtained written permission from the Court or Supervising Officer;

(h)  Report in person within five(5)working days of todays date
     or immediately upon your release to the District Clerk Felony
     Collections Dept. 2nd Fl., Room C2-3 Frank Crowley Bldg., to
     arrange payment of Court Costs (amount to be assessed by Court
     Clerk), Fine, and, if assessed Attorney Fees.In addition, pay in full
     all monies as assessed by the Court pursuant to the payment agreement
     established by the Felony Collections Department.

(i)  Support your dependants;

(j)  Pay a Supervision fee of $60.00 per month plus a $2.00 transaction
     fee to the Supervision Officer of this Court on or before the first
     day of each month hereafter during Supervision; money order, cashiers
     check or credit card online at www.payfeesnow.com
                         CONTINUED ON PAGE 2

Page 2 of 3

Cause Number F1033155J / F1033129J

(k) Participate in the Community based program, Dallas Area Crime Stoppers Inc., by making a monetary contribution of $50.00 payable through the community supervision officer of this Court as directed within 90 days of being placed on Community Supervision;

(1) First contact to the Volunteer Center must be made by the defendant within 30 days from referral and defendant is to start 160 hours of Community Service at an approved Community Service Project or projects designated by the Community Supervision and Corrections Department. A processing fee of $55.00 payable to the Volunteer Center, will be required for referrals through the Volunteer Center. Hours of service to be completed by term of Supervision;

(m) Report as directed to the Community Supervision and Corrections Department Comprehensive Assessment and Treatment Services program (C.A.T.S.), Frank Crowley Bldg., 133 N. Riverfront Blvd., 9th floor, Dallas, TX 75207, obey all program instructions and/or treatment for Substance-Abuse and/or Psychological Health; and continue with such adherence until release is granted by the program or the Court. Pay any costs assessed by CATS in accordance with program guidelines. Pay any and all costs associated with assessment, evaluation or treatment in accordance with program guidelines.
(Reporting hours are from 8:00 a.m. until 5:00 p.m.)

(n) Submit a non-dilute random urine sample and/or medical test at the request of the Supervision Officer to determine the use of illicit drugs or alcohol, paying the total cost of such urinalysis of $200.00 payable at $10.00 monthly to the Community Supervision & Corrections Department;

(o) IF CONVICTED OF A FELONY OFFENSE:
Submit as directed, a buccal swab specimen to the Department of Public Safety under Sub-Chapter G, Chapter 411, Government Code, for the purpose of creating a DNA record of the defendant (Article 42.12 sec 11(a)(22). All costs incurred are to be paid by the Defendant;

(P) Do not possess, consume or purchase any alcoholic beverages, or illegal controlled substances during the term of Supervision;

CONTINUED ON PAGE 3

Page 3 of 3

Cause Number F1033185J / F1033129J

(Q)  Within ___45___ days from referral, participated in a domestic
violence treatment program (BIPP) through a court-approved resource,
making an observable, deliberate and diligent effort to comply with
all directives provided by the program until released successfully by
the agency of the Court.  Defendant to pay all costs of
counseling/treatment;

(R)  Attend all school and or GED classes every school day unless
you have an excused absence according to school rules. Obey all
published school rules and regulations. A suspension or explusion
is an unexcused absence.

(S)  Within 60 days from referral participate in a Safe Neighborhood
Training session at: Frank Crowley Building, 133 N. Riverfront Blvd.,
Dallas, TX : Sessions are held at 6:30 p.m., in the Central Jury
Room, 2nd Floor, on the 4th Wednesday of each month. (except
Holidays) Defendant shall report on time, dress appropriately, and
not be under the influence of alcohol or controlled substances.
NO ELECTRONIC DEVICES OR LIGHTERS WILL BE ALLOWED IN THE BUILDING.

(T)  Do not have any form of contact, be it in person, by mail, telephone
or any form or communication with _____TONIA CUMMINS_____
directly or indirectly, for the duration of the Supervision term.

(U)  On Wednesday Friday 10/22/10 at 1:00 p.m., REPORT IN PERSON TO the
SOUTH OFFICE at 214-330-0383. 4909 Cockrell Hill Rd., Dallas, TX
75236;

You are hereby advised that under the law of this State, the Court shall
determine the terms and conditions of your supervision, and may at any
time during the period of Supervision, alter or modify the conditions of
your Supervision. The Court also has the authority at any time during the
period of Supervision to revoke your Supervision and/or proceed to
adjudication for violation of any of the conditions of your Supervision
set out above.

Witness our Signatures this day of 14th Oct 20 10

_____                    _____
Defendant                                  Judge

_____
Court Supervision Officer



VOL 632 PAGE 166

## CASE NO. F-0441751-P
INCIDENT NO./TRN: 9094939460

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 203rd JUDICIAL DISTRICT** |
| | § | |
| **V.** | § | **COURT** |
| | § | |
| **LYDIA ANN MILLER** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| STATE ID NO.: TX03964768 | § | |

## JUDGMENT ADJUDICATING GUILT

| | | |
|---|---|---|
| Judge Presiding: **HON. Jennifer Balido** | Date Judgment Entered: | **10/18/2010** |
| Attorney for State: **Layne Jackson** | Attorney for Defendant: | **Paul Johnson** |
| Date of Original Community Supervision Order:<br>**4/4/2005** | Statute for Offense:<br>**32.21 Penal Code** | |

Offense for which Defendant Convicted:
**FORG GOV INST**

Date of Offense:
**11/29/2004**

| Degree:<br>**3RD DEGREE FELONY** | Plea to Motion to Adjudicate:<br>**TRUE** | Findings on Deadly Weapon:<br>**N/A** |
|---|---|---|

Terms of Plea Bargain:
**2 YEARS PENITENTIARY**

| Date Sentence Imposed: | **10/18/2010** | Date Sentence to Commence: | **10/18/2010** |
|---|---|---|---|

Punishment and Place of Confinement: **2 YEARS INSTITUTIONAL DIVISION, TDCJ**

**THIS SENTENCE SHALL RUN CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| Fine:<br>$ **N/A** | Court Costs:<br>$ **723.00** | Restitution:<br>$ **N/A** | Restitution Payable to:<br>☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |
|---|---|---|---|

☐ **Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.**

**Sex Offender Registration Requirements do not apply to the Defendant.** TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **N/A** .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
|---|---|
| | From 11/30/2004 to 12/3/2004    From 3/25/2005 to 4/4/2005   From 10/3/2006 to 10/10/2006 |
| Time Credited: | From 10/14/2010 to 10/18/2010    From    to    From    to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A DAYS**   NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

The Court previously deferred adjudication of guilt in this case. Subsequently, the Court heard the matter of Defendant's compliance with and obedience to the terms and conditions of the Court's Order of Deferred Adjudication of Guilt. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

After hearing and considering the evidence presented by both sides, the Court **FINDS THE FOLLOWING:** (1) The Court previously found the Defendant to be qualified for community supervision; (2) the Court **DEFERRED** further proceedings, made no finding of guilt, and rendered no judgment; (3) the Court issued an order placing Defendant on community supervision for a period of **4 YEARS;**



(4) The Court assessed a fine of $ 1500.00; (5) While on community supervision, Defendant violated the terms and conditions of community supervision as set out in the State's **ORIGINAL** Motion to Adjudicate Guilt as follows:
See attached Motion to Adjudicate Guilt.

    Accordingly, the Court **GRANTS** the State's Motion to Adjudicate the Defendant's Guilt in the above cause. **FINDING** the Defendant committed the offense on the date as noted above, the Court **ORDERS, ADJUDGES AND DECREES** that Defendant is **GUILTY** of the offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the applicable provisions of Tex. Code Crim. Proc. art. 42.12 § 9.
    The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options [select one]**

☒ **Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ**. The Court **ORDERS** Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement in Lieu of Payment.** The Court **ORDERS** Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY**. The Court **ORDERS** Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence [select one]**

☒ The Court **ORDERS** Defendant's sentence **EXECUTED**.

☐ The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED**. The Court **ORDERS** Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.
    The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

### Furthermore, the following special findings or orders apply:

**Signed and entered on October 18, 2010**

x _Jennifer Balido_

Jennifer Balido
JUDGE PRESIDING

Clerk: D K Baldwin

Certificate of Thumbprint attached

Right Thumbprint

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

THE STATE OF TEXAS

CAUSE NO. F 0 4 4175 1 -P

vs. L404A

*L Miller*

JUDICIAL 203rd   DISTRICT COURT

DALLAS COUNTY, TEXAS

**RIGHT THUMB**

DEFENDANT'S _____ HAND

THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.

DONE IN COURT THIS _18_ DAY OF ___OCT___ _ _ , 20 _10_.

_____
BAILIFF/DEPUTY SHERIFF

*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:

__ _   LEFT THUMBPRINT      _ _   LEFT/RIGHT INDEX FINGER

_ _   OTHER, _ _ _ _ _ _ _ _ _

SIGNED AND ENTERED ON THIS _18_ DAY OF ___Oct___ _ _ , 20 _10_.

*Jennifer Baldo*
PRESIDING JUDGE

NO. F04-41751P                          203RD JUDICIAL DISTRICT COURT

THE STATE OF TEXAS
                                        DALLAS COUNTY, TEXAS

VS:
                                        JULY    TERM, 2007

LYDIA ANN MILLER
            MOTION TO PROCEED WITH AN ADJUDICATION OF GUILT

        COMES NOW the State of Texas by and through her Criminal District
Attorney and would show the Court the following.
        That LYDIA ANN MILLER  , defendant was duly and legally placed on
Community Supervision for a period of FOUR (4)  years in the above
entitled and numbered cause in the 203rd Judicial District Court of Dallas
County, Texas, on the  4TH  day of  APRIL  A.D., 2005  for the
offense of:
                        FORGERY GOVERNMENT INSTRUMENT
        A THIRD DEGREE FELONY OFFENSE, AS CHARGED IN THE INDICTMENT

That the defendant has violated the following conditions: d.h.i.k
   of said supervision in that;

                          SEE PAGE 2 ATTACHED

 This violation-offense occurred after  APRIL 4. 2005  and during the
term of Supervision.

        WHEREFORE, the State prays that said Defendant be cited to appear
before this Honorable Court and show cause why the Court should not proceed
with an adjudication of guilt on the original charge.

        This the  27TH  day of  NOVEMBER , A.D. 2007.

                                        CRAIG WATKINS
                                        District Attorney
                                        Dallas County, Texas

                                        BY: _____
                                            Asst. District Attorney

 A copy of this motion was delivered to the Defendant on the 18th
day of  OCTOBER  A.D., 2010

                                        _____
                                        Court Supervision Officer

        I received a copy of this motion on the  18th  day of  October
A.D. 2010 .

                                        _____
                                                Defendant
                ML# 370345          By: jes

MOTION TO PROCEED WITH AN ADJUDICATION OF GUILT
- PAGE 2 -

NO. F04-41751P                              203RD JUDICIAL DISTRICT COURT

THE STATE OF TEXAS                          DALLAS COUNTY, TEXAS

VS.

LYDIA ANN MILLER                     JULY          TERM, 2007

(d)     LYDIA ANN MILLER did violate condition (d) in that she did not
        report to Kaufman County Supervision Officer as directed for the months
        of August 2007 through November 2007.

(h)     LYDIA ANN MILLER did violate condition (h) in that she did not pay
        Court Costs in the amount of $548.00 to the District Clerk of Dallas
        County and remaining balance is $548.00. FINES in the amount of
        $1500.00 and remaining balance is $1500.00.

(j)     LYDIA ANN MILLER did violate condition (j) in that she did not pay
        a Supervision Fee in the amount of $60.00 per month, and is currently
        delinquent $1744.00.

(k)     LYDIA ANN MILLER did violate condition (k) in that she failed to
        start/complete community service hours as directed.



THE STATE OF TEXAS

VS.

**LYDIA ANN MILLER**

CAUSE NO. F **0441751** ·P

203rd               DISTRICT COURT
JUDICIAL

DALLAS COUNTY, TEXAS

### ORDER TO WITHDRAW FUNDS

TO: INMATE TRUST ACCOUNT, TEXAS DEPARTMENT OF CRIMINAL JUSTICE

COPY TO:  **LYDIA ANN MILLER**
TDCJ#                                    SID# 03964768

**GREETINGS:**

THE ABOVE named Texas Department of Criminal Justice offender has of this date been assessed court costs, fees, and/ fines in the District Court of Dallas County, Texas, in the above entitled and numbered cause in accordance with the sentenc imposed as reflected in the judgment attached to this Order. The Court finds that the offender is unable to pay the court cost fees, and/or fines on this date and that the funds should be withdrawn from the Offender's Inmate Trust Account. Court cost fees, and/or fines have been incurred as represented in the attached judgment in the amount of $**(723.00)** for court fees ar costs, and $**(N/A)** in fines.

THE COURT ORDERS that payment be made out of the Offender's Inmate Trust Account as follows:
Pay an initial amount equal to the lesser of:

(1)      15% of the account balance up to and including $100, plus 25% of any portion of the account balance that between $100.01 and $500 inclusive, plus 50% of any portion of the account balance that is more than $50
or

(2)      The total amount court costs, fees, and/or fines that remains unpaid.

In each month following payment of the initial amount, payment shall be made out of the Offender's Inmate Trust Account : an amount equal to the lesser of:

(1)      10% of each month's deposit in the Offender's Inmate Trust Account; or

(2)      The total amount of court costs, fees, and/or fines that remains unpaid.

Payments are to continue until the total amount of court costs, fees, and/or fines are paid in full or the offender is release from confinement.

IT IS FURTHER ORDERED that payments for court fees, court costs, and fines shall not be withdrawn pursuant to this ord until all orders which the department has been notified of requiring an inmate to pay child support, restitution, and/ reimbursement to the Health and Human Services Commission for financial assistance to a child of the inmate for the child health needs under Chapter 31 of the Human Resources Code have been paid in full.

The department (Inmate Trust Account) shall withdraw money from the trust account of the offender, hold same in a separa account, and shall forward said money to the Dallas County District Clerk on the earlier of the following dates:

(1)      Monthly;

(2)      The date the total amount to be forwarded equals the total amount which remains unpaid; or

(3)      The date the offender is released.

The Court enters this order pursuant to Texas Government Code §501.014 this (18TH) day of (October), (2010).

_Jennifer Balido_
**JUDGE PRESIDING**



VOL 737 PAGE 266

CASE NO. F-1057389-L
INCIDENT NO./TRN: 9175350246

| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| v. | § | COURT #5 |
| | § | |
| TERANCE TERRELL PATTERSON | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX06361621 | § | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| Judge Presiding: | HON. Carter Thompson | Date Judgment Entered: | 10/19/2010 |
| Attorney for State: | Herschel Woods | Attorney for Defendant: | Paul Johnson |

Offense for which Defendant Convicted:
**THEFT ENH**

| Charging Instrument: | Statute for Offense: |
| **INDICTMENT** | **31.030 Penal Code** |

Date of Offense:
6/26/2010

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
| STATE JAIL FELONY-sec 12.44(a) PC | GUILTY | N/A |

Terms of Plea Bargain:
**OPEN**

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Date Sentence Imposed: | 10/19/2010 | Date Sentence to Commence: | 10/19/2010 |

| Punishment and Place of Confinement: | 3 DAYS COUNTY JAIL |

THIS SENTENCE SHALL RUN **CONCURRENTLY**.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
| $ N/A | $ 244.00 | $ N/A | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was N/A .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. | | |
| | From 6/26/2010 to 6/27/2010  From    to    From    to | | |
| Time Credited: | From    to    From    to    From    to | | |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. | | |
| | N/A DAYS    NOTES: N/A | | |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

Judgment of Conviction by Court Waiver of Jury Trial 073107



      Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.

      The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

      The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options  (select one)**

☐ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, State Jail Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☒ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court ORDERS Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence  (select one)**

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

      The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**<u>Furthermore, the following special findings or orders apply:</u>**

Signed and entered on October 19, 2010

*C. Thompson*

X_____
Carter Thompson
JUDGE PRESIDING

Clerk: J HOLLINGSWORTH

Right Thumbprint*

*Thumbprint Certification attached.

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

**THE STATE OF TEXAS**                    CAUSE NO. F *10 17389.*

**VS.**                                          **CRIMINAL**   **DISTRICT COURT**   **#5**

*T Patton*                                    **DALLAS COUNTY, TEXAS**



**RIGHT THUMB**                          DEFENDANT'S ___*RT*___ HAND

**THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.**

**DONE IN COURT THIS** *19th* **DAY OF** *Oct* , 20 *10* .

*J. Mulkey 834*

**BAILIFF/DEPUTY SHERIFF**

**\*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:**

_____ **LEFT THUMBPRINT**          _____ **LEFT/RIGHT INDEX FINGER**

_____ **OTHER,** _____

**SIGNED AND ENTERED ON THIS** *19th* **DAY OF** *Oct* , 20 *10* .

*C. Thompson*

**PRESIDING JUDGE**



VOL 737 PAGE 284

CASE NO. F-0619385-L
INCIDENT NO./TRN: 9107411863

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| V. | § | COURT #5 |
| | § | |
| KATRINA JACKSON | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX07668807 | § | |

# ORDER OF DEFERRED ADJUDICATION

| | | | |
|---|---|---|---|
| Judge Presiding: | Hon. **Carter Thompson** | Date Order Entered: | **10/20/2010** |
| Attorney for State: | **Rachel Clark** | Attorney for Defendant: | **Paul Johnson** |

Offense:
**AGGRAVATED SEX CONTENT CHILD/14**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **Penal Code** |

Date of Offense:
**7/1/2003**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **1ST DEGREE FELONY** | **GUILTY** | **N/A** |

Terms of Plea Bargain:
**5 YEARS DEFERRED PROBATION**

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

## ADJUDICATION OF GUILT DEFERRED;
### DEFENDANT PLACED ON COMMUNITY SUPERVISION.

### PERIOD OF COMMUNITY SUPERVISION: 5 YEARS

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 473.00 | $ N/A | ☐ VICTIM (see below)  ☐ AGENCY/AGENT (see below) |

Sex Offender Registration Requirements apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **10 years.**

| Time Credited: | **N/A DAYS** |
|---|---|
| | NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney as named above.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

Order of Deferred Adjudication 0-3107                    Page 1 of 2



Both parties announced ready for trial. Defendant waived the right of trial by jury and entered a plea as indicated above. The Court admonished the Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court FINDS such evidence substantiates Defendant's guilt. The Court FINDS that, in this cause, it is in the best interest of society and Defendant to defer proceedings without entering an adjudication of guilt and to place Defendant on community supervision.

The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS that Defendant is given credit noted above for the time spent incarcerated. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

The Court ORDERS that no judgment shall be entered at this time. The Court further ORDERS that Defendant be placed on community supervision for the adjudged period so long as Defendant abides by and does not violate the terms and conditions of community supervision. See TEX. CODE CRIM. PROC. art. 42.12 § 5(a).

**Furthermore, the following special findings or orders apply:**

**Signed and entered on October 20, 2010**

X _C. Thompson_

Carter Thompson
JUDGE PRESIDING

Clerk: J HOLLINGSWORTH

Right Thumbprint*

*Thumbprint Certification attached.

Page 1 of 4     CONDITIONS OF COMMUNITY SUPERVISION
THE STATE OF TEXAS                    IN THE CRIMINAL DISTRICT COURT 5
                                      DALLAS COUNTY, TEXAS

Vs.
KATRINA JACKSON                       OCTOBER    Term, 2010

Cause No. F0619385L                   REGULAR SUPERVISION
Offense   AGG SEX ASSLT CHILD · (F1)  DEFERRED ADJUDICATIONXXXX
Cause No.                             SHOCK PROBATION
Offense                               ML. No. 480221

In accordance with the authority conferred by the Community Supervision
and Parole Law of the State of Texas you have been placed on Community
Supervision on this date 10/20/10  for a period of   FIVE(5) years. It is
the order of this Court that you comply with the following conditions of
supervision:

(a)  Commit no offense against the laws of this or any other State or the
     United States, and do not possess a firearm during the term of
     supervision;

(b)  Avoid injurious and vicious habits, and do not use marijuana,
     narcotics, dangerous drugs, inhalants or prescription medication
     without first obtaining a prescription for said substances from a
     licensed physician;

(c)  Avoid persons or places of disreputable or harmful character and do
     not associate with individuals who commit offenses against the laws
     of this State or the United States;

(d)  Obey all rules and regulations of the Supervision Department, and
     report to the Supervision Officer as directed by the Judge or
     Supervision Officer, to-wit:
     WEEKLY/TWICE MONTHLY/OR MONTHLY ON APPOINTED DATE/TIME.

(e)  Permit the Supervision Officer to visit you at your home or
     elsewhere, and notify the Supervision Officer not less than
     twenty-four (24) hours prior to any changes in your home or
     employment address;

(f)  Work faithfully at suitable employment as far as possible, and seek
     the assistance of the Supervision Officer in your efforts to secure
     employment when unemployed;

(g)  Remain within a specified place;to-wit: Dallas County, Texas, or
     Approved Supervising County, and do not travel outside Dallas
     County, or Approved Supervising County, without first having
     obtained written permission from the Court or Supervising Officer;

(h)  Report in person within five(5)working days of todays date
     or immediately upon your release to the District Clerk Felony
     Collections Dept. 2nd Fl.,Room C2-3 Frank Crowley Bldg., to
     arrange payment of Court Costs (amount to be assessed by Court
     Clerk), Fine, and, if assessed Attorney Fees.In addition, pay in full
     all monies as assessed by the Court pursuant to the payment agreement
     established by the Felony Collections Department.

(i)  Support your dependants;

(j)  Pay a Supervision fee of $60.00 per month plus a $2.00 transaction
     fee to the Supervision Officer of this Court on or before the first
     day of each month hereafter during Supervision;cash,cashiers check,
     or credit online at www.payfeesnow.com

CONTINUED ON PAGE 2

Page 2 of 4

Cause Number F0619385L

(k)  Participate in the Community based program, Dallas Area Crime
     Stoppers Inc., by making a monetary contribution of $50.00 payable
     through the community supervision officer of this Court as directed
     within 90 days of being placed on Community Supervision;

(l)  Within 30 days from a referral, defendant is to begin 320    hours of
     Community Service at an approved Community Service Project or projects
     designated by the Community Supervision and Corrections Department. A
     processing fee may be required. Hours of service to be completed at the
     direction of the Supervising Officer and by the term of Supervision;

(m)  Report as directed to the Community Supervision and Corrections
     Department Comprehensive Assessment and Treatment Services
     program (C.A.T.S.), Frank Crowley Bldg., 133 N. Riverfront Blvd.,
     9th floor, Dallas, TX 75207, obey all program instructions
     and/or treatment for Substance Abuse and/or Psychological
     Health; and continue with such adherence until release is granted
     by the program or the Court. Pay any and all costs associated
     with assessment, evaluation or treatmene in accordance with program
     guidelines.
     (Reporting hours are from 8:00 a.m. until 5:00 p.m.)

(n)  Submit a non-dilute random urine sample and/or medical test at the
     request of the Supervision Officer to determine the use of illicit
     drugs or alcohol, paying the total cost of such urinalysis of
     $200.00    payable at $10.00 monthly to the Community Supervision &
     Corrections Department;

(o)  Do not have any form of contact, be it in person, by mail,telephone
     or any form or communication with    JHARRAD DICKINSON        .
     directly or indirectly, for the duration of the Supervision term.

(p)  Do not have any form of contact, be it in person, by mail, telephone
     or any form of communication with any child 17 years of age or
     younger, directly or indirectly,

(q)  Do not go within 1000 feet of any premise where children 17 years of
     age or younger congregate or gather, and do not participate in any
     program where children 17 years or younger are or may also be
     participants;

(r)  No later than the 30th day after the date you are released/placed on
     Community Supervision, You shall go in person to the appropriate
     Texas Department of Public Safety, Drivers License Office, and obtain
     a yearly renewable Texas Drivers License or personal identification
     certificate for the duration of the period you are required to
     register as a sex offender;

(s)  If directed pay a fee that equals the actual cost of providing public
     notice in a newspaper. Payment in entirety to be made to the
     Community Supervision Officer of this Court within 90 days of the date
     of Community Supervision;

CONTINUED ON PAGE 3

Page 3 of 4

Cause Number F0619385L

(t)   Submit as directed, a blood sample or other specimen to the Department
      of Public Safety under Sub-Chapter G, Chapter 411, Government Code,
      for the purpose of creating a DNA record of the defendant (Article 12
      & 11 (a) (23)). All costs incurred are to be paid by the Defendant;

(u)   Do not possess, acquire, obtain, retain, or review journalistic,
      video, photographic, electronic, compact disk, computer-generated or
      computer originated material, or material generated by an individual
      or material that is sent or received by electronic mail that is
      sexually-oriented and/or portrays nudity or a child or an adult;

(v)   Register with the Sex Offender Registration Program, within 7 days to
      MESQUITE P.D., 777 N. GALLOWAY, MESQUITE, TX 75149//972-216-6625
      You must report in person and have a photo ID and proof of residency.
      As defined in TCCP Chapter 62, Article 62.051, or any municipality
      or County where you reside or intend to reside for more than 7 days,
      providing proof of registration to your supervising officer;

(w)   Pay a Sex Offender fee of $5.00 per month to the Sex Offender Fund,
      through Dallas County Community Supervision and Corrections Department

(x)   Within 45 days from referral, participate in counseling through
      An Approved Registered Sex Offender Treatment Provider and continue
      in counseling as required making observable deliberate and diligent
      effort to comply with all directives and instructions provided by
      The Registered Sex Offender Treatment Provider or its staff;

(y)   Submit and PASS a clinical polygraph with a court approved polygraph
      at least once every 12 months or as directed by a therapist or
      supervision officer. Submit to a penile plethysmograph and/or ABEL
      assessment as directed by a therapist or supervision officer;

(z)   Do not purchase, view or possess printed or recorded materials that
      may be used for the purpose of deviant sexual arousal. Do no frequent
      any place where nudity is permitted or go to places where pornographic
      materials are available, viewed, rented or sold;

(aa)  Admit a Supervision Officer into your residence and allow a reasonable
      review of any journalistic, video, electronic, compact disk, computer
      generated, or originated materials, electronic mail or photographs in
      the home as requested;

CONTINUED ON PAGE 4

Page 4 of 4

Cause Number F0619385L

(bb) Report on **THRUSDAY 10/28/10 @ 10:00 AM** to Officer **WINSTON** for Sex Offender Orientation provided by the Dallas County Community Supervision & Corrections Dept., 899 Stemmons Frwy., Dallas, TX 75207 Phone: 214-653-8519, following all directives of Supervising Officer.

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of your supervision, and may at any time during the period of Supervision, alter or modify the conditions of your Supervision. The Court also has the authority at any time during the period of Supervision to revoke your Supervision and/or proceed to adjudication for violation of any of the conditions of your Supervision set out above.

Witness our Signatures this day of October 20 2010

_____                    _____
Defendant                                   Judge

_____
Court Supervision Officer

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

**THE STATE OF TEXAS**                    **CAUSE NO. F** _O6.19385 ._

**VS.**                              **CRIMINAL    DISTRICT COURT   #5**

_Katrina Jackson_

**DALLAS COUNTY, TEXAS**



**RIGHT THUMB**                          **DEFENDANT'S _____ HAND**

**THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-
NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION
OF THE ABOVE STYLED AND NUMBERED CAUSE.**

**DONE IN COURT THIS** _2_ **DAY OF** _OCTOber_ **, 20** _10_ **.**

_____
**BAILIFF/DEPUTY SHERIFF**

**\*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:**

_____ **LEFT THUMBPRINT**              _____ **LEFT/RIGHT INDEX FINGER**

_____ **OTHER, _____**

**SIGNED AND ENTERED ON THIS _____ DAY OF _____, 20___ _.**

_____
**PRESIDING JUDGE**



VOL 737 PAGE 435

### CASE NO. F-1033741-L
INCIDENT NO./TRN: 9180805884

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| V. | § | COURT #5 |
| | § | |
| SAUL LUNA | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX | § | |

## ORDER OF DEFERRED ADJUDICATION

| Judge Presiding: | HON. **Carter Thompson** | Date Order Entered: | **10/28/2010** |
|---|---|---|---|
| Attorney for State: | **Dewey Mitchell** | Attorney for Defendant: | **Paul Johnson** |

Offense:
**POSSESSION CONTROLLED SUBSTANCE /HEROIN**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **481.115 Health and Safety Code** |

Date of Offense:
**2/20/2010**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **STATE JAIL FELONY** | **GUILTY** | **N/A** |

Terms of Plea Bargain:
**2 YEARS DEFERRED PROBATION**

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |

### ADJUDICATION OF GUILT DEFERRED;
### DEFENDANT PLACED ON COMMUNITY SUPERVISION.

### PERIOD OF COMMUNITY SUPERVISION: 2 YEARS

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 664.00 | $ 206.00 | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was N/A .

| Time Credited: | **N/A DAYS** |
|---|---|
| | NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney as named above.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.



Both parties announced ready for trial. Defendant waived the right of trial by jury and entered a plea as indicated above. The Court admonished the Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court FINDS such evidence substantiates Defendant's guilt. The Court FINDS that, in this cause, it is in the best interest of society and Defendant to defer proceedings without entering an adjudication of guilt and to place Defendant on community supervision.

The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS that Defendant is given credit noted above for the time spent incarcerated. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

The Court ORDERS that no judgment shall be entered at this time. The Court further ORDERS that Defendant be placed on community supervision for the adjudged period so long as Defendant abides by and does not violate the terms and conditions of community supervision. See TEX. CODE CRIM. PROC. art. 42.12 § 5(a).

### Furthermore, the following special findings or orders apply:
DEFENDANT SENTENCE TO WILMER TREATMENT CENTER

**Signed and entered on October 28, 2010**

X _____
Carter Thompson
JUDGE PRESIDING

Clerk: J HOLLINGSWORTH

**Right Thumbprint***

*Thumbprint Certification attached.

Page 1 of 3    CONDITIONS OF COMMUNITY SUPERVISION
THE STATE OF TEXAS          IN THE CDC 5
                           DALLAS COUNTY, TEXAS

Vs.
Saul Luna                    October    Term, 2010

Cause No. F1033741L              REGULAR SUPERVISION_____
Offense  Possession of CS-Heroin    FSJ    DEFERRED ADJUDICATION XXXX
Cause No. _____       SHOCK PROBATION_____
Offense  _____        ML. No. 479783

In accordance with the authority conferred by the Community Supervision
and Parole Law of the State of Texas you have been placed on Community
Supervision on this date 10-28-10 for a period of 2 years. It is
the order of this Court that you comply with the following conditions of
supervision:

(a)  Commit no offense against the laws of this or any other State or the
     United States, and do not possess a firearm during the term of
     Supervision;

(b)  Avoid injurious and vicious habits, and do not use marijuana,
     narcotics, dangerous drugs, inhalants or prescription medication
     without first obtaining a prescription for said substances from a
     licensed physician;

(c)  Avoid persons or places of disreputable or harmful character and do
     not associate with individuals who commit offenses against the laws
     of this State or the United States;

(d)  Obey all rules and regulations of the Supervision Department, and
     report to the Supervision Officer as directed by the Judge or
     Supervision Officer, to-wit:
     WEEKLY/TWICE MONTHLY/OR MONTHLY ON APPOINTED DATE/TIME.

(e)  Permit the Supervision Officer to visit you at your home or
     elsewhere, and notify the Supervision Officer not less than
     twenty-four (24) hours prior to any changes in your home or
     employment address;

(f)  Work faithfully at suitable employment as far as possible, and seek
     the assistance of the Supervision Officer in your efforts to secure
     employment when unemployed;

(g)  Remain within a specified place;to-wit: Dallas County, Texas, or
     Approved Supervising County, and do not travel outside Dallas
     County, or Approved Supervising County, without first having
     obtained written permission from the Court or Supervising Officer;

(h)  Report in person within five(5)working days of todays date
     or immediately upon your release to the District Clerk Felony
     Collections Dept. 2nd Fl.,Room C2-3 Frank Crowley Bldg., to
     arrange payment of Court Costs (amount to be assessed by Court
     Clerk), Fine, and, if assessed Attorney Fees.In addition, pay in full
     all monies as assessed by the Court pursuant to the payment agreement
     established by the Felony Collections Department.

(i)  Support your dependants;

(j)  Pay a Supervision fee of $60.00 per month plus a $2.00 transaction
     fee to the Supervision Officer of this Court on or before the first
     day of each month hereafter during Supervision;money order, cashiers
     check or credit card online at www.payfeesnow.com

CONTINUED ON PAGE 2

Page 2 of 3

Cause Number F1033741L

(k)   Participate in the Community based program, Dallas Area Crime
      Stoppers Inc., by making a monetary contribution of $50.00 payable
      through the community supervision officer of this Court as directed
      within 90 days of being placed on Community Supervision;

(l)   First contact to the Volunteer Center must be made by the
      defendant within 30 days from referral and defendant is to start
      120   hours of Community Service at an approved Community Service
      Project or projects designated by the Community Supervision and
      Corrections Department. A processing fee of $55.00 payable to
      the Volunteer Center, will be required for referrals through the
      Volunteer Center. Hours of service to be completed by term of
      Supervision;

(m)   Report as directed to the Community Supervision and Corrections
      Department Comprehensive Assessment and Treatment Services
      program (C.A.T.S.), Frank Crowley Bldg., 133 N. Riverfront Blvd.,
      9th floor, Dallas, TX 75207, obey all program instructions
      and/or treatment for Substance Abuse and/or Psychological
      Health; and continue with such adherence until release is granted
      by the program or the Court. Pay any costs assessed by CATS in
      accordance with program guidelines. Pay any and all costs associated
      with assessment, evaluation or treatment in accordance with program
      guidelines.
      (Reporting hours are from 8:00 a.m. until 5:00 p.m.)

(n)   Submit a non-dilute random urine sample and/or medical test at the
      request of the Supervision Officer to determine the use of illicit
      drugs or alcohol, paying the total cost of such urinalysis of
      $200.00    payable at $10.00 monthly to the Community Supervision &
      Corrections Department;

(o) IF CONVICTED OF A FELONY OFFENSE:
      Submit as directed, a buccal swab specimen to the Department
      of Public Safety under Sub-Chapter G, Chapter 411, Government
      Code, for the purpose of creating a DNA record of the defendant.
      (Article 42.12 sec 11(a)(22), All costs incurred are to be paid
      by the Defendant;

CONTINUED ON PAGE 3

Page 3 of 3

Cause Number F1033741L

(p) Reimburse the law enforcement agency for drug analysis costs in the amount of $ 206.00 payable to the Dallas County C.S.C.D. at the rate of $10.00 per month due on or before the 1st day of each month hereafter until paid in full;

(q) Attend all school and or GED classes every school day unless you have an excused absence according to school rules. Obey all published school rules and regulations. A suspension or explusion is an unexcused absence.

(r) On Wednesday/Friday Wilmer at 1:00 p.m., REPORT IN PERSON TO the NORTH OFFICE at 972-484-0653. 2627 Zeirich Lane Dallas, TX 75229;

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of your supervision, and may at any time during the period of Supervision, alter or modify the conditions of your Supervision. The Court also has the authority at any time during the period of Supervision to revoke your Supervision and/or proceed to adjudication for violation of any of the conditions of your Supervision set out above.

Witness our Signatures this day of October 28 20 10

_____          _____
Defendant                            Judge

_____
Court Supervision Officer

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

**THE STATE OF TEXAS**                    CAUSE NO. F *10 33741.*

**VS.**                              **CRIMINAL   DISTRICT COURT   #5**

*S Luna*                       **DALLAS COUNTY, TEXAS**



**RIGHT THUMB**                    **DEFENDANT'S** *R+* **HAND**

**THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.**

**DONE IN COURT THIS** *28* **DAY OF** *Oct* , 20*10* .

                         *D. West  #805*
                    **BAILIFF/DEPUTY SHERIFF**

**\*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:**

_____ **LEFT THUMBPRINT**        _____ **LEFT/RIGHT INDEX FINGER**

_____ **OTHER,** _____

**SIGNED AND ENTERED ON THIS** _____ **DAY OF** _____, 20___.

                         *C. Thompson*
                    **PRESIDING JUDGE**



10/28/2010 11 14 26 AM

Loc. Kays Tower KT 02, 2nd Floor KT 02-H   Bookin Number: 10080766   Audit Number: 201021367

## APPOINTMENT OF COUNSEL FOR INDIGENT DEFENDANT

The State of Texas                          Criminal District Court No. 5 (FL)
Vs.                                         District Court
**GERARDO MONTIEL**                         Dallas County, Texas.

| Cause No.: | Offense | LD |
|---|---|---|
| F0638670L | POSS MJ > 5 LBS  **P/V** | F3 |

    It appearing that the defendant has executed a sworn statement certifying that he/she
is without means to employ counsel and requesting appointment of counsel; the Court finds
that the defendant is indigent and hereby appoints:  The Attorney: PAUL JOHNSON
Phone: 214-761-0707      Alt. Phone: 214-202-8461
Email: PJJDOC@AOL.COM
Address: 1825 MARKET CENTER BLVD, SUITE 320  DALLAS, TX 75207

A practicing attorney of the State to represent the defendant in said case(s).

