# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

*Gary Green*,

    Petitioner,

v.

*Lorie Davis*, Director, Texas Department of
Criminal Justice, Correctional Institutions
Division,

    Respondent

No. 3-15-CV-02197-M-BH

Death Penalty Case

## PETITIONER'S OBJECTIONS TO THE FINDINGS, CONCLUSIONS
## AND RECOMMENDATION TO DENY POSTPETITION FUNDING
## OF THE UNITED STATES MAGISTRATE JUDGE (ECF-52)

**Michael Mowla**
**P.O. Box 868**
**Cedar Hill, TX 75106**
**Phone: 972-795-2401**
**Fax: 972-692-6636**
**michael@mowlalaw.com**
**Texas Bar No. 24048680**
**Attorney for Petitioner**
**(Lead counsel of record)**

**Lydia M.V. Brandt**
**The Brandt Law Firm, P.C.**
**P.O. Box 326**
**Farmersville, TX  75442**
**Phone: 972-752-5805**
**lydiabrandt566@gmail.com**
**Texas Bar No. 00795262**
**Attorney for Petitioner**

## I.  Table of Contents

I.      Table of Contents ........................................................................................2

II.     Table of Authorities ....................................................................................3

III.    Background ..................................................................................................5

IV.     Objections ...................................................................................................6

        1.      Objection to Page 5 of the Findings, "The claims that Green seeks to investigate appear to have been adjudicated on the merits by the state court. If so, new evidence that was not before the state court in making the determination under 2254(d) may not be considered"; and to page 6 of the Findings, "Green has not attempted to show how his claims could come within an exception to bar under the Texas law; funding for procedurally barred claims is not required." ....................................6

        2.      Objection to the Findings on pages 7 (the "strategy" employed by state habeas counsel) and 8 ("Green appears to argue that the SEM should be applied twice for a total reduction of 10 points rather than 5)..............................................................................................................17

        3.      Objection to the Findings on pages 6-8 regarding *Martinez* and *Trevino* ........................................................................................................18

        4.      Objection to the Findings because they do not address Petitioner's request to investigate the *Wiggins*-claim..............................................23

        5.      Objection to Page 5 of the finding that any of the requested funding is barred by Pinholster or the § 2254(d)(1)-bar ....................................26

V.      Conclusion and Prayer ..............................................................................27

VI.     Certificate of Service ...............................................................................29

## II. Table of Authorities

**Cases**

*Allen v. McCurry*, 449 U.S. 90 (1980) ................................................................. 26

*Atkins v. Virginia*, 536 U.S. 304 (2002) .............................................................. 15

*Ayestas v. Davis*, No. 16-6795, 137 S.Ct. 1433 (2017) .................................... 19

*Cathey v. Davis (In re Cathey)*, 857 F.3d 221 (5th Cir. May 11, 2017) ....................... 16

*Corley v. United States*, 556 U.S. 303 (2009) ...................................................... 20

*Crutsinger v. Stephens*, 576 F.Appx. 422 (5th Cir. 2014) ..................................... 19

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .......................................................... 6

*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) ....................................... 14

*Ex parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015) ...................................... 16

*Fidelity Standard Life Ins. Co. v First Nat. Bank & Trust Co.*, 510 F.2d 272 (5th Cir. 1975) ............................................................................................................ 26

*Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010 (Tex. Crim. App. Oct. 3, 2012) ............................................................................. 9, 13

*Hall v. Florida*, 134 S.Ct. 1986 (2014) ......................................................... 15, 17

*Hansberry v. Lee*, 311 U.S. 32 (1940) ................................................................ 27

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326 (Fed. Cir. 2001) ............................ 26

*Jefferson v. Upton*, 130 S.Ct. 2217 (2010) (per curiam) ....................................... 24

*Jimenez v. Quarterman*, 555 U.S. 113 (2009) .................................................... 20

*Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978) ....................................... 26

*Martel v. Clair*, 565 U.S. 648 (2012) ................................................................. 21

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012) ...................................................... 18, 28

*Mays v. Stephens*, 757 F.3d 211 (5th Cir. 2014) ................................................. 17

*McFarland v. Scott*, 512 U.S. 849 (1994) ...................................................... 21, 22

3

*Montana v. United States*, 440 U.S. 147 (1979) ................................................................ 26

*Newbury v. Stephens*, 756 F.3d 850 (5th Cir. 2014) ......................................................... 19

*Porter v. McCollum*, 130 S.Ct. 447 (2009) (per curiam) .................................................. 24

*RecoverEdge L.P. v. Pentecost, et al.*, 44 F.3d 1284 (5th Cir. 1995) .............................. 26

*Roberson v. Stephens*, 614 Fed.Appx. 124 (5th Cir. 2015) .............................................. 25

*Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App.2008) ..................................................... 9

*Sears v. Upton*, 130 S.Ct. 3259 (2010) (per curiam) ....................................................... 24

*Trevino v. Thaler*, 133 S.Ct. 1911 (2013) ................................................................... 18, 28

*Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009) ............................................ 12

*Ward v. Stevens*, 777 F.3d 250 (5th Cir. 2015) ................................................................ 20

*Wiggins v. Smith*, 539 U.S. 510 (2003) .......................................................................... 23

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................................ 12

**Statutes**

18 U.S.C. § 3006A (2017) ............................................................................................... 22

18 U.S.C. § 3599 (2017) .......................................................................................... 20, 22

28 U.S.C. § 1738 (2017) ................................................................................................ 26

28 U.S.C. § 2254(d) (2018) ............................................................................................ 27

Texas Penal Code § 19.03 (2009) ..................................................................................... 9

**Other Authorities**

Frank M. Gresham, *Interpretation of Intelligence Test Scores in Atkins Cases: Conceptual and Psychometric Issues*, 16 Applied Neuropsychology 91 (2009) ................................................................................................................................ 17

