UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GARY GREEN,<br>TDCJ No. 999561,<br><br>    Petitioner,<br><br>v.<br><br>LORIE DAVIS, Director,<br>Texas Department of Criminal Justice,<br>Correctional Institutions Division,<br><br>    Respondent, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    Civil Action No. 3:15-CV-2197-M |

## MEMORANDUM OPINION AND ORDER

Petitioner Gary Green ("Petitioner") filed this federal habeas corpus action pursuant to 28 U.S.C. § 2254, challenging his 2010 Dallas County conviction for capital murder and sentence of death. For the reasons discussed below, Petitioner is not entitled to federal habeas corpus relief or a Certificate of Appealability.

### I. Background[1]

On September 21, 2009, after Petitioner wrote a letter to his wife Lovetta Armstead, expressing his anger with her and explaining his plan to murder her and her three children, and then to take his own life. He then fatally stabbed Lovetta, and asphyxiated and drowned her six-year-old daughter, Jazzmen Montgomery. Petitioner cleaned himself, changed clothes, and went to church to pick up Lovetta's sons. Petitioner drove the two boys home, where he stabbed nine-

---

[1] A more detailed account of Petitioner's capital offense appears in the Texas Court of Criminal Appeals' opinion affirming his conviction and sentence. *See Green v. State*, AP-76,458, 2012 WL 4673756, *1-*4 (Tex. Cri. App. Oct. 3, 2012), *cert. denied*, 569 U.S. 1019 2013).

year old Jarrett Armstead in the stomach and attempted to stab twelve-year-old Jerome Armstead. The boys convinced Petitioner not to kill them. After Petitioner left the scene in their mother's vehicle, the boys went next door to alert a neighbor. Jarrett received emergency medical treatment and survived his wound. Jarrett and Jerome testified at trial that Petitioner confessed to them that he killed their mother and sister. Petitioner turned himself in to authorities and gave a videotaped confession, which was admitted into evidence at trial as State Exhibit 91. He confessed he stabbed Lovetta about thirty times and drowned Jazzmen.

On October 30, 2009, a Dallas County grand jury indicted Petitioner in cause no. F09-59380-S, on a single count of capital murder – that he intentionally and knowingly caused the death of Lovetta Armstead by fatally stabbing her with a knife during the same criminal transaction in which he intentionally and knowingly caused the death of Jazzmen Montgomery by asphyxia and drowning.[2]

A.      *Guilt – Innocence Phase*

The guilt-innocence phase of Petitioner's capital murder trial commenced on October 26, 2010.

1.      *Jerome and Jarrett Armstead's Testimony*

In addition to viewing Petitioner's videotaped confession, the jury heard the testimony of Jarrett and Jerome Armstead. Jerome testified that on the evening of the murders, Petitioner entered the church dressed in a black dress shirt, black slacks, and black dress shoes, and waited for them. Petitioner told them their mother was out clubbing with her friend, and that their sister

---

[2] Petitioner's original indictment appears among the state court records filed in this cause in the Clerk's Record in Volume 1 (henceforth "1 C.R."), at 7-8. The indictment was amended twice to clarify that the charged method of Jazzmen's death was both asphyxiation and drowning. 1 C.R. at 37, 49.

was staying with their grandmother. Jerome noticed nothing unusual about Petitioner's behavior. When they arrived at home, Petitioner informed them that he had spoken with their mother, and she did not want him to take them to their grandmother's home. Petitioner told Jerome to take a shower or a bath. Jerome went to take a bath, and Jarrett went to their bedroom. While in the bath tub, Jerome heard Jarrett screaming, "help, he's trying to kill me." Jerome got out of the tub and grabbed his clothes. Petitioner entered the bathroom, holding the screaming Jarrett by the collar. Jerome jumped back into the tub. Petitioner threw Jarrett on to the toilet and said, "give me some reasons why I shouldn't kill y'all." Jarrett said, "we're too young to die." Petitioner then stabbed Jarrett and told him to shut up. Petitioner tried to stab Jerome but missed. Petitioner then said, "come on, I got to show y'all something." Holding a knife to Jarrett's neck, Petitioner said he would not kill them and led them to their mother's room, where he unlocked their mother's bedroom door and opened it. When they saw their mother lying on the floor, not breathing, both boys fell to their knees crying. The boys glanced in the bathroom and saw their sister's body lying against the tub with her hands duct taped behind her back and blood all over the bathroom. Their sister did not appear to be breathing. Petitioner told Jarrett to get him some clothes and instructed Jerome to get some pills on the dresser. Petitioner threw their mother's cell phone on the bed and told them to call the police once he left. When Jerome attempted to dial the phone, Petitioner ordered him to wait until he left. Petitioner said he had killed their mother and sister, and that he loved their mother to death. Petitioner made both boys give him a hug before he left. Just before he drove away, Petitioner said he was going to kill himself. The boys ran next door to alert the neighbor. Jarrett Armstead's trial testimony largely mirrored that of his older brother. 46 Tr. 98-148.

3

2. *The Medical Examiners' Testimony*

The jury heard testimony from the medical examiners who performed the autopsies on Lovetta and Jazzmen. Dr. Jill Urban, the forensic pathologist who performed the autopsy on Lovetta, testified that Lovetta suffered thirty stab wounds. Her body also showed signs of asphyxia, including a bruise to the side of the neck that could have been made by fingers, petechiae to the surface of the eye, and hemorrhage around the cartilage in the larynx. The manner of Lovetta's death was homicide, and the cause of her death was the thirty stab wounds, none of which would have been fatal individually. Dr. Urban opined that the stab wounds would have been sufficient to cause death without Lovetta's other injuries. 47 Tr. 97-109.

Dr. Meredith Lann, who performed the autopsy on Jazzmen, testified Jazzmen's ankles and wrists were bound with duct tape, and there was adhesive residue on Jazzmen's left cheek. There was a hemorrhage to the top of Jazzmen's skull. Petechiae were present in the eyelids, overlying the thymus (lower neck), the lining of the lungs, and the epiglottis. A small tear and small scrapes were present on the lower left lip. There was a small hemorrhage of the deep muscle on the right side of the neck as well as a hemorrhage in the back left shoulder muscles. Jazzmen's lungs showed signs of pulmonary edema, which the medical examiner testified was likely from a lack of oxygen. A pink frothy substance was present in the nose and mouth, suggesting pulmonary edema and a reaction to hypoxia. A telephone cord was also wrapped around the ankles and tied in a knot. Dr. Lann opined that Jazzmen was asphyxiated to death, her death was not instantaneous, and her injuries were consistent with Petitioner's confession. 47 Tr. 110-22.

3. *Other Prosecution Witnesses' Testimony*

Lovetta's mother, Margarita Brooks, identified both her daughter's handwriting and Petitioner's handwriting on the notes they wrote and apparently exchanged on the day of the

4

murders. 46 Tr. 36-59. The neighbor to whose home Jarrett and Jerome went after Petitioner left the scene, Latasha Bradfield, testified she went next door and observed Lovetta's and Jazzmen's bloodied bodies. 46 Tr. 59-99. Dr. Joseph Martinez, an emergency room physician who treated Petitioner for his injuries after he turned himself in, testified that Petitioner confessed that he had stabbed his wife with a kitchen knife. 46 Tr. 89-98. The police detective who took Petitioner's videotaped confession testified he gave Petitioner *Miranda* warnings before taking the statement, and he identified the video recording of Petitioner's confession that was admitted into evidence and played in open court for the jury. 47 Tr. 25-77. Several other law enforcement officers who either processed the crime scene or accompanied Petitioner to the hospital to obtain medical treatment for the superficial injuries he sustained in his confrontation with Lovetta testified as to what they observed at the crime scene or following Petitioner's arrest. The defense presented no witnesses.

### 4. *The Verdict*

On October 28, 2010, the jury returned its verdict, finding Petitioner guilty of capital murder as charged in the indictment.[3] 48 Tr. 33-34.

### B. *Punishment Phase*

The punishment phase of Petitioner's capital murder trial commenced on November 1, 2010.

### 1. *The Prosecution's Evidence*

The prosecution introduced evidence showing Petitioner had pleaded guilty in Dallas County in 1989 to a charge of aggravated assault and in 1990 to a charge of aggravated robbery.

---

[3] The jury charge and verdict form from the guilt-innocence phase of Petitioner's trial appear at 1 C.R. 145-53.

49 Tr. 6-8 (State Exhibits 140-41). A Dallas police officer who arrested Petitioner in 1989 for possession with intent to distribute crack cocaine testified about his pursuit and arrest of Petitioner. 49 Tr. 24-30. The victim of Petitioner's 1989 aggravated assault testified regarding the circumstances of the assault and her injuries, which required her to be hospitalized for a week. 49 Tr. 30-54. A Texas Department of Criminal Justice ("TDCJ") Parole Division case worker testified he interviewed Petitioner in prison in 1992; during that interview, Petitioner stated he sold crack cocaine for about six months to see if he could get away with it, and committed an armed robbery of the grocery store where he had been employed as an act of revenge for his termination. 49 Tr. 76-84. Belinda Lacy, a former correctional officer at a TDCJ facility where Petitioner was incarcerated, testified Petitioner married her and then abandoned her shortly after she helped convince state parole officials to release him. 49 Tr. 103-16. Shulonda Ransom, the mother of two of Petitioner's children, testified to Petitioner's propensity to anger easily and to choke her to the point of unconsciousness. 49 Tr. 121-36. A former correctional officer testified about an incident during Petitioner's incarceration in which Petitioner threw a food tray and struck him. 50 Tr. 6-24. Petitioner's former supervisor at the grocery store that Petitioner robbed testified regarding the extreme violence, including firing shots and kicking open an office door, that Petitioner and his accomplice employed during the robbery. 49 Tr. 85-102. A TDCJ warden testified as an expert regarding the TDCJ's prisoner classification system and the opportunities for violence among the TDCJ inmate population. 50 Tr. 25-60, 86-92. Jarrett and Jerome Armstead, Lovetta's mother, and Jazzmen Montgomery's biological father all furnished victim impact testimony. 50 Tr. 114-24.