    Signed this 28th day of October, 2010

                                          JUDGE
                                          Carter Thompson

IndigentAppointmentPD

Cause No. _F06 38670_

THE STATE OF TEXAS     0     IN THE _____CDC 5_____
VS. _Gerardo Montiel_    0     DISTRICT COURT _____
        0     DALLAS COUNTY, TEXAS

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL*

I, judge of the trial court, certify this criminal case:

☐   is not a plea-bargain case, and the defendant has the right of appeal, [or]

☐   is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial, and not withdrawn or waived, and the defendant has the right of appeal, [or]

☐   is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal, [or]

☒   is a plea-bargain case, and the defendant has NO right of appeal, [or]

☐   the defendant has waived the right of appeal, [or]

☐   other (please specify): _____

_____      _10/29/10._
Judge                                Date Signed

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, as set forth below, including any right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeals judgment and opinion to my last known address and that **I have only 30 days** in which to file a *pro se* petition for discretionary review in the court of appeals. Tex. R. App. P. 68.2. I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit. I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a *pro se* petition for discretionary review.

_X Gerardo Montiel_        _____
Defendant                                       Defendant's Counsel
Mailing Address:                             State Bar No.:
                                               Mailing Address: _10778230_
Telephone #:
Fax # (if any):                                   Telephone #:
                                               Fax # (if any):

*A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case - --- that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant ---- a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2). In order to perfect an appeal a written notice of appeal must be filed with the trial court clerk within **30 days (90 days if a timely motion for new trial is filed) after the day sentence is imposed or suspended in open court or after the day the trial court enters an appealable order.**



VOL 807 PAGE 0515

## CASE NO. F-1059245-J
### INCIDENT NO./TRN: 9108226075

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| v. | § | COURT #3 |
| | § | |
| TROY ANTHONY WILLIAMS | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX08309680 | § | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| | | | |
|---|---|---|---|
| Judge Presiding: | **Hon. Gracie Lewis** | Date Judgment Entered: | **11/3/2010** |
| Attorney for State: | **Brandon Birmingham** | Attorney for Defendant: | **Paul Johnson** |

Offense for which Defendant Convicted:
**AGGRAVATED ASSAULT/DEADLY WEAPON**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **22.02 Penal Code** |

Date of Offense:
**7/11/2010**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **CLASS A MISDEMEANOR** | **GUILTY** | **N/A** |

Terms of Plea Bargain:
**90 DAYS DAYS COUNTY JAIL. NO FINE.**

| Plea to 1st Enhancement Paragraph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
|---|---|---|---|
| Findings in 1st Enhancement Paragraph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |
| Date Sentence Imposed: | **11/3/2010** | Date Sentence to Commence: | **11/3/2010** |

| Punishment and Place of Confinement: | **90 DAYS COUNTY JAIL** |
|---|---|

### THIS SENTENCE SHALL RUN CONCURRENTLY.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ **N/A** | $ **267** | $ **N/A** | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

☐ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **N/A** .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
|---|---|
| | From **8/11/2010** to **11/3/2010** From      to          From      to |
| Time Credited: | From      to          From      to          From      to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A** DAYS    NOTES: **N/A** |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.



Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.

The Court **FINDS** Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is **GUILTY** of the above offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs, and restitution as indicated above.

**Punishment Options  (select one)**

☐ **Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, State Jail Division, TDCJ.** The Court **ORDERS** Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☒ **County Jail—Confinement / Confinement In Lieu of Payment.** The Court **ORDERS** Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY.** The Court **ORDERS** Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence  (select one)**

☒ The Court **ORDERS** Defendant's sentence **EXECUTED.**

☐ The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED.** The Court **ORDERS** Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**

_____

**Signed and entered on November 3, 2010**

X _Gracie Lewis_
Gracie Lewis
JUDGE PRESIDING

Clerk: L.STOKES

Right Thumbprint*

*Thumbprint Certification attached.

WILLIAMS, TROY F1059245J

10



1

2

3

4

5

6

7

8

9

10

11

12

13            APPLICANT'S EXHIBIT NO. 70

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

## BUSINESS RECORDS AFFIDAVIT

I, Virginia Porter, certify that I am employed by the County of Dallas and that my official title is County Auditor. I am a custodian of records for the Auditor's Office. I state that the records for payment of services rendered by Paul J. Johnson for period September 23, 2009 through May 1, 2011, were provided in response to a request made on July 2, 2014 by Robert Romig, Office of Capial Writs. These electronic records were downloaded, printed and copied as true and accurate representation of business data submitted for processing and maintained in the custody of the Auditor's Office. I am the custodian of those records.

I further state that:

1.    Such records were kept in the course of a regularly conducted business activity of the County Auditor; and

2.    Such records were made by deputized staff as a regular practice.

3.    Electronic records were authenticated against original entry records by deputized staff.

I hereby certify under penalty of perjury that the aforesaid is true and correct.

Executed on the ___9th_____ day of ___July_____, 2014.


Name: Virginia Porter
Title: County Auditor

EXHIBIT
70

| Trading Partner | Invoice Date | Invoice Num | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 9/23/2009 | 07-20006 | $540.00 | 9/30/2009 | 194TH  092309 |
| PAUL J JOHNSON | 9/23/2009 | 09-00416-1 | $8,280.00 | 1/25/2010 | 292ND 092309 DISP, 063009-092009 COMP CAP MURDER NO DEATH PENALTY |
| PAUL J JOHNSON | 9/24/2009 | 09-33827 | $150.00 | 9/30/2009 | 194TH  092409 |
| PAUL J JOHNSON | 9/29/2009 | 09-45059 | $360.00 | 10/15/2009 | 203RD  092909 |
| PAUL J JOHNSON | 10/1/2009 | 09-33325 | $360.00 | 10/8/2009 | 292ND 100109 |
| PAUL J JOHNSON | 10/1/2009 | 08-73496 | $1,530.00 | 1/25/2010 | 292ND 100109 DISP, 120308-093009 08-73567,09-71271 COMP |
| PAUL J JOHNSON | 10/2/2009 | 04-72299-1 | $1,890.00 | 1/25/2010 | 203RD 100209 DISP, 050509-100109 COMP |
| PAUL J JOHNSON | 10/5/2009 | 09-71731 | $1,170.00 | 1/25/2010 | 204TH 100509 DISP, 060809-100509 COMP 09-54481 |
| PAUL J JOHNSON | 10/6/2009 | 09-56091 | $450.00 | 10/26/2009 | CDC#2  100609 |
| PAUL J JOHNSON | 10/6/2009 | 09-57909 | $360.00 | 11/13/2009 | 282ND 100609 |
| PAUL J JOHNSON | 10/7/2009 | 09-56284 | $450.00 | 11/3/2009 | CDC#1  100709 |
| PAUL J JOHNSON | 10/9/2009 | 01-43155 | $270.00 | 10/22/2009 | 203RD  100909 REV |
| PAUL J JOHNSON | 10/13/2009 | 09-24717 | $450.00 | 10/27/2009 | CDC#3  101309 F09-24719 |
| PAUL J JOHNSON | 10/14/2009 | 09-58388 | $90.00 | 10/22/2009 | 194TH  101409 |
| PAUL J JOHNSON | 10/15/2009 | 07-19809 | $90.00 | 10/27/2009 | 265TH 101509 |
| PAUL J JOHNSON | 10/15/2009 | 08-55287 | $270.00 | 10/29/2009 | 203RD  101509 REV |
| PAUL J JOHNSON | 10/15/2009 | 09-41375 | $180.00 | 12/22/2009 | CDC#4 092809 093009 101509 COMP RETAINED COUNSEL |
| PAUL J JOHNSON | 10/16/2009 | 00-52611 | $270.00 | 10/26/2009 | 203RD  101609 REV |
| PAUL J JOHNSON | 10/16/2009 | 04-40053 | $270.00 | 10/26/2009 | 203RD  101609 REV |
| PAUL J JOHNSON | 10/16/2009 | 05-32773 | $270.00 | 11/4/2009 | 195TH 101609 REV |
| PAUL J JOHNSON | 10/22/2009 | 08-33181 | $360.00 | 11/4/2009 | 194TH 102209 |
| PAUL J JOHNSON | 10/22/2009 | 09-52794 | $315.00 | 1/25/2010 | CDC#2 102209 DISP, 072809-102309 COMP |
| PAUL J JOHNSON | 10/26/2009 | 09-01180 | $1,350.00 | 1/25/2010 | 203RD 102609 DISP, 072309-102309 COMP |
| PAUL J JOHNSON | 10/26/2009 | 08-60966 | $1,710.00 | 1/25/2010 | 203RD 102609 DISP, 121008-102009 COMP |
| PAUL J JOHNSON | 10/29/2009 | 08-61112 | $270.00 | 11/13/2009 | 291ST 102909 REV |
| PAUL J JOHNSON | 10/30/2009 | 08-30507 | $270.00 | 11/11/2009 | 265TH 103009 REV |
| PAUL J JOHNSON | 11/3/2009 | 09-33354 | $360.00 | 11/13/2009 | CDC#4 110309 06-71425 |
| PAUL J JOHNSON | 11/4/2009 | 09-53525 | $270.00 | 11/11/2009 | 282ND 110409 |
| PAUL J JOHNSON | 11/4/2009 | 07-51905 | $270.00 | 11/30/2009 | 291ST  110409 REV |
| PAUL J JOHNSON | 11/5/2009 | 08-14820 | $4,900.00 | 1/25/2010 | 282ND 110509 DISP, 110708-110209 COMP |
| PAUL J JOHNSON | 11/6/2009 | 09-18718 | $360.00 | 11/16/2009 | 203RD  110609 |
| PAUL J JOHNSON | 11/6/2009 | 09-57938 | $540.00 | 12/22/2009 | CDC#1 110609 DISP 08-73762 |
| PAUL J JOHNSON | 11/9/2009 | 08-58438 | $360.00 | 12/1/2009 | 204TH 110909 |
| PAUL J JOHNSON | 11/11/2009 | 08-50537 | $1,400.00 | 1/25/2010 | CDC#5 111109 DISP, 072709-111009 COMP |
| PAUL J JOHNSON | 11/12/2009 | 09-18759 | $360.00 | 11/17/2009 | 203RD  111209 |
| PAUL J JOHNSON | 11/16/2009 | 09-42275 | $1,530.00 | 1/25/2010 | 203RD 111609 DISP, 042209-110609 COMP 09-01355 |
| PAUL J JOHNSON | 11/18/2009 | 09-14684 | $990.00 | 1/25/2010 | 203RD 111609 DISP, 093009,101209,102709,111009,111309 COMP |
| PAUL J JOHNSON | 11/18/2009 | 09-61076 | $2,500.00 | 1/25/2010 | 282ND 111809 DISP, 110509-111809 COMP |
| PAUL J JOHNSON | 11/20/2009 | 09-30265 | $360.00 | 12/7/2009 | 203RD  112009 |
| PAUL J JOHNSON | 11/23/2009 | 08-53841-1 | $450.00 | 12/7/2009 | 282ND  112309 F08-16378 |
| PAUL J JOHNSON | 11/24/2009 | 09-48259 | $360.00 | 12/7/2009 | 194TH  112409 |
| PAUL J JOHNSON | 11/24/2009 | 09-24694 | $630.00 | 1/25/2010 | 283RD 112409 DISP,112409 COMP 09-24693,09-47684 |
| PAUL J JOHNSON | 11/24/2009 | 09-58269 | $540.00 | 1/25/2010 | 195TH 112409 |
| PAUL J JOHNSON | 12/1/2009 | 07-45504 | $270.00 | 1/25/2010 | 265TH 120109 REV |
| PAUL J JOHNSON | 12/3/2009 | 08-62720 | $765.00 | 1/25/2010 | 195TH 120309 DISP, 102809,111709,111909 COMP |
| PAUL J JOHNSON | 12/4/2009 | 08-39160 | $4,590.00 | 1/25/2010 | CDC#2 120409 DISP 080409-120209 COMP |
| PAUL J JOHNSON | 12/4/2009 | 08-71972 | $1,350.00 | 1/29/2010 | 195TH 120409 DISP 012109-120309 COMP |
| PAUL J JOHNSON | 12/7/2009 | 09-59069 | $360.00 | 1/25/2010 | CDC#1 120709 09-59066,07-56511 |
| PAUL J JOHNSON | 12/7/2009 | 08-63283 | $260.00 | 1/25/2010 | CDC#1 120709 |
| PAUL J JOHNSON | 12/7/2009 | 08-58697 | $270.00 | 2/4/2010 | 265TH 120709 07-19782 |
| PAUL J JOHNSON | 12/9/2009 | 09-71900 | $891.00 | 12/22/2009 | 194TH  120909 DISP  102209-120909 COMP |
| PAUL J JOHNSON | 12/9/2009 | 09-54239 | $450.00 | 1/7/2010 | CDC#6 120909 07-58992 |
| PAUL J JOHNSON | 12/10/2009 | 07-25165 | $270.00 | 12/31/2009 | 203RD 121009 REV |
| PAUL J JOHNSON | 12/10/2009 | 07-60042 | $270.00 | 1/25/2010 | 195TH 121009 08-71057 REV |
| PAUL J JOHNSON | 12/11/2009 | 08-67985 | $150.00 | 12/23/2009 | CCC#2 121109 IC |
| PAUL J JOHNSON | 12/14/2009 | 09-60883 | $360.00 | 12/23/2009 | CDC#1  121409 |
| PAUL J JOHNSON | 12/14/2009 | 09-60757 | $270.00 | 12/8/2011 | 265TH 121409 DISP REV |
| PAUL J JOHNSON | 12/15/2009 | 09-52264 | $360.00 | 1/25/2010 | 283RD 121509 |
| PAUL J JOHNSON | 12/18/2009 | 09-60513 | $360.00 | 12/29/2009 | 203RD 121809 DISP |
| PAUL J JOHNSON | 12/28/2009 | 09-58292 | $540.00 | 1/8/2010 | CDC#7  122809 |
| PAUL J JOHNSON | 1/4/2010 | 07-32739-2 | $270.00 | 1/8/2010 | 194TH 010410 REV |
| PAUL J JOHNSON | 1/4/2010 | 09-55786 | $135.00 | 1/8/2010 | CDC#2 110909, 112409 COMP RETAINED COUNSEL |
| PAUL J JOHNSON | 1/4/2010 | 09-62370 | $90.00 | 1/15/2010 | 291ST 010410 DISP 122109 COMP |
| PAUL J JOHNSON | 1/5/2010 | 05-50375 | $270.00 | 1/12/2010 | 203RD  010510 REV |

| Trading Partner | Invoice Date | Invoice Num | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 1/11/2010 | 05-58855 | $270.00 | 1/21/2010 | 291ST 011110 REV |
| PAUL J JOHNSON | 1/13/2010 | 07-14107 | $135.00 | 4/23/2010 | CDC#2 010510,011310 COMP |
| PAUL J JOHNSON | 1/14/2010 | 93-23938 | $90.00 | 1/14/2010 | CDC#2 121109 COMP RETAINED COUNSEL |
| PAUL J JOHNSON | 1/14/2010 | 09-52901 | $450.00 | 1/26/2010 | 363RD  01 1410 |
| PAUL J JOHNSON | 1/20/2010 | 09-30882 | $360.00 | 1/29/2010 | 194TH 012010 |
| PAUL J JOHNSON | 1/21/2010 | 08-60418-2 | $540.00 | 1/29/2010 | 283RD 012110 08-60419,09-39251 |
| PAUL J JOHNSON | 1/26/2010 | 09-35023 | $540.00 | 2/8/2010 | 282ND 012610 09-35024 |
| PAUL J JOHNSON | 1/27/2010 | 07-01327-1 | $270.00 | 2/10/2010 | CDC#3 012710 REV |
| PAUL J JOHNSON | 1/27/2010 | 08-20776 | $990.00 | 4/29/2010 | 363RD  012709 DISP 101409-012510 COMP  08-20734,08-02000 |
| PAUL J JOHNSON | 1/28/2010 | 09-11167 | $360.00 | 2/4/2010 | 283RD 012810 09-72850 |
| PAUL J JOHNSON | 1/29/2010 | 09-52326 | $6,120.00 | 5/24/2010 | CDC#7 012610 DISP  012509, 012609, 012809, 012909 JURY TRIAL 052109-012910  COMP-CAP MUR NO DEATH |
| PAUL J JOHNSON | 2/2/2010 | 01-32561 | $270.00 | 2/16/2010 | 265TH  020210 REV |
| PAUL J JOHNSON | 2/5/2010 | 07-25678 | $90.00 | 2/16/2010 | 265TH 020510 DISP 012010 COMP REV |
| PAUL J JOHNSON | 2/8/2010 | 09-20923 | $360.00 | 2/25/2010 | 203RD  020810 |
| PAUL J JOHNSON | 2/9/2010 | 09-52049 | $540.00 | 3/1/2010 | 203RD 020910 08-48767 08-48768 |
| PAUL J JOHNSON | 2/10/2010 | 08-61280 | $270.00 | 2/22/2010 | 265TH 021010 REV |
| PAUL J JOHNSON | 2/10/2010 | 07-49330 | $270.00 | 2/26/2010 | CDC#2  021010 F07-49331 REV |
| PAUL J JOHNSON | 2/15/2010 | 08-59589 | $270.00 | 2/23/2010 | 203RD  021510 F08-55767 REV |
| PAUL J JOHNSON | 2/16/2010 | 08-59681 | $270.00 | 2/23/2010 | 265TH  021610 F07-60735,F07-73903 REV PARTIAL |
| PAUL J JOHNSON | 2/16/2010 | 08-62713 | $135.00 | 4/15/2010 | CDC#1 012710, 020110 REV COMP HIRED COUNSEL |
| PAUL J JOHNSON | 2/25/2010 | 09-62042 | $360.00 | 3/3/2010 | 203RD 022510 09-57072 |
| PAUL J JOHNSON | 2/25/2010 | 08-51802 | $270.00 | 3/15/2010 | 265TH 022510 REV |
| PAUL J JOHNSON | 3/1/2010 | 09-57181 | $225.00 | 6/22/2010 | 203RD  122209-012010 COMP RETAINED ATTY |
| PAUL J JOHNSON | 3/2/2010 | 09-73149 | $540.00 | 3/15/2010 | 203RD 030210 |
| PAUL J JOHNSON | 3/4/2010 | 09-60494 | $540.00 | 3/15/2010 | CDC#7 030410 |
| PAUL J JOHNSON | 3/4/2010 | 09-57778 | $360.00 | 3/15/2010 | 194TH 030410 |
| PAUL J JOHNSON | 3/5/2010 | 09-17091 | $360.00 | 3/12/2010 | CDC#4  030510 |
| PAUL J JOHNSON | 3/8/2010 | 09-41840 | $460.00 | 3/12/2010 | 265TH 030810 |
| PAUL J JOHNSON | 3/8/2010 | 08-52023-1 | $270.00 | 4/1/2010 | CDC#1  030810 F08-52019 REV |
| PAUL J JOHNSON | 3/11/2010 | 09-33944 | $360.00 | 3/16/2010 | CDC#3 031110 |
| PAUL J JOHNSON | 3/11/2010 | 08-14821 | $9,300.00 | 5/24/2010 | 282ND 031110 DISP 110708-031110 COMP CAP MUR NO DEATH |
| PAUL J JOHNSON | 3/12/2010 | 09-12056 | $270.00 | 3/18/2010 | 265TH 031210 REV |
| PAUL J JOHNSON | 3/12/2010 | 08-58798 | $270.00 | 3/25/2010 | 265TH 031210 REV |
| PAUL J JOHNSON | 3/12/2010 | 09-60829 | $135.00 | 4/22/2010 | CDC#6 030510-031210 COMP RETAINED COUNSEL |
| PAUL J JOHNSON | 3/16/2010 | 08-55700 | $3,800.00 | 5/24/2010 | 282ND 031610 DISP 082008-031210 COMP 10-00236  NON DEATH |
| PAUL J JOHNSON | 3/19/2010 | 09-19037 | $160.00 | 4/15/2010 | 283RD  112409-012010 COMP HIRED COUNSEL |
| PAUL J JOHNSON | 3/22/2010 | 09-54388 | $540.00 | 3/29/2010 | 203RD 032210 |
| PAUL J JOHNSON | 3/23/2010 | 09-35271 | $450.00 | 4/13/2010 | 203RD  032310 |
| PAUL J JOHNSON | 3/24/2010 | 09-72114 | $2,250.00 | 6/28/2010 | 203RD  032410 DISP 100809-032210 COMP  09-22064,09-56710 |
| PAUL J JOHNSON | 3/25/2010 | 09-34988 | $540.00 | 4/7/2010 | 203RD 032510 |
| PAUL J JOHNSON | 3/30/2010 | 10-24039 | $450.00 | 4/16/2010 | CDC#6 033010 09-54292 |
| PAUL J JOHNSON | 3/30/2010 | 09-13439 | $135.00 | 4/26/2010 | 265TH031610-033010 COMP RETAINED COUNSEL 09-56494 |
| PAUL J JOHNSON | 3/31/2010 | 07-30939 | $270.00 | 4/8/2010 | CDC#3 033110 REV |
| PAUL J JOHNSON | 4/1/2010 | 09-53627 | $270.00 | 4/14/2010 | CDC#4 040110 REV |
| PAUL J JOHNSON | 4/2/2010 | 09-72655 | $360.00 | 4/8/2010 | 203RD 040210 |
| PAUL J JOHNSON | 4/2/2010 | 07-32864 | $270.00 | 4/14/2010 | 292ND 040210 07-32865 REV |
| PAUL J JOHNSON | 4/2/2010 | 10-52278 | $360.00 | 4/16/2010 | CDC#1 040210 06-73915 |
| PAUL J JOHNSON | 4/2/2010 | 97-43007-1 | $405.00 | 5/5/2010 | CDC#3 040210 DISP 031610, 031810-040110 COMP |
| PAUL J JOHNSON | 4/2/2010 | 07-32866 | $270.00 | 5/17/2010 | 292ND  040210 REV |
| PAUL J JOHNSON | 4/5/2010 | 10-53073 | $360.00 | 4/9/2010 | CDC#6  040510 |
| PAUL J JOHNSON | 4/5/2010 | 08-41763 | $360.00 | 4/23/2010 | CDC#2 040510 |
| PAUL J JOHNSON | 4/5/2010 | 08-40808 | $180.00 | 5/26/2010 | 265TH 012010-021010 COMP 040510 RETAINED COUNSEL 08-40527 09-61586 |
| PAUL J JOHNSON | 4/7/2010 | 09-16910 | $360.00 | 4/13/2010 | 203RD  040710 |
| PAUL J JOHNSON | 4/7/2010 | 09-58426-1 | $540.00 | 4/14/2010 | 292ND 040710 |
| PAUL J JOHNSON | 4/7/2010 | 09-41762 | $90.00 | 4/15/2010 | 195TH 040710 RETAINED COUNSEL |
| PAUL J JOHNSON | 4/7/2010 | 09-62370-1 | $360.00 | 4/23/2010 | 291ST 040710 |
| PAUL J JOHNSON | 4/8/2010 | 09-72390 | $450.00 | 4/13/2010 | 363RD  040810 |
| PAUL J JOHNSON | 4/9/2010 | 09-30659 | $270.00 | 4/16/2010 | CDC#5 040910 REV |

| Trading Partner | Invoice Date | Invoice Num. | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 4/9/2010 | 04-57828 | $270.00 | 4/19/2010 | CDC#5 040910 REV |
| PAUL J JOHNSON | 4/12/2010 | 08-66953 | $270.00 | 4/23/2010 | 195TH 041210 REV |
| PAUL J JOHNSON | 4/12/2010 | 10-52469 | $360.00 | 4/26/2010 | 265TH 041210 |
| PAUL J JOHNSON | 4/13/2010 | 10-50984 | $360.00 | 4/22/2010 | 203RD 041310 09-61124 |
| PAUL J JOHNSON | 4/13/2010 | 87-90773 | $270.00 | 5/4/2010 | CDC#1 041310 REV |
| PAUL J JOHNSON | 4/14/2010 | 07-15601 | $450.00 | 4/22/2010 | 203RD 041410 05-58312 |
| PAUL J JOHNSON | 4/14/2010 | 09-72949 | $450.00 | 4/26/2010 | 282ND 041410 |
| PAUL J JOHNSON | 4/14/2010 | 03-58863-1 | $270.00 | 4/27/2010 | CDC#1 041410 REV |
| PAUL J JOHNSON | 4/14/2010 | 09-41432 | $810.00 | 4/29/2010 | 363RD  111209-040110 10-00408,09-40940,09-40961 |
| PAUL J JOHNSON | 4/15/2010 | 05-72165 | $270.00 | 4/23/2010 | CDC#5 041510 REV |
| PAUL J JOHNSON | 4/15/2010 | 09-53060 | $1,305.00 | 5/24/2010 | 292ND  101309-041510 COMP - FLED TO MEXICO BEFORE TRIAL |
| PAUL J JOHNSON | 4/15/2010 | 10-52802 | $450.00 | 6/22/2010 | 282ND  041510 |
| PAUL J JOHNSON | 4/16/2010 | 10-52308 | $360.00 | 4/23/2010 | 291ST 041610 06-44796,06-43924 |
| PAUL J JOHNSON | 4/22/2010 | 10-50771 | $990.00 | 5/5/2010 | CDC#5 042210 DISP 010410-041710 COMP 08-30924 REV |
| PAUL J JOHNSON | 4/23/2010 | 10-40779 | $540.00 | 5/10/2010 | 291ST  042310 |
| PAUL J JOHNSON | 4/23/2010 | 07-72689 | $270.00 | 5/11/2010 | CDC#5  042310 REV |
| PAUL J JOHNSON | 4/23/2010 | 10-17493 | $540.00 | 5/17/2010 | 195TH 042310 |
| PAUL J JOHNSON | 4/30/2010 | 08-67803 | $7,810.00 | 5/26/2010 | 265TH 043010 DISP 070506-043010 COMP  CAP MURDER 06-87751 |
| PAUL J JOHNSON | 5/3/2010 | 08-58678 | $180.00 | 12/29/2010 | CDC#3 050310 DISP 031710-050310 COMP 09-01382 |
| PAUL J JOHNSON | 5/5/2010 | 07-58086 | $12,330.00 | 5/24/2010 | 363RD  050510 DISP 122109-050410 COMP 09-1431,09-01432 |
| PAUL J JOHNSON | 5/6/2010 | 10-52483 | $540.00 | 5/20/2010 | CDC#5  050610 |
| PAUL J JOHNSON | 5/7/2010 | 09-59454 | $270.00 | 5/26/2010 | CDC#1 050710 REV |
| PAUL J JOHNSON | 5/7/2010 | 09-17033 | $1,305.00 | 6/9/2010 | CDC#1  050710 DISP 120409-050710 COMP |
| PAUL J JOHNSON | 5/10/2010 | 10-71480 | $540.00 | 5/19/2010 | 282ND 051010 |
| PAUL J JOHNSON | 5/11/2010 | 08-52632 | $270.00 | 5/14/2010 | CDC#2 051110 REV |
| PAUL J JOHNSON | 5/11/2010 | 10-33843 | $450.00 | 5/20/2010 | 194TH 051110 10-33929 |
| PAUL J JOHNSON | 5/12/2010 | 09-88109 | $450.00 | 5/19/2010 | 203RD 051210 08-62284 |
| PAUL J JOHNSON | 5/17/2010 | 10-50778 | $360.00 | 5/27/2010 | 291ST 051710 |
| PAUL J JOHNSON | 5/17/2010 | 08-39160-1 | $1,980.00 | 1/4/2011 | CDC#2 120909-051710 COMP |
| PAUL J JOHNSON | 5/18/2010 | 94-56820-10 | $270.00 | 5/26/2010 | 203RD 051810 COM HEARING |
| PAUL J JOHNSON | 5/19/2010 | 08-57012 | $1,000.00 | 1/7/2011 | CDC#6  051910 DISP 062408-071010 COMP |
| PAUL J JOHNSON | 5/20/2010 | 07-40060 | $270.00 | 5/27/2010 | 265TH 052010 REV |
| PAUL J JOHNSON | 5/21/2010 | 09-34436 | $450.00 | 5/28/2010 | CDC#3 052110 |
| PAUL J JOHNSON | 5/21/2010 | 10-52229 | $450.00 | 6/11/2010 | CDC#1  052110 |
| PAUL J JOHNSON | 5/21/2010 | 06-44301 | $270.00 | 6/11/2010 | CDC#1 052110 REV |
| PAUL J JOHNSON | 5/27/2010 | 09-20346 | $270.00 | 6/8/2010 | CDC#3 052710 REV 08-52991 |
| PAUL J JOHNSON | 5/27/2010 | 10-00480 | $540.00 | 6/11/2010 | 203RD  052710 10-00498,10-00497 |
| PAUL J JOHNSON | 5/27/2010 | 09-62236 | $360.00 | 6/11/2010 | 203RD  052710 09-62237,10-51334,10-51336 |
| PAUL J JOHNSON | 5/27/2010 | 07-72689-1 | $270.00 | 6/14/2010 | CDC#5 052710 REV |
| PAUL J JOHNSON | 9/3/2010 | 09-72981 | $720.00 | 1/5/2011 | 203RD 060310 DISP 032210-060310 COMP |
| PAUL J JOHNSON | 6/15/2010 | 10-55247 | $400.00 | 6/22/2010 | 282ND  061510 08-51044,10-12514 |
| PAUL J JOHNSON | 6/15/2010 | 08-29815 | $500.00 | 6/22/2010 | 282ND  061510 08-72460 |
| PAUL J JOHNSON | 6/16/2010 | 06-50485 | $270.00 | 6/22/2010 | CDC#7 061610 REV |
| PAUL J JOHNSON | 6/16/2010 | 08-18029 | $270.00 | 6/22/2010 | 203RD 061610 REV 03-35148 |
| PAUL J JOHNSON | 6/16/2010 | 09-39270 | $360.00 | 6/22/2010 | 203RD  121809-042810 COMP RETAINED COUNSEL |
| PAUL J JOHNSON | 6/16/2010 | 08-57774 | $360.00 | 7/7/2010 | 265TH 061610 DISP  091009-022210 COMP |
| PAUL J JOHNSON | 6/17/2010 | 09-71359 | $360.00 | 6/22/2010 | 203RD 061710 |
| PAUL J JOHNSON | 6/17/2010 | 07-60861 | $270.00 | 6/29/2010 | 194TH 061710 07-55796 REV |
| PAUL J JOHNSON | 6/21/2010 | 93-71066-10 | $270.00 | 7/1/2010 | 203RD 062110  HEARING AGREED |
| PAUL J JOHNSON | 6/21/2010 | 09-39410 | $540.00 | 7/16/2010 | CDC#6 062110 09-53388 |
| PAUL J JOHNSON | 6/22/2010 | 07-72689-2 | $270.00 | 7/1/2010 | CDC#5 062210 REV PARTIAL |
| PAUL J JOHNSON | 6/22/2010 | 10-53505 | $540.00 | 7/1/2010 | 291ST 062210 |
| PAUL J JOHNSON | 6/22/2010 | 10-34244 | $540.00 | 7/1/2010 | CDC#3 062210 10-34245 10-34243 09-33944 |
| PAUL J JOHNSON | 6/22/2010 | 09-12056-1 | $270.00 | 7/2/2010 | 265TH 062210 REV |
| PAUL J JOHNSON | 6/22/2010 | 10-53890 | $540.00 | 7/2/2010 | 265TH 062210 |
| PAUL J JOHNSON | 6/22/2010 | 08-40197 | $360.00 | 7/16/2010 | CDC#6 062210 08-40198 |
| PAUL J JOHNSON | 6/23/2010 | 09-20343 | $270.00 | 7/2/2010 | CDC#5 062310 REV |
| PAUL J JOHNSON | 6/28/2010 | 10-51123 | $360.00 | 7/1/2010 | CDC#7 10-51123 |

| Trading Partner | Invoice Date | Invoice Num | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 6/28/2010 | 10-54148 | $180.00 | 1/10/2011 | CDC#7 040910-062310 COMP |
| PAUL J JOHNSON | 6/29/2010 | 09-71653 | $3,195.00 | 2/8/2011 | 194TH 062910 DISP 082709-062810 COMP TWO FULL DAYS CONT. TRIAL  10-00656 |
| PAUL J JOHNSON | 6/30/2010 | 10-15757 | $360.00 | 7/12/2010 | CDC#3 063010 |
| PAUL J JOHNSON | 7/1/2010 | 10-53671 | $360.00 | 7/12/2010 | 283RD 070110 05-49385 09-40784 |
| PAUL J JOHNSON | 7/1/2010 | 10-71722 | $360.00 | 7/13/2010 | CDC#3 070110 |
| PAUL J JOHNSON | 7/6/2010 | 09-50753 | $450.00 | 2/15/2011 | 282ND 070610 DISP |
| PAUL J JOHNSON | 7/7/2010 | 08-50176-1 | $540.00 | 12/29/2010 | CDC#5 070710 DISP 052710-070710 COMP REV CAP MURDER NON DEATH |
| PAUL J JOHNSON | 7/8/2010 | 09-61552 | $450.00 | 12/30/2010 | 194TH 070810 |
| PAUL J JOHNSON | 7/9/2010 | 08-58999 | $270.00 | 7/27/2010 | 265TH 070910 REV |
| PAUL J JOHNSON | 7/13/2010 | 06-88971 | $270.00 | 1/5/2011 | CDC#5 071310 REV |
| PAUL J JOHNSON | 7/16/2010 | 07-47399 | $380.00 | 7/28/2010 | CDC#6  071610 |
| PAUL J JOHNSON | 7/21/2010 | 09-46755 | $450.00 | 8/4/2010 | CDC#1 072110 08-46836 08-46838 09-24414 |
| PAUL J JOHNSON | 7/22/2010 | 02-33552 | $270.00 | 8/4/2010 | CDC#1 072210 REV |
| PAUL J JOHNSON | 7/22/2010 | 08-61130 | $4,770.00 | 1/4/2011 | CDC#2 072210 DISP 120909-071810 COMP |
| PAUL J JOHNSON | 7/23/2010 | 09-47921 | $360.00 | 8/2/2010 | CDC#3  072310 |
| PAUL J JOHNSON | 7/23/2010 | 10-55770 | $270.00 | 12/28/2010 | CDC#3 072310 COMPETENCY HEARING |
| PAUL J JOHNSON | 7/23/2010 | 10-23893 | $900.00 | 1/5/2011 | 203RD 072310 DISP 051810-072210 COMP |
| PAUL J JOHNSON | 7/27/2010 | 06-28349 | $450.00 | 7/30/2010 | CDC#5  072710 05 27871 05 27869 |
| PAUL J JOHNSON | 7/27/2010 | 03-33847 | $270.00 | 8/4/2010 | 203RD 072710 REV |
| PAUL J JOHNSON | 7/27/2010 | 06-29535 | $150.00 | 11/19/2010 | 291ST 072010 072710 COMP |
| PAUL J JOHNSON | 7/28/2010 | 08-73182 | $540.00 | 8/3/2010 | CDC#2 072810 08-73311 09-24077 08-61157 |
| PAUL J JOHNSON | 7/28/2010 | 09-47939 | $360.00 | 8/4/2010 | CDC#4 072810 |
| PAUL J JOHNSON | 7/28/2010 | 05-40871 | $270.00 | 8/13/2010 | 265TH 072810 REV |
| PAUL J JOHNSON | 7/28/2010 | 02-39820 | $100.00 | 11/19/2010 | 291ST HIRED LAWYER  072210- 072710 COMP |
| PAUL J JOHNSON | 8/3/2010 | 08-72858 | $2,070.00 | 12/22/2010 | 203RD 080310 DISP 030409-080310 COMP |
| PAUL J JOHNSON | 8/10/2010 | 08-25212 | $270.00 | 9/16/2010 | 265TH  081010 REV |
| PAUL J JOHNSON | 8/10/2010 | 10-50856 | $360.00 | 11/22/2010 | CDC#2 081010 DISP 062110-081010 COMP 10-51037 |
| PAUL J JOHNSON | 8/11/2010 | 06-87675-1 | $270.00 | 11/22/2010 | CDC#2 081110 REV |
| PAUL J JOHNSON | 8/11/2010 | 04-01281 | $360.00 | 11/23/2010 | CDC#6 081110 DISP |
| PAUL J JOHNSON | 8/12/2010 | 09-71652 | $2,700.00 | 1/4/2011 | 291ST  081210 DISP 082009-081210 COMP |
| PAUL J JOHNSON | 8/17/2010 | 10-33820 | $450.00 | 8/20/2010 | CDC#3 081710 10-33821 |
| PAUL J JOHNSON | 8/19/2010 | 10-57389 | $360.00 | 10/25/2010 | CDC#5 081910 |
| PAUL J JOHNSON | 8/27/2010 | 09-62328 | $360.00 | 9/8/2010 | CDC#5 082710 |
| PAUL J JOHNSON | 8/27/2010 | 08-33989 | $450.00 | 9/16/2010 | CDC#5  082710 10 00658 |
| PAUL J JOHNSON | 8/27/2010 | 08-12074-2 | $270.00 | 9/23/2010 | CDC#7  082710 REV |
| PAUL J JOHNSON | 8/28/2010 | 10-33741 | $360.00 | 11/3/2010 | CDC#5  082810 |
| PAUL J JOHNSON | 8/31/2010 | 08-20340 | $270.00 | 9/7/2010 | CDC#5 083110 REV 08-20341 |
| PAUL J JOHNSON | 9/1/2010 | 08-57635 | $270.00 | 9/14/2010 | 203RD  090110 REV |
| PAUL J JOHNSON | 9/7/2010 | 07-57105 | $270.00 | 9/16/2010 | 203RD  090710 REV |
| PAUL J JOHNSON | 9/8/2010 | 10-11930 | $360.00 | 9/23/2010 | CDC#5 090810 |
| PAUL J JOHNSON | 9/10/2010 | 08-45484 | $270.00 | 10/14/2010 | 265TH 091010 DISP REVOC |
| PAUL J JOHNSON | 9/13/2010 | 04-56249 | $270.00 | 9/20/2010 | CDC#5 091310 REV |
| PAUL J JOHNSON | 9/13/2010 | 10-24111 | $360.00 | 9/21/2010 | 203RD 091310 |
| PAUL J JOHNSON | 9/13/2010 | 10-14875 | $135.00 | 12/28/2010 | 292ND 091310 DISP 082510 083110 090710 COMP HIRED ATTY |
| PAUL J JOHNSON | 9/14/2010 | 10-25008 | $450.00 | 9/21/2010 | 203RD 091410 10-51158 |
| PAUL J JOHNSON | 9/14/2010 | 10-57648 | $450.00 | 10/19/2010 | 283RD 091410 |
| PAUL J JOHNSON | 9/15/2010 | 10-58525 | $540.00 | 9/29/2010 | 291ST 091510 10-58732 |
| PAUL J JOHNSON | 9/16/2010 | 10-53745 | $360.00 | 9/23/2010 | CDC#7  091610 |
| PAUL J JOHNSON | 9/16/2010 | 07-14109 | $270.00 | 9/29/2010 | 291ST  091610 REV 07-14089 |
| PAUL J JOHNSON | 9/16/2010 | 10-71108 | $540.00 | 9/29/2010 | 291ST  0961610 |
| PAUL J JOHNSON | 9/16/2010 | 07-57105-1 | $270.00 | 10/1/2010 | 203RD  091610 REV |
| PAUL J JOHNSON | 9/16/2010 | 08-60898 | $270.00 | 10/14/2010 | 265TH 091610 DISP REVOC |
| PAUL J JOHNSON | 9/20/2010 | 09-16778 | $360.00 | 10/1/2010 | 203RD  092010 |
| PAUL J JOHNSON | 9/21/2010 | 09-13441 | $540.00 | 10/11/2010 | 283RD 092110 09-13442 |
| PAUL J JOHNSON | 9/27/2010 | 08-13106 | $270.00 | 10/4/2010 | CDC#1 092710 REV |
| PAUL J JOHNSON | 9/29/2010 | 10-57793 | $360.00 | 10/13/2010 | 204TH 092910 DISP |
| PAUL J JOHNSON | 9/29/2010 | 09-00622 | $720.00 | 12/21/2010 | 203RD RETAINED COUNSEL 032610-092910 COMP |
| PAUL J JOHNSON | 9/30/2010 | 09-54593-1 | $270.00 | 10/11/2010 | CDC#1  093010  REV |