**Treatises**

*Diagnostic and Statistical Manual of Mental Disorders* 5th ed. ...................................... 12

Donald G. Dutton, *The Neurobiology of Abandonment Homicide*, 7 Aggression & Violent Behav. 407 (2002) ............................................................................................. 11

To the Honorable United States District Judge Barbara Lynn:

1.      Undersigned counsel files these objections to the *FINDINGS, CONCLUSIONS AND RECOMMENDATION TO DENY POSTPETITION FUNDING* of the United States Magistrate Judge ("Findings") (ECF-52):

III.    **Background**

2.      On April 11, 2016, Petitioner filed a prepetition *Opposed First Motion for Funding* (ECF-8).

3.      The government filed a response (ECF-10), and Petitioner filed a reply (ECF-11).

4.      On May 23, 2016, the Magistrate Judge entered findings that recommended against relief. (ECF-14). Petitioner file objections to the recommendations. (ECF-16).

5.      On June 13, 2016, Petitioner filed the petition under 28 U.S.C. § 2254 (ECF-17).

6.      On July 12, 2016, Judge Lynn overruled Petitioner's objections. (ECF-22).

7.      On March 13, 2017, the government filed its answer to the petition under 28 U.S.C. § 2254. (ECF-36).

8.      On June 18, 2017, Petitioner filed the *POSTPETITION MOTION FOR FUNDING BASED ON ADDITIONAL EVIDENCE AND INTERVENING SUPREME COURT AND FIFTH CIRCUIT CASELAW* ("postpetition funding motion"). (ECF-42).

9.      On June 19, 2017, Petitioner filed the reply to the Government's answer to the petition under 28 U.S.C. § 2254. (ECF-43).

10.     On July 7, 2017, the Government filed the response to the postpetition funding motion. (ECF-44).

11.     On February 38, 2018, the Magistrate Judge entered the Findings recommending that the postpetition funding motion be denied. (ECF-52).

5

12.     These objections follow.

13.     Citations to the Appendix ("App.") refer to the Appendix submitted with the postpetition funding motion, ECF-42-1).

## IV.     Objections

**1.     Objection to Page 5 of the Findings, "The claims that Green seeks to investigate appear to have been adjudicated on the merits by the state court. If so, new evidence that was not before the state court in making the determination under 2254(d) may not be considered"; and to page 6 of the Findings, "Green has not attempted to show how his claims could come within an exception to bar under the Texas law; funding for procedurally barred claims is not required."**

14.     On page 5 of the Findings, the Magistrate Judge concludes, "[T]he claims that Green seeks to investigate appear to have been adjudicated on the merits by the state court. If so, new evidence that was not before the state court in making the determination under 2254(d) may not be considered, citing *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). (ECF-52, p. 5, first full paragraph).

15.     The Findings also concluded on the top of page 6, "Green has not attempted to show how his claims could come within an exception to bar under the Texas law; funding for procedurally barred claims is not required." (ECF-52, p. 6.).

16.     As explained before, in the writ of habeas corpus ("11.071-Application"), state habeas counsel raised 20 grounds for relief (App.369-725):

(1) systemic failure of trial counsel prejudiced the punishment phase (ineffective assistance of counsel, or "IAC");

(2) trial counsel failed to properly investigate and prepare lay witnesses for the punishment phase (IAC);

6

(3) trial counsel failed to investigate and present evidence from additional witnesses that would have benefited Petitioner's mitigation investigation (IAC);

(4) trial counsel failed to develop and present sufficient expert testimony during the punishment phase (IAC);

(5) trial counsel failed to present a full history of Petitioner's life (IAC);

(6) trial counsel was ineffective for failing to present the testimony of a competent social historian during the punishment phase (IAC);

(7) trial counsel was ineffective for failing to rebut aggravating evidence presented by the prosecution (IAC);

(8) trial counsel was ineffective for failing to present evidence that Petitioner would not be a future danger (IAC);

(9) trial counsel was ineffective when he advised Petitioner to plead not guilty, but then conceded Petitioner's guilt to the jury during closing arguments;

(10) trial counsel was ineffective by failing to rebut the State's evidence during the innocence-guilt phase(IAC);

(11) Petitioner was deprived of a full review of the record of the trial because of the ineffective assistance of both trial and appellate counsel(IAC);

(12) trial counsel was ineffective by creating a conflict of interest (IAC);

(13) because jurors viewed Petitioner in shackles, the Judgment and sentence must be reversed without a showing of prejudice;

(14) evidence of Petitioner's mental retardation should prevent his execution and should have been presented at trial;

(15) Petitioner's mental impairments make in ineligible for a death sentence;

(16) Petitioner was deprived of a fair and impartial jury because of the ineffective assistance of both trial and appellate counsel (IAC);

(17) the State engaged in purposeful discrimination by using a peremptory strike to remove a minority venire member (*Batson*);

(18) appellate counsel was ineffective by failing to appeal the trial court's erroneous denial of Petitioner's motion to preclude the death penalty (IAC);

(19) Petitioner's death sentence is unconstitutional because it was assigned based on the arbitrary system of administering the death penalty in Texas; and

(20) Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

17.     None of these claims address abandonment rage. In fact, not even close.

18.     In the petition (ECF-17), Petitioner raised: (1) a substantive *Atkins* claim and ineffective assistance of trial counsel ("IATC"); (2) a claim under *Atkins*, IATC, and IATC under *Martinez/Trevino* based on the culpability and personal characteristics of Petitioner, rather than "categorical exclusions," Petitioner's psychosis and the catathymic crisis he suffered at the time of the offense; (3) a Fifth and Fourteenth Amendment shackles issue and IATC under *Martinez/Trevino*; (4) IATC under *Strickland* and *Martinez/Trevino* on the issue of abandonment rage; and (5) IATC under *Wiggins*. (ECF-16).