2. *The Defense's Evidence*

The defense presented an extensive case in mitigation.

### a.    *Petitioner's Aunt's Testimony*

Petitioner's aunt, Shirley Coleman, testified extensively regarding the history of mental illness in Petitioner's family and his background. Petitioner's maternal grandmother, Bertha Curry, had lifelong mental health problems for which she took medication, and she engaged in frequent episodes of bizarre behavior, including faking pregnancies and miscarriages. Petitioner's mother Mary was the oldest child in her family, not an attentive parent, and had been hospitalized twice for nervous breakdowns. Petitioner's daughter has mental health issues, specifically Attention Deficit Disorder, for which she receives medical treatment. A substantial number of Petitioner's relatives had mental illnesses, including an uncle who murdered his wife and then took his own life. Ms. Coleman described Petitioner's father Thomas Carter ("Carter"), who spent time in military prison, as physically and emotionally abusive toward both Petitioner and Petitioner's mother. Carter choked Petitioner's mother in front of Petitioner. Multiple members of Petitioner's extended family had been victims of homicide. She believed that Petitioner acted like a normal kid in high school, but after returning home from his first prison stint, he behaved differently. He brought a wife with him, had no friends, and would often burst out laughing for no apparent reason. Petitioner once told her he was involved in a robbery other than the one at the grocery store where he had once worked. 51 Tr. 6-34, 44-51.

### b.    *Petitioner's Former Romantic Partner's Testimony*

Lenelle Williams testified about her relationship with Petitioner. She met Petitioner around December 2003, and they eventually began a romantic relationship. They shared an apartment for two years while Petitioner was working. During that time, Petitioner helped to look after her grandchildren. Petitioner was not a drinker, preferred to be alone, and often watched television and listened to the radio. Petitioner often spoke when there was no one else in the room with him,

spoke about vampires as if they actually existed, and claimed to hear rats she could not hear. Petitioner had a car and was good to her throughout their period of cohabitation. She moved to Arlington to help her son with babysitting, and continued to talk with Petitioner on the phone, but they had little face-to-face contact after that. They continued to speak on the phone even after Petitioner became involved with Lovetta. Petitioner worked for a florist and at Walmart. Petitioner stayed with her on occasion when he was having problems with Lovetta. Petitioner called Lenelle shortly before the murders and told her he was feeling stressed. When she heard of Lovetta's murder, she was shocked, thinking "that is not Gary." 51 Tr. 52-71, 81-91.

     c.    *Petitioner's Mother's Testimony*

Petitioner's mother, Mary Sampson, described Petitioner's childhood in the South Oak Cliff area of Dallas as chaotic and marked by multiple bizarre incidents. 51 Tr. 92-159. Petitioner stayed to himself while growing up. His grades in school were not good but she was satisfied with them. Petitioner was age seven when she married Leon Sampson ("Sampson"), to whom she has been married for thirty-one years. Sampson took Petitioner to job sites, but Petitioner was unwilling to help do the remodeling work Sampson did. Petitioner was not good at housework or yardwork. In middle school, Petitioner once went on to the roof of a school building and threatened to jump off, but his aunt talked him down. From that point on, Petitioner constantly said that he was stressed and that no one understood him. Petitioner would not sit with his back toward a door and kept a baseball bat in his room. He felt as if people were talking about him. Petitioner once claimed that someone had broken into the house while he was in the shower. Petitioner dropped out of school in the eleventh grade. His daughter, who was seven at the time of trial, was constantly in trouble at school, and played by herself.

Mrs. Sampson testified she was shocked when Petitioner was put on probation for dealing drugs and then assaulting his girlfriend. He became even more withdrawn after he left the penitentiary the first time. He was later arrested for robbing a grocery store. Petitioner married Belinda Lacy when he got out of prison, but they remained together less than a year. He chain-smoked and often said he was stressed. Petitioner was involved in at least three romantic relationships after prison, including with Lenelle Williams, Lovetta, and Shulonda – the mother of two of his children. Shortly before the murders, Petitioner called his mother from Timberlawn mental hospital to inform her that he had checked himself into that facility because he was at the end of his rope. He told her he wanted to go to sleep and never wake up. He remained at Timberlawn for five days, until Lovetta came and picked him up. She and Petitioner's younger brother, Nysasno, spoke on the phone with Petitioner after the murders, and they later went to the location where he was staying, and convinced him to turn himself in. She has seen remorse in Petitioner, who told her he has seen Lovetta sitting at the foot of his bed talking to him.

Mrs. Sampson explained that her sister was treated for mental problems, one of her brothers killed his wife and then committed suicide, and her mother sees doctors and takes medication for mental health issues. Mrs. Sampson had a nervous breakdown while pregnant with Nysasno, after her brother committed suicide, and she has been prescribed Valium.

Mrs. Sampson testified that Carter, the father of both her sons, was physically abusive, kicking her in the stomach and blackening her eye while she was pregnant with Nysasno. She left Carter in 1978-79. Carter once attempted to get Petitioner to fight another child. Petitioner witnessed Carter being violent toward Mrs. Sampson. Petitioner was age two when Carter went to the Fort Leavenworth penitentiary, where he died. Carter was out of the house by the time Nysasno was born.

On cross-examination, Mrs. Sampson testified Petitioner was arrested for aggravated robbery less than four months after getting out of prison for assaulting his former girlfriend, Jennifer. She did not write State Exhibit 160 (a letter addressed to state parole officials urging Petitioner's release, purportedly from her), and she believes that document is in Petitioner's handwriting. While she only knows that her sister has been treated for mental health issues, she believes other relatives have been to mental hospitals. She believes her own mother's mental health is normal. During her prior testimony before the grand jury, she testified Petitioner had no mental issues growing up, was not mentally retarded, and had never told her that he had been sexually abused.

### d. *Petitioner's Grandmother's Testimony*

Petitioner's maternal grandmother, Bertha Curry, also testified extensively regarding his childhood and background. 51 Tr. 160-93. Carter beat both Petitioner and Petitioner's mother "all the time"; he was a violent person who kicked Petitioner's mother while she was pregnant with Petitioner's younger brother. Petitioner was "real young" when Carter was out of the picture.

As a child, Petitioner once grabbed and bit the head off a snake, but when she attempted to tell Petitioner's mother about the incident, Petitioner's mother did not want to hear about it and insisted nothing was wrong with Petitioner. Mrs. Curry has been taking anxiety medication and antidepressants for many years. One of her daughters, a sister of Petitioner's mother, was sent to a psychiatric hospital. Her stepson killed his wife and himself.

Petitioner was never a normal child. From an early age, Petitioner said that he did not want to live because the devil was after him. As a child, Petitioner often cried and did not want to be with friends because he was afraid that they would make fun of him. He reached the ninth or tenth grade in school, had a lot of friends growing up, but preferred to play by himself. After Petitioner

got out of prison the first time, he was never happy and often talked of suicide. He had jobs at a grocery store and a warehouse when he got out of prison, but never held those jobs more than a year. Petitioner began withdrawing from her around 2007-08, and seemed nervous and unfocused on normal things. She last saw Petitioner in December 2008, when he was with Lovetta and her three children. Petitioner was capable of being kind and had relationships with Jennifer, Shulonda, and Belinda. Mrs. Curry believes Petitioner's crimes do not reflect his true personality.

e.    *School Psychologist's Testimony*

Dr. Kellie Gray-Smith, a licensed school psychologist who reviewed Petitioner's school records, testified regarding Petitioner's poor academic performance and related subjects. 51 Tr. 204-33. She testified that members of the African-American community tend to seek out mental health treatment less often than members of other groups because of a lack of awareness, misperceptions, distrust of mental health professionals, distrust of medical treatment, perceptions that mental illnesses are merely bad behavior, and fears that students labeled as mentally ill will be stigmatized and denied opportunities later in life. Genetic factors also contribute to many mental illnesses, and where heredity links a family to mental illness, some behaviors are not recognized as pathological or problematic. She stated early intervention is critical in treating mental illness and that special education programs address disabilities and emotional and behavioral problems.

Dr. Gray-Smith testified that Petitioner's school records show he was not successful academically, and his pattern of academic failure was chronic, pervasive, and alarming. She was unable to explain the absence of any record showing Petitioner had been evaluated for special education services. Petitioner performed in the lowest ten percent academically across many grade levels and displayed poor social skills. Dr. Gray-Smith testified that, if compensatory skills are

not learned in childhood, the inability to relate to others leads to isolation, feelings of rejection, poor classroom performance, withdrawal behaviors, low self-esteem, poor academic performance despite cognitive and academic potential, and the need to lash out and act out, all behaviors that will escalate if not treated.

      f.     *Neuropsychologist's Testimony*

Dr. Gilbert Martinez, a neuropsychologist who tested, interviewed, and evaluated Petitioner, testified at great length regarding Petitioner's mental health. 52 Tr. 5-125. Petitioner presented as severely depressed and despondent and had an IQ that hovered right around the upper end of the borderline range and lower end of the average range, with a full-scale score of 78 or 79. There was not a lot of evidence of severe cognitive disturbance, i.e., brain damage or head injury. Petitioner has some difficulty with higher level thinking and although he is not mentally retarded, he displays mental disorders of mood and thought. Petitioner also displays personality disorders, i.e., problems with interpersonal behavior and suffers from chronic problems with mood, including both depression and episodes of agitation, irritability and elevated mood. Petitioner's thought problems include a lifelong history of hypervigilance, suspiciousness, and paranoid thinking and behavior. Dr. Martinez diagnosed Petitioner with Schizoaffective Disorder of the Bipolar Type, a severe mental illness characterized by severe depression, withdrawal, lack of motivation, insomnia, loss of appetite, intense sadness, and thinking characterized by suspiciousness, agitation, irritability or elevated mood, and paranoid, possibly delusional, thoughts.