| Trading Partner | Invoice Date | Invoice Num | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 9/30/2010 | 10-60385 | $360.00 | 10/15/2010 | CDC#2 093010 |
| PAUL J JOHNSON | 10/1/2010 | 09-30883 | $360.00 | 10/14/2010 | 203RD 100110 DISP 10-59155 |
| PAUL J JOHNSON | 10/1/2010 | 10-52065 | $360.00 | 10/19/2010 | CDC#7 100110 |
| PAUL J JOHNSON | 10/6/2010 | 07-24608 | $270.00 | 12/28/2010 | CDC#5 100610 REV |
| PAUL J JOHNSON | 10/11/2010 | 00-23686 | $270.00 | 10/26/2010 | 265TH  101110 REV |
| PAUL J JOHNSON | 10/12/2010 | 10-58082 | $450.00 | 10/26/2010 | 363RD  101210 10 58083 |
| PAUL J JOHNSON | 10/14/2010 | 10-33129 | $360.00 | 10/25/2010 | CDC#3 101410 10-33155 |
| PAUL J JOHNSON | 10/18/2010 | 04-41751 | $270.00 | 10/29/2010 | 203RD 101810 REV |
| PAUL J JOHNSON | 10/20/2010 | 06-19385 | $1,980.00 | 12/31/2010 | CDC#5 102010 DISP 093009-102010 COMP |
| PAUL J JOHNSON | 10/28/2010 | 10-33741-1 | $360.00 | 12/28/2010 | CDC#5 102810 |
| PAUL J JOHNSON | 10/29/2010 | 06-38670 | $360.00 | 11/23/2010 | CDC#5  102810-102910 COMP |
| PAUL J JOHNSON | 11/2/2010 | 10-24440 | $250.00 | 11/15/2010 | 194TH RETAINED COUNSEL  061510-102910 COMP |
| PAUL J JOHNSON | 11/4/2010 | 10-59245 | $450.00 | 11/10/2010 | CDC#3 110410 |
| PAUL J JOHNSON | 11/5/2010 | 09-59380-1 | $67,350.00 | 3/2/2011 | 282ND  091309-110510 COMP DEATH PENALTY PARTIAL |
| PAUL J JOHNSON | 11/9/2010 | 03-74515 | $270.00 | 11/19/2010 | 265TH 110910 REV |
| PAUL J JOHNSON | 11/9/2010 | 09-41838 | $360.00 | 11/22/2010 | 203RD 110910 |
| PAUL J JOHNSON | 11/10/2010 | 09-55932 | $540.00 | 12/17/2010 | 204TH 111010 PARTIAL |
| PAUL J JOHNSON | 11/15/2010 | 09-55009 | $1,530.00 | 12/31/2010 | CDC#5 111510 DISP 092510-111510 COMP |
| PAUL J JOHNSON | 11/15/2010 | 09-59380 | $59,512.50 | 1/25/2011 | 282ND  092309-091210 COMP CAP MUR DEATH PEN PARTIAL |
| PAUL J JOHNSON | 11/16/2010 | 05-15264 | $270.00 | 11/19/2010 | 265TH 111610 05-15265 REV |
| PAUL J JOHNSON | 11/16/2010 | 09-18903 | $1,300.00 | 1/4/2011 | 291ST 111610 DISP 090909-111610 COMP |
| PAUL J JOHNSON | 11/17/2010 | 07-73968 | $270.00 | 11/23/2010 | CDC#5 111710 REV |
| PAUL J JOHNSON | 11/17/2010 | 08-49929 | $2,520.00 | 12/1/2010 | CDC#6 111710 DISP  081809-111410 COMP |
| PAUL J JOHNSON | 11/19/2010 | 09-30919 | $270.00 | 12/3/2010 | CDC#1  111910 REV |
| PAUL J JOHNSON | 11/19/2010 | 10-34983 | $360.00 | 12/3/2010 | CDC#1 111910 DISP |
| PAUL J JOHNSON | 11/23/2010 | 10-35251 | $360.00 | 12/6/2010 | 363RD  112310 |
| PAUL J JOHNSON | 11/29/2010 | 10-54538 | $360.00 | 12/6/2010 | CDC#5 112910 DISP |
| PAUL J JOHNSON | 11/29/2010 | 09-58719 | $360.00 | 12/10/2010 | CDC#6 112910 |
| PAUL J JOHNSON | 11/30/2010 | 10-39929 | $450.00 | 12/3/2010 | CDC#2 113010 DISP |
| PAUL J JOHNSON | 12/3/2010 | 09-25226 | $270.00 | 12/14/2010 | CDC#6 120310 REV |
| PAUL J JOHNSON | 12/7/2010 | 10-48437 | $720.00 | 12/16/2010 | CDC#7  090710 091510 102010 111110 120710 |
| PAUL J JOHNSON | 12/9/2010 | 05-71947 | $270.00 | 12/15/2010 | CDC#1 120910 REV |
| PAUL J JOHNSON | 12/9/2010 | 10-53406 | $900.00 | 12/20/2010 | 203RD 120910 DISP 090710-110410 COMP 10-71736 10-71737 |
| PAUL J JOHNSON | 12/10/2010 | 08-30552-2 | $270.00 | 12/15/2010 | 203RD 121010 DISP REVOC |
| PAUL J JOHNSON | 12/14/2010 | 10-25611 | $360.00 | 12/21/2010 | 282ND 121410 DISP 10-25081 REVOC |
| PAUL J JOHNSON | 12/15/2010 | 10-11007 | $990.00 | 12/21/2010 | 203RD 121010 DISP 080510-121510 COMP |
| PAUL J JOHNSON | 12/16/2010 | 05-72839-1 | $540.00 | 12/21/2010 | 282ND 121610 DISP REVOC 111910-120710 COMP 05-56031 |
| PAUL J JOHNSON | 12/16/2010 | 10-31442 | $450.00 | 12/21/2010 | 195TH 121610 DISP 10-31616 |
| PAUL J JOHNSON | 12/17/2010 | 09-52529 | $270.00 | 12/21/2010 | 291ST 121710 DISP REVOC |
| PAUL J JOHNSON | 12/17/2010 | 06-38536 | $270.00 | 12/21/2010 | 194TH REV |
| PAUL J JOHNSON | 12/17/2010 | 07-48482 | $270.00 | 12/28/2010 | 291ST 121710 REV |
| PAUL J JOHNSON | 12/17/2010 | 06-15789-2 | $270.00 | 12/30/2010 | CDC#2 121710 REV |
| PAUL J JOHNSON | 12/17/2010 | 10-41716 | $450.00 | 12/30/2010 | CDC#1 121710 |
| PAUL J JOHNSON | 12/20/2010 | 08-24499 | $270.00 | 12/28/2010 | CDC#5 122010 08-24500 REV |
| PAUL J JOHNSON | 12/20/2010 | 09-25184 | $1,170.00 | 12/30/2010 | 291ST  122010 DISP 052010-070910 COMP |
| PAUL J JOHNSON | 12/20/2010 | 10-60575 | $450.00 | 1/20/2011 | 204TH 122010 |
| PAUL J JOHNSON | 12/21/2010 | 09-39244 | $270.00 | 12/30/2010 | CDC#1  122110 REV |
| PAUL J JOHNSON | 12/21/2010 | 09-16233 | $1,980.00 | 7/16/2012 | 203RD  122110 DISP 080609-021710 COMP |
| PAUL J JOHNSON | 1/6/2011 | 03-57619-1 | $270.00 | 7/12/2012 | 291ST 010611 DISP REV |
| PAUL J JOHNSON | 1/12/2011 | 08-72301 | $270.00 | 7/12/2012 | 291ST 011211 DISP REV |
| PAUL J JOHNSON | 1/13/2011 | 09-31021 | $270.00 | 7/9/2012 | 265TH 011311 DISP REV 09-31022 09-31023 |
| PAUL J JOHNSON | 1/13/2011 | 10-54438 | $990.00 | 7/9/2012 | 195TH RETAINED COUNSEL 042110 052510 061110 061710 062110 063010 071310 071510 080310 081210 081810 082510 090210 090810 091610 100610 110210 120710 121610 010411 010811 COMP |
| PAUL J JOHNSON | 1/13/2011 | 08-41870 | $1,170.00 | 7/10/2012 | CDC#4 011311 DISP 100109-011311 COMP |
| PAUL J JOHNSON | 1/14/2011 | 01-62691 | $540.00 | 7/9/2012 | 203RD 011411 DISP |
| PAUL J JOHNSON | 1/18/2011 | 08-55557 | $270.00 | 7/10/2012 | CDC#5 011411 DISP REV |
| PAUL J JOHNSON | 1/18/2011 | 10-25280 | $150.00 | 2/23/2011 | CDC#6  011811 |
| PAUL J JOHNSON | 1/18/2011 | 10-58351-2 | $720.00 | 7/11/2012 | 194TH  011811 DISP 092410-011811 COMP |
| PAUL J JOHNSON | 1/18/2011 | 10-40662 | $810.00 | 1/2/2013 | 292ND 011811 DISP 081310 121610 010611 011111-011211 011411 COMP |

| Trading Partner | Invoice Date | Invoice Num | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 1/20/2011 | 08-24666 | $9,135.00 | 7/10/2012 | CDC#7 012011 DISP 110509-012011 COMP CAPITAL MURDER |
| PAUL J JOHNSON | 1/21/2011 | 09-50680 | $270.00 | 3/17/2011 | 265TH 012111 REV |
| PAUL J JOHNSON | 1/26/2011 | 09-25467 | $4,770.00 | 1/9/2013 | CDC#3 012611 DISP 122809-012411 COMP |
| PAUL J JOHNSON | 1/27/2011 | 00-00820 | $1,080.00 | 2/7/2011 | CDC#5 070710-111110 |
| PAUL J JOHNSON | 1/27/2011 | 09-53016 | $270.00 | 2/11/2011 | 203RD 012711 DISP REVOC |
| PAUL J JOHNSON | 1/28/2011 | 10-62795 | $360.00 | 2/11/2011 | CDC#1 012811 10-62796 |
| PAUL J JOHNSON | 1/28/2011 | 08-71512 | $270.00 | 2/11/2011 | CDC#1 012811 REV |
| PAUL J JOHNSON | 1/28/2011 | 08-39160-2 | $1,665.00 | 7/16/2012 | CDC#2 012811 DISP REV 072710-012711 COMP |
| PAUL J JOHNSON | 2/3/2011 | 10-34798 | $360.00 | 7/16/2012 | CDC#2 020311 DISP |
| PAUL J JOHNSON | 2/7/2011 | 09-72919 | $90.00 | 7/27/2012 | CDC#5 020711 COMP HIRED ATTY |
| PAUL J JOHNSON | 2/8/2011 | 09-40250 | $270.00 | 1/9/2013 | 282ND 020811 DISP REV 07-34134 |
| PAUL J JOHNSON | 2/10/2011 | 10-58015 | $180.00 | 7/10/2012 | CDC#5 021011 DISP 090810 091010 092110 100411-111811 COMP HIRED ATTY |
| PAUL J JOHNSON | 2/11/2011 | 10-11101 | $1,170.00 | 7/11/2012 | CDC#1 021111 DISP 102610-021111 COMP 10-25363 10-11115 06-47766 |
| PAUL J JOHNSON | 2/11/2011 | 09-25290 | $270.00 | 7/12/2012 | 291ST 021111 DISP REV |
| PAUL J JOHNSON | 2/11/2011 | 10-00854-1 | $1,897.42 | 1/10/2013 | CDC#7 020811 021111 COPY EXPENSES CAP MUR |
| PAUL J JOHNSON | 2/14/2011 | 10-56886 | $1,170.00 | 7/11/2012 | CDC#1 021411 DISP 123010-021011 COMP |
| PAUL J JOHNSON | 2/14/2011 | 09-44557 | $2,340.00 | 7/11/2012 | 195TH 021411 DISP 071509-021411 071609-021111 090309-021411 COMP |
| PAUL J JOHNSON | 2/15/2011 | 10-33820-1 | $270.00 | 2/23/2011 | CDC#3 021511 REV |
| PAUL J JOHNSON | 2/15/2011 | 10-58017 | $1,170.00 | 1/10/2013 | CDC#7 021511 DISP 091610-021811 COMP |
| PAUL J JOHNSON | 2/16/2011 | 10-13256 | $450.00 | 2/24/2011 | CDC#6 021611 |
| PAUL J JOHNSON | 2/16/2011 | 10-25694 | $450.00 | 2/24/2011 | CDC#6 021611 |
| PAUL J JOHNSON | 2/17/2011 | 10-14415 | $450.00 | 3/25/2011 | CDC#5 021711 |
| PAUL J JOHNSON | 2/18/2011 | 07-30305 | $270.00 | 2/25/2011 | CDC#1 021811 REV |
| PAUL J JOHNSON | 2/21/2011 | 09-54939 | $270.00 | 7/11/2012 | CDC#1 022111 DISP 09-54938 REV |
| PAUL J JOHNSON | 2/22/2011 | 08-13301 | $360.00 | 7/11/2012 | CDC#1 022211 DISP |
| PAUL J JOHNSON | 2/24/2011 | 10-00586 | $3,465.00 | 7/11/2012 | 292ND 022411 DISP 021511-022411 COMP 10-40776 MURDER |
| PAUL J JOHNSON | 2/28/2011 | 11-60318 | $900.00 | 7/11/2012 | CDC#2 022812 DISP 092711-022712 COMP |
| PAUL J JOHNSON | 3/1/2011 | 07-46704 | $270.00 | 3/3/2011 | 282ND 030111 REV |
| PAUL J JOHNSON | 3/1/2011 | 07-73159 | $270.00 | 3/3/2011 | 282ND 030111 REV |
| PAUL J JOHNSON | 3/1/2011 | 06-83442 | $270.00 | 3/7/2011 | CDC#5 030111 DISP REVOC |
| PAUL J JOHNSON | 3/1/2011 | 09-60244 | $270.00 | 3/7/2011 | 265TH 030111 09-45321 REV |
| PAUL J JOHNSON | 3/3/2011 | 07-30054 | $270.00 | 7/11/2012 | 203RD 030311 REV |
| PAUL J JOHNSON | 3/4/2011 | 08-46836 | $900.00 | 7/16/2012 | CDC#1 030411 DISP 111910-031311 COMP 08-46838 09-46755 REV |
| PAUL J JOHNSON | 3/7/2011 | 08-33579 | $1,440.00 | 7/10/2012 | CDC#5 030711 DISP 051910-030711 COMP 08-54275 |
| PAUL J JOHNSON | 3/8/2011 | 10-71905 | $1,620.00 | 7/13/2012 | 291ST 051810-030811 COMP |
| PAUL J JOHNSON | 3/9/2011 | 03-58863-2 | $270.00 | 3/14/2011 | CDC#1 030911 DISP REVOC |
| PAUL J JOHNSON | 3/11/2011 | 10-24962 | $360.00 | 3/23/2011 | CDC#2 031111 DISP 08-63876 |
| PAUL J JOHNSON | 3/15/2011 | 09-60632 | $270.00 | 4/26/2011 | 265TH 031511 REV |
| PAUL J JOHNSON | 3/15/2011 | 10-72289 | $810.00 | 7/13/2012 | 363RD RETAINED COUNSEL 091010 091610 092210 100110 100610 101110 110410 111010 111610 120210 120710 120910 121410 122110 010711 011211 011911 012611 012711 COMP 09-16845 |
| PAUL J JOHNSON | 3/21/2011 | 09-60793 | $1,710.00 | 7/12/2012 | 363RD 032111 DISP 110209-032111 COMP 09-56876 09-72982 |
| PAUL J JOHNSON | 3/22/2011 | 09-39434 | $360.00 | 3/30/2011 | CDC#7 032211 |
| PAUL J JOHNSON | 3/24/2011 | 10-41232 | $360.00 | 4/8/2011 | CDC#1 032411 |
| PAUL J JOHNSON | 4/1/2011 | 09-50030 | $270.00 | 7/9/2012 | 204TH 040111 DISP REV |
| PAUL J JOHNSON | 4/4/2011 | 10-31343 | $360.00 | 4/8/2011 | CDC#5 040410 |
| PAUL J JOHNSON | 4/4/2011 | 07-30939-1 | $270.00 | 4/11/2011 | CDC#3 040411 REV |
| PAUL J JOHNSON | 4/4/2011 | 10-24708 | $540.00 | 7/9/2012 | 265TH 040411 DISP 101410 102010 111510 021011 033011 COMP |
| PAUL J JOHNSON | 4/5/2011 | 10-61302 | $450.00 | 4/11/2011 | CDC#2 040511 10-61303 |
| PAUL J JOHNSON | 4/5/2011 | 09-55050-1 | $270.00 | 5/19/2011 | CDC#1 040511 DISP REVOC |
| PAUL J JOHNSON | 4/5/2011 | 09-60167 | $270.00 | 5/19/2011 | CDC#1 040511 DISP REVOC |
| PAUL J JOHNSON | 4/11/2011 | 09-41663 | $270.00 | 4/14/2011 | 203RD 041111 DISP REVOC |
| PAUL J JOHNSON | 4/11/2011 | 11-00092 | $360.00 | 4/21/2011 | CDC#6 041111 |
| PAUL J JOHNSON | 4/11/2011 | 09-01268 | $540.00 | 4/21/2011 | CDC#6 041111 |
| PAUL J JOHNSON | 4/11/2011 | 10-14556 | $450.00 | 4/21/2011 | 291ST 041111 |
| PAUL J JOHNSON | 4/11/2011 | 06-35096 | $270.00 | 4/25/2011 | 265TH 041111 REV |
| PAUL J JOHNSON | 4/11/2011 | 10-73448 | $360.00 | 5/5/2011 | CDC#5 041111 |
| PAUL J JOHNSON | 4/11/2011 | 10-00854 | $10,890.00 | 7/13/2012 | CDC#7 090110-041111 COMP CAP MURDER |
| PAUL J JOHNSON | 4/14/2011 | 10-20966 | $360.00 | 4/20/2011 | CDC#2 041411 |
| PAUL J JOHNSON | 4/14/2011 | 11-20897 | $540.00 | 4/29/2011 | 291ST 041411 DISP |

| Trading Partner | Invoice Date | Invoice Num. | Invoice Amount | GL Date | Description |
|---|---|---|---|---|---|
| PAUL J JOHNSON | 4/14/2011 | 09-73177 | $900.00 | 5/13/2011 | CDC#3 032511-041411 COMP |
| PAUL J JOHNSON | 4/14/2011 | 10-53638 | $5,850.00 | 1/8/2013 | 363RD 041411 DISP 032610-040411 COMP CAP MURDER |
| PAUL J JOHNSON | 4/15/2011 | 09-72722 | $360.00 | 5/12/2011 | CDC#1 041511 |
| PAUL J JOHNSON | 4/18/2011 | 11-51943 | $360.00 | 4/21/2011 | CDC#3 041811 |
| PAUL J JOHNSON | 4/18/2011 | 10-55770-1 | $540.00 | 4/21/2011 | CDC#3 041811 |
| PAUL J JOHNSON | 4/18/2011 | 10-61162 | $270.00 | 4/21/2011 | 203RD 041811 PRO VIO/REV |
| PAUL J JOHNSON | 4/19/2011 | 11-25835 | $540.00 | 4/21/2011 | 194TH 041911 |
| PAUL J JOHNSON | 4/19/2011 | 11-50975 | $540.00 | 5/3/2011 | 195TH 041911 DISP |
| PAUL J JOHNSON | 4/21/2011 | 08-61625 | $270.00 | 4/26/2011 | 265TH 042111 REV |
| PAUL J JOHNSON | 4/25/2011 | 09-55156 | $270.00 | 4/27/2011 | 203RD 042511 |
| PAUL J JOHNSON | 4/25/2011 | 09-56091-1 | $270.00 | 4/27/2011 | CDC#2 042511 REV |
| PAUL J JOHNSON | 4/26/2011 | 02-45278 | $270.00 | 5/3/2011 | 292ND 042611 DISP REVOC |
| PAUL J JOHNSON | 4/28/2011 | 11-14723 | $540.00 | 5/3/2011 | 195TH 042811 DISP |
| PAUL J JOHNSON | 4/28/2011 | 06-66459 | $270.00 | 5/5/2011 | 292ND 042811 06-66157 REV |
| PAUL J JOHNSON | 4/28/2011 | 10-61067 | $450.00 | 5/12/2011 | CDC#1 042811 |
| PAUL J JOHNSON | 4/28/2011 | 10-12102 | $810.00 | 7/13/2012 | CDC#5 042811 DISP 011410 120110 121010 012011 020311 020811 021711 030211 030811 031011 032411-032511 COMP 10-12101 |
| PAUL J JOHNSON | 4/29/2011 | 09-71231 | $3,330.00 | 7/17/2012 | 363RD 042911 DISP 050410-050510 050710 051210 051410 052710 060310 060810 061710 062610 070710 071710 072210 072910 081110 081810 082310 090910 101410 102810 011311 012411 021011 022611 030411-032611 040211-041611 042111-042911 COMP |
| PAUL J JOHNSON | 5/2/2011 | 08-54926 | $270.00 | 5/6/2011 | CDC#1 050211 |
| | Total | | $402,130.52 | | |

11

1

2

3

4

5

6

7

8

9

10

11

12

13          APPLICANT'S EXHIBIT NO. 71

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR                282ND JUDICIAL DISTRICT COURT

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

121 Olive Street                                          (817) 379-4663
Keller, Texas 76248                            Facsimile (817) 622-8077

**Social History Summary**

**The State of Texas vs. Gary Green**

**Early Developmental and Social History:**
   Gary was born to Mary Lee Sampson and Thomas Carter when his mother was 17 years of age. He was the product of an unplanned pregnancy. He was born at Parkland Hospital without incident. Gary feels that he has been best friends with his mother since his birth. Based on family and friend descriptions of Thomas' behavior, he was either mentally ill, a significant substance abuser, or most likely-both. He was never a functional person and was discharged from the military due to attacking his commanding officer with a karate chop – a behavior that he frequently did in public and may have been indicative of mental illness.

   Gary harbored animosity towards his father for abandoning the family and reportedly told him so at the time of his death. Thomas died when Gary was 34 years of age. Thomas Carter was an abusive mate and father and he was a significant womanizer. He could not hold a job and never maintained a household. In fact, his family had kicked him out of the family home and he was living in a washeteria when he met Mary Lee Sampson. He never provided child support for the children before or after he and Mary broke up. Mary ultimately left him when she was pregnant with her second child, Nysasno, because Thomas was abusive to her during her pregnancy. Gary only has the one younger brother, Nysasno.

   Gary was raised primarily by his mother and her husband, Leon Sampson, Gary's stepfather. Gary sees his stepfather, Leon, as his father. He describes having a good relationship with both his mother and stepfather though Nysasno claims Gary had a hard time accepting Leon's parenting and claims their mother frequently told Gary he "was just like your father." His stepfather has been a laborer and his mother a nurse. Gary's early home life is described as being strained by his desire to remain in his room alone from an early age. This caused numerous family fights. Poverty was a burden. They always had a roof over their head though sometimes there was not enough food to eat.

Green Gary - Social History Summary.doc
Last printed 8/17/2010 4:36:00 PM



Dr. Goodness & Associates                                          Matter: Green, Gary

**Adult Social History:**
Gary left home when he first went to prison at age 19.

Gary became sexually active at age 13. He has had two marriages and two divorces. He has had numerous live-in relationships. He frequently cheated on his partners and was promiscuous. In fact, this promiscuity led to him having three children all who are age seven: Cameron, Gary Jr., and LaJade. All together, Gary has five women who have borne him children and from 2007 to 2009, he had three stepchildren with the deceased.

It appears that his two most significant romantic relationships wherein he truly cared about the individual was with Jennifer, the woman he went to prison for beating, and Lovetta, his wife whom he killed.

**Physical, Emotional, Sexual Abuse Experienced and Observed:**
Only recently has Gary claimed to have been sexually abused at age 3 years by Shirley Jones, his mother's sister. Gary reportedly observed physical abuse between his father and mother. According to his maternal grandmother, this made a significant impact on his functioning at that time.

**Educational History:**
According to Gary, the school wanted to place him in special education starting in pre-K, but his mother "talked them out of it."

Gary reported that he always felt like an outsider or outcast in school. He was picked on and made fun of. He was fearful of school, especially in elementary school. He likens himself to the kids of Columbine, as he felt he lacked a connection with people and he understood why the Columbine youths wanted to kill people. He dropped out of school in the 11th grade because of his deep disconnection with people.

Gary's actual education records are difficult to interpret. It appears that he rarely passed any form of standardized testing. In the fifth grade, he was still reading at the third grade level, though sixth grade notes that he is on level for reading and math. It is difficult to understand how he could have been reading on grade level in sixth grade when he had not been the year earlier and his grades were a mixture of C's, D's and F's. The seventh grade scores are missing, and he failed all subjects in eighth grade. Inexplicably, he was placed in the ninth grade and passed all subjects. He was in football that year and one has to wonder if his grades are accurate given his past academic history. It is possible that his grades were falsified by the school in order for him to play football. The following year when he was not in football, he was again failing all of his classes. He dropped out of school in December of 1988.

Gary earned a GED in 1993 while at Tennessee Colony Prison. He also received a certificate in drafting there. He took some college courses in liberal arts within the prison, but stated he ultimately dropped out.

Dr. Goodness & Associates                                                Matter: Green, Gary

## Occupational History:

Gary never entered the military. Though Gary believes he got along well with all coworkers and bosses, his brother reported working with Gary at his longest held job (4 years) as a night crew supervisor at Wal-Mart and having managers ask Nysasno why Gary had difficulty doing the job. Moreover, Gary recalls leaving one job, McShan's Florist, in order to get better pay, but the company's paperwork indicates that he was terminated after only two days of employment because he would not do the job. His application statements for that job are indicative of an individual who truly wants to work. This suggests the real issue may have been that he was incapable of focusing and learning to do the job at that time.

Indeed, his brother Nysasno describes Gary, even as an adolescent, as having great difficulty following instructions and completing even simple tasks such as hammering a nail accurately or working in a timely manner. Gary's job at the floral company was to deliver flowers. This is not a difficult job, and thus the notion that his thoughts were too disorganized to function adequately at the job is reasonable. Interestingly, Gary's job before the floral company was very short-lived as well. This was as an electrician's helper.

According to Rodney Haney, a coworker of Gary's at Wal-Mart, Gary quit Wal-Mart for no explainable reason. Though Mr. Haney was instructed by their boss to attempt to get Gary to return to work, his efforts were to no avail and Gary refused to provide a real reason for his departure. It seems that Gary just was not functioning.

From 2004 to 2006, he worked temporary jobs. According to Gary, he did this because he had child support warrants and tried to avoid garnishment.

## Mental Health History:

Mr. Green's relatives describe numerous behaviors indicative of mental illness beginning at age 7 or 8. Several relatives attempted to get Gary's mother to solicit psychological assistance, but this only angered her and she steadfastly denied he had problems. Thus, even though relatives attempted to reason with his mother, his mother refused to acknowledge the significant problems that Gary had. Please refer to the various Collateral Interview Reports of friends and family for their descriptions of Gary's many, many unusual, concerning or bizarre behaviors that are indicative of psychotic symptoms.

Gary also believes he might have begun having mental health problems as early as preschool. He stated that his parents always described him as being withdrawn and he has always preferred to be alone. Gary feels isolated even when with people. As an example, he stated that he feels as if he were "a recent immigrant who does not speak the language" when he is amongst people, including his family. He stated he can be at a family reunion with many relatives and feel no connection with anyone else. Being around others makes him anxious, this was especially so when he was a child. It was particularly difficult for him to accept being "so different" than others as a child and he hated God for making him different until he came to "just accept" himself. He has always viewed himself as an outcast, but came to accept it because "you have to love and respect yourself."

Gary describes paranoia and feeling as if people are talking about him all of the time. His family corroborate he has long been paranoia, especially after he got out of prison in 2000. He believes he can sense that others are starting at him or saying negative things about him, even if he is not looking at them. When he senses this, he may turn to look at them and if they are looking at him, he sees this as confirmation that his notions were correct. He believes that most people, "nine out of ten," *despise* him because he can sense that they do. He feels alone and misunderstood. He describes being "stressed" about how others perceive him.

Gary describes spending his time "locked" in his own mind in a "private sanctuary." He describes significant rumination that has been longstanding. Since the offense, he ruminates about what he did and tries to "figure out exactly where I was at fault and what I could have done differently." He described feeling like he was "on the ledge of a building, dangling half on and half off the edge" every day since he was a child.

Gary reported that mental health problems were never discussed in his family, even though multiple family members had mental health issues. He stated that there is a taboo in the African-American community about having mental illness. His wife, Lovetta, frequently told him he needed mental health assistant. She believed he was bipolar because he has constant mood swings wherein he is laughing and smiling one moment and withdrawn the next. Others also describe him this way and his brother stated he never knew "which personality" he would have "to deal with today."

Nysasno, Gary's brother, attempted to get him to go to a mental hospital on numerous occasions. Nysasno stated that this would usually be in the evening time and it would take him hours to convince Gary to go. Gary would agree to do so "in the morning," but by the time morning came he would refuse.

His only mental health hospitalization came after he wagered with his wife (the deceased) about whether or not he was actually mentally ill. On 8/20/09, he went to Timberlawn and, much to his chagrin, found that the doctors agreed with her. He stated he did not like confinement and he did not like that they did not allow him to go home and pack a bag for his stay there. He did not like that they did not provide him with any form of talk therapy. He likened his treatment at Timberlawn to "telling a doctor about a headache and only being given an aspirin; treating the symptoms rather than the underlying problems." Given how mental health hospitals work, he has a valid argument. He was diagnosed with Recurrent Depression with Psychotic Features, Severe at Timberlawn. He was discharge on 8/24/09 with Risperdal and Remeron, with a referral to Dallas MetroCare.

Timberlawn medical records document suicidal ideation, depression, isolation, decreased energy, increased hopelessness, racing thoughts, anxiety, irritability, mood swings and paranoia. He described the anxiety as being worse than the depression and indicated an inability to sleep due to rumination.

Gary enrolled in MetroCare services on 8/27/09. At that time, he still believed that people were out to get him and did not like him. He was described as easily agitated. He did not continue to take the medications, as they were too expensive.

Dr. Goodness & Associates                                    Matter: Green, Gary

Gary applied for Social Security Disability after he was released from Timberlawn. He was denied disability, though the letter did not reach him until after his arrest.

Gary reported that he attempted suicide as a child by taking sleeping pills. He also took two bottles of Tylenol PM and drank liquor in an attempt to commit suicide shortly before his arrest.

TDCJ medical records indicate he has struggled with rumination, anxiety, "built up pressure," suicidal ideation, withdrawal, feelings of having a nervous breakdown, "a sense of losing himself," and depression from 1991 through 1999. They believed his "stress" levels caused his hypertension to get out of control. He was assigned to receive counseling at several points during those incarcerations. They also gave him stress management groups, but no psychotropic medications.

The most recent medical records available to this writer indicated that since his incarceration for this offense, jail psychiatrists have seen him as anxious and depressed, but not psychotic. He is prescribed Paxil and Remeron for depression. He is prescribed Atarax for anxiety.

Gary has a significant family history for mental illness. Gary believes that all of his maternal aunts and cousins receive disability for a mental illness. Other family members have reported the same. He has had one maternal uncle who committed combined homicide-suicide. He has a cousin, Willie Valentine, who spends time in mental institutions. His biological father is described by several relatives as having behaviors similar to Gary and appearing to have significant mental health problems. It is believed that he has been to a mental hospital. At least one of Gary's children, LaJade, is believed to have mental health issues as well. His mother stated she has had "a nervous breakdown" and suffers from depression.

**Medical History:**
Gary has never seen a primary care physician in his adult life. He was treated for an STD in the 8th grade. He was shot in the neck at age 18, which required an operation. He had another operation on his stomach after his oldest son's mother threw a knife at him when they were both sixteen years old.

Gary has significant hypertension, which runs in his family. His "stress levels" have long been thought to aggravate his hypertension. Conceptualized another way – his untreated mental illness has caused anxiety that has aggravated his blood pressure.

**Substance Abuse History:**
Gary reported having his first drink of alcohol at age sixteen. His maximum usage was $20 per month. He denied alcohol was an issue. Marijuana use was much more significant, with his peak daily habit being approximately $20 per day. He first began smoking marijuana at age 12 and smoked until his arrest. Though he has had a charge involving heroin, he denied being a heroin user. He has sold drugs. Many describe him as acting like he was on a substance though they did not believe he was suggesting mental illness.

Dr. Goodness & Associates                                                                    Matter: Green, Gary

**Religious History:**

Gary sees his stepfather as "the conscious force behind our faith." They attended church every Sunday as a family, and attended bible studies and church activities during the week. Gary has spent some time being a Muslim after he was introduced to that in prison. Gary feels he has spoken to an angel, and believes his family has witnessed this.

**Legal History:**

Gary does not have a juvenile legal history.

On 7/28/89, Gary was charged with Possession of a Controlled Substance – Cocaine less than 28 grams after being found under a car with the baggie. He was given four years probation and a fine of $750.

His second charge occurred on 8/6/89 at age 18. This charge involved Jennifer, his high school sweetheart. Gary was convicted of Aggravated Assault after badly beating, choking, stomping and stabbing Jennifer before driving her to a hospital and <u>voluntarily waiting for police</u>. He had attempted to strangle her with the shoe strings from his boot. According to his mother, Gary did that because Jennifer had an abortion against his wishes. While being driven to Lew Sterritt, he asked an officer to allow him to escape and shoot him. He offered the officer $5,000, which was declined. Gary received four years in TDC for this offense. He actually served only three months.

On 4/19/90, Gary and several accomplices donned masks and committed Aggravated Robbery at a County Fair Food Store. Gary made a <u>voluntary confession</u> and received 20 years TDC and a $750 fine. He did ten years and three months of that time. According to Gary, he did that time in maximum security. He got out in 2000.

Gary's next charge was the index offenses involving capital murder.

**Prison / Jail Behavior:**

According to his TDCJ disciplinary records, he received 11 disciplinaries between December of 1991 and April of 1994. He fought with inmates on three occasions, failed to go to medical appointments as ordered on several occasions, exposed his penis once, failed to appear for school once, and failed to complete a reasonable amount of work once. In 1994, he was charged with throwing his food tray at an officer. Felony charges were filed, but dismissed when an Officer witness provided conflicting information.

While incarcerated, Gary met corrections officer Belinda Lacey, with whom he began a relationship. She quit her job around 1997 or 1998 as a result. She picked him up from prison when he was discharged and they married. The marriage was short-lived. According to Gary, his relationship began with Belinda in 1995. This corresponds to when he stopped getting disciplinary actions.

Dr. Goodness & Associates                                          Matter: Green, Gary

**Summary:**
   In conclusion, the information provided in this report is a summary of the defendant's background and social history and is meant to augment the many other reports made in this case. Please feel free to contact me should more explanation be needed or should you have concerns of any nature. I appreciate the opportunity to be of assistance and participate in the legal process with this very complex case.