19.     Abandonment rage is about diminished-capacity.

20.     Presenting evidence of mental illness to show diminished-capacity as a matter of a defendant's constitutional rights is explained in *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim.

App.2008), which was handed down almost two years (December 10, 2008) before Petitioner's trial took place.

21.     As Judge Cochran explained, to negate the mens rea element of a crime: "If, instead of blindness, the defendant suffers from mental delusions such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim. Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser or Muslim. That is the required mens rea and that is the State's constitutional burden of proof." *Id*. at 594-595.

22.     The TCCA somewhat further clarified this in *Green v. State*, No. AP-76,458, 2012 Tex. Crim. App. Unpub. LEXIS 1010, *id*. at *10-11 (Tex. Crim. App. Oct. 3, 2012). Here, the TCCA again acknowledged the defense of diminished capacity negating mens rea: "In order for diminished capacity to negate the required mens rea, the jury would have to believe that appellant suffered from a mental illness, that he was suffering from that very mental illness at the time of the murders, and that, because of the mental illness, he was not acting intentionally or knowingly when he committed the murders."

23.     The critical procedural and factual history is that on October 30, 2009, under Texas Penal Code § 19.03(a)(7) (2009), Petitioner was indicted for Capital Murder, multiple victims. (CR-Trial-1.7).

24.     Trial counsel was appointed shortly thereafter.

25.     The trial of the case began in October 2010.

26.     Petitioner was sentenced to death on November 5, 2010. (CR-Trial.162-163).

9

27.     During the innocence-guilt proceedings, trial counsel presented no diminished-capacity defense because trial counsel *presented no evidence*. (RR48.9). During Petitioner's closing argument, trial counsel explained to the jury:

> "I don't really understand exactly what the purpose of these proceedings are this morning, other than I thought both sides would probably stand up and tell you that there's really no issue in dispute here for you to decide this morning…And we pretty much told you in voir dire that the Defendant was guilty. I think all of you as you came through this process, you expected what you were going to hear was a situation where the proof was undeniable.

(RR48.17-18).

28.     Commenting that he does not "…really understand exactly what the purpose of these proceedings (innocence-guilt proceedings) equals presenting no evidence, and trial counsel followed through with his promise.

29.     Closing arguments during the innocence-guilt phase by the State focuses on Petitioner's anger at Lovetta ending their relationship (RR48.10-29), as was the argument of trial counsel: "[W]e didn't put on any evidence in the innocence/guilt phase, and you know why, don't you? Because he was guilty. He is guilty of this brutal, heinous capital murder." (RR53.29). Trial counsel also references the letter Petitioner wrote to Lovetta before he killed her. (RR53.51).

30.     Then, state habeas counsel never challenged trial counsel's failure to use the evidence of Petitioner's mental impairment to negate mens rea.

31.     Thus, it is simply **not** correct that "…(Petitioner) is putting a new spin on his mental health which was thoroughly examined at the time of trial and then reexamined during state habeas review: Green now seeks to attack both trial and state habeas counsel for ignoring Green's alleged 'abandonment rage'" as the Government previously claimed.

32.     Petitioner conducted an exhaustive explanation of why abandonment rage is an issue that should have been investigated by trial counsel and state habeas counsel but was **not**. *See* Petition, ECF-17, Ground 4; postpetition funding motion, ECF-42, p. 10-23. Petitioner incorporates these arguments into this objection in their entirety.

33.     There is no merit in the conclusion that the claim of abandonment rage has "defaulted" or was previously presented.

34.     Nor is there any merit that the claim is somehow not relevant or a "new spin" when both the State and trial counsel argued that Petitioner committed the crimes due to his extreme anger at Lovetta for breaking off the relationship and asking him to leave their home.

35.     As explained several times before, abandonment-rage or "abandonment-homicide" concerns the killing of a spouse or significant other the context of a domestic-abandonment. Donald G. Dutton, *The Neurobiology of Abandonment Homicide*, 7 Aggression & Violent Behav. 407 (2002); (App.354-368). "[I] am describing reactive spousal homicides resulting either from a perception that a spouse is leaving or has left or those longer-term 'abandonments' predicated on emotional distancing and an ensuing 'catathymic crisis.'" (App.355). Dutton identified two recurring issues that arise in abandonment rage situations: (1) men who experience "abandonment rage" and acted in a controlling way to avoid it, frequently questioning their spouses on their whereabouts, etc., which ultimately led to the men harming their spouses (App.356); and (2) the perpetrator's choice of an intimate partner as the target of the abandonment rage underscores the origin of that rage, which is the abandonment by a parent. The "abandonment terror" is transferred to the adult partner because the ego deficits generated by the original trauma necessitate a current partner to maintain ego integrity. (App.363).

11

36.     Further, "abandonment-rage" is a recognized ground in the Fifth Circuit as detailed in *Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009). Like Petitioner, the appellant in *Walbey* suffered extreme trauma during childhood. Walbey was abandoned in a shelter at age 13, while at about the same age, Petitioner once nearly committing suicide by climbing on top of a building and frequently hallucinated, believing he saw vampires. (HR3.23). Petitioner would watch his father beat up his mother. (HR3.17-18). Petitioner's father also abused Petitioner. (HR3.18-19). Just like Walbey, witnessing extreme abuse and being abused caused Petitioner to believe that abusive relationships are normal. (HR3.20-21).