Dr. Martinez also diagnosed Petitioner with features of several different personality disorders: borderline personality disorder, paranoid personality disorder, avoidant personality disorder, depressive personality, and antisocial personality disorder ("ASPD"). The term "mental illness" describes dysfunction in thought and mood while a "personality disorder" describes a

person's behavior. Dr. Martinez said that regardless of which personality disorder Petitioner has, he also has Schizoaffective Disorder, a severe form of depression mixed with agitation, mania, and racing thoughts. Dr. Martinez described Petitioner as having a lifelong history of paranoid and delusional ideation, both with and without mood problems. Schizoaffective Disorder is treatable with medications. Dr. Martinez explained there is a very high comorbidity between mental disorders and substance abuse, as the mentally ill tend to self-medicate, which can make things worse.

Dr. Martinez's review of Petitioner's mental health records revealed to him that Petitioner reported episodes of severe depression, sadness, affective instability, anxiety, agitation, and paranoid delusions. At Timberlawn, Petitioner reported symptoms of depression, isolation, decreased energy, racing thoughts, and feelings of helplessness, but denied suicidal or homicidal ideation, and was diagnosed with a major depressive disorder with psychotic features. Dr. Martinez explained that with depression, usually thinking slows down and so Petitioner's reported racing thoughts were inconsistent with a major depressive episode. Petitioner was prescribed Risperdal for thought disorders and Remeron for depression but did not remain at Timberlawn long enough for either medication to fully take effect. Dr. Martinez opined that Petitioner's depression is severe enough to promote psychosis, and that his major depressive disorder is a severe mental illness. At Timberlawn, Petitioner reported feeling depressed his entire life, feeling worthless, and expressed a passive suicidal ideation, i.e., he stated he wanted to go to sleep and not wake up. Dr. Martinez explained that it is not uncommon for patients to feel even more depressed once they are in a hospital.

On cross-examination, Dr. Martinez admitted Petitioner was not diagnosed with a mental illness during either of his incarcerations or while in custody prior to trial, but expressed the

opinion that the quality of mental health care Petitioner received while in custody was poor. He admitted Petitioner's chronic abuse of marijuana could lead to a depressed affect or the opposite, and that Petitioner was not diagnosed with Schizoaffective Disorder at Timberlawn. Dr. Martinez did point out that Petitioner was placed under close observation while at Timberlawn due to suicidal ideation, but admitted Petitioner apparently had little trouble sleeping while there and checked himself out of that facility. Dr. Martinez admitted that while awaiting trial for capital murder, Petitioner was diagnosed with adjustment disorder and requested an issue of *Psychology Today* magazine. Dr. Martinez stated that Petitioner reported that he set fire to a dog while he was a child and engaged in conduct before age fifteen which qualified him for a diagnosis of conduct disorder, and that Petitioner meets many of the criteria for antisocial personality disorder. Dr. Martinez did not discuss Petitioner's capital offense with him, did not review the video recording of Petitioner's confession, and could not express any opinion regarding whether Petitioner's capital offense was related to Schizoaffective Disorder.

Dr. Martinez explained the term "comorbidity" means a person can have both a mental illness and a personality disorder. He believes Petitioner was having a mental and emotional breakdown when he went to Timberlawn. Dr. Martinez reported that Petitioner was treated in prison for depression and a nervous breakdown, and he is dubious of Petitioner's IQ score of 105 reported in his prison records. Dr. Martinez testified that Petitioner's action in driving his girlfriend Jennifer to the hospital after assaulting her was inconsistent with both a lack of remorse and a diagnosis of ASPD. He also stated that persons with ASPD can be outgoing, even charming.

g.    *Petitioner's Brother's Testimony*

Petitioner's brother, Nysasno Carter, furnished additional background testimony on Petitioner. 52 Tr. 126-58. Nysasno testified that, while he got along with their step-father Leon

Sampson ("Sampson") growing up, Petitioner never bonded with Sampson and their relationship was "good and bad." Petitioner could not learn to use the tools Sampson used in his remodeling business. He believes Petitioner is mentally ill because he always talked about death and was "off by himself" at school. While Petitioner isolated himself, Nysasno got along with Petitioner. Petitioner made poor grades in school. Many people in their family have mental problems but won't admit it. Petitioner quit high school in the eleventh grade.

He visited Petitioner frequently during Petitioner's second term of incarceration. After getting out of prison, Petitioner worked at Walmart. Petitioner always acted strange, never normally. Nysasno worked for a time in a job that required him to travel extensively and often spoke with Petitioner on the phone while on the road. Prior to the murders, Petitioner told him that he was hearing demons, was feeling stressed, and had nothing to live for. Nysasno told Petitioner to pray. Petitioner called him once when Petitioner was at Timberlawn to say he needed help. When Nysasno went to pick up Petitioner following the murders, Petitioner appeared "really spaced out." Petitioner was depressed following his arrest and claimed to hear voices.

Petitioner married Belinda Lacy after getting out of prison, but their marriage lasted only about three weeks. Petitioner thereafter fathered four children with three different women in an eighteen-month period. Nysasno was concerned that Petitioner was not taking care of those children. Petitioner had a lot of friends. No one forced Petitioner to check himself into Timberlawn. Petitioner worked for a time installing large batteries for corporations. Petitioner admitted to Nysasno that he killed Lovetta but would not discuss Jazzmen's murder. Nysasno and his mother located Petitioner the night of the murders in an unfamiliar place, by using caller ID.

3.    *The Verdict*

On November 5, 2010, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial, concluding (1) unanimously and beyond a reasonable doubt there was a probability the Petitioner would commit criminal acts of violence that would constitute a continuing threat to society, and (2) unanimously that taking into consideration all of the evidence, including the circumstances of the offense and the Petitioner's character, background, and personal moral culpability, there was not a sufficient mitigating circumstance to warrant a sentence of life imprisonment rather than a death sentence.[4]  53 S.F. Trial, 79-81.  The trial judge imposed a sentence of death as prescribed by Texas law.  53 S.F. Trial, 81-82.

C.    *State Post Trial Proceedings*

Petitioner appealed his conviction and sentence.[5]  In an unpublished opinion issued October 3, 2012, the Texas Court of Criminal Appeals affirmed.  *Green v. State*, AP-76,458, 2012 WL 4673756 (Tex. Crim. App. Oct. 3, 2012), *cert. denied*, 569 U.S. 1019 (2013).

---

[4] The jury charge and verdict form from the punishment phase of Petitioner's capital murder trial appear at 1 of 2 C.R. at 154-61.

[5] Petitioner's Brief asserted forty-six points of error. Points 1-15 complained the state trial court erred in denying the defense's challenges for cause to various members of the jury venire. Points 16-17 argued the resulting jury was biased or prejudiced against Petitioner. Points 18-24, 27, and 29-30 argued the state trial court erred in making a wide variety of evidentiary and procedural rulings, including overruling multiple defense objections to prosecutorial jury argument. Point 25 argued the execution of the severely mentally ill violates the Eighth Amendment. Point 26 argued there was insufficient evidence to establish Petitioner committed capital murder. Point 28 argued there was insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue. Points 31-43 argued the Texas capital sentencing statute violated various aspects of the federal Constitution. Point 44 argued the trial court erred in failing to quash the indictment. Points 45-46 argued the cumulative effect of the foregoing alleged errors violated both state and federal constitutional principles.

On June 15, 2012, Petitioner filed an application for state habeas corpus relief.[6]  On July 14-16 and 18, 2014, the state trial court held an extensive evidentiary hearing in Petitioner's state habeas corpus proceeding.  On December 31, 2014, the state habeas trial court issued its findings of fact and conclusions of law and recommended state habeas corpus relief be denied, concluding in pertinent part that (1) Petitioner's *Atkins* claim lacked merit, (2) Petitioner's evidence showing that he is mentally ill did not preclude his execution under Eighth Amendment principles, (3) there was no credible evidence showing Petitioner's jury saw Petitioner in shackles during trial, (4) Petitioner's trial counsel did not render ineffective assistance by failing to present evidence at the guilt-innocence phase of trial showing Petitioner suffered from a mental illness at the time of his

---

[6] Petitioner's 341-page state habeas corpus application asserted twenty claims for relief. Petitioner argued that his trial counsel rendered ineffective assistance in connection with the punishment phase of Petitioner's capital murder trial by failing to adequately investigate Petitioner's case and background and present available mitigating evidence.  He argued his trial counsel rendered ineffective assistance in connection with the guilt-innocence phase of trial by advising him to plead not guilty and failing to call Dr. Martinez to testify at the guilt-innocence phase of trial that Petitioner was mentally ill.  He claimed his state appellate counsel rendered ineffective assistance by failing to present points of error on direct appeal addressing (1) the failure of the state trial court to record the contents of all bench conferences, (2) the presence of jurors on Petitioner's jury who were not disposed to consider some forms of mitigating evidence, and (3) all of the arguments challenging the constitutionality of the Texas capital sentencing statute asserted in the defense's pretrial motions.  He argued his trial counsel operated under a conflict of interest when counsel had Petitioner testify under oath in open court that he was satisfied with the strategic decisions made by his counsel regarding which witnesses to call and whether Petitioner would testify.  He argued his jurors saw Petitioner wearing leg shackles during the trial and the trial court never made a factual finding that such restraints were necessary.  He argued the Eighth Amendment precluded the imposition of the death penalty in his case because he is mentally retarded and suffers from Schizoaffective Disorder of the Bipolar Type.  He argued the prosecution violated the rule in *Batson* by striking a female Hispanic venire member.  He argued the Texas capital sentencing scheme is unconstitutionally arbitrary and his constitutional rights were violated when his jury was never instructed that a single "no" vote on the mitigation special issue would result in a life sentence.