Respectfully submitted,

Kelly R. Goodness, Ph.D.
Clinical and Forensic Psychologist
License #3-1223

12

1

2

3

4

5

6

7

8

9

10

11

12

13            APPLICANT'S EXHIBIT NO. 72

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR            282ND JUDICIAL DISTRICT COURT

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

121 Olive Street
Keller, Texas 76248

(817) 379-4663
Facsimile (817) 379-0320

**Collateral Interview List**

**The State of Texas vs. Gary Green**

**Collateral Interviews Completed:**
Mary Sampson – mother
Leon Sampson – maternal stepfather
Bertha Curry – maternal grandmother
Nysasno Carter – brother
Shirley Coleman – maternal aunt
Irving Green -- maternal uncle
Arron Green – maternal uncle
Sarah Carter – paternal step-grandmother
Dana Carter – paternal cousin
Margaret Young – ex-girlfriend
Lenell Williams – ex-girlfriend
Stephanie West – ex-girlfriend
Rodney Haney – lifelong friend
Corey Foster – childhood friend
Tony Mitchell – childhood friend
Lottie Tucker – former parole officer
Karen Knight -- former probation officer
Belinda Lacey – ex-girlfriend

**Collaterals Interviews Attempted:**
LaQuisha Jones – maternal aunt
Abraham Mundane – former employer
Levie Smith – childhood friend

**Potential Collateral Interviews Not Located:**
Suhlonda Ransom – ex-girlfriend. PI to locate, as family did not have contact information.

Eddie Hudson – former supervisor. PI unable to locate.

Green, Gary - Collateral Interview List
Last printed 3/30/2011 9:42:00 AM



DEFENDANT'S
EXHIBIT
72

Dr. Goodness & Associates                                      Matter: Green, Gary

Pearlie Mae Carter – paternal aunt. Dana Carter, Pearlie Mae's daughter, refused to provide her contact details.

Darius DeMarcus Young – son. Last known address had an eviction notice posted when the PI attempted an in-person contact.

Keith Perkins – childhood friend. PI unable to locate

James Jernigan – childhood friend. PI unable to locate.

Pastor King. Prescreening appointment required before he determines if he will speak with anybody.

Louvenia Valentine – maternal aunt. Shirley Coleman was to provide contact details for Louvenia, but Louvenia advised Shirley she did not wish to be contacted and instructed Shirley not to provide contact information.

Thelma – maternal aunt. Shirley Coleman was to provide contact details for Thelma, but Thelma advised Shirley she did not wish to be contacted and instructed Shirley not to provide contact information.

Patricia Newberry – maternal aunt. Shirley Coleman was to provide contact details for Patricia, but Patricia advised Shirley she did not wish to be contacted and instructed Shirley not to provide contact information.

13



APPLICANT'S EXHIBIT NO. 73

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

---

| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Mary Sampson, the defendant's biological mother**

**June 14, 2010 – Dallas County Courthouse**

**The State of Texas vs. Gary Green**

---

## Mary Sampson Background

- ➤ Social History
    - o Ms. Sampson first married Thomas Carter. He died in 2004.
        - ▪ Thomas Carter was Nysasno's biological father (**NOTE**: *Need to find out about Gary's biological father.*)
        - ▪ Mr. Carter was extremely abusive.
        - ▪ He was a womanizer.
        - ▪ He was abusive during her pregnancy with Nysasno, and thus she left.
        - ▪ He did not provide child support.
    - o Ms. Sampson next married Leon Sampson, to whom she remains married.
    - o Ms. Sampson had two children, Gary is the oldest and Nysasno is the youngest.

- ➤ Mental Health History
    - ▪ Ms. Sampson has suffered from depression. She believes she has had several "nervous breakdowns." She reported that she was prescribed Valium in the 1970's after her divorce, due to a "nervous breakdown." She has difficulty verbalizing what this means.
    - ▪ She uses the words nervous breakdown because her doctor used those words in the 1970's. When she has her worst symptoms, she is unable to sleep or rest.
    - ▪ She has had similar nervous breakdown symptoms each time her sisters have passed away. Three sisters have passed. Her brother killed himself and she stated it became "really bad" then and became "really bad" after the defendant was charged with his offenses.



DEFENDANT'S
EXHIBIT
23

Dr. Goodness & Associates                                           Matter: Green, Gary

➤ Birth and Childhood
  o  Gary was born by caesarian birth.

➤ Adolescence
  o  He set two dogs on fire with his friend Marcus when they were 13 or 14 years old.
  o  He dated Jennifer all of 12th grade. He got a job with the Green Team that summer. He came home scared, stating that Jennifer was pregnant and wants an abortion. He was very upset asking how someone could take a life like that. Next thing she knew, Jennifer was in the hospital. He had stomped her face. Gary was the one that took her to the hospital and stayed until the police arrived.
    ▪  It is her understanding that Gary beat Jennifer because she had an abortion against his wishes.
  o  She knows of no physical abuse towards the defendant. She understands the defendant claims sexual abuse recently, but she did not know of it as a child. She stated that she would have dealt with it at the time if she had known it.

➤ Education History
  o  Ms. Sampson recalls Gary as being "book smart," but she could give no details about his educational history.

➤ Employment History
  o  As an adolescent, Gary worked for her husband doing remodeling jobs. He did not fulfill his responsibilities very well.
  o  It was difficult for Gary to find a job.
  o  "Gary couldn't even rake the yard right." He was not good with his hands and had difficulty with directions. He had a fascination with the radios and TV's in the house and he would take them apart, but he never could get them back together.

➤ Adult Social History
  o  Lavetta was very jealous. Every time Gary left, she would threaten him with telling the parole officer something negative to get him in trouble.
  o  Lavetta never brought her children with her to Ms. Sampson's home. She only seemed to want to be with Gary and did not seem to care about her own children, though Gary cared about them. Gary complained about Lavetta not caring about her children all the time, and he stated he was stressed about it.
  o  Gary feared returning to prison, so Lavetta's threats to tell his parole officer anything were significant to him.

Dr. Goodness & Associates                                            Matter: Green, Gary

- Ms. Sampson stated that her nervous breakdowns involve crying all the time and withdrawal. "I couldn't get passed it." She stated her longest term of depression or nervous breakdown involved one year after her brother killed himself.

## Family Constellation

➢ Ms. Sampson has five sisters and four brothers, seven of whom were on her mother's side.

➢ Gary has three children, all of whom are 7 years of age.
  - o LaJade is the defendant's biological daughter and lives with Ms. Sampson. She receives medication for ADHD. Ms. Sampson describes her as having oppositional qualities. "She gets mad when you tell her to do anything." She tends to act older than her age.
  - o LaJade plays by herself and talks to herself. Ms. Sampson is open to having her evaluated for mental health problems.
  - o LaJade sees Dr. Matthews at Spruce, which is some sort of mental health treatment facility.

➢ There is a family history of mental illness.
  - o Debra Jones, her sister, heard and saw things. She believed a man was inside of her stomach. She died three years ago from a heart attack. (**NOTE**: *Ms. Sampson is to try to get her SSN and we need to request her MHMR records and medical records.*)
    - This is Ms. Sampson's youngest sister. She was reportedly addicted to drugs.
  - o Her paternal half-brother committed suicide after he barricaded his wife in a room. He shot and killed her, and then killed himself. He constantly stated he was "stressed." The brother had gone to Aunt Betty Nickberry and told her that he was going to kill himself, but she told him he was drunk and needed to go sleep it off. He followed through with his threats. (**NOTE**: *Contact the stepmother and Aunt Betty.*)

## Gary Green Background

➢ Ms. Sampson attempts to see Gary frequently. She last saw him on Saturday. He stresses that he keeps seeing her every time he goes to sleep and this is distressing. He stated that he had a dream that she said not to worry, that all would be alright. He cries and cries when Ms. Sampson sees him.

Dr. Goodness & Associates                                        Matter: Green, Gary

- Gary always looked as if someone was trying to come after him. He would never sit with his back exposed to the door, and had fears of someone coming up behind him.
- As a child, he slept with a baseball bat in his room because he feared someone would hurt him. He never could explain these fears to anyone's satisfaction.
- Gary always slept with the light on until he went to the penitentiary. He is afraid of rats and cats.

➢ Substance Use History
  o Ms. Sampson knows that he smoked marijuana to relieve his stress, but she would not allow this in her home. She does not know of other substance abuse.
  o He does not drink to excess.

➢ Offense
  o He kept saying that he wanted to sleep. She told him that he had face what he had done. Once they took him to the police station, they realized he had three stab wounds to the back. He wouldn't say what happened.
  o Gary frequently said things that made no sense. He frequently stated that he had a plan and "I'm trying to figure this out" but he never explained what this meant.
  o She believes her son has an anger management problem, and he was remanded to anger management treatment after he was incarcerated for harming Jennifer. She does not believe the services that he received were significant, as she sometimes took him to those sessions herself and they would last no more than 20 minutes and sometimes as little as 5 minutes. "He was never there long." (**NOTE**: *We need these records.*)

Dr. Goodness & Associates                                    Matter: Green, Gary

- o   Lavetta loved to drink and go out. She was always drinking.
- o   Lavetta reportedly moved to Dallas to escape a man who had tried to kill her in Tyler.

➢ Medical History
- o   She knows of no head injuries.

➢ Mental Health History
- o   Ms. Sampson first became concerned about Gary's mental health when he was in the 9th grade and a boy took his jacket and threw it. The jacket got dirty. It took three teachers to pry Gary off of the boy whom he was choking.
- o   They moved away from that school, but Gary went back after this incident and tried to jump off of the building. His friend Marcus came and got Ms. Sampson and her sister and said that Gary was going to jump. Ms. Sampson believed that he was just trying to get attention. Gary, however, kept stating "I'm stressed." He could never provide a clear answer about what being stressed meant and he also always complained about being tired, thought it didn't make sense to her.
- o   Ms. Sampson took him to several pediatricians at Parkland neighborhood clinics. She believes she went at least twice because of her concerns about Gary's mental health and violence.
- o   Since approximately age 19, Gary would say he was "on a mission." He never could explain what the mission was. He lived with his mother and frequently did not want anyone visiting her home because of the mission he was on. She never understood this. It seemed worse when he didn't have a job – he would talk more about being on a mission during these times.
- o   She never saw him talk to himself.
- o   He was always quiet and kept to himself, but this increased over the years. He is a soft-spoken person. You could say whatever mean things you wanted to to him and he would not react. He only reacted when people physically got in his way.
- o   Paranoia
  - ▪   When Gary was 17 or 18 years old, there was an incident where he believed that someone had broken into their house and tried to hurt them. He tried to run out of the house and sustained a gash in his leg. Ms. Sampson stated there was no possible way that there could have been someone after him, as there was no evidence in her opinion that this was true. But Gary believed it. The house had burglar bars so she does not understand why he could not accept that no one was trying to come after him.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

---

121 Olive Street                                          (817) 379-4663
Keller, Texas 76248                              Facsimile (817) 379-0320

---

### Collateral Interview Summary – Nysasno Carter, the defendant's half-brother

### June 14, 2010 – Dallas County Courthouse

### The State of Texas vs. Gary Green

---

### Nysasno Carter Background

➢ Nysasno now works for himself running two trucks. He does both short and long haul. He employs others.

➢ In the past, Nysasno has worked for his stepfather doing remodeling work, just as Gary did. Gary would become very jealous that Nysasno would bring home a paycheck from that work.

➢ Nysasno spent four and a half years in prison for aggravated robbery. He was out in 1997.

### Family Constellation

➢ In terms of family history of mental illness, Gary's paternal aunt, Pearlie Carter, was on many medications, though Nysasno is not sure what these were for.

➢ Jaden, Gary's daughter, appears to also have mental health problems. "She's different than my kids. She reminds me of him." She frequently forgets what she is doing. Loud noises bother her a lot, just like they do Gary.

➢ Gary has asked Nysasno to get his son's name changed so Gary's action would not affect him. The child's teacher told him his daddy was a baby killer and the child threw a stapler. Gary being where he is for what he is there for is affecting the children.

### Gary Green Background

➢ Family Dynamics

   o As children, Gary had difficulty accepting Mr. Carter as his stepfather. It was the typical stepchild mode, stating that his stepfather "ain't my father." Nysasno was

Dr. Goodness & Associates                                      Matter: Green, Gary

disappointed with Gary for this because Mr. Carter was always kind to them. The arguments never got out of hand.

o   Nysasno felt that Gary's father and him were the same. Nysasno allowed his father to stay at Nysasno's home once and all he wanted to do was watch movies all day long and he seemed to act like Gary.

o   Gary frequently would not tell their mother much of anything of import because she always told him he was just like his father.

o   When their father was on life support, Gary opened up and told him he hated him. He was crying and then their father passed. Gary hated their father for not being there for them. Nysasno has tried to get Gary to see that he needs to be there for his own children.

➤ Employment History

o   Gary frequently refused to go to the jobsite with his stepfather, or when he did go he was very clumsy and had no ability to follow the directions for even simple carpentry skills. Nysasno does not believe that Gary deliberately messed up jobs, rather he was incapable of being competent at the job.

  ▪   Gary was not able to perform basic tasks of carpentry, such as measuring wood and cutting it to the length needed. He would be shown how to do something over and over again, but couldn't do it. He was able to talk about doing a task, but he was never able to apply the principals he was taught.

o   Nysasno also worked with Gary at Wal-Mart. Gary did a good job there as a night crew supervisor. At least he did so at first, but ended up not doing what was required of him or leaving before his shift was done. The managers began to ask Nysasno what was wrong with his brother. He didn't know what to tell them. Gary just seemed to flake out, and he has decline "from that point on over the years." That was when he was about 27 or 29.

o   Other examples of Gary doing a bad job or just simply not understanding what was being taught to him involve their father teaching them to change the oil in a vehicle. Gary put the oil in a gas tank, seeming to truly believe that was what he was supposed to do.

o   Nysasno sees his brother and book smart, but he can't apply any concepts.

➤ Religious History

o   When Gary was first incarcerated, he became Muslim, but then he reconverted when he got it.

➤ Mental Health History

o   Nysasno believes that Gary has needed help since Nysasno was 9 years of age.

Dr. Goodness & Associates

Matter: Green, Gary

- o Bizarre Behavior
  - At times, Gary talks and does not make sense. If Nysasno asks him questions to see if he is oriented, such as where he is, Gary gets mad. Nysasno sometimes asks him if he is drinking or high since he is not making sense, and Gary defensively responds "Are you drinking or high?"
  - Gary frequently "would just be staring at me" as if no one where home. He would shut down for no reason and have a zombie-like stare.
  - On at least two occasions, Nysasno was speaking with Gary on the phone. They had no argument or problem, but Gary would simply put the phone down without warning. It was nonsensical.
  - Nysasno described loose associations.
  - Gary talks to himself and you would swear someone was in the room with him. Nysasno would ask him who he was talking to and Gary would get defensive.
  - Gary frequently would withdraw into himself. Gary was always seen by others as being mad or acting crazy. A number of Nysasno's friends have mentioned that Gary was crazy. Some days they were scared to approach him. Those individuals include Rodney Haines, Levy Smith, Corey Foster, Jones Jernigan and Keith Perkins. (**NOTE**: *The private investigator should interview these individuals.*)
  - Gary frequently seemed to say the opposite of what he should be saying.
  - Gary frequently stated "No one ever understands me." He always talked about being stressed.
  - Gary frequently perseverated on issues of death.
  - Gary has always believed that somebody was out to get him.

- o Daily Functioning
  - Nysasno sees his brother as having at least three different personalities and frequently would ask Gary which one he "was dealing with today." You never knew how he was going to respond.
  - Nysasno never knows how Gary is going to be. One minute you're having a regular conversation with him and then an hour later he's talking about how tired and depressed he is when he wasn't an hour before. Nysasno describes him as frequently "going off the deep end."
  - Gary has "ups and downs, highs and lows."
  - Gary always complained of being tired.
  - Gary never seemed invested in anything and never seemed like anything went right for him. He always said that no one would understand him, just

Dr. Goodness & Associates                                    Matter: Green, Gary

as their father did.

- Always wondered "what frame of Earth am I dealing with today" with Gary.

   o Treatment

- Nysasno believed on numerous occasions that Gary should go to hospital and told him so. Gary was resistant. He does believe he received some kind of treatment during his incarceration.

- He considered forcefully taking Gary to the hospital and instead repeatedly spent time talking to him about going to the hospital. Gary agreed multiple times but by the time morning would roll around would not go.

- He was not surprised with Gary went to Timberlawn.

   o Suicidality

- After the offense, Nysasno spoke with Gary around 6:30 or 7 p.m. and asked what happened. Gary said he was cleaning up. Nysasno could tell he was not in the right frame of mind. He looked like death. He was aglow with death. He was not responding even when the police spoke with him.

- He kept saying he was tired of living.

➢ Criminal History

   o All Nysasno knows about Gary's prior criminal history with Jennifer is that he took her to a park, tied her up and stabbed her. He threw her in a creek. He drove around and went back and took her to the hospital.

➢ Offense

   o Nysasno believes that Lavetta filing for divorce initiated the offense. Gary has told him he does not know why he stabbed the baby other than Lavetta grabbed the baby.

**Trial**

➢ Nysasno believes that Gary wants to die now and will deliberately do nothing to help himself in his case.

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

### Collateral Interview Summary – Stephanie West, the defendant's ex-girlfriend and mother of Cameron Green

### July 8, 2010 – Telephone

### The State of Texas vs. Gary Green

------------------------------------------------------------------------------

**Impressions of this Witness**: Though she feels they had a significant relationship, her lack of knowledge about the defendant, his family and his actions suggest that she truly was one of the other women with whom he spent very little time, though enough to get her pregnant.

### Her Relationship with the Defendant

➢ She met Gary in 2000. They met through a mutual friend. She was attracted to his personality. He was fun to talk to and understood her.

➢ Gary was sneaking around with her. She did not know this until the day she was giving birth, when Mary Sampson told her. She was "disappointed." He had not been living with her, but stayed in and out for a month or so when she first had Cameron. It was hard for her to let him stay there after she knew about the other women. He had nothing to say for himself.

➢ They stayed together for six months after Cameron was born in 2002. They broke up because he "refused" to help me with the baby. "I guess he couldn't do it or he refused to." He did not provide financially for Cameron. He changed the diapers and fed the baby. She was mad at first that he would not support his child, but she got over it "when I knew it was my child and I would have to take care of him."

➢ He was never abusive towards Stephanie. She never saw him become violent towards any other person.

➢ Currently, she does not have much contact with Gary. "I feel sorry for him. I didn't think he would do anything like that. I don't know what pushed his buttons to make him do that."

➢ She has spoken with child support people after he was first arrested.

Dr. Goodness & Associates                                    Matter: Green, Gary

## Family Constellation:

- ➢ Cameron, the defendant's son
  - o 7 years old and in the second grade.
  - o She has never suspected any mental health problems. He has no learning problems in school, and in fact is "very smart."
  - o Cameron does know LaJade, but none of Gary's other children.
  - o Cameron sees Mary infrequently.
- ➢ She knew his mother, brother and stepfather. She did not know his extended family.

## Gary Green Background:

- ➢ Mental health history
  - o She never suspected he had mental health issues. She never observed him speaking to himself or other bizarre behavior.
  - o He sometimes changed the subject for no reason while they were talking, but this was not frequent. His conversations made sense to her.
  - o When time to go to bed, he would stay up until 2 or 3 in the morning and get up around 7 or 8. When sleeping, he would jump up and down like somebody was in sleep or having nightmares.
  - o "All the time" said he was stressed out. She is not sure, but thinks he may have been stressed because he did not have a job and was socially isolated.
  - o Stayed to himself a lot.
  - o He spoke of being depressed, but not killing himself.

- ➢ Substances
  - o He smoked marijuana when they were together. It was not much around her, because she did not like it around her.

- ➢ Social History
  - o She never knew him to be around males or have male friends.

## Trial:

- ➢ She has not been contacted before today.

Green, Gary - Collateral Interview - West, Stephanie - 7-8-10                    Page 2 of 2
3/30/2011 9:36:00 AM

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Leon Sampson, the defendant's stepfather**

**June 14, 2010 – Dallas County Courthouse**

**The State of Texas vs. Gary Green**

---

## Leon Sampson (stepfather of the defendant)
- ➤ Relationship History:
  - o Mr. Sampson has been married twice and divorced once. He is now happily married to Ms. Mary Sampson, the defendant's biological mother, and has been "for about 30 years."
  - o He and Mary met while living across the hall from each other in the same apartments. They began dating after five or six months. It took them three years to get married.
  - o Mary had two children and Leon had two children before they got together. Since then, they have also raised a niece, nephew and two grandchildren because "responsibility just fell my way." One of the grandchildren belongs to the defendant.
- ➤ Occupational History:
  - o Mr. Sampson is currently working for a liquor warehouse and has for the past 24 years.
  - o When the defendant was an adolescent, Mr. Sampson did remodeling as a side job. "I didn't do any major jobs. Just more residential."

## Defendant's Family Background:
- ➤ Thomas Carter (defendant's biological father)
  - o Thomas was in and out of Mary's life and apartment while Mr. Sampson and Mary dated.
  - o "In my opinion he was kind of a womanizer and didn't do any work that I know of. Kind of a lazy type person."

Dr. Goodness & Associates                                          Matter: Green, Gary

- o Mr. Sampson denied direct knowledge of physical or mental abuse committed by Mr. Carter. Ms. Sampson told him that "she was in a bad situation with him" and that he would bring home women while with Ms. Sampson.
- o Ms. Sampson reported that Thomas beat her.
- o Both the defendant and Nysasno had contact with X but not until they were of driving ages and would leave the house to go visit him.
- o Mr. Carter was not in his children's lives. He did not pay child support nor did he take advantage of visitation privileges.
- o Gary's daughter, LaJade, lives with Mr. Sampson and his wife. Gary has shown concern about his daughter asking for advice about how to raise her.

## His Relationship with Defendant:

- ➤ Mr. Sampson had a reportedly good relationship with the defendant, even considering him as his own son.
- ➤ Mr. Sampson willingly supported the defendant both emotionally and financially.
- ➤ Gary went to church with Mr. Sampson until he was approximately 14 or 15 years old. He then got "sidetracked." Mr. Sampson has difficulty describing what sidetracked means, other than Gary stopped going to church and hanging out with the family as much.

## Defendant's Educational History:

- ➤ The defendant never completed high school.
  - o "He was good for a while and I don't know. He just got sidetracked. He just kind of veered away."
  - o The defendant was reported to have always attended school while enrolled and that "he didn't get into *too* much trouble." He cannot really describe what this means.
- ➤ Mr. Sampson reported him as "smart."
- ➤ The defendant had friends in school. Mr. Sampson cannot recall much about them.

## Defendant's Occupational History:

- ➤ When Mr. Green lived with the Sampsons as an adolescent, he worked for Mr. Sampson doing residential remodeling work.
  - o Mr. Sampson reported that Mr. Green "would do the helper work." The defendant would complete basic tasks such as helping with roofing materials, placement and nailing of roofing materials, and assisting working when hanging cabinets.

Dr. Goodness & Associates                                      Matter: Green, Gary

## Defendant's Sexual Abuse History:

> He has heard the defendant has claimed sexual abuse by family members, but "I have no reason to believe it."

## Mental Health History:

> Gary Green (Defendant)
>> o   No known mental health problems now.
>> o   Reportedly had no problems as a child either.
> No reported family history of mental health problems.

## Defendant's Medical History:

> Reportedly shot once and stabbed once on separate occasions.
> Suffered an automobile injury but with no known head injury.
> Does not know about head injuries.

## History of Violence:

> The defendant stabbed Jennifer. He was "a little violent I think" with Jennifer.
> Mr. Sampson reported that the defendant had a temper but not a violent temper and he was usually easily talked down from states of anger or aggression.
> No other known violence.
> The defendant has never attacked Mr. Sampson. He has a temper "but it's not bad." Mr. Sampson stated "you can talk to him" when he was mad and he would calm down.

## Defendant's Best Quality:

> "If we called him to do anything or help us and he was able to he would."

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Irving Green, the defendant's maternal uncle**

**July 8, 2010 – Telephone**

**The State of Texas vs. Gary Green**

---

### Irving Green (maternal uncle of the defendant)

- ➢ He works in landscaping and lawn service.
- ➢ He is illiterate. It appears illiteracy is prevalent in this family.

### Family Constellation:

- ➢ Thomas Carter, the defendant's father
  - o Irving and Thomas grew up together, and Irving introduced Thomas to Mary, something he now regrets.
  - o Thomas thought he was Bruce Lee. He did karate all the time. Sometimes he would get mad if somebody looked at him, and he yell at them and appear as if he was going to strike them.
  - o He was in the Army and at some point was sent to Leavenworth, reportedly for using karate on a commanding officer.
  - o Reportedly checked himself into a mental hospital to "get himself together."
  - o Worked for two or three days at a time, and then lost his jobs.
  - o Heard that Thomas used drugs, but he does not now for sure.
- ➢ Debra Green, the defendant deceased aunt
  - o She went to a "disturbed home" before she died.
  - o One time Debra kept saying her name was "Showtime" and she would put a spell on people. She walked around the house looking wild and zombie-like.
- ➢ Irving knows little of Thomas' family. He does recall that Thomas' father was quiet and stared a lot when spoken to.
- ➢ Willie Valentine, Irving's nephew, has a mental health history and has been hospitalized.

Dr. Goodness & Associates                                              Matter: Green, Gary

## Defendant's Mental Health History / Bizarre Behaviors:

➢ Irving always thought Gary had mental health problems. He tried to tell Mary that Gary needed help, "but she didn't want to hear. Nothing wrong with my baby or something like that."

➢ "He used to say he was stressed out a lot" about his life in general.

➢ Gary had a number of bizarre behaviors that started in childhood and continued through adulthood:

  o He often stared off into space when they were talking.

  o He often had the same wild, zombie-eyed staring that Irving saw his sister, Debra.

  o Conversationally, he would change the subject frequently, and often the things he said made no sense.

  o "He was like real strange." Sometimes he would laugh for no reason, and when asked about it he would say he was thinking about something.

  o He often talked to himself, and when asked about it he would explain that he was "thinking out loud."

  o He would take off and nobody would know where he was. One time Gary wanted Irving to accompany him to Gary's mother's house. He left Irving at Mary's house and came back the next day, never telling anybody where he went or why.

  o When asked why he did bizarre things, he would stare at Irving or even laugh. "That was just him."

## Defendant's Occupational History:

➢ Believes Gary had a hard time holding a job because he was not good with people and angered easily. If somebody said something upsetting to Gary, he would get overly angry.

## History of Violence:

➢ Once while at Bertha's house watching TV, Gary assaulted Jennifer for no reason. He got up to get himself something to eat, and then just went off on her. His speech did not make any sense. Irving had to physically get him off of Jennifer when Gary was choking her. Gary tried to choke Irving as well. There was no clear reason for why he aggressed.

  o A month or so later, he tried to strangle her with a shoe string and he went to prison for this.

➢ Once while joking with Gary about a haircut, Gary jumped out the car. He did not wait for Mary to stop the vehicle, he simply jumped out. He picked up a stick and came back to the car, hitting Irving with it. After that, Irving did not joke around with Gary, fearing somebody would end up hurt.

Dr. Goodness & Associates                                          Matter: Green, Gary

### Trial Issues

> He has no interest in testifying at the trial and will be happy to just "sit back and watch." He initially stated he was worried about being for harmful than helpful, but even without that concern he does not wish to testify.

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Arron Green, the defendant's maternal uncle**

**July 9, 2010 – Frank Crowley Courts Building**

**The State of Texas vs. Gary Green**

---

### Arron Green's Background

- Arron has sought mental health treatment for himself. After an MHMR evaluation, the doctor "assumed I needed some sessions." He did some sessions and believes this helped him get off the criminal path.
- Sexually abused by an adult woman when he was six years of age.
- He served eight years in a federal prison for robbing armored cars. Prior to that, he received five years probation for pulling a gun on two guys in a fight outside of a gym.

### Cultural Implications of Mental Illness

- Most people in the African-American community do not address mental health issues.
- "Nobody wants to be labeled as crazy."
- He does not equate this with a perceived lack of intelligence or a weakness, just not something people want to admit or accept. "Just lots of denial."
- As he has aged, he has seen a shift in the acceptance of mental illness in the African-American community, but it is still a taboo of sorts.

### Family Constellation

- Family history of mental illness and/or tragedy
  - Uncle Billy Ray Harper was shot by police during a robbery.
  - Uncle Joe Calvin Harper was killed in a hotel while selling drugs.
  - Uncle Louis Harper was killed by drug dealers in West Dallas.
  - His brother killed his wife and then committed suicide.

Dr. Goodness & Associates                                              Matter: Green, Gary

- o His oldest son receives services through MHMR for depression. Arron believes this likely started at an early age, and he wishes they had sought treatment sooner. His son is prescribed medications.

- o "The older I got, the more I started looking at our family background" regarding mental illness. He began to wonder about the generational effects of mental illness based on what he saw in his father's family and wanted to find a way to head this off for his own children.

➤ His mother had 10 children. Three children are from one marriage, and four are from another. Some children were successful and became college educated. Others did not. Many have some form of mental health problems, even though not formally diagnosed.

➤ "There's a lot of hurt people" on both sides of the family.

➤ Mr. Green has four children, ages 19-28, and he keeps a close eye on his children to make sure they do not have the problems he did.

## Gary Green Background

➤ Arron did not spend much time with Gary growing up because of the way the family was divided based on multiple marriages. He has only seen Gary three times total in his lifetime.

➤ The last time Arron saw Gary, he had rented a car for Gary. Gary took off with the car and Arron was stuck with a $500 bill. This was upsetting to Arron because this was an effort to get back into Gary's life.

➤ Mental Health History

- o "It was brought up" that Gary had some mental health problems. Arron thought something was wrong with Gary, but he never questioned it and kept his distance.

- o He never observed any bizarre behaviors.

- o Arron spoke with Mary about Gary's mental health after he was arrested and Mary mentioned a time when Gary wanted to jump off of a school building.

➤ Personality

- o "He kept to himself a lot." Arron assumed this was because of the division in family. When visiting Mary, he did not see Gary around the family and believed he chose to distance himself.

- o "There was a lot of things going on with him."

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street<br>Keller, Texas 76248 | (817) 379-4663<br>Facsimile (817) 379-0320 |

**Collateral Interview Summary – Bertha Curry, the defendant's maternal grandmother**

**July 9, 2010 – Bertha Curry residence**

**The State of Texas vs. Gary Green**

---

### Bertha Curry Background

➢ She currently takes a host of medications, including Lexapro, Clonidine and Meloxicam.

➢ She was married twice, to Irving Green and James Jones. Mr. Jones had high blood pressure and frequent nosebleeds, and doctors said he was at risk for a stroke.

### Family Constellation

➢ Leora Carey – Ms. Curry's mother. She had nine live births, and six miscarriages. Her husband, and Ms. Curry's father, is Leroy Robinson.

➢ Debra Jones – Ms. Curry's daughter

  o She used a lot of drugs, such as wet and marijuana. She died of a heart attack at 42 years of age.

  o Debra had been treated at Vernon State Hospital in 1997 or 1998. She was there for 12 – 18 months.

  o She believed that people were taking pictures of her through the television or alarms sensors. She said the other people were naked and were trying to get her to be naked as well.

  o Police officers kept an eye on Debra because they knew Ms. Curry and looked out for her family. She told the police that her daughter wanted help and needed to be picked up, but she did not want to call the law on Debra for fear it would damage their relationship. The police took her to Vernon.

Dr. Goodness & Associates                                        Matter: Green, Gary

➢ Mary Sampson – Mr. Green's mother and Ms. Curry's daughter
   o She did not like Ms. Curry telling her about Gary or her own life problems, such as being married to abusive Thomas Carter.
   o Relationship with Thomas
      ▪ They met right after Ms. Curry's husband died from high blood pressure. Thomas' parents lived down the street from Ms. Curry. His parents had kicked him out of their home and he began sleeping at a washeteria in the neighborhood, which is when he met Mary.
      ▪ Mary liked that Thomas' eyes looked Chinese. Thomas thought he was Bruce Lee and tried to use karate on people.

➢ Thomas Carter – Mr. Green's father
   o He enlisted in the army, and very quickly attacked his commanding officer via karate. He may not have even completed basic training. He was dishonorably discharged and sent to Leavenworth.
   o When he returned from Leavenworth, he and Mary got back together. Ms. Curry told her not to, but she did not want to leave her husband.
   o Ms. Curry always believed him to have mental problems. He had some bizarre behaviors.
      ▪ He would do karate moves in the street. He tried to teach karate to the younger guys.
      ▪ She suspected he used a lot of drugs. Often "his eyes were dangling and he was acting crazy." He would tell the kids around him in the neighborhood to try LSD. She believes he used LSD, angel dust, cocaine and whatever else he could get.
   o He did not do well keeping a job. "He did a lot of hustling." He was lazy.
   o He "beat the daylights" out of Mary. Gary told Ms. Curry that Thomas would "whoop the daylights out of him or throw him by the collar across the room."
      ▪ Before the children were born, Ms. Curry told Thomas that if he hurt her child again, she would hurt him. "He either needed to quit hurting her or quit her."

➢ Levenia Valentine – Ms. Curry's sister
   o Ms. Curry told Levenia that her children needed some form of psychological help.
   o Mother of Willie Valentine, Jr. and Robert Valentine.
➢ Robert Valentine – the defendant's cousin
   o Mental health history includes psychotropic medications and therapy.

Dr. Goodness & Associates                                                          Matter: Green, Gary

      o  Raped Ms. Curry's 2-year-old granddaughter when he was babysitting her. He was 14 or 15 at the time.

- Willie Valentine, Jr. is another cousin of Mr. Green with a history of psychotropic medications and therapy.

- Family Dynamics
  - o Gary did not like his father. He would not even go to his funeral.
  - o Ms. Curry does not have much contact with her living siblings. Of the six daughters, she speaks to three of them a few times a year. She prefers to keep to herself, and always has.

## Gary Green Background

- Relationship with the defendant
  - o "We got along great. Real great." (However, her later report indicates this was not the case.)
  - o When he was upset, she was able to calm him.
  - o Gary came around her house all the time. He would come by for his favorite foods, and she would tell him she would make his foods the next day to get him to come back. This was her method of keeping an eye on him.
  - o In the last five or six years, she would see him every six months or so. He called frequently, but avoided coming by because he knew his grandmother would be "on his case." Prior to the offense, he became more distant and she did not speak to him in the few months leading up to the offense.

- Mental Health History
  - o Ms. Curry has wanted to discuss Gary's mental health for his entire life. "Growing up, he was not a normal child. He was not normal when he was grown up."
    - Ms. Curry voiced her concern to Gary's mother when he was four or five, and Mary Sampson said that Ms. Curry was just "making fun of her babies." She did not want to hear what Ms. Curry had to say and did not appear concerned.
    - She talked to Gary about her concerns and he agreed that he needed help. He told her two or three years before his hospitalization that "if he could make up his mind he would go." He told her he needed to get himself together because he was hearing voices telling him to do things he did not want to do. She did not ask what types of things these voices told him, because "I was afraid of what he'd tell me and I didn't want to get

Dr. Goodness & Associates                                        Matter: Green, Gary

depressed." He was afraid if he went he would be given too much medication and not be able to remember anything.

- ▪ After his second incarceration, he began acting much worse. He did not want to have any contact with his family. He wrote letters to his family saying he did not want contact with his "so called" grandmother anymore.

- o Suicidality / Homicidality
  - ▪ He first mentioned suicidality at three years of age when he was tired of seeing his father abusing his mother.
  - ▪ He frequently mentioned wanting to kill himself.
  - ▪ He often mentioned wanting to kill people.

- o Bizarre behaviors
  - ▪ She set the yard on fire to get rid of the snakes that had infested her backyard. Gary would go out to the hole where the snakes were, and he would bite the heads off the snakes. He would come into the house with the head of the snake dangling out of his mouth, telling Bertha that the snakes were nice and were his friends.
  - ▪ After beating Jennifer, he hung her from a tree in the cemetery.
  - ▪ "Quite a bit" of times when he would shift topics when talking. She thought he was trying to throw her off because he did not want hear what she was saying.
  - ▪ "All the time" he said things that did not make sense.
  - ▪ He often laughed for no reason or at times that did not make sense to those around him. When she would ask him about this, he would say he was thinking about funny things that had happened before.
  - ▪ Frequently talked to himself, telling "this dude to leave me alone." Several times Ms. Curry came into his bedroom thinking he was having a nightmare, and he was telling somebody to leave him alone. He said there was another person in the room. "He used to scare me talking to other people" that were not actually in the room.
  - ▪ He prefers to keep to himself, much like Ms. Curry.

- o Paranoia
  - ▪ He always thought people were after him.
  - ▪ If somebody was looking at him, he would get upset and make comments about hurting the person.

Dr. Goodness & Associates                                                    Matter: Green, Gary

- Until the day Thomas Carter died, Gary was worried that his father would kill his mother.

➢ Childhood and Adolescence
  - o Thomas Carter tried to kill Mary Sampson when Gary was a young child. Gary saw his father throw Mary off a balcony and choke her while she was pregnant with Nysasno. He also saw his father strike his mother.
  - o He began dating Jennifer when they were in high school.
    - Ms. Curry warned Jennifer that she should not date Gary because he was "a troubled child and always wanted to kill himself or somebody else."
    - He "beat the tar out of her" and went to jail for that.
    - She went back to him when he was released from jail, and he tried to kill her again. She went back to him numerous times, even after Ms. Curry admonished her.