37.     Further, abandonment-rage is a type of attachment disorder that begins in childhood and continues into adulthood. As explained in the DSM-5, attachment disorder is a type of trauma- and stressor-related disorder where exposure to a traumatic or stressful event is a diagnostic criterion. *Diagnostic and Statistical Manual of Mental Disorders* 5th ed., 267. (DSM),

38.     Just as the Fifth Circuit in *Walbey* applied *Williams v. Taylor*, 529 U.S. 362, 369 (2000), this Court should as well. In *Williams*, the Fifth Circuit held that trial counsel can be prejudicially ineffective even if: (1) some of the available mitigation evidence is presented; and (2) there is psychiatric testimony, and that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing. *Walbey*, *id*. at 802-803.

39.     And just as the Fifth Circuit rejected the State's "bald" assertions of the obvious, which is that the appellant's crime was brutal, this Court should do as well.  The point of a diminished capacity defense is to "…negate the required mens rea, (which requires a showing that) (Petitioner) suffered from a mental illness, that he was suffering from that very mental illness at the time of the murders, and that, because of the mental illness, he was not acting intentionally or

knowingly when he committed the murders." *Green*, 2012 Tex. Crim. App. Unpub. LEXIS 1010, at *10-11.

40.     Without the funding to investigate this claim, which was never investigated before, Petitioner will be denied his constitutional right to effective counsel at both the trial and postconviction level. In *Walbey*, the Fifth Circuit held that the appellant satisfied both prongs of *Strickland* and remanded the case with instructions to the district court to grant the defendant a writ of habeas corpus, directing Texas either to grant him a new punishment hearing or impose an appropriate noncapital alternative sentence. *Id*. at 806.

41.     Next, Petitioner has also thoroughly discussed the *Atkins* issue. *See* Petition, ECF-17, Grounds 1-2 postpetition funding motion, ECF-42, p. 10-27. Petitioner incorporates these arguments into this objection in their entirety.

42.     The *Atkins* claim was **not** properly investigated by either trial counsel or state habeas counsel.

43.     As the first Affidavit of Robert Romig (state habeas counsel) (App.827-828) indicates, state habeas counsel engaged Dr. James Patton to review only a portion of Petitioner's records and to offer suggestions about potential further investigation of whether Petitioner suffered from intellectual disability, but was not asked to provide (and did not provide) an assessment of whether Petitioner showed adaptive deficits or met the diagnostic criteria for intellectual disability. (App.827-828).

44.     State habeas counsel did **not** retain other expert witnesses to evaluate Petitioner for intellectual disability primarily because the workload and budget of the office. This decision was not based on a belief that further investigation would **not** yield beneficial evidence or on a belief that Petitioner was ineligible for a diagnosis of intellectual disability. (App.828).

13

45.     Mr. Romig also testified (by affidavit) that it was the ***policy*** of the prior director of the Office of Capital and Forensic Writs (state habeas counsel) until mid-2015 to **not** request funding for experts from state habeas courts if the office lacked funding for a case. *See* ECF-49.

46.     This policy was discontinued by the present director of that office. *Id*.

47.     As reflected in the *SECOND AFFIDAVIT OF ROBERT ROMIG*, Mr. Romig confirmed that "…[T]he policy under (the previous director) was to rely on the legislative appropriation made directly to the OCFW to fund all case investigation and litigation activities, including experts. It was also the OCFW's policy at that time not to refuse appointment to cases unless absolutely necessary. Thus, as time went on, the appropriation made by the Legislature for case investigation and litigation had to cover the cost of more cases." *Id*.

48.     Further, "[A]s director of the office, Mr. Levenson decided all matters pertaining to funding, including the decision whether to request funding from the trial court. I do not recall any instance during my time at the OCFW (Office of Capital and Forensic Writs) that we requested funding from the trial court." *Id*.

49.     Thus, this Court has an **admission** by state habeas counsel that the Atkins claim was **not** investigated due to budgetary constraints and a policy of the prior director of OCFW to not ask for funding from the state habeas corpus.

50.     And, not only was there no investigation performed that would have yielded evidence supporting Petitioner's *Atkins* claim, the state habeas court relied heavily upon *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), especially when considering the diagnostic prong:

- *See* ECF-17-5, App.0303-0305.0308; ECF-17-6, App.0426-0427 (finding that "[I]n Texas, mental retardation is defined as a disability characterized by: (1) significantly subaverage general intellectual functioning, (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Ex parte Briseno*, 135 S.W.3d 1, 6-7 (Tex. Crim. App. 2004)

14

- Significantly subaverage general intellectual functioning is usually evidenced by an IQ of about 70 or below, approximately two standard deviations below the mean on a standardized intelligence test. *See Briseno*, 135 S.W.3d at 7 n.24. Applicant fails to establish that he possesses significantly subaverage intellect.

- The record reflects that Applicant received a full-scale IQ score of 78 when he was tested by defense expert Dr. Gilbert Martinez prior to trial. Taking into consideration the standard error of measurement ("SEM"), this score would reflect a range of 73 to 83 with 95% confidence.

- (ECF-17-6, App.0448-0449) Because the Texas Legislature has not adopted specific legislation, the Court of Criminal Appeals established guidelines in *Ex parte Briseno* for addressing *Atkins* claims. 135 S.W.3d 1, 5 (Tex. Crim. App. 2004). These guidelines were designed to assist the factfinder in determining whether a defendant has "that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty." Ex parte Sosa, 364 S.W.3d 889, 891 (Tex. Crim. App. 2012).

- (373) As outlined in Briseno (and previously discussed under Applicant's claim of ineffective assistance of trial counsel), mental retardation is defined as a disability characterized by: (1) significantly subaverage general intellectual functioning, (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Briseno*, 135 S.W.3d at 6-7. Additionally, the Applicant must prove the first and second prongs are linked - the adaptive limitations must be related to a deficit in intellectual functioning and not a personality disorder.

51.     As previously stated, *Briseno* is no longer valid, and this Court may not use the *Briseno* factors to determine whether an inmate is intellectually disabled.