For unknown reasons, the electronic version of the state court records filed by Respondent as ECF no. 24 does not include the Petitioner's state habeas corpus application.  However, Respondent did submit a hard copy of that voluminous document, which appears in Volume 1 of the State Habeas Record (henceforth "SHR"), 2-365.

capital offense, and (5) Petitioner's trial counsel did not render ineffective assistance in connection with the punishment phase of trial by failing to adequately investigate Petitioner's background and present all available mitigating evidence, more specifically finding the strategic and tactical decisions made by Petitioner's trial counsel regarding the presentation of mitigating evidence were objectively reasonable and did not prejudice Petitioner.[7]

The Texas Court of Criminal Appeals subsequently denied Petitioner's state habeas corpus application in an unpublished order adopting all of the trial court's findings and conclusions. *Ex parte Gary Green*, WR-81,575-01, 2015 WL 3899220 (Tex. Crim. App. June 24, 2015).

D.    *Federal Habeas*

Petitioner filed his original petition for federal habeas corpus relief on June 13, 2016 [ECF no. 17], asserting five claims for relief. Specifically, Petitioner argued the Eighth Amendment precludes his sentence of death because he is intellectually disabled and suffers from a serious mental illness. He argued his jury saw him in shackles during trial and the state trial court failed to make a finding of necessity with regard to the use of such shackles. He argued his trial counsel rendered ineffective assistance at the guilt-innocence phase of trial by failing to assert a diminished capacity defense. His trial counsel allegedly rendered ineffective assistance by failing to adequately investigate his background and present available mitigating evidence. Respondent filed her answer on March 13, 2017 [ECF no. 36]. Petitioner filed his reply brief on June 19, 2017 [ECF no. 43].

---

[7] A copy of the state habeas trial court's December 31, 2014 order containing its findings and conclusions appears among the state court records filed electronically by Respondent at ECF no. 24-69 (at 228-34 of 234) and ECF no. 24-70 (at 1-90 of 210).

## II. Standard of Review

Because Petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), it governs this Court's review of Petitioner's claims for federal habeas corpus relief. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA, this Court cannot grant Petitioner federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law:

"the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under [AEDPA], a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 101(2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) provides that federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings, which are presumed to be correct, were erroneous. *Schriro*, 550 U.S. at 473-74; *Rice*, 546 U.S. at 338-39; *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300-01 (choosing not to resolve the issue of §

2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

The deference to which state court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Evans v. Davis*, 875 F.3d 210, 216-17 (5th Cir. 2017) (§ 2254(d) directs federal habeas courts to review only a state court's ultimate decision and not the written opinion explaining that decision and requires the federal court to consider all the arguments and theories that could have supported the state court's decision), *cert. denied*, 139 S. Ct. 78 (2018); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010); *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010).

### III. The *Atkins* Claim

In his first claim for federal habeas corpus relief, Petitioner argues he is ineligible for execution under the Supreme Court's holding in *Atkins v. Virginia*, 536 U. S. 304 (2002), which precludes the execution of the intellectually disabled. ECF no. 17, at 50-80.

A.   *State Court Disposition*

Petitioner fairly presented the Texas Court of Criminal Appeals with an *Atkins* claim as his fourteenth claim in his state habeas corpus application.[8] Petitioner argued that when the standard error of measurement of plus or minus five points is considered, his score of 78 on a standardized IQ test administered by Dr. Martinez shortly before trial caused the lower end of his adjusted IQ score range (73-83) to fall within the range of IQ scores (65-75) recognized as the upper end of the intellectually disabled range. He argued his IQ score of 105 reported in prison records should be disregarded as unreliable. He argued evidence regarding his background presented at trial demonstrated he suffered from deficits in adaptive behavior in the areas of academic skills and social and practical skills. He argued evidence existed showing that his low intellectual functioning and deficits in adaptive skills, including social isolation, were apparent prior to his reaching age eighteen.

While Petitioner did present the state habeas court with testimony from his mother and younger brother suggesting he performed poorly in school and socially isolated himself as a child, Petitioner presented the state habeas court with no clinical evaluation supporting his assertion of intellectual disability. Petitioner's mother testified before the state habeas court that Petitioner isolated himself as a child and said vampires were chasing him.[9] Petitioner's brother Nysasno testified before the state habeas court that both Petitioner and their father had mood swings and Petitioner talked to himself, wore strange clothes, and was picked on by other kids.[10] Nysasno

---

[8] Petitioner's *Atkins* claim appears at pages 271-89 of his state habeas corpus application. 1 SHR 288-306.

[9] Testimony of Mary Sampson, 4 SHR 197-99 [24-82 ECF 198-200 of 245].

[10] Testimony of Nysasno Carter, 4 SHR 217-22 [24-82 ECF 218-23 of 245].

also testified Petitioner would not fight back when picked on by others, and was sad when his ninth-grade girlfriend became pregnant and then moved away because he was proud of being a father and felt a sense of loss.[11]

None of the expert witnesses who testified before the state habeas court offered an opinion that Petitioner was intellectually disabled, had ever been diagnosed by a qualified mental health professional as intellectually disabled, or had ever been referred by school or prison officials for testing for intellectual disability. During his state habeas hearing, Petitioner called a Ph.D. criminologist/sociologist who had interviewed Petitioner and his mother, reviewed Petitioner's records, and prepared a social history on Petitioner. She testified extensively regarding Petitioner's familial and social history, but did not suggest Petitioner had ever been diagnosed as intellectually disabled or referred for testing for intellectual disability.[12] The state called a licensed psychologist who had testified on Petitioner's behalf at trial. She testified regarding her interactions with Petitioner's defense team but did not suggest Petitioner was intellectually disabled or had ever been referred for testing for intellectual disability.[13] The state called a forensic psychiatrist retained by Petitioner's defense team to evaluate Petitioner prior to trial, but whom the defense team chose not to call to testify because he concluded he could not concur in Dr. Martinez's diagnosis of Schizoaffective Disorder, and his own diagnosis of multiple personality disorders would have likely proven harmful to Petitioner at the punishment phase of trial.[14] He did not suggest Petitioner was intellectually disabled.

---

[11] *Id.*

[12] Testimony of Dr. Valerie Wright, 3 SHR 15-55 [24-81 ECF 16-56 of 108].

[13] Testimony of Dr. Kellie Gray-Smith, 3 SHR 69-81 [24-81 ECF 70-82 of 108].

[14] Testimony of Dr. David Self, 4 SHR 134-44 [24-82 ECF 135-45 of 245].

At the state habeas hearing Petitioner presented the testimony of a forensic psychiatrist who evaluated Petitioner and opined that while Petitioner meets the criteria for Schizoaffective Disorder Bipolar Type, a condition he described as a combination of schizophrenia and bipolar disorder which negatively affects a person's ability to interact with others, engage in interpersonal relationships, and engage in romantic relationships. He did not assess Petitioner for mental retardation and expressed no opinion regarding that issue.[15]

The state called the clinical psychologist who served as the mitigation specialist for Petitioner's defense team prior to trial, who testified extensively concerning the defense team's approach to presenting its case in mitigation at the punishment phase of Petitioner's capital murder trial, but did not suggest Petitioner was intellectually disabled.[16] Petitioner presented the state habeas court with no testimony rebutting Dr. Martinez's trial testimony that Petitioner is in the low average to borderline range of intellectual functioning and not intellectually disabled.[17]

The state habeas trial court concluded (1) Petitioner was procedurally barred from presenting this claim because he failed to raise it on direct appeal and (2) alternatively, he failed to demonstrate that he displays significantly subaverage general intellectual functioning or limitations in adaptive functioning sufficient to meet the definition of intellectually disabled.[18]

---

[15] Testimony of Dr. Bhushan Agharkar, 5 SHR 4-44 [24-83 ECF 5-45 of 66].

[16] Testimony of Dr. Kelly Renee Goodness, 6 SHR 16-49 [24-84 ECF 17-50].

[17] Testimony of Dr. Gilbert Martinez, 52 Tr. 21-24, 30, 68.

[18] State Habeas Trial Court's Findings and Conclusions, 82-87; 2 SHR 671-76 [24-70 ECF 76-81 of 210]. This opinion uses the terms "intellectually disabled" and "intellectual disability" to describe the terms "mentally retarded" and "mental retardation," respectively, used by the Supreme Court in *Atkins* and subsequent opinions. This practice is consistent with the terminology employed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (henceforth "DSM-5") and the Supreme Court's more recent opinions.

B.    *Clearly Established Federal Law*

In *Atkins*, the United States Supreme Court concluded that the execution of mentally

retarded persons failed to fulfill either of the two justifications for capital punishment, i.e.,

retribution and deterrence, and held it is forbidden by the Eighth Amendment. *Atkins*, 536 U. S.

at 318-21. The Supreme Court cited two clinical definitions of "mental retardation" with approval:

> The American Association on Mental Retardation (AAMR) defines mental
> retardation as follows: "*Mental retardation* refers to substantial limitations in
> present functioning. It is characterized by significantly subaverage intellectual
> functioning, existing concurrently with related limitations in two or more of the
> following applicable adaptive skill areas: communication, self-care, home living,
> social skills, community use, self-direction, health and safety, functional
> academics, leisure and work. Mental retardation manifests before age 18." Mental
> Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).
>
> The American Psychiatric Association's definition is similar. "The
> essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant limitations
> in adaptive functioning in at least two of the following skill areas: communication,
> self-care, home living, social/interpersonal skills, use of community resources, self-
> direction, functional academic skills, work, leisure, health and safety (Criterion B).
> The onset must occur before age 18 years (Criterion C). Mental Retardation has
> many different etiologies and may be seen as a final common pathway of various
> pathological processes that affect the functioning of the central nervous system."
> Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild
> mental retardation is typically used to describe people with an IQ of 50-55 to
> approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 309 n.3

The Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically

considered the cutoff IQ score for the intellectual function prong of the mental retardation

definition." *Brumfield v. Cain,* 135 S. Ct. 2269, 2278 (2015) (quoting *Atkins*, 536 U. S. at 309

---

*See, e.g., Hall v. Florida*, 572 U.S. 701, 704 (2014) (discussing the identical nature of "mental
retardation" and "intellectual disability").

n.5). Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability."