➢ Adult Social History
  - o For awhile in 2004, he was living with the mother of one of his sons.
  - o Lovetta, his wife
    - He was in a relationship with another woman when he married Lovetta. He told Ms. Curry that he did not want to marry Lovetta and she was constantly pressuring him. He was "supposed" to be marry the other woman he was seeing.
    - Ms. Curry told them to get some form of marriage counseling after hearing Gary talk about all of the problems in the marriage.
    - Lovetta came to the house before and after Christmas, spending time with Ms. Curry and taking lots of pictures of herself with the family.
    - Gary did not like Ms. Curry treating Lovetta's children like they were her real grandchildren. He admonished her for feeding Loretta's children when she fed the others.

➢ Substance Abuse History
  - o He smoked cigarettes all the time. When he was upset, he would smoke more and this was a gauge of how upset he was.
  - o Gary drank "a whole lot" of beer.
  - o He used "a lot" of marijuana, smoking every day of the week.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street<br>Keller, Texas 76248 | (817) 379-4663<br>Facsimile (817) 379-0320 |

**Collateral Interview Summary – Rodney Haney, lifelong friend of the defendant**

**July 9, 2010 – Rodney Haney residence**

**The State of Texas vs. Gary Green**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Rodney Haney Background
➢ Recently laid off from Pet Smart.
➢ Currently separated. Previously married and divorced. Four children in total.

## Green Family Constellation
➢ Mary Sampson – mother
➢ Thomas Carter – father
   o Suspects a "way bad" drug problem because he was homeless at times. Rodney was with Nysasno and Gary when they would pick him up at other people's homes, get him fed and take care of him.
   o His nonsensical speech was worse than Gary's.
➢ Nysasno – brother
   o Rodney sees Nysasno every day. They are close.
➢ Gary and Nysasno are nothing like, almost like "night and day." Nysasno is outgoing and family oriented, the type of person who would give the shirt off his back.
➢ Gary did not make a lot of time for his children.

## Gary Green Background
➢ Relationship with the defendant
   o He has known Gary for 25 years, since they were neighbors when Gary lived with Mary Sampson. They also worked together at Wal-Mart when Gary got out of prison.

Dr. Goodness & Associates                                                 Matter: Green, Gary

➢ Mental Health History

  o Rodney has always believed that Gary had mental health problems.

    ▪ After prison, Gary was not the same person and seemed even worse to Rodney. He was always on edge, easily agitated. Gary often raised his voice to let people know where he stood on things or when they had irritated him.

    ▪ He would smoke more when agitated, and that was a gauge of his mood. When he was chain smoking, Rodney it was bad.

  o "Weird, like he smoked some different kind of drug." He would be fun and congenial one day, and the next day mean and angry. They never knew what his demeanor would be like from day to day, and this kept people away from him.

  o Frequently mentioned being stressed about child support, probation or people who were after him.

  o He learned of the Timberlawn hospitalization from Nysasno, after the offense.

  o Bizarre behaviors

    ▪ He always felt that somebody was after him. Some people really were after him because of his past illegal activities.

    ▪ Often stared off in space, as if he was in deep thought.

    ▪ Often said things that made no sense, but "you don't mind it or you don't question it. You don't want to get into a conflict with him or he'd snap off on you. You knew his demeanor." Many people had this experience and would not question him or point out that he made no sense out of fear of his reaction.

      • Their mutual friends would discuss his odd behavior, wondering what was wrong with him or what drugs he was on. Everybody assumed he was on drugs. "Based on the way he acted, it seemed like a person who was on drugs. One minute he's one way, and then he'd just flip."

    ▪ Conversations could quickly switch from intelligible to nonsensical.

➢ Occupational History – Wal-Mart

  o He did not do a "great job" at Wal-Mart.

  o He started off as a stocker and worked up into management. Gary did not relate well to the people he supervised. His height and weight were intimidating to others, and his general approach was gruff.

- o Depending on the staffing, he would have to stock the shelves, clean up or other tasks. He was slower than others at tasks, but he always got the job done.
- o He struggled to acclimate to new tasks or procedures.
- o Gary quit Wal-Mart for no reason. The store manager liked Gary so much that when Gary quit, the store manager sent Rodney home to talk to Gary to convince him to come back. He would not go back, regardless of Rodney's arguments about his future. He offered no reason for why he would not go back. The store manager was disappointed.

➤ Childhood and Adolescence
- o "Gary was always kind of different" as a child, like he had a "harder core" than others and had something to prove.
  - ▪ In one incident, a mutual friend said something about Gary and he "exploded." It took several people to calm him down and prevent an all out fight.
- o He did not have many friends in the neighborhood or at school.
- o Rodney never observed behavior bizarre in Gary as a child or adolescent. He was a quiet kid, but not strange. The bizarre behavior came later.

➤ Adult Social History
- o Suhlonda
  - ▪ They met at Wal-Mart, where they both worked. Gary had two children with her, and they lived together briefly.
  - ▪ Rodney warned Gary that Suhlonda was "trouble."
    - • She is not mentally stable. She sucks her thumb. Conversationally she is "like a fifth grader."
- o Jennifer
  - ▪ He dated her and cared for her a lot. They were together every day.
- o Rodney never met Lovetta. Gary did not bring Lovetta around and did not come around after he married her.

- o Always had some number of women he was "working." He would brag about his conquests. He never mentioned any problems with his girlfriends.
  - ▪ In general, Gary is possessive with of the people he dates.

- o He did not have many friends and mostly kept to himself. People in the neighborhood knew not to mess with Gary or they would "get fucked up." This

was not based on a history of people causing him problems, but people were naturally intimidated by his stature or the looks he would give.

➢ Substance Abuse History
  o Gary never mentioned drug use to Rodney.
  o They would drink three or four beers after their overnight shifts.

➢ Criminal History
  o "He crossed the line quit a few lines" with his illegal activities.

➢ Offense
  o A few people who knew about Jennifer were not surprised by the offense, but by and large most of his friends, family and folks in the neighborhood were surprised.

**Trial**
➢ Rodney would testify if necessary.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street<br>Keller, Texas 76248 | (817) 379-4663<br>Facsimile (817) 379-0320 |

**Collateral Interview Summary – Stephanie West, the defendant's ex-girlfriend and mother of Cameron Green**

**July 8, 2010 – Telephone**

**The State of Texas vs. Gary Green**

**Impressions of this Witness**: Though she feels they had a significant relationship, her lack of knowledge about the defendant, his family and his actions suggest that she truly was one of the other women with whom he spent very little time, though enough to get her pregnant.

**Her Relationship with the Defendant**

- She met Gary in 2000. They met through a mutual friend. She was attracted to his personality. He was fun to talk to and understood her.

- Gary was sneaking around with her. She did not know this until the day she was giving birth, when Mary Sampson told her. She was "disappointed." He had not been living with her, but stayed in and out for a month or so when she first had Cameron. It was hard for her to let him stay there after she knew about the other women. He had nothing to say for himself.

- They stayed together for six months after Cameron was born in 2002. They broke up because he "refused" to help me with the baby. "I guess he couldn't do it or he refused to." He did not provide financially for Cameron. He changed the diapers and fed the baby. She was mad at first that he would not support his child, but she got over it "when I knew it was my child and I would have to take care of him."

- He was never abusive towards Stephanie. She never saw him become violent towards any other person.

- Currently, she does not have much contact with Gary. "I feel sorry for him. I didn't think he would do anything like that. I don't know what pushed his buttons to make him do that."

- She has spoken with child support people after he was first arrested.

Dr. Goodness & Associates                                                        Matter: Green, Gary

### Family Constellation:

- ➢ Cameron, the defendant's son
    - o  7 years old and in the second grade.
    - o  She has never suspected any mental health problems. He has no learning problems in school, and in fact is "very smart."
    - o  Cameron does know LaJade, but none of Gary's other children.
    - o  Cameron sees Mary infrequently.
- ➢ She knew his mother, brother and stepfather. She did not know his extended family.

### Gary Green Background:

- ➢ Mental health history
    - o  She never suspected he had mental health issues. She never observed him speaking to himself or other bizarre behavior.
    - o  He sometimes changed the subject for no reason while they were talking, but this was not frequent. His conversations made sense to her.
    - o  When time to go to bed, he would stay up until 2 or 3 in the morning and get up around 7 or 8. When sleeping, he would jump up and down like somebody was in sleep or having nightmares.
    - o  "All the time" said he was stressed out. She is not sure, but thinks he may have been stressed because he did not have a job and was socially isolated.
    - o  Stayed to himself a lot.
    - o  He spoke of being depressed, but not killing himself.

- ➢ Substances
    - o  He smoked marijuana when they were together. It was not much around her, because she did not like it around her.

- ➢ Social History
    - o  She never knew him to be around males or have male friends.

### Trial:

- ➢ She has not been contacted before today.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

---

121 Olive Street                                              (817) 379-4663
Keller, Texas 76248                                 Facsimile (817) 379-0320

---

**Collateral Interview Summary – Lenell Williams, the defendant's ex-girlfriend**

**July 15, 2010 – Telephone**

**The State of Texas vs. Gary Green**

---

**Impressions of this witness:** She can be used to establish that he was asking for help in the weeks leading up to the offense.

**Lenell Williams Background**

➢ Bad back, bad knees. Hysterectomy in March. Auto accident in April.

➢ SSDI.

**Gary Green Background**

➢ Relationship with the defendant

   o She met him at her sister's birthday party. He was working at Wal-Mart at the time. They talked and played dominoes. They had similar interests, such as not drinking much (at that time) and not going to clubs.

   o They "got into it" over her children. He would tell her what she needed to do about the children, but never offered to actually help her.

   o She was a sociable person and he was not. He did not socialize with her family, and when she would visit them in East Texas he would complain that she was gone too long or too much.

   o Never mistreated her.

   o She still cares for him. They write one another and she still visits him. "No matter how we break up, we was always friends."

   o After they "broke up," Gary often called her at night, whispering, or from a pay phone to talk to her. He said that Lovetta would get upset about him talking to Lenell.

Green, Gary - Collateral Interview - Williams, Lenell- 7-15-10                    Page 1 of 3
3/30/2011 9:36:00 AM

Dr. Goodness & Associates                                    Matter: Green, Gary

➤ Gary's Personality

    o He is quiet. Mostly kept to himself.

    o Things would "stress him out" and he would get real quiet. He would say he was stressed and go to his room, keeping to himself.

➤ Mental Health History

    o Lenell believes Gary has always had some form of mental illness.

    o Reported stress

        ▪ Sometimes she would be worried about him having a mental illness when he got stressed or overly quiet. She told him he needed to see someone because he was "always" stressed out.

        ▪ He would often call her at 3 a.m. and talk about being stressed about life with Lovetta. Lovetta did not clean or help around the house, and she left him to take care of her children while she was out at the clubs.

        ▪ Two years ago, he called her after they had not spoken in a year. He told her was "so stressed" about his relationship with Lovetta, and that he needed to get help or he did not know what he would do or what would happen.

    o Treatment

        ▪ Once told her he was going to check himself into a hospital "because he just didn't feel right and couldn't get away."

        ▪ She believes he did go to the hospital, but Lovetta came and checked him out.

    o Bizarre behaviors

        ▪ He would talk about needing to get away, and when she asked what he needed to get away from, he said he wanted to make sure nothing (presumably Lovetta) was going to harm Lenell.

        ▪ He does not like people speaking continuously.

        ▪ One time had a conversation with his dead aunt.

        ▪ She has seen him talking to himself, though she did not understand what he was saying. She observed this "not very often," but "sometimes quite a bit."

- He is afraid of vampires. He told her when they met that a vampire followed him home and he had to abandon his bicycle in the trails behind his house.

- He would talk nonsensically. She does not remember specific instances, but knows he said things that did not make sense.

- He was always writing things. She did not read what he wrote, but he always wrote. Sometimes he would make lists, or write stuff out of the bible.

- He reads the bible a lot and now writes her things out of the bible.

➢ Lovetta, the defendant's wife

o Lovetta called Lenell's house several times after she learned Gary was calling her. Every time she called, Gary was not actually with Lenell. "She was never nice to me."

o One or two months prior to the offense, Lovetta called at 3 a.m. When told Gary was not at Lenell's, Lovetta started asking about other women. She hung up after saying "I'm gonna show you bitches."

- Lenell asked Mary to tell Gary to tell Lovetta to stop calling her house and harassing him. Mary said that Lovetta was calling other women as well, asking if Gary was with them.

- Gary never did tell Lenell where he was on that particular night, and said he would "take care" of Lovetta calling.

- Lovetta said that she believed Gary and Lenell were just friends, but she texted Lenell two days later to say that she and Gary had just had sex.

o Two or three weeks before the offense, Lovetta told Lenell that she would call Gary's parole officer if he did not come home. She did not care that he was not at Lenell's house, but wanted her to deliver the message anyway.

o Several times he tried to leave her, and Lenell thinks Lovetta drove him over the edge.

➢ Substance Use History

o Drinking or drugs were never a problem for him. "If Gary did something like that, it was never around me." She heard about his drug use, but did not see it.

➢ Offense

o Gary called Lenell while she was in Houston and begged her to come and get him or he would have to have himself locked up. He told her to come as soon as she could to get him. The following Sunday, Mary called Lenell to tell her about the offense.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

121 Olive Street                                    (817) 379-4663
Keller, Texas 76248                          Facsimile (817) 379-0320

**Collateral Interview Summary – Tony Mitchell, the defendant's childhood friend,**

**August 20, 2010 – Telephone (214) 808-1466**

**The State of Texas vs. Gary Green**



- Mr. Mitchell when they were 17 or 18 years old. They did not have a lot of contact, as Mr. Mitchell went away to the Navy at 19 years of age. He saw Gary again approximately three times between Gary's prison confinements. Mr. Mitchell sat in the car and visited Gary about five minutes each time, so there was almost no contact.

- As adolescents, they mainly played basketball together. Gary did not speak much.

- Gary was "gangsterish" and "was one who would really do something to prove something." He was notorious for fighting and people saw him as "the enforcer." Mr. Mitchell never saw him fight.

- Mr. Mitchell described Gary as being like "whoever he was hanging with." If he hung out with pimps, he was a pimp. If he hung out with gangsters, he was gangster.

- Tony always felt like he was more "a wannabe" than a true gangster *because* his mother was so nice and sweet. She was one of the few mothers in the neighborhood that the children really respected they would say "yes ma'am" and "no ma'am" around.

  - He feels Gary's mother really tried with "those boys," but you could see the stress on her face.

  - She would allow certain boys such as Mr. Mitchell to come by and get Gary, but others she would tell he was not at home when they knew he was.

- He never saw him talk to himself, but he quoted rap songs all the time.

- He only knew of one girlfriend and believes the defendant beat her.

- He could not be predicted. He would be smiling one minute and "go the extreme other way next." He changed on a dime.

- Most all of the guys they grew up with have been to prison. This is why Tony went to the Navy.

  - He is extremely grateful that his mother, who was one of 16 children, helped to keep them out of extreme poverty and trouble. He goes on describe how his

Green, Gary - Collateral Interview - Mitchell, Tony - 8-20-10kg                    Page 1 of 2
9/13/2010 9:48:00 AM

Dr. Goodness & Associates                                    Matter: Green, Gary

mother kept him with her when she would go to church or anywhere else to keep him from running the streets in their bad neighborhood. That was necessary if you were not going to end up in prison in that neighborhood. (NOTE: *Could use him to show how bad the neighborhood was and what it would take to get out. Problem is, he believes Green is such a bad man he would provide a lot of bad information about him too.*)

o Keith Perkins was one of Gary's heroes and he was one of the baddest dudes. He's in prison now.

➢ He tried to get Pastor King's cell phone for me, but after he tried stated that no one is ever able to get a hold of him unless you fill out a request slip and then he calls you in for an appointment.

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Corey Foster, the defendant's childhood friend,**

**August 20, 2010 – Telephone (972) 201-4487**

**The State of Texas vs. Gary Green**

---

- Has known Gary since he was 12 years old. However, has very little information about him because "we both started doing our own thing when we were 16 or 17" and Mr. Foster was incarcerated for the last 17.5 years. He has only been out of the pen for 30 days. *(**Note**: Can use him to establish many/most men go to prison in that disadvantaged hood...rite of passage.)*
- They were neighbors.
- Nysasno and Gary were completely different people.
  - o Nysasno acted like a normal kid and Gary did not.
  - o Gary stayed to himself and "acted strange." He would not hang out with other children but would come and play group sports.
- Corey never observed bizarre behavior or nonsensical talk.
- Saw Gary get into fights with "just different guys in the neighborhood" as you never knew what would make him mad. "He's hard to figure out" as to what would set him off. He was a very angry person and no one knew why. He would fight with his stepfather.
- The most noteworthy thing about Gary is that he never said much of anything at all.
- Never saw him use drugs or talk to himself.

# *Dr. Goodness & Associates*
### *A Clinical and Forensic Psychology Practice*

---

| | |
|---|---|
| 121 Olive Street<br>Keller, Texas 76248 | (817) 379-4663<br>Facsimile (817) 379-0320 |

**Collateral Interview Summary – Karen Knight, Mr. Green's former probation officer**

**August 20, 2010 – Telephone**

**The State of Texas vs. Gary Green**

---

- Ms. Knight only supervised the defendant for three weeks. Lottie Tucker turned his case over to her when she got sick.
- Saw once in the office and once at home, but did not go into the home.
- Ms. Knight got lost, called the house and Lovetta put him on the phone to explain directions. Gary then went outside and met Ms. Knight. She had no concerns about his functioning at the time she met with him, and claimed that it is normal for parolees to come outside to meet her at the car.
- She mostly noted that he was "awful quiet," but Lottie had told her that he was.
- He always made sense.
- He told her just left Green Oaks hospital, but did not tell her left against medical advice. She told him to go to MHMR and she was in the process of referring him for the mental health caseload because he had gone to Green Oaks. She cannot recall whether or not *she* thought he needed to go on the mental health caseload because she did not know him long enough.
- **Lovetta never called her with concerns, but Lottie told her the wife had called several times with complaints and concerns. Lovetta told Lottie she was having to put him out.**

# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Shirley Coleman, the defendant's maternal aunt**

**August 20, 2010 and August 23, 2010 – Telephone**

**The State of Texas vs. Gary Green**

------------------------------------------------------

<u>*Note:*</u> *Ms. Coleman sounded mildly manic during one of the interviews... She needs an in-person interview, especially if you will use her at trial. She establishes that the family is filled with mentally ill folks, folks with substance abuse problems and folks with legal problems. She knows of several murders or murderers in the family. She establishes Mary's significant denial as a parent.*

### Shirley Coleman Background

➤ Shirley's husband is in prison.

➤ Shirley works at the florist that Gary worked at and she will ask Abraham Mundane, Gary's supervisor, to call me. He is retired now but lives down the street from her. They recall that he called in and quit, stating that he didn't want to drive the company truck because people were trying to run him over in the company truck.

### Gary Bess Childhood

➤ Mary did not teach her boys responsibility. They had no discipline. She would believe anything that Gary said, even if he told her the sky was falling. She never whipped them and had no rules.

➤ Mary had marital problems with her current husband and left him in 1984 or 1985 and stayed with Shirley for one week. Mary did not like the rules in Shirley's house and left. Her marital problems may have been related to Gary's behavior problems.

➤ An example of Mary believing anything and not paying attention to her children comes from when Nysasno stole a car at age 14. He told his mother it was loaned to him by a friend. Shirley tried to tell Mary that nobody is going to loan a 14 year old a car and leave it sitting in front of a house for three days. Mary said she did not think there was anything wrong with it, but in the end found out it was stolen.

Dr. Goodness & Associates                                                    Matter: Green, Gary

## Gary Bess Adulthood

- ➢ Gary lived with her for six months after his second time in prison.
- ➢ Her husband helped him get a job at Wal-Mart, though her husband only worked there "for a minute."
- ➢ Living together went fine. Gary did not like that she locks the door at 10 p.m. weeknights and 11 p.m. weekends, but they did not argue about it. She also would charge you $5 if you left the light on all night long so as to teach responsibility.
- ➢ Shirley is a no nonsense kind of lady and she would not allow Gary to bring some "of his people" to her. For example, she wanted nothing to do with LeNell, who was too old for Gary. She saw LeNell as an "autistic" person who functioned at the age of a 20 year old. She "just ain't normal."
- ➢ She never met LaJade's mother.
- ➢ Suhlonda was young when she and Gary met. Shirley thought Suhlonda was "crazy" and had something wrong with her, but she seemed happy with him. Shirley told Gary that he could not bring Suhlonda to her house anymore.
- ➢ She never met Lovetta, but spoke to her on the phone and she was very nice.
- ➢ It was Shirley that got Gary to tell where he was to turn himself in.
- ➢ The only time she thought he had mental health problems was when he got out of prison and started claiming his name was something different, but perhaps that's because he's Muslim.
- ➢ "I don't think for one minute he had mental problems."
- ➢ She does not "care what," Gary's actions are unexplainable and inexcusable.
- ➢ When he was in prison, he wrote Linda Hill to complain that none of the family were visiting him and that they were no longer his family.

## Bertha Curry, the defendant's maternal grandmother

- ➢ Shirley stated that her mother was just like Mary and had no rules in her home. That is why Shirley has not allowed her mother to have any hand in raising her children and does not allow them to go to her home.
- ➢ She does not like her grandchildren going to her mother's house.
- ➢ Shirley's mother says crazy, crazy things...said that Shirley's oldest son was her mother's husband's child.
- ➢ Shirley's family does not know where she lives, not even her mother. She talked to her mother the other day, but appears to have limited contact even via phone.
  - o She last visited her mother's home the other day to bring her mother some toiletries "because her face is so messed up" with something.

Dr. Goodness & Associates                                    Matter: Green, Gary

> Shirley does not remember anything about snakes in the yard. Her mother says "crazy stuff" all the time. **She has said that Linda wrote songs that are put in her head to sing at their funerals and that her dead children are communicating with her.**

> Bertha does bizarre things: When a family member had a baby in the hospital, Bertha also claimed to be pregnant and took some liver and threw it in the toilet. She told her husband that was their baby. Her then boyfriend, who later was her husband's, whose wife was at the hospital having their child when this happened, and she pretended to be having her own baby. Shirley does not know why her mother does this, but she has been this way all Shirley's life.

> Shirley's sister had to take Shirley out of her mother's house once because her mother was bashing her head against the wall for disagreeing with her.

> When Shirley was 10, she was raped by her mother's husband's brother (George "Red" Curry), who was her also aunt's boyfriend, who was on a prison furlough from Seagoville. When she told her mother, her family took her to Parkland and told her to say that she was raped at a party by an unknown man. Her mother beat her when she wanted to tell the truth.

> Bertha will act as if whatever is happening in other's lives is also happening in hers, such as high blood pressure, carpal tunnel, etc. "Whatever is wrong with you is wrong with her."


**Family Constellation**

> Sister died on drugs - Deborah.

  o When Deborah was arrested (which was often), she would use other family member's names instead of her own.

  o At some point, Shirley was on probation for something Deborah did involving breaking into an apartment in the complex where Shirley lived.

    ▪ Bertha made Shirley take Deborah's heat.

      • Her mother said that Shirley needed to go ahead and go to jail for Deborah because Deborah had been in enough trouble and had children to care for.

      • Shirley's mother said she would care for her children while Shirley was in jail, but did not.

      • Deborah lived in Shirley's home while she was in jail!

    ▪ This kind of behavior is what made Shirley stop hanging around her family. They are bad news. Other examples of why she stopped seeing family:

      • Her brother is in prison now. He broke into Shirley's house with their brother (James Jones and Irving Green), and she put them in prison but took much criticism from family for doing so.

Dr. Goodness & Associates                                    Matter: Green, Gary

- LaQuisha, Shirley's niece and Deborah's daughter, was living in Shirley's sisters house with her boyfriend after her sister died. Her boyfriend was selling drugs out of the house. Shirley wanted her niece out of the house and told the family, but the family did not want them out of the house. Shirley called the landlord. The family was angry at her for this, and accused her of wanting to "run everything" and being nosy.

- Let another sister live with her when Shirley got out of rehab, after her sister's family had burned her or set her on fire or something (we did not understand this story....). Her sister was using drugs in the house. Shirley did not want this in her house and told her mother that she was putting her sister out. Her mother "cussed me out and called the police on me."

  o The police came out and intervened, and Shirley had to appear before a judge. **She got in so much legal trouble because of her family that the judge advised her to avoid her family.** It's hard to stay away from her mother and her family, but her family uses drugs, all have mental problems and they try to make her look bad.

➢ Five years ago, her sisters Mary and Deborah claimed being raped by their father. Shirley is angry about these outcries because the sisters waited until after their father was long dead. She does not know if the abuse occurred or not, but knows she did not get abused.

➢ Aunt Pauline said that if anything happened to her, she wanted Shirley and her husband to care for her rather than being sent to her own sister's house (Bertha).
  o "She was serious and crying."
  o Shirley ended up caring for her when she had alzheimers but ended up accused by the family of elder abuse....., but Pauline's lawyer new about the family and intervened.
  o Pauline ended up in a nursing home up the street from Shirley's house.
  o Shirley's family tried to put her in jail for taking Pauline's money and abusing her. Pauline's lawyer intervened because Shirley did have power of attorney and was using her aunt's money for her aunt's care.

➢ Deborah, Linda and James Jones Jr are Bertha and James' kids
➢ Mary, Irving Ray Green, Diane Green – all from Irving Linda may also be Irving's child, but they do not know.
➢ Diane was stabbed 49 times by a man who tried to take her money. Prostitute
  o Diane had two girls.

Dr. Goodness & Associates                                              Matter: Green, Gary

- Montrece is not known to use drugs. She has never held a job because "she do what she do, just running the streets and living off men."
- LaQuisha does use drugs.

➢ Deborah died from drug use. She knew using crack may kill her, and said that since that was how she lived, that was how she could die.
  o Deborah's children did not go to prison, but had drug problems.
  o CPS removed the children from the home.

➢ Shirley's children have been to college and own homes.
  o They do not associate with the rest of the family.

➢ June Booker was Bertha's third husband. Fourth was D.J. Curry. Matt Sebastion was fifth, and she married him in the backyard.

➢ James Jr. told Shirley that he burned somebody and did not want her to tell anybody, but she said she could not keep that secret and told his mother.
  o He said it was a gang fight at a party. The victim had already been beaten and left on the ground, and James shot him. He is now in prison for murder.

➢ Irving's children: two that Shirley knows of, but he claimed not to know if his kids were his. Tina and Dafanyer Green.


➢ Dalon has recently been attributed to Ray.

➢ Nysasno -Shirley has never seen him doing drugs. He seems "pretty stable" to her.
  o He has a wife his mother cannot stand.

➢ Shirley estimates that "all" her family has some form of mental illness. They do not do "normal stuff," many get checks for some kind of illness and most do not function right.

➢ Louvenia Valentine has a "crazy drunk ass family." She has four sons. Three of the sons collect checks and still live with Louvenia.
  o **\*\*Shirley will get Louvenia's phone number and call the office with it later today, as well as other family members (Patricia, Thelma).**

➢ Thelma has two daughter with "something" wrong with them.
  o Two of her grandchilden also have something wrong with them, like their mother Kate. Shannon has had CPS in her life "so many times" and "anything that ain't right, she does it."

➢ Shirley has no contact with Gary's children.

➢ Patricia Newberry has three girls and one boy. The son is in federal prison for drug charges.

➢ Lucy had three children.
  o One son was murdered in 2005.

Dr. Goodness & Associates                                        Matter: Green, Gary

- o   One is in prison.
- o   Cedric lives near the family.

➤ Faye has three children. James, Demetria and one other girl. She left her children with a rapist. When he died, the family was told to come collect the children, but did not. She is now married to a man who recently got out of prison.

- o   Faye is "crazy like momma."

➤ His cousin Fran works in Lew Sterritt and had to disclose that he was on her floor.

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Margaret Young, the defendant's ex-girlfriend**

**August 31, 2010 – Telephone**

**The State of Texas vs. Gary Green**

---

## Margaret Young background

➢ She is frequently in court as part of a mentorship program

➢ She has been interviewed by the prosecution.

## Relationship with defendant

➢ They met in high school, when she was 15 years old. When they met, Gary was into sports rather than hanging out with the other kids and doing typical adolescent things.

➢ They were together for about 1.5 years, and their relationship ended halfway through her pregnancy with Darrius DeMarcus Young, her son with the defendant. The pregnancy was "just something that happened and we wasn't together after that." They broke up when she transferred to a different school.

➢ Gary did not do anything to help with Darrius before he was incarcerated or after. Gary's brother Nysasno saw Darrius a few times, but otherwise Darrius has had no real interaction with Gary's family. When Margaret tried to get court-ordered child support, Gary was already incarcerated. She has never received financial or other assistance from Darrius' father.

➢ He was never abusive towards Margaret

➢ Gary maintained some contact after prison, but no contact in recent years.

## Gary Green background

➢ When at school with Margaret, Gary did not hang out with other guys. He may have spent time with his track team, but she does not know.

Green, Gary - Collateral Interview - Young, Margaret - 8-31-10kg            Page 1 of 2
3/30/2011 9:37:00 AM

Dr. Goodness & Associates                                    Matter: Green, Gary

➢ "Totally shocked" when she found out about this charge and his other charges. She heard about the current charges from her family, who saw it on television. She read about the offense in the newspaper and told Darius about it.

➢ She never observed him using drugs or alcohol.

➢ She never observed any bizarre behavior.

➢ Family Constellation

  o Margaret saw Gary's mother every day after school until she was pregnant. Margaret's family lived near Gary. Mary Sampson was a "good mother" who baby sat state kids at her house.

  o When she lived in the area, it was "okay" and not bad. She moved away from the area when she was pregnant.

  o Darrius

    ▪ Darius has no mental health problems.

    ▪ Gary saw Darius when he was 14 years old, when Gary got out of prison and came to visit. That was the only time he saw Darius, and Darius was okay with that.

    ▪ Currently unemployed, but worked at Wal-Mart

    ▪ Expecting a child

    ▪ Looks like Gary. "He spitting image of his father."

  o Margaret has left it up to Darrius as to whether or not he has any contact or relationship with the defendant.

# *Dr. Goodness & Associates*
## *A Clinical and Forensic Psychology Practice*

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 379-0320 |

**Collateral Interview Summary – Dana Carter, the defendant's paternal cousin**

**September 10, 2010 – Telephone**

**The State of Texas vs. Gary Green**



Dana Carter, 36-year-old cousin of the defendant – Pearlie Mae's daughter – the defendant's paternal aunt's daughter

- ➢ Dana believes her mother may be upset by a telephone call if she is not warned. She asked that I return the call on Monday to get her mother's telephone number and her oldest sister, Sugeon Washington's, telephone number. She is going to visit her mother today to warn her of the call.

- ➢ Dana remembers Thomas. She saw him once or twice a year. She did not think he had mental health problems "just anger problems." She stated he had a bad attitude and would not let things roll of his back. What some people could ignore he couldn't. She had heard he had gotten violent and gotten into fights, but she never observed this.

- ➢ Dana met Gary when they were kids, but has little recall of him.

- ➢ Her mother practically raised Thomas in the country after their mother passed away early. Most of the family history resides with her mother.

- ➢ Dana has two sisters. The three of them have not evidenced mental health problems. She does not believe her mother has a mental health problem either.

# *Dr. Goodness & Associates*
### *A Clinical and Forensic Psychology Practice*

121 Olive Street
Keller, Texas 76248

(817) 379-4663
Facsimile (817) 379-0320

**Collateral Interview Summary – Lottie Tucker, the defendant's parole officer**

**September 10, 2010 – Telephone**

**The State of Texas vs. Gary Green**

---

> ➤ Ms. Tucker stated she does not have a file on the defendant.

> ➤ She stated the defendant never displayed any symptoms in front of her. He seemed to be intelligent and free of mental illness, though she believes he may have been a little depressed. She stated many folks would not like to talk about depression and thus she thinks it a possibility.

> ➤ She is surprised and shocked when this happened. One cannot predict human behavior, she never saw this coming.

> ➤ He did not want to work. She had to push him to get a job.

> ➤ His wife only called once. She did not say she was afraid of him or complain of anything. She did not want him to know that she called, but she was calling to see if he could move elsewhere without it messing up his parole. She was on Section 8 housing and he was not supposed to be living with her. She wanted him out only because of that reason. She was told by Tucker that he could move.

> ➤ Ms. Tucker is opposed to assisting with any mental health defenses, as she believes the defendant engaged in a premeditated crime spree.



# Dr. Goodness & Associates
## A Clinical and Forensic Psychology Practice

121 Olive Street                                                                (817) 379-4663
Keller, Texas 76248                                              Facsimile (817) 379-0320

**Collateral Interview Summary – Sarah Carter, the defendant's paternal step-grandmother**

**September 10, 2010 – Telephone**

**The State of Texas vs. Gary Green**

Sarah Carter, Thomas Carter's stepmother = step-grandmother of the defendant

➢ Ms. Carter does not wish to be bothered again in this case. She does not want to testify. She was very difficult to interview and provides few details. She stated that she is old and does not want to be bothered.

➢ She saw Gary many times when he was growing up because he lived in her neighborhood. Gary's behavior and persona reminded her of Thomas "all of the time." She could not provide any specifics.

➢ She was married to Thomas' father for fifty years. He died in 1993. She never believed he had any mental health problems. He was a truck driver.

➢ Thomas came to live with them when he was approximately 15 years old. He had been raised by his mother. She believes both Thomas and Gary had a poor childhood because they were raised in too many different places. She indicated that their upbringing was not good but did not wish to discuss it or say why she thought this.

➢ Thomas was a disobedient child. She would not give examples.

➢ Thomas talked to himself "all of the time."

➢ Thomas sometimes said bizarre or nonsensical things.

➢ Thomas was violent on several occasions, but she could not describe any of the occasions.

➢ She is a woman who is "filled with the Holy Ghost" and knows that both Thomas and Gary were "hurt in their hearts." She would not say what this meant.

➢ Thomas only had one sister, Pearlie Mae. She knows of no other siblings. Pearlie Mae did not have mental health problems. Pearlie Mae is dead. (This is contrary to what we've been told.)

The State of Texas v. Gary Green
Ennis, Texas; Sunday, September 26, 2010; 5:10 PM

Interview of Belinda Lacey

I was told he was up for capital; not planning on coming to trial unless I'm subpoenaed. I have no bad feelings toward him. We met in 1997 approximately.

I was working in the kitchen and that is where we met. I liked his seeming sense of well-groundedness; he painted a very good picture of himself as a responsible person. I didn't get to know a lot about him, even though I married him.

I worked there for about seven months because you cannot work there and date the prisoners, I gave my two-week notice because of Gary; I thought the relationship was serious enough. I did not even know how much longer he would be in prison. I visited every time there was visitation for one or two hours.

I worked at ADS in collections, and then I went to work for an insurance company. I would put money in his books but not because he asked me, though never over $100.

ADS went out of business in 2008 the city of Jacksonville. I was relocated to Ennis and that is how I ended up here. I lost my job on July 2, 2009. My mom moved in with us in 2003 and she is still with us.

He was never disrespectful to me.

When he got out in October 2000 he called me to meet him. I did want to go with him but in hindsight it hurt my career to go with him to Dallas; I had a difficult time while in Dallas.

We got married in October 2000 at his mother's house. I didn't think there was anything unusual about her; I admired her and she seemed a stronger person that I was. She seemed stable and appeared to have principles. His mother wanted him to be sure that he remembered that he was now a married man. I stayed with him until November, maybe December. He moved out much earlier than me. I was trying to get on my feet. I had nowhere to go.

I never thought he had mental health problems, never saw him talk to himself. No visions, no voices, no seeing things.

I tried to talk to him about God; he would listen and said it would be no problem.

He was never aggressive to me or to others.

I did not know what he was in prison for until I was subpoenaed. I learned it was for felony Robbery.

I don't know what other inmates thought of him.

I moved from Dallas on January 2001 and did hear from him; last I heard from him was maybe June.

Knowing what he is charged with makes me fearful. He is just not the person I thought he was. This is just horrifying. I don't have anything negative to say about him.