52.     On March 28, 2017, the SCOTUS handed down *Moore v. Texas*, 137 S.Ct. 1039, 2017 U.S. LEXIS 2185 (U.S. March 28, 2017), which eliminated the use of the *Briseno* factors. The question before the SCOTUS was whether the use by the TCCA of the *Briseno* factors in determining whether an individual may be executed violates the Eighth Amendment, *Hall v. Florida*, 134 S.Ct. 1986 (2014), and *Atkins v. Virginia*, 536 U.S. 304 (2002) since the *Briseno* factors do not utilize current medical diagnostic standards regarding intellectual disability, and instead require the use of outdated medical standards.

15

53.     *Moore* reversed *Ex parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015) and eliminated the *Briseno* factors where factors other than those discussed in *Atkins* that a factfinder might focus upon when deciding if an individual is intellectually disabled or personality disordered may be considered.

54.     In *Moore*, despite recognition by the TCCA that the medical community's "conceptions of intellectual disability and its diagnosis have changed since Atkins and Briseno were decided," the TCCA found that the trial court's recommended relief was err because it used "…the most current position, as espoused by the AAIDD, regarding the diagnosis of intellectual disability rather than the test that [the TCCA] established in *Briseno*." Further, because the Texas Legislature has **not** enacted legislation to implement the mandate of the SCOTUS in *Atkins*, the TCCA determined that it will follow the AAMR's 1992 definition of intellectual disability that the TCCA adopted in *Briseno* for *Atkins* claims presented in Texas death-penalty cases.

55.     Under the now-eliminated *Briseno* factors, for a death-row inmate to show he is intellectually disabled for Eighth Amendment purposes and exempt from execution, he must show by a preponderance of the evidence that: (1) he suffers from significantly subaverage general intellectual functioning, generally shown by an IQ of 70 or less; (2) his significantly subaverage general intellectual functioning is accompanied by related and significant limitations in adaptive functioning; and (3) the onset of the above two characteristics occurred before the age of eighteen.

56.     However, no longer may a court use the WAIS-IV scaled-score of 70 as a 'hard-number' to determine whether a person is intellectually disabled for Eighth Amendment purposes since this is materially inconsistent with current medical diagnostic standards.

57.     And, *Moore* was acknowledged by the Fifth Circuit on May 11, 2017 in *Cathey v. Davis (In re Cathey),* 857 F.3d 221 (5th Cir. May 11, 2017).

58.     Petitioner's WAIS-IV-score that was administered to Petitioner when he was 38 years old was 78. (RR52.22-23).

59.     Because of *Moore*, the issue of Petitioner's intellectual disability must be relitigated based on current medical diagnostic standards as the SCOTUS. There is no present standard that is specific to Texas to determine intellectual disability for Eighth Amendment purposes.  Current medical diagnostic standards are found under *Hall*, in which the SCOTUS held that the intellectual-disability-determination should consider the Standard Error of Measurement ("SEM"), which in turn accounts for a "band of error concept" that is plus-or-minus five points from the test taker's score. *Hall*, 134 S.Ct. at 2000; *see also Mays v. Stephens*, 757 F.3d 211, 218 n.17 (5th Cir. 2014) and Frank M. Gresham, *Interpretation of Intelligence Test Scores in Atkins Cases: Conceptual and Psychometric Issues*, 16 Applied Neuropsychology 91, 92-93 (2009). As discussed previously, after applying the SEM, "[A]n IQ between 70 and 75 or lower is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. 309 n.5 (internal citations omitted).

60.     Subtracting the 5-points from Petitioner's WAIS-IV-score of 78 places Petitioner within the 70-75-range for the intellectual-function prong. This is simple arithmetic: the 5-point SEM acts as a standard deviation, which is simply a measure used to quantify the amount of variation or dispersion of a set of data-values. A 5-point deviation from Petitioner's WAIS-IV-score of 78 possibly places him within the 70-75-point range.

**2. Objection to the Findings on pages 7 (the "strategy" employed by state habeas counsel) and 8 ("Green appears to argue that the SEM should be applied twice for a total reduction of 10 points rather than 5)**

61.     Thus, there is **no basis** for the finding that "Green appears to argue that the SEM should be applied twice for a total reduction of 10 points rather than 5, but that has no legal basis.

17

(Mot. Funding at 12-13.) In applying Hall, the Supreme Court in Moore applied the SEM only once." Findings, p. 8. Petitioner objects to this finding as well.

62.     And for the same reasons, there is **no basis** for the finding that the "strategy" employed by state habeas counsel that "Ultimately, our team on Mr. Green's case decided not to retain further expert assistance in regard to an intellectual disability claim based on a weighing of the likelihood of developing further beneficial evidence versus the benefit of using time and resources elsewhere on Mr. Green's case (Romig Aff. at App. 828.) appears particularly sound in light of Green's IQ scores that place him above the standard error of measurement for intellectual disability."

63.     This finding misinterprets Mr. Romig's affidavit.  Mr. Romig **never** stated or inferred that the reason why his office did not pursue additional funding was because they saw no merit in the *Atkins* claim. His affidavits are clear that they simply ran out of money to pursue the claim, and due to the policy of the director of the office at the time, they did not ask the trial court for funding.

64.     Thus, the Findings that "Green has not attempted to show how his claims could come within an exception to bar under the Texas law" is incorrect and should be overruled.

**3.  Objection to the Findings on pages 6-8 regarding *Martinez* and *Trevino***

65.     Petitioner objects to the findings on pages 6-8 regarding the conclusion that *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 133 S.Ct. 1911 (2013) do not apply here as to the abandonment-rage and *Atkins* claims.

66.     Per *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), if state habeas counsel is ineffective, a petitioner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law by showing:

(1) state habeas counsel was constitutionally deficient in failing to include the claim in his first state habeas application, and (2) the underlying IATC claim is "substantial," meaning that it has "some merit." *See Newbury v. Stephens*, 756 F.3d 850, 868 (5th Cir. 2014), *citing Martinez*.