*Brumfield v. Cain*, 135 S. Ct. at 2278.[19]

In *Hall v. Florida*, the Supreme Court recognized the imprecision inherent in IQ testing

and that a court must consider the standard error of measurement ("SEM") when assessing

intellectual disability:

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.
>
> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

*Hall v. Florida*, 572 U.S. 701, 721-22 (2014).

In *Moore v. Texas*, 137 S. Ct. 1039, 1048-53 (2017), the Supreme Court restricted States'

abilities to circumscribe the legal definition of "intellectual disability," holding a State's

determination under *Atkins* must be guided by current medical standards. It emphasized that its

holding in *Hall* implicitly required that states employ current medical diagnostic standards in

---

[19] In *Bobby v. Bies*, 556 U. S. 825 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins*. *Bobby v. Bies*, 556 U.S. at 831.

making findings of significantly subaverage intellectual functioning and significant deficits in adaptive skills:

> In *Hall v. Florida*, we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70. Although *Atkins* and *Hall* left to the States "the task of developing appropriate ways to enforce" the restriction on executing the intellectually disabled, States' discretion, we cautioned, is not "unfettered." Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination, we clarified, the determination must be "informed by the medical community's diagnostic framework." We relied on the most recent (and still current) versions of the leading diagnostic manuals - the DSM-5 and AAIDD-11. Florida, we concluded, had violated the Eighth Amendment by "disregarding established medical practice." We further noted that Florida had parted ways with practice and trends in other States. *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards.

*Moore v. Texas*, 137 S. Ct. at 1048-49 (citations omitted). "The medical community's current standards supply one constraint on States' leeway in the area. Reflecting improved understanding over time, current manuals offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.*, 137 S. Ct. at 1053 (citation omitted). The Supreme Court also held that States are not free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual functioning or deficits in adaptive skills. *See Moore*, 137 S. Ct. at 1050-53 (holding a Texas appellate court erred in applying a set of non-clinical criteria, i.e., "the *Briseno* factors," in evaluating a defendant's claim of intellectual disability).

C.     *Petitioner's Intellectual Capacity*

At Petitioner's capital murder trial, the defense's neuropsychologist, Dr. Martinez, testified on both direct and cross-examination that Petitioner was not mentally retarded.[20]   During

---

[20] Testimony of Dr. Gilbert Martinez, 52 Tr. 21-24, 30, 68.

Petitioner's state habeas corpus proceeding, the three attorneys who made up Petitioner's defense team at trial testified without contradiction that his defense team (1) made a point to ask each of the mental health experts who evaluated Petitioner prior to trial to determine whether Petitioner was intellectually disabled, (2) none of the defense team's mental health experts concluded Petitioner was intellectually disabled, (3) the majority of the mental health experts who evaluated Petitioner for the defense also did not believe Petitioner had a mental illness, and (4) Petitioner never did or said anything to suggest to his defense team that he was intellectually disabled.[21] As explained above, Petitioner offered the state habeas court no evidence showing he has ever been diagnosed by a qualified mental health professional as intellectually disabled or referred for testing for intellectual disability. Equally significant, the Petitioner presented the state habeas court with no expert testimony or other evidence showing how the so-called Flynn effect might impact his IQ score.[22]

The Supreme Court's 2017 holding in *Moore* is inapplicable to this Court's analysis of the objective reasonableness of the Texas Court of Criminal Appeals' 2015 decision rejecting Petitioner's *Atkins* claim on the merits. *See Shoop v. Hill*, 139 S. Ct. 504, 507-08 (2019) (under

---

[21] Testimony of Paul Johnson, 4 SHR 26-27, 46-53, 57-59, 68, 73, 79-82, 84, 86-87, 95-97, 126-28 [24-82 ECF 27-28, 47-54, 58-60, 69, 74, 80-83, 85, 87-88, 96-98, 127-29 of 245]; Testimony of Brady Wyatt, 4 SHR 153-54 [24-82 ECF 154-55]; Testimony of Kobby Warren, 4 SHR 177 [24-82 ECF 178].

[22] "The Flynn Effect 'is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized.'" *In re Cathey*, 857 F.3d 221, 227 (5th Cir. 2017). "[P]roponents of the Flynn Effect argue IQ scores must be adjusted downward by 0.3 points for each year that has passed since the test was normed to arrive at a proper measure of the test taker's IQ." *Smith v. Duckworth*, 824 F.3d 1233, 1244 (10th Cir. 2016).

AEDPA, the Supreme Court's 2017 opinion in *Moore v. Texas* was not clearly established federal law when an Ohio state court rejected Hill's *Atkins* claim in 2009).

There are valid reasons why the state habeas court could have found Petitioner's claim of intellectual disability unpersuasive. Petitioner offered the state habeas court an IQ test score (78), generated more than a year after Petitioner's capital offense, which was outside the upper limit of the intellectually disabled range (75). While the lower end of the SEM for Petitioner's IQ score (i.e., a range of 73-83) fell within the intellectually disabled range of 65-75, Petitioner offered the state habeas court no mental health expert opinion suggesting Petitioner is intellectually disabled. On the contrary, the only expert opinion properly before the state habeas court was Dr. Martinez's trial testimony that Petitioner was not intellectually disabled.

None of the Petitioner's defense team's mental health professionals who evaluated Petitioner prior to trial concluded he was intellectually disabled. Petitioner has never presented any court with any testimony from a qualified mental health professional suggesting Petitioner is intellectually disabled. In fact, Dr. Agharkar, the neuropsychologist who evaluated Petitioner in connection with Petitioner's state habeas proceeding, testified he did not even evaluate Petitioner for intellectual disability.

Petitioner's state habeas court reasonably concluded from the evidence before it that Petitioner's claim he suffered from deficits in adaptive skills during his developmental period was without merit. Although the trial testimony of Dr. Gray-Smith established Petitioner performed poorly academically across many grade levels, she admitted that Petitioner's academic performance increased markedly, even dramatically, when he reached ninth grade and began participating in football and that Petitioner had never been tested (or referred for testing) for special

education services while enrolled in school.[23] The evidence before the state habeas court included testimony from Petitioner's family and friends establishing that, following his second release from prison, Petitioner found work at Walmart and rose to the level of supervisor, a position he later quit.[24] Petitioner's brother testified at trial that Petitioner found employment for a time installing large batteries.[25] A woman with whom Petitioner had a long-term relationship testified that while Petitioner resided with her, he had a car, was employed by a florist for about a year, and then worked at Walmart.[26] The state habeas court reasonably could have determined Petitioner's poor academic performance in school was the product of a lack of motivation rather than an indication of an inability to perform in the classroom.

Petitioner argues the evidence before his state habeas court, particularly the testimony of his experts, Dr. Martinez and Dr. Agharkar, established that he suffered from deficits in social and interpersonal skills. This Court's independent review of the record belies that assertion. While incarcerated, Petitioner developed a romantic relationship with Belinda Lacy, a guard at his TDCJ facility, that resulted in her resigning her position, working for Petitioner's release on parole and, once Petitioner obtained his release, culminated in their marriage. After his release from prison, Petitioner had a long-term romantic relationship with Shulonda Robinson, who bore Petitioner two children. Petitioner also maintained a long term, intimate relationship, and cohabitated, with Lenelle Williams. Their relationship continued at least on a platonic level even after he became involved with Lovetta Armstead. After they had been involved and cohabitated for some time,

---

[23] Testimony of Dr. Kellie Gray-Smith, 51 Tr. 222-24.

[24] Testimony of Nysasno Carter, 52 Tr. 136; Testimony of Shirley Coleman, 51 Tr. 27.

[25] Testimony of Nysasno Carter, 52 S.F. Trial, at 153.

[26] Testimony of Lenelle Williams, 51 S.F. Trial, at 57, 66, 86-87.

Petitioner convinced Lovetta to marry him. Given this record, the state habeas court could reasonably have concluded Petitioner does not suffer from significant deficits in terms of his interpersonal or social skills. This Court concurs. Petitioner was able to become intimately involved with several different women and to maintain long-term relationships with them when it served his purposes.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's *Atkins* claim during Petitioner's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding. Under AEDPA, Petitioner's first claim does not entitle him to federal habeas corpus relief.

## IV. Constitutionality of Subjecting the Mentally Ill to the Death Penalty

In his second claim for federal habeas relief, Petitioner argues the death penalty is an unconstitutional violation of the Eighth Amendment's prohibition against cruel and unusual punishment when applied to convicted criminal defendants who suffer from a severe mental illness, *i.e.*, Schizoaffective Disorder of the Bipolar Type. ECF no. 17 at 81-106. He argues there is no qualitative distinction for Eighth Amendment purposes between criminal defendants who suffer from severe mental illnesses such as his, and those who are intellectually disabled.

A.    *State Court Disposition*

Petitioner fairly presented this same argument to the Texas Court of Criminal Appeals as both his twenty-fifth point of error on direct appeal[27] and his fifteenth claim for state habeas corpus

---

[27] Petitioner's Eighth Amendment challenge to the execution of the mentally ill appears at pages 92-94 of Appellant's Brief.

relief.[28]  On direct appeal, the Texas Court of Criminal Appeals rejected Petitioner's Eighth Amendment point of error on the merits. *Green v. State*, AP-76,458, 2012 WL 4673756, \*32-\*33. The state habeas trial court concluded Petitioner's fifteenth claim for relief was procedurally barred because it had been raised and rejected on the merits in Petitioner's direct appeal; alternatively, the state habeas trial court concluded the Supreme Court's holding in *Atkins* barring the execution of the intellectually disabled did not apply to persons diagnosed as mentally ill, especially a mental illness as moderate as that diagnosed at Petitioner's trial by Dr. Martinez.[29]  The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions when it denied Petitioner's state habeas corpus application. *Ex parte Gary Green*, WR-81,575-01, 2015 WL 3899220, \*1.