14



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13            STATE'S EXHIBIT NO. 1
14
15
16
17
18
19
20
21
22
23
24
25
```



STATE'S EXHIBIT

PENGAD 800-631-6989

TRIAL DOCKET - CRIMINAL DISTRICT COURT - DALLAS COUNTY, TEXAS

BAIL STATUS: JAIL

NO. F09-59380-YS

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN | ADA<br>Paul Johnson<br>214-761-0707 | CAP MUR MULT/HAB | 6<br>Oct 30, 2009 |

| DATE OF ORDER | ORDER OF COURT |
|---|---|
| 11/18/09 | Arrest |
| 11/20/09 | cont'd 12/11/09 |
| 12/11/09 | cont'd 1/08/10 |
| 1/08/10 | cont'd 2/11/10 |
| 2/11/10 | Adm Re: ∆'s decision to seek death penalty |
| 2/11/10 | cont'd 3/10/10 |
| 3/10/10 | pretrial, hrg'g pretrial |
| 4/15/10 | special setting 7/13/10 |
| 4/15/10 | cont'd 8/23/10 |
| 4/15/10 | D∆L cont'd 8/19/10 |
| 8/23/10 | voir dire 6 strongly resisted (Tues). State's challenge granted, 23 chancellor ∆'s 1 |
| | 88 Newman expld'd. ∆'s granted. agreed |
| 8/24/10 | 122 Christine ∆* 2 ∆ expld'd. agreed, 123 Melo agreed, 125 Coleman agreed, agreed, |
| | 205 Fryer agreed, 207 Choupper ... #4 |
| | 131 ... Mathis excused, 157 Parker excused, 255 Nixon excused ∆ - 32 Hall excused |
| 8/25/10 | 336 Rice excused |
| | 209 Mode agreed, 254 Currie excused, 247 Hartman #3, 157 Christine S* 1 |
| 8/24/10 | 159 Harmon excused |

BAIL STATUS:

TRIAL DOCKET .. CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

No. F-09-59230-S

01

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| v. GARY GREEN | | | |

ORDERS OF COURT

| DATE OF ORDER | |
|---|---|
| 8/30/10 | Wildine 638 ANISE SUMMER agreed, 575 DERICK ANTN KELLOGG Anise, 542 JESTINY |
| 8/31/10 | Duncan agreed, 607 Benjamin Birch Cause, 595 Antony Johnson agreed, 660 KEVIN KEIR A#3, 112 Judith Kay Peterson agreed, JAC Naomi KELLEY A#4, 700 SHAWN MATTHEW agreed, 704 Winterella Casstian Crews re-set |
| 9/1/10 | 943 ELIZABETH HERN agreed, 636 MAVIS JEAN FULTON agreed, 948 John Luis DEFILIPPO S#2, 942 Joshua Moline agreed, 955 Adolphus ALEXANDER agreed |
| 9/2/10 | 1055 FIDEL RUIZ Cause, 1051 ELIZABETH LOPEZ A#5, 1055 Lucille Padilla agreed, 1074 Jonathan Freeman claud excepted, 1078 Bobby Ray Williams agreed [signature] |
| 9/7/10 | (157) Gary Ray Siddling – ExcusedByAgrmt, 1045 Edie Marie Morenger – ExcusedByAgrmt (155) Terry Andra Walker – ExcusedByAgrmt, (135) Paul Olmerg – Excused By Agrmt (100) Cathy Young – Excused, (116) Jeffery R Visrozki – S#3, (127) Martha Naugle-Excused (128) Stephanie Scott – Excused, (195) Jaqueline Preston – ExcusedX |

TRIAL DOCKET ·· CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

No. F09-59380-YS

**BAIL STATUS:**

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN ✓ | | CAP. MURDER - MULT/AAB | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 9/9/10 | (230) Ruth Strtchfield - Challenged D; (231) ANETA Johnson - Δ #7; (3) Juror Quete |
| 9/10/10 | (41) Daniel, Stephen Lopez - EXCUSED; (44) Richard Atkins - Excused - (450) Robert Bruce - St #6 |
| | (383) KIRBY MAY - S#4 |
| 9/13/10 | 1421 CURTIS GODDEN - cause 9 446 Stephanie CARROTH - S#5 9 16 Linda Johnson agreed |
| | 90 Jerry Lee Delozen cause 9 92 William Rey Gustason agreed |
| 9/14/10 | 169 Timothi Wayne REITER cause 9 244 Steven Mark FRENZZEL agreed |
| | 233 Mary Ellen GEANES cause 9 195 DALIA BLEAS Agued 9 1291 STERNE |
| | WAYNE TITENSOR Agreed |
| | Veriqinia Susan - Adrantial questionaire Blackout — 279 Allysen Johnson cause |
| 9/15/10 | 204 James Keith BALLER D#8 |
| 9/16/10 | 379 John Edward GALVAN cause 9 652 MARTHA Espart cause |
| | 571 Riley John Jarvik next 9 653 Tostyn Drue Sneed S#5 9 404 |
| | John POZADZIDES St #6 |

BAIL STATUS:

No. _____

TRIAL DOCKET -- CRIMINAL DISTRICT COURT -- DALLAS COUNTY, TEXAS

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 9/20/10 | |
| 9/24/10 | |
| 9/22/10 | |
| 9/23/10 | |
| 9/27/10 | |
| 9/28/10 | |
| 9/29/10 | |

TRIAL DOCKET -- CRIMINAL DISTRICT COURT -- DALLAS COUNTY, TEXAS

BAIL STATUS:

No. _____

PROSECUTORS

| STATE OF TEXAS | ATTORNEYS | OFFENSE | |
|---|---|---|---|
| vs. | Paul Johnson | CAPITAL MURDER | Andy Beach |
| | Coby Warren | | Josh Healey |
| GARY GREEN | Brady Wyatt | | Jennifer Bennett |
| | | | Heath Harris |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 9/30/10 | #224 - Maud Taylor - Excused - #263 - Karen Thompson - Excused - #1363 - Jackie Brewer - (S#16) - #50 Henry Judy - Excused - #1197 Cynthia Milce - (S#11) |
| | #1189 - Linda Brotkin - Excused |
| 10/1/10 | #1341 - Jeanette Ekwos - Excused - #1377 - Bench Drake - Excused - #1366 Henry Zhao - Excused - #189 Henry King - (S#2) |
| 10/4/10 | #391 - Ricky Janak - Excused - (S#13) - #347 - Murtagha - Excused - German Long - Excused |
| | #20A - Margaret Hale - (S#14) - #39A - Ann Branch - Excused - #39A- Jason McCann - Excused - Portia Mason #263 - Excused - #850 Dewey Kennedy - |
| | Excused (No Show) |
| 10/5/10 | #1B - Clint Spencer - Excused - Orena Hobo Dad - Excused - Jonnie's Pee bles - |
| | #1120 - Danielle Smith - Excused - David Follett #17A - Excused - #113 - Odell |
| | Snyder - Excused - Charlotte Garrett - 8A - Excused - Thomas Forsher - |
| | 1313 - Excused |
| 10/6/10 | #1432 - Sherri Page - Excused - #1458 Dennis Thompson - Excused |

**TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS**

NO. F-0959380

BAIL STATUS: JAIL

| STATE OF TEXAS | ATTORNEY | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN | | CAP MUR MULT | 10/02/09 |

**ORDER OF COURT**

**DATE OF ORDER**

**10/6/10**
# 1451 Kevin Cochran – EXcused   # 7B – Edward Morren – EXcused
#52A – Woodrow McFadden (3 #11)   #518 – Micky Carr – EXcused
#53A – Mike Emery (3 #11)

**10/7/10**
#17A – Lisa Hensley (stat'd)   # 13A – Marina Trevino – 5 #14
#14A – Delores Jenkins – EXcused – Remains Excused 11 480 – Excused
#25A – Charles Bledsoe – EXcused   # 43B – Robert Johns –
#2C – 5004A Cole Mau – EXcused   # 10C Randell McFadLong – R 610

**10/11/10**
#1A – Lisa Rogan – EXcused Jaynes #14A – EXcused  15C John
Carpenter – EXcused  #31A Andrew Acord – EXcused  67B James
Jedson – EXcused  # 33A Lisa Khone – EXcused #31C James
Burgess – EXcused, # 57B David Grant – Ncallburyed #254 –
Irma Ramirez – Blagnalgd Denton Denton

**10/12/10**
# 35C – Shanna Garcia – EXcused  # 24C – Andrew Weiser – EXcused
#50A – Elias Quintero – EXcused  #12L – Billy Lair – EXcused
#64A – Debra Story – #12 J. Marjorie Jerden – 9D Excused
#16D – David Campbell – EXcused  # 13B – Dwan Smith –
EXcused, # 7D Linda Banks – EXcused # 17B – Russ Zil Desch –
①1B Steve Sparks – # 9B – EXcused  #9A – Nikki James – EXcused

**10/13/10**
#54D – Randy Phillips – EXcused  #9L – Ruben Requeno – EXcused  #58D –
Randall Bell – EXcused  #42B – Robin Th. Holton – EXcused  #21B –
Kathryn Fairfield – EXcused  #32B – Katherine – EXcused  #25B – Nicolas Form –
#21B Ryan – Mary Rodriguez – EXcused  #25B – David Belknap –
EXcused, #37D – Melinda Gutierrez – EXcused, #3D – David Belknap –
EXcused, #60B – Wendall Vanbrun – EXcused  TOT 29 McRusr #358 – EXcused
54B – Mel-d. Tran – EXcused, E.H.R – Rebut'd nut, remind #26 – Denholland 11

14

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

BAIL STATUS: JAIL

| DATE OF ORDER | STATE OF TEXAS | ATTORNEY | OFFENSE | DATE OF FILING |
|---|---|---|---|---|
| | GARY GREEN | | CAP MUR MULT | 10/02/09 |

15

ORDER OF COURT

| | |
|---|---|
| 10/19/10 | #62B- THOMAS WHITMAN - EXCUSED,  #44C - DEBORAH ALLEN- EXCUSED,  #38C - KARON HALSELL - EXCUSED,  #70 VICKY FELTS - EXCUSED,  #16C - SUSAN RUMBO - EXCUSED,  #144 NITTA MORRIS - EXCUSED,  #8C - JOHN SMITHSHIRE - ALT (#1)  #148C - LYNN WILLENS - EXCUSED,  #1D - TRICICIA DIEHL - (ALT #2) |
| 10/19/10 | Sworn in as witnesses:  Latasha Bradfield, Shirley Coleman, Joseph Johnson, Felacia Lacy, Eric Montgomery, Shalinda Ranson, Eugieville Scott, Lativa Smith, Ny-yessia Chatten |
| 10/25/10 | Sworn in as witnesses -  Allison # 9395, Castico # 8962, Champseum # 6652, Collins # 6293, Cindeart # 8947  Ingram # 7002, Jones # 8456, Kinch Roeben # 924, Lewis-Krauce # T1726, Moatl # 58064  Reynolds # 8245, Osuna # 7024, Roseira # 9855, Somers # 7157, Smith # 6006, Toomey # 9528  Quintanilla # 9321, Vick # 7702, Willens # 9110, Dengeraus Armstead, Esham Harris,  Adam # 8721, Nailal Bailey, Lester Harris |

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

BAIL STATUS: JAIL

NO. F-0959380

91

| STATE OF TEXAS | ATTORNEY | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN | | CAPITAL MURDER | 10/02/09 |

| DATE OF ORDER | ORDER OF COURT |
|---|---|
| 10/5/10 | Pre-Trial MS Set aside Denied after hrng |

TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

NO. F-0959380

BAIL STATUS: JAIL

17

| STATE OF TEXAS | ATTORNEY | OFFENSE | DATE OF FILING |
|---|---|---|---|
| GARY GREEN | | CAP MUR MULT | 10/02/09 |

| DATE OF ORDER | ORDER OF COURT |
|---|---|
| 10/28/10 | St & △ rest & Close. ↑↑ 9:55 - 10:06 △ - 10:06 - 10:09 ↑↑ - 10:09 - 10:20 Jury Verdict → Guilty as Charged → 10:37 |
| 11/5/10 | Punishment ↑↑ & △ rest & Close. ↑↑ - 10:30 - 11:02 △ - 11:02 - 11:26 All Jurors swore of terms ↑↑ - 11:38 - 12:12 Case against themselves Ans △ - 12:15 - 12:47 Verdict → Death Penalty Yes on SQ Ess. One (nods) No on SQ Ess. Two (nods) |

15



1

2

3

4

5

6

7

8

9

10

11

12

13          STATE'S EXHIBIT NO. 2

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

STATE'S
EXHIBIT
2

14 yrs total
8 in current job    supervision for behavioral
                    issues therapist
                         ADHD n emotional
                              disturbance.

Kelie Graysmith —
    Doctorate in school
         psychology

         — provides school based
              services.
         — knowledge of school
              culture & climate.

she is very concerned "shocked"
    that he wasn't referred to
    special ed services.

Pattern of arresting school failure
    could be due to learning
    difference and/or emotional
    disturbance.
         — need to rule out

Clinical work in school based
    — not broad based

Disabling condition and educational need
    — covers academic, social, behavioral

Special Ed - isnt just for education/academic

Also for kids w/ disabling conditions
    depression
    schizophrenia
    anxiety
    any mood condition
        - bipolar. etc.

No actual diagnosis required
    for

Clear data needed / not actual diagnosis

Behavioral Problems
    Verbal / Arguing          ⎫ Separate
    Withdrawal / Isolation    ⎬ Categories
    Poor social skills        ⎭
    Sarcasm
    difficulty making friends

Education is not just academic
                    social
                    behavioral

failures to treat
lead to
unemployment
underemployment
prison
mental hospital

If the males are seen at the
same rate in prison as
in sp ed.
— this also lead to stigma

They're not ready for the community
if not treated.

but they don't really
correlate

△ seems in bottom 10% percentile
below in grade expectations
age expectations

plus - often bc of genetic component
parents may have issues
themselves and dont recognize
these things.
        distorted perception if
its present in home for
the family

        — often normalized
    "that's just how he is"

    " that's just the way we are"


Cultural Aspects

    studied it in Grad School
    HISD — similar to DISD

    requires cultural competence
    Cu the

Culture overview mental issues
differently depending
on ethnic/religious or
race background

- have diff views on what
mental illness is

Af Am - believe suicide,
depression, anxiety,
bipolar disorders

are bad behaviors
misbehavior
poor parenting
poor discipline

fail to recognize its a
neurological based
condition that has,
a name and can be
treated

There is distrust of mental health
misperception to
services — some justified
a) tuskegee - syphilis study.

they were deceived —
they were whats
discouraged from using penicillin to
treat it —

Black women receive high rate
of hysterectomys
black kids are often medicated
@ higher rates as diff
than whites to the exclusion
of other treatment

A lot of Blacks have lifestyle
illness that are treated
as urgent care instead of
being dealt w/ key preventative
type comprehensive care

Church —
many black community leaders
are very skeptical about
mental health issues
particulaly school based
issues
they warn people not to allow

and discourage treatment and
when their problems to
discipline issues.

Psychology is looked down on
by Af Am

"Why do they have to be
labeled to get help."

parents fight to prevent having
their kids labeled
b/c of the stigma involved

Doesn't matter to her what
diagnosis a child may have
they look @ behaviors
A      Learning disability
  problem may be only academic
  - can be in only one area
      b/c of cognitive problem
        , math for example

Wouldn't expect Mom not to
know.

— the only time you see
this type of lack of
knowledge is when child
don't live w/ parent

Conclusions –

School district failed him
parents failed him

don't believe grades are valued
when we played sports

Parents w/ problems themselves
see this behavior as normal

Reasons for seeking services    — cant afford them
  — uninsured              — cultural bias.
  — stigma                 — suspicion or distrustful

F A P E
e  h  u  d
  o  i  u
  n  c  c
  r     a
  i     t
  a     o
  g     n
  e

failure to address at early age
leads to more persistent problem

early intervention is the goal of
    all psych association that
    are

D's records alone would have
been sufficient for referral

Chronic Academic Failure —
    huge red flag
    when it persists you normally
    see social & behavioral
    problems
    —they start to feel different

if there is suspicion of a disabling
problem - academic/behavioral
they are legally obligated to
expedite the process

Left untreated —
        becomes worse with time
        perpetuate themselves
        turbos build on themselves
                and create bigger failures

You are ill equipped for Adulthood
        no skills
        - social skills - life less
                - self esteem issues
                - problem solving skills
                - ability to make friends
                - can't sustain work

        have trouble getting jobs and
        if they do sustaining it

        they act out instead of working
                through problems

16



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13                    STATE'S EXHIBIT NO. 3
14
15
16
17
18
19
20
21
22
23
24
25
```

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

STATE'S
EXHIBIT
3

# Dr. Kellie Graysmith

## Occupation / Duties

## Educational Background

BA. Psychology      Tx A&M

Doctorate School Psychology
            UNC @ chapel hill

Multicultural Training
  — Ages, Cultures, Socioeconomic
            Backgrounds

Function's
  — Assess emotional/behavior
            functioning
  — crisis intervention

  — diagnose developmental
            disabilities
  — behavioral intervention

SPECIAL EDUCATION COORDINATOR
PLANO I.S.D.

RETAINED TO: CONSULT
REVIEW
TESTIFY re issues
involving her
area of expertise

CULTURAL ASPECTS OF
LEARNING DISABILITYS
EMOTIONAL DISTURBANCES

— MANY AA's suffer from lack
of mental health treatment
or services
  - psychology looked down on by AA's
  — distrustful / suspicious of
            treatment — some warranted
  - cultural bias
  - afraid of stigma
  - uninsured
  - can't afford

— community leaders are distrustful

CULTURAL —
    — self perpetuates by not being treated
    — strong genetic component to
       behavioral / mental illness
          — people w/ problems
           themselves see it
           as normal

    — AA community —
      — believes mental illnesses
        (suicide, depression, anxiety
        schizo, bipolar)
         — are bad behaviors
          — poor parenting
          — lack of discipline

    — they fail to recognize it as
      neurologically based condition
      that can be diagnosed / treated

# GENETIC COMPONENT

KIDS/ADULTS w/ mental illness
- often fail to see symptoms
- have poor insight into their
  conditions
- limited judgment & reasoning
- distorted perceptions of
  reality

Prevents them from recognizing
   AS well as accessing TREATMENT
dont realize
- THESE ARE BRAIN BASED
   DIFFERENCES.
      - interfere w/ problem
      solving/coping skills

THEY have limited capacity to
   recognize illnesses / symptoms
in their loved ones
      - thus mental symptoms
      are enabled/escalated
      by the family

SELF MEDICATION deters them
from seeking treatments.

IMPORTANCE OF EARLY
DETECTION / DIAGNOSIS.

— your area of daily expertise
★ EDUCATION IS ACADEMIC, SOCIAL, BEHAVIORAL
What is special ed? PURPOSE-
— identifies behavioral, social
academic weaknesses and
develops strategies

MISCONCEPTION THAT IT ONLY
DEALS W/ ACADEMIC DISABILITY

— teaches emotional and/or
behavior mgmt skills
— teach critical social skills
problem solving
aggressiveness
withdrawal / ISOLATION
making friends

YOU deal w/ full spectrum of
emotional / mental disorders
— depression, schizo, anxiety
mood disorders

Chronic academic failure
 — huge red flag
 — when it persists, you normally
    see social / behavioral
    problems

      — failure to address at
        early age leads to
        more persistent problems

         — aggression
         — non compliance
         — dropout
         — behavior problems
    ** — secondary mental
            illness
              — depression
              — anxiety
              — learning difference

Without proper education
  — academic, social & behavioral —
  They often fail to become
  productive members of society
    — unstable work — securing / keeping
    — risk of criminal behavior / judicial involvement
    — drug / alcohol use

poor social
skills needed
for healthy
relationships

THESE PEOPLE start to feel
different than other people
   — ill equipped for adulthood
   — affects self esteem
   — confidence
   — ability to make friends
   — healthy relationships
   — cant sustain employment
** THESE ARE RISK FACTORS
   FOR DEPRESSION AND OTHER
   BEHAVIORAL / MOOD PROBLEMS

FAILURES BUILD UPON THEMSELVES
   AND CREATE BIGGER FAILURES.

      — unemployment
      — under employment
      — prison
      — mental hospitals

REVIEW OF GARY GREEN RECORDS -

NOT ASKED TO INTERVIEW OR DIAGNOSE GG

ASKED TO REVIEW SCHOOL RECORDS and offer opinions

CHRONIC ACADEMIC FAILURE

RECORDS ARE VERY LIMITED BUT EXTREMELY CLEAR THAT △ WAS IN NEED OF REFERRAL

'SHOCKED' THAT △ wasn't referred to sp ed services

△ had only 1 yr of avg grades 9th grade
   - playing sports
   - history of fraudulent grading

CHRONIC ACADEMIC FAILURE
   - should have been evaluated

△ would be in bottom
10%
— below in grade expectations
        age expectations


REVIEW OF MOMS BELIEF THAT
    △ did well in school
and thought he graduated

    — this lack of knowledge
      usually only seen when
      child doesnt live w/ parent

    — not unusual based
      on cultural component

    — also based on possible
      genetic component
      — possibly dealing
        w/ issues herself

CONCLUSIONS :

not trying to excuse / justify
Δ's behavior or crime
— explaining possible
problems that led to
it.

didn't learn till last week what
Δ had done.

— consistent with persistent
and worsening behavioral
problems and/or mental
illness

System failed to spot early

Parents failed to spot early

lack of intervention,
treatment, diagnosis.



17

1

2

3

4

5

6

7

8

9

10

11

12

13          STATE'S EXHIBIT NO. 4

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

STATE'S
EXHIBIT
4

*South Texas Neuropsychological Associates, PLLC*

**Gilbert Martinez, Ph.D.**
Licensed Psychologist
Clinical Neuropsychology

3603 Paesanos Parkway
Suite 300
San Antonio, TX 78231
fax (210)-615-6906
Ph (210)-614-3011

# REPORT OF PSYCHOLOGICAL
## NEUROPSYCHOLOGICAL EVALUATION

**Name:** Mr. Gary Green    **Assessment Date(s):** 5/25/10
**Date of Birth:** 3/14/1971    **Age:** 39
**Examiners:** Gilbert Martinez, Ph.D.

**Disclosure Statement:** The information contained in this report is strictly confidential and protected by law. This information should generally only be interpreted the presence of a qualified psychologist.

The following report was prepared using voice recognition software and may contain contextual or grammatical errors.

**Reason for Referral:** Mr. Gary Green was referred for a comprehensive neuropsychological assessment to evaluate his cognitive, intellectual, and emotional functioning. This information was requested for the purpose of assisting in legal proceedings.

**Records Reviewed:**

Medication List
Records from Parkland Health and Hospital System/Dallas County Jail Health
Records from Timberlawn Mental Health System
Report of Collateral Interviews –Attorney Work Product

**Background/Record Review:** Gary Green is a 39 year old, right-handed, African-American male who is currently in detention in the Dallas County jail. He has been charged with capital murder. Various records were available for review. A written list of his current medications includes sulphamethoxazole, paroxetine hcl, clonodine hcl, acetaminophen, mirtazapine, hydroxine hcl, amlodipine besylate, and rifampin.

Records from Timberlawn Mental Health System describe an inpatient psychiatric admission from 8/20/09 to 8/24/09 with complaints of depression, isolation, suicidal thoughts, racing thoughts, anxiety, and irritability. The report also noted Mr. Green reported he "had thoughts of sleeping and not waking up". A report of initial assessment on 8/20/09 describes increased isolation, hopelessness, passivity, and decreased energy. It was reported the patient expressed a desire to "just go to sleep and not wake up". He otherwise denied suicidal intent but stated "(I) just want to escape the pain". The report also described anxiety and irritability and the patient stating "can't shut off my thoughts". Paranoid ideation was also noted, with the patient reporting that people were plotting against him and talking about him. Mr. Green also stated "I'm not paranoid I know this is happening" and "I want to know the truth". The initial plan of care involved clarifying diagnosis because of a family history of bipolar disorder, and he was noted to not have hypomanic or manic symptoms, with the exception of irritability. He had been taking Remeron and Respirdal and was described as initially depressed and with constricted affect. The report also noted "by 8/22/09, he felt even more depressed being in the hospital. He was eager to be discharged". Upon discharge on 8/24/09, he reported continuing to feel depressed but denied having suicidal thoughts or medication side effects. He was subsequently discharged at his own request as he did not meet criteria for commitment. Diagnostic impressions included Major Depressive Disorder, Recurrent, With Psychotic Features, and "Rule out Bipolar Disorder Type II", and prognosis was dependent on treatment compliance. Mr. Green was also noted to suffer from hypertension and possible sleep apnea.

A report of health screening by Dallas County Jail Health on 9/22/09 describes multiple stab wounds. The report also indicated Mr. Green reported hearing voices, stating "I started hearing them last week and that's when everything escalated". He was placed on suicide precautions. A psychiatric provider progress note dated 9/23/09 described a hospitalization in August of 09 for 4 ½ days for "schizophrenic and manic depression". The report also described multiple suicide attempts as a teenager as well as current suicidal ideation and there was questionable possible history of heroin abuse and a reported history of cannabis use. The report also noted Mr. Green "attempted an overdose on 80 tablets of the combination of Benadryl and Tylenol" and that the patient "wants to die" and "feels it is less painful to die than to live". Psychiatric exam was otherwise essentially normal and problematic personality factors included impulsivity, irritability, and a tendency to be easily angered. Diagnostic impressions included Adjustment Disorder with Depressed Mood. Follow-up clinic notes on 9/25/09 describe continued problems with sleep and appetite as well as "depressed affect, congruent between affect an expression". Recommendations included continued suicide precautions. A follow up report on 9/28/09 describes "no objective evidence for self harm" and recommendations included discontinuation from suicide precautions" with "crisis stabilization" and follow-up. A psychiatric provider progress note dated 9/28/09 describes rumination about his legal issues and a desire to be isolated. A mental health follow-up note dated 11/5/09 describes problems with sleep and recommendations included discontinuing Celexa and continuing Remeron and hydroxyzine. During a clinic

2

note brief dated 11/17/09, Mr. Green stated "I have images and voices related to my case" and his thought processes were described as "organized and goal directed". A report of another visit on 1/25/10 describes preoccupations with a belief that he is being judged and issues related to his incarceration. He was noted to have "a relatively flat affect" and spoke "very calmly and deliberately". During a follow-up visit on 12/11/10, Mr. Green was described as "normal" and it was noted that "his mood is appropriately depressed for this environment". The report also indicated that "patient has responded very well to brief episodic counseling" and that he "generally talks about people judging others and is very philosophical and analytical". A psychiatric provider progress note on 3/17/10 describes medications to include hydroxyzine, Lisinopril, and paroxetine. During a follow-up visits on 5/27/10 Mr. Green reported having difficulty sleeping and described his perceptions that some of the medications were not working. The report also described a "thought pattern devoid of delusion, hallucination, or si/hi".

Available records also included notes from a collateral interview on 6/14/10 with Mr. Green's half brother, Nysasno Carter. Mr. Carter provided numerous examples of Mr. Green's difficulty learning and completing many basic tasks around the home and at work. Mr. Green appeared to have difficulty understanding the steps involved in completing tasks since age 9. He also reported that Mr. Green "has always believed that somebody was out to get him" and would often talk to himself as if someone were in the room with him when there is actually no one present. Mr. Green would become defensive when asked about this. Mr. Carter also described episodes where Mr. Green "talks and does not make sense", prompting his family to ask "are you drinking or high?". Mr. Green would reportedly become angry when questioned about this as well. He sometimes appeared to stare blankly and "would shut down for no reason". He also described loose associations and significant problems in his relationships with his father and other family members. A pattern of behavioral instability was also described, and Mr. Green was noted to frequently be "going off the deep end". He was also noted to have "ups and downs, highs and lows". He described "three different personalities" and was not sure which one he is "dealing with today". He also reported that he would hear voices and described an incident during which he set fire to his dogs as a child.

Mr. Carter also noted that Mr. Green was socially withdrawn and that many of his friends often felt that he was "being mad or acting crazy". This caused others to be scared of approaching Mr. Green. He also reportedly frequently stated "no one ever understands me" and was preoccupied with death. His family urged him to seek attention for these issues but he was resistant. Mr. Carter also described his perception that Mr. Green hopes to die by being passive about his murder charges. He described a paternal family history of mental illness as well.

Please refer to the appropriate records for greater detail regarding Mr. Green's medical, psychological, educational, social, and legal history.

3

**Clinical Interview:** Mr. Green was interviewed as part of the current assessment to gather information regarding his personal history. He reported being incarcerated since September 21, 2009 and being charged with capital murder. When asked about his medical history, Mr. Green reported being admitted to "a mental institution" in August of 2009, when after being evaluated "they decided it was best I not leave for 24 hours". He reported being treated for "severe depression" but indicated he was discharged early because "I made them release me because I was paranoid of that type of environment because people were walking into my room". He denied suffering from hallucinations, stating "I always saw what was there". He also denied suffering from delusions. He reported being prescribed medication at that time but was unable to recall the name. He also reported currently taking three medications for depression but was unable to recall the names of these as well

With respect to other medical history, Mr. Green reported being diagnosed with hypertension at the beginning of his current incarceration. He also described several traumatic injuries, including being stabbed in the abdomen by a girlfriend at age 16, with subsequent 72 hour hospitalization. He reported being unable to recall whether he suffered a loss consciousness as a result of this incident. Mr. Green also reported being shot in the neck at age 18, which also resulted in a three-day hospitalization for evaluation and treatment. He also reported being shot in the foot during a robbery in 2007, with a two-day hospitalization, and noted he was hospitalized for stab wounds on his back shortly after his more recent arrest in September, 2009. Mr. Green denied having a significant loss of consciousness or noticeable cognitive changes as a result of these incidents.

Mr. Green also reported suffering from headaches "all the time". He reported currently suffering from headaches three days per week, at least once per day, which he described as "throbbing all over". He noted "in my opinion it has to do with stress and depression" stating "once I start thinking about something is hard to turn it off". Mr. Green otherwise denied having a history of head trauma and associated loss of consciousness, as well as a history of stroke, seizures, or other significant neurological abnormality. He reported having a normal birth and early developmental history.

When asked about his cognition, Mr. Green reported having a "pretty good memory". He reported having difficulty focusing his attention since his incarceration but otherwise denied having significant attentional deficits. He also denied having problems with speech, comprehension, vision, or hearing.

When asked about his emotional functioning, Mr. Green reported suffering from a long history of depression, stating "I've always been depressed". He reported that on a scale of one to 10 his current depression is a "two-and-a-half". He related his depression to social and interpersonal issues, stating "I've always not been social, I've always seen people for how they were, they are always mean to you and try to hurt you, they get close to you to try to hurt you". He also reported being severely depressed during childhood but

4

indicated that he never received attention for his emotional problems, stating "my mother always knew I was different, at that time people didn't want to acknowledge they had a problem with their child".

Mr. Green also reported suffering from anxiety "all the time". When asked specifically about his symptoms, he reported suffering from persistent worry, tension, nervousness, and stress. He reported having particular difficulty when he is "bombarded with a lot of noise", and noted he will "normally stay away from crowds and people". He also reported that he has suffered from anxiety "all my life" and also has "lots of insomnia". He reported having lifelong problems with sleep, which he attributed to rumination, stating "I go days exhausting myself then pass out, I could never stop my mind from racing so I can't sleep". He denied having problems with his appetite or energy level.

When asked about suicidality, Mr. Green reported trying to take his life "a lot of times". He noted this began during childhood, stating "I tried a lot as a kid I just couldn't go through with it, I just tried to ease the pain of the suffering, I thought that to leave here was the best way to ease the suffering". He also reported having indifference about dying, stating "I ain't got a problem with dying, nobody cares about nobody" and again reverted to interpersonal descriptions, stating "you need to watch the people that's closest to you, they are the ones that try to hurt". He also pointed out that he would not try to prevent his death, stating "I won't tell you anything to try to save my life, in fact I'd rather be dead". Upon specific and detailed questioning he denied having current plans or intention to harm himself.

When asked about other aspects of his general psychosocial history, Mr. Green reported suffering childhood physical and emotional abuse. He reported that his stepfather would "whoop me a lot" and that his mother would also "hit me a lot". He also reported being sexually abused by a maternal aunt at age 3 but did not provide further detail.

Mr. Green reported regularly smoking one to 1½ packs of cigarettes per day and also using chewing tobacco regularly prior to his incarceration. He reported using alcohol since age 16 and regularly consuming between three to five glasses of liquor or one sixpack of beer per day about two days per week. He reported that he "drank more when I was really depressed" and indicated that his alcohol consumption affected his depression, stating "the more I drank the more I realize my problems, it made me think about my problems". He denied having a history of DWI or problems working because of his alcohol use.

Mr. Green also reported smoking marijuana regularly as an adult. He reported beginning his use of marijuana at age 12 and smoking marijuana daily throughout his adulthood until his incarceration. He also reported using ecstasy about twice per week for three years prior to his incarceration. He noted that ecstasy "makes me more happy and social" but that "when it wears off I fall into a deeper state of depression, then I can't sleep". Mr. Green also reported taking over-the-counter sleep aids, including Tylenol PM and

5

Benadryl, which he used about every other day prior to his incarceration. He denied having a history of using other illicit drugs and denied being arrested or having legal problems as a result of his drug use.

**Collateral Interview:** Mr. Green's mother, Mary Sampson, was also interviewed as part of the current assessment to gather information about his history. She indicated there were no significant complications with his birth and delivery, with the exception of her undergoing a C-section as a result of elevated blood pressure. She reported that he became "more withdrawn as a teenager", when he "didn't like a bunch of people around him". At this point he "started acting more different". She described an episode during which he apparently cut his knee while in the shower at age 14 and began yelling that "someone was trying to kill him". No one else was present and the family was not able to determine why he believed that someone had attacked him in the shower. She noted that Mr. Green tended to require more attention than her other son, and that he had difficulty focusing on chores and yardwork. He also "always took things apart and couldn't put these things back together".

Ms. Sampson also described another episode during which he called her in the middle of the night and was very distressed because "someone was trying to kill him, he said somebody's chasing me". She then sought assistance from her younger son and when they called Mr. Green several minutes later, he was fine and acted as if had never called her. He was never able to provide an explanation for this telephone call or his behavior at that time.

Ms. Sampson also described Mr. Green as "always cautious" and noted that he began to have "lots of depression going into his 20s". He reportedly would become "bothered when he couldn't get things accomplished" and tended to repeat that he was "on a mission" whenever he had difficulty. She also noted that he would "get aggravated if something was taken from him" or if he couldn't complete a task or accomplish a goal. He reportedly had periods when he "got real angry all the time" and often appeared to become distressed because he was very giving and tended to focus on doing things for others. She reported that "it seemed like he was messed up" when he came to visit her last summer, prompting her to advise him to seek assistance. He reportedly went to an MHMR, where "they helped him but he left". He was also preoccupied with having money and tended to not spend time with his children, stating that he was "on a mission" when asked about his activities. She noted that he has always demonstrated a strong desire to "please everybody", and "always gave people things they asked for".

**Social History:** With respect to his general social history, Mr. Green reported being born in Dallas and residing in the Dallas/Fort Worth area throughout most of his life. He reported living in a house with his wife and her three children for several years prior to his incarceration. He also reported being incarcerated for 10 years between 1990 and

6

2000. Mr. Green reported being married twice. He was initially married for six or seven years prior to being divorced. He was subsequently married in 2009 and he reported filing for annulment after 61 days and his wife is now deceased. He also reported having five children between the ages of seven and 23. Mr. Green reported his father died of organ failure due to drug abuse in 2004. He noted that his parents separated during his infancy because his father was abusive and that his mother remarried when he was three years old. He reported that his mother lives in Dallas and indicated they maintain regular contact. He also reported maintaining regular contact with his brother and also has a half-sister.

When asked about his educational history, Mr. Green reported attending school to the 10th grade and later a GED while in prison. He described himself as an average student and denied being held back. However, he reported that remedial classes were recommended during kindergarten and first grade but that his "mother spoke with them and they looked the other way so to speak".

Mr. Green reported being employed in several settings prior to his incarceration. He reported working as a battery technician for an electronics firm for about eight months and also worked for a temp agency for several years as well. He also reported working as an electrician's helper, Wal-Mart manager, and delivery driver in the past. Mr. Green reported his leisure interest to include running, sports, and bicycle riding.

**Behavioral Observations:**  Mr. Green was evaluated in a room in the Dallas County Detention Center. He was escorted by a guard, who waited outside of the room during the assessment. The evaluation was conducted face-to-face on a wooden table without obstructions. The purpose and nature of the evaluation was explained and Mr. Green provided written informed consent.

Mr. Green was evaluated while he sat in a chair. He ambulated independently, with no observable problems with gait upon gross inspection. Mr. Green was of large frame and moderately overweight. He wore jail attire and there were no observable problems with grooming or personal hygiene. He wore glasses throughout the assessment and his eyes appeared red and irritated. Mr. Green appeared his age, and his physical presentation was otherwise unremarkable.

Mr. Green was fully oriented to person, place, and time. Mr. Green's vision with correction and hearing appeared to be adequate for testing purposes. Eye contact was poor and he tended to look down throughout most of the assessment in a submissive posture. His upper extremity motor speed was slow but grossly within normal limits for praxis and dexterity bilaterally upon casual inspection, and there were no grossly observable problems with motor movement. Mr. Green's speech was slow and low in volume, with normal prosody and articulation. The range of his expressive vocabulary

7

was average. His speech was otherwise generally coherent and goal directed. His receptive language abilities appeared to be grossly intact, and he was able to comprehend all task instructions.

Mr. Green's mood was severely depressed and he appeared extremely sad and despondent. His affect was flat. He was otherwise calm, pleasant, and fully cooperative. Mr. Green's approach to testing was slow but otherwise generally deliberate and efficient. Mr. Green's social behavior was generally age-appropriate. His understanding of the testing process was fair, as was his awareness of his cognitive test performance.

Mr. Green appeared to put forth his best effort throughout the assessment. Rapport with Mr. Green was adequately established and maintained. An assessment was completed and the following test results appear to be an adequate assessment of Mr. Green's current neuropsychological and emotional functioning.

**Tests Administered:**

Record Review
Clinical Interview
Mental Status Examination
Wechsler Memory Scale-Revised (WMS-III)
     Information and Orientation
     Logical Memory I
     Logical Memory II
     Mental Control
Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
California Verbal Learning Test-Second Edition (CVLT-II)
Wisconsin Card Sorting Test (WCST)
Wide Range Achievement Test-Fourth Addition (WRAT-IV)
Test of Memory Malingering (TOMM)
Rey Osterreith Complex Figure
     Copy
     Immediate Recall
     Delayed Recall
Letter Cancellation
Line Bisection Test
Controlled Oral Word Association
Trail Making Test A & B
Draw a Person Test
Kinetic Family Drawing
Rorschach Inkblot Technique
Structured Inventory of Malingered Symptomatology (SIMS)
Personality Assessment Inventory (PAI)

8



**TEST RESULTS:**

**Response Bias:** Mr. Green's performance on a task designed to evaluate effort on cognitive testing and response bias (TOMM) was within normal limits (T1=50; T2=50). His performance on this measure was indicative of positive effort in his approach to cognitive testing.