67.     The Findings observe on page 6, "[A]s more fully set out in the prior recommendation and the order adopting that recommendation, merely establishing a disagreement between experts does not show ineffective assistance of counsel. (FCR at 5-7; Order at 5-7.) This law has not changed since those decisions. "*Martinez* ... does not mandate pre-petition funding, nor does it alter our rule that a prisoner cannot show a substantial need for funds when his claim is procedurally barred from review," *citing Crutsinger v. Stephens*, 576 F.Appx. 422, 431 (5th Cir. 2014).

68.     However, these issues are **not** about "merely establishing a disagreement between experts." **No expert evaluated Petitioner for abandonment-rage or the *Atkins* claim**. This is clear from the record and facts presented.

69.     The Findings instead dismiss the *Martinez/Trevino* claims on these issues because the Findings determined that Petitioner has not shown that he is entitled to the funding, and regardless of the decision in *Ayestas*, *Martinez/Trevino* do **not** mandate funding.

70.     Although *Martinez* and *Trevino* indeed do not mandate "pre-petition" (or postpetition) funding, *Ayestas* may mandate it.

71.     The Findings acknowledge that the issue of "reasonably necessary" meaning "substantial need" is "under review" by the SCOTUS in *Ayestas v. Davis*, No. 16-6795, 137 S.Ct. 1433 (2017). ECF-52, p. 4.

72.     The issue in *Ayestas* as to "[w]hether the Fifth Circuit erred in holding that 18 U.S.C. § 3599(f) withholds 'reasonably necessary' resources … *where the claimant's existing*

19

*evidence does not meet the ultimate burden of proof at the time the Section 3599(f) motion is made*." (emphasis supplied) Exhibit 1, *Ayestas* Brief for Petitioner at *i*.

73.     The argument of Ayestas (and Petitioner) is that the Fifth Circuit's substantial-need test is incompatible with § 3599(f)'s plain meaning, structure, and purpose because it "requires a higher showing than 'reasonable' need, contrary to § 3599(f)'s plain meaning."

74.     Under 18 U.S.C. § 3599(f) (2017), Petitioner is entitled to "investigative, expert, and other services" that are "reasonably necessary for the representation" in capital cases.

75.     Although courts use the "substantial-needs" test, § 3599(f) authorizes services when a movant can establish a "substantial need" for the services, the language of § 3599(f) is clear, and when the statutory language is plain, a court must enforce it according to its terms. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

76.     And, a court should **not** interpret a statute that would "confuse two critically distinct terms." *Corley v. United States*, 556 U.S. 303, 316 (2009).

77.     Per *Ward v. Stevens*, 777 F.3d 250, 266 (5th Cir. 2015), auxiliary services should be denied **only** if: (1) it supports a meritless claim, meaning that the claim on its face would never success (*i.e.*, such as where an inmate whose measured WAIS-IV IQ score is well above 70 and he requests funding for an *Atkins* claim), (2) it merely supplements prior evidence, or (3) the constitutional claim is procedurally barred at the time the motion is made. None of these factors exist here (emphasis supplied).

78.     As explained above, the Findings merely reference the issue in *Ayestas* and did not properly analyze the substantial-needs test.

79.     However, concluding that Petitioner is **not** entitled to investigative services because he failed to present sufficient evidence showing that he may have a viable claim for relief is placing the "cart-before-the-horse."

80.     If this Court does not allow funding for services and then concludes that Petitioner failed to present evidence that the funding may produce, this Court effectively creates a precondition for funding that violates the plain language of § 3599(f).

81.     Section 3599(f) was enacted to enhance representation for a capital defendant and ensure that potentially meritorious claims are **investigated and litigated**.

82.     Logically, a claim **cannot** be litigated before it is investigated. A "procedure" that does **not** allow funding for auxiliary services based on a conclusion that the claim has no merit before the litigant has had a chance to investigate the claim violates § 3599(f) and due process

83.     Petitioner has now tried to obtain funding for these investigative services twice.

84.     Neither trial or state habeas counsel attempted to obtain funding for the issues pertaining to the request for services for the reasons stated above.

85.     Unless this Court corrects these issues, Petitioner cannot investigate and present relevant factual allegations that investigative services would uncover.

86.     Thus, the meritorious factual issues will "never be heard," and Congress "did not intend for the express requirement" of investigative services "to be defeated in this manner." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). *See also Martel v. Clair*, 565 U.S. 648, 662-663 (2012) (§ 3599 grants federal capital defendants and capital habeas petitioners "enhanced rights of representation.").

87.     The purpose of § 3599 is to "improve the quality of representation afforded to capital [habeas] petitioners and defendants alike." *Martel*, 565 U.S. at 659.

88.     18 U.S.C. § 3599(f) (2017) accomplishes this by requiring lawyers in capital cases to have more legal experience than 18 U.S.C. § 3006A (2017) demands in the non-capital context. *Id*.

89.     Further, 18 U.S.C. § 3599(f) (2017) provides more money for investigative and expert services than are available under Section 3006A, which "'reflec[ts] a determination that quality legal representation is necessary' to foster 'fundamental fairness in the imposition of the death penalty.'" *Id*., *quoting McFarland*, 512 U.S. at 855, 859.

90.     In *McFarland*, the SCOTUS held that failure to appoint counsel to an indigent, capitally sentenced prisoner in advance of the filing of a habeas corpus application created a substantial risk that the prisoner's habeas claims would never be heard on the merits, and therefore violated the right to quality legal representation afforded by 18 U.S.C. § 3599. 512 U.S. at 856.

91.     The Court also concluded that preapplication representation was essential because: (1) the complexity of habeas corpus jurisprudence; and (2) the need to investigate and identify the factual bases of possible claims. *Id*. at 855-56.