B.    *Fifth Circuit Authority*

The Fifth Circuit has repeatedly rejected arguments that the Eighth Amendment bars states from executing those who are mentally ill. *See, e.g., Smith v. Davis*, 927 F.3d 313, 339 (5th Cir. 2019) (rejecting the argument that the severely mentally ill lack sufficient moral culpability to permit a sentence of death); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) (holding Fifth Circuit precedent forecloses the notion that the Eighth Amendment prohibits execution of the mentally ill); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (denying a Certificate of Appealability on a claim that the Eighth Amendment prohibits execution of the mentally ill); *In re*

---

[28] Petitioner's Eighth Amendment claim challenging the execution of the mentally ill appears at pages 290-94 of his state habeas corpus application. 1 SHR 307-11.

[29] State Habeas Trial Court's Findings and Conclusions, 87-90; 2 SHR 676-79 [24-70 ECF no. 81-84 of 210].  More specifically, the state habeas court found as follows: "Dr. Martinez's diagnosis of Applicant's mental health was, at best, weak evidence that Applicant suffered from mental illness. And the illness diagnosed was moderate in nature." *Id.*, at 89, ¶ 410; 2 SHR 678 [24-70 ECF 83 of 210].

*Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (rejecting the argument that *Atkins* and *Roper* created a new rule, making execution of the mentally ill unconstitutional).

The United States Supreme Court has not expanded its holding in *Atkins* to include all criminal defendants suffering from a diagnosable "mental illness." *See Smith v. Davis*, 927 F.3d at 339 (because no decision of the Supreme Court holds that the severely mentally ill are ineligible for execution, state court's rejection on the merits of Eighth Amendment claim was not contrary to clearly established federal law). As the Fifth Circuit has made clear, there was no clearly established federal law barring the execution of the mentally ill at the times the Texas Court of Criminal Appeals rejected this same claim on the merits in the course of Petitioner's direct appeal (i.e., on October 3, 2012) or his state habeas corpus proceeding (i.e., on June 24, 2015). *See Busby v. Davis*, 925 F.3d 699, 715 (5th Cir. 2019) (the Supreme Court's decisions addressing intellectual disability claims in *Moore* and *Hall* did not become "clearly established federal law" until their respective dates of issuance).

The Texas Court of Criminal Appeals' rejections on the merits during Petitioner's direct appeal and state habeas corpus proceedings of Petitioner's Eighth Amendment challenges to the execution of the mentally ill were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's direct appeal or state habeas corpus proceeding. Under AEDPA, Petitioner's second claim does not entitle him to federal habeas corpus relief.

## V. Shackling

In his third claim for federal habeas relief, Petitioner argues that two of his jurors observed him in leg restraints during trial and the state trial court failed to make any findings that such restraints were necessary. ECF no. 17, at 107-30.

A.    *State Court Disposition*

Petitioner raised the same claim in his thirteenth claim for state habeas corpus relief.[30] The state habeas court heard testimony from multiple witnesses. Petitioner's lead trial counsel, Paul Johnson, testified during the state habeas corpus proceeding (1) "Sir, I can tell you that absolutely there's no possible way they saw him wearing leg restraints," (2) he believed the only way the jury could have seen Petitioner's leg restraints was if the jurors were capable of seeing through the solid wood surrounding the front and sides of the defense bench, which went down to within an inch of the floor, and (3) it was impossible for the jury to have witnessed Petitioner being brought into the courtroom because the jury was never in the jury box when Petitioner was brought into the courtroom.[31] Another of his trial counsel testified at the state habeas hearing that he made sure Petitioner's leg restraints were not visible to the jury, and the bailiffs made sure the Petitioner was seated when the jury came in or out of the courtroom.[32] Petitioner's third trial attorney testified he did not believe it was possible for the jury to have seen the Petitioner wearing leg restraints because Petitioner never walked in or out of the courtroom with the jury in the jury box.[33]

---

[30] Petitioner's challenge to his shackling during trial appears at pages 262-70 of his State Habeas Corpus Application. 1 SHR 279-87.

[31] Testimony of Paul Johnson, 4 SHR 13-15, 105-06 [24-82 ECF 14-15, 106-07 of 245].

[32] Testimony of Brady Wyatt, 4 SHR 155-56 [24-82 ECF 156-57 of 245].

[33] Testimony of Kobby Warren, 4 SHR 178-81 [24-82 ECF 179-82 of 245].

Bailiff Tony Lancaster testified during the Petitioner's state habeas hearing that Petitioner wore only leg shackles during trial, was not a special security threat, and was respectful and followed instructions. Lancaster testified Petitioner sat approximately twenty to twenty-five feet from the jury box, the prosecution table was situated between the jury box and the defense table, and both tables were covered all the way to the floor in such a way as to obstruct the jury's view of the footwear worn by anyone at the defense table. Lancaster believed it was not possible for someone sitting in the jury box to see Petitioner's feet. More importantly, Lancaster testified the jury was not present when Petitioner walked into the courtroom, he sat down before the jury was brought into the courtroom, and Petitioner did not leave the courtroom until the jury left the jury box.[34]

Petitioner presented the testimony of two of his jurors who had furnished the state habeas court with affidavits stating they had seen Petitioner in leg shackles during trial. One of the jurors testified that he saw Petitioner in leg restraints once or twice during trial and he saw Petitioner in restraints during the punishment phase of trial when Petitioner was walking or standing, but he did not discuss the restraints with anyone during deliberations.[35] The other juror testified that he did not recall actually seeing the Petitioner in restraints but saw that the Petitioner was not moving easily or comfortably and thought he was restrained.[36]

After hearing this conflicting testimony, the state habeas trial court found the affidavits and testimony of the jurors who claimed to have seen Petitioner in shackles during the trial not credible

---

[34] Testimony of Tony Lancaster, 3 SHR 58-66 [24-81 ECF 59-67 of 108].

[35] Testimony of T_ F_ S_, 3 SHR 84-93 [24-81 ECF 85-95 of 108]. It is the policy of this Court to identify jurors in capital murder trials by their initials.

[36] Testimony of J_ P_, 3 SHR 94-105 [24-81 ECF 95-106].

and recommended denial of the claim.[37] The Texas Court of Criminal Appeals adopted the trial court's findings.

B.     *Clearly Established Federal Law*

The Constitution forbids a state from using visible shackles routinely in the guilt-innocence phase of a criminal trial. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). Visible shackling is permissible only in the presence of a special need. *Id.* The same principles apply to the punishment phase of a capital trial. *Id.*, at 632. "[C]ourts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding," absent special circumstances such as security concerns or escape risks specifically related to the defendant on trial. *Id.*, at 633.

C.     *AEDPA Analysis*

"AEDPA does not allow federal habeas courts to gainsay state courts' assessments of credibility on a cold paper record." *Morales v. Thaler*, 714 F.3d 295, 303 (5th Cir. 2013). A state court's credibility determinations made in the course of a state habeas proceeding after an evidentiary hearing are factual findings to which this Court must give deference. *See Trottie v. Stephens*, 720 F.3d 231, 243-44 (5th Cir. 2013) (holding a state habeas court's express reliance upon a trial counsel's affidavit to reject an ineffective assistance claim was a credibility determination to which the federal habeas court was required to give deference); *Morales v. Thaler*, 714 F.3d at 303 n.4 (holding state habeas court's implicit determination that two witnesses were not credible was a factual finding to which the federal habeas court was required to give deference).

---

[37] State Habeas Trial Court's Findings and Conclusions, 79-80; 2 SHR 668-69 [24-70 ECF 73-74 of 210].

The state habeas court's factual determination, i.e., that the jurors' affidavits and testimony that they saw Petitioner in leg shackles during trial was not credible, is reasonable in view of the testimony of the court bailiff and Petitioner's trial counsel, all of whom insisted (1) it was physically impossible for the jurors to have seen Petitioner's leg shackles and (2) Petitioner was never brought into or taken out of the courtroom in the jury's presence. More importantly, Petitioner has failed to present this Court with clear and convincing evidence showing the state habeas court's credibility finding is erroneous. *See Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"). The same state trial judge who presided over Petitioner's trial also presided over Petitioner's state habeas proceeding and had the opportunity to view firsthand the demeanor of the witnesses during the state habeas hearing. No evidence currently before this Court, much less any clear and convincing evidence, warrants second-guessing this express credibility finding.

The Texas Court of Criminal Appeals' rejection on the merits during Petitioner's state habeas proceeding of Petitioner's complaint about the use of visible shackles during his capital trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor did it result from a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas proceeding. Under AEDPA, Petitioner's third claim does not entitle him to federal habeas relief.

## VI. Ineffective Assistance Claims

In his fourth and fifth claims for federal habeas relief, Petitioner argues his trial counsel rendered ineffective assistance (1) at the guilt-innocence phase by failing to assert a defense and present evidence showing Petitioner suffered from diminished capacity at the time of his capital offense as a result of "abandonment rage," and (2) at the punishment phase, by failing to adequately investigate Petitioner's background and present available mitigating evidence showing he suffered from Schizoaffective Disorder of the Bipolar Type, paranoid delusions, low intellectual functioning, and abandonment rage at the time of his capital offense. ECF no. 17, at 131-61.