Mr. Green's responses on a psychiatric symptom validity measure were suggestive of a tendency to over-endorse symptomatology on subscales related to neurologic impairment, affective disorders, and psychosis.

**Intellectual Assessment:** Mr. Green was also administered a comprehensive measure of intelligence (WAIS-IV). The following *italicized* section contains excerpts from a **computer generated report** a based on Mr. Green's responses on the WAIS-IV:

### General Intellectual Ability

*Mr. Green was administered 10 subtests of the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV). His composite scores are derived from these subtest scores. The Full Scale IQ (FSIQ) composite score is derived from 10 subtest scores and is considered the most representative estimate of global intellectual functioning. Mr. Green's general cognitive ability is within the borderline range of intellectual functioning, as measured by the FSIQ. His overall thinking and reasoning abilities exceed those of only approximately 7% of individuals his age (FSIQ = 78; 95% confidence interval = 74-83). Mr. Green may experience difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities. His ability to reason with words is comparable to his ability to reason without the use of words. Mr. Green's verbal and nonverbal reasoning abilities are in the low average range.*

### Verbal Comprehension

*Mr. Green's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the low average range and above those of only 10% of his peers (VCI = 81; 95% confidence interval = 76-87). The VCI is designed to measure verbal reasoning and concept formation. Mr. Green performed comparably on the verbal subtests contributing to the VCI, suggesting that the various verbal cognitive abilities measured by these subtests are similarly developed. Furthermore, he may experience little or no difficulty in keeping up with his peers in situations that require verbal skills.*

### Perceptual Reasoning

*Mr. Green's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index (PRI) are in the low average range and above those of only 14% of his peers (PRI =84; 95%*

 **WAIS-IV**

confidence interval = 79-91). The PRI is designed to measure fluid reasoning in the perceptual domain with tasks that assess nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli. Mr. Green performed comparably on the perceptual reasoning subtests contributing to the PRI, suggesting that his visual-spatial reasoning and perceptual-organizational skills are similarly developed.

### Working Memory

Mr. Green's ability to sustain attention, concentrate, and exert mental control is in the low average range. He performed better than approximately 9% of his peers in this area (Working Memory Index (WMI) = 80; 95% confidence interval 74-88).

### Processing Speed

Mr. Green's ability in processing simple or routine visual material without making errors is in the low average range when compared to his peers. He performed better than approximately 10% of his peers on the processing speed tasks (Processing Speed Index [PSI] = 81; 95% confidence interval 75-91). Mr. Green's performance on the subtests that compose the PSI is quite variable; therefore, the PSI score should be interpreted with caution. He performed much better on Symbol Search (Scaled score = 9), which is more demanding of attention to detail and visual discrimination, than on Coding (scaled score = 4), which is more demanding of fine-motor skills, short-term memory, and learning ability.

### WAIS-IV Summary

Mr. Green is a 39-year-old male who completed the WAIS–IV. His general cognitive ability, as estimated by the WAIS–IV, is in the borderline range (FSIQ = 78). Mr. Green's verbal comprehension and perceptual reasoning abilities were both in the low average range (VCI = 81, PRI = 84). Mr. Green's ability to sustain attention, concentrate, and exert mental control is in the low average range (WMI = 80). Mr. Green's ability in processing simple or routine visual material without making errors is in the low average range when compared to his peers (PSI = 81). However, due to variability between the two subtests that compose the PSI, caution is warranted when interpreting scores and a closer look at the individual subtests is recommended.

### Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 20 | VCI | 81 | 10 | 76-87 | Low Average |
| Perceptual Reasoning | 22 | PRI | 84 | 14 | 79-91 | Low Average |
| Working Memory | 13 | WMI | 80 | 9 | 74-88 | Low Average |
| Processing Speed | 13 | PSI | 81 | 10 | 75-91 | Low Average |
| Full Scale | 68 | FSIQ | 78 | 7 | 74-83 | Borderline |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.

Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.


**WAIS-IV**

## Verbal Comprehension Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Similarities | 18 | 6 | 9 | 6 | 1.04 |
| Vocabulary | 27 | 7 | 16 | 8 | 0.73 |
| Information | 9 | 7 | 16 | 8 | 0.85 |
| (Comprehension) | 21 | 8 | 25 | 9 | 0.99 |

## Perceptual Reasoning Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Block Design | 32 | 8 | 25 | 7 | 0.99 |
| Matrix Reasoning | 10 | 6 | 9 | 5 | 0.95 |
| Visual Puzzles | 11 | 8 | 25 | 7 | 1.04 |
| (Figure Weights) | 8 | 6 | 9 | 6 | 0.99 |
| (Picture Completion) | 10 | 7 | 16 | 7 | 1.2 |

## Working Memory Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Digit Span | 17 | 5 | 5 | 4 | 0.73 |
| Arithmetic | 12 | 8 | 25 | 9 | 0.99 |
| (Letter-Number Seq.) | 16 | 7 | 16 | 7 | 1.12 |

## Processing Speed Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Symbol Search | 31 | 9 | 37 | 9 | 1.56 |
| Coding | 33 | 4 | 2 | 3 | 1.2 |
| (Cancellation) | 39 | 10 | 50 | 9 | 1.62 |

**Academic Functioning:** Mr. Green was also administered a screening measure of academic achievement. He obtained the following scores on the WRAT-IV:

| Subtest | Standard Score | Percentile | Grade EQ. |
|---|---|---|---|
| Word Reading | 75 | 5th | 5.1 |
| Sentence Comprehension | 78 | 7th | 7.7 |
| Spelling | 85 | 16th | 7.7 |
| Math Computation | 87 | 19th | 6.9 |

Mr. Green's scores on a test of reading skills were in the borderline range, at the fifth grade level. Mr. Green was able to read single syllable words, and a few very common and basic multi-syllable words. Reading comprehension scores were also in the

Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.

 **WAIS-IV**

borderline range, at the seventh grade level. Spelling scores were low average, at the seventh grade level, as Mr. Green was able to spell relatively common multi-syllable words. Written arithmetic abilities were also low average, at the sixth grade level. Mr. Green was able to complete many written arithmetic problems involving addition, subtraction, division, and multiplication, but was unable to complete moderately complex problems involving fractions, decimals, and percentages.

**Memory and Attention:** Mr. Green was fully oriented to person, place, and time. Performance on a task of mental tracking and control was mildly impaired.

Immediate memory for meaningfully related verbal material was moderately impaired. Delayed recall for the same material was average, without significant decay on the delayed portion of this task. Mr. Green's ability to reproduce a moderately complex figure from immediate memory was low average, without significant disorganization or distortion. Recall of the same figure following a 20 minute delay was also low average, as was his ability to copy the same design.

**Visual-spatial functioning:** Performance on a task of visual scanning (letter cancellation) was within normal limits for speed and accuracy. Performance on a task of visual attention (line bisection) was within normal limits.

**Executive Functioning:** Response style was slow. Visuo-motor tracking was in the average range for speed and accuracy. Visuo-motor tracking with alternating response sets was also average for speed and accuracy. Controlled verbal fluency was below normal limits. Mr. Green's performance on an untimed task involving nonverbal learning, reasoning, and mental shifting was impaired.

**Emotional Functioning:** Mr. Green was administered a written objective questionnaire (PAI) designed to evaluate his personality and emotional functioning. The number of uncompleted items was within acceptable limits. Mr. Green's scores on the PAI validity scales suggest he attended properly to item content. However, there were several inconsistent responses to similar items, and Mr. Green's responses were suggestive of a defensiveness about certain personal shortcomings and a possible exaggeration of certain problems. Mr. Green's responses also revealed a potential tendency to avoid negative or unpleasant aspects of himself. However, he positively endorsed items that are not typically endorsed by defensive respondents, including items related to "impact of traumatic events; physical signs of anxiety; thoughts of death or suicide; suspiciousness; unusual ideas or beliefs; unusual sensory-motor problems; stress

Version 1.0.0     Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.     Gary C
Page 12


**WAIS-IV**

in the environment; failures in close relationships; unhappiness; poor sense of identity; distrust; disruptions in thought process; unsupportive family or friends; physical signs of depression; poor interpersonal rapport; frequent routine physical complaints; hostility and bitterness; preoccupation with physical functioning; tension and apprehension; compulsiveness or rigidity; feelings of helplessness; moodiness; inflated self-esteem; low frustration tolerance; history of antisocial behavior; drug abuse or dependence; poor control over anger; and alcohol abuse or dependence". Mr. Green's responses were also suggestive of a tendency to portray himself in a negative manner, as is often observed in a "cry for help". He also positively endorsed items related to "suspiciousness; physical signs of anxiety; failures in close relationships; inflated self-esteem; distrust; stress in the environment; and unusual ideas or beliefs". These potential response bias issues limited the usefulness of PAI data in exploring Mr. Green's emotional adjustment.

Interpretation of the PAI clinical scales revealed a pattern of endorsement that is typically associated with acute distress and severe impairment in psychosocial functioning. Individuals with similar profiles tend to suffer from problems with thinking and concentration, as well as hostility, resentment, and suspiciousness. They tend to be overly sensitive in social interactions and have difficulty maintaining close relationships. They also tend to feel mistreated by people around them and are often withdrawn and isolated. Mr. Green also endorsed an unusually high level of suspiciousness and mistrust. This level of endorsement is usually associated with paranoia and hostility with delusional ideation. Individuals with similar patterns tend to have strong feelings of resentment and misinterpret the intentions of others, as they often feel as if they are being treated poorly. As a result, they are often seen by others as being very hostile and have difficulty establishing and maintaining constructive personal relationships.

Individuals with similar self descriptions also tend to suffer from unusual patterns of thinking and experience, such as that which is commonly observed in psychotic episodes. They often experience impairment in reality testing and may suffer from hallucinations and prominent delusional beliefs during episodes of acute distress. This contributes to their social isolation and detachment.

Mr. Green also positively endorsed items related to anxiety, rumination, posttraumatic stress, somatic preoccupation, depression, variable mood, drug problems, and rigidity. His responses to questions regarding personality traits were suggestive of uncertainty, instability, problematic interpersonal relationships, and fears of abandonment and rejection. He also endorsed items related to intense and recurrent suicidal ideation.

Mr. Green's responses on a visual projective measure were noteworthy for low content and a guarded/defensive response set. Many of his responses were strongly suggestive of severely negative affective ideation, with substantial morbidity. His responses were also indicative of a strong tendency to feel threatened by ambiguous stimuli and to

Version 1.0.0    Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.

Gary C
Page 13



struggle with moral and religious internal conflicts. His responses on a projective
drawing measure were generally unremarkable.

**Diagnostic Impressions (DSM-IV):**

Axis I:  295.70  Schizoaffective Disorder, Bipolar Type
         294.9   Cognitive Disorder NOS, With Prominent Deficits in Executive
                 Functioning
         Rule Out:
         304.30  Cannabis Dependence, In Sustained Full Remission in a
                 Controlled Environment
         305.30  Hallucinogen Abuse

Axis II:  301.9  Personality Disorder NOS (Mixed), Premorbid, With Paranoid,
                 Borderline, Avoidant, and Depressive Features (DSM-IV
                 Research Criteria)

Axis III: Hypertension; See medical records

Axis IV: Psychosocial Stressors: incarceration, capital murder charge/litigation,
                                 social isolation, separation from primary support
                                 group

Axis V: Current GAF: 48

**Summary/Interpretation:** Mr. Green was administered a broad range of standardized
measures designed to evaluate his cognitive, intellectual, and emotional functioning. His
performance on a recall task evaluating response bias was within normal limits and
suggestive of positive effort on cognitive testing. His responses on a measure of
psychiatric symptom endorsement was suggestive of a strong tendency to respond
positively to questions related to neurologic impairment, affective disorders, and
psychosis. During the clinical interview, Mr. Green appeared to be open and honest when

Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.

 **WAIS-IV**

answering questions regarding his history and psychological functioning. He was also able to provide a comprehensive history, with the exception of difficulty in recalling the names of his current medications.

Mr. Green's mood during the assessment was severely depressed and despondent, with psychomotor slowing and other physiologic symptoms of depression. He also described a history of lifelong history of anxious and depressive symptomatology that was consistent with his current clinical presentation. Medical records describe a history of intervention for depression, with a hospitalization in August of 2009 for an episode of acute depression, suicidal ideation, racing thoughts, irritability, insomnia, and persecutory ideation.

Mr. Green's behavioral history is strongly indicative of a lifelong pattern of persecutory/delusional ideation and behavior. Information gathered through clinical interview and record review revealed a persistent tendency to believe that he is being conspired against, cheated on, and maliciously maligned. As a result, he is resentful and angry, with his paranoid ideation causing significant impairment in his behavior and subsequently, his social and occupational functioning. This was also reflected in his responses on objective testing.

Collateral interviews with Mr. Green's mother and brother also provided substantial detail regarding his psychological history. Mr. Green was described as socially withdrawn, suspicious, and depressed. Family members also described recurring episodes involving hallucinations, distortions in thought content, and disorganized language and behavior. Consistent with his documented psychiatric history, they also described recurrent problems with persecutory delusions and episodes of emotional decompensation associated with his disturbed thought and mood. This clinical course and symptom pattern meets diagnostic criteria for Schizoaffective Disorder, Bipolar Type.

Mr. Green also appears to suffer chronic deficits in interpersonal behavior that involve pervasive mistrust and suspiciousness. Individuals with similar clinical presentations tend to feel that they have been deeply injured by others. They are often preoccupied with doubts of the trustworthiness of others and tend to have difficulty confiding in others. They also tend to bear grudges and are prone to episodes of overt hostility, especially when they feel betrayed. When stressed, emotional decompensation escalates a pattern affective instability, suicidal ideation and gesturing, intense fear of abandonment, poor control of anger, and stress related increases in paranoid ideation. These deficits in interpersonal behavior are consistent with a characterological disturbance and includes borderline, paranoid, avoidant, and depressive features.

Mr. Green's cognitive test performance revealed a pattern of moderate but substantial deficits in complex executive functioning, including abstraction, mental shifting, and

Version 1.0.0                Copyright © 2009 by NCS Pearson, Inc.
                      All rights reserved. Printed in the United States of America.

Gary C
Page 15



feedback learning. This pattern of cognitive test performance is often associated with chronic disorders of thought and mood, although the possibility Mr. Green's cognitive deficits may be associated with brain damage cannot be excluded, especially given his tumultuous developmental and behavioral history.

Mr. Green's performance on a comprehensive measure of intelligence was in the Low Average to borderline range, with comparable scores on verbal and nonverbal subtests. However, there was significant scatter/fluctuation in subtest scores that was suggestive of difficulty with thought and sustained attention/concentration. Academic screening scores were also generally in the low average range and consistent with the verbal IQ scores. There was no evidence to support the presence of a formal learning disability.

Mr. Green also described a pattern of chronic marijuana use that likely meets diagnostic criteria for Cannabis Dependence which has been in remission due to limited access in a controlled jail environment. He also described the regular use of illicit hallucinogenic drugs (ecstasy) that may meet diagnostic criteria for substance abuse as well. Mr. Green's descriptions of his alcohol use history were of clinical concern but did not appear to fully meet criteria for an Alcohol Abuse or Dependence disorder. The overall pattern of substance abuse, as described, is likely not sufficient to contribute to permanent cognitive dysfunction.

**Conclusions/Opinions:** Mr. Green suffers from chronic depression and disturbed thought and behavior that meet diagnostic criteria for Schizoaffective Disorder, Bipolar Type. In addition to long-term problems with depression, a pattern of chronic suspiciousness, mistrust, fear of abandonment, unresolved anger, depressive ideation, and social avoidance episodically escalates into a thought/mental disorder with prominent persecutory delusions. Deficits in executive functioning exacerbate ineffective coping strategies and misinterpretation. The more severe symptoms currently appear to be moderated by Mr. Green's current psychotropic medication regimen and a relatively stable environment in jail that limits exposure to acute stressors associated with maladaptive interpersonal behavior and relationships.

**Recommendations:**

1. Mr. Green is currently functioning fairly well in the structured environment of the jail where he has few demands placed on him. I am sure his current medication regimen has also assisted with his mood and agitation problems. However, he is not on an anti-psychotic medication. He is at high risk for decompensation, especially as the stress of a death penalty trial bears down on him.

Version 1.0.0                    Copyright © 2009 by NCS Pearson, Inc.                    Gary C
                        All rights reserved. Printed in the United States of America.              Page 16

 **WAIS-IV**

2. I believe his competence to stand trial is negatively impact by his symptoms of mental illness and compromised emotional functioning. His significant depression, anxiety, and paranoid delusional thinking that will complicate his ability to attend to moderately complex material and rationally consult with counsel. He has deficits in thinking, abstraction, and executive functioning that impair his decision making. These cognitive and affective issues may cause Mr. Green substantial difficulty when consulting with attorneys and will limit his ability to comprehend and respond to information presented in legal proceedings.

3. Mr. Green requires continued medical intervention for his problems with mood and thought. His current medication regimen has likely been a major factor in the moderation of his affective and paranoid symptoms, but a psychiatrist should be consulted to maximize his treatment response.

4. Mr. Green's emotional and cognitive functioning is likely to fluctuate significantly based on medication efficacy and the recurrence of prominent stressors. His coping skills are limited and he is likely to exhibit episodes of acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen.

5. As it becomes available, further information from medical records and other collateral interviews will be useful in further exploring the nature and extent of Mr. Green's problems with mood, thought, and behavior.

Thank you for allowing me the opportunity to evaluate Mr. Green. If I can be of further assistance, please do not hesitate to contact me.

Gilbert Martinez, Ph.D.
Licensed Psychologist
Clinical Neuropsychology

Copyright © 2009 by NCS Pearson, Inc.
All rights reserved. Printed in the United States of America.

18



1

2

3

4

5

6

7

8

9

10

11

12

13                    STATE'S EXHIBIT NO. 5

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

P.O Box 448
Flint, Texas 75762

Ph. 903-561-7041
Fax 903-561-5342
dselfmd@yahoo.com



**DAVID SELF M.D.**
**FORENSIC PSYCHIATRY**



STATE'S
EXHIBIT
5

## FORENSIC PSYCHIATRIC REPORT

**RE:** State of Texas v Gary Green

**CAUSE #:** F09-59380 282nd District Court Dallas County, Texas

**PURPOSE:** To form an expert opinion regarding the defendant's **Competency to Stand Trial** as defined in Chapter 46B of the Texas Code of Criminal Procedures.

**DATE OF REPORT:** 8/10/2010

**SOURCES OF INFORMATION:**
1) Conference with defense counsel Paul Johnson for ½ hour re defendant's ability to communicate with counsel and process/utilize information.
2) Examination of defendant in Lew Sterritt jail on 7/11/2010 for approximately 1 hour 40 minutes.
3) Review of Indictment.
4) Review of Neuropsychological Evaluation Report done by Gilbert Martinez PhD dated 5/25/2010
5) Review of medical records from Timberlawn and jail mental health services.

**DISCLOSURE AND WARNING:**
Prior to commencing the examination, the defendant was warned:
   1) Dr. David Self is not acting as my physician, but is seeing me in a wholly legal role in order to form an opinion regarding my Competency to Stand Trial.
   2) Dr. David Self will not undertake treatment of any illness I may be found to have.
   3) The communication between Dr. David Self and me is not protected by the usual doctor-patient confidentiality.  Dr. David Self will make a written report to the court regarding his findings and opinions derived from our communication.
   4) I have the right to consult with my attorney before or during Dr. David Self's examination of me.
He was able to reiterate these conditions in his own words, indicating understanding. He signed a printed attestation to that effect.

**RELEVENT HISTORY:** The defendant was arrested, and has remained incarcerated since 9/22/2010.

**PAST PSYCHIATRIC HISTORY:**  The defendant's formal psychiatric history is limited to an admission to Timberlawn psychiatric hospital in 8/09 for four days. He presented with complaints of depressed mood, suicidal ideation, racing thoughts, anxiety, and irritability. He was noted in the record to have paranoid thoughts of being plotted against. Initial diagnostic impressions included Bipolar Disorder, due in part to a provided history of close kin with that disorder.  His discharge diagnosis was Major Depression, Recurrent, with Psychotic Features, and Rule Out Bipolar Disorder Type 2.

**Page 2 of 5**
**Green, Gary CST**

He was discharged at his own insistence. It was felt he did not make criteria for involuntary commitment.  He was prescribed Risperdal (an antipsychotic medication with mood stabilizing properties) and Remeron (an antidepressant).  He reported that he did not fill his prescriptions due to financial concerns.

He is seen regularly by jail mental health providers.  He is diagnosed with Depressive Disorder Not Otherwise Specified.  He is prescribed Atarax 50 mg (an antihistamine used as an antianxiety / aid to sleep) by mouth at bedtime and Remeron 45 mg (an anti-depressant) by mouth at bedtime.

**PAST MEDICAL HISTORY:** Non-contributory.

**INTERVIEW:** He came willingly to the interview. He was awake and alert throughout. His attorney, Paul Johnson, was in the room for a brief time, and instructed the defendant to be open and honest with me.  The defendant appeared to be cooperative, cordial, and forthcoming throughout my examination of his competency. I found no evidence that he was other than honest in his responses.  There was no evidence of fabricated or exaggerated signs or symptoms of mental illness.

**MENTAL STATUS EXAMINATION:**

**1) APPEARANCE AND BEHAVIOR:** He was dressed in clean and neat jail issue. He appeared to have adequate hygiene and attention to grooming. His general behavior was unremarkable, with neither agitation nor retardation.

**2) SPEECH:** His speech was of slightly slow rate, with slightly increased latency of response. The volume of his speech was normal.  His speech had normal variability of tone and inflection.

**3) MOOD AND AFFECT:** He described his current mood as moderately depressed, with frequent episodes of intense panic anxiety. He reported this was his prevalent and predominant mood in recent weeks, most of the day, every day. He reported that he was capable of enjoyment and mirth when pleasing events (e.g. visits from family) occurred.  His affective expression of emotion was somewhat constricted, but consistent with reported mood. There was little or no variability of affect.

**4) NEUROVEGETATIVE FUNCTIONS:** He reported very disturbed sleep patterns for the past several years.  He stated he has problems initiating and maintaining sleep. He reported early awakening related to the noise level in the jail. He reported a normal appetite, eating all of his trays plus $100-200 worth of commissary food each month. Despite his report of eating well, he reports he has lost a substantial amount of weight since being incarcerated.

**5) THOUGHT CONTENT:**  There was no evidence of frank delusional thought.  He does have chronic thoughts of a suspicious nature regarding other persons' opinion of, and intentions toward him.   He denied recent thoughts of suicide, but admitted he had intermittently considered suicide for much of his life.

**Page 3 of 5**
**Green, Gary CST**

**6) THOUGHT PROCESS:** His thoughts were well organized, clear, coherent, and germane to question topics.

**7) SENSORY PERCEPTION:** He reported that he frequently experiences "hearing voices" that don't originate from others. He describes these voices as occurring within his head. He reports he hears these voices when "I feel victimized". He states the frequency of these voices was considerably increased prior to his hospitalization at Timberlawn, and is far less frequent lately.

**8) MEMORY, ORIENTATION, AND CONCENTRATION:** He scored 29 of 30 on the Folstein Mini Mental Status Exam. He missed one of three items on five minute recall. His orientation was fully intact. He had adequate ability to concentrate and attend, as measured by this coarse clinical measure. His intellect is estimated to fall in the low normal to borderline range.

**9) INSIGHT AND JUDGMENT:** He accepts that he has mental illness that negatively impacts his life. He is currently accepting of his need for medication to help manage his mental illness. His judgment is grossly intact to clinical screening. He is able to formulate basic simple solutions / approaches to hypothetical situations.

**DIAGNOSIS/ASSESSMENT:**

**AXIS I** History of Major Depression with Psychotic Features vs. Bipolar Disorder Type 2
        Cannabis dependence- institutional remission
        Hallucinogen abuse –institutional remission

**AXIS II** Personality Disorder Not Otherwise Specified-with Antisocial, Paranoid, and.
        Schizotypal traits.

**CONFERENCE WITH DEFENSE COUNSEL:** Mr. Green's defense counsel, Paul Johnson, reported to me that he had no difficulty communicating effectively with the defendant. He stated the defendant appeared to understand his advice and instructions. He reported that the defendant was able to disclose necessary information regarding the alleged offenses.

**COMPETENCY SPECIFIC EXAMINATION:**

1) **UNDERSTANDING OF CHARGES AND CONSEQUENCES:** The defendant has an accurate factual and rational understanding of his formal charges, the alleged events which underlie the charges and the potential consequences if he is convicted. He is a well informed layman regarding the legal proceedings. Understanding such details as the requirement for a unanimous jury decision to receive the maximal punishment. He understands the strength of the case against him.

2) **ABILITY TO DISCLOSE PERTINENT FACTS, EVENTS, AND STATES OF MIND TO COUNSEL:** He is capable of informing his counsel about pertinent information relating to his defense. He was able to give me a rational and plausible detailed account of events during the time period of the alleged offenses. There are no major barriers to effective communication between the defendant and his lawyer. He has confidence in his attorney's ability and dedication to providing him the best defense possible. He stated, "I've got to tell him the whole truth, or he can't help me".

3) **ABILITY TO ENGAGE IN REASONED DECISION MAKING REGARDING LEGAL STRATEGIES AND OPTIONS.** He is capable of processing information and utilizing it to make reasoned decisions regarding his legal defense. He understands the notion of weighing the strength of the case against him in the process of choosing legal alternatives. He has a trusting relationship with his defense counsel, and is appropriately reliant on counsel in the decision making process. He understands the concept of plea bargaining, and the consequences of a plea agreement. He understands the right to a jury trial, and also understands the potential risks of such.

4) **UNDERSTANDING OF THE ADVERSARIAL NATURE OF CRIMINAL JUSTICE PROCEEDINGS:** With brief tutoring he was able to get a good layman's understanding of the various players and their roles in the criminal justice system. He stated, "My attorney is for me"; "The prosecutor is against me"; "The judge hears the evidence, weighs it, and passes judgment." "If there's a jury then they make the judgment, and the judge is a referee". He had a basic understanding of his Constitutional rights and protections (e.g. self-incrimination, trial by jury, right to counsel, etc). As stated above he understands the basics of the plea bargaining process.

5) **ABILITY TO BEHAVE APPROPRIATELY IN THE COURTROOM:** He understands the behavioral requirements of the court room and is able to conform his behavior to those requirements.

6) **ABILITY TO TESTIFY:** Should he and his counsel so elect, he has the requisite capacities and abilities to function as an effective witness on his own behalf.

**Page 5 of 5**
**Green, Gary CST**

**OPINION:**

It is my opinion, held with reasonable psychiatric certainty, that **GARY GREEN**
**IS COMPETENT TO STAND TRIAL AT THIS TIME.**  He has a rational and
factual understanding of the charges and proceedings against him; and understands the
potential consequences if convicted.  He has the ability to consult with his attorney with
a reasonable degree of rational understanding.

He is receiving psychotropic medications that likely contribute to his competency to
stand trial.  His current regimen does not adversely affect his demeanor or his ability to
participate in the proceedings, and I would advise its continuance.

If I may provide additional information, or be of other service, please contact me.

Respectfully,

_____        _____
David Self M.D.                              Date

19



1

2

3

4

5

6

7

8

9

10

11

12

13          STATE'S EXHIBIT NO. 6

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

P.O Box 448
Flint, Texas 75762
dselfmd@yahoo.com

Ph. 903-561-7041
Fax 903-561-5342



✚ DAVID SELF M.D. ✚
**FORENSIC PSYCHIATRY**

**RE:** Gary Green
**Date of Report:** 10/27/2010
**Purposes:** I was retained by defense counsel to form an expert opinion regarding Mr. Green's mental condition; with specific reference to factors that might serve to mitigate his blameworthiness in regard to the offenses charged.

**Sources of Information:**
 **1)** Interview / examination of the defendant on 7/12/2010 for approximately 2 hours; and, on 8/18/2010 for approximately 4 hours.
 **2)** Neuropsychological report by Gilbert Martinez PhD dated 5/25/2010.
 **3)** Medical records of the Dallas County Jail pertaining to the psychiatric treatment of the defendant during his incarceration 9/23/2009 – 5/27/2010.
 **4)** Medical records of Timberlawn Psychiatric Hospital pertaining to the defendant's inpatient admission 8/20/2009 – 8/24/2009.
 **5)** City of Dallas Police Department records pertaining to the investigation of alleged offenses occurring 9/21/2009 with which the defendant is charged.
 **6)** TDCJ-ID Pen Packet pertaining to the defendant.
 **7)** Video recording of a police interview with the defendant on 9/22/2009.
 **8)** Notes from collateral interviews with family members and friends (Nysano Carter defendant's brother; Rodney Haney lifelong friend; Irving Green defendant's maternal uncle; Shirley Coleman defendant's maternal aunt; Arron Green defendant's maternal uncle: Stephanie Green defendant's ex-girlfriend and mother of his child; Mary Sampson defendant's mother; Leon Sampson defendant's step-father; Lenell Williams defendant's ex-girlfirend.
 **9)** Audio recording of a Forensic Interview with Jerome Armstead.
 **10)** Audio recording of a Forensic Interview with Jerrett Armstead.
 **11)** Copies of handwritten letters between the defendant and his wife.

**Situational History:** The defendant is charged with Capital Murder in relation to the deaths of his wife, Lovetta Armstead, and step-daughter Jazzmen Montgomery on 9/21/2009.  He has been incarcerated in the Dallas County Jail since 9/22/2009.

**Past Psychiatric History:**

**1)** He was voluntarily admitted to Timberlawn Psychiatric Hospital on 8/20/2009 for complaints of depressed mood, suicidal thoughts, social isolation, racing thoughts , anxiety, and irritability. He reported decreased energy and a sense of hopelessness. He admitted to thoughts of wanting to "Just go to sleep and not wake up", and, "I just want to escape the pain"; but, denied active thoughts of killing himself. He was noted to be paranoid, with thoughts of others plotting against him and speaking ill of him. He asserted that these were accurate perceptions, ("I'm not paranoid, I know this is happening"). He described difficulty sleeping and an inability to "shut off" his thoughts, which he perceived as racing.  He was noted to be very anxious, with mood lability, and irritability.

He was diagnosed with Axis I Major Depression with Psychotic features, and a deferred diagnosis on Axis II. He was treated with Remeron (an antidepressant) and Risperdal (an anti-psychotic). He was discharged against advice on 8/24/2009.

**2)** He has been followed by Dallas County Jail Mental Health service throughout his incarceration from 9/22/2009 – present.   At the time of his arrest he reported that he had intentionally overdosed on acetaminophen / diphenhydramine, reportedly ingested approximately 80 tablets. He was treated and released from Baylor Hospital for the overdose and some stab wounds to his shoulder.  He reported at the initial Mental Health screening at jail, that he'd been hearing "voices" for several days prior to the alleged offenses.  He complained of depressed mood and anxiety. He admitted to continuing thoughts of wishing to die, but denied an active suicide plan.  He was placed on suicide precautions for several days. He was given a diagnosis of Adjustment Disorder with Depressed Mood and was prescribed Remeron (an anti-depressant) and Celexa (an antidepressant). Later, Celexa was discontinued and Remeron was continued along with hydroxyzine (an anti-anxiety medication).  He has been seen at regular intervals throughout his incarceration.

**3)** He was examined by Gilbert Martinez PhD, a neuropsychologist, on 5/25/2010.  In addition to a clinical interview he administered a battery of neuropsychological tests.  He measured his intelligence via the WAIS as

Full Scale IQ of 78; placing him in the Borderline Intellectual Functioning range. He diagnosed Mr. Green as having Schizoaffevtive Disorder, Bipolar Type; Cognitive Disorder NOS with Prominent Deficits in Executive Functioning; and Personality Disorder Not Otherwise Specified with Paranoid, Borderline, Avoidant, and Depressive Features.

**Family Psychiatric History:**

While there is modest formal Family Psychiatric History, there is a sbstantial informal one.  Formal Family Psychiatric History consists of a maternal aunt who was diagnosed as having schizophrenia, and reportedly spent several years in a state hospital. Though reportedly never seen by mental health professionals, the defendant's mother reports having had several "nervous breakdowns".  The defendant's father, who abandoned the family while the defendant was quite young, reportedly evidenced bizarre behavior chronically, and was homeless, living on the street for extended periods of time.  Within the family, there is general agreement that he either had severe mental illness or substance abuse, or both.

**Social History:**

The defendant's father abandoned the family when he was very young. The defendant's mother was ,by her own account, frequently emotionally unstable and unable to provide consistent, effective parenting.  The defendant reports that he was physically abused by his stepfather.

**Interview:**

The defendant came willingly to the interviews.  He appeared to be forthcoming and honest in his responses.  I saw no evidence that he was attempting to exaggerate or fabricate signs or symptoms of mental illness.

Mr. Green described a lifelong history of feeling ostracized and unaccepted by others.  He recalls his childhood as a miserable time when he was picked on and ridiculed by other children, and hypercriticized by adults.  He believed that others thought of him as "crazy".  He recalls being a "loner", largely due to his severe mistrust and suspiciousness of others. His life has been characterized by tumultuous, instable relationships with others.  He admits to continual scanning for signs of impending rejection and betrayal; and, constant expectation that anyone he gets close to will betray him eventually.

He has a lifelong tendency to be emotionally labile; experiencing rapid and dramatic shifts in mood state. Depression, anxiety, and anger predominate these shifting moods.  Mr. Green recounts having most

frequently had a depressed mood.  He admits to recurrent suicidal ideas for his entire remembered life. He has had multiple instances of parasuicidal behavior in response to these mood states. His mood swings are frequently precipitated by social stimuli that most people would consider innocuous, but that he interprets as threatening or demeaning.

He admits to frequent abuse of alcohol and marijuana throughout his adult life.  He also admits to less frequent use / abuse of ecstasy.  His substance abuse has the characteristics of "self-medication" of poorly tolerated mood states.

Mr. Green reports experiencing  "hearing voices" intermittently throughout adult life.  He characterizes these voices as seeming to be within his head, unfamiliar, variously either single or multiple, and generally imparting negative messages (e.g. "kill yourself").  He reports that these phenomena occur most frequently when he is "stressed" and feeling "victimized".  He also recounts having had bizarre beliefs intermittently, such as believing a demon was chasing him, or that a television program is delivering a message especially to him from God.

The defendant admits to frequent  changes in his basic self-concept and identity.  An example of this is his conversion to Islam while incarcerated, and then re-conversion to Christianity upon release.

**COLLATERAL REPORTS OF DEFENDANT'S BEHAVIOR:**

The defendant's mother, Mary Sampson, reported that she has had concerns about his mental health since his teen years.  She recounted an incident in which he became uncontrollably angry and aggressive with a classmate over a minor affront.  He was transferred to another school in response to this incident.  He later returned to this school and caused quite a scene by getting on the roof and threatening to jump.  His family had to come and talk him down.   She recounted that he has frequently referred to an enigmatic "mission" that he was on. His mother describes him as avoidant of social interaction, and even objected to her having visitors at her home while he lived there. Mrs. Sampson recounted an incident when he was 17 or 18 years old in which he suddenly became convinced someone had broken into their house with intent to harm them. She recounted that it was very obvious no such thing had happened; but, he was  so convinced and emotionally upset by this belief that he severely injured his leg while fleeing the house.  She reported that such fearful, suspicious thoughts and resultant behavior were constant features of his

behavior. He would never sit with his back to the door, and slept with a baseball bat for protection.

The defendant's brother, Nysano Carter, described the defendant as having had emotional problems lifelong. He recounted that the defendant frequently made statements that were basically unintelligible, describing loosely associated thought. He has frequently observed the defendant actively engaged in self-talk that appeared to be conversational in nature, when there was no one else present. He reported that Gary has continually expressed the beliefs that people were "out to get him". Mr. Carter stated that the defendant was frequently very withdrawn. He said that mutual acquaintances uniformly expressed the opinion that the defendant was "crazy".

Rodney Haney, a lifelong friend of the defendant reported that he frequently expressed the belief that somebody was "after him". He recounted the defendant's tendency to make nonsensical remarks. He spoke of the defendant's unusually changeable emotional state. Mr. Haney also reported that mutual acquaintances frequently commented on the defendant's odd behavior.

**MENTAL STATUS EXAMINATION:**
**1) APPEARANCE AND BEHAVIOR:** He was awake and alert in both sessions. His hygiene and grooming were adequate. His general behavior was somewhat subdued, sitting with his head down, making infrequent direct eye contact.
**2) SPEECH:** His speech was slightly slowed in rate, and soft in volume. He had normal variation of inflection and rhythm. His latency of response was slightly lengthened.
**3) MOOD AND AFFECT/ NEUROVEGETATIVE FUNCTIONS:** He reported a depressed mood, of moderate intensity. He reported that he had been depressed most of the day, every day for some time. Additionally, he reported occasional anxiety attacks in recent months. He reported that he was capable of experiencing pleasure in response to certain stimuli, but denied capability of mirth for some time. His affective expression of emotion was somewhat constricted and did not vary much. He reported occasional "high" moods, that were responsive to events (e.g. family visits), but denied hypomanic or manic periods of sustained elation or irritability. He complained of chronic sleep disturbances for the past four years. He reported difficulty initiating

**Page 6**

sleep due to ruminative thought. He estimated receiving only 3-4 hours of sleep per 24 hours, and complained of chronic, subjective fatigue. He reported having a "healthy" appetite, but reported significant weight loss in jail. He reported a grossly diminished libido for the past 2 years.