92.     And, the Court concluded that a stay of execution was required because absent one, the representation could not be made meaningful. *Id*. at 858.

93.     Thus, *McFarland* makes it clear that the failure to afford a qualifying petitioner meaningful and quality legal representation (which includes investigative services) violates the representation right that 18 U.S.C. § 3599(f) (2017) affords Petitioner because it creates a substantial risk that his habeas claims will be forfeited or go unreviewed by the federal court.

94.     And, it violates the Sixth, Eighth, and Fourteenth Amendments since Petitioner will be prevented from litigating his claims. Petitioner **cannot** prove the prejudice-prong of *Strickland* if he is not granted the resources to do so.

95.     Thus, regardless of what test this Court uses (either the current, incorrect standard or the standard asserted by Ayestas), § 3599(f) does **not** require Petitioner to prove his claims before investigating them. One cannot make **either** a substantial- or reasonable-showing without funding to investigate, develop, and present evidence of a substantial- or reasonable-showing.

### 4.  Objection to the Findings because they do <u>not</u> address Petitioner's request to investigate the *Wiggins*-claim

96.     Ground 5 of the Petition argued an IATC-claim under *Wiggins*. (ECF-17).

97.     The Findings to **not** appear to address Petitioner's request to investigate the *Wiggins*-claim but may indirectly aver to the claim by discussing the funding-amounts (part of the requested amount pertains to the investigation of the *Wiggins*-claim).

98.     Because this may be an oversight by the Magistrate Judge, Petitioner makes an objection to this issue as well.

99.     As discussed in prior pleadings, the investigations conducted by both trial and state habeas counsel is like what the SCOTUS deemed insufficient in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), which held trial counsel ineffective because of an inadequate mitigation investigation.

100.    In *Wiggins*, although trial counsel arranged psychological testing for the defendant and obtained some government records, the Court found that they "acquired only rudimentary knowledge of his history from a narrow set of sources." *Id*.

101.    A specialist like Dr. Kessner would "compile() a comprehensive and well-documented psychosocial history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to

23

enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation." (App.206). And, the specialist "often plays an important role as well in maintaining close contact with the client and his family while the case is pending." (App.207).

102.    A proper (and constitutionally sufficient) adequate mitigation-investigation includes review of various factors including (but not limited to) the defendant's prenatal history, medical, trauma, abuse or neglect, education, employment, multi-generation family history, juvenile correctional experience, religious, gender, sexual orientation, ethnic, racial, cultural, and socioeconomic histories. This requires multiple interviews with fact witnesses to establish trust to elicit sensitive information to conduct a thorough and reliable life-history investigation. *Sears v. Upton*, 130 S.Ct. 3259 (2010) (per curiam); *see also Porter v. McCollum*, 130 S.Ct. 447, 452-454 (2009) (per curiam) (de novo review of trial counsel's performance found that it was deficient because counsel failed to conduct a thorough mitigation investigation) and *Jefferson v. Upton*, 130 S.Ct. 2217 (2010) (per curiam). It requires an inquiry into aspects of the defendant's life, locating and reviewing the records, witnesses, and assisting counsel to present the mitigation-case.

103.    It was, after all, trial counsel who presented no evidence during the innocence-guilt phase (RR48.9), and rather explained to the jury,

> "I don't really understand exactly what the purpose of these proceedings are this morning, other than I thought both sides would probably stand up and tell you that there's really no issue in dispute here for you to decide this morning…And we pretty much told you in voir dire that the Defendant was guilty. I think all of you as you came through this process, you expected what you were going to hear was a situation where the proof was undeniable.

(RR48.17-18).

24

104.     If this was indeed the case, and notwithstanding the failure of trial counsel to present the abandonment-rage evidence, which would have been easily spotted, then per trial counsel, this case was 'all about mitigation.'

105.     However, no such mitigation-investigation was performed by any prior attorney or expert. There was no qualified mitigation investigator and thus no adequate mitigation investigation performed as required by the ABA standards or the Supreme Court.

106.     Further, as detailed before, the evaluation conducted by the defense mental-health experts at trial were **not** adequate under standards required for forensic mental health valuations because to the extent they were provided with a social history of Petitioner, the mental-health professionals were given information predicated on an **inadequate** mitigation investigation.

107.     Despite trial counsel's conclusory assertions, the casefile clearly shows that at the time of the offense, Petitioner had a severe mental illness and severe psychological or cognitive impairments. These impairments likely rendered Petitioner unable to form the requisite intent to commit capital murder and would have been a mitigating factor in the punishment phase. This was made clear in *Roberson v. Stephens*, 614 Fed.Appx. 124 (5th Cir. 2015), in which the Fifth Circuit recognized that Texas law admits relevant mental impairment in during the innocence-guilt phase to negate the mens rea element of the specific offense of Capital Murder.

108.     Finally, the impairments that undersigned counsel has spotted give rise to the claim of whether Petitioner is **not** eligible for death because of the type and severity of his mental illness at the time of the offense.  These issues form the basis of *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005).

**5.   Objection to Page 5 of the finding that any of the requested funding is barred by Pinholster or the § 2254(d)(1)-bar**

109.     The relitigation bar of 28 U.S.C. § 2254(d) is a form of issue preclusion, a doctrine that provides that once a court decides an issue of fact or law necessary to its judgment, the decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *Montana v. United States*, 440 U.S. 147, 153 (1979); *see also RecoverEdge L.P. v. Pentecost, et al.*, 44 F.3d 1284, 1291 (5th Cir. 1995) (Issue preclusion does not apply where the issues involve application of different legal standards). Issue preclusion applies if: (1) the issue is identical to one decided in the first action; (2) the issue was litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom preclusion is invoked had a full-and-fair opportunity to litigate the issue in the first action. *Johnson v. United States*, 576 F.2d 606, 611-615 (5th Cir. 1978); *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001).