A.    *State Court Disposition*

Petitioner presented more expansive versions of these same ineffective assistance complaints in his first through eighth, tenth, and fourteenth claims for state habeas relief.[38] The state habeas court admitted numerous affidavits from witnesses presenting evidence of Petitioner's background that were largely redundant of the trial testimony of defense witnesses. More specifically, the state habeas court admitted the affidavits of Dr. Bhushan Agharkar and Dr. Valerie Wright (both of whom testified during the state habeas hearing); Petitioner's mother and brother (who testified both at trial and during the Petitioner's state habeas hearing); Dr. Kellie Gray-Smith and Dr. Gilbert Martinez (both of whom testified at trial but not during the state habeas proceeding); attorney Michael Gross; Petitioner's state habeas investigator, Brian Fayhee; Petitioner's uncle, Irvin Ray Green; Petitioner's cousin, Montrece Green; Petitioner's "grandmother by marriage", Willie Mae Green; Petitioner's uncle, James Jones; Petitioner's

---

[38] Petitioner's multifaceted ineffective assistance claims appear in his state habeas corpus application at pages 14-214, 220-27, 271-89. 1 SHR 31-231, 237-44, 288-306.

stepfather, Leon Sampson; Petitioner's childhood friends, Levi and Raymond Smith; and Petitioner's school, payroll, court, and medical records.[39]

The state habeas court also heard extensive testimony from Petitioner's trial counsel concerning their strategic decision-making.[40] One of Petitioner's trial counsel testified that while he believed Petitioner suffered from Schizoaffective Disorder of the Bipolar Type, the defense team discovered no evidence showing Petitioner suffered from any deficits in adaptive skills or other indications of intellectual disability.[41] Petitioner's new mental health expert, Dr. Agharkar, corroborated Dr. Martinez's diagnosis at trial of Schizoaffective Disorder.[42] Petitioner's mother and brother also offered additional, double-edged, testimony about Petitioner's background.[43] The clinical psychologist who served as Petitioner's defense team's mitigation specialist explained the defense team's strategic decision-making at both phases of trial.[44] Petitioner's defense team's forensic mental health expert explained he was not called to testify at trial because his opinions would have been unhelpful to the defense.[45]

---

[39] These voluminous documents appear in 7 SHR, 8SHR, 9 SHR [24-85 ECF, 24-86 ECF, 24-87 ECF].

[40] Testimony of Paul Johnson, 4 SHR 6-132 [24-82 ECF 7-133 of 245]; Testimony of Brady Wyatt, 4 SHR 146-65 [24-82 ECF 147-66]; Testimony of Kobby Warren, 4 SHR 174-81 [24-82 ECF 175-82].

[41] Testimony of Brady Wyatt, 4 SHR 153, 165 [24-82 ECF 154, 166].

[42] Testimony of Dr. Bhushan Agharkar, 5 SHR 4-44 [24-83 ECF 5-45].

[43] Testimony of Mary Sampson, 4 SHR 183-213 [24-82 ECF 184-214 of 245]; Testimony of Nysasno Carter, 4 SHR 214-42 [24-82 ECF 215-43].

[44] Testimony of Dr. Kelly Renee Goodness, 6 SHR 16-49 [24-84 ECF 17-50 of 54].

[45] Testimony of Dr. David Self, 4 SHR 134-44 [24-82 ECF 135-45].

The state habeas trial court concluded Petitioner's trial counsel acted in an objectively reasonable manner in presenting Petitioner's mental health evidence through clinical, rather than forensic, mental health experts to avoid cross-examination regarding psychopathy, and in presenting most of the information contained in Dr. Wright's social history of Petitioner through the testimony of lay witnesses at the punishment phase of trial.[46] The state habeas court concluded Petitioner's trial counsel also acted reasonably in choosing not to present mental health evidence during the guilt-innocence phase of trial because Texas law recognizes no defense for diminished capacity other than insanity, and Petitioner failed to present any evidence showing he was suffering from a mental disease or defect at the time of his capital offense that was so severe as to rebut the culpable *mens rea* for his capital offense.[47] Finally, the state habeas trial court concluded that none of the Petitioner's complaints about the performance of his trial counsel established that Petitioner was prejudiced by the acts or omissions of his trial counsel.[48] The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions when it denied Petitioner's state habeas corpus application.

B.    *Clearly Established Federal Law*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

---

[46] State Habeas Court's Findings & Conclusions, 36-37, 41-42; 2 SHR 625-26, 630-31 [24-70 ECF 30-31, 35-36 of 210].

[47] State Habeas Court's Findings & Conclusions, 53-55; 2 SHR 642-44 [24-70 ECF 47-49 of 210].

[48] State Habeas Court's Findings & Conclusions, 36-37, 41-42, 53-55 [24-70 ECF 30-31, 35-36, 47-49 of 210].

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009); *Strickland*, 466 U.S. at 688-89. Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the

proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, such as those complaints the state courts summarily dismissed under the Texas writ abuse statute or which the petitioner failed to fairly present to the state court, review of the unadjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding de novo review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U. S. at 534 (holding the same).

Under AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. AEDPA, by setting forth necessary predicates before state court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Under section 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter*, 562 U. S. 86, 103 (2011).

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington v. Richter*, 562 U. S. at 101 (citations omitted).

C.   *AEDPA Analysis*

1.   *Guilt-Innocence Phase of Trial*

The Texas Court of Criminal Appeals reasonably rejected Petitioner's tenth ground for state habeas relief, i.e., his ineffective assistance complaint that his trial counsel failed to present a diminished capacity defense at the guilt-innocence phase of his capital murder trial, concluding this complaint satisfied neither prong of *Strickland*. Both on direct appeal and in his state habeas proceeding, the state courts specifically held Texas law recognizes no "diminished capacity" defense except when evidence shows a defendant suffered from a mental disease or defect so severe as to rebut or disprove the culpable mental state for the offense.[49] The Texas Court of

---

[49] *Green v. State*, AP-76-458, 2012 WL 4673756, *4 (citing *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas.")); State Habeas Court's Findings & Conclusions, 54 (citing *Ruffin* for the same principle); 2 SHR 643 [24-70 ECF 48 of 210].

Criminal Appeals' conclusion in the course of Petitioner's direct appeal and state habeas proceeding that the only diminished capacity defense available under Texas law is the defense of insanity is binding upon this Court in this federal habeas corpus proceeding. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009).

Dr. Goodness, Petitioner's defense team's mitigation specialist and a clinical psychologist with vast experience in forensic matters, testified without contradiction during Petitioner's state habeas corpus proceeding that she believed there was no value to be gained from presenting mental health testimony during the guilt-innocence phase of Petitioner's capital murder trial because Petitioner's letter detailing his reasons and plans for murdering Lovetta and her children was coherent and did not demonstrate any disorganized thinking on Petitioner's part.[50] Petitioner's lead trial counsel, a veteran capital litigator, likewise testified (1) he believed Petitioner's confessional letter furnished a detailed, logical, cogent expression of Petitioner's feelings, (2) nothing in Petitioner's letter suggested he was undergoing a psychotic break, a delusional active psychosis, or a mental illness at the time of his offense, and (3) Petitioner's letter, together with his confessions to police and the surviving sons of Lovetta, foreclosed any rational effort to mount a mental health based defense at the guilt-innocence phase of Petitioner's capital murder trial.[51]

Petitioner presented the state habeas court with no evidence showing it was objectively unreasonable for Petitioner's trial counsel not to present a diminished capacity defense at the guilt-

---

[50] Testimony of Dr. Kelly Renee Goodness, 6 SHR 28-29, 33 [24-84 ECF 29-30, 34 of 54].

[51] Testimony of Paul Johnson, 4 SHR 12, 83 [24-82 ECF 13, 84 of 245].

innocence phase of Petitioner's capital murder trial. *See Busby v. Davis*, 925 F.3d at 726-27 (holding ineffective assistance claim premised on failure to assert an *Atkins* claim failed where there was no evidence showing Busby's trial counsel acted unreasonably in relying upon the opinion of the defense's mental health expert that Busby was not intellectually disabled); *Coble v. Quarterman*, 496 F.3d 430, 437-38 (5th Cir. 2007) (Texas trial counsel did not render ineffective assistance by failing to raise a diminished capacity defense, where no expert would support an insanity defense, and instead presented mental health testimony at punishment phase of capital murder trial).

Furthermore, Petitioner presented the state habeas court with no evidence showing there is a reasonable probability that, but for the failure of his trial counsel to present a diminished capacity defense at the guilt-innocence phase of trial, the outcome of either phase of Petitioner's capital murder trial would have been any different. As both Dr. Goodness and Petitioner's lead trial counsel acknowledged, the evidence of Petitioner's guilt was overwhelming. Petitioner's confessions to the police, an emergency room physician, and Lovetta's sons were compelling and fully supported by the physical evidence. Petitioner's letter explaining in advance his reasons for committing his offense and Petitioner's calm, detached demeanor throughout his videotaped confession belie the assertion he was suffering from a form of diminished capacity recognized by Texas law at the time he committed his offense or when he later gave his confessions. Petitioner recalled the details of his offense without difficulty, and even demonstrated for detective Quirk how he had stabbed Lovetta. The forensic evidence discovered during the autopsies of Lovetta and her daughter confirmed many of the details of Petitioner's confession, even down to the exact number of stab wounds Petitioner inflicted on Lovetta. During his confession, Petitioner also

recalled his conversations with Jerome and Jarrett the night of the murders in great detail -- details both young men later confirmed during their trial testimony.

More significantly, none of the expert witnesses who testified at trial or during Petitioner's state habeas corpus proceeding opined that Petitioner suffered from a mental illness which rendered him incapable of understanding the criminal nature of his capital offense. Section 8.01(a) of the Texas Penal Code provides: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Battaglia v. State*, 537 S.W.3d 57, 61 n.3 (Tex. Crim. App. 2017), *cert. denied*, 138 S. Ct. 943 (2018). Petitioner offered the state habeas court no evidence showing that, at the time of his capital offense, he met the Texas statutory definition of insanity. Given these facts, the Texas Court of Criminal Appeals reasonably concluded Petitioner's complaint about the failure of his trial counsel to present a diminished capacity defense at the guilt-innocence phase of trial satisfied neither prong of *Strickland*.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's ineffective assistance complaint about his trial counsel's failure to present a diminished capacity defense at the guilt-innocence phase of trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding. Under AEDPA, Petitioner's fourth claim does not entitle him to federal habeas relief.

2.    *Punishment Phase of Trial*

In his final claim for federal habeas relief, Petitioner cobbles together his first through eighth and fourteenth claims for state habeas relief and argues in conclusory fashion that his trial

47

counsel could have done a better and more convincing, job presenting the mitigating evidence the defense actually presented at trial, and should have further investigated and presented additional available mitigating evidence, including evidence showing he is intellectually disabled and suffers from low intellectual functioning and paranoid delusions. ECF no. 17, at 150-61.

The Texas Court of Criminal Appeals reasonably concluded such complaints of ineffective assistance satisfied neither prong of *Strickland*.[52] The state habeas court concluded Petitioner's trial counsel made sound, well-investigated, strategic decisions regarding how to present evidence of Petitioner's background and mental health at trial, and many of his family members were reluctant to furnish Petitioner's defense team with mitigating information.[53] The state habeas trial court concluded Petitioner was not prejudiced by (1) the failure of his trial counsel to call all the additional witnesses who furnished affidavits during Petitioner's state habeas proceeding, (2) his defense team's presentation of mitigation testimony through Dr. Martinez and Dr. Gray-Smith, and (3) his trial counsels' decision not to call the defense team's forensic psychiatrist, Dr. Self, to testify at trial.[54] The state habeas court also concluded Petitioner's defense counsel acted reasonably in choosing to present mitigating evidence of Petitioner's background through Petitioner's family members rather than through a social historian, in part because it exposed the jury firsthand to other members of Petitioner's family who were themselves mentally ill and did

---

[52] State Habeas Court Findings & Conclusions, 24-51, 60-62; 2 SHR 613-40, 649-51 [24-70 ECF 18-45, 54-56 of 210].

[53] *Id.*

[54] *Id.*

not recognize Petitioner's mental illness and, thereby, helped to demonstrate why Petitioner's needs as a child had gone unmet.[55]

As explained above, Petitioner's trial counsel presented evidence at trial showing Petitioner grew up in a disadvantaged, neglected, abusive environment in which he was exposed to violence, forced to fight, and deprived of the emotional support he needed to be able to deal with his mental and emotional problems. The state habeas court concluded Petitioner failed to present any evidence showing what additional, potentially mitigating testimony trial witnesses (such as Belinda Lacy, Jennifer Alcorn Wheeler, and Shulonda Ransom) could have furnished had they been called to testify for the defense at the punishment phase of trial or that uncalled witnesses (such as Stephanie West and Margaret Young) were available to furnish potentially mitigating testimony at the punishment phase of Petitioner's capital murder trial.[56] The state habeas court also concluded Petitioner's trial counsel acted reasonably in relying upon the defense's cross-examination of prosecution expert witness Warden Nelson to elicit testimony showing Petitioner's history of only minor disciplinary infractions during his prior terms of incarceration, rather than calling a defense expert witness on the subject of future dangerousness.[57] Finally, the state habeas trial court concluded Petitioner's trial counsel acted in an objectively reasonable manner, and one which did not prejudice Petitioner, when they chose not to argue or present evidence showing that Petitioner was intellectually disabled.[58]

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] State Habeas Court Findings & Conclusions, 24-51, 60-62; 2 SHR 613-40, 649-51 [24-70 ECF 18-45, 54-56 of 210].

Having independently reviewed the entirety of the record from Petitioner's trial and state habeas proceedings, this Court concludes the Texas Court of Criminal Appeals' rejection on the merits of Petitioner's ineffective assistance complaints regarding his trial counsels' performance at the punishment phase of trial was objective reasonable. The Texas Court of Appeals' findings and conclusions regarding Petitioner's ineffective assistance claims summarized above were likewise objectively reasonable given the evidentiary record before the state habeas court. The Texas Court of Criminal Appeals accurately concluded the "new" mitigating evidence presented by Petitioner during his state habeas proceeding was largely duplicative of the mitigating evidence Petitioner's trial counsel presented at trial.

Petitioner's lead trial counsel and mitigation specialist both testified they believed they presented available mitigating evidence about Petitioner's difficult childhood and childhood mental problems more efficiently through the testimony of Petitioner's family members, rather than through an expert social historian like Dr. Wright. They believed the testimony of a social historian would have been subject to potential hearsay objections and cross-examination regarding harmful information discovered by the defense team. Having reviewed the affidavits tendered by Petitioner to the state habeas court, this Court independently concludes this strategic decision by Petitioner's defense was reasonable. The affidavits Petitioner furnished to the state habeas court from his family members, friends, and Dr. Wright were replete with double-edged evidence that was just as likely to harm Petitioner on the future dangerousness special issue as to potentially help him on the mitigation special issue. For instance, Petitioner's mother testified during the state habeas hearing, but not at trial, that Petitioner assaulted his former high school girlfriend, Jennifer, after he learned she had undergone an abortion. This new testimony potentially would have cast Petitioner's brutal assault of Jennifer in an even more heinous light than was the case at the

punishment phase of trial, when it was presented as an unprovoked and unexplained act of violence.

Likewise, this Court concludes, as did the Texas Court of Criminal Appeals, that it was reasonable for Petitioner's trial counsel to present testimony regarding Petitioner's educational background and mental health through defense experts Dr. Gray-Smith and Dr. Martinez. Petitioner's defense team deliberately exposed these two experts to only a portion of the evidence from the guilt-innocence phase of trial, as well as the evidence the defense had available regarding Petitioner's background, because the defense reasonably wished to limit the scope of prosecutorial cross-examination. Petitioner's lead trial counsel testified that he did not want any of the defense's expert witnesses at trial cross-examined regarding Petitioner's background and the definition of psychopathy, a favorite tactic of the Dallas County District Attorney's Office in capital cases. Petitioner failed to present the state habeas court with any evidence showing this strategic decision was objectively unreasonable.

Finally, this Court concludes the Texas Court of Criminal Appeals' conclusions regarding the prejudice prong of *Strickland* were also objectively reasonable. In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must reweigh all the evidence in aggravation against the totality of available mitigating evidence had the Petitioner's trial counsel chosen a different course. *Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *Hinton v. Alabama,* 571 U.S. 263, 1089 (2014). To satisfy

the prejudice prong, the likelihood of a different result must be substantial, not just conceivable. *Harrington*, 562 U.S. at 112; *Strickland*, 466 U.S. at 693.

In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests that additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available. *See Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins*, 539 U.S. at 524-26 (trial counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams*, 529 U.S. at 395-96 (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).

With regard to the prejudice prong of *Strickland*, the Supreme Court held the petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence. Unlike defense counsel in the capital murder trials the Supreme Court described in *Wiggins*, *Porter*, and *Williams*, Petitioner's trial counsel undertook an extensive investigation into Petitioner's background, searching for

mitigating evidence, and presented a substantial case in mitigation during Petitioner's trial. As explained above, Petitioner's defense team presented the testimony of Petitioner's younger brother, mother, maternal grandmother, aunt, and a pair of mental health experts, who described at great length the difficulties Petitioner experienced growing up in a disadvantaged family, with many relatives who displayed signs of mental illness and a physically abusive biological father and a neglectful mother. Petitioner's mental health experts furnished testimony regarding Petitioner's poor academic performance and low intellectual functioning. Dr. Martinez also furnished a diagnosis of Schizoaffective Disorder of the Biploar Type, which he described as a severe form of mental illness negatively affecting Petitioner's cognitive abilities and interpersonal relationships. Contrary to the situations in *Wiggins*, *Porter*, and *Williams*, Dr. Agkarkar and the Petitioner's other state habeas witnesses did not present extensive "new" mitigating evidence during Petitioner's state habeas corpus proceeding. In fact, Dr. Agharkar's testimony during Petitioner's state habeas hearing did little more than corroborate and reiterate Dr. Martinez's trial testimony.

In contrast to the missing evidence in *Wiggins*, *Porter*, and *Williams*, the Court finds Petitioner's "new" mitigating evidence added little to the extensive mitigation evidence Petitioner's defense team presented at trial, and could have opened the door to potentially devastating cross-examination, particularly from Petitioner's mother. Mrs. Sampson testified without contradiction at the state habeas hearing that Petitioner burned two dogs, abused marijuana and alcohol, impregnated three different girls before he dropped out of high school, and that both she and Petitioner's biological father encouraged Petitioner to fight other children.

The prosecution presented an extremely strong case at the punishment phase of trial, including the grisly details of his capital offense, horrific testimony from Petitioner's former sexual

partners concerning his acts of violence toward them, testimony documenting Petitioner's other felonies (including drug-dealing and an armed robbery of a grocery store in which he and a partner fired multiple shots inside the store), and graphic testimony regarding Petitioner's attempts to kill Lovetta's two young sons the same evening he murdered her and her daughter. Given the evidence presented at trial, this Court independently concludes there is no reasonable probability the punishment phase of Petitioner's capital murder trial would have ended any differently had Petitioner's trial counsel undertaken any or all of the actions Petitioner now complains should have been undertaken during his capital murder trial.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaints about the performance of his trial counsel in connection with the punishment phase of his capital murder trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding. Under AEDPA, Petitioner's fifth claim does not entitle him to federal habeas corpus relief.

## VII. Certificate of Appealability

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c) (2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997). A CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the district court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a

constitutional right and (2) the district court's procedural ruling was correct). This Court did not dispose of any of Petitioner's federal habeas corpus claims on procedural grounds.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. at 15.

Reasonable minds could not disagree with this Court's conclusions that the Texas Court of Criminal Appeals reasonably (1) rejected Petitioner's Eighth Amendment claims, i.e., his *Atkins* claim and his argument that the Constitution categorically prohibits the execution of the mentally ill, (2) determined all of Petitioner's ineffective assistance claims fail to satisfy either prong of *Strickland*, and (3) rejected as factually unsound his complaint that his jury saw him shackled during trial.

Accordingly, it is hereby ORDERED that:

1.    The referral of this cause to the Magistrate Judge is **WITHDRAWN.**

2.    All relief requested by Petitioner is **DENIED.**

**3**.    Petitioner is **DENIED** a Certificate of Appealability on all of his claims.

4.    All other pending motions are **DISMISSED AS MOOT**.

Signed September ____, 2019.

BARBARA M.G. LYNN
CHIEF JUDGE