**5) THOUGHT CONTENT:** While I elicited no frank, well formed delusions, he did admit to pervasive persecutory suspiciousness. He reported that he has "always felt like an alien", and had chronically been unable "to connect to people." He admits to constant scanning for betrayal or malevolent intent in others. He admits to frequent thoughts of death and / or suicide throughout his life, but denies such thoughts recently.

**6) THOUGHT PROCESS:** His expressed thought was generally linear, relevant, logical, and coherent. His thinking tended to be simplistic and somewhat concrete.

**7) SENSORY PERCEPTION:** He reported hearing "voices" not associated with an actual person. He characterized these perceptions as occurring inside his head. He did not have an identity associated with the voices, and could not tell me if they were male or female. He said that sometime there was only one voice and sometimes there were several. He reported that frequent content was such as "Kill yourself". He said the voices occurred in response to feeling "victimized", and abated when he was visited by family.

**8) MEMORY, ORIENTATION, AND CONCENTRATION:** He scored a 29 of possible 30 on the MMSE , indicating adequate memory, orientation, and ability to concentrate.

**9) INSIGHT AND JUDGMENT:** He accepts that he has mental illness that negatively impacts his life. He is currently accepting of his need for medication to help manage his mental illness.   His judgment is grossly intact to clinical screening. He is able to formulate basic simple solutions / approaches to hypothetical situations

**DISCUSSION and DIAGNOSES:**

There is little doubt that the defendant has experienced severe, chronic, dysfunctional mental states throughout his adult life. The appropriate diagnostic labeling of his mental problems is far more difficult. The several mental health professionals that have seen him in recent months have arrived at different conclusions. When hospitalized **Page 6**at Timberlawn, he was diagnosed as having Major Depression

with Psychotic Features, with consideration given to Bipolar Disorder. Dr. Martinez diagnosed him as having Schizoaffective Disorder, Bipolar Type. The jail mental health staff have diagnosed him as having Adjustment Disorder with Depressed Mood.

While there is considerable "scatter" among these diagnoses, there also is some commonality. They all recognize his mood problems as being central to his dysfunction. Two of the three also focus on psychotic features in response to his presentation of sensory / perceptual distortion and irrational paranoid beliefs,.

It is my opinion there are several important findings to be accounted for:  1) intense emotional instability / lability 2) disturbed relationships with others due to his being chronically highly suspicious and anticipatory of rejection / betrayal to an irrational extent 3) recurrent experiences of poor reality testing (hearing "voices", having paranoid beliefs, referential experiences), especially when he is "stressed".

There are several possible diagnoses that might account for these factors. There is enough atypicality to the defendant's presentation to cause diagnostic uncertainty and diversity of expert opinions. My diagnoses express this uncertainty, while attempting to accurately account for all the clinical findings.

**DIAGNOSES:**

**Axis I 1)** Rule out Psychotic Disorder Not Otherwise Specified
      **2)** Rule out  Mood Disorder Not Otherwise Specified
      **3)** Polysubstance abuse in institutional remission

**Axis II 1)**Personality Disorder Not Otherwise Specified with Borderline, Paranoid,  Schizotypal, and Antisocial features.
      **2)** Low average to borderline intellectual functioning
      **3)** Cognitive Disorder per neuropsychologic testing

These diagnoses reflect my inability to confidently exclude Axis I mental illness, while essentially stating my belief that most of these findings can be attributed to a severe mixed personality disorder. Personality disorders affect about 10% of the general population. This group of mental disorders is defined by maladaptive personality characteristics that have a consistent and serious effect on work and interpersonal relationships.

**Page 8**

While it is not known what the exact causes of severe personality disorders are it is felt they are multifactorial. There are biologic, psychological, and social factors The biological factors probably consist of inborn temperamental abnormalities. Impulsivity and emotional instability are known to be heritable. Similar characteristics can also be found in the close relatives of patients with these traits. Research suggests that the impulsivity that characterizes borderline personality might be associated with decreased serotonin activity in the brain.

The psychological factors in these illnesses vary a great deal. Some borderline patients describe highly traumatic experiences in their childhood, such as physical or sexual abuse. Others describe severe emotional neglect. Many borderline patients have parents with impulsive or depressive personality traits. However, some patients report a fairly normal childhood. Most likely, any of these scenarios is possible. Borderline pathology can arise from many different pathways.

The social factors reflect many of the problems of modern society. We live in a fragmented world, in which extended families and communities no longer provide the support they once did. In contemporary urban society, children have more difficulty meeting their needs for attachment and identity. Those who are vulnerable may have a particularly strong need for an environment providing consistent expectations and emotional security.

Most likely, severe personality disorders of this type develop when all these risk factors are present. Children who are at risk by virtue of their temperament can still grow up perfectly normally if provided with a supportive environment. However, when the family and community cannot meet the special needs of children at risk, they may develop serious impulsivity and emotional instability

Borderline traits are the most frequent in clinical practice, and are also one of the most difficult and troubling problems in all of psychiatry. Borderline personality traits are described as a prolonged disturbance of personality function in a person characterized by depth and variability of moods, chaotic and unstable interpersonal relationships, disturbances in self-image and identity, and behavior.

During stressful times, this disturbance can lead to periods of dissociation and "psychotic-like" experiences.

Paranoid personality disorder is a psychiatric diagnosis characterized by paranoia and a pervasive, long-standing suspiciousness and generalized mistrust of others. Those with the condition are hypersensitive, easily slighted, and habitually relate to the world by vigilant scanning of the environment for clues or suggestions to validate their prejudicial ideas or biases. Paranoid individuals think they are in danger and look for signs and threats of that danger, disregarding any facts. They tend to be guarded and suspicious and have quite constricted emotional lives. They have a relative incapacity for meaningful emotional involvement and a general pattern of isolated withdrawal.

Schizotypal traits characterized by a need for social isolation, odd behavior and thinking, and often unconventional beliefs. Schizotypal is widely understood to be a "schizophrenia spectrum" disorder. Rates of schizotypal traits are much higher in relatives of individuals with schizophrenia than in the relatives of people with other mental illnesses or in people without mentally ill relatives.

Diagnostic uncertainty regarding phenomena such as the defendant's presentation has been a central feature of psychology and psychiatry for decades. While these types of individuals don't manifest the same symptoms and dysfunctions as do persons with schizophrenia or bipolar disorder, their severity of dysfunction is frequently equal to or greater than that of schizophrenic or bipolar patients; and, there are enough similarities of presentation to yield considerable uncertainty as to just what disorder they suffer from.

**RELATIONSHIP OF DEFENDANT'S MENTAL PROBLEMS TO THE OFFENSES:** In order to better understand the defendant's behavior, one must realize the extremely distorted perception of events that prompted his behavior. His reaction to his wife's stated intent to divorce him was completely beyond the normal range of expected behavior. He did not just perceive a loss of a relationship, but a calloused betrayal that threatened his very existence. This is obviously an irrational perception that is of psychotic proportion. In response to this irrational, compelling belief, he formulated a plan to kill his wife, her children, and himself as his only available response. Tragically, he

began to act on this plan.  Thankfully, he aborted the plan before he severely physically harmed the boys.  This is in no way intended to excuse his behavior; but, is offered to assist the triers of fact in understanding what transpired.

     Respectfully submitted,

_____   _____

David Self M.D.   Date



20

1

2

3

4

5

6

7

8

9

10

11

12

13        STATE'S EXHIBIT NO. 7

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

STATE'S
EXHIBIT
1

David Self —

   not enough clear ev
   to support an
   Axis I diagnoses

suggestion of psychotic disorder
— subtle, not much

he has horrible personality
disorders

Antisocial Disorder — is clearly
   present,

Borderline Personality Disorders
   arguably they's there was
   undertreated underlying
   psychosis

There just isnt enough ev present
   to support Axis I diagnosis

He has narcissistic traits but
doesn't fit criteria
for diagnosis

Personality disorders are
very serious

— they make bad indicators
in regard to future
dangerousness,
bc it can't be
treated and it will
always be present.

makes him more likely
to be future danger.

David will not go very
far at all in regards
to any Axis I diagnosis
that he would not
argue with a low level
diagnosis if someone else
made it — HE WON'T

△ has severe character pathologies

△ hearing voice -
not hallucinatory at all
in line w/ personality disorder

Talking about Thinkerstown diagnosis

- doesn't really agree w/
their diagnosis b/c its
all self reported

△ Dr letter -
not delusional @ all

Chapman Tape -
talks about voices but not
hallucinatory; its an

MDD — Δ doesnt meet the
criteria.

the depression in BPD are
transient
— change from one
minute to the next.

Δ's paranoia

Δ meets criteria for 4
personality disorders

Δ's paranoia is generally
not delusional
→ doesnt meet criteria

BPD is severe-

it is biological, genetic
inheritable

it isnt choices he made
it was visited upon him

Strategy re mitigation:

— put in collaterals

Medication dont make a
difference to BPDs

thats why people misdiagnose
as bipolar
— b/c it can be
treated.

BPDs are extremely problematic
for treatment b/c they
are constantly splitting

mood change.

In adult bipolar you
see long periods of
moods

BPD's can change rapidly
depending on
underlying stimulus

bipolar doesn't really
change b/c of
stimulus

Treating BPD -

can't cure -

just try to manage it
as best you can

Jail Diagnosis
1 is taking Remeron
depressive disorder NOS.

anti depressive
extremely hypnotic, sedative
drug.

his dosage in jail
is 45 mil
the max FDA rec is 60

Δ's letter to Lovetta —
ev of a narcissistic wound
from Lovetta.
not psychotically derived
no evidence of psychosis or
delusion
— its logical thought
although obviously
not rational
— gross emotional
overreaction.

This is not good for △
b/c it shows that he
would probably be future
danger.

---

Risk Assessment =
   wasn't asked to do it.

△ has some psychopathic
characteristics but doesn't
meet criteria for
diagnosis



21

1
2
3
4
5
6
7
8
9
10
11
12
13          STATE'S EXHIBIT NO. 8
14
15
16
17
18
19
20
21
22
23
24
25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT



Cause No: F09-59380

STATE'S
EXHIBIT
8

---

**Kristi Compton, Ph.D.**
*Clinical and Forensic Psychology*
♦12830 Hillcrest Rd, Ste. D231, Dallas Texas, 75203   ♦(972)960-1472   ♦(972)960-1476 (fax)

---

### Competency To Stand Trial Evaluation

**Re:  THE STATE OF TEXAS VS. GARY GREEN
IN THE 282nd JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS**

**Cause No:** F09-59380

**Date of Evaluation:** 08-05-2010

**REFERRAL REASON:** The defendant's attorney, Paul Johnson, requested an evaluation to assess the defendant's competency to stand trial. According the Texas Code of Criminal Procedure, 46B.003:

A person is incompetent to stand trial if the person does not have:

1.  Sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or
2.  A rational as well as factual understanding of the proceedings against the person.

According to 46B.024, the following factors should be considered in assessing competency:

1.  The capacity of the defendant during the criminal proceedings to:

    A.  Rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;
    B.  Disclose to counsel pertinent facts, events, and states of mind;
    C.  Engage in a reasoned choice of legal strategies and options;
    D.  Understand the adversarial nature of criminal proceedings;
    E.  Exhibit appropriate courtroom behavior; and
    F.  Testify

2.  Whether the defendant has a diagnosable mental illness or is a person with mental retardation;

3.  The impact of the mental illness or mental retardation, if existent, on the defendant's capacity to engage with counsel in a reasonable and rational manner; and

1

Cause No: F09-59380

4. If the defendant is taking psychoactive or other medications:

    A. Whether the medication is necessary to maintain the defendants competency; and
    B. They effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

## Methods of Evaluation:

- **Evaluation of Competency to Stand Trial-Revised (ESCT-R)**
  The ESCT-R is a semi-structured interview that has been show to have high validity. It is designed to assess the legal standard for competency as propounded by *Dusky v. United States (1960)*. It also encompasses screening for feigned incompetency.

- **Test of Memory Malingering (TOMM)**
  The TOMM is a 50 item recognition test that was is to assess an individual's propensity to feign impairment and not put forth full effort during the testing.

- **Clinical Interview with the defendant**

- **Mental Status Examination**

- **Document Review:**

1. Records from Timberlawn Hospital dated 08-20-09 to 08-24-09 show he was hospitalized secondary to emotional instability. He was diagnosed with Major Depressive Disorder, recurrent, with psychotic features with a rule out on Bipolar II Disorder. He was prescribed Risperdal and Remeron.

2. A Neuropsychological examination conducted by Dr. Gabriel Martinez on 05-25-10 show a diagnosis of Schizoaffective Disorder, Bipolar Type, Cognitive Disorder NOS, and Personality Disorder NOS with avoidant, paranoid, and borderline features.

3. Records from Parkland Jail Health show he has been diagnosed with Depressive Disorder, NOS and Adjustment Disorder, NOS. Upon incarceration he was placed on suicide watch after attempting to commit suicide prior to his arrest. The records reflect he has been seen by a mental health professional on a consistent basis. There are notations he tends to

2

GREEN 0000003367

Cause No: F09-59380

become preoccupied with the judgment of others. The vast majority of the notes indicate the defendant is coherent and can relate spontaneously. The notes do not show a consistent pattern of psychotic features.

**General Observations**: The defendant is a 39 year old African-American male who was evaluated at the Lew Sterrett Detention Facility. He appears his stated age. He presented well groomed, suggesting he has been attendant to personal hygiene. The defendant presented with a blunted affect and made limited eye contact. However, he related spontaneously and showed no difficulties with receptive or expressive speech. His communication abilities appear intact. No abnormal motor movements were observed.

He was informed that his attorney had requested an evaluation regarding his mental competency to stand trial. He was advised of the limits of confidentiality, specifically that a report would be submitted to his attorney. He voluntarily agreed to proceed with the evaluation.

**Relevant Background Information:**

\*\*The information in this section was obtained directly from the defendant. The primary purpose of obtaining a social history during a competency evaluation is to assess the defendant's ability to coherently relate and provide relevant and logical details. This ability is of import in assisting with ones defense. The social history is not intended to be a full description of life.

**Childhood History:** The defendant reports that he was born at Parkland Hospital and raised in the Dallas area by his mother and stepfather. He reports having no contact with his biological father during his childhood. He reports meeting his biological father around the age of 34. his father was quite ill and was unaware of his presence. The defendant was raised with one younger brother. He reports he considers his stepfather his primary father figure.

The defendant reports a lonely and isolated childhood. He indicates that he always felt different and was bullied by other children. He recalls having very few friends and tended to isolate "because he was different and other people were messed up."

**Educational History:** The defendant reports he completed the tenth grade and later earned a GED. He denies being placed in any special education, but states he was a "slow learner."

**Adult Relationship History:** The defendant reported that he has been married twice. He reports being married from 1995 until approximately 2001. He states he married again on July 25th 2009, but sixty days after the marriage his wife requested an annulment. He states they had lived together for 3 ½ years prior to getting married.

3

GREEN 0000003368

Cause No: F09-59380

The defendant denied overt symptoms of psychosis such as auditory hallucinations, visual hallucinations, tactile hallucinations, olfactory hallucinations, thought broadcasting, thought insertion, or thought withdrawal.

He does appear to have a generalized paranoid predisposition, as it is apparent he believes that others are not trustworthy and in some manner want to harm him. The defendant also harbors some relatively strange ideas. For example, he reports believing in vampires and werewolves. He also indicates he can sense whether a person has a "good or bad spirit."

The defendant reports having no close confidants except for first degree relatives. He states he has always been more comfortable around animals then people, primarily because he believes people are basically untrustworthy and evil.

## Mental Status Examination

**Orientation:** The defendant was alert and oriented to person, time, place, and situation.

**Mood/Affect:** He presented with a depressed mood and blunted affect.

**Speech:** The defendant's speech was slow, but coherent and logical. His rate and volume of speech was within the normal range. He communicated relevantly and appeared to have no deficits with receptive or expressive speech.

**Thought Processes:** The defendant was able to relate in a coherent and logical fashion, indicating goal directed thought processes.

**Thought Content:** The defendant exhibits some paranoid ideation as well as general negative thought patterns. There are no indications of severe delusions or psychotic processes at this time.

**Attention/Concentration:** The defendant appears to have average attentional abilities. This was evidenced by his ability to spell "world" backwards as well as perform serial 3 subtractions from 30 without error. He was attentive during the evaluation process and appeared to track and respond to speech.

**Memory:** The defendant appears to have relevantly intact biographical memory, as he could recall specific events in his childhood. He also could recall his date of birth, social security number, and his children's ages. His short term recall appears intact as he was able to recite 6 out 6 numbers after immediate presentation. His delayed recall was fair as he could recall 2 out of 3 words after a 5 minute interval.

**Fund of Information:** The defendant was able to identify the current president, the most recent former president, and provided an explanation of events that occurred on 09-11-2001. His fund of information appears average for his age.

5

GREEN 0000003370

Cause No: F09-59380

**Estimate of Intelligence:** Prior intellectual testing done by Dr. Martinez show a full scale I.Q. of 78, which falls within the borderline range of functioning. However, the defendant accurately identifed the similarity between an apple and an orange, a bus and a car, and an egg and a seed.

### Malingering Assessment

The defendant was administered the Test of Memory Malingering to rule out the possibility of not putting forth full effort during the interview and/or making a concerted effort to appear more impaired than may truly be the case. The person is shown 50 pictures and immediately following the presentation of the pictures another 50 pictures are shown with two pictures on each page and the person is asked to identify the ones he/she had seen previously. Most individuals, even those with severe brain dysfunction can identify at least 25% correctly. The defendant correctly identified 50 out of 50 on the first trial. Therefore, the second trial was not warranted. His performance on this measure indicates he was not attempting to feign cognitive impairment.

**Clinical Summary:** The defendant's presentation indicates he is depressed. He also endorsed symptoms consistent with a Bipolar Spectrum Disorder. He did not report experiencing any auditory hallucinations or delusions at this time. He appears preoccupied with paranoid thoughts and endorses some rather bizarre and odd thinking. There is some mild evidence of magical thinking within his thought processes. However, these appear to be more aligned with a dysfunctional personality than with overt psychosis.

**Diagnostic Impressions (according to DSM-IV-TR criteria):**

Based on the information obtained in the course of this evaluation, the following DSM-IV-TR diagnoses are warranted:

**Axis I:**     Bipolar Disorder, NOS with a history of psychotic features.

**Axis II:**    Personality Disorder, NOS with Paranoid, Antisocial, Schizotypol, and Schizoid features.

**Axis III:**   Hypertension per medical reports.

**Axis IV:**     Incarceration.

**Axis V:**     **GAF=** 70 out of 100

GREEN 0000003371

Cause No: F09-59380

2. *Capacity to relate to defense counsel, comprehend instructions and advice, and to make decisions after receiving advice:*

The defendant was able to coherently and rationally communicate during this evaluation. He stated he has a good relationship with his attorney and has full trust in him. He further stated that he has had no difficulty understanding his attorney. He reports having no disagreements with his attorney, but stated he could talk to him calmly and rationally if such a disagreement arose. The defendant was able to track conversation during this evaluation and followed instructions during testing. Based upon his presentation, there are no concerns he would not be able to comprehend instructions or make decisions after receiving advice.

3. *Capacity to testify relevantly and be cross examined if necessary:*

The defendant was able to attend and answer questions appropriately. Therefore, if absolutely necessary he would be able to testify in his own defense.

4. *Capacity exhibit appropriate courtroom behavior:*

The defendant reports understanding courtroom decorum. He reports never acting out in a courtroom setting. He indicates that during a trial he would communicate to his attorney via writing notes or whispering. He clearly articulated an understanding that one is not to be disruptive in a courtroom.

5. *Capacity to understand the charges against him and the dispositions, pleas, and possible penalties:*

The defendant was able to identify his charge and the possible range of penalties. He clearly was able to identify the difference between being found innocent or guilty.

6. *Capacity to disclose pertinent facts surrounding the alleged offense, events, and states of mind:*

The defendant reported he has been capable of fully relating his version of the offense to his attorney. He states he was able to detail his state of mind as well as provide information about witnesses. Based upon his presentation, there are no significant concerns that he would not be able to provide relevant information to his attorney.

8

GREEN 0000003372

Cause No: F09-59380

### 7. Impact of any existing mental illness or mental retardation on the defendant's capacity to engage with counsel in a reasonable and rational manner.

While the defendant appears to be an individual with mental illness, it is not sufficiently impacting his ability to communicate relevantly with his attorney and assist in his defense. He is currently on medications and it appears to be effectively moderating symptoms.

**ESCT-R Results:**

- Factual Understanding of the Proceedings: The defendant earned a T score of 75 on the ESCT-R that measures this domain. This falls within the competent range.

- Rational Understanding of the Proceedings: The defendant earned a T score of 75 on the ESCT-R scale that assesses this domain. This falls within the competent range.

- Capacity to Assist Counsel: The defendant earned a T score of 75 on the ESCT-R scale that assesses this domain. This falls within the competent range.

*Below is shown a tabular representation and assessment of relevant abilities:*

| Ability | Poor | Below Average | Average | Above Average |
|---|---|---|---|---|
| Rationally understand the charges against him and the potential consequences of the pending criminal proceedings | | | x | |
| Disclose to counsel pertinent facts, events, states of mind | | | x | |
| Engage in a reasoned choice of legal strategies | | | x | |
| Understand the adversarial nature of criminal proceedings | | | x | |
| Exhibit appropriate courtroom behavior | | | **x** | |
| Testify and cross examine witnesses | | | x | |
| Assist counsel with defense | | | x | |

**Opinions and Recommendations:** The defendant clearly exhibited a factual and rational understanding of all parties in a courtroom proceeding. He did not exhibit any psychotic or delusional reasoning related to any party. Further, he was able to relevantly communicate and could assist his attorney with his defense.

Therefore, under the criteria of Article 46B.024:

9

Cause No: F09-59380

**Mr. Gary Green appears competent to stand trial.**

It is recommended that he remain on medications during the trial in order to sustain a competent status.

I respectfully submit this report, with the full understanding that competency is a matter of law and ultimately is an issue for a judge or a jury to decide.

Respectfully Submitted,

Kristi Compton. Ph.D.

10

GREEN-0000003374

22



1

2

3

4

5

6

7

8

9

10

11

12

13        STATE'S EXHIBIT NO. 9

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

# Dr. Goodness & Associates
### A Clinical and Forensic Psychology Practice

STATE'S
EXHIBIT
9

| | |
|---|---|
| 121 Olive Street | (817) 379-4663 |
| Keller, Texas 76248 | Facsimile (817) 622-8077 |

April 30, 2012

Robert Romig
Office of Capital Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78711

**RE: Gary Green, Cause No. F09-59380-S**

Dear Mr. Romig:

I received the affidavit you prepared and for which you requested my signature. I do not believe the affidavit accurately reflects the events that occurred or the events as I conveyed them to you. I cannot sign a document that has significant spin. I understand your job is to assist Mr. Green as much as possible on appeal, but I can only attest to the following:

> Paul Johnson did retain me to assist in developing a mitigation case in the Gary Green matter.

> Mr. Johnson is a very hands-on, involved attorney who heads all of his cases and maintains control of his cases.

> On cases in which I have assisted him, Mr. Johnson prefers to conduct collateral interviews with me rather than receiving a summary of interviews, and he also prefers to do some interviews himself. He may also have assigned some interviews to co-counsel. Mr. Johnson joined me for a variety of interviews. He conducted a variety of interviews on his own, and he may have conducted some interviews with co-counsel or assigned them to co-counsel.

> I summarize interviews that I conduct independently and often summarize those in which attorneys accompany me though it is possible that I do not summarize a meeting if an attorney is present and does not request a summary. I would have to go through my files in detail to ascertain who I interviewed on my own in this case, who I interviewed with Mr. Johnson, who I interviewed with all counsel present and who may have gotten interviewed and their interview never summarize given Mr. Johnson was present and took the notes himself.

➢ I provided Mr. Johnson with my recommendations of various experts that I believed might be helpful in developing the mitigation case. One of those experts, Dr. David Self, had several conversations with me leading up to the trial. It was my belief from those discussions that he would be able to provide helpful mental health testimony though understandably there would be negative aspects to his testimony as well. Once he issued his final report and we met with him, he ultimately came to mostly conclusions that would be more damaging to the case than helpful. We discussed retaining yet another mental health expert. Ultimately, after considering the three potential testifying experts' opinions (Dr. Gilbert Martinez, Dr. Kristi Compton and Dr. David Self), Mr. Johnson elected not to retain another mental health professional.

➢ I identified a list of potential witnesses that I recommended be sought and interviewed. We all added and subtracted from the list as the case progressed. Ultimately, Mr. Johnson made final decisions about witnesses and I do not question his judgment.

➢ I did sit through at least a fair portion of the penalty phase of Mr. Green's trial in order to assist Mr. Johnson as needed. I provided whatever consultation he requested during that time and I prepared Dr. Martinez for his testimony. I likely spoke with some of the family members about their testimony, but cannot specifically recall the particulars of those discussions. I extensively prepared Dr. Kellie Gray-Smith for testimony on multiple occasions.

➢ I specifically used Dr. Gilbert Martinez, in these cases, as he is not forensic and is unaware of the literature on psychopathy and other traditionally hurtful matters to defense cases. Dr. Martinez would be able to testify about his beliefs about the defendant's mental health problems without being used to go through the Hare Psychopathy Checklist, which is traditionally done by district attorneys (especially in Dallas County) when a forensic psychologist/psychiatrist is used. In addition, given Dr. Gray-Smith did not evaluate the defendant and also is not forensic, she could make the relevant points about the lack of mental health treatment within the African-American community and the failings of his education without being used to provide hurtful testimony. Likewise, Mr. Johnson interviewed treating mental health professionals pre- and post-offense and determined they would not be helpful to the defense, and thus they were not called.

➢ I do not believe it is my place to second guess my client's judgment about how to try their cases or proceed legally. I advise them, provide the services requested and then allow them to use whatever opinions or work product as they see fit.

Dr. Goodness & Associates                                                                          Matter: Green, Gary

➤ Mental oddities are normal in families and thus not recognized.

➤ This family is classic in this regard.

Capable of bonding

➤ Lennell, ex-girlfriend, still cares for him.

➤ Jennifer cared about him enough to correspond after he was imprisoned for beating her.

➤ Mother is still and advocate.

Cultural Issues

➤ African-Americans are less inclined to seek treatment/mental health assistance

Academic

➤ Very poor education.

➤ Should have had special education evaluation/services, but mom refused.

Cognitive Dysfunction

➤ Poor ability to follow instructions

Takes responsibility for behavior / remorse

➤ Took Jennifer to the hospital when he beat her.

➤ Admitted to robbery.

➤ Tells mom he sees victim/dreams about her.

➤ Turned self in for index offense

Mental Illness

➤ Diagnosed with Bipolar Disorder, Schizophrenia and personality disorders"

Dr. Goodness & Associates                                    Matter: Green. Gary

➢ I did recommend a number of mitigation themes in this case some of which are copied below. Ultimately, as in every case, it was the lead attorney's prerogative as to what to present to the jury.

**"Potential Mitigation Themes**

**The State of Texas vs. Gary Green**

Family History of Mental Illness

➢ Pervasive through family – refer to genogram

➢ Many have services through MHMR or get SSDI/SSI

    o Thelma

    o Debra

    o Sabrina, and her two children

    o Thomas Carter

    o Bertha

        ■ Held a doll and said she was pregnant

    o LaJade

Family Violence

➢ Father was abusive towards Gary. Made Gary fight another child.

➢ Father abused mom in front of Gary.

➢ Aunt Diane was murdered.

➢ Uncle Robert Earl murder wife and self

Family Dysfunction

➢ Many members have had CPS involvement.

➢ Legal issues are prevalent – dad in prison.

Dr. Goodness & Associates                                          Matter: Green, Gary

I hope the above information is helpful in clarifying the events that transpired in this case.

Respectfully Submitted,

*Kelly R. Goodness, Ph.D.*

Kelly R. Goodness, Ph.D.
License #3-1223

KG/wp

23

1

2

3

4

5

6

7

8

9

10

11

12

13            STATE'S EXHIBIT NO. 10

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT

24

1

2

3

4

5

6

7

8

9

10

11

12

13          STATE'S EXHIBIT NO. 11

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT



STATE'S
EXHIBIT
__11__

# AFFIDAVIT OF KELLY GOODNESS

I, Kelly Goodness, Ph.D, declare as follows:

1. My name is Kelly Goodness.

2. I own and operate Dr. Goodness & Associates, a clinical and forensic psychology practice.   This practice offers both psychological evaluation and treatment of patients and forensic services.   In addition, I maintain a clinical practice where I evaluate and treat patients for psychiatric disorders.  I also teach psychology courses at the University of Texas at Dallas.

3. My office's Forensic Services Division provides assistance in witness investigation, forensic case evaluation, expert witness testimony, and other trial consultation.

4. I was contacted by attorney Paul Johnson to consult on the capital trial of Gary Green.  I previously worked with Mr. Johnson on two or three other cases.  In Green's case, I was asked to provide consultation on what witnesses needed to be interviewed and what types of defense experts ought to be utilized in order to develop the punishment case.  I was not asked to be the trial team's mitigation specialist.

5. In my experience, Paul Johnson runs his own show and does his own mitigation work, and the Green case was no exception.  It was clear that he was in charge of the development of the case.  Some attorneys ask me to take more of a lead role in the development of mitigation evidence.  But in Green's case, Mr. Johnson limited my role to providing advice and recommendations.

1

6. My office initially advised Mr. Johnson on what records to gather to begin their investigation on Green's background. Then, I helped develop a list of potential witnesses to interview based on these records. I did not decide which witnesses to interview, though, or whether there were other witnesses not on the list that needed to be interviewed.

7. I participated in some of the interviews with Mr. Johnson and his second chair counsel. I also conducted a few interviews by telephone without Mr. Johnson present. My understanding is that Mr. Johnson also conducted interviews without me present, though I do not know of whom.

8. My records indicate the following interviews were done by my office.

   a. June 14, 2010 – Mary Sampson, Leon Sampson, and Nysasno Carter – in person at the Dallas County Courthouse – Paul Johnson present

   b. July 8, 2010 – Irving Green, Stephanie West – by telephone

   c. July 9, 2010 – Bertha Curry – in person at Curry's residence – Paul Johnson, Brady Wyatt, and Kobby Warren present

   d. July 9, 2010 – Aaron Green – in person at the Dallas County Courthouse – Paul Johnson, Brady Wyatt, and Kobby Warren present

   e. July 9, 2010 – Rodney Haney – in person at Haney's residence - Paul Johnson, Brady Wyatt, and Kobby Warren present

   f. July 15, 2010 – Lenelle Williams – by telephone

2

    g. August 20, 2010 and August 23, 2010 – Shirley Coleman – by telephone

    h. August 20, 2010 – Tony Mitchell, Cory Foster, Karen Knight – by telephone

    i. August 31, 2010 – Margaret Young – by telephone

    j. September 10, 2010 – Lottie Tucker, Sarah Carter, Dana Carter – by telephone

    k. September 26, 2010 – Belinda Lacy, by telephone

9. I also advised Mr. Johnson on what type of and which experts to hire. I recommended hiring an expert who could testify both specifically about Green's educational performance and generally about the role of mental illness in the African American community. I recommended Dr. Kellie Gray-Smith for this role.

10. I also recommended hiring Dr. Gilbert Martinez. I have previously hired Dr. Martinez to testify on neuropsychology related matters. I typically prefer to limit Dr. Martinez's testimony to a clinical diagnosis, rather than forensic testimony. I suggested this to Mr. Johnson. I spoke with Dr. Martinez several times, and I believe Mr. Johnson had one interview with him.

11. Finally, I recommended hiring Dr. David Self as a forensic psychiatrist. I believe Mr. Johnson planned on using Dr. Self to testify about the interplay between Green's mental illness and the crime and to identify mitigating factors. However, a few weeks before trial, Dr. Self provided his report to the Green defense team and changed his opinion about what we had previously discussed for his testimony. Mr. Johnson decided not to use Dr. Self at trial. I recommended hiring another expert, but Johnson decided not to.

3

12. I sat through the penalty phase of Green's trial in order to assist with any questions Mr. Johnson had. However, I did not decide which witnesses were going to testify. Nor did I prepare any witnesses for testimony. I was not in charge of developing the themes for the defense. I did assist in preparing Dr. Martinez for his testimony, but that was the limit of my evidence preparation.

13. I have read and reviewed this four page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the ___ day of _____, 2012 in Dallas, Texas.

_____
Kelly Goodness

Subscribed and sworn to before me on _____, 2012.


_____

Notary Public, State of Texas

4

Dr. Goodness & Associates                                    Matter: Green, Gary

## Poor Parental Involvement

> Mom oblivious – even to Nysasno stealing a car.

> Refused to address Gary's mental health issues as a child.

> Did not recognize Gary's need for academic intervention.

> Father absent in childhood.

> Mom has "nervous breakdown" while Gary was an infant.

## Gary's Behavior Suggestive of Mental Illness

> Withdrawal/stays to self

> Attempted to jump of school

> No friends

> Paranoid behavior and thoughts

> Felt people talked about him or where out to get him

> Laughed without reason

> Talks to self

> Heard rats (not real)

> Difficulty keeping a job

> Nonsensical talk

> Talking to TV

> Fear of vampires

> Common refrain of "I'm stressed"

> Talked of suicide

> Timberlawn admission

## Families often do not recognize mental illness

25



1

2

3

4

5

6

7

8

9

10

11

12

13          STATE'S EXHIBIT NO. 12

14

15

16

17

18

19

20

21

22

23

24

25

JOSEPH E. PHILLIPS, CSR            282ND JUDICIAL DISTRICT COURT

**Stephanie Fargo**



STATE'S
EXHIBIT

12

| | |
|---|---|
| **From:** | Kelly Goodness, Ph.D. <kelly.goodness@drgoodness.com> |
| **Sent:** | Friday, July 18, 2014 9:51 AM |
| **To:** | Stephanie Fargo |
| **Subject:** | FW: Green, Gary |
| **Attachments:** | Jail Psych Records.pdf; Timber Lawn Records.pdf |
| | |
| **Importance:** | High |

---

**From:** Dr. Kelly Goodness [mailto:Kelly.Goodness@drgoodness.com]
**Sent:** Monday, July 12, 2010 9:20 PM
**To:** 'David Self '
**Subject:** FW: Green, Gary
**Importance:** High

---

**From:** Dr. Kelly Goodness [mailto:Kelly.Goodness@drgoodness.com]
**Sent:** Tuesday, July 06, 2010 3:46 PM
**To:** David (Stanley) Self M.D. (david.self@dshs.state.tx.us)
**Cc:** Paul Johnson (pjjdoc@aol.com)
**Subject:** Green, Gary
**Importance:** High

As discussed☺ ... some records attached.

Paul – Will you please ensure that Dr. Self gets a full copy of the offense report? Please confirm that you will be doing this. I am on my way out of town and will not be able to copy what I have to send to him. I have forwarded all other records he requested aside from the neuropsych report, which I will forward when Dr. Martinez signs it today.

Thanks for agreeing to assist. Mr. Johnson has promised court orders and a letter by tomorrow. I will forward all information as discussed. Please address competency and if competent, MSO. I anticipate using you for mitigation testimony to explain:
- his diagnosis
- when it likely started
- how someone could go untreated with a psychotic illness
- the effect of his illness on his occupational abilities and overall ability to function adequately in life (can his illness have made him appear more lazy and antisocial than he really was)
- the effect of his illness on his offense actions
- there is treatment available and the structure of prison can have a therapeutic effect
- Medication recommendations?


Many thanks-kg

**Kelly R. Goodness, Ph.D.**
*Clinical and Forensic Psychology*

1

121 Olive Street
Keller, Texas 76248
Office: (817) 379-4663 (GOOD)
Fax: (817) 622-8077 – Fax

Please visit us on the web at www.drgoodness.com

*The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual(s) or organization named above. If you are not the intended recipient, or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and any attachments contained herein is prohibited. If you have received this email in error, please immediate notify me by return email and delete this email from your computer and/or network system.*

26

```
 1              TRIAL COURT CAUSE NO.F09-59380-S

 2                WRIT NO. W09-59380-S(A)

 3   GARY GREEN                )( IN THE 282ND JUDICIAL

 4   VS.                       )( DISTRICT COURT OF

 5   THE STATE OF TEXAS        )( DALLAS COUNTY, TEXAS

 6

 7                *    *    *    *    *    *

 8           I,Joseph E. Phillips, Official Court Reporter in

 9   and for the 282nd Judicial District Court of Dallas

10   County, State of Texas, do hereby certify that the above

11   exhibits constitute true and complete duplicates (where

12   possible to duplicate) of the original exhibits, excluding

13   physical evidence, admitted into evidence during the Trial

14   on the Merits in the above-entitled and numbered cause as

15   set out herein before the HONORABLE ANDY CHATHAM, Judge of

16   the 282nd Judicial District Court of Dallas County, Texas,

17   and a jury trial or other proceedings beginning February

18   28th, 2014.

19           WITNESS MY OFFICIAL HAND on this the 19th day of

20   August, 2014.

21           /S/ JOSEPH E. PHILLIPS
                 Joseph E. Phillips, CSR
22               Official Court Reporter
                 282nd Judicial District Court
23               133 N. Riverfront Blvd., LB-32
                 Dallas, TX   75207
24               joeandtuckerdog@yahoo.com

25                                    ORIGINAL
```

JOSEPH E. PHILLIPS, CSR          282ND JUDICIAL DISTRICT COURT