110.     In a federal civil case, a district court must apply issue preclusion to state-court adjudications. 28 U.S.C. § 1738 (2017); *Fidelity Standard Life Ins. Co. v First Nat. Bank & Trust Co.*, 510 F.2d 272, 273 (5th Cir. 1975) (records and judicial proceedings in state court have full faith-and-credit in federal district courts).

111.     Issue preclusion does **not** apply to state-court adjudications "where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Allen v. McCurry*, 449 U.S. 90, 100 (1980).

112.     Thus, a party who has had one **fair-and-full opportunity to prove a claim** and has failed in that effort should not be permitted to go to trial on the merits of that claim a second time *unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a case*. *Johnson*, 576 F.2d at 614 (emphasis supplied). *See Montana*, 440 U.S.

at 164 n.11 ("[R]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation).

113.    Here, the relitigation bar of § 2254(d) should **not** apply because the facts and circumstances of what occurred at the trial- and state-habeas level (as Petitioner has explained in exhaustive detail) do not lend themselves to show that Petitioner received due process.

114.    If a litigant in a prior proceeding did **not** have a meaningful opportunity to be heard due to the lack of the quality, extensiveness, or fairness of procedures in the prior proceeding, then it violates due process for a federal district to apply issue preclusion to the prior adjudication. *Hansberry v. Lee*, 311 U.S. 32, 41 (1940) (The absence of fairness in apply issue preclusion violates the due process clauses of the Fifth and Fourteenth Amendments).

115.    This conclusion applies to the habeas petitioner such as Petitioner who did not have a full and fair opportunity to litigate the Grounds decided by the state court, so this Court should **not** apply the relitigation bar of 28 U.S.C. § 2254(d) (2018).

## V. Conclusion and Prayer

For the reasons stated above, undersigned counsel requests that the Court overrule the Findings (ECF-52) and grant the relief requested in the postpetition funding motion, which is to grant funding to Petitioner so that undersigned counsel may:

- Retain Dr. Kessner to answer the following questions:

  - **Question 1:** Given the pretrial investigation conducted by Dr. Kelly Goodness and trial counsel, and based on the information provided by federal habeas counsel, was the evaluation conducted by the defense mental health experts at trial adequate under the standards required for forensic mental health evaluations?

  - **Question 2:** If the evaluations by the defense mental health experts at trial, including the recommendations by Dr. Kelly Goodness, were professionally not adequate, can a professionally adequate evaluation now be conducted, and what would such an evaluation entail, including answers to the following:

27

- **2A:** Whether, at the time of the offense, Petitioner had a severe mental illness or severe psychological or cognitive impairments (or both)? If so, what were those illnesses or impairments?

- **2B:** If Petitioner has a severe mental illness or psychological impairments, were they such that they rendered him unable to form the requisite intent to commit capital murder?

- Use the funding to further the inquiring based on the answers to the two questions above and raise a substantial IATC claim under *Wiggins* because of the failure to identify, investigate, develop and present mental health themes in innocence-guilt **and** the punishment phases of trial (*e.g.*, abandonment-rage), and to show that state habeas counsel was ineffective in failing to do so as well, to establish cause to overcome procedural default under *Martinez*, 132 S.Ct. 1309 (2012), and *Trevino*, 133 S.Ct. 1911 (2013).

- Allow undersigned counsel to utilize Dr. Kessner to help counsel investigate another potential IATC claim for failure to challenge the constitutionality in executing Petitioner, who was mentally ill at the time of the offense (neither IATC claim was raised at trial or in state habeas)

- Fund the investigation through Dr. Kessner, who provided an estimate of 110 hours for performing the following tasks: (1) obtaining and reviewing records (40 hours); (2) interview of third parties (10 hours); (3) reviewing documents (10 hours); (4) interview and examination of Petitioner (15 hours); (5) consultations with attorneys for Petitioner (10 hours); (6) consultation with other experts (5 hours); (7) time for drafting reports (5 hours); and (8) travel (15 hours). (App.008). Dr. Kessner's fee is $225 per hour. (App.008).  The requested amount for Dr. Kessner's time is **$24,750**.

- Fund the investigation by paying $2,250 for Dr. Kessner's expenses (App.008-009), bringing the total funding request for Dr. Kessner is **$27,000**.

- Retain Dr. Seay for **$12,380**, which is broken down as: out-of-town rate (two trips to Dallas; 1 trip to Livingston) ($2,500 X 3) = $7,500; hours to review records, telephone conferences, report writing ($250 X 12) = $3,000, and travel Hours (2 round-trips Austin to Dallas; 1 round trip Austin to Livingston) (16 + 7.5 x $80) = $1,880.

- Alternatively, if this court is reluctant to authorize $27,000 and recommend it be approved by the Fifth Circuit, Petitioner requests that the Court authorize $7,500, which does not need Circuit approval, and after it is exhausted, Petitioner be allowed, *ex parte* and under seal, to seek additional monies up to the $27,000 and $12,380, reporting to the Court the progress and results of the preliminary work of Drs. Kessner and Seay, and explain what additional work they propose to undertake and its reasonable necessity.

Respectfully submitted,

Michael Mowla
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Petitioner

**/s/ Michael Mowla**
**Michael Mowla**

Lydia M.V. Brandt
P.O. Box 326
Farmersville, TX 75442-0326
Phone: 972-699-7020
lydiabrandt566@gmail.com
Texas Bar No. 00795262
Attorney for Petitioner

**VI.    Certificate of Service**

I certify that on March 21, 2018, a copy of this document was served on the Government through the ECF-system.

**/s/ Michael Mowla**
**Michael Mowla**